**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID LEIBOWITZ, BENJAMIN LEIBOWITZ, JASON LEIBOWITZ, AARON LEIBOWITZ, and PINCHAS GOLDSHTEIN<br><br>        Plaintiffs,<br><br>v.<br><br>IFINEX INC., BFXNA INC., BFXWW INC., TETHER HOLDINGS LIMITED, TETHER OPERATIONS LIMITED, TETHER LIMITED, TETHER INTERNATIONAL LIMITED, DIGFINEX INC., PHILIP G. POTTER, GIANCARLO DEVASINI, LUDOVICUS JAN VAN DER VELDE, REGINALD FOWLER, CRYPTO CAPITAL CORP., and GLOBAL TRADE SOLUTIONS AG,<br><br>        Defendants. | No. _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Kyle W. Roche (*admission pending*)
Joseph M. Delich
**ROCHE FREEDMAN LLP**
185 Wythe Ave. F2
Brooklyn, NY 11249
kyle@rochefreedman.com
jdelich@rochefreedman.com

Velvel (Devin) Freedman
(*pro hac pending*)
**ROCHE FREEDMAN LLP**
200 South Biscayne Boulevard
Suite 5500
Miami, Florida 33131
vel@rochefreedman.com

Plaintiffs David Leibowitz, Benjamin Leibowitz, Jason Leibowitz, Aaron Leibowitz, and Pinchas Goldshtein individually and on behalf of all others similar situated, bring this action against iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Philip G. Potter, Giancarlo Devasini, Ludovicus Jan van der Velde, Reginald Fowler, Crypto Capital Corp., and Global Trade Solutions AG. (collectively, "Defendants"), and allege as follows:

## I.   **INTRODUCTION**

*The methods and techniques of manipulation*
*are limited only by the ingenuity of man.*[1]

1.    This action concerns a sophisticated scheme that coopted a disruptive innovation — cryptocurrency — and used it to defraud investors, manipulate markets, and conceal illicit proceeds.

2.    Part-fraud, part-pump-and-dump, and part-money laundering, the scheme was primarily accomplished through two enterprises — Bitfinex and Tether — that commingled their corporate identities and customer funds while concealing their extensive cooperation in a way that enabled them to manipulate the cryptocurrency market with unprecedented effectiveness.

---

[1] *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

3.      Founded in 2012, Bitfinex is one of the world's largest cryptocurrency exchanges — a marketplace for individuals to buy and sell various cryptocurrencies.

4.      Tether is the central authority over the cryptocurrency called "tether," or "USDT" [2] — one of the world's first "stablecoins." While most cryptocurrencies are not backed by tangible assets, "stablecoins," such as USDT, aim to solve the volatility inherent in cryptocurrency  by pegging themselves to a tangible asset held in reserve.

5.      Together, Bitfinex and Tether manipulated a market that, by design, is supposed to be decentralized.

6.      At the heart of this scheme was Tether's claim "that the number of [USDT] tokens in circulation will always equate to the dollars in its bank account." This claim enabled Bitfinex and Tether to signal to the market that there was rapidly growing demand  for cryptocurrencies because each USDT printed represented another U.S. dollar invested into the market.

7.      This claim was a lie.

8.      Tether issued extraordinary amounts of unbacked USDT to manipulate cryptocurrency prices. Because the market believed the lie that one USDT equaled

_____

[2] Hereinafter, for purposes of clarity, this Complaint will refer to Tether the company as "Tether" and tether the cryptocurrency as USDT, which is short for "United States Dollar Tether." Tether does issue other "tether" coins "pegged" to different currencies, for example the "Euro tether" (EURT), which are similarly referred to by their trading symbols.

one U.S. dollar, Bitfinex and Tether had the power to, and did, manipulate the market on an unprecedented scale to profit from boom-and-bust cycles they created.

9.     From 2017 through 2018, Tether printed 2.8 billion USDT and used it to flood the Bitfinex exchange and purchase other cryptocurrencies. This artificially inflated demand for cryptocurrencies and caused prices to spike.

10.     As the cryptocurrency market reached a fever pitch, Tether's mass issuance of USDT created the largest bubble in human history. When it burst, over $450 billion of value disappeared in less than a month. The fallout continues to affect the cryptocurrency market, including by causing prices to be lower than they would have been but for the manipulation.



---

[3] Exhibit 1, Eric Lam, Mathieu Benhamou & Adrian Leung, *Did Bitcoin Just Burst? How It Compares to History's Biggest Bubbles*, BLOOMBERG (Jan. 17, 2018), https://perma.cc/DL4Z-6JDQ.

11.    As explained below, economists estimate that from 2017 to 2018 as much as half the growth in the cryptocurrency market was driven by Bitfinex and Tether's manipulative scheme.

12.    In a brash display of lawlessness, Tether and Bitfinex continue to defraud the market, even in the face of an ongoing investigation by the New York Attorney General, the CFTC, and the Department of Justice.

13.    Fully aware of the incredible harm they've inflicted on the cryptocurrency market, on October 5, 2019, Bitfinex and Tether published statements where they generally described the allegations contained herein, admitted that they "fully expect" to be sued, and stated that they "would not be surprised if just such a lawsuit will be filed imminently."[4]

14.    Calculating damages at this stage is premature, but there is little doubt that the scale of harm wrought by the Defendants is unprecedented. Their liability to the putative class likely surpasses $1.4 trillion U.S. dollars.[5]

---

[4] *Bitfinex Anticipates Meritless and Mercenary Lawsuit Based on Bogus Study*, BITFINEX.COM (Oct. 5, 2019), https://perma.cc/9TTB-27B8; *Tether Anticipates Meritless and Mercenary Lawsuit Based on Bogus Study*, TETHER.TO (Oct. 5, 2019), https://perma.cc/Z7H3-2YA2.

[5] "The combined market capitalization of all virtual currencies as of January 6, 2018, was roughly $795 billion; by Feb. 6, 2018, the total value had dropped to $329 billion." *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 219 (E.D.N.Y. 2018). This time period alone represents potential damages of $466 billion before being trebled under the antitrust and RICO statutes.

## II.   PARTIES

### A. Plaintiffs

15.    Plaintiff David Leibowitz is a citizen of West Palm Beach, Florida. Since July 2014, David has held a legal interest in the cryptocurrencies bitcoin and bitcoin cash through his holdings in the Pantera Bitcoin Fund Ltd.[6] During the relevant time period, David also personally owned the cryptocurrencies ether and litecoin.

16.    Jason Leibowitz is a citizen of New York, New York. During the relevant time period, Jason Leibowitz owned bitcoin, bitcoin cash, ether, ether classic, litecoin, bitcoin gold, Ripple XRP, Stellar Lumens, Tron, QTUM, Monero, ZCash, Dash, Augur, NEO, EOS, WAVES, OMG, Cardano, NEM, IOTA, POWR, ICON, and STEEM.

17.    Benjamin Leibowitz is a citizen of New York, New York. During the relevant time period, Benjamin Leibowitz owned bitcoin, bitcoin cash, ether, litecoin, bitcoin gold, Ripple XRP, Stellar Lumens, Monero, ZCash, OMG, Cardono, NEO, and POWR.

---

[6] Pantera Bitcoin Fund is a long-only non-discretionary hedge fund that invests 100% of its subscriptions into bitcoin and bitcoin cash. It provides investors with quick, secure access to large amounts of bitcoin and bitcoin cash — without the burdens of trading and safekeeping them. *See* PANTERACAPITAL.COM, https://perma.cc/G388-J89S.

18.     Aaron Leibowitz is a citizen of Westchester, New York. During the relevant time period, Aaron Leibowitz owned bitcoin, bitcoin cash, ether, Waves, and EOS.

19.     Pinchas Goldshtein is a citizen of Miami, Florida. During the relevant time period, Pinchas Goldhstein owned bitcoin and bitcoin future contracts.

**B. Defendants**

     i.     <u>DigFinex</u>

20.     Defendant DigFinex Inc. is incorporated in, and a citizen of, the British Virgin Islands.[7] DigFinex operates as the ultimate parent company of the Bitfinex Defendants (defined below), the Tether Defendants (defined below), and is the majority owner of iFinex, Inc., and Tether Holdings Limited.[8]

21.     The shareholders of DigFinex are Ludovicus Jan van der Velde, Giancarlo Devasini, Paolo Ardoino,[9] Philip Potter, Stuart Hoegner,[10] and Perpetual Action Group (Asia) Inc.[11]

---

[7] Exhibit 2, Aff. of Whitehurst ¶ 89 ECF No. 1, *James v. iFinex Inc.*, No. 450545/2019 (N.Y. Sup. Ct. April 25, 2019) ("Whitehurst Affirmation"); Exhibit 3, ECF No. 16, *James v. iFinex* (N.Y. Sup. Ct. April 25, 2019) ("DigFinex and iFinex Register of Directors").

[8] Exhibit 2 ¶ 8, 16 (Whitehurst Affirmation); Exhibit 4, Certificate of Interested Entities, ECF No. 4, *iFinex Inc. v. Wells Fargo*, No. 3:17-CV-01882 (N.D. Cal. April 5, 2017) ("Certificate of Interested Entities").

[9] Ardoino is the Chief Technical Officer of both Bitfinex and Tether.

[10] Hoegner is the General Counsel of both Bitfinex and Tether.

[11] Exhibit 4 (Certificate of Interested Entities).

ii.   The Bitfinex Defendants

22.    Defendants iFinex Inc., BFXNA Inc., and BFXWW Inc. are owned and operated by the same small group of executives and employees that together operate an online platform called "Bitfinex" for exchanging and trading virtual currency.[12] Plaintiffs provide more detailed allegations about these Defendants below, but for ease of reference and unless otherwise noted, this Complaint will refer to these Defendants collectively as "Bitfinex" or the "Bitfinex Defendants."

23.    Defendant iFinex Inc. is incorporated in, and a citizen of, the British Virgin Islands.[13] iFinex owns and operates the online cryptocurrency exchange called "Bitfinex" accessible at bitfinex.com.[14] It is also the holding company that wholly owns Defendants BFXNA Inc. and BFXWW Inc.[15]

24.    Defendant BFXNA Inc. is incorporated in, and a citizen of, the British Virgin Islands.[16] It is the entity that interfaces with U.S. customers that want trade on the Bitfinex exchange.[17]

---

[12] Exhibit 2 ¶ 10 (Whitehurst Affirmation).

[13] Exhibit 2 ¶ 7, (Whitehurst Affirmation); Exhibit 3 (DigFinex and iFinex Register of Directors).

[14] *Terms of Service*, BITFINEX.COM § 14.5 (July 12, 2019) ("The Site and Services are owned by iFinex."), https://perma.cc/4U5J-3MKY.

[15] Exhibit 2 ¶ 8, (Whitehurst Affirmation); Exhibit 5, Aff. of Hoegner ¶ 3, ECF No. 78, *James v. iFinex* (N.Y. Sup. Ct. May 21, 2019).

[16] Exhibit 5 ¶ 3 (Hoegner Affirmation).

[17] *Terms of Service*, BITFINEX.COM, at preamble (July 12, 2019), https://perma.cc/4U5J-3MKY.

25.     Defendant BFXWW Inc. is incorporated in, and a citizen of, the British Virgin Islands.[18] It is the entity that interfaces with non-U.S. customers that want to trade on the Bitfinex exchange.[19]

### iii.     Tether Defendants

26.     Defendants Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited are owned and operated by the same small group of executives and employees that together operate an enterprise called "Tether" which is the central authority over, and issuer of, USDT. For ease of reference and unless otherwise noted, this Complaint refers to these Defendants as "Tether" or the "Tether Defendants."

27.     Defendant Tether Holdings Limited is incorporated in, and a citizen of, the British Virgin Islands.[20] It is the holding company of Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.[21]

---

[18] Exhibit 5 ¶ 3 (Hoegner Affirmation).

[19] *Terms of Service*, BITFINEX.COM, at preamble (July 12, 2019), https://perma.cc/4U5J-3MKY.

[20] Exhibit 2 ¶ 13 (Whitehurst Affirmation); Exhibit 5 ¶ 5 (Hoegner Affirmation)..

[21] *Id.*

28.     Defendant Tether Operations Limited appears to be incorporated in, and a citizen of, the British Virgin Islands.[22] It is the entity that interfaces with Tether's U.S. customers that want to trade USDT.[23]

29.     Defendant Tether International Limited is incorporated in, and a citizen of, the British Virgin Islands.[24] It is the entity that interfaces with Tether's non-U.S. customers that want to trade USDT.[25]

30.     Defendant Tether Limited is incorporated in, and a citizen of, Hong Kong.[26] Tether Limited is the entity that issues USDT.[27]

---

[22] Exhibit 6, *Tether Operations Limited*, LEI-LOOKUP.COM, https://perma.cc/5RGR-9X8E.

While the Office of the New York Attorney General alleged that Tether Operations Limited and Tether International Limited were incorporated in Hong Kong, Plaintiffs were unable to identify any corroborating records in the Hong Kong registry.

[23] Exhibit 2 ¶ 13 (Whitehurst Affirmation).

[24] Exhibit 7, *Tether International Limited*, LEI-LOOKUP.COM, https://perma.cc/JUR6-DHZE.

[25] Exhibit 2 ¶ 13 (Whitehurst Affirmation).

[26] Exhibit 8 (Hong Kong Registry-Tether Limited), https://perma.cc/RDU3-9E7D. Tether Limited also has a lapsed Legal Entity Identifier (LEI) that incorrectly identifies a *different* address in Taiwan as its registered address. Exhibit 9, *Tether Limited*, LEI-LOOKUP.COM, https://perma.cc/FLT7-B8L7.

[27] Exhibit 10, *Tether: Fiat currencies on the Bitcoin blockchain*, TETHER.TO at 4 (June 2016) (the "Tether White Paper"), https://perma.cc/HM4V-5B3L.

iv.    The Individual DigFinex, Bitfinex, and Tether Defendants

31.    Defendant Ludovicus Jan van der Velde[28] ("Velde") is the Chief Executive Officer of both the Bitfinex and Tether enterprises.[29] He has held this position since early 2013.[30] Velde is one of two directors listed on the corporate registries of DigFinex, iFinex, and Tether Limited.[31] Velde is also a shareholder of DigFinex and Tether Holdings Limited, and is the former CEO of DigFinex shareholder Perpetual Action Group (Asia).[32] Velde is a citizen of the Netherlands.[33]

32.    Defendant Giancarlo Devasini was involved in creating Bitfinex. He is the Chief Financial Officer of Bitfinex and Tether.[34] Devasini is the other director identified on the corporate registries of DigFinex, iFinex, and Tether Limited.[35] He

---

[28] Defendant van der Velde sometimes use the aliases JL, Jan Ludovicus, and Jean-Louis.

[29] *Bitfinex Leadership – Jean-Louis van der Velde, Chief Executive Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/3XVL-DNQC.

[30] *Id.*

[31] Exhibit 3 (DigFinex and iFinex Register of Directors); Exhibit 8 (Hong Kong Registry-Tether Limited).

[32] Exhibit 4 (Certificate of Interested Entities); Exhibit 11 (LinkedIn page identifying Velde as former CEO of Perpetual Action Group (Asia)).

[33] Exhibit 3 (DigFinex and iFinex Register of Directors).

[34] *Bitfinex Leadership – Giancarlo Devasini, Chief Financial Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/4B32-XAWZ. Devasini was also the president of Smart Property Solutions SA, the Swiss company behind Tether's Euro-backed stablecoin EURT. *See Terms of Service*, TETHER.CH (Sep. 10, 2017), https://perma.cc/L77C-BTKP; Exhibit 12, *Commercial Register*, SWISS OFFICIAL GAZETTE OF COMMERCE (May 16, 2017), https://perma.cc/7LG6-QAWX.

[35] Exhibit 3 (DigFinex and iFinex Register of Directors); Exhibit 8 (Hong Kong Registry-Tether Limited).

is also a shareholder of Tether Holdings Limited and DigFinex.[36] Devasini is a citizen of Italy. In the early days of Bitfinex and Tether, Devasini posted under the username "urwhatuknow" on the bitcointalk.org forum.[37]

33.    Defendant Philip G. Potter was the Chief Strategy Officer of the Bitfinex and Tether enterprises until June 2018.[38] He also was or is a director of Tether Holdings Limited and a shareholder in DigFinex.[39] Potter is a citizen of New York.[40]

v.    The Crypto Capital Defendants

34.    Defendant Crypto Capital Corp. is incorporated in, and citizen of, Panama.[41] Crypto Capital Corp operated as a "payment processor" that marketed itself to cryptocurrency exchanges.[42] In reality, it served as an illegal "shadow bank"

---

[36] Exhibit 4 (Certificate of Interested Entities).

[37] *See, e.g., Re: [Beta]Bitfinex.com first Bitcoin P2P lending platform for leverage trading*, BITCOINTALK.ORG (April 22, 2013), https://perma.cc/RTL5-GSNS. Bitcointalk.org is an internet forum dedicated to the discussion of bitcoin and other cryptocurrencies.

[38] Anna Irrera, *Bitfinex chief strategy officer departs*, REUTERS (June 22, 2018), https://perma.cc/A4Z2-HDYF.

[39] *Tether Holdings Limited*, OFFSHORE LEAKS DATABASE, https://perma.cc/UDT7-ACVW; Exhibit 4 (Certificate of Interested Entities).

[40] Exhibit 13 at 2, ECF No. 95, *James v. iFinex* (N.Y. Sup. Ct. July 8, 2019) (Feb. 2018 Bank Account Application).

[41] *Crypto Capital Corp.*, OPENCORPORATES.COM, https://perma.cc/CX94-QSCU.

[42] CRYPTOCAPITAL.CO (Oct. 4, 2019), https://perma.cc/D3CL-HQ6L.

that granted the Bitfinex and Tether enterprises access to the global financial system without regulatory oversight.

35.      Defendant Global Trade Solutions AG is incorporated in, and a citizen of, Switzerland.[43] Global Trade Solutions AG owns and operates Crypto Capital Corp.[44] The Swiss regulatory agency FINMA placed Global Trade Solutions AG on its public warning list in May 2019.[45]

36.      Defendant Reginald Fowler acted as an employee, agent, or partner of Defendant Crypto Capital Corp. and Global Trade Solutions AG.[46] He is a citizen of the United States and a resident of Arizona.

37.      For ease of reference, organizational charts of certain Defendants and their various relationships to one another are attached as Exhibit 16.

---

[43] *Kanton Zug Commercial Register*, ZG.CHREGISTER.CH (Oct. 4, 2019), https://perma.cc/P8A9-U7QA.

[44] CRYPTOCAPITAL.CO (Oct. 4, 2019) ("Crypto Capital is owned and operated by Global Trade Solutions AG"), https://perma.cc/D3CL-HQ6L.

[45] *Public Warning List*, FINMA.CH, https://perma.cc/HG4N-CPA7. FINMA uses its warning list to identify "companies and individuals who may be carrying out unauthorized services and are not supervised by FINMA." *Id.*, https://perma.cc/W5FD-B8KP.

[46] Exhibit 14 at 1, 5, Mem. In Support of Detention, ECF No. 6, *United States v. Fowler*, No. 19-9181MJ (D. Ariz. May 1, 2019) (Fowler Memorandum); Exhibit 15 ¶ 8, Superseding Indictment, ECF No. 7, *United States v. Fowler*, No. 19-CR-254 (S.D.N.Y. April 30, 2019) ("Fowler Indictment"); Robert-Jan den Haan, *Indictment reveals new clues in the Crypto Capital situation*, YAHOO (May 2, 2019), https://perma.cc/D763-NMYS.

## III.   **JURISDICTION AND VENUE**

38.    The court has original jurisdiction over the federal claims in this action

pursuant to 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1964(c).

39.    Venue lies within this District under 15 U.S.C. § 22, 18 U.S.C. § 1965,

and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found,

or had agents in this District, and a substantial portion of the alleged activity affected

interstate trade and commerce in this District.

40.    During the Class Period,[47] Defendants used the instrumentalities of

interstate commerce, including interstate wires, to effectuate their illegal scheme.

41.    Defendants' manipulation, conspiracy, and conduct alleged herein was

in U.S. import commerce and/or had direct, substantial and reasonably foreseeable

effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims,

within the meaning of 15 U.S.C. § 6a.

42.    This Court has personal jurisdiction over each Defendant, because each

Defendant transacted business, maintained substantial contacts, and/or they or their

coconspirators committed overt acts in furtherance of their illegal conspiracy, in the

United States, including in this District. The scheme was directed at, and had the

---

[47] The Class Period is defined as the period between Tether's first USDT issuance
(October 6, 2014) to the present.

intended effect of, causing injury to persons residing in, located in, or doing business in this District.

43.     The Court also has quasi in-rem jurisdiction over the Defendants by virtue of their U.S. dollar accounts in New York.

## IV.   FACTUAL ALLEGATIONS

### A. Cryptocurrencies and Cryptocurrency Exchanges

44.     A cryptocurrency is a digital asset designed to work as a medium of exchange and/or a store of value. Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

45.     Bitcoin[48] was the world's first decentralized cryptocurrency. It is also the largest and most popular cryptocurrency with a market cap of $147 billion as of October 5, 2019.[49] Bitcoin spawned a market of cryptocurrencies that, together with bitcoin, have a current market cap of $219 billion.

46.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the blockchain.

---

[48] The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

[49] https://coinmarketcap.com/.

47.    Instead of a bank account number, each bitcoin user has a "public key" that is the address used to receive bitcoin from others. Every public key can be readily identified on the Bitcoin blockchain along with the number of bitcoins associated with that particular public key.

48.    There are two methods of acquiring bitcoin.

49.    The first is to "mine" it. Because there is no centralized authority that keeps track of bitcoin spending, the Bitcoin protocol issues new bitcoin to individuals that expend computing power to update its ledger. This process is called bitcoin mining.

50.    The second is to get it from someone else. Practically, this can be accomplished by receiving bitcoin as a gift or by purchasing it.

51.    Online cryptocurrency exchanges are one place to purchase bitcoin. Cryptocurrency exchanges are similar to traditional stock or commodities exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currency.

52.    Early on, bitcoin was the only cryptocurrency available on exchanges. As cryptocurrencies grew in popularity, however, exchanges began listing other cryptocurrencies as well.

53.    As the cryptocurrency market grew, trading volumes on exchanges grew as well. In early 2013, daily bitcoin trading volumes hovered between $1

million and $25 million. By the end of 2017, daily bitcoin trading volumes ranged between $200 million and $3.8 billion.[50]

### B. Bitfinex

54.    Bitfinex was publicly announced in 2013 when its Chief Technology Officer, Raphael Nicolle, posted about its creation on the popular online cryptocurrency forum bitcointalk.org.[51]

55.    Bitfinex is now one of the "largest and least regulated" cryptocurrency exchanges in the world.[52] While many exchanges only facilitate crypto-to-crypto transactions, Bitfinex is one of relatively few that allows users to deposit and withdraw "fiat currency."[53]

56.    Bitfinex has made conflicting statements about its operational locations. Some statements identify its principal place of business as Hong Kong,

---

[50] https://www.blockchain.com/charts/.

[51] [BETA]Bitfinex.com first Bitcoin P2P lending platform for leverage trading, BITCOINTALK.ORG (Oct. 22, 2012), https://perma.cc/XRX7-B22T.

[52] Exhibit 17, Nathaniel Popper, Bitcoin's Price Was Artificially Inflated, Fueling Skyrocketing Value, Researchers Say, N.Y. TIMES (June 13, 2018), https://perma.cc/U6UV-KQ3V.

[53] Fiat currency is legal tender whose value is backed by the government that issued it, e.g., dollars or euros.

China.[54] Others only identify offices in Taiwan.[55] In 2019, Bitfinex's General Counsel, swore that "[n]either Bitfinex nor Tether has a single headquarters or home office. Rather, **the Companies have decentralized operations** in different countries including Hong Kong, Switzerland, and Taiwan."[56] Today, Bitfinex's website identifies only London and Taiwan locations.[57]

57.   In June 2016, the Commodity Futures Trading Commission (the "Commission") fined Bitfinex $75,000 after finding that "Bitfinex engaged in illegal, off-exchange commodity transactions and failed to register as a futures commission merchant, in violation of Section 4(a) and 4d of the [Commodity Exchange] Act." [58]

58.   The Commission also found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities, and are therefore subject as a commodity to applicable provisions of the [Commodity Exchange] Act and Regulations."[59]

---

[54] Exhibit 18, *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, *1 (June 2, 2016) (consent order between the CFTC and Bitfinex identifying Hong Kong as its principal place of business); @Bitfinex, TWITTER (Sep. 5, 2017), https://perma.cc/YKA4-S6U5 (Bitfinex's official Twitter account identifying its location as Hong Kong).

[55] Exhibit 19, Compl. ¶¶ 6–8, ECF No. 1, *iFinex v. Wells Fargo* (N.D. Cal. April 5, 2017) ("Wells Fargo Complaint").

[56] Exhibit 5 ¶ 6 (Hoegner Affirmation) (emphasis added).

[57] *Bitfinex Privacy Policy*, BITFINEX.COM (Aug. 18, 2019), https://perma.cc/ZQ3H-N46Y.

[58] Exhibit 18 at 2 (2016 CFTC Order).

[59] *Id.* at 5.

## C. Tether

59.     Tether is the entity in control of the cryptocurrency USDT, one of the first stablecoins. Stablecoins are cryptocurrencies designed to maintain a consistent value relative to one or more assets such as gold or fiat currency. Unlike the underlying asset it represents, a stablecoin can be transferred between parties across borders instantaneously with minimal cost.

60.     Stablecoins attempt to address the illiquidity and price volatility in the cryptocurrency market. Indeed, price volatility is one of the main obstacles to widespread adoption of cryptocurrencies as a means of exchange and store of value.[60] As a former CEO of Goldman Sachs put it, "Something that moves up and down 20 percent in a day doesn't feel like a store of value."[61]

61.     Unlike bitcoin, USDT cannot be mined. Instead, Tether unilaterally controls the creation of new USDT.

62.     Tether's beginnings trace back to July 2014, when a startup called Realcoin claimed it had produced the first stablecoin that would "be backed one-to-one by a fully auditable reserve of dollars."[62] Realcoin was founded by investor

---

[60] John O. McGinnis & Kyle Roche, *Bitcoin: Order Without Law in the Digital Age*, 94 IND. L.J. __ (forthcoming 2019), https://ssrn.com/abstract=2929133.

[61] Exhibit 20, Dakin Campbell, *Blankfein Says It's Too Soon for a Bitcoin Strategy*, BLOOMBERG (Nov. 30, 2017), https://perma.cc/73SS-WB42.

[62] Exhibit 21, Michael J. Casey, *Dollar-Backed Digital Currency Aims to Fix Bitcoin's Volatility Dilemma*, WALL ST. J. (July 8, 2014), https://perma.cc/NX5W-UTYZ.

Brock Pierce,[63] its first CEO Reeve Collins, and software engineer Craig Sellars. According to Collins, by issuing realcoins they were "digitizing the dollar and giving that digital dollar access to the Bitcoin blockchain."[64]

63.     Collins stated that realcoins would "be introduced or removed from circulation depending on whether dollars are being added or redeemed."[65] He also claimed that Realcoin had already found a "major banking partner," that it would "maintain a real-time record of its dollar-based reserves," and that its "lawyers [were] working to obtain U.S. money transmitter licenses from those states that require them."[66]

64.     In November 2014, Realcoin renamed itself Tether and rebranded realcoins as "tether" or USDT, the ticker under which the token is listed on cryptocurrency exchanges around the world.[67]

---

[63] Pierce is a is an American entrepreneur known for his enthusiasm for cryptocurrencies.

[64] Exhibit 21, *Dollar-Backed Digital Currency*, WALL ST. J. (July 8, 2014), https://perma.cc/NX5W-UTYZ.

[65] *Id.*

[66] *Id.*

[67] Pete Rizzo, *Realcoin Rebrands as 'Tether' to Avoid Altcoin Association*, COINDESK (Nov. 20, 2014), https://perma.cc/DD89-UPL8.

65.     In September 2014, two months prior to the rebranding, Defendants Potter and Devasini incorporated Tether Holdings Limited in the British Virgin Islands.[68]

66.     One month later, on October 6, 2014, Tether issued its first batch of stablecoins, "printing" 100 USDT — allegedly equivalent to $100.[69]

67.     After the rebranding, Collins reiterated the Realcoin promise. He publicly asserted "that the number of [USDT] in circulation will always equate to the dollars in its bank account" and "that there are no pegs or formulas that complicate the process for its partners."[70] He was unequivocal about the implications: "When you want to redeem them, we issue you cash."

---

[68] *Tether Holdings Limited*, OFFSHORE LEAKS DATABASE, https://perma.cc/UDT7-ACVW.

[69] OMNIEXPLORER.INFO, https://perma.cc/L9ZQ-LPSS.

Tether initially issued USDT on the Omni layer of the Bitcoin blockchain, but over time began to offer USDT tokens on other networks that included Ethereum, Tron, and EOS. Issuances can be tracked through the following addresses designated as the Tether Printer for each network:

Omni (Oct. 6, 2014 – April 24, 2019): https://www.omniexplorer.info/address/3MbYQMMmSkC3AgWkj9FMo5LsPTW1zBTwXL.

Omni (April 24, 2019 – Present): https://www.omniexplorer.info/address/32TLn1WLcu8LtfvweLzYUYU6ubc2YV9eZs.

Ethereum (Nov. 28, 2017 – Present): https://etherscan.io/token/0xdac17f958d2ee523a2206206994597c13d831ec7?a=0xc6cde7c39eb2f0f0095f41570af89efc2c1ea828.

EOS (July 22, 2019 – Present): https://bloks.io/account/tethertether.

Tron (April 13, 2019 – Present): https://www.trxplorer.io/address/THPvaUhoh2Qn2y9THCZML3H815hhFhn5YC.

[70] *Realcoin Rebrands*, COINDESK (Nov. 20, 2014), https://perma.cc/DD89-UPL8.

68.     The November 2014 rebranding also announced that Tether had formed "new partnerships in the bitcoin space, including agreements with Hong Kong-based bitcoin exchange Bitfinex."[71]

69.     The November 2014 announcement did not reveal, though, that it was Devasini and Potter, *i.e., Bitfinex's* CFO and CSO, that had created and have controlled Tether's holding company since September 2014.[72]



---

[71] *Id.*

[72] *Tether Holdings Limited*, OFFSHORE LEAKS DATABASE, https://perma.cc/UDT7-ACVW.

70.     Nor did it reveal that Velde and Devasini, *i.e., Bitfinex's* CEO and CFO, had similarly incorporated Tether Limited in September and served as its only directors.[73]

71.     An archived copy of the Tether website from March 2015 identified Potter and Devasini as "advisors" and did not identify Velde at all.[74]

**Phillip G. Potter**
Advisor

Phil brings over 20 years of Wall Street financial and leadership experience to the team. Phil was Co-Founder and CTO of both Mercury Securities and Dimension Capital, where he combined his financial & technical knowledge to lead successful exits. Currently Phil serves as the Chief Strategy Officer of Bitfinex, a leading Bitcoin exchange in Hong Kong.

**Giancarlo Devasini**
Advisor

Giancarlo began his career as a physician, before going on to pursue his passion for technology. He went on to serve as a Founder and CEO of several IT companies specializing in integrated circuits and computer hardware in the semiconductor industry. Giancarlo currently serves as the CFO and COO of Bitfinex, a leading Bitcoin exchange in Hong Kong.

72.     The fact that the same individuals in control of Bitfinex — a cryptocurrency exchange — were also secretly in control of Tether — a cryptocurrency supposedly backed by the U.S. dollar — is concerning even without the strong evidence of wrongdoing contained herein.

73.     This overlapping control structure remained largely concealed from the general public for over a year until the Paradise Papers leaked in November 2017.[75]

---

[73] Exhibit 8 (Hong Kong Registry–Tether Limited).

[74] *Our Team*, TETHER.TO (Mar. 29, 2015), https://perma.cc/UC2T-JEJF.

[75] Exhibit 22, Nathaniel Popper, *Warning Signs About Another Giant Bitcoin Exchange*, N.Y. TIMES (Nov. 21, 2017), https://perma.cc/N33P-WNDG.

23

74.     Similarly concerning is that USDT is always initially transferred from Tether's "treasury wallet" to Bitfinex and not directly to any other exchanges.

75.     Tether's treasury wallet is the account solely controlled by Tether in which all USDT are created or destroyed. All new USDT are first sent to the Tether Treasury after being created. Any redeemed USDT must similarly be transferred back to the Treasury to be "revoked," *i.e.* destroyed.[76]



76.     Tether's exclusive relationship with Bitfinex for initial USDT issuances means that Bitfinex was often Tether's only customer.[78]

---

[76] *See* Exhbit 10 at 8 (Tether White Paper).

[77] *What is Driving Tether's Growth and What Financial Institutions Could Learn From It*, CHAINALYSIS (Aug. 2018), *available at* TETHER.TO, https://perma.cc/4MYT-3F8B.

[78] Robert-Jan Den Haan, *Clearing Up Misconceptions: This is How Tether Should (and Does) Work*, BITCOIN MAGAZINE (June 14, 2018), https://perma.cc/6J2Q-2U33.

77.     As of this filing, USDT is reportedly the most widely used cryptocurrency in the world by trading volume, surpassing even bitcoin.[79] Bitfinex and Tether's Chief Technical Officer recently boasted that USDT possesses a near-perfect monopoly on the stablecoin market by accounting for 98.7% of worldwide stablecoin trading volumes.[80]

78.     It is also the fourth largest cryptocurrency in the world, with a market cap of over $4.1 billion based on the over 4.1 billion USDT in circulation,[81] which *should* mean Tether holds over $4.1 billion U.S. dollars on deposit in its bank accounts.

### D. The History of Tether's 1:1 USDT/USD Guarantee

79.     Throughout its existence, Tether has marketed USDT as enabling traders to move in and out of positions across different cryptocurrencies and different cryptocurrency exchanges. Its pitch is that USDT's reliable price coupled with its digital representation on the blockchain offers the best of both worlds. It is stable and safe like the U.S. dollar while being easily transferable and divisible like other cryptocurrencies.

---

[79] Exhibit 23, Olga Kharif, *The World's Most Used Cryptocurrency Isn't Bitcoin*, Bloomberg (Oct. 1, 2019), https://perma.cc/9A3H-DYT8.

[80] Exhibit 24, *Olga Kharif, Biggest Crypto Exchange Takes on Tether with Own Stablecoins*, BLOOMBERG (June 5, 2019), https://perma.cc/XNE7-RV78.

[81] www.coinmarketcap.com.

80.     USDT's value was necessarily derived from Tether's guarantee that each USDT was backed by one U.S. dollar held in reserve.

81.     Up until March 20, 2015, Tether's website stated that USDT

> is backed 100% by actual fiat currency assets in our reserve account and **always maintains a one-to-one ratio with any currency held**. For example, 1 USDT = 1 USD. With almost zero conversion and transfer fees, [USDT] is redeemable for cash at any time.[82]

82.     During that same time, Tether's website also claimed that "Tether currencies are essentially Dollars, Euros, and Yen formatted to work on the Blockchain. [USDT]s always hold their value at 1:1 to their underlying assets."[83]

83.     On June 17, 2016, Tether released a white paper further assuring the world that each USDT was backed by actual assets. It promised that:

> [E]ach [USDT] in circulation represents one US dollar held in our reserves (i.e. a one-to-one ratio) which means the system is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve.[84]

84.      The white paper also referenced Tether's commitment to "maintaining the guarantee of 100% redeemability"[85] and it promised that USDT "may be redeemable/exchangeable for the underlying fiat currency pursuant to Tether

---

[82] *Frequently Asked Questions*, TETHER.TO (Mar. 20, 2015) (emphasis added), https://perma.cc/L46W-VCNX.

[83] *Id.*

[84] Exhibit 10 at 9 (Tether White Paper).

[85] *Id.* at 17.

Limited's terms of service or, if the holder prefers, the equivalent spot value in

Bitcoin."[86]

85.    Finally, it also included the chart below depicting how USDT are

created when fiat is deposited and then withdrawn from circulation when redeemed

for fiat:[87]



86.    A year later on April 5, 2017, during court proceedings against Wells

Fargo, Velde filed a declaration, under penalty of perjury, explaining that:

> Customers who want to purchase Virtual Currency through
> Bitfinex must deposit U.S. dollars or [USDT] into their Bitfinex

---

[86] *Id.* at 4.

[87] *Id.* at 7–8.

account and in exchange receive an equivalent amount of Virtual Currency until they ask Bitfinex to remit back the U.S. dollars they deposited. Likewise, customers who want to purchase [USDT] through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of [USDT] until they ask Tether to remit back the U.S. dollars they deposited. . . . For these systems to work, customers depend on Bitfinex's and Tether's ability to send back to them the U.S. dollars they deposited with Bitfinex or Tether.[88]

87.     Until February 2019, Tether's website continued to represent that every USDT in circulation was "backed 1-1 by traditional currency held in our reserves. So 1 USDT is always equivalent to 1 USD."[89]



88.     On March 4, 2019, with Tether under criminal investigation by the Department of Justice, the CFTC, and the New York Attorney General, Tether's guarantee was altered to instead assert that every USDT was "1-1 pegged to the dollar" and "100% backed" by reserves that "from time to time may include other assets."[90]

---

[88] Exhibit 25, Decl. of Velde ¶¶ 12, 14, ECF No. 9, *iFinex v. Wells Fargo* (N.D. Cal. April 5, 2017) (Velde Declaration).

[89] TETHER.TO (Feb. 19, 2019), https://perma.cc/B663-LR72.

[90] TETHER.TO (Mar. 04, 2019), https://perma.cc/FWY6-23EP.

89.    As of August 17, 2019, representations that (1) "outstanding [USDT] are backed 1-to-1 by traditional currency," that (2) "1 USDT is always equivalent to 1 USD," and that (3) "users can freely deposit, trade and withdraw USDT" and "convert[] these to fiat" continued to appear on Bitfinex's website.



90.    Tether's counsel represented to the Office of the New York Attorney General that "issuances of new [USDT] occur when an investor has requested to purchase [USDT] by depositing U.S. dollars with Tether the company, or by depositing U.S. dollars with a trading platform that is authorized to accept dollar deposits in exchange for USDT."[93]

[91] *What are Tethers*, BITFINEX.COM (Aug. 17, 2019), https://perma.cc/YAT8-S2P8.

[92] *Fiat on Bitfinex*, BITFINEX.COM (Aug. 17, 2019), https://perma.cc/5NMJ-G4KT.

[93] Exhibit 2 ¶ 34 (Whitehurst Affirmation).

91.     In spite of these representations — which have shifted in form, but not in substance over a period of at least five years — USDT *are not* backed 1:1 by U.S. dollars, any other currency, or even "other assets." As explained in detail below, Tether's 1:1 USDT/USD guarantee is a lie that has been leveraged by Tether and Bitfinex to monopolize the stablecoin market and thereby manipulate the cryptocurrency market.

## E. The Cryptocurrency Market is Susceptible to Manipulation

*"Illiquid markets, such as Bitcoin are easy prey to manipulation."*
*— Defendant Giancarlo Devasini, Dec. 5, 2012[94]*

92.     Bitfinex and Tether's plans were aided, in part, by the inherent price volatility and lack of regulation in the cryptocurrency market. This volatility has left the cryptocurrency market highly susceptible to price manipulation.

93.     Volatility is caused by a variety of factors, including the fact that regulatory agencies are still assessing how to best apply existing regulatory frameworks to this market.

94.     Volatility is also due, in part, to the fact that many cryptocurrencies are commodities, not stocks. They don't sell products, earn revenue, employ individuals, or return dividends — qualities that would make them easier to value. And unlike commonly traded commodities like gold or silver, the cryptocurrency asset class is

---

[94] *Re: I forced the 10-day high last night. What do you think about that?*, BITCOINTALK.ORG (Dec. 5, 2012), https://perma.cc/6A6T-Q93F.

comparatively new and doesn't have a long trading history to help traders understand the factors underlying its market demand.

95.     Lastly, volatility is caused by the lack of significant price anchors that come with large scale institutional capital investments.

96.     Because these conditions have, to date, created an environment with significant price volatility, the cryptocurrency market is highly susceptible to price manipulation.

97.     One infamous example of such manipulation took place between 2013 and 2014 and was accomplished with an automated trading program coined the "Willy Bot."

98.     Automated trading programs like the Willy Bot enable traders to execute manipulative tactics with precision. These programs are commonly referred to as "bots."

99.     Between 2013 and 2014, Mark Karpeles, the owner and operator of the failed cryptocurrency exchange Mt. Gox, implemented the Willy Bot to successfully manipulate bitcoin's price from about $150 to over $1,000 in less than 3 months.[95]

---

[95] Exhibit 26, Neil Gandal et al., *Price Manipulation in the Bitcoin Ecosystem*, 95 J. OF MONETARY ECON. 86 (2018), https://perma.cc/A9QN-ZV8N.

When Mt. Gox finally suspended trading due to its insolvency, the price fell to $500.[96]

100.   Before its collapse, "Mt. Gox was the biggest trading platform for bitcoin" and "was handling 70% of all bitcoin trading" worldwide.[97] Mark Karpeles was its sole owner and operator.

101.   On May 25, 2014, an anonymous trader posted a report titled, "The Willy Report: proof of massive fraudulent activity at Mt. Gox and how it has affected the price of Bitcoin."[98]

102.   The Willy Report provided detailed analysis of Mt. Gox's leaked trading logs and concluded that someone had programmed a bot to buy 10-20 bitcoin every five to ten minutes. The report concluded that this "enormously" affected the price of bitcoin and played a key role in its rise to $1,000.[99]

103.   Since then, additional academic research has reached the same conclusion. In an article published last year, one team found that:

> suspicious trading activity of a single actor was the primary cause
> of the massive spike in the USD/BTC exchange rate in which the

---

[96] Exhibit 27, Paul Vigna, *5 Things About Mt. Gox's Crisis*, WALL ST. J. (Feb. 25, 2014), https://perma.cc/A2WH-SXFL.

[97] *Id.*

[98] Exhibit 28 (the "Willy Report"), https://perma.cc/EN6E-2HJP.

[99] *Id*.

rate rose from around $150 to over $1,000 in just two months in late 2013.[100]

104.   The researchers observed that the "Willy account became active on September 9, 2013" and continued to trade until their data cutoff on November 30, 2013. Because Karpeles owned and operated the exchange, "Willy" never actually had to pay for bitcoin, but nonetheless bought "around 268,132 for just under $112 million" during that time period. One passage captures their findings particularly well:

> Separating the days on which Willy was active from those he was not, reveals a dramatic difference: In the case of Mt. Gox, the average USD/BTC rate increased by $21.85 on the 50 days Willy was active; it actually fell (by $0.88 on average) on days when Willy was not active. The same dramatic difference holds for the other exchanges as well. These results are striking and suggest that Willy's activity could have caused huge jumps in the exchange rate on all of the exchanges.



Figure 1:  Bitcoin-USD exchange rate at Bitstamp exchange, with periods of suspicious activity shaded.

---

[100] Exhibit 26, *Price Manipulation*, 95 J. OF MONETARY ECON. 86 (2018), https://perma.cc/A9QN-ZV8N.

105. While it was initially unclear who controlled the Willy Bot, Karpeles eventually admitted to controlling it at his trial in 2017.[101]

106. The Willy Bot scheme underscores how control over an exchange and the opportunity to make trades with non-existent money allowed a single individual to dramatically influence cryptocurrency prices, even without sophisticated manipulation tactics like wash trading, match trading, and spoofing. The simple power to acquire cryptocurrencies with non-existent U.S. dollars interferes with the natural price discovery process and misleads market participants.

### F. How Tether and Bitfinex Caused the 2017-18 Bitcoin Bubble

*This is going to be the largest bubble of our lifetimes. . .*
*You can make a whole lot of money on the way up, and we plan on it.*
*—Michael Novogratz, September 26, 2017* [102]

107. Bitfinex and Tether leveraged USDT and their control of the Bitfinex exchange to inflate one of the largest bubbles in history.

108. From 2014 to 2016, bitcoin's price fluctuated between $200 and $800. By the end of 2016, bitcoin — as well as other cryptocurrencies — began to see significant gains.

---

[101] William Suberg, *Mt. Gox Trial Update: Karpeles Admits 'Willy Bot' Existence*, COINTELEGRAPH (July 11, 2017), https://perma.cc/5FMC-SJYM.

[102] Exhibit 29, Erik Schatzker, *A Crypto Fund King Says Bitcoin Will Be the Biggest Bubble Ever*, BLOOMBERG (Sep. 26, 2017), https://perma.cc/T3PK-RJL2. Novogratz is the CEO of Galaxy Digital, a New York based cryptocurrency investment firm. The NYAG investigation into Tether and Bitfinex revealed correspondence between Bitfinex and Galaxy Digital to onboard Galaxy as a customer of Bitfinex in October 2018.

109.   On March 1, 2017, the price of bitcoin had climbed to $1,200. Throughout the first half of 2017, bitcoin continued to experience significant gains, rising to just above $2,000 by July.[103]



110.   From there, bitcoin's price rose rapidly until, on December 17, 2017, it reached a record high of nearly $20,000. By then, bitcoin's market cap was nearly $327 billion, roughly the size of Amazon's market cap during the same period.

111.   Then the market crashed.

112.   Between January and February 2018, bitcoin's price fell to $6,200. The bitcoin market continued to hemorrhage throughout 2018. Roughly one year from its previous high, bitcoin's market cap was only $62 billion, or $3,500 per bitcoin.

113.   The disappearance of $265 billion in bitcoin wealth was the result of Bitfinex and Tether propping and popping the largest bubble in history.

---

[103] www.coinmarketcap.com.

114.    The chart below conveys the scale of this event by comparing bitcoin's

relative price inflation with other infamous bubbles.[104]



115.    The economic devastation was not confined to bitcoin. As bitcoin fell,

so did the rest of the cryptocurrency market it had spawned. "The combined market

capitalization of all virtual currencies as of January 6, 2018, was roughly $795

billion; by Feb. 6, 2018, the total value had dropped to $329 billion." *CFTC v.

McDonnell*, 287 F. Supp. 3d 213, 219 (E.D.N.Y. 2018).

---

[104] Exhibit 1, *Did Bitcoin Just Burst?*, BLOOMBERG (Jan. 17, 2018),
https://perma.cc/DL4Z-6JDQ.

116.   As explained below, USDT was *not* backed 1:1 by U.S. dollars. Bitfinex and Tether issued billions of unbacked USDT to manipulate the price of bitcoin and other cryptocurrencies.

117.   This scheme enabled Bitfinex and Tether to buy massive amounts of bitcoin without paying for it — just like Karpeles in 2013-2014 — and profit outrageously from the boom-and-bust cycles they created.

### i.   Professor Griffin's analysis demonstrates Tether and Bitfinex manipulated the price of bitcoin

118.   In June 2018, Professor John Griffin and Amin Shams published an analysis of USDT issuances on SSRN entitled *Is Bitcoin Really Un-Tethered* (hereinafter the "Griffin Article").[105]

119.   The Griffin Article's main conclusion was that USDT-driven price manipulation of bitcoin accounted for as much as half of bitcoin's price gains during the period of March 1, 2017 through March 31, 2018.

120.   The Griffin article examined two alternative hypotheses to explain how Tether issued USDT during this time frame.

121.   The first hypothesis was that Tether issued USDT in response to legitimate demand for a pegged digital currency. Under this hypothesis, USDT is

---

[105] John Griffin is the James A. Elkins Centennial Chair in Finance at McCombs School of Business at the University of Texas at Austin. He is a leading expert in Forensic Finance. The Griffin Article is attached as Exhibit 30, https://ssrn.com/abstract=3195066. As of the time of this filing, the Griffin Article has the 49th most downloads on SSRN.

fully backed by U.S. dollars. This hypothesis is called the "pulled hypothesis," because investors are "pulling" USDT into the market.[106]

122.   The alternative hypothesis is that Tether issues USDT as part of a supply-driven scheme to manipulate the price of bitcoin by purchasing it with unbacked USDT.[107] This hypothesis is called the "pushed hypothesis" because Tether is issuing USDT independently of demand and "pushing" it into the market.

123.   Since Tether controls USDT issuance, Bitfinex and Tether can set strategic price floors for bitcoin that trigger buy orders executed with unbacked USDT and costlessly ensure the price of bitcoin never falls below the pre-determined floor.[108] Like the Willy Bot, the persistent purchases would result in significant price increases over the long-term.

124.   Large USDT issuances and bitcoin purchases would normally have an inflationary effect that decreases the relative value of USDT relative to bitcoin, but the reserve guarantee enforces a floor on USDT prices, which causes bitcoin's price to increase relative to the U.S. dollar.[109] Thus, the issuance of USDT signals an artificial demand for bitcoin to the market.

---

[106] Exhibit 30 at 10 (Griffin Article).

[107] *Id.*

[108] *Id.* at 11.

[109] *Id.*

125.    Under the pushed scheme, as bitcoin's price rises, Bitfinex and Tether can cash out by selling the bitcoin they've acquired for U.S. dollars, likely at a slower pace and on opaque channels with less price impact than their initial buying patterns.[110]

126.    In other words, Tether and Bitfinex purchase bitcoin with fake USDT to draw in momentum investors then cash out by selling it to them for real U.S. dollars.

127.    If anyone ever asks questions, Tether can convert cryptocurrencies to U.S. dollars or use its U.S. dollar profits to retroactively provide reserves for USDT and claim those reserves were there all along.[111]

128.    To determine which hypotheses was valid, Griffin examined over 200 gigabytes of transactional data from over ten different sources.[112] The public nature of the blockchain meant that Griffin was able to analyze a significant amount of USDT transactions to date, including issuances.

---

[110] *Id.*

[111] *Id.*

[112] *Id.* at 12.

129.    Griffin first confirmed that Tether sends all new USDT to Bitfinex, and that Bitfinex largely sends USDT to two other exchanges: Poloniex and Bittrex.[113] For example, by February 2018 Bitfinex had sent Poloniex 2.99 billion USDT.[114]

130.    Griffin next determined that when bitcoin prices decreased, USDT was issued and used to purchase bitcoin, but that this was not mirrored by redemptions when bitcoin prices were increasing.[115] He concluded that this indicated USDT was used to fend off downturns in bitcoin prices rather than benign market making activities.

131.    In other words, Tether and Bitfinex buy bitcoin with USDT when prices drop to keep the price artificially high.

132.    Griffin next analyzed Tether issuances between March 1, 2017 to March 31, 2018 to test how strongly these issuances correlated with bitcoin price increases.[116] He found that the timing of these issuances strongly correlated with half of all bitcoin price increases that year.

133.    Griffin concluded his findings were "most consistent with the supply-driven manipulation hypothesis" that Tether was pushing USDT into the market.[117]

---

[113] *Id.* at 16.

[114] *Id.* at 17.

[115] *Id.* at 20.

[116] *Id.* at 23.

[117] *Id.* at 26.

40

134.   As Griffin explained in an interview with Bloomberg:

First, [USDT] are created by the parent company Tether Ltd., often in large chunks such as 200 million. Almost all new coins then move to Bitfinex. When Bitcoin prices drop soon after the issuance, [USDT] at Bitfinex and other exchanges are used to buy Bitcoin in a coordinated way that drives the price.[118]

135.   The chart below depicts this correlation between USDT issuances and bitcoin price increases:



136.   Griffin also observed evidence consistent with the use of "round-number thresholds" as "price anchors to set a price floor" in order "to stabilize and drive up the price" of bitcoin. The premise of a price anchor is that "if investors can demonstrate a price floor, then they can induce other traders to purchase."[119]

---

[118] Exhibit 31, Matt Robinson & Matthew Leising, *Tether Used to Manipulate Price of Bitcoin During 2017 Peak: New Study*, BLOOMBERG (June 13, 2018), https://perma.cc/5KXS-RMT5.

[119] Exhibit 30 at 5 (Griffin Article).

ii.   Other studies corroborate the Griffin Article's conclusions

137.   A few months prior to the publication of the Griffin Article, a report with the title "Quantifying the Effect of Tether" (the "Tether Report") was published online.[120] Similar to Griffin's analysis, the Tether Report concluded that "Tether printing moves the market appreciably; 48.8% of BTC's price rise in the period studied occurred in the two-hour periods following the arrival of 91 different Tether grants to the Bitfinex wallet." The report warned that the "Bitfinex withdrawal/deposit statistics are unusual and would give rise to further scrutiny in a typical accounting environment."[121]

138.   In its analysis of bitcoin price data and USDT transactions, the report found that:

> The price data suggests that Tether may not be minted independently of Bitcoin price and may be created when Bitcoin is falling; it also rejects the notion that Tether is not having a great influence on the Bitcoin price. One interpretation of the data suggests that Tether could account for nearly half of Bitcoin's price rise, not even allowing for follow-on effects and the psychological effects of rallying the market repeatedly. The transaction data could trigger extreme scrutiny and audits due to a questionable pattern of transactions.[122]

---

[120] Exhibit 32 (the "Tether Report"), https://perma.cc/6RV2-KLYR.

[121] *Id.*

[122] *Id.*

139.   On October 3, 2019, TokenAnalyst, a cryptocurrency researching company "on a mission to bring transparency to the decentralized economy," [123] similarly concluded that Tether's issuance of USDT correlated with upward bitcoin price movement.[124]

140.   TokenAnalyst analyzed the "relationship between \$BTC price and \$USDT supply over the course of history" and determined that "on days where #USDT ERC20 is minted, 70.0% of the time the price of BTC moves up" and "on days where #USDT Omni is minted, 50.0% of the time the price of BTC moves up."[125]

141.   In July of 2018, Dr. Gerard Martinez reviewed the Griffin Article.[126] After walking through the relevant evidence, Dr. Martinez concluded that the "statistics support the theory that Tether Limited and Bitfinex corporations used Tether to buy Bitcoin in key occasions during the meteoric rise of Bitcoin prices of 2017 and beginnings of 2018"; that "[t]hese corporations would print Tether right

---

[123] TOKENANALYST.IO, https://perma.cc/QS5K-5CWP.

[124] Exhibit 33, Olga Kharif, *Bitcoin Gains Correlate with Tether Issuance, Researcher Says*, BLOOMBERG (Oct. 3, 2019), https://perma.cc/CWU4-ZXHP.

[125] @theokenanalyst, Twitter (Oct. 3, 2019), https://perma.cc/4T66-6LH7. Tether issues USDT by notating its issuance on either the Omni layer of the Bitcoin blockchain or on the Ethereum blockchain as an ERC20 token.

[126] Dr. Gerard Martinez, MEDIUM (July 12, 2018), https://perma.cc/4QW2-FJPQ ("The ideas and analysis methods of this article are not new, they are all taken from or inspired by the recently published paper "Is Bitcoin Really Un-Tethered?" by John M. Griffin et al. and the so-called Tether Report. However, the results shown here are probably the currently most updated on the internet and, hopefully, a bit easier to understand than the cited publications.")

after transient Bitcoin price dips . . .”; that “Tether Ltd. would then buy Bitcoin with the freshly minted Tether and would promote the creation of a fraudulent bullish market, which would attract more investors to buy Bitcoin, contributing this way to increase the bubble (momentum effect)”; and then as the penultimate “part of the strategy . . . Tether Ltd. would send the freshly bought Bitcoin to their accounts in Bitfinex.”[127]

        iii.   Further evidence of Bitfinex and Tether's scheme

142.   These empirical conclusions are reinforced by other evidence demonstrating that Bitfinex and Tether actively engaged in coordinated market manipulation.

143.   For example, in April 2017, Potter publicly discussed Bitfinex's plans to create a “private market for the equity [shareholders] to trade among themselves.”[128] Bitfinex today “offer[s] an order type called ‘hidden,’ in which the ‘hidden’ order does not appear on the publicly visible order book.”[129] These are precisely the sort of “opaque channel” hypothesized by Griffin as a mechanism for selling off bitcoin without crashing the price.

---

[127] *Id.*

[128] WhalePool, *CSO Bitfinex Phil Potter and WhalePool bitcoin traders celebrate BFX Token 100% Payment apr/2017*, YOUTUBE, at 10:10 (April 3, 2017), https://archive.org/details/2017.04.03.whalepoolcsobitfinexphilpotter.

[129] *Virtual Markets Integrity Initiative Report,* OFFICE OF THE N.Y. ATT'Y GEN. (Sep. 18, 2018), https://virtualmarkets.ag.ny.gov/. [https://perma.cc/7YS8-LS7S]

144.   This hidden market is entirely consistent with a report published by the New York Attorney General finding that Bitfinex fosters an environment ripe for abuse. Despite the fact that "[t]rading by platform employees poses a conflict of interest," Bitfinex does "not provide any restrictions on employee trading."[130]

145.   Furthermore, in June 2014, one month after the "Willy Report" about Mt. Gox was published, Devasini all but admitted that he was working on a "Willy Bot" of his own to drive the price of bitcoin to $10,000:



146.   The ability to implement a trading bot like the Willy Bot is corroborated by a report from the New York Attorney General finding that Bitfinex offers a number of "special order types" that "are only useful to professional, automated traders using sophisticated algorithmic strategies, where orders can be submitted and

---

[130] *Virtual Markets Integrity Initiative Report*, https://virtualmarkets.ag.ny.gov/.

[131] *Re: And we have another Bitfinex Hookey THIEVING Short Squeeze!*, BITCOINTALK.ORG (June 22, 2014), https://perma.cc/HW9Q-5JVA.

cancelled automatically, in response to market signals not visible (or even available) to regular traders."[132]

147.   As described more below (*see infra* Part IV.G), Bitfinex and Tether's purported ability to issue hundreds of millions of USDT at the same time their longtime banking relationships and U.S. correspondent account access were terminated is equally alarming.

148.   Indeed, in the midst of this liquidity crisis, Devasini virtually admitted to manipulating the price of bitcoin. In October 2018, Devasini wrote to a Crypto Capital representative: "please understand all this could be extremely dangerous for everybody, the entire crypto community . . . [bitcoin] could tank to below 1k if we don't act quickly."[133]

149.   In other words, Tether ran its printing press to issue an asset supposedly backed by U.S. dollars at a time it was losing access to U.S. dollar clearing. This makes no sense unless Tether issued unbacked USDT despite its 1:1 guarantee.

150.   Further corroboration that USDT is being issued without any real controls in place is demonstrated by the fact that on July 13, 2019, Tether

---

[132] *Virtual Markets Integrity Initiative Report*, https://virtualmarkets.ag.ny.gov/.  In particular, Bitfinex offers "'Fill-or-Kill,' in which the order is canceled in its entirety if it does not execute immediately and in full" and "Post-Only' (also known as 'Maker-or-Cancel'), in which the order only posts to the order book if it would not fill an already-posted order."

[133] Exhibit 34, ECF No. 100, *James v. iFinex, Inc.* (N.Y. Sup. Ct. July 8, 2019) (chat transcript between Devasini and New York trading client in late 2018 and early 2019).

accidentally issued 5,000,000,000 USDT, and then revoked it in the span of just twenty minutes. Chief Technical Officer Ardoino attributed this to "an issue with the token decimals."[134]

151.   On October 15, 2018, the market registered concern that Tether did not have the full reserves it claimed.[135] A massive sell-off caused the price of USDT to drop as low as $0.85.

152.   On November 20, 2018, Bloomberg reported that the DOJ's criminal probe was coordinating with the CFTC and that "among the issues the Justice Department is examining is how Tether Ltd. creates new coins and why they enter the market predominantly through Bitfinex."[136]

153.   On November 27, 2018, the New York OAG subpoenaed Bitfinex and Tether.[137]

154.   The DOJ's criminal probe focused on Bitfinex and Tether to determine if the 2017 cryptocurrency rally was "fueled in part by manipulation."[138]

---

[134] @paoloardoino, TWITTER (July 13, 2019), https://perma.cc/PQT8-RND7.

[135] Exhibit 35, Andrea Tan, Eric Lam, & Benjamin Robertson, *Crypto Markets Roiled as Traders Question Tether's Dollar Peg*, Bloomberg (Oct. 15, 2018), https://perma.cc/VT5T-LWJW.

[136] Exhibit 36, Matt Robinson & Tom Schoenberg, *Bitcoin-Rigging Criminal Probe Focused on Tie to Tether*, BLOOMBERG (Nov. 20, 2018), https://perma.cc/E28G-4MCM.

[137] Exhibit 37, ECF No. 8, *James v. iFinex, Inc.* (N.Y. Sup. Ct. April 25, 2019) (Bitfinex subpoena); Exhibit 38, ECF No. 10, *James v. iFinex, Inc.* (N.Y. Sup. Ct. April 25, 2019) (Tether subpoena).

[138] Exhibit 36, *Bitcoin-Rigging Criminal Probe Focused on Tie to Tether*, BLOOMBERG (Nov. 20, 2018), https://perma.cc/E28G-4MCM.

155.   The issuance of USDT for price manipulation appears to have continued to the present day. The chart below depicts the strong correlation between USDT issuance and an uptick in 2019 bitcoin prices.[139]



## G. How Bank Fraud and Money Laundering with Crypto Capital Made Price Manipulation of the Cryptocurrency Market Possible

*Being in the bitcoin business is really about playing cat and mouse with the correspondent banks. The problem with becoming big . . . is that we can't fly under the radar anymore.*
*—Philip Potter, Bitfinex CSO[140]*

156.   As described below, access to the U.S. financial system was an essential component of Defendants' scheme. Indeed, the entire premise of Tether depends on

---

[139] Exhibit 33, *Bitcoin Gains Correlate with Tether*, BLOOMBERG (Oct. 3, 2019), https://perma.cc/CWU4-ZXHP.

[140] *WhalePool Interview: Bitfinex CSO Comments on Litigation Withdraw[a]l against Wells Fargo apr/2017*, YOUTUBE at 13:55 (April 12, 2017), https://archive.org/details/2017.04.12whalepoolbitfinexcsocomments.

its use of the U.S. financial system — *i.e.* U.S. dollar deposits — to back its manufactured digital assets.

157.   To facilitate its access to U.S. dollars, Bitfinex and Tether partnered with a Panamanian entity named Crypto Capital Corp.

158.   As conventional banks began shutting Tether and Bitfinex accounts down for money laundering and other compliance issues, Tether and Bitfinex became even more enmeshed with Crypto Capital and a complicated shell game of money laundering.

159.   Inexplicably, in the face of this growing pressure, Tether kept its printing presses hot. Indeed, it often issued large amounts of USDT right as it lost access to U.S. dollar banking relationships.

160.   By early 2018, Crypto Capital was purportedly in control of over $1 billion of Bitfinex funds without a single written agreement having existed over their four-year business partnership.[141]

161.   Much of the conduct described below is criminal. The crimes committed by Tether, Bitfinex, Crypto Capital, and their executives include Bank Fraud (18 U.S.C. § 1344), Money Laundering (18 U.S.C. § 1956); Monetary Transactions Derived From Specified Unlawful Activities (18 U.S.C. § 1957),

---

[141] Exhibit 2 ¶¶ 58–59 (Whitehurst Affirmation).

Operating an Unlicensed Money Transmitting Business (18 U.S.C. 1960), and Wire Fraud (18 U.S.C. § 1343).

162.   Indeed, Bitfinex and Tether executives publicly discussed violating many of these laws in the past and expressed their intent to continue doing so in the future.

i.   Overview of U.S. correspondent banking

163.   To engage in U.S. dollar transactions, Bitfinex and Tether required either (1) a U.S. bank account or (2) an account with a bank that maintains its own "correspondent account" with a U.S. bank. In the second scenario, the correspondent account serves as an intermediary and "clears" the U.S. dollar transaction.

164.   Money never actually "moves" in cross-border transactions. In order to facilitate transfers in other currencies, banks maintain "correspondent accounts" at foreign banks. "Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions."[142]

165.   To send a cross-border transaction in U.S. dollars, a series of bank accounts are credited or debited accordingly. The graphic below depicts a typical U.S. dollar transaction in which

---

[142] *Sigmoil Resources, N.V. v. Pan Ocean Oil Corp. (Nigeria),* 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996).

(1) Bitfinex instructs its bank to wire U.S. dollars to a customer located in the United Kingdom;

(2) the Taiwanese bank debits Bitfinex's account and instructs its U.S. correspondent to process the transaction;

(3) the U.K. correspondent is instructed to debit the account of the Taiwanese correspondent and credit the account of the U.K. bank;

(4) the U.K. bank is instructed to credit the customer's account;

(5) the U.K. customer gains access to the funds.



166.   Access to a U.S. correspondent account is essential to international transactions in U.S. dollars.[143]

167.   For the correspondent bank, these transactions are riskier from an anti-money laundering perspective because the originator and beneficiary are one step

---

[143] *See Correspondent banking*, COMMITTEE ON PAYMENTS AND MARKET INFRASTRUCTURES, BANK FOR INTERNATIONAL SETTLEMENTS, at 9 (July 2016) ("On a cross-border level, however, correspondent banking is essential for customer payments and for the access of banks themselves to foreign financial systems for services and products that may not be available in the banks' own jurisdictions."), https://perma.cc/9Z92-KSU6.

removed from the bank. Money launderers often capitalize on this disconnect by using shell companies to obscure the true counterparties even more."[144]

168.   This is hardly a secret. The FBI recently told Congress that the "pervasive use of shell companies, front companies, nominees, or other means to conceal the true beneficial owners of assets is a significant loophole in this country's anti-money laundering (AML) regime."[145]

ii.   U.S. correspondent banking is essential to Bitfinex and Tether

169.   Because Bitfinex and Tether needed to accept U.S dollars, convert illicit gains into U.S. dollars, as well as honor customer withdrawal requests for U.S. dollars, access to U.S. correspondent banking was critical to the Defendants' manipulation scheme.

170.   In fact, as of April 2017, Bitfinex and Tether told a U.S. federal court that U.S. dollar transactions were the *only* types of transactions they engaged in with customers: "Bitfinex can receive or remit only U.S. dollars for customers' purchase of Virtual Currency" and that "Tether can receive or remit only U.S. dollars for customers' purchases."[146]

---

[144] Exhibit 39, Alexander Weber, et al., *Money to Launder? Here's How (Hint: Find a Bank)*, BLOOMBERG (Mar. 9, 2019), https://perma.cc/DXP4-FHXX.

[145] Statement of Acting Deputy Asst. Director, CID, FBI to Senate Committee on Banking, Housing, and Urban Affairs, *Combating Illicit Financing by Anonymous Shell Companies* (May 21, 2019), https://perma.cc/P2W9-URMT.

[146] Exhibit 19 ¶¶ 17–18 (Wells Fargo Complaint).

171.   The Bitfinex and Tether Defendants made these statements in a lawsuit they filed against Wells Fargo when it terminated its correspondent banking services.

172.   Statements made by Bitfinex and Tether in that lawsuit underscore just how essential U.S. correspondent access was to their operations and how losing it should have stopped their ability to operate and issue USDT. Specifically, they stated that Wells Fargo's "decision to suspend outgoing wire transfers in U.S. dollars from plaintiffs' correspondent accounts presented an existential threat to their businesses," and that if they "could not remit to customers U.S. dollars that belong to their customers, [their] businesses would be crippled" and "brought to a standstill."[147]

173.   On or around November 28, 2017, Phil Potter opened new business accounts for DigFinex and iFinex at the New York Branch of Metropolitan Commercial Bank.[148] On December 20, 2017, Potter opened another new account at the New York Branch of Metropolitan Bank on behalf of Tether Holdings Limited.[149] On or around February 16, 2018, Potter opened more new accounts at the New York branch of Signature Bank on behalf of DigFinex and iFinex.[150]

---

[147] *Id.* ¶ 47.

[148] Exhibit 40, ECF No. 94, *James v. iFinex* (N.Y. Sup. Ct. July 8, 2019) (Dec. 2017 Bank Account Application).

[149] *Id.*

[150] Exhibit 13 (Feb. 2018 Bank Account Application).

174.    These accounts demonstrate Bitfinex and Tether's dependency on the U.S. banking system and on New York banks in particular.

175.    But as explained below, these specific accounts were not viable for the Defendants' general operations. This was either because the banks could not provide the necessary correspondent banking services, or perhaps because a history of account closures had caused Bitfinex and Tether to no longer even attempt to operate their business openly through regulated banks for fear the accounts would be shut down.

iii.    <u>Bitfinex and Tether's cat and mouse games</u>

176.    Early on, Bitfinex and Tether utilized Taiwanese banks that maintained U.S. correspondent accounts at Wells Fargo.[151]

177.    On March 31, 2017, Wells Fargo stopped providing correspondent banking services for Bitfinex and Tether.[152]

178.    Two weeks after being cut off by Wells Fargo, on April 12, 2017, Potter told the cryptocurrency trading community WhalePool that "it was getting harder and harder to move money around."[153]

---

[151] Exhibit 19 ¶¶ 31–33 (Wells Fargo Complaint).

[152] *Id.* ¶¶ 40-41.

[153] *WhalePool Interview: Bitfinex CSO Comments on Litigation Withdraw[a]l against Wells Fargo apr/2017*, YOUTUBE at 6:40 (April 12, 2017), https://archive.org/details/2017.04.12whalepoolbitfinexcsocomments.

179.   Potter went on to explain that everybody banking offshore is "in some sort of don't ask don't tell relationship with their banks,"[154] and that U.S. banks were exiting the dollar clearing business because many "banks have been held accountable for their actions as correspondents in a lot of other money laundering and criminal cases" and that "money laundering is their biggest concern."[155]

180.   Potter clarified, though, that "the problem here [wa]s not really Wells Fargo. It is the system."[156] He then described Bitfinex's past efforts to evade the "system" of money laundering laws banks are required to comply with, and expressed Bitfinex's commitment to evading them in the future:

> There are other correspondent banks that won't do business with us, Wells Fargo just happens to be the last one available to us with our banks in Taiwan. . .[157]

> We have a lot of other tricks. Being in the bitcoin business is really about playing cat and mouse with the correspondent banks. It's always been that. The problem with becoming big, and also we have massive balances at the banks, is that [Bitfinex] can't fly under the radar anymore. . . .

> Right now in Taiwan there is a moratorium . . . on banks opening up new offshore accounts. That's an example. Even if we wanted to register some new corporate entities, move some money around, things that we would normally do, all that is slowed down right now. [158]

---

[154] *Id.* at 30:30.

[155] *Id.* at 9:20.

[156] *Id.* at 11:00.

[157] *Id.* at 11:15.

[158] *Id.* at 13:55.

181.   In another discussion from the same time period, Potter said:

> We've had banking hiccups in the past, we've just always been able to route around it or deal with it, open up new accounts, or what have you… shift to a new corporate entity, lots of cat and mouse tricks that everyone in Bitcoin industry has to avail themselves of.[159]

182.   One way the Defendants attempted to conceal from banks and regulators the true risk profile of their transactions was by using a Hong Kong company they had incorporated, Renrenbee Limited, to create the illusion of compliance with anti-money laundering laws.

183.   But Renrenbee Limited was initially incorporated as Bitfinex Limited in March 2013.[160] At that time, Velde was listed as a director, and Devasini became a director by December 2013.

184.   But in April 2014, Bitfinex Limited was renamed Renrenbee Limited and registered as a Money Services Operator (MSO) in Hong Kong in order to reassure Bitfinex customers without revealing to banks that Bitfinex was the true counterparty. [161]

---

[159] *Bitfinex Tether Phil Potter 'Solved' Banking Problems with illegal money laundering tactics*, YOUTUBE (April 24, 2017), https://archive.org/details/2017.04.24bitfinextetherphilpotter.

[160] Exhibit 41 (Hong Kong Registry-Renrenbee Limited), https://perma.cc/4CUU-JY72.

[161] *Re: [OFFICIAL]Bitfinex.com first Bitcoin P2P lending platform for leverage trading*, BITCOINTALK.ORG (Nov. 10, 2014) (Devasini instructing customer inquiring about to "look for Renrenbee Limited" in the registry), https://perma.cc/TV5D-RRW3.

185.  By January 2016, the Defendants had even established a separate website for Renrenbee Limited to reinforce their sham that it was an independent entity.[162]

186.  This deception continued when the Tether White Paper was published in June 2016 where Tether falsely represented that it "was concluding a principal-agency agreement with RenRenBee Limited" whereby Renrenbee would "provide anti-money laundering compliance work and customer due diligence procedures as agent for Tether as principal."[163]

187.  Bitfinex also falsely held Renrenbee Limited out as an independent provider of compliance services. Even though Renrenbee Limited no longer exists, to this day the Know-Your-Customer (KYC) form on Bitfinex's website represents that "KYC/AML collection and processing is handled for Bitfinex by the appointed money service operator Renrenbee Ltd."[164]

188.  The sham nature of Renrenbee's compliance function is further corroborated by the fact that Bitfinex and Tether do not observe standard KYC and AML practices. According to the New York Attorney General, unlike most exchanges, Bitfinex does not "require customers to submit a range of personal

---

[162] RENRENBEE.COM (Jan. 15, 2016), https://perma.cc/7YJS-PP7E.

[163] Exhibit 10 at 18 (Tether White Paper).

[164] Exhibit 42 (Bitfinex KYC Form), https://perma.cc/TDM3-UXFR.

identifying information and government-issued identification before allowing new customers to trade" and only requires "little more than an email address to begin trading virtual currencies."[165]

189.   To further facilitate their cat and mouse games, Bitfinex and Tether regularly open and use bank accounts in the name of shell companies to conceal their connection to transactions.

190.   On or around January 26, 2018, Bitfinex began instructing customers to deposit funds in an account held in the name of a different company, Haparc B.V., at a different bank, ING Groep NV in the Netherlands.[166] ING closed this account one month later after Bloomberg reported its existence.[167]

191.   In October 2018, Bitfinex began using a Hong Kong bank account held in the name of a company called "Prosperity Revenue Merchandising Limited" to engage in U.S. dollar transactions routed through a U.S. correspondent account at Citibank.[168]

---

[165] *Virtual Markets Integrity Initiative Report*, https://virtualmarkets.ag.ny.gov/.

[166] Robert-Jan den Haan, *The Bitfinex IEO, how did we get here?*, THEBLOCK (May 8, 2019), https://perma.cc/F493-P375.

[167] Exhibit 43, Ruben Munsterman & Matthew Leising, *Digital Exchange Bitfinex, Under U.S. Scrutiny, Gets ING Account*, BLOOMBERG (Feb. 20, 2018), https://perma.cc/4RHP-X4RF.

[168] *Bitfinex appears to have moved its business to a Hong Kong bank*, THE BLOCK (Oct. 16, 2018), https://perma.cc/HJX7-76BH.

iv.   <u>Bitfinex and Tether's dependence on Crypto Capital to further</u>
<u>obfuscate, avoid money laundering laws, and continue operating</u>

192.   Bitfinex and Tether have worked with Defendant Crypto Capital Corp. as a "third party payment processor" since 2014 without any contract or written agreement.[169]

193.   Despite the lack of any documented agreement, "by 2018 Bitfinex had placed over one billion dollars of co-mingled customer and corporate funds with Crypto Capital."[170]

194.   Evidence from the end of 2017 through 2018 reveals Bitfinex and Tether's questionable banking practices and its desperate need to access the U.S. banking system.

195.   On December 5, 2017, Bloomberg published a story about Tether's refusal to disclose the location of its cash reserves without a non-disclosure agreement in place.[171] This same article reported that online documents showed Bitfinex was directing prospective customers to deposit funds in an account that

---

[169] Exhibit 2 ¶¶ 58–59 (Whitehurst Affirmation). The defendants' counsel also explained to the OAG that "Bitfinex and Tether have also used a number of other third party "payment processors" to handle client withdrawal requests, including various companies owned by Bitfinex/Tether executives, as well as other 'friends' of Bitfinex — meaning human being friends of Bitfinex employees that were willing to use their bank accounts to transfer money to Bitfinex clients who had requested withdrawals." *Id.* ¶ 60.

[170] *Id.* ¶ 58.

[171] Exhibit 44, Matthew Lesing, *There's an $814 Million Mystery Near the Heart of the Biggest Bitcoin Exchange*, BLOOMBERG (Dec. 5, 2017), https://perma.cc/K5W2-C68C.

belonged to a different company, Crypto SP. Z.O.O., at Spoldzielczy Bank in Poland.[172]

196.   On March 28, 2018, the United States indicted several individuals connected to Backpage.com on multiple counts of money laundering and prostitution.[173] This indictment specifically identified Crypto Capital as one of the companies the Backpage defendants utilized to launder their money.[174]

197.   A week later, on April 6, 2018, Polish law enforcement seized $375 million USD worth of zloty from accounts held by Crypto SP. Z.O.O (the Bitfinex shadow account), Neso SP. Z.O.O., and ITRAN SP. Z.O.O.[175] These companies are shell companies controlled by Crypto Capital.

---

[172] *See also Bitfinex Reveals a New Polish Bank Account Under a Panama Registered Company*, TRUSTNODES (Nov. 22, 2017), https://perma.cc/AEJ6-VEGA.

[173] Exhibit 45, Indictment, ECF No. 1, *United States v. Lacey*, No. 18-CR-422 (D. Ariz. Mar. 28, 2018). Backpage was a website that had become the largest marketplace for buying and selling sex before being shut down in April 2018.

[174] *Id.* ¶ 155.

[175] Robert-Jan den Haan, *The Bitfinex IEO, how did we get here?*, THEBLOCK (May 8, 2019), https://perma.cc/F493-P375.

Until April 2016, ITRAN had been named Global Transaction Services. *See* Exhibit 46, Indictment, ECF No. 1, *Barrs v. United States*, No. 16-cr-161 (N.D. Ga. May 10, 2016), (indictment of operator of Global Transaction Services for money laundering violations).

198.   Polish law enforcement found these companies "did not actually carry out any economic activity" but "were created solely to make their bank accounts available for international criminal financial operations."[176]

199.   These seizures affected Bitfinex's ability to honor withdrawal requests and, throughout 2018, Devasini "repeatedly beseeched an individual at Crypto Capital ("Oz") to return Bitfinex's funds."[177]

200.   About one month later, on May 16, 2018, the United States District Court for the District of Arizona entered a forfeiture order over funds held in a Crypto Capital account.[178]

201.   With nowhere else to turn, and even though it had begged Crypto Capital to release funds for months, Bitfinex was *still* directing customers to Crypto Capital into early October 2018.[179]

202.   For example, on October 5, 2018, in an exchange with a Bitfinex customer seeking to withdraw fiat, Devasini wrote "if you are interested in a faster

---

[176] Rafal Pasztelanski, *Kolumbijskie kartele prały setki milionów przez spółki z Pruszkowa i okolic*, TVP.INFO (June 4, 2018), https://perma.cc/449Z-66NM, https://perma.cc/9TFY-CB7H (Google Translation).

[177] Exhibit 2 ¶ 62 (Whitehurst Affirmation).

[178] Exhibit 47, Prelim. Order of Forfeiture at 3, ECF No. 22, *United States v. Backpage.com*, No. 2:18-CR-00465 (D. Ariz. May 16, 2018).

[179] Mike Dudas, *Bitfinex appears to be banking with HSBC*, THE BLOCK (Oct. 6, 2018), https://perma.cc/2FSQ-3KB4. This account was maintained at HSBC in New York in the name of Global Trading Solutions, LLC, one of Crypto Capital's shell companies.

solution, please consider www.cryptocapital.co."[180] A minute later, he wrote "with Cryptocapital moving fiat is a matter of minutes, not days[.] [W]e send and receive in real time, USD, EUR, JPY."

203.    When the customer pointed out that EUR deposits were suspended on Bitfinex's website, Devasini responded "as I said if you open an account with Cryptocapital we can flow EUR without problem.[181]

204.    Devasini's assurances to customers helped conceal the reality that Bitfinex's banking relationship with Crypto Capital was in chaos.

205.    On October 15, 2018, Devasini, going by the name "Merlin," had the following exchange with a representative from Crypto Capital, going by the handle CCC:

> **Merlin**
> Hey Oz, sorry to bother you every day, is there any way to move at least 100M to [*redacted*]? We are seeing massive withdrawals and we are not able to face them anymore unless we can transfer some money out of Cryptocapital.
> **Merlin**
> I understand some of the funds are being held by [text hidden], but what about the rest?
> **Merlin**
> under normal circumstances I wouldn't bother you (I never did so far) but this is a quite special situation and I need your help, thanks
> **Merlin**
> I have been telling you since a while
> **Merlin**

---

[180] Exhibit 34 (chat transcript between Devasini and New York trading client in late 2018 and early 2019).

[181] *Id.*

too many withdrawals waiting for a long time

**Merlin**

is there any way we can get money from you? Tether or any other form? Apart with cryptocapital we are running low in cash reserves

**Merlin**

please help

**CCC**

I know. We are following the banks we post as many as we can and let them process as much as possible according to them. Everytime we push them they push back with account closure without reason

**Merlin**

dozens of people are now waiting for a withdrawal out of cryptocapital

**Merlin**

I need to provide customers with precise answer at this point, can't just kick the can a little more

**Merlin**

the international I mean

**CCC**

I will keep you posted here

**CCC**

On the process of all international payments.

**Merlin**

please understand all this could be extremely dangerous for everybody, the entire crypto community

**Merlin**

BTC could tank to below 1k if we don't act quickly[182]

206.   A month later, on November 21, 2018, Merlin again desperately pleaded with the Crypto Capital representative, noting that "it's always difficult to tell our customers something real":

**Merlin**

please update me about the situation, we have serious problems if we don't get some funds from you with this week

**Merlin**

---

[182] Exhibit 2 ¶¶ 63–67 (Whitehurst Affirmation).

> I wish we had some clarity, it's always very difficult to tell our customers something real and this fuels the uncertainty[183]

207.   Evidence collected in the New York AG's investigation into Bitfinex and Tether indicates that "Merlin" is most likely Devasini.[184]

208.   In other words, Bitfinex and Tether were so desperate to access the U.S financial system and U.S. dollars that they were directing funds to Crypto Capital despite its clear connection to money laundering, account seizures, and an inability to move funds out.

209.   Defendant Fowler was at the center of Crypto Capital's operations during this time. Fowler set up the shell companies and bank accounts that Bitfinex and Tether depended on.

210.   According to the United States Attorney for the Southern District of New York, Defendant Fowler was involved "in a scheme to operate a shadow bank *on behalf of cryptocurrency exchanges* in which hundreds of millions of dollars passed through accounts controlled by [him] in jurisdictions around the world."[185] As described below, these exchanges included Bitfinex.

---

[183] *Id.*

[184] Exhibit 48, ECF No. 86, *James v. iFinex* (N.Y. Sup. Ct. Jan. 24, 2018) (email from Devasini stating his skype account name is "Merlinmagoo" and his telegram account is "@Merlinthewizard.").

[185] Exhibit 14 at 1 (Fowler Memorandum) (emphasis added).

211.   Interviews conducted in the course of the Department of Justice's investigation "corroborated in part" public reporting that Crypto Capital and other companies associated with Fowler "ha[d] failed to return $851 million" to Bitfinex.[186]

212.   As alleged by the New York Attorney General, "the lack of access to money held by Crypto Capital" — at least in part because of the seizure of various accounts by law enforcement — "made it impossible for Bitfinex to honor its client[s'] withdrawal requests."[187]

213.   Virtually all of the "cat and mouse" banking tactics described above constitute serious federal crimes.

214.   Bitfinex and Tether's inability to honor withdrawal requests in the wake of account seizures by law enforcement make clear that their illegal activity was inseparable from their business operations.

> v.   USDT issuances cannot be reconciled with Tether's economic reality

215.   Bitfinex and Tether's banking troubles should have been a constraint on their ability to issue or redeem USDT — either because they lost part of their 1:1 reserves, or because they were constrained in their ability to receive additional cash to back up the USDT they were about to issue.

---

[186] *Id.* at 3.

[187] Exhibit 2 ¶ 63 (Whitehurst Affirmation).

216.   Instead, moments of crisis often coincide with Tether issuing massive amounts of new USDT.

217.   On March 31, 2017, Wells Fargo terminated its relationship with Bitfinex and Tether.[188] A couple weeks later, on April 17, 2017, Bitfinex and Tether lost their last direct banking relationship in Taiwan and stopped accepting deposits.[189] The very next day, Tether issued 10 million USDT.[190]

218.   On April 22, 2017, Tether issued a statement that "all incoming international wires to Tether have been blocked and refused by our Taiwanese banks. As such, we do not expect the supply of tethers to increase substantially until these constraints have been lifted."[191]

219.   Tether's next publicly reported banking relationship was its opening of an account at Noble Bank International in Puerto Rico five months later.[192]

---

[188] Ex. 19 ¶ 40 (Wells Fargo Complaint).

[189] *Pausing Wire Deposits to Bitfinex*, BITFINEX.COM (April 17, 2017), https://perma.cc/C3QP-494X.

[190] omniexplorer.info (April 18, 2017), https://perma.cc/MF7J-KSLL.

[191] *Announcement*, TETHER.TO (April 22, 2017), https://perma.cc/AW3W-TJZK.

[192] In September 2017, Tether opened an account with Noble Bank International in Puerto Rico. Exhibit 2 ¶53 (Whitehurst Affirmation). Brock Pierce, the original founder of Tether, also founded Noble Bank International, which had only recently launched on May 11, 2017. @brockpierce, TWITTER (Aug. 4, 2018) ("Tether was my idea. Haven't had any involvement or ownership since the early days. I also started Noble Bank and again haven't had any involvement since the early days."), https://perma.cc/C27P-KUWM; @noblebankint, *Noble Bank International: The Next-Generation Bank Designed for FX & OTC Post-Trade Services*, MEDIUM (May 11, 2017), https://perma.cc/J5KQ-W2DU.

66

220. During these five months when Tether lost access to mainstream banking, it issued 390 million USDT. Tether's ability to accrue this much money under these circumstances is questionable, but the number becomes inexplicable when you consider that *for the first 2.5 years* of Tether's existence (October 2014 through March 2017) it issued less than 55 million USDT in total.[193]

221. In other words, losing access to U.S. dollar clearing marked the beginning of a five-month period when Tether issued seven times more USDT than it had the prior two and a half years combined.

222. In absolute numbers, total outstanding USDT had gone from approximately $60 million while Tether had access to the Wells Fargo correspondent account, to approximately $450 million after losing it.

223. Tether was becoming untethered, and it would only get worse.

224. From October 28, 2017 to December 20, 2017, Tether issued another 805,048,400 USDT.[194] This brought the total amount of all outstanding USDT, and hence Tether's supposed cash reserves, to over $1,250,000,000.[195] Suspiciously,

---

[193] *Tether Supply*, BLOCKSPUR, https://blockspur.com/tether/trends/supply.

[194] *Id.*

[195] https://coinmarketcap.com/currencies/tether/

Tether refused to disclose the location of its massive cash reserves without a nondisclosure agreement in place.[196]

225.   Despite the apparently unprecedented demand for USDT, Bitfinex and Tether closed new account registrations on December 21, 2017, stating that they would not re-open until January 15, 2018.[197]

226.   In the short span of less than one month after Bitfinex and Tether closed the door to potential new market entrants (December 28, 2017 through January 23, 2018), Tether issued more than **1 billion new USDT**,[198] all of which was supposed to be backed by U.S. dollars in bank accounts that Tether refused to disclose or audit.[199]

227.   This rapid series of large issuances came to an abrupt stop on January 24, 2018. This coincidentally was the same day that the Tether Report was published

---

[196] Exhibit 44, *There's an $814 Million Mystery*, BLOOMBERG (Dec. 5, 2017), https://perma.cc/K5W2-C68C.

[197] *Bitfinex and Tether Close New Accounts Registration, No Longer Accept New Users*, TRUSTNODES (Dec. 21, 2017), https://perma.cc/UCQ2-BSVB.

[198] OMNIEXPLORER.INFO, https://perma.cc/YPC4-LTJ9; OMNIEXPLORER.INFO, https://perma.cc/9JRW-76ND; ETHERSCAN.IO, https://etherscan.io/token/0xdac17f958d2ee523a2206206994597c13d831ec7?a=0xc6cde7c39eb2f0f0095f41570af89efc2c1ea828.

[199] Exhibit 44, *There's an $814 Million Mystery*, BLOOMBERG (Dec. 5, 2017), https://perma.cc/K5W2-C68C.

online. The Tether Report identified links between the issuance of USDT and bitcoin price increases.[200]

228.   Strangely though, issuances resumed even as Crypto Capital's accounts began to be targeted by law enforcement around the world (in March, April, May and October of 2018). On March 20, 2018, Tether issued another 300 million USDT, bringing the total value of all outstanding USDT to over $2,520,000,000.[201] Tether issued another 250 million USDT on May 18, 2018.[202]

229.   USDT issuances eventually show some sensitivity to public suspicion about the legitimacy of Tether and Bitfinex. In the mid-2018, Bitfinex's worsening liquidity crisis and the growing evidence that Bitfinex and Tether manipulated the price of bitcoin resulted in mounting pressure for Bitfinex and Tether to prove their legitimacy.

230.   On June 25, 2018, two weeks after the Griffin paper was published, Tether issued 250 million USDT.[203] A Bloomberg reporter was subsequently shown bank statements indicating that on July 6, 20, and 24, Tether sent Bitfinex a total of

---

[200] On January 30, 2018, Bloomberg published a story revealing the December 6, 2018 subpoena from the CFTC. Exhibit 49, Matthew Leising, *U.S. Regulators Subpoena Crypto Exchange Bitfinex, Tether*, BLOOMBERG (Jan. 30, 2018), https://perma.cc/8EFM-944U.

[201] OMNIEXPLORER.INFO, https://perma.cc/2757-LDCD; *Tether Supply*, blockspur.com, https://perma.cc/CGZ8-WAMQ.

[202] OMNIEXPLORER.INFO, https://perma.cc/2757-LDCD.

[203] *Id.*

$250 million U.S. dollars and Bitfinex sent 250 million USDT back to the Tether Treasury.[204] This was held out as evidence that Tether's cash reserves were genuine and just so happened to be undertaken right after some of the strongest proof that Tether was issuing unbacked USDT to manipulate the price of bitcoin.

231.   On October 15, 2018, as Bitfinex's inability to honor withdrawals became apparent to the market, a massive sell-off caused the price of USDT to drop as low as $0.85.[205]

232.   On October 23, 2018, the Department of Justice publicly seized Crypto Capital funds in three U.S. accounts held by Reginald Fowler and/or Global Trading Solutions LLC at HSBC.[206]

233.   The next day, Tether "revoked" 500 million USDT from the Tether Treasury, taking it out of circulation and relieving them of an *obligation* to have $500,000,000 on hand to back that USDT.[207]

---

[204] Exhibit 50, Matthew Leising, *Crypto-Mystery Clues Suggest Tether Has The Billions It Promised*, BLOOMBERG (Dec. 18, 2018), https://perma.cc/7P5E-6BWB; OMNIEXPLORER.INFO, https://perma.cc/3UJM-7GKT. While Tether removed the USDT from circulation it did not "destroy" it as it had promised to do with any redemptions for fiat. *See* Exhibit 10 at 8 (Tether White Paper) ("Step 5 - Tether Limited destroys the tethers and sends fiat currency to the user's bank account.").

[205] Exhibit 35, *Crypto Markets*, BLOOMBERG (Oct. 15, 2018), https://perma.cc/VT5T-LWJW.

[206] Exhibit 15 ¶ 7 (Fowler Indictment). The government also seized funds in two additional accounts with HSBC on November 16, 2018.

[207] https://omniexplorer.info/tx/76cc7c991e61749d7f4bf6cc7fec63c2d0286c891e386d9c96b66aa939683859; *Upcoming USDT Redemption – Oct. 24, 2018*, TETHER.TO (Oct. 24, 2018),

234.   Tether revoked these 500 million USDT because its dollar reserves were increasingly being called into question and it needed to allay concern by offering *proof* that it had enough reserves to back all outstanding USDT. Since Tether didn't have this much in reserve, it solved this problem by removing 500 million USDT from circulation to reduce its cash reserve requirements to match what it could show on a bank statement.

235.   One week later, on November 1, 2018, Tether published a letter purportedly from Deltec Bank — with no identifiable signatory — representing that the "portfolio cash value" of Tether's account was $1,831,322,828,[208] which, if true, was sufficient to cover the now-reduced total amount in circulation.

236.   Deltec is located in the Bahamas, a jurisdiction with strategic deficiencies in anti-money laundering controls.[209] In fact, just four days after Tether announced its relationship with Deltec Bank, there were public reports on steps "to seize assets held in bank accounts with Deltec Bank & Trust and Ansbacher

---

https://web.archive.org/web/20181024170928/https://tether.to/upcoming-usdt-redemption-october-24th-2018/.

[208] Exhibit 51, *Tether Letter*, TETHER.TO (Nov. 1, 2018), https://perma.cc/974F-3YTV.

[209] FIN-2019-A001, Advisory on the Financial Action Task Force-Identified Jurisdictions with Anti-Money Laundering and Combatting the Financing of Terrorism Deficiencies, FINCEN (Mar. 8, 2019), https://perma.cc/S4TN-X8DM.

(Bahamas) as part of a crackdown on corruption linked to the Nicolas Maduro-led regime."[210]

### H. NYAG Investigation

237.   On April 25, 2019, the Office of the New York Attorney General filed an *ex parte* application pursuant to the Martin Act and obtained an order requiring Bitfinex and Tether to produce certain documents and a preliminary injunction enjoining them "from taking any further action to access, loan, extend credit, encumber, pledge, or make any other similar transfer or claim between Bitfinex and Tether in order to preserve the status quo and protect the interests of New York tether holders and Bitfinex clients."[211]

238.   The filings alleged that the Bitfinex trading platform allowed New Yorkers to purchase and trade virtual currencies" and "explain[ed] how Bitfinex no longer has access to over $850 million dollars of co-mingled client and corporate

---

[210] Neil Hartnell, *Bahamas Bank Accounts Targeted For US Seizure*, THE TRIBUNE (Nov. 5, 2018), https://perma.cc/CT26-9KQP; *see also* Daniel Bethencourt, *New Jersey Bank Handled $20 Million for Firm Tied to Venezuelan Laundering Scheme*, MONEYLAUNDERING.COM (July 24, 2019) ("Another large transfer—the $5 million wire from Deltec Bank & Trust Limited in the Bahamas that prosecutors referenced in their July 2018 complaint against Gustavo Hernandez— arrived at City National on Feb. 28, 2017, internal records show."), https://perma.cc/DUK5-DGLJ.

[211] Exhibit 2 ¶¶ 96–97 (Whitehurst Affirmation).

funds that it handed over without any written contract or assurance, to a Panamanian

entity called 'Crypto Capital Corp.'"[212]

239.    The filings also stated that even though Tether knew Crypto Capital

funds were inaccessible, in

> November 2018, Tether transferred $625 million held in its
> account at Deltec to Bitfinex's account at Deltec. Bitfinex, in
> turn, caused a total of $625 million to be transferred from
> Bitfinex's account at Crypto Capital to Tether's account at Crypto
> Capital, through a ledger entry at Crypto Capital crediting
> Tether's account in the amount of $625 million and debiting
> Bitfinex's account by a corresponding amount. The purpose of
> this exchange was to allow Bitfinex to address liquidity issues
> unrelated to tethers.

Exhibit 2 ¶ 85 (Whitehurst Affirmation). Then, in March 2019, the Defendants

> purportedly reversed the $625 million 'transfer' from Bitfinex's
> to Tether's Crypto Capital account. That reversal was affected so
> that the $625 million cash transfer from Tether's Deltec account
> to Bitfinex's could be characterized as a loan from Tether to
> Bitfinex. That is, the transaction documents treated Bitfinex's
> receipt of $625 million in November 2018 as though Bitfinex had
> drawn down $625 million of the $900 million of available credit.
>
> The net result was that Tether had, step by step, diminished the
> backing of tethers: first, in November 2018, by going from actual
> cash in hand to $625 million in an inaccessible Crypto Capital
> account; and then, in November 2018, by replacing even that
> questionable source of backing by nothing more than a $625
> million IOU from Bitfinex—a related company with serious
> enough liquidity problems to require an emergency nine-figure
> loan.

---

[212] Press Release, *Attorney General James Announces Court Order Against "Crypto"
Currency Company Under Investigation For Fraud*, N.Y. Att'y Gen. (April 25, 2019),
https://perma.cc/99U6-NRK9.

Br. Opp. Stay at 13, ECF No. 6, *iFinex Inc. v. James*, No. 2019-03341 (1st Dep't August 30, 2019).

240.   If there was any doubt before, it's now absolutely clear that Tether no longer has cash reserves to back USDT at a 1:1 ratio.

241.   On August 19, 2019, Judge Cohen denied Bitfinex and Tether's motions to dismiss on jurisdictional grounds and dissolved the stay of the OAG's investigation, which had been in place since May 16, 2019.[213] *James v. iFinex Inc.*, No. 450545/2019, 2019 WL 3891172 (N.Y. Sup. Ct. Aug. 19, 2019). Bitfinex and Tether appealed and moved for a stay pending appeal, ECF No. 4, *iFinex Inc. v. James*, No. 2019-03341 (1st Dep't August 21, 2019). The First Department entered an order staying discovery on September 24, 2019.[214]

## V.   CLASS ALLEGATIONS

242.   Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> All persons or entities that held or transacted in cryptocurrencies, including but not limited to USDT, ether, bitcoin, and bitcoin derivatives, in the United States or its territories at any time from October 6, 2014, through the present (the "Class").

---

[213] The OAG's opposition to the motion to dismiss submitted extensive evidence of the Defendants' contacts with New York. *See* Whitehurst Aff. with Exhibits, ECF Nos. 81–108, *James v. iFinex Inc.* (N.Y. Sup. Ct. July 8, 2019).

[214] https://perma.cc/LXB7-E5GJ.

243.   Excluded from the Class are any Bitfinex or Tether customers subject to those sites' Terms of Service which include an arbitration clause, Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

244.   Plaintiffs reserve the right to amend the Class definition if further investigation and/or discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

245.   The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands. Members of the Class may be identified by publicly accessible blockchain ledger information. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

246.   Defendants have acted on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

247.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.

248.   Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Defendants' practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' practices.

249.   Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class actions and cryptocurrency related litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

250.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Furthermore, the interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered

by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

251.   Plaintiffs anticipate no difficulty in the management of this action as a class action.

252.   WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that they be named Class Representatives, that Roche Freedman LLP be named Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Market Manipulation**
**Commodities Exchange Act (the "CEA")**
**(Against DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants)**

253.   Plaintiffs incorporate paragraphs 1 to 252.

254.   Bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other cryptocurrencies are commodities within the definition of 7 U.S. Code § 1a.

255.   DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual DigFinex, Bitfinex, and Tether Defendants (the "Individual

Defendants"), through the acts alleged, specifically intended to and did cause unlawful and artificial prices in bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other cryptocurrencies in violation of the CEA, 7 U.S.C. § 1, et seq.

256.   As demonstrated above, DigFinex, Bitfinex Defendants, Tether Defendants, and Individual Defendants, individually and collectively, had the ability to cause, and did cause, artificial prices.

257.   Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate not later than one year after July 21, 2010, the date Dodd-Frank was enacted. 7 U.S.C. §§ 9, 25.

258.   The CFTC timely promulgated Rule 180.1, 17 C.F.R. § 180.1. Rule 180.1 makes it

> unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

259.   DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated Rule 180.1(a), by *inter alia*, communicating false information about USDT being backed 1:1, using this unbacked USDT to purchase bitcoin and sustain false price floors, and otherwise misrepresenting the demand for USDT, bitcoin, and other cryptocurrencies by issuing unbacked USDT and using it to execute manipulative trades on, at least, the Bitfinex exchange. These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.

260.   As a direct result of DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial

prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein. Plaintiffs and members of the Class were further legally injured and suffered injury in fact because they transacted in bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other cryptocurrencies, in an artificial and manipulated market operating under the artificial prices caused by DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants. That conduct caused injury to the Plaintiffs and the Class.

261.   WHEREFORE Plaintiffs pray that the Court adjudge and decree that DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the CEA, 7 U.S.C. § 1, et seq., damaged Plaintiffs thereby, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class for the actual damages suffered, and disgorge Defendants of their ill-gotten gains.

## SECOND CAUSE OF ACTION
### Principal Agent Liability
### Commodities Exchange Act
### (Against DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants)

262.   Plaintiffs incorporate paragraphs 1 to 261.

263.   Bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

264.   DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants are each liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

265.   Plaintiffs and members of the Class are each entitled to actual damages sustained in cryptocurrencies, including bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other cryptocurrencies, for the violations of the CEA alleged in this Complaint.

266.   WHEREFORE Plaintiffs pray that the Court adjudge and decree that the DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the CEA, 7 U.S.C. § 1, et seq., damaged Plaintiffs thereby, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class for the actual damages suffered.

### THIRD CAUSE OF ACTION
**Aiding and Abetting**
**Commodities Exchange Act**
**(Against DigFinex, the Bitfinex Defendants, the Tether**
**Defendants, the Individual Defendants, and the Crypto Capital**
**Defendants)**

267.   Plaintiffs incorporate paragraphs 1 to 266.

268.   Bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

269.   DigFinex, the Bitfinex Defendants, the Tether Defendants, the Individual Defendants, and the Crypto Capital Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other defendants. Each did so with knowledge of other defendants' manipulation of cryptocurrency prices through unbacked USDT issuances and manipulative trades, and substantially and willfully intended to assist these manipulations to cause artificial prices during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

270.   WHEREFORE Plaintiffs pray that the Court adjudge and decree that DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the CEA, 7 U.S.C. § 1, et seq., damaged Plaintiffs thereby, and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class for actual damages suffered.

### FOURTH CAUSE OF ACTION
**Unlawful Competition**
**Sherman Act § 2**
**(Against the Tether Defendants)**

271.   Plaintiffs incorporate paragraphs 1 to 270.

272.   This action arises out of 15 U.S.C. § 15 that provides a civil remedy by a party that was injured due to a violation of 15 U.S.C. § 2.

273.   Defendant Tether controls more than 80% of the market for stablecoins in the United States and the world. Tether therefore has monopoly power.

274.  Tether's monopoly power allows it to raise prices and exclude competition within the cryptocurrency market.

275.  As described in detail above, Tether has issued massive amounts of unbacked USDT to flood the stablecoin market with USDT so as to willfully maintain its monopoly on the market and exclude competition.

276.  Its issuance of unbacked USDT was designed to gain greater market share so Tether could eliminate stablecoin competition and maintain pricing control over the bitcoin and cryptocurrency market.

277.  Tether's actions have actually harmed competition, consumers, and members of the Class by decreasing consumer choice for other stablecoins and fraudulently manipulating the price of bitcoin and other cryptocurrencies.

278.  As a result of Tether's abusive actions, Plaintiffs and members of the Class suffered economic damages, including compensatory and consequential damages.

279.  WHEREFORE, Plaintiffs request that the Court adjudge and decree that Plaintiffs and members of the Class have antitrust standing under the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26; that the Tether Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 2; enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, and attorneys' fees.

## FIFTH CAUSE OF ACTION
### RICO 18 U.S.C. § 1962(c)
### (Against All Defendants)

280. Plaintiffs incorporate paragraphs 1 to 279.

281. This Count is against DigFinex, the Bitfinex Defendants, the Tether Defendants, the Individual Defendants and the Crypto Capital defendants (collectively, the "Count Five Defendants").

282. The Count Five Defendants together constitute an "enterprise" within the definition of 18 U.S.C. § 1961(4), that is, a group of persons associated in fact, engaged in and whose activities affect interstate commerce.

283. Each of the Count Five Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of unlawful racketeering activity and for the unlawful purpose of intentionally defrauding the Plaintiffs through the manipulation of cryptocurrency prices.

284. Pursuant to and in furtherance of their fraudulent scheme, the Count Five Defendants committed multiple related acts that constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5), including but not limited to the following examples:

    a. Operating an Unlicensed Money Transmitting Business (18 U.S.C. 1960(b)(1)(A)).

        i. Exchangers of convertible virtual currency are "money transmitters" as defined at 31 C.F.R § 1010.100(ff) (5) and "financial institutions" as defined at 31 C.F.R § 1010.100(t).

ii. Operating an unlicensed money transmitting business in New York is a Class A misdemeanor. N.Y. Banking Law § 650(2).

iii. From the beginning of the Class Period to the present, DigFinex, the Bitfinex Defendants, and the Individual Defendants operated Bitfinex as a money transmitting business which affects interstate or foreign commerce "without an appropriate money transmitting license" in New York and other states "where such operation is punishable as a misdemeanor or a felony under State law." 18 U.S.C. § 1960(b)(1)(A).

iv. From the beginning of the Class Period to the present, DigFinex, the Tether Defendants, and the Individual Defendants operated Tether as money transmitting business which affects interstate or foreign commerce "without an appropriate money transmitting license" in New York and other states "where such operation is punishable as a misdemeanor or a felony under State law." 18 U.S.C. § 1960(b)(1)(A).

v. From the beginning of the Class Period to the present, Crypto Capital Corp., Global Trade Solutions AG and Reginald Fowler operated Crypto Capital as a money transmitting business which affects interstate or foreign commerce "without an appropriate money transmitting license" in New York and other states "where such operation is punishable as a misdemeanor or a felony under State law." 18 U.S.C. § 1960(b)(1)(A).

b. Operating an Unlicensed Money Transmitting Business (18 U.S.C. 1960(b)(1)(B)).

i. From the beginning of the Class Period to the present, DigFinex and the Bitfinex and Individual Defendants operated Bitfinex as a money transmitting businesses that failed "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B).

ii. While the Count Five Defendants registered BFXNA Inc. as money services business with FinCEN, they have falsely reported that its activities were limited to Wyoming, and also conducted Bitfinex's money transmitting business in the United

States through a number of other unregistered entities and shell companies.

iii. From the beginning of the Class Period to the present, DigFinex the Tether Defendants, and Individual Defendants operated Tether as a money transmitting business that failed "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B).

iv. While the DigFinex, the Tether Defendants, and Individual Defendants registered Tether Limited as a money services business with FinCEN, they have falsely reported that its activities were limited to Wyoming, and also conducted Tether's money transmitting business in the United States through a number of other unregistered entities and shell companies.

v. From the beginning of the Class Period to the present, Crypto Capital Corp., Global Trade Solutions AG and Reginald Fowler operated Crypto Capital operated Crypto Capital as a money transmitting business that failed "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B).

c. Operating an Unlicensed Money Transmitting Business (18 U.S.C. 1960(b)(1)(C)).

i. From the beginning of the Class Period to the present, the Count Five Defendants operation of Bitfinex, Tether, and Crypto Capital involved "the transportation or transmission of funds" they knew "to have been derived from a criminal offense or [we]re intended to be used to promote or support unlawful activity" in violation of 18 U.S.C. § 1960(b)(1)(C).

ii. For example, even though he knew that Crypto Capital funds had been seized by law enforcement, Devasini continued to instruct customers to use Crypto Capital for withdrawals.

d. Money Laundering (18 U.S.C. § 1956)

    i.  During the Class Period, the Count Five Defendants used and directed customers to use various bank accounts opened by Crypto Capital to engage in U.S. dollar transactions with the intent to conceal or disguise the true nature, location, source, ownership, or control of the funds, including:

        1.  An account in the name Crypto S.P. Z.O.O. at Spoldzielczy Bank in Poland that was used on or around November 2017;

        2.  Accounts in the names of Global Trade Solutions AG, MOGW Energy Trade LDA, and Eligibility Criterion Unipessoal LDA at Caixa Geral de Depositos in Portugal that were used on or around February 2018;

        3.  Accounts in the name of Global Trading Solutions, LLC at HSBC Bank N.A. in New York on or around October 2018, Enterprise Bank & Trust in New Jersey during 2018, and Citibank in New York during 2018.

   ii.  During the Class Period, the Defendants used Renrenbee Limited as a shell company to open bank accounts and engage in U.S. dollar transactions with the intent to conceal or disguise the true nature, location, source, ownership, or control of the funds.

  iii.  On or around January 24, 2018, the Count Five Defendants used Haparc B.V. as a shell company to open a bank account at ING Bank and engage in U.S. dollar transactions with the intent to conceal or disguise the true nature, location, source, ownership, or control of the funds.

  iv.  On or around June 15, 2018, the Count Five Defendants incorporated the Hong Kong company Prosperity Revenue Merchandising and by October 16, 2018 had begun using it as a shell company to open a bank account at the Bank of Communications and engage in U.S. dollar transactions through a correspondent account at Citibank in New York with the intent to conceal or disguise the true nature, location, source, ownership, or control of the funds.

e.  Bank Fraud (18 U.S.C. § 1344)

      i.  From 2015 to the present, the Count Five Defendants knowingly executed and attempted to execute a scheme or artifice to defraud a U.S. financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a U.S. financial institution, by means of false and fraudulent pretenses, representations, and promises.

      ii.  The Count Five Defendants "intended to and did victimize the U.S. banks and exposed them to actual or potential losses" when they used shell companies like those described above in paragraph 284(d) and repeatedly "provided false and misleading statements through the use of multiple layered entities and by stripping material information from wire transfer instructions which influenced the decision-making of the U.S. banks."[215]

f.  Monetary Transactions Derived from Specified Unlawful Activities (18 U.S.C. § 1957).

      i.  The Count Five Defendants also knowingly engaged in monetary transactions with funds derived from specified unlawful activities, namely operating an unlicensed money transmitting business, money laundering, and bank fraud in violation of 18 U.S.C. §§ 1960, 1956, 1344.

g.  Monetary Transactions Derived from Specified Unlawful Activities (18 U.S.C. § 1957).

      i.  The Count Five Defendants also knowingly engaged in monetary transactions with funds derived from specified unlawful activities, namely operating an unlicensed money transmitting business, money laundering, and bank fraud in violation of 18 U.S.C. §§ 1960, 1956, 1344.

h.  Wire Fraud (18 U.S.C. § 1343)

      i.  The Count Five Defendants knowingly engaged in wire fraud by transmitting by means of wire, *i.e.* the internet, numerous and

---

[215] *United States v. Zarrab*, No. 15-CR-867 (RMB), 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016).

false representations that, *inter alia*, USDT were backed 1:1 by U.S. dollars in violation of 18 U.S.C. § 1343.

    ii. For example, even though he knew that Crypto Capital could not process transactions, Devasini continued to instruct customers to use Crypto Capital in violation of 18 U.S.C. § 1343.

285.   The acts of money laundering, bank fraud, monetary transactions derived from specified unlawful activities, wire fraud, and the operation of an unlicensed money transmitting business set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

286.   The Count Five Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

287.   As a direct and proximate result of the Count Five Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Count Five Defendants were able to manipulate cryptocurrency prices and injure Plaintiffs' property.

288.   WHEREFORE, Plaintiffs request that this Court enter judgment against the Count Five Defendants for actual damages, treble damages, attorneys' fees and disgorgement of ill-gotten gains.

<u>**SIXTH CAUSE OF ACTION**</u>
**Fraud**
**(Against the Bitfinex Defendants and Tether Defendants)**

289.   Plaintiffs incorporate the paragraphs 1 to 288.

290.   The Bitfinex and Tether Defendants repeatedly made materially false statements, or misleadingly omitted to state a material fact, including the following examples:

a.   On October 5, 2019, the Bitfinex website falsely stated "All Tether tokens are fully backed by reserves and are issued and traded on Bitfinex pursuant to market demand, and not for the purpose of controlling the pricing of crypto assets."

b.   On August 20, 2019, the Bitfinex website falsely stated that "Any assertion that we have misled our customers about Tether (USDT), its backing, or about the negotiated transaction between Bitfinex and Tether is false."

c.   Until at least August 17, 2019, Bitfinex's website falsely stated that "outstanding [USDT] are backed 1-to-1 by traditional currency," that "1 USDT is always equivalent to 1 USD."

d.   On March 4, 2019, Tether's website falsely stated that USDT was "1-1 pegged to the dollar" and "100% backed."

e.   Until February 19, 2019, Tether's website falsely stated that "[E]very [USDT] is backed 1-1 by traditional currency held in our reserves. So, 1 USDT is always equivalent to 1 USD."

f.   In a sworn declaration dated April 5, 2017, Velde falsely stated that Tether is a financial technology company that operates a platform to store, send, and make purchases with a form of digital currency – digital tokens called tethers – that are fully backed by U.S. dollars on deposit from customers," that "[USDT] may be redeemed or exchanged for the underlying U.S. dollars," that "customers who want to purchase [USDT] through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of [USDT] until they ask Tether to remit back the U.S. dollars they deposited. . . . For these systems to work, customers depend on Bitfinex's and Tether's ability to send back to them the U.S. dollars they deposited with Bitfinex or Tether."

g. On June 17, 2016, Tether released a white paper that falsely stated that "each [USDT] in circulation represents one US dollar held in our reserves (i.e. a one-to-one ratio) which means the system is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve" and that that USDT "may be redeemable/exchangeable for the underlying fiat currency pursuant to Tether Limited's terms of service or, if the holder prefers, the equivalent spot value in Bitcoin."[216]

h. Until at least March 20, 2015, Tether's website falsely stated that "Tether currencies are essentially Dollars, Euros, and Yen formatted to work on the Blockchain. [USDT]s always hold their value at 1:1 to their underlying assets."

i. Until at least March 20, 2015, Tether's website falsely stated that USDT "is backed 100% by actual fiat currency assets in our reserve account and always maintains a one-to-one ratio with any currency held. For example, 1 USDT = 1 USD. With almost zero conversion and transfer fees, [USDT] is redeemable for cash at any time."

j. On January 15, 2015, Bitfinex falsely stated that "Each [USDT] is backed 1-to-1 by its corresponding currency, which can be viewed and verified in real-time via the Tether.to website and on the Blockchain. Tether will be fully transparent and audited to demonstrate 100% reserves at all times."

k. Bitfinex's use of unbacked USDT was also fraudulent as it was a false representation to the market of bitcoin's price and demand.

291. The Bitfinex Defendants and Tether Defendants made these statements knowing that they were false, or with reckless disregard for their truth.

292. The Bitfinex Defendants and Tether Defendants never corrected these materially false statements and continue to represent to Plaintiffs and the public that USDT was backed by a 1:1 guarantee.

---

[216] *Id.* at 4.

293.   The Bitfinex Defendants and the Tether Defendants intended that the market, and Plaintiffs as participants in the market, rely on these false representations of material fact.

294.   Plaintiffs reasonably relied on these false representations of material fact to their detriment when purchasing and selling cryptocurrencies at artificial prices caused by these materially false statements.

295.   As an actual and proximate result of the above, Plaintiffs have suffered actual damages in a result to be determined at trial.

296.   The Bitfinex Defendants and Tether Defendants committed all of the aforesaid acts deliberately, willfully, maliciously and oppressively.

297.   WHEREFORE, Plaintiffs request that this Court enter judgment against the Bitfinex and Tether Defendants for actual damages and punitive damages.

**SEVENTH CAUSE OF ACTION**
**Violation of the New York Deceptive Trade Practices Law NY GBL §349**
**(Against the Bitfinex Defendants and Tether Defendants)**

298.   Plaintiffs incorporate the paragraphs 1 to 297.

299.   In committing the acts alleged above, the Bitfinex and Tether Defendants engaged in unfair, deceptive, untrue or misleading acts by omitting, or failing to disclose the material fact that USDT was not backed 1:1 and that the market demand created by the Bitfinex and Tether Defendants was fraudulent.

300.   These above-described unlawful, unfair and fraudulent business practices by the Tether and Bitfinex Defendants present an ongoing threat to Plaintiffs and the putative Class. The Tether and Bitfinex Defendants have systematically perpetrated deceptive and unfair practices upon members of the public and have intentionally deceived the market.

301.   The Bitfinex and Tether Defendants' willful and knowing violation of NY GBL §349 has caused Plaintiffs and the Class to suffer injury.

302.   Further, the Bitfinex and Tether Defendants' deceptive practices were consumer-oriented aimed at manipulating the cryptocurrency market and thereby transfer wealth from consumers to themselves.

303.   The Bitfinex and Tether Defendants should be required to make restitutionary disgorgement of its ill-gotten profits pursuant to GBL §349.

304.   Plaintiffs are entitled to all applicable damages, including treble damages, injunctive relief, and attorneys' fees pursuant to GBL §349-h.

**EIGHTH CAUSE OF ACTION**
**Permanent Injunctive Relief**
**(Against the Bitfinex Defendants and Tether Defendants)**

305.   Plaintiffs incorporate the paragraphs 1 to 304, and to the extent necessary, plead this cause of action in the alternative.

306.   Permanent and irreparable injury will result unless the Tether and Bitfinex Defendants are permanently stopped from issuing unbacked USDT and/or using that USDT and the Bitfinex exchange to manipulate the price of bitcoin.

307.   Accordingly, Plaintiffs seek permanent and injunctive relief prohibiting this practice

308.   WHEREFORE, Plaintiffs request this Court enter judgment against the Tether and Bitfinex Defendants for injective relief as permitted by law.

## COSTS, INTEREST, AND ATTORNEYS' FEES

309.   WHEREFORE, Plaintiffs request that the Court award reasonable costs of suit, pre- and post-judgment interest, and reasonable attorney's fees.

## JURY TRIAL

310.   Plaintiffs demand a trial by jury for all claims.

Dated: October 6, 2019

/s/     *Joseph M. Delich*

Kyle W. Roche (*admission pending*)
Joseph M. Delich
**ROCHE FREEDMAN LLP**
185 Wythe Ave. F2
Brooklyn, NY 11249
kyle@rochefreemdan.com
jdelich@rochefreedman.com

Velvel (Devin) Freedman (*pro hac vice pending*)
**ROCHE FREEDMAN LLP**
200 South Biscayne Boulevard
Suite 5500
Miami, Florida 33131
vel@rochefreedman.com

*Attorneys for Plaintiffs*