SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Inquiry by LETITIA JAMES,        :
Attorney General of the State of New York,

                                                      :

             Petitioner,

                                                      :

Pursuant to Article 23-A of the New York General
Business Law in regard to the acts and practices of   :   Index No.:

                                                      :

iFINEX INC., BFXNA INC., BFXWW INC.,                  :
TETHER HOLDINGS LIMITED, TETHER
OPERATIONS LIMITED, TETHER LIMITED,                   :
TETHER INTERNATIONAL LIMITED,

                                                      :

             Respondents,

in promoting the issuance, distribution, exchange,    :
advertisement, negotiation, purchase, investment advice
or sale of securities or commodities in or from New   :
York State.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIRMATION OF BRIAN M. WHITEHURST IN SUPPORT OF OAG's *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO GENERAL BUSINESS LAW § 354

BRIAN M. WHITEHURST, hereby affirms, under penalty of perjury, as follows:

1.    I am an Assistant Attorney General in the Office of Letitia James, Attorney

General of the State of New York ("OAG" or "Attorney General"), and am an attorney admitted

to practice before the courts of this State. I am familiar with the facts and circumstances of

OAG's investigation of iFinex Inc., BFXNA Inc., BFXWW Inc. (collectively, "Bitfinex"),

Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International

Limited (collectively, "Tether," and together with Bitfinex, "Respondents").

2.      I submit this affirmation, along with exhibits, based on personal knowledge, the examination of records and documents contained in the files of OAG, and in certain matters upon information and belief.

3.      This affirmation is submitted in support of OAG's *ex parte* application for relief pursuant to General Business Law ("GBL") § 354.

4.      OAG has determined to commence an action against Respondents pursuant to the Martin Act, GBL § 352 *et seq.*

5.      OAG seeks an Order pursuant to GBL § 354 directing Respondents to produce documents, records and information which are material and necessary to OAG's ongoing investigation.

6.      Additionally, OAG seeks an Order granting preliminary injunctive relief pursuant to GBL § 354 pending the completion of OAG's investigation, in order to maintain the *status quo* and avoid continuing and future harm to New York investors.

**Respondents**

7.      Respondent iFinex Inc. is incorporated in the British Virgin Islands, with offices or operations in London, Hong Kong and Taipei, and other locations worldwide.

8.      Respondents BFXNA Inc. and BFXWW Inc. are wholly-owned subsidiaries of iFinex Inc., and are also incorporated in the British Virgin Islands. Based on information provided by counsel for Respondents, BFXNA contracts with clients based in the United States, including New York. Based on information provided by counsel for Respondents, BFXWW contracts with non-U.S. clients.

9.      BFXNA is registered with the United States Department of the Treasury Financial Crimes Enforcement Network as a money transmitter.

2

10. Based on information provided to OAG by Respondents, iFinex, BFXNA, and BFXWW are operated by the same small group of executives and employees. Together, the entities operate an online platform called "Bitfinex" for exchanging and trading virtual currency. For ease of reference, and unless otherwise noted, this Affirmation will refer to iFinex, BFXNA, and BFXWW collectively as "Bitfinex."

11. Bitfinex is not licensed by the New York Department of Financial Services to engage in virtual currency business activity in New York.

12. In 2016, BFXNA consented to entry of an Order Instituting Proceedings with the Commodity Futures Trading Commission, resolving an investigation into BFXNA (and with to respect activities prior to January 2015, iFinex) in connection with its operation of the Bitfinex trading platform, concerning violations of Sections 6(c) and 6(d) of the Commodity Exchange Act. A copy of that Order is attached hereto as Exhibit A.

13. Based on information provided to OAG by Respondents, Tether Holdings Limited, incorporated in the British Virgin Islands, is the holding company of Tether Limited, Tether Operations Limited and Tether International Limited, all of which are believed to be incorporated in Hong Kong. Based on information provided to OAG by Respondents, Tether Operations Limited is responsible for processing Tether's U.S.-based investors. Based on information provided to OAG by Respondents, Tether International Limited is responsible for processing Tether's non-U.S. based investors. For ease of reference, and unless otherwise noted, this Affirmation will refer to Tether Holdings Limited, Tether Limited, Tether Operations Limited and Tether International Limited as "Tether."

14. Tether is not licensed by the New York Department of Financial Services to engage in virtual currency business activity in New York

3

15.     Based on information provided to OAG by Respondents, the Tether entities are owned and operated by the same small group of executives and employees who operate Bitfinex. Bitfinex and Tether have several dozen additional employees around the world. OAG has reason to believe that certain of those individuals are, or have been, located in New York.

16.     Based on information provided to OAG by Respondents, Tether is majority-owned by an entity named DigFinex Inc., which is also the majority owner of iFinex.

17.     According to documents and information provided to OAG by Respondents, at various times in 2017 and 2018 both Bitfinex and Tether maintained accounts at two New York-based commercial banks, Signature Bank and Metropolitan Commercial Bank.

## The Bitfinex Trading Platform

18.     "Virtual currencies," also commonly referred to as "cryptocurrencies," are digital units that are used as a medium of exchange or form of digitally-stored value. To date, nearly two thousand virtual currencies have been created and are traded around the world. The most-well known virtual currency is bitcoin, which is also the most widely-traded and highly valued virtual currency.

19.     Virtual currencies are widely traded and exchanged online through various trading platforms, which often refer to themselves as "exchanges." These trading platforms perform a function akin to traditional stock or commodities exchanges by matching buyers and sellers of virtual currency. The platforms also perform functions akin to traditional broker-dealers, transfer agents, or clearing firms, and many platforms also hold client cash deposits. There are now at least 130 different trading platforms available to exchange virtual currencies worldwide. Unlike traditional stock and commodities exchanges, virtual currency trading platforms now in operation have not registered under state or federal securities or commodities laws. Nor are there

4

generally applied standards for operations, disclosures, surveillance, or other investor
protections.

20. The New York Department of Financial Services has promulgated regulations
regarding the conducting of virtual currency business activity in New York.

21. Bitfinex operates a virtual currency trading platform. Investors access the
Bitfinex trading platform and place orders through its website, available at www.bitfinex.com.

22. Over ninety virtual currencies are listed for trading on the Bitfinex platform,
including prominent virtual currencies like bitcoin and ether, as well as a host of other less-
prominent and thinly-traded symbols. Bitfinex earns money by, among other things, charging
investors a fee for trades made on its platform. Bitfinex also provides users with the ability to
store their virtual currency and transfer their holdings to a different trading platform.

23. Bitfinex is one of the relatively few virtual currency trading platforms that allows
traders to deposit and withdraw so-called "fiat" currency, including U.S. dollars, euros, pounds,
and yen. Traders using the Bitfinex platform can deposit dollars with Bitfinex, convert them to
virtual currency at the rates offered by Bitfinex, trade the virtual currency they have purchased,
convert their virtual currency holdings back into dollars, and withdraw the funds. It is important
that Bitfinex has sufficient U.S. dollar deposits on hand to fill withdrawal orders submitted by
traders.

24. OAG's investigation has determined that, prior to August 2017, Bitfinex had few
or no restrictions on who could access their trading platform, meaning that New York-based
investors were able to create accounts, fund them with U.S. dollars, convert into virtual currency,
trade, and withdraw funds. In August 2017, Bitfinex announced it would no longer permit U.S.-
based individual investors to access the trading platform, but U.S.-based business entities were

5

still permitted to trade. In August 2018, Bitfinex's ostensible exclusion of U.S.-based individual

investors expanded to include all U.S.-based entities, except those entities or organizations that

maintained an incorporation address outside of the United States. Those investors are known as

Eligible Contract Participants, or "ECPs." OAG has reason to believe that several U.S. and New

York-based ECPs continue to transact on the Bitfinex trading platform.

25.     OAG has reason to believe that Bitfinex still allows New York-based individual

investors to deposit, trade, and withdraw virtual currencies, and engage in other transactions, on

the Bitfinex trading platform.

**Tether**

26.     The primary function of Tether the company is as the issuer of a virtual currency

also called "tether."

27.     Tether is listed on at least several dozen virtual currency trading platforms around

the world, trading under the symbol "USDT."

28.     Unlike most virtual currencies, the market price of which fluctuates as they are

exchanged on trading platforms around the world, "tether" is a so-called "stablecoin," a term that

is used to describe a virtual currency that is always supposed to have the same real-dollar value.

"Stablecoins" have characteristics of securities and commodities. In the case of tethers, one

tether is always supposed to be valued at one U.S. dollar.

29.     According to public statements made by Tether, one use for tethers is to allow

traders to quickly enter and exit positions in other virtual currencies, at a stable and predictable

price. Since one tether is always (supposed to be) equal to one U.S. dollar, traders can use

tethers to trade between different virtual currencies, or across different trading platforms, with

minimal short-term price risk.

6

30.    In order to signal to the market that each tether held by investors is equal to one U.S. dollar, Tether has long represented that for every outstanding tether issued and trading in the market, the company itself holds one U.S. dollar in reserve.

31.    Prior to late February 2019, Tether represented that every outstanding tether was "backed" by, and thus should be valued at, one U.S. dollar. Tether represented to investors that "Every tether is always backed 1-to-1, by traditional currency held in our reserves. So 1 USDT is always equivalent to 1 USD." An archived copy of Tether's website, www.tether.to, from February 19, 2019 is attached hereto as Exhibit B.

32.    By March 4, 2019, Tether changed its disclosure, representing that "[e]very tether is always 100% backed by our reserves, which include traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities (collectively, 'reserves'). Every tether is also 1-to-1 pegged to the dollar, so 1 USDT is always valued by Tether at 1 USD." An archived copy of Tether's website, www.tether.to, from March 4, 2019 is attached hereto as Exhibit C.

33.    Tether represents to investors that any holder of tethers can redeem them from Tether the company at the rate of one U.S. dollar.

34.    Tether maintains complete control over the issuance of new tethers. Counsel for Respondents has represented to OAG that issuances of new tether occur when an investor has requested to purchase tethers by depositing U.S. dollars with Tether the company, or by depositing U.S. dollars with a trading platform that is authorized to accept dollar deposits in exchange for tethers.

35.    Tether are one of the most prominent and widely-traded virtual currencies. According to Tether's website, over 2.6 billion tethers are outstanding and traded in the market.

7

36.     Until November 2017, tethers were available for purchase directly from the Tether website by New York investors.

37.     From November 2017 to December 2018, purchases of tether could be made only via the Bitfinex trading platform. OAG has reason to believe that, during this time, New York investors could and did use the Bitfinex trading platform to purchase, sell, and exchange tethers on the Bitfinex platform.

38.     According to counsel the Respondents, as of December 2018, investors were once again able to purchase tethers directly from the Tether website.

39.     New York investors may still trade tethers on several virtual currency trading platforms that are licensed to do business in New York. OAG has reason to believe that certain ECPs with operations in New York can redeem tether for dollars directly from Tether.

## Commencement of OAG's Investigation

40.     OAG commenced an investigation of Bitfinex and Tether in 2018.

41.     As part of its investigation, OAG sought documents and information from third-party entities (for example, banks and audit firms) that were believed to have previously performed services for Bitfinex and Tether.

42.     Having learned of OAG's communication with those entities, counsel for Bitfinex and Tether affirmatively contacted OAG on November 3, 2018 to discuss the investigation. Counsel – the law firms Morgan, Lewis & Bockius LLP, located in New York, and Steptoe & Johnson LLP, located in Washington, D.C. -- informed OAG that they represented Bitfinex and Tether jointly.

43.     On November 21, 2018 counsel for Bitfinex and Tether, and attorneys for OAG, discussed the investigation. Counsel indicated that Bitfinex and Tether would provide

8

documents and information to OAG. Subsequently, counsel requested that OAG issue subpoenas for sought-after material. Neither Bitfinex nor Tether are registered for service of process in New York. Counsel agreed to accept service of the subpoenas, via email, on behalf of their clients.

44.     On November 27, 2018, OAG served subpoenas pursuant to Article 23-A of the General Business Law (the Martin Act), Executive Law § 63(12), and Civil Practice Law and Rules §2302(a) on Bitfinex and Tether, seeking documents and information. Counsel accepted service of the subpoenas via email.

45.     A copy of OAG's subpoena to Bitfinex is attached hereto as Exhibit D. A copy of OAG's subpoena to Tether is attached hereto as Exhibit E. The requests in the subpoenas are identical.

46.     On November 30, 2018, counsel for Bitfinex and Tether accepted services of the subpoenas via email, and shortly thereafter began producing certain documents in response thereto.

47.     On December 21, 2018, OAG requested a meeting with counsel for Bitfinex and Tether to take place in early-to-mid January 2019, to discuss various issues related to the investigation. Counsel counter-proposed a meeting in February 2019 – almost two months later. To accommodate them, a meeting was held on February 21, the details of which will be discussed below.

## Bitfinex and Tether's Troubled Banking Relationships

48.     Because Bitfinex and Tether allow clients to deposit and withdraw U.S. dollars in exchange for virtual currency, the companies hold large sums of U.S. dollars, and must maintain relationships with banks that can reliably hold the funds and process client deposits and

9

withdrawals, including banks that can operate in the United States and will service U.S. individuals.

49.     As explained to OAG attorneys by Respondents' counsel, many U.S. banks and other financial institutions will not do business with unregulated or off-shore companies that deal in virtual currencies.

50.     According to documents provided to OAG by Respondents, and as explained to OAG attorneys by Respondents' counsel, Bitfinex and Tether have had a succession of unsuccessful banking relationships around the world over the past several years. Prior to 2017, Bitfinex and Tether had used several Taiwan-based banks to make and receive wire transfers to fulfill client orders for U.S. dollars, and for other purposes. Wells Fargo acted as the correspondent bank. In March 2017, Wells Fargo elected to no longer process U.S. dollar wire transfers from Bitfinex and Tether accounts, forcing the companies to quickly find alternative arrangements.

51.     In a subsequent lawsuit, Bitfinex and Tether alleged that Wells Fargo's decision "presented an existential threat to their business," and that if Bitfinex and Tether "could not remit to customers U.S. dollars that belong to their customers, [their] business would be crippled." A copy of the Bitfinex's complaint against Wells Fargo is attached hereto as Exhibit F.

52.     The lawsuit was withdrawn shortly after filing.

53.     According to documents provided to OAG by Respondents, and as explained to OAG attorneys by Respondents' counsel, by September 2017 Bitfinex and Tether were using a Puerto Rico-based entity named Noble Bank International ("Noble") to handle their accounts. Noble Bank International was a subsidiary of a New York-based entity named Noble Markets LLC.

10

54.    According to documents provided to OAG, Respondents ended their banking relationship with Noble in October 2018. As explained to OAG attorneys by Respondents' counsel, Bitfinex and Tether closed their accounts with Noble due to low-interest rates and a lack of capacity to process a high volume of wire transfers to clients, among other reasons.

55.    As of early 2019, Noble appears to no longer be in operation.

56.    In November 2018, Tether announced publicly that it had "established a banking relationship with Deltec Bank & Trust Limited," with headquarters in the Bahamas. In that announcement, Tether also represented that "USDT in the market are fully backed by US dollars that are safely deposited in our bank accounts." A copy of Tether's announcement is attached hereto as Exhibit G.

57.    However, at no point known to OAG has Bitfinex or Tether disclosed to clients that they have used third party "payment processors" to handle client withdrawals, nor have they disclosed who those "payment processors" are.

58.    According to counsel for Bitfinex and Tether, in 2014 Bitfinex began a relationship with a (believed to be) Panamanian entity called Crypto Capital Corp. (Crypto Capital") to act as one of their "payment processors." According to documents provided to OAG by Respondents, by 2018 Bitfinex had placed over one billion dollars of co-mingled customer and corporate funds with Crypto Capital.

59.    As explained to OAG attorneys by Respondents' counsel, no contract or similar written agreement was ever entered into between Crypto Capital and Bitfinex or Tether.

60.    As explained to OAG attorneys by Respondents' counsel, Bitfinex and Tether have also used a number of other third party "payment processors" to handle client withdrawal requests, including various companies owned by Bitfinex/Tether executives, as well as other

11

"friends" of Bitfinex – meaning, human being friends of Bitfinex employees that were willing to use their bank accounts to transfer money to Bitfinex clients who had requested withdrawals.

61.    OAG believes that Bitfinex required the services of third-party payment processors like Crypto Capital because, at the time, Bitfinex had no reliable bank that could or would work with it.

## Bitfinex Struggles to Fill Client Withdrawal Requests Due to Crypto Capital's Loss or Theft of Approximately $850 Million

62.    Documents provided to OAG demonstrate that by mid-2018, Bifinex was having extreme difficulty honoring its clients' requests to withrdaw their money from the trading platform, because Crypto Capital, which held all or almost all of Bitfinex's funds, refused to process customer withdrawal requests, and refused or was unable to return any funds to Bitfinex.

63.    In communication logs produced to OAG covering the period of April 2018 to early 2019, a senior Bitfinex executive ("Merlin") repeatedly beseeched an individual at Crypto Capital ("Oz") to return Bitfinex's funds.  For example, in August 2018, the senior Bitfinex executive made clear that lack of access to the money held by Crypto Capital made it impossible for Bitfinex to honor its client's withdrawal requests:

Merlin, [15.08.18 11:46]
Hey Oz, sorry to bother you every day, is there any way to move at least 100M to either          ? We are seeing massive withdrawals and we are not able to face them anymore unless we can transfer some money out of Cryptocapital
Merlin, [15.08.18 11:47]
I understand some of the funds are being held by          , but what about the rest?
Merlin, [15.08.18 11:48]
under normal circumstances I wouldn't bother you ( I never did so far) but this is a quite special situation and I need your help, thanks

64.    In early October 2018, rumors began circulating online that Bitfinex was close to insolvency, as numerous clients reported that they had been unable to withdraw their money from the Bitfinex trading platform.  On October 7, 2018, Bitfinex published a notice to investors ensuring them that the company was not insolvent, and that rumors to that effect were "a targeted campaign based on nothing but fiction."  The notice continued:

12

> [W]e do not entirely understand the arguments that purport to show
> us to be insolvent without providing any explanation about why…
>
> [V]erified Bitfinex users can freely withdraw Euros, Japanese Yen,
> Pounds Sterling, and U.S. Dollars. Complications continue to exist
> for us in the domain of fiat transactions as they do for most crypto-
> currency related organizations...
>
> Stories and allegations currently circulating mentioning an entity
> called Noble Bank have no impact on our operations, survivability,
> or solvency.

A copy of Bitfinex's October 7, 2018 notice to investors is attached hereto as Exhibit H.

65.     Similarly, on October 15, 2018, Bitfinex published a notice to the market stating

that "it is important for us to clarify that:  **All cryptocurrency and fiat withdrawals** are, and

have been, processing as usual without the slightest interference . . . **All fiat** (USD, GBP, JPY,

EUR) **withdrawals** are processing, and have been, as usual," (emphasis in original). A copy of

Bitfinex's October 15, 2018 notice is attached hereto as Exhibit I.

66.     That was untrue.  Documents provided to OAG by Respondents show that during

this time, Bitfinex was having severe problems processing client withdrawals.  The very same

day as the notice to the market set forth above, October 15, 2018, the senior Bitfinex executive

("Merlin") wrote the following to his contact at Crypto Capital ("CCC"):

Merlin, [15.10.18 09:53]
I have been telling you since a while
Merlin, [15.10.18 09:53]
too many withdrawals waiting for a long time
Merlin, [15.10.18 09:54]
is there any way we can get money from you? Tether or any other form? Apart with cryptocapital we are running low in cash reserves
Merlin, [15.10.18 09:54]
please help
CCC, [15.10.18 09:54]
I know. We are following the banks we post as many as we can and let them process as much as possible according to them , Everytime we push them
they push back with account closure without reason
Merlin, [15.10.18 09:55]
dozens of people are now waiting for a withdrawal out of cryptocapital

*  *  *

Merlin. [15.10.18 10:01]
I need to provide customers with precise answers at this point, can't just kick the can a little more
Merlin. [15.10.18 10:02]
the international I mean
CCC. [15.10.18 10:02]
I will keep you posted here
CCC. [15.10.18 10:02]
On the process of all international payments .
Merlin. [15.10.18 10:02]
please understand all this could be extremely dangerous for everybody, the entire crypto community
Merlin. [15.10.18 10:03]
BTC could tank to below 1k if we don't act quickly

    67.    Documents provided to OAG by Respondents also demonstrate that the loss of

funds continued to threaten Bitfinex's ability to uphold its obligations to its investors through the

end of 2018. Over the course of several months in late 2018, the senior executive at Bitfinex

wrote the following to his contact at Crypto Capital:

Merlin. [17.10.18 22:28]
Oz I need urgently some funds
Merlin. [17.10.18 22:28]
either Tethers or USD, we need at least 100M within the next week
Merlin. [17.10.18 22:29]
the situation looks bad, we have more than 500 withdrawals pending and they keep coming in

Merlin. [18.10.18 08:34]
sorry to be pushy but can you try sendig something already today
Merlin. [18.10.18 08:35]
we have about 400 small wires pending, the total amount is only 5M, but we have to send them out quickly, people are enraged

Merlin. [18.10.18 08:38]
too much money is trapped with you and we are currently walking on a very thin crust of ice

14

Merlin. [15.11.18 16:14]
I hope you will be able to send something big pretty soon. the situation is not looking good
CCC. [15.11.18 16:17]
We are pushing everyday. The previous KNF from Poland just resigned over scandal of shaking down banks ..
CCC. [15.11.18 16:17]
So it's very good for us to get funds release asap
CCC. [15.11.18 16:17]
https:. businessinsider.com.pl wiadomosci marcm-pachucki-now\m-po-szefa-
knf wxsv 1n5?pushmedia~9a5a6f9e3b75dce&utm_source~pushSource&utm_campaign~pushCampaign&utm_medium~pushMedium
Merlin. [15 11.18 16:19]
any realistic estimate about Poland?
Merlin. [15.11.18 16:20]
it was july when you told me for the first time it was to be expected any time
Merlin. [15.11.18 16:20]

Merlin. [21.11.18 09:27]
please update me about the situation. we have serious problems if we don't get some funds from you within this week

Merlin. [27.11.18 15:18]
I wish we had some clarity. it's always very difficult to tell our customers something real and this fuels the uncertainty

Merlin. [28.11.18 10:52]
we are at the end of the month and you haven't been sending out one wire. even 1 usd for the whole month
Merlin. [28.11.18 10:54]
[ Photo ]
Merlin. [28.11.18 10:55]
I think you should stop playing and tell me the truth about what is going on
Merlin. [28.11.18 10:56]
I am not your enemy. I am here to help you and have been very patient so far. but you need to cut the crap and tell me what is going on

68.   According to documents provided to OAG by Respondents, and based on

statements made by counsel for Respondents to OAG attorneys, an individual at Crypto Capital

told the senior Bitfinex executive the reason that funds totaling $851 million could not be

returned to Bitfinex was because the funds were seized by governmental authorities in Portugal,

Poland, and the United States. Based on statements made by counsel for Respondents to OAG

attorneys, Respondents do not believe Crypto Capital's representations that the funds have been

seized.

69.   According to documents provided to OAG by Respondents, and based on

statements made by counsel for Respondents to OAG attorneys, the $851 million remains

inaccessible to Bitfinex.

70.     Bitfinex has not publicly disclosed the loss of funds.

71.     According to Respondents, the funds placed with Crypto Capital include co-mingled client and Bitfinex corporate funds. For example, documents produced to OAG by the Respondents show at least $23 million of those funds appear to be from just one New York-based Bitfinex client.

## Bitfinex and Tether Have Engaged in Undisclosed, Conflicted Transactions to Cover Bitfinex's Losses by Transferring Money Out of Tether's Reserve Funds

72.     In an in-person meeting on February 21, 2019, counsel for Bitfinex and Tether explained that, in order to make up for the apparent loss of $851 million to Crypto Capital, Bitfinex and Tether were in the process of contemplating a transaction that would permit Bitfinex to draw upon Tether's cash reserves on an as-needed basis.

73.     As described by counsel, Bitfinex would take a "line of credit" of $600 to $700 million on the reserve funds backing tethers. Counsel did not suggest what, if any, benefit would accrue to Tether, or holders of tethers, from this transaction. Nor did counsel suggest that this transaction would be disclosed to the public, including investors trading on the Bitfinex platform or holders of tether.

74.     When asked by attorneys for OAG whether the contemplated transaction would constitute a conflict of interest (given that Bitfinex and Tether are owned and operated by the same people), counsel characterized the impending transaction as "arm's length," without providing justification for how that could be the case.

75.     At that meeting, counsel did not inform OAG of the terms or schedule of any repayment for when Bitfinex planned to draw on the Tether funds, nor did counsel provide any information regarding terms for repayment of any drawn amounts.

16

76.     Counsel's disclosures at the February 21 meeting raised serious questions about

the viability of Bitfinex as an ongoing concern, the possibility that Tether's cash reserves would

be dissipated and unrecoverable, and whether Bitfinex and Tether have misled their clients

(including both clients of the Bitfinex trading platform, and holders of tethers) regarding the

matters described above.

77.     During the February 21 meeting, OAG asked counsel for the Respondents to

provide more information about the circumstances surrounding the loss of funds to Crypto

Capital, and the imminent "line of credit" transaction to cover Bitfinex's losses.

78.     On February 26, 2019, OAG sent a letter to counsel for Bitfinex and Tether

seeking the following material, to be provided no later than March 7, 2019:

- Additional information, including production of documents, regarding how tethers are issued and propagated into the market, as well as additional information evidencing the "demand" or purchase orders for tethers that counsel for Bitfinex and Tether indicated underlie the creation and issuance of blocks of tether;

- Production in response to OAG's subpoenas calling for documents and communications regarding issuances/redemptions of tether in October and November 2018;

- Information and materials relevant to the August-October 2018 time period, during which OAG believed that approximately $400 million in tethers were "redeemed" via Bitfinex;

- A full written description of, and any documentation and information evidencing, the events concerning the loss of approximately $850 million of Bitfinex client funds to Crypto Capital;

- Production of documents and information regarding any co-mingled client funds that were placed with Crypto Capital, as well as any contracts or other similar documentation between Bitfinex and Crypto Capital;

- Compensation structure for Bitfinex/Tether executives and investors.

17

79.     OAG's letter also sought specific written responses to questions concerning the
number of New York traders using the Bitfinex trading platform and New York holders of
tethers.

80.     A copy of the letter to counsel for the Respondents, dated February 26, 2019, is
attached hereto as Exhibit J.

81.     On March 4, 2019 counsel for Bitfinex and Tether responded to OAG's letter with
an email stating, "it is not possible to get this information by March 7." Counsel did not provide
an alternative production date to OAG.

82.     On March 11, 2019, Respondents made a production of documents to OAG which
primarily consistent of, in the words of counsel for Respondents, "tweets by Bitfinex and blog
posts by Bitfinex and Tether," all of which were already in the public domain. Nothing was
produced concerning the impending "line of credit" transaction.

83.     On March 13, 2019, OAG again sought information from Bitfinex and Tether
regarding the imminent "line of credit" transaction, due to growing concern that responses to
OAG request for documents and information were being withheld until after the "line of credit"
transaction closed.

84.     On March 19, 2019, Respondents made a production largely consisting of
screenshots and picture files of previously-produced materials, none of which appeared relevant
or even responsive to OAG's requests, most especially OAG requests concerning the imminent
"line of credit" transaction.

85.     On March 29, 2019, OAG received a letter from counsel for Respondents which
disclosed, for the first time, that the imminent "line of credit" transaction had already closed, two
days before. The description of the transaction differed significantly from what OAG was told

18

just weeks earlier in the February 21, 2019 meeting, and included new information about a

previous, undisclosed transfer of $625 million from Tether's reserves to Bitfinex. As set forth in

that letter:

> During November 2018, Tether transferred $625 million held in its account at Deltec to Bitfinex's account at Deltec. Bitfinex, in turn, caused a total of $625 million to be transferred from Bitfinex's account at Crypto Capital to Tether's account at Crypto Capital, through a ledger entry at Crypto Capital crediting Tether's account in the amount of $625 million and debiting Bitfinex's account by a corresponding amount. The purpose of this exchange was to allow Bitfinex to address liquidity issues unrelated to tethers.

> In or about late December 2018, the Companies and their counsel developed concerns about the availability of some of the funds at Crypto Capital, totaling over $850 million. While Crypto Capital's principals have represented that the unavailable funds have been seized or otherwise restrained by governmental authorities in Poland, Portugal, and the United States, the Companies grew concerned that Crypto Capital's principals may be engaged in a fraud . . .

> Bitfinex immediately undertook negotiations with Tether on an agreement under which Tether extended a secured, revolving line of credit of up to $900 million on commercially reasonable terms (including a term of three years and an interest rate of 6.5% in outstanding loans under the facility), documented in a loan facility negotiated between the two companies at arm's length with the benefit of separate counsel and approved as required by each company's corporate governance processes. Under this transaction, the line of credit is secured by a share charge over 60,000,000 iFinex Inc. shares owned by DigFinex, which DigFinex agreed not to otherwise encumber. That transaction closed on or about March 19, 2019. The total accessed under the loan facility as of today's date is equal to $700 million.

> On March 27, 2019, Bitfinex and Tether initiated a transaction debiting $625 million previously credited to Tether's account at Crypto Capital, and transferring those funds to Bitfinex's account at Crypto Capital. This transaction was made because the prior exchange of assets was converted into a line of credit secured by the DigFinex shares.

86.   The transaction documents were signed on behalf of Bitfinex and Tether by the

same two individuals. Those two individuals are also directors and owners of Digfinex, Bitfinex

and Tether.

19

87. According to counsel for Bitfinex and Tether, and confirmed by transaction documents, the shares "securing" the "line of credit" are shares of iFinex that are owned by Digfinex.

88. Digfinex is owned and operated by the same individuals that own and operate Bitfinex and Tether.

89. A relevant excerpt of the iFinex and Digfinex corporate registration documents in the British Virgin Islands, specifically the Register of Directors for Digfinex and iFinex, and provided to OAG by Respondents, is attached hereto as Exhibit K.

90. Relevant excerpts of written resolutions of the loan agreement for Digfinex and iFinex, including signature pages, dated March 15, 2019, and provided to OAG by Respondents, are attached hereto as Exhibit L.

91. Relevant excerpts of a Facility Agreement, including the signature pages, dated March 19, 2019, and provided to OAG by Respondents, are attached hereto as Exhibit M.

92. OAG believes that neither the November 2019, $625 million transfer of Tether reserves, nor the $900 million "line of credit" on Tether's reserves have been disclosed to investors.

93. Respondents have only produced limited relevant information regarding the facts and circumstances of the $625 million transfer and the subsequent "line of credit" transaction.

**OAG's Requested Relief**

94. OAG's ongoing investigation seeks to determine, among other things, the extent to which New York investors are exposed to ongoing fraud being carried out by Bitfinex and Tether.

20

95.    The Proposed Order accompanying this application requires production of the

following documents and information:

     i.    All documents and information requested in the Subpoenas issued by the Attorney General to Respondents dated November 27, 2018;

    ii.    All documents and information required by the Attorney General in a letter to Respondents dated February 26, 2019;

    iii.    All documents concerning Bitfinex users, accounts, clients ,or customers that reside or are believed to reside, do business, or are believed to do business, in New York;

    iv.    All documents concerning holders of tether that reside, or are believed to reside, in New York;

    v.    All documents and communications concerning any business relationship with any New York-based, or New York licensed, company, in whatever regard;

    vi.    All documents and communications regarding any transaction, of whatever nature, to loan, extend credit, encumber, pledge, or make any other claim, of any variety or description, on the U.S. dollar reserves underlying tethers, to Bitfinex or any other entity;

    vii.    All documents and communications regarding any transaction, of whatever nature, to purchase, borrow, disperse, or loan tethers to or from third parties, including between Tether and Bitfinex, wherever located;

    viii.    All documents evidencing all requests, orders, or demands for U.S. dollar withdrawals from the Bitfinex trading platform, including the amount requested, date the request was received, date the request was fulfilled, date the request was cancelled, and status of still-pending requests, since January 2018;

    ix.    All documents evidencing each order or request for purchase, issuance, or redemption of tethers since January 1, 2017, and which include the date of the order/request, the date on which it was executed, the amount of tether purchased/issued/redeemed, the name and wallet address of the purchasing/ordering/requesting person or entity, date any such purchase/order/request was cancelled, and status of any still-pending purchases/orders/requests;

    x.    A current accounting of all Bitfinex and Tether corporate, banking, trading, and client accounts, including but not limited to those holding U.S. or foreign currency, or virtual currency, wherever located;

21

xi.    Identification of all New York and United States customers of Bitfinex whose funds were provided to Crypto Capital and the amount of any such outstanding funds;

xii.   Respondents' tax filings for the years 2017 and 2018;

xiii.  A report, no less often than weekly, with supporting documents and communications, evidencing any issuances or redemptions of tethers to or from Tether or Bitfinex, which shall include identification of the purchaser or redeemer of tether, the amount of tethers purchased or redeemed, how long the purchase or redemption request took to fulfill, the wallet address the tethers were sent to/came from, and how the tethers were paid for/paid out;

xiv.   Identification of all Eligible Contract Participants ("ECPs") controlled by U.S. persons trading, past or present, on the Bitfinex trading platform or invested in tether;

xv.    All documents and communications concerning any decision to permit any ECP to trade on the Bitfinex platform or to invest in tether, including, but not limited to, all copies of any ECP certification and evidence provided to Respondents by ECPs; and

xvi.   All other documents that may be requested by the Attorney General or a designated assistant during the course of this investigation.

96.    OAG does not seek to enjoin or interfere with the orderly operation of Bitfinex or

Tether's legitimate businesses, if any, including orders by legitimate traders on the Bitfinex

platform, or legitimate tether holders, to redeem their tethers for dollars. Indeed, protecting

legitimate traders using the Bitfinex platform, and legitimate holders of tether, primarily those

residing in New York, is why a preliminary injunction is necessary now to preserve the *status

quo* pending the completion of OAG's investigation.

97.    However, OAG does seek to enjoin Respondents from taking any further action

to access, loan, extend credit, encumber, pledge, or make any other similar transfer or claim

between Bitfinex and Tether in order to preserve the *status quo* and protect the interests of New

York tether holders and Bitfinex clients.

22

98.    Because of the potential for Respondents to immediately initiate a further loan,
line of credit, transfer additional funds if given advance notice of the Proposed Order, or take
other steps that may jeopardize the interests of investors, Respondents have not been given
notice of this application.

99.    No previous application for the relief requested in the Proposed Order has been
made by OAG to this or any other court.

Dated: April 24, 2019
       New York, New York

                                                    _____
                                                    Brian M. Whitehurst