UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
*1:30 pm, Jun 02, 2016*

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| BFXNA INC. d/b/a BITFINEX, ) | CFTC Docket No. 16 – 19 |
| ) | |
| Respondent. ) | |
| ) | |

ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, AS AMENDED,
MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS

I.

The Commodity Futures Trading Commission ("Commission") has reason to believe that from in or about April 2013 to at least February 2016 (the "Relevant Period"), BFXNA Inc. d/b/a Bitfinex ("Bitfinex" or "Respondent") and, prior to January 2015, Bitfinex's predecessor in interest, iFinex Inc., violated Sections 4(a) and 4d of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a) and 6d (2012). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Bitfinex engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

II.

In anticipation of the institution of an administrative proceeding, Bitfinex has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Bitfinex consents to the entry of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions ("Order") and acknowledges service of this Order.[1]

---

[1] Bitfinex consents to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Bitfinex does not consent to the use of the Offer, or the findings or conclusions in this Order consented to in the Offer, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor does Bitfinex consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.

## III.

The Commission finds the following:

### A. SUMMARY

During the Relevant Period, Bitfinex operated an online platform for exchanging and trading cryptocurrencies, mainly bitcoins. Bitfinex's platform permitted users, including individuals and entities that did not meet the definition of an eligible contract participant or eligible commercial entity, to borrow funds from other users on the platform in order to trade bitcoins on a leveraged, margined, or financed basis. Bitfinex was not registered with the Commission. During the Relevant Period, Bitfinex did not actually deliver bitcoins purchased on a leveraged, margined, or financed basis to the traders who purchased them within the meaning of Section 2(c)(2)(D)(ii)(III)(aa) of the Act. Instead, Bitfinex held the purchased bitcoins in bitcoin deposit wallets that it owned and controlled. Therefore, Bitfinex engaged in illegal, off-exchange commodity transactions and failed to register as a futures commission merchant, in violation of Sections 4(a) and 4d of the Act, 7 U.S.C. §§ 6(a) and 6d.

### B. RESPONDENT

**BFXNA Inc. d/b/a Bitfinex** is a corporation formed and existing under the laws of the British Virgin Islands, and has its principal place of business at suite 13/F, 1308 Bank of America Tower, 12 Harcourt Road, Central, Hong Kong, China. Bitfinex has never been registered with the Commission in any capacity.[2]

### C. FACTS

Bitfinex operates an online platform for exchanging and trading cryptocurrencies, mainly bitcoins. Bitfinex's "Exchange Trading" feature permits users to exchange dollars for bitcoins and litecoins, and vice-versa, as well as to trade cryptocurrencies for other cryptocurrencies.[3] Bitfinex states that it operates the "most liquid exchange in the world" for trading between bitcoins and dollars, and offers traders multiple different order types through which to place trades. Users access Bitfinex's platform and place orders through its website, www.bitfinex.com.

Another of Bitfinex's services is its "Margin Trading" feature. Through this feature, Bitfinex permits traders to borrow dollars and bitcoins from other users on the platform in order to open leveraged positions on Bitfinex's exchange. Bitfinex refers to the participants on the platform who act as lenders as "Margin Funding Providers." In order to initiate a loan, Margin

---

[2] As of January 30, 2015, Bitfinex has been registered with the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury as a Money Services Business. Prior to January 2015, iFinex Inc. carried on business with U.S. customers. BFXNA Inc. is a wholly-owned subsidiary of iFinex Inc. and iFinex Inc.'s successor-in-interest with respect to the U.S.-facing business.

[3] Nearly all of the trading volume on Bitfinex's platform during the Relevant Period was in bitcoin. Litecoin made up a small portion of volume. This order will use the shorthand "bitcoin" to describe all cryptocurrencies traded on Bitfinex during the Relevant Period.

Funding Providers enter offers in Bitfinex's online tool to lend funds with their own chosen terms (daily rate of return, duration, and amount), or they can lend at the "Flash Return Rate" set by the market. When an offer to borrow is accepted by a trader ("Financing Recipient"), the Financing Recipient can use the borrowed funds to buy or sell bitcoins on Bitfinex's exchange. In addition to repaying the borrowed funds, Financing Recipient are responsible for paying fees and interest to the Margin Funding Providers.

Bitfinex is not a principal, counterparty, or market-maker in any bitcoin trade. Rather, Bitfinex administers and enforces the contracts established between Margin Funding Providers and Financing Recipients.

The Bitfinex platform allows maximum leverage of 3.33-to-1 (i.e., a 30% initial margin requirement). Traders may close out positions at any time without penalty for closing it. This will reimburse the Margin Funding Provider, and the position will be settled at a profit or loss. Financing Recipients can also "claim" their positions, by paying off the outstanding loan, or they can trade out of positions. If a Financing Recipient's equity in a position falls below 15%, the position is forcibly liquidated in order to ensure repayment of the loan.

From April 2013 to August 2015, when a customer purchased bitcoins on Bitfinex, the purchased bitcoins were held for the benefit of the buyer in Bitfinex's omnibus settlement wallet. The individual customer interests in the omnibus settlement wallet were accounted for in real time on Bitfinex's database. However, the omnibus settlement wallet was owned and controlled by Bitfinex and Bitfinex held all "private keys" associated with its omnibus settlement wallet.[4] Financing Recipients had no rights to access or use the bitcoins that they had purchased until Bitfinex released them, following satisfaction of the Financing Recipient's outstanding loan. Bitfinex considered bitcoins held in the omnibus wallet to belong to the Financing Recipients, but subject to a lien in the amount of any outstanding loan plus fees owed to the Margin Funding Provider.

In August 2015, Bitfinex changed its model so that bitcoins purchased using the Exchange Trading feature were held in multi-signature wallets established by a third party firm that were individually enumerated for each trader. Bitcoins purchased using the Exchange Trading feature were settled to the Blockchain on an intra-day basis. However, Bitfinex retained control over the private keys to these wallets as well.

In January 2016 and for the remainder of the Relevant Period, during the course of the Division of Enforcement's investigation, Bitfinex changed its model again so that bitcoins purchased using both the Exchange Trading and Margin Trading features were held in individually enumerated, multi-signature wallets. However, Bitfinex continued to retain control over the private keys to those wallets.

During the Relevant Period, Bitfinex's Margin Trading services were available to retail customers, and are not limited to eligible contract participants ("ECPs") or eligible commercial entities ("ECEs"). However, corporate users comprised a significant portion of Bitfinex's

---

[4] In the context of cryptocurrencies, a "private key" is a secret number (usually a 256-bit number) associated with a deposit wallet that allows bitcoins in that wallet to be spent.

3

trading volume during the Relevant Period. In 2015, 88% of the dollars deposited to and withdrawn from Bitfinex were by corporate users.

Bitfinex's cooperation with the Commission's investigation was significant. After learning that the Commission was potentially investigating Bitfinex, on September 17, 2015 – which was before the Commission had announced any enforcement action involving bitcoin – Bitfinex affirmatively contacted staff of the Division of Enforcement to offer its cooperation. During the course of the investigation conducted by the Division of Enforcement, Bitfinex consistently responded to requests for information fully and quickly, both in writing and via oral presentations.

In response to the Division of Enforcement's investigation, Bitfinex represents that it has made a number of changes to its business practices in order to attempt to come into compliance with the Act and Regulations.

## IV.

## LEGAL DISCUSSION

A.  **Relevant Statutory Background**

Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Public Law 111-203, 124 Stat. 1376 (2010) ("the Dodd-Frank Act") amended the Commodity Exchange Act to add, among other things, new authority over certain leveraged, margined, or financed retail commodity transactions.

Section 742(a) of the Dodd-Frank Act added Section 2(c)(2)(D) to the Act.[5] That jurisdictional provision broadly applies to any agreement, contract, or transaction in any commodity that is entered into with, or offered to (even if not entered into with), a non-eligible contract participant ("non-ECP") or non-eligible commercial entity ("non-ECE")[6] on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis. 7 U.S.C. § 2(c)(2)(D)(i). Section 2(c)(2)(D) further provides that such an agreement, contract, or transaction shall be subject to Sections 4(a), 4(b), and 4b of the Act "as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii).

Section 2(c)(2)(D)(ii) of the Act excepts certain transactions from Commission jurisdiction. Section 2(c)(2)(D)(ii)(III)(aa) excepts a contract of sale that results in "actual

---

[5] Section 2(c)(2)(D) of the Act became effective July 16, 2011.

[6] As is relevant to this matter, Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi), defines an eligible contract participant as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000, or which is in excess of $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. The term eligible commercial entity is defined at Section 1a(17) of the Act, 7 U.S.C. § 1a(17).

delivery" within 28 days ...."[7] As found by the Eleventh Circuit, the term "actual delivery" is unambiguous, and is therefore given its ordinary meaning. "Delivery" is "[t]he formal act of transferring something"; it denotes a transfer of possession and control." *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 978-9 (11th Cir. 2014) (*citing Black's Law Dictionary* 494 (9th ed. 2009)). As such, "'[a]ctual delivery" denotes '[t]he act of giving real and immediate possession to the buyer or the buyer's agent.'" *Id.* "Actual delivery" is distinct from "constructive delivery." *See id.* (holding that "the electronic transfer of documents indicating control or possession" without physical transfer of the commodity "is by any definition constructive, rather than actual."); *see also Black's Law Dictionary* 494 (9th ed. 2009) (defining "constructive delivery" as "[a]n act that amounts to a transfer of title by operation of law when actual transfer is impractical or impossible"). "Actual" is that which "exist[s] in fact" and is "real," rather than constructive. *Id.* at 40.

The Commission's interpretation is consistent with the Eleventh Circuit's definition. The determination of whether "actual delivery" has occurred within the meaning of Section 2(c)(2)(D)(ii)(III)(aa) requires consideration of evidence beyond the four corners of the contract documents. In determining whether actual delivery has occurred, the Commission employs a functional approach to assess whether there has been a "real and immediate" transfer of "possession and control" to the "buyer or the buyer's agent" of the commodity. The Commission examines how the agreement, contract, or transaction is marketed, managed, and performed. Ownership, possession, title, and physical location, as well as the relationships between the buyer, seller, and possessor of the commodity, and the manner in which the sale is recorded and completed are all relevant considerations in determining whether there has been actual delivery. Thus, physical delivery of the entire quantity of the commodity, including the portion purchased using leverage, margin or financing, into the possession of the buyer, or a depository other than the seller, the seller's parent company, partners, agents and affiliates will satisfy the actual delivery exception, provided that the purported delivery is not a sham.[8] By contrast, actual delivery will not have occurred if only a "book entry" is made by the seller purporting to show that delivery of the commodity has been made.

Congress did not express any intent to limit the reach of Section 2(c)(2)(D). Rather, in enacting the statute Congress expressed its intent that Section 2(c)(2)(D) should be applicable to a broad range of agreements, contracts, and transactions.

B.  **The Commission's Jurisdiction**

Section 1a(9) of the Act defines "commodity" to include, among other things, "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The definition of a "commodity" is broad. *See, e.g., Board of Trade of City of Chicago v. SEC*, 677 F. 2d 1137, 1142 (7th Cir. 1982). Bitcoin and other virtual

---

[7] The Commission has not adopted any regulations permitting a longer actual delivery period for any commodity pursuant to Section 2(c)(2)(D)(ii)(III)(aa) of the Act. Accordingly, the 28 day actual delivery period set forth in this provision remains applicable to all commodities.

[8] *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426 (Aug. 23, 2013) (CFTC interpretation regarding the meaning of the term "actual delivery" as set forth in the Act).

currencies are encompassed in the definition and properly defined as commodities, and are therefore subject as a commodity to applicable provisions of the Act and Regulations. *See In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29, 2015 WL 5535736, [Current Transfer Binder] (CCH) ¶ 33,538 (CFTC Sept. 17, 2015); *In re TeraExchange LLC*, CFTC Docket No. 15-33, 2015 WL 5658082, [Current Transfer Binder] (CCH) ¶ 33,546 (CFTC Sept. 24, 2015).

Many of the customers who entered into financed transactions in bitcoin on Bitfinex were not eligible contract participants or eligible commercial entities. Indeed, many were individual investors who did not meet the $10 million discretionary investment threshold to be considered ECPs. Moreover, Bitfinex offered such transactions on a margined or leveraged basis, and/or such transactions were financed by Margin Funding Providers through Bitfinex's financing order book. Bitfinex's retail financed transactions in bitcoin therefore fell squarely within the Commission's jurisdiction under Section 2(c)(2)(D) of the Act.

Bitfinex's retail-financed commodity transactions in bitcoin did not result in actual delivery to the Financing Recipients who traded on Bitfinex's platform. Bitfinex did not transfer possession and control of any bitcoin to the Financing Recipients, unless and until all liens on the bitcoin were satisfied. Prior to satisfaction of the liens, the Financing Recipients' bitcoins were held in an omnibus settlement wallet owned and controlled by Bitfinex, and to which Bitfinex held the private keys needed to access the wallet. Bitfinex's accounting for individual customer interests in the bitcoin held in the omnibus settlement wallet in its own database was insufficient to constitute "actual delivery." *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426, 52,428 (Aug. 23, 2013) ("book entry" purporting to show delivery insufficient). Similarly, when Bitfinex changed its model in August 2015 and January 2016, it retained control over the private keys to those wallets, and the Financing Recipients had no contractual relationship with the third party firm that established the wallets. *See id.*

Therefore, Bitfinex's transactions are not excepted from the Commission's jurisdiction under Section 2(c)(2)(D)(ii)(III)(aa) of the Act. Also, Bitfinex had the authority to force liquidate customers' positions without the customers' prior consent if their equity fell beneath a preset level, which further evidenced Bitfinex's possession and control over the bitcoins.

C.    **Bitfinex Violated Section 4(a) of the Act: Illegal, Off-Exchange Transactions**

As stated above, retail commodity transactions within the scope of Section 2(c)(2)(D) of the Act are subject to enforcement under Section 4(a) of the Act, among other provisions, as if such transactions are commodity futures contracts. Section 4(a) of the Act makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a commodity futures contract, unless such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility for the specific commodity.

Bitfinex offered to enter into, executed, and/or confirmed the execution of financed retail commodity transactions. None of the financed retail commodity transactions were conducted on

or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility. Bitfinex therefore violated Section 4(a) of the Act.

**D.     Bitfinex Violated Section 4d(a) of the Act by Failing to Register as a Futures Commission Merchant**

Section 4d(a) of the Act requires all persons acting as futures commission merchants ("FCMs") to register with the Commission. Section 1a(28) of the Act defines a FCM, in relevant part, as an individual, partnership, corporation or trust, that is engaged in soliciting or accepting orders for retail commodity transactions, or that accepts money in connection with such transactions. *See* 7 U.S.C. §1a(28)(i)(I)(aa)(DD). *See also CFTC v. Hunter Wise Commodities, et al.*, 1 F.Supp.3d 1311 (S.D. Fla. 2014) (entering summary judgment against purported precious metals wholesaler for failing to register as an FCM).

Bitfinex accepted orders for retail commodity transactions and received funds from those customers in connection with retail commodity transactions. Bitfinex was not, however, registered with the Commission in any capacity. Therefore, Bitfinex violated Section 4d(a) of the Act.

## V.

## FINDINGS OF VIOLATION

Based on the foregoing, the Commission finds that, during the Relevant Period, Bitfinex violated Sections 4(a) and 4d of the Act.

## VI.

## OFFER OF SETTLEMENT

Bitfinex has submitted the Offer in which it, without admitting or denying the findings and conclusions herein:

A.     Acknowledges receipt of service of this Order;

B.     Admits the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.     Waives:

   1. the filing and service of a complaint and notice of hearing;

   2. a hearing;

   3. all post-hearing procedures;

4. judicial review by any court;

5. any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

6. any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30, relating to, or arising from, this proceeding;

7. any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

8. any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D. Stipulates that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Bitfinex has consented in the Offer;

E. Consents, solely on the basis of the Offer, to the Commission's entry of this Order that:

1. makes findings by the Commission that Bitfinex violated Sections 4(a) and 4d of the Act;

2. orders Bitfinex to cease and desist from violating Sections 4(a) and 4d of the Act;

3. orders Bitfinex to pay a civil monetary penalty in the amount of seventy-five thousand dollars $75,000, plus post-judgment interest;

4. orders Bitfinex and its successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A. Bitfinex shall cease and desist from violating Sections 4(a) and 4d of the Act, 7 U.S.C. §§ 6(a) and 6d (2012).

C. Bitfinex shall pay a civil monetary penalty in the amount of seventy-five thousand dollars ($75,000) (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on

the CMP Obligation beginning on the date of entry of this Order, and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006). Bitfinex shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC/AMZ-341
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644
> Fax: (405) 954-1620
> Nikki.gibson@faa.gov

If payment is to be made by electronic funds transfer, Bitfinex shall contact Nikki Gibson or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Bitfinex shall accompany payment of the CMP Obligation with a cover letter that identifies Respondent and the name and docket number of this proceeding. Bitfinex shall simultaneously transmit copies of the cover letter and the form of payment to: (1) Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and (2) Deputy Director, Commodity Futures Trading Commission, Chicago Regional Office, 525 West Monroe, Suite 1100, Chicago, IL 60661.

D. Public Statements: Bitfinex agrees that neither it nor any of its successors and assigns, agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Bitfinex's: (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Bitfinex and its successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

E. Cooperation with the Commission: Bitfinex shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission investigation related thereto.

F. Partial Satisfaction: Bitfinex understands and agrees that any acceptance by the Commission of partial payment of Bitfinex's CMP Obligation shall not be deemed a

waiver of Bitfinex's obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

G. <u>Change of Address/Phone</u>: Until such time as Bitfinex satisfies in full its CMP Obligation as set forth in this Order, Bitfinex shall provide written notice to the Commission by certified mail of any change to its telephone numbers and mailing addresses within ten (10) calendar days of the change.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

*[signature]*
Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: June 2, 2016