Laurie Edelstein (Bar No. 164466)
Seth R. Sias (Bar No. 260674)
STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, California 94304
Telephone: (650) 687-9500
Facsimile: (650) 687-9499
ledelstein@steptoe.com
ssias@steptoe.com

Michael Baratz (*pro hac vice* application filed concurrently)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone:  (202) 429-3000
Facsimile:   (202) 429-3902
mbaratz@steptoe.com

*Attorneys for Plaintiffs iFinex Inc., BFXNA Inc., BFXWW Inc., and Tether Limited*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| iFINEX INC., BFXNA INC., BFXWW INC., and TETHER LIMITED,<br><br>  Plaintiffs,<br><br>  v.<br><br>WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A.<br><br>  Defendants. | No. 17 Civ. 1882<br><br>**COMPLAINT FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND INJUNCTIVE RELIEF**<br><br>**Demand for Jury Trial** |

Plaintiffs iFinex Inc. ("iFinex"), BFXNA Inc. ("BFXNA"), and BFXWW Inc. ("BFXWW") (collectively, "Bitfinex"), and Tether Limited ("Tether"),[1] by their attorneys, Steptoe & Johnson LLP, as and for its Complaint against defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), allege as follows:

## NATURE OF ACTION

1. This is an action for intentional interference with contractual relations and injunctive relief arising from Wells Fargo's interference with plaintiffs' customer contracts. Wells Fargo has suspended U.S. dollar wire transfer operations needed to remit to plaintiffs' customers U.S. dollars that the customers deposited with plaintiffs to purchase digital currency, causing imminent and irreparable harm to plaintiffs. Plaintiff Bitfinex's business involves Virtual Currency, which, as defined in this Complaint, refers to an emerging form of a digital asset designed to work as a medium of exchange using cryptography to secure the transactions and to control the creation of additional units of the currency. Tether operates a platform to store, send, and make purchases with digital tokens called tethers that are backed by U.S. dollars on deposit from customers. Wells Fargo's suspension of U.S. dollar wire transfers also is interfering with plaintiffs' ability to conduct business, such as their ability to pay employees and suppliers.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000.

3. This Court has personal jurisdiction over defendants because they are headquartered or maintain multiple offices in San Francisco, and their compliance officers involved in making the decisions at issue in this action are based in San Francisco.

4. Pursuant to 28 U.S.C. § 1391(b)(2)(3), venue is proper in this District in that a substantial part of the events or omissions giving rise to the claim occurred in San Francisco and

---

[1] iFinex Inc., BFXNA Inc., BFXWW Inc., and Tether Limited are collectively referred to as plaintiffs.

STEPTOE & JOHNSON LLP
1891 Page Mill Road, Suite 200
Palo Alto, CA 94304

no other venue is more appropriate. In particular, upon information and belief, Wells Fargo's decision to suspend wire transfers in U.S. dollars from plaintiffs' correspondent accounts occurred in San Francisco, where Wells Fargo & Company is headquartered.

**INTRADISTRICT ASSIGNMENT**

5. Pursuant to Civil Local Rule 3-5 of the United States District Court for the Northern District of California, the San Francisco division is proper because Wells Fargo's decision to suspend wire transfers in U.S. dollars from plaintiffs' correspondent accounts occurred in San Francisco, where Wells Fargo & Company is headquartered.

**THE PARTIES**

6. iFinex is a privately-held financial technology company that operates a Virtual Currency trading platform and is incorporated in the British Virgin Islands with offices in the Republic of China (Taiwan).

7. BFXNA and BFXWW are wholly-owned subsidiaries of iFinex that are incorporated in the British Virgin Islands. BFXNA contracts with U.S. based customers that use iFinex's Virtual Currency platform, while BFXWW contracts with non-U.S. customers. iFinex, BFXNA, and BFXWW (collectively, "Bitfinex") operate globally, with their primary banking relationships in Taiwan.

8. Tether is a privately-held financial technology company that operates a platform to store, send, and make purchases with digital tokens called tethers that are backed by U.S. dollars on deposit from customers. Tether is incorporated in Hong Kong and has offices in Taiwan.

9. Wells Fargo & Company is a U.S.-based financial institution incorporated in Delaware and headquartered in San Francisco, California.

10. Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States and has its corporate headquarters is in South Dakota. Upon information and belief, Wells Fargo Bank, N.A. maintains multiple offices in the State of California.

## FACTUAL BACKGROUND

### Bitfinex and Tether's Businesses

11. Bitcoin is the most widely-used and best-known Virtual Currency. Virtual Currency is not considered "currency" for taxation purposes by the U.S. government; however, other governments may treat Virtual Currency as "currency" for taxation and other purposes. Virtual Currency exchanges are regulated as "money services businesses" under U.S. federal law. Several U.S. corporations and nonprofit organizations, including Overstock.com, Inc., Microsoft Corporation, Dell Corporation, and Expedia, Inc., accept Virtual Currency as a method of payment and financial transaction.

12. Transactions involving Virtual Currency are generally recorded on a "blockchain" (literally, a chain of sequentially-validated blocks of Virtual Currency transactions), which is an auditable and cryptographically-secured global ledger in which transactions are recorded much like the recording of transactions using debit or credit cards.

13. Virtual Currency is stored in what is referred to as a "digital wallet." Digital Wallets allow users to send, receive, and transfer Virtual Currency and pay for goods or services using Virtual Currency.

14. Tether is a digital token and each tether unit issued into circulation is backed one-to-one by the U.S. dollar, *i.e.*, customer dollars held by Tether. Tethers may be redeemed for U.S. dollars on deposit from customers. Once a tether has been issued, it can be stored or spent.

15. Bitfinex owns and operates a leading global Virtual Currency trading platform through the website at www.bitfinex.com.

16. Bitfinex provides technological software to allow its customers (both businesses and individuals around the world) to engage in the trade of Virtual Currency, including, but not limited to, bitcoins and Litecoins, using U.S. dollars or other Virtual Currencies.

17. Currently, Bitfinex can receive or remit only U.S. dollars for customers' purchase of Virtual Currency.

18. Tether owns and operates a digital platform that allows customers to store, send, and make purchases using tethers, which are backed by U.S. dollars on deposit from customers. Currently, Tether can receive or remit only U.S. dollars for customers' purchases.

19. Bitfinex and Tether are leading members of the Blockchain Alliance. The Blockchain Alliance is a non-profit corporation that creates a forum for U.S. and global law enforcement and regulatory agencies and approximately 30 digital currency companies to share information and best practices and to work together to combat criminal activity using digital currency, such as government corruption, money laundering, and terrorist financing.

20. Plaintiffs have worked cooperatively with U.S. law enforcement agencies, such as the Department of Justice, Federal Bureau of Investigation, the Internal Revenue Service, the Department of Homeland Security, the Secret Service; with independent federal regulators such as the Commodity Futures Trading Commission; and, with state regulatory agencies and others, to uphold the highest standards of integrity and compliance with regulatory law.

21. BFXNA and Tether are registered with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") as Money Services Businesses. They make reports to FinCEN and to other international Financial Intelligence Units.

**Bitfinex's and Tether's Agreements with Their Customers**

22. Before using the Bitfinex or Tether platforms, customers must enter into a contract with Bitfinex or Tether, agreeing to their terms of service, which are publicly available on plaintiffs' respective websites at https://www.bitfinex.com/terms and https://tether.to/legal/.

23. Customers agree to undergo an extensive due diligence process to use Bitfinex's and Tether's platforms.

24. For instance, plaintiffs have comprehensive "know your customer" ("KYC") standards that require two forms of valid government photo identification, a bank statement, and proof of address. As a basic KYC measure, plaintiffs also require their verified customers to provide a photograph of themselves (i.e., a "selfie") holding ID documents with writing mandated by plaintiffs on a separate paper, including the date. Enhanced due diligence standards are undertaken if warranted or advisable. Plaintiffs' verified customers are also checked against

the Thomson Reuters World-Check database, which includes a check of the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control.[2]

25. Plaintiffs also have in place standards to monitor transactions, assess risks, and file Suspicious Activity Reports (SARs) and other reports required by U.S. law.

26. Customers who want to purchase and trade Virtual Currency through Bitfinex must deposit U.S. dollars or tethers into their Bitfinex account, and in exchange receive an equivalent amount of Virtual Currency until they ask Bitfinex to remit back the U.S. dollars they deposited.

27. Likewise, customers who want to purchase tethers through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of tethers until they ask Tether to remit back the U.S. dollars they deposited.

28. For these platforms to work, customers depend on Bitfinex's and Tether's ability to send back to them the U.S. dollars they deposited with Bitfinex or Tether.

29. Bitfinex currently has Virtual Currency equal to approximately $430 million USD and customer deposits in banks in Taiwan equal to approximately $130 million USD. Tether currently has customer deposits in banks in Taiwan of approximately $50 million USD.

30. Customers rely on Bitfinex and Tether to be able to send them back U.S. dollars upon request to customers' respective bank accounts. This is conceptually similar to a customer of a U.S. financial institution having access to her money from a branch, on demand, 24/7 through an ATM. There is at least one critical difference, however. Although financial institutions may engage in fractional reserve banking, plaintiffs do not. Plaintiffs must, and do,

---

[2] Thomson Reuters World-Check is a highly structured database of intelligence on heightened risk individuals and organizations. Widely adopted by the world's largest financial institutions and corporations, World-Check intelligence supports the Know your Customer and Third Party Risk compliance process in areas such as politically-exposed person monitoring, sanction screening, AML/CFT risk, and anti-bribery and corruption. *Source:* https://www.thomsonreuters.com/en/products-services/risk-management-solutions/customer-and-third-party-risk/thomson-reuters-world-check.html.

make available every dollar of customers' deposits on Bitfinex and Tether, provided that correspondent banks process transactions.

### Bitfinex's and Tether's Contracts with Their Taiwan-Based Banks

31.  Plaintiffs hold or have held customers' deposits in accounts at one of four Taiwan-based banks: Hwatai Commercial Bank, KGI Bank, First Commercial Bank and Taishin Bank (collectively, the "Taiwan-Based Banks").

32.  Plaintiffs have contracts with each of these Taiwan-Based Banks to conduct business on their behalf with international financial institutions that are not affiliated with plaintiffs, including U.S. banks such as Wells Fargo, pursuant to correspondent bank agreements. However, plaintiffs are not direct customers of the U.S. Banks.

33.  Wells Fargo is a correspondent bank for the Taiwan-Based Banks.

34.  Correspondent banks are able to transfer money internationally, using the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") network.

35.  SWIFT assigns each financial organization a unique code, and upon information and belief, Wells Fargo processed the transfers to, with, and from the Taiwan-Based Banks on plaintiffs' behalf from the United States.

36.  Plaintiffs rely on these Taiwan-Based Banks to make and receive wire transfers with and through Wells Fargo from plaintiffs' correspondent accounts to obtain and transmit value for their customers in USD, *e.g.*, to fulfill customer orders to send back to customers the U.S. dollars that customers deposited with plaintiffs, settle accounts, and for plaintiffs to pay their employees and suppliers.

### Wells Fargo's Sudden Refusal to Conduct Wire Transfers from Plaintiffs' Accounts at the Taiwan-Based Banks

37.  Upon information and belief, for two years, the Taiwan-Based Banks have been able to conduct both ingoing and outgoing wire transfers in U.S. dollars through Wells Fargo on accounts listing Bitfinex and Tether and their customers as beneficiaries.

38.  As part of its KYC due diligence process with the Taiwan-Based Banks, Wells Fargo knew, or should have known, that the Taiwan-Based Banks were conducting these wire

transfers from accounts held by plaintiffs and knew, or should have known, that the nature of plaintiffs' business involved wire transfers to receive or remit U.S. dollars for the purpose of providing customers with the means to purchase Virtual Currency or tethers.

39. Upon information and belief, during the latter half of March 2017, Wells Fargo informed the Taiwan-Based Banks that it would no longer service outgoing wire transfers from plaintiffs' correspondent accounts that plaintiffs rely on to fulfill requests to remit U.S. dollars to customers, without requesting further due diligence concerning these accounts.

40. By contrast, crucially, Wells Fargo has continued to process incoming wires to plaintiffs' accounts through the Taiwan-Based Banks without interruption or delay. For example, at least nine incoming wires to Bitfinex have been processed through Wells Fargo and to the Taiwan-Based Banks since March 31, 2017.

41. Taishin Bank ("Taishin") was the last of the Taiwan-Based Banks processing wires for and on behalf of the plaintiffs through Wells Fargo. On Friday, March 31, 2017, however, near the close of business in Taiwan, Taishin confirmed to Bitfinex that Wells Fargo would no longer process plaintiffs' outgoing wires as a correspondent bank for Taishin.

42. The Taiwan-Based Banks were closed for local (Taiwan) bank holidays on April 3 and 4, 2017, making it impossible for the plaintiffs to get clarification on Wells Fargo's decision or to provide any additional due diligence information Wells Fargo required to continue processing wire transfers to plaintiffs' customers.

43. Upon information and belief, Wells Fargo has not provided any explanation as to why it will no longer process plaintiffs' outgoing wires through the Taiwan-Based Banks.

44. Plaintiffs have received no inquiry or request for information. If any request had been made, plaintiffs would have fully cooperated and responded to same. Plaintiffs have a long history of responding timely to requests for information from the Taiwan-Based Banks and, indirectly, from any correspondent banks.

**Effect of Wells Fargo's Decision on Bitfinex's and Tether's Businesses**

45. Wells Fargo's decision to suspend U.S. dollar wire transfer operations from plaintiffs' correspondent accounts and its refusal to speak directly to plaintiffs about their

correspondent accounts has substantially interfered with plaintiffs' ability to operate their businesses and honor their contractual obligations to their customers, as plaintiffs' counsel has repeatedly informed Wells Fargo.

46. For example, customers have already begun complaining about the delay in wire transfers.

47. Indeed, plaintiffs expressly informed Wells Fargo that its decision to suspend outgoing wire transfers in U.S. dollars from plaintiffs' correspondent accounts presented an existential threat to their businesses. They informed Wells Fargo that if plaintiffs could not remit to customers U.S. dollars that belong to their customers, plaintiffs' businesses would be crippled as of Wednesday April 5, 2017. They would be brought to a standstill.

48. Plaintiffs' inability to transfer U.S. dollars to their customers also will almost certainly undermine plaintiffs' reputation and customer goodwill, resulting in the loss of both current and prospective customers.

49. If plaintiffs are not able to send timely to their worldwide customers the U.S. dollars that belong to them, plaintiffs' customers likely will view the failure as plaintiffs' own wrongdoing or inability to provide the requested currency and they will turn to plaintiffs' competitors, some of which have lower due diligence standards than plaintiffs.

## CLAIM FOR RELIEF

### Intentional Interference with Contractual Relations

### (All Defendants)

50. Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth herein.

51. Plaintiffs provide their customers with a means of exchanging U.S. dollars into Virtual Currency or tethers and vice versa.

52. Wells Fargo knew, or should have known, of plaintiffs' arrangement with their customers because plaintiffs' terms of service contracts are publicly available on Bitfinex's and Tether's websites.

53. Wells Fargo knew, or should have known, that plaintiffs provide this service to their customers because of the due diligence Wells Fargo has conducted with plaintiffs' Taiwan-Based Banks to open U.S. correspondent accounts and has previously processed many wire transfers from plaintiffs' correspondent accounts. Furthermore, Wells Fargo apparently continues to process wire transfers into plaintiffs' correspondent accounts at the Taiwan-based Banks.

54. Wells Fargo knew, or should have known, that disruption of plaintiffs' performance of their contracts with their customers is certain or substantially certain to occur as a result of Wells Fargo's decision to suspend outgoing wire transfers in U.S. dollars from plaintiffs' U.S. correspondent accounts because it will completely cripple plaintiffs' ability to process their customers' requests to send to customers U.S. dollars that belong to their customers and bring plaintiffs' businesses to a standstill.

55. Plaintiffs' inability to transfer U.S. dollars to their customers as a result of Wells Fargo's action also will almost certainly undermine plaintiffs' reputation and customer goodwill, resulting in the loss of both current and prospective customers.

56. Upon information and belief, Wells Fargo made its decision to disrupt plaintiffs' ability to send wire transfers in U.S. dollars intentionally or knowingly without substantial justification.

57. Wells Fargo also failed to provide notice to plaintiffs or the opportunity to address any possible diligence concerns.

58. Wells Fargo's decision to suspend outgoing wire transfers in U.S. dollars from plaintiffs' correspondent accounts, unless and until enjoined and restrained by this Court, will cause great and irreparable harm to plaintiffs.

59. Plaintiffs seek a preliminary and permanent injunction against Wells Fargo to prevent it from suspending, rejecting, or refusing to process wire transfers in U.S. dollars from plaintiffs' correspondent accounts without notice and without the opportunity for plaintiffs to address any possible due diligence concerns.

60. As a result of Wells Fargo's conduct as described herein, plaintiffs also have, and will in the future, suffer actual and compensatory damages in an amount to be determined at trial.

61. Wells Fargo's conduct as described herein constitutes intentional interference with plaintiffs' contractual relations with their customers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

A. Granting declaratory and/or injunctive relief as appropriate;

B. Awarding compensatory damages in excess of $75,000 in favor of plaintiffs for the damages sustained as a result of the wrongful conduct alleged and as will be established through discovery and/or at trial, together with interest thereon; and

C. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury.

Respectfully submitted,

Dated: April 5, 2017                    STEPTOE & JOHNSON LLP

By: */s/ Laurie Edelstein*
    Laurie Edelstein
    Michael Baratz (*pro hac vice* application submitted concurrently)
    Seth R. Sias

*Attorneys for Plaintiffs iFinex Inc., BFXNA, Inc., BFXWW, Inc., and Tether Limited*