FILED IN OPEN COURT
U.S.D.C. Atlanta

MAY 1 0 2016

James ~~N.~~ Hatten, Clerk
By: Deputy Clerk

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

DANIEL BARRS

Criminal Indictment

No.  **1  16 - C R - 1 6 1**

THE GRAND JURY CHARGES THAT:

## Count One
### (Willful Failure to Maintain an Effective Anti-Money Laundering Program)

1. From in or about 2009 through in or about December 2014, in the Northern District of Georgia and elsewhere, the defendant, DANIEL BARRS, did willfully fail to develop, implement, and maintain an effective anti-money laundering program, including, at a minimum (a) the development of internal policies, procedures, and controls designed to guard against money laundering; (b) the designation of a U.S. compliance officer to coordinate and monitor day-to-day compliance with the Currency and Foreign Transactions Report Act of 1970 (commonly known as the Bank Secrecy Act, or "BSA"), 31 U.S.C. § 5311, *et. seq.,* and anti-money laundering requirements; (c) the establishment of an ongoing employee training program; and (d) the implementation of sufficient independent testing for compliance conducted by bank personnel or an outside party, to wit, the defendant, DANIEL BARRS, willfully failed to enact adequate policies, procedures, and controls to ensure that Global Transaction Services,

LLC ("GTS") obtained adequate information about its customers and adequately reported suspicious financial transactions in accordance with the Bank Secrecy Act, willfully failed to hire a qualified U.S. compliance officer at GTS to coordinate and monitor day-to-day compliance with the Bank Secrecy Act, willfully failed to sufficiently train GTS employees to monitor for suspicious activity and comply with the Bank Secrecy Act, and willfully failed to implement suggestions from independent examinations for compliance, which caused GTS to fail to have sufficient procedures to protect against money laundering.

### The Entities

2.  Global Transaction Services, LLC ("GTS") was a company registered in the state of Georgia, with its principal place of business in Marietta, Georgia, within the Northern District of Georgia. During the majority of the period between approximately 2009 through at least as late as December 2014, GTS was registered with the U.S. Department of Treasury, Financial Crimes Enforcement Network (FinCEN) and the Georgia Department of Banking and Finance as a money transmitting business.

3.  At various times from 2009 through at least as late as December 2014, GTS operated in partnership with several interrelated entities ("the GTS entities"), each of which were controlled by the defendant, DANIEL BARRS, and other individuals known and unknown to the Grand Jury, and each of which facilitated GTS's money transmitting business:

        a.  Global Transaction Services, UK, a company registered in the United Kingdom;

      b. Global Transaction Management, HK, a company registered in Hong Kong;

      c. Global Transaction Processing, LLC, a company registered in the state of Georgia;

      d. Global Transaction Management, LLC, a company registered in the state of Georgia;

      e. GTS Support, LLC, a company registered in the state of Georgia; and

      f. Global Transatlantic Solutions, LLC, a company registered in the state of Georgia.

### The Bank Secrecy Act

4. The Bank Secrecy Act and its implementing regulations require financial institutions to establish and maintain programs designed to detect and report suspicious activity, and to maintain certain related records "where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311.

5. Among other things, the BSA requires that financial institutions "maintain appropriate procedures to ensure compliance with [the BSA] and regulations prescribed under [the BSA] or to guard against money laundering." 31 U.S.C. § 5318(a)(2). Pursuant to 31 U.S.C. § 5318(h)(1), GTS was required to establish and maintain an anti-money laundering ("AML") compliance program that, at a minimum:

3

a. provided internal policies, procedures, and controls designed to guard against money laundering;

b. provided for a compliance officer to coordinate and monitor day-to-day compliance with the BSA and AML requirements;

c. provided for an ongoing employee training program; and

d. provided for independent testing for compliance conducted by bank personnel or an outside party.

6. In addition, the BSA and its implementing regulations require financial institutions to "report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). Pursuant to 31 C.F.R. § 1022.320(a)(1), money services businesses are required to "file with the Treasury Department . . . a report of any suspicious transaction relevant to a possible violation of law or regulation." These reports are commonly known as "Suspicious Activity Reports" (SARs).

7. The BSA's implementing regulations state that "money transmitters" are one type of money services business required to file SARs. 31 C.F.R. § 1022.320(a)(1) and 31 C.F.R. § 1010.100(ff)(5). Pursuant to 31 C.F.R. § 1010.100(ff)(5)(i)(A), a money transmitter is defined as a person who provides "money transmission services," which is defined as the "acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." "'Any means' includes, but is not limited to, through a financial agency or institution . . . an electronic funds

4

transfer network; or an informal value transfer system. 31 C.F.R. § 1010.100(ff)(5)(i)(A).

8. Pursuant to 31 C.F.R. § 1022.320(a)(2), a SAR must be filed if the financial transaction at issue involves at least $2,000 in funds and the business knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):

> a. involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation;
>
> b. is designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act;
>
> c. serves no business or apparent lawful purpose, and the reporting money services business knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or
>
> d. involves use of the money services business to facilitate criminal activity.

### GTS Background

9.  The defendant, DANIEL BARRS, created GTS in 2009 as a money transmitting business specializing in international transactions. On or about August 9, 2009, the defendant, DANIEL BARRS, caused to be filed a Certificate of Organization in the name of "Global Transaction Services, LLC," with the Georgia Secretary of State. On or about February 1, 2014, the defendant, DANIEL BARRS, transferred ownership of GTS to "H. V. L." by signing an "Assignment of Membership Interest." However, the defendant, DANIEL BARRS, continued to exercise control over GTS operations after this assignment of membership interest through at least the end of 2014.

10. The defendant, DANIEL BARRS, and other individuals known and unknown to the Grand Jury, advertised GTS's services through word of mouth and on GTS's website. Specifically, GTS's website claimed that it, "specialize[d] in a money transmission and foreign exchange services for international trading businesses and those that provide financial services to them." GTS drew its customer base from an array of domestic and foreign customers seeking to minimize the costs associated with international transactions. According to its website, "GTS can improve your financial performance and allow you to increase international business by reducing the associated costs, risks and delays in the international payment process. We can also improve your customer relationships by allowing you to trade in the currency of their choice." GTS also marketed its services to high-volume customers, entities involved in using

prepaid debit cards, and entities that frequently interacted with the same international customers.

11. Throughout this period, GTS drew its profits from account opening fees and transaction fees charged to its customers. For instance, under the GTS "standard plan," the account opening fee cost $500, an external transfer fee cost $20, and an incoming funds fee cost $8.

12. For the first several years that GTS was in business, the company operated out of the residence of the defendant, DANIEL BARRS, as well as the residence of "H. V. L.", both of which were within the Northern District of Georgia. At one point, GTS operations moved to a small office location located in Marietta, Georgia, also within the Northern District of Georgia. At different points from 2009 through 2015, the GTS entities had additional personnel working overseas, including but not limited to the United Kingdom and Spain.

13. The GTS entities initially banked with several domestic financial institutions; however, these institutions repeatedly closed GTS's accounts. Beginning in 2012, the GTS entities began banking in Poland.

14. From 2009 through at least the end of 2014, the GTS entities transmitted hundreds of millions of dollars' worth of wires on behalf of its customers. These transactions came from a broad array of customers located throughout the world. Many of these transactions occurred directly through GTS while others occurred at the direction of GTS through accounts in the names of other GTS entities. The defendant, DANIEL BARRS, knew that many customers chose GTS because they were unable to open their own bank accounts in the United States. The

7

defendant, DANIEL BARRS, was also aware that many wires were sent from or to countries that posed money laundering concerns.

15. From the date that GTS was formed, the defendant, DANIEL BARRS, was aware that the company was required to establish and maintain an effective anti-money laundering program. For instance, state and federal regulators as well as an independent examiner told the defendant, DANIEL BARRS, that GTS was required to establish and maintain an effective anti-money laundering program. On or about October 4, 2012, under the direction of the defendant, DANIEL BARRS, GTS adopted a lengthy corporate compliance plan ("the 2012 GTS Compliance Plan") that acknowledged the company's responsibility to comply with the Bank Secrecy Act, to prevent the company's services from being used for money laundering, other illegal activity or terrorist financing, and to report suspicious financial transactions by timely filing SARs. Furthermore, GTS's website stated, "[w]e will often ask you to justify why transactions are being made, and demonstrate the economic basis of the payment. This may be done by telephone and/or by email. You should be prepared to provide us with invoices, purchase orders, delivery notes, contracts and any other documentary evidence that the transactions that are being made have a verifiable economic basis."

## The Defendant's Efforts to Obtain Banking for the GTS Entities

16. During the time period of this Indictment, the defendant, DANIEL BARRS, sought to obtain bank accounts for GTS operations even though U.S. financial institutions repeatedly closed the company's accounts.

8

17. In 2011, the defendant, DANIEL BARRS, became the controlling owner over Hometown Community Bank, a financial institution that was then located in Braselton, Georgia, within the Northern District of Georgia.  At the time, Hometown Community Bank was a small community-based bank that was in need of capital as a result of the turmoil in the financial markets beginning in 2007.  The defendant, DANIEL BARRS, knowing that Hometown Community Bank was in need of capital in order to stay solvent, partnered with two other individuals to inject $3 million into the bank.  The defendant, DANIEL BARRS, believed that by obtaining ownership over Hometown Community Bank, GTS would be able to obtain banking and conduct international transactions with ease.

18. Once the defendant, DANIEL BARRS, obtained a controlling interest in Hometown Community Bank in late 2011, he opened a bank account in the name of GTS, and began processing millions of dollars' worth of international transactions through the bank.  The defendant, DANIEL BARRS, was notified that Hometown closed the GTS account shortly after it started processing these transactions because of compliance concerns.  The defendant, DANIEL BARRS, also ordered the bank to begin installing Society for Worldwide Interbank Financial Terminals (SWIFT) Software.  SWIFT software enables financial institutions to facilitate international transactions.  After being notified that federal regulators opposed this move given Hometown's financial difficulties and small size, the defendant, DANIEL BARRS, ordered bank employees to

ignore the regulators and install the software anyway. However, federal regulators refused to allow this plan to proceed.

19. In 2013, the defendant, DANIEL BARRS, created an entity named "Global Transatlantic Solutions" in order to dupe at least one financial institution into permitting GTS to having an account. On or about August 23, 2013, the defendant, DANIEL BARRS, signed an Operating Agreement on behalf of Global Transatlantic Solutions. On or about August 26, 2013, the defendant, DANIEL BARRS, submitted an application for an Employer Identification Number to be filed with the Internal Revenue Service on behalf of "Global Transatlantic Solutions."

20. On or about August 28, 2013, the defendant, DANIEL BARRS, caused to be filed business account applications on behalf of "Global Transatlantic Solutions, LLC." with Everbank, a U.S. financial institution. On or about August 30, 2013, Everbank requested that "H. V. L." send additional information on behalf of Global Transatlantic Solutions, LLC. In response to a series of questions from Everbank about this business, "H. V. L." sent an email on September 2, 2013, that stated that Global Transatlantic Solutions was not a money transmitter and that the source of funds for this account would be "[c]ustomers paying bills." In response to a question about the purpose of Global Transatlantic Solutions, "H. V. L." referred the Everbank employee to www.gt-solutions.net, which stated:

> Global Transatlantic Solutions, LLC is a corporate consultancy practice, active throughout the world, registered in the USA in 2012.

10

Our mission is to provide confidential consultancy services to the international business community through the provision, acquisition and disposal of corporate structures and the provision of other specific support services via our own staff, affiliates or independent consultants.

What distinguishes us from others is our ability to actually support a business model rather than just provide a legal framework.

We can provide structures in Spain, France, UK, Poland, Mauritius and the US. Our solutions are designed to protect client assets whilst producing a rapid return on investment through cost savings, increased profitability or tax efficiency.

Our profitability is achieved solely through the quality of our long-term client relationships, achieved by deliberately restricting our services to a small number of clients.

21. After the Global Transatlantic Solutions account was opened, the defendant, DANIEL BARRS, caused financial transactions to be processed through Everbank on behalf of GTS clients. The defendant, DANIEL BARRS, knew that Global Transatlantic Solutions was not a consulting firm but was instead a shell company set up for the sole purpose of enabling the GTS entities to obtain a bank account. The defendant, DANIEL BARRS, believed that by setting up this domestic bank account under false pretenses, the GTS entities would be able to process international financial transactions with ease.

11

### *Willful Failure to Appoint Competent BSA/AML Compliance Officers*

22. The 2012 GTS Compliance Plan approved by the defendant, DANIEL BARRS, stated that the Board of Directors was responsible for appointing a BSA/AML Compliance Officer and "ensuring that such person has sufficient knowledge, authority, and resources to effectively meet the requirements of the Bank Secrecy Act."

23. However, the defendant, DANIEL BARRS, knew that GTS never had an adequately trained U.S. compliance officer on its staff to monitor the complex international financial transactions that the company facilitated. The GTS U.S. Compliance Officer in 2011 had never before handled BSA/AML compliance issues. The GTS U.S. Compliance Officer in 2012 was the defendant, DANIEL BARRS' grandson, who was at the time 19 years old and had only ever been employed as a pizza deliveryman and as a grocery store cashier. The GTS U.S. Compliance Officer in 2013 and 2014 had never before handled BSA/AML compliance issues. The GTS U.S. Compliance Officer in late 2014 similarly had never before handled BSA/AML compliance issues. The defendant, DANIEL BARRS, did not take sufficient steps to adequately train these individuals to effectively run the company's BSA/AML program and knew that the failure to do so meant that GTS could never effectively monitor its customers' financial transactions as it was required to do so under the Bank Secrecy Act.

### *Willful Failure to Train GTS Employees*

24. The 2012 GTS Compliance Plan approved by the defendant, DANIEL BARRS, stated that all MSBs are required to have an ongoing training program

for employees "*reasonably designed* to ensure the business meets its responsibilities under the Bank Secrecy Act. At a minimum, the MSB's training program must provide training of all new personnel whose duties may require knowledge of the BSA. Training of employees should be appropriate to their roles and responsibilities, conducted regularly, and clearly documented."

25. However, the defendant, DANIEL BARRS, knew that GTS never adequately trained its employees on BSA/AML compliance. While GTS employees had limited training on BSA/AML matters, they never received adequate training to deal with the highly complex international transactions in which the company specialized. As a result, the defendant, DANIEL BARRS, knew that GTS employees were not equipped to monitor and detect suspicious financial transactions, money laundering, potentially illegal activity or terrorist financing, as they were required to do under the Bank Secrecy Act.

### *Willful Failure to Adopt Recommendations From Independent Examinations*

26. At various times, the defendant, DANIEL BARRS, engaged the services of at least one BSA/AML examiner to evaluate GTS's compliance programs. The defendant, DANIEL BARRS, knew that GTS needed to obtain a satisfactory report of independent examination in order to obtain banking relationships.

27. In October 2012, EXAMINER ONE prepared a "Report of Independent Examination for BSA/AML" on behalf of GTS. The defendant, DANIEL BARRS, knew that at the time that this report was being prepared, EXAMINER ONE was also attempting to help GTS obtain accounts at various financial institutions. EXAMINER ONE recommended several changes to GTS procedures, including:

a. "GTS needs to complete additional due diligence on its non-bank financial institution customers to verify licensing/registration and confirm the entity has a reasonably designed compliance program to monitor against abuse for money laundering and terrorist financing"

b. "The BSA officer should consider attending and participating in additional formal training at the annual conference of NMTA, MTRA, or ACAMS."

c. "The BSA Compliance Officer must ensure that all performed training is documented. Company indicated that will create a training log file and will ask annually to all employees to sign an acknowledgement of BSA/AML Compliance Program form to be kept for a period of five (5) years."

28. The defendant, DANIEL BARRS, willfully failed to address the concerns that were raised in EXAMINER ONE's 2012 report. In 2014, the defendant, DANIEL BARRS, engaged the services of EXAMINER ONE to prepare an additional report. On or about September 9, 2014, EXAMINER ONE submitted a report to the defendant, DANIEL BARRS, that stated, "we found the company's management to have inadequate understanding of potential risks and insufficient commitment to an effective compliance program sufficient to address the company's unique risks. The results of this review are that we find this entity's anti-money laundering compliance program to be insufficient, leaving the company at significant potential risk for abuse." EXAMINER ONE notified

14

the defendant, DANIEL BARRS, of the following problems with GTS's BSA/AML compliance program:

    a. "It is unreasonable that GTS has not filed any suspicious activity reports. We believe that a deeper investigation, including review of activities described above, would reasonably result in need to file SARs. Activity was identified during testing for this review that should be further examined and most likely result in SAR filing."

    b. "GTS has not adequately managed operations to ensure that compliance and risk management findings and recommendations shared with it during prior examinations are worked to completion in a timely manner in order to better protect the company."

    c. "MSBs are required to maintain effective risk-based policies, procedures and controls that are effectively implemented, adequately maintained, and protect from abuse of services for use in money laundering and terrorist financing. GTS has not made and does not make sure of its written program with actual policies being those that are communicated and maintained verbally. A sufficient risk-based program reduced to writing needs to be effectively implemented and maintained going forward."

  d. "GTS needs to complete additional due diligence on its non-bank
financial institution customers to verify licensing/registration
and confirm the entity has a reasonably designed compliance
program sufficient to protect against abuse for money laundering
and terrorist financing."

  e. "There have been a number of situations where the company
should have filed a SAR and chose not to.  An in-depth audit
review of customer files and transaction activity should be
performed to determine if and what SARs should be filed at this
time."

  f. "[The compliance officer] was hired as BSA compliance officer
for the Company and although having prior legal training, has
had no substantial prior relevant experience in financial services
or with BSA/AML/OFAC compliance nor has [the compliance
officer] been provided with sufficient training in order to
accurately understand the risk of the company, basic
requirements under the BSA, and [the compliance officer's]
personal risk in overseeing BSA/AML responsibilities.
Additional training is necessary to ensure that the company
adequately understands their responsibilities and may accurately
understand and act upon risks."

29. EXAMINER ONE notified the defendant, DANIEL BARRS, about the
problems described in the September 9, 2014, report.  The defendant, DANIEL

BARRS, told EXAMINER ONE that these concerns were overblown and refused to pay for the independent examination until the report was revised so that GTS could obtain banking.  EXAMINER ONE refused to revise the examination report despite the defendant, DANIEL BARRS' insistence that it do so.

### *Effects of the Defendant's Willful Failure to Establish an Effective Anti-Money Laundering Program*

30. As a result of the defendant, DANIEL BARRS' willful failure to develop, implement, and maintain an effective anti-money laundering program, GTS failed to have sufficient procedures to protect against money laundering.  The 2012 GTS Compliance Plan approved by the defendant, DANIEL BARRS, stated that GTS was required to file a SAR with FinCEN describing actual or suspected criminal activity.  This was broken into three separate types of suspicious financial transactions:  (1) funds or assets involving suspected illegal activities, (2) transactions that appear to be designed to evade BSA regulations, and (3) transactions with no business or apparent lawful purposes.

31. Despite GTS's written compliance program, from 2009 through the end of December 2014, the company failed to file a single SAR.

### *Entities Engaged in Illegal Activity*

32. As a result of the defendant, DANIEL BARRS' willful failure to develop, implement, and maintain an effective anti-money laundering program, GTS processed millions of dollars in transactions on behalf of entities that were potentially engaged in illegal activity based upon information that was readily available to the general public.

33. From August 2014 through September 2014, the GTS entities transmitted 44 wires totaling $744,925 that listed the purpose as being for "ENTITY ONE" or "ENTITY TWO." Publicly available press releases from the U.S. Department of Justice and Federal Bureau of Investigation in September 2014 stated that ENTITY ONE, ENTITY TWO, and several other corporations and individuals had been charged with running a large-scale offshore asset protection, securities fraud, and money laundering scheme. As a result of the defendant, DANIEL BARRS' willful failure to develop, implement, and maintain an effective anti-money laundering program, GTS never took steps to investigate the nature of these transactions and failed to timely file a SAR on any transaction associated with ENTITY ONE and ENTITY TWO.

34. From at least March 2012 through at least May 2012, the GTS entities transmitted at least $579,420 with the remittance reference stating "ENTITY THREE." In late 2012 and early 2013, the GTS entities transmitted at least $368,790 on behalf of ENTITY THREE. A publicly available press release from the U.S. Department of Justice in July 2012 stated that an individual under indictment for operating a Ponzi scheme had used ENTITY THREE to commit the offense. As a result of the defendant, DANIEL BARRS' willful failure to develop, implement, and maintain an effective anti-money laundering program, GTS never took steps to investigate the nature of these transactions and failed to timely file a SAR on any transaction associated with ENTITY THREE.

35. At various times, the GTS entities transmitted wires on behalf of or that referenced ENTITY FOUR. For instance, in September 2014, the GTS entities

18

transmitted at least 20 wires totaling $85,440.60 on behalf of ENTITY FOUR.
Publicly available records from August 2014 indicated that the Massachusetts
Securities Division was investigating ENTITY FOUR for operating a gold
pyramid scheme. Publicly available records from September 2014 indicated that
the Massachusetts Securities Division had filed a civil fraud complaint against
ENTITY FOUR and its principals. As a result of the defendant, DANIEL BARRS'
willful failure to develop, implement, and maintain an effective anti-money
laundering program, during the timeframe that the defendant, DANIEL BARRS,
operated GTS, the company never took steps to investigate the nature of these
transactions and failed to timely file a SAR on the September 2014 transactions
associated with ENTITY FOUR.

*Transactions with No Apparent Business or Lawful Purpose*

36. As a result of the defendant, DANIEL BARRS' willful failure to establish
an effective anti-money laundering program, GTS processed millions of dollars
in transactions for entities that had no apparent business or lawful purpose.

37. From February 2012 through December 2013, the GTS entities transmitted
at least 66 wires totaling $11,927,936 on behalf of ENTITY FIVE. Many of these
wires occurred within days of one another and listed the remittance reference as
"distribution of funds." The website for ENTITY FIVE, a Malta-based
corporation, stated that it was a company specializing in search engine
optimization. As a result of the defendant, DANIEL BARRS' willful failure to
establish an effective anti-money laundering program, GTS took no steps to
verify how these wires related to search engine optimization, the nature of the

19

business activity, why many of the wires listed the purpose as "distribution of funds," and failed to timely file a SAR on any transaction associated with ENTITY FIVE.

38. From April 2012 through August 2013, the GTS entities transmitted at least 25 wires totaling $1,578,804.18 on behalf of ENTITY SIX.  At the time of these wires, ENTITY SIX, a Cyprus-based company, had a limited public profile, with no website or business listings.  Publicly available websites indicated that various consumers disputed what appeared to be fraudulent credit card charges from ENTITY SIX.  As a result of the defendant, DANIEL BARRS' willful failure to establish an develop, implement, and maintain an anti-money laundering program, GTS took no steps to verify the nature of ENTITY SIX's business, the purpose of the wires, whether ENTITY SIX was engaged in illegal activity, and failed to timely file a SAR on any transaction associated with ENTITY SIX.

39. From early 2012 through late 2014, the GTS entities transmitted hundreds of wires totaling over $2 million on behalf of ENTITY SEVEN.  At the time of many of these wires, ENTITY SEVEN, a Belize-based company, was publicly listed in various websites as being associated with illegal spamming activity and internet fraud.  As a result of the defendant, DANIEL BARRS' willful failure to develop, implement, and maintain an effective anti-money laundering program, GTS took no steps to verify the nature of ENTITY SEVEN's business, the purpose of the wires, whether ENTITY SEVEN was engaged in illegal activity, and failed to timely file a SAR on any transaction associated with ENTITY SEVEN.

### *Suspicious Iraqi Dinar Transactions*

40. The defendant, DANIEL BARRS, knew that GTS drew much of its business from at least two companies that specialized in the sale of the Iraqi dinar and other so-called "exotic currencies" (such as the Vietnamese Dong and Egyptian Pound).  In particular, GTS processed tens of millions of dollars in transactions for IRAQI DINAR EXCHANGER ONE.  From July 2011 through April 2012 alone, GTS processed tens of millions of dollars in international wires on behalf of IRAQI DINAR EXCHANGER ONE.  These transactions were sent through GTS's Polish bank accounts to and from various accounts held in the United States, Bermuda, and Kuwait.

41. At the time that GTS facilitated many of IRAQI DINAR EXCHANGER ONE's financial transactions, GTS employees knew that various consumers purchased the dinar under the belief that the currency would spontaneously and exponentially grow in value, commonly referred to as a "revaluation."

42. At the time that GTS facilitated many of IRAQI DINAR EXCHANGER ONE's financial transactions, the defendant, DANIEL BARRS, and other GTS employees, knew that various regulators had concerns regarding the sale of the Iraqi dinar.  For instance, the Georgia Department of Banking and Finance questioned the defendant, DANIEL BARRS, at one point about how he knew the Iraqi dinar business was not a scam.

43. GTS also processed international wires on behalf of overseas-based individuals associated with IRAQI DINAR EXCHANGER ONE.  From at least as

21

early as 2012 through at least as late as 2014, GTS facilitated the transfer of hundreds of thousands of dollars between IRAQI DINAR EXCHANGER ONE and an individual based in Japan who was operating as an Iraqi dinar "reseller." This individual purchased dinar in bulk from IRAQI DINAR EXCHANGER ONE and sold it to his/her own customer base in Japan.

44. The Japan reseller submitted dozens of wires that listed the remittance reference as "purpose to buy antique books." On October 27, 2014, the Chief Operating Officer of IRAQI DINAR EXCHANGER ONE sent an email to GTS asking for assistance in finding funds that had been transmitted by the Japan reseller. The email stated, "[a]ttached is the wire confirmation for $24,550 from [the Japan reseller] to us." Attached to this email was a document entitled, "Confirmation/Statement of Remittance." This document indicated that the Japan reseller was transmitting $24,550 to GTS "to buy antique books." At the time of these wires, the defendant, DANIEL BARRS, knew that IRAQI DINAR EXCHANGER ONE was a foreign currency exchanger and had never been in the business of selling or buying books or antiquities.

45. As a result of the defendant, DANIEL BARRS' willful failure to develop, implement, and maintain an effective anti-money laundering program, GTS failed to investigate the nature of the Iraqi dinar transactions and failed to timely file a SAR on any transaction related to the Iraqi dinar.

All in violation of Title 31, United States Code, Section 5318(h) and 5322(a) and Title 31, Code of Federal Regulations, Section 1022.210(a).

22

## Count Two
(Money Laundering Conspiracy)

46. The Grand Jury re-alleges and incorporates herein by reference the factual allegations set forth in paragraphs 2-45.

47. Beginning in or about 2009, and continuing to on or about December 31, 2014, in the Northern District of Georgia and elsewhere, the defendant, DANIEL BARRS, did knowingly combine, conspire, and agree with others, both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, to wit: mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343; in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## Forfeiture

48. Upon conviction of the offenses alleged in Count Two of the Indictment, the Defendant, DANIEL BARRS, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the money laundering offense and all property traceable to such property.

49. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

23

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A     _TRUE_     BILL

_____
FOREPERSON

JOHN A. HORN
*United States Attorney*

THOMAS J. KREPP
*Assistant United States Attorney*
Georgia Bar No. 346781

600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

24