UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID LEIBOWITZ, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　　　-<br>　　　　　v.-<br><br>IFINEX INC., *et al.*,<br><br>　　　　　　　Defendants. | 19 Civ. 9236 (KPF) |
| ERIC YOUNG, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　　-v.-<br><br>IFINEX INC., *et al.*,<br><br>　　　　　　Defendants. | 20 Civ. 169 (KPF) |
| BRYAN FAUBUS,<br><br>　　　　　　　Plaintiff,<br><br>　　　　　-v.-<br><br>IFINEX INC., *et al.*,<br><br>　　　　　　Defendants. | 20 Civ. 211 (KPF) |
| JOSEPH EBANKS,<br><br>　　　　　　　Plaintiff,<br><br>　　　　　-v.-<br><br>IFINEX INC., *et al.*,<br><br>　　　　　　Defendants. | 20 Civ. 453 (KPF)_ |

**THE *LEIBOWITZ* PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE *EBANKS* AND *YOUNG* MOTIONS TO APPOINT INTERIM CLASS COUNSEL**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.    The *Leibowitz* Team Has Demonstrated That It Is Best Positioned and
      Qualified to Represent the Interests of the Class. .......................................... 3

      A.    The *Leibowitz* Plaintiffs Have Assembled the Most Compelling Team of
            Attorneys and Experts. ........................................................................ 3

      B.    The *Leibowitz* Plaintiffs Filed the Most Compelling Complaint. ....... 7

II.   The *Leibowitz* Plaintiffs Have Properly Tailored the Definition of the Class. .... 12

      A.    Only the *Leibowitz* Plaintiffs Are Assured Of Standing To
            Bring CEA Claims ............................................................................. 12

      B.    The Scope of the Class Defined by the *Leibowitz* Plaintiffs Is Proper and a
            Strong Basis for Appointing Their Attorneys As Interim Lead Counsel .......... 15

      C.    The Class Period Defined By the *Leibowitz* Plaintiffs Is Proper and a
            Strong Basis for Appointing Their Attorneys As Interim Lead Counsel .......... 16

CONCLUSION ...................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bank Brussels Lambert, S.A. v. Intermetals Corp.*,
    779 F. Supp. 741 (S.D.N.Y. 1991) ..................................................................................12

*Chevron Corp. v. Donziger*,
    833 F.3d 745 (2d Cir. 2016)...........................................................................................19

*Commodity Futures Trading Comm'n v. McDonnell*,
    287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) ...................................................................13

*Hamilton v. LLM Mgmt.*,
    C.A. No. 13-2932, 2016 WL 589869 (E.D. Pa. Feb. 11, 2016)......................................19

*In re Bank of Am. Corp. Sec. Derivative & Emp't Ret. Income Sec. Act (ERISA) Litig.*,
    258 F.R.D. 260 (S.D.N.Y. 2009) ....................................................................................21

*In re Boeing Co. Aircraft Secs. Litig.*,
    No. 19 CV 2394, 2019 WL 6052399 (N.D. Ill. Nov. 15, 2019)......................................20

*In re BP, PLC Secs. Litig.*,
    758 F. Supp. 2d 428 (S.D. Tex. 2010) ............................................................................21

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012) ..............................................................................13

*In re Doral Fin. Corp. Sec. Litig.*,
    414 F. Supp. 2d 398 (S.D.N.Y. 2006) ............................................................................20

*In re Elan Corp. Sec. Litig.*,
    No. 08 Civ. 8761, 2009 WL 1321167 (S.D.N.Y. May 8, 2009)......................................21

*In re Gentiva Secs. Litig.*,
    281 F.R.D. 108 (E.D.N.Y. 2012).....................................................................................20

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................................................................14

*In re Nat'l Gas Commodity Litig.*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004) ............................................................................12

*In re Recoton Corp. Secs. Litig.*,
    248 F.R.D. 606 (M.D. Fla. 2006) ...................................................................................20

*Krueger v. Wyeth, Inc.*,
    396 F. Supp. 3d 931 (S.D. Cal. 2019).............................................................................19

*M.G. v. N.Y. City Dep't of Educ.*,
  162 F. Supp. 3d 216 (S.D.N.Y. 2016) ...........................................................................14, 15

*Miami Police Relief & Pension Fund v. Fusion-io, Inc.*,
  No. 13-cv-05368-LHK, 2014 WL 2604991 (N.D. Cal. June 10, 2014) .............................20

*Sullivan v. Barclays PLC*,
  13-CV-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .....................................13

*Vale v. McGuinn*,
  2009 U.S. Dist. LEXIS 95352 (S.D.N.Y. Oct. 5, 2009) ........................................................7

**Other Authorities**

Fed. R. Civ. P. 23(g) .............................................................................................................1, 7

1 *McLaughlin on Class Actions* § 5:3 (16th ed. Oct. 2019 update) .........................................20

3 *Newberg on Class Actions* § 7:26 (5th ed. Dec. 2019 update) ............................................20

Plaintiffs, David Leibowitz, Benjamin Leibowitz, Jason Leibowitz, Aaron Leibowitz, and Pinchas Goldshtein (the "*Leibowitz* Plaintiffs"), respectfully submit this memorandum in opposition to the *Ebanks* and *Young* Plaintiffs' motions for appointment as interim class counsel (ECF Nos. 71 and 75), and in further support of their motion to appoint their counsel Roche Cyrulnik Freedman LLP (RCF), Schneider Wallace Cottrell Konecky LLP (SWCK), and Selendy & Gay (S&G) as interim class counsel.

## INTRODUCTION

The numerous complaints, briefs, and expert affidavits filed in this litigation demonstrate that RCF, SWCK and S&G are the firms "best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2). While the *Ebanks* and *Young* Plaintiffs are represented by fine counsel, counsel for the *Leibowitz* Plaintiffs are best positioned and qualified to serve as interim class counsel, primarily because (1) their first-filed complaint demonstrates superior work in identifying and pursuing the relevant claims in this action and acting to ensure that those claims are properly pleaded; (2) their team consists of attorneys and experts with irreproachable credentials, including in matters involving cryptocurrencies; and (3) they have demonstrated leadership by diligently advancing the proceedings in this Court.

The *Ebanks* and *Young* Plaintiffs' attempts to discredit *Leibowitz* Plaintiffs' counsel are meritless. The *Leibowitz* team of three law firms brings together diverse, cross-disciplinary talent with all of the resources necessary to ensure excellent representation for the class and to maximize the size of the prospective recovery. The *Leibowitz* team demonstrated the quality of its work by filing a complaint in this Court—months before any other firm—that serves as the structural and intellectual template for the subsequent, copycat actions.

The *Ebanks* Plaintiffs incorrectly assert (at 2) that the *Leibowitz* Plaintiffs have alleged a "broad and unwieldly class definition that may hinder recovery for the primary victims of defendant's scheme: bitcoin purchasers." The *Leibowitz* Plaintiffs have defined their class to reflect the full extent of the market impact that Defendants' misconduct has caused and to ensure that they obtain the discovery necessary to proceed with the most logical class definition at the certification stage. Both counsel and the Court retain the discretion to refine the class for purposes of certification, further underscoring the utility in identifying a class of injured class members with the appropriate breadth at the pleadings stage.

Similarly, the class period the *Leibowitz* Plaintiffs have defined properly reflects both the scope of their well-founded causes of action and the relief sought thereunder. Defendants' misconduct began well before the April 2017 date that marks the beginning of the *Ebanks* Plaintiffs' class period. In each of their claims, including under the Commodities Exchange Act, the Sherman Act, and the RICO Act, the *Leibowitz* Plaintiffs properly seek to redress the entire history of such misconduct. Indeed, under the RICO statute, the *Leibowitz* Plaintiffs seek, and the Court has the discretion to award, disgorgement of the defendants' ill-gotten gains, making it crucial that the class period span the entire history of the misconduct. The approach the *Leibowitz* Plaintiffs have chosen is the sounder strategy—one more likely to benefit the putative class. Where the class period should correspond to the time period of the relevant allegations in the complaint, the class period the *Ebanks* Plaintiffs adopt is unduly and unnecessarily limited. The *Leibowitz* Plaintiffs' class period is a particularly compelling factor for appointing their attorneys as interim class counsel, moreover, because a longer class period is a well-established basis for appointing the lead plaintiffs.

Accordingly, for these reasons, those set forth below, and those set forth in their briefs

supporting their motion for appointment as interim lead counsel (ECF Nos. 58 and 78), the *Leibowitz* Plaintiffs respectfully submit that the Court should appoint RCF, SWCK and S&G as interim class counsel.

## ARGUMENT

I.    **THE *LEIBOWITZ* TEAM HAS DEMONSTRATED THAT IT IS BEST POSITIONED AND QUALIFIED TO REPRESENT THE INTERESTS OF THE CLASS.**

A.    **The *Leibowitz* Plaintiffs Have Assembled the Most Compelling Team of Attorneys and Experts.**

The three-firm leadership structure that the *Leibowitz* Plaintiffs have created is best able to represent the interests of the putative class for several reasons.

*First*, the *Leibowitz* team is the only proposed group with the requisite experience litigating matters related to cryptocurrencies. This experience will be critical to representing the interests of the class in this litigation because, unlike more traditional asset classes like gold and stocks, the decentralized nature of cryptocurrencies poses unique legal issues that require expertise to unpack. The *Leibowitz* team has retained Andreas Antonopoulos, one of the most recognized experts on bitcoin and blockchain technologies in the world, demonstrating a commitment to pursuing and analyzing the technical issues in this case to the greatest degree. The *Leibowitz* team has also retained Michael Perklin, one of the leading experts in blockchain forensics—the science behind identifying, clustering, and modeling cryptographic data to discover useful information concerning the actors engaged in cryptocurrency transactions— which will be vital to handling the challenges that the anonymity of cryptocurrency transactional records can pose for fact discovery. While counsel for the *Young* and *Ebanks* plaintiffs have handled class actions and commodities-related litigation, none of their counsel has identified any significant experience in litigation involving cryptocurrencies, let alone the

level of expertise of Messrs. Antonopoulos and Perklin.[1] The *Leibowitz* team is therefore best positioned and qualified to prevent Defendants from exploiting the complexities of cryptocurrency to try to avoid liability in the way that they exploited those same complexities to harm the class in the first place.

*Second*, the *Leibowitz* team has the most expertise in litigating antitrust, commodities, RICO, and consumer-protection claims, which are the core claims the *Leibowitz* Plaintiffs laid out in their first-filed complaint. RCF's lawyers have litigated antitrust claims for both plaintiffs and defendants for more than a decade. (ECF No. 78 at 12-14.) SWCK is representing Humana, Inc., Health Care Service Corporation, Inc., and Molina Health in direct action litigation concerning price-fixing of generic drugs; FujiFilm, Agfa Corporation, Mag Instruments, and Kodak in antitrust litigation concerning aluminum; a class of indirect purchaser plaintiffs in antitrust litigation concerning foreign exchange ("FX") securities and U.S. government treasuries securities; the Commonwealth of Puerto Rico for its own purchases and as *parens patriae* in antitrust litigation concerning chicken and pork price fixing; and has tried antitrust claims on behalf of a certified class of purchasers of 'set top' cable boxes. As the Court likely appreciates, antitrust trials—and lawyers that have tried them—are extremely rare. In addition, Matthew S. Weiler, a recent addition to the SWCK firm, successfully litigated RICO claims in recovering over $300 million for purchasers of automobiles that had emissions-cheating technology while at his prior firm. SWCK attorneys have been involved in all aspects

---

[1] Counsel for the *Ebanks* Plaintiffs identify (at 2) two California state actions related to the failure to register certain digital tokens under federal securities laws. These registration cases do not involve the technical complexity that this case will present, and they have been consolidated and led in federal court by other firms. *See Zakinov v. Ripple Labs, Inc.*, 4:18-cv-06753 (N.D. Cal.), *In re Tezos Sec. Litig.*, No. 17-CV-06779-RS (N.D. Cal.). The matters being pursued by counsel for the *Ebanks* plaintiffs have not advanced significantly in litigation and appear duplicative of the federal litigations led by counsel selected under the PSLRA.

of prosecuting this litigation, including assessing and evaluating potential claims; retention of experts; and briefing these issues concerning appointment of interim class counsel.

S&G has extensive experience in matters relating to cases involving complex financial transactions, RICO claims, antitrust disputes, New York consumer-protection laws, and class actions. S&G's attorneys have litigated all types of complex financial matters—from residential mortgage-backed securities to reinsurance contracts to credit default swaps—securing trial and appellate victories and numerous favorable settlements. *See* ECF No. 78 at 14-18. S&G successfully represented McKinsey & Company in a high-profile RICO dispute in the Southern District of New York, and its attorneys have litigated RICO claims in multiple industries. *Alix v. McKinsey & Co.*, 18-4141 (S.D.N.Y.).

S&G also led an antitrust action representing the American Federation of Teachers and other investors in an action against Goldman Sachs, Merrill Lynch, Barclays, Citigroup, and others alleging collusive violations of the Sherman Act arising out of the $13 trillion U.S. Treasuries market, and its attorneys have represented numerous other clients—including Discover Financial Services, Pulse Network, Connecticut General Life Insurance, the YES Network, and Ticketmaster—in major antitrust actions, including a suit on behalf of Discover against Visa and MasterCard in the Southern District of New York that settled on the eve of trial for $2.75 billion, *Discover Financial Services v. Visa U.S.A. Inc.*, No. 04-7844 (S.D.N.Y.). S&G partners have experience in commodities disputes, having appeared before the Commodities Futures Trading Commission in a non-public matter involving manipulation of crude oil prices. S&G's attorneys are also leading experts in New York's General Business law, which is the basis of the *Leibowitz* Plaintiffs' consumer-protection claims. And S&G's attorneys have served as class counsel in several high-profile actions, including representing a class of

public servants in an action against loan servicer Navient in the Southern District of New York. *Hyland v. Navient Corporation*, No. 18-9031 (S.D.N.Y.).

*Third*, the three-firm structure the *Leibowitz* Plaintiffs have created gives the class extensive and diverse resources that other counsel cannot match.[2] The *Leibowitz* proposal offers the class the benefit of nearly 100 attorneys with principal offices located in New York, Florida, Texas, and California. The combination of lead attorneys from RCF and S&G located in New York with the geographic diversity of other counsel is important for a class that consists of purchasers of cryptocurrencies across the United States.

With the addition of S&G, the *Leibowitz* team also offers diversity unmatched by other elite litigation firms, as women own the majority of S&G's equity. The firm's ownership includes Caitlin Halligan and Maria Ginzburg, who will be leading this litigation for the S&G team. S&G offers diversity on other axes as well, with 21 percent of its lawyers presently identifying as LGBTQ and 30 percent identifying as people of color. S&G's has been recognized as a leading firm in Diversity & Inclusion by The Financial Times,

---

[2] A three-firm structure is warranted given the unique aspects of the subject matter, the risks of the litigation, and the resources that are necessary to protect the putative class' interest. *See In re Municipal Derivatives Antitrust Litigation*, 08-cv-2516-VM (S.D.N.Y. July 25, 2008) (appointing three firms to lead antitrust case on behalf of purchasers of municipal derivatives and noting they "filed the first complaints in this case"). Courts often appoint three co-lead firms or more in antitrust and other complex class action litigation. *In re Treasuries Securities Auction Antitrust Litigation*, 15-md-2673, ECF No. 186 (S.D.N.Y.) (appointing three firms to co-lead antitrust litigation concerning manipulation of U.S. treasuries auctions and noting "the interests of the purported class are best served by appointing no more than three firms as co-lead counsel," and appointing the group with the first-filed complaint); *Yates Construction Co., Inc. v. Sigma Corporation*, 12-169, ECF No. 58 (S.D. N.Y. May 10, 2012) (appointing Kirby along with two other firms as co-lead counsel for indirect purchasers in antitrust case concerning ductile iron pipe fittings); *Le v. Zuffa LLC*, 15-cv-1045 (D. Nev.) (three are co-lead counsel in monopolization cases brought by mixed-martial arts fighters against the UFC).

https://perma.cc/2CTJ-DDVH, and shortlisted for "The Most Pioneering Firm for Gender Diversity" award by Chambers and Partners, https://perma.cc/DRE2-WSLB.

S&G's model is also built on providing substantive opportunities for its junior lawyers, which is an approach that RCF and SWCK have similarly implemented. In the past two years, both S&G and SWCK associates have deposed witnesses, defended depositions, examined witnesses at trial and in arbitration, and presented argument on major motions—including motions to dismiss and for summary judgment. Two of S&G's associates conducted a full trial as pro bono counsel (under partner supervision) in the Eastern District of New York, *Desreameaux v. Delta Air Lines, Inc*., No. 15-00347 (E.D.N.Y.). The *Leibowitz* team's established record of providing meaningful roles for its associates at all levels will continue in litigation on behalf of the *Leibowitz* Plaintiffs and the putative class.

### B.      The *Leibowitz* Plaintiffs Filed the Most Compelling Complaint.

The *Leibowitz* Plaintiffs filed a class action that advanced first-of-its-kind antitrust, commodities, and RICO legal theories against a group of Defendants for manipulation of the cryptocurrency market. In contending that their complaints somehow demonstrate a more thorough pre-filing investigation, the *Young* and *Ebanks* Plaintiffs brush aside the fact that, even though they had many more months to formulate their analyses, they assert legal theories that are largely transcribed from the *Leibowitz* complaint and do not offer any unique causes of action. To the contrary, as discussed further below, *infra* at §§ II.B, II.C, they self-limit the scope of their class and class period in a way that is not sensibly designed to benefit the class through discovery and up to certification.

In trying to deemphasize the fact that the *Leibowitz* Plaintiffs were the first to file, the *Young* and *Ebanks* Plaintiffs fail to acknowledge the role that the *Leibowitz* complaint played in inspiring their subsequent legal claims. The *Young* and *Ebanks* Plaintiffs inappropriately rely

7

on cases where a government enforcer had already identified the claims and potential defendants.[3] That did not happen here. There was no "race to the courthouse" in this case, as the *Leibowitz* complaint was filed six months after the NYAG investigation had become public. The following timeline illustrates that, even with public reporting dating back to November 2017, no law firm filed suit until counsel for the *Leibowitz* Plaintiffs filed suit.

---

[3] *Vale v. McGuinn*, 2009 U.S. Dist. LEXIS 95352 (S.D.N.Y. Oct. 5, 2009), is inapposite as it concerned a leadership application under the PSLRA, where the work done in identifying the claims in filing first can only be considered to rebut the "presumption" that the plaintiff with the largest financial loss is the adequate plaintiff under the PSLRA. *Id.* at *13. Here the work done by counsel in "identifying" the claims at issue is a Rule 23(g)(1) criterion.

**Figure 1 – Timeline of Relevant Events**



This timeline distinguishes this litigation from cases such as those based on allegations

relating to manipulation of LIBOR, where most of the firms, including Kirby, filed suit less

than a month after "[t]he fact of the investigations came to light."[4] The mechanics of the manipulation were substantially more in focus in these LIBOR disclosures, as UBS had reported that the Department of Justice, the SEC, the CFTC, and foreign regulators were investigating the hallmarks of a Section 1 violation under the Sherman Act, namely, "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."[5] In this case, the NYAG investigation denotes wrongdoing and is a "plus factor" for purpose of analyses the Court may make at later stages of the litigation, but the claims at issue here were not self-reported by a defendant or identified by an investigator. Counsel for the *Leibowitz* Plaintiffs are responsible for developing these allegations and the legal theories supporting them.

A comparison of the three complaints shows that the majority of the fact development and legal research is taken directly from the *Leibowitz* Complaint:

- The *Leibowitz* Plaintiffs' history of Bitfinex, Tether, and Tether's 1-1 guarantee were all largely adopted by the *Young* and *Ebanks* complaints. *Compare Leibowitz* Compl. ¶¶ 54–91 *with Young* Compl. ¶¶ 37–68 and *Ebanks* Compl. ¶¶ 33–43.

---

[4] *FTC Capital GMBH v. Credit Suisse Group AG*, Case No. 11-cv-2613, ECF No. 1 at ¶ 66 (S.D.N.Y. April 15, 2011) ("The fact of the investigations came to light on March 15, 2011 when UBS disclosed in its annual report that it had received subpoenas from the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Department of Justice, as well as an information request from the Japanese Financial Supervisory Agency, relating to its interest rate submissions to the BBA. UBS's disclosure states that the focus of the investigations is 'whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times.'"). Kirby and dozens of other firms brought suit within a month or less of the time UBS publicly announced the investigation.

[5] Kirby itself submitted a brief in LIBOR correctly identifying as leadership criteria on the first page of its brief that its group "filed the first case in any jurisdiction" in seeking appointment as interim co-lead counsel. *In Re: Libor-Based Financial Instruments Antitrust Litigation*, Case No. 11-cv-2316, ECF No. 23 at 7 (S.D.N.Y. Sept. 1, 2011); *see also In re BP Propane Indirect Purchaser Antitrust Litig.*, Case No. 06-cv-3541 (N.D. Ill. 2010), ECF No. 51 at 13 (N.D. Ill. Oct. 3, 2006) (proposed leadership group that included Kirby submitted declaration claiming right to leadership based on involvement since "inception" of claims and filing "the first complaint in the country" in leadership motion, which was granted).

- The *Young* and *Ebanks* Complaints largely tracked *Leibowitz* Plaintiffs' description of how USDT issuances were used to inflate the price of bitcoin. *Compare Leibowitz* Compl. ¶¶ 107–55 *with Young* Compl. ¶¶ 68–106 and *Ebanks* Compl. ¶¶ 64–105.

- The *Leibowitz* Plaintiffs' description of Defendants' shadow banking and Devasini's admission to working on a "willy bot" to manipulate the price of bitcoin were similarly imitated by the *Ebanks* Complaint. *Compare Leibowitz* Compl. ¶¶ 145, 156–236 *with Ebanks* Compl ¶¶ 87, 59–63. The *Young* Complaint, meanwhile, included the same excerpts of conversations between Devasini and Crypto Capital that the *Leibowitz* plaintiffs had already highlighted. *Compare Leibowitz* Compl. ¶¶ 205-206 *with Young* Compl. ¶¶ 121-122.

Although the *Young* and *Ebanks* Plaintiffs assert coordination with experts to corroborate their allegations prior to filing, their experts merely replicated and restyled the fundamental work that supports the *Leibowitz* complaint. With months of additional time to consider the substance and structure of the *Leibowitz* complaint, neither the *Young* Plaintiffs nor the *Ebanks* Plaintiffs are able to articulate anything significant that these consultations have done to advance the claims of the class.

The *Young* Plaintiffs tout (at 12) working with industry experts to develop a "proprietary algorithm" to identify "specific dates of Defendants' manipulation of Bitcoin." Yet the data and figures they cite from their complaint appear to be reformatted from the *Leibowitz* complaint. *See e.g.*, ECF No. 78 at 25 (comparing *Leibowitz* Compl. ¶ 137 to *Young* Compl. ¶¶ 137-39). Indeed, all of the "analysis" the *Young* Plaintiffs feature as the basis for their selection as interim class counsel is simply repackaged blockchain transactional data. This data is readily available to the public and can be retrieved with minimal effort from many sources by anyone sufficiently familiar with blockchain systems. ECF No. 78-1, Perklin Aff. ¶¶ 7, 9.

The *Ebanks* Plaintiffs' assertions of expert contributions are even less persuasive. Their counsel aver (at 1) that they have been "investigating the claims at issue for more than nine months" and that they "consulted with a market manipulation expert to corroborate the core allegations," but nearly all of the charts in their complaint are taken from the *Leibowitz*

complaint. *Compare Ebanks* Compl. ¶¶ 13, 41, 46, 68, 79, 103 *with Leibowitz* Compl. ¶¶ 10,

75, 85, 114, 135. This includes the original chart created by the *Leibowitz* Plaintiffs to analyze

the relationship between USDT issuances and the price of bitcoin:



It is telling that the *Ebanks* motion does not articulate any, contribution the *Ebanks* Plaintiffs

have made to the class's claims as a result of their nine-month investigation.[6]

While the foregoing expert consultation may or may not have benefitted counsel, the

derivative complaints do not reflect the benefits of that work in any clear way, and the *Leibowitz*

Plaintiffs are plainly positioned to press their claims with the very best of expert assistance.

## II.   THE *LEIBOWITZ* PLAINTIFFS HAVE PROPERLY TAILORED THE DEFINITION OF THE CLASS.

### A.   Only The *Leibowitz* Plaintiffs Are Assured Of Standing To Bring CEA Claims

Only the *Leibowitz* action was brought by a named plaintiff who purchased bitcoin

futures, and as a result only RCF, SWCK and S&G are currently in a position to represent

---

[6] It is worth noting that only the *Leibowitz* Plaintiffs filed within two years of the peak of the bitcoin bubble, thereby completely foreclosing potential limitations arguments that might have otherwise been raised by the Defendants against the CEA claims.

purchasers of both bitcoin and bitcoin futures through their class representatives should this Court find that only futures purchasers have standing under the CEA. The *Leibowitz* complaint is also the only complaint with class representatives who purchased several other cryptocurrencies whose manipulation bears on the class recovery, which is a matter for expert analysis; the other complaints do not offer this optionality in class representativeness.

The *Ebanks* complaint pursues a CEA strategy that excludes futures and focuses only on bitcoin spot market trades. Omitting claims for purchasers of bitcoin futures creates a risk that such CEA claims will be dismissed, given precedent that suggests one, in other contexts for other markets, cannot bring a private cause of action under the CEA for manipulation in the spot market alone. *See Bank Brussels Lambert, S.A. v. Intermetals Corp*., 779 F. Supp. 741, 749 (S.D.N.Y. 1991) ("With respect to the distinction between the current market and futures transactions, the [CEA], as noted above, simply limits its coverage and the CFTC's jurisdiction to futures. *It does not cover the spot market*, regardless of the motivation of the transactions.") (emphasis added); *see also In re Nat'l Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004). The "CFTC's broad authority" has always extended to "manipulation in derivatives markets and underlying spot markets." *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) (holding CFTC had authority over virtual currencies). That is not the same as saying there is a private cause of action. *See Bank Brussels Lambert, S.A*, 779 F. Supp. at 749; *In re Nat'l Gas Commodity Litig.*, 337 F. Supp. 2d at 511.

Counsel for the *Leibowitz* Plaintiffs identified and took steps to mitigate these issues by, among other things, ensuring their action included a purchaser of bitcoin futures. This initiative, which makes the *Leibowitz* Plaintiffs' claims materially stronger than those of other

plaintiffs, underscores the quality the investigation and legal work on behalf of the putative

class undertaken by counsel for the *Leibowitz* Plaintiffs.

*Ebanks'* assertion (at 2) that the *Leibowitz* Complaint does "not even allege the

plaintiffs transacted in the investments at issue" is incorrect. In their first cause of action for

market manipulation under the CEA, the *Leibowitz* Plaintiffs allege that they "and members

of the Class were further legally injured and suffered injury in fact because they transacted in

bitcoin, ether, bitcoin derivatives, including bitcoin futures contracts, and other

cryptocurrencies, in an artificial and manipulated market operating under the artificial prices

caused by DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual

Defendants." *Leibowitz* Compl. ¶ 260.

Just as important, however, is that *Ebanks* misstates the pleading requirements for this

type of manipulation claim because "[t]here is no bright line rule regarding the application of

loss causation principles under the CEA." *In re Crude Oil Commodity Futures Litig.*, 913 F.

Supp. 2d 41, 60 (S.D.N.Y. 2012). That is because "the period during which the manipulative

activity occurs is not necessarily a proxy for the period when losses attributable to artificial

prices occur," and "the issue of 'actual damages' thus becomes a complex factual inquiry."

*Id.*; *see also Sullivan v. Barclays PLC*, 13-CV-2811 (PKC), 2017 WL 685570, at *31

(S.D.N.Y. Feb. 21, 2017) ("Defendants argue that plaintiffs have not sufficiently alleged

actual damages because they do not trace the dates of defendants' alleged manipulations to

each of plaintiffs' individual transactions. But many 'courts have observed that loss causation

is not a statutory element of proof under the CEA,' the way that it is for fraud-on-the-market

claims in the securities context.").

**B.     The Scope of the Class Defined by the *Leibowitz* Plaintiffs Is Proper and a Strong Basis for Appointing Their Attorneys As Interim Lead Counsel**

The *Leibowitz* Plaintiffs alone have defined a class with the breadth to capture the full impact of the Defendants' wrongs here. The suggestion by the *Ebanks* Plaintiffs that the class should be limited to purchasers of Bitcoin understates the scale of the wrongdoing that the *Leibowitz* Plaintiffs have identified. The Defendants have engaged in a market manipulation scheme that undermined systemic foundations of the entire cryptocurrency market. The *Leibowitz* Plaintiffs, alone amongthe named plaintiffs, have alleged purchases of the other six cryptocurrencies analyzed in the Griffin Report with price increases linked to USDT issuances. *Compare* Compl. ¶¶ 15-19; Griffin Report at 6 ("This 1% of our time series (over the period from the beginning of March 2017 to the end of March 2018) is associated with 58.8% of Bitcoin's compounded return and 64.5% *of the returns on six other large cryptocurrencies* (Dash, Ethereum Classic, Ethereum, Litecoin, Monero, and Zcash)." (emphasis added).).

It is appropriate, then, for the class to be defined, as the *Leibowitz* Plaintiffs have defined it, to capture as much of that impact as possible. *See Leibowitz* Compl. ¶ 242 (defining the class as including persons that held or transacted in cryptocurrencies in the relevant period). The narrow definition the *Ebanks* Plaintiffs propose, which includes only those who purchased bitcoin in their class period, *see Ebanks v. iFinex, Inc.*, No. 20 Civ. 453, ECF No. 1 ¶ 106, ignores the harm done to those who purchased either bitcoin derivatives or other cryptocurrencies that were affected by the Defendants' price manipulation scheme.

Any criticisms of the definition of the *Leibowitz* class, moreover, are procedurally improper at this early stage. Whether the members of the *Leibowitz* class have equally meritorious claims threatens to raise a pre-discovery "mini-trial" that would not be appropriate even for class certification. *M.G. v. N.Y. City Dep't of Educ.*, 162 F. Supp. 3d 216, 231

(S.D.N.Y. 2016) (explaining that "a motion for class certification should not become a mini-trial on the merits") (quotations and ellipsis omitted). The principle that the underlying merits should not be assessed at this early stage is well-founded because both the plaintiffs and the Court may modify the class definition on the basis of discovery. *See In re Libor-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 463-64 (S.D.N.Y. 2018) (a broad class definition is not a basis for dismissing the complaint, where both the plaintiffs and the court may modify the class definition). The Court "has a duty to ensure that the class is properly constituted and has broad discretion to modify the class definition as appropriate to provide the necessary precision," *N.Y. City Dep't of Educ.*, 162 F. Supp. at 232, and it may exercise such discretion even after certification based on "subsequent developments in the litigation," *id.* at 231-32. The *Leibowitz* Plaintiffs have defined their class—as well as their class period, as discussed below—to ensure that they obtain the discovery necessary to proceed with the most logical class definition at the certification stage. Accordingly, because both counsel and the Court retain such discretion, the different class definitions before the Court at this stage do not present any compelling basis for selecting interim class counsel.

### C.      The Class Period Defined By the *Leibowitz* Plaintiffs Is Proper and a Strong Basis for Appointing Their Attorneys As Interim Lead Counsel

The *Ebanks* Plaintiffs criticize (at 2) the *Leibowitz* Plaintiffs for seeking a "class period [that] inexplicably begins in 2014." It hardly benefits the class to pick a fight with competing class periods during the process of selecting class leadership, particularly where one competing group advocates for a shorter period without the benefit of any discovery. In addition, it is the *Ebanks* Plaintiffs' short class period definition, which does not begin until April 1, 2017, that unnecessarily prejudices the rights of the putative class.

The longer class period proposed by the *Leibowitz* Plaintiffs is appropriate because the conduct at issue began well before April 1, 2017. The *Leibowitz* Plaintiffs explain that the very "heart" of Defendants' scheme to manipulate cryptocurrency markets was Tether's claim, which was a lie, "that the number of [USDT] tokens in circulation will always equate to the dollars in its bank account." *Leibowitz* Compl. ¶¶ 6-7. "This claim enabled Bitfinex and Tether to signal to the market that there was rapidly growing demand for cryptocurrencies because each USDT printed represented another U.S. dollar invested into the market." *Id.* ¶ 6. Tether began to make this false claim in October 2014, from the very first issuances of USDT tokens. *Id.* ¶¶ 40, 66-67. The *Leibowitz* Plaintiffs intend to show that this deceptive conduct affected the prices of cryptocurrencies in the relevant market before April 2017.

In defining their class period, moreover, the *Leibowitz* Plaintiffs reasonably seek to redress defendants' ill-gotten gains from before April 2017. Since its inception, "Tether has marketed USDT as enabling traders to move in and out of positions across different cryptocurrencies and different cryptocurrency exchanges. Its pitch is that USDT's reliable price coupled with its digital representation on the blockchain offers the best of both worlds. It is stable and safe like the U.S. dollar while being easily transferable and divisible like other cryptocurrencies." *Id.* ¶ 79. Accordingly, as shown by the efforts that Tether went to on its website (in, for example, 2015) and through the release of its white paper (in June 2016), "USDT's value was necessarily derived from Tether's guarantee that each USDT was backed by one U.S. dollar held in reserve." *Id.* ¶¶ 80-84. In short, the Defendants in the *Leibowitz* Complaint improperly profited from Tether, at the expense of class members, on the basis of its central misrepresentation about the relationship between Tether and the U.S. dollar for years before April 2017.

17

Similarly, Defendants were unjustly enriched by deceptive conduct that falls within the *Leibowitz* class period, but not the *Ebanks* class period, and accordingly would only be recoverable by the *Leibowitz* Plaintiffs. The *Leibowitz* complaint explains at length how the "Willy Bot" scheme ending in approximately May 2014 provided the opportunity to make trades with non-existent money, allowed a single individual to dramatically influence cryptocurrency prices, and interfered with the natural price discovery process, and misleading market participants. *Id.* ¶¶ 97-106. The *Leibowitz* Plaintiffs then further allege that in June 2014, one month after the "Willy Report" about the Willy Bot was published, defendant Devasini "all but admitted that he was working on a 'Willy Bot' of his own to drive the price of bitcoin to $10,000." *Id.* ¶ 145. In September 2014, as part of the rebranding of "Realcoin" to "Tether," defendants Potter and Devasini incorporated Tether Holdings Limited in the British Virgin Islands. One month later, on October 6, 2014, Tether issued its first batch of USDT. The November 2014 rebranding also announced that Tether had formed "new partnerships in the bitcoin space, including agreements with Hong Kong-based bitcoin exchange Bitfinex." *Id.* ¶¶ 65-69.

This announcement did not reveal, however, that it was Devasini and Potter, who were *Bitfinex's* CFO and CSO, that had created and have controlled Tether's holding company since September 2014. Nor did the November 2014 announcement reveal that Velde and Devasini, who were *Bitfinex's* CEO and CFO, had similarly incorporated Tether Limited in September 2014 and served as its only directors.

Only the *Leibowitz* Plaintiffs are in position to obtain recovery based on the failure to disclose the fact that the same individuals in control of Bitfinex (a cryptocurrency exchange) were also secretly in control of Tether (a cryptocurrency supposedly backed by the U.S. dollar).

18

This key part of Defendants' scheme remained largely concealed from the general public for over a year until November 2017. *Id.* ¶¶ 69-73. This deceptive conduct also affected the prices of cryptocurrencies in the relevant market before April 2017, but only the *Leibowitz* Plainitiffs have defined a class period that covers the whole of that conduct.

The *Leibowitz* Plaintiffs also explain how and why Tether's use of U.S. correspondent banks prior to April 2017 was a linchpin of its deceptive and fraudulent scheme and its manipulation of the cryptocurrency market and should be included within the class period. *Id.* ¶¶ 169-91. Allegations in a complaint that Tether filed in federal court in April 2017, for example, make clear that from at least March 2015 until March 2017, when Wells Fargo terminated the relationship, Defendants relied on Wells Fargo as a U.S. correspondent bank as part of this scheme. *Id.* ¶¶ 176-80. In particular, Tether's Taiwan-based banks had been able to conduct both ingoing and outgoing wire transfers in U.S. dollars through Wells Fargo on accounts listing Bitfinex and Tether and their customers as beneficiaries. *Id.* Ex. 19 ¶¶ 37-39 (Wells Fargo Complaint). The *Leibowitz* Plaintiffs then explain, including by repeated citations to Defendants' own statements, how Tether's use of U.S. correspondent banks in the years *before* April 2017was critical to their overall scheme. *Id.* ¶¶ 176-88. As the *Leibowitz* Plaintiffs explain, the scale of Defendants' manipulation and market impact grew after the first quarter of 2017, but the manipulative conduct harmed Plaintiffs beforehand. Members of the putative class plainly stand to benefit from claims that address the earlier as well as the subsequent misconduct.

The longer class period the *Leibowitz* Plaintiffs have defined, based on the foregoing allegations, properly reflects both the scope of their well-founded causes of action and the relief sought thereunder. The CEA, for example, operates to protect investors against market

manipulation to redress abusive and fraudulent trade practices. Defendants began their fraudulent trade practices, and engaged in market manipulation, before the class period as the *Ebanks* Plaintiffs define it. Section 2 of the Sherman Act, as another example, prohibits unilateral conduct that monopolizes or attempts to monopolize the relevant market. In connection with its issuance of unbacked USDT, Tether formed its intent to create monopoly power, monopolize the relevant market, and to restrict choice and maintain bitcoin pricing control before the class period as the *Ebanks* Plaintiffs define it. The RICO Act, in turn, addresses situations in which, among other prohibited conduct, the defendants have engaged in a pattern of racketeering activity through an enterprise. The Defendants in the *Leibowitz* complaint created their RICO enterprise and began to engage in the relevant pattern of racketeering activity, by engaging in predicate acts, before the class period as the *Ebanks* Plaintiffs define it.

Indeed, under the RICO statute, the *Leibowitz* Plaintiffs seek—and the Court has the discretion to award—disgorgement of the Defendants' ill-gotten gains. *See Chevron Corp. v. Donziger*, 833 F.3d 745, 137-39 (2d Cir. 2016). Defendants began to enjoy such ill-gotten profits before the class period as the *Ebanks* Plaintiffs define it—as early as October 2014, when the Defendants launched USDT with a false promise of a 1:1 USD reserve. The *Leibowitz* Plaintiffs sensibly define the relevant class period to seek the disgorgement of such profits. *See, e.g.*, *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 939 (S.D. Cal. 2019) (plaintiffs seek damages as a result of purchasing defendants' products "during the class period," as well as "restitutionary disgorgement of the net profits Defendants earned from class members as a result of the allegedly unfair practices"); *Hamilton v. LLM Mgmt.*, C.A. No. 13-2932, 2016 WL 589869, at *2 (E.D. Pa. Feb. 11, 2016) (class complaint alleging that "the funds that the

defendants received during the class period were wrongfully gained by the defendants" and contending "that the defendants must disgorge all monies that were received from the plaintiff and other members of the class"). The *Ebanks* Plaintiffs' complaint thus neither challenges critical aspects of the Defendants' misconduct nor seeks to make them disgorge their illicit profit from that misconduct.

The *Leibowitz* Plaintiffs' approach is the sounder strategy and more likely to benefit the class. The class period should include "the period during which members of the proposed class incurred the claimed injury." 3 *Newberg on Class Actions* § 7:26 (5th ed. Dec. 2019 update) (quotations omitted). The class period should also correspond to the time period of the relevant allegations in the complaint, and the Court should shorten that period only if it concludes "as a matter of law" that the relevant allegations correspond to a shorter period. 1 *McLaughlin on Class Actions* § 5:3 (16th ed. Oct. 2019 update). If the *Ebanks* Plaintiffs raised questions regarding the proposed class period here—and they have not—"when there are substantial questions as to the length of the class period, a broader time period should be certified." *In re Recoton Corp. Secs. Litig.*, 248 F.R.D. 606, 623 (M.D. Fla. 2006) (citing cases). This is especially true where, as here, the Court can reasonably expect Defendants to dispute the scope of appropriate discovery. The broader class period defined by the *Leibowitz* Plaintiffs does not limit the scope of discovery they can reasonably seek; it signals their intent to explore, assess, and pursue the full scope of defendants' relevant misconduct, to the benefit of the putative class.

Finally, the *Leibowitz* Plaintiffs' class period is a particularly compelling factor for appointing their attorneys as interim lead counsel because a longer class period is a well-established basis for appointing the lead plaintiffs. The prevailing approach in the federal courts for appointing a lead plaintiff is that "the longer class period" governs. *In re Boeing Co. Aircraft*

21

*Secs. Litig.*, No. 19 CV 2394, 2019 WL 6052399, at *3 (N.D. Ill. Nov. 15, 2019) (collecting extensive precedent); *see, e.g.*, *Miami Police Relief & Pension Fund v. Fusion-io, Inc.*, No. 13-cv-05368-LHK, 2014 WL 2604991, at *1 n.3 (N.D. Cal. June 10, 2014) ("For purposes of appointing a lead plaintiffs, the longest class period governs."). A principal rationale for this approach is that a longer class period "encompasses more potential class members." *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 402-03 (S.D.N.Y. 2006); *see, e.g.*, *In re Gentiva Secs. Litig.*, 281 F.R.D. 108, 113-14 (E.D.N.Y. 2012) ("For the purpose of determining a lead plaintiff, the Court finds that the use of the longer, most inclusive class period . . . is proper, as it encompasses more potential class members."); *In re Bank of Am. Corp. Sec. Derivative & Emp't Ret. Income Sec. Act (ERISA) Litig.*, 258 F.R.D. 260, 269 (S.D.N.Y. 2009) (applying the longest class period for selecting lead plaintiff).

In appointing lead plaintiffs, some courts have described the relevant standard as using "the longest noticed class period unless the factual allegations supporting that period are obviously frivolous." *In re BP, PLC Secs. Litig.*, 758 F. Supp. 2d 428, 433-35 (S.D. Tex. 2010); *see, e.g.*, *In re Elan Corp. Sec. Litig.*, No. 08 Civ. 8761, 2009 WL 1321167, at *1 (S.D.N.Y. May 8, 2009) ("I do not find the claims which anchor the longer . . . class period to be implausible, and I find that it is appropriate to use the more inclusive class period."). The *Leibowitz* Plaintiffs' allegations supporting their longer period, as shown above, are well founded and well documented—and the *Ebanks* Plaintiffs do not appear to argue otherwise.

## **CONCLUSION**

The *Leibowitz* Plaintiffs respectfully submit, for the reasons set forth above and in both their previous motions for lead counsel, that the Court should appoint RCF, SWCK, and S&G as interim co-lead counsel to represent the putative class.

Dated:          February 7, 2020

                                    Respectfully submitted,


/s/ Todd M. Schneider                         /s/ Kyle W. Roche
Todd M. Schneider (*pro hac vice*)            Kyle W. Roche
Jason H. Kim (*pro hac vice*)                 Joseph M. Delich
Matthew S. Weiler (*pro hac vice*             Edward Normand
forthcoming)                                  Jason Cyrulnik
Kyle G. Bates (*pro hac vice*)                Amos Friedland
SCHNEIDER WALLACE COTTRELL                    ROCHE CYRULNIK FREEDMAN LLP
    KONECKY LLP                               99 Park Avenue, 19th Floor
2000 Powell Street, Suite 1400                New York, NY 10016
Emeryville, CA 94608                          kyle@rcfllp.com
tschneider@schneiderwallace.com               jdelich@rcfllp.com
jkim@schneiderwallace.com                     tnormand@rcfllp.com
mweiler@schneiderwallace.com                  jcyrulnik@rcfllp.com
kbates@schneiderwallace.com                   afriedland@rcfllp.com


/s/ Philippe Z. Selendy                       Velvel (Devin) Freedman (*pro hac vice*)
Philippe Z. Selendy                           Constantine Economides
Caitlin Halligan                              ROCHE CYRULNIK FREEDMAN LLP
Maria Ginzburg                                200 South Biscayne Boulevard
Andrew R. Dunlap                              Suite 5500
SELENDY & GAY PLLC                            Miami, Florida 33131
1290 Sixth Avenue                             vel@rcfllp.com
New York, NY 10104                            ceconomides@rcfllp.com
pselendy@selendygay.com
challigan@selendygay.com
mginzburg@selendygay.com
adunlap@selendygay.com


                        *Counsel for Plaintiffs and the Proposed Class*

                                        23