K2o1leia

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID LEIBOWITZ, et al.,

                    Plaintiffs,

            v.                          19 Civ. 9236 (KPF)
                                        20 Civ. 169 (KPF)
                                        20 Civ. 211 (KPF)
                                        20 Civ. 453 (KPF)
iFINEX INC., et al.,

                    Defendants.         Oral Argument

------------------------------x

                                        New York, N.Y.
                                        February 24, 2020
                                        1:14 p.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                        APPEARANCES

ROCHE CYRULNIK FREEDMAN LLP
     Attorneys for Leibowitz Plaintiffs 19 Civ. 9236
BY:  KYLE W. ROCHE, ESQ.
     JOSEPH M. DELICH, ESQ.

SELENDY & GAY PLLC
     Attorneys for Leibowitz Plaintiffs 19 Civ. 9236
BY:  CAITLIN J. HALLIGAN, ESQ.

SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP
     Attorneys for Leibowitz Plaintiffs 19 Civ. 9236
BY:  TODD M. SCHNEIDER, ESQ.
     MATTHEW S. WEILER, ESQ.

KIRBY McINERNEY LLP
     Attorneys for Young Plaintiffs 20 Civ. 169
BY:  KAREN M. LERNER, ESQ.
     DAVID E. KOVEL, ESQ.
     ANTHONY E. MANEIRO, ESQ.

K2o1leia

APPEARANCES
(Continued)

RADICE LAW FIRM, P.C.
     Attorneys for Young Plaintiffs 20 Civ. 169
BY:  JOHN D. RADICE, ESQ.

GLANCY PRONGAY & MURRAY LLP
     Attorneys for Plaintiff Faubus 20 Civ. 211
BY:  GREGORY B. LINKH, ESQ.

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiff Ebanks 20 Civ. 453
BY:  BRIAN E. COCHRAN, ESQ.
     SAMUEL H. RUDMAN, ESQ.

WALDEN MACHT & HARAN LLP
     Attorneys for Defendants
BY:  JAMES WALDEN, ESQ.
     VERONICA M. WAYNER, ESQ.
     DANIEL J. CHIRLIN, ESQ.

K2o1leia

1            (Case called)

2            THE COURT:  Good afternoon to everyone.  There are

3       four of these cases, and three of you are proposing yourselves

4       as lead plaintiff's counsel.

5            With respect to the plaintiffs in what I'll call the

6       Leibowitz action, may I have the appearances of counsel,

7       beginning with plaintiffs' counsel, and may I know in

8       particular who will be arguing the motion for lead plaintiff's

9       counsel.  Thank you.

10           MR. ROCHE:  Kyle Roche for the Leibowitz plaintiffs,

11      and I will be arguing our motion with Caitlin Halligan.

12           MS. HALLIGAN:  Good afternoon.  Thank you, your Honor.

13           THE COURT:  Two of you are going to argue?  Can one of

14      you argue this or no?

15           MR. ROCHE:  We'd prefer -- well, we feel we both can

16      demonstrate the quality of our firms' representation, but if

17      your Honor prefers, one of us can argue.

18           MS. HALLIGAN:  And we promise to be expeditious, your

19      Honor.

20           THE COURT:  I do appreciate that.  The issue is,

21      you're feeding right into my argument, which is that are there

22      too many lawyers on your team, but we'll figure that out.  No,

23      don't worry.  I'll give you that opportunity.  Who else is with

24      you?

25           MR. SCHNEIDER:  Your Honor, Todd Schneider.  I'm going

K2o1leia

1     to listen.

2               THE COURT:  That is a great idea.  Thank you very

3     much.

4               Okay.  Sir.

5               MR. DELICH:  Joseph Delich, your Honor.  I'll also be

6     listening as well.

7               THE COURT:  Okay.  Thank you.

8               And that is it for the Leibowitz team.  Someone else

9     on the Leibowitz team?  Sir, yes.

10              MR. WEILER:  Matt Weiler, and I'll be listening as

11    well.

12              THE COURT:  I appreciate that.  Thank you.

13              May I ask the defendants -- are you at the back table?

14    Thank you.

15              Sir, does your firm have a horse in this particular

16    set of races?

17              MR. WALDEN:  No, your Honor.

18              THE COURT:  All right.  I do appreciate you attending

19    nonetheless.  And you are, sir?

20              MR. WALDEN:  Jim Walden, your Honor.

21              THE COURT:  Thank you.  And with you at the table are?

22              MS. WAYNER:  Veronica Wayner.

23              THE COURT:  Thank you.  And?

24              MR. CHIRLIN:  Daniel Chirlin.

25              THE COURT:  Thank you.  And I won't ask you to

K2o11eia

1    reintroduce yourself in each of the cases.  I know who you now

2    are.  Thank you very much.

3              In the Young matter, may I ask, please, for folks to

4    introduce themselves and tell me who is arguing the motion.

5    Thank you.

6              MS. LERNER:  Good afternoon, your Honor.  Karen Lerner

7    from Kirby McInerney.  I will be arguing the motion.

8              THE COURT:  Terrific.  Thank you.

9              And with you at the table?

10             MR. RADICE:  John Radice from the Radice Law Firm,

11   your Honor.

12             THE COURT:  Okay.  And anyone else from the firm?

13   Yes.  Go ahead, please.

14             MR. MANEIRO:  Anthony Maneiro, your Honor.

15             THE COURT:  Yes.  Thank you.

16             MR. KOVEL:  And David Kovel, your Honor.

17             THE COURT:  Thank you very much.  Thank you.

18             In the Faubus litigation?

19             MR. LINKH:  Greg Linkh, your Honor.

20             THE COURT:  And you're actually the one who has not

21   proposed a team, is that correct?

22             MR. LINKH:  Yes.  We filed a motion in support of the

23   Radice and Kirby McInerney firm, but we are not seeking --

24             THE COURT:  In that respect, sir, do you want to be

25   heard with respect to your motion in support or is it enough to

K2o1leia

1    rest on your written submissions?

2              MR. LINKH:  I'll rest on the papers unless you have

3    any further questions for me.

4              THE COURT:  I do not.  But thank you very much.

5              All right.  And in the Ebanks matter, which -- the

6    gentleman standing is someone other than Ebanks.  Let me --

7              MR. COCHRAN:  That's correct, your Honor.  Brian

8    Cochran from the Robbins Geller firm.  I will be arguing the

9    motion.  And with me in the jury box is Samuel Rudman.

10             THE COURT:  Thank you.

11             MR. RUDMAN:  Good afternoon, your Honor.  I'll be

12   watching.

13             THE COURT:  You'll be watching.  I do appreciate that.

14   Thank you.

15             All right.  I'm going only in order of the date of

16   filing of the complaint, but I'd like to address the Leibowitz

17   motion first.

18             Mr. Roche, I'll let you and Ms. Halligan trade off as

19   need be.  Is it your intention to speak from there or speak

20   from the podium?

21             MR. ROCHE:  If I can speak from the podium.

22             THE COURT:  If you can do that without inconveniencing

23   all of the other attorneys at the table, I'll let you do that.

24             MR. ROCHE:  Not a problem.

25             THE COURT:  You say not a problem.  We'll see what

K2o11eia

1    they say.  All right.

2                MR. ROCHE:  Good afternoon, your Honor.

3                THE COURT:  Sir, good afternoon.

4                Let me ask this question, please.  Am I correct -- and

5    I may not be -- that any of the three proposed lead counsel

6    groups would be adequate under Federal Rule of Civil Procedure

7    23; it's just a question of who best represents?  Or do you

8    believe that one of your competing groups is simply inadequate

9    and it would be inappropriate, indeed reversible error, for me

10   to appoint someone else as lead plaintiff counsel?

11               MR. ROCHE:  No, your Honor.  Our position is that all

12   counsel here is adequate and all three applications consist of

13   excellent attorneys from top-tier firms.

14               THE COURT:  Okay.

15               MR. ROCHE:  So our position, you know, unless your

16   Honor has any further preliminary questions, you know, our --

17               THE COURT:  Actually, just following on that, sir --

18               MR. ROCHE:  Yes.

19               THE COURT:  -- if you agree and if the other folks in

20   the courtroom agree, I'd prefer not to get into a discussion of

21   the legal issues, because I think everyone is in agreement as

22   to what the governing law is, and I'd really like to focus on

23   factual issues that make your proposed team the team that I

24   should enshrine as lead plaintiff counsel.

25               MR. ROCHE:  Yes.  I think that comes down to two

K2o1leia

points, your Honor:

First, I think we've shown the greatest leadership so far in this class action for two reasons.  We were the first to investigate the market manipulation at issue and file the first of its kind class action.

And two, since filing this action, we've put together the team, the best team with cross-functional expertise to litigate this case on behalf of this class.

And, you know, I think what sets our application apart is expertise in the subject matter, and that being cryptocurrency.  This is a market manipulation case, but unlike other market manipulation cases that deal with stocks or commodities, cryptocurrencies are fundamentally unique and relatively new, and this case does potentially represent importance beyond just this case, given that the law on cryptocurrency is relatively new.

As your Honor likely appreciates from the *Tucker v. Chase Bank* matter, cryptocurrencies at a minimum present definitional issues, difficult definitional issues.  These conceptual difficulties will be even more present in this litigation because the implicated statutes are far more complex.  And the competing complaints filed in this litigation already demonstrate this.  There's been a lot of briefing relating to the scope of the competing complaints, primarily on two points: (1) should this case be narrowed to just Bitcoin

K2o1leia

purchasers; and (2) what is required to plead standing under

the CEA's private cause of action.  And I think our application

shows that we've thought through these issues, both from a

legal and technical perspective.

          And to the first issue, we believe that it is not in

the class's interest to carve out Bitcoin purchasers because

the evidence shows that the defendants directly manipulated the

cryptocurrency market as a whole.

          THE COURT:  Please pause for a second, sir.

          MR. ROCHE:  Yes.

          THE COURT:  One of the competing firms -- I believe it

was the Robbins Geller firm -- suggested that in so doing, you

are in fact subjecting yourself and class members to the

possibility of an intraclass conflict.  Could you speak to that

issue, please.

          MR. ROCHE:  Yes.  I don't think -- there is no

intraclass conflict here.

          THE COURT:  Okay.  Well, I assumed you'd take that

position.  But maybe you could tell me why.

          MR. ROCHE:  Yes, a couple points.  One, the fact of

the matter is that most people who buy many cryptocurrencies

also purchase Bitcoin so, you know, it is the case with my

clients in particular.  If we were to create subclasses here,

you'd be putting plaintiffs in separate lawsuits, and, you

know, that speaks to our understanding and why we brought the

K2o1leia

case on behalf of all cryptocurrency holders and purchasers is
that this cryptocurrency market does really work, for purposes
of the statute, as one market.  And as Judge Gardephe held in
the class counsel decision in the *Treasury Securities*
litigation, "Absent a fundamental conflict between class
members, the Court is not required to divide the class."

As I've, you know, articulated before, there's no
fundamental conflict here.  The people who purchased these
cryptocurrencies, and who are harmed by the defendants'
conduct, are people who typically purchase many
cryptocurrencies, especially when you're looking at the peak of
the bubble, which happened in 2017 and 2018.

And I'd like to just make one other point on the
matter.  The Griffin report, which was first published in 2008,
which I think most of our applications have represented, serves
as a fundamental piece of the substance of our allegations.
His central thesis was, "Alternatively, if Tether is 'pushed'
on market participants, Bitfinex supplies Tether regardless of
demand from investors with fiat currency to purchase Bitcoin
and other cryptocurrencies."

And your Honor, I think for purposes of this
particular point, it would be helpful if I handed up to the
Court a -- Joe, do you have a copy of that?  I think this
graph, which is from page 43 of the Griffin report, which was
filed as Exhibit 30 to our complaint --

K2o1leia

1          THE COURT:  Yes, sir.

2          MR. ROCHE:  -- helps illustrate this point.

3          So, your Honor, and I'll -- if you look at -- does

4     everyone have a copy?

5          THE COURT:  You're fine.  Go ahead.

6          MR. ROCHE:  So if you look at the top of this -- and

7     this is the Griffin report we're looking at -- the top part,

8     Exhibit A is Bitcoin.  And what this shows is that in the hours

9     before Tether issuances, Bitcoin's price is going down.  And

10    then shortly after Tether is issued, Bitcoin's price pops back

11    up.  And if you look right below that, the other major

12    cryptocurrencies, which our plaintiffs are the only ones who

13    have purchased, all six other major cryptocurrencies

14    demonstrate the exact same pattern.  Shortly before Tether is

15    issued, the price goes down, and then right after, the price

16    goes back up.

17          And to separate the class into just Bitcoin purchasers

18    I think presents, frankly, discovery issues.  Defendants are

19    going to argue, well, the class is just Bitcoin so you don't

20    get our transactional data from our exchange related to

21    purchases of other cryptocurrencies, and, you know, that is not

22    in the class's interest because the scheme perpetuated by the

23    defendants was complex.  They used Tether to purchase not just

24    Bitcoin but, as Griffin points out, other cryptocurrencies as

25    well to inflate the market, depending on what was most

K2o1leia

1   profitable at the time.

2           Your Honor, unless you have any further questions, I'd

3   like to -- I said we'd be brief -- have Caitlin Halligan come

4   up here and speak to the strength of the team.

5           THE COURT:  All right.  I may direct my questions to

6   her, but thank you very much.

7           Ms. Halligan.

8           MS. HALLIGAN:  Thank you, your Honor.

9           Let me be very brief, and let me start by answering

10  the first question that you asked, which is:  Do we have too

11  many law firms here.

12          THE COURT:  Yes.

13          MS. HALLIGAN:  So rather than file follow-on

14  complaints, we pooled our resources because we think that

15  together, our shared expertise will best serve the class.  In

16  terms of how that would work and why it would be efficient, as

17  you have seen, Mr. Roche has substantial, deep, and I think

18  probably unparalleled among the folks in this room, expertise

19  in cryptocurrency and how it works that would be extremely

20  beneficial in terms of moving us through this case, including

21  discovery, without needing to rely as heavily on experts.

22  Mr. Schneider's firm has deep, deep class action experience.

23  He has handled many cases around the country.  And Selendy &

24  Gay has substantial experience handling very complex financial

25  matters and other litigation, and we also have substantial

K2o1leia

expertise with respect to the state law claims that are at

issue here, as well as RICO.  So our view is that together we

could best serve the Court and the class in what is a very

complicated case involving a lot of novel issues of fact, of

technology, and of law.

THE COURT:  The concern I have -- and it's borne out

by other cases in which I've been involved -- is that sometimes

the team can just be too unwieldy.  My concerns are several.

One is that in other cases that I've had, I've made clear to

the team that I will only speak with one person, that I only

want to have communications, from my perspective, with one

person.  And though it will sound a little bit as though I'm

contradicting myself, I do want to minimize the possibility of

unnecessary duplication of effort or what I fear is like a

conference call that goes on every day where everybody just

tells everybody else something because of the sheer numerosity

of attorneys.  How can I have comfort that three law firms is

not too many law firms?

MS. HALLIGAN:  Well, first of all, with respect to the

first point your Honor raised, I can certainly represent to you

that going forward, one of us and only one of us will address

the Court.

THE COURT:  Okay.

MS. HALLIGAN:  And to the extent that that protracted

proceedings today, we apologize to that.  Really the reason

K2o1leia

| | |
|---|---|
| 1 | that we both wanted to get up is to explain why it was that |
| 2 | Mr. Schneider's firm and our firm, having seen the first |
| 3 | complaint that was put together, thought that it was what would |
| 4 | most effectively represent the interests of the class.  So that |
| 5 | was really what we wanted to convey to your Honor. |
| 6 |         In terms of duplication, I can assure you that, as we |
| 7 | did in thinking about the hearing today, that there will be no |
| 8 | unnecessary communications with the Court or otherwise.  I |
| 9 | think we all are fairly busy with a range of matters and will |
| 10 | be very judicious in handling that. |
| 11 |         THE COURT:  I wasn't being clear enough. |
| 12 |         MS. HALLIGAN:  Pardon me, your Honor. |
| 13 |         THE COURT:  No, no.  My concern is not merely that I'd |
| 14 | have 20 of you writing me at the same time; my bigger concern |
| 15 | is that if and when there were to be a fee petition in the |
| 16 | case -- |
| 17 |         MS. HALLIGAN:  Yes. |
| 18 |         THE COURT:  -- we're getting miles and miles ahead of |
| 19 | ourselves -- that I would see 20 different people on a |
| 20 | conference call and all billing for that conference call.  So |
| 21 | what I'm trying to understand is, if you can share -- |
| 22 |         MS. HALLIGAN:  Yes. |
| 23 |         THE COURT:  -- what would or has been put in place to |
| 24 | minimize the amount of wasted time getting everybody up to |
| 25 | speed. |

K2o1leia

1          MS. HALLIGAN:  Well, for example, your Honor, we have

2     thought through how we would allocate responsibilities going

3     forward.  Maybe sharing that with you will give you some

4     comfort on that front.

5          So for example, I think that with respect to a lot of

6     the fact discovery that would take place here, Mr. Roche's

7     firm, especially because of the deep expertise they have and

8     the work that they have already done in retaining two experts,

9     would handle the bulk of that.  I think that Selendy & Gay

10    would handle, for example, working with an expert to look at

11    the economics of the manipulation, and it would probably do

12    some amount of the work with respect to depositions.

13    Mr. Schneider's firm I think would take the laboring oar with

14    respect to class certification and class discovery.  So we've

15    already had a conversation among ourselves, your Honor, about

16    how we would divide that.  And I think that Selendy & Gay would

17    take the lead on briefing and arguing substantive motions

18    because it's an area where we have a lot of expertise,

19    including in this courthouse.  So we've already tried to put in

20    place I think a strategy that would ensure that there wouldn't

21    be any unnecessary duplication.

22          I would also just add, your Honor -- and I'm sure this

23    is evident from the papers -- that the Kirby group I think also

24    already has three firms -- the Kirby, Radice, and it looks to

25    me like Glancy as well.  And so I think that we are not alone

K2o1leia

in recognizing that making sure there are sufficient resources

to properly handle this absolutely in a cost-efficient way but

handling it appropriately is the right way to go.

          THE COURT:  I think I understand what you're just

saying.  I'm assuming -- I think the answer is that I know this

already, that I have the fees of the teams that have been

presented to me -- I cannot say, well, two of you can stay but

I will not have a third law firm on the case, because that

would be a level of micromanaging I wouldn't have to do.  I

would really only get involved if it got to the point where it

would complicate things or whether things were not presented

adequately to me or I began to feel as though there was

unnecessary churning of the amount.  But I don't get to tell

you to have two firms, correct?

          MS. HALLIGAN:  Do you mean suggesting that we go from

three to two?

          THE COURT:  Indeed.  Indeed.

          MS. HALLIGAN:  Sort of a maybe a *Survivor* in the

courtroom?

          THE COURT:  Exactly.  Who are you voting off the

island?

          MS. HALLIGAN:  Yes.  Your Honor, obviously, you know,

we will follow whatever guidance the Court suggests, but truly,

I can assure you that we will not be looking to duplicate or,

you know, be anything other than exceedingly efficient.  And a

K2o1leia

1    number of us I think have come from other experiences where

2    efficiency has been at a premium.  I think that that's how we

3    approach our work just as a matter of due course, and I can

4    assure the Court that we would take on this assignment in

5    exactly that same way.  It's also what is obviously going to

6    serve the best interests of the class, but I think it's how we

7    all prefer to practice as well.

8          THE COURT:  You argue that a lot of what's in the

9    three complaints that follow the Leibowitz complaint is lifted

10   from the Leibowitz complaint.  Is it possible that that's just

11   because it's information that's out there in the public and

12   it's come from that publicly available information, or do you

13   actually believe that they are lifting language, or lifting the

14   work product of your complaint?

15         MS. HALLIGAN:  Your Honor, you know, whatever's in the

16   complaint is in the complaint.  I do think some of the

17   paragraphs in some of the complaints read remarkably similarly.

18   But here's what I think the value added is that Mr. Roche and

19   his firm brought to the table in crafting the first complaint.

20         So if you step back, there are two pieces of

21   information out there in the world.  One is the Griffin report,

22   which has since been updated, but it was updated after the

23   complaint was filed, and that report lays out and explains the

24   way in which US dollar Tether issuances were transacted in a

25   way that gives rise to an inference of manipulation.  The

K2o1leia

```
1    second piece of information is an affirmation filed by the New
2    York Attorney General's Office in a GBL Section 354 action that
3    the Attorney General's Office brought under the Martin Act to
4    put a lock on funds, and in that application, the Attorney
5    General details concerns about whether or not there's
6    sufficient funds to make it credible that there is actually a
7    one-to-one dollar backing.  So those two pieces of information
8    were in the world, and Mr. Roche and his firm not only put
9    those together but did the work to understand what legal claims
10   those might give rise to.  So it's very different than, for
11   example, a stock-drop case, where the claims are fairly
12   self-evident, or a case where either the Justice Department or
13   the New York Attorney General's Office engages in an
14   investigation and issues an assurance of discontinuance and
15   then you quickly see follow-on litigation that's tied to those
16   findings.  The work of understanding the implications for the
17   class members was really the value added.  So to the extent the
18   theories are the same or the graphic representation of those
19   U-shaped price curves that you see in one of the complaints, I
20   think that that's simply a representation of the allegations
21   set forth in the first complaint.
22            THE COURT:  Realizing that in having you speak first
23   there's a certain advantage that you have over the other two
24   teams that are putting themselves forward, do you want to speak
25   now about why you believe your team should be picked over the
```

K2o1leia

other two.  And you've spoken in all positive terms, and in an

appropriate but nonetheless critical way, I would like you to

comment on your competition.

            MS. HALLIGAN:  Sure.

            So obviously, your Honor, you have before you I think

very expert, seasoned law firms who have particularly deep

experience in the class action front.  I think that the

cryptocurrency expertise that we bring to the table will be

essential for a couple of reasons.  And I don't think there's

any indication that it's matched, both with respect to

Mr. Roche and his colleagues as well as the experts that

they've retained.

            So first of all, I think understanding how these

transactions work sufficient to elucidate how there is

manipulation, I think that that's the nub of this case, and so

being up the learning curve on that I think is a tremendous

advantage to the class.  And I also think it will make

discovery much more efficient.  Some of the discovery here will

be about understanding how you unpack the blockchain ledger.

Now the details of that I would leave to Mr. Roche, but I

certainly understand enough to know that being able to come to

the table and have a sophisticated conversation about that with

our experts will be much more efficient.

            I think also, when you look at the scope of the

complaints, they are different in meaningful ways.  As

K2o1leia

Mr. Roche explained, I think, especially because the Griffin

report identifies at least six other cryptocurrencies -- and I

think that's why he handed that up -- in which the pricing

curves look the same, there is every reason to think that the

manipulation goes beyond Bitcoin itself, and so we don't see

any reason to artificially narrow the class to Bitcoin

purchasers.  And in addition, I think there may be questions

about whether or not the plaintiff in the case alleging simply

Bitcoin purchases, not purchases of futures, whether there is

actually a viable cause of action under the Commodities

Exchange Act, and those are four of the seven claims in that

complaint.

         Finally, I think that the inclusion of the state law

claims is very important here.  The General Business Law

Section 349 is extraordinarily broad.  It covers any

consumer-oriented conduct.  Now Mr. Walden has already

suggested to the Court in his premotion letter that he thinks

it's not within the scope of the statute.  I think we'd have a

very different view on that point.  But I can tell you that we

have very deep experience litigating the scope of that statute

before the New York Court of Appeals, including as recently as

two weeks ago.  And so I think our ability to understand the

scope of that possible allegation and claim is something that

would be very advantageous to the class.

         THE COURT:  All right.  Anything else?

K2o1leia

```
1            MS. HALLIGAN:  Last point I would make is this, your
2    Honor:  I think this is a case, probably obviously, that poses
3    tremendous novel questions of law and fact, and we are very
4    much committed to certainly advancing the interests of the
5    class, making sure that this case is litigated as vigorously as
6    it should be but also to helping the Court make its way through
7    this new technology, new legal issues, in a way that is
8    helpful.
9            THE COURT:  Thank you very much.
10           MS. HALLIGAN:  Thank you, your Honor.
11           THE COURT:  Ms. Lerner, do you wish to be heard now on
12   behalf of the Kirby firm, Kirby team.  I don't know how you've
13   defined yourselves.
14           MS. LERNER:  Yes, your Honor.  I think we've defined
15   ourselves as the Kirby-Radice team.
16           THE COURT:  Thank you so much.  I'm sorry, Mr. Radice,
17   for leaving you out.
18           Yes.  Okay.  Then let me hear from you, please, as to
19   why.
20           MS. LERNER:  Good afternoon, your Honor.
21           THE COURT:  Good afternoon.
22           MS. LERNER:  I'd like to discuss briefly five reasons
23   why I believe that the Kirby-Radice team should be appointed
24   interim co-lead counsel.
25           First reason is, we have filed the most original
```

K2o1leia

1    investigation here.  It far surpasses any other complaint

2    currently before your Honor.  It's not that we have every

3    reason to believe; it's that we actually have included three

4    specific regression analyses.  We have identified for the first

5    time at least 236 specific transactions over 115 days that we

6    have alleged that the defendants manipulated Bitcoin prices on

7    U.S.-based exchanges.  And for the absence of doubt, let me

8    just say one more time, there is no other complaint that

9    includes that level of investigation.

10           The second is that we are the most qualified.  Your

11   Honor, any suggestion here that our complaint is in any way

12   derivative denigrates our experience in this area to the extent

13   that we were working on this matter in particular months before

14   any other complaint was filed.  We are class action lawyers.

15   We come from two experienced law firms.  This is what we do

16   every single day.  We are antitrust, commodities lawyers.  We

17   focus on esoteric financial instruments in derivatives, on

18   exchanges.  This is really what we do.

19           The third reason, your Honor, resources.  We have

20   already committed significant time and investment in this case,

21   efforts, and we have more than ample wherewithal, just based on

22   our experiences, to see this through to resolution.

23           THE COURT:  Let's pause on that.

24           MS. LERNER:  Sure, your Honor.

25           THE COURT:  Because it has two parts to it, and the

K2o1leia

1    one is what you've done so far, and the second part of it is

2    what you intend to do in the future.  You've heard my

3    discussions with the first team, Mr. Roche and Ms. Halligan,

4    about my concerns about there being overstaffing or too many

5    lawyers on the case, or a structure that would be inefficient

6    in terms of either communicating with me or getting information

7    out to the team.  I would like to hear from you on that point,

8    and then I'll work backwards to the work that you've done so

9    far.  So if you could speak to that point first, please.

10             MS. LERNER:  Sure, your Honor.

11             In terms of how we plan to work this matter here,

12    we've given a lot of thought to it.  It's based on our past

13    experiences in numerous, large antitrust commodities class

14    actions.  I understand your Honor's concern completely when you

15    talk about fee applications, because we file them regularly

16    before the court.  Right now we're seeking final approval in

17    the largest futures-only class action matter in history of that

18    settlement, before Judge Buchwald in this courthouse.  So I

19    understand.

20             I don't believe that two law firms, the Kirby-Radice

21    team, would be overstaffing.  We have slightly over 40 lawyers

22    who are available to be working on this matter.  We've thought

23    about it very carefully, based on expertise, based on what we

24    do all the time.  We know our strengths.  We have an incredibly

25    strong working relationship, having previously worked with the

K2o1leia

1    Radice firm on other class actions, that we know that nobody

2    puts their ego here in terms of the type of work that we're

3    going to do.  What we're really interested in is serving the

4    best interests of the class.

5             THE COURT:  On the issue of the work that you've

6    committed to date, I'd like to understand that a little bit.

7    To the extent that what you're saying is, as you began by

8    saying, yours is the most original complaint, yours has the

9    most original work and it should be recognized, I understand

10   that, but I'm sure you're not arguing that just because you've

11   spent a lot of time thinking about these issues, that is

12   something that necessitates my appointing your team of firms as

13   co-lead counsel, right?  Am I correct?

14            MS. LERNER:  Absolutely, your Honor.

15            THE COURT:  Okay.

16            MS. LERNER:  Of course.  You know, what I'm really

17   getting at here is two things.  The first thing I think is the

18   idea that first to file involves some sort of -- deserves some

19   sort of credit in this case.  Here, the real reason, you

20   know -- if you look like at the *GSE Bonds* case, the real reason

21   why first to file gets points for originality is because of

22   just that -- it's original.  That's just simply not the case

23   here.  Instead, there aren't a whole bunch of copycat cases

24   that were filed after.  The case that was actually filed after

25   is ours.  That case is completely original.  So I would say,

K2o1leia

1   you know, that in terms of why I would talk about our original

2   complaint and the first to file, that's really why.

3            The second thing I would say is, in terms of the

4   original investigation here that we've done, you need that in

5   order to withstand a motion to dismiss, and, your Honor, we

6   know that this case was filed in October by the Roche law firm.

7   We had already, like I said, you know, worked on this for

8   months.  The reason why we decided to file in the Western

9   District of Washington is specifically because we allege that

10  the defendants manipulated the price of Bitcoin through

11  U.S.-based exchanges.  One of those happens to have been

12  headquartered in Seattle.  We then went ahead, we filed in

13  Seattle, where we had planned, in the Western District of

14  Washington.  That was November 22nd.

15           On December 2nd, your Honor, the Roche firm, the Roche

16  team sent your Honor a letter and said that they had intended

17  to stand on their complaint, and we really felt that our

18  complaint already had offered them particularized allegations

19  that would have assisted in withstanding a motion to dismiss.

20  At that point, your Honor, we really thought that for

21  efficiency's sake, how often we litigate here, it just became

22  clear that the two cases needed to come together.  We became

23  incredibly concerned.  In addition, you know, the Griffin

24  article had already been updated, and we needed to avoid the

25  potential for inconsistent rulings.  We then worked

K2o1leia

1    cooperatively with the defendants.  They agreed to accept

2    service of process in this district and to facilitate

3    consolidation.  And that's what brought us here.

4            We believe that the complaint that we filed -- and I'm

5    more than happy to go into why I believe that our investigation

6    actually is much stronger than any of the other complaints

7    here, more original.  We believe that our complaint is the one

8    that can better withstand a motion to dismiss.

9            THE COURT:  Is it possible that the Leibowitz team,

10   "Roche and Pals," could update their complaint in order to

11   include the information that you've brought to my attention in

12   your complaint?

13           MS. LERNER:  Sure, your Honor.

14           THE COURT:  I'm not saying they would.  They haven't

15   yet said they would either.  But I think I'm understanding you

16   to say that part of the reason that you're here is you're

17   concerned that a class that you were seeking to represent in

18   the Western District of Washington was going to be ill served

19   in this district.  Correct?

20           MS. LERNER:  Your Honor, I wouldn't say ill served.  I

21   don't want to do the defendants' work for them.  And I

22   definitely don't want to say anything negative about any of the

23   other complaints, from a legal perspective, that have been

24   filed.  But I will say that we do have more particularized

25   allegations in our complaint that would have been better able

K2o1leia

1    to withstand a motion to dismiss and that there was a grave

2    concern about inconsistent rulings in the Western District of

3    Washington if we had remained there.

4            The other option was we could have gone through an

5    MDL.  That would have slowed things down tremendously.  Again,

6    your Honor, we were thinking very strongly about the best

7    interests of the class, and it seemed that getting as quickly

8    as possible -- which is exactly what we did -- here before your

9    Honor, working cooperatively with the defendants to get here,

10   seemed like the best course of action.

11           THE COURT:  One of the things that you put forward as

12   your strength is the proprietary algorithm.  I'm not sure you

13   can disclose it to me because it would be less proprietary, but

14   I would like to understand, because your adversaries are

15   suggesting that your proprietary algorithm isn't all that big

16   of a deal and a lot of work that is analyzed and discussed in

17   your complaint is derivative of either Professor Griffin's

18   article and its update or things that are readily available to

19   the public.  Perhaps you could explain why they are incorrect.

20           MS. LERNER:  Your Honor, it's not just the proprietary

21   algorithm, which I would not want to disclose the methodology

22   behind it, but I'm more than happy to talk about it.  It's in

23   no way just a matter of what the Leibowitz team did.  Basically

24   after they saw our complaint, in their opposition to our motion

25   papers they blew up their own publicly available graph and they

K2o1leia

noticed that there were these repetitive U-shaped curves.

That's not really where, your Honor, you know, our proprietary

algorithm came in.  Where our proprietary algorithm came in was

that we then went on and we did an econometric analysis in

order to determine 115 specific days, 115 specific days with

236 specific instances where there was manipulation of Bitcoin

directly through -- and this is the important part, your

Honor -- U.S.-based exchanges.  There's nothing like that that

exists, and there's nothing derivative about that or out there

in the publicly available information that did not involve our

experts that we worked very strongly with in order to come up

with that.

          THE COURT:  Okay.  Could you speak to the issues

raised by the Robbins Geller firm with respect to intraclass

conflicts and the advisability, or not, of defining the class

more narrowly.

          MS. LERNER:  Your Honor, I can.  I just have two more

things that --

          THE COURT:  Of course.  Oh, yes.  Points 4 and 5?

Yes.  That's fine.  As long as you remember --

          MS. LERNER:  Yes, and I intend to be brief, but I just

want to also say that in terms of pleading standards, we have

three regressions, so I didn't even get to that yet.  You know,

and I'll just say about those regressions that two of them deal

with, in terms of pleading standards, demonstrating the

K2o1leia

lockstep pricing relationship between Bitcoin and Bitcoin

future prices.

          THE COURT:  Can you slow down for court reporter and

judge.  Thank you so much.

          Okay.  Go ahead.

          MS. LERNER:  I do this in depositions too.  I

apologize to the court reporter.

          But basically one of our regressions, your Honor, is

critical for withstanding a motion to dismiss, the pleading

standards that have been articulated -- for instance, in the

*AFEX* case.  We have a lockstep pricing relationship that we

have demonstrated between spot Bitcoin and Bitcoin futures

prices.  And we did that both for the CME as well as the CBOE.

          And then the other regression that I would point your

Honor to is that we didn't just take publicly available

information and suggest that the defendants may have been

replenishing their Tether holdings at the end of the month by

liquidating Bitcoin; we actually have a regression that

determines that.  So I would just say that, you know, in terms

of our complaint, in no way being derivative of what is out

there from any other party, you know, we are by -- far and away

we have the most original complaint.

          So your Honor, you wanted me to go back to points 4

and 5?

          THE COURT:  Yes, please.

K2o1leia

1          MS. LERNER:  Okay.  So just for point 4, I think we

2     already really talked about it.  I was going to just mention

3     under the discretionary factors that we have been able to work

4     with the defendants, with Mr. Walden.  They've already agreed

5     to accept service of process here in this district for the

6     Young plaintiffs and to facilitate consolidation in order to

7     expedite matters to get us here, as I explained.  We also have

8     the support of the Glancy firm that filed the Faubus action.

9          The last point that I would say is that the structure

10    that's been proposed by Robbins Geller, at this point we see

11    that as premature.  It would be very inefficient at this point

12    to run a subclass.  It's also out of synch with the case law

13    under *Treasury*, *AFEX*, and *Gold*, and it's unnecessary because

14    there is no actual conflict.

15          And your Honor, you asked, you know, just as a last

16    point, every case really involves novel law and facts.  I mean,

17    all of the cases that we see being cited in this case, your

18    Honor, in order to make novel law are going to be cases that

19    the Kirby-Radice team has already been involved in.  We'd like

20    to build on those cases.  We work inclusively with other firms

21    all the time.  That's what we do in these class actions.  We

22    accommodate all varieties of leadership structures.  But we

23    really believe that by far, the Kirby-Radice team is best

24    suited to be appointed in this case.

25          THE COURT:  Anything else you'd like me to know?

K2o1leia

1          MS. LERNER:  I would be happy to discuss any questions

2     that your Honor has, but I think that we've covered a lot of

3     the waterfront.

4          THE COURT:  I think I'm fine.  I believe -- but you'll

5     tell me if I'm wrong -- that in giving me your reasons for why

6     the Kirby-Radice team is the team that should be hired, you

7     have implicitly explained why the other two teams should not be

8     hired, but if there is something more specific -- I know they

9     will not take offense, and I really do need to know, so if

10     there's something specific you'd like to say with respect to

11     either of the other teams, I'd be happy to hear from you on

12     that point.

13          MS. LERNER:  Your Honor, you know, we have great

14     respect.  We work with all these firms, you know, all the time.

15     We have a long history working with other firms, so I think

16     that we don't want to say too much else.  I'm happy to take

17     questions, but I'll rest at this time.

18          THE COURT:  That is it.  Thank you very much.

19          All right.  Mr. Cochran?

20          MR. COCHRAN:  Yes, your Honor.

21          THE COURT:  Mr. Cochran.

22          MR. COCHRAN:  Would it be okay if I present from here,

23     your Honor.

24          THE COURT:  Of course it would be.  Thank you.  I

25     understand.  And actually, I appreciate it, and the folks

K2o1leia

1    sitting next to you I'm sure do as well.

2          May I ask, sir, in light of what you've heard from

3    Mr. Roche, Ms. Halligan, and Ms. Lerner, you're still

4    persisting with your motion to be appointed interim counsel?

5          MR. COCHRAN:  Yes, your Honor.  In fact more so.  I've

6    been emboldened.  But I have responses to a lot of what was

7    said, so I can get to those or I can answer your questions,

8    your Honor.  Whatever you prefer.

9          THE COURT:  No.  Whatever you'd like to tell me, I'd

10   like to hear.

11         MR. COCHRAN:  So I will echo what's been said already.

12   I think you have three groups of well-qualified lawyers before

13   the Court.  However, that's not the Rule 23(g) standard for

14   interim class counsel.  In particular, I think the Schneider

15   Wallace and Selendy & Gay firms would be inappropriate because

16   Rule 23(g)(1)(A)(i) looks to work counsel has done in the case.

17   The Court must consider that factor.  They've done nothing in

18   the case that they have noted at any point.  Rule 23(g) is not,

19   you filed a deficient motion and then in the responses, well,

20   I'm going to bring in other lawyers who have maybe more

21   resources or more experience under the factors to try to fix

22   that, which I believe is somewhat of what is going on here.  So

23   that's --

24         THE COURT:  Wait, wait.  Let me make sure I understand

25   what you're saying.  Do you suggest that they've actually just

K2o1leia

1    filed a placeholder complaint, or is it that the complaint,

2    wittingly or otherwise, was inadequate and they're just trying

3    to shore it up now by bringing in other law firms?

4              MR. COCHRAN:  Your Honor, Roche is the only firm that

5    filed a complaint.

6              THE COURT:  I'm aware.

7              MR. COCHRAN:  Schneider and Wallace did not file a

8    complaint.  They've said -- and the Selendy & Gay firm only

9    came on in terms of the responses, so not even on the initial

10   motion, and they've not said anything that they've done in the

11   case with respect to their two firms.  So I think that's

12   inappropriate to appoint.  I've actually never had a situation

13   where a firm has come in, you know, midstream on a leadership

14   motion and say, well, I'm going to add me to that group too.

15   So I think that is inappropriate.

16             THE COURT:  Well, then let me make sure I understand

17   what you're saying.  You're not disputing, or maybe you are

18   disputing, that were they added to the Roche team, they would

19   bring value; your point is that the inquiry for me has to have

20   been what to date have they done, not what can you expect them

21   to do if I appoint them as interim co-lead counsel.

22             MR. COCHRAN:  Exactly, your Honor.  Under

23   Rule 23(g)(1)(A)(i), the Court must consider the work that the

24   firms have done to date.

25             THE COURT:  But what if the work that they've done to

K2o1leia

1  date includes meeting with the Roche firm, understanding the

2  nature of the complaint, and bringing their own experience to

3  bear on the state law causes of action and the anticipated

4  class action issues and anticipated motion to dismiss?  I mean,

5  what I'm saying, inartfully this time, is that their work may

6  not be evident from the materials that are docketed, and yet

7  may be evident from the submissions that they've made, their

8  written submissions in connection with this motion and their

9  presentation here today.  Is that not what I am to consider?

10          MR. COCHRAN:  Well, I think if they had something to

11  say, they would have said it, your Honor, so I think it's not

12  appropriate to really speculate about what they've done to

13  date.  They haven't said anything.  It's not in the papers.

14          THE COURT:  Well, they've told me today that they have

15  been meeting and discussing how best to structure the team so

16  that the strengths of the team are used best.

17          MR. COCHRAN:  Yes, and that is perfectly appropriate

18  for consideration, your Honor.

19          THE COURT:  Okay.  But you're saying that's not enough

20  because two of the three legs of the tripod haven't really done

21  anything with respect to the pleadings or the contemplated

22  motion to dismiss opposition.

23          MR. COCHRAN:  Right, your Honor.  I think our view

24  would be that it's more than putting together a leadership

25  application that needs to be done.

K2o1leia

So now the Radice firm has made much of their experience in the cryptocurrency space, the one cryptocurrency case, the *Wright* action in Florida, and have argued that somehow that endows them with substantially more expertise than my two cryptocurrency cases, notwithstanding the fact that those are actually class actions, which is what the language of the Rule 23(g) specifies, and they've been pending for a longer time than those.  Now I don't think anybody can stand up here and claim decades of experience with cryptocurrencies.  It's a new field.  So I think that that factor, you know, to the extent the Court considers it, I think it actually favors our firm being appointed, but to be frank, I don't think anybody can claim to be the expert in this space.  That case is still ongoing.  Nobody can recover for anybody at this point.

Now with that being said, I think in many respects, although it's a shiny new package in terms of the cryptocurrency nature of the case, the content is your classic pump-and-dump market manipulation scheme.  And the Robbins Geller firm is among the most experienced firms in the country in this space.  We've secured many of the largest recoveries in history, including the *Enron* class action, recently the *Interchange Antitrust Litigation*, which, again, under 23(g)(1)(A)(i) is particularly relevant.  It involves a claim that's at issue in this case, which Judge Brodie just signed off on at the end of last year.

K2o1leia

1          And to look again, you know, by comparison at the

2     Roche firm, you know, let's hold up this cryptocurrency

3     experience.  Well, if you look at the actual submission that

4     they made in their opening papers -- and I agree they've tried

5     to add on firms subsequently, add experience and add heft, but

6     there's not significant plaintiff side class action experience,

7     with the exception of Mr. Economides, who at the time he was

8     working on those cases was an associate at my firm.  So I think

9     it's somewhat ironic that in their application to appoint

10    themselves over Robbins Geller today, they're actually relying

11    on cases where Mr. Economides was working under lawyers at my

12    firm.  And I think that relative lack -- I'm not questioning

13    the qualifications of the lawyers.  Again, I'm focused on just

14    what the Rule 23(g) inquiry is.  I think that inexperience

15    really shows in the pleading, the way the case was framed.

16         Your Honor, for example, paragraph 14 of the Roche

17    complaint claims there's $1.4 trillion in liability at stake,

18    which is roughly the GDP of Spain.  I think, you know, anybody

19    can put some astronomical figure in a pleading; it's quite

20    another thing to go out and actually demonstrate that you're

21    able to get a significant recovery for your clients and for

22    investors.  So we think those factors heavily weigh in our

23    favors, the knowledge of law and expertise.

24         Now as to the investigation and the prefiling work,

25    Robbins Geller has spent the most time of any of these firms in

K2o1leia

1    crafting the pleadings, developing a legal strategy that we

2    believe provides the best avenue for success to the putative

3    class.

4           THE COURT:  Please back up a moment.  I want to hear

5    what you said again.  You spent the most time, is that it?

6           MR. COCHRAN:  I believe so, your Honor.

7           THE COURT:  How do you know?

8           MR. COCHRAN:  Oh, well, I guess we don't really know,

9    but, you know, we --

10          THE COURT:  I'm not disputing, sir, that you and your

11   firm have spent a lot of time on this case, but when you use

12   superlatives like "we spent the most time," I candidly just

13   don't know.  I don't think folks have given me to date an

14   aggregate amount of time that the putative members of their

15   interim co-lead counsel team have spent, and so I just worry

16   about that.  I want to keep you honest.

17          MR. COCHRAN:  And I can explain what the basis is for

18   that.

19          THE COURT:  Please.

20          MR. COCHRAN:  So your Honor, everybody became aware of

21   this issue with the publication, not -- it wasn't a

22   publication; it was the Griffin report, which came out in June

23   of 2018.

24          THE COURT:  Yes.

25          MR. COCHRAN:  Okay.  I actually called Professor

K2o1leia

Griffin after that report came out and talked with him about

his paper and his analysis because I thought, if you're going

to sue somebody for market manipulation, it's incredibly

important that you understand this analysis.  I also retained a

market manipulation expert as a consulting expert to

corroborate the findings of the Griffin report.  However, we

thought it was prudent to wait until that report received

peer-reviewed publication.  That way -- because at the time,

Bitfinex was saying, this is not true.  And we thought it was

important to wait because through the peer review process, now

the filings have a legitimacy from academic standards in that

field saying this has a basis.  So the Roche firm filed before

that came out.  We thought it was prudent to wait and see how

that got -- that it was accepted, number one, and how the

report changed.  In fact, it did change in ways that actually

made it a better case, in our view.

THE COURT:  Has anyone retained Professor Griffin as

their expert witness?

MR. COCHRAN:  As far as I'm aware, no, your Honor, and

it was very important to him that, you know -- he was not

interested and partly because, you know, there was the peer

review process ongoing at the time.

THE COURT:  Fair enough.

Go ahead.

MR. COCHRAN:  So again, we took that time; that time

K2o1leia

1    paid off.  You know, before I was a lawyer, your Honor, I was a

2    teacher, and I would give an assignment, and if the students

3    came back in ten minutes and got all the answers wrong, they

4    got a lower grade, but if they took their time and they got all

5    the answers correct, they got a higher grade.  And I think the

6    Rule 23(g)(1)(A)(i) inquiry looks at that.  It's not who is

7    first to the courthouse but who put in the superior pleading

8    and superior work product.

9             And I'm just going to point out what I believe are a

10   couple -- there are many examples I can give, but I'm going to

11   point out a few from the Roche pleading that I think are very

12   concerning.  The first is the class definition.  The Roche firm

13   has defined the class to include everyone who has owned or

14   transacted a cryptocurrency over a six-year time frame.  A

15   cryptocurrency is an asset class.  It would be akin to defining

16   the class as everyone who owned a stock or everyone who owned a

17   bond.  The definition is hopelessly overbroad.  But again, I

18   think that speaks perhaps to the relative lack of experience to

19   actually prosecuting, from the plaintiff's side, one of these

20   cases through the merits phase of the proceedings, where you

21   actually have to put on evidence at summary judgment and at

22   trial, sustain your burden of proof in front of a judge and

23   jury.

24             THE COURT:  One moment, please, sir.

25             I hear what you're saying, and if we were just talking

K2o1leia

1    about the complaint on the day it was filed, the Roche

2    Leibowitz complaint on the day it was filed, I might agree with

3    you.  But now I have a whole bunch of lawyers in this room, the

4    majority of whom seem to think that we should be proceeding in

5    a way contrary to the way you're defining the class.  So are

6    they all wrong?

7              MR. COCHRAN:  Well, your Honor, I don't -- if I may.

8              THE COURT:  You may.

9              MR. COCHRAN:  I don't know that I agree that we have

10   everybody -- it feels that way.  The Kirby firm filed a class

11   that is not -- with the same definition.  I'm sure they filed

12   the one they felt was best.  That's on behalf of Bitcoin and

13   Bitcoin futures.

14             THE COURT:  Right.

15             MR. COCHRAN:  Okay.  That's much closer to my class

16   definition, and I don't think that presents the same problems,

17   because they've done these types of cases; they know what it

18   takes to actually prove your case.  I don't think anybody can

19   stand up here and say, we're going to prove every

20   cryptocurrency.  There are hundreds, if not thousands of

21   cryptocurrencies in existence.  We have market-specific claims.

22   There is no allegation in any of the three complaints filed by

23   any law firm that defendants took specific actions with

24   specific intent to manipulate any of those other markets.

25             THE COURT:  What about the graph I was just handed

K2o1leia

today, which is an exhibit to the complaint?

        MR. COCHRAN:  That's not the actions of defendants.
That's potentially the effect of defendants' market
manipulation scheme, but the allegations are consistent across
all three of the complaints, which is that defendants issued
Tethers, used those Tethers to buy Bitcoin.

        THE COURT:  Okay.

        MR. COCHRAN:  That's the case.  That's all anybody has
alleged, as far as I'm aware, and Griffin has found you could
have some of these other markets who were impacted but
certainly not all cryptocurrencies in existence, which is going
to create huge problems for this case.  If their liability is
anything close to the $1.4 trillion that the Roche firm is
suggesting, you have a limited fund situation.  I don't need to
know the finances of Bitfinex to know they don't have a
trillion dollars on hand to pay the claim.  So you're
essentially taking money and potential recovery from the true
victims of defendants' scheme and complicating things and
making it less likely that they'll actually receive recovery.

        Now I do want to make one point of clarification.  We
are not asking the Court to define a subclass or choose a class
or whatever today.  That is not our request.  Our point is that
under the Rule 23(g) factors, the Court is to look at the work
that plaintiff's counsel has done to date and the adequacy of
representation.  And we think of the firms here, we alone have

K2o1leia

1    made it important to put the true victims, the Bitcoin

2    purchasers, front and center.  If we were appointed lead of the

3    case, we would be lead of the whole consolidated action, and

4    just like any firm here, in that same situation, we owe a

5    fiduciary duty to the class and define the class as we think is

6    best, just like they said they plan to do.

7            THE COURT:  All right.  But assuming you are so

8    appointed and you file a consolidated amended class action

9    complaint, how will you define the class?

10           MR. COCHRAN:  I think we'll add the futures

11   potentially, because I think that there's a way to do that that

12   is not creating this type of a conflict.  That's more commonly

13   done.  I think it's extremely unlikely that, unless there's

14   some -- it's not in their complaint, but unless there's

15   something that there's evidence that defendants took specific

16   actions to manipulate other markets, that we're just going to

17   start throwing in other markets as part of this case, because

18   it's a market manipulation case.

19           THE COURT:  Please continue, sir.

20           MR. COCHRAN:  So I think, again, that points to the

21   relative lack of experience.

22           The other big red flag for us, they failed to plead

23   actual injury in the case.  Second Circuit in 2018 said in

24   these market manipulation cases under the CEA, in the antitrust

25   action, that's a requirement.  You must plead that.  Instead,

K2o1leia

1    the Roche firm says, well, our clients owned cryptocurrencies.

2    Well, that's not enough under controlling law.  And the Kirby

3    firm says, well, they transacted in cryptocurrencies that

4    artificially inflated prices.  Again, that's not enough under

5    controlling Second Circuit law.  The reason being, because you

6    can transact -- and this is what the Second Circuit said in the

7    *Total Gas* case -- and make money.  Let's say you bought Bitcoin

8    in 2009; you sold it in December 2017 at the height of the

9    asset bubble.  You could have made a lot of money.  You would

10   have no claim, you would have no damages, you would not be an

11   adequate class representative, and you might not even be a

12   member of the class.  The defendants raised it in their motion

13   to dismiss letter.  The Roche firm, for whatever reason --

14   inexplicable to me -- declined to amend their complaint.  We

15   raised it again in our motion for interim class counsel

16   briefing.  Nobody has come forward and said what the actual

17   transactions are.  And this again gets to the work plaintiff's

18   counsel has done in the case.

19           If I may, I'm just going to quote the Second Circuit.

20   889 F.3d at 113-114.  "The level of detail required will depend

21   on the facts of the case -- the more different the contracts

22   and the more distant the contracts traded, the more work a

23   plaintiff will need to do to make the connection between a

24   defendant's manipulation and a plaintiff's injury."  Your

25   Honor, we did that work.

K2o1leia

1          And again, you know, this idea that our complaint is

2     somehow derivative of theirs, it's easily disprovable.  We all

3     have the complaints.  Look at the complaints.  I had a draft of

4     my complaint done before they ever filed their case.  We have

5     different claims, different class, different class period,

6     unique allegations, different set of defendants.  So it's

7     simply not true.

8          And I do think it's somewhat ironic to cast aspersions

9     on the work that my firm has done and, frankly, the work that

10    the Kirby firm has done, which also we believe reflects

11    independent work product, while at the same time asking to

12    appoint two firms who have to date not done anything other than

13    work with counsel on how they're going to present their

14    leadership application, as far as we're aware.  So we think

15    under that prong, the work to date prong, we clearly win that

16    as well.

17         And then just briefly on the financial resources,

18    which is the last prong, your Honor, we are the only

19    application before the Court that's a single firm.  We are the

20    largest firm in the country that specializes in this type of

21    work.  I believe we're twice the size of the Roche triumvirate

22    of three firms.  We're many multiples of any other firm here.

23    200 lawyers.  Many of the most preeminent class action

24    litigators in the country, an in-house team, which saves the

25    class money, an in-house team of investigators, forensic

K2o1leia

1       accountants, damage specialists, trial support staff.

2               And most importantly, your Honor, we have a track

3       record of taking these big complicated cases the distance.  We

4       were counsel, for example, on the *High Frequency Trading* case.

5       That's another –– that's in front of Judge Furman –– that

6       presents complex novel issues, huge amounts at stake, and we've

7       been prosecuting that case successfully for years.  We've gone

8       to trial.

9               The *Household* case is a great example.  It took us 14

10      years.  We won at trial, and we took it up to the Seventh

11      Circuit.  Came back down.  On the precipice of a second trial,

12      we were able to settle the case for over $1½ billion, which is

13      the largest posttrial securities class action recovery ever.

14      But that was after a cash outlay of over $30 million; 14 years

15      of work, over $30 million.

16              Now I do have a concern about the Roche firm being

17      able to take on a case of this magnitude because they're a

18      relatively new firm.  Again, not talking about the quality of

19      the lawyers.

20              THE COURT:  When you say the Roche firm, you mean the

21      entire team or just the Roche Freedman firm, sir?

22              MR. COCHRAN:  Well, just the Roche firm.

23              THE COURT:  Okay.  But they're not going it alone,

24      they say.  They've got two other firms joining them for this.

25      Are you saying collectively their financial resources would not

K2o1leia

1    allow -- I'm sorry.  You'll have to excuse me if I pause.  The

2    idea of 14 years of seeing you all before me is a little -- of

3    course, that's the worst case scenario.  Thank you.

4           But assuming, as I think we ought to, that the

5    litigation goes on for a period of years, and it involves

6    substantial resources, however that is defined, you don't think

7    the other two teams could handle that?

8           MR. COCHRAN:  The issue, your Honor, is that the other

9    two firms they brought in are inappropriate for appointment

10   under Rule 23(g).

11          THE COURT:  Oh, so I shouldn't even consider them.

12          MR. COCHRAN:  Yes.  That's exactly correct.

13          THE COURT:  But one of the things that struck me about

14   your submission was that you were actually suggesting

15   intraclass conflicts, and you started talking about that, but

16   do you want to speak more about that issue, sir.

17          MR. COCHRAN:  Absolutely, your Honor.

18          So we think that there needs to be somebody who's

19   committed to representing Bitcoin purchasers.  We're the only

20   firm that has specified the actual injury in the Bitcoin

21   market.  That's in paragraph 20 of our complaint.  That's

22   another reason it took us a little longer to file our case,

23   because we wanted to get it right.  The conflict,

24   potentially -- again, it's not something where you have to

25   create a subclass at this phase.  That's not what we're saying.

K2o1leia

<pre>
 1    What we're saying is it's important that the Robbins Geller

 2    firm be a part of the leadership structure because the way that

 3    the case is framed is on behalf of -- primarily of Bitcoin

 4    purchasers as victims.  The conflict is created not by the

 5    Kirby team's complaint but by the Roche team.  The way they've

 6    defined the class creates a textbook situation for Bitcoin

 7    purchasers because you have a limited fund scenario.  There is

 8    a larger liability than the defendants could ever hope to pay

 9    in all of the years, you know, for a very, very, very long

10    time.  They've said over $1.4 trillion.  So now there's only so

11    much money to go around, so you're going to argue that, well,

12    these guys who bought Altcoin or Litecoin or, you know,

13    Scooby-Doo coin -- there's just so many coins; there's

14    literally hundreds of those -- deserves some of that pot too.

15    Well, guess what?  You're taking it away from the people who

16    have been totally decimated by this scheme, and that's our

17    client, and it's incredibly important that their interests are

18    put front and center, and that's what we're going to do.  And

19    we will absolutely -- if we were to, you know, receive the

20    honor of being appointed interim class counsel here, we're

21    going to take a hard look.  If the Bitcoin futures market has a

22    colorable basis and a pleadable basis under Rule 11 and it

23    makes sense, they will be added in the complaint.  And the same

24    will be true to the extent we have other markets.  I just

25    haven't seen it yet.  They didn't put it in the complaint.
</pre>

K2o1leia

1    This graph they held up doesn't satisfy the elements of the

2    claim, which is what, at the end of the day, you have to do for

3    these folks to be truly victims and have a claim here.  So

4    that's a big, big problem in this case.

5         THE COURT:  You spoke earlier about the resources of

6    the Robbins Geller firm, and certainly I've heard of the firm,

7    and I know their work in some of the class action cases.  I

8    know you have experience with the antitrust issues, with the

9    Commodities Exchange Act issues.  Other than what you told me

10   earlier, how deep is your bench with respect to Bitcoin?

11        MR. COCHRAN:  It's as deep as anybody.  Again --

12        THE COURT:  That's the issue.  Yes.

13        MR. COCHRAN:  I can tell your Honor, I helped develop

14   this area, developing of cryptocurrency class actions.  I filed

15   and worked on one of the earliest of these.  There was a rash

16   of these cases a couple years ago.  So in the height of

17   Bitcoin, in 2017, all of these follow-on issuers thought, oh,

18   we can make a lot of money; we'll make our own coin and issue

19   it.  The problem was they were violating the federal securities

20   laws.  So we have a case.  It's in San Francisco Superior

21   Court.  Roche falsely claims that ours was derivative of the

22   federal case.  Actually the state cases were filed first.  They

23   got moved.  One got remanded, one stayed, removed.  The federal

24   cases came second.  And they helped lay the groundwork for how

25   do you litigate one of these cases.  And we're very far down

K2o1leia

1   the stream, but again, I can't get up here and say, you know,

2   we've been doing this for decades.  We have not.  I've been

3   doing it now I guess about three years, I'd say.  Two -- over

4   two years.  Between two and three years.  So I think that's

5   about as good as it gets, in terms of class actions, right?

6   And I've talked with and worked with many counsel on different

7   issues.  We are in discovery heavily in the *Dynamic Ledger*

8   case.  So we have some, at least.

9              THE COURT:  Okay.  Given that you are speaking last,

10  I'm going to give the other two teams an opportunity to speak

11  again in case there are things that have come up in your

12  presentation that they had not known to address.  You'll let me

13  know if at the end you need to be heard again, but I do think

14  you've managed to respond.

15             MR. COCHRAN:  Thank you, your Honor.

16             THE COURT:  And thank you very much.

17             Mr. Roche and Ms. Halligan, do you want to be heard

18  again.

19             MS. HALLIGAN:  Sure, your Honor.  Thank you.  And I'll

20  be very brief.

21             THE COURT:  Of course.

22             MS. HALLIGAN:  So just to respond to a couple of the

23  points that came up, your Honor, if I can.

24             First of all, with respect to the scope of the class

25  and whether or not it is too broad to be manageable, I think

K2o1leia

1    that the difference is in part in the theory of what's

2    happening here.  As our complaint lays out, the nub of the

3    difficult -- of the violation here is not just with respect to

4    Bitcoin itself but leveraging the ability to control the price

5    of Bitcoin, to control prices and reduce competition in the

6    broader cryptocurrency market, and that's laid out in the

7    Griffin report.  And so from our point of view, questions about

8    allocation are not a reason to trim the class so dramatically

9    at this juncture, and obviously if discovery suggests that it

10   should be narrowed, then it would be.  But not at this point.

11   I think it's leaving way too much on the table in terms of

12   potential violations.

13          Secondly, with respect to the point that we did not

14   sign on to the initial complaint that was filed, rather than

15   file largely duplicative complaints, we looked closely at the

16   complaint that the Roche firm had filed, and for the reasons

17   that I laid out for your Honor, we thought that it very well

18   captured the harm here, laid out the basis for the causes of

19   action, and have looked very closely, as I hope our

20   presentation today makes clear for the Court, and done a

21   substantial amount of work in that window.  We do anticipate

22   filing an amended complaint.  I think that there are a number

23   of issues that we would look at, including, for example,

24   whether or not it is appropriate to provide specific dates with

25   respect to some of those transactions and also whether or not,

K2o1leia

1    in light of the updated Griffin report -- which of course came

2    down after our complaint was filed -- whether there are

3    additional allegations that are appropriate and whether there

4    is anything further and more specific to say, at a minimum,

5    about the six other cryptocurrencies that are identified in his

6    report.  So we do anticipate doing that, and I think that the

7    work that we would do in that regard and the work we did to

8    prepare to come in and talk to your Honor today certainly is

9    something that's fair to take into account.

10             In terms of whether there's a conflict here, I think

11   the case law is clear that it is way too premature to decide

12   that there is some sort of intraclass conflict.  We believe the

13   issues, the classes would be aligned, but in any event, there's

14   time to address that down the road, should it be an issue, and

15   the precedence is clear that that's the appropriate time, not

16   with respect to choosing who should be interim class counsel.

17             Finally, with respect to resources, your Honor, we are

18   more than able to take on the challenges that this case

19   presents.  Mr. Schneider's firm, as I think is detailed in our

20   papers, has been doing class action litigation for a very long

21   time.  We have been doing very complex financial litigation,

22   including, for example, a case on behalf of the FHFA against, I

23   don't know, ten other law firms on the other side and about a

24   dozen banks, so I think we're very well able to handle very

25   complicated discovery, to do it efficiently.

K2o1leia

1          We have, at Selendy & Gay alone, at this point about

2     50 attorneys and staff attorneys that bring us up to about 150

3     folks, so we are, while efficient for sure, able to pull in

4     whatever resources are necessary.  We also have financial

5     analysts and industry specialists who are on staff at the firm

6     and plenty of litigation support.  So I'm confident that the

7     resources are not an issue here.

8          And I'd be happy to answer any other questions the

9     Court has.

10          THE COURT:  I don't have any.  Thank you very much.

11          Ms. Lerner?

12          MS. LERNER:  Thank you again, your Honor.

13          There have been a lot of concessions here from the

14     other counsel and adoption of things I think we've already gone

15     over, so I'm going to be extremely brief.

16          The Robbins Geller firm has suggested that you need to

17     plead specific dates of transactions in order to withstand the

18     motion to dismiss.  I just want your Honor to know that our

19     experts have checked.  Each of our named plaintiffs have traded

20     on a date affected by the manipulation that we have already

21     pled.  I just think that this further demonstrates that our

22     complaint already satisfies a higher pleading standard.

23          The other complaints clearly have regurgitated a lot

24     of publicly available academic information.  I think that I've

25     shown today that our complaint is groundbreaking.

K2o1leia

1          In terms of questions about class definition,

2   defendants, relevant time period, of course if appointed

3   interim lead counsel, we would subsequently anticipate filing a

4   consolidated amended complaint and we would refine our

5   allegations.  But right now, you know, as of now, your Honor, I

6   would say that we've done the work.  We filed the most

7   original, the most investigative, and the most comprehensive

8   complaint, and we are ready to go forward.

9          THE COURT:  All right.  Thank you very much.

10         Mr. Cochran, anything else?

11         MR. COCHRAN:  No, your Honor, unless you have any

12  questions.

13         THE COURT:  I do not.  Thank you.

14         MR. COCHRAN:  Thank you.

15         THE COURT:  Let me please do this.  It was my hope to

16  decide the motion this afternoon, but my concern is -- and I'll

17  be very transparent with you -- I have a criminal sentencing in

18  30 minutes, and I don't want to shortchange that defendant.  So

19  what I'd like to do is to provide a time where folks can call

20  in and I'll give you a decision, so let me see when I can find

21  such a time.

22         And obviously not everyone in this courtroom has to

23  call in.

24         Thursday at 4:00, is that a date and time that works

25  for people?  I have some conferences until 4:00.  Does 4:00

K2o11eia

1  work?

2          Okay.  So Thursday at 4:00.  We will issue a minute

3  entry that will have the call-in information.  We'll be calling

4  into this system in this courtroom.  And I will give you a

5  decision then.

6          You've made my decision very difficult, which is a

7  testament to all of your abilities, and I thank you for that.

8  I just want to look at the materials that I've been given in

9  light of some of the arguments that you've made, and again, I

10  thought I'd have more time than I do to deal with this and to

11  prepare for sentencing.

12          Mr. Roche, or Ms. Halligan, anything else to address

13  in this proceeding?

14          MR. ROCHE:  No, your Honor.

15          THE COURT:  Thank you very much.

16          Ms. Lerner, anything else to address in this

17  proceeding?

18          MS. LERNER:  No, your Honor.

19          THE COURT:  All right.  Mr. Cochran, anything else to

20  address in this proceeding?

21          MR. COCHRAN:  No, your Honor.

22          THE COURT:  Okay.  Mr. Linkh, because you're here,

23  anything in this proceeding?

24          MR. LINKH:  No, your Honor.

25          THE COURT:  Thank you.

K2o1leia

1              And folks at the back table, anyone want to say

2    anything?

3              MR. WALDEN:  No, your Honor.

4              THE COURT:  All right.  Thank you for your time and

5    for your preparation for this conference, and I'll talk to you

6    Thursday at 4:00.  Thank you very much.

7              THE DEPUTY CLERK:  All rise.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25