**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) <br><br> **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Matthew Script, Benjamin Leibowitz, Jason Leibowitz, Aaron Leibowitz, and Pinchas Goldshtein (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Philip G. Potter, Giancarlo Devasini, Ludovicus Jan van der Velde, Reginald Fowler, Crypto Capital Corp, Bittrex, Inc., and Poloniex, LLC (together, "Defendants"), and allege as follows:

## I.   Introduction

1.     Defendants have executed a sophisticated scheme to fraudulently inflate the price of cryptocommodities, a class of crypto-assets that includes bitcoin. Defendants' scheme was wildly effective, causing the price of these cryptocommodities to spike far above their legitimate value in the largest bubble in human history, and ultimately resulting in billions of dollars of damage to innocent cryptocommodity purchasers.

2.     The cryptocommodity market that Defendants manipulated was new and complex, and Defendants' misconduct is staggering in its scope and audacity.

3.     Keeping their identities secret, Defendants made massive, carefully timed purchases of cryptocommodities to signal to the market that there was enormous demand and thus cause the price of those commodities to spike.

4.     There was no such demand. The assets Defendants used to make these purchases were essentially counterfeit.

5.     These purchases were made with Defendants' own fraudulently issued crypto-asset called "tether" or "USDT"—a "stablecoin," so called because it is purportedly pegged to and backed by U.S. dollars held in reserve. Tether, the company that created USDT, represented to the market that every USDT in circulation was backed by a U.S. dollar in Tether's bank account, and

holders could exchange their USDT for those dollars anytime they wished. USDT was thus held out as the digital equivalent of U.S. dollars.[1]

6.    That was a lie.

7.    In reality, Tether issued *billions* of USDT to itself with *no* U.S. dollar backing— simply creating the USDT out of thin air. Tether hid that fact by "selling" newly issued USDT to Bitfinex, a crypto-exchange that was secretly owned and operated by the same individuals who owned and operated Tether. Because Bitfinex and Tether were essentially the same, Tether could simply transfer newly issued USDT into its account on Bitfinex without receiving U.S. dollars in exchange, as was required from genuine customers.

8.    As a result, when Tether issued unbacked USDT, every USDT issued thereafter, whether in exchange for U.S. dollars or not, was debased because there were not enough U.S. dollars in reserve to back every USDT. And the more USDT that Tether issued to Bitfinex, the more debased each USDT became.

9.    Bitfinex and Tether were able to maintain the illusion that USDT was fully backed with the assistance of shadow banks, including Crypto Capital, a shadow bank that Fowler operated, which ensured that Bitfinex and Tether had access to U.S. correspondent banks and thus could exchange U.S. dollars in response to requests from legitimate customers as needed.

10.   With the willing assistance of Bittrex, Inc. ("Bittrex") and Poloniex LLC ("Poloniex"), two other crypto-exchanges, Bitfinex and Tether used fraudulently issued USDT to make strategically timed, massive purchases of cryptocommodities just when the price of those commodities was falling.

---

[1] This Complaint refers to Tether the company as "Tether" and tether the crypto-asset as USDT, which is short for "United States Dollar Tether."

11.     Believing the lie that one USDT equaled one U.S. dollar, the market interpreted these massive purchases as reflecting meaningful consumer demand for cryptocommodities, which prevented the prices of those cryptocommodities from falling further. Thus, the same purchases that converted the USDT that Bitfinex and Tether had fraudulently created for free into valuable cryptocommodities also artificially inflated the value of those cryptocommodities. Bitfinex and Tether could then trade those cryptocommodities for other assets whose value was not inflated, including by selling them for U.S. dollars.

12.     Defendants' manipulative purchases caused prices to skyrocket. From December 2016 to December 2017, the price of bitcoin increased *twenty-five-fold*, from $800 to $20,000, largely due to Defendants' price manipulation. The price of other cryptocommodities also skyrocketed over this same time: Ether and litecoin, for example, rose from $8 and $4.50 to $750 and $230, respectively.

13.     Plaintiffs purchased cryptocommodities at these artificially inflated prices, paying far more than they would have paid without Defendants' price manipulation.

14.     Inevitably, that bubble burst. By December 2018, the price of bitcoin was only $3,500. Over $450 billion of value disappeared in less than a year. Other cryptocommodities, such as ether and litecoin, experienced a similarly rapid fall in value of over 80% by the end of December 2018.

15.     In the wake of this crash, numerous experts have analyzed Bitfinex and Tether exchanges and confirmed the details of this scheme. The New York Attorney General, the Commodity Futures Trading Commission (the "CFTC"), and the Department of Justice each have ongoing

investigations into various Defendants. And indeed, Bitfinex and Tether admitted before the in-ception of this lawsuit that they "fully expect" to be sued.[2]

16.     Defendants' conduct was brazen. It was criminal. And the harm it caused was dev-astating. Plaintiffs, and the class they represent, deserve to be made whole.

17.     Plaintiffs seek to redress Defendants' misconduct, occurring from February 17, 2015, to the present (the "Class Period"), on behalf of the class of cryptocommodities purchasers described herein, under the Sherman Act, the Commodities Exchange Act ("CEA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), common law fraud, and the New York Gen-eral Business Law.

## II.     Parties

### A.     Plaintiffs

18.     Matthew Script is a citizen of Buffalo, New York. During the Class Period, he pur-chased cryptocommodities, the prices of which had been artificially inflated by Defendants' mar-ket manipulation, and as a result suffered economic losses and actual damages. For example, Mat-thew Script made the following purchases:

    a.     On October 24, 2017, he purchased 0.08362939 bitcoin for $480.82.

    b.     On October 24, 2017, he purchased 0.47647755 ether for $147.01.

    c.     On November 29, 2017, he purchased 0.06356349 bitcoin for $721.22.

    d.     On November 30, 2017, he purchased 0.01013354 bitcoin for $96.16.

    e.     On December 9, 2017, he purchased 0.01713119 bitcoin for $240.41.

    f.     On December 17, 2017, he purchased 0.05150696 bitcoin for $961.63.

---

[2] *Bitfinex Anticipates Meritless and Mercenary Lawsuit Based on Bogus Study*, BITFINEX.COM (Oct. 5, 2019), https://perma.cc/9TTB-27B8; *Tether Anticipates Meritless and Mercenary Lawsuit Based on Bogus Study*, TETHER.TO (Oct. 5, 2019), https://perma.cc/Z7H3-2YA2.

   g.     On January 5, 2018, he purchased 0.02986745 bitcoin for $500.05.

19.     Jason Leibowitz is a citizen of New York, New York. During the Class Period, he purchased cryptocommodities, the prices of which had been artificially inflated by Defendants' market manipulation, and as a result suffered economic losses and actual damages. For example, Jason Leibowitz made the following purchases:

   a.     On January 6, 2016, he purchased 22 bitcoin for $9,803.69.

   b.     On July 3, 2016, he purchased 14 bitcoin for $9,427.84.

   c.     On November 5, 2017, he purchased 16.48699964 ether for $5,000.00.

   d.     On November 17, 2017, he purchased 20 bitcoin cash for 2.50114287 bitcoin.

   e.     On November 17, 2017, he purchased 100 ether classic for 2.50114287 bitcoin.

   f.     On November 26, 2017, he purchased 10 Zcash for 0.35988776 bitcoin.

   g.     On November 26, 2017, he purchased 8.86152055 monero for 0.15337342 bitcoin.

   h.     On January 17, 2018, he purchased 0.53495903 dash for 0.53495903 bitcoin.

20.     Benjamin Leibowitz is a citizen of New York, New York. During the Class Period, he purchased cryptocommodities, the prices of which had been artificially inflated by Defendants' market manipulation, and as a result suffered economic losses and actual damages. For example, Benjamin Leibowitz made the following purchases:

   a.     On August 10, 2017, he purchased 5 ether for $1,537.82.

   b.     On August 10, 2017, he purchased 5 litecoin for $303.05.

   c.     On January 8, 2018, he purchased 1.03187263 bitcoin for $15,000.

   d.     On January 16, 2018, he purchased 5 ether for $5,879.64.

   e.     On January 16, 2018, he purchased 25 litecoin for $5,320.44.

21.     Aaron Leibowitz is a citizen of Westchester, New York. During the Class Period, he purchased cryptocommodities, the prices of which had been artificially inflated by Defendants' market manipulation, and as a result suffered economic losses and actual damages. For example, on August 18, 2017, Aaron Leibowitz purchased 7.46063569 bitcoin for 47.9444488 bitcoin cash.

22.     Pinchas Goldshtein is a citizen of Miami, Florida. During the Class Period, he purchased cryptocommodities futures, the prices of which had been artificially inflated by Defendants' market manipulation and as a result suffered economic losses and actual damages. For example, between January 16, 2018 and June 3, 2020, Pinchas Goldshtein purchased 629 bitcoin futures positions.

**B.     Defendants[3]**

**1.     DigFinex**

23.     DigFinex Inc. ("DigFinex") is incorporated in, and a citizen of, the British Virgin Islands.[4] DigFinex operates as the ultimate parent company of the Bitfinex Defendants (defined below) and the Tether Defendants (defined below), and is the majority owner of iFinex, Inc. and of Tether Holdings Limited.[5]

---

[3] For reference, organizational charts of some Defendants and their relationships are attached as Exhibit 1.

[4] Brian M. Whitehurst Affirmation ¶ 89, ECF No. 1, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. Apr. 25, 2019) ("Whitehurst Aff."); Whitehurst Aff. Ex. K, ECF No. 16, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. Apr. 25, 2019) ("DigFinex and iFinex Register of Directors").

[5] Whitehurst Aff. ¶¶ 8, 16; Certificate of Interested Entities at 1, ECF No. 4, *iFinex Inc. v. Wells Fargo & Co.*, No. 3:17-CV-01882 (N.D. Cal. Apr. 5, 2017) ("Certificate of Interested Entities").

24.     The shareholders of DigFinex are Ludovicus Jan van der Velde, Giancarlo Devasini, Paolo Ardoino ("Ardoino"),[6] Philip Potter, Stuart Hoegner ("Hoegner"),[7] and Perpetual Action Group (Asia) Inc.[8]

### 2.     The Bitfinex Defendants

25.     iFinex Inc., BFXNA Inc., and BFXWW Inc. (collectively, "Bitfinex" or the "Bitfinex Defendants") together operate an online platform called "Bitfinex" for exchanging and trading crypto-assets.[9]

26.     iFinex Inc. is incorporated in, and is a citizen of, the British Virgin Islands.[10] iFinex Inc. owns and operates the online crypto-exchange called "Bitfinex" accessible at bitfinex.com.[11] It is also the holding company that wholly owns Defendants BFXNA Inc. and BFXWW Inc.[12]

27.     BFXNA Inc. is incorporated in, and is a citizen of, the British Virgin Islands.[13]

28.     BFXWW Inc. is incorporated in, and is a citizen of, the British Virgin Islands.[14]

---

[6] Ardoino is the Chief Technology Officer of both Bitfinex, *see Bitfinex Leadership – Paolo Ardoino, Chief Technology Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/3ERS-AM6N, and Tether.

[7] Hoegner is the General Counsel of both Bitfinex, *see Bitfinex Leadership – Stuart Hoegner, General Counsel*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/W8UA-PRF4, and Tether.

[8] Certificate of Interested Entities at 1.

[9] Whitehurst Aff. ¶ 10.

[10] Whitehurst Aff. ¶ 7; DigFinex and iFinex Register of Directors.

[11] *Terms of Service*, BITFINEX.COM § 14.5 (July 12, 2019) ("The Site and Services are owned by iFinex."), https://perma.cc/4U5J-3MKY.

[12] Whitehurst Aff. ¶ 8; Stuart Hoegner Affirmation ¶ 3, ECF No. 78, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. May 21, 2019) ("Hoegner Aff.").)

[13] Hoegner Aff. ¶ 3.

[14] *Id.*

### 3.    The Tether Defendants

29.    Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited (collectively, "Tether" or the "Tether Defendants") are the central authority over, and issuer of, USDT.

30.    Tether Holdings Limited is incorporated in, and is a citizen of, the British Virgin Islands.[15] It is the holding company of Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.[16]

31.    Tether Operations Limited appears to be incorporated in, and to be a citizen of, the British Virgin Islands.[17]

32.    Tether International Limited is incorporated in, and is a citizen of, the British Virgin Islands.[18]

33.    Tether Limited is incorporated in, and is a citizen of, Hong Kong. [19]

---

[15] Whitehurst Aff. ¶ 13; Hoegner Aff. ¶ 5.

[16] *Id.*

[17] *Tether Operations Limited*, LEI-LOOKUP.COM, https://perma.cc/5RGR-9X8E. While the Office of the New York Attorney General alleged that Tether Operations Limited and Tether International Limited were incorporated in Hong Kong, Whitehurst Aff. ¶ 13, Plaintiffs were unable to identify any corroborating records in the Hong Kong registry.

[18] *Tether International Limited*, LEI-LOOKUP.COM, https://perma.cc/JUR6-DHZE.

[19] *Tether Limited*, HONG KONG REGISTRY, https://perma.cc/RDU3-9E7D. Tether Limited also has a lapsed Legal Entity Identifier (LEI) that incorrectly identifies a *different* address in Taiwan as its registered address. *See Tether Limited*, LEI-LOOKUP.COM, https://perma.cc/FLT7-B8L7.

4.      **The Individual DigFinex, Bitfinex, and Tether Defendants**

34.     Ludovicus Jan van der Velde ("Velde")[20] is the Chief Executive Officer of iFinex Inc., BFXNA Inc., BFXWW Inc., and Tether Limited.[21] He has held this position since early 2013.[22] Velde is one of two directors listed on the corporate registries of DigFinex, iFinex Inc., and Tether Limited.[23] Velde is also a shareholder of DigFinex and Tether Holdings Limited, and is the former CEO of DigFinex shareholder Perpetual Action Group (Asia).[24] Velde is a citizen of the Netherlands.[25]

35.     Giancarlo Devasini ("Devasini") was involved in creating Bitfinex. He is the Chief Financial Officer of Bitfinex and Tether.[26] Devasini is the other director identified on the corporate registries of DigFinex, iFinex Inc., and Tether Limited.[27] He is also a shareholder of Tether

---

[20] Velde sometimes use the aliases JL, Jan Ludovicus, and Jean-Louis.

[21] *Bitfinex Leadership – Jean-Louis van der Velde, Chief Executive Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/3XVL-DNQC.

[22] *Id.*

[23] DigFinex and iFinex Register of Directors; *Tether Limited*, HONG KONG REGISTRY, https://perma.cc/RDU3-9E7D.

[24] Certificate of Interested Entities at 1; J.L. van der Velde, LINKEDIN, (identifying Velde as former CEO of Perpetual Action Group (Asia)), https://perma.cc/5FQW-N3GQ.

[25] DigFinex and iFinex Register of Directors.

[26] *Bitfinex Leadership – Giancarlo Devasini, Chief Financial Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/4B32-XAWZ. Devasini was also the president of Smart Property Solutions SA, the Swiss company behind Tether's Euro-backed stablecoin EURT. *See Terms of Service*, TETHER.CH, https://perma.cc/E5FH-PZ6H (last updated Sept. 10, 2017); *Commercial Register*, SWISS OFFICIAL GAZETTE OF COMMERCE (May 16, 2017), https://perma.cc/7LG6-QAWX.

[27] DigFinex and iFinex Register of Directors; *Tether Limited*, HONG KONG REGISTRY, https://perma.cc/RDU3-9E7D.

Holdings Limited and DigFinex.[28] Devasini is a citizen of Italy.[29] In the early days of Bitfinex and Tether, Devasini posted under the username "urwhatuknow" on the bitcointalk.org forum.[30]

36.     Philip G. Potter ("Potter" and with Velde and Devasini the "Individual Defendants") was the Chief Strategy Officer of the Bitfinex and Tether enterprises until June 2018.[31] He also was or is a director of Tether Holdings Limited and a shareholder in DigFinex.[32] Potter is a citizen of New York.[33]

### 5.     The U.S. Exchange Defendants

37.     Bittrex and Poloniex, (together, the "U.S. Exchange Defendants") operate online platforms for exchanging and trading crypto-assets.

38.     Bittrex is incorporated in, and is a citizen of, Delaware. Its principal place of business is in Seattle, Washington.

39.     Poloniex is incorporated in, and is a citizen of, Delaware. Its principal place of business is in Boston, Massachusetts.

---

[28] Certificate of Interested Entities.

[29] DigFinex and iFinex Register of Directors.

[30] *See, e.g.*, urwhatuknow, *Re: [Beta]Bitfinex.com first Bitcoin P2P lending platform for leverage trading*, BITCOINTALK.ORG (April 22, 2013, 11:17 PM, 11:20 PM, 11:28 PM,11:30 PM), https://perma.cc/RTL5-GSNS. Bitcointalk.org is an internet forum dedicated to the discussion of bitcoin and other crypto-assets.

[31] Anna Irrera, *Bitfinex chief strategy officer departs*, REUTERS (June 22, 2018), https://perma.cc/A4Z2-HDYF.

[32] *Tether Holdings Limited*, OFFSHORE LEAKS DATABASE, https://perma.cc/UDT7-ACVW; Certificate of Interested Entities.

[33] Brian M. Whitehurst Aff. Ex. N, at 2, ECF No. 95, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. July 8, 2019) (Feb. 2018 Bank Account Application).

###### 6. Crypto Capital Defendants

40.     Crypto Capital Corp. ("Crypto Capital") is incorporated in, and is citizen of, Panama.[34] Crypto Capital operated as a "payment processor" that marketed itself to crypto-asset exchanges.[35]

41.     Reginald Fowler (with Crypto Capital, the "Crypto Capital Defendants") acted as an employee, agent, or partner of Defendant Crypto Capital.[36] He is a citizen of Arizona.

## III.     Jurisdiction and Venue

42.     This Court has original subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1964(c).

43.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

44.     Venue lies in this District under 15 U.S.C. § 22, 7 U.S.C. § 25(c), 18 U.S.C. § 1965, and 28 U.S.C. § 1391, because one or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

45.     This Court has personal jurisdiction over each Defendant pursuant to N.Y. C.P.L.R. 301 and 302(a)(1)-(3), 18 U.S.C. § 1965(a)-(b), and Federal Rule of Civil Procedure 4(k). Each

---

[34] *Crypto Capital Corp.*, OPENCORPORATES.COM, https://perma.cc/CX94-QSCU.

[35] *See generally* CRYPTOCAPITAL.CO, https://perma.cc/D3CL-HQ6L.

[36] Exhibit 14 at 1, 5, Mem. In Support of Detention, ECF No. 6, *United States v. Fowler*, No. 19-9181MJ (D. Ariz. May 1, 2019) (Fowler Memorandum); Exhibit 15 ¶ 8, Superseding Indictment, ECF No. 7, *United States v. Fowler*, No. 19-CR-254 (S.D.N.Y. April 30, 2019) ("Fowler Indictment"); Robert-Jan den Haan, *Indictment reveals new clues in the Crypto Capital situation*, YAHOO (May 2, 2019), https://perma.cc/D763-NMYS.

Defendant transacted business, maintained substantial contacts, and/or they or their coconspirators committed overt acts in furtherance of their illegal conspiracy in the United States, including in this District. The Bitfinex Defendants and the Tether Defendants have submitted to jurisdiction in multiple states, including New York. Defendants' scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

46.    The Court also has quasi in-rem jurisdiction over Defendants by virtue of U.S. dollar accounts in New York.

## IV.    Factual Allegations

### A.    Background - Crypto-assets and the Cryptocommodity Market

#### 1.    Bitcoin: The First Crypto-Asset

47.    This case concerns crypto-assets.[37] Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.

48.    Bitcoin[38] was the world's first major crypto-asset. While the potential of a fully digital asset had previously been recognized in theory, Bitcoin's novel architecture provided three key traits that enabled it to succeed: It is a secure medium of exchange, it has a controlled supply, and it is decentralized.

49.    **Secure Medium of Exchange:** Bitcoin works effectively because it can be securely transferred to exactly one person at a time. Most digital assets, like all digital files, can be easily

---

[37] The commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies." In order to avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto-assets" to describe the full range of digital assets.

[38] The term "bitcoin" can refer to a computer protocol or a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

duplicated, potentially allowing transfer of a single asset to multiple people. The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

50.     Bitcoin solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every bitcoin in existence. Each Bitcoin user has a digital "address" used to receive bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of bitcoin associated with that address. By looking at the blockchain, anyone can see every bitcoin transaction in which that address has engaged.

51.     By providing a full transaction history of each bitcoin, the blockchain allows for the secure exchange of all bitcoin. Any attempt to duplicate a bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that bitcoin. There is thus no effective way to counterfeit bitcoin.

52.     **Controlled Supply:** Bitcoin maintains its blockchain and provides for new bitcoin to enter the economy through a consensus mechanism known as "mining." Individuals "mine" bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain. Those who mine bitcoin—"miners"—are rewarded with new bitcoin.

53.     The mining process creates a scarcity that underlies the value of bitcoin. Bitcoin is designed so it gets harder and harder to mine. The more bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new bitcoin. This process ensures that the supply of bitcoin will not rise sharply or unpredictably, thus preventing a flood of new bitcoin that could undercut the value of the preexisting bitcoin. Likewise, the number of

bitcoin that miners receive as a reward is halved roughly every four years. This will continue until all bitcoin have been mined, at which point miners will receive fees paid solely by network users.

54.     Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver. While the supply of bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and bitcoin is not devalued. This ensures market participants that their bitcoin will not diminish in value due to sudden inflation.[39]

55.     **Decentralized**: Bitcoin's architecture ensures that it is entirely decentralized. The Bitcoin protocol was first released on October 31, 2008 through a white paper authored under the pseudonym Satoshi Nakamoto. That paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."[40] While the first 50 bitcoin were mined into existence by Satoshi three months after the release of the white paper, it has since attracted a community of many competing miners who work to ensure the decentralization of the network.

56.     Accordingly, there is no 'Bitcoin Inc.' that administers or manages Bitcoin as a whole. If Bitcoin were run on centralized servers, the underlying value of bitcoin would rely on the trust that individuals had in those operating the centralized servers. If Bitcoin's creator could issue more bitcoin at a whim, the value of bitcoin would reflect that uncertainty. But because

---

[39] Subsequent to the invention of bitcoin, other crypto-assets have adopted approaches other than mining for ensuring a controlled supply. In particular, some crypto-assets now use a consensus mechanism called "Proof of Stake," which provides new currency to those who own the most of that currency instead of those who expend significant electrical resources mining. This consensus mechanism shares with bitcoin mining, however, the core feature that there is no way for additional digital coins to be released to the market outside of a predetermined protocol that ensures scarcity.

[40] https://bitcoin.org/bitcoin.pdf.

Bitcoin's cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

57.     This decentralization distinguishes Bitcoin from other assets. The value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation. The value of government bonds is tied to the credit of the government that issues them. The value of a currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank. None of this is true for Bitcoin.

### 2.     The Diversification of Crypto-Assets

58.     Since the creation of Bitcoin, the number and types of distinct crypto-assets have grown dramatically. In April 2013, there were only seven crypto-assets listed on coinmarketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, that site monitors more than 2,000 crypto-assets.

59.     The creators of different crypto-assets have decided, in many instances, to deviate from core features of Bitcoin, creating crypto-assets that work in numerous different ways and serve numerous different purposes and markets.

60.     Some crypto-assets are not intended to be used as a secure medium of exchange. Basic attention token ("BAT"), for example, is a crypto-asset architecture designed to provide a transparent solution for the digital advertising market. Released by the creators of the Brave web browser, BAT can be used to obtain a variety of advertising and attention-based services, as it is exchanged between publishers, advertisers, and users. The token's utility is therefore derived from the attention of internet users. When used in conjunction with the Brave web browser, BAT creates a transparent and efficient block-chain based digital advertising market: publishers receive more revenue for displaying advertisements on their websites because middlemen fees are reduced,

advertisers achieve better targeting and higher returns on their advertisement budgets, and users have greater control of how their data is used for targeted advertising.

61.      Other crypto-assets are distributed through issuances akin to those of traditional corporate securities and do not have a controlled supply. The crypto-asset XRP, for example, was not mined but instead was created and sold to customers by an entity called Ripple. Similarly, several crypto-assets known as ERC-20 tokens have been issued in Initial Coin Offerings ("ICOs"). In these ICOs, digital tokens are created and sold to the public, deriving their value from the promises of the issuers. The issuers of an ERC-20 token known as TaTaTu, for example, promised to use the money raised through an ICO to create a video streaming platform, on which Ta-TaTu tokens could be used to pay for membership. Similarly, Sirin Labs created an ERC-20 token, SRN, that it sold with the promise of using that revenue to create a secure phone using blockchain technology.

62.      Some crypto-assets are not decentralized. ERC-20 tokens, for example, do not have an independent blockchain unique to that digital asset. Other crypto-assets can be used on only one platform. BinanceCoin, for example, is usable exclusively on the crypto-exchange Binance; hence its value depends on the continued vitality of that platform.

63.      These are only some of the many varieties of crypto-assets that have arisen since the creation of Bitcoin. Deviations from the Bitcoin model have led to different markets for different crypto-assets suited for different uses by different types of customers.

### 3.      The Cryptocommodity Market

64.      Some crypto-assets reproduce Bitcoin's defining central architecture—they provide a secure medium of exchange for general purposes, have a controlled supply that cannot be unilaterally increased, and are decentralized. These crypto-assets are called "cryptocommodities."

Cryptocommodities, which include Bitcoin, make up a distinct market, which has grown substantially and, as of this filing, has a total market capitalization of over $176 billion.

65.     Demand for cryptocommodities is driven by the desire for a cryptographically secure and pseudonymous means of exchange in digital transactions for a wide variety of assets, independent of the control of any government, which can also be held by customers as a long-term, independent store of value. Demand is also driven by the speed with which cryptocommodities can be used to execute and settle transactions—especially those conducted on international digital platforms—and their ability to be used in "microtransactions" that may be too costly if performed with fiat currency or through other electronic means, such as credit cards.

66.     Examples of the cryptocommodities at issue here are bitcoin, bitcoin cash, ethereum, ethereum classic, litecoin, monero, dash, and ZCash.

67.     The different cryptocommodities within this market, such as bitcoin and ether,[41] are reasonable substitutes for each other. They (1) are suitable for satisfying the demand for products that allow for quick and secure transactions; (2) can serve as long-term stores of value not controlled by a government or a private entity; (3) and are efficient for both large and small transaction volumes.

68.     Fiat currency and gold (or other precious metals) are not substitutes for cryptocommodities. They do not provide a cryptographically secure, anonymous means of exchange. Their use in digital transactions, and particularly cross-border transactions, is generally accompanied by fees and other transaction costs that are considerably higher than those for cryptocommodities. They are not practical for digital "microtransactions" due to limits on their divisibility and the

---

[41] Just as "bitcoin" refers to one unit of exchange in the "Bitcoin" system, so too does "ether" refer to one unit of exchange in the "Ethereum" system.

transaction costs involved. And fiat currencies are not independent of government influence or control.

69.     Other crypto-assets that are not a secure medium of exchange, not controlled in supply, or not decentralized are likewise not substitutes for cryptocommodities. Crypto-assets designed for use within a closed digital ecosystem—like BAT, used only for participation in a decentralized digital advertising marketplace—are not designed to be securely and rapidly exchanged for a variety of other assets. Crypto-assets designed for use on a highly centralized or closed digital ecosystem—like BinanceCoin, used only on the Binance crypto-exchange—also are not used as a general means of secure exchange. And crypto-assets issued without a protocol that independently ensures a controlled supply—like ERC-20 tokens—do not offer an independent store of value, because their value depends on the actions of the issuers and the market's perception of those actions.

70.     Accordingly, an attempt to increase the price of a cryptocommodity above a competitive price by 5% or more would not result in customers switching to fiat currency, gold, or other crypto-assets.

71.     There are meaningful barriers to entry into the cryptocommodity market. These barriers include the need to create a sufficiently large community of independent "miners" and other users to create a distributed "peer-to-peer" network to verify transactions on their own block-chains. Additionally, the need for cryptocommodities to be traded on exchanges, a process that requires significant technical challenges, represents a barrier to entry before any given cryptocommodity can become a widely accepted means of exchange with a long-term, independent store of value.

72.     The cryptocommodity market includes both the cryptocommodities themselves (e.g., bitcoin, ether, litecoin) and their corresponding futures contracts. A futures contract is an agreement to purchase or sell an underlying asset at a predetermined date. In the context of bitcoin futures, investors are exposed to the future price of bitcoin.

73.     Bitcoin futures have traded on the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange since December 2017. Bitcoin futures stopped trading on the Chicago Board Options Exchange in June 2019.

74.     Futures and spot transactions for the same commodity are inherently part of the same product market because they involve the same commodity. While a commodity's prices may be lower or higher in futures transactions than in spot transactions, those prices will necessarily converge as the delivery date for the futures converges to the present.

75.     Bitcoin and bitcoin futures prices move in step, indicating that the spot market for bitcoin directly affects bitcoin future prices. Any price manipulation or interference with price discovery in the "spot" market accordingly has direct and immediate effects on bitcoin futures prices.

76.     The chart below illustrates the close relationship between prices of bitcoin and bitcoin futures on the CME from December 2017 until February 2020:



77.     Regulatory filings confirm the connection between the "spot" price and futures prices. The final settlement price for bitcoin futures traded on the CME is equal to the CME CF Bitcoin Reference Rate ("BRR"). CME informed the CFTC that "[s]tatistical analysis indicates that the BRR accurately reflects the underlying spot market." In other words, CME designed bitcoin futures to track the spot price as closely as possible. Bitcoin futures that traded on Cboe were similarly engineered.

78.     The geographic market for cryptocommodities is global. Developers, issuers, and miners of cryptocommodities can be in any country. Crypto-exchanges are located all over the world and many allow access to customers from all over the world. Cryptocommodities transactions occur over the internet and so are not geographically limited.

### a.     The Cryptocommodity Market Is Susceptible to Manipulation

*"Illiquid markets, such as Bitcoin[,] are easy prey to manipulation."*
   — Defendant Devasini[42]

79.     The cryptocommodity market has historically been vulnerable to price manipulation because it is volatile and lightly regulated.

80.     The average daily volatility of bitcoin, ethereum, and litecoin from 2014 to 2019 was seven times greater than the volatility of the Bloomberg commodity index; three times greater than the volatility of the Bloomberg energy index; and six times the volatility of the Bloomberg precious metal index.

81.     This volatility derives in part from the newness of the cryptocommodity market; absent a long trading history, it is difficult for traders to anticipate price movements. This volatility also derives, in part, from a lack of easily reportable figures understood to correlate with growth. Unlike the value of conventional commodities like oranges, which is tied to physical and quantifiable metrics like rainfall, the values of cryptocommodities are not linked to physical metrics. The lack of significant price anchors that come with large-scale institutional capital investments also contribute to volatility.

82.     The cryptocommodity market has also, for much of its existence, been subject to limited regulation. The CFTC categorized bitcoin as a commodity in 2015 and since then has brought few enforcement actions.

83.     These conditions created an environment ripe for manipulation.

84.     One infamous example of such manipulation took place between 2013 and 2014 through an automated trading program (a "bot") termed the "Willy Bot."

---

[42] urwhatuknow, *Re: I forced the 10-day high last night. What do you think about that?*, BITCOINTALK.ORG (Dec. 5, 2012, 4:18 PM), https://perma.cc/6A6T-Q93F.

85.     Between 2013 and 2014, Mark Karpeles, the owner and operator of crypto-ex-change Mt. Gox, which then handled 70% of all bitcoin trading,[43] implemented the Willy Bot to successfully manipulate bitcoin's price from about $150 to over $1,000 in less than two months.[44] When Mt. Gox finally suspended trading due to its insolvency, the price fell to $500.[45]

86.     On May 25, 2014, an anonymous trader posted a report titled, "The Willy Report: proof of massive fraudulent trading activity at Mt. Gox, and how it has affected the price of Bitcoin" (the "Willy Report").[46] The Willy Report provided a detailed analysis of Mt. Gox's leaked trading logs and concluded that someone had programmed a bot to buy ten to twenty bitcoin every five to ten minutes. It concluded that this "enormously" affected the price of bitcoin and played a key role in its rise to $1,000.[47]

87.     Additional academic research reached the same conclusion. In an article published in 2018, one team found that "suspicious trading activity of a single actor was the primary cause of the massive spike in the USD/BTC exchange rate in which the rate rose from around $150 to over $1,000 in just two months in late 2013."[48]

88.     The researchers observed that the Willy account became active on September 9, 2013 and continued to trade until their data cutoff on November 30, 2013. Because Karpeles owned

---

[43] Neil Gandal et al., *Price Manipulation in the Bitcoin Ecosystem*, 95 J. OF MONETARY ECON. 86 at 87 (2018), https://perma.cc/P35S-M7TN.

[44] *Id.*

[45] Paul Vigna, *5 Things About Mt. Gox's Crisis*, WALL ST. J. (Feb. 25, 2014), https://perma.cc/A2WH-SXFL.

[46] The Willy Report (May 25, 2014), https://perma.cc/EN6E-2HJP.

[47] *Id*.

[48] Gandal, *supra* note 43, at 87.

and operated the exchange, Willy never actually had to pay for bitcoin, but nonetheless "acquired 268,132 bitcoin, nominally for around $112 million" during that time period.[49]

89.     One passage captures their findings particularly well:

> Separating the days on which Willy was active from those he was not, reveals a dramatic difference: In the case of Mt. Gox, the average USD/BTC rate increased by $21.85 on the 50 days Willy was active; it actually fell (by $0.88 on average) on days when Willy was not active. The same dramatic difference holds for the other exchanges as well…These results are striking and make it very clear that the suspicious purchasing activity could have caused the huge price increases.[50]

90.     The below chart from the Gandal article illustrates the dramatic effectiveness of this scheme[51]



Figure 1: Bitcoin-USD exchange rate at Bitstamp exchange, with periods of suspicious activity shaded.

---

[49] *Id.* at 89.

[50] *Id.* at 93 (emphasis in original).

[51] *Id.* at 90.

91.     While it was initially unclear who controlled the Willy Bot, Karpeles eventually admitted to controlling it at his trial in 2017.[52]

92.     The Willy Bot scheme underscores how control of an exchange and the opportunity to trade with non-existent money can allow a single individual or entity to dramatically influence cryptocommodity prices.

### b.     The Cryptocommodity Bubble

93.     From 2014 to 2016, bitcoin's price fluctuated between $200 and $800. But, by the end of 2016, bitcoin—and other cryptocommodities—began to see significant price increases. By March 2017, the price of bitcoin was $1,200. By July 2017, it was just above $2,000.[53]

94.     On December 17, 2017, the price of bitcoin reached a record high of nearly $20,000. At that point, bitcoin's market capitalization was nearly $327 billion, roughly the same as Amazon at that time.

95.     Then the market crashed.

96.     By February 2018, bitcoin's price fell to $6,200. The bitcoin market continued to hemorrhage throughout that year. In December 2018, roughly a year from its high, the price of bitcoin was $3,500, and bitcoin's market capitalization was down to $62 billion.

---

[52] William Suberg, *Mt. Gox Trial Update: Karpeles Admits 'Willy Bot' Existence*, COINTELEGRAPH (July 11, 2017), https://perma.cc/5FMC-SJYM.

[53] *Top 100 Cryptocurrencies by Market Capitalization*, COINMARKETCAP.COM, https://coinmarketcap.com/.

97.     The relative price inflation of the bitcoin bubble far exceeded that of the most infamous market bubbles in history, including France's Mississippi bubble, Britain's South Sea bubble, the Dutch tulip bubble, and the dot.com bubble on the Nasdaq composite index:[54]



**How Bitcoin's Ascent Stacks Up**
The cryptocurrency's rally tops historical asset bubbles

■ Bitcoin   ■ Mississippi   ■ Tulips   ■ South Sea   ■ Nasdaq Composite

Note: Starting price is the price three years prior to each asset's high, or the earliest available price in cases with fewer than three years of data.
Source: Bloomberg, International Center for Finance at Yale School of Management, Peter Garber

**Bloomberg**

98.     The economic devastation was not confined to bitcoin. As bitcoin prices fell, so did the prices of other cryptocommodities. The combined market capitalization of all virtual currencies as of January 6, 2018, was roughly $795 billion; by Feb. 6, 2018, the total value had dropped to $329 billion.

---

[54] Eric Lam et al., *Did Bitcoin Just Burst? How It Compares to History's Big Bubbles*, BLOOMBERG (Jan. 17, 2018), https://perma.cc/DL4Z-6JDQ.

### 4.    How Crypto-Assets Are Transferred and Exchanged

99.    Unlike in traditional banks, where each customer has a bank account and is identified as the owner, control of crypto-assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto-assets, including bitcoin and USDT.

100.    To use Bitcoin as an example, the public key is used to produce the bitcoin address. A bitcoin address is a destination for transfers of bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9.

101.    A private key allows the owner of a bitcoin address to access it, like a long PIN or password for a conventional bank account.

102.    Those who wish to transfer bitcoin need to know the recipient's bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts

103.    A transfer of bitcoin is public to the extent that anyone can see the transferor's bitcoin address, the recipient's bitcoin address, and the quantity of assets transferred. That is, anyone could see that bitcoin address 1s5F transferred 10.3 bitcoin to bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are private.

104.    Because transfers between addresses are all public, one can follow the flow of crypto-assets by downloading and analyzing the relevant blockchain. This allows economic

experts to perform sophisticated forensic analyses to trace the digital chain of custody of crypto-assets belonging to a particular address.

105.     Crypto-exchanges emerged to enable smoother and faster trading between individuals, just as stock and commodities exchanges emerged to enable easy trading of securities among counterparties who never meet.

106.     When a customer wishes to trade crypto-assets on an exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset. The exchange will typically then transfer the crypto-assets into one of its other addresses for storage.

107.     When a customer with an existing account wishes to transfer more crypto-assets into an exchange to use in future trades, she must ask the exchange for a deposit address. This destination address is often different each time the customer makes a transfer, meaning that one cannot easily trace transactions belonging to a particular individual.[55]

108.     This process is similar to the process used by a customer transferring funds to an online account with a stockbroker like Charles Schwab or E-Trade. Such a customer wires funds from her personal bank account to an account controlled by the broker, for which she has a PIN and password. The broker credits her with an equivalent amount of funds on its trading platform and places the funds it received into its reserve.

---

[55] For an example of how to withdraw/deposit with Poloniex's USDT personal deposit address, *see How to deposit/withdraw USDT-Tron, USDT-ERC, USDT-OMNI*, POLONIEX, https://support.poloniex.com/hc/en-us/articles/360040015014-How-to-deposit-withdraw-USDT-TRON-USDT-ERC-USDT-OMNI

109.    When a customer wants to withdraw a crypto-asset from an exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address.

110.    But trades within a single crypto-exchange are not visible in the way that trades between users are, because such intra-exchange trades do not transfer actual crypto-assets between addresses. That is, if Jane Smith transfers bitcoin from her 1s5F address, which is not on Poloniex, to an address controlled by Poloniex, the blockchain will record a transfer from the 1s5F address to an address designated by Poloniex and from there to an address that Poloniex uses to store consumer bitcoin. But trades Jane makes within Poloniex will not be recorded on the blockchain. Instead, intra-exchange transactions are kept only on the account balance sheets for customers trading on the platform. Such intra-exchange activity is visible to the exchange itself, and may be publicized, but it is not public.

### B.    The Defendants' Roles in the Crypto-Economy

111.    Defendants each played an important role in the larger crypto-economy, which they took advantage of to manipulate cryptocommodity prices for their own benefit.

#### 1.    Tether

112.    Tether controls the crypto-asset USDT, one of the first stablecoins.

113.    Stablecoins are crypto-assets designed to maintain a consistent value relative to one or more 'real world' assets like gold or fiat currency.

114.    Unlike bitcoin, stablecoins are not mined and are not cryptocommodities. For most stablecoins, an issuer unilaterally controls the creation of new coins. Absent restrictions on the creation of new coins, a stablecoin would be valueless—it would be subject to potentially unlimited inflation as more was created.

115.     For a stablecoin to have value, its issuer must promise that it will keep the coin 'stable' by issuing new coins only in a manner linked to the asset it is intended to mirror.

116.     For USDT, this promise came in the form of three guarantees. First, Tether promised that each USDT would be backed by one U.S. dollar held in Tether's reserves. Second, Tether promised that it would issue new USDT only in response to legitimate market demand—customers' willing to exchange dollars one-for-one for USDT. Third, Tether promised that customers could exchange USDT for U.S. dollars at any time.

117.     These promises, if true, would ensure that the value of a USDT would always be one U.S. dollar. When a customer sent Tether one U.S. dollar, Tether would send one USDT in exchange, putting it into circulation. When a customer sent Tether one USDT, Tether would provide one U.S. dollar in exchange and revoke that USDT from circulation—a process known as "burning" USDT.

118.     These USDT issuances and burns, like bitcoin transactions, are all visible by anyone with internet access on the blockchain. However, the corresponding U.S. dollar exchanges that are supposed to occur in this process are not visible to the public.

119.     Tether's promises were the foundation of USDT's value. If Tether were telling the truth, a USDT would combine the best aspects of fiat currency and crypto-assets: It would be stable and safe like the U.S. dollar but also, like other crypto-assets, easily transferable across different crypto-exchanges, and free from many government regulations.

120.     These promises extend back to Tether's founding. In July 2014, a startup called Realcoin claimed it had produced the first stablecoin "backed one-to-one by a fully auditable

reserve of dollars."[56] Realcoin was founded by investor Brock Pierce, its first CEO Reeve Collins, and software engineer Craig Sellars. According to Collins, by issuing realcoins they were "digitizing the dollar and giving that digital dollar access to the Bitcoin blockchain."[57]

121.    Collins stated that realcoins would "be introduced or removed from circulation depending on whether dollars are being added or redeemed."[58] He also claimed that Realcoin had already found a "major banking partner," that it would "maintain a real-time record of its dollar-based reserves," and that its "lawyers [were] working to obtain U.S. money transmitter licenses from those states that require them."[59]

122.    Realcoin was soon rebranded as Tether. In September 2014, Potter and Devasini incorporated Tether Holdings Limited in the British Virgin Islands.[60] In November 2014, Realcoin was renamed Tether and its realcoins were rebranded as "tether" or USDT, the ticker under which the token is listed on crypto-exchanges around the world.[61]

123.    On October 6, 2014, Tether issued its first batch of stablecoins, "printing" 100 USDT—allegedly equivalent to $100.

124.    After the rebranding, Collins reiterated Tether's guarantee. He publicly asserted "that the number of [USDT] in circulation will always equate to the dollars in its bank account"

---

[56] Michael J. Casey, *Dollar-Backed Digital Currency Aims to Fix Bitcoin's Volatility Dilemma*, WALL ST. J. (July 8, 2014), https://perma.cc/NX5W-UTYZ.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Tether Holdings Limited*, OFFSHORE LEAKS DATABASE, https://perma.cc/UDT7-ACVW.

[61] Pete Rizzo, *Realcoin Rebrands as 'Tether' to Avoid Altcoin Association*, COINDESK (Nov. 20, 2014), https://perma.cc/DD89-UPL8.

and "that there are no pegs or formulas that complicate the process for its partners."[62] He was

unequivocal: "When you want to redeem them, we issue you cash."[63]

125.    Similarly, from its formation until March 20, 2015, Tether's website stated that

USDT

> is backed 100% by actual fiat currency assets in our reserve account
> and *always maintains a one-to-one ratio with any currency held*. For
> example, 1 USDT = 1 USD. With almost zero conversion and trans-
> fer fees, [USDT] is redeemable for cash at any time.[64]

126.    During that same time, Tether's website also claimed that "Tether currencies are

essentially Dollars, Euros, and Yen formatted to work on the Blockchain. [USDT]s always hold

their value at 1:1 to the underlying assets." [65]

127.    On June 17, 2016, Tether released a white paper further assuring the public that

each USDT was backed by non-digital assets. It promised that:

> [E]ach [USDT] in circulation represents one US dollar held in our reserves
> (i.e. a one-to-one ratio) which means the system is fully reserved when the
> sum of all [USDT] in existence (at any point in time) is exactly equal to the
> balance of USD held in our reserve. [66]

128.    To bolster confidence in Tether's reserves, the white paper asserted Tether's com-

mitment to "maintaining the guarantee of 100% redeemability"[67] and promised that USDT "may

---

[62] *Id.*

[63] *Id.*

[64] *Frequently Asked Questions*, TETHER.TO (Mar. 20, 2015) (emphasis added), https://perma.cc/L46W-VCNX.

[65] *Id.*

[66] *Tether: Fiat currencies on the Bitcoin blockchain*, TETHER.TO, at 9 (June 17, 2016), https://perma.cc/M2WS-58JC.

[67] *Id.* at 17.

be redeemable/exchangeable for the underlying fiat currency pursuant to Tether Limited's terms

of service or, if the holder prefers, the equivalent spot value in Bitcoin."[68]

129.    Tether's white paper also depicted how USDT supposedly would be created when

fiat was deposited and would be withdrawn from circulation when redeemed for fiat:[69]



130.    A year later, on April 5, 2017, during court proceedings against Wells Fargo, Velde

filed a declaration, under penalty of perjury, swearing to USDT's redeemability:

> Tether is a financial technology company that operates a platform to
> store, send, and make purchases with a form of digital currency –
> digital tokens called [USDT]– that are fully backed by U.S. dollars
> on deposit from customers. [USDT] may be redeemed or exchanged
> for the underlying U.S. dollars. . . . Customers who want to purchase
> Virtual Currency through Bitfinex must deposit U.S. dollars or
> [USDT] into their Bitfinex account and in exchange receive an
> equivalent amount of Virtual Currency until they ask Bitfinex to re-
> mit back the U.S. dollars they deposited. Likewise, customers who
> want to purchase [USDT] through Tether must deposit U.S. dollars
> in their Tether account and in exchange receive an equivalent
> amount of [USDT] until they ask Tether to remit back the U.S. dol-
> lars they deposited. . . . For these systems to work, customers

---

[68] *Id.* at 4.

[69] *Id.* at 7–8.

depend on Bitfinex's and Tether's ability to send back to them the
U.S. dollars they deposited with Bitfinex or Tether.[70]

131.    Until February 2019, Tether's website continued to represent that Tether "converts cash into digital currency," that "[e]very [USDT] is always backed 1-to-1, by traditional currency held in our reserves[] [s]o 1 USDT is always equivalent to 1 USD;" and that "all [USDT] in circulation always match our reserves."[71]

132.    On March 4, 2019, Tether claimed that every USDT was "1-to-1 pegged to the dollar" and "100% backed" by reserves that "from time to time may include other assets."[72]

133.    On April 25, 2019, Tether's counsel represented to the Office of the New York Attorney General that "issuances of new [USDT] occur when an investor has requested to purchase [USDT] by depositing U.S. dollars with Tether the company, or by depositing U.S. dollars with a trading platform that is authorized to accept dollar deposits in exchange for USDT."[73]

134.    In November 2019, Tether claimed that "[a]ll Tether tokens are fully backed by reserves."[74] As of filing, the Tether website continues to proclaim: "Tether allows you to store, send and receive digital tokens pegged to dollars, euros, and offshore Chinese yuan."[75]

---

[70] J.L. van der Velde Declaration ¶¶ 5, 6, 12, 14, ECF No. 9, *iFinex Inc. v. Wells Fargo & Co.*, No. 3:17-CV-01882 (N.D. Cal. Apr. 5, 2017).

[71] TETHER.TO (Feb. 19, 2019), https://perma.cc/B663-LR72.

[72] TETHER.TO (Mar. 04, 2019), https://perma.cc/FWY6-23EP.

[73] Whitehurst Aff. ¶ 34.

[74] *Tether Response to Flawed Paper by Griffin and Shams*, TETHER.TO (Nov. 7, 2019), https://perma.cc/MEK6-GKT4.

[75] *FAQs*, TETHER.TO, https://tether.to/faqs/.

135.    As of filing, USDT is reportedly the most widely used crypto-asset in the world by trading volume, surpassing even bitcoin.[76] Bitfinex and Tether's Chief Technical Officer recently boasted that USDT possesses a near-perfect monopoly on the stablecoin market by accounting for 98.7% of worldwide stablecoin trading volumes.[77]

136.    Indeed, for much of the relevant time period, Tether had a nearly 100% market share in stablecoin, as demonstrated by this chart:



[76] Olga Kharif, *The World's Most Used Crypto-asset Isn't Bitcoin*, Bloomberg (Oct. 1, 2019), https://perma.cc/9A3H-DYT8.

[77] Olga Kharif, *Biggest Crypto Exchange Takes on Tether With Own Stablecoins*, BLOOMBERG (June 6, 2019), https://perma.cc/XNE7-RV78.

137.    USDT is currently the third largest crypto-asset in the world by market capitalization, purportedly over \$9.1 billion based on the over 9.1 billion USDT in circulation.[78] If Tether's original representations were accurate, then Tether would hold over \$9.1 billion in deposits.

138.    Tether Limited is registered as a money services business with the Department of the Treasury's Financial Crime Enforcement Network.

### 2.    Bitfinex

139.    Bitfinex is one of the "largest and least regulated" crypto-exchanges in the world.[79] While many crypto-exchanges only facilitate crypto-to-crypto transactions, Bitfinex is one of relatively few that allow users to deposit and withdraw fiat currency such as U.S. dollars or euros. Accordingly, Bitfinex is a common entry point for new traders, allowing them to convert traditional currency into crypto-assets.

140.    Bitfinex was publicly announced in 2012 when its Chief Technology Officer, Raphael Nicolle, posted about its creation on the popular online crypto-asset forum bitcointalk.org.[80]

141.    In June 2016, the CFTC fined Bitfinex \$75,000 after finding that "Bitfinex engaged in illegal, off-exchange commodity transactions and failed to register as a futures commission merchant, in violation of Section 4(a) and 4d of the [Commodity Exchange] Act."[81]

142.    BFXNA, Inc., is registered as a money services business with the Department of the Treasury's Financial Crime Enforcement Network.

---

[78] *Top 100 Cryptocurrencies by Market Capitalization*, COINMARKETCAP.COM, https://coinmarketcap.com/.

[79] Nathaniel Popper, *Bitcoin's Price Was Artificially Inflated, Fueling Skyrocketing Value, Researchers Say*, N.Y. TIMES (June 13, 2018), https://perma.cc/U6UV-KQ3V.

[80] unclescrooge, [*BETA*]*Bitfinex.com first Bitcoin P2P lending platform for leverage trading*, BITCOINTALK.ORG (Oct. 22, 2012, 8:41 AM), https://perma.cc/XRX7-B22T.

[81] *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5-6 (June 2, 2016).

143.     BFXNA, Inc. does not appear in the NMLS database.

144.     Bitfinex has developed a platform prone to manipulation. In April 2017, Potter publicly discussed Bitfinex's plans to create a "private market for the equity [shareholders] to trade among themselves."[82] Bitfinex today "offer[s] an order type called 'hidden,' in which the 'hidden' order does not appear on the publicly visible order book."[83] These hidden orders present an "opaque channel" mechanism for selling off bitcoin without crashing the price.

145.     Similarly, a report published by the New York Attorney General found that Bitfinex was ripe for abuse. Even though "[t]rading by platform employees poses a conflict of interest," Bitfinex does "not provide any restrictions on employee trading."[84] Bitfinex also offers a number of "special order types" that "are only useful to professional, automated traders using sophisticated algorithmic strategies, where orders can be submitted and cancelled automatically, in response to market signals not visible (or even available) to regular traders."[85]

---

[82] WhalePool, *CSO Bitfinex Phil Potter and WhalePool bitcoin traders celebrate BFX Token 100% Payment apr/2017*, YOUTUBE, at 10:10 (Apr. 3, 2017), https://archive.org/details/2017.04.03.whalepoolcsobitfinexphilpotter.

[83] *Virtual Markets Integrity Initiative Report,* OFFICE OF THE N.Y. ATT'Y GEN. (Sep. 18, 2018), https://virtualmarkets.ag.ny.gov/. [https://perma.cc/7YS8-LS7S]

[84] *Id.* § III.B.

[85] *Id.* § II.A.

146.    And in June 2014, one month after the Willy Report about Mt. Gox was published,
Devasini all but admitted on an online message board that he was working on a "Willy Bot" of his
own to drive the price of bitcoin to $10,000, as shown in this screen shot[86]:



147.    On January 15, 2015, Bitfinex represented that "each [USDT] is backed 1-to-1 by
its corresponding currency, which can be viewed and verified in real-time via the Tether.to website
and on the Blockchain. Tether will be fully transparent and audited to demonstrate 100% reserves
at all times."[87]

148.    On its website, Bitfinex has continued to represent that USDT was backed 1 to 1
by U.S dollars. On August 20, 2019, the Bitfinex website represented that "any assertion that we
have misled our customers about Tether (USDT), its backing . . . is false."[88] On October 5, 2019,
the Bitfinex website stated that "all [USDT] are fully backed by reserves and are issued and traded
on Bitfinex pursuant to market demand, and not for the purpose of controlling the pricing of crypto
assets."

---

[86] *Re: And we have another Bitfinex Hookey THIEVING Short Squeeze!*, BITCOINTALK.ORG (June 22, 2014), https://perma.cc/HW9Q-5JVA

[87] *Bitfinex Feature Announcement: Tether*, BITFINEX.COM (Jan. 15, 2015), https://perma.cc/T4N8-G7DQ.

[88] *Statement in Response to Justice Joel M. Cohen's Order*, BITFINEX.COM (Aug. 20, 2019), https://perma.cc/9NRR-SU28.

149. As of this filing, Bitfinex represents that: (1) "[o]utstanding [USDT] is backed 1-to-1 by traditional currency held in Tether Limited's reserves"; (2) "1 USDT is always equivalent to 1 USD;" and (3) "users can freely deposit, trade and withdraw USDT" and "convert[] these to fiat … through means of USDT/USD … trading pairs on our platform."[89]

150. Bitfinex's website also explains that "Tether (USDT) is a stablecoin with a value meant to mirror the value of the U.S. dollar."[90] Bitfinex touts the same "best of both worlds" benefits of investing in USDT and similar stablecoins: "A digital token pegged to fiat currency provides individuals and organizations with a robust and decentralized method of exchanging value while using a familiar accounting unit."[91]

151. Defendants also falsely represented that there was legitimate market demand for USDT. In a quarterly investor update from December 2017, Bitfinex was adamant that Tether was issuing USDT to real customers, not Bitfinex: "The reason for the continuing creation of Tethers is simple: demand from verified Bitfinex customers."[92]

### 3. Tether's Concealed Links to Bitfinex

152. In November 2014, when Realcoin rebranded to become Tether, it stated that Tether had formed "new partnerships in the bitcoin space, including agreements with Hong Kong-based bitcoin exchange Bitfinex."[93]

---

[89] *What is Tether?*, BITFINEX.COM (last updated May 22, 2020), https://perma.cc/35Y2-B99Z.

[90] *Tether USD (USDT)*, BITFINEX.COM (last updated May 1, 2020), https://perma.cc/62LL-F8SQ.

[91] *Tether EUR (EURT)*, BITFINEX.COM (last updated May 1, 2020), https://perma.cc/R88Q-PZ4R.

[92] Bitfinex Quarterly Update, PASTEBIN (Dec. 2, 2017), https://perma.cc/TA3W-QCV4.

[93] Pete Rizzo, *Realcoin Rebrands as 'Tether' to Avoid Altcoin Association*, COINDESK (Nov. 20, 2014), https://perma.cc/DD89-UPL8.

153.    The November 2014 announcement omitted that Devasini and Potter—Bitfinex's CFO and CSO—created and had controlled Tether's holding company since September 2014.[94]

154.    It also omitted that Velde and Devasini—Bitfinex's CEO and CFO—had incorporated Tether Limited in September 2014 and served as its only directors.[95]

155.    An archived copy of the Tether website from March 2015 identified Potter and Devasini as "advisors" and did not identify Velde at all.[96]

156.    This overlapping control structure remained largely concealed from the public until November 2017, when German reporters leaked over 13 million electronic documents known as the Paradise Papers.[97]

157.    The links between Tether and Bitfinex go beyond their shared control.

158.    Tether's "Treasury" is the account, solely controlled by Tether, in which all USDT are revoked/burned.[98]

159.    Until November 2017, customers could purchase USDT directly from Tether in exchange for U.S. dollars.[99] These direct purchases were reenabled on November 27, 2018.

---

[94] *Tether Holdings Limited*, OFFSHORE LEAKS DATABASE, https://perma.cc/UDT7-ACVW.

[95] *Tether Limited*, HONG KONG REGISTRY, https://perma.cc/RDU3-9E7D.

[96] *Our Team*, TETHER.TO (Mar. 29, 2015), https://perma.cc/UC2T-JEJF.

[97] Nathaniel Popper, *Warning Signs About Another Giant Bitcoin Exchange*, N.Y. TIMES (Nov. 21, 2017), https://perma.cc/N33P-WNDG.

[98] *See* Tether White Paper, at 8.

[99] Whitehurst Aff. ¶ 36.

160.     But direct purchases have always made up a tiny fraction of all issued USDT. The vast majority was issued to accounts on Bitfinex, which was the *only* exchange to which Tether directly transferred USDT. [100]

161.     Tether's exclusive relationship with Bitfinex for initial USDT issuances meant that Bitfinex was the only meaningful path for USDT to enter the crypto-economy. Bitfinex's role in distributing USDT accordingly gave it substantial economic power in the crypto-markets.[101]

### 4.     Poloniex

162.     Poloniex is a crypto-exchange founded in 2014 by Tritian D'Agosto. It is secretive about its operations and has disclosed little about who oversees them.

163.     Poloniex charges a per-trade fee based on its customers' rolling 30-day volume and on whether the order is a "maker" or a "taker."[102] A "maker" is an order that creates liquidity in a market and a "taker" is an order that reduces liquidity.[103] The per-trade fee ranges from 0.00% for a large maker order to 0.25% for a small taker order.[104] Poloniex also charges customers a trans-action fee for every withdrawal.[105]

164.     For most of the relevant time period, Poloniex did not accept fiat-based deposits or offer fiat-based exchanges. Until July 2019, for example, a Poloniex customer could not exchange

---

[100] *What is Driving Tether's Growth and What Financial Institutions Could Learn From It*, CHAINALYSIS (Aug. 2018), *available at* tether.to, https://perma.cc/4MYT-3F8B.

[101] Robert-Jan Den Haan, *Clearing Up Misconceptions: This is How Tether Should (and Does) Work*, BITCOIN MAGAZINE (June 14, 2018), https://perma.cc/6J2Q-2U33.

[102] *Poloniex Fee Schedule*, POLONIEX.COM (Jan. 8, 2020), https://perma.cc/47C6-FP58.

[103] *Id.*

[104] *Id.*

[105] *Id.*

bitcoin for U.S. dollars. Instead, Poloniex is a "crypto-to-crypto exchange," allowing its customers to trade only different crypto-assets for each other.

165.    Thus, until July 2019, all such transactions on Poloniex thus involved crypto-asset "trading pairs"—a trade of one type of crypto-asset for another. An example of a trading pair is USDT/bitcoin, whereby one buys USDT with bitcoin or sells USDT for bitcoin. As of today, there are 61 USDT-based trading pairs on Poloniex.[106]

166.    By integrating USDT into its exchange, Poloniex adopted Tether's guarantee that each USDT was backed by one U.S. dollar. In a press release, Poloniex and Tether jointly announced that:

> Tether's integration with Poloniex allows its customers to transact with fiat currencies across the exchange and blockchain without the volatility concerns related to Bitcoin or alt coins. Tether is a secure platform that allows deposited US dollars (and soon euros, Japanese yen and other fiat currencies) to be converted into 1-to-1 backed [USDT] and held in online or offline wallets.[107]

167.    Indeed, Poloniex CEO D'Agosta is identified as a "Featured Partner" on Tether's website, and is quoted as stating that "Tether's growing adoption and careful attention to legal compliance have made it the leader in solutions for fiat on the blockchain." [108]

168.    Poloniex benefited by allowing USDT trading. By listing USDT, it provided customers a purportedly dollar-based asset to trade on its platform. This promoted the popularity of crypto-assets generally and increased the number of transactions on its platform specifically, leading to increased trading and withdrawal fees for Poloniex. As a result of its early listing and promotion of USDT, Poloniex quickly became one of the largest crypto-exchanges: By the end of

---

[106] https://www.coingecko.com/en/exchanges/poloniex.

[107] *Tether Now Integrated With Poloniex Exchange*, Yahoo (Feb. 26, 2015), https://perma.cc/PB3H-P8Z9.

[108] *Why Use Tether*, TETHER.TO, https://perma.cc/2RA9-ZFPF.

2017, Poloniex was executing $7.6 billion in USDT trading for various digital coins on a monthly basis.

169.    Poloniex is registered as a money services business with the Department of the Treasury's Financial Crime Enforcement Network. On its website, it purports to be "committed to compliance with all applicable law requiring identification and verification of its customers."[109]

### 5.    Bittrex

170.    Bittrex is a crypto-exchange founded in 2014 by three cybersecurity engineers. Like Poloniex, Bittrex is secretive about its operations and has disclosed little about them.

171.    Bittrex, like Poloniex, charges a trading fee for each trade filled by the Bittrex matching engine, which varies depending on the account's 30-day volume and whether the order is a "maker" or "taker."[110] Its trading fee ranges from 0.00% (for large maker orders) to 0.25% (for small taker orders).[111] Bittrex also charges customers a transaction fee for each withdrawal.[112]

172.    Bittrex, like Poloniex, did not accept U.S. dollar deposits for most of its history, allowing its customers to trade only different crypto-assets for each other. Bittrex introduced U.S. dollar trading for corporate customers in May 2018 and for retail customers in August 2018.

173.    In March 2017, Bittrex became the second crypto-exchange to enable USDT trading for other crypto-assets. As of today, there are 67 USDT-based trading pairs offered on Bittrex's

---

[109] *Notice to our legacy account* holder, POLONIEX.COM (Dec. 27, 2017), https://perma.cc/2VCY-XA8S.

[110] *Bittrex Service Fees and Withdrawal Limitations*, BITTREX.COM (Sept. 18, 2019), https://perma.cc/99W9-FZE5.

[111] *Id.*

[112] *Id.*

website.[113] In offering USDT to its customers, Bittrex has worked closely with Tether and adopted its guarantee that each USDT is backed by one U.S. dollar.

174.     Indeed, on August 25, 2017, Bittrex advertised to its customers the ability to purchase USDT from Bittrex through wire transfer.[114] In advertising USDT purchases, Bittrex stated that "[w]ires are processed using *$1 for 1 USDT*."[115]

175.     As a result of its early listing and promotion of USDT, Bittrex quickly became one of the largest crypto-exchanges: By the end of 2017, Bittrex was executing $4.6 billion in USDT trading for various digital coins on a monthly basis.

176.     On August 10, 2015, Bittrex filed an application to the New York Department of Financial Services ("NYSDFS") to engage in Virtual Currency Business Activity in New York.[116] Before its application, and while that application was pending, Bittrex permitted New York-based customers trading access to Bittrex under a "safe harbor" provision permitted by NYSDFS.[117]

177.     On April 10, 2019, NYSDFS rejected Bittrex's application, citing (i) "non-existent or inadequate" policies and procedures; (ii) significant concerns "as to the experience, level of authority and effectiveness of the Compliance Officer in discharging his responsibilities;"

---

[113] https://www.coingecko.com/en/exchanges/bittrex.

[114] *FAQ Question: Purchase USDT via Wire Transfer*, BITTREX.COM, https://support.bittrex.com/hc/en-us/articles/115001293992-Purchase-USDT-via-Wire-Transfer (archived by archive.org at https://archive.is/2yJqO).

[115] *Id.*

[116] Daniel Sangeap, Letter to Bill Shihara, STATE OF NEW YORK DEPARTMENT OF FINANCIAL SERVICES (Apr. 10, 2019), https://www.dfs.ny.gov/system/files/documents/2019/04/dfs-bittrex-letter-41019.pdf

[117] *Id.*

(iii) "lack of a comprehensive training program" with respect to required anti-money laundering and compliance practices; and (iv) "inadequate customer due diligence."[118]

178.    NYSDFS's examiners "found that a large number of transactions were missing required tax identification numbers, customer names, or birthdate related information."[119] In addition, NYSDFS noted that there were "a substantial number of aliases" including clearly false names, such as "abc-abc," "Donald Duck," and "Elvis Presley."[120]

179.    Like Poloniex, Bittrex is registered as a money services business with the Department of the Treasury's Financial Crime Enforcement Network. On its website, it purports to comply with the Know-Your-Customer and anti-money laundering regulations.[121]

### 6.    Reginald Fowler and Crypto Capital

180.    To facilitate their access to U.S. dollars, Bitfinex and Tether first partnered with Panamanian entity Crypto Capital in 2014, and by 2017 had become completely dependent on it for day-to-day business operations.

181.    Crypto Capital was a "shadow bank for crypto-exchanges" that facilitated the exchange of fiat currencies for cryptocommodities.

182.    Fowler was at the center of Crypto Capital's scheme to "operate a shadow bank on behalf of crypto-exchanges in which hundreds of millions of dollars passed through accounts controlled by [him] in jurisdictions around the world." Among other things, he was responsible for

---

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Bittrex, Inc. Privacy Policy - Version 3*, BITTREX.COM (Nov. 1, 2018), https://perma.cc/LF97-G7YS.

creating shell companies and opening bank accounts that could be used by Bitfinex and Tether to process U.S. dollar and other fiat transactions.

183.    As conventional banks began shutting down Tether and Bitfinex accounts for money laundering and other compliance issues, Tether and Bitfinex became enmeshed with Crypto Capital.

184.    By early 2018, Fowler and Crypto Capital controlled over $1 billion of Bitfinex funds, even though Crypto Capital and Bitfinex never entered into a single written agreement over their four-year business partnership.[122]

C.    **The Defendants Manipulate Cryptocommodity Prices**

185.    Defendants played major roles in the crypto-economy. Tether issued a purportedly stable crypto-asset. Bitfinex, Bittrex, and Poloniex controlled crypto-exchanges. Crypto Capital acted as a source of liquidity that enabled crypto-entities to access fiat currency.

186.    Defendants leveraged this collective power to create the largest asset bubble in history.

187.    Defendants engaged in a sophisticated scheme to artificially inflate the price of cryptocommodities by purchasing bitcoin and other cryptocommodities with USDT that was not fully backed by U.S. dollars when the price of bitcoin was falling, creating the illusion of increased demand for cryptocommodities, and thus driving up cryptocommodity prices. Defendants benefited from this scheme in several ways, not least by preserving the larger cryptocommodity economy on which their business models depended, and by artificially preserving the value of their cryptocommodity reserves.

_____

[122] Whitehurst Aff., ¶¶ 58–59 .

188.    In the normal course, customers who purchased USDT from either Tether or Bitfinex did so by exchanging one U.S. dollar for one USDT. If a customer did not provide a dollar, then, according to Tether's representations, Tether or Bitfinex did not provide a USDT. But because the same people and entities controlled Tether and Bitfinex, Tether could and did send newly issued USDT to Bitfinex addresses that Tether and Bitfinex controlled in exchange for nothing. The market would believe those new USDT were fully backed by, readily exchangeable for, and thus equivalent to real U.S. dollars.

189.    Bitfinex and Tether transferred that fraudulent USDT to Bittrex and Poloniex, where Bitfinex and Tether used it to purchase cryptocommodities, which they then transferred back to the Bitfinex exchange and sold, thereby turning the cryptocommodities into fiat currency or other assets.

190.    But this was not just a money laundering scheme. Defendants also used these transactions to artificially inflate cryptocommodity prices, creating a fraudulently bullish market for the assets they purchased. Bitfinex and Tether would then sell those assets at an inflated price through the opaque channels they created on Bitfinex without crashing the cryptocommodities' trading price.

191.    Expert analysis shows that Bitfinex and Tether issued unbacked USDT and used that debased USDT to buy large amounts of cryptocommodities when the prices of those cryptocommodities were falling. Because the market believed USDT was fully backed by U.S. dollars, it perceived these purchases as investment of the equivalent of fiat currency in those cryptocommodities, reflecting genuine customer demand at those prices. This perceived demand naturally attracted more purchases and further raised cryptocommodity prices. Thus, the same purchases

that converted Bitfinex and Tether's freely printed USDT into valuable cryptocommodities also artificially inflated the value of those assets.

192.    Defendants all knew of, contributed to, and benefited from this common scheme.

**1.    Bitfinex and Tether Lied About USDT's Customer Demand and 1:1 U.S. Dollar Backing**

193.    Core to Defendants' scheme was Tether's ability to convince the markets that USDT was backed one to one by U.S. dollars. For most of Tether's history, as alleged above, its guarantee was unambiguous. Because the market accepted Tether's representation, USDT had the same economic power within the crypto-economy as U.S. dollars.

194.    Tether's promise that USDT was fully backed by U.S. dollars was false. Expert analysis of USDT flows from the Tether Treasury confirms that massive new USDT issuances went to Bitfinex accounts that Tether and Bitfinex controlled, rather than to legitimate customers, and that Bitfinex transferred these new USDT issuances to accounts on Bittrex and Poloniex that Bitfinex and Tether controlled. These enormous issuances could not have been backed by U.S. dollars held in reserve, as confirmed both by analysis of those flows and because Tether and Bitfinex did not have meaningful access to the banking necessary to exchange U.S. dollars when Tether issued this USDT.

**a.    Analysis of USDT Flows Shows that USDT Was Often Issued to Accounts Controlled by Bitfinex, Rather Than to Actual Customers**

195.    USDT is created by Tether's "USDT authorizer," which authorizes the creation of new USDT to the Tether Treasury. Tether represented to the market that authorized USDT would sit in the Treasury until it was "issued" to market participants who requested it, at which point it

would be exchanged for a corresponding amount of real dollars.[123] The USDT authorizer also enables Tether to revoke or "burn" USDT, which should only happen when USDT is redeemed for U.S. dollars.



196.    When Tether issued USDT to the Tether Treasury, it sent nearly all that USDT to Bitfinex, where it sat in one or more addresses. When Tether issued USDT to real customers at their request, that USDT was generally credited to customers' accounts on Bitfinex.[124]



197.    From Bitfinex, customers were free to transfer the USDT as they pleased. They could hold it on Bitfinex, transfer it to their own, separate addresses, or transfer it to another exchange.

198.    However, for most of its history, Bitfinex did not permit its customers to trade USDT for other crypto-assets.[125] Instead, individuals could only purchase USDT for U.S. dollars on Bitfinex. If they desired to trade USDT for other crypto-assets, they would have to move the USDT to other crypto-exchanges.

---

[123] *See, e.g.*, Whitehurst Aff. ¶ 34.

[124] While Tether at times transferred newly issued USDT directly to customers, the aggregate amount of such direct transfers was relatively small.

[125] Bitfinex would not enable USDT to bitcoin trading until March 11, 2019. *Bitfinex lists USDT markets for BTC and ETH*, BITFINEX.COM (Mar. 11, 2019), https://perma.cc/P8SH-NXQ8.

199.    Bitfinex did not allow its customers to trade USDT for other crypto-assets on its platform because it already allowed them to trade directly for U.S. dollars. Therefore, Bitfinex's customers did not purchase USDT to trade it on the Bitfinex exchange.

200.    Instead, USDT was useful for customers on other crypto-exchanges, especially those that did not allow U.S. dollar trading. On other exchanges, like Bittrex and Poloniex, customers could trade USDT for other crypto-assets. Thus, Tether and Bitfinex needed the assistance of Bittrex and Poloniex to implement and perpetuate their fraudulent scheme.

201.    If USDT were issued legitimately, an analysis of the USDT blockchain would show each USDT issuance going to many addresses in relatively small volumes. From there, it would continue to move in different and diffuse ways. That is the story the blockchain tells for the relatively small amount of USDT that Tether issued directly to customers—many small amounts of USDT issued in unround numbers to many different addresses.

202.    This is what one would expect if one could attach tracking chips to new bills issued by the U.S. Treasury. The bills would start together at a bank and then pass in small amounts to many individuals, who would exchange them for goods and services, distributing them broadly into the economy.

203.    The blockchain for USDT issued to Bitfinex tells a very different story. Although some USDT behaves in the way one would expect, the vast majority of flows of USDT from the Tether Treasury to Bitfinex were in large, round numbers— in amounts and at times highly unlikely to reflect genuine customer demand—and went primarily to just *two* addresses, issuance after issuance.

204.    Bitfinex's    USDT    addresses,    1KYiKJEfdJtap9QX2v9BXJMpz2SfU4pgZw ("1KYi") and 1GjgKbj69hDB7YPQF9KwPEy274jLzBKVLh ("1Gjg"), were publicly identified

as belonging to Bitfinex on the Tether rich list website, which purports to list the "Top USDT Balances".[126]

205.    One of the two addresses that received a vastly disproportionate amount of new USDT issuances to Bitfinex had the public address 1J1dCYzS5Ee-rUuJCJ6iJYVPytCMVLXrgM91J1d ("1J1d"). Whenever USDT was deposited into this account, it was transferred to Poloniex, where it was credited to an account controlled by Bitfinex.

206.    Similarly, the other address receiving a wildly disproportionate flow of USDT, which had the address 1AA6iP6hrZfYiacfzb3VS5JoyKeZZBEYRW ("1AA6"), transferred all the USDT it received to Bittrex before crediting an account controlled by Bitfinex.

207.    Because 1AA6 and 1J1d each consistently received large amounts of USDT from Bitfinex's exchange addresses (1KYi and 1Gjg), and sent the USDT exclusively to a single exchange address for Bittrex and Poloniex (respectively), it is clear that Bitfinex used these addresses to move USDT to its accounts on those exchanges.



[126] *See:e.g.*, https://web.archive.org/web/20181115182949/https://wallet.tether.to/richlist

208.    The scale of this scheme was extraordinary. Expert analysis reveals that through the end of 2018, 3 billion USDT—72% of all USDT ever issued as of that time—was transferred onto Bittrex and Poloniex through the 1AA6 and 1J1d addresses.

209.    There was a tight correlation between the size of new issuances and the size of the transfers to these addresses that followed. For the average USDT issuance between January 2017 and December 2018, there were transfers to these addresses representing 72% of the issuance. During the same time, the correlation coefficient between the issuances and the size of the transfers was 69%.

210.    This volume of USDT flowing into these two addresses cannot be explained by legitimate market demand—Tether and Bitfinex were clearly issuing new USDT directly to themselves.

211.    To return to the example in which one could track newly minted U.S. dollars, this would be like seeing 72% of each new issuance of dollars put into two duffel bags that were walked to two specific stockbrokers and invested in the same pair of trading accounts.

212.    The illegitimacy of these flows is confirmed by how they dramatically changed following public scrutiny of Tether. On January 24, 2018, a report entitled "Quantifying the Effect of Tether" (the "Tether Report") was published online. Based on an analysis of blockchain data, the Tether Report concluded "that Tether may not be minted independently of Bitcoin price and may be created when Bitcoin is falling" to boost bitcoin prices.[127]

213.    In the nine days *before* the Tether Report, Tether issued 700 million USDT, and more than 400 million USDT were transferred from Bitfinex to the 1AA6 and 1J1d addresses as well as to other addresses. For ten days *after* the Tether Report, transfers of USDT to other

---

[127] http://www.tetherreport.com/. [https://perma.cc/JXT6-VJGQ]

addresses continued, but no new USDT was issued and there were no transfers to the 1AA6 and 1J1d addresses.

| Date | Net Authorization | Net Issuance | Bitfinex to 1AA6 (Bittrex) | Bitfinex to 1J1d (Poloniex) | Bitfinex to Unknown |
|---|---|---|---|---|---|
| 1/1/18 | 0 | 0 | 6,326,290 | 8,214,319 | 6,641,643 |
| 1/2/18 | 0 | 0 | 8,296,344 | 7,546,876 | 26,175,584 |
| 1/3/18 | 0 | 0 | 13,567,814 | 10,904,839 | 53,254,035 |
| 1/4/18 | 100,000,000 | 100,000,000 | 10,501,838 | 12,041,418 | 32,775,616 |
| 1/5/18 | 0 | 0 | 5,239,008 | 9,016,592 | 12,883,465 |
| 1/6/18 | 0 | 0 | 11,944,044 | 7,385,257 | 7,432,570 |
| 1/7/18 | 0 | 0 | 3,576,121 | 4,883,694 | 10,244,134 |
| 1/8/18 | 0 | 0 | 10,241,584 | 14,279,214 | 18,191,265 |
| 1/9/18 | 0 | 0 | 10,689,327 | 16,210,672 | 12,278,634 |
| 1/10/18 | 0 | 0 | 11,343,687 | 12,593,620 | 15,478,520 |
| 1/11/18 | 0 | 0 | 16,464,147 | 16,677,068 | 11,911,886 |
| 1/12/18 | 0 | 0 | 3,132,332 | 1,216,108 | 36,834,675 |
| 1/13/18 | 0 | 0 | 10,318,053 | 6,838,851 | 18,571,186 |
| 1/14/18 | 50,000,000 | 50,000,000 | 10,025,716 | 5,985,536 | 28,151,346 |
| 1/15/18 | 100,000,000 | 100,000,000 | 13,352,047 | 8,285,689 | 37,365,778 |
| 1/16/18 | 100,000,000 | 100,000,000 | 29,900,372 | 20,595,578 | 37,678,417 |
| 1/17/18 | 100,000,000 | 100,000,000 | 6,657,893 | 21,673,607 | 79,782,686 |
| 1/18/18 | 100,000,000 | 100,000,000 | 57,565,094 | 24,134,725 | 104,687,785 |
| 1/19/18 | 100,000,000 | 100,000,000 | 21,927,463 | 13,487,604 | 36,716,771 |
| 1/20/18 | 100,000,000 | 0 | 4,140,514 | | 20,406,757 |
| 1/21/18 | 0 | 100,000,000 | 29,358,333 | 15,490,865 | 45,538,478 |
| 1/22/18 | 0 | 0 | 11,585,667 | 9,808,951 | 21,836,283 |
| 1/23/18 | 100,000,000 | 100,000,000 | 11,519,226 | 16,442,575 | 46,289,851 |
| 1/24/18 | 0 | 0 | 0 | 0 | 39,745,961 |
| 1/25/18 | 0 | 0 | 0 | 0 | 18,129,712 |
| 1/26/18 | 0 | 0 | 0 | 0 | 21,639,530 |
| 1/27/18 | 0 | 0 | 0 | 0 | 9,505,939 |
| 1/28/18 | 0 | 0 | 0 | 0 | 5,887,284 |
| 1/29/18 | 0 | 0 | 0 | 0 | 20,479,596 |
| 1/30/18 | 0 | (200,000,000) | 0 | 0 | 17,383,318 |
| 1/31/18 | 0 | 200,000,000 | 0 | 0 | 10,371,587 |
| 2/1/18 | 0 | 0 | 0 | 0 | 14,237,922 |
| 2/2/18 | 0 | 0 | 0 | 0 | 9,444,980 |
| 2/3/18 | 0 | 0 | 7,314,818 | 0 | 20,492,542 |
| 2/4/18 | 0 | 0 | 7,537,027 | 0 | 1,548,438 |

Tether Report published → (arrow pointing to 1/23/18 row)

214.    If the Tether Report were wrong, and the 1AA6 and 1J1d addresses that received these massive issuances of USDT belonged to legitimate customers, separate from Bitfinex and Tether, then those issuances would not have stopped after the report. These customers would have continued purchasing new USDT at the same rates as they had previously. But, in fact, Bitfinex and Tether used the 1AA6 and 1J1d addresses to transfer the USDT they created without U.S. dollar backing and without legitimate consumer demand. They stopped using those addresses immediately after the Tether Report to avoid further scrutiny.

215.    Returning once more to the analogy of freshly printed U.S. dollars with tracking chips attached, this would be similar to a halt in the minting of new dollars, and a halt in the

deposits of those dollars into suspect accounts, immediately after the New York Times published an exposé that the Federal Reserve was printing unauthorized U.S. dollars.

216.    Expert analysis has provided further confirmation that Tether was issuing unbacked USDT. Since Tether was issuing unbacked USDT, Bitfinex often needed to delist USDT or sell bitcoin for U.S. dollars so Tether's end-of-month reports showed equal amounts of U.S. dollars and outstanding USDT. The more unbacked USDT that was issued and sent to Bittrex and Poloniex in a given month, the more bitcoin Bitfinex needed to sell, which put downward pressure on the price of bitcoin.

217.    Expert analysis has revealed just such a monthly decrease in Bitcoin pricing. Altogether, expert analysis suggests that Tether issued Bitfinex between 1 and 3 billion unbacked USDT that was then sent to Bitfinex accounts on Bittrex and Poloniex.

218.    Contrary to its representations, Tether was not just issuing USDT in response to demand from consumers, which would involve distributing relatively small amounts to many accounts. Instead it was also, and in secret, making large issuances to its affiliate, Bitfinex, which then moved the USDT to two specific accounts on two ostensibly competing exchanges.

### b.    Tether's Struggles with Correspondent Banking Reveal That Its Promise of a 1:1 Reserve Was Impossible

219.    Theoretically, Tether could have set aside a U.S. dollar in reserve for each new USDT it issued to its accounts on Bitfinex. If that were the case, then USDT would remain readily exchangeable for U.S. dollars and so the digital equivalent of U.S. dollars.

220.    While Tether insisted its USDT was issued only in response to actual customer demand, *see supra* ¶ 142, such an explanation is economically impossible. iFinex, the parent

company to Bitfinex and Tether, had revenues of \$333.5 million in 2017.[128] But in December 2017 alone, Tether issued \$605 million to Bitfinex. Bitfinex and Tether simply did not have the cash reserves on hand to back the USDT it was issuing to itself.

221.    This is why Tether and Bitfinex kept its transfers to its accounts at Bittrex and Poloniex secret. This is why its large issuances of USDT were never accompanied by announcements from Tether that it was issuing millions of new USDT into the crypto-economy. And this is why its issuances and transfers of USDT to Bittrex and Poloniex via the 1AA6 and 1J1d addresses ceased immediately after the Tether Report was published.

222.    Tether's promises to its customers—that it maintained a 1:1 reserve of U.S. dollars that it could use to redeem USDT—are incompatible with the simple reality that Tether did not have access to the banking systems required to maintain such a reserve.

223.    Access to the U.S. financial system was an essential component of Tether's business. Tether's fundamental model depends on its use of the U.S. financial system—*i.e.*, U.S. dollar deposits and redemptions—to back its manufactured digital assets.

224.    To accept and transmit U.S. dollars to their customers, Bitfinex and Tether require either a U.S. bank account or an account with a bank that maintains its own "correspondent account" with a U.S. bank. In the second scenario, the correspondent account serves as an intermediary and 'clears' the U.S. dollar transaction.

225.    Money never actually 'moves' across the border in international transactions. To transmit funds in other currencies, banks maintain 'correspondent accounts' at foreign banks.

---

[128] *Initial Exchange Offering of LEO Tokens*, BITFINEX.COM (May 8, 2019), https://perma.cc/LC7E-HY62.

"Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions."[129]

226.   To transmit U.S. dollar funds internationally, a series of bank accounts are credited or debited accordingly. The graphic below depicts a typical U.S. dollar transaction in which:

- Bitfinex instructs its bank to wire U.S. dollars to a customer located in the United Kingdom;

- a Taiwanese bank debits Bitfinex's account and instructs its U.S. correspondent to process the transaction;

- the U.K. correspondent bank is instructed to debit the account of the Taiwanese correspondent and credit the account of the U.K. bank;

- the U.K. bank is instructed to credit the customer's account; and

- the U.K. customer gains access to the funds.



227.   Access to a U.S. correspondent account is therefore essential to transmitting U.S. dollars internationally.[130]

---

[129] *Sigmoil Resources, N.V. v. Pan Ocean Oil Corp. (Nigeria),* 234 A.D.2d 103, 104 (1st Dep't 1996).

[130] *See Correspondent banking*, COMMITTEE ON PAYMENTS & MKT. INFRASTRUCTURES, BANK FOR INTERNATIONAL SETTLEMENTS, at 9 (July 2016) ("On a cross-border level, however, correspondent banking is essential for customer payments and for the access of banks themselves to foreign financial systems for services and products that may not be available in the banks' own jurisdictions."), https://perma.cc/9Z92-KSU6.

228.    For the correspondent bank, these transactions are high-risk from an anti-money laundering perspective because the originator and beneficiary are one step removed from the bank. Money launderers often capitalize on this disconnect by using shell companies to obscure the true counterparties even more.[131]

229.    This is hardly a secret. The FBI recently told Congress that the "pervasive use of shell companies, front companies, nominees, or other means to conceal the true beneficial owners of assets is a significant loophole in this country's anti-money laundering (AML) regime."[132]

230.    Because Bitfinex's and Tether's businesses required them to exchange USDT for U.S. dollars, access to U.S. correspondent banking was critical. Without it, they could not operate.

231.    In April 2017, Bitfinex and Tether told a U.S. federal court that the U.S. dollar was the only currency it could exchange for crypto-assets: "Bitfinex can receive or remit only U.S. dollars for customers' purchase [sic] of Virtual Currency" and that "Tether can receive or remit only U.S. dollars for customers' purchases."[133]

232.    However, as Bitfinex and Tether explained to the New York Attorney General, "many U.S. banks and other financial institutions will not do business with unregulated or offshore companies that deal in virtual currencies," leading Bitfinex and Tether to have "a succession of unsuccessful banking relationships around the world over the past several years."[134]

---

[131] Alexander Weber, et al., *Money to Launder? Here's How (Hint: Find a Bank)*, BLOOMBERG (Mar. 9, 2019), https://perma.cc/DXP4-FHXX.

[132] Statement of Acting Deputy Asst. Director, CID, FBI to Senate Committee on Banking, Housing, and Urban Affairs, *Combating Illicit Financing by Anonymous Shell Companies* (May 21, 2019), https://perma.cc/P2W9-URMT.

[133] Complaint ¶¶ 17º18, ECF No. 1, *iFinex Inc. v. Wells Fargo & Co.*,, No. 3:17-CV-01882 (N.D. Cal. Apr. 5, 2017) ("Wells Fargo Compl.").

[134] Whitehurst Affirmation ¶¶ 49–50.

233.    Early on, Bitfinex and Tether utilized Taiwanese banks that maintained U.S. corre-spondent accounts at Wells Fargo to exchange cryptocommodities for U.S. dollars.[135] But on March 31, 2017, Wells Fargo stopped providing correspondent banking services for Bitfinex and Tether.[136]

234.    In a lawsuit they filed against Wells Fargo, Bitfinex and Tether stated that Wells Fargo's "decision to suspend outgoing wire transfers in U.S. dollars from [their] correspondent accounts presented an existential threat to their businesses," and that if they "could not remit to customers U.S. dollars that belong to their customers, [their] businesses would be crippled" and "brought to a standstill."[137]

235.    Soon after, Tether was then cut off from Taiwanese banks on April 17, 2017. On April 22, 2017, Tether issued a statement confirming that "all incoming international wires to Tether have been blocked and refused by our Taiwanese banks. *As such, we do not expect the supply of tethers to increase substantially until these constraints have been lifted*."[138]

236.    Bitfinex and Tether's banking troubles should have constrained their ability to issue or redeem USDT—either because they lost part of their U.S. dollar reserves or because they could not receive additional U.S. dollars to back the USDT they would issue. If Tether's representations were accurate, it could not have issued new USDT until it found a way to receive new U.S. dollars.

---

[135] Wells Fargo Complaint ¶¶ 31–33.

[136] *Id.* ¶¶ 40-41.

[137] *Id.* ¶ 47.

[138] *Announcement*, TETHER.TO (Apr. 22, 2017) (emphasis added), https://perma.cc/AW3W-TJZK.

237.    Yet Tether continued to issue massive amounts of new USDT. On April 18, 2017—just two weeks after Wells Fargo terminated its relationship with Bitfinex and Tether,[139] and just one day after they lost their last direct banking relationship in Taiwan[140]—Tether issued *1.6 million* new USDT, and then an additional *10 million* new USDT a week later.[141]



238.    Other massive issuances followed, despite Tether's lack of access to U.S. banking. In May 2017, Tether issued *46 million* new USDT.

239.    Tether's next publicly reported banking relationship was five months later, when it opened an account at Noble Bank International in Puerto Rico in September 2017.[142]

---

[139] Wells Fargo Compl. ¶ 40.

[140] *Pausing Wire Deposits to Bitfinex*, BITFINEX.COM (April 17, 2017), https://perma.cc/C3QP-494X.

[141] omniexplorer.info (April 18, 2017), https://perma.cc/MF7J-KSLL.

[142] Whitehurst Affirmation ¶53. Brock Pierce, the original founder of Tether, also founded Noble Bank International, which had only recently launched on May 11, 2017. @brockpierce, TWITTER (Aug. 4, 2018) ("Tether was my idea. Haven't had any involvement or ownership since the early days. I also started Noble Bank and again haven't had any involvement since the early days."),

240. During these six months when Tether did not have access to U.S. correspondent banking, it issued *409 million* new USDT.

241. There is no plausible way that Tether could have accrued the additional $409 million necessary to back those issuances when it had no access to the correspondent banking it would have needed to obtain such a large volume of deposits from customers.

242. This is even less plausible when one considers that Tether issued less than 42 million USDT in total for the first 2.5 years of its existence (October 2014 through March 2017), while it had access to the U.S. correspondent banking system, but issued approximately 409 million new USDT in the six months after losing it.



243. Defendants did not stop there.

---

https://perma.cc/C27P-KUWM; @noblebankint, *Noble Bank International: The Next-Generation Bank Designed for FX & OTC Post-Trade Services*, MEDIUM (May 11, 2017), https://perma.cc/J5KQ-W2DU.

244.    From October 28, 2017 to December 31, 2017, Tether issued another 932,032,665 USDT.[143] This brought the total amount of all outstanding USDT—and hence Tether's supposed U.S. dollar reserves—to over $1.25 billion.[144]

245.    This makes especially little sense after considering that Tether suspended direct redemptions of USDT for U.S. dollars in November 2017, which should have caused less demand for USDT, not more.



246.    Tether refused to disclose the location of its massive cash reserves without a non-disclosure agreement in place.[145] That is because these reserves did not exist.

247.    As explained in greater detail below, Tether relied on Crypto Capital and Reginald Fowler to circumvent correspondent bank monitoring and facilitate access to U.S. banking. *See*

---

[143] *Id.*

[144] https://coinmarketcap.com/currencies/tether/

[145] *There's an $814 Million Mystery*, BLOOMBERG (Dec. 5, 2017), https://perma.cc/K5W2-C68C.

*infra* at Part IV.C.4. From early 2017 through late 2018, Bitfinex customers transferred more than $1.5 billion to various bank accounts purportedly held or controlled by Crypto Capital.[146]

248.    But by at least April 2018, Bitfinex was having "extreme difficulty honoring its clients' requests to [withdraw] their money from the trading platform" because "Crypto Capital … refused or was unable to return any funds to Bitfinex."[147]

249.    Despite these banking difficulties, Tether issued 130 million new USDT on April 24, 2018. If Tether in fact had received $130 million in additional new reserves in April alone, it should not have had any difficulty accessing the relatively modest amounts of money needed for customers who wished to exchange their USDT for U.S. dollars.

250.    Tether and Bitfinex continued having trouble accessing money from Crypto Capital. In an October 15, 2018 chat, Devasini pleaded to a Crypto Capital employee: "is there any way we can get money from you?" noting that "[a]part with cryptocapital we are running low in cash reserves."[148] Devasini indicated he needed $100 million to honor redemptions.[149]

---

[146] Devasini Decl. ¶ 12, ECF No. 1-1, In re, iFinex, No. 1:20-mi-00042-JPB-AJB (N.D. Ga. April 10, 2020).

[147] Whitehurst Decl. ¶¶ 62–63.

[148] Whitehurst Decl. ¶ 66.

[149] *Id.*

251.    Two days later, on October 17, 2018, Devasini was still seeking $100 million from Crypto Capital. But on October 16, 2018 Tether redeemed 250 million USDT, something it clearly lacked sufficient funds to do unless that USDT had never been backed to begin with.



252.    Tether attempted to reassure the market that USDT was fully backed by U.S. dollars despite these banking issues. On November 1, 2018, Tether published a letter from the Deltec Bank & Trust that claimed that Tether's account with their bank contained over $1.8 billion, which was enough to cover all outstanding USDT.[150]

253.    But one month before it did so, Tether had removed from circulation, or "delisted," 1.04 billion USDT—reducing the amount of USDT in the crypto-economy by *nearly 40%*, and bringing the total amount of USDT in circulation to just under the 1.8 billion necessary to line up with the Deltec letter.

254.    If Tether were honest, and each USDT was backed by a real U.S. dollar, this delist-ing would have required customers to collectively redeem 1.04 billion USDT for cash in a single

---

[150] https://tether.to/wp-content/uploads/2018/11/Tether-Letter.pdf

month. Such a redemption would be visible on the USDT blockchain, which would show massive amounts of USDT being transferred from many customers' addresses or accounts on other exchanges to Bitfinex or to the Tether Treasury.

255.    But analysis of the USDT blockchain does not reveal such sizable transfers. In fact, the net transfers back to Bitfinex in October 2018 are small fraction of the delisted amount—roughly 72 million USDT total—and nowhere near the 1.04 billion of delisted USDT.

256.    This is because Tether had issued that USDT directly to Bitfinex without receiving U.S. dollars in exchange. It could now just as easily pull USDT back from Bitfinex and destroy it without having to pay U.S. dollars in return.

257.    Likewise, because legitimately delisting USDT requires a one-for-one exchange of U.S. dollars, Tether and Bitfinex would have had to send out *$1 billion U.S. dollars* in October 2018—something they simply could not do, as that very same month they were pleading for money from Crypto Capital.

258.    Tether did not have access to the banking necessary to retain a U.S. dollar reserve that matched its USDT issuances. While it tried to hide this fact from customers with the assistance of Crypto Capital, analysis of its banking history shows that maintaining the needed reserve was impossible.

## 2.    Bitfinex Used Debased USDT to Manipulate the Cryptocommodity Market With Bittrex and Poloniex

259.    As shown above, Defendants convinced the market that USDT was fully backed by US dollars and issued in response to real demand, and thus acquired the ability to 'print money' in the crypto-economy. But they went further, using the USDT they printed for themselves to manipulate the cryptocommodity market.

a.    **Bitfinex Used Debased USDT to Purchase Crypto-Assets on Bittrex and Poloniex**

260.    As discussed above in Part IV.C.1.a, most USDT was issued to Bitfinex and sent to Bitfinex's deposit addresses on Bittrex and Poloniex: [151]



261.    From October 2014 through December 2018, Tether issued 4.2 billion USDT to Bitfinex, which represented 98% of all issued USDT during that time.

262.    During the same time, approximately 3 billion USDT—72% of all USDT issued—was transferred to Bittrex and Poloniex through the 1AA6 and 1J1d deposit addresses.



[151] Poloniex controlled additional USDT exchange addresses beyond 1Po1 that served similar functions and do not affect this analysis.

263.    Of the flows of USDT into the 1AA6 and 1J1d deposit addresses, the vast majority were these transfers from Bitfinex. Bitfinex sent 77% of the USDT inflows to Bittrex's 1AA6 address and 84% of the USDT inflows to Poloniex's 1J1d address.



264.    After USDT sent to Bittrex and Poloniex was credited to its accounts, Bitfinex used it to purchase bitcoin and other cryptocommodities. Those cryptocommodities were then sent back to Bitfinex's exchange address, where Bitfinex could sell its illicitly acquired cryptocommodities to its customers for U.S. dollars.



265.    Expert analysis shows that larger USDT flows to 1AA6 and 1J1d were associated with significantly higher BTC/USDT trading volumes on Bittrex and Poloniex, and that those

higher trading volumes correlated with larger flows of bitcoin back to Bitfinex, as seen in the charts below:

**Correlation between USDT transfers and BTC-USDT trading volumes on Bittrex**

**Correlation between BTC-USDT trading volumes and Bitcoin transfers from Bittrex to Bitfinex**





**Correlation between USDT transfers and
BTC-USDT trading volumes on Poloniex**



**Correlation between BTC-USDT trading volumes and
Bitcoin transfers from Poloniex to Bitfinex**



266.    On average, in the hour after USDT flows from Bitfinex to Bittrex/Poloniex, trading volume on the two crypto-exchanges doubled:

| | BTC-USDT trading volume | |
| --- | --- | --- |
| | Poloniex | Bittrex |
| Hours with inflow | 2,387,276 | 1,867,134 |
| Hours without inflow | 1,020,957 | 820,769 |
| Difference | 234% | 227% |
| Effect of 1 USDT inflow to BTC-USDT trading volume | 1.57 | 0.98 |

267.    There are also high correlations between the transfers of USDT from Bitfinex to Bittrex/Poloniex, and the trading volumes of other cryptocommodities. As shown below, ethereum (ETH), ethereum classic (ETC), and litecoin (LTC) trading volumes on these exchanges show similarly high correlations with USDT transfers from Bitfinex.

**Correlation of transfers of USDT with trading volumes of other cryptocommodities**

| Exchange & Ticker | Bitfinex USDT transfer correlation |
| --- | --- |
| Bittrex BTC-USDT Volume | 0.880 |
| Bittrex ETH-USDT Volume | 0.860 |
| Poloniex BTC-USDT Volume | 0.846 |
| Poloniex ETC-USDT Volume | 0.796 |
| Bittrex LTC-USDT Volume | 0.754 |
| Poloniex LTC-USDT Volume | 0.740 |
| Bittrex ETC-USDT Volume | 0.728 |
| Poloniex XMR-USDT Volume | 0.723 |
| Poloniex DASH-USDT Volume | 0.693 |
| Bittrex DASH-USDT Volume | 0.677 |
| Bittrex BTG-USDT Volume | 0.674 |
| Bittrex XMR-USDT Volume | 0.658 |
| Bittrex ADA-USDT Volume | 0.647 |
| Poloniex ETH-USDT Volume | 0.633 |
| Poloniex BCH-USDT Volume | 0.554 |
| Bittrex BCH-USDT Volume | 0.058 |

268.    Higher USDT transfer volumes from Bitfinex through 1J1d and 1AA6 also increased the amount of bitcoin purchased on the two domestic exchanges. For each USDT Bitfinex transferred to Bittrex, the bitcoin trading volume on Bittrex increased by $0.96. Similarly, for each USDT Bitfinex transferred to Poloniex, the bitcoin trading volume on Bittrex increased by $1.50.

269.    The daily flows from the Tether Treasury to Bitfinex are also generally round numbers, while daily flows from the Treasury to unknown addresses are generally not round numbers. That means the Treasury flows to Bitfinex (which are afterwards sent to Bittrex and Poloniex) are unlikely to be demand-driven (*i.e.*, resulting from many individuals' transactional demand for USDT) given their "lumpy" nature.

270.    There is a clear pattern: Larger USDT flows from Bitfinex to Bittrex and Poloniex are followed by increased BTC/USDT trading on those exchanges; then larger bitcoin flows back from those exchanges to Bitfinex as Bitfinex transfers the bitcoin back; and ultimately those bitcoin flows back to Bitfinex are followed by increased BTC/USD trading on Bitfinex, as Bitfinex exchanges the fraudulently purchased bitcoin for U.S. dollars.



271.    Bitfinex bought bitcoin with debased USDT on Bittrex and Poloniex, and then sold it for U.S. dollars to its U.S. customers on its own exchange.

    **b.    The Scale and Impact of the Cryptocommodity Manipulation**

272.    Because the market believed that USDT was fully backed by U.S. dollars, it perceived Bitfinex and Tether's anonymous purchases with fraudulent USDT as reflecting massive and measurable customer demand for those cryptocommodities. These purchases thus naturally raised cryptocommodity prices. The chart below shows the correlation between USDT issuances and bitcoin price increases:



273.    As expert analysis reveals, in the hours following the transfer of USDT from Bitfinex to Bittrex and Poloniex, the price of bitcoin increased appreciably. Bitcoin returns were close

to zero when there were no USDT transfers, and the more USDT that was transferred, the more the returns increased.





274.    This effect on bitcoin prices was particularly pronounced for major new USDT is-

suances. Before February 5, 2018, for example, the price of bitcoin had been falling for several

days. On February 5, there was a major outflow of $36 million of USDT from Bitfinex to Bittrex

and Poloniex. Over the following days, bitcoin prices rebounded sharply:

**Bitcoin Price Before and After $36 Million USDT Outflow**



275.    A similar pattern can be observed on December 14, 2017, when there was a major outflow of 38 million USDT to Bittrex and Poloniex:

**Bitcoin Price Before and After $38 Million USDT Outflow**



276.    Bitfinex frequently used its USDT transfers to Bittrex and Poloniex to strategically purchase bitcoin when bitcoin prices were falling, and on the many occasions when it did so, it

was remarkably effective at reversing price declines and driving prices back up. For example, in the absence of USDT transfers from Bitfinex to Poloniex and Bittrex, the probability of a bitcoin price rebound after an initial price decline on Poloniex and Bittrex is between 14% and 18%. By contrast, when Bitfinex transfers USDT to Bittrex and Poloniex following an initial price decline, these probabilities increase to between 26% and 30%—i.e., when Bitfinex strategically transfers USDT to Poloniex and Bittrex, it almost doubles the probability of a bitcoin price rebound on those exchanges. This shows that Defendants strategically purchased bitcoin when prices were falling and were remarkably effective at reversing declines and driving prices back up.

277.     Indeed, Bitfinex generally transferred larger amounts of USDT when prices were falling. For example, the average size of USDT transfers from Bitfinex to Bittrex was $33,319 when bitcoin prices had gone up in the previous four hours, but the average size of a transfer increased tenfold when bitcoin prices had gone down by more than 5%. A similar pattern appears with the size of USDT transfers from Bitfinex to Poloniex relative to bitcoin prices on Poloniex.

**Bitfinex transfers larger amounts USDT to Bittrex when Bitcoin prices go down**



**Bitfinex transfers larger amounts USDT to Poloniex when Bitcoin prices go down**



278.     Bitfinex's strategy was extraordinarily effective at causing "price reversions" that result in a "u-shaped" price pattern around major issuances of USDT. The chart below shows one example of this. On February 6, 2018, between 12:00 to 8:00 a.m., the price of bitcoin on Poloniex

fell from $7,015 to $6,170. At 8:00 a.m., Bitfinex transferred 2 million USDT to Poloniex. Almost immediately, the price began to climb, reaching $7,420 by 7:00 p.m.



279.    The result was that Bitfinex's transfers of USDT to Bittrex and Poloniex were followed by higher prices, not only for bitcoin, but also for ether and other cryptocommodities. For example, the Poloniex trading volume for ether was 40% higher in hours with transfers than in hours before the transfer. And the price of ether went up 0.5% on Poloniex within four hours after USDT transfers from Bitfinex to Poloniex. The below graphic illustrates the relationship between ether prices and the Bitfinex transfers of USDT to Bittrex and Poloniex.



### c. Independent Expert Analysis Corroborates the Existence of Defendants' Manipulative Scheme

280.    Academic experts unaffiliated with Plaintiffs noted the suspicious patterns of trading activity that characterized Defendants' scheme and the evidence that USDT is debased and used to manipulate cryptocommodities.

281.    In June 2018, Professor John Griffin and Amin Shams published an analysis of USDT issuances on SSRN entitled *Is Bitcoin Really Un-Tethered* (the "Griffin Article").[152]

282.    The Griffin Article's main conclusion was that USDT-driven price manipulation of bitcoin accounted for as much as half of bitcoin's price gains during the period of March 1, 2017 through March 31, 2018.[153]

---

[152] John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (June 13, 2018, updated Oct. 28, 2019), https://ssrn.com/abstract=3195066. John Griffin is the James A. Elkins Centennial Chair in Finance at McCombs School of Business at the University of Texas at Austin. He is a leading expert in Forensic Finance. As of the time of this filing, the Griffin Article has the 44th most downloads on SSRN.

[153] *Id.* at 4.

283.    The Griffin Article examined two alternative hypotheses to explain how Tether issued USDT during this time frame.[154]

284.    The first hypothesis was that Tether issued USDT in response to legitimate demand for a pegged digital currency. Under this hypothesis, USDT is fully backed by U.S. dollars. This hypothesis was called the "pulled hypothesis," as investors would be "pulling" USDT into the market.[155]

285.    The alternative hypothesis was that Tether issued USDT as part of a supply-driven scheme to manipulate the price of bitcoin by purchasing it with debased USDT. This hypothesis was called the "pushed hypothesis," as Tether would issue USDT independently of demand and "push" it into the market. Under this hypothesis, Tether can convert crypto-assets to U.S. dollars or use its U.S. dollar profits to retroactively provide reserves for USDT and claim those reserves were always present.[156]

286.    To determine which hypothesis was valid, Griffin examined over 200 gigabytes of transactional data from over ten different sources. The public nature of the blockchain meant that Griffin was able to analyze a significant amount of USDT transactions to date, including issuances.[157]

---

[154] *Id.* at 2.

[155] *Id.*

[156] *Id.* at 2-3.

[157] *Id.* at 12-13.

287.     Griffin first confirmed that Tether sent almost all new USDT to Bitfinex and that Bitfinex largely sent USDT to two other exchanges: Bittrex and Poloniex. For example, by February 2018 Bitfinex had sent Poloniex 2.99 billion USDT.[158]

288.     Griffin next determined that when bitcoin prices decreased, USDT was issued and used to purchase bitcoin, but this was *not* mirrored by redemptions when bitcoin prices increased. He concluded that this indicated USDT issuances were used to fend off downturns in bitcoin prices not benign market making activities.[159]

289.     In other words, Tether and Bitfinex bought bitcoin with USDT when prices dropped to keep the price artificially high.

290.     Griffin next analyzed Tether issuances from March 1, 2017 to March 31, 2018 to test how strongly these issuances correlated with bitcoin price increases. He found that the timing of these issuances strongly correlated with half of all bitcoin price increases in 2018.[160]

291.     Griffin concluded his findings were "most consistent with the supply-driven manipulation hypothesis" that Tether was pushing USDT into the market.[161]

292.     As Griffin explained in an interview with Bloomberg:

> First, [USDT] are created by the parent company Tether Ltd., often in large chunks such as 200 million. Almost all new coins then move to Bitfinex …. When Bitcoin prices drop soon after the issuance, [USDT] at Bitfinex and other exchanges are used to buy Bitcoin in a coordinated way that drives the price . . . .[162]

---

[158] *Id.* at 17.

[159] *Id.* at 20.

[160] *Id.* at 22-23.

[161] *Id.* at 26.

[162] Matt Robinson & Matthew Leising, *Tether Used to Manipulate Price of Bitcoin During 2017 Peak: New Study*, BLOOMBERG (June 13, 2018), https://www.bloomberg.com/news/articles/2018-06-13/professor-who-rang-vix-alarm-says-tether-used-to-boost-bitcoin?sref=M1aR4EEK.

293.    On October 28, 2019, Professor Griffin and his co-author released a revised and updated version of the Griffin Article (the "Revised Griffin Article").[163]

294.    Like the original, the Revised Griffin Article concluded that public blockchain data was "generally consistent with [new USDT] being printed unbacked and pushed out onto the market"[164] and that, "[o]verall," there was no "evidence to support the demand-based hypothesis."[165]

295.    Both articles also support the idea that these interventions were timed to keep the prices of cryptocommodities above certain "round number thresholds"[166] so as to create the impression those prices were subject to "floors" below which they would not drop.[167]

296.    Griffin observed that the data suggested the use of round-number thresholds as "price anchors to set a price floor" in order "to stabilize and drive up the price" of bitcoin. The premise of a price anchor is that "if investors can demonstrate a price floor, then they can induce other traders to purchase."[168]

297.    Professor Griffin found that, on normal trading days, trading volume in bitcoin increased on either side of such round number thresholds:[169]

---

[163] John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (Oct. 28, 2019), https://ssrn.com/abstract=3195066. [https://perma.cc/5E34-W7YK]

[164] *Id.* at 8.

[165] *Id.* at 44.

[166] Griffin & Shams, *supra* note 152, at 26.

[167] *Id.* at 6.

[168] *Id.* at 5.

[169] Griffin & Shams, *supra* note 163 at 61.

Other Days



298.    But on days following new USDT issuances, he found that trading volume in-creased only when cryptocommodity prices were just above a round number threshold, consistent with manipulation to keep prices from falling:[170]

Days Following Authorization



299.    The Revised Griffin Article traced the price manipulation activity to "one large player" that "is associated with more than half of the exchange of Tether for Bitcoin at Bitfinex,

---

[170] *Id.*

suggesting that the distribution of Tether into the market is from a large player and not many different investors bringing cash to Bitfinex to purchase Tether."[171]

300.     That player is the conspiracy controlled by Defendants.

301.     The Revised Griffin Article also recognized the possibility that the same manipulation had occurred with regard to other cryptocommodities and crypto-assets.[172]

302.     The Griffin Article and the Revised Griffin Article are not the only independent analyses of Defendants' conduct.

303.     On January 24, 2018, the Tether Report was published online and, similar to the Griffin Report, concluded that "Tether printing moves the market appreciably; 48.8% of BTC's price rise in the period studied occurred in the two-hour periods following the arrival of 91 different Tether grants to the Bitfinex [address]."[173]

304.     The Tether Report warned that the "Bitfinex withdrawal/deposit statistics are unusual and would give rise to further scrutiny in a typical accounting environment."[174]

305.     In its analysis of bitcoin price data and USDT transactions, the Tether Report found:

> The price data suggests that Tether may not be minted independently of Bitcoin price and may be created when Bitcoin is falling; it also rejects the notion that Tether is not having a great influence on the Bitcoin price. One interpretation of the data suggests that Tether could account for nearly half of Bitcoin's price rise, not even allowing for follow-on effects and the psychological effects of rallying the market repeatedly. The transaction data could trigger extreme scrutiny and audits due to a questionable pattern of transactions.[175]

---

[171] *Id.* at 5.

[172] *Id.* at 58

[173] *See supra* note 127.

[174] *Id.*

[175] *Id.*

306.     As discussed, *supra* at Part IV.C.1.a, in the nine days *before* the Tether Report, Tether issued 100 million USDT, and tens of millions of USDT were transferred from Bitfinex to the 1AA6 and 1J1d addresses as well as to other addresses. For ten days *after* the Tether Report, transfers of USDT to other addresses continued normally, but no new USDT was issued and there were no transfers to the 1AA6 and 1J1d addresses. Tether and Bitfinex ceased these suspicious transfers after the Tether Report was issued because the Tether Report was right and they did not want to get caught.

307.     On October 3, 2019, TokenAnalyst, a crypto-asset research company "on a mission to bring transparency to the decentralized economy,"[176] similarly concluded that Tether's issuance of USDT correlated with upward bitcoin price movement.

308.     TokenAnalyst analyzed the "relationship between \$BTC price and \$USDT supply over the course of history"[177] and determined that "on days where #USDT ERC20 is minted, 70.0% of the time the price of BTC moves up" and "on days where #USDT Omni is minted, 50.0% of the time the price of BTC moves up."[178]

309.     In July 2018, Dr. Gerard Martinez reviewed the Griffin Article.[179] After walking through the relevant evidence, Dr. Martinez concluded that the "statistics support the theory that Tether Limited and Bitfinex corporations used Tether to buy Bitcoin in key occasions during the

---

[176] *Company*, TOKENANALYST, https://www.tokenanalyst.io/about (last visited June 1, 2020).

[177] TokenAnalyst (@thetokenanalyst), TWITTER (Oct. 3, 2019 7:33 a.m.), https://twitter.com/thetokenanalyst/status/1179721098239397889.

[178] *Id.*

[179] Dr. Gerard Martinez, MEDIUM (July 12, 2018), https://perma.cc/4QW2-FJPQ ("The ideas and analysis methods of this article are not new, they are all taken from or inspired by the recently published paper 'Is Bitcoin Really Un-Tethered?''?' by John M. Griffin et al. and the so-called Tether Report. However, the results shown here are probably the currently most updated on the internet and, hopefully, a bit easier to understand than the cited publications.") (emphases omitted)).

meteoric rise of Bitcoin prices of 2017 and beginnings of 2018"; that "[t]hese corporations would print Tether right after transient Bitcoin price dips"; that "Tether Ltd. would then buy Bitcoin with the freshly minted Tether and would promote the creation of a fraudulent bullish market, which would attract more investors to buy Bitcoin, contributing this way to increase the bubble (momentum effect)"; and then "Tether Ltd. would send the freshly bought Bitcoin to their accounts in Bitfinex."[180]

### 3.  Bittrex and Poloniex Were Knowing Participants in the Scheme

310.   The Bittrex and Poloniex Defendants agreed with the Tether and Bitfinex Defendants to manipulate the market for cryptocommodities.

311.   Bittrex and Poloniex specifically set up the 1J1d and 1AA6 addresses to receive transfers of UDST from Bitfinex, knew that Bitfinex was the entity making those transfers, knew that this USDT was not being issued in response to legitimate consumer demand—and hence was not fully backed by U.S. dollars—and knew that Tether and Bitfinex were trading that debased USDT for cryptocommodities, driving up cryptocommodity prices.

312.   Bittrex and Poloniex knew that Bitfinex was the entity depositing massive volumes of USDT into the 1J1d and 1AA6 addresses because Bittrex and Poloniex had worked specifically with Bitfinex to enable those transfers.

313.   As described above, *see supra* at Part IV.A.4, a normal customer seeking to transfer USDT into Bittrex or Poloniex would be given an address created by the exchange to receive that transfer. These addresses, however, are not generally used multiple times. Normal customers are routinely given a new deposit address when they want to transfer USDT to their Bittrex or Poloniex account.

---

[180] *Id.*

314.     In contrast, expert analysis has revealed that the 1J1d and 1AA6 addresses func-

tioned as repeat destination addresses for large transfers of USDT from Bitfinex. Prior to the re-

lease of the Tether Report on January 24, 2018, Bitfinex sent *$1.5 billon* to Poloniex through the

1J1d address and *$1.2 billion* to Bittrex through the 1AA6 address. That Bitfinex, unlike normal

customers, was able to use the same addresses repeatedly shows that Bitfinex had made special

arrangements with Bittrex and Poloniex.

315.     That the 1J1d and 1AA6 addresses were reused illustrates that Bitfinex made a be-

spoke arrangement with Bittrex and Poloniex to let it to make transfers more easily and quickly

than other customers. By reusing the same destination addresses, these exchanges allowed Bitfinex

to transfer funds without having to request a new destination and wait for the exchanges to provide

one.

316.     This arrangement is akin to those that some casinos have with large-scale, repeat

gamblers. While a normal casino patron usually must exchange cash for chips, or wait for the

casino to confirm a credit line, some casinos will pre-establish access to the funds of individuals

whom the casino knows are high-level gamblers to smooth the process of them obtaining new

chips. So too, Bittrex and Poloniex deviated from their normal protocols to smooth their receipt of

transfers from Bitfinex.

317.     The bespoke nature of this arrangement is highlighted by the fact that transfers into

these accounts occurred before Bittrex and Poloniex accepted USDT from normal customers. In

2015, before these exchanges allowed their customers to trade USDT, Bittrex and Poloniex set up

and integrated the 1J1d (Poloniex) and 1AA6 (Bittrex) USDT deposit addresses for Bitfinex and

integrated USDT trading into their platform. USDT transfers to/from Poloniex begin on February

17, 2015; on Bittrex, they begin on September 21, 2015. These transfers preceded by several years

any (identifiable) USDT transfers to any other crypto-exchange (other than Bitfinex).

318.    Transfers of a new crypto-asset, such as USDT, require cooperation and coordination between the issuer and the exchange. Enabling USDT trading required substantial technical coordination between Tether Ltd. and both Bittrex and Poloniex. For example, Bittrex released a statement about USDT implementation on a new blockchain that concluded: "We would like to thank the Tether team for working closely with us."[181] Enabling USDT trading on Poloniex would have required even more coordination, as it was the first crypto-exchange to allow users to exchange USDT for other crypto-assets, such as bitcoin.

319.    The fact that these USDT transfers occurred long before USDT had become an established crypto-asset, when the total market capitalization of USDT was only $450,000 (or less), indicates that there was early cooperation and coordination between Tether Ltd. and/or Bitfinex on the one hand and Bittrex and Poloniex on the other, long before either of the latter two exchanges enabled their account holders to engage in USDT trading for other crypto-assets.

320.    Even independent of these arrangements, Bittrex and Poloniex knew that USDT sent to 1J1d and 1AA6 belonged to Bittrex because federal know-your-customer ("KYC") requirements prohibit them from accepting such large transfers from an anonymous source.

321.    Indeed, both Bittrex and Poloniex had such KYC systems in place and, by policy, knew the identities of anyone sending large quantities of crypto-asset to and from its exchange. To create an account on Bittrex, a user is required to submit photos of the user's official government

---

[181] Albert, *Support for ERC20-based Tether [USDT] Deposits and Withdrawals*, BITTREX.COM (July 25, 2019), https://perma.cc/NZ7J-VSGL.

identification and face to verify his or her identity.[182] The same is required on Poloniex for accounts that are permitted to withdraw more than $25,000 per day.[183]

322.   Accordingly, Bittrex and Poloniex knew that Bitfinex was using its accounts on these exchanges to purchase incredible amounts of cryptocommodities. As crypto-exchanges accepting deposits from Bitfinex, it would have had direct visibility into the daily trading activity of the Bitfinex account.

323.   Transactions between Bitfinex and these two addresses comprised a substantial portion of all USDT trading early on. For example, in February 2016, these addresses received nearly one third of all 1.45 million USDT in circulation. Transfers of a third of all USDT in existence to two exchanges where they could not be traded by the general public cannot be explained by legitimate customer demand. But it is consistent with Bittrex and Poloniex's collaborating with the Tether and Bitfinex Defendants.

324.   Because they knew the USDT flowing into the 1AA6 and 1J1d addresses was coming from Bitfinex, Bittrex and Poloniex knew it was not consistent with Tether's core promise that USDT was issued only in response to market demand. That Bittrex and Poloniex were in on that part of the scheme is alone sufficient to imply they knew this USDT was not backed.

325.   Furthermore, Bittrex and Poloniex must have been aware of the close relationship between Bitfinex and Tether given their KYC policies, and certainly no later than the release of the Paradise Papers in November 2017, which should have caused Bittrex and Poloniex to

---

[182] *Creating a Bittrex Account and Performing Verification*, BITTREX.COM (Apr. 5, 2017), https://perma.cc/5UGH-CFC7.

[183] cryptowarrior88, *Poloniex Basics - How to create and verify an account, securing an account, funding and withdrawing your Bitcoins on the Poloniex trading platform*, STEEMIT (2017), https://perma.cc/XV9E-ADKQ.

conclude that their receipt of USDT transfers from Bitfinex were effectively the same as their receipt of USDT transfers from Tether—i.e., these USDT were not fully backed by U.S. dollars.

326.     Moreover, Bittrex and Poloniex would not have ignored publicly available news about Bitfinex's lack of capital that made it obvious Bitfinex could not have sent Tether U.S. dollars for the USDT that ended up on Bittrex and Poloniex. Both exchanges had set up these bespoke addresses for Bitfinex's exclusive use, and these transfers were very important to these exchanges' business.

327.     Bitfinex's inability to transfer such large amounts of cash to Tether beginning no later than April 18, 2017, after Bitfinex lost its final banking relationship,[184] was publicly available and readily apparent. Only eight months earlier (in August 2016), Bitfinex had been hacked, with account holders losing approximately $70 million, and which Bitfinex had only just fully repaid in early April 2017.[185] Bittrex and Poloniex would not have failed to notice these catastrophic problems affecting a critical customer for whom they had set up bespoke addresses.

328.     Nonetheless, between April 19 and 30, 2017, Bitfinex transferred $7.9 million in USDT to Poloniex and $95,714 to Bittrex; those USDT transfers increased to $80 million and $1.8 million (respectively) in May 2017; and to $144 million and $40 million (respectively) in June 2017. Bittrex and Poloniex likewise must have known that it was highly implausible that these USDT transfers to their exchanges were fully backed by U.S. dollars.

---

[184] *Announcement*, TETHER (Apr. 22, 2017) ("Since April 18, 2017, all incoming international wires to Tether have been blocked and refused by our Taiwanese banks."), https://perma.cc/AW3W-TJZK.

[185] The timing of Bitfinex's payment of $25 million in early April 2017 to its account holders for their (remaining) stolen crypto-asset balances coincides with $27 million of new USDT issuances by Tether in March 2017. The March 2017 new USDT issuances were far higher than those in any previous month.

329.    Bittrex and Poloniex knew that newly issued USDT was going directly to Tether's affiliate, Bitfinex, which was shipping the USDT to Bittrex and Poloniex to buy cryptocommodities. Because they knew this USDT was not issued in response to legitimate customer demand and that Bitfinex did not have the necessary capital to purchase that USDT, they knew it was not fully backed by or redeemable for U.S. dollars.

330.    On August 25, 2017, Bittrex went one step further by offering to sell USDT to its large customers – i.e., those willing to wire Bittrex $100,000 or more – using a "$1 for 1 USDT" exchange rate, despite knowing the USDT was not backed 1:1 by U.S. dollars [186]

331.    Because it happened on their exchanges, Bittrex and Poloniex also knew that Tether and Bitfinex were using this debased USDT to buy cryptocommodities. They knew which assets the Tether Defendants were buying and when, and that the cryptocommodities they purchased were being transferred back to Bitfinex. They also knew how those purchases affected cryptocommodity prices on their own exchanges. Given the size and regularity of these transfers through a mechanism they created for that exact purpose and their perfect visibility into the transactions, Bittrex and Poloniex knew the manipulative effect of the transactions on their exchanges.

332.    Bittrex and Poloniex ignored their legal obligations as registered money services businesses to report suspicious transactions under federal bank secrecy act regulations. They should have reported repeated transfers of newly issued USDT from Bitfinex that were used to purchase cryptocommodities on their exchanges and prevented further such transfers. They did not. Instead, they set up private addresses to enable such transfers.

---

[186] Ryan, *Purchase USDT via Wire Transfer*, BITTREX (Aug. 25, 2017), https://archive.is/2yJqO.

333.    Bittrex and Poloniex thus knew about the scheme to fraudulently inflate crypto-commodity prices, did not report it despite a legal obligation to do so, and knew about their own role in that scheme. This is because they agreed to participate in that scheme.

334.    This agreement explains why Bitfinex used Bittrex and Poloniex in the first place. Between June 2016 and December 2017 (the peak of the bubble), the cumulative net flow of USDT to Bittrex and Poloniex accounted for more than half of all USDT issued even though trading of cryptocommodities and other crypto-assets on Bittrex and Poloniex represented only a small fraction of the overall market.

335.    Binance, on the other hand, is the largest crypto-exchange in the world. Currently, Binance has a 24-hour trading volume of $1.9 billion, compared to $38 and $49 million for Bittrex and Poloniex.[187] However, when Binance first listed USDT, minimal USDT flowed to its exchange. And even at the peak of the bubble, Binance experience relatively little USDT demand.

---

[187] *Top Crypto-asset Exchanges Ranking by Trust Score*, COINGECKO, https://www.coingecko.com/en/exchanges (last visited June 1, 2020).



336.    Binance saw so little demand for USDT because Tether and Bitfinex used Bittrex and Poloniex to execute their scheme. Tether and Bitfinex used Bittrex and Poloniex rather than Binance, or a broader range of different exchanges, because Bittrex and Poloniex were part of the scheme to set cryptocommodity prices.

337.    The illegitimacy of the flows from Bitfinex to the 1J1d and 1AA6 deposit addresses is further confirmed by how the flows dramatically changed following release of the Tether Report. *See supra* at Part IV.C.1.a. Given the large flows of USDT from Bitfinex through 1J1d and 1AA6 prior to that date, which had been long occurring on a daily basis, Bittrex and Poloniex would have been aware when they ceased entirely and would have known about the allegations in the Tether Report when they were published.

338.    Moreover, after the release of the Tether Report, there was a change in the pattern of USDT transfers from Bitfinex to 1J1d, and 1AA6, with greater flows of newly issued USDT going from Bitfinex to new addresses on Bittrex and Poloniex instead. That is because Bittrex and

Poloniex agreed with Bitfinex to change how USDT was distributed in response to the Tether Report.

339.    Bittrex and Poloniex benefited not only from commissions they extracted from each cryptocommodity trade but also from increased trading volume. For otherwise peripheral exchanges, these large trades of purportedly fiat-backed USDT created an impression of legitimacy and consumer trust, leading to further trades and fees for the two exchanges.

340.    Indeed, the USDT flows from Bitfinex were a central component of Poloniex's and Bittrex's trading business, which grew substantially after they enabled USDT trading. In 2017, Poloniex's USDT-based crypto-asset trading had ballooned to $29.9 billion. Similarly, Bittrex's USDT-based crypto-asset trading was $10 billion in 2017, even though it only started allowing such trading in March 2017.

341.    Moreover, as crypto-exchanges, Bittrex and Poloniex necessarily had substantial cryptocommodity reserves that they accumulated through the commissions they charged for trading. The value of these reserves was propped up by the inflated price of cryptocommodities, and Bittrex and Poloniex could exchange those cryptocommodities for other assets, taking advantage of the bubble they helped create.

### 4.    Reginald Fowler and Crypto Capital Were Knowing Participants in the Scheme

342.    As discussed above, *see supra* at Part IV.C.1.a, Bitfinex and Tether faced "a succession of unsuccessful banking relationship around the world over the past several years,"[188] largely because banks were unwilling to assume the risk of money laundering liability that came

---

[188] Whitehurst Aff. ¶ 50.

with providing corresponding accounts for unregulated, offshore entities, like Bitfinex and Tether. The solutions they found were Reginald Fowler and Crypto Capital.

343.    Two weeks after Bitfinex was cut off by Wells Fargo, on April 12, 2017, Potter gave an interview on the crypto-trading website WhalePool in which he described Bitfinex's banking troubles caused by its commitment to avoiding regulation and his intent to continue flouting those laws.[189]

344.    Potter explained that, in his view, everyone banking offshore is "in some sort of don't-ask-don't-tell … arrangement with their banks,"[190] and that U.S. banks were exiting the dollar clearing business because many "banks have been held accountable for their actions as correspondents in a lot of other money laundering and criminal … cases" and that "money laundering is their biggest concern."[191]

345.    Normal banks' dedication to complying with money laundering laws meant it was "getting harder and harder to move money around."[192] Potter clarified, though, that "the problem here [wa]s not really Wells Fargo. It's the system."[193] He then described Bitfinex's past efforts to evade the "system" of money laundering laws with which banks are required to comply, and expressed Bitfinex's commitment to evading them in the future:

---

[189] *WhalePool Interview: Bitfinex CSO Comments on Litigation Withdraw[a]l against Wells Fargo apr/2017*, YOUTUBE (Apr. 12, 2017), https://archive.org/details/2017.04.12whalepoolbitfinexcsocomments.

[190] *Id.* at 30:44.

[191] *Id.* at 9:22.

[192] *Id.* at 6:40.

[193] *Id.* at 11:03.

There are other correspondent banks that won't do business with us, Wells Fargo just happens to be the last one available to us with our banks in Taiwan. . . .[194]

We have a lot of other tricks. . . . Being in the bitcoin business is really about playing cat-and-mouse with the correspondent banks…. It's always been that. But the problem with becoming big, and also . . . we have massive balances that we hold with the banks, is that [Bitfinex] can't fly under the radar anymore. . . .

Right now in Taiwan there is a moratorium . . . on banks opening up new offshore accounts. That's an example. So even if we wanted to register some new corporate entities, move some money around, things that we would normally do, . . . all that is slowed down right now for us.[195]

346.    In another discussion from the same time period, Potter said:

We've had banking hiccups in the past, we've just … always been able to route around it or deal with it, open up new accounts, or what have you, shift to a new corporate entity, there've been lots of … cat-and-mouse tricks that everyone in Bitcoin industry has to avail themselves of.[196]

347.    As Potter hinted in this interview, Bitfinex and Tether began regularly opening and using bank accounts in the name of shell companies to conceal their involvement with the transactions and circumvent legitimate banks' refusal to process their wire transfers because of the risk of money laundering liability.

348.    For example, on or around January 26, 2018, Bitfinex had opened a bank account at ING Groep NV in the Netherlands, in the name of "Haparc B.V.," and instructed customers to deposit funds in that account to execute its exchanges.[197] ING closed this account one month later,

---

[194] *Id.* at 11:15.

[195] *Id.* at 13:55.

[196] *Bitfinex Tether Phil Potter 'Solved' Banking Problems with illegal money laundering tactics*, at 00:00 YOUTUBE (Apr. 24, 2017), https://archive.org/details/2017.04.24bitfinextetherphilpotter.

[197] Robert-Jan den Haan, *The Bitfinex IEO, how did we get here?*, THE BLOCK (May 8, 2019), https://perma.cc/F493-P375.

after Bloomberg reported its existence.[198] And in October 2018, Bitfinex opened an account at a Hong Kong bank, in the name of "Prosperity Revenue Merchandising Limited," to exchange crypto currency for U.S. dollars.[199]

349.    Bitfinex had used Defendant Crypto Capital as a "third party payment processor[]" since 2014 without any contract or written agreement.[200] But as they lost their access to legitimate banks, Bitfinex and Tether increasingly relied on Crypto Capital to facilitate their access to U.S. correspondent banking services to execute USDT-to-U.S. dollar exchanges.

350.    By early 2018, Fowler and Crypto Capital purportedly controlled over $1 billion of co-mingled customer and corporate Bitfinex funds, even though Crypto Capital and Bitfinex had not had a single written agreement over their four-year business partnership.[201] This was "all or almost all" of Bitfinex and Tether's funds.[202]

351.    Fowler was at the center of Crypto Capital's operations during this time.

352.    According to the United States Attorney for the District of Arizona, Fowler participated "in a scheme to operate a shadow bank on behalf of crypto-exchanges in which hundreds of

---

[198] Ruben Munsterman & Matthew Leising, *Digital Exchange Bitfinex, Under U.S. Scrutiny, Gets ING Account*, BLOOMBERG (Feb. 20, 2018), https://perma.cc/4RHP-X4RF.

[199] *Bitfinex appears to have moved its business to a Hong Kong bank*, THE BLOCK (Oct. 16, 2018), https://perma.cc/HJX7-76BH.

[200] Whitehurst Aff. ¶ 57 (internal quotation marks omitted); *see also id.* ¶¶ 58–59. Defendants' counsel also explained to the OAG that "Bitfinex and Tether have also used a number of other third party 'payment processors' to handle client withdrawal requests, including various companies owned by Bitfinex/Tether executives, as well as other 'friends' of Bitfinex — meaning human being friends of Bitfinex employees that were willing to use their bank accounts to transfer money to Bitfinex clients who had requested withdrawals." *Id.* ¶ 60.

[201] *Id.* ¶¶ 58–59.

[202] *Id.* ¶ 62.

millions of dollars passed through accounts controlled by [him] in jurisdictions around the world."[203]

353.    Bitfinex was one of those crypto-exchanges.

354.    Fowler set up the shell companies and bank accounts on which Bitfinex and Tether depended.

355.    For example, in December 2017, Fowler provided access to an account he created for Crypto Capital using a shell company at Spoldzielczy Bank so that Bitfinex and Tether could execute their exchanges with customers.[204] Less than a month earlier, it was reported that Bitfinex was directing prospective customers to deposit funds into that shell company's account, falsely omitting the fact that the funds were ultimately going to Bitfinex, with whom Spoldzielczy Bank would not have done business.[205]

356.    On April 6, 2018, one week after several individuals were indicted for money laundering and prostitution in the United States, Polish law enforcement seized $375 million USD worth of Polish zloty from multiple Crypto Capital accounts, including Crypto SP. Z.O.O—the Bitfinex shadow account in which it had instructed customers to deposit fiat.[206]

---

[203] Fowler Memorandum at 1.

[204] Matthew Leising, *There's an $814 Million Mystery Near the Heart of the Biggest Bitcoin Exchange*, BLOOMBERG (Dec. 5, 2017), https://perma.cc/K5W2-C68C.

[205] *See also Bitfinex Reveals a New Polish Bank Account Under a Panama Registered Company*, TRUSTNODES (Nov. 22, 2017), https://perma.cc/AEJ6-VEGA.

[206] Haan, *supra* note 197. Until April 2016, ITRAN had been named Global Transaction Services. *See* Indictment, *Barrs v. United States*, No. 16-cr-161 (N.D. Ga. May 10, 2016) (ECF No. 1) (indictment of operator of Global Transaction Services for money laundering violations).

357.    Polish law enforcement found these companies "did not actually carry out any economic activity" but "were created solely to make their bank accounts available for international criminal financial operations."[207]

358.    These were not the only time Fowler and Crypto Capital made their bank accounts available to Bitfinex, either. For example, from approximately April to June 2018, Crypto Capital agreed to let Bitfinex and its customers use an account opened at Citibank, N.A. (000207129503) in the United States for a different shell company: Global Trading Solutions, LLC.

359.    And in October 2018, Fowler and Crypto Capital allowed Bitfinex and its customers to use an account opened for Global Trading Solutions at HSBC USA Bank (141000147) in New York.[208] Bitfinex directed its customers to deposit funds into that account.[209]

360.    Without the illicit access to the U.S. financial system facilitated by Fowler and Crypto Capital, Bitfinex and Tether would not have been able to honor any withdrawal requests, which would have quickly exposed that USDT was not redeemable or fully backed. Fowler and Crypto Capital's conduct was thus essential to Bitfinex and Tether's scheme to make manipulative purchases with debased USDT.

361.    Fowler and Crypto Capital knew that Bitfinex and Tether relied on Crypto Capital's accounts to transact in fiat currency, and that these transactions supported the market's belief that USDT was fully backed, which in turn facilitated the manipulation of cryptocommodity prices.

---

[207] Rafal PasztelanskiPasztelański, *Kolumbijskie kartele prały setki milionów przez spółki z Pruszkowa i okolic*, TVP.INFO (June 4, 2018), https://perma.cc/449Z-66NM, (Google translation available at https://perma.cc/9TFY-CB7H).

[208] Indictment ¶ 10, *United States v. Fowler*, No. 19 Cr. 254 (S.D.N.Y. Apr. 11, 2019) (ECF No. 4).

[209] Mike Dudas, *Bitfinex appears to be banking with HSBC*, THE BLOCK (Oct. 6, 2018), https://www.theblockcrypto.com/post/1272/bitfinex-moves-its-banking-relationship-to-hsbc.

362.    For example, on October 15, 2018, Devasini, going by the name "Merlin," had the

following exchange with Oz Yosef from Crypto Capital, going by the handle "CCC":

> **Merlin**
> Hey Oz, sorry to bother you every day, is there any way to move at
> least 100M to [*redacted*]? We are seeing massive withdrawals and
> we are not able to face them anymore unless we can transfer some
> money out of Cryptocapital
>
> …
>
> **CCC**
> I know. We are following the banks we post as many as we can
> and let them process as much as possible according to them. Eve-
> rytime [*sic*] we push them they push back with account closure
> without reason
> **Merlin**
> dozens of people are now waiting for a withdrawal out of crypto-
> capital
>
> …
>
> **Merlin**
> I need to provide customers with precise answer at this point, can't
> just kick the can a little more
> **Merlin**
> the international I mean
> **CCC**
> I will keep you posted here
> **CCC**
> On the process of all international payments.
> **Merlin**
> please understand all this could be extremely dangerous for every-
> body, the entire crypto community
> **Merlin**
> BTC could tank to below 1k if we don't act quickly[210]

---

[210] Whitehurst Aff. ¶¶ 63–67; *see also* Aff. of Brian M. Whitehurst in Supp. of the OAG's Opp. to
Resp'ts' Mot. to Dismiss Ex. E, *James v. iFinex Inc.* (Sup. Ct. N.Y. Cty. July 8, 2019) (ECF No. 86)
(email from Devasini stating his skype account name is "Merlinmagoo" and his telegram account is
"@Merlinthewizard").

363.     The Crypto Capital Defendants were thus perfectly aware of the critical role they played in Bitfinex and Tether's scheme to prop up the price of cryptocommodities. Without Crypto Capital's assistance processing "international payments," the market would realize USDT was not fully backed and the price of bitcoin "could tank to below 1k," which would harm "the entire crypto community."

364.     Fowler and Crypto Capital also directly benefited from the scheme to prop up cryptocommodity prices. Crypto Capital extracted fees, and the higher prices of cryptocommodities benefitted Crypto Capital's business as a "shadow bank for individuals and institutions who wanted to buy and sell crypto-asset."[211] If the cryptocommodity bubble burst, Crypto Capital would no longer generate the "staggering amount of money" that it had over the previous few years.[212]

365.     Fowler and Crypto Capital also benefitted because they were able to earn substantial interest on the funds Crypto Capital held on Bitfinex's behalf.[213]

366.     Fowler and Crypto Capital also had their own stores of cryptocommodities. The value of these reserves was propped up by the inflated price of cryptocommodities, and the Crypto Capital Defendants could exchange those cryptocommodities for other assets, taking advantage of the bubble they helped create.

### D.     The New York Attorney General Investigates Bitfinex and Tether

367.     On April 25, 2019, the Office of the New York Attorney General filed an *ex parte* application pursuant to the Martin Act and obtained (a) an order requiring Bitfinex and Tether to

---

[211] Fowler Memorandum at 3.

[212] *Id.* at 4.

[213] Devasini Decl. ¶ 11.

produce certain documents, and (b) a preliminary injunction enjoining the exchanges "from taking any further action to access, loan, extend credit, encumber, pledge, or make any other similar transfer or claim between Bitfinex and Tether in order to preserve the *status quo* and protect the interests of New York tether holders and Bitfinex clients."[214]

368.   The filings allege that the Bitfinex trading platform "allow[ed] New Yorkers to purchase and trade virtual currencies" and "explain how Bitfinex no longer has access to over $850 million dollars of co-mingled client and corporate funds that it handed over, without any written contract or assurance, to a Panamanian entity called 'Crypto Capital Corp.'"[215]

369.   The filings also state that, even though Tether knew Crypto Capital funds were inaccessible, in

> November 2018, Tether transferred $625 million held in its account at Deltec to Bitfinex's account at Deltec. Bitfinex, in turn, caused a total of $625 million to be transferred from Bitfinex's account at Crypto Capital to Tether's account at Crypto Capital, through a ledger entry at Crypto Capital crediting Tether's account in the amount of $625 million and debiting Bitfinex's account by a corresponding amount. The purpose of this exchange was to allow Bitfinex to address liquidity issues unrelated to tethers.[216]

370.   Then, in March 2019, the Defendants

> purportedly reversed the $625 million 'transfer' from Bitfinex's to Tether's Crypto Capital account. That reversal was effected so that the $625 million cash transfer from Tether's Deltec account to Bitfinex's could be characterized as a loan from Tether to Bitfinex. That is, the transaction documents treated Bitfinex's receipt of $625 million in November 2018 as though Bitfinex had drawn down $625 million of the $900 million of available credit. The net result was that Tether had, step by step, diminished the backing of tethers: first, in November 2018, by going from actual cash in hand to $625

---

[214] Whitehurst Aff. ¶ 97.

[215] Press Release, N.Y. Att'y Gen., *Attorney General James Announces Court Order Against "Crypto Currency Company Under Investigation For Fraud* (Apr. 25, 2019), https://perma.cc/99U6-NRK9.

[216] Whitehurst Aff. ¶ 85. (quoting letter March 29, 2019 letter from Defendants' counsel).

> million in an inaccessible Crypto Capital account; and then, in No-
> vember 2018, by replacing even that questionable source of backing
> by nothing more than a $625 million IOU from Bitfinex—a related
> company with serious enough liquidity problems to require an emer-
> gency nine-figure loan.[217]

371.    If there had been any doubt before, it was now clear that Tether had never had cash reserves to back USDT at a 1:1 ratio.

E.    **Defendants Continue to Issue Unbacked USDT and Manipulate Prices**

372.    Since January 2020, Tether has printed and issued an additional 4.7 billion USDT, increasing the total amount in circulation to approximately 9 billion USDT.[218]

373.    Defendants have continued to represent that new issuances of USDT are made in response to market demand. For example, on March 10, 2020, Tether's CTO Paulo Ardoino delivered a presentation titled "The Story of Tether" in which he discussed the growth of USDT's volume. In that presentation, he represented that the growth of USDT demand in 2019 from $2 billion to ~$4 billion was in response to an "opportunity for big institutions and funds to make money."[219]

374.    On March 12, Tether announced on its twitter account that it had "surpassed a market capitalization of $5 billion, amid a surge in interest in crypto's most liquid, stable and trusted currency!"[220]

---

[217] Mem. of Law in Opp. to Emergency Mot. for a Stay Pending Appeal, at 13, *James v. iFinex Inc.*, No. 2019-03341 (ECF No. 6) (1st Dep't Aug. 30, 2019) (citation omitted).

[218] https://coinmarketcap.com/currencies/tether/.

[219] https://twitter.com/CryptoCompare/status/1254737076374982656. [https://archive.is/K6A2W].

[220] @Tether_to, Twitter (Mar. 12, 2020), https://twitter.com/Tether_to/status/1238181467106181120. [https://archive.is/AXufS].

375.    Although Defendants took further steps to conceal their scheme after the release of

the Tether Report, they continue to issue unbacked USDT to purchase cryptocommodities.

## V.    Class Allegations

376.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a), (b), and

(c)(4) of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") defined as follows:

> All persons or entities that purchased or otherwise acquired crypto-
> commodities (including Bitcoin, Bitcoin Cash, Ethereum, Ethereum
> Classic, Litecoin, Monero, Dash and ZCash) or cryptocommodity
> Futures, in the United States or its territories at any time from Feb-
> ruary 17, 2015 through the present and were injured thereby.

377.    Plaintiffs also seek to represent a subclass (the "Cryptocommodity Futures Sub-

class") defined as follows:

> All persons or entities that purchased or otherwise acquired Crypto-
> commodity Futures in the United States or its territories at any time
> from February 17, 2015, through the present and were injured
> thereby.

378.    The Class excludes any person or entity whose purchases of cryptocommodities or

cryptocommodity futures were exclusively through Bitfinex, Bittrex, or Poloniex. Also excluded

from the Class are Defendants and their officers, directors, management, employees, subsidiaries,

or affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse,

and any person within the third degree of relationship living in the Judge's household and the

spouse of such a person.

379.    Plaintiffs reserve the right to amend the definitions of the Class if further investi-

gation and/or discovery indicate that the Class definition should be narrowed, expanded, or other-

wise modified.

380.    The members of the Class are so numerous that joinder of all members is impracticable. The precise number of members of the Class is unknown to Plaintiffs at this time, but it is believed to be in the tens of thousands.

381.    The members of the Class are readily ascertainable and identifiable. They may be identified by publicly accessible blockchain ledger information. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

382.    Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

383.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

    a.    Whether Tether's issuance of USDT was "one to one" backed with U.S. dollars;

    b.    The nature, degree, and extent of Defendants' manipulation of the price of Bitcoin and other cryptocommodities through issuance of USDT;

    c.    Whether Tether and Bitfinex had monopoly power in the market for cryptocommodities;

    d.    Whether Defendants monopolized or attempted to monopolize the market for cryptocommodities for purposes of the Sherman Act, 15 U.S.C. § 2;

    e.    Whether Defendants engaged in a combination and conspiracy to fix, lower, maintain, stabilize and/or otherwise manipulate cryptocommodities for purposes of the Sherman Act, 15 U.S.C. §§ 1, 3;

    f.    Whether Defendants committed one or more predicate acts for purposes of RICO, 18 U.S.C. § 1962 *et seq.*;

    g.    Whether Defendants engaged in a "pattern" of "racketeering activity" for purposes of RICO;

    h.    Whether Defendants violated Section 1962(a) of RICO;

    i.    Whether Defendants violated Section 1962(c) of RICO;

    j.    Whether Defendants violated Section 1962(d) of RICO;

k.  Whether Defendants' manipulated Bitcoin and injected artificial prices into Bitcoin futures that traded on the CME and Cboe;

l.  Whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the CEA;

m.  Whether Defendants' conduct violated Sections 6(c)(1) and 22 of the CEA;

n.  Whether Defendants acted to aid and abet violations of the CEA;

o.  Whether the Class suffered injury due to violations of antitrust laws, RICO, and the CEA;

p.  The appropriate class-wide measure of relief for the Defendants' violations of the antitrust laws, RICO, and the CEA;

384.  Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Defendants' practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages from Defendants' practices.

385.  Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class actions and crypto-asset-related litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

386.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Furthermore, the interests of the members of the Class in individually controlling the prosecution of

separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered by some of the individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

387.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

388.    WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a), (b) and (c)(4) of the Federal Rules of Civil Procedure, that they be named Class Representatives, that undersigned counsel be named Co-Lead Class Counsel, and that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Monopolization
### Sherman Antitrust Act Section 2
### (By the Class Against DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants)

389.    Plaintiffs incorporate the preceding paragraphs.

390.    DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants willfully acquired and maintained market power in the market for cryptocommodities in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

391.    During the Class Period, DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants used the instrumentalities of interstate commerce, including interstate wires, to effectuate their illegal scheme.

392.    DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual De-fendants' manipulation and conduct alleged herein was in U.S. import commerce and had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims, within the meaning of 15 U.S.C. § 6a.

393.    DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual De-fendants have market power in the cryptocommodities market because they can control prices of cryptocommodities. These Defendants exercised this control over cryptocommodities prices through their ability to issue large amounts of USDT over a very short time period while falsely representing that the USDT is fully backed by U.S. dollar reserves and issued only when demanded by customers. These Defendants used this large supply of debased USDT to artificially inflate cryptocommodity prices. These Defendants accomplished this price control by targeting large new issuances of unbacked USDT to times when the cryptocommodity prices were falling, signaling to the market that there was a large market demand causing an increase in cryptocommodity prices.

394.    DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual De-fendants acquired and maintained this market power through anticompetitive actions, including by misrepresenting to the market that Tether was fully backed by U.S. dollars, misrepresenting that Tether was released to the market only in response to legitimate consumer demand, concealing the relationship between Bitfinex and Tether, and manipulating cryptocommodity prices through stra-tegic USDT issuances and purchases. These Defendants continue to dominate the stablecoin mar-ket and used that domination to attempt to control prices in the cryptocommodity market.

395.    There is no legitimate business justification for, or procompetitive benefits caused by, these Defendants' anticompetitive conduct. Any ostensible procompetitive benefit was pre-textual or could have been achieved by less restrictive means.

396.    Plaintiffs and members of the Class have been injured in their business and property by reason of DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

397.    Plaintiffs and members of the Class have suffered an injury that is of the type the antitrust laws were intended to prevent and that flows from that which makes these Defendants' acts unlawful. These Defendants' scheme to use debased USDT to purchase bitcoin and other cryptocommodities interfered with the natural interplay of market forces. These Defendants "pushed" debased USDT onto Bittrex and Poloniex where they used it to purchase bitcoin and other cryptocommodities. These actions deprived Plaintiffs and members of the Class of a competitive marketplace. The prices at which Plaintiffs and members of the Class purchased cryptocommodities were higher than the prices that Plaintiffs would have paid absent Defendants' scheme. This anticompetitive conduct has caused Plaintiffs and members of the Class to pay supracompetitive prices, which is an injury of the type that the antitrust laws were intended to prevent.

398.    These Defendants directly caused this injury to Plaintiffs and members of the Class. Plaintiffs and members of the Class are naturally motivated to enforce the antitrust laws because they purchased cryptocommodities on exchanges during the relevant period at prices that were inflated as a result of these Defendants' scheme. There are no other purchaser of cryptocommodities who were more directly injured than Plaintiffs and members of the Class.

399.    WHEREFORE, Plaintiffs request that the Court adjudge and decree that Plaintiffs and members of the Class have antitrust standing under the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26; that DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 2; enter joint and several judgments against these

Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, injunctive relief, and attorneys' fees.

## SECOND CAUSE OF ACTION

**Attempted Monopolization**
**Sherman Antitrust Act Section 2**
**(By the Class Against DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants)**

400.     Plaintiffs incorporate the preceding paragraphs.

401.     DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants specifically intended to obtain market power by anticompetitive means in the market for cryptocommodities in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

402.     To the extent they did not or do not possess actual monopoly power, DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants had or have a dangerous probability of success in maintaining monopoly power over the cryptocommodity market. Defendants continue to dominate the stablecoin market and used that domination to attempt to control prices in the cryptocommodity market.

403.     DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants have attempted to obtain market power through anticompetitive actions, including misrepresenting to the market that Tether was fully backed by U.S. dollars, misrepresenting that Tether was released to the market only in response to legitimate consumer demand, concealing the relationship between Bitfinex and Tether, and manipulating cryptocommodity pricing through strategic issuances.

404.     There is no legitimate business justification for, or procompetitive benefits caused by, the anticompetitive conduct of DigFinex, the Bitfinex Defendants, the Tether Defendants, and

the Individual Defendants. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

405.    DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants jointly operated Tether and Bitfinex such that they can considered one entity—as if they were divisions of the same company—for purposes of monopolization. Tether and Bitfinex were controlled by the Individual Defendants, and made decisions that were in the economic interest of Tether and Bitfinex and the Individual Defendants' jointly, rather than the any of them individually.

406.    Plaintiffs and members of the Class have been injured in their business and property by reason of DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

407.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants' continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

408.    These Defendants' scheme and concrete acts undertaken in furtherance thereof directly resulted in Plaintiffs and members of the Class paying artificially high prices for cryptocommodities during the Class Period. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

409.    WHEREFORE, Plaintiffs request that the Court adjudge and decree that Plaintiffs and members of the Class have antitrust standing under the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26; that DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants

violated the Sherman Antitrust Act, 15 U.S.C. § 2; enter joint and several judgments against these Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, injunctive relief, and attorneys' fees.

### THIRD CAUSE OF ACTION

**Conspiracy to Monopolize**
**Sherman Act Antitrust Action Section 2**
**(By the Class Against All Defendants)**

410.    Plaintiffs incorporate the preceding paragraphs.

411.    Defendants conspired to obtain market power by anticompetitive means in the market for cryptocommodities in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

412.    Defendants engaged in a pattern of concerted action which included, *inter alia*, the issuance of unbacked USDT, the transfer of USDT and cryptocommodities across three exchanges, and bank fraud to obtain correspondent banking to conceal the debased nature of USDT.

413.    Defendants engaged in a number of overt acts in furtherance of this conspiracy, including the issuance of unbacked USDT, the transfer of USDT and cryptocommodities across three exchanges, and bank fraud in order to obtain correspondent banking to conceal the debased nature of USDT.

414.    Defendants took these actions with the specific intent to obtain market power over the market for cryptocommodities.

415.    Defendants' scheme and the concrete acts undertaken in furtherance thereof directly resulted in Plaintiffs and members of the Class paying artificially high prices for cryptocommodities during the Class Period. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

416.    WHEREFORE, Plaintiffs request that the Court adjudge and decree that Plaintiffs and members of the Class have antitrust standing under the Clayton Antitrust Act, 15 U.S.C. §§ 15,

26; that Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 2; enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, injunctive relief, and attorneys' fees.

### FOURTH CAUSE OF ACTION

**Agreement in Restraint of Trade
Sherman Antitrust Act Sections 1 and 3
(By the Class Against All Defendants)**

417.    Plaintiffs incorporate the preceding paragraphs.

418.    This action arises out of 15 U.S.C. § 15, which provides a civil remedy by a party that was injured due to a violation of 15 U.S.C. §§ 1 & 3.

419.    The Tether and Bitfinex Defendants conspired and agreed with the U.S. Exchange Defendants and Crypto Capital Defendants to manipulate cryptocommodity prices by using de-based USDT, not fully backed by U.S. dollars, to purchase cryptocommodities at strategic moments, creating the false impression of significant demand for those cryptocommodities and keeping prices artificially high. That price-fixing agreement is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade without any countervailing procompetitive rationale.

420.    Defendants' conspiracy occurred within the flow of, and substantially affected, interstate commerce, and commerce in U.S territories.

421.    The U.S. Exchange Defendants and Bitfinex are horizontal competitors. Absent collusion, the U.S. Exchange Defendants and Bitfinex would have competed with one another concerning the operation of their respective exchanges and would not have allowed the Tether and Bitfinex Defendants to issue massive unbacked USDT and purchase cryptocommodities.

422.    Absent collusion, debased USDT would not have been issued to Bittrex and Polo-niex, two relatively small exchanges, in such large amounts relative to other larger exchanges that competed with Bittrex and the U.S. Exchange Defendants.

423.    Absent collusion, Bittrex would not have been able to purchase large amounts of Bitcoin and other cryptocommodities with debased USDT on Bittrex and Poloniex.

424.    Absent collusion, the prices of cryptocommodities would be determined by the nat-ural interplay of supply and demand.

425.    Absent collusion, Defendants would have never been able to inflate the prices of bitcoin and other cryptocommodities. Defendants benefitted by coordinating their market activi-ties.

426.    Defendants' actions are inconsistent with unilateral conduct that is in each of their rational self-interest and strongly indicate collusion. Bitfinex and the U.S. Exchange Defendants each had (1) KYC requirements and/or reporting requirements under Financial Crimes Incentives Network ("FinCEN");[221] and (2) their own anti-fraud policies that governed conduct on their re-spective exchanges. Facilitation of a scheme to inflate prices of bitcoin and other cryptocommod-ities using debased USDT in the manner alleged violates Bitfinex's and the U.S. Exchange De-fendants' terms of use and is therefore contrary to their self-interests.

---

[221] *See* https://www.bitfinex.com/legal/terms ("Bitfinex monitors for and assesses suspicious or sanctionable transactions under applicable AML, CTF, Anti-Corruption, and Economic Sanctions Laws, as well as undertakes mandatory reporting to FinCEN, OFAC, FIA, and international regulators."); https://bittrex.zendesk.com/hc/en-us/articles/360000560871 ("As a registered Money Services Business, Bittrex maintains an internal anti-money laundering and know your customer compliance program ('AML/KYC Program'). The AML/KYC Program is a risk-based program founded on requirements of the Bank Secrecy Act, other anti-money laundering laws and implementing regulations, and guidance promulgated by the Financial Crimes Enforcement Network."); https://web.archive.org/web/20170602184943/https://poloniex.com/terms ("Poloniex is registered with FinCEN as an MSB (Money Services Business), registration number 31000055869515. Poloniex may be required to file details of account activity to this organization from time to time.").

427.   The Crypto Capital Defendants' conduct is inconsistent with unilateral action and strongly indicates collusion because their actions in opening accounts under false pretenses and creating shell companies are independently criminal. Indeed, certain of the Crypto Capital Defendants have been indicted for bank fraud. The Crypto Capital Defendants would have not have undertaken these serious risks unless they expected to be rewarded from the proceeds of the overall scheme.

428.   Defendants' conduct constitutes a *per se* violation of the antitrust laws because the intention of the scheme was to fix, stabilize, or otherwise maintain prices of cryptocommodities. The risk of harm from this conduct is clear and obvious: it was to restrict free and unfettered price discovery through competition that the Sherman Act was enacted to promote.

429.   Defendants' scheme and concrete acts undertaken in furtherance thereof directly resulted in Plaintiffs and members of the Class paying artificially high prices for cryptocommodities during the Class Period. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

430.   WHEREFORE, Plaintiffs request that the Court adjudge and decree that the Tether, Bitfinex, U.S. Exchange, and Crypto Capital Defendants violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3; enter joint and several judgments against these Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, injunctive relief, interest, reasonable expenses, and attorneys' fees.

## FIFTH CAUSE OF ACTION

**Market Manipulation**
**Commodities Exchange Act**
**(By the Cryptocommodity Futures Subclass Against All Defendants)**

431.   Plaintiffs incorporate the preceding paragraphs.

432.     Cryptocommodities are commodities within the definition of 7 U.S.C. § 1a. The CFTC has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities, and are therefore subject as a commodity to applicable provisions of the [Commodity Exchange] Act and Regulations."[222]

433.     Defendants specifically intended to and did cause unlawful and artificial prices in cryptocommodities in violation of the Commodities Exchange Act (the "<u>CEA</u>"), 7 U.S.C. § 1 *et seq.*

434.     DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants, individually and collectively, had the ability to cause, and did cause, artificial prices.

435.     Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

436.     The CFTC timely promulgated Rule 180.1(a), which makes it

> unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

---

[222] *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5-6 (June 2, 2016).

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

437.    Defendants violated Rule 180.1(a), by *inter alia*, communicating false information about USDT being fully backed by U.S. dollars, using this debased USDT to purchase cryptocommodities and sustain false price floors, and otherwise misrepresenting the demand for cryptocommodities by issuing unbacked USDT and using it to execute manipulative trades. These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocommodity market.

438.    As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Cryptocommodity Futures Subclass have suffered actual damages and injury in fact due to artificial prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein. Plaintiffs and members of the Cryptocommodity Futures Subclass were further legally injured and suffered injury in fact because they transacted in futures contracts of cryptocommodities in an artificial and manipulated market operating under the artificial prices caused by DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants. That conduct caused injury to the Plaintiffs and the Cryptocommodity Futures Subclass .

439.    WHEREFORE, Plaintiffs pray that the Court adjudge and decree that DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the CEA, 7 U.S.C. § 1 *et seq.*, damaged Plaintiffs and members of the Class; and enter joint and several

judgments against Defendants in favor of Plaintiffs and members of the Cryptocommodity Futures Subclass for the actual damages suffered, and disgorge Defendants of their ill-gotten gains.

## SIXTH CAUSE OF ACTION

**Principal Agent Liability**
**Commodities Exchange Act**
**(By the Cryptocommodity Futures Subclass Against All Defendants)**

440.    Plaintiffs incorporate the preceding paragraphs.

441.    Cryptocommodities are commodities within the definition of 7 U.S.C. § 1a.

442.    Defendants are each liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

443.    Plaintiffs and members of the Cryptocommodity Futures Subclass are each entitled to actual damages sustained in cryptocommodities futures for the violations of the CEA alleged in this Complaint.

444.    WHEREFORE, Plaintiffs pray that the Court adjudge and decree that the DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the CEA, 7 U.S.C. § 1 *et seq.*, damaged Plaintiffs and members of the Class; and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Cryptocommodity Futures Subclass for the actual damages suffered.

## SEVENTH CAUSE OF ACTION

**Aiding and Abetting**
**Commodities Exchange Act**
**(By the Cryptocommodity Futures Subclass Against All Defendants)**

445.    Plaintiffs incorporate the preceding paragraphs.

446.    Cryptocommodities are commodities within the definition of 7 U.S.C. § 1a.

447.    Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other defendants. Each did so with knowledge of other defendants' manipulation of cryptocommodity prices through debased USDT issuances and manipulative trades, and substantially and willfully intended to assist these manipulations to cause artificial prices during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

448.    WHEREFORE, Plaintiffs pray that the Court adjudge and decree that DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants violated the CEA, 7 U.S.C. § 1 *et seq.*, damaged Plaintiffs and members of the Class; and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Cryptocommodity Futures Subclass for actual damages suffered.

## EIGHTH CAUSE OF ACTION

### RICO 18 U.S.C. § 1962(c)
### (By the Class Against the Count Eight Defendants)

449.    Plaintiffs incorporate the preceding paragraphs.

450.    The Class brings this cause of action against DigFinex, the Bitfinex Defendants, the Tether Defendants, Velde, Devasini, Potter, Fowler, and Crypto Capital (collectively, the "Count Eight Defendants").

451.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

452.    At all relevant times, each Plaintiff and member of the Class was and is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) and entitled to sue for recovery of treble damages under 18 U.S.C. § 1964(c).

**Defendant Persons**

453.    At all relevant times, each of DigFinex Inc., iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Limited, Tether Operations Limited, Tether International Limited, Poloniex, Inc., Bittrex, Inc., Ludovicus Jan van der Velde, Giancarlo Devasini, Philip G. Potter, Crypto Capital, and Reginald Fowler was, and is, a "person" within the meaning of 18 U.S.C. § 1961(3).

**Enterprise**

454.    DigFinex, the Bitfinex Defendants, the Tether Defendants, the Individual Defendants, Poloniex, and Bittrex have been associated-in-fact and have constituted a RICO enterprise since at least 2015; Crypto Capital and Fowler were part of the enterprise from at least 2016 to October 2019 (the "Enterprise"). 18 U.S.C. § 1961(4).

455.    Since at least 2015, each of DigFinex, and the Bitfinex, Tether, and Individual Defendants has been a person separate and distinct from the Enterprise itself; Crypto Capital and Fowler were separate and distinct from the Enterprise itself while they were part of the Enterprise.

456.    The purpose of the Enterprise was to manipulate the price of cryptocommodities by engaging in a scheme to defraud the market. The Enterprise used a purported stablecoin, USDT, which the Tether, Bitfinex, and Individual Defendants fraudulently represented was backed 1:1 by U.S. dollar reserves. These misrepresentations allowed these Defendants to issue new, unbacked USDT and use that debased USDT to artificially inflate the prices of cryptocommodities through transactions on the Bittrex and Poloniex exchanges.

457.    As a direct and proximate result of the Count Eight Defendants' conduct, Plaintiffs and members of the Class suffered injury by purchasing cryptocommodities at artificially inflated prices they would not have paid but for the Count Eight Defendants' scheme. As purchasers of these artificially inflated cryptocommodities, Plaintiffs and members of the Class were thus the

direct victims of Defendants' scheme. At all times, the scheme required the coordination and active participation of each defendant involved in the Enterprise.

458.    The Enterprise is primarily structured through an association-in-fact among Dig-Finex; the Bitfinex, Tether, and Individual Defendants; Bittrex; and Poloniex. From at least 2016 to October 2019, the Enterprise was also structured through an association between these defendants, Fowler, and Crypto Capital. At all times, the scheme required the coordination and active participation of each defendant in the Enterprise.

459.    Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants are associated by the formal corporate ownership relationships between them, including the Individual Defendants' ownership and control of DigFinex and the Bitfinex and Tether Defendants, and their positions as corporate officers and directors of DigFinex and the Bitfinex and Tether Defendants.

460.    Crypto Capital, Global Trade AG ("Global Trade"),[223] and Fowler were associated-in-fact with the other members of the Enterprise because they shared the Enterprise's purpose of artificially inflating cryptocommodity prices. Crypto Capital serviced multiple crypto-exchanges like Bitfinex. High trading activity on exchanges like Bitfinex necessarily meant more deposits in accounts maintained by Crypto Capital and more interest received from the banking institutions where Crypto Capital deposited funds, which gave Crypto Capital an economic incentive to keep cryptocommodity prices high and therefore to ensure that USDT appeared to be a legitimate, fully backed stablecoin. Crypto Capital, Global Trade, and Fowler conducted business with the other

---

[223] Global Trade owned and operated Crypto Capital Corp. CRYPTOCAPITAL.CO (Oct. 4, 2019) ("Crypto Capital is owned and operated by Global Trade Solutions AG."), https://perma.cc/D3CL-HQ6L.

members of the Enterprise and maintained an ongoing relationship with them from at least 2016 through October 2019.

461.    Bittrex and Poloniex are associated-in-fact with the other members of the Enterprise because they shared the Enterprise's purpose of artificially inflating cryptocommodity prices. Bittrex and Poloniex each operated a crypto-exchange and accepted trades of USDT and other cryptocommodities. A high volume of USDT trading activity boosts traffic to the Bittrex and Poloniex exchanges, allowing them to reap more fees associated with that trading activity and increased traffic. Bittrex and Poloniex each had and have an economic incentive to keep cryptocommodity prices high and therefore ensure that USDT appeared to be a legitimate, fully backed stablecoin. Bittrex and Poloniex have allowed other Count Eight Defendants to execute high-volume USDT trades on their crypto-exchanges to further the Enterprise from at least 2015 through the present.

462.    In addition to their association through formal corporate structures, each of Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants is distinct from each of the other Bitfinex, Tether, and Individual Defendants:

a.    The Tether Defendants issue USDT and transfer USDT to the Bitfinex accounts of customers who wish to purchase USDT.

b.    The Bitfinex Defendants operate the Bitfinex crypto-exchange, where U.S. and non-U.S. customers can trade cryptocommodities. The Bitfinex Defendants do not issue USDT. The Bitfinex Defendants interface with U.S. customers who wish to trade on the Bitfinex exchange.

c.    DigFinex is the parent company of the Tether and Bitfinex Defendants.

d.    The Individual Defendants are controlling directors and shareholders of DigFinex, which owns and controls Tether Holdings Limited, which owns

and controls Tether Operations Limited, Tether International Limited, and Tether Limited. DigFinex owns and controls iFinex, which owns and controls BFXNA, Inc. and BFXWW, Inc.

e.  Velde has been the Chief Executive Officer of Bitfinex and Tether since 2013, a director of DigFinex and iFinex since 2013, and a director of Tether Limited since 2014.

f.  Devasini has been the Chief Financial Officer of Bitfinex and Tether since 2013, a director of DigFinex and iFinex since 2013, and a director of Tether Limited since 2014.

g.  Potter was the Chief Strategy Officer of Bitfinex and Tether, and a director or Tether Holdings Limited, from 2013 until June 2018.

h.  The Individual Defendants did not commit their predicate acts to carry out their normal or ostensible duties but rather to conduct, manage, and operate the Enterprise or to associate with other members of the Enterprise so that the Enterprise could carry out its scheme.

463.  At all relevant times, Crypto Capital, Global Trade, Fowler, Bittrex, and Poloniex were distinct from each other and from the other Count Eight Defendants:

a.  Fowler was an employee and agent of Crypto Capital and Global Trade and, in furthering the Enterprise, did not operate these corporate entities in the course of his normal or ostensible employment responsibilities.

b.  Bittrex and Poloniex are not connected to any other Count Eight Defendant through formal corporate relationships.

464.    The Count Eight Defendants all participated in the Enterprise and the scheme, as alleged below.

465.    The Tether, Bitfinex, and Individual Defendants have falsely represented that USDT is backed 1:1 by U.S. dollars, that USDT is issued only in response to market demand, and that USDT can be redeemed for U.S. dollars at any time. Instead, Tether issued USDT not in response to market demand. Even the first of these unbacked issuances devalued all USDT in circulation. Every subsequent issuance of USDT was thus an issuance of "debased" USDT. Tether compounded this issue by continuing to issue USDT not in response to market demand. Even so, the Tether, Bitfinex, and Individual Defendants continued to misrepresent that all USDT was backed 1:1 by U.S. dollars.

466.    These fraudulent misrepresentations allowed Tether to create the false impression that USDT had the value of a dollar. By fraudulently inducing the market to purchase USDT, these Defendants were able to maintain the illusion that USDT was a true stablecoin. With this illusion established, these Defendants, along with other Count Eight Defendants, were able to manipulate cryptocommodity prices by issuing large amounts of debased USDT through Bitfinex and exchange them for cryptocommodities through Bittrex and Poloniex.

467.    Bitfinex participated in the scheme to defraud by interfacing with customers who wished to purchase, trade, and sell USDT. Bitfinex knowingly and falsely represented to those customers that USDT was backed 1:1 by fiat currency reserves even though it knew Tether had issued unbacked USDT. Bitfinex also associated with Crypto Capital, Global Trade, and Fowler to ensure that its customers would be able to deposit and withdraw U.S. dollars in exchange for USDT, further perpetuating the illusion that USDT was a real stablecoin.

468.    Bitfinex also knew that Tether had issued millions of debased USDT, yet it accepted the debased USDT from Tether and held it on the Bitfinex crypto-exchange in one of two addresses controlled by the Bitfinex and Tether Defendants. Bitfinex transferred the debased USDT to Bitfinex accounts held on two other crypto-exchanges, Bittrex and Poloniex, primarily through two intermediate addresses, 1J1d and 1AA6. Bitfinex sold the unbacked USDT to Bittrex's and Poloniex's customers in exchange for cryptocommodities, with the intent of driving up the price of those cryptocommodities. Bitfinex transferred the proceeds of these sales from Bittrex and Poloniex back to Bitfinex.

469.    DigFinex's ownership and control of iFinex and Tether Holdings Limited allowed the Bitfinex and Tether Defendants to associate and work together closely to carry out their unlawful activities.

470.    Crypto Capital and Global Trade acted as the Enterprise's gateway to banking with U.S. financial institutions. Ready access to U.S. dollars was critical to the Enterprise's scheme—without it, the Enterprise could not easily exchange USDT for U.S. dollars upon request, which was necessary to maintain the illusion that USDT was a stablecoin fully backed by U.S. dollar reserves. Crypto Capital and Global Trade provided that access.

471.    Fowler acted as an employee, agent, or partner of Crypto Capital and Global Trade. Fowler set up shell companies for Crypto Capital and Global Trade so that the Bitfinex and Tether Defendants could interface with customers wishing to deposit and debit fiat currency in exchange for USDT and cryptocommodities.

472.    Bittrex and Poloniex facilitated the Enterprise's scheme. Bittrex and Poloniex knew that Bitfinex was transferring large amounts of debased USDT to their exchanges. Bittrex and Poloniex accepted these transfers and knowingly allowed Bitfinex and Tether—as owners of the

addresses holding the USDT—to sell the debased USDT for cryptocommodities on their exchanges, driving up the cryptocommodity prices.

473.    The Enterprise engaged in, and its activities affected, interstate commerce. The Bitfinex and Tether Defendants made their fraudulent misrepresentations and fraudulent omissions through use of United States wires, directing their misrepresentations and omissions at U.S.-based customers. The Enterprise used Crypto Capital to gain access to the U.S. banking system and to monies deposited by customers in accounts fraudulently established by the Enterprise.

## Conduct, Operation, and Management of the Enterprise
## Through a Pattern of Racketeering Activity

474.    The Count Eight Defendants agreed to and did conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), directly and indirectly, by operating and managing the Enterprise.

475.    The Count Eight Defendants have committed predicate acts, as defined in 18 U.S.C. § 1961(1)(B), directed others within the Enterprise to commit such acts, and overseen the commission of such predicate acts for the common purpose of manipulating the price of cryptocommodities by engaging in a scheme to defraud the market.

476.    The Individual Defendants are controlling directors and shareholders of DigFinex, which owns and controls Tether Holdings Limited, which owns and controls Tether Operations Limited, Tether International Limited, and Tether Limited. DigFinex owns and controls iFinex, which owns and controls BFXNA, Inc. and BFXWW, Inc.

477.    The Individual Defendants have directly or through DigFinex's other officers, directors, and employees controlled and operated the affairs of the Bitfinex and Tether Defendants.

478.    Velde has been the Chief Executive Officer of Bitfinex and Tether since 2013, a director of DigFinex and iFinex since 2013, and a director of Tether Limited since 2014. As the

senior officer of Bitfinex and Tether, Velde has had and has exercised the ultimate executive au-
thority for DigFinex, Tether, and Bitfinex. Velde was aware of the Enterprise's scheme and, for
example, fraudulently misrepresented that USDT was fully backed by U.S. dollars deposited by
customers, including in a sworn declaration filed in U.S. court proceedings on April 5, 2017.

479.    Devasini has been the Chief Financial Officer of Bitfinex and Tether since 2013, a
director of DigFinex and iFinex since 2013, and a director of Tether Limited since 2014. Devasini
helped create the Bitfinex crypto-exchange. As a senior officer of Bitfinex and Tether, Devasini
has had and has exercised decision-making authority for the operations and conduct of DigFinex,
Tether, and Bitfinex since 2013. As the CFO, Devasini has controlled and overseen the financial
affairs of Bitfinex and Tether and Tether. Devasini was aware of the Enterprise's scheme and, for
example, corresponded with employees at Crypto Capital regarding Bitfinex customer funds held
through Crypto Capital's network of accounts controlled by shell companies.

480.    Potter was the Chief Strategy Officer of Bitfinex and Tether, and a director of
Tether Holdings Limited, from 2013 until June 2018. As a senior officer of Bitfinex and Tether,
Potter had and exercised decision-making authority for the operations and conduct of DigFinex,
Bitfinex, and Tether. Potter was aware of the Enterprise's scheme and, for example, made public
statements indicating that he knew of the Enterprise's money laundering activities, including the
"tricks" that Bitfinex employs to evade money-laundering requirements and otherwise secure the
necessary access to the U.S. banking system for Bitfinex and Tether's customers.

481.    The corporate DigFinex, Bitfinex, and Tether Defendants have helped operate or
manage the Enterprise in at least the following ways:

   a. DigFinex's shareholders and directors have made materially false and mis-
     leading representations that USDT was backed 1:1 by U.S. dollars. The

corporate Bitfinex and Tether Defendants have hosted these false claims on the Bitfinex and Tether websites.

b.   DigFinex and the corporate Bitfinex and Tether Defendants established and operated money transmitting businesses, including to establish platforms for customers to purchase and exchange USDT.

c.   The Tether Defendants issued USDT knowing that it was not fully backed by fiat currency reserves. These unlawful issuances resulted in immediate economic benefits to the Tether Defendants because they now owned and controlled USDT, which was falsely valued based on the representation that it was backed by fiat currency held in Tether's reserves. Tether issued un-backed USDT on at least 116 days between 2016 and the end of 2018.

d.   To profit from their newly issued USDT holdings, the Tether and Bitfinex Defendants engaged in a series of unlawful monetary transactions to transform the unbacked USDT into fiat currency or other cryptocommodities on at least 433 days between 2016 and the end of 2018.

e.   Bitfinex engaged Crypto Capital to help facilitate Bitfinex's crypto-to-U.S. dollar exchanges, directing its customers to deposit monies in accounts held through shell companies established by Crypto Capital's agent and employee, Fowler. Indeed, through iFinex, the Bitfinex Defendants admitted in court filings that they engaged Crypto Capital for this purpose.

482.   Fowler conducted the affairs of the Enterprise by identifying and pursuing ways to facilitate Bitfinex and Tether's access to U.S. correspondent banks, and to facilitate their exchange of USDT and other cryptocommodities for U.S. dollars, while knowing of the Enterprise's scheme.

In this role, Fowler repeatedly defrauded foreign and U.S. banks, and the Bitfinex Defendants aided and abetted this fraud.

### Predicate Acts of Racketeering Activity

483.    Defendants have collectively engaged in at least the following predicate acts, 18 U.S.C. § 1961(1), within their pattern of racketeering activity, 18 U.S.C. §§ 1961(5), 1962(c).

### Wire Fraud:
### 18 U.S.C. § 1343

484.    The Bitfinex, Tether, and Individual Defendants have made substantial use of the U.S. wires to carry out their fraudulent scheme, in violation of 18 U.S.C. § 1343.

485.    The Bitfinex, Tether, and Individual Defendants intentionally transmitted by means of the internet at least the following false representations, which these Defendants knew were false, or which these Defendants made with reckless disregard for their truth, because they knew or plainly should have known at the time of each statement that USDT was not backed 1:1 by U.S. dollars, by 100% reserves; that USDT had not been issued and traded on Bitfinex solely pursuant to market demand; that USDT had been issued and used for the purpose of controlling the price of crypto assets; and that USDT was not redeemable for cash at any time:

- On October 5, 2019, the Bitfinex website falsely stated that "All [USDT] are fully backed by reserves and are issued and traded on Bitfinex pursuant to market demand, and not for the purpose of controlling the pricing of crypto assets."

- On August 20, 2019, the Bitfinex website falsely stated that "Any assertion that we have misled our customers about tether (USDT), its backing, or about the negotiated transaction between Bitfinex and Tether is false."

- Until at least August 17, 2019, Bitfinex's website falsely stated that "outstanding [USDT] are backed 1-to-1 by traditional currency," and that "1 USDT is always equivalent to 1 USD."

- On March 4, 2019, Tether's website falsely stated that USDT was "1-1 pegged to the dollar" and "100% backed."

- Until February 19, 2019, Tether's website falsely stated that "Every [USDT] is backed 1-1 by traditional currency held in our reserves. So, 1 USDT is always equivalent to 1 USD."

- In a sworn declaration dated April 5, 2017, Velde falsely stated that "Tether is a financial technology company that operates a platform to store, send, and make purchases with a form of digital currency – digital tokens called tethers – that are fully backed by U.S. dollars on deposit from customers," and that "[USDT] may be redeemed or exchanged for the underlying U.S. dollars."

- On June 17, 2016, Tether released a white paper that falsely stated that "each [USDT] in circulation represents one US dollar held in our reserves (i.e. a one-to-one ratio) which means the system is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve" and that that USDT "may be redeemable/ exchangeable for the underlying fiat currency pursuant to Tether Limited's terms of service or, if the holder prefers, the equivalent spot value in Bitcoin."

- Until at least March 20, 2015, Tether's website falsely stated that "Tether currencies are essentially Dollars, Euros, and Yen formatted to work on the Blockchain. [USDT] always hold their value at 1:1 to their underlying assets."

- Until at least March 20, 2015, Tether's website falsely stated that USDT "is backed 100% by actual fiat currency assets in our reserve account and always maintains a one-to-one ratio with any currency held. For example, 1 USDT = 1 USD. With almost zero conversion and transfer fees, Tether is redeemable for cash at any time."

- On January 15, 2015, Bitfinex falsely stated that "Each [USDT] is backed 1-to-1 by its corresponding currency, which can be viewed and verified in real-time via the Tether.to website and on the Blockchain. Tether will be fully transparent and audited to demonstrate 100% reserves at all times."

486.    The Bitfinex, Tether, and Individual Defendants never publicly corrected these materially false statements of fact and continue to represent to the market that USDT is backed by a 1:1 guarantee. These Defendants intended that the market rely on these false representations throughout the Class Period, and the market reasonably did so, considering these representations were cast as a core aspect of Tether's business.

487.    The Tether and Bitfinex websites are routed through the United States. The Bitfinex, Tether, and Individual Defendants intended individuals within the United States to access

and view these false representations, individuals within the United States did access and view these false representations, and this has been true throughout the Class Period.

488.    The false representation that USDT is fully backed by U.S. dollars, through U.S. wires, is a core component of the Enterprise's scheme because those representations are a substantial factor in driving the value of USDT and making it a desirable cryptocommodity product to purchase, hold, and trade. Without these misrepresentations, the Count Eight Defendants could not have perpetuated the Enterprise's scheme.

489.    After issuing unbacked USDT, every transaction with a customer in response to a legitimate customer demand for USDT made through the U.S. wires also constituted an act of wire fraud. Tether's customers relied on Tether's knowingly false representation that USDT was backed 1:1 by U.S. dollars when they demanded new USDT. Instead, they received debased USDT. These fraudulent transactions were a core component of the Enterprise's scheme because they allowed the Count Eight Defendants to continue to maintain the illusion that Tether issued USDT only in response to market demand. This illusion was critical for the Enterprise's scheme because otherwise purchases of cryptocommodities with USDT would not have driven up the price of the cryptocommodities in the cryptocommodities market.

490.    The Bitfinex, Tether, and Individual Defendants also engaged in fraudulent omissions via U.S. wire, *i.e.*, the internet, when they made numerous representations constituting half-truths. On March 12, 2020, for example, Tether announced on Twitter: "Today we have surpassed a market capitalization of $5 billion, amid a surge of interest in crypto's most liquid, stable and trusted currency! This important milestone confirms Tether's place as the pre-eminent stablecoin, with the biggest market capitalization." This statement omits that the market capitalization of

USDT has not resulted solely from market demand, but rather from Defendants issuing themselves USDT, and therefore is fraudulent.

491.    The Bitfinex, Tether, and Individual Defendants never publicly corrected these materially false statements of fact and continue to represent to the market that USDT is backed by a 1:1 guarantee. These Defendants intended that the market rely on these false representations throughout the Cass Period, and the market reasonably did so, considering these representations were cast as a core aspect of Tether's business.

<div align="center">

**Bank Fraud:
18 U.S.C. § 1344**

</div>

492.    The Bitfinex, Tether, and Individual Defendants worked with Crypto Capital, Global Trade, and Fowler to facilitate Bitfinex and Tether's access to U.S. correspondent banks and to facilitate their exchange of USDT and other cryptocommodities for U.S. dollars in violation of 18 U.S.C. 1344(2).

493.    From early 2017 through late 2018, Bitfinex customers transferred more than $1.5 billion to various bank accounts purportedly held or controlled by Crypto Capital.[224] According to Devasini, "when Bitfinex customers sought to deposit fiat currency into their Bitfinex accounts, Bitfinex would provide customers with banking details to which the deposits were to be remitted by bank wire, as well as certain identifiers to include in the wire details.[225]

494.    Devasini further explained:

Once Crypto Capital received funds transmitted, it would use the identifier to allocate deposits to a Bitfinex account and communicate receipt of the deposit to Bitfinex. Generally, Bitfinex would log onto the Crypto Capital platform to confirm that the wire was received and approve the deposit receipt. At that point, the funds

---

[224] Devasini Decl. ¶ 12, *In re, iFinex*, No. 1:20-mi-00042-JPB-AJB (N.D. Ga. April 10, 2020).), ECF No. 1-1.

[225] *Id*. ¶ 8.

were made available to the Bitfinex customer on the Bitfinex platform. Pursuant to the parties' agreement, Crypto Capital would hold these funds on behalf of Bitfinex, but would also transfer funds to Bitfinex on demand.

Customer withdrawals processed by Crypto Capital were handled similarly. A Bitfinex customer would submit a withdrawal request to Bitfinex. Bitfinex would log onto the Crypto Capital platform and fill in the beneficiary details provided by the customer. Bitfinex would then approve the withdrawal request and Crypto Capital would settle the withdrawal by remitting the funds to the Bitfinex customer from a bank account owned by Crypto Capital.[226]

495.   In February 2018, up to and including in or about October 2018, Fowler and Crypto Capital opened and used numerous bank accounts at financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation, including a bank based in Manhattan, New York, and in so doing falsely represented to these financial institutions that the accounts would be primarily used for real estate investment transactions even though Fowler knew that the accounts would be used, and were in fact used, by himself, Crypto Capital, and others to transmit funds on behalf of an unlicensed money transmitting business related to the operation of Bitfinex and other crypto-exchanges. These accounts included:

      a.    an account at HSBC Bank USA in the name of Global Trading Solutions LLC (account number 141000147);

      b.    two accounts at HSBC Bank USA in the name of Reginald D. Fowler (account number 861668);

      c.    an account at HSBC Securities USA account in the name of Reginald D. Fowler (account number HMB861668);

      d.    an account at HSBC Securities USA account in the name of Global Trading Solutions LLC (account number HMB861666);

      e.    two accounts at Citibank, N.A. in the name of Global Trading Solutions (account numbers 207112962 and 206618910);

      f.    two accounts at Citibank, N.A. in the name of Reginald D. Fowler (account numbers 42024768923 and 42001787749);

---

[226] *Id.* ¶¶ 9–10.

g.      two accounts at Enterprise Bank and Trust in the name of Global Trading
        Solutions LLC (account numbers 1127177 and 1127193);

h.      an account at Enterprise Bank and Trust in the name of Eligibility Crite-
        rion (account number 1127548);

i.      two accounts at Enterprise Bank and Trust in the name of Reginald D.
        Fowler (account numbers 1128700 and 1128727);

j.      an account at Enterprise Bank and Trust in the name of Spiral Global De-
        velopment Corporation (account number 1127599);

k.      an account at Enterprise Bank and Trust in the name of Spiral Sports II
        (account number 1235784);

l.      an account at JP Morgan Chase in the name of Spiral Global Development
        Corporation (account number 779558365); and

m.      an account at JP Morgan Chase in the name of Global Trading Solutions
        LLC (account number 296219550).

496.    In 2018, from approximately April to June, Crypto Capital, Global Trade, and

Fowler allowed Bitfinex to use Global Trading Solution LLC's account at Citibank, N.A. (account

number 00020712950), fraudulently omitting to inform Citibank in opening and maintaining the

account that it would be and was being used to receive funds from Bitfinex customers and that

such funds would be and were being transferred to Bitfinex, with whom the bank would not have

done business; fraudulently omitting to inform Citibank that Bitfinex was directing its customers

to deposit funds into the Citibank account in order to evade U.S. banking and financial regulations;

and thus fraudulently omitting to inform Citibank that Bitfinex was a party to the wire transactions

from Bitfinex customers to the account.

497.    In 2018, Crypto Capital and Fowler allowed Bitfinex to use Global Trading Solu-

tion LLC's accounts at Enterprise Bank & Trust (account numbers 1127177 and 1127193), in New

Jersey, fraudulently omitting to inform Enterprise Bank & Trust in opening and maintaining the

accounts that it would be and was being used to receive funds from Bitfinex customers and that

such funds would be and were being transferred to Bitfinex, with whom the bank would not have done business; fraudulently omitting to inform Enterprise Bank & Trust that Bitfinex was directing its customers to deposit funds into the Enterprise Bank & Trust accounts in order to evade U.S. banking and financial regulations; and thus fraudulently omitting to inform Enterprise Bank & Trust that Bitfinex was a party to the wire transactions from Bitfinex customers to the Enterprise Bank & Trust account.

498.    In 2018, beginning in October, Crypto Capital and Fowler allowed Bitfinex to use Global Trading Solution LLC's account at HSBC USA Bank (account number 141000147), fraudulently omitting to inform HSBC USA Bank in opening and maintaining the account that it would be and was being used to receive funds from Bitfinex customers and that such funds would be and were being transferred to Bitfinex, with whom the bank would not have done business; fraudulently omitting to inform HSBC USA Bank that Bitfinex was directing its customers to deposit funds into the HSBC USA Bank account in order to evade U.S. banking and financial regulations; and thus fraudulently omitting to inform HSBC USA Bank that Bitfinex was a party to the wire transactions from Bitfinex customers to the HSBC USA Bank account.

499.    Crypto Capital and Fowler thus intended to and did victimize the foregoing banks and exposed them to losses by providing false and misleading statements through the use of layered entities and by failing to convey material information in wire transfer instructions which influenced the decision-making of the banks.

500.    The Bitfinex Defendants knowingly aided and abetted Crypto Capital and Fowler's bank fraud by directing Bitfinex customers to deposit funds in the foregoing bank accounts and by providing them instructions on how to do so in order to allow Crypto Capital and Fowler to make the funds available to Bitfinex. Crypto Capital and Fowler executed these deposit transactions

through their network of accounts. Bitfinex approved the transfer of funds between these accounts, in addition to requiring its customers to omit information in wire instructions that would reveal Bitfinex's role in the transaction.

501.    The Bitfinex, Tether, and Individual Defendants have also committed bank fraud. These Defendants opened and used a bank account in the name of a shell company to conceal their involvement with the transactions and circumvent banks' refusal to process their wire transfers because of the risk of liability for money laundering.

502.    In October 2018, Bitfinex began to use an account in the name of Prosperity Revenue Merchandising Limited at the Bank of Communications, in New York, to deposit Bitfinex customer funds, fraudulently omitting to inform the Bank of Communications in opening and maintaining the account that it would be and was being used to receive funds from Bitfinex customers and that such funds would be and were being transferred to Bitfinex, with whom the bank would not have done business; fraudulently omitting to inform the Bank of Communications that Bitfinex was directing its customers to deposit funds into the Bank of Communications account in order to evade U.S. banking and financial regulations; and thus fraudulently omitting to inform the Bank of Communications that Bitfinex was a party to the wire transactions from Bitfinex customers to the Bank of Communications account.

503.    The Bitfinex, Tether, and Individual Defendants thus intended to and did victimize the foregoing bank and exposed it to losses by providing false and misleading statements through the use of layered entities and by stripping material information from wire transfer instructions which influenced the decision-making of the bank.

**Money Laundering:**
**18 U.S.C. § 1956**

504.   Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual De-
fendants, knowing that the property involved represented the proceeds of specified unlawful ac-
tivity, conducted numerous financial transactions that involved such proceeds with the intent to
promote the carrying on of specified unlawful activity and with the knowledge that the transactions
were designed to conceal the nature, location, source, ownership, or control of such proceeds. 18
U.S.C. § 1956(a)(1).

505.   The debased USDT that DigFinex and the Bitfinex, Tether, and Individuals De-
fendants issued to themselves were proceeds derived, directly or indirectly, from their commission
of wire fraud. 18 U.S.C. § 1956(c)(9). Despite the fact that the USDT was not backed 1:1 by the
U.S. dollar, due to these Defendants' wire fraud, the market believed that the USDT still had value
and therefore defendants were able to use this USDT to engage in financial transactions.

506.   Knowing the debased USDT were the proceeds of their wire fraud, 18 U.S.C. §
1956(c)(1), Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defend-
ants transferred that unbacked USDT to addresses at Poloniex and Bitfinex, intending to conceal
the nature, location, source, ownership, or control of such proceeds. 18 U.S.C. § 1956(a)(1)(B)(i).
Bitfinex and Tether knew that if they stored and used their proceeds on the Bitfinex exchange, the
market would figure out that they, in fact, had ownership and control of such proceeds and learn
that the USDT, in fact, was not backed and had little to no value.

507.   Each transfer was a financial transaction because it affected interstate or foreign
commerce involving the movement of funds by wire and because they involved Bittrex and Polo-
niex, which are both registered money transmitters as defined in 31 U.S.C. § 5312(a)(2)(R); *see
also* 31 C.F.R. §§ 1010.100(t)(3), (ff)(5).

508.    On numerous occasions, the Tether and Bitfinex Defendants purchased cryptocom-
modities on the Bittrex and Poloniex crypto-exchanges using the unbacked USDT they had trans-
ferred to Bittrex and Poloniex, intending to conceal the true nature, source, ownership, and control
of the funds. 18 U.S.C. § 1956(a)(1)(B)(i). Defendants knew that they could not make such pur-
chases on their own exchange, because the market would figure out that Bitfinex and Tether were
the true owners and controllers of the USDT and that the USDT was unbacked.

509.    Each purchase was a financial transaction because it affected interstate or foreign
commerce involving the movement of funds by wire and because it involved Bittrex or Poloniex,
which are registered money transmitters as defined in 31 U.S.C. § 5312(a)(2)(R); 31 C.F.R. §§
1010.100(t)(3), (ff)(5).

510.    DigFinex and the Tether, Bitfinex, and Individual Defendants also intended all
transactions described above to promote the commission of further specified unlawful activity,
including wire fraud, the operation of an unlawful money transmitting business, and monetary
transactions in property from specified unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i). They in-
tended to continue their fraudulent scheme by issuing themselves unbacked USDT—which re-
quired sufficient reserves so that USDT holders could redeem USDT for U.S. dollars without a
problem—and using it purchase cryptocommodities to obtain the reserves they needed.

511.    Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual De-
fendants, with the intent to promote the carrying on of specified unlawful activity, also transmitted
funds to a place in the United States from a place outside the United States. 18 U.S.C. §
1956(a)(2)(A). DigFinex and the Bitfinex, Tether, and Individual Defendants transmitted un-
backed USDT, constituting funds, onto the Bittrex exchange in the United States from outside the
United States, and onto the Poloniex exchange in the United States from outside the United States,

with the intent, as explained above, to promote the Enterprise's commission of wire fraud and operation of money transmitter businesses without licenses.

512.     Crypto Capital, Global Trade, and Fowler also engaged in money laundering. Crypto Capital conducted financial transactions with Bitfinex's customers, accepting deposits from Bitfinex customers into Crypto Capital's accounts, knowing that these deposits were or included proceeds of the wire fraud that USDT was backed 1:1 by U.S. dollars. Crypto Capital was a financial institution in that it was engaged as a business in the transmission of funds, including as a business engaged in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system. 18 U.S.C. §§ 1956(a)(1), (c)(4), 1956(c)(6)(A); 31 U.S.C. § 5312(a)(2)(R). Crypto Capital, Global Trade, and Fowler intended these transactions to promote the commission of further specified unlawful activity, including the wire fraud, monetary transactions in property derived from specified unlawful activity, and the operation of an unlawful money transmitting business. Crypto Capital, Global Trade, and Fowler also intended and designed these transactions to conceal the true nature, location, source, ownership, or control of these proceeds, as evidenced by their bank fraud.

### Monetary Transactions in Property Derived From Specified Unlawful Activity: 18 U.S.C. § 1957

513.     DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants knowingly engaged in monetary transactions in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity. 18 U.S.C. § 1957(a).

514.     The debased USDT these Defendants used to purchase cryptocommodities to artificially inflate their prices was criminally derived property of a value greater than $10,000. 18 U.S.C. § 1957(a).

138

515.    This debased USDT was property constituting or derived from proceeds obtained from specified unlawful activity, including wire fraud, money laundering, the operation of an unlawful money transmitting business, and previous monetary transactions in property derived from such specified unlawful activity all of which occurred in the United States. 18 U.S.C. §§ 1957(f)(3), 1956(c)(7)(A), 1961(1)(B).

516.    These Defendants knew this property was criminally derived when they engaged in the transactions. 18 U.S.C. § 1957(a).

517.    This debased USDT constituted, or was derived from, proceeds obtained from such specified unlawful activity because it was property derived from, directly or indirectly, such unlawful activity, including the gross receipts of such activity. 18 U.S.C. § 1957(f)(2). The unbacked USDT was obtained from the commission of wire fraud. Because they convinced the market that USDT was backed 1:1 by USD, these Defendants were able to issue themselves USDT without depositing USD into their reserves.

518.    Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants engaged in numerous monetary transactions in this criminally derived property, by using the unbacked USDT, by and through Bitfinex, Bittrex, and Poloniex, to purchase cryptocommodities to artificially inflate their prices. These transactions were monetary transactions because they constituted the transfer or exchange of funds by, through, or to a financial institution. 18 U.S.C. § 1957(f)(1).

519.    These transactions constituted the transfer or exchange of funds in or affecting interstate or foreign commerce by, through, or to a financial institution because the USDT constituted funds and because each of Tether, Bitfinex, Bittrex, and Poloniex was a federally registered

money transmitter. 18 U.S.C. §§ 1957(f)(1), 1956(c)(6)(A); 31 U.S.C. § 5312(a)(2) (R); 31 C.F.R. §§ 1010.100(t)(3), 1010.100(ff)(5).

520.   These transactions were financial transactions because they affected interstate or foreign commerce involving the movement of funds by wire and because they involved the use of a financial institution engaged in, and the activities of which affected, interstate or foreign commerce. 18 U.S.C. § 1956(c)(4)(B).

521.   Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants also knowingly engaged in monetary transactions in property derived from specified unlawful activity whenever they transferred USD to customers in response to customer requests to redeem USDT in amounts greater than or equal to $10,000. 18 U.S.C. § 1956(a).

522.   Crypto Capital, Global Trade, and Fowler also knowingly engaged in monetary transactions in property derived from specified unlawful activity. They engaged in monetary transactions with Bitfinex's customers, accepting deposits from Bitfinex customers acquiring unbacked USDT into Crypto Capital's accounts, in amounts greater than $10,000, knowing that these deposits were proceeds of the wire fraud that USDT was backed 1:1 by U.S. dollars.

523.   These transactions constituted the transfer or exchange of funds in or affecting interstate or foreign commerce by, through, or to a financial institution because these deposits constituted funds and because, as Crypto Capital, Global Trade, Fowler, and Bitfinex agreed and implemented, Bitfinex directed its customers to deposit funds into the accounts of the FDIC-insured banks, including Citibank, N.A., Enterprise Bank & Trust, HSBC USA Bank, and Bank of Communications. 18 U.S.C. §§ 1957(f)(1), 1956(c)(6)(A), 5312(a)(2)(A).

524.   Crypto Capital, Global Trade, and Fowler knowingly engaged in these monetary transactions because they knew that the deposits from Bitfinex's customers acquiring unbacked

USDT were derived from specified unlawful activity, including previous monetary transactions in property derived from specified unlawful activity.

### Operating Unlicensed Money Transmitting Businesses:
### 18 U.S.C. § 1960

525.　DigFinex, the Bitfinex Defendants, and the Individual Defendants have operated Bitfinex as a money transmitting business affecting interstate and foreign commerce, throughout the Class Period, "without an appropriate money transmitting license" in New York and other states "where such operation is punishable as a misdemeanor or a felony under State law." 18 U.S.C. § 1960(b)(1)(A).

526.　DigFinex, the Bitfinex Defendants, and the Individual Defendants have operated Bitfinex as an exchanger of virtual currency since at least 2012. Exchangers of convertible virtual currency are "money transmitters" because they are engaged in "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire." 18 U.S.C. § 1960(b)(2); 31 C.F.R § 1010.100(ff)(5). These Defendants opened bank accounts in New York for the purpose of operating their money transmitting business. Operating an unlicensed money transmitting business in New York is a Class A misdemeanor. N.Y. Banking Law § 650(2).

527.　Crypto Capital, Global Trade, and Fowler operated Crypto Capital as a money transmitting business affecting interstate and foreign commerce, during the Class Period, "without an appropriate money transmitting license" in New York and other states "where such operation is punishable as a misdemeanor or a felony under State law." 18 U.S.C. § 1960(b)(1)(A).

528.　Crypto Capital, Global Trade, and Fowler operated Crypto Capital as a payment processor that would deposit and withdraw fiat funds, to and from any crypto-exchange around the world, on behalf of its customers. Crypto Capital was thus engaged in "transferring funds on

behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire." 18 U.S.C. § 1960(b)(2). Crypto Capital, Global Trade, and Fowler opened bank accounts in New York and other states for the purpose of operating their money transmitting business, in violation of New York law. N.Y. Banking Law § 650(2).

529.    DigFinex, the Bitfinex Defendants, and the Individual Defendants, throughout the Class Period, have operated Bitfinex as a money transmitting businesses, affecting interstate and foreign commerce, that failed "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B).

530.    In registering BFXNA Inc. as money services business with FinCEN, the Bitfinex Defendants falsely reported that its activities were limited to Wyoming, and also conducted Bitfinex's money transmitting business in the United States through a number of other unregistered entities and shell companies.

531.    DigFinex the Tether Defendants, and the Individual Defendants, throughout the Class Period, have operated Tether Limited as a money transmitting business, affecting interstate and foreign commerce, that failed "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B).

532.    In registering Tether Limited as a money services business with FinCEN, DigFinex, the Tether Defendants, and the Individual Defendants falsely reported that its activities were limited to Wyoming, and also conducted Tether's money transmitting business in the United States through a number of other unregistered entities and shell companies.

533.     Crypto Capital, Global Trade, and Fowler, during the Class Period, operated Crypto Capital as a money transmitting business, affecting interstate and foreign commerce, that failed "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B). Crypto Capital, Global Trade, and Fowler never registered Crypto Capital as a money transmitting business, as required. 31 U.S.C. § 5330(a).

534.     The Count Eight Defendants' operation of Bitfinex, Tether, and Crypto Capital, affecting interstate and foreign commerce, during the Class Period, involved "the transportation or transmission of funds" that the Count Eight Defendants knew "to have been derived from a criminal offense" and were "intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C).

535.     The Count Eight Defendants, as detailed above, knew that the U.S. dollars received from customers in exchange for unbacked USDT was income derived from specified unlawful activity; and that the unbacked USDT used to purchase and inflate the price of cryptocommodities were proceeds and funds derived from such income and from specified unlawful activity. The Count Eight Defendants directly transmitted these funds to and from Tether, the Bitfinex crypto-exchange, the Bittrex and Poloniex crypto-exchanges, and the Bitfinex customer accounts held through Crypto Capital.

**Relatedness and Continuity**

536.     The Count Eight Defendants' predicate acts forming the pattern of racketeering activity were committed for the common purpose of manipulating the price of cryptocommodities by engaging in a scheme to defraud the market, thereby harming Plaintiffs and the members of the Class by causing them to pay artificially high prices for the cryptocommodities in the cryptocommodities market.

537.    These predicate acts, and any others identified after further discovery, shared common participants (the Count Eight Defendants), common victims (the Class Members), common methods of commission by way of complex, unlawful financial transactions and misrepresentations about USDT (manifested in all of the predicate acts), and a common, related result (artificial inflation of cryptocommodity prices).

538.    The Count Eight Defendants' violations of 18 U.S.C. §§ 1343, 1344, 1956, 1957, and 1960 to the harm of Plaintiffs and the members of the Class have extended a period of more than two years, from at least 2015 through the present, and involved distinct and independent criminal acts. The predicate acts were neither isolated nor sporadic events, but instead involved regular and repeated violations of law to accomplish the Count Eight Defendants' desired ends in conducting the affairs of and operating the Enterprise.

539.    The common purpose of manipulating the price of cryptocommodities by engaging in a scheme to defraud the market became a primary and profitable part of the regular way of conducting the business of Tether, Bitfinex, Bittrex, and Poloniex, at least until the filing of this lawsuit, and thus still threatens to repeat itself absent an injunction or judgment. Plaintiffs assert, on information and belief, that Defendants continue to engage in predicate acts within the pattern of racketeering activity, including the issuance of unbacked USDT to manipulate cryptocommodity prices.

### Causation, Injury, and Damages

540.    As a direct and proximate result of the Count Eight Defendants' predicate acts of racketeering activity in violation of 18 U.S.C. § 1962(c), including wire fraud, bank fraud, money laundering, and operating unlicensed money transmitting businesses, the Plaintiffs and members of the class suffered injury to their New York property and are entitled to damages.

541.    The Tether, Bitfinex, and Individual Defendants' use of unbacked USDT to purchase cryptocommodities to artificially inflate their prices, which constituted money laundering, 18 U.S.C. § 1956, and monetary transactions in property derived from specified unlawful activity, to wit, wire fraud, 18 U.S.C. § 1957, directly and proximately caused harm to Plaintiffs and members of the Class, who paid artificially inflated prices for cryptocommodities.

542.    The Tether, Bitfinex, and Individual Defendants' wire fraud, 18 U.S.C. § 1343, directly and proximately harmed the Plaintiffs and members of the Class because the fraud allowed the Count Eight Defendants to maintain the illusion that USDT had the market value of U.S. dollars and was freely exchangeable at that value for other assets. The wire fraud directly and proximately caused harm to the Plaintiffs and members of the Class because the Count Eight Defendants used their misrepresentations to issue millions of debased USDT, artificially inflating the price of cryptocommodities.

543.    The Count Eight Defendants' bank fraud, 18 U.S.C. § 1344, caused harm to Plaintiffs and members of the Class, because the bank fraud allowed DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants to derive and use the income of U.S. dollars to issue debased USDT to purchase cryptocommodities in order to artificially inflate their prices.

544.    The Count Eight Defendants' operation of unlicensed money transmitting businesses, 18 U.S.C. § 1960, caused harm to Plaintiffs and members of the Class, because these unlicensed money transmitting businesses helped maintain the false illusion that USDT was a fully backed stablecoin and because the Count Eight Defendants used these money transmitting businesses to purchase cryptocommodities for the purpose of artificially inflating prices and to extract income in the form of U.S. dollars in exchange for USDT, which the Count Eight Defendants used to issue unbacked USDT for such purchases.

545.    It was a foreseeable and natural consequence of the Enterprise's purpose to use unbacked USDT to manipulate cryptocommodity prices, in order to sell the cryptocommodities at artificially inflated prices, that the cryptocommodity purchasers, including Plaintiffs and the members of the Class, would have to pay artificially inflated prices for the cryptocommodities.

546.    There are no more immediate victims better situated to sue for damages for this price inflation than Plaintiffs and the members of the Class, and there is no risk of duplicative recovery by others.

547.    Plaintiffs are entitled to recover treble damages for the injury they suffered as a result of the Count Eight Defendants' unlawful conduct pursuant to 18 U.S.C. § 1964(c).

548.    WHEREFORE, Plaintiffs pray that the Court adjudge and decree that the Count Eight Defendants violated 18 U.S.C. § 1962(c) and thereby damaged Plaintiffs and members of the Class; and enter joint and several judgments against the Count Eight Defendants in favor of Plaintiffs and members of the Class for the actual damages suffered, treble damages, attorneys' fees, and the disgorgement of the Count Eight Defendants' ill-gotten gains.

## NINTH CAUSE OF ACTION

### RICO § 1962(a)
### (In the Alternative, by the Class Against the Count Nine Defendants)

549.    Plaintiffs incorporate the preceding paragraphs.

550.    The Class brings this cause of action, in the alternative to the Eighth Cause of Action, against Digfinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants (collectively, the "Count Nine Defendants").

551.    The RICO statute makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest

in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

552.    At all relevant times, each Plaintiff and Class Member was and is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) and is entitled to sue for recovery of treble damages under 18 U.S.C. § 1964(c); and each of the Count Nine Defendants was and is a "person" under 18 U.S.C. §§ 1961(3) and 1964(a).

553.    The Count Nine Defendants engaged in a pattern of racketeering activity, as described in Count Eight, to induce the market to believe that USDT was a legitimate stablecoin backed 1:1 by U.S. dollars. The Count Nine Defendants' predicate acts of racketeering activity include, *inter alia*, wire fraud in violation of 18 U.S.C. § 1343; monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957; and operating unlicensed money transmitting businesses in violation of 18 U.S.C. § 1960.

554.    The Count Nine Defendants received income and proceeds of income derived from their pattern of racketeering activity in two ways: *First*, the Count Nine Defendants received income from their pattern of racketeering activity when legitimate customers purchased USDT with U.S. dollars. *Second*, the Count Nine Defendants used transactions with these customers and continued fraudulent misrepresentations to help persuade the market that USDT was backed 1:1 by U.S. dollars, thereby enabling the Count Nine Defendants to issue millions of debased USDT. This debased USDT, which had the market value of U.S. dollars and was freely exchangeable at that value for other assets, constituted proceeds of the income derived from the Count Nine Defendants' pattern of racketeering activity.

555.    Defendants then used their self-issued, debased USDT in the operation of an association-in-fact enterprise, whose purpose was to artificially inflate cryptocommodity prices and

profit therefrom. That enterprise consisted of the Tether Defendants, the Bitfinex Defendants, the Individual Defendants, Poloniex, and Bittrex (the "Count Nine Enterprise").

556.     The Count Nine Defendants invested debased USDT in cryptocommodities through transfers of debased USDT from Tether to the Bitfinex crypto-exchange, and then to the Bittrex and Poloniex crypto-exchanges, where the debased USDT was sold for cryptocommodities. This use of debased USDT in the operation of the Count Nine Enterprise directly caused cryptocommodity prices to increase.

557.     The Count Nine Defendants used debased USDT derived from their unlawful racketeering activity by continuing these issuances and transactions over the course of several years.

558.     The Count Nine Defendants' investment and use of debased USDT in the operation of Count Nine Enterprise directly and proximately harmed Plaintiffs, because the sale of unbacked USDT in exchange for cryptocommodities caused the price of cryptocommodities to increase artificially. Plaintiffs purchased cryptocommodities at these artificially inflated prices and suffered losses as a result.

559.     Plaintiffs are entitled to recover treble damages for the injury they suffered as a result of Defendants' unlawful conduct pursuant to 18 U.S.C. § 1964(c).

560.     WHEREFORE, in the alternative to Count Eight, Plaintiffs pray that the Court adjudge and decree that the Count Nine Defendants violated 18 U.S.C. § 1962(a) and thereby damaged Plaintiffs and members of the Class; and enter joint and several judgments against the Count Nine Defendants in favor of Plaintiffs and members of the Class for the actual damages suffered, treble damages, attorneys' fees, and for the disgorgement of the Count Nine Defendants' ill-gotten gains.

## TENTH CAUSE OF ACTION

### RICO § 1962(d)
### (By the Class Against All Defendants)

561.    Plaintiffs incorporate the preceding paragraphs.

562.    The Class brings this cause of action against all Defendants.

563.    The RICO statute makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

564.    At all relevant times, each Plaintiff and Class Member was and is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) and is entitled to sue for recovery of treble damages under 18 U.S.C. § 1964(c); and each Defendant was and is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

565.    Defendants agreed to further an endeavor that, if completed, constituted a violation of § 1962(c) or § 1962(a), by agreeing to participate in or facilitate predicate acts through which some or all of the Defendants would conduct or participate in the affairs of the associated individuals and entities constituting the Enterprise. Defendants thus agreed to conduct or facilitate the conduct, management, or operation of the Enterprise. Defendants also agreed to use the proceeds derived from the Count Nine Defendants' pattern of racketeering activity in operation of the Count Nine Enterprise.

566.    Defendants agreed to further the objective, described in Counts Eight and Nine, of manipulating the price of cryptocommodities by engaging in a scheme to defraud the market; and of achieving that objective through conduct constituting a pattern of racketeering activity, either by themselves or by others in the Enterprise, in order to conduct and participate in the affairs of, and to operate, the Enterprise, or to facilitate the operation and management of the Enterprise.

567.    Defendants agreed to participate in or facilitate conduct, described in Count Eight, constituting wire fraud, bank fraud, money laundering, transacting in property derived from specified unlawful activity, and operating unlicensed money transmitting businesses:

>  a.    DigFinex, the Tether Defendants, the Bitfinex Defendants, the Individual Defendants, and Fowler agreed to and did facilitate the commission of wire fraud, bank fraud, money laundering, transacting in property derived from specified unlawful activity, and operating unlicensed money transmitting businesses.

>  b.    Bittrex and Poloniex agreed to and did facilitate the commission of wire fraud, money laundering, and transacting in property derived from specified unlawful activity.

568.    Defendants knew that this conduct was part of a related series of predicate acts, constituting a pattern of racketeering activity, and that this related series of predicate acts was necessary to further the Enterprise's objective of manipulating the price of cryptocommodities by engaging in a scheme to defraud the market.

569.    Defendants thus conspired to conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity, or to facilitate the operation of the enterprise, and thus to violate § 1962(c).

570.    With respect to the income or proceeds of that income derived from the pattern of racketeering activity, to use or invest such income or proceeds in the operation of the Enterprise, and thus to violate § 1962(a).

571.    In furtherance of their conspiracy, Defendants engaged in overt acts that directly and proximately caused Plaintiffs to suffer injury and that constituted acts of racketeering or acts otherwise unlawful under the RICO statute.

572.    WHEREFORE, Plaintiffs pray that the Court adjudge and decree that Defendants violated § 1962(d) of the RICO statute and thereby damaged Plaintiffs and members of the Class; and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class for actual damages and for the disgorgement of Defendants' ill-gotten gains.

## ELEVENTH CAUSE OF ACTION

### Fraud
### (By the Class Against the Bitfinex Defendants, Tether Defendants, and Individual Defendants)

573.    Plaintiffs incorporate the preceding paragraphs.

574.    The Bitfinex Defendants, Tether Defendants, and Individual Defendants made at least the following false representations, which these Defendants knew were false, or which these Defendants made with reckless disregard for their truth, because they knew or plainly should have known at the time of each statement that USDT was not backed 1:1 by U.S. dollars, by 100% reserves; that USDT had not been issued and traded on Bitfinex solely pursuant to market demand; that USDT had been issued and used for the purpose of controlling the price of cryptocommodities; and that USDT was not redeemable for cash at any time:

    a.    On October 5, 2019, the Bitfinex website falsely stated that "All [USDT] are fully backed by reserves and are issued and traded on Bitfinex pursuant to market demand, and not for the purpose of controlling the pricing of crypto assets."

    b.    On August 20, 2019, the Bitfinex website falsely stated that "Any assertion that we have misled our customers about [USDT], its backing, or about the negotiated transaction between Bitfinex and Tether is false."

    c.    Until at least August 17, 2019, Bitfinex's website falsely stated that "outstanding [USDT] are backed 1-to-1 by traditional currency," that "1 USDT is always equivalent to 1 USD."

    d.    On March 4, 2019, Tether's website falsely stated that USDT was "1-1 pegged to the dollar" and "100% backed."

e.  Until February 19, 2019, Tether's website falsely stated that "Every USDT is backed 1-1 by traditional currency held in our reserves. So, 1 USDT is always equivalent to 1 USD."

f.  In a sworn declaration dated April 5, 2017, Velde falsely stated that USDT is a financial technology company that operates a platform to store, send, and make purchases with a form of digital currency – digital tokens called [USDT] – that are fully backed by U.S. dollars on deposit from customers," that "[USDT] may be redeemed or exchanged for the underlying U.S. dollars," that "customers who want to purchase [USDT] through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of [USDT] until they ask Tether to remit back the U.S. dollars they deposited. . . . For these systems to work, customers depend on Bitfinex's and Tether's ability to send back to them the U.S. dollars they deposited with Bitfinex or Tether."

g.  On June 17, 2016, Tether released a white paper that falsely stated that "each [USDT] in circulation represents one US dollar held in our reserves (i.e. a one-to-one ratio) which means the system is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve" and that that USDT "may be redeemable/exchangeable for the underlying fiat currency pursuant to Tether Limited's terms of service or, if the holder prefers, the equivalent spot value in Bitcoin."

h.  Until at least March 20, 2015, Tether's website falsely stated that "[USDT] are essentially Dollars, Euros, and Yen formatted to work on the Blockchain. [USDT] always hold their value at 1:1 to their underlying assets."

i.  Until at least March 20, 2015, Tether's website falsely stated that USDT "is backed 100% by actual fiat currency assets in our reserve account and always maintains a one-to-one ratio with any currency held. For example, 1 USDT = 1 USD. With almost zero conversion and transfer fees, [USDT] is redeemable for cash at any time."

j.  On January 15, 2015, Bitfinex falsely stated that "Each [USDT] is backed 1-to-1 by its corresponding currency, which can be viewed and verified in real-time via the Tether.to website and on the Blockchain. Tether will be fully transparent and audited to demonstrate 100% reserves at all times."

k.  Bitfinex's use of debased USDT was also fraudulent as it was a false representation to the market of bitcoin's price and demand.

575.  The Bitfinex Defendants, Tether Defendants, and Individual Defendants never publicly corrected these materially false statements of fact and continue to represent to Plaintiffs and the public that USDT is backed by a 1:1 guarantee. These Defendants intended that the market,

and Plaintiffs as participants in the market, rely on these false representations throughout the class period, and the market reasonably did so, considering these representations were cast as a core aspect of Tether's business.

576.    The Tether and Bitfinex websites are routed through the United States, and individuals within the United States can access and view these false representations, and this has been true throughout the Class Period.

577.    The Bitfinex Defendants, Tether Defendants, and Individual Defendants also had a duty of disclosure based on their superior knowledge about the true status of Tether's U.S. dollar reserves and about their scheme to manipulate the price of cryptocommodities, and based on their obligation to make not misleading their minting and issuance of new USDT while the Tether and Bitfinex websites described Tether as backed 1:1 by U.S. dollars, where the disclosed facts misleadingly suggested that the minting and issuances were made solely as a function of and in response to market demand.

578.    The Bitfinex Defendants, Tether Defendants, and Individual Defendants thus committed fraud, in the form of materially fraudulent omissions from the Tether and Bitfinex websites, by minting and issuing new USDT without disclosing that USDT was not backed 1:1 by U.S. dollars; that USDT had not been minted or issued solely pursuant to market demand; that USDT had been minted and issued for the purpose of controlling the price of crypto assets; and that USDT was not redeemable for cash at any time; because with respect to each such omission, these Defendants knew that these omissions made materially misleading the website statements that Tether is backed 1:1 by U.S. dollars, or acted with reckless disregard for that fact.

579.     Plaintiffs reasonably relied on these false representations and omissions of material fact to their detriment when purchasing cryptocommodities at artificially high prices caused by these materially false statements and omissions.

580.     As an actual and proximate result of the above, Plaintiffs have suffered actual damages in a result to be determined at trial.

581.     The Bitfinex Defendants, Tether Defendants, and Individual Defendants committed the foregoing acts and omissions publicly, deliberately, willfully, maliciously, and oppressively.

582.     WHEREFORE, Plaintiffs request that this Court enter judgment against the Bitfinex Defendants, Tether Defendants, and Individual Defendants for actual damages, punitive damages, and the disgorgement of these Defendants' ill-gotten gains.

## TWELFTH CAUSE OF ACTION

**New York Deceptive Trade Practices Law**
**NY GBL § 349**
**(By the Class Against the Bitfinex Defendants,**
**Tether Defendants, and Individual Defendants)**

583.     Plaintiffs incorporate the preceding paragraphs.

584.     The Bitfinex Defendants, Tether Defendants, and Individual Defendants engaged in unfair, deceptive, untrue, or misleading acts by knowingly misrepresenting, or misrepresenting with reckless disregard for the facts, that USDT is backed 1:1 by U.S. dollars; thatTether would issue new USDT only in response to legitimate market demand; that USDT is redeemable for cash at any time; and that any assertions that Bitfinex has misled customers about USDT, its backing, or the negotiated transaction between Tether and Bitfinex are false.

585.     The Bitfinex Defendants, Tether Defendants, and Individual Defendants have engaged in unfair, deceptive, untrue, or misleading acts by knowingly, or by acting with reckless disregard for the facts, with a duty to disclose the truth, misleadingly and fraudulently omitting

from their statements, including on their websites, that USDT had not been minted or issued solely pursuant to market demand; and that USDT had been minted and issued for the purpose of controlling the price of cryptocommodities.

586.    The Bitfinex Defendants, Tether Defendants, and Individual Defendants have systematically perpetrated deceptive and unfair practices upon members of the public and have intentionally deceived the market. These unlawful, unfair, and fraudulent business practices present an ongoing threat to Plaintiffs and the members of the Class.

587.    These deceptive trade practices occurred in New York, including because the Bitfinex Defendants, Tether Defendants, and Individual Defendants relied on the use of New York banks to process transactions; intended and allowed consumers in New York to use the Bitfinex and Tether websites and Bitfinex trading platform, or else acted with reckless disregard with respect to such use; intended for consumers in New York to use the Bittrex and Poloniex websites, which they did; and used New York firms to provide services relating to the deceptive acts and omissions, including reviewing the cash reserves backing USDT and making public statements about those reserves and the operation of the Bitfinex trading platform.

588.    These deceptive practices were consumer-oriented aimed at manipulating the cryptocommodity market and thereby transferring wealth from consumers to the Bitfinex Defendants, Tether Defendants, and Individual Defendants.

589.    These willful and knowing violations of NY GBL § 349 have caused Plaintiffs and members of the Class to suffer injury, including the payment of artificially high prices in the cryptocommodities market.

590.    The Bitfinex Defendants, Tether Defendants, and Individual Defendants should be required to disgorge their ill-gotten gain.

591.     WHEREFORE, Plaintiffs request that this Court enter judgment against the Bit-finex Defendants, Tether Defendants, and Individual Defendants for all applicable damages, including treble damages, injunctive relief, and attorneys' fees pursuant to GBL § 349-h.

## COSTS, INTEREST, AND ATTORNEYS' FEES

592.     Plaintiffs request that the Court award reasonable costs of suit, pre- and post-judgment interest, and reasonable attorneys' fees.

## JURY TRIAL

593.     Plaintiffs demand a trial by jury for all claims.

/s/ Caitlin Halligan
Philippe Z. Selendy
Caitlin Halligan
Andrew R. Dunlap
SELENDY & GAY PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com

/s/ Todd M. Schneider
Todd M. Schneider (*pro hac vice*)
Jason H. Kim (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
Kyle G. Bates (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
    KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*

/s/ Kyle W. Roche
Kyle W. Roche
Edward Normand
Velvel Freedman (*pro hac vice*)
Joseph M. Delich
ROCHE CYRULNIK FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
tnormand@rcfllp.com
vel@rcfllp.com
jdelich@rcfllp.com