**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No.: 1:19-cv-09236 (KPF) (SN) |

## <u>MEMORANDUM OF LAW IN SUPPORT OF TETHER AND BITFINEX DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIMS</u>

Michael Jason Lee, Esq. (admitted *pro hac vice*)
LAW OFFICES OF MICHAEL JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Tel : (858) 550-9984
Fax : (858) 550-9985

Jim Walden
Stephanie T. Levick
Daniel A. Cohen
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, NY 10004
Tel: (212) 335-2030
Fax: (212) 335-2040

Sunjina K. Ahuja, Esq. (admitted *pro hac vice*)
Christopher J. Beal, Esq. (admitted *pro hac vice*)
DILLON MILLER & AHUJA LLP
5872 Owens Ave, Suite 200
Carlsbad, CA 920008
Tel.: (858) 587-1800
Fax: (858) 587-2587

*Counsel for Defendants, iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Ludovicus Jan van der Velde, and Giancarlo Devasini.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

THE ALLEGATIONS OF THE COMPLAINT ..................................................... 5

    A.    Tether and Bitfinex ................................................................. 5

    B.    The Alleged Market Manipulation .......................................... 5

ARGUMENT ........................................................................................................ 6

  I.    Plaintiffs' Antitrust Claims Should Be Dismissed ................................ 6

    A.    Plaintiffs Lack Antitrust Standing Because They Allege No Injury to Competition (Counts 1-4) ........................................ 6

    B.    Plaintiffs' Section 2 Monopolization Claim Should Be Dismissed (Count 1) ....................................................... 8

        1.    Plaintiffs Fail to Plausibly Allege the Defendants Have Monopoly Power in the Cryptocommodities Market ................... 8

        2.    Plaintiffs Fail to Allege Anticompetitive Conduct ...................... 10

    C.    Plaintiffs Fail to Allege Attempted Monopolization of the Cryptocommodities Market (Count 2) ..................................... 10

    D.    Plaintiffs Fail to Plausibly Allege a Conspiracy to Monopolize (Count 3) ............................................................................. 12

    E.    Plaintiffs Fail to Plausibly Allege an Agreement in Restraint of Trade Under Sherman Act, Sections 1 and 3 (Count 4) ........... 14

  II.    Plaintiffs' CEA Claims Should Be Dismissed (Counts 5-7) ............... 14

    A.    Plaintiffs Lack Standing to Bring Claims Under the CEA ...... 15

    B.    Plaintiffs Fail to State a Claim of Market Manipulation Under the CEA ............................................................................... 17

        1.    Plaintiffs Fail to Allege a Section 6(c)(1) Market Manipulation Claim with Particularity (Count 5) ...................... 17

            (a)    Plaintiffs Have Not Alleged A Specific Intent to Manipulate the Price of Cryptocommodities ................... 18

            (b)    Plaintiffs Have Not Plausibly Alleged the Existence of an Artificial Price ........................................... 19

i

(c)   Plaintiffs Have Not Plausibly Alleged That Defendants Had an Ability to Create an Artificial Price, Let Alone Caused the Artificial Price.................... 21

2.   Plaintiffs Fail to Allege a Rule 180.1(a) Market Manipulation Claim (Count 5)....................................... 21

C.   Plaintiffs Fail to State a Claim for Vicarious Liability Under the CEA (Counts 6-7) ...................................................................... 23

III.   Plaintiffs Fail to State a RICO Claim (Counts 8-10) ............................................. 24

A.   Plaintiffs Fail to Plead Proximate Causation ............................................. 24

B.   Plaintiffs' Core Claim—that USDT Was Unbacked—Draws From Unfounded and Unreasonable Inferences ......................................... 28

C.   Plaintiffs Fail to Adequately Plead Two Predicate Acts........................... 30

1.   No Wire Fraud (18 U.S.C. § 1343)................................................. 31

2.   No Bank Fraud (18 U.S.C. § 1344) ................................................ 31

3.   No Money Laundering (18 U.S.C. § 1956) .................................... 33

4.   No Unlawful Money Transactions (18 U.S.C. § 1957) ................ 34

5.   No Money Transmitting (18 U.S.C. § 1960) ................................. 34

IV.   The Court Should Dismiss Plaintiffs' State Law Claims....................................... 36

A.   Plaintiffs Fail to State a Claim for Common Law Fraud (Count 11) .............................................................................................................. 36

1.   Plaintiffs Fail to Plead Reliance or Transaction Causation.................................................................................... 36

2.   Plaintiffs Fail to Plead Damages or Loss Causation..................... 37

B.   Plaintiffs Fail to State a Claim Under GBL § 349 (Count 12).................. 38

1.   The Plaintiffs Do Not Allege Consumer-Oriented Wrongdoing ................................................................................ 38

2.   The Plaintiffs Do Not Allege Direct Causation ............................ 39

CONCLUSION.................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*4 K & D Corp. v. Concierge Auctions, LLC,*
  2 F. Supp. 3d 525 (S.D.N.Y. 2014)..................................................................27

*7 West 57th Street Realty Company, LLC v. Citigroup, Inc.,*
  771 F. App'x 498 (2d Cir. 2019) ....................................................................25

*Abraham v. American Home Mortgage Servicing, Inc.,*
  947 F. Supp. 2d 222 (E.D.N.Y. 2013) .............................................................39

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
  181 F.3d 216 (2d Cir. 2007)........................................................................9, 11

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006)........................................................................................24

*Aquino v. Trupin,*
  833 F. Supp. 336 (S.D.N.Y. 1993).................................................................32

*Atlantic Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)..........................................................................................7

*Bank of China, N.Y. Branch v. NBM LLC,*
  359 F.3d 171 (2d Cir. 2004)...........................................................................32

*Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.,*
  149 A.D.3d 146, 48 N.Y.S.3d 654 (1st Dep't 2017) .....................................38

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)........................................................................................14

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,*
  754 F.2d 57 (2d Cir. 1985).............................................................................32

*Bridge v. Phoenix Bond & Indem. Co.,*
  553 U.S. 639 (2008)........................................................................................27

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993)..........................................................................................6

*CFTC v. Int'l Financial Services (New York), Inc.,*
  323 F. Supp. 2d 482 (S.D.N.Y. 2004).............................................................22

*CFTC v. McDonnell,*
  332 F. Supp. 3d 641 (E.D.N.Y 2018) .........................................................21, 22

*CFTC v. Wilson*,
   No. 13 Civ. 7884, 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ..................................... 19, 20

*City of New York v Smokes-Spirits.Com*,
   911 N.E.2d 834 (N.Y. 2009) ................................................................................................. 39

*Clark v. Rameker*,
   573 U.S. 122 (2014) .............................................................................................................. 34

*DeAngelis v. Corzine*,
   17 F. Supp. 3d 270 (S.D.N.Y. 2016) ..................................................................................... 39

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .................................................................................................. 36

*Doe v. Trump Corp.*,
   385 F. Supp. 3d 265 (S.D.N.Y. 2019) ................................................................................... 27

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005) ......................................................................................................... 22, 23

*Eastman Kodak v. Image Technical Serv.*,
   504 U.S. 451 (1992) ................................................................................................................ 9

*Edmonds v. Seavey*,
   No. 08 Civ. 5646, 2009 WL 2949757 (S.D.N.Y. Sept. 15, 2009) ......................................... 32

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*,
   129 F.3d 240 (2d Cir.1997) ................................................................................................... 12

*Elliott Industries Ltd. Partnership v. BP America Production Co.*,
   407 F.3d 1091 (10th Cir. 2005) .............................................................................................. 7

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018) .................................................................................................. 25

*Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*,
   No. 02 Civ. 7313, 2004 WL 634171 (S.D.N.Y. Mar. 30, 2004), *aff'd in part, vacated in part*
   *on other grounds*, 169 F. App'x 655 (2d Cir. 2006) .............................................................. 20

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ............................................................................................. 30, 31

*Fisher v. Painewebber Inc.*,
   No. 94 Civ. 2202, 1994 WL 512356 (S.D.N.Y. Sept. 20, 1994) ........................................... 30

*Frintzilas v. DirecTV, LLC*,
   731 F. App'x 71 (2d Cir. 2018) ............................................................................................. 40

iv

*Harry v. Total Gas & Power North America, Inc.*,
    244 F. Supp. 3d 402 (S.D.N.Y. 2017) ................................................................. 17

*Hemi Group, LLC v. City of New* York,
    559 U.S. 1 (2010) ................................................................................................ 27

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992) ....................................................................................... 24, 25

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014) ............................................................................ 8, 10

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ........................................................... 17, 23

*In re Amaranth Natural Gas Commodities Litig.*,
    612 F. Supp. 2d 376 (S.D.N.Y. 2009) ................................................................. 18

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    995 F. Supp. 2d 291 (S.D.N.Y. 2014), *aff'd sub nom. SRM Global Master Fund Ltd. P'ship v.
    Bear Stearns Companies L.L.C.*, 829 F.3d 173 (2d Cir. 2016) ............................ 37

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016) ................................................................. 22

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
    No. 11 MD 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ......................... 19

*In re Crude Oil Commodity Litig.*,
    No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ......................... 18

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013), *vacated on other grounds, Gelboim v. Bank of America
    Corp.*, 823 F.3d 759 (2d Cir. 2016) .................................................................... 22

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013) ................................................................. 15

*In re Platinum & Palladium Antitrust Litig.*,
    No. 1:14 Civ. 9391, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ...................... 15

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................. 23

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ........................................................................... 19

*In re Term Commodities Cotton Futures Litigation*,
371 F. Supp. 3d 95 (S.D.N.Y. 2019)................................................................ 16

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
822 F. Supp. 2d 368 (S.D.N.Y. 2011)......................................................... 36, 37

*KMB Warehouse Distributors, Inc. v. Walker Manufacturing Co.*,
61 F.3d 123 (2d Cir. 1995).......................................................................... 8

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................................................................... 30

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 414, 646 N.Y.S.2d 76 (N.Y. 1996) .............................................. 37

*Laub v. Faessel*,
297 A.D.2d 28 (1st Dep't 2002) .................................................................. 37

*Laydon v. Mizuho Bank, Ltd.*,
No. 12 Civ. 3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...................... 7

*Loveman v. Lauder*,
484 F. Supp. 2d 259 (S.D.N.Y. 2007)......................................................... 20

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)................................................................... 12, 13

*Morris v. Gilbert*,
649 F. Supp. 1491 (E.D.N.Y. 1986) ........................................................... 39

*New York University v. Continental Insurance Co.*,
662 N.E.2d 763 (N.Y. 1995)..................................................................... 38

*Nguyen v. FXCM Inc.*,
364 F. Supp. 3d 227 (S.D.N.Y. 2019).......................................................... 17

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ............................................................................. 8

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990)........................................................................ 27

*Pasternack v. Lab. Corp. of Am. Holdings*,
27 N.Y.3d 817 (2016) .............................................................................. 36

*Portney v. CIBA Vision Corp.*,
593 F. Supp. 2d 1120 (C.D. Cal. 2008) ........................................................ 9

*Pulse Creations, Inc. v. Vesture Grp., Inc.*,
    154 F. Supp. 3d 48 (S.D.N.Y. 2015)..................................................................... 38

*Ramiro Aviles v. S & P Glob., Inc.*,
    380 F. Supp. 3d 221 (S.D.N.Y. 2019).................................................................. 36

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................................. 9

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
    366 F. Supp. 3d 516 (S.D.N.Y. 2018).................................................................. 18

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)............................................................................................. 11

*Spinelli v. Nat'l Football League*,
    96 F.Supp.3d 81 (S.D.N.Y. 2015)........................................................................ 14

*State of N.Y. by Abrams v. Anheuser-Busch, Inc.*,
    811 F. Supp. 848 (E.D.N.Y. 1993). ....................................................................... 8

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ................................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................. 18

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)..................................................................................... 9

*Twin Labs., Inc. v. Weider Health & Fitness*,
    900 F.2d 566 (2d Cir. 1990)................................................................................. 11

*United States v. Approximately 250 Documents Containing the Forged Hand Writing of
    President John F. Kennedy & Others*,
    No. 03 Civ. 8004, 2008 WL 4129814 (S.D.N.Y. Sept. 5, 2008)........................... 33

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)................................................................................. 31

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................. 9

*United States v. Petix*,
    No. 15 Cr. 227A, 2016 WL 7017919 (W.D.N.Y. Dec. 1, 2016)........................... 34

*United States v. Stavroulakis*,
    952 F.2d 686 (2d Cir. 1992)................................................................................. 33

*Weir v. Cenlar FSB*,
    No. 16 Civ. 8650, 2018 WL 3443173 (S.D.N.Y. July 17, 2018) ...................................... 24, 27

*Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*,
    45 F. Supp. 2d 1164 (D. Kan. 1999) ............................................................................. 9

*William v. Affinion Group, LLC*,
    889 F.3d 116 (2d Cir. 2018) ....................................................................................... 31

*Williams v. Bank Leumi Tr. Co.*,
    No. 96 Civ. 6695, 1997 WL 289865 (S.D.N.Y. May 30, 1997) .................................... 32

**Statutes**

18 U.S.C. § 1343 .................................................................................................................. 30

18 U.S.C. § 1344 ............................................................................................................ 30, 31

18 U.S.C. § 1956 ............................................................................................................ 30, 33

18 U.S.C. § 1957 ............................................................................................................ 30, 34

18 U.S.C. § 1960 .................................................................................................... 30, 34, 35

18 U.S.C. § 1961 .................................................................................................................. 30

18 U.S.C. § 1962 .................................................................................................................. 27

18 U.S.C. § 1964 .................................................................................................................. 27

7 U.S.C. § 25(a)(1) ............................................................................................................... 15

Commodity Exchange Act § 22 ..................................................................................... 15, 17

Commodity Exchange Act § 6 ........................................................................................ 17, 22

General Business Law § 349 ........................................................................................... passim

**Rules**

CFTC Rule 180.1 ........................................................................................................... 21, 22

Fed. R. Civ. P. 9(b) .......................................................................................................... 3, 18

**Other Authorities**

2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501 (4th ed. 2020) ...................... 9

## PRELIMINARY STATEMENT

Bitfinex[1] and Tether[2] are accused of fraudulently issuing between $1 billion to $3 billion worth of the "stablecoin" tether, which they allegedly used to buy other cryptocommodities over a five-year period to prop up prices. Through the alleged scheme, they "created the largest asset bubble in history"[3]—the well-known explosion of crypto-assets values to *$795 billion* in 2017-2018, which soon crashed by more than half. If blaming this global market phenomenon on a proportionately miniscule group of stablecoin transactions seems ridiculous, it is.

Beyond the shaky factual foundation of this case, the Amended Consolidated Class Action Complaint (the "Complaint" or "Compl.") has glaring legal flaws that call for the case to be dismissed in its entirety. Those flaws are the subject of this motion.

Plaintiffs' core theory is that Defendants sent false price signals to the cryptocommodities market via fraudulent tether issuances. The issuances were fraudulent, the theory goes, because, like any stablecoin, tethers are only supposed to be issued when customers buy them for the equivalent amount of traditional currency. One U.S. dollar tether (or "USDT") is worth $1.00, and can be redeemed for the price paid (less fees) at any time. Traders use stablecoins like USDT so that they can trade other virtual currencies more efficiently, without having to traverse back-and-forth between the crypto-assets infrastructure and the traditional banking system.

According to Plaintiffs, Defendants issued an unspecified amount of tethers in exchange for nothing, and then Tether's affiliate, the crypto-assets exchange Bitfinex, used these "unbacked"

---

[1] "Bitfinex" or the "Bitfinex Defendants" refer to iFinex Inc., BFXNA Inc., and BFXWW Inc.

[2] "Tether" or the "Tether Defendants" refer to Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited.

[3] (Compl. ¶ 186.) Despite the correction, bitcoin prices maintained significant value by the end of 2018. The price of bitcoin in December 2018 ($3,500.00)—at the end of the alleged scheme—was still nearly three times higher than in March 2017 ($1,200). (*Id*. ¶¶ 93-96.)

tethers to buy cryptocommodities when prices were falling, to falsely signal genuine market demand for these cryptocommodities. Plaintiffs allege that Defendants later sold their newly purchased cryptocommodity for cash, thereby "backfilling" the reserves that were supposed to be held against outstanding tethers (yet somehow this did not undo the inflationary effect of the initial purchases).

Plaintiffs are five buyers of "cryptocommodities" (a subset of cryptocurrencies that Plaintiffs define as those that are "decentralized" and that have a controlled supply, like bitcoin) who seek to represent anyone in the United States that ever bought cryptocommodities over a five-year period and who was supposedly injured by the inflated prices. Plaintiffs bring a wide range of claims, but fail to adequately allege any of them.

*First*, Plaintiffs' antitrust claims should be dismissed because there is no allegation of harm to competition. Whatever may be said about the allegedly underlying scheme, it has nothing to do with preventing market entrants, entrenching a monopolist, or otherwise reducing competition. Separately, Plaintiffs' claims for monopolization cannot proceed absent allegations that Defendants have monopoly power in the cryptocommodities market—that is, that Defendants have such a dominant market position that they can raise prices and restrict output. Nothing like that is alleged (nor would it be plausible). Simply put, alleging that a deceptive scheme can *impact* prices does not mean that the wrongdoer is a monopolist, or that the claim fits within the antitrust laws.

*Second*, Plaintiffs' market manipulation claims under the Commodity Exchange Act ("CEA") should be dismissed because Plaintiffs fail to plead actual damages. Plaintiffs allege that Defendants' "carefully timed" transactions with "unbacked" tethers created artificially high prices, but fail to allege whether their own purchases were made anywhere near those times. The CEA covers only commodity *futures*. The one Plaintiff who purchased futures is not alleged to have

done so in a manner that connects to the alleged price inflation (as opposed to, for example, the downward price pressure created by Defendants' offsetting sales). This is part of a larger problem whereby the Plaintiffs fail to allege market manipulation with the particularity required by Federal Rule of Civil Procedure ("Rule") 9(b).

For example, while Plaintiffs rely heavily on an academic paper—which, it should be emphasized, has been revised to concede that the allegedly suspicious trading patterns could very well be attributed to a market "player" and not to any wrongdoing by Bitfinex or Tether[4]—they do not tie any of the paper's analysis to their specific purchases, or to what was happening in the cryptocommodities market at those times. They essentially point to the boom-and-bust of the volatile cryptocommodities market and seek to hold Defendants responsible for every penny of supposedly "inflated" values.

*Third*, Plaintiffs' RICO claim fails to meet the stringent "proximate cause" requirements unique to RICO. A RICO plaintiff must allege a "direct" injury that is the "first step" in the causal chain triggered by the wrongdoing—that is, without independent factors that could disrupt the cause-and-effect relationship. This requirement is necessary so that the stiff remedies of RICO are available only in narrow circumstances, with immediate and clear causation. Here, Plaintiffs do not allege any direct transactions with Defendants, but instead allege that, via an untold number of independent trading decisions by an untold number of market participants, the decision to issue "unbacked" tethers at one point in time caused Plaintiffs to overpay for cryptocommodities somewhere else, and some point in time later, in the markets. That Plaintiffs seek to hold Defendants responsible for what they call the "largest asset bubble in history" only confirms that

---

[4] John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (Oct. 28, 2019) (the "Revised Griffin Article"), at page 7 (*see* Compl. ¶ 293).

they are relying on exactly the sort of remote, speculative theories of causation that cannot suffice for purposes of RICO.

Beyond the causation problem, Plaintiffs' central fraud allegation—that the Defendants issued "unbacked" tether—has not been plausibly pleaded. The Plaintiffs do not plead they have direct knowledge of tether's backing, but rather, make unfounded allegations which cannot sustain their unreasonable inferences. Moreover, Plaintiffs have failed to sufficiently allege two "predicate acts" of racketeering activity, as the predicate acts upon which they rely are either ill-pled or are legally defective for various reasons.

*Finally*, while the Court should not exercise supplemental jurisdiction over the remaining claims under state law, those claims, too, are not adequately pleaded. Common law fraud requires (among other things) allegations that Plaintiffs relied upon the allegedly fraudulent statements, as opposed to the impersonal "fraud-on-the-market" type reliance that is sometimes allowed in the context of federal securities fraud claims. Plaintiffs here do not allege their purchases were made in reliance on anything Defendants said or did. Similar reasons require dismissal of Plaintiffs' last state law claim for consumer fraud under General Business Law ("GBL") § 349. And in all events GBL § 349 covers only consumer goods, not cryptocommodities.[5]

The Court should therefore dismiss the Complaint with prejudice.[6]

---

[5] Notably, Plaintiffs make no substantive allegations against Defendant DigFinex Inc. ("DigFinex"), requiring its dismissal from this case. Similarly, Plaintiffs offer only a handful of allegations against Ludovicus Jan van der Velde and Giancarlo Devasini (the "Individual Defendants"), which lack sufficient facts to sustain any of Plaintiffs' claims against them.

[6] To aid the Court, annexed as Appendix A is a chart listing Plaintiffs' causes of action and the Defendants named in each cause of action.

## THE ALLEGATIONS OF THE COMPLAINT

### A.  Tether and Bitfinex

Tether issues a digital token called "tether," which is a type of "stablecoin." (Compl. ¶¶ 5, 112.) Unlike cryptocommodities, stablecoins are intended to maintain a stable price because they are issued in exchange for, and "backed" by, the traditional (or "fiat") currency in which they are denominated. (*Id*. ¶ 113.) For example, U.S. dollar tethers, or "USDT," are issued when purchased for U.S. dollars, and Tether maintains an equivalent amount of reserves that keep the value of USDT stable. (*Id*. ¶ 116.) Traders generally use stablecoins as a convenient means to buy and sell other virtual currencies because stablecoins are equivalent to fiat currency but are "formatted to work on the Blockchain" (*i.e*., outside the traditional, less efficient banking system). (*Id*. ¶ 126.)

Bitfinex is one of the world's largest virtual currency exchanges, and is a corporate affiliate of Tether. (*Id.* ¶¶ 139, 459.)

### B.  The Alleged Market Manipulation

Plaintiffs are five individuals who allegedly made varying purchases of cryptocommodities between January 6, 2016 and June 3, 2020, but Plaintiffs provide no details about sales or out of pocket losses. (*Id.* ¶¶ 18-22.) Plaintiffs allege that, "from February 17, 2015 to the present," Defendants engaged in a "sophisticated scheme to artificially inflate the price of cryptocommodities by purchasing bitcoin and other cryptocommodities with USDT that was not fully backed by U.S. dollars when the price of bitcoin was falling, creating the illusion of increased demand for cryptocommodities, and thus driving up cryptocommodity prices." (*Id*. ¶¶ 17, 187.)

The alleged scheme worked as follows: Tether allegedly "printed" unbacked USDT, which it transferred to Bitfinex. (*Id.* ¶¶ 191, 196, 216.) No customer made corresponding dollar deposits to support the issuance and circulation of this USDT. Instead, Bitfinex simply transferred the USDT to addresses on two other exchanges, Bittrex and Poloniex (the "1AA6" and "1J1d"

addresses, which Plaintiffs allege were owned by Bitfinex). Bitfinex then allegedly purchased an equivalent amount of bitcoin (*e.g.* 100,000 USDT would be used to purchase $100,000 worth of bitcoin). (*Id.* ¶¶ 214-16.) Plaintiffs claim Bitfinex made "massive, carefully timed purchases" with *unbacked* USDT to falsely "signal to the market that there was enormous demand" for cryptocommodities (including bitcoin), drawing in investors, whose own trading activity would cause prices to spike. (*Id.* ¶¶ 3, 11.)

Meanwhile, Bitfinex transferred the purchased bitcoin from Bittrex and Poloniex to itself and thereafter sold it, thereby providing the reserves for the formerly "unbacked" USDT now circulating in the market. Magically, however, while selling such bitcoin on the Bitfinex exchange purportedly created "downward pressure" on bitcoin price, it did not fully unwind the price increases from previously purchasing the same bitcoin on Bittrex and Poloniex. (*Id.* ¶¶ 215-16.)

Plaintiffs allege that Tether issued between $1 and $3 billion in unbacked USDT over the five-year scheme, and that somehow this unbacked USDT was responsible for inflating worldwide virtual currency market capitalization to $795 billion—over *250 times* the allegedly unbacked USDT—before the bubble burst, and values dropped to $329 billion. (*Id.* ¶¶ 98, 186, 208, 217.)

## ARGUMENT

### I.   PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED

#### A.   Plaintiffs Lack Antitrust Standing Because They Allege No Injury to Competition (Counts 1-4)

The antitrust laws do not "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (internal quotation marks and citation omitted). Instead, the antitrust laws provide a remedy only for injuries flowing "from a competition-*reducing* aspect or

effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).

That essential element is missing here. While Plaintiffs allege that Tether "possesses a near-perfect monopoly on the stablecoin market" (Compl. ¶ 135), this is not a case about Tether exploiting that position, for example, to exclude others from entering the stablecoin business or to somehow charge supra-competitive prices for stablecoins. Rather, Plaintiffs allege Defendants manipulated the cryptocommodities market through deceptive conduct (misrepresentations concerning USDT reserves), which caused other market participants to bid up cryptocommodity prices. (*Id*. ¶ 393.) This has nothing to do with reduced competition.

Plaintiffs' allegation that market prices were "artificially inflate[d]" (*id*.) does not suffice. The Supreme Court has rejected the view that all misconduct that "distorts the markets" results in antitrust injury. *Atlantic*, 495 U.S. at 339 n.8. Thus, if a plaintiff merely alleges "that prices were distorted" but "does not allege that this was a result of a reduction in competition," there is no antitrust claim. *Laydon v. Mizuho Bank, Ltd*., No. 12 Civ. 3419, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014).

For example, in *Elliott Industries Ltd. Partnership v. BP America Production Co*., 407 F.3d 1091 (10th Cir. 2005), the plaintiff, on behalf of a putative class of owners of royalty interests in certain oil and gas wells, alleged that the two oil companies operating the wells conspired to charge an "exorbitant," undisclosed "processing fee" in order to "drive down the amount the class receive[d]" in royalties. *Id*. at 1123. The Tenth Circuit dismissed the antitrust claims because "[e]ven assuming [the] conduct is anticompetitive," secretly imposing an "illegitimate post-production cost" was not "competition-reducing … behavior." *Id*. at 1125.

7

So too here. Whatever may be said of the alleged misconduct, it is not in any sense competition-reducing. Therefore, all the Plaintiffs' antitrust claims must be dismissed.

### B.   Plaintiffs' Section 2 Monopolization Claim Should Be Dismissed (Count 1)

To state a claim for monopolization under Section 2 of the Sherman Act, Plaintiffs must plausibly allege facts showing (1) "the possession of monopoly power in the relevant market"; and (2) "anticompetitive conduct," *i.e.*, "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted). Plaintiffs fail to allege sufficient facts on either element.

### 1.   Plaintiffs Fail to Plausibly Allege the Defendants Have Monopoly Power in the Cryptocommodities Market

"Market power is the ability to raise price profitably by restricting output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (emphasis omitted). Without "the ability to raise unilaterally prices and profitably maintain those prices above competitive levels and/or restrict output in the market," when a defendant "implements an anticompetitive restraint" consumers will simply "switch to a competitor's product." *State of N.Y. by Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 871 (E.D.N.Y. 1993).

Here, Plaintiffs allege that Defendants "have market power in the cryptocommodities market because they can control prices of cryptocommodities." (Compl. ¶ 393.) But this confuses Defendants' alleged ability to engage in deceptive conduct that will *impact* how others bid prices in the cryptocommodities market with the type of power a monopolist would have—namely, the power to "restrict output" and thereby raise prices "unilaterally." *KMB Warehouse Distributors, Inc. v. Walker Manufacturing Co.*, 61 F.3d 123, 129 (2d Cir. 1995). There is no hint in the Complaint that Tether, "by restricting its own output … can restrict marketwide output and, hence,

increase marketwide prices." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).[7]

For example, in *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1194 (D. Kan. 1999), one health care system sued another for hiring away 13 physicians in the wake of a failed joint venture negotiations. The court rejected the antitrust claims for lack of market power (among other reasons). Even though there was evidence that "defendants have some ability to influence prices in the relevant markets," that was insufficient because, in "a competitive environment, almost every participant will have some ability to influence prices." *Id*. at 1194. Market power exists "only where the defendant possesses the ability to *control* prices." *Id*. (emphasis added); *see Eastman Kodak v. Image Technical Serv.*, 504 U.S. 451, 481 (1992) (market power is the power to "control prices or exclude competition") (citation omitted); *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1128 (C.D. Cal. 2008) (defendant accused of improperly "exact[ing] royalties" to "driv[e] up the costs of contact lens manufacturers" did not have "market power" because defendant did not have a dominant position or even participate in relevant market).

Here, there are no plausible factual allegations to suggest that Defendants have such a dominant market share of cryptocommodities that they can dictate prices in a market that Plaintiffs allege is worth hundreds of *billions* of dollars and involves "many hundred" different tokens.

---

[7] Plaintiffs' confusion perhaps stems from the fact that the case law will sometimes state that market power means "the power to control prices or exclude competition." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (citation omitted). But "the meaning—though not the literal wording—" of this "standard formulation" is not that any alleged "control" over prices equates to market power. 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501 (4th ed. 2020). It is that a defendant has market power when it "(1) can profitably set prices well above its costs and (2) enjoys some protection against rival's entry or expansion that would erode such supracompetitive prices and profits." *Id*. This "[m]ore precise[]" expression of the standard, *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), has been specifically endorsed and quoted by the Second Circuit. *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 2007) (quoting Areeda & Hovenkamp treatise).

(Compl. ¶¶ 47 n.37, 64.) Rather, according to Plaintiffs, whatever "power" the Defendants had over prices arose from the allegedly manipulative scheme—misrepresenting to the market that all USDT in circulation are fully backed by reserves. Plaintiffs allege that Defendants "accomplished this price control by targeting large new issuances of unbacked USDT to times when the cryptocommodity prices were falling, _signaling to the market_ that there was a large market demand _causing an increase_ in cryptocommodity prices." (_Id._ ¶ 393 (emphasis added).) Indeed, Plaintiffs accuse Defendants of drawing in _other_ market participants whose bids, in turn, impacted market price. This is not the same as Defendants having the power of a monopolist to abuse a dominant market share and _unilaterally_ raise prices or restrict the supply of cryptocommodities.

On this independent basis, Plaintiffs' monopolization claims must be dismissed.

### 2.    Plaintiffs Fail to Allege Anticompetitive Conduct

Plaintiffs' Section 2 monopolization claim must also be dismissed because Plaintiffs have failed to plausibly allege that Defendants engaged in anticompetitive or otherwise exclusionary conduct. Anticompetitive conduct is "conduct without a legitimate business purpose that makes sense only because it eliminates competition." _In re Adderall_, 754 F.3d at 133 (internal quotation marks and citation omitted). Plaintiffs offer no such allegations here. They allege only that Tether and Bitfinex, through a market manipulation scheme, caused cryptocommodity prices to rise. They do _not_ allege that Tether and Bitfinex sought to, or did in fact, exclude any other participant entering the cryptocommodities market (whether as buyer, seller, or issuer), or controlled bitcoin or other cryptocommodity supply in a way that excluded competitors from participating.

### C.    Plaintiffs Fail to Allege Attempted Monopolization of the Cryptocommodities Markets (Count 2)

Plaintiffs allege that "[t]o the extent [Defendants] did not or do not possess actual monopoly power," they should alternatively be liable for _attempted_ monopolization. (Compl.

¶ 402.) Attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

As discussed in Section I.B.2, above, Plaintiffs do not plausibly allege facts supporting the first element, that Defendants engaged in anticompetitive or otherwise exclusionary conduct.

Plaintiffs also fail to plausibly allege facts supporting the other two elements.

With respect to the "specific intent to monopolize" element, Plaintiffs fail to allege facts to suggest that the alleged manipulative scheme, even if true, has anything to do with gaining monopoly power. At best, the allegations indicate an intent to profit from releasing unbacked USDT into the market and then "backfilling" their reserves. This conduct would not contemplate or require monopolizing either the bitcoin market specifically or cryptocommodities generally.

Plaintiffs also fail to allege a "dangerous probability [of] . . . a monopoly." A necessary, "threshold showing" for this element is that the defendant has a sufficient market share in the first place, so that the alleged attempt has a "dangerous probability of success." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990). The Second Circuit has "held that a 33 percent market share does not approach" the required showing. *AD/SAT*, 181 F.3d at 229.

Here, Plaintiffs simply make the conclusory allegation that Defendants "had or have a dangerous probability of success in maintaining monopoly power over the cryptocommodity market." (Compl. ¶ 402.) They do not allege that Bitfinex or Tether held any particular share of the global cryptocommodities market. While Bitfinex is alleged to have used "between 1 and 3 billion unbacked USDT" (*id.* ¶ 217) to purchase bitcoin on Bittrex and Poloniex, these purported purchases appear to have been made over a long period of time. And, in any event, Plaintiffs allege Defendants did not maintain their holdings of bitcoin, but rather transferred them back to Bitfinex

to sell for U.S. dollars. (*Id.* ¶¶ 216, 270.) Thus, whatever share of the relevant market Defendants may have possessed at any one time was both minimal and transient, and flatly insufficient to find a dangerous probability of obtaining a monopoly.[8]

### D.    Plaintiffs Fail to Plausibly Allege a Conspiracy to Monopolize (Count 3)

A conspiracy claim under Section 2 must allege "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 246 (2d Cir.1997) (internal quotations omitted).

Here, for the same reasons as shown in Section I.C, above, Plaintiffs fail to plausibly allege a specific intent to monopolize.

This claim must also be dismissed because Plaintiffs fail to plausibly allege a conspiracy among Defendants. In the antitrust context, "[a] plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). A plaintiff may meet its burden either by (1) alleging "direct evidence that the defendants entered into an agreement in violation of the antitrust laws," such as "a recorded phone call in which two competitors agreed to fix prices at a certain level," or (2) by alleging "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and

---

[8] While Plaintiffs allege that Defendants "possesses a near-perfect monopoly on the stablecoin market" (Compl. ¶ 135), that is *not* the market that Plaintiffs allege is at risk of monopolization. The Complaint is clear that the alleged attempt is to gain "monopoly power over the cryptocommodity market." (*Id.* ¶ 402.) In fact, stablecoins like tethers do not meet Plaintiffs' own definition of cryptocommodities: crypto-assets that "have a controlled supply that cannot be unilaterally increased, and are decentralized." (*Id.* ¶ 64.) Stablecoins are centralized, and their issuers can unilaterally increase supply. Plaintiffs concede that "stablecoins are not mined and *are not cryptocommodities*." (*Id.* ¶ 114 (emphasis added).) Thus, any alleged stablecoin monopoly is irrelevant here.

plus factors." *Id.* at 136*.* (citations omitted). Plus factors may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (citations omitted)

Here, Plaintiffs do not allege direct evidence of an actual agreement between or among Defendants to monopolize the cryptocommodities market. To the extent Plaintiffs rely upon indirect evidence, they fail to allege the kind of circumstantial evidence or plus factors from which the Court could infer an actual agreement to monopolize. For instance, Plaintiffs' allegations concerning Poloniex and Bittrex amount to nothing more than describing two exchanges operating out of their own economic self-interest. Indeed, Plaintiffs acknowledge that "Poloniex [and Bittrex] benefited by allowing USDT trading. By listing USDT, it provided customers a . . . dollar-based asset to trade on its platform . . . . As a result of its early listing and promotion of USDT, Poloniex quickly became one of the largest crypto-exchanges …." (Compl. ¶ 168.)

Plaintiffs' allegations that Crypto Capital or Fowler were involved in a conspiracy to monopolize the cryptocommodities market makes even less sense. Neither one is alleged to have operated in the market. Neither operates an exchange or is engaged in the purchase or sale of cryptocommodities. Bitfinex may have relied upon Crypto Capital to act as a payment processor. But that arrangement does not therefore mean Defendants and Crypto Capital (or Fowler) conspired to monopolize the cryptocommodities market.

Finally, Plaintiffs allege no facts concerning DigFinex's or the Individual Defendants' purported involvement in a conspiracy. Generally, Plaintiffs fail to allege facts that, even if taken as true, establish that the Defendants engaged in concerted, overt acts with the specific intent to achieve an unlawful monopoly. Other than threadbare allegations that Defendants were part of a

"conspiracy," there are no facts that describe the conspiratorial conduct or explain how the purported conspiracy sought to create an unlawful monopoly in a relevant market.

### E. Plaintiffs Fail to Plausibly Allege an Agreement in Restraint of Trade Under Sherman Act, Sections 1 and 3 (Count 4)

Section 1 of the Sherman Act prohibits restraints on trade "effected by a contract, combination, or conspiracy," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (citations omitted), and Section 3 "merely extends the reach of Section 1 to trade or commerce involving U.S. Territories and the District of Columbia." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 107 n.10 (S.D.N.Y. 2015). Here, Plaintiffs have failed to plead the elements of a Section 1 or 3 claim for the same reasons as discussed above. *First*, Plaintiffs have alleged no unlawful agreement, for the same reasons set forth in Section I.D, above. *Second*, the Complaint fails to plead facts to support a conclusion that Defendants' conduct restrained trade in the cryptocommodities market or caused harm to competition in that market, for the reasons set forth in Section I.B.

## II. PLAINTIFFS' CEA CLAIMS SHOULD BE DISMISSED (COUNTS 5-7)

Plaintiffs limit their CEA claims for "market manipulation" (Count 5), and for "principal agent" and "aiding and abetting" liability (Counts 6 and 7), to the "Cryptocommodity Futures Subclass," defined as "All persons or entities that purchased or otherwise acquired Cryptocommodity Futures in the United States or its territories at any time from February 17, 2015, through the present and were injured thereby." (Compl. ¶ 377).[9]

---

[9] Plaintiffs do so because "[i]t is nevertheless well-settled that the CEA *only provides a private cause of action to investors that traded in futures contracts* at artificial prices," and that "[p]urchasers who transacted in 'spot markets' for traditional commodities generally do not have claims under the CEA." Dkt. 78 at 3; *see also id.* at 9 n.5 (citing cases).

The Complaint only identifies one Plaintiff who transacted in cryptocommodities futures—Pinchas Goldstein, who purports to represent the "Cryptocommodities Futures Subclass." (Compl. ¶¶ 22, 377.) Yet, Plaintiffs' allegations concerning Goldstein state only:

> During the Class Period, he purchased cryptocommodity futures, the prices of which had been artificially inflated by Defendants' market manipulation and as a result suffered economic losses and actual damages. For example, between January 16, 2018 and June 3, 2020, Pinchas Goldstein purchased 629 bitcoin futures positions.

(*Id*. ¶ 22.) These conclusory allegations, bereft of the specific factual information about dates, prices, quantities, and damages, are wholly insufficient. Accordingly, Plaintiffs' claims under the CEA should be dismissed for multiple, independent reasons, discussed below.[10]

### A.  Plaintiffs Lack Standing to Bring Claims Under the CEA

CEA § 22(a) confers standing only on a plaintiff who "has suffered 'actual damages' as a result of defendant's manipulation." *In re LIBOR-Based Financial Instruments Antitrust Litig*., 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) (quoting 7 U.S.C. § 25(a)(1)). For these purposes, when the claim is "based on discrete, episodic instances of manipulation"—as opposed to "persistent" manipulation throughout the relevant period—a plaintiff must allege "transaction[s] at a time during which prices were artificial as a result of defendants' alleged . . . manipulative conduct, and that the artificiality was adverse" to the plaintiff's position. *In re Platinum & Palladium Antitrust Litig*., No. 1:14 Civ. 9391, 2017 WL 1169626, at *28 (S.D.N.Y. Mar. 28, 2017) (citations and quotations omitted)

---

[10] Bitcoin futures trading commenced on December 18, 2017. *See, e.g.*, CME Group, *CME Group Self-Certifies Bitcoin Futures to Launch Dec. 18*, CISION PR NEWSWIRE (Dec. 01, 2017, 07:00 ET) https://www.prnewswire.com/news-releases/cme-group-self-certifies-bitcoin-futures-to-launch-dec-18-300564891.html. Economic experts have identified that event as having caused the bitcoin bubble to burst. *See, e.g.*, Galina Hale, Arvind Krishnamurthy, Marianna Kudlyak, and Patrick Shultz, *How Futures Trading Changed Bitcoin Prices*, FRBSF ECONOMIC LETTER 2018-12 (May 7, 2018), https://www.frbsf.org/economic-research/files/el2018-12.pdf.

Here, Plaintiffs allege only episodic (not persistent) manipulation. They accuse the Defendants of making "massive, *carefully timed*" cryptocommodity purchases with unbacked tethers over a five-year period that caused bitcoin and other cryptocommodity prices to "spike." (Compl. ¶ 3, 10 (emphasis added).) According to the Complaint, in order to hide evidence of the scheme in certain "end-of-month reports," Defendants had to sell bitcoin, placing "downward pressure" on the same prices that the scheme had supposedly inflated. (*Id*. ¶ 216.) Thus, whether and to what extent a particular plaintiff was injured will depend on *when* each Plaintiff made purchases *in relation to* the "carefully timed," allegedly fraudulent transactions.

Yet this critical level of detail is missing from the Complaint. Plaintiffs allege they made various purchases of bitcoin and other cryptocommodities on various dates from 2016 to 2020 (*id.* ¶¶ 18-22), but make no effort to tie those purchases to the alleged, "carefully timed" manipulative conduct. For example, while Plaintiffs allege that "in the hours following the transfer of USDT from Bitfinex to Bittrex and Poloniex, the price of bitcoin increased appreciably," Plaintiffs nowhere allege that they purchased bitcoin (or any other cryptocommodity) during these hours, or whether they ever sold any positions at a loss. (*Id*. ¶ 273.) In response to a pre-motion letter, Plaintiffs argued that they have sufficiently alleged damages insofar as they "have alleged they transacted in markets manipulated by the conspiracy," citing in support *In re Term Commodities Cotton Futures Litigation*, 371 F. Supp. 3d 95 (S.D.N.Y. 2019). (ECF 138.) But that case cuts *against* standing because the plaintiff there "specifically allege[d] losses of approximately $289,520 on the July 2011 Contract indicating the detrimental impact of the market manipulation." 371 F. Supp. 3d at 100. That level of specificity is exactly what is missing here, particularly as to the lone futures investor, Goldshtein. Plaintiffs fail to identify what money they lost by what trades, or how those trades are particularly connected to the manipulation. For these reasons, Plaintiffs

lack standing. *See Harry v. Total Gas & Power North America, Inc.*, 244 F. Supp. 3d 402, 415-16 (S.D.N.Y. 2017); *see also Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 240 (S.D.N.Y. 2019) (dismissing where plaintiffs provided "no accounting of actual losses suffered or analyses of potential damages based on assessments of orders actually placed").[11]

### B.     Plaintiffs Fail to State a Claim of Market Manipulation Under the CEA

Even if Plaintiffs were able to allege standing under Section 22 of the CEA—which they cannot—a "complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)'s requirement" of particularity, *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008), which Plaintiffs have failed to do.

### 1.     Plaintiffs Fail to Allege a Section 6(c)(1) Market Manipulation Claim with Particularity (Count 5)

To state a Section 6(c)(1) CEA claim for market manipulation, Plaintiffs must allege facts with particularity showing that (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial price; and (4) Defendants specifically intended to cause the artificial price. *See Total Gas*, 244 F. Supp. 3d at 412. The Complaint provides none of this requisite specificity.

Instead, the Complaint broadly claims that *from October 6, 2014 to the present*, Defendants manipulated the market for cryptocommodities by "communicating false information about USDT being fully backed by U.S. dollars, using this debased USDT to purchase cryptocommodities and sustain false price floors, and otherwise misrepresenting the demand for cryptocommodities by issuing unbacked USDT and using it to execute manipulative trades." (Compl. ¶ 437.) The

---

[11] Plaintiffs cannot claim discovery will remedy any alleged inability to identify manipulative trades that allegedly harmed them. The dates of USDT issuances are matters of public record. (Compl. ¶ 272.) So are the dates and times of USDT transfers from Bitfinex to the 1J1d and 1AA6 wallets, which are visible on public blockchains.

Complaint is replete with charts, graphs, and generalized allegations about what "expert analysis" supposedly reveals, but no actual details about specific dates, specific trade prices or amounts, alleged price floors, or price movements constituting the alleged manipulation. An alleged manipulative scheme described in such a "wholly … conclusory manner," fails to satisfy Rule 9(b) and should be dismissed. *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007).

Beyond this basic pleading failure, Plaintiffs fail to make out the requisite elements, particularly as to Goldshtein, the sole Plaintiff who engaged in futures transactions.

### (a)   Plaintiffs Have Not Alleged A Specific Intent to Manipulate the Price of Cryptocommodities

To allege price manipulation under the CEA, Plaintiffs must allege that each Defendant *specifically* intended to influence the price of cryptocommodities through Tether's manipulative acts. Moreover, Rule 9(b)'s heightened pleading standard requires a plaintiff to allege facts that "give rise to a *strong inference* of scienter." *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (emphasis in original) (internal quotation marks omitted).

That inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). This requires pleading facts showing that a defendant "acted with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 552 (S.D.N.Y. 2018).

Here, Plaintiffs fail to allege any specific facts demonstrating Defendants' *intent* to manipulate the cryptocommodities market. Plaintiffs do not, for instance, reference "specific communications between the Defendants about any specific plan to cause artificial prices or an

artificial price trend in the [cryptocommodities] market." *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD 2213, 2012 WL 6700236, at \*11 (S.D.N.Y. Dec. 21, 2012).

Instead, to meet their high burden, Plaintiffs ask the Court to infer scienter on the basis of Bitfinex's alleged purchases of bitcoin on the Bittrex and Poloniex exchanges with unbacked USDT and subsequent sales of those bitcoin on the Bitfinex exchange for U.S. dollars. Even if true—and they are not—those facts would not support a plausible inference of an intent to manipulate, because they are more susceptible to the alternative explanation that such conduct was simply intended to increase the amount of USDT in circulation, without any intent to manipulate bitcoin or any other cryptocommodity prices.

### (b)   Plaintiffs Have Not Plausibly Alleged the Existence of an Artificial Price

Plaintiffs fail to plead that an artificial price existed in the cryptocommodities market. An artificial price is a price that "does not reflect basic forces of supply and demand." *CFTC v. Wilson*, No. 13 Civ. 7884, 2018 WL 6322024, at \*13 (S.D.N.Y. Nov. 30, 2018); *see In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998). "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *Silver Futures*, 2012 WL 6700236, at \*12.

Here, Plaintiffs allege that Defendants "misrepresent[ed] the demand for cryptocommodities by issuing unbacked USDT and using it to execute manipulative trades. These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocommodity market." (Compl. ¶ 437.) Despite this word salad of conclusory accusations, Plaintiffs fail to articulate any theory as to why bitcoin (or other

cryptocommodity) prices did not rise as a result of the basic forces of supply and demand rather than the minuscule fraction of the total market that Defendants' alleged purchases represent.

As Judge Sullivan recognized in *CFTC v. Wilson*, an intent to bid, with an understanding that such bids would affect settlement prices, cannot serve as the basis for an artificial price. 2018 WL 6322024, at *14-15. Here, Bitfinex's alleged bitcoin purchases were a tiny fraction of the trade volume. Between March 1, 2017 and December 31, 2017, according to a data source cited repeatedly in the Complaint (*see* Compl. ¶¶ 93 n.53, 137 n.78, 244 n.144), total trading volume for bitcoin exceeded over $860 *billion*.[12] During the same period, Tether issued roughly $1.2 billion of "new" USDT. (*Id*. ¶¶ 242, 244.) Thus, these USDT issuances, at most, represent less than 1/7 of 1% of the total bitcoin trade volume.

The Complaint itself admits that bitcoin trading on Bittrex and Poloniex represents a minuscule portion of the market. (*Id*. ¶ 335 ("Currently, Binance has a 24-hour trading volume of $1.9 billion, compared to $38 and $49 million for Bittrex and Poloniex").) Thus, Bitfinex's alleged trades on Bittrex and Poloniex represent a tiny fraction of the total bitcoin trades occurring on any given day, the overwhelming majority occurring on other exchanges.

Plaintiffs' theory—that carefully timed purchases signaled price support—cannot in itself account for why prices did not simply stabilize, but "*skyrocket[ed]*" (*id*. ¶ 12), much less how Bitfinex's supposed minuscule purchases relative to the overall trade volume could possibly distort true price discovery. That failure is particularly notable for the lone futures purchaser, Goldshtein,

---

[12] *Historical    data    for    Bitcoin*, COINMARKETCAP, https://coinmarketcap.com/currencies/bitcoin/historical-data/?start=20170301&end=20171230. The Court may take judicial notice of publicly-reported price and volume trading data. *See Loveman v. Lauder*, 484 F. Supp. 2d 259, 268 (S.D.N.Y. 2007); *Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*, No. 02 Civ. 7313, 2004 WL 634171, at *11 (S.D.N.Y. Mar. 30, 2004), *aff'd in part, vacated in part on other grounds*, 169 F. App'x 655 (2d Cir. 2006).

who entered the market in 2018 after the downturn and at a time when, despite new USDT issuances, bitcoin prices continued *falling*. (*Id*. ¶ 96.)

> ### (c)   Plaintiffs Have Not Plausibly Alleged That Defendants Had an Ability to Create an Artificial Price, Let Alone Caused the Artificial Price

For the same reasons, Plaintiffs fail to allege facts that support a finding that Defendants had an ability to manipulate bitcoin or other cryptocommodity prices and that Defendants' purported manipulation was the proximate cause of artificial prices.

As discussed in Section II.B.1(b) above, Plaintiffs do not plausibly explain how Defendants could manipulate the bitcoin market through their alleged purchases with USDT. To the contrary, Plaintiffs' own allegations, and publicly available data regarding trade volume, refute the notion that Bitfinex's unilateral conduct could have any sustained price impact on bitcoin or other commodities. Further, as discussed above, Plaintiffs fail to provide factual allegations demonstrating that Bitfinex had any such ability as concerns the lone futures investor, Goldshtein, whose conclusorily alleged purchases appear to have occurred in a *falling* market.

> ## 2.   Plaintiffs Fail to Allege a Rule 180.1(a) Market Manipulation Claim (Count 5)

In addition to direct claims under the CEA, Plaintiffs also assert market manipulation claims under CFTC Rule 180.1. To state a cause of action under Rule 180.1(a), a plaintiff must allege that the defendants "engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); with scienter; and in connection with a contract of sale of a commodity in interstate commerce." *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y 2018). Where a plaintiff's claim is based upon a material misrepresentation, the plaintiff must also

separately allege (1) reliance and (2) loss causation. *See In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 673 (S.D.N.Y. 2016).

As a threshold matter, Plaintiffs' Rule 180.1(a) claim fails for the same reasons as their Section 6(c)(1) claim, *i.e.*: (1) lack of standing; (2) failure to allege scienter; and (3) failure to allege the elements of manipulation, particularly as to the sole futures investor, Goldshtein. In addition, because Plaintiffs' claims hinge on Tether's and Bitfinex's supposed *misrepresentations* that USDT was issued without dollar deposits, they should also be dismissed for failing to allege facts showing either reliance or loss causation.

As to reliance, Plaintiffs do not claim they were even exposed to, much less made any investment decisions based upon, Defendants' alleged misrepresentations.[13] Nowhere do Plaintiffs allege a single purchase of USDT or exchange of USDT for any bitcoin or other cryptocommodity on the basis of any representation by Defendants concerning USDT.

As to loss causation, to the extent Plaintiffs allege that Defendants' conduct caused sustained price increases, an "artificially inflated purchase price" will "not itself constitute or proximately cause the relevant economic loss" for such purposes. *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 717 (S.D.N.Y. 2013)*, vacated on other grounds, Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016) (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342-47 (2005)). Plaintiffs must allege a loss caused by Defendants' alleged misrepresentations, rather than "changed economic circumstances, changed investor

---

[13] Plaintiffs similarly fail to allege that any misrepresentations by Defendants were *material* either to them or the putative class. "A misleading statement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *CFTC v. Int'l Financial Services (New York), Inc.*, 323 F. Supp. 2d 482, 500 (S.D.N.Y. 2004) (internal quotation marks and citation omitted); *McDonnell*, 332 F. Supp. at 641.

expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account" for the supposed losses. *Dura*, 544 U.S. at 342-46.

### C.   Plaintiffs Fail to State a Claim for Vicarious Liability Under the CEA (Counts 6-7)

Plaintiffs' claims for vicarious liability fail for two reasons. *First*, these claims are foreclosed by Plaintiffs' failure to plead a primary violation for manipulation: "In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the [CEA], a plaintiff must first prove that a primary party committed a commodities violation." *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996); *see also In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011) (dismissing aiding and abetting claim as a matter of law where primary manipulation claim failed).

*Second*, even assuming Plaintiffs adequately pled primary violations, Plaintiffs' vicarious liability allegations are too vague and conclusory to survive a motion to dismiss: "[T]o state a claim for vicarious liability [under the CEA], plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal maintain[ed] control over key aspects of the undertaking." *In re Amaranth*, 587 F. Supp. 2d at 546 (internal quotation marks omitted; alteration in original). Thus, to adequately allege aiding and abetting liability, Plaintiffs must establish that "the defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *Id.* at 531.

Plaintiffs fail to distinguish principal from agent. They similarly fail to allege that any Defendant had a principal-agent relationship with any other Defendant such that the "principal manifested an intent to grant the agent authority, the agent agreed, and the principal maintain[ed] control over key aspects of the undertaking." *Id.* at 546 (alteration in original). Nor have Plaintiffs

23

alleged the remaining elements of knowledge, intent, and action in furtherance of the principal's objective. Thus, the vicarious liability claims should be dismissed.

## III.   PLAINTIFFS FAIL TO STATE A RICO CLAIM (COUNTS 8-10)

As detailed below, Plaintiffs fail to state a RICO claim because (a) they have not sufficiently pleaded proximate cause, (b) the lynchpin of their various fraud claims requires the Court to give them the benefit of unfounded and unreasonable inferences, and (c) their "predicate acts" of racketeering activity are defective for various reasons.[14]

### A.   Plaintiffs Fail to Plead Proximate Causation

Any RICO claim requires a plaintiff to allege proximate cause—*i.e.*, a "*direct relation* between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) (emphasis added). This is a demanding requirement. Merely alleging but-for causation—that "but for" the defendant's wrongful conduct, the plaintiff would not have suffered injury—is insufficient. *Id.* at 266. Rather, for RICO proximate cause purposes, the law does not go "beyond the first step" in the causal chain, so that relief is foreclosed when there are "independent factors" between the alleged wrongdoing and the alleged harm. *Id.* at 269, 271. This limitation exists because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation." *Id.* at 269.

For example, in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), a supplier of steel mill products sued its main competitor for having devised a scheme to underpay taxes and thereby unfairly "gain sales and market share." *Id.* at 454 (alteration removed). The Supreme Court found no proximate causation because the alleged losses went well beyond the "first step":

---

[14] Plaintiffs' failure to plead a substantive RICO claim "necessarily means that their conspiracy claim is inadequately pleaded and must be dismissed as well." *Weir v. Cenlar FSB*, No. 16 Civ. 8650, 2018 WL 3443173, at *8 (S.D.N.Y. July 17, 2018) (collecting cases).

> The attenuated connection between [the] injury and the . . . injurious conduct thus implicates fundamental concerns expressed in *Holmes* . . . A court considering the claim would need to begin by calculating the portion of [the defendant's] price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of [the plaintiff'] lost sales attributable to the relevant part of the price drop. *The element of proximate causation recognized in* Holmes *is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.*

*Id.* at 459-60 (emphasis added); *see also Empire Merchants, LLC v. Reliable Churchill LLLP,* 902 F.3d 132, 140 (2d Cir. 2018) (noting that the "direct relation" requirement stops at the "first step" to avoid the "administrative difficult[y]" of "determin[ing] how much the tortious conduct injured the defendant, as compared to other factors").

Similarly, in *7 West 57th Street Realty Company, LLC v. Citigroup, Inc.*, 771 F. App'x 498 (2d Cir. 2019), the court found no proximate cause when a bondholder alleged that LIBOR price fixing caused its "bond portfolio to decline in value." As the Court explained, whatever injury was alleged suffered, "the injury was directly caused by buy/sell decisions that independent market actors made," even if "LIBOR may have influenced" those decisions. *Id.* at 504.

Here, the "first step" that allegedly caused Plaintiffs' injury did not involve *Plaintiffs* at all. That first step was Bitfinex's alleged purchase of bitcoin or other cryptocommodities on Bittrex or Poloniex with "unbacked" USDT. (*See* Compl. ¶¶ 3, 10.) Those transactions, however, involve sales by *third parties*—not Plaintiffs—of cryptocommodities in exchange for allegedly unbacked USDT. Plaintiffs not only exclude themselves and the Class from such USDT transactions (*id.* ¶ 378) but expressly confine their claim to their own subsequent *purchases* of bitcoin or other cryptocommodities *after* the alleged Bitfinex transactions. (*Id.* ¶¶ 18-22, 377.) Thus, the direct victims of the alleged "first step" are the persons who sold their cryptocommodities to Bitfinex for "debased" USDT, not Plaintiffs or the class.

Plaintiffs instead allege a wholly indirect injury. Plaintiffs claim they were "injured" because these initial transactions caused bitcoin to soar across all exchanges "in the hours following the transfer of USDT from Bitfinex to Bittrex and Poloniex." (*Id.* ¶ 273.) Plaintiffs allege they "paid artificially inflated prices" for bitcoin, however, they fail to allege *when* they made their purchases in relation to Bitfinex's alleged transactions. (*Id.* ¶ 541.)

As Plaintiffs concede, those soaring bitcoin prices were the result of the independent actions of numerous other traders and market participants: "[t]his perceived demand *naturally attracted* more purchases and further raised cryptocommodity prices," (*id.* ¶ 191 (emphasis added)), and that purchase of bitcoin with "freshly minted Tether … would promote the creation of a fraudulent bullish market, which would attract more investors to buy bitcoin, contributing this way to increase the bubble" (*id.* ¶ 309). That is, the alleged price rise depended wholly on the decisions and actions of independent actors that Tether and Bitfinex did not control, and indeed with whom they did not even interact, and from whose purchases their own alleged actions are several steps removed. Furthermore, Plaintiffs' claim of causation ignores the contribution of innumerable other factors that might influence the market and investor decisions (*e.g.*, speculation; introduction of other cryptocurrencies; distrust of centralized, government-controlled money supply; initial coin offerings; increasing media attention; and bullish market reports).

In sum, Plaintiffs' RICO claim faces two separate proximate causation problems. *First*, their alleged injury occurred not at the "first step," but at an untold number of steps removed from this conduct. *Second*, an innumerable number of trades by an innumerable number of market participants, all making voluntary market decisions based upon an innumerable number of factors,

stand between Defendants' alleged conduct and Plaintiffs' alleged injury.[15] The alleged causation here is thus even more remote than what was lacking in *Citigroup* and *Anza*, discussed above. [16]

Finally, this fatal flaw is a matter of pleading, not proof. As Judge Schofield has explained, "even at the pleading stage, civil RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276-77 (S.D.N.Y. 2019). Accordingly, the RICO claims should be dismissed.[17]

---

[15] Plaintiffs' failure to plead a substantive RICO claim "necessarily means that their conspiracy claim," Count 10, "is inadequately pleaded and must be dismissed as well." *See Weir*, 2018 WL 3443173, at *8 (citations omitted).

[16] *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), one of the few reported proximate causation decisions where a RICO claim was successfully based upon false statements made to a third party, illustrates what is lacking here. In *Bridge*, the defendants' false representations about their bidding caused the local government to award them bids that, under the bidding system, might have been awarded to plaintiffs if the truth had been revealed. The court in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), explained that the causation theory was "straightforward" because of the "zero-sum nature of the auction." *Id.* at 14. No such "zero-sum" game exists here. Instead, "[m]ultiple steps"—in the form of countless market transactions, and similarly countless market forces—"separate the alleged fraud from the asserted injury." *Id.*

[17] For similar reasons, Plaintiffs' § 1962(a) (Count 9) also fails to satisfy proximate cause. Section 1962(a), in relevant part, prohibits "investing … income" that is "derived . . . from a pattern of racketeering activity" in "acquisition of any interest in, or the establishment or operation of" an enterprise. Under § 1964(c), Plaintiffs must additionally allege that their injuries were caused by reason of the alleged investment. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 82–83 (2d Cir. 1990). Plaintiffs do not identify a new "enterprise" into which the supposed racketeering income was "invested" to cause their alleged injury. Rather, as illustrated by Compl. ¶ 554 ("Defendants … continued fraudulent misrepresentations to help persuade the market that USDT was backed 1:1"), their alleged injuries "were all caused by the alleged misrepresentations" that constitute the "predicate acts of wire fraud," which "are insufficient to state a claim under §[] 1962(a)." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 544 (S.D.N.Y. 2014). Further, Plaintiffs simply fail to allege any direct injury for their § 1962(a) claim because the persons *directly* injured by Defendants' alleged purchase of bitcoin or other cryptocommodities with "debased" USDT remains the sellers, who by the Class definition are not Plaintiffs.

### B.   Plaintiffs' Core Claim—that USDT Was Unbacked—Draws From Unfounded and Unreasonable Inferences

The lynchpin of the Complaint is Plaintiffs' allegation that, from 2015 to the present, Tether persistently misrepresented that USDT was backed by matching dollar deposits. This claim expressly underlies the RICO (wire fraud), common law fraud, and GBL § 349 claims and implicitly underlies the antitrust and CEA claims. Yet Plaintiffs fail to plausibly allege, especially under heightened pleading standards for fraud claims, that Tether issued unbacked USDT.

Plaintiffs offer no direct evidence supporting their claim that Tether lacked sufficient reserves. Moreover, Plaintiffs do not and cannot quantify the extent to which Tether's reserves were allegedly deficient, as Plaintiffs' various assertions at least implicitly acknowledge that Tether had substantial dollar reserves in its various bank accounts across time. (*E.g.*, ¶ 252). Lacking any direct evidence, Plaintiffs rely primarily but mightily on unreasonable inferences from three pieces of shaky circumstantial evidence:

*First*, Plaintiffs cite the Tether's lack of access to a U.S. correspondent bank account, arguing essentially that Tether could not have reserves for USDT issued during the period because it had no bank account to take the purchaser's money. However, Plaintiffs concede that Tether and Bitfinex lacked a U.S. correspondent bank account only for 5 months—between April 1, 2017 and September 1, 2017 (*id*. ¶¶ 233-42), and, outside this period, had such an account. Further, they concede that, during the 5-month period in question, customers could deposit funds for USDT purchases both through other trading platforms, such as Bitfinex, and through Crypto Capital (*id*. ¶¶ 133, 247). Thus, the 5-month absence of a correspondent account cannot give rise to a reasonable inference that USDT was "unbacked"—based on this evidence, the inference is both unfounded and unreasonable.

*Second*, to demonstrate *Tether's* supposed lack of reserves sufficient to back USDT, Plaintiffs refer to a document issued by *iFinex Inc. ("iFinex")*, which they claim shows Tether or Bitfinex's lack of reserves for all issued USDT. (*Id.* ¶ 220 & n.128, citing iFinex Inc., Initial Exchange Offering of LEO Tokens (May 8, 2019), https://www.bitfinex.com/wp-2019-05.pdf.) That allegation involves two gross errors: (1) on its face, the document itself does not report iFinex's reserves or revenue, but, instead, its gross profit *(i.e.*, gross revenue less *cost of goods sold)*, which is utterly irrelevant to what "reserves" Tether and Bitfinex may have; and (2) Plaintiffs confuse an *income sheet* item (revenues or gross profit) with a *balance sheet* item (reserves or customer deposits).[18] In either event, the document cannot be misconstrued to establish an inference that Tether and Bitfinex lacked sufficient reserves.

*Third*, Plaintiffs cite Crypto Capital's implosion and refusal in 2018 to supply *Bitfinex* with funds Crypto Capital held in trust for Bitfinex. (*Id.* ¶ 248). It is true that Crypto Capital imploded and defaulted on its obligations to Bitfinex. But Crypto Capital's refusal to remit Bitfinex's funds does not mean (a) USDT was not backed by reserves when issued (the fact that Crypto Capital had the money proves the contrary), or (b) the Crypto Capital funds somehow ceased to exist when it failed to pay, as Bitfinex had and has a valid claim (which it is pursuing through litigation) to the return of these funds. Moreover, this all occurred at the Bitfinex level. Plaintiffs concede that—in

---

[18] Reserves or customer deposits (funds that are redeemable upon request) are no more "revenue" to Tether than they are to a bank. Rather, as the sources cited in the Complaint make clear, Tether's "revenues" are (1) interest income on its reserves, and (2) fees charged to customers for Tether's services. *See* Robert-Jan Den Haan, *Clearing Up Misconceptions: This is How Tether Should (and Does) Work*, BITCOIN MAGAZINE (June 14, 2018), https://bitcoinmagazine.com/articles/clearing-misconceptions-how-tether-should-and-does-work [https://perma.cc/6J2Q-2U33] (*cited in* Compl. ¶ 161 n.101) ("The only source of 'revenue' generated by Tether itself is the interest gained on the U.S. dollars held in its reserve"); *Tether: Fiat currencies on the Bitcoin blockchain*, TETHER, at 4 (June 17, 2016), https://tether.to/wp-content/uploads/2016/06/TetherWhitePaper.pdf [https://perma.cc/M2WS-58JC] ("Users can buy or sell as many tethers as they want, quickly, and with very low fees," *cited in* Compl. ¶ 127 n.66).

response to the crisis—two things happened: (a) Bitfinex made a public disclosure, and (b) Tether, which had its own banking facilities and reserves, loaned it a sizeable sum to shore up its reserves. (*Id*. ¶¶ 239, 252, 369-70.) So, the dilemma with Crypto Capital's failure to release Bitfinex's funds cannot be twisted by Plaintiffs into an unfounded and unreasonable "inference" that USDT was unbacked by reserves when it was issued.

*Finally*, while Plaintiffs rely on an academic article, the article was revised to concede that the alleged purchases propping up the markets could have been made by "one large player" in the markets. (*Id*. ¶ 299.) For the reasons above, Plaintiffs' assertion that the "player" is collectively, the Defendants, is based on unreasonable inferences.

Although Plaintiffs are entitled to all *reasonable* inferences from stated *facts*, the Court need not accept Plaintiffs' explanations where there are "alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). The inference must "rise[] to what experience indicates is an acceptable level of probability." *Fisher v. Painewebber Inc.*, No. 94 Civ. 2202, 1994 WL 512356, at *2 (S.D.N.Y. Sept. 20, 1994) (internal quotation marks and citation omitted). Here, Plaintiffs' proffered evidence gives rise to no reasonable inference that USDT was "unbacked," and thus the Court should reject the Plaintiffs' various fraud theories—including under RICO—for this reason alone.

### C.   Plaintiffs Fail to Adequately Plead Two Predicate Acts

A RICO plaintiff must allege "at least two [predicate] acts of racketeering activity" committed in a ten-year period. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 178 (2d Cir. 2004) (alteration in original) (quoting 18 U.S.C. § 1961(5)). Plaintiffs choose five such offenses: 18 U.S.C. §§ 1343 (wire fraud), 1344 (bank fraud), 1956 (money laundering), 1957 (proceeds of unlawful activity), and 1960 (operation of a money transmitter business). As shown below, Plaintiffs fail to adequately allege any of them, which is an independent basis to dismiss.

1.      **No Wire Fraud (18 U.S.C. § 1343)**

Plaintiffs have failed to plead the requisite fraudulent intent. The essential elements of wire fraud are (1) a scheme to defraud; (2) to get money or property and (3) furthered by use of interstate mail or wires. *William v. Affinion Group, LLC*, 889 F.3d 116 (2d Cir. 2018). Plaintiffs must also establish scienter, which requires facts that "give rise to a strong inference of fraudulent intent." *Satinwood, Inc.*, 385 F.3d at 179.  Fraudulent intent for purposes of wire fraud requires "that some actual harm or injury was *contemplated* by the schemer." *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir. 1994) (emphasis in original). "Because the defendant must intend to harm the fraud's victims, 'misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud. . . instead, the deceit must be coupled with a contemplated harm to the victim.'" *Id.* Here, Plaintiffs are unable to establish scienter because the actual scheme they allege did not contemplate any harm to purchasers of USDT.

That is, Plaintiffs generally allege that Defendants engaged in a scheme to use "unbacked" USDT to purchase bitcoin or other cryptocommodities, which were subsequently sold for cash, thereby establishing the reserves for the previously "unbacked" USDT now in circulation. (Compl. ¶¶ 187-89.) Plaintiffs do not allege that any purchaser of USDT actually received less in value than what Defendants represented. Nor do they allege that any USDT holder was unable to redeem the full value of their USDT with Bitfinex or Tether. Thus, the intent of the "scheme," as alleged, involved getting USDT into circulation in the markets, not defrauding purchasers of USDT.

2.      **No Bank Fraud (18 U.S.C. § 1344)**

Plaintiffs' bank fraud claims rest upon the allegation that Crypto Capital made false statements or omissions to certain U.S. banks, which allegedly exposed those banks to a "risk of loss." (*Id*. ¶¶ 496-98.) Plaintiffs allege that Bitfinex "knowingly aided and abetted" this alleged bank fraud. (*Id.* ¶ 500.) Plaintiffs fail to state a claim for three reasons.

*First*, numerous courts have held that "a RICO plaintiff who is not a financial institution under the statute lacks standing or injury to bring a RICO claim based on bank fraud." *Edmonds v. Seavey*, No. 08 Civ. 5646, 2009 WL 2949757, at *6 n.8 (S.D.N.Y. Sept. 15, 2009). The rationale for these holdings is that the bank, not third parties, is the direct victim of any such alleged fraud, thus negating proximate cause. *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004). Here, neither Crypto Capital's alleged misrepresentations or omissions to the banks, nor deposits and withdrawals of dollar deposits by Bitfinex's customers, influenced the cryptocommodity prices paid by Plaintiffs. It is therefore difficult to see how any such misrepresentations victimized them.

*Second*, Plaintiffs fail to allege facts establishing aiding and abetting, *i.e.*, (1) actual knowledge of the alleged wrong, and (2) substantially assisting its commission. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985); s*ee also, Aquino v. Trupin*, 833 F. Supp. 336, 344 (S.D.N.Y. 1993) (dismissing aiding and abetting claim where "the plaintiffs have alleged no facts which raise an inference that SBC knew of any underlying securities fraud"). Nor do Plaintiffs allege Bitfinex played any role beyond providing customers instructions for depositing or withdrawing funds and confirming the availability of the funds for customer use. Without more, Plaintiffs' allegations cannot sustain aider-and-abettor liability. *See Williams v. Bank Leumi Tr. Co.*, No. 96 Civ. 6695, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) ("[T]he mere fact that all the participants in the alleged scheme used accounts at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability.").

*Third*, Plaintiffs separately allege that Bitfinex, Tether, and the Individual Defendants committed bank fraud by opening a bank account in the name of a shell company in October 2018.

(Compl. ¶¶ 501-02.) However, while ¶ 502 identifies this bank as "Prosperity Revenue Merchandising Limited at the Bank of Communications, in New York," that is a clear error. Plaintiffs admit that this bank is a foreign bank located in Hong Kong, not New York (*id.* ¶ 348 & n.199), rendering the bank fraud statute inapplicable. *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992) (scheme's victim must be "a federally insured or chartered bank").

### 3.    No Money Laundering (18 U.S.C. § 1956)

Plaintiffs allege that DigFinex, Tether, Bitfinex, and the Individual Defendants committed money laundering under 18 U.S.C. § 1956(a)(1) because: (1) "knowing the debased USDT were proceeds of their wire fraud," they (2) "transferred that unbacked USDT to addresses at Poloniex and Bittrex" (Compl. ¶ 506), (3) with intent to conceal the nature, source, ownership, and control of the funds (*id.* ¶ 508), and (4) such transfers were "financial transactions" because they involved "movement of funds" to financial institutions (*id.* ¶ 509). Alternatively, Plaintiffs allege Defendants violated § 1956(a) (2) by transferring USDT with the "intent . . . to promote . . . wire fraud and operation of money transmitting businesses" without a license. (*Id.* ¶ 511.)

These allegations fail to state a claim for four reasons. *First,* they rise and fall with Plaintiffs' "wire fraud" claims. Since the former fail to state a claim, so do the latter.

*Second*, contrary to Plaintiffs' allegations, USDT that is issued, whether or not backed, is not criminal "proceeds," because it is not "derived from or obtained or retained, directly or indirectly" from an unlawful activity under 18 U.S.C. § 1956(c)(9). *See United States v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy & Others*, No. 03 Civ. 8004, 2008 WL 4129814, at *2 (S.D.N.Y. Sept. 5, 2008) (holding that forged documents, misrepresented to be genuine, are an instrumentality, not "proceeds," of crime).

*Third*, contrary to Plaintiffs' allegations, transfer of USDT does not constitute movement of "funds." USDT is not in fact money, being neither issued by a sovereign nor generally accepted

as payment for goods and services and functioning solely as a "trading pair" for certain cryptocurrencies on certain crypto-exchanges. *Cf. United States v. Petix,* No. 15 Cr. 227A, 2016 WL 7017919, at *4-7 (W.D.N.Y. Dec. 1, 2016) (holding that bitcoin is not "funds" because it is not "sums of money," quoting *Clark v. Rameker*, 573 U.S. 122, 127 (2014)).[19]

*Fourth*, Plaintiffs do not explain how transfers of USDT to Poloniex and Bittrex involved specific intent "to promote the Enterprise's commission of" either "wire fraud" or "operation of money transmitter businesses without licenses." Merely reciting the elements of the crime *pro forma*, of course, is not sufficient to satisfy Plaintiffs' pleading obligations.

### 4.     No Unlawful Money Transactions (18 U.S.C. § 1957)

Plaintiffs allege that DigFinex, Tether, and Bitfinex "knowingly engaged in monetary transactions in criminally derived property" in violation of 18 U.S.C. § 1957(a) by: (1) transferring unbacked USDT, which was (2) "property constituting or derived from proceeds" of unlawful activity (specifically, it appears, wire fraud), and which was (3) "funds" and/or (4) used "by, and through Bitfinex, Bittrex, and Poloniex, to purchase cryptocommodities to artificially inflate their prices." (Compl. ¶¶ 515, 517-19.) These allegations fail to state a claim because, as discussed: (a) Plaintiffs fail to adequately plead wire fraud; (b) issuance of unbacked USDT does not constitute criminal "proceeds"; and (c) USDT does not constitute "funds."

### 5.     No Money Transmitting (18 U.S.C. § 1960)

Plaintiffs allege that DigFinex, Bitfinex, and the Individual Defendants operated Bitfinex as a "money transmitter business" in "New York and other states" in violation of 18 U.S.C.

---

[19] While other courts, *contra Petix*, have held that "bitcoin" is "funds," Defendants respectfully submit that *Petix* is the better-reasoned decision, particularly as to USDT, which unlike bitcoin, is *not* recognized as tender for real-world goods and services.

§ 1960(b)(1)(A). (Compl. ¶¶ 525-26.) "Money transmitting" means "transferring funds on behalf of the public." 18 U.S.C. § 1960(b)(2).

This claim, however, rests solely upon conclusory allegations. For example, Plaintiffs allege that "these Defendants opened bank accounts in New York for the purpose of operating their money transmitting business" (Compl. ¶ 526), yet identify no such account—other than the "Prosperity" account, which is actually in Hong Kong. (*Id*. ¶ 348 & n.199.) Similarly, while Plaintiffs allege that when registering BFXNA Inc. and Tether Limited as money service businesses, various defendants "falsely reported" that their activities were limited to Wyoming, when they actually transmitted "through a number of other unregistered entities and shell companies" (*id*. ¶¶ 530, 532). Plaintiffs do not identify any such U.S.-based unregistered entities and shell companies.

Plaintiffs alternatively allege that the "Count Eight Defendants' operation of Bitfinex [and] Tether … involved 'the transportation or transmission of funds' [they] knew 'to have been derived from a criminal offense' and were 'intended to be used to promote or support unlawful activity.'" (*Id*. ¶ 534.) This appears to be, specifically, the "U.S. dollars" the Defendants supposedly "received from customers in exchange for unbacked USDT." (*Id*. ¶ 535.) However, like the bank fraud allegations discussed above, Plaintiffs do not allege how Tether or Bitfinex's receipt of dollars from their own customers proximately caused any alleged injury to *Plaintiffs*, which supposedly arose from a wholly separate market manipulation scheme.[20]

---

[20] Plaintiffs appear to allege that the causal link that "the *unbacked* USDT used to purchase and inflate the price of cryptocommodities were proceeds and funds" derived from their unlawful money transmitter business. (Compl. ¶ 535 (emphasis added).) This allegation is either self-contradictory or self-defeating. It is self-contradictory because, according to Plaintiffs, "unbacked USDT" is *not* the proceeds of dollar deposits transmitted by customers, but instead something that Tether allegedly created *ex nihilo*. It is self-defeating because if the USDT used by Tether/Bitfinex

## IV.   THE COURT SHOULD DISMISS PLAINTIFFS' STATE LAW CLAIMS

If the federal claims are dismissed, the Plaintiffs' stated basis for suing in federal court will no longer hold. (*Id.* ¶ 42.) While the Court retains discretion to address the state law claims under a theory of supplemental jurisdiction, a "district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). There is no reason to depart from that settled guidance in this case. Regardless, should the Court reach the state law claims, Plaintiffs have failed to adequately state them.

### A.   Plaintiffs Fail to State a Claim for Common Law Fraud (Count 11)

Plaintiffs' claim for common law fraud must be dismissed because Plaintiffs fail to plead (1) reliance or transaction causation; and (2) and damages or loss causation.

#### 1.   Plaintiffs Fail to Plead Reliance or Transaction Causation

Under settled law, to state a common-law fraud claim, Plaintiffs must plead *actual reliance* on the fraudulent statements—not "presumed reliance" based upon "fraud on the market." *See Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) ("The requisite reliance is actual reliance, not the presumed reliance of a Section 10(b) action"); *accord Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 283 (S.D.N.Y. 2019).[21]

Plaintiffs, however, plead no facts showing that any purchases identified in Complaint ¶¶ 18-22 occurred in actual reliance upon a specific disclosure about USDT of which Plaintiffs were contemporaneously aware. Instead, they offer only the following conclusory allegation:

---

to make purported cryptocommodity purchases was, in fact, "backed" by dollar deposits (how else could money transmitting be involved), then it defeats Plaintiffs' market manipulation allegations.

[21] Plaintiffs similarly cannot allege that *third parties* (*i.e.*, the "market") relied on Defendants' misrepresentations. "[T]hird-party reliance does not satisfy the reliance element of a fraud claim." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (N.Y. 2016).

"Plaintiffs reasonably relied on these false representations and omissions of material fact to their detriment when purchasing cryptocommodities at artificially high prices caused by these materially false statements and omissions." (Compl. ¶ 579.) As such, Plaintiffs fail to plead reliance as a matter of law. *See Int'l Fund Mgmt.*, 822 F. Supp. 2d at 386 (holding that conclusory allegations that Plaintiffs "read and relied upon" the alleged false statements were insufficient)*; In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 313 (S.D.N.Y. 2014) (holding that plaintiff's failure to allege "that it actually purchased any particular Bear Stearns securities on any particular date in reliance on any particular alleged misstatements in the 2006 Form 10–K" was insufficient)*, aff'd sub nom. SRM Global Master Fund Ltd. P'ship v. Bear Stearns Companies L.L.C.*, 829 F.3d 173 (2d Cir. 2016). Accordingly, Plaintiffs' fraud claim should be dismissed for failure to allege reliance.

Plaintiffs similarly fail to allege transaction causation. *Laub v. Faessel*, 297 A.D.2d 28, *31 (1st Dep't 2002) ("To establish causation, plaintiff must show . . . that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation)."). Plaintiffs do not allege anything Bitfinex or Tether said about USDT that induced them to make purchases of bitcoin or other cryptocommodities.

### 2.   Plaintiffs Fail to Plead Damages or Loss Causation

New York follows the "out-of-pocket rule" for common law fraud damages, under which Plaintiffs are "limited to recovering their losses," *i.e.*, the "actual pecuniary loss sustained as a direct result of the wrong." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 414, 422, 646 N.Y.S.2d 76, 76 (N.Y. 1996). Here, the Complaint does not allege an actual out-of-pocket-loss, for the simple reason that Plaintiffs never allege they sold any of their cryptocommodity holdings at a loss.

Plaintiffs also fail to allege loss causation. As the First Department recently held:

> Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff . . . . To establish loss causation a plaintiff must prove that the subject of the fraudulent statement or omission was the cause of the actual loss suffered. Moreover, *when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not . . . proven . . . that its loss was caused by the alleged misstatements as opposed to intervening events*…. Indeed, when an investor suffers an investment loss due to a market crash [] of such dramatic proportions that [the] losses would have occurred at the same time and to the same extent regardless of the alleged fraud, loss causation is lacking . . . .

*Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 149 A.D.3d 146, 149, 48 N.Y.S.3d 654, 656–57 (1st Dep't 2017) (internal quotation marks and citations omitted).

Plaintiffs cannot escape the force of these authorities. Plaintiffs allege only that a crash occurred in late 2017 and cryptocommodity prices have declined. Plaintiffs fail to allege the crash occurred because the cryptocommodities market learned about Defendants' alleged fraud. Accordingly, Plaintiffs common-law fraud claim is deficient and should be dismissed.

### B.  Plaintiffs Fail to State a Claim Under GBL § 349 (Count 12)

GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." There are three elements: (1) "the challenged act or practice was consumer-oriented"; (2) "it was misleading in a material way"; and (3) the plaintiff "suffered injury as a result of the deceptive act." *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, *58 (S.D.N.Y. 2015) (Failla, J.). Plaintiffs fail to sufficiently plead these critical elements, as discussed below.

### 1.  The Plaintiffs Do Not Allege Consumer-Oriented Wrongdoing

To invoke GBL § 349, Plaintiffs must "charge conduct that is consumer oriented." *New York University v. Continental Insurance Co.,* 662 N.E.2d 763, 770 (N.Y. 1995). Cryptocommodity-related transactions fail this test.

New York state and federal courts, for example, have found GBL § 349 inapplicable to claims concerning securities because, unlike "an automobile, a television set, or the myriad consumer goods found in supermarkets," securities are "purchased as investments, not as goods to be 'consumed' or 'used.'" *Morris v. Gilbert,* 649 F. Supp. 1491, 1497 (E.D.N.Y. 1986). For the same reason, GBL § 349 is inapplicable to commodities-related investments. *See DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2016) ("[Plaintiff's] § 349 claim suffers from the same defects as the claim in *Morris*. [Plaintiff] invested funds with MF Global and MFGI as investments, not as a purchase of traditional consumer goods.").

Cryptocommodities are a species of commodity and, further, are investment vehicles; they are not "traditional consumer goods" or "goods to be 'consumed' or 'used.'" Under *Morris* and its progeny, therefore, GBL § 349 is inapplicable.

### 2.    The Plaintiffs Do Not Allege Direct Causation

To plead a plausible claim under GBL § 349, each Plaintiff "*must individually plead that the disclosures he or she received were inadequate*, misleading, or false, and that she was injured as a result of the insufficient or false disclosures." *Abraham v. American Home Mortgage Servicing, Inc.*, 947 F. Supp. 2d 222, 234 (E.D.N.Y. 2013) (emphasis added). Here, Plaintiffs do not even allege they purchased USDT, the subject of Defendants' alleged misrepresentations. Nor do they allege that any particular representation by Defendants caused them to make any of the purchase decisions concerning bitcoin or other cryptocommodities.

Further, New York law requires "more than an allegation of 'but for' cause to state a claim for relief" under § 349. *City of New York v Smokes-Spirits.Com*, 911 N.E.2d 834, 839 (N.Y. 2009). Instead, the causation chain must be "direct," meaning that plaintiffs must "plead that they have suffered actual injury caused by a materially misleading act, not that a misleading act led to further steps which eventually harmed them." *Frintzilas v. DirecTV, LLC*, 731 F. App'x 71, 72 (2d Cir.

2018) (internal quotation marks omitted). As discussed in Section III.A, Plaintiffs' alleged injuries involve a remote chain of causation, involving an untold number of intermediary market actors and transactions in between the alleged wrongdoing and their supposed harm. On this independent basis, the GBL § 349 claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice.

Dated: September 3, 2020                         Respectfully Submitted,


LAW OFFICES OF MICHAEL JASON LEE,         WALDEN MACHT & HARAN LLP
APLC

*/s/ Michael Jason Lee*                          */s/ Jim Walden*
Michael Jason Lee (admitted pro hac vice)        Jim Walden
4660 La Jolla Village Drive, Suite 100           Stephanie T. Levick
San Diego, CA 92122                              Daniel A. Cohen
Tel : (858) 550-9984                             One Battery Park Plaza, 34th Floor
Fax : (858) 550-9985                             New York, NY 10004
                                                 Tel: (212) 335-2030
                                                 Fax: (212) 335-2040


DILLON MILLER & AHUJA LLP
*/s/ Sunjina K. Ahuja*
Sunjina K. Ahuja (admitted *pro hac vice*)
Christopher J. Beal (admitted *pro hac vice*)
5872 Owens Ave, Suite 200
Carlsbad, CA 920008
Tel.: (858) 587-1800
Fax: (858) 587-2587


*Counsel for Defendants, iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Ludovicus Jan van der Velde, and Giancarlo Devasini*

40

## APPENDIX A

Chart of Plaintiffs' Causes of Action

| Count | Cause of Action | Defendants |
|---|---|---|
| 1 | Monopolization (Sherman Act § 2) | DigFinex; Bitfinex Defendants; Tether Defendants; Individual Defendants |
| 2 | Attempted Monopolization (Sherman Act § 2) | DigFinex; Bitfinex Defendants; Tether Defendants; Individual Defendants |
| 3 | Conspiracy to Monopolize (Sherman Act § 2) | All Defendants |
| 4 | Agreement in Restraint of Trade (Sherman Act §§ 1 and 3) | All Defendants |
| 5 | Market Manipulation (CEA §§ 6(c)(1), 22 and CFTC Rule 180.1) | All Defendants |
| 6 | Principal Agent Liability (CEA § 2(a)(1)) | All Defendants |
| 7 | Aiding and Abetting (CEA § 22(a)(1)) | All Defendants |
| 8 | RICO (18 U.S.C. § 1962(c)) | DigFinex; Bitfinex Defendants; Tether Defendants; Individual Defendants; Potter; Fowler; Crypto Capital |
| 9 | RICO (18 U.S.C. § 1962(a)) | DigFinex; Bitfinex Defendants; Tether Defendants; Individual Defendants |
| 10 | RICO Conspiracy (18 U.S.C. § 1962(d)) | All Defendants |
| 11 | Common Law Fraud | Bitfinex Defendants; Tether Defendants; Individual Defendants |
| 12 | New York Deceptive Trade Practices Law (GBL § 349) | Bitfinex Defendants; Tether Defendants; Individual Defendants |