**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE TETHER AND BITFINEX CRYPTO
ASSET LITIGATION

Index No. 1:19-cv-09236-KPF

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE EXCHANGE DEFENDANTS' MOTION TO DISMISS**

Dated:  September 3, 2020

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone:  (213) 430-6000

MCNAUL EBEL NAWROT &
HELGREN PLLC
600 University Street, Suite 2700
Seattle, WA 98101
Telephone:  (206) 467-1816

*Attorneys for Bittrex, Inc.*

NELSON MULLINS RILEY &
SCARBOROUGH LLP
One Post Office Square 30th Floor
Boston, MA  02109
Telephone:  (617) 217-4700

NELSON MULLINS RILEY &
SCARBOROUGH LLP
280 Park Avenue
15th Floor, West
New York, New York 10017
Telephone:  (646) 428-2600

*Attorneys for Poloniex, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 2

    A.    The Alleged "Conspiracy" Between the Tether Defendants ..................... 2

    B.    The Exchange Defendants ...................................................................... 3

ARGUMENT ........................................................................................................................ 4

    I.    All claims against the Exchange Defendants should be dismissed because
the CAC does not plausibly plead an agreement to manipulate
cryptocurrency trading ............................................................................. 4

        A.    The CAC's factual allegations do not lead to a plausible inference
that the Accounts are owned or controlled by Bitfinex ........................... 4

        B.    The CAC's factual allegations do not lead to a plausible inference
that the Exchange Defendants agreed Bitfinex could use the
Accounts to manipulate cryptocurrency trading ....................................... 6

    II.    The Sherman Act claims against the Exchange Defendants should be
dismissed ................................................................................................ 8

        A.    The CAC fails to plausibly plead that the Exchange Defendants
even entered into an agreement ............................................................... 8

        B.    The CAC contains no facts suggesting that the Exchange
Defendants agreed to monopolize the crypto-commodities market
or restrain trade .................................................................................... 11

    III.    The CEA claims against the Exchange Defendants should be dismissed .......... 13

        A.    Plaintiffs' CEA claims are time-barred ................................................. 13

        B.    The CAC fails to adequately allege that Plaintiffs suffered actual
damages ................................................................................................ 15

        C.    The CAC fails to adequately plead a manipulation claim ...................... 17

            1.    The CAC fails to plead a manipulative act .................................. 17

            2.    The CAC fails to allege that the Exchange Defendants
intentionally or recklessly deceived the market .......................... 18

**TABLE OF CONTENTS**
(continued)

**Page**

3. The CAC fails to plead reliance ................................................... 18

D. The CAC fails to state a claim for principal-agent liability or for aiding and abetting ................................................................................... 19

IV. The RICO claim against the Exchange Defendants should be dismissed ........... 20

A. The CAC fails to allege facts supporting a RICO conspiracy claim ....... 21

B. The CAC does not adequately plead that Plaintiffs' alleged injuries were proximately caused by a RICO violation ....................................... 24

CONCLUSION .......................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 West 57th Street Realty Co., LLC. v. Citigroup, Inc.*,
   771 F.Appx 498 (2d Cir. 2019)...................................................................................25

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
   2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020)...............................................................6

*Am. Football League v. Nat'l Football League*,
   323 F.2d 124 (4th Cir. 1963) ......................................................................................11

*Apex Hosiery Co. v. Leader*,
   310 U.S. 469 (1940)....................................................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................20, 23

*Baisch v. Gallina*,
   346 F.3d 366 (2d Cir. 2003).........................................................................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................4, 8, 10, 12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) ............................................................18

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
   187 F.3d 229 (2d Cir. 1999).........................................................................................21

*Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*,
   2012 WL 1231775 (S.D.N.Y. Apr. 12, 2012)..............................................................21

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
   129 F.3d 240 (2d Cir. 1997).........................................................................................11

*Elsevier Inc. v. W.H.P.R., Inc.*,
   692 F. Supp. 2d 297 (S.D.N.Y. 2010)..........................................................................21

*Elsevier, Inc. v. Grossman*,
   2013 WL 6331839 (S.D.N.Y. Dec. 5, 2013) (Failla, J.) .......................................21, 24

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)....................................................................................20, 24

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*,
 927 F. Supp. 2d 88 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Inv'rs, Inc. v.*
 *Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016) ...........................................................19

*Goldfine v. Sichenzia*,
 118 F. Supp. 2d 392 (S.D.N.Y. 2000)...............................................................................22, 23

*Harry v. Total Gas & Power N. Amer., Inc.*,
 889 F.3d 104 (2d Cir. 2018)..............................................................................................15, 16

*Hecht v. Commerce Clearing House, Inc.*,
 897 F.2d 21 (2d Cir. 1990)......................................................................................................24

*Hemi Group, LLC v. City of New York, N.Y.*,
 559 U.S. 1 (2010).....................................................................................................................24

*In re Adient plc Sec. Litig.*,
 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020).............................................................................17

*In re Amaranth Nat. Gas Commodities Litig.*,
 587 F. Supp. 2d 513 (S.D.N.Y. 2008).......................................................................................19

*In re Commodity Exchange, Inc.*,
 213 F. Supp. 3d 631 (S.D.N.Y. 2016).......................................................................................17

*In re Crude Oil Commodity Litig.*,
 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ..........................................................................17

*In re Elevator Antitrust Litig.*,
 502 F.3d 47 (2d Cir. 2007) (per curiam).................................................................................8, 9

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
 213 F. Supp. 3d 530 (S.D.N.Y. 2016).................................................................................14, 18

*In re Nat. Gas Commodity Litig.*,
 337 F. Supp. 2d 498 (S.D.N.Y. 2004).......................................................................................13

*In re Platinum and Palladium Antitrust Litig.*,
 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .........................................................................17

*Katzman v. Victoria's Secret Catalogue*,
 167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd* 113 F.3d 1229 (2d Cir. 1997)....................................20

*Kramer v. Pollock-Krasner Found.*,
 890 F. Supp. 250 (S.D.N.Y. 1995)............................................................................................12

*Makowski v. United Broth. of Carpenters & Joiners of Am.*,
 2010 WL 3026510 (S.D.N.Y. Aug. 2, 2010)......................................................................22, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1985)...........................................................................................12

*Morin v. Trupin*,
711 F. Supp. 97 (S.D.N.Y. 1989)......................................................................22

*Nat'l Group for Commc'ns & Computer Ltd. v. Lucent Techs., Inc.*,
420 F. Supp. 2d 253 (S.D.N.Y. 2006)...............................................................21

*NECA-IBEW Pension Tr. Fund v. Bank of Amer. Corp.*,
2013 WL 620257 (S.D.N.Y. Feb. 15, 2013).....................................................14

*Sewell v. Bernardin*,
795 F.3d 337 (2d Cir. 2015)..............................................................................13

*Shah v. Meeker*,
435 F.3d 244 (2d Cir. 2006), *abrogated on other grounds by Merck & Co. v.
Reynolds*, 559 U.S. 633 (2010) ........................................................................14

*Singh v. NYCTL 2009-A Tr.*,
2016 WL 3962009 (S.D.N.Y. July 20, 2016) ...................................................10

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
366 F. Supp. 3d 516 (S.D.N.Y. 2018)...............................................................19

*United States v. $1,399,313.74 in U.S. Currency*,
591 F. Supp. 2d 365 (S.D.N.Y. 2008)...............................................................11

*United States v. Bailey*,
444 U.S. 394 (1980)...........................................................................................11

*Wu v. Bitfloor, Inc.*,
2020 WL 2512108 (S.D.N.Y. May 15, 2020) ...................................................14

**Rules**
Fed. R. Civ. P. 9(b) ......................................................................................17, 20

Fed. R. Civ. P. 12(b)(6)..........................................................................................1

**Statutes**
7 U.S.C. § 9 (2018) ..............................................................................................13

7 U.S.C. § 25(c) (2011).........................................................................................13

**Other Authorities**
17 C.F.R. 180.1 ....................................................................................................18

17 C.F.R. § 180.1(a) (2018) .................................................................................13

Arjun Kharpal, *All you need to know about tether, the cryptocurrency that could have 'devastating' effects on the market*, CNBC (Feb. 2, 2018), https://www.cnbc.com/2018/02/02/tether-what-you-need-to-know-about-the-cryptocurrency-worrying-markets.html; ...................................................................15

https://www.omniexplorer.info/address /1J1dCYzS5EerUuJCJ6iJYVPytCMVLXrgM9/1317 .....................................................6

https://www.omniexplorer.info/address/1AA6iP6hrZfYiacfzb3VS5JoyKeZZBE YRW/949) ...................................................................................................................6

John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (Oct. 28, 2019), https://ssrn.com/ abstract=3195066 .........................................................................7

Matthew Leising, *Crypto Exchange Bitfinex, Tether Are Said Subpoenaed by CFTC*, Bloomberg (Jan. 30, 2018), https://www.bloombergquint.com/business/crypto-exchange-bitfinex-tether-said-to-get-subpoenaed-by-cftc.....................................................................15

Nathaniel Popper, *Worries Grow That the Price of Bitcoin Is Being Propped Up*, N.Y. Times (Jan. 31, 2018), https://www.nytimes.com/2018/01/31/technology/ bitfinex-bitcoin-price.html ..............14, 15

Poloniex: FAQ, https://support.poloniex.com/hc/en-us/articles/360041078913-Level-1-vs-Level-2-Verification-Features .................................................................5

*Prohibition on the Employment, or Attempted Employment, of Manipulative Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) ......................................................................................................17

*Quantifying the Effect of Tether*, TETHER REPORT (Jan. 24, 2018), https://www.tetherreport.com ...........................................................................10, 14

§6.1 of Bittrex, Inc. Terms of Service (Effective Date:  November 1, 2018), https://bittrex.zendesk.com/hc/en-us/articles/360000560871 ................................5, 6

## PRELIMINARY STATEMENT

Plaintiffs have spent 156 pages, 223 footnotes, and 593 paragraphs describing a vast "conspiracy" among the Tether Defendants[1] and their banker, but the Amended Consolidated Class Action Complaint (the "CAC") is most notable for what it does not say—namely, its failure to include a single sustainable allegation that the Exchange Defendants—Bittrex, Inc. and Poloniex, LLC—had any knowledge of or role in the scheme.  Plaintiffs attempt to patch this gaping hole in the CAC with unsupported conclusions and rank speculation, rather than allegations of fact.  Such conclusory allegations cannot save the claims against the Exchange Defendants from dismissal under Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs allege that Defendants conspired to create "the largest bubble in human history"—a scheme that, had it occurred, obviously would have required a high degree of coordination between its individual members, including the Exchange Defendants.  Yet Plaintiffs do not allege an actual agreement between the Tether Defendants and Exchange Defendants, nor that any of them ever met or communicated in any way about the alleged scheme.

Instead, Plaintiffs ask the Court to conclude that the Exchange Defendants secretly gave the Bitfinex entities "bespoke" accounts and special considerations, that the Exchange Defendants closely inspected the USDT transfers at issue as they were happening, that they concluded that Tether and Bitfinex must have been working together to issue "debased" USDT for the specific purpose of manipulating the market, and that they then agreed with Tether and Bitfinex (and also among themselves) to join in on this elaborate plot.  That conspiracy theory is fatally implausible.

---

[1] The term "Tether Defendants" refers to iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Philip G. Potter, Giancarlo Devasini, and Ludovicus Jan van der Velde.

It also necessarily depends upon two fundamental premises based on Plaintiffs' speculation rather than allegations of fact: (i) that Bitfinex owned or controlled the trading accounts through which the allegedly manipulative trading occurred, and (ii) that the Exchange Defendants knew that the Tether Defendants were using those alleged "Bitfinex accounts" to engage in manipulation.  As explained below, Plaintiffs' failure to allege any facts supporting these conclusions is fatal to each of the claims asserted against the Exchange Defendants.

Each of the claims also fails as a matter of law.  The antitrust claims fail because the CAC does not allege any facts suggesting that the Exchange Defendants agreed to monopolize the cryptocurrency market—in which they are neither buyer nor seller—or otherwise "restrain trade."  The Commodity Exchange Act ("CEA") claims fail because they are time-barred, and because Plaintiffs fail to plead multiple essential elements.  The Racketeer Influenced and Corrupt Organizations Act ("RICO") claims fail because Plaintiffs do not plead facts demonstrating a RICO conspiracy, or that they suffered an injury proximately caused by such a conspiracy.  All of the claims should be dismissed.

## FACTUAL BACKGROUND

### A.    The Alleged "Conspiracy" Between the Tether Defendants

Plaintiffs allege that the Tether Defendants carried out a "conspiracy" to manipulate the "cryptocommodities" market using USDT—a so-called "stablecoin" created by Tether that purports to be backed 1:1 by U.S. dollars (or corresponding assets held in reserve).  The basic premise of USDT is that, for every USDT in circulation, there is $1.00 held in reserve by Tether.  Thus, holders of USDT may, at any time, redeem their USDT for a corresponding number of U.S. dollars, thereby rendering USDT "stable."  (CAC ¶¶ 114–16.)

The CAC alleges that Tether issued billions of USDT to Bitfinex, a cryptocurrency exchange, without receiving any U.S. dollars in return, thereby "debasing" all other USDTs then

in existence.  (*Id.* ¶ 7.)  Plaintiffs allege that Tether's principals secretly owned and controlled Bitfinex and collectively they used this supposedly unbacked USDT to trade on the cryptocurrency exchanges maintained by the Exchange Defendants in order to inflate the price of other crypto assets, such as Bitcoin.  (*Id.* ¶ 10.)

B.    **The Exchange Defendants**

The Exchange Defendants are cryptocurrency exchanges.  They receive fees from each trade executed on their platforms, not from selling crypto assets themselves.  (*Id.* ¶¶ 163, 171.) The only direct communications alleged between them and any of the Tether Defendants concern the technical coordination that was necessary to integrate USDT onto their respective exchanges. (*See id.* ¶¶ 166–67, 173–74.)

Plaintiffs allege that between 2015 and 2018, the owner of an account on the Bitfinex platform transferred approximately 3 billion USDT to deposit addresses on Bittrex ("1AA6") and Poloniex ("1J1d") (collectively, the "Accounts").  (*Id.* ¶ 262.)[2]  Plaintiffs allege that USDT transfers into the Accounts stopped temporarily during a ten-day period in January 2018, after an online article suggested that unbacked USDT might have been used to boost the price of Bitcoin (the so-called "Tether Report").  (*Id.* ¶¶ 212–13.)

Finally, Plaintiffs allege that the two Accounts each include a permanent deposit address into which the accountholder is able to make repeated deposits, and that the Exchange Defendants do not provide "normal" customers with permanent deposit addresses.  (*Id.* at ¶ 313– 16.)

---

[2] There is no 1J1dCYzS5EerUuJCJ6iJYVPytCMVLXrgM91J1d wallet address (*see* CAC ¶ 205) associated with Poloniex.  The correct address is 1J1dCYzS5EerUuJCJ6iJYVPytCMVLXrgM9.

## ARGUMENT

All of Plaintiffs' claims should be dismissed for the reasons stated in the Tether Defendants' Motion to Dismiss—and the Exchange Defendants incorporate those arguments herein—but the claims against the Exchange Defendants should be dismissed for additional reasons. Brought under three different federal statutes—the Sherman Antitrust Act, the CEA, and RICO—Plaintiffs' claims against the Exchange Defendants all rest on speculation that the Exchange Defendants agreed and conspired with the Tether Defendants to manipulate cryptocommodity markets. The CAC's factual allegations, however, do not plausibly support such allegations. The CAC also fails to plead sufficient facts to state a claim under any of the three statutes.

## I.     All claims against the Exchange Defendants should be dismissed because the CAC does not plausibly plead an agreement to manipulate cryptocurrency trading.

The claims against the Exchange Defendants depend upon two conclusory allegations, neither of which is supported by factual allegations. First, Plaintiffs allege that the Accounts are owned or controlled by Bitfinex. Second, Plaintiffs allege that the Exchange Defendants knew Bitfinex was using those accounts to manipulate the market. Because the CAC does not contain sufficient factual allegations to make either assertion plausible, it should be dismissed against the Exchange Defendants. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

### A.     The CAC's factual allegations do not lead to a plausible inference that the Accounts are owned or controlled by Bitfinex.

Plaintiffs' entire case rests on the notion that the Accounts are owned or controlled by Bitfinex. Plaintiffs do not allege any fact—i.e., no document, no witness, no email, no other communication—suggesting that the Accounts are owned or controlled by Bitfinex. Instead, Plaintiffs ask the Court to *infer* that the accounts are owned or controlled by Bitfinex based on innocuous facts that do not demonstrate such ownership or control.

4

The CAC contends, for example, that because the owner of the Accounts received large influxes of USDT from an account on the Bitfinex exchange, "it is *clear* that Bitfinex used these addresses to move USDT to its accounts on those exchanges."  (CAC ¶ 207.)[3]  But just because the owner of the Accounts transferred USDT from the Bitfinex exchange to addresses on the Bittrex and Poloniex exchanges does not lead to the conclusion that Bitfinex controlled or owned the Accounts.  Bitfinex is an exchange with thousands of customers around the world, so transfers from the Bitfinex exchange to the Accounts say nothing about the ownership of the Accounts.  The fact that transfers were made, even large ones, cannot lead to a plausible inference that the Accounts were owned by any particular person or entity.

The CAC likewise notes that transfers were made to the same deposit addresses and claims that addresses "are not *generally* used multiple times" because *"[n]ormal* customers are routinely given a new deposit address when they want to transfer USDT to their Bittrex or Poloniex account."  (*Id.* ¶ 313.)  But Plaintiffs' guesswork about how deposit addresses work is wrong and is rebutted by information available to the Plaintiffs.  Both Exchange Defendants allow customers to use a single, recurring account address.  *See* Poloniex: FAQ, https://support.poloniex.com/hc/en-us/articles/360041078913-Level-1-vs-Level-2-Verification-Features ("To check *your deposit address* balance . . . .  You can simply send more, until the balance of *your deposit address* is above the required amount."); § 6.1 of Bittrex, Inc. Terms of Service (Effective Date: November 1, 2018), https://bittrex.zendesk.com/hc/en-us/articles/360000560871 ("Hosted Wallet" allows customers to generate single address for

---

[3] Unless otherwise stated, all emphasis is added and all internal quotation marks, citations, and original alterations are omitted from quoted passages.

transfers).[4]  And even if using the same address repeatedly is not the "general" practice, that is not a basis to infer that the Accounts are owned or controlled by Bitfinex.

Finally, the CAC contends "that transfers into these accounts occurred before [the Exchange Defendants] accepted USDT from normal customers."  (CAC ¶ 317.)  This statement is also not supported by the publicly available facts and is contradicted by the CAC itself.  As Plaintiffs acknowledge, "USDT transfers to/from Poloniex begin on February 17, 2015; on Bittrex, they begin on September 21, 2015."  (*Id.*; *see also id.* ¶ 166 & n.107 (citing February 26, 2015 article titled "Tether Now Integrated with Poloniex Exchange").)  Publicly available blockchain data shows that the first USDT transfers in the Accounts did not occur for months or even years later: The first USDT transfer into 1J1d (Poloniex) occurred on June 27, 2016 (*see* https://www.omniexplorer.info/address/1J1dCYzS5EerUuJCJ6iJYVPytCMVLXrgM9/1317) and the first USDT transfer into 1AA6 (Bittrex) occurred on March 27, 2017 (*see* https://www.omniexplorer.info/address/1AA6iP6hrZfYiacfzb3VS5JoyKeZZBEYRW/949).

   **B.    The CAC's factual allegations do not lead to a plausible inference that the Exchange Defendants agreed Bitfinex could use the Accounts to manipulate cryptocurrency trading.**

Plaintiffs' other central premise—i.e., that the Exchange Defendants knew that Bitfinex was behind the Accounts, was using them to transfer unbacked USDT to their exchanges, and agreed to this behavior—is again nothing more than speculation.  The CAC refers, for example, to the Exchange Defendants' know-your-customer ("KYC") obligations, which require the Exchange Defendants to take steps to know who trades on the exchanges.  But Plaintiffs do not plead facts suggesting that the KYC documentation linked the Accounts to Bitfinex.

---

[4]  The Court may consider documents incorporated by reference into the CAC or "matters of public record" on a motion to dismiss.  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 2020 WL 4734989, at *1 n.2 (S.D.N.Y. Aug. 14, 2020).

Plaintiffs' next contention, that the Exchange Defendants "should have" known that the USDT was not fully backed by U.S. dollars, is based on the November 2017 Paradise Papers, which suggested that there was an "overlapping control structure" between Tether and Bitfinex. (CAC ¶ 156.)  Plaintiffs do not explain why knowledge of that theory of common ownership—assuming the Exchange Defendants even read the Paradise Papers—means that the Exchange Defendants knew Bitfinex and Tether were allegedly issuing unbacked USDT and using it to manipulate the crypto market.

Finally, for the reasons explained in the Tether Defendants' motion, Plaintiffs' allegations do not lead to an inference that USDT was unbacked, and they certainly do not lead to an inference that the Exchange Defendants knew that the USDT was unbacked.  The primary source of Plaintiffs' accusations appears to be what the CAC calls the "Revised Griffin Article," written by University of Texas Finance Professor John Griffin.  (*See id.* ¶¶ 218–301 (discussing John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (Oct. 28, 2019), https://ssrn.com/ abstract=3195066).)  The article concludes that the large USDT transfers to the Accounts were "consistent *either* with one large player purchasing Tether with cash at Bitfinex and then exchanging it for Bitcoin, *or* Tether being printed without cash backup and pushed out through Bitfinex in exchange."  (Revised Griffin Article, at 7.)  Professor Griffin spent over a year on his article and "examined over 200 gigabytes of transactional data from over ten different sources."  (CAC ¶¶ 281, 286, 293.)  And despite all that time, expertise, and data analysis, in his final version of the article, Professor Griffin still could not rule out that the transfers in question were attributed to "one large player purchasing Tether with cash at Bitfinex and then exchanging it for Bitcoin."  (Revised Griffin Article, at 7.)[5]  It is simply not plausible to

_____

[5] As the Exchange Defendants have told the Court and Plaintiffs, they are prepared to present admissible evidence proving that the Accounts belong to an individual, who is not associated with

infer that the Exchange Defendants must have known otherwise.  Because Plaintiffs' factual allegations are insufficient to yield a plausible inference that the Exchange Defendants knew about, and therefore agreed to, the alleged scheme, all claims against them should be dismissed.

**II.     The Sherman Act claims against the Exchange Defendants should be dismissed.**

The two antitrust claims asserted against the Exchange Defendants—conspiracy to monopolize under Section 2 and agreement in restraint of trade under Section 1—should be dismissed because Plaintiffs have not plausibly alleged that the Exchange Defendants entered into any agreement, much less an agreement to monopolize or restrain trade.

**A.     The CAC fails to plausibly plead that the Exchange Defendants even entered into an agreement.**

Both of Plaintiffs' antitrust claims against the Exchange Defendants require Plaintiffs to plead, and ultimately prove, that the Exchange Defendants entered into an agreement.  *See, e.g.*, *Twombly*, 550 U.S. at 553 (for Section 1 claim, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (Section 2 conspiracy claim must be dismissed if it fails to "allege facts that would provide plausible grounds to infer an agreement").  To survive this motion, "it is not enough to make allegations of an antitrust conspiracy that are *consistent* with an unlawful agreement"; the "complaint must contain 'enough factual matter (taken as true) *to suggest* that an agreement to engage in anticompetitive conduct was made.'"  *Elevator Antitrust Litig.*, 502 F.3d at 50 (quoting *Twombly*, 550 U.S. at 556).  Plaintiffs must plead facts sufficient to infer that the Exchange Defendants *agreed* to go along with the Tether Defendants' alleged antitrust violations.

---

Bitfinex or under Bitfinex's control, who purchased USDT and used it for cross-exchange arbitrage—exactly what Griffin hypothesized was the alternate explanation for the flows of USDT onto Bittrex and Poloniex.

The CAC does not plead direct evidence of such an agreement.  Nowhere in its 156 pages is there a single allegation that either of the Exchange Defendants communicated with each other or with any of the other Defendants—no meeting, no email, no phone call, nothing—beyond the technical coordination with Tether to allow USDT trading on their exchanges.  Instead, Plaintiffs ask the Court to infer such an agreement from circumstances and speculation.  But the actual facts the CAC pleads do not point toward an agreement or "nudge plaintiffs' claims across the line from conceivable to plausible."  *Id.* at 50–51 (affirming dismissal of complaint because allegations were mere "theoretical possibilities" without "facts adequate to show illegality").

As explained above, Plaintiffs allege, for example, that USDT was repeatedly transferred from Bitfinex to the 1AA6 address and the 1J1d address (CAC ¶ 207) and that addresses "are not *generally* used multiple times" because *"[n]ormal* customers are routinely given a new deposit address when they want to transfer USDT" (*id.* ¶ 313).  As explained above, that allegation is contradicted by the others in the CAC and publicly available facts.  But even assuming the arrangement were out of the ordinary, *unusual* or *abnormal circumstances* are not sufficient to infer an *illegal agreement*.  Plaintiffs' own analogy proves this point: They note "that some casinos have [special arrangements] with large-scale, repeat gamblers . . . to smooth the process of them obtaining new chips" even though nothing illegal is happening.  (*Id.* ¶ 316.)  That the Exchange Defendants might have made special arrangements with a high-volume customer likewise does not suggest illegality.  Plaintiffs' subjective, vague opinions do not state an antitrust claim because in this Circuit, an antitrust plaintiff must plead "*facts* adequate to show illegality." *Elevator Antitrust Litig.*, 502 F.3d at 51.

The same goes for Plaintiffs' allegation that the owner of the Accounts was not a "legitimate customer[]" because after USDT transfers to both addresses for 23 straight days,

there were no USDT transfers to either address for ten days, and this break coincided with publication of the "Tether Report." (*See* CAC ¶¶ 212–14; http://www.tetherreport.com/.) There are of course all kinds of reasons why transfers might have stopped for a few days, and Plaintiffs do not plead that is the only break in transfers during the class period.

These facts do not lead to a plausible inference that anything *unlawful* was happening, much less an antitrust violation. And they provide no basis to infer that the Exchange Defendants entered into an *agreement* to commit that supposed antitrust violation.

Plaintiffs' allegation (*id.* ¶¶ 318–19) that the Exchange Defendants had to coordinate with Tether to allow USDT trading on their exchanges is even more innocuous. Tether was a new crypto-asset, and the Exchange Defendants' business was providing a market for its customers to trade crypto-assets. Plaintiffs' complaint that a lot of USDT was traded on the exchanges (*id.* ¶¶ 334–36) likewise does not suggest that the Exchange Defendants entered into an unlawful agreement: Even if the Exchange Defendants "agreed" to allow USDT trading on their exchanges and "agreed" that customers could trade as much USDT as they wanted, neither of those agreements is an antitrust violation. It is more "in line with a wide swath of rational and competitive business strategy" than it is with an antitrust conspiracy and therefore is insufficient to plead an antitrust claim. *Twombly*, 550 U.S. at 554.

Plaintiffs' claims against the Exchange Defendants rest on the notion that they should have known of the alleged scheme because, for example, they had KYC obligations (CAC ¶¶ 320–21), they had "visibility into the daily trading activity" (*id.* ¶ 322), there was "publicly available news" about Bitfinex that the Exchange Defendants "would not have failed to notice" (*id.* ¶¶ 326–27), and "[b]ecause it happened on their exchanges" (*id.* ¶ 331). But "'should have known' is not enough to establish conspiracy." *Singh v. NYCTL 2009-A Tr.*, 2016 WL 3962009,

at *10 (S.D.N.Y. July 20, 2016) (granting motion to dismiss conspiracy claim).  After all, constructive knowledge is not actual knowledge, and even actual knowledge is not an intent to agree.  *See, e.g.*, *United States v. Bailey*, 444 U.S. 394, 405 (1980) (distinguishing "knowledge" from "specific intent").  And Plaintiffs will not be able to cite a single post-*Twombly* case finding an antitrust claim stated against an exchange purely because others may have used the exchange for anticompetitive conduct.  That is not even a basis to infer *knowledge* of unlawful behavior, much less the requisite *agreement* to engage in it.  *See United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 376 (S.D.N.Y. 2008) (granting motion to dismiss because courts do not "make logical leaps" or "credit conclusory assertions" in "the absence of facts").

**B.     The CAC contains no facts suggesting that the Exchange Defendants agreed to monopolize the crypto-commodities market or restrain trade.**

Even if Plaintiffs adequately alleged that the Exchange Defendants entered into an agreement, both antitrust claims fail because the CAC's allegations do not give rise to a plausible inference that the Exchange Defendants' intention in doing so was either to monopolize the crypto-commodities market or to restrain trade.  *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (explaining that conspiracy and intent to monopolize are separate requirements of Section 2 claim and affirming dismissal); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) (Section 1 claim requires proof "that the combination or conspiracy . . . ha[d] as its purpose restraint upon competition in the market").

Plaintiffs plead no facts suggesting that the Exchange Defendants possessed a "specific intent to monopolize," as required for their Section 2 claim.  *See Elecs. Commc'ns*, 129 F.3d at 246; *see also Am. Football League v. Nat'l Football League*, 323 F.2d 124, 132 n.18 (4th Cir. 1963) (monopolization claim requires showing that defendant possessed "specific, subjective intent to gain an illegal degree of market control").  All the CAC offers is the conclusory

sentence that "Defendants took these actions with the specific intent to obtain market power over the market for cryptocommodities."  (CAC ¶ 414; *see also id.* ¶ 411 ("Defendants conspired to obtain market power . . . .").)  But conclusions are not facts, and there is not a single factual allegation about the Exchange Defendants' supposed desire to work with other exchanges—i.e., their competitors (*id.* ¶ 421)—to grant them monopoly power.  Even before *Twombly* it was not plausible to infer that either of the Exchange Defendants would have acted against its own self-interest.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1985) (rejecting antitrust claim because "if the factual context renders [plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary"); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995) (dismissing conspiracy to monopolize claim after finding it "implausible" because defendants "lack[ed] a rational [economic] motive to conspire with the [other] defendants to establish a monopoly").

Similarly, the CAC fails to allege any facts showing that the Exchange Defendants agreed to "restrain trade," as required for their Section 1 claim, and once again offers only a generic conclusory allegation: "That price-fixing agreement is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade without any countervailing procompetitive rationale."  (CAC ¶ 419; *see also id.* ¶ 428 ("Defendants' conduct constitutes a *per se* violation of the antitrust laws because the intention of the scheme was to fix, stabilize, or otherwise maintain prices of cryptocommodities.").)  This conclusory allegation against all Defendants does not suggest that the Exchange Defendants—who do not sell cryptocommodities, but merely offer a marketplace for others to do so—agreed to fix the prices of those commodities.

**III.    The CEA claims against the Exchange Defendants should be dismissed.**

Plaintiffs bring their CEA claims under Section 6(c)(1) and CFTC Rule 180.1(a), which prohibit the use of any manipulative device in connection with a futures contract.  *See* 7 U.S.C. § 9 (2018); 17 C.F.R. § 180.1(a) (2018).  The only alleged violations Plaintiffs attribute to the Exchange Defendants are that they falsely equated USDT with U.S. dollars.  (*See* CAC ¶¶ 166 (Poloniex press release stating "Tether is a secure platform that allows deposited US dollars . . . to be converted into 1-to-1 backed [USDT] and held in online or offline wallets."), ¶ 174 ("Bittrex advertised to its customers the ability to purchase USDT from Bittrex through wire transfer" and "stated that '[w]ires are processed using *$1 for 1 USDT*.'").)  Plaintiffs' CEA claims should be dismissed because (i) they are time-barred, (ii) Plaintiffs do not adequately allege they suffered actual damages, and (iii) the CAC contains insufficient factual allegations.

**A.    Plaintiffs' CEA claims are time-barred.**

Dismissal with prejudice is appropriate, where, as here, "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."  *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015).  Manipulation claims under the CEA must "be brought not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c) (2011).  "A cause of action 'arises' under the CEA when a party is placed on inquiry notice of the violation."  *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004).  Plaintiffs' CEA claims against the Exchange Defendants are therefore time-barred if Plaintiffs were on inquiry notice of their claims before June 3, 2018, because Plaintiffs first asserted CEA claims against the Exchange Defendants on June 3, 2020.

Inquiry notice arises "when circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded."  *Id.*  "[C]ourts apply a discovery accrual rule wherein discovery of the injury, not discovery of the other elements of a claim, is what starts

13

the clock." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 573 (S.D.N.Y. 2016).  "[T]he relevant inquiry in market manipulation cases is not when a plaintiff sold a contract or commodity at a loss, but rather when a plaintiff should have discovered that some market participant fraudulently distorted the relevant market, thereby causing the loss." *Wu v. Bitfloor, Inc.*, 2020 WL 2512108, at *6 (S.D.N.Y. May 15, 2020).  "The duty to inquire can be triggered by information contained in the financial press, mainstream media, and publicly filed documents." *NECA-IBEW Pension Tr. Fund v. Bank of Amer. Corp.*, 2013 WL 620257, at *5 (S.D.N.Y. Feb. 15, 2013); *see also Shah v. Meeker*, 435 F.3d 244, 249–51 (2d Cir. 2006) (affirming dismissal of complaint as time-barred based on *Fortune* magazine article), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).

Here, Plaintiffs were on inquiry notice before June 2018 because they base their claims on the Tether Report published six months earlier, in January 2018.  (*See* CAC ¶¶ 212–14, 221, 303–06, 314, 337–39, 375.)  The Tether Report not only suggested market manipulation, it identified Bittrex and Poloniex as potentially participating exchanges.  *See Quantifying the Effect of Tether*, TETHER REPORT (Jan. 24, 2018), https://www.tetherreport.com.  The mainstream media likewise reported these allegations in January 2018: For example, the New York Times published a lengthy article noting, among other things, a subpoena from the Commodities Futures Trading Commission ("CFTC")  to Bitfinex, "investors . . . raising alarm bells about Tether" due to the creation of large amounts of new Tether, that "Tether has never produced a real audit, leading suspicions that Bitfinex may be printing virtual money backed by nothing," and a quote from a market analyst who stated "[t]his absolutely reeks of price manipulation."  Nathaniel Popper,

14

*Worries Grow That the Price of Bitcoin Is Being Propped Up*, N.Y. Times (Jan. 31, 2018), https://www.nytimes.com/2018/01/31/technology/ bitfinex-bitcoin-price.html.[6]

The report and articles should have prompted Goldshtein—the only Plaintiff that allegedly purchased a futures contract (CAC ¶ 22)—to inquire into the truthfulness of the Exchange Defendants' supposedly false statements about USDT by January 2018.  His CEA claims against the Exchange Defendants filed in January 2020 are therefore six months too late and time-barred.

### B.    The CAC fails to adequately allege that Plaintiffs suffered actual damages.

Plaintiffs' CEA claims should also be dismissed because they have not adequately alleged that Goldshtein suffered actual damages.  "[T]he fact that Section 22 limits a defendant's liability to 'actual damages' compels a plaintiff to plead 'actual injury caused by the violation' in addition to the elements of whatever violation they allege in order to successfully state a [CEA] claim."  *Harry v. Total Gas & Power N. Amer., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018).  Acknowledging that "it is rare that a plaintiff will be able to allege that she traded directly with a defendant," the Second Circuit in *Total Gas* stated that "[m]ore commonly, she will have to plead enough facts to make plausible the inference that the prices of her trades with a third party have been substantially influenced by a defendant's trades with a third (or fourth or fifth . . . ) party."  *Id.* at 112.  The Second Circuit further stated:

> When a plaintiff seeks to make plausible a connection between distinct contract types traded on distinct exchanges without a formal rule-based price linkage she will have to plead with greater detail.  After all, in a world of increasingly interconnected markets, it is always possible to claim that the price of one commodity affected another to some degree.  A boilerplate pleading stating that

---

[6] *See also* Arjun Kharpal, *All you need to know about tether, the cryptocurrency that could have 'devastating' effects on the market*, CNBC (Feb. 2, 2018), https://www.cnbc.com/2018/02/02/tether-what-you-need-to-know-about-the-cryptocurrency-worrying-markets.html; Matthew Leising, *Crypto Exchange Bitfinex, Tether Are Said Subpoenaed by CFTC*, Bloomberg (Jan. 30, 2018), https://www.bloombergquint .com/business/crypto-exchange-bitfinex-tether-said-to-get-subpoenaed-by-cftc.

boundaries between markets are porous would allow practically any trader to sue for any manipulation they happened to have heard about in any other commodity. Pleading injury would effectively no longer be a requirement, since at least marginal harm could always effectively be assumed.

*Id.*

The Second Circuit rejected the plaintiffs' arguments that they had sufficiently pleaded actual damages by pleading that the plaintiffs and defendants traded in "one big integrated market" and that plaintiffs' positions in a derivatives contract tied to one natural gas hub were "de facto affected by Total Gas's manipulation" in other natural gas hubs. *Id.* at 114. The Second Circuit concluded that "even assuming arguendo that Total Gas's manipulations impacted Plaintiffs, their complaint provides just as much support for the proposition that they were benefitted by Total Gas's trading as for the proposition that they were harmed by it." *Id.* at 114–15.

Here, Plaintiffs have not pleaded enough facts to make plausible the inference that the prices of Goldshtein's trades have been "substantially influenced" by the Exchange Defendants' statements in 2015 and 2017 regarding the dollar backing of USDT. The only allegations in the CAC about Goldshtein's purchases are that (1) he purchased 629 Bitcoin futures positions, (2) at some unspecified time(s) in an approximately two and a half year period, (3) the prices of those contracts were artificially inflated by Defendants' purported market manipulation, and (4) "as a result [Goldshtein] suffered economic losses and actual damages." (CAC ¶ 22.) Plaintiffs do not point to a single specific transaction Goldshtein entered into and do not plead any "facts to make it plausible that the impact on [Goldshtein] was harmful rather than neutral or beneficial." *Total Gas*, 889 F.3d at 113. Plaintiffs ask the Court to do exactly what the Second Circuit prohibited in *Total Gas*—allow their CEA claims to proceed on the theory that purported manipulation of USDT somehow affected all cryptocommodities futures contracts with any underlying

cryptocurrency on any cryptocurrency exchange anywhere in the United States for over five years.  Plaintiffs' CEA damages allegations are not plausible should be dismissed.

### C.    The CAC fails to adequately plead a manipulation claim.

To state a manipulative device claim under the CEA Plaintiffs must plead, among other elements: (1) a manipulative act, (2) scienter, and (3) reliance.  *In re Commodity Exchange, Inc.*, 213 F. Supp. 3d 631, 673 (S.D.N.Y. 2016).[7]  And because their claim is based on allegedly "false information" (CAC ¶ 437), they must comply with the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) where defendants allegedly created a "false impression" to drive up oil futures).  Plaintiffs have not met this burden on any of these three requirements.

### 1.    The CAC fails to plead a manipulative act.

Plaintiffs allege that the Exchange Defendants violated the CEA by communicating false information about USDT being fully backed by U.S. Dollars, but the only alleged statements identified by the Plaintiffs could not plausibly have been false when made.  A claim "premised on a misstatement cannot occur unless an alleged material misstatement was false at the time it was made.  Thus, [a] statement believed to be true when made, but later shown to be false, is insufficient."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *12 (S.D.N.Y. Apr. 2, 2020).

---

[7] The CFTC has made clear that a CEA manipulative device claim should be judged in accordance with "the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5." CFTC, *Prohibition on the Employment, or Attempted Employment, of Manipulative Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011); *see also In re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at *34 (S.D.N.Y. Mar. 28, 2017) ("The language of CEA section 6(c)(1), particularly the operative phrase 'manipulative or deceptive device or contrivance,' is virtually identical to the terms used in section 10(b) of the Securities Exchange Act of 1934. . . . Accordingly, case law developed under Section 10(b) of the Exchange Act and SEC Rule 10b-5 is instructive in construing CEA Section 6(c)(1) and Commission Regulation 180.1(a).").

For Poloniex, Plaintiffs cite a joint press release by Poloniex and Tether stating that Tether allows dollars to be converted into 1-to-1 backed USDT.  (*See* CAC ¶ 166.)  Plaintiffs do not allege that the statement was false when it was made in February 2015.  Nor are there facts alleged in the CAC that would support such an inference.  For Bittrex, Plaintiffs claim only that on August 25, 2017, Bittrex informed customers that they could purchase USDT from Bittrex through wire transfers and that it would cost "*$1 for 1 USDT*."  (*Id.* ¶ 174.)  Plaintiffs do not explain what was false about that notice, since purchasers of USDT on Bittrex in fact paid 1 U.S. Dollar for each USDT.

### 2.    The CAC fails to allege that the Exchange Defendants intentionally or recklessly deceived the market.

"Plaintiffs' manipulative device claims under Section 6(c)(1) and 17 C.F.R. 180.1 require scienter to be proven by intentional or reckless conduct."  *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 569 n.27 (S.D.N.Y. 2016).  Once again, Plaintiffs' allegations about the Exchange Defendants are insufficient.  As explained above, Plaintiffs ask the Court to infer the Exchange Defendants' knowledge of unbacked Tether by arguing that they "must have known" it was unbacked and therefore "must have" intended to deceive the market. (*See, e.g.*, CAC ¶ 328 ("Bittrex and Poloniex likewise must have known that it was highly implausible that these USDT transfers to their exchanges were fully backed by U.S. Dollars.").) In this Circuit, however, "'should have known' allegations are insufficient to allege scienter." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 2020 WL 1529371, at *29 (S.D.N.Y. Mar. 30, 2020) (dismissing fraud claim for failure to plead scienter).

### 3.    The CAC fails to plead reliance.

Plaintiffs do not allege that Goldshtein relied on the statements from the Exchange Defendants about USDT, precluding him from stating a CEA claim against them.  Nowhere in

the CAC is there any allegation that Goldshtein read, much less relied on, the statements issued by Bittrex or Poloniex.  And to rely on a fraud-on-the-market presumption, Plaintiffs "must demonstrate that the alleged misrepresentations were publicly known[,] . . . that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed."  *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 99 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016).  The CAC does not make this showing.

> **D.**    **The CAC fails to state a claim for principal-agent liability or for aiding and abetting.**

Plaintiffs' claims for principal-agent liability and for aiding and abetting fail for two reasons.  First, they are foreclosed by Plaintiffs' failure to plead a primary violation for CEA manipulation.  *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018).  Second, Plaintiffs have not adequately pleaded either theory of vicarious liability.  To adequately plead a claim for principal-agent liability, Plaintiffs must plead "(1) the principal's manifestation of intent to grant authority to the agent and (2) agreement by the agent."  *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 532 (S.D.N.Y. 2008).  Here, the CAC contains no allegation that any of the Defendants intended to grant authority to Bittrex or Poloniex, or that either Exchange Defendant accepted authority from any of the other Defendants.

Plaintiffs have also failed to plead any facts supporting their aiding and abetting claim.  The CAC contains one conclusory paragraph on aiding and abetting, which states that "Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA" and did so with "knowledge of other defendants' manipulation of cryptocommodity prices . . . and substantially and willfully intended to assist these manipulations to cause artificial prices

during the Class Period." (CAC ¶ 447.) Merely repeating the statutory language does not satisfy Rule 9(b). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs' aiding and abetting claim should also be dismissed.

## IV.   The RICO claim against the Exchange Defendants should be dismissed.

Civil RICO is considered "'an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), *aff'd* 113 F.3d 1229 (2d Cir. 1997). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* Those concerns are particularly relevant here where the Exchange Defendants face civil RICO claims and potential treble damages for merely operating their cryptocurrency exchanges.

Because, as the Tether Defendants explain, Plaintiffs' substantive RICO claims fail, the RICO conspiracy claim against the Exchange Defendants also fails. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (dismissal of RICO conspiracy claim where Plaintiffs did not "adequately allege a substantive violation of RICO"). Plaintiffs' RICO conspiracy claim against the Exchange Defendants fails for additional reasons. First, Plaintiffs do not plead facts sufficient for a plausible inference that (1) Bittrex or Poloniex knowingly entered into an agreement to facilitate the alleged scheme, (2) Bittrex or Poloniex actually agreed to commit two predicate acts in furtherance of the enterprise, or (3) that if the predicate acts had been committed, they would have constituted a pattern of racketeering activity as required for a RICO violation. Second, Plaintiffs do not plead that their alleged injury was proximately caused by any action of the Exchange Defendants.

### A.    The CAC fails to allege facts supporting a RICO conspiracy claim.

To state their RICO conspiracy claim, Plaintiffs must allege facts "that each defendant 'knew about and agreed to facilitate' a pattern of racketeering activity."  *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, 2012 WL 1231775, at *8 (S.D.N.Y. Apr. 12, 2012) (quoting *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003)).  Accordingly, "the Second Circuit has instructed that a plaintiff must prove that (i) the defendants agreed to form and associate themselves with a RICO enterprise; (ii) the defendants agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise; and (iii) if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity."  *Elsevier, Inc. v. Grossman*, 2013 WL 6331839, at *11 (S.D.N.Y. Dec. 5, 2013) (Failla, J.) (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244–45 (2d Cir. 1999)).  To survive a motion to dismiss, a RICO conspiracy claim must:

> contain allegations of some factual basis for a finding of a conscious agreement among the defendants. . . .  These allegations must not be conclusory, but must set forth facts that show that each defendant entered into an agreement *to conduct the affairs of a particular, identified enterprise through a pattern of racketeering activity*—not simply that each defendant committed two predicate acts, without regard to whether those acts were committed in furtherance of the activity of the enterprise.

*Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010) (emphasis in original); *see also Nat'l Group for Commc'ns & Computer Ltd. v. Lucent Techs., Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) (dismissing RICO conspiracy claim where plaintiff "repeatedly state[d] that defendants 'conspired' or 'agreed' with one another" without "set[ting] forth sufficient facts to suggest how each defendants, through words or actions, reached an agreement").

Here, Plaintiffs have simply not plead facts that would support a RICO conspiracy claim. Instead, Plaintiffs only make conclusory allegations and parrot the language of the statute.  *See*

*Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 407 (S.D.N.Y. 2000) ("The mere parroting of the statutory language in the pleadings is insufficient to show that each defendant knowingly agreed to participate in the alleged scheme.").  Plaintiffs allege:

- "Defendants agreed to further an endeavor that, if completed, constituted a violation of § 1962(c) or § 1962(a), by agreeing to participate in or facilitate predicate acts through which some or all of the Defendants would conduct or participate in the affairs of the associated individuals and entities constituting the Enterprise."  (CAC ¶ 565.)

- "Defendants agreed to further the objective .  .  . of manipulating the price of cryptocommodities by engaging in a scheme to defraud the market; and of achieving that objective through conduct constituting a pattern of racketeering activity, either by themselves or by others in the Enterprise, in order to conduct and participate in the affairs of, and to operate, the Enterprise, or to facilitate the operation and management of the Enterprise."  (*Id.* ¶ 566.)

- "Bittrex and Poloniex agreed to and did facilitate the commission of wire fraud, money laundering, and transacting in property derived from specified unlawful activity."  (*Id.* ¶ 567(b).)

Plaintiffs present no facts suggesting a conscious agreement among the Tether Defendants and the Exchange Defendants.  They do not identify any communication or meeting among the Defendants about an agreement, nor do they state what actions were taken (and by whom) in furtherance of such an agreement.  These types of factual details are necessary to plausibly plead an agreement.  *See Makowski v. United Broth. of Carpenters & Joiners of Am.*, 2010 WL 3026510, at *5 (S.D.N.Y. Aug. 2, 2010) ("plaintiff must allege 'that each defendant, by words or actions, manifested an agreement" to commit a RICO conspiracy).

Plaintiffs only speculate regarding the existence of an agreement between the Tether Defendants and the Exchange Defendants, but that is insufficient.  *See Morin v. Trupin*, 711 F. Supp. 97, 111 (S.D.N.Y. 1989) ("[A] plaintiff 'must show that the defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses.").  For example, Plaintiffs contend that Bittrex and Poloniex "each operated a

crypto-exchange and accepted trades of USDT and other cryptocommodities" since 2015 as alleged proof of this agreement.  (CAC ¶ 461.)  Operating their crypto-exchanges—and permitting trading of USDT on those exchanges—is not evidence of any *agreement* to engage in a pattern of racketeering conduct between Bittrex, Poloniex, or the Tether Defendants, but rather "more likely explained by" activities in the normal course of Bittrex and Poloniex's day-to-day business. *See Iqbal*, 556 U.S. at 681 (plaintiffs' allegations were consistent with an unlawful purpose, "[b]ut given more likely explanations, they do not plausibly establish this purpose.").

The only facts Plaintiffs allege to support an agreement is that Bittrex and Poloniex allowed USDT to trade on their respective exchanges.  This is not sufficient to allege a conscious agreement to commit a RICO conspiracy.  If the types of allegations Plaintiffs assert here are enough to find an agreement between the Bittrex, Poloniex and the Tether Defendants, then any cryptocurrency exchange allowing trading of USDT is also liable for a RICO claim.

In addition to this fundamental failing, Plaintiffs do not allege facts demonstrating an agreement to commit at least two predicate acts, which is also essential to a RICO conspiracy claim.  "Plaintiffs must specifically allege that each of these defendants entered into an agreement to commit two predicate acts . . . .  Plaintiffs must . . . allege the defendants embraced the conspiracy.  The defendant must be aware of the existence of the conspiracy, and understand that the RICO enterprise extends beyond his individual role." *Goldfine*, 118 F. Supp. 2d at 407.  Plaintiffs have failed to plead facts making this showing.[8]  Instead, Plaintiffs allege only that the Exchange Defendants "facilitated the Enterprise's scheme . . . [because they knew] that Bitfinex was transferring large amounts of debased USDT to their exchanges and [Bittrex and Poloniex]

---

[8] Plaintiffs make the conclusory allegation that Bittrex and Poloniex "agreed to and did facilitate" wire fraud and money laundering without setting forth any facts plausibly showing an agreement to commit these predicate acts as part of the enterprise in the first place.  (*See* CAC ¶ 567(b).)

accepted these transfers" anyhow.  (CAC ¶ 472.)  According to Plaintiffs, this was allegedly

because the Exchange Defendants "knew" the wallet addresses the USDT transfers were made to

were owned or controlled by Bitfinex.  (*See e.g.*, *id.*)  But as explained above, the CAC contains

insufficient facts to plausibly infer such "knowledge."

Lastly, Plaintiffs have failed to allege that "had [the predicate acts] been carried out, they

would have constituted a *pattern* of racketeering activity."  *Elsevier, Inc.*, 2013 WL 6331839, at

*11.  The 13-month time frame in which Plaintiffs assert predicate acts were committed in

furtherance of the alleged enterprise is insufficient to establish a pattern of racketeering activity.

*See First Capital Asset Mgmt.*, 385 F.3d at 181 (Second Circuit has "never found a close-ended

pattern where the predicate acts spanned fewer than two years.").

Plaintiffs speculate that the Exchange Defendants *must have* known, *must have* agreed,

and *must have* taken steps to facilitate the scheme, but do not allege the facts of (1) a conscious

agreement between the Defendants, (2) an agreement to commit two predicate acts, or (3) that

the predicate acts constituted racketeering activity.  The RICO claim should be dismissed.

**B.    The CAC does not adequately plead that Plaintiffs' alleged injuries were proximately caused by a RICO violation.**

Plaintiffs also do not allege facts that Bittrex or Poloniex "*proximately* cause[d]

plaintiff's injury."  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–25 (2d Cir.

1990) .  Where a plaintiff's theory of proximate causation "requires [the court] to move well

beyond the [causal] first step, that theory cannot meet RICO's direct relationship requirement."

*See Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 10 (2010).  The injury Plaintiffs

allege—"purchasing cryptocommodities at artificially inflated prices they would not have paid

but for the . . .  Defendants' conduct" to "manipulate the price of cryptocommodities by

engaging in a scheme to defraud the market"—is too remote to qualify as "direct injury."  (CAC ¶¶ 456–57.)

The Exchange Defendants are not identified as active participants in the "Enterprise" and are not a "Count Eight Defendant" that allegedly "caused" Plaintiffs' RICO injuries.  (*See id.* ¶¶ 450, 457.)  They are not alleged to have issued either the USDT or the cryptocommodities that Plaintiffs allegedly bought at artificially inflated prices.  Plaintiffs also do not allege that they bought their cryptocommodities on either the Bittrex or Poloniex exchanges.  There simply is nothing in the CAC tying Plaintiffs' alleged injuries to Bittrex or Poloniex.  Without such factual allegations, there is no basis to sustain a claim that Bittrex or Poloniex *proximately* caused Plaintiffs' alleged injuries.  *See Makowski*, 2010 WL 3026510, at *8 ("When factors other than the defendant's RICO violation 'are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.'").

Instead, Plaintiffs allege only that Bittrex and Poloniex operated their businesses in the normal course—allowing cryptocurrencies to be traded—and in so doing, a scheme was perpetrated by other Defendants that eventually resulted in Plaintiffs' injury.  This link is "too remote, purely contingent, or indirect" to be sufficient to overcome a motion to dismiss.  *See 7 West 57th Street Realty Co., LLC. v. Citigroup, Inc.*, 771 F.Appx 498, 503–04 (2d Cir. 2019).

## CONCLUSION

The CAC spins a fantastical tale alleging an elaborate scheme of epic fraud.  But innuendo is insufficient to state a claim.  The CAC should be dismissed as to the Exchange Defendants.  And because Plaintiffs have had multiple opportunities to plead their best claim, the dismissal should be with prejudice.

Dated:    September 3, 2020
          New York, New York

Respectfully submitted,


**O'MELVENY & MYERS LLP**

/s/ Abby F. Rudzin
Abby F. Rudzin
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000
arudzin@omm.com

William K. Pao
(*admitted pro hac vice*)
400 South Hope Street
Los Angeles, California 90071
Telephone:  (213) 430-6000
wpao@omm.com

**MCNAUL EBEL NAWROT &
HELGREN PLLC**

Greg J. Hollon
(*admitted pro hac vice*)
Timothy B. Fitzgerald
600 University Street, Suite 2700
Seattle, WA 98101
Telephone:  (206) 467-1816
ghollon@mcnaul.com
tfitzgerald@mcnaul.com

*Attorneys for Bittrex, Inc.*

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

Matthew G. Lindenbaum
(*admitted pro hac vice*)
One Post Office Square 30th Floor
Boston, MA  02109
Telephone:  (617) 217-4700
matthew.lindenbaum@nelsonmullins.com

Robert L. Lindholm
280 Park Avenue
15th Floor, West
New York, New York 10017
Telephone:  (646) 428-2600
robert.lindholm@nelsonmullins.com

*Attorneys for Poloniex, LLC*