**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re Tether and Bitfinex
Crypto Asset Litigation

Case No. 19-cv-09236 (KPF)

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW**
**IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS**

Philippe Z. Selendy
Caitlin Halligan
Andrew R. Dunlap
SELENDY & GAY PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com

Todd M. Schneider (*pro hac vice*)
Jason H. Kim (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
Kyle G. Bates (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
   KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
jkim@schneiderwallance.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

Kyle W. Roche
Edward Normand
Velvel Freedman (*pro hac vice*)
Joseph M. Delich
ROCHE CYRULNIK FREEDMAN LLP
90 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
tnormand@rcfllp.com
vel@rcfllp.com
jdelich@rcfllp.com

*Interim Lead Counsel and Attorneys for the*
*Plaintiffs and the Proposed Class*

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ....................................................................................................................4

    A.    Defendants Lie To The Markets About USDT .......................................................4

        1.    Expert Analysis Shows That Tether Did Not Issue USDT Only In Response To Legitimate Customer Demand .................................5

        2.    Tether's Banking History Shows That USDT Was Not Fully Backed By U.S. Dollars .......................................................7

        3.    Tether's Strategically Timed "Burning" Of Over A Billion USDT Shows That USDT Was Not Fully Backed By U.S. Dollars ......................8

    B.    Defendants Use Debased USDT To Manipulate The Crypto-Commodity Market .................................................................................9

ARGUMENT ......................................................................................................................11

I.    PLAINTIFFS STATE VIABLE ANTITRUST CLAIMS .................................................12

    A.    Plaintiffs Have Antitrust Standing Because They Transacted In A Market Subject To Price Manipulation ...........................................................12

    B.    Plaintiffs State Viable Section 2 Claims ...........................................................14

        1.    The Bitfinex/Tether Defendants Have Monopoly Power Because They Directly Controlled Crypto-Commodity Prices ...............................14

        2.    The Bitfinex/Tether Defendants' Manipulation Of Crypto-Commodity Prices Was Anticompetitive .......................................17

        3.    Defendants Conspired To Monopolize The Crypto-Commodities Market ...........................................................................18

        4.    Alternatively, Defendants Attempted To Monopolize The Crypto-Commodity Market ...........................................................19

    C.    Plaintiffs State Viable Section 1 Claims ...........................................................19

        1.    Defendants Conspired To Inflate Crypto-Commodity Prices ...................20

        2.    Defendants' Conduct Unreasonably Restrained Trade ............................25

II.     PLAINTIFFS STATE VIABLE COMMODITIES EXCHANGE ACT CLAIMS ........... 25

        A.      Plaintiffs Have CEA Standing ................................................................. 25

        B.      Plaintiffs State A Viable Price Manipulation Claim ............................... 28

        C.      Plaintiffs State A Viable Manipulative Device Claim ........................... 33

        D.      Plaintiffs State Viable Aiding and Abetting Claims .............................. 35

        E.      Plaintiffs State Viable Principal/Agent Liability Claims ....................... 36

        F.      Plaintiffs' CEA Claims Against The Exchange Defendants Are Timely ............. 38

III.    PLAINTIFFS STATE VIABLE RICO CLAIMS ........................................... 41

        A.      The RICO Defendants' Predicate Acts Proximately Caused Plaintiffs'
                RICO Injury Under § 1962(c) ................................................................. 42

                1.      The RICO Defendants' Sales of Unbacked USDT Injured Plaintiffs
                        Directly By Causing Crypto-Commodity Price Inflation .......................... 43

                2.      The Continued Inflation of Crypto-commodity Prices After The
                        RICO Defendants' USDT Sales was a Direct and Foreseeable
                        Result of The RICO Defendants' Conduct .................................... 47

        B.      If The RICO Defendants Did Not Cause Plaintiffs' Injury in Violating
                § 1962(c), Then The Bitfinex/Tether Defendants Necessarily Caused The
                Injury In Violating § 1962(a) ................................................................. 51

        C.      Plaintiffs Have Properly Pled The Commission Of Two Or More Predicate
                Acts Against Each RICO Defendant ...................................................... 54

                1.      Wire Fraud ................................................................................. 54

                2.      Money Laundering ...................................................................... 55

                3.      Operation Of Unlicensed Money Transmitting Businesses ................ 57

                4.      Bank Fraud ................................................................................. 59

        D.      The Complaint Properly Pleads A RICO Claim Against Fowler And Potter ........ 62

        E.      Plaintiffs Adequately Allege A RICO Conspiracy Against All Defendants ......... 64

IV.     PLAINTIFFS STATE VIABLE STATE-LAW CLAIMS ................................ 66

        A.      Plaintiffs Adequately Allege Common-Law Fraud ............................... 66

|  |  | 1. | Plaintiffs Adequately Allege Reliance | 66 |
|  |  | 2. | Plaintiffs Adequately Allege Causation | 68 |
|  |  | 3. | Plaintiffs Adequately Allege Damages | 69 |
|  |  | 4. | Plaintiffs Adequately Allege Potter's Participation in the Fraud | 69 |
|  | B. | Plaintiffs Adequately Allege A GBL § 349 Claim | | 71 |
|  |  | 1. | Plaintiffs Allege Consumer-Oriented Misconduct | 71 |
|  |  | 2. | Plaintiffs Adequately Allege Causation Because The Deceptive Scheme Targeted Consumers | 73 |
| V. | THIS COURT HAS PERSONAL JURISDICTION OVER FOWLER | | | 75 |
|  | A. | The Court Has Personal Jurisdiction Over Fowler Under the CEA | | 76 |
|  | B. | The Court Has Personal Jurisdiction Over Fowler Under The RICO Statute | | 76 |
|  | C. | The Court Has Personal Jurisdiction Over Fowler Under The CPLR | | 78 |
|  |  | 1. | Plaintiffs Allege That Fowler Transacted Business In New York | 78 |
|  |  | 2. | Plaintiffs' Claims Arise From Fowler's Business Activity In New York | 81 |
|  | D. | The Court Has Personal Jurisdiction Over Fowler As A Co-Conspirator | | 82 |
|  | E. | Personal Jurisdiction Over Fowler Comports With Due Process | | 83 |
| CONCLUSION | | | | 84 |

## **TABLE OF AUTHORITIES**

**Pages**

**Cases**

*7 West 57th Street Realty Company, LLC v. Citigroup, Inc.*,
    771 Fed. App'x 498 (2d Cir. 2019)..................................................... 45

*Abraham v. American Home Mortgage Servicing, Inc.*,
    947 F.Supp.2d 222 (E.D.N.Y. 2013) ................................................ 73

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999)...................................................... 16, 19

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) .............................................................. 81, 82

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988)...................................................................... 17

*Almanza v. United Airlines, Inc.*,
    851 F.3d 1060 (11th Cir. 2017) ..................................................... 64

*AmTrust Fin. Servs., Inc. v. Lacchini*,
    260 F. Supp. 3d 316 (S.D.N.Y. 2017)......................................... 75, 76

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)........................................................ 20, 22

*Anderson v. Indiana Black Expo, Inc.*,
    81 F. Supp. 2d 494 (S.D.N.Y. 2000)............................................... 81

*Anza v. Ideal Steel Corporation*,
    547 U.S. 451 (2006).................................................................... 47

*Aquino v. Trupin*,
    833 F. Supp. 336 (S.D.N.Y. 1993)................................................. 61

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................... 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................ 33

*Bank of China v. NBM LLC*,
    359 F.3d 171 (2d Cir. 2004).......................................................... 61

*Basis PAC-Rim Opportunity Fund v. TCW Asset Mgmt. Co.*,
    149 A.D.3d 146 (1st Dep't 2017) .................................................. 68

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 11

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ......................................................... 81

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ............................................................... passim

*Casper Sleep, Inc. v. Mitcham*,
    2016 WL 7188788 (S.D.N.Y. Nov. 17, 2016) ............................... 75

*CFTC v. Wilson*,
    2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ............................... 30

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ..................................................... 82, 83

*Chevron Corp. v. Donziger*,
    871 F. Supp. 2d 229 (S.D.N.Y. 2012) ......................................... 43

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ......................................................... 32

*City of Long Beach v. Total Gas & Power North America, Inc.*,
    2020 WL 3057796 (S.D.N.Y. June 8, 2020) ............................... 13

*City of New York v. Cyco.Net, Inc.*,
    383 F. Supp. 2d 526 (S.D.N.Y. 2005) ..................................... 76, 77

*City of New York v. Smokes-Spirits.Com, Inc.*,
    12 N.Y.3d 616 (2009) ................................................................... 74

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
    878 F.3d 36 (2d Cir. 2017) ........................................................... 29

*Comm. Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016) ..................................... passim

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
    271 F.3d 374 (2d Cir. 2001) ......................................................... 49

*Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York*,
    994 F. Supp. 133 (E.D.N.Y. 1998) ............................................... 12

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018)...........................................................................47

*Dale v. Banque SCS Alliance S.A.*,
    2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005)..............................................57

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)..........................................................................77

*De Sole v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 387 (S.D.N.Y. 2015)...........................................................65

*De Sole v. Knoedler Gallery, LLC*,
    974 F. Supp. 2d 274 (S.D.N.Y. 2013)...........................................................47

*DeAngelis v. Corzine*,
    17 F. Supp. 3d 270 (S.D.N.Y. 2016).......................................................71, 72

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001)..........................................................................63

*Dennis v. JP Morgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018)...........................................................49

*DigitalIRA.com v. Kingdom Tr. Co.*,
    2019 WL 5896362 (D.S.D. Nov. 12, 2019)...................................................56

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016)............................................................................11

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006)...........................................................17

*Eastman Kodak Co. v. Henry Bath LLC*,
    936 F.3d 86 (2d Cir. 2019)......................................................................16, 25

*Edmonds v. Seavey*,
    2009 WL 2949757 (S.D.N.Y. Sept. 15, 2009)..............................................61

*Elliott Industries Limited Partnership v. BP American Production Co.*,
    407 F.3d 1091 (10th Cir. 2005) ................................................................13, 14

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F. Supp. 2d 297 (S.D.N.Y. 2010)...........................................................78

*Elsevier, Inc. v. Grossman*,
    77 F. Supp.3d 331 (S.D.N.Y. 2015)..............................................................38

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
    902 F.3d 132 (2d Cir. 2018)....................................................................................... 46

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) .................................................................................................... 33

*Fezzani v. Bear, Stearns & Co.*,
    384 F.Supp.2d 618 (S.D.N.Y. 2004)......................................................................... 67

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019)....................................................................... 83

*Frintzilas v. DirecTV, LLC*,
    731 F. App'x 71 (2d Cir. 2018) ................................................................................. 74

*GAMCO Inv'rs, Inc. v. Vivendi, S.A.*,
    927 F. Supp. 2d 88 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Inv'rs, Inc. v.*
    *Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016) ..................................... 34

*Gates v. Wilkinson*,
    2003 WL 21297296 (S.D.N.Y. June 4, 2003) .................................................. 77

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)............................................................................ passim

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)....................................................................................... 15

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014)....................................................................................... 83

*Guy's Mechanical Sys., Inc. v. FIA Card Servs.*, N.A.,
    339 F. App'x 193 (3d Cir. 2009) ............................................................................... 53

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014*)*...................................................................................................... 35

*Harry v. Total Gas & Power North America, Inc.*,
    889 F.3d 104 (2d Cir. 2018)............................................................................... 27, 28

*Hart v. Internet Wire, Inc.*,
    145 F. Supp. 2d 360 (S.D.N.Y. 2001)....................................................................... 32

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990).............................................................................. 46, 48

*Hemi Grp. v. City of New York, N.Y.*,
    559 U.S. 1 (2010)............................................................................................. 42, 46

*Hodges v. Monkey Capital LLC*,
    2018 WL 9686569 (S.D. Fla. Aug. 14, 2018)...................................................... 56

*Holmes v. Parade Place, LLC*,
    2013 WL 5405541 (S.D.N.Y. Sept. 26, 2013).................................................... 39

*Holmes v. Sec. Inv. Protection Corp.*,
    503 U.S. 258 (1992)................................................................................ 43, 48, 49

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013).................................................... 33

*Ideal Steel Supply Corp. v. Anza*,
    547 U.S. 451 (2006).......................................................................................... 52

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011)........................................................................ 51, 52, 53

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014), *as corrected* (June 19, 2014)............................. 17

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ................................................ 24

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008, *aff'd*, 730 F.3d 170 (2d Cir. 2013) ............... 35, 76

*In re Bear Stearns*,
    995 F.Supp.2d 291 (S.D.N.Y. 2014)................................................................. 66

*In re Blech Sec. Litig.*,
    961 F. Supp. 569 (S.D.N.Y. 1997)................................................................... 67

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)............................................................... 28

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)..................................................... passim

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009).............................................................................. 70

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012).............................................................. 11

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)................................................................................ 23

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ................................................. 29

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ...................................... 26, 31, 34, 35

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016) ...................................... 35, 36, 37

*In re Nat. Gas Commodity Litig.*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004) .................................................. 35

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .................................... 26

In re *Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) .................................... 26, 83

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017) .................................................. 83

*In re Refco Inc. Sec. Litig.*,
    826 F. Supp. 2d 478 (S.D.N.Y. 2011) .................................................. 48

*In re Reichmeierr*,
    2020 WL 1908328 (Bankr. D. Kan. Apr. 15, 2020) ........................ 56

*In re Sumitomo Copper Litig.*,
    104 F. Supp. 2d 314 (S.D.N.Y. 2000) .................................................. 45

*In re Sumitomo Copper Litig.*,
    120 F. Supp. 2d 328 (S.D.N.Y. 2000) .................................................. 38

*In re Term Commodities Cotton Futures Litig.*,
    2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ........................ 15, 16

*In re Term Commodities Cotton Futures Litig.*,
    2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014) ................................ 15

*In re Term Commodities Cotton Futures Litig.*,
    2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ................................ 50

*In re Tezos Secs. Litig.*,
    2018 WL 4293341 (August 7, 2018) .................................................. 56

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
    812 F.2d 786 (2d Cir. 1987) .................................................. 18

*Int'l Fund Mgmt. v. Citigroup*,
    822 F.Supp.2d 368 (S.D.N.Y. 2011)...................................................................66

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018)........................................................11, 22

*K & D Corp. v. Concierge Auctions, LLC*,
    2 F. Supp. 3d 525 (S.D.N.Y. 2014)...................................................................52

*Kelco Constr., Inc. v. Spray in Place Sols., LLC*,
    2019 WL 4467916 (E.D.N.Y. Sept. 18, 2019) ................................................53

*KMB Warehouse Distributors, Inc. v. Walker Manufacturing Co.*,
    61 F.3d 123 (2d Cir. 1995)...............................................................................16

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012)..............................................................................38

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ......................................................................................81

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 414 (N.Y. 1996) ..............................................................................69

*Laub v. Faessel*,
    297 A.D.2d 28 (1st Dep't 2002) ......................................................................67

*Lavastone Capital LLC v. Conventry First LLC*,
    2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015)..................................................60

*Laydon v. Mizuho Bank, Ltd.*,
    2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .................................................13

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (Jan. 20, 2005) ...........................................................................38

*Levy v. BASF Metals Ltd.*,
    917 F.3d 106 (2d Cir.), *cert. denied*, 140 S. Ct. 536 (2019)............................38

*Licci v. Lebanese Canadian Bank*,
    20 N.Y.3d 327 (2012) ................................................................................81, 82

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)..................................................................79, 81, 84

*LLM Bar Exam, LLC v. Barbri, Inc.*,
    271 F. Supp. 3d 547 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136 (2d Cir. 2019) .....11

*Local Ventures & Invs., LLC v. Open Found.*,
2019 WL 7877935 (N.D. Cal. Mar. 12, 2019)................................................. 56

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
797 F.3d 160 (2d Cir. 2015).......................................................................... 68

*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*,
137 F. Supp. 3d 430 (S.D.N.Y. 2015)........................................................... 41

*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*,
386 F. Supp. 3d 319 (S.D.N.Y. 2019)........................................................... 64

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013).......................................................................... 22

*Merced Irrigation Dist. v. Barclays Bank PLC*,
165 F. Supp. 3d 122 (S.D.N.Y. 2016)................................................... passim

*Minpeco, S.A. v. ContiCommodity Services, Inc.*,
552 F. Supp. 332 (S.D.N.Y. 1982)........................................................... 66, 67

*Minpeco, S.A. v. Hunt*,
718 F. Supp 168 (S.D.N.Y. 1989)................................................................. 49

*Morris v. Gilbert*,
649 F. Supp. 1491 (E.D.N.Y. 1984), ........................................................... 72

*N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*,
102 A.D.3d 5 (2d Dep't 2012)....................................................................... 74

*New York University v. Continental Insurance Company*,
662 N.E.2d 763 (1995).................................................................................. 73

*Newman v. Warnaco Grp., Inc.*,
335 F.3d 187 (2d Cir. 2003).......................................................................... 38

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018).................................................................................. 16

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
85 N.Y.2d 20 (1995)..................................................................................... 71

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990)............................................................................ 51

*Pasternack v. Lab. Corp. of Am. Holdings*,
27 N.Y.3d 817 (N.Y. 2016) ..................................................................... 66, 67

xi

*PepsiCo, Inc. v. Coca-Cola Co.*,
　　315 F.3d 101 (2d Cir. 2002)..............................................................15

*Pettenato v. Beacon Health Options, Inc.*,
　　425 F. Supp. 3d 264 (S.D.N.Y. 2019).................................................78

*Philadelphia v. Bank of America*,
　　2020 WL 6430307 (S.D.N.Y. Nov. 2, 2020).......................................21

*Pincione v. D'Alfonso*,
　　506 F. App'x 22 (2d Cir. 2012). ........................................................77

*Pludeman v. N. Leasing Sys., Inc.*,
　　890 N.E.2d 184 (N.Y. 2008)........................................................69, 70

*Portney v. CIBA Vision Corp.*,
　　593 F. Supp. 2d 1120 (C.D. Cal. 2008) .............................................16

*Pryor v. Jaffe & Asher, LLP*,
　　992 F. Supp. 2d 252 (S.D.N.Y. 2014)................................................14

*PT United Can Co. v. Crown Cork & Seal Co.*,
　　138 F.3d 65 (2d Cir. 1998)..........................................................76, 78

*Ramiro Aviles v. S&P*,
　　380 F.Supp.3d 221 (S.D.N.Y. 2019).........................................66, 79, 81, 82

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
　　51 F.3d 1421 (9th Cir. 1995) ............................................................16

*Reich v. Lopez*,
　　38 F. Supp. 3d 436 (S.D.N.Y. 2014).................................................43

*Related Cos. v. Ruthling*,
　　2017 WL 6507759 (S.D.N.Y. Dec. 18, 2017). .................................61

*Reves v. Ernst & Young*,
　　507 U.S. 170 (1993)..........................................................................63

*Salinas v. United States*,
　　522 U.S. 52 (1997)......................................................................64, 65

*Schultz v. Commercial Programming Unlimited Inc.*,
　　1992 WL 396434 (S.D.N.Y. Dec. 23, 1992) .....................................67

*Scone Investments, L.P. v. Am. Third Market Corp.*,
　　1998 WL 205338 (S.D.N.Y. Apr. 28, 1998).......................................67

*SEC v. U.S. Envtl., Inc.*,
  155 F.3d 107 (2d Cir. 1998)..................................................................... 32, 33

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985)..................................................................................... 41

*Shak v. JPMorgan Chase & Co.*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016)......................................................... 15

*Simington v. Lease Fin. Grp., LLC*,
  2012 WL 651130 (S.D.N.Y. Feb. 28, 2012)................................................ 70

*Sims v. First Consumers Nat. Bank*,
  303 A.D.2d 288, 289 (1st Dep't 2003) ....................................................... 72

*Singh v. NYCTL 2009-A Tr.*,
  2016 WL 3962009 (S.D.N.Y. July 20, 2016), *aff'd*, 683 F. App'x 76 (2d Cir.
  2017) ........................................................................................................... 22

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
  2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ................................................ 24

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
  17 F. Supp. 3d 207 (E.D.N.Y. 2014) .......................................................... 48

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
  450 F.3d 100 (2d Cir. 2006)........................................................................ 78

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)......................................................... 83

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
  954 F.3d 529 (2d Cir. 2020)..................................................... 43, 44, 45, 49

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)........................................................................ 39

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)........................................................................ 12

*Sullivan v. Barclays*,
  2017 WL 685570 (S.D.N.Y. 2017).............................................................. 26

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998).................................................................... 16, 19

*Trump v. Vance*,
  2020 WL 4861980 (S.D.N.Y. Aug. 20, 2020)............................................. 23

*Twin Labs., Inc. v. Weider Health & Fitness*,
    900 F.2d 566 (2d Cir. 1990)............................................................................ 19

*United States v. $1,399,313.74 in U.S. Currency*,
    591 F. Supp. 2d 365 (S.D.N.Y. 2008)............................................................ 22

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)............................................................................ 20

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)............................................................................ 25

*United States v. Applins*,
    637 F.3d 59 (2d Cir. 2011)............................................................................. 65

*United States v. Approximately 250 Documents Containing the Forged Hand Writing of*
    *President John F. Kennedy & Others*,
    2008 WL 4129814 (S.D.N.Y. Sept. 5, 2008)................................................ 57

*United States v. Arrington*,
    941 F.3d 24 (2d Cir. 2019)............................................................................. 64

*United States v. Bailey*,
    444 U.S. 394 (1980)........................................................................................ 22

*United States v. Budovsky*,
    2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015)............................................... 56

*United States v. Ciccone*,
    312 F.3d 535 (2d Cir. 2002)............................................................................ 64

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)........................................................................... 55

*United States v. Day*,
    700 F.3d 713 (4th Cir. 2012) ......................................................................... 57

*United States v. Faiella*,
    39 F. Supp. 3d 544 (S.D.N.Y. 2014).............................................................. 56

*United States v. Fowler*,
    No. 19-CR-254 (S.D.N.Y. Feb. 20, 2020) ..................................................... 79

*United States v. Fowler,* 19-cr.-00245, ECF No. 66 (S.D.N.Y).. ............................... 58

*United States v. Gotti*,
    457 F. Supp. 2d 411 (S.D.N.Y. 2006)............................................................ 53

*United States v. Gotti*,
  459 F.3d 296 (2d Cir. 2006)..................................................................... 57

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ............................................................................... 14

*United States v. Maher*,
  108 F.3d 1513 (2d Cir. 1997)................................................................... 57

*United States v. Murgio*,
  209 F. Supp. 3d 698 (S.D.N.Y. 2016)...................................................... 56

*United States v. Petix*.
  2016 WL 7017919 (W.D.N.Y. Dec. 1, 2016)........................................... 56

*United States v. Prevezon Holdings LTD.*,
  122 F. Supp. 3d 57 (S.D.N.Y. 2015)........................................................ 83

*United States v. Thorn*,
  317 F.3d 107 (2d Cir. 2003)..................................................................... 57

*United States v. Turkette*,
  452 U.S. 576 (1981)................................................................................ 51

*United States v. Ulbricht*,
  31 F. Supp. 3d 540 (S.D.N.Y. 2014)................................................... 55, 56

*United States v. Vorley*,
  420 F. Supp. 3d 784 (N.D. Ill. 2019) ...................................................... 29

*United States v. Yannotti*,
  541 F.3d 112 (2d Cir. 2008)..................................................................... 64

*United States v. Zarrab*,
  2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016). .................................... 59, 60

*United States v. Zichettello*,
  208 F.3d 72 (2d Cir. 2000)....................................................................... 64

*Vandenberg v. Adler*,
  2000 WL 342718 (S.D.N.Y. Mar. 31, 2000) ........................................... 67

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*,
  2020 WL 4586729 (S.D.N.Y. Aug. 10, 2020)........................................... 79

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)....................................................................... 18

*Welch Foods, Inc. v. Duane Packer & Food Express, Inc.*,
   1994 WL 665399 (W.D.N.Y. Nov. 22, 1994) ................................................. 77

*Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*,
   45 F. Supp. 2d 1164 (D. Kan. 1999) ............................................................ 16

*Williams v. Bank Leumi Tr. Co.*,
   1997 WL 289865 (S.D.N.Y. May 30, 1997) ................................................. 61

*Wu v. Bitfloor, Inc.*,
   2020 WL 2512108 (S.D.N.Y. May 15, 2020) ............................................... 38

## **Statutes**

15 U.S.C. § 3 ........................................................................................................ 20

18 U.S.C § 1965(b) ......................................................................................... 78, 83

18 U.S.C. § 1344 .................................................................................................. 59

18 U.S.C. § 1956 .................................................................................................. 44

18 U.S.C. § 1957 .................................................................................................. 43

18 U.S.C. § 1960 ............................................................................................. 58, 59

18 U.S.C. § 1962 ........................................................................................... passim

18 U.S.C. § 5312 .................................................................................................. 44

7 U.S.C. § 25 ................................................................................... 26, 33, 38, 76

N.Y. Gen. Bus. Law § 349 .............................................................................. passim

Sherman Act, 15 U.S.C.S. § 1 ........................................................................ 2, 19

Sherman Act, 15 U.S.C.S. § 2 ........................................................................ 2, 14

Sherman Act, 15 U.S.C.S. § 3 ............................................................................. 20

## **Other Authorities**

2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020) .............................. 16

Kate Rooney, Much of Bitcoin's 2017 Boom was Market Manipulation, Research Says,
   CNBC, Jun. 13, 2018,
   https://www.cnbc.com/2018/06/13/much-of-bitcoins-2017-boom-was-market-
   manipulation-researcher-says.html. ..................................................................... 38

Tether Report ................................................................................................................. 39, 40

**<u>Rules</u>**

CFTC Rule 180 .............................................................................................................. 33, 35

Fed. R. Civ P. 12(b)(6)............................................................................................. 2, 23, 78

Fed. R. Civ. P. 9(b) ............................................................................................................. 28

New York CPLR § 302.................................................................................................. passim

Plaintiffs Matthew Script, Benjamin Leibowitz, Jason Leibowitz, Aaron Leibowitz, and Pinchas Goldstein respectfully submit this consolidated memorandum of law in opposition to the motions to dismiss filed by the Bitfinex Defendants and Tether Defendants (Dkt. 143, "B/T Br." with the Bitfinex Defendants and Tether Defendants collectively with Defendants Devasini, Velde, Potter, and Digfinex as the "Bitfinex/Tether Defendants"); Philip G. Potter (Dkt. 145, "Potter Br."); U.S. Exchange Defendants (Dkt. 147, "Ex. Br."); and Reginald Fowler (Dkt. 149, "Fowler Br."). Capitalized terms not otherwise defined have the meaning given to them in Plaintiffs' Amended Consolidated Class Action Complaint (Dkt. 114, "CAC" or "Complaint").

## PRELIMINARY STATEMENT

The Bitfinex/Tether Defendants, Exchange Defendants, Potter, Crypto Capital, and Fowler (together "Defendants") engaged in a far-reaching conspiracy to enrich themselves at the expense of ordinary investors by manipulating the prices of crypto-commodities. The Bitfinex/Tether Defendants (secretly under common control, including control by Potter, a co-founder and senior executive) offered a so-called "stablecoin," USDT, that they claimed was backed at all times by an equivalent amount of dollar reserves. But those promised "reserves" were a fiction. In truth, USDT was unbacked. The Tether Defendants (collectively "Tether") were "printing" it out of thin air and sending it to Bitfinex, a crypto-exchange operated by the Bitfinex Defendants. From there, the conspirators moved billions of unbacked USDT to two crypto-exchanges operated by the Exchange Defendants (ostensibly their competitors), where the USDT was used to make carefully timed purchases of crypto-commodities whenever prices threatened to fall below certain round-number thresholds, thereby fraudulently giving the appearance of price "floors" in the market. With the ability to directly control crypto-commodity prices, Defendants' scheme inflated a colossal bubble. When the bubble burst, investors like Plaintiffs, who purchased crypto-commodities at artificially inflated prices, sustained significant damages.

Defendants' scheme was brazen, and so are their motions to dismiss. Defendants repeatedly ask the Court to endorse their preferred explanation for events and to draw inferences in their favor, notwithstanding that Rule 12(b)(6) requires the Court to accept Plaintiffs' allegations as true and to afford Plaintiffs every favorable inference. Defendants invent purported pleading deficiencies by simply ignoring inconvenient allegations and ask the Court to hold Plaintiffs to higher pleading standards than precedent requires. The Court should deny the motions.

*First*, Plaintiffs have adequately alleged antitrust claims. Defendants attack Plaintiffs' standing with inapposite, out-of-circuit authority to suggest Plaintiffs must allege a "harm to competition," *e.g.*, B/T Br. at 2, 6-8, when the Second Circuit recognizes antitrust injury (and therefore antitrust standing) where plaintiffs transacted in a market subject to price manipulation, as alleged here. *Infra* at § I.A. Plaintiffs state a claim under Section 2 of the Sherman Act because Defendants manipulated crypto-commodity prices through strategically timed uses of debased USDT. That conduct was anticompetitive because it involved market manipulation for profit and lies to the market about USDT's backing. *Infra* at §§ I.B.1–2. Plaintiffs also state viable conspiracy and attempted monopolization claims. *Infra* at §§ I.B.3–4. Additionally, Plaintiffs state a claim under Section 1 of the Sherman Act because they allege facts sufficient to infer a conspiracy to manipulate crypto-commodity prices—in other words, price fixing: a *per se* Section 1 violation. Defendants' contrary arguments require the Court to inappropriately resolve disputed factual issues on a motion to dismiss or hold Plaintiffs to an improperly stringent pleading standard. *Infra* at § I.C.

*Second*, Plaintiffs have adequately alleged claims under the Commodities Exchange Act ("CEA"). Plaintiff Goldshtein has standing because, contrary to Defendants' mischaracterization of the Complaint, Plaintiffs allege price manipulation throughout the class period and are therefore not required at the pleading stage to tie any particular trade to a concrete damages figure. *Infra* at

§ II.A. Plaintiffs adequately allege price manipulation and market manipulation (as well as aiding and abetting and principal-agent claims) by detailing how Defendants coordinated to carefully time purchases of crypto-commodities, using unbacked USDT, to create the illusion of price "floors." *Infra* at §§ II.B–C. While Defendants proffer alternative explanations for what is set forth in Plaintiffs' allegations, this motion is not the time to decide whose version is more plausible. Nor, contrary to Defendants' suggestion, are Plaintiffs required at this early stage to produce incriminating communications among the Defendants to plead a CEA claim.

*Third*, Plaintiffs have adequately alleged RICO claims. Defendants' proximate cause arguments ask the Court to carve up Defendants' scheme into discrete parts—for example, by focusing on the printing of unbacked USDT in isolation, without considering Defendants' use of unbacked USDT to manipulate crypto-commodity prices. Plaintiffs allege that Defendants manipulated crypto-commodity prices by issuing unbacked USDT to create artificial price "floors." That does not (as Defendants claim) depend on the independent, subsequent actions of other market participants. *Infra* at § III.A.1. Plaintiffs also independently allege proximate cause because price manipulation was the direct and foreseeable result of Defendants' conduct—indeed, price manipulation was the object of the scheme. *Infra* at § III.A.2. And, in the alternative, even if Defendants' conduct did not cause Plaintiffs injury pursuant to 18 U.S.C. § 1962(c), that conduct necessarily caused the injury pursuant to § 1962(a). *Infra* at § III.B. Defendants' attacks on the sufficiency of Plaintiffs' predicate-act allegations are meritless. *Infra* at § III.C.

*Fourth*, Plaintiffs state valid claims under New York state law. On common-law fraud, Defendants ignore a long line of cases recognizing that market manipulation schemes are actionable where the plaintiff relies on the integrity of market prices, as Plaintiffs do here. Defendants' cases involve securities fraud rather than market manipulation and are irrelevant. *Infra* at § IV.A.1.

Defendants also inappropriately rely on cases decided on summary judgment to contest causation and damages. *Infra* at § IV.A.3. As to Plaintiffs' GBL § 349 claim, Defendants inappropriately ask the Court to find—as a matter of law—that the novel digital assets at issue in this case are not consumer products, which they are, *infra* at § IV.B.1, and to find Defendants' conduct did not cause Plaintiffs injuries, even though New York courts find causation adequately alleged where (as here) Defendants' deceptive scheme successfully targeted consumers, i*nfra* at § IV.B.2.

Finally, this Court has jurisdiction over Fowler pursuant to the CEA, RICO, and CPLR statutes, in addition to having jurisdiction over him as a co-conspirator. *Infra* at § V.

Defendants' motions to dismiss should be denied in their entirety.

## BACKGROUND

This case concerns crypto-assets—digital assets that use cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. CAC ¶ 47. Two types of crypto-assets are relevant here: crypto-commodities and stablecoins. Crypto-commodities provide a secure medium of exchange, have a controlled supply (new units are issued through a consensus mechanism called "mining"), and are decentralized. *Id.* ¶¶ 49–57. Bitcoin is one. Stablecoins are meant to hold a consistent value relative to one or more real-world assets like gold or fiat currency. *Id.* ¶ 113. Stablecoins are not mined or decentralized; their supply is controlled by an issuer who promises to issue coins fully backed by the corresponding asset. *Id.* ¶¶ 114–15.

### A.    Defendants Lie To The Markets About USDT

Tether issued a stablecoin called "USDT," which it promised was fully backed by U.S. dollars. Tether and its officers promised the market—repeatedly—that (1) each USDT would be backed by one U.S. dollar held in Tether's reserves; (2) Tether would issue new USDT only in response to legitimate market demand—*i.e.*, customers willing to exchange dollars one-for-one for

USDT; and (3) customers could redeem their USDT for U.S. dollars at any time. *Id.* ¶¶ 116, 125–34, 147–50, 165–67, 174.

Tether distributed USDT through Bitfinex, a crypto-exchange that also told its customers that USDT was fully backed, 1 for 1, by a reserve of U.S. dollars. *Id.* ¶¶ 115–34, 148–51, 160–61. Using a Bitfinex account, customers could buy new USDT that was issued by Tether's treasury or could redeem USDT for U.S. dollars, at which point Tether should have delisted (or "burned") the redeemed USDT, to keep the USDT supply at the same level as Tether's U.S. dollar reserves. *Id.* ¶¶ 117–18, 158, 195–96.

Secretly, Bitfinex and Tether were under common control. *Id.* ¶ 152–53. Potter and Defendant Giancarlo Devasini—Bitfinex's CSO and CFO, respectively—created and controlled Tether's holding company, *id.* ¶ 153, and Devasini and Defendant Ludovicus Jan van der Velde—Bitfinex's CEO—were the only directors of Tether Limited, *id.* ¶ 154. Defendants hid these facts, creating the illusion that USDT was supported by two independent entities, *id.* ¶¶ 152–61, thus reassuring the market that USDT was fully backed by U.S. dollars by creating the illusion of an independent entity that distributed and could monitor the legitimacy of USDT.

Defendants' assurances were lies. USDT was *not* fully backed by U.S. dollars; it was only partially backed, and thus debased. Tether did *not* issue USDT only in response to genuine market demand; it issued unbacked USDT for its own purposes without regard to real demand. This reality is clear from expert analysis of the USDT blockchain—the digital ledger that records all USDT transactions—and public information about Tether's and Bitfinex's banking history.

### 1.    Expert Analysis Shows That Tether Did Not Issue USDT Only In Response To Legitimate Customer Demand

Expert analysis of the USDT blockchain shows that, contrary to Defendants' representations, Tether did not issue most USDT in response to legitimate market demand. Rather, 72% of

all USDT that Tether issued through the end of 2018—purportedly $3 billion worth—flowed to just two addresses. *Id.* ¶¶ 203, 208. One address ("1J1d") transferred all USDT it received to the crypto-exchange Poloniex, *id.* ¶ 205; the other address ("1AA6") transferred all USDT it received to the crypto-exchange Bittrex, *id.* ¶ 206. If the demand for USDT were genuine, USDT should have flown through numerous customer accounts on numerous crypto-exchanges. Instead, it was disproportionately directed to two exchanges through just two addresses. This indicates that Defendants used the 1J1d and 1AA6 accounts to issue USDT to themselves or to co-conspirators, not in response to market demand.[1]

This lack of genuine demand is confirmed by comparing the activity in the 1J1d and 1AA6 accounts to broader market activity. From January 15, 2018 to January 23, 2018, for example, 700 million USDT were issued and more than 400 million USDT were transferred from Bitfinex to both the 1J1d and 1AA6 accounts and other accounts. *Id.* ¶¶ 212–14. On January 24, 2018, a report entitled "Quantifying the Effect of Tether" (the "Tether Report") was published online, *id.* ¶ 212, concluding that "that Tether may not be minted independently of Bitcoin price and may be created when Bitcoin is falling" to boost bitcoin prices, *id.* ¶¶ 212, 305. For the next ten days, transfers of USDT from Bitfinex to other addresses continued at the same rate as before—but no new USDT was issued and transfers to the 1AA6 and 1J1d addresses stopped cold. *Id.* ¶ 213. If the owners of

---

[1] On October 27, 2020, notwithstanding the Court's denial of their request to move for pre-discovery summary judgment on the basis of supposedly admissible evidence regarding the ownership of the 1J1d and 1AA6 accounts, Dkts. 135, 139 (finding the proposed motion "not appropriate at this early stage of litigation"), the Exchange Defendants produced an unsigned declaration that challenges several of Plaintiffs' allegations. Although anonymous sources are inherently unreliable, *see United States v. Walker*, 7 F.3d 26, 30 (2d Cir. 1993), Plaintiffs and their experts have examined the few assertions in this declaration capable of independent verification based on publicly available information, without discovery. Acting in an abundance of caution, Plaintiffs have taken this ongoing analysis into account in the arguments in this brief. None of the factual assertions that Plaintiffs have been able to verify based on publicly available information have any bearing on the viability of Plaintiffs' claims.

the 1AA6 and 1J1d addresses were independent actors, they would have kept buying USDT as the same rate as before—just like other traders. But they did not. This indicates that the owners of the 1AA6 and 1J1d addresses conspired with Tether and Bitfinex following the Tether Report to avoid scrutiny.

### 2. Tether's Banking History Shows That USDT Was Not Fully Backed By U.S. Dollars

Tether's promise to keep as many U.S. dollars in reserve as there were USDT in circulation was simply not possible given Tether's troubled banking history. Bitfinex and Tether's banks cut off their accounts in early 2017, *id.* ¶¶ 223–35, and they would not regain access to correspondent banking for another six months, *id.* ¶ 239. Yet during those six months, Tether issued 409 million new USDT—nearly ten times as much as in the prior two-and-a-half years. *Id.* ¶¶ 240, 242. There is no plausible way that Tether could have received or held the $409 million required to fully back those issuances without access to correspondent banking. *Id.* ¶ 241.

Tether's promise is even more implausible given its relationship with Crypto Capital and Fowler, who used illegal shadow banking to manufacture the illusion of Tether's promised cash reserves. Crypto Capital and Fowler created accounts in the name of shell corporations, where Bitfinex and Tether directed customers to deposit currency. *Id.* ¶¶ 354–59. These accounts were closed when banks caught on, driving Crypto Capital and Fowler to create new accounts in what Potter called a "cat-and-mouse" game. *Id.* ¶¶ 344–45.

Yet even when Tether experienced liquidity issues despite its relationship with Crypto Capital and Fowler, it continued to issue new USDT, revealing that USDT was unbacked. For example, in April 2018, when Tether issued 130 million new USDT, Bitfinex complained of "extreme difficulty" in honoring redemption requests because it could not access funds it held with Crypto Capital. *Id.* ¶ 248. Similarly, in October 2018, when Tether issued 250 million new USDT,

Devasini complained that Bitfinex needed $100 million to honor redemptions. *Id.* ¶¶ 250–51. If USDT had been backed, there is no scenario in which Tether could issue new USDT while struggling to redeem old USDT. If Tether had actually received the millions of dollars necessary to issue new, fully-backed USDT on either occasion, it could have easily honored any redemption requests. *Id.* ¶¶ 219, 249, 251.

### 3. Tether's Strategically Timed "Burning" Of Over A Billion USDT Shows That USDT Was Not Fully Backed By U.S. Dollars

Tether's delisting (or "burning") of over a billion USDT in 2018 further confirms that USDT was not fully backed by U.S. dollars. In November 2018, Tether published a letter from Deltec Bank & Trust (the "Deltec Letter") that claimed Tether's account there contained over $1.8 billion, enough to cover all then-outstanding USDT. *Id.* ¶ 252.

A month earlier, however, Tether had delisted 1.04 billion USDT—nearly 40% of all then-existing USDT—to bring the total amount of USDT in circulation down to just under 1.8 billion. *Id.* ¶ 253. It is beyond unlikely that independent investors all coincidentally decided to redeem 1.04 billion USDT in the month just before Tether published the Deltec Letter. Even if they had, the USDT blockchain would show customers transferring a total of 1.04 billion USDT from accounts on other exchanges to Bitfinex or the Tether Treasury in October 2018, *id.* ¶ 254, but the blockchain shows net transfers of only 72 million, *id.* ¶ 255. And if they had redeemed 1.04 billion fully-backed USDT, Tether and Bitfinex would have had to send $1.04 billion to redeeming customers—something they could not do in October 2018, when they were pleading for Crypto Capital to send them one-tenth that amount to honor redemptions. *Id.* ¶¶ 250, 257. The only plausible explanation is that the 1.04 billion USDT Tether burned was not backed by U.S. dollars at all.

### B.     Defendants Use Debased USDT To Manipulate The Crypto-Commodity Market[2]

By convincing the market that USDT was fully backed by U.S. dollars, Defendants effectively created a money printer—they could create USDT on demand that the market would accept as equivalent to U.S. dollars. Defendants then used the debased USDT they created to drive up the prices of crypto-commodities, inflating a massive bubble from which they profited in several ways.

For this scheme to work, Bitfinex and Tether needed the cooperation of other crypto-exchanges—Bittrex and Poloniex—where one could trade USDT for crypto-commodities. Tether worked closely with Bittrex and Poloniex to list USDT on those exchanges. *Id.* ¶ 318. Instead of requiring a new address for each transfer, as was typical, these exchanges facilitated the scheme by allowing repeated transfers from Bitfinex to the 1AA6 and 1J1d addresses. *Id.* ¶¶ 313–16. Plaintiffs allege that the Defendants worked together. The Exchange Defendants' must have been aware of the unbacked nature of USDT and its use to manipulate crypto-commodity prices based on the pattern of transfers and issuances they could observe, but ignored their obligation to report suspicious transfers. *Id.* ¶¶ 208, 320–21, 324–26, 331–33. And the Bitfinex/Tether Defendants were working with Crypto Capital and Fowler to mask Tether's inadequate reserves, with Potter trying to quell the market's liquidity concerns even as Devasini begged for unlawful access to capital. *Id.* ¶¶ 342–66.

Once Defendants transferred USDT from Bitfinex to Bittrex and Poloniex, they traded it for bitcoin and other crypto-commodities, and sent those crypto-commodities back to Bitfinex's

---

[2] In light of further review of publicly available information, Plaintiffs do not rely in this brief on statements in paragraphs 317 and 323 of the Complaint that transfers of USDT onto Bittrex and Poloniex before June 2016 and March 2017 went into the 1J1d and 1AA6 addresses, respectively. Plaintiffs also do not rely on the allegation in paragraph 173 that trading of USDT on Bittrex began in March 2017.

exchange address, where the conspirators sold the crypto-commodities to unwitting market participants for U.S. dollars. *Id.* ¶ 264. The data confirm it: When large amounts of USDT flowed to the 1AA6 and 1J1d addresses, there was significantly more trading of USDT for bitcoin on Bittrex and Poloniex and significantly increased flows of bitcoin back to Bitfinex. *Id.* ¶ 265.

Defendants' trades inflated crypto-commodity prices. These were not like most crypto-commodity trades, which exchange one crypto-commodity for another (say, bitcoin for ethereum). Trades among different crypto-commodities affect the market's perception of one crypto-commodity's value relative to another, but not of crypto-commodities relative to other asset classes. Because Defendants were trading USDT for crypto-commodities—and because the market believed USDT was fully backed by U.S. dollars—the market saw their trades as adding *new* money into the crypto-commodity market, not merely moving existing money around within it. *Id.* ¶ 272. Thus, within hours of USDT being transferred from Bitfinex to the 1AA6 and 1J1d addresses, the price of bitcoin increased appreciably. *Id.* ¶ 273.

Defendants designed their trades to keep crypto-commodity prices up. On average, they transferred ten times as much USDT to Bittrex and Poloniex after crypto-commodity prices had gone down by 5% or more than they did after those prices had gone up. *Id.* ¶¶ 276–77. By buying crypto-commodities while prices were falling, Defendants pushed prices back up. In February 2018, for example, after bitcoin prices had fallen to under $7,000, Defendants issued 36 million USDT, and the price promptly rose to over $8,500. *Id.* ¶ 274. Defendants also timed their trades to keep crypto-commodity prices above "round number thresholds," creating the impression that prices were subject to "floors" below which they would not drop, inducing other traders to purchase. *Id.* ¶¶ 295–96. Devasini all but admitted this manipulation in October 2018, when he

implored Crypto Capital to provide $100 million to redeem USDT, warning that bitcoin could "tank" to below $1,000 "if we don't act quickly." *Id.* ¶ 362.

Defendants' conspiracy created the largest asset bubble in history. At its height, bitcoin traded near $20,000, before falling to less than $4,000. *Id.* ¶ 272. Defendants bought crypto-commodities using debased USDT and sold them at grossly inflated prices, reaping huge profits. Bittrex, Poloniex, Crypto Capital and Fowler also had substantial crypto-commodity holdings, which benefitted from inflated crypto-commodities prices. *Id.* ¶¶ 341, 366. Bittrex and Poloniex further benefitted from increased trading volume and extra commissions. *Id.* ¶¶ 339–40. These profits, however, came at the expense of Class members, who purchased crypto-commodities falsely inflated by Defendants' manipulation.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citations and internal quotation marks omitted). "[T]he only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). As there is no "probability requirement at the pleading stage," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), the Court "[should not] judge the merits of the parties' competing claims." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 688 (S.D.N.Y. 2012).

Claims of coordination or conspiracy thus survive a motion to dismiss when plaintiffs "allege enough facts to support the inference that a conspiracy actually existed." *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 309 (S.D.N.Y. 2018) (Failla, J.). This bar is "not high." *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 577 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136 (2d Cir. 2019). Plaintiffs need not "rule out the

11

possibility of independent action," *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (quotation and citation omitted), nor "mention a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010).

Plaintiffs' claims easily meet these standards. Defendants' contrary arguments are meritless and many—which often cite outside sources and suggest alternative inferences to be drawn from Plaintiffs' allegations, Ex. Br. at 5, 7—are inappropriate at the pleadings stage.[3]

## I.   PLAINTIFFS STATE VIABLE ANTITRUST CLAIMS

### A.   Plaintiffs Have Antitrust Standing Because They Transacted In A Market Subject To Price Manipulation

A plaintiff suffers antitrust injury, and therefore has antitrust standing, when it transacts in a market subject to price manipulation and loses money as a result. The injury "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."

---

[3] It is unclear whether Defendants Devasini, Velde, and Digfinex have moved to dismiss at all. Although the "Bitfinex and Tether Defendants' Motion to Dismiss" cover page identifies counsel as representing Defendants Devasini, Velde, and Digfinex, those Defendants are not encompassed by the definition of Bitfinex or Tether provided within. Dig. Br. at 1. The only references to these Defendants, meanwhile, occurs in a footnote. *Id.* at 4.

If these Defendants intended to move to dismiss, their arguments are meritless. The allegations against Velde and Devasini demonstrate their concealed simultaneous control of Bitfinex and Tether, contributing to the illusion that USDT was backed, CAC ¶¶ 152–161. Velde, under penalty of perjury, stated that USDT was backed 1:1 with U.S. dollars. *Id.* ¶ 130. Devasini also personally implored Crypto Capital to provide more funds, while acknowledging the impact of the scheme on the price of Bitcoin. *Id.* ¶ 362. Digfinex, meanwhile, is the entity through which the concealed common control of Bitfinex and Tether was achieved. *Id.* ¶¶ 23–24, 152–61. These allegations suffice to state claims against all of these Defendants. *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York*, 994 F. Supp. 133, 142 (E.D.N.Y. 1998) (recognizing that claims against individual defendants should not be dismissed when the complaint alleges "that the individual defendants dominated and controlled the corporations as officers, directors, and principal stockholders, and alleg[es] specific overt acts of some defendants")

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (quotation omitted).[4] "[W]hen consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* at 772 (quotation omitted); *see also Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 133 (S.D.N.Y. 2016) ("Merced has pled an antitrust injury causally linked to Barclays' practices: it is a purchaser of electricity on the daily markets in which it alleges it paid higher supra-competitive prices or received lower sub-competitive prices as a result of Barclays' rate-manipulation."); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 ("*Crude Oil*") (S.D.N.Y. 2012) ("Plaintiffs' alleged injury— losses from transacting in a market tainted by price manipulation—is of the type antitrust laws were intended to prevent." (internal quotations omitted)).[5] Plaintiffs' injury falls squarely within these precedents: they transacted in a crypto-commodities market inflated by Defendants' manipulation and so paid inflated prices. CAC ¶¶ 185–316, 316–22, 324–366.

In arguing that Plaintiffs have not alleged antitrust standing (B/T Br. § I.A; Potter Br. at 6), Defendants rely on *Elliott Industries Limited Partnership v. BP American Production Co.*, 407 F.3d 1091 (10th Cir. 2005). *Elliott* confirms Plaintiffs' standing. In *Elliott*, defendants charged

---

[4] Defendants improperly rely on *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014), which found that manipulation of the TIBOR reference rate did not create antitrust standing. Because the Second Circuit subsequently found antitrust injury based on manipulation of the LIBOR rate in *Gelboim*, *Laydon* is no longer good law.

[5] Defendants do not cite *City of Long Beach v. Total Gas & Power North America, Inc.*, 2020 WL 3057796 (S.D.N.Y. June 8, 2020), though it was decided before they filed their motions. There, the court found no antitrust standing when the alleged manipulation could have been performed by "any other participant in the market." *Id.* at *18. The decision has no application here, as Defendants' failure to cite it implicitly concedes. Defendants' manipulation could not have been performed by other market participants; rather, it depended on Defendants' unique roles as issuers and distributors of USDT. Defendants more closely resemble the banking association in *Gelboim* that manipulated LIBOR rates, which the Second Circuit found created antitrust standing. 823 F.3d at 765.

13

high fees to process natural gas, thus reducing plaintiff's royalty payments from gas leases. *Id.* at 1125. The Tenth Circuit held the plaintiff lacked antitrust standing because his injury did not derive from the anticompetitive behavior he alleged—he did not participate in the oil-processing market or pay the fees; he owned royalties indirectly reduced because of the fees. *Id.* at 1125. The court noted that the plaintiff *would* have suffered antitrust injury if defendants had conspired to suppress natural gas prices, thus reducing plaintiffs' resulting royalty payments. *Id.* This case is akin to the Tenth Circuit's hypothetical: Defendants conspired to inflate crypto-commodity prices, harming Plaintiffs who transacted in the crypto-commodity market. Even under Defendants' out-of-circuit authority, Plaintiffs have alleged antitrust standing.

### B.    Plaintiffs State Viable Section 2 Claims

Plaintiffs state monopolization claims under Section 2 of the Sherman Act, which requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).[6] Plaintiffs also state viable conspiracy and attempted monopolization claims.

### 1.    The Bitfinex/Tether Defendants Have Monopoly Power Because They Directly Controlled Crypto-Commodity Prices[7]

The Second Circuit has held that a Section 2 plaintiff may plead monopoly power by alleging a defendant's direct control over prices. *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386

---

[6] No Defendant challenges the adequacy of Plaintiffs' definition of the crypto-commodities market. Such arguments thus cannot be properly raised in reply, as "it is well established that a court should not consider arguments that are raised for the first time in a reply brief." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 260 (S.D.N.Y. 2014) (Failla, J.) (internal quotations and alterations omitted).

[7] In this subsection, the term "Defendants" is intended to refer specifically to the Bitfinex/Tether Defendants.

F.3d 485, 500 (2d Cir. 2004); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002); *see also Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016) (recognizing that "district courts in this Circuit have continued to acknowledge that direct evidence of price control or exclusion of competitors may be used to prove monopoly power").

Applying these principles, courts in this district have specifically held that a plaintiff can plead monopoly power by alleging defendants' ability to manipulate prices in a commodities market. In *Merced*, even though the defendant "did not have the capability to provide or accept physical electricity," 165 F. Supp at 129, the court found that the plaintiff had alleged monopoly power by alleging the defendants' "ability to distort ordinary forces of supply and demand in setting the Daily Index Prices." *Id.* at 143. "[P]leading a defendant's direct control over prices is an alternative to pleading relevant market share," such that Section 2 encompasses "claims of price manipulation in commodities trading through direct evidence of pricing power." *Id.* at 141. Similarly, in *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198 ("*Cotton*") (S.D.N.Y. Dec. 20, 2013), *on reconsideration in part,* 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014), the defendant had pricing power in the cotton market although it did not sell cotton, because it could manipulate cotton prices by "squeezing" the market for cotton futures. *Id.* at *24–25. And in *Crude Oil*, the defendant had pricing power in the market for crude oil futures, although it did not produce crude oil, because it could manipulate futures prices through a of complicated transactions. *Id.* at 51 .

As in those cases, Plaintiffs allege the relevant Defendants have monopoly power in the crypto-commodities market because they could and did manipulate crypto-commodity prices by using debased USDT to purchase crypto-commodities at strategic times in strategic amounts. CAC ¶¶ 272–279, 295–300. The Bitfinex/Tether Defendants thus exploited their unique ability to issue debased USDT to create the illusion of price floors. While the Bitfinex/Tether Defendants suggest

the Complaint falls short because it alleges that Defendants used issuances of new USDT to signal demand to the market, thereby causing an increase in prices (B/T Br. 9–10), the reliance on false market signals is common in antitrust cases where market power is achieved through manipulation of a commodities market, as in *Merced*, *Cotton*, and *Crude Oil*. Defendants argue (B/T Br. 8–9) that they lack power to "restrict output" of crypto-commodities, but—as *Merced*, *Cotton*, and *Crude Oil* show—this is not necessary if Defendants can directly control prices. Defendants do not cite any relevant authority to the contrary. They selectively quote Areeda and Hovenkamp (B/T Br. 9), but that treatise observes that "[c]ourts often define market power as the ability (1) to control prices *or* (2) to 'exclude competition,'" 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 501 (4th ed. 2020) (original emphasis)—that is, controlling prices is independently sufficient to show market power. And the case Defendants discuss most extensively is inapposite because it did not involve allegations of manipulation of commodity prices. *See Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1187 (D. Kan. 1999) (granting summary judgment where plaintiffs' expert conceded defendant's hiring of competitor's employees did not give defendant power to control market prices).[8]

---

[8] In fact, none of Defendants' cases involve allegations of manipulation of a commodities market. *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999); *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998); *KMB Warehouse Distributors, Inc. v. Walker Manufacturing Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Eastman Kodak v. Image Technical Serv.*, 504 U.S. 451, 481 (1992).

### 2. The Bitfinex/Tether Defendants' Manipulation Of Crypto-Commodity Prices Was Anticompetitive[9]

Defendants do not seriously contest that their alleged conduct was anticompetitive. Nor could they. Intentional distortion of a commodities market through manipulation for profit is anti-competitive. *See Merced*, 165 F. Supp. 3d at 143; *Crude Oil*, 913 F. Supp. 2d at 56. Plaintiffs plead Defendants acted anticompetitively by manipulating the crypto-commodities market through their artificial inflation of prices for their own profit, thus constraining the market for other participants. *E.g.*, CAC ¶ 273. The sole case the Bitfinex/Tether Defendants cite to suggest their conduct was not anticompetitive, *In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. 2014), *as corrected* (June 19, 2014), did not involve allegations of market manipulation like those involved here; instead, the case assessed whether patent-holders on a prescription drug violated a duty to deal by undersupplying generic manufacturers under a contract, *id.* at 133-34.

Plaintiffs independently plead anticompetitive conduct by alleging that the relevant Defendants lied to the market. CAC ¶¶ 193–258. Anticompetitive conduct includes "unethical and deceptive practices." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988); *see also Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 187 (S.D.N.Y. 2006) (describing "allegations of fraud or other anticompetitive conduct"). Defendants' false statements that USDT was fully backed by U.S. dollars and issued in response to legitimate market demand, being both unethical and deceptive, easily qualify.

---

[9] In this subsection, the term "Defendants" is intended to refer specifically to the Bitfinex/Tether Defendants.

### 3.     Defendants Conspired To Monopolize The Crypto-Commodities Market

Plaintiffs adequately plead that all Defendants conspired to violate Section 2, which requires "concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly" and "the commission of an overt act in furtherance of the conspiracy." *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987). Plaintiffs detail how Defendants worked together with the intention to manipulate crypto-commodity prices. *See* CAC ¶¶ 185–316, 316–22, 324–365. The specific steps Defendants took—including carefully timing purchases of crypto-commodities to maximize their impact on the market by creating the illusion of price floors and reversing declines—strongly suggest they acted with the requisite specific intent. *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (finding that anticompetitive conduct can support inference of specific intent to monopolize); *Crude Oil.*, 913 F. Supp. 2d at 58 (finding specific intent where plaintiffs alleged conspiracy to manipulate commodities market).

Defendants' contrary arguments mischaracterize the Complaint. The Bitfinex/Tether Defendants assert there are no allegations that they sought monopoly power (B/T Br. at 11), but Plaintiffs plainly allege that the volume and careful timing of their crypto-commodity purchases is best explained by an intent to inflate crypto-commodity prices. *See, e.g.*, CAC ¶¶ 274–79, 295–300. The Exchange Defendants, similarly, assert it is implausible that they conspired with a purportedly competing exchange like Bitfinex (Ex. Br. at 11–12), but Plaintiffs allege that the scheme brought the Exchange Defendants additional commissions, increased traffic to their exchanges, and increased the value of their crypto-commodity reserves, CAC ¶¶ 339–41—more than enough to reasonably infer that they would conspire to raise crypto-commodity prices.

### 4.    Alternatively, Defendants Attempted To Monopolize The Crypto-Commodity Market[10]

Plaintiffs also more than adequately plead a Section 2 claim for attempted monopolization, which requires that "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99–100 (2d Cir. 1998). Plaintiffs allege anti-competitive conduct, *supra* at § I.B.2, and specific intent to monopolize, *supra* at § I.B.3. For the final element, "a lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim," *Tops Mkts.*, 142 F.3d at 100, and Plaintiffs plead even greater market power by alleging Defendants' ability to manipulate prices, *supra* at § I.B.1.

Defendants argue (B/T Br. 11–12) that Plaintiffs do not allege that Bitfinex or Tether held any particular share of the crypto-commodity market, but Plaintiffs need not do so here because they allege Defendants' intent and ability to control market prices. *Merced*, 165 F. Supp. 3d at 143 (sustaining attempted monopolization claims where plaintiffs alleged conduct intended to manipulate market prices, even though plaintiffs were not buyers or sellers in that market). The two cases Defendants cite, *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990) and *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 229 (2d Cir. 1999), did not deal with attempts to control prices and are thus inapposite.

### C.    Plaintiffs State Viable Section 1 Claims

Plaintiffs state conspiracy claims under Section 1 of the Sherman Act, which requires them to plead "(1) a combination or some form of concerted action between at least two legally distinct

---

[10] In this subsection, the term "Defendants" is intended to refer specifically to the Bitfinex/Tether Defendants.

economic entities that (2) unreasonably restrains trade." *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016).[11] In antitrust conspiracy cases, "[a]llegations connecting defendants to the conspiracy must be viewed in light of the complaint as a whole." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 172 (2d Cir. 2012).

### 1. Defendants Conspired To Inflate Crypto-Commodity Prices

"At the pleading stage, a complaint claiming [Section 1] conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (citation and quotation omitted). Plaintiffs may satisfy this standard with "allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors," which include "(1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *Id.* (citations and quotations omitted). In *Gelboim*, the Second Circuit held that plaintiffs, who purchased financial instruments with interest rates tied to LIBOR, pleaded that defendant banks conspired to manipulate LIBOR by alleging that they communicated with each other and knew each other's confidential information, economic evidence of the conspiracy, and a motive to conspire in the form of higher profits. *Id.* at 781–82. The court stressed that these allegations sufficed even if "susceptible to an equally likely interpretation." *Id.* (citation and quotation omitted).

Under *Gelboim*, Plaintiffs easily state a claim. They allege that Defendants conspired to manipulate crypto-commodity prices by falsely telling the market that USDT was fully backed by U.S. dollars, CAC ¶¶ 116, 125–35, 147–50, 165–67, 173–74, distributing debased USDT through

---

[11] Section 3 of the Sherman Act extends Section 1 to the territories and the District of Columbia, 15 U.S.C. § 3; the same arguments that apply to Plaintiffs' Section 1 claim thus also apply to their Section 3 claims.

Bitfinex to Bittrex and Poloniex, *id.* ¶¶ 195–207, 310–18, and there using it to strategically buy crypto-commodities to inflate crypto-commodity prices, *id.* ¶¶ 260–71. Plaintiffs allege the relevant Defendants worked together—the Bitfinex/Tether Defendants worked with the Exchange Defendants to facilitate their manipulation of USDT, getting the Exchange Defendants to ignore appropriate regulations that would have revealed the unbacked nature of USDT, *id.* ¶¶ 331–33, and worked with Crypto Capital and Fowler to mask Tether's inadequate reserves, *id.* ¶¶ 342–66. They allege communications among the conspirators—specifically, conversations in which Devasini admitted that publicly revealing USDT was not fully backed by U.S. dollars would cause the price of Bitcoin to "tank." *Id.* ¶ 362. They allege the conspirators' ability to respond rapidly to events like the publication of the Tether Report by ceasing all trading immediately. *Id.* ¶¶ 212–15. They allege the economic impact of the conspiracy—presenting quantitative evidence of how it inflated crypto-commodity prices. *Id.* ¶¶ 272–309. And Plaintiffs explain how each Defendant profited from the conspiracy, *id.* ¶¶ 339–40, 36, thus pleading motive. Plaintiffs also allege that Bitfinex and Tether are under investigation by the New York Attorney General about matters related to the lack of USDT backing, *id.* ¶¶367–71. *See Philadelphia v. Bank of Am.*, 2020 WL 6430307, at *8 (S.D.N.Y. Nov. 2, 2020) (recognizing related government investigation and stop to allegedly unlawful behavior as plus factors supporting inference of conspiracy). This is more than sufficient to plead a conspiracy. *Gelboim*, 823 F.3d at 781–82; *see also Cotton Futures*, 2013 WL 9815198, at *23 (plaintiffs adequately alleged conspiracy to manipulate markets when they "identif[ied] the principal of the plan as well as the aiders and abettors, who all jointly collaborated to engage in anticompetitive conduct" and "allege[d] a motive for the agreement, namely to reap considerable profits, and identify specific acts by [the defendants] tending to show an agreement was made, either tacitly or expressly").

21

Defendants' contrary arguments are meritless. *First*, the Exchange Defendants propose other explanations for the suspicious trading and insist that Plaintiffs must rule out all possible innocent explanations of Defendants' conduct (Ex. Br. 9–10), but "at the motion-to-dismiss stage, [plaintiffs] must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation." *Gelboim*, 823 F.3d at 782 (original emphasis). Plaintiffs are not required to show that the allegations suggesting agreement "are more likely than not true or that they rule out the possibility of independent action." *Anderson News*, 680 F.3d at 184.

*Second*, the Bitfinex/Tether and Exchange Defendants complain that Plaintiffs do not quote communications among Defendants confessing to the conspiracy (B/T Br. at 13; Ex. Br. at 9), but that is not necessary. "[A] plaintiff may allege 'circumstantial facts supporting the *inference* that a conspiracy existed.'" *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018) (Failla, J.) (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)) (original emphasis). This makes sense. "[C]onspiracies are rarely evidenced by explicit agreements," and "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Gelboim*, 823 F.3d at 781; *see also Citigroup*, 709 F.3d at 136 (inferences of conspiracy from circumstantial evidence are often needed because "'smoking gun' [evidence] can be hard to come by, especially at the pleading stage").[12] The circumstantial evidence here is overwhelming.

---

[12] The cases the Exchange Defendants cite do not impose a higher pleading standard. Most of them have nothing to do with antitrust at all. *United States v. Bailey*, 444 U.S. 394 (1980) (appeal of criminal conviction for escape); *Singh v. NYCTL 2009-A Tr.*, 2016 WL 3962009 (S.D.N.Y. July 20, 2016), *aff'd*, 683 F. App'x 76 (2d Cir. 2017) (discussion of attorneys' fees in context of civil foreclosures); *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365 (S.D.N.Y. 2008) (civil forfeiture action of personal savings account).

And, while not required to do so, Plaintiffs do cite direct evidence—conversations between Devasini and Crypto Capital acknowledging that bitcoin prices would collapse if the markets learned USDT was not fully backed by U.S. dollars. CAC ¶ 362.[13]

*Third*, Exchange Defendants argue that "out of the ordinary, unusual or abnormal" trading does not support a conspiracy claim. Ex. Br. at 9. But Plaintiffs plead more: that expert analysis shows that crypto-commodity trades on Bittrex and Poloniex moved in tandem with new issuances of debased USDT, CAC ¶¶ 212–19, and that those trades were strategically timed to inflate crypto-commodity prices, *id.* ¶¶ 272–309.[14]

*Fourth*, the Bitfinex/Tether Defendants and Exchange Defendants assert that Poloniex and Bitfinex simply acted in their self-interest (B/T Br. at 13, Ex. Br. at 12), but Plaintiffs allege far more: that Poloniex and Bitfinex lied to the market about USDT's backing, CAC ¶ 318, created a mechanism for trading debased USDT for crypto-commodities, *id.*, enabled the Bitfinex/Tether Defendants to access their platforms through specially provided accounts, *id.* ¶¶ 313–16, ignored regulations that required them to report this misconduct, *id.* ¶¶ 331–33, and profited not simply

---

[13] The Exchange Defendants reliance (Ex. Br. at 8-9) on *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir. 2007), is misplaced. There, the plaintiffs alleged "conclusory allegations" that (1) were "without any specification of any particular activities by any particular defendant" and (2) "which one could postulate without knowing any facts whatever." *Id.* at 50-51. In contrast, Plaintiffs allege specific details about the operation and effect of the conspiracy.

[14] The Exchange Defendants (Ex. Br. at 7–8 & n.5) attempt to resurrect their unsuccessful bid to inject the possibility that "an individual, who is not associated with Bitfinex or under Bitfinex's control" used the 1J1D and 1AA6 accounts "for cross-exchange arbitrage." The "evidence" the Exchange Defendants allude to is irrelevant at this juncture because, in "adjudicating a Rule 12(b)(6) motion, a court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Trump v. Vance*, 2020 WL 4861980, at *10 (S.D.N.Y. Aug. 20, 2020) (citations omitted).

from increased commissions and site traffic but also from crypto-commodity reserves that increased in value as a result of the conspiracy, *id.* ¶¶ 339–41, 366.

*Finally*, Potter and Fowler cannot evade liability by complaining there should be more allegations about their individual conduct. Potter Br. § II, Fowler Br. § II.B. Corporate officers may be held "personally liable for damages arising from an antitrust violation" when they "participated in the unlawful acts" or "acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws." *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000) (plaintiff pleaded Section 1 claim against individual defendants with allegations of "the influence they exerted in effectuating Sony's corporate policy"). Plaintiffs have alleged in detail Potter's and Fowler's roles in the conspiracy. Potter founded Tether, CAC ¶ 122, concealed his simultaneous control of Tether and Bitfinex from the market, *id.* ¶¶ 152–56, and made specific, repeated public statements of Tether's intent to evade banking laws and anti-money laundering regulations. *Id.* ¶¶ 343–47. Fowler was at the center of Crypto Capital, which used illegal shadow banking to create the illusion of Tether's reserve by opening accounts in the names of shell companies when banks would no longer deal with the Bitfinex/Tether Defendants. *Id.* ¶¶ 347–66. Fowler's and Potter's focus on the relative number of references to them in Plaintiffs' allegations "misses the point," as "the infrequency with which [defendants] are individually identified throughout the complaint" is not the relevant inquiry. *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *8 (E.D.N.Y. Sept. 22, 2010). "The more relevant consideration is whether the instances in which they are specifically mentioned or identified sufficiently establish or allow for the reasonable inference that they joined or were members of the alleged conspiracy." *Id.* at *131–32. Plaintiffs' allegations against Fowler and Potter meet this burden.

24

### 2. Defendants' Conduct Unreasonably Restrained Trade

Defendants' conduct is a *per se* violation of Section 1. The Second Circuit has repeatedly held that price fixing includes conduct beyond traditional horizontal agreements between direct competitors. For example, *Gelboim* holds that a conspiracy to depress LIBOR was the equivalent of *per se* price fixing and "[t]he unfamiliar context of [the] horizontal price-fixing claims provides no basis to disturb application of the per se rule." 823 F.3d at 771–72. Similarly, in *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 95–96 (2d Cir. 2019), the Second Circuit found *per se* price fixing where speculators shuttled aluminum between warehouses to artificially increase an element of the aluminum market price. *See also United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015) ("[I]t is well established that per se condemnation is not limited to agreements that literally set or restrict prices," and "any conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity ... is illegal per se, and the precise machinery employed ... is immaterial.").

Defendants make no credible counterarguments. The Exchange Defendants, Potter, and Fowler do not challenge this element at all. The Bitfinex/Tether Defendants suggest only that Plaintiffs fail to allege restraint of trade "for the reasons set forth in Section I.B" (B/T Br. at 14), but that section addresses Plaintiffs' Section 2 claim, *id.* B/T Br. at 8–10, and thus is inapposite.

## II. PLAINTIFFS STATE VIABLE COMMODITIES EXCHANGE ACT CLAIMS[15]

### A. Plaintiffs Have CEA Standing

A plaintiff who bought or sold a commodities futures contract or swap has standing to sue under Section 22(a) of the CEA if the defendant's manipulation caused the plaintiff "actual

---

[15] Defendant Fowler does not respond to the CEA claims against him. Those claims would survive any motion to dismiss for the same reasons such claims survive against other Defendants.

damages." 7 U.S.C. § 25(a)(1). As a court in this District has held, a plaintiff may do so by alleging she purchased contracts during a proposed class period in which defendants persistently manipulated and inflated the market, as in the manipulation of LIBOR. *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 718 (S.D.N.Y. 2013), *vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016). A plaintiff need not allege the details of each contract purchased or estimate losses with precision, because the information necessary to ascertain those losses—*e.g.*, in the LIBOR manipulation context, the spread between LIBOR's "true" level and its level when plaintiffs sold their contracts— "might be in the possession of defendants" and "could not be known by plaintiffs" before discovery. *Id.* at 719; *see also In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *29 (S.D.N.Y. Mar. 28, 2017), *on reconsideration,* 449 F. Supp. 3d 290 (S.D.N.Y. 2020) (recognizing that plaintiffs who allege persistent manipulation "need not match specific trades with days on which they alleged" manipulation occurred).

This principle confirms that Plaintiffs have adequately pleaded CEA standing here. Plaintiff Goldshtein alleges that he bought 629 bitcoin future positions between January 16, 2018, and June 3, 2020—during the Class Period when Defendants persistently manipulated and inflated crypto-commodity prices. CAC ¶¶ 22, 279, 372. This is enough. He cannot be expected to know now, at the pleadings stage, the precise amount of his damages. *LIBOR I*, 935 F. Supp. 2d at 719 ("[P]laintiffs have adequately alleged actual damages by alleging that they purchased their contracts at an inflated price, that the degree of LIBOR artificiality later changed, and that they suffered damages as a result."); *see also Sullivan v. Barclays*, 2017 WL 685570, at *31 (plaintiffs pleaded CEA standing by alleging "a years-long conspiracy to secretly manipulate the Euribor" and that they made trades within that time, even though they did not trace the dates of that

manipulation to each of their individual transactions). Just like the LIBOR and Euribor plaintiffs, Plaintiffs cannot ascertain the true level of crypto-commodity prices without discovery.

The Bitfinex/Tether Defendants incorrectly assert that Plaintiffs allege only episodic and not persistent manipulation. B/T Br. 15–16. Plaintiffs have specifically alleged that the Defendants scheme was designed to keep prices of crypto-commodities high by reversing declining prices and keeping prices above round-number thresholds. CAC ¶¶ 274–77, 295–96. These techniques were designed to, and succeeded in, creating the impression of a price floor that stabilized and increased the price of crypto-commodities throughout the class period. *Id.* ¶ 296.

Defendants are not helped (Ex. Br. 15–17; B/T Br. 16–17) by *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104 (2d Cir. 2018). In *Harry,* plaintiffs lacked CEA standing because they did not allege a connection between defendants' manipulation of prices at four regional natural gas hubs and prices on the separate hub where plaintiffs traded. *Id.* at 114–15. But the Second Circuit held that plaintiffs would have had standing if they had alleged "trad[ing] (at a detriment) in a contract the price of which was tied … to the price of a contract that a defendant was plausibly manipulating." *Id.* This case is like that hypothetical. Goldshtein has alleged that his prices were substantially influenced by Defendants' manipulation because he alleges that the bitcoin contracts he traded were directly tied to the crypto-commodity prices that Defendants manipulated by buying crypto-commodities at strategic times with debased USDT. CAC ¶¶ 75–77. This link also resembles those between LIBOR rates and the contracts referencing those rates, *Gelboim*, 823 F.3d at 765–66, and between gold prices and gold futures, *In re Commodity Exch.,*

27

*Inc.*, 213 F. Supp. 3d 631, 644–46 (S.D.N.Y. 2016), both of which were sufficient to plead CEA standing. *Harry*. 889 F.3d at 113 (citing both cases).[16]

### B.    Plaintiffs State A Viable Price Manipulation Claim

To state a price manipulation claim, Plaintiffs must allege that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *Comm. Exch., Inc.*, 213 F. Supp. 3d 631, 668 (S.D.N.Y. 2016) (internal quotations omitted). If the claim sounds in fraud, the Rule 9(b) standard is "generally relaxed," and "the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *Id.* at 668 (internal quotations and citations omitted).

Plaintiffs plead the first three elements—which overlap, *id.* at 668–69—by alleging that Defendants could and did cause artificially inflated prices for crypto-commodities and crypto-commodity futures through strategic purchases with debased USDT during the Class Period. CAC ¶¶ 219–64. Plaintiffs have identified a significant number of days on which anomalous price swings occurred uniquely around large issuances of new USDT during the Class Period. *Id*. ¶¶ 272–79. This easily states a claim; because Defendants inflated crypto-commodity prices, the prices were artificial in that they did not "reflect basic forces of supply and demand." *Comm. Exch.*, 213 F. Supp. 3d at 669–72 (sustaining CEA price manipulation claim where plaintiffs alleged a conspiracy to fix gold futures). If demand is based on fraudulent information, then such

---

[16] Potter argues that Goldshtein lacks standing to bring CEA claims against him because Potter stepped down midway through the period in which Goldshtein purchased Bitcoin futures. Pot. Br. § III.A. But Goldshtein's first purchase were made on January 16, 2017 — before Potter resigned. CAC ¶¶ 22. Potter cites no case suggesting that this purchase was insufficient to confer standing.

information is not a legitimate component of the supply-demand equation, and the equation reveals an artificial price. *See City of Providence v. Bats Glob. Mkts, Inc.*, 878 F.3d 36, 49 (2d Cir. 2017). Defendants' manipulative and fraudulent conduct also "prevented true price discovery." CAC ¶ 437. If the process of price discovery is based on fraudulent information, then the resulting price will be artificial. *See, e.g.*, *United States v. Vorley*, 420 F. Supp. 3d 784, 802 (N.D. Ill. 2019) (recognizing that "market price is only as 'real' as the data that inform the process of price discovery").

Plaintiffs further allege that Defendants could and did cause this artificial pricing. A plaintiff may show such causation by alleging that the defendant's conduct "had an immediate effect on pricing" in the market. *Comm. Exch.*, 213 F. Supp. 3d at 671. Plaintiffs thus "plausibly allege" that such issuances were "at least one cause of the alleged artificial pricing" resulting from the price swings. *Comm. Exch.*, 213 F. Supp. 3d at 671. And because Plaintiffs have "plausibly alleged a conspiracy" and have alleged that the Defendants manipulated the crypto-commodities market "by virtue of their respective roles" in that market, *id.* at 669, Plaintiffs have adequately alleged these elements against all Defendants. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *22 (S.D.N.Y. Sept. 20, 2016) (holding that plaintiffs were not required to allege each defendant's ability to "independently influence" prices when they had alleged the role of each defendant in the conspiracy).

The Bitfinex/Tether Defendants proceed as if Plaintiffs have not explained how trades made with debased USDT could have inflated prices in the larger crypto-commodity market. B/T Br. at 19–21. They have. By buying at critical moments, when crypto-commodity prices fell or approached a round-number threshold, Defendants created the artificial impression of price floors, causing prices to rise. CAC ¶¶ 295–300. These trades had an outsized impact because the market

saw them as injecting new assets into the crypto-commodity market, not simply swapping one crypto-commodity for another. *Id.* ¶ 272.

The Bitfinex/Tether Defendants instead argue (B/T Br. at 20) that there may be explanations for the pricing *other* than the one Plaintiffs allege. This assertion provides no reason to dismiss the CEA claims. The prospect that it was "possible" that some price movements resulted from natural forces of supply and demand does not defeat a plaintiff's claim. *Comm. Exch.*, 213 F. Supp. 3d at 669. Tellingly, the opinion Defendants cite, *CFTC v. Wilson*, 2018 WL 6322024, at *14 (S.D.N.Y. Nov. 30, 2018), found the CFTC's allegations unsupported after a full trial, not at a motion to dismiss. A motion to dismiss is not the occasion to decide which explanation will ultimately prevail. *Comm. Exch.*, 213 F. Supp. 3d at 669 (court "may not pick and choose among plausible explanations and must assume that Plaintiff's well-plead allegations are true"). Plaintiffs allege that the crypto-commodity market looked to USDT-for-bitcoin trading in particular as a signal for both USDT and crypto-commodity demand and further support their allegations quantitatively. *See, e.g.*, CAC ¶¶ 11, 259, 272, 324, 373, 393–94. On a motion to dismiss, the Bitfinex/Tether Defendants cannot demand that the Court ignore Plaintiffs' well-pled allegations.

Plaintiffs also allege Defendants' specific intent to manipulate the crypto-commodities market. "Specific intent to manipulate prices can be pled by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Comm. Exch.*, 213 F. Supp. 3d at 670 (internal quotations omitted). Plaintiffs must show that "Defendants acted (or failed to act) with the purpose or conscious object of causing or affecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Id.* at 670 (internal quotations and brackets omitted). Plaintiffs detail each Defendant's role in the crypto-economy and how they profited from

the scheme. CAC ¶¶ 339–40, 366. They also allege misbehavior including Potter and other Defendants concealing links between Bitfinex and Tether, *id.* ¶¶152–161, misrepresenting USDT's backing, *id.* ¶¶ 193–258, failing to comply with legal reporting obligations on the part of the Exchange Defendants, *id.* ¶¶ 331–33, and Potter and Devasini working with Fowler and Crypto Capital to use illegal shadow banking to create the illusion that Tether was fully backed by U.S. dollars, *id.* ¶¶ 219–58.[17] The legitimate forces of supply and demand thus operated on fraudulent misinformation — where the newly issued USDT was unbacked, the USDT subsequently used to purchase these crypto-commodities was thus devalued, and the newly issued USDT was issued for the specific purpose of offsetting price drops in bitcoin in particular. *See, e.g.*, CAC ¶¶ 193–258.

The Bitfinex/Tether Defendants' only criticism on this score is that Plaintiffs do not cite specific communications among the Defendants outlining their plan. B/T Br. at 18–19. Such allegations are unnecessary. "[S]cienter may be established by showing that defendants had both motive and opportunity," *LIBOR-I*, 935 F. Supp. 2d at 715, which Plaintiffs abundantly allege here. And Plaintiffs do allege communications in which Devasini told Crypto Capital that, if they could not maintain the illusion of Tether's reserves, the price of Bitcoin could "tank." CAC ¶ 362. Defendants had the opportunity to manipulate prices because, as also explained above, the close relationship between these entities allowed Tether to use Bitfinex immediately to make the newly issued and unbacked USDT available to exchange for bitcoin and other crypto-commodities. *See, e.g.*, *id.* ¶¶ 152–61, 195–218, 260–61.

---

[17] Potter's attempt to provide an innocent explanation of his comments describing Tether and Bitfinex's illicit attempts to access correspondent banking, Pott Br. § III.B, is inappropriate for this motion to dismiss. And Potter again attempts to minimize the allegations against him, ignoring that Plaintiffs have alleged not only that he is a former executive of Bitfinex and Tether but also particular actions he took to support the manipulation of crypto-commodity prices. *See, e.g.*, CAC ¶¶ 122, 152–56, 343–47.

The Exchange Defendants complain that Plaintiffs allege only their constructive knowledge (Ex. Br. at 11), but this misrepresents both the governing standard and the significance of Plaintiffs' allegations. A defendant participates in a manipulative scheme by acting knowingly or recklessly in helping to affect the trading at issue. *See SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111–12 (2d Cir. 1998) (addressing the "manipulative or deceptive device or contrivance" language under the securities laws); *Comm. Exch.*, 213 F. Supp. 3d at 670 (addressing the CEA). The defendant's "personal motivation for manipulating the market is irrelevant"; he may be liable even if he "were motivated by a desire to obtain compensation." *U.S. Envtl.*, 155 F.3d at 112. Plaintiffs allege substantial circumstantial evidence of the Exchange Defendants' scienter—including a failure to comply with regulatory obligations in the face of repeated transfers of massive amounts of USDT through the same addresses. CAC ¶¶ 320–22, 331–33. And the subsequent volume of USDT trades—72% of all USDT issued during the relevant time period—is grossly disproportionate to the Exchange Defendants' market share, *id.* ¶¶ 208, 335, further indicating that the Exchange Defendants knew the trades were not legitimate. Such allegations of specific intent are "sufficient where plaintiffs allege facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Commodity Exch.*, 213 F. Supp. 3d at 670; *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (recklessness can be found in instances of "[e]gregious refusal to see the obvious, or to investigate the doubtful").[18]

---

[18] The Exchange Defendants argue (Ex. Br. at 18) that allegations that a defendant "should have known" facts are insufficient to show scienter, from a line of cases based on the premise that such allegations show only "negligence." *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368–69 (S.D.N.Y. 2001). In alleging what the Exchange Defendants "must have known," as shown below, Plaintiffs allege far more than negligence.

### C.       Plaintiffs State A Viable Manipulative Device Claim

Plaintiffs plead a manipulative device claim under 7 U.S.C. § 25(a)(1)(D)(i), which pro-

vides remedies for the use of "any manipulative device or contrivance," and under CFTC

Rule 180.1, which prohibits the use of "any manipulative device, scheme, or artifice to defraud,"

by alleging that Defendants engaged in a scheme to inflate crypto-commodity prices though stra-

tegically timed trades with debased USDT. *See Comm. Exch.*, 213 F. Supp. 3d at 672–73 (plaintiffs

pleaded manipulative device claims by alleging defendants engaged in a scheme to suppress gold

prices through coordinated trading). A "contrivance" is a "scheme, plan, or artifice." *Ernst & Ernst*

*v. Hochfelder*, 425 U.S. 185, 199 n.20 (1976) (internal quotations omitted). The participation in a

scheme thus may constitute the employment of a manipulative contrivance, regardless of whether

the defendant had a "manipulative purpose." *U.S. Envtl., Inc.*, 155 F.3d at 111–12. Plaintiffs have

adequately alleged standing and scienter for this claim, and have adequately alleged each Defend-

ants' conduct, for the same reasons as for the price manipulation claim.

The Exchange Defendants assert that they did not make false statements (Ex. Br. at 17–

18), but Plaintiffs allege that both Bittrex and Poloniex falsely stated that Tether was fully backed

by U.S. dollars. CAC ¶¶ 166, 174. The Exchange Defendants' alternative explanations of their

statements cannot justify dismissal. Also, as the Exchange Defendants concede (Ex. Br. at 17 n.7),

courts look to Section 10(b) of the 1934 Securities Exchange Act for guidance in interpreting the

phrase "manipulative or deceptive device or contrivance" in the CEA, *Comm. Exch.*, 213 F. Supp.

3d at 672, and Section 10(b) "prohibits not only material misstatements but also manipulative

acts"—including "a transaction [that] sends a false pricing signal to the market," *ATSI Commc'ns,*

*Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007); *see also IBEW Local 90 Pension Fund*

*v. Deutsche Bank AG*, 2013 WL 1223844, at *11 (S.D.N.Y. Mar. 27, 2013) ("One can be held

liable in connection with such a [manipulative] scheme even if he did not himself make a material

33

misstatement in connection with it"). The Exchange Defendants, as explained above, participated in a scheme that sent false pricing signals to the market and caused artificial prices. CAC ¶¶ 112–38, 193–258, 204–07, 259–79; *see, e.g.*, *Comm. Exch.*, 213 F. Supp. 3d at 673 (manipulation shown where "the market relies on the transactions to signal true, rather than manipulative, demand") (internal quotations omitted). Plaintiffs allege a manipulative device because they allege the Exchange Defendants' role in that scheme. *Id.* ¶¶ 310–16, 318–22, 324-41.

Defendants also argue that Plaintiffs do not adequately plead reliance, loss causation, or materiality. B/T Br. at 21–23, Ex. Br. at 18–19. But where, as here, plaintiffs allege both misrepresentations and manipulation in the context of a broad manipulative scheme, they satisfy their pleading burden "by alleging with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Comm. Exch.*, 213 F. Supp. 3d at 673 (sustaining market manipulation claims based on misrepresentation and manipulation in the context of benchmark manipulation) (internal citation and quotation omitted). Plaintiffs have done that, and there is no requirement to plead anything further. CAC ¶¶ 259–316, 318–33, 324-66. The single securities fraud case Exchange Defendants cite (Ex. Br. 19) does not address the CEA's requirements for a manipulative device claim. *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88 (S.D.N.Y. 2013), *aff'd sub nom. GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214 (2d Cir. 2016). The Bitfinex/Tether Defendants misleadingly cite *LIBOR I* to argue that allegations of inflated prices do not plead proximate cause (B/T Br. at 22 (citing *LIBOR I*, 935 F.Supp.2d at 717)), but the portion of *LIBOR I* they reference dealt with pleading "actual damages" for CEA standing purposes, *LIBOR I*, 935 F. Supp.2d at 717, and then held plaintiffs met that standard by alleging

inflated prices, a changing degree of inflation, and resulting damages, *id.* at 719. Plaintiffs here plead exactly that. CAC ¶¶ 272–309.[19]

### D.    Plaintiffs State Viable Aiding and Abetting Claims

Even if Plaintiffs had not adequately alleged direct liability under the CEA against some Defendants, those Defendants would be liable for aiding and abetting the other Defendants. To plead an aiding and abetting claim, Plaintiffs must allege that Defendants "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004). As discussed, Plaintiffs allege each Defendant's scienter and actions in furtherance of the conspiracy, CAC ¶¶ 260–79, 310–16, 318–22, 324-66, which easily states a claim. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 571 (S.D.N.Y. 2016) (holding that allegations of conspiracy suffice to plead CEA aiding and abetting claim); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 542 (S.D.N.Y. 2008) (aiding and abetting where highly suspicious trading activity by natural gas trader made it "reasonable to infer" that the defendant-broker "may have suspected that manipulation was occurring"), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

Defendants' grab-bag of contrary arguments is meritless. The Bitfinex/Tether Defendants assert that Plaintiffs have not pleaded an underlying manipulation claim (B/T Br. 23), but, as

---

[19] If a plaintiff must show reliance or loss causation under Rule 180.1(a), then—consistent with the parallel language in the securities laws, *Comm. Exch.*, 213 F. Supp. 3d at 672; *London Silver*, 213 F. Supp. 3d at 562—Plaintiffs' allegations should benefit from the "fraud on the market" theory, *see Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 274 (2014*).* Plaintiffs have alleged how Defendants' lies that USDT was backed and issued in response to legitimate market demand led the market to interpret the manipulative purchases as reflecting legitimate demand for crypto-commodities. *See, e.g.*, CAC ¶¶ 13–14, 22, 93–98, 187, 221, 306, 337–38, 375. These allegations easily compel the inference that the market relied on the fraudulent market manipulation and that this misconduct caused Goldshtein economic loss.

discussed, they have. *See supra* at 27–31. The Bitfinex/Tether Defendants also assert that Plaintiffs' vicarious liability allegations are vague. B/T Br. 23. Not so. Plaintiffs' allegations of the conspiracy are quite detailed, and at the pleadings stage there is nothing to suggest either the Individual Defendants or the corporate Defendants' employees were acting outside the scope of their employment. The Exchange Defendants pretend that Plaintiffs' aiding and abetting liability allegations consist of a single paragraph (Ex. Br. at 19–20), but Plaintiffs' claims incorporate the detailed factual allegations laid out in the rest of the complaint, CAC ¶¶ 440, 445. Among other allegations, Plaintiffs allege that the Exchange Defendants adopted the representations that USDT was backed 1:1 by the U.S. dollar, *id.* ¶¶ 166, 174 and facilitated the creation of the 1J1D and 1AA6 accounts, which enabled Bitfinex to sell billions of debased USDT to their customers in exchange for crypto-commodities, *id.* ¶¶ 260–65. Potter, finally, suggests Plaintiffs have not alleged how he furthered the scheme (Potter Br. at 10–11), but Plaintiffs in fact allege that he incorporated a number of Bitfinex and Tether entities, CAC ¶ 122; helped develop the Bitfinex platform to make it prone to manipulation, *id.* ¶ 144; helped conceal Bitfinex and Tether's true relationship, *id.* ¶¶ 153–56; and served as an architect, with Fowler and Crypto Capital, of the shadow-banking scheme that facilitated the illusion that USDT was fully backed by U.S. dollars, *id.* ¶¶ 342–47.

### E.     Plaintiffs State Viable Principal/Agent Liability Claims

To plead a claim for principal-agent liability under the CEA, Plaintiffs must allege that "[an] agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 571 (citations omitted).

Plaintiffs meet that standard for Potter, Devasini and Velde by alleging they worked as agents of Bitfinex and Tether and served as corporate officers of and acted for the benefit of those corporations. CAC ¶¶ 34–36. As to Devasini, acting as Chief Financial Officer of the Bitfinex

Defendants and Tether Defendants, he was involved in the creation of the Bitfinex and Tether entities, *id.* ¶¶ 35, 122; admitted that Bitfinex was working on a bot to manipulate the price of crypto-commodities, *id.* ¶¶ 146–47; helped to conceal the relationship between Bitfinex and Tether, *id.* ¶¶ 153–56; and worked closely with Crypto Capital to obscure the fact that USDT was not fully backed, *id.* ¶¶ 250–52. As to Velde, acting as Chief Executive Officer of Tether, as to two critical aspects of the scheme, he falsely swore to the 1:1 backing of USDT, *id.* ¶ 130, and helped to conceal the relationship between Bitfinex and Tether, *id.* ¶¶ 154–56. As to Potter, he incorporated a number of Bitfinex and Tether entities, *id.* ¶ 122; helped to develop the Bitfinex platform to make it prone to manipulation, *id.* ¶ 144; helped to conceal Bitfinex and Tether's true relationship, *id.* ¶¶ 153–56; and served as an architect, with Fowler and Crypto Capital, of the shadow-banking scheme that facilitated the illusion that USDT was fully backed by U.S. dollars, *id.* ¶¶ 342–47. These Individual Defendants were thus "engaged in the management, direction, control or transaction of business or affairs of the Defendants." *London Silver Fixing*, 213 F. Supp. 3d at 571 (quotations and brackets omitted).

Plaintiffs' allegations also necessarily suggest the involvement of other employees of the corporate Defendants, as yet unknown to Plaintiffs, for whose actions those corporate Defendants are liable. Because there is "no indication, at this stage, that these employees acted on a lark or in any way outside the scope of their employment," this claim should be sustained. *Id.* (sustaining principal-agent liability claims where allegations of silver fixing necessarily implied the involvement of as-yet unnamed traders and defendant employees); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *25 (sustaining principal-agent liability claims based on allegations of foreign exchange rate manipulation where "nothing in the [complaint]

suggests that any trader was operating outside the scope of his employment when engaging in" the alleged manipulation).

### F.    Plaintiffs' CEA Claims Against The Exchange Defendants Are Timely

Under the CEA's two-year statute of limitations, 7 U.S.C. § 25(c), a cause of action accrues when the plaintiff "discovered her CEA injury." *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir.), *cert. denied*, 140 S. Ct. 536 (2019). A plaintiff is on inquiry notice of CEA claims "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Comm. Exch.*, 213 F. Supp. 3d at 675 (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012)). "Said another way, the relevant inquiry in market manipulation cases is not when a plaintiff sold a contract or commodity at a loss, but rather when a plaintiff should have discovered that some market participant fraudulently distorted the relevant market, thereby causing the loss." *Wu v. Bitfloor, Inc.*, 2020 WL 2512108, at *6 (S.D.N.Y. May 15, 2020).

"Defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194–95 (2d Cir. 2003) (quotations and citation omitted). In addition, "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss." *Lentell*, 396 F.3d 161, at 168 (quotations and citations omitted). At the pleadings stage, Defendants' burden of showing that a plaintiff was on inquiry notice outside the limitations period is "extraordinary and appropriate only in extreme circumstances." *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) (quotations omitted) ("Since issues of constructive knowledge depend on inferences drawn from the facts of each particular case, summary judgment is often inappropriate on issues of inquiry notice") (quotations and citation omitted); *see also Elsevier, Inc. v. Grossman*, 77 F. Supp.3d 331, 350 (S.D.N.Y. 2015) (same).

38

The Exchange Defendants argue that Goldshtein's claims against them are untimely, but do not dispute that Goldshtein learned of his CEA injury in the last two years. Instead, they assert Goldshtein was on inquiry notice by January 2018, because the Tether Report and articles in the New York Times and on CNBC at that time purportedly should have prompted him to inquire into the truthfulness of the Exchange Defendants' false statements. Ex. Br. at 14–15.

*First*, the Tether Report does not fall into the category of "the kind of materials" with which plaintiffs are typically charged with knowledge as a matter of law. *Holmes v. Parade Place, LLC*, 2013 WL 5405541, at *13 (S.D.N.Y. Sept. 26, 2013). The Tether Report was written by an anonymous author, was not published by a news organization or other industry publication, was not published in an academic journal, and was not the result of a government investigation or legal proceeding.[20] The Second Circuit "ha[s] never affirmed the dismissal of a complaint as time-barred based on a story that appeared only in a specialty publication, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence." *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 432 (2d Cir. 2008).

*Second*, the Tether Report did not put Goldshtein on inquiry notice of active crypto-commodity manipulation outside the limitations period. The Tether Report disclaimed that it was evidence of any scheme: "The statistics presented herein do not establish wrongdoing but merely give rise to the opinion that the observed behavior appears questionable and should be further examined." https://perma.cc/JXT6-VJGQ. The cited articles also did not present such evidence. It was not until the Griffin Report—published October 28, 2019—well within the limitations period—

---

[20] The Tether Report's relative obscurity may be why the Tether Defendants did not issue any public response to it. In contrast, Bitfinex and Tether immediately and publicly denied the conclusions in the Griffin Report when it was released. *See* https://www.cnbc.com/2018/06/13/much-of-bitcoins-2017-boom-was-market-manipulation-researcher-says.html.

that the public received substantial evidence that debased USDT was being used to inflate crypto-commodity prices. And nothing prior to the Griffin Report revealed the influence on crypto-commodity futures like those which Goldshtein purchased.

The detailed allegations of market manipulation in the Complaint are based on substantial legal, forensic, and expert economic analysis that does not appear in the Tether Report, including detailed analysis of:

- The use of intermediate addresses (1J1d and 1AA6) for USDT transfers among the Exchange Defendants and the corresponding round–trip transactional flows used to implement the manipulation, CAC ¶¶ 205–11;

- Bitcoin address clustering and the round-trip flows of USDT and bitcoin between and among the Exchange Defendants, *id.* ¶¶ 260–64;

- The impact of USDT trade flows among the Exchange Defendants on the volume of both bitcoin and other crypto-commodity trading activity on those exchanges, *id.* ¶¶ 265–71;

- The timing of USDT issuances and redemptions relative to Tether's stated assets, *id.* ¶ 220, and interruptions of its banking relationships, *id.* ¶¶ 216–18, 233–58;

- The impact of USDT flows on bitcoin prices, *id.* ¶¶ 272–79;

- Suspicious trading patterns associated with "round number" price thresholds (included in the Griffin Article), *id.* ¶¶ 295–98; and

- The impact of the Tether Report itself on USDT issuances and the pattern of USDT transactions among the Exchange Defendants, which was not publicly analyzed in the months following the report, *id.* ¶¶ 212–15.

Goldshtein also was not on inquiry notice of the Exchange Defendants' participation in a manipulative scheme. The Tether Report did not "identif[y] Bittrex and Poloniex as potentially participating exchanges," Ex. Br. at 14; it mentioned them in passing. The Tether Report used the flows into Bittrex's general deposit wallet as an example of a data distribution that was not suspicious. https://perma.cc/JXT6-VJGQ. Poloniex was mentioned only along with another exchange in analyzing flows into wallets that briefly accepted Tether. It took Plaintiffs' experts considerable time—at considerable cost—to analyze the USDT blockchain and uncover data showing that 72% of all USDT issued from October 2014 through December 2018 flowed through two accounts on Bittrex and Poloniex. CAC ¶ 262. Such extraordinary measures were not available to, much less should be expected of, an investor of reasonable intelligence. *See Comm. Exch.*, 213 F. Supp. 3d at 675 (plaintiffs were not on notice of manipulation that "was only discernable based on their analysis of thousands of days of historical pricing data" (internal quotations omitted)); *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 462 (S.D.N.Y. 2015) (finding that possibility of hiring additional expert who might have revealed injury did not demonstrate that plaintiff was on inquiry notice).

## III.    PLAINTIFFS STATE VIABLE RICO CLAIMS

Defendants do not dispute that Plaintiffs have adequately alleged several elements of a § 1962(c) RICO claim: the existence of a RICO "enterprise" distinct from the persons conducting it, and a "sufficient relat[ion]" between predicate acts to demonstrate a "pattern" of racketeering. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The Bitfinex/Tether Defendants, Fowler, and Potter contend that Plaintiffs have not adequately alleged proximate causation or the underlying predicate acts, and Fowler further argues the Complaint does not allege that he conducted the enterprise's affairs. B/T Br. 24–27, 30–35; Fowler Br. 18–22; Potter Br. 11–14. The Exchange Defendants focus on Plaintiffs' RICO conspiracy claim, arguing that Plaintiffs did not sufficiently

allege their knowledge of the underlying market manipulation scheme or any agreement to partic-

ipate in it, and also contest whether proximate cause or a "pattern" of racketeering have been ade-

quately alleged. Ex. Br. 21–25. The Complaint sufficiently alleges every element of Plaintiffs'

RICO claims, and Defendants' motions to dismiss them should be denied.[21]

## A.   The RICO Defendants' Predicate Acts Proximately Caused Plaintiffs' RICO Injury Under § 1962(c)[22]

The Bitfinex/Tether Defendants contend that Plaintiffs have not adequately alleged proxi-

mate cause because their injury is purportedly several "steps removed" from Defendants' conduct,

and because other "market participants," not Defendants, supposedly injured Plaintiffs. B/T

Br. 26–27. These arguments misapprehend controlling law and ignore Plaintiffs' allegations.

Proximate cause "is a flexible concept that does not lend itself to a black-letter rule that

will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654

(2008) (internal quotations omitted). Courts assess whether there is "some direct relation between

the injury asserted and the injurious conduct alleged." *Id.* (internal quotations and citations omit-

ted). The injurious conduct, for purposes of proximate cause, is the RICO predicate acts, and thus

the "compensable injury flowing from a RICO violation necessarily is the harm caused by the

predicate acts." *Hemi Grp. v. City of New York, N.Y.*, 559 U.S. 1, 13 (2010) (internal quotations

omitted). Plaintiffs need only allege injury from one of the predicate acts at issue here to survive

---

[21] In the section of their brief addressing RICO, the Bitfinex/Tether Defendants describe Plaintiffs' allegation that USDT was unbacked as resting on "unreasonable inferences." B/T Br. at 28–30. It is not clear which element of Plaintiffs' RICO claims Defendants are attempting to contest, but in any event, as summarized in the Background section above, the Complaint is replete with specific allegations demonstrating how Plaintiffs, as well as academic researchers and experts, concluded that USDT is unbacked.

[22] In this subsection, the term "Defendants" or "RICO Defendants" is intended to refer specifically to DigFinex, the Bitfinex Defendants, the Tether Defendants, Velde, Devasini, Potter, Fowler, and Crypto Capital.

a motion to dismiss. *See, e.g.*, *Reich v. Lopez*, 38 F. Supp. 3d 436, 449 (S.D.N.Y. 2014) ("Plaintiffs do not need to suffer injury from each of the predicate acts underlying their RICO claim; direct injury from one is enough."); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 253 (S.D.N.Y. 2012) ("A RICO damages plaintiff need allege only that it has suffered an injury directly resulting from some or all of the activities comprising the violation." (internal quotations omitted). Plaintiffs' allegations satisfy this standard. Congress modeled RICO on the federal antitrust laws, *see Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992), and the same requirements of proximate causation "apply with equal force to" both types of claims. *Accord Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 576 (2d Cir. 2020) (finding injury-in-fact requirement satisfied for price manipulation claim brought pursuant to Sherman Act and RICO). Defendants do not challenge the sufficiency of Plaintiffs' allegations that Defendants proximately caused artificially inflated prices in violation of the antitrust laws, and those allegations are equally sufficient to show proximate causation on the RICO claims.

### 1. The RICO Defendants' Sales of Unbacked USDT Injured Plaintiffs Directly By Causing Crypto-Commodity Price Inflation

In saying that Plaintiffs were not victims of the "first step" of Defendants' scheme, the Bitfinex/Tether Defendants simply ignore the Complaint's allegations. B/T Br. 25. The conduct Defendants describe as the "first step"—"Bitfinex's alleged purchase of bitcoin or other crypto-commodities on Bittrex or Poloniex with 'unbacked' USDT," *id.*—by itself inflated prices by forcing a price floor. *See, e.g.*, CAC ¶ 187. That "first step" was money laundering—the use of newly issued USDT to acquire bitcoin and other crypto-commodities (*i.e.*, the transfer of "funds" in financial transactions) in criminally derived property from specified unlawful activity (*i.e.*, the USDT derived from the Bitfinex/Tether Defendants' other predicate acts of wire fraud and operating an unlawful money transmitting business). 18 U.S.C. §§ 1957(a), 1957(f)(2), 1957(f)(3),

1957(f)(1), 1956(c)(4), 1956(c)(6)(A), 5312(a)(2)(J), (R); *see also infra* Section III.C.2. Defend-ants' money laundering artificially inflated crypto-commodity prices and thus injured Plaintiffs and the Class, who purchased crypto-commodities at artificial prices. CAC ¶¶ 11–13, 18–22, 185–316, 318–22, 324-66, 372–75, 466–68. Plaintiffs thus allege a "direct relation between the injury asserted and the injurious conduct alleged." *Bridge*, 553 U.S. at 654. On this basis alone, Plaintiffs have shown proximate causation.

Contrary to what the Bitfinex/Tether Defendants contend, the Complaint does not allege that the artificial prices "depended *wholly* on the decisions and actions of independent actors," *i.e.*, other investors attracted to "soaring bitcoin prices." B/T Br. 26 (emphasis added). It is true that Defendants' scheme induced other investors to buy into a bubble (which raised prices even fur-ther), *see* CAC ¶ 191, and—as explained *infra* Section III.A.2—Plaintiffs have properly alleged proximate cause as to those later price increases. But Plaintiffs' injury is not "wholly" derived from those later purchases, because the "first step" of Defendants' conduct—using USDT to es-tablish fraudulent price floors in the crypto-commodity market—was a predicate act that injured Plaintiffs by manipulating prices, and that harm did not depend on the actions of later investors. CAC ¶¶ 280–309.

Courts in this circuit recognize that plaintiffs who trade in a manipulated market can estab-lish RICO injury and causation. The Second Circuit's recent decision in *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529 (2d Cir. 2020), illustrates the point. There, the court held that plaintiffs' trades in forwards, interest rate swaps, and swaptions at artificial prices constituted a sufficient injury, where plaintiffs alleged that defendants had manipulated a component price of the derivatives that plaintiffs traded and plaintiffs "had to pay higher prices as a result of Defend-ants' market manipulation." *Id*. at 534 (internal quotations and brackets omitted). The court found

plaintiffs' allegations "that Yen LIBOR is routinely used to price Yen FX forwards" and their "explanation of the role Yen LIBOR plays in the generic pricing formula" sufficient to state a claim, *id*, just as the allegations here that Defendants manipulated crypto-commodity prices are sufficient. *Sonterra* also implicitly recognized that paying higher prices "as a result" of market manipulation was sufficient to show causation. *Id.* at 533. Plaintiffs' injury here is similarly tied directly to Defendants' manipulation. Plaintiffs "consist of persons who were allegedly directly injured by their presumed reliance on artificial prices resulting from the enterprise's alleged manipulation of the market," and thus have alleged the requisite causal link. *See In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 321 (S.D.N.Y. 2000).

This case is therefore unlike *7 West 57th Street Realty Company, LLC v. Citigroup, Inc*., 771 Fed. App'x 498 (2d Cir. 2019), on which the Bitfinex/Tether Defendants rely (B/T Br. 25). That case found no proximate cause where the alleged conduct was the manipulation of LIBOR but the alleged injury was a change in value of bonds *not* pegged to LIBOR, and the "opacity and illiquidity" of the market in which the plaintiffs' bonds traded precluded use of ordinary economic tools to assess reliance or damages. *Id.* at 502–04. Here, by contrast, Defendants committed repeated acts of wire fraud to issue an unbacked stablecoin, USDT—acts which were necessary for their market manipulation to work, so that the market would believe purchases made with USDT had a higher value than they actually did. Defendants' wire fraud was followed by repeated acts of money laundering to transfer unbacked USDT to Bittrex and Poloniex for the purpose of price manipulation. CAC ¶¶ 187–91. Defendants furthered their scheme to inflate prices in the crypto-commodity market by committing other predicate acts to prop up the lie about USDT's value—operating an unlicensed money transmitting business, bank fraud, and transactions in specified unlawful activity. *See id.* ¶ 193, 221–23, 230–54. These predicate acts, too, were "substantial

factor[s] in the sequence of responsible causation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir. 1990). The damages stemming from Defendants' harmful conduct are directly measurable—indeed, Plaintiffs have already provided correlations between USDT inflows and increased crypto-commodity trading activity on the Bittrex and Poloniex exchanges, *see* CAC ¶¶ 265–70, and the immediate bitcoin price increases in the initial wake of USDT transfers, *see id.* ¶¶ 272–76. With the benefit of discovery, Plaintiffs will be able to identify the full scope of Defendants' manipulative acts, and experts will be able to calculate how those incidents led to price inflation for each crypto-commodity in much the same way that experts in securities cases would analyze the stock market's trading history. For the same reason, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018), does not help Defendants. B/T Br. at 25.

Nor does it matter that Defendants did not sell USDT directly to Plaintiffs when they laundered it through the Bittrex and Poloniex exchanges. *See* B/T Br. at 25. First-party reliance on Defendants' lies about USDT's value is not required for proximate causation; it is enough that the non-Class purchasers of USDT on the Bittrex and Poloniex exchanges relied on Defendants' misrepresentations about the value of USDT when they transacted with Defendants. *Accord Bridge*, 553 U.S. at 658 (proximate cause satisfied where third-party municipal actor was target of defendants' misrepresentations and plaintiffs did not transact directly with defendants). Contrary to Defendants' contention, it is not critical that *Bridge* involved misrepresentations made in a "zero sum" closed auction. B/T Br. 27 n.16. *Bridge*'s logic can be extended to other situations where a plaintiff does not transact directly with a defendant.[23] *D'Addario v. D'Addario*, 901 F.3d 80, 97

---

[23] In *Hemi Group*, the Court pointed out that for every bid the *Bridge* defendants won through their fraud, another bidder necessarily lost out. 559 U.S. at 14–15. Similarly, here, for every injection of USDT onto the market, subsequent purchasers of crypto-commodities—including Plaintiffs— lost money.

(2d Cir. 2018) (misrepresentations to decedent's estate proximately caused harm to legatee of es-

tate even though "additional step" separated conduct from claimed harm); *De Sole v. Knoedler*

*Gallery, LLC*, 974 F. Supp. 2d 274, 310 n.15 (S.D.N.Y. 2013) (permitting RICO claims to proceed

against defendant who misrepresented origins of several forged paintings she sold to a gallery,

despite never having contact with subsequent purchasers of paintings from gallery owner). Here,

Defendants made misrepresentations to a closed universe—the market in which Plaintiffs trans-

acted. Those misrepresentations inflated crypto-commodity prices for all market participants—

purchasers of USDT on the Bittrex and Poloniex exchanges as well as every Class member during

the Class Period. *E.g.*, CAC ¶ 272–79.

Contrary to Defendant's contention, B/T Br. at 24, *Anza v. Ideal Steel Corporation*, 547

U.S. 451 (2006), does not provide any ground to conclude that the causal chain here is too remote.

The harm the plaintiff suffered in *Anza* was the inability to compete with a defendant's offering of

lower prices for the same goods. *See id.* at 457–58. The predicate act was tax fraud, which the

court said harmed only the state as tax collector; any injury to plaintiff resulting from how defend-

ant used the added revenues gained through the tax fraud was incidental or derivative of the earlier

fraud. *Id.* Here, Defendants' manipulation of the crypto-commodity market was not a mere by-

product of Defendants' scheme; it was the *object* of the scheme. *E.g.*, CAC ¶¶ 272–79.

### 2.   The Continued Inflation of Crypto-commodity Prices After The RICO Defendants' USDT Sales was a Direct and Foreseeable Result of The RICO Defendants' Conduct

Not only have Plaintiffs alleged an immediate and direct injury from Defendants' conduct,

*see* Part III.A.1, *supra*, but they also have alleged proximate cause for price inflation in the crypto-

commodity market that occurred after Defendants used unbacked USDT to prop up prices. While

the Bitfinex/Tether Defendants assert that the presence of other purchasers in the crypto-commod-

ity market precludes this showing, B/T Br. at 26, their argument ignores the allegations that these

purchases and the accompanying additional increase in prices were "a foreseeable and natural consequence of [Defendants'] scheme," for which Defendants are liable. *Bridge*, 553 U.S. at 658; *see also* CAC ¶ 271.

Defendants overstate the applicable pleading standard when they argue that Plaintiffs' causation theory must rule out the "contribution of innumerable other factors that might influence the market and investor decisions." B/T Br. at 26. In fact, one way to demonstrate the directness of the connection between Defendants' conduct and Plaintiffs' harm is to show that that conduct was a "substantial factor in the sequence of responsible causation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990); *see also In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 537 (S.D.N.Y. 2011) ("RICO case law provides that there does not have to be only one cause, as long as the defendant's conduct is a 'substantial factor' directly leading to the injury."); *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 235 (E.D.N.Y. 2014) (finding that defendants' fraudulent issuance of peer medical review reports "was, at the very least, a 'substantial factor' in the insurance companies' decisions to deny plaintiff's no-fault claims, and that this result was 'reasonably foreseeable' by all defendants involved in the production of [such] reports"). Plaintiffs have alleged in detail why Defendants' misconduct substantially caused price inflation. They need not rule out every conceivable alternative cause to survive a motion to dismiss.

Nor are Plaintiffs' injuries merely derivative of injuries suffered by a third party; the damages Defendants inflicted—the price increases caused by Defendants' exchange of USDT on the Bittrex and Poloniex exchanges—harmed plaintiffs directly. *See* CAC ¶¶ 273–75. Plaintiffs' injuries are akin to those suffered by the broker-dealers injured in *Holmes*, who "bought substantial amounts of [defendant-manipulated] stock with their own funds" and suffered financially after the manipulation was revealed and stock prices plummeted. *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S.

258, 262–63 (1992). Although the Court found that the *plaintiffs* in that case—who had covered the defunct broker-dealers' losses—could not recover for defendants' manipulation, the Court acknowledged that the broker-dealers, by contrast, were "directly injured" by that manipulation. *Id.* at 273. By comparison, the *Holmes* plaintiffs, the Court explained, could have been injured by wholly independent factors such as the broker-dealers' "poor business practices or their failures to anticipate developments in the financial markets." *Id.* As explained above, *supra* at § III.A.1, the Complaint alleges direct injury sustained as a result of Defendants' market manipulation. CAC ¶¶ 376–77; *accord Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 384 (2d Cir. 2001) (finding proximate cause where plaintiffs were "not alleging an injury that was derivative of injury to others").

Defendants' conduct here resembles cases in which a defendant is alleged to have manipulated a "component" of a derivative, such as LIBOR rates, which reflect the interest rates at which banks lend funds. Manipulation of these rates changes the market's assessment of the value of the derivative being traded. Similarly, Defendants' lies about USDT induced the market to believe that crypto-commodity purchases made with USDT should hold a certain value. In that context, manipulation harms plaintiffs who transact in the relevant derivative market, even though the price of the derivative is affected by market-wide trading done in reliance on the relevant component rates. *See, e.g.*, *Sonterra*, 954 F.3d at 534 (finding that plaintiffs asserted RICO injury by alleging that they "entered into derivatives transactions at prices that were 'artificial' due to Defendants' price fixing"); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 184 (S.D.N.Y. 2018) (upholding RICO claims against defendants who manipulated "a component of the price of the derivatives in which [plaintiffs] transacted"); *Minpeco, S.A. v. Hunt*, 718 F. Supp 168, 178 (S.D.N.Y. 1989) (denying motion to set aside verdict on causation grounds because plaintiff

49

established that defendant "used the mails and wires to plan and execute the conspiracy to manipulate the market, which caused [plaintiff's] injury"). Likewise, Defendants' fraud caused the market to place an artificially high value on crypto-commodities purchased with debased USDT. *See* CAC ¶¶ 193–94. Plaintiffs will prove the precise quantum of harm directly caused by Defendants' conduct through expert discovery and testimony; it is enough at the motion to dismiss stage that Plaintiffs have alleged injury caused by their purchase of crypto-commodities at prices inflated by Defendants' conduct.

Moreover, where Plaintiffs allege a RICO injury resulting from price manipulation, the analysis of causation under the CEA properly informs the analysis of RICO causation. Under the CEA, the "causation element requires that a defendant be the proximate cause of the price artificiality." *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *33 (S.D.N.Y. Sept. 30, 2020). "[T]here can be multiple causes of an artificial price," but "where these causes can be sorted out, and respondents are *a* proximate cause of the artificial price, a charge of manipulation can be sustained." *Id.* (internal quotations omitted) (emphasis added). "Finally, given the fact-intensive nature of the inquiry, causation is generally a jury question." *Id.* (internal quotations omitted); *see also id.* at 33–34 (concluding, based on the "constellation of evidence," including expert analysis of "highly unusual price patterns" and the "unique volatility" of the relevant market, that "a reasonable jury could conclude that Defendants were the proximate cause of the artificial prices" at issue).

### B.  If The RICO Defendants Did Not Cause Plaintiffs' Injury in Violating § 1962(c), Then The Bitfinex/Tether Defendants Necessarily Caused The Injury In Violating § 1962(a) [24]

Defendants misapprehend the nature of Plaintiffs' § 1962(a) theory. Under § 1962(a), the plaintiff must allege an "investment" injury caused "not by the pattern of racketeering activity itself, but rather by the use or investment of the proceeds of that activity." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 321 (2d Cir. 2011) (citing *Ouaknine v. MacFarlane*, 897 F.2d 75, 82–83 (2d Cir. 1990)). Defendants cite *Ouaknine* without explanation, B/T Br. 27 n. 17; to the extent they suggest that Plaintiffs have not alleged the requisite investment injury, the Complaint is clear that the Bitfinex/Tether Defendants used newly issued USDT to acquire bitcoin and other crypto-commodities, thereby artificially inflating the prices of these assets. CAC ¶¶ 259–309. If these acquisitions did not constitute predicate acts of money laundering and if the other predicate acts did not cause Plaintiffs' injury, as Defendants assert, then Defendants' acquisitions constituted their use or investment of the "proceeds" of income derived directly or indirectly from a pattern of racketeering activity in the operation of an enterprise designed to manipulate the crypto-commodity market, CAC ¶¶ 555–58, and the harm caused by the acquisitions was necessarily "distinct" from any injury that any predicate acts caused, *Ideal Steel*, 652 F.3d at 326–28.

Section 1962(a) prohibits the use of "proceeds" or "ill-gotten gain" to operate an enterprise. 18 U.S.C. § 1962(a); *United States v. Turkette*, 452 U.S. 576, 585 (1981). For purposes of this provision, the "proceeds" of Defendants' racketeering are the "'funds derived from a pattern of racketeering activity.'" *Ideal Steel*, 652 F.3d at 322 (quoting H.R. Rep. No. 91-1549, at 57). As Plaintiffs explain below, *infra* at § III.C.2, the plain meaning of the term "funds" encompasses

---

[24] In this subsection, the term "Defendants" is intended to refer specifically to the Bitfinex/Tether Defendants.

crypto-assets, including USDT. Defendants committed wire fraud when they lied about USDT's 1:1 backing and issued large amounts of unbacked USDT. CAC ¶¶ 126, 486–89. This debased USDT constituted "proceeds" of Defendants' wire fraud. Defendants invested those proceeds into a market manipulation enterprise by using the USDT to make large purchases of crypto-commodities on the Bittrex and Poloniex exchanges. *Id.* ¶¶ 556–57. Plaintiffs' harm, for purposes of their § 1962(a) claim, thus stems directly from Defendants' "use" or "investment" of USDT into the market manipulation enterprise—precisely the type of injury that § 1962(a) contemplates. Under this theory, Defendants' market manipulation enterprise was also distinct from their prior racketeering activity, such that Defendants' were not merely reinvesting the proceeds into a single enterprise. *See* B/T Br. 27 n.17 (citing *K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 544 (S.D.N.Y. 2014)). Instead, Defendants' initial, predicate acts of wire fraud were aimed at "legitimate" customers of USDT and other market participants relying on the existence of a purported stablecoin. Once Defendants derived proceeds from these predicate acts—in the form of self-issued USDT—they used and invested those proceeds in the market manipulation enterprise, which moved those proceeds through the Bittrex and Poloniex exchanges in order to inflate crypto-commodity prices.

*Ideal Steel* confirms this point. The *Ideal Steel* defendants devised a scheme to underpay taxes, allowing them to realize higher profits on the sale of their goods which they used to open more stores, in turn increasing their market share at the expense of plaintiff's market share. *Ideal Steel Supply Corp. v. Anza*, 547 U.S. at 454. The Supreme Court found that this scheme did not cause RICO injury under § 1962(c), but did not address causation under § 1962(a). On remand, the Second Circuit distinguished the causation analysis under § 1962(c) and held that under § 1962(a), the plaintiff had sufficiently alleged that the act of investing the proceeds (namely, the

additional funds defendants obtained by underpaying their taxes) of prior racketeering activity (tax fraud) in a competitor store that siphoned away the plaintiff's customers had directly caused the plaintiff's injury. *Ideal Steel*, 652 F.3d at 327–28. As in *Ideal Steel*, if this Court concludes that Plaintiffs have not adequately alleged causation under § 1962(c), their allegations show causation under § 1962(a). *See id.*; *Kelco Constr., Inc. v. Spray in Place Sols., LLC*, 2019 WL 4467916 *7–8 (E.D.N.Y. Sept. 18, 2019) (holding that plaintiff properly alleged § 1962(a) claim under *Ideal Steel*). Notably, Congress intended that § 1962(a) and § 1962(c) *not* overlap, such that it makes sense to present them in the alternative where there are alternative ways of viewing proximate causation. *See*, *e.g.*, *Guy's Mechanical Sys., Inc. v. FIA Card Servs.*, N.A., 339 F. App'x 193, 194 (3d Cir. 2009) ("In order to avoid overlap with 18 U.S.C. § 1962(c), which creates liability for any injury caused by a pattern of racketeering activity, the Third Circuit has held that a claim under § 1962(a) must allege an injury resulting from the investment of racketeering activity distinct from an injury caused by the predicate acts themselves." (internal quotations omitted)).

Finally, it is worth noting that although Plaintiffs meet a more demanding standard, § 1962(a) "does not require evidence tracing the income or proceeds invested in the enterprise directly to the racketeering acts," so long as the evidence demonstrates a "sufficient nexus" between the proceeds and the enterprise. *United States v. Gotti*, 457 F. Supp. 2d 411, 423–24 (S.D.N.Y. 2006). That nexus is alleged here; the Bitfinex/Tether Defendants' capacity to use the USDT to acquire valuable crypto-assets derived, directly and indirectly, from the acts of wire fraud committed by misrepresenting that USDT was fully backed. *See, e.g.*, CAC ¶ 554.

### C.    Plaintiffs Have Properly Pled The Commission Of Two Or More Predicate Acts Against Each RICO Defendant [25]

Plaintiffs have adequately alleged that Defendants committed the predicate acts of wire fraud, money laundering, unlawful monetary transactions, operating an unlawful money transmitting business, and bank fraud.

### 1.    Wire Fraud

In asserting that their wire fraud "did not contemplate any harm to purchasers of USDT" because "Plaintiffs do not allege that any purchaser of USDT actually received less in value than what Defendants represented," B/T Br. at 31, the Bitfinex/Tether Defendants again mischaracterize the alleged scheme. Defendants "debased" USDT by selling USDT to unsuspecting customers who believed Defendants' fraudulent misrepresentations that USDT was backed 1:1 by fiat currency—even though that was untrue. *See, e.g.*, CAC ¶ 489. Those purchasers relied on Defendants' misrepresentations regarding the value of USDT and purchased USDT they thought had the value of a true stablecoin but, instead, had a "debased" value. By falsely asserting that the USDT in circulation was a true stablecoin, Defendants perpetuated the illusion that USDT was backed and leveraged that illusion to drive up prices of other crypto-commodities purchased with USDT. *See id.* ¶¶ 486–88. With these misrepresentations, Defendants intended to harm purchasers of USDT and market participants generally. *Id.* ¶ 486.

These allegations suffice to plead wire fraud as a predicate act. *See Dennis v. JP Morgan Chase & Co.*, 343 F. Supp. 3d at 191 (holding that where amended complaint alleged goal of scheme was to affect price and value of certain financial instruments, allegations were sufficient

---

[25] In this subsection, the term "Defendants" or "RICO Defendants" is intended to refer specifically to DigFinex, the Bitfinex Defendants, the Tether Defendants, Velde, Devasini, Potter, Fowler, and Crypto Capital.

for purposes of pleading wire fraud). As to the requirement that wire fraud include an element of specific fraudulent intent, *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994), Plaintiffs allege Defendants' intent to defraud the market, *see* CAC ¶ 486. The "necessary result" of the market manipulation scheme was to harm purchasers of crypto-commodities; thus Defendants' "fraudulent intent may be inferred from the scheme itself." *D'Amato*, 39 F.3d at 1257.

### 2. Money Laundering

The Bitfinex/Tether Defendants argue, *see* B/T Br.at 33–34, that USDT was not derived, obtained, or retained from unlawful activity, and thus is not "proceeds" for purposes of money laundering. But USDT was derived from Defendants' wire fraud and constitutes proceeds of that wire fraud. The first time Defendants issued USDT *not* in response to legitimate market demand, Defendants' first act of wire fraud was complete because Defendants repeatedly claimed that USDT was only issued in response to legitimate demand (which is how the Bitfinex/Tether Defendants purportedly built their fiat currency "reserves"). CAC ¶¶ 488–89. Defendants continued to commit wire fraud by continuing to claim that USDT was backed 1:1 by fiat currency. Any additional USDT issued after the first "unbacked" USDT was issued represents the ongoing "proceeds" of Defendants' misrepresentations; the Bitfinex/Tether Defendants were able to issue USDT to which the market could ascribe value because of their repeated misrepresentations about its supposed 1:1 U.S. dollar backing.

Moreover, transfer of a crypto-asset such as USDT constitutes movement of funds under the money laundering statute. *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 569-57 (S.D.N.Y. 2014) (Forrest, J.) (explaining that because Bitcoins "can be either used directly to pay for certain things or can act as a medium of exchange" the money laundering statute is "broad enough to encompass" transactions involving them). USDT, like Bitcoins, can be used directly to pay for certain things; indeed, Defendants themselves market USDT as a "stablecoin with a value meant

to mirror the value of the U.S. dollar." CAC ¶ 150. USDT "may be bought and sold using legal tender" and is used to purchase other crypto-commodities, just like other virtual currencies, which in turn can be used to purchase other goods or services. The federal courts thus sensibly and regularly refer to crypto-asset "funds,"[26] and courts in this District have repeatedly held that crypto-commodities such as bitcoin constitute "funds." *See, e.g.*, *United States v. Murgio,* 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016); *United States v. Budovsky*, 2015 WL 5602853, at *13 (S.D.N.Y. Sept. 23, 2015); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) (finding bitcoin clearly constitutes "money" or "funds" under a plain reading of either term). These courts recognize that the value of crypto-assets, like that of non-digital currency, "lies in its ability to pay for things." *Ulbricht*, 31 F. Supp. 3d at 570. For this very reason, crypto-assets constitute "funds," and when derived from a pattern of racketeering, "proceeds."[27]

Unlike the cases the Bitfinex/Tether Defendants cite, B/T Br. at 33, this situation is thus very different from an assertion that "forged documents" constitute proceeds, given that documents are not used as currency themselves. *See United States v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy & Others*, 2008 WL 4129814, at *2

---

[26] *See, e.g.*, *In re Reichmeierr*, 2020 WL 1908328, at *1 (Bankr. D. Kan. Apr. 15, 2020) (explaining as to the debtor that "friends, colleagues, and family members began having him manage their own cryptocurrency funds"); *DigitalIRA.com v. Kingdom Tr. Co.*, 2019 WL 5896362, at *1 (D.S.D. Nov. 12, 2019) ("Many investors also use an account service provider who facilitates the purchase, sale, and delivery of cryptocurrency funds."); *Local Ventures & Invs., LLC v. Open Found.*, 2019 WL 7877935, at *1 (N.D. Cal. Mar. 12, 2019) ("Lewis informed OPEN that he would retain OPEN's funds, in the form of cryptocurrency tokens, in trust as a partial payment until the situation had been resolved."); *Hodges v. Monkey Capital LLC*, 2018 WL 9686569, at *3 (S.D. Fla. Aug. 14, 2018) ("Defendants have converted the cryptocurrency Plaintiffs have deposited with Defendants as investment funds."); *In re Tezos Secs. Litig.*, 2018 WL 4293341, at *2 n.6 (explaining as to the market value of the amount of then-outstanding crypto-assets Ethereum and bitcoin that as of December 2017, "a surge in the cryptocurrency market left these funds with a value of over $1 billion").

[27] The Tether Defendants' reliance on *United States v. Petix*. 2016 WL 7017919, at *4–7 (W.D.N.Y. Dec. 1, 2016), is thus not reflective of the law in this District.

(S.D.N.Y. Sept. 5, 2008). Defendants also argue, *see* B/T Br. at 34 n.19, that USDT is not legal tender, but as shown, the plain meanings of "proceeds" and "funds" include more than money. In any event, Defendants themselves market USDT as a "stablecoin with a value meant to mirror the value of the U.S. dollar." CAC ¶ 150. USDT "may be bought and sold using legal tender" and is used to purchase other crypto-commodities, just like other virtual currencies, which in turn can be used to purchase other goods or services. USDT thus operates in the same manner as commodities like gold, which can be exchanged for paper currencies, and which may constitute "funds" for purposes of money laundering. *United States v. Day,* 700 F.3d 713, 725 (4th Cir. 2012).

Finally, while the Bitfinex/Tether Defendants claim Plaintiffs did not allege specific intent to promote the RICO enterprise's commission of wire fraud or operation of an unlicensed money-transmitting business (B/T Br. at 34), Plaintiffs have alleged *both* an intent to conceal the proceeds of their racketeering activity as well as specific intent to promote the continuation of their market manipulation scheme. *See* CAC ¶ 506 (intent to conceal); *id.* ¶ 510 (intent to promote further unlawful activity). Either is sufficient to make out a claim for money laundering. *See United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006); *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003); *United States v. Maher*, 108 F.3d 1513, 1528 (2d Cir. 1997); *see also Dale v. Banque SCS Alliance S.A.*, 2005 WL 2347853, at *5 n.2 (S.D.N.Y. Sept. 22, 2005) (finding money laundering elements satisfied for RICO claim).[28]

### 3.    Operation Of Unlicensed Money Transmitting Businesses

Plaintiffs allege three distinct theories of predicate act liability for illegal money transmitting: (1) that Defendants operated "without an appropriate money transmitting license" in New

---

[28] Defendants' arguments regarding the sufficiency of Plaintiffs' allegations of unlawful monetary transactions are duplicative of their arguments regarding wire fraud and money laundering and fail for the same reasons.

York and other states "where such operation is punishable as a misdemeanor or a felony under State law" in violation of Section 1960(b)(1)(A), CAC ¶ 525; (2) that they operated "as a money transmitting business, affecting interstate and foreign commerce, that failed 'to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code'" in violation of Section 1960(b)(1)(B), CAC ¶ 529; and (3) that they engaged in illegal money transmitting that "involved 'the transportation or transmission of funds' that the Count Eight Defendants knew 'to have been derived from a criminal offense' and were 'intended to be used to promote or support unlawful activity'" under Section 1960(b)(1)(C), CAC ¶ 534.

With respect to the first theory, Defendants contend primarily that Plaintiffs did not adequately allege the use of a New York bank account for purposes of money transmitting, B/T Br. at 34–35, ignoring that Plaintiffs alleged the opening of a New York HSBC bank account for this precise purpose. CAC ¶ 359. Indeed, plaintiffs alleged the existence and use of 13 bank accounts used for the purpose of money transmitting. *Id.* ¶ 495(a)–(m). Moreover, the bill of particulars in the criminal case against Fowler, filed after the amended complaint, points to even more bank accounts (56 accounts at 12 banks) opened by Fowler and likely used for illegal money transmitting by Defendants. *United States v. Fowler,* 19-cr.-00245, ECF No. 66 (S.D.N.Y.). Thus, Plaintiffs adequately alleged money transmitting in New York without a license under subsection (b)(1)(A).

As for the second theory, Defendants characterize as unsupported, B/T Br. at 35, Plaintiffs' allegations that—contrary to federal regulations—Defendants omitted all states in which they do business. However, Plaintiffs identified multiple shell companies Defendants used to operate their money transmitting business, including Global Trading Solutions LLC and Global Development Corporation. CAC ¶ 495. Plaintiffs also allege that Tether and Bitfinex executives stated their intent to secure money transmitting licenses "in the U.S.," *id.* ¶ 121, and have been involved in legal

proceedings involving Tether in California and New York, *id.* ¶¶ 130, 133. Moreover, Plaintiffs alleged that Tether is the "most widely used crypto-asset in the world by trading volume, surpassing even bitcoin," *id.* ¶ 135, undercutting any claims that Defendants' money transmitting activities were limited to Wyoming.

Finally, with respect to the third theory, Defendants argue that Plaintiffs "do not allege how Tether or Bitfinex's receipt of dollars from their own customers proximately caused any alleged injury to Plaintiffs." B/T Br. at 35. But Plaintiffs do in fact allege that connection: Defendants sold some USDT to legitimate customers for actual U.S. dollars because those sales and customers buttressed the illusion that USDT was backed. CAC ¶ 489. This allegation is not "self contradictory," B/T Br. at n.20, because the legitimate sales were induced by Defendants' misrepresentations about USDT's backing—*i.e.*, by the wire fraud—and so the dollars received from legitimate customers nonetheless derived from Defendants' criminal conduct. CAC ¶¶ 489, 435. Nor is it "self-defeating," B/T Br. at n 20.; although *some* USDT may have been issued in response to legitimate demand, *all* USDT was debased (including the USDT that customers purchased with actual dollars) because Defendants were also issuing unbacked USDT. *Id.* ¶489. Thus, by making Defendants' misrepresentations about USDT seem more plausible, transmitting USDT to legitimate customers was an integral part of the market-manipulation scheme that injured Plaintiffs. *Id.* 544. Section 1960(b)(1)(C) requires nothing more.

### 4. Bank Fraud

Plaintiffs pleaded a "scheme to defraud" for purposes of the bank fraud statute. *See* 18 U.S.C. § 1344. One violates this provision by "engag[ing] in or attempt[ing] to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." *United States v. Zarrab*, 2016 WL 6820737, at *11 (S.D.N.Y. Oct. 17, 2016).

As in *Zarrab*, Defendants here induced customers to use bank accounts they knew had been fraudulently established in an effort to "influence[] the decision-making of the U.S. banks," *i.e.*, to ensure that the U.S. banks would continue to provide banking access to Crypto Capital and, in turn, to Bitfinex. *Id.* at *13. Crypto Capital "provided false and misleading statements" to those banks "through the use of multiple layered entities" in order to set up the accounts. *Id.* Bitfinex and Tether then provided "wire transfer instructions" to customers that fraudulently omitted critical information about the purpose of the accounts—that is, that the accounts were being used to exchange USDT for non-virtual currency contrary to the understanding of the banks. *Id.*

Defendants argue that only defrauded financial institutions may bring a RICO claim based on bank fraud, but the provision is not so narrow. Bank fraud is indisputably a predicate act for a civil RICO claim, and "racketeering activity" can surely be understood to include bank fraud. Restricting standing to assert bank fraud as a RICO predicate to financial institutions would dilute the function served by the civil RICO provisions. *See, e.g.*, *Lavastone Capital LLC v. Conventry First LLC*, 2015 WL 1939711, at *3 n.4 (S.D.N.Y. Apr. 22, 2015) (collecting precedent and permitting a RICO plaintiff to invoke bank fraud as a predicate act where the plaintiff was not the defrauded financial institution).

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), reflects the same reasoning. There, the Court held that a RICO plaintiff need not have been the party defrauded to assert wire fraud as a predicate act. *See id.* at 648. The Court affirmed the reversal of the district court, which had held that the plaintiffs there lacked standing because they did not receive or rely upon the fraudulent representations and thus "'at best were indirect victims of the fraud.'" *Id.* at 645. The relevant question, instead, is whether the plaintiff has suffered some injury arising, at least in part, from others' reliance on the defendant's misrepresentations. *See id.* at 645–48. Nor is *Bank of*

60

*China v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004) (cited at B/T Br. at 31), in which the Second Circuit held that a RICO plaintiff who was not the victim of wire fraud lacked standing to invoke it as a predicate act, to the contrary. As other courts in this circuit have concluded, *Bridge* requires a different result. *See, e.g.*, *Related Cos. v. Ruthling*, 2017 WL 6507759, at *19 (S.D.N.Y. Dec. 18, 2017). The same is true for bank fraud; a plaintiff need not be the direct victim—*i.e.*, a financial institution—to rely on it as predicate act for purposes of a RICO claim.[29]

Defendants further contend (B/T Br. at 32) that Plaintiffs fail to plead aiding and abetting liability for want of allegations that Defendants had actual knowledge of the alleged wrongdoing or aided in its commission, but the Complaint says otherwise. Bitfinex and Tether knew about Crypto Capital and Fowler's bank fraud and knew about—indeed, masterminded—the underlying scheme to defraud. *See* CAC ¶¶ 146, 250–51. Defendants rely on cases where the party or parties accused of aiding and abetting were not central players in the alleged scheme. *See Williams v. Bank Leumi Tr. Co.*, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (defendants' only awareness of "check-kiting scheme" stemmed from a "sequence of account transfers," which was insufficient to show knowledge); *Aquino v. Trupin*, 833 F. Supp. 336, 343–44 (S.D.N.Y. 1993) (no facts showing defendants were aware of the underlying fraudulent scheme). Those cases are inapposite here, where the Bitfinex/Tether Defendants knew they could only carry out their scheme to defraud the market if they had access to U.S. correspondent banks. *See, e.g.*, CAC ¶¶ 222–27, 230. Defendants similarly knew that U.S. banks would not allow Bitfinex and Tether to open accounts

---

[29] Defendants also cite *Edmonds v. Seavey*, an unreported case that nowhere acknowledges the changed landscape following *Bridge*. 2009 WL 2949757, at *6 n.8 (S.D.N.Y. Sept. 15, 2009). In a footnote, *Edmonds* finds that the plaintiff failed to plead bank fraud as a RICO predicate act but acknowledges that even if he had, such a RICO claim could not survive summary judgment. Plaintiffs respectfully submit that the better view, consistent with *Bridge* and *Ruthling*, is that such claims should go forward.

directly. *See id.* ¶ 232. Bitfinex and Tether used Crypto Capital so that they could gain access to the U.S. banking system. *See id.* ¶¶ 342–50. Bitfinex and Tether then directed customers to use accounts that had been fraudulently opened and maintained. *Id.* ¶¶ 495–500. This is sufficient to plead aiding and abetting liability.

### D.     The Complaint Properly Pleads A RICO Claim Against Fowler And Potter

Fowler argues that he cannot be held liable for a substantive RICO violation because Plaintiffs have not sufficiently pleaded that he conducted the affairs of the RICO enterprise. Fowler Br. at 21–22. Similarly, Potter argues that the Complaint does not adequately distinguish the misconduct of each individual Defendant, and therefore fails to state a claim against him. Potter Br. at 18–21. Both arguments fail.

The Complaint describes each Defendant's participation in the conduct or control of the enterprise. As to Fowler, it explains that he played a crucial role in ensuring that the enterprise would have access to U.S. correspondent banking, a necessary component of the scheme. *See, e.g.*, CAC ¶ 482. Without access to U.S. correspondent banking, the enterprise would not be able to exchange U.S. dollars with customers who wished to purchase Tether. And without those transactions, the enterprise would not be able to maintain the illusion that USDT is a legitimate stablecoin backed by fiat currency or U.S. dollar reserves. *See id.* ¶¶ 9; *supra* § IV.C.1.b. Fowler was the key operator of the banking arm of the enterprise and committed numerous acts of bank fraud in furtherance of the enterprise's scheme to defraud. CAC ¶¶ 348–66.

For example, Fowler opened at least 17 different bank accounts purportedly on behalf of a shell entity called "Global Trading Solutions." *Id.* ¶ 495. The bill of particulars in the criminal case against Fowler, filed after the amended complaint was filed, confirms the accuracy of these allegations; it lists 56 bank accounts, at 12 banks, in Fowler's name and the names of 14 different entities, including Global Trading Solutions. *United States v. Fowler,* ECF No. 66. By opening

these accounts, Fowler ensured the enterprise would have access to correspondent banking so that Bitfinex and Tether customers would be able to deposit U.S. dollars, maintaining the illusion that USDT was a legitimate stablecoin. CAC ¶¶ 358–59. Fowler had every reason to do so, since the success of the scheme benefited Crypto Capital, and its operator—Fowler—given that Crypto Capital was in control of over a billion dollars' worth of Bitfinex funds. *Id.* ¶ 184. These allegations suffice to show that Fowler had "more than just '*some* part in directing [the enterprise's] affairs.'" *DeFalco v. Bernas*, 244 F.3d 286, 310 (2d Cir. 2001) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). Because "RICO liability is not limited to those with primary responsibility for the enterprise's affairs," Fowler can be held liable for his role in conducting the enterprise's affairs through a pattern of bank fraud and operation of an unlicensed money transmitting business. *Reves*, 507 U.S. at 179.

As for Potter, he was a senior corporate officer of Bitfinex and Tether. He exercised decision-making control over the corporate entities, including control over their misstatements regarding USDT's backing. And he was aware of the Defendants' scheme and sought to employ various "cat-and-mouse tricks" to ensure that the enterprise would have access to correspondent banking. *See* CAC ¶¶ 144, 343–47, 480.

As to wire fraud and money laundering, Potter argues that Plaintiffs have not alleged any misrepresentations by Potter specifically. *See* Potter Br. at 12–14. But the Complaint alleges that Potter was Chief Strategy Officer of the Bitfinex and Tether entities. CAC ¶ 36. In this capacity, Potter committed the predicate acts of wire fraud and money laundering when Bitfinex and Tether misrepresented that USDT was backed 1:1 by fiat currency and transferred USDT through the Bittrex and Poloniex exchanges.

### E.     Plaintiffs Adequately Allege A RICO Conspiracy Against All Defendants

Under § 1962(d), Plaintiffs must show "(1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 340 (S.D.N.Y. 2019). "[T]he RICO conspiracy provision . . . is even more comprehensive than the general conspiracy offense" because it contains "no requirement of some overt act or specific act." *Salinas v. United States*, 522 U.S. 52, 63 (1997). As to the requirement that a RICO conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," it is sufficient for conspiracy purposes that the defendant merely "adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65.

As to any given conspirator, "it suffices that he adopt [] the goal of furthering or facilitating the criminal endeavor." *United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002). "One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense." *Salinas v. United States*, 522 U.S. at 65. In particular, to be convicted as a conspirator under RICO, "one must be shown to have possessed knowledge of only the general contours of the conspiracy." *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000). The defendant "need only know of, and agree to, the general criminal objective of a jointly undertaken scheme." *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008); *United States v. Arrington*, 941 F.3d 24, 36–37 (2d Cir. 2019). The standards for pleading an antitrust conspiracy apply equally to pleading a RICO conspiracy. *See, e.g.*, *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 n.6 (11th Cir. 2017) ("[T]he *Twombly* parallel-conduct pleading standard, which was developed for the 'agreement'

64

element of a Sherman Act § 1 conspiracy claim, applies equally to both RICO enterprise and RICO conspiracy allegations.").

The Bitfinex/Tether Defendants do not address the § 1962(d) claim (though they acknowledge that the Complaint pleads a RICO conspiracy count against all Defendants, *see* B/T Br. at App. A), but the Exchange Defendants and Fowler argue that Plaintiffs have not adequately alleged a substantive RICO claim under § 1962(c) *See* Ex. Br. at 20; Fowler Br. at 22–23. That is wrong, as explained above. In addition, it is not necessary to allege that a conspiracy defendant committed a predicate act to plead a § 1962(d) claim. *Salinas*, 522 U.S. at 63. Nor must the conspirators have been part of the enterprise. *United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011) ("We accordingly conclude . . . that the establishment of an enterprise is not an element of the RICO conspiracy offense."). Instead, "for purposes of establishing a RICO conspiracy, the government is required to prove only the existence of an *agreement* to violate RICO's substantive provisions." *Id.* at 74 (internal alterations and quotations omitted) (emphasis in original).

Plaintiffs have properly alleged the existence of an agreement to manipulate the crypto-commodity market. The Defendant-conspirators had knowledge of the RICO scheme and the enterprise's planned conduct. Defendants also knew that "predicate acts would be committed by some member of the enterprise" to further the market manipulation scheme. *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 409 (S.D.N.Y. 2015). Indeed, on behalf of the "Bitfinex Team," Devasini said that he was "working on" a tool that would help inflate crypto-commodity prices. CAC ¶ 146. At bottom, Plaintiffs have pled that Defendants "knew of and agreed to facilitate the scheme." *In re Sumitomo*, 104 F. Supp. 2d at 314 (internal quotations and citations omitted).This is sufficient to make out a claim for conspiracy under § 1962(d).

## IV.    PLAINTIFFS STATE VIABLE STATE-LAW CLAIMS[30]

### A.    Plaintiffs Adequately Allege Common-Law Fraud

Defendants offer no compelling grounds to dismiss Plaintiffs' common-law fraud claim. While the Bitfinex/Tether Defendants and Potter contend Plaintiffs have not sufficiently alleged reliance, causation, or damages, their arguments are belied by applicable law and the Complaint itself.

### 1.    Plaintiffs Adequately Allege Reliance

Defendants claim Plaintiffs fail to allege actual reliance, B/T Br. at 36, Potter Br. at 15, but all the cases Defendants cite involve securities fraud. *See Int'l Fund Mgmt. v. Citigroup*, 822 F.Supp.2d 368 (S.D.N.Y. 2011); *Ramiro Aviles v. S&P*, 380 F.Supp.3d 221 (S.D.N.Y. 2019); *In re Bear Stearns*, 995 F.Supp.2d 291 (S.D.N.Y. 2014). Plaintiffs allege fraud by market manipulation, not securities fraud, and courts have long recognized that reliance on artificial market prices suffices in a market manipulation case. By alleging reliance on the integrity of market prices that Defendants fraudulently inflated, *see* CAC ¶ 579, Plaintiffs have properly pleaded reliance.

Plaintiffs' claims resemble those in *Minpeco, S.A. v. ContiCommodity Services, Inc.*, 552 F. Supp. 332 (S.D.N.Y. 1982), where a plaintiff alleged a scheme "to monopolize the silver market" by "artificially boost[ing] the price of silver to an unprecedented and artificially high level." *Id.* at 334. The court allowed a fraud claim to proceed because "the creation of an 'artificial market' was fraud, even where the defendants had made no affirmative representations." *Id.* at 337.[31]

---

[30] In this section, the term "Defendants" is intended to refer specifically to the Bitfinex/Tether Defendants.

[31] *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817 (N.Y. 2016), is not to the contrary. That case—which did not involve market manipulation—recognized that fraud is actionable where a third party "acted as a conduit to relay the false statement to plaintiff, who then relied on the

*Minpeco* holds that, "in the context of market manipulation, New York law requires only that a plaintiff allege reliance on the integrity of the market to satisfy the reliance element of common law fraud." *In re Blech Sec. Litig.*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997); *see also Schultz v. Commercial Programming Unlimited Inc.*, 1992 WL 396434, at *3 (S.D.N.Y. Dec. 23, 1992) ("[I]n the context of allegations of market manipulation a New York court may only require a plaintiff to allege reliance on the integrity of the market to satisfy the reliance element of common law fraud."); *Scone Investments, L.P. v. Am. Third Market Corp.*, 1998 WL 205338, at *10 (S.D.N.Y. Apr. 28, 1998) (same); *Fezzani v. Bear, Stearns & Co.*, 384 F.Supp.2d 618, 647 (S.D.N.Y. 2004) (recognizing "case law in this district to support [the] contention that there is a cause of action under New York law for fraud based on market manipulation"); *Vandenberg v. Adler*, 2000 WL 342718, at *12 (S.D.N.Y. Mar. 31, 2000) ("Allegations of direct and knowing participation in a market manipulation scheme that injured plaintiff are sufficient to state a [common law] fraud claim.").[32]

---

misrepresentation to his detriment," and so "indirect communication *can* establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it." *Id.* at 828. Applying *Pasternack*'s logic here, Defendants used the market as a conduit to transfer inflated price information to Plaintiffs, who then purchased crypto-commodities at artificial prices to their detriment. Defendants intended Plaintiffs and the Class to rely on those artificial market prices. Indeed, that widespread reliance is the object of any market manipulation scheme.

[32] For the same reasons, *Laub v. Faessel*, 297 A.D.2d 28 (1st Dep't 2002), is inapposite. *Laub* did not involve market manipulation, but rather a claim that an investment advisor misrepresented his training and experience. *Id.* at 31. Because the plaintiff did not allege any misrepresentations about the quality of the relevant investments, nor that he had invested because of the advisor's supposed qualifications, the First Department found no causation. *Id.* Here, Plaintiffs allege their investments were induced by artificial prices resulting from Defendants' market manipulation scheme. CAC ¶ 579.

### 2.     Plaintiffs Adequately Allege Causation

Defendants contend that Plaintiffs cannot establish causation as a matter of law, relying on *Basis PAC-Rim Opportunity Fund v. TCW Asset Mgmt. Co.*, 149 A.D.3d 146 (1st Dep't 2017). B/T Br. at 37–38. But *Basis* does not preclude causation on the allegations here.

*First*, the procedural posture in *Basis* is dispositively different. The First Department found summary judgment was appropriate because defendant had "proffered evidence that [the relevant investments] would have collapsed regardless of the assets selected . . . due to the housing market crash," and plaintiff then "failed to raise an issue of fact." *Id.* at 150. The court expressly recognized that a different standard would apply on a motion to dismiss. "[W]hether Plaintiffs can prove [their] allegations—and whether defendants in turn can proffer evidence that the [investments] would have collapsed regardless, due to the larger crash in the . . . market—are evidentiary matters for later phases of this lawsuit." *Id.* at 149–50 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 188 (2d Cir. 2015)). Likewise here, whether Plaintiffs can *prove* their causal allegations is a question "for later phases of this lawsuit." *Id.*

*Second*, Plaintiffs allege a causal link between Defendants' scheme to manipulate market prices and the collapse of the crypto-commodity market: Defendants used unbacked USDT to drive up crypto-commodity prices, *e.g.*, CAC ¶¶ 272–74, and as a result of Defendants' market manipulation, Plaintiffs purchased crypto-commodities at artificially high prices and suffered losses when the bubble inflated by Defendants inevitably burst, *e.g.*, *id.* ¶¶ 12–14. Plaintiffs are "not required" to "plead that the alleged fraud caused their losses *independently*" of any larger market decline. *Loreley*, 797 F.3d at 189 (emphasis in original). "The requirement, if any, to plead *a* causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Id.* (emphasis in original).

### 3.  Plaintiffs Adequately Allege Damages

Plaintiffs allege they purchased crypto-commodities at artificially inflated prices and, as a result, suffered damages. CAC ¶¶ 18–22. While Defendants argue that Plaintiffs have failed to allege an "out of pocket" loss, B/T Br. at 37, the case on which Defendants rely does not help them. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 414 (N.Y. 1996), concluded—on summary judgment—only that damages were not available where plaintiffs "received more than twice the fair market value for their shares," and their supposed injury was caused not by anything defendants had done but by an intervening change in tax law. *Id.* at 422. In other words, New York's "out of pocket" rule requires that a plaintiff seek compensation for something they lost, rather than something they might have gained absent fraud. Here, Plaintiffs are seeking compensation for losses sustained when the price of crypto-commodities they purchased at artificially high prices declined. Those specific, measurable losses are adequate to plead fraud.

### 4.  Plaintiffs Adequately Allege Potter's Participation in the Fraud

While Potter contends that Plaintiffs have not alleged facts establishing his fraudulent intent, Potter Br. at 16, corporate "officers and directors" like Potter "may be held individually liable" for fraud "if they participated in or had knowledge of the fraud." *Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 485, 491 (N.Y. 2008). Even without "specific details of each individual defendant's conduct," New York courts "have never required talismanic, unbending allegations" because "sometimes such facts are unavailable prior to discovery." *Id.* at 493. What matters is that "the scheme, as alleged, gives rise to the reasonable inference . . . that the officers, as individuals and in the key positions they held, knew of and/or were involved in the fraud." *Id.*[33]

---

[33] Potter criticizes Plaintiffs for citing *Pludeman* because (he claims) it reflects only state law, not federal law. Potter Br. at 15–16. But courts in this district have cited *Pludeman* when applying

Plaintiffs have alleged circumstances showing that Potter could not possibly have been ignorant of the fraud here. Potter was Chief Strategy Officer for both Bitfinex and Tether and co-founded Tether, CAC ¶ 36, and he does not deny that he continues to be a shareholder in DigFinex, *id.* ¶ 24. Potter, together with Defendant Devasini, founded the Tether enterprise by rebranding a different purported stablecoin—"Realcoin"—as "Tether" and incorporating Defendant Tether Holdings, Ltd. in 2014. *Id.* ¶ 122. Potter concealed his simultaneous control of Tether and Bitfinex—two apparently distinct entities that played separate but significant roles in the crypto-economy—to enable Defendants' conspiracy. *Id.* ¶¶ 152–56. And Potter made specific, repeated public statements evincing the enterprise's intent to evade banking laws and anti-money laundering regulations to further Defendants' scheme. *Id.* ¶¶ 343–47.

Potter's citation to *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009), confirms the sufficiency of Plaintiffs' allegations. There, the Second Circuit *reversed* the grant of a motion to dismiss because "Rule 9(b) requires only the *circumstances* of fraud to be stated with particularity; knowledge itself can be alleged generally." *Id.* at 695 (emphasis in original). Potter's role as a co-founder and senior executive for Bitfinex and Tether provides "circumstances" from which the Court can infer Potter's knowledge of, and participation in, the fraud. *See id.*

Potter tries to distance himself from the statements on "on Bitfinex's and Tether's public websites" about Tether's 1:1 backing. Potter Br. at 16. But, given Potter's management roles at those companies, the statements are properly attributed to him. They are nothing like the incidental

Rule 9(b) and rejecting arguments about impermissible group pleading, such as the argument Potter raises here. *See*, *e.g.*, *Simington v. Lease Fin. Grp., LLC*, 2012 WL 651130, at *10 (S.D.N.Y. Feb. 28, 2012) (Forrest, J.) (denying motion to dismiss over "group pleading" objection and citing *Pludeman* with approval).

statements buried behind a customer-service portal in *DeAngelis*, to which Potter tries to analogize. *See* 17 F.Supp.3d at 281. The misrepresentation about Tether being backed dollar-for-dollar was Tether's entire supposed business model, and one of the key features of Tether that Potter and his co-conspirators held out to the market. Those misstatements are thus more like the "group-published statements" reflecting the organization's mindset (and Potter's mindset, as a co-founder and senior executive), which *DeAngelis* recognized would be sufficient to plead fraud. *See id.*

### B.   Plaintiffs Adequately Allege A GBL § 349 Claim

#### 1.   Plaintiffs Allege Consumer-Oriented Misconduct

Plaintiffs state a claim under GBL § 349 because they allege "acts or practices [that] have a broad[] impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 27 (1995). Crypto-commodities are a novel digital asset with multiple consumer-facing applications, including facilitating "quick and secure transactions" among consumers or between consumers and merchants. *See* CAC ¶¶ 65, 67. Defendants' scheme to manipulate the price of crypto-commodities is thus "consumer oriented in the sense that [it] potentially affect[s] similarly situated consumers." *Oswego*, 85 N.Y.2d at 27. Defendants cite no cases holding that crypto-commodities fall outside the scope of § 349. Nor could they: no court has ruled on § 349's application to the new and rapidly changing technologies that make such digital assets possible. At best, Defendants' assertion that crypto-commodities are not consumer goods raises fact questions that should be resolved after discovery.

The cases Defendants cite are inapplicable. Defendants point to *Morris v. Gilbert* for the proposition that § 349 does not apply to *securities* transactions, *see* 649 F. Supp. 1491, 1497

(E.D.N.Y. 1984), but Plaintiffs do not allege that USDT or crypto-commodities are securities.[34] Indeed, the Bitfinex/Tether Defendants have argued in other cases that USDT and other stablecoins are *not* securities, and should not be heard to argue otherwise in this litigation. *See James v. iFinex*, No. 2019-03341 (1st Dep't), Br. for Resp.-Appellants at 35. Moreover, *Morris* turned on the fact that securities can only be "purchased as investments, not as goods to be 'consumed' or 'used.'" *Id.* By contrast, although some consumers may purchase crypto-commodities as investments, others use crypto-commodities for different purposes, such as for "'microtransactions' that may be too costly if performed with fiat currency or through other electronic means, such as credit cards." CAC ¶ 65; *see also Sims v. First Consumers Nat. Bank*, 303 A.D.2d 288, 289 (1st Dep't 2003) (recognizing § 349's application to payment methods such as credit cards). Thus, whether crypto-commodities are best classified as consumer goods (or something else) cannot be resolved in Defendants' favor on a motion to dismiss.

For similar reasons, Defendants' reliance on *DeAngelis v. Corzine*, 17 F. Supp. 3d 270 (S.D.N.Y. 2016), is misplaced. Contrary to Defendants' assertions, B/T Br. at 39, Potter Br. at 17, *DeAngelis* did not hold that § 349 could never apply to the purchase or sale of commodities. Rather, it dismissed a § 349 claim where a sophisticated investor transacted with a commodities brokerage, and it was undisputed that the investor's transactions were made "as investments, not as a purchase of traditional consumer goods." *Id.* at 284. By contrast, Plaintiffs have alleged that crypto-commodities have broader use and application than the bespoke investments at issue in *DeAngelis*. *See* CAC ¶¶ 65, 67.

---

[34] *Gray v. Seaboard Sec., Inc.* (Potter Br. at 17) also held only that § 349 does not apply to the purchase or sale of securities, and is distinguishable for the same reason. *See* 14 A.D.3d 852, 853 (3d Dep't 2005).

*New York University v. Continental Insurance Company* does not help Defendants. *See* B/T Br. at 38. It stands only for the familiar principle that "[p]rivate contract disputes unique to the parties" are not "consumer oriented" because § 349 is not intended to reach customized contracts "in which each side was knowledgeable and received expert representation and advice." 662 N.E.2d 763, 770 (N.Y. 1995); *see also U.W. Marx, Inc. v. Bonded Concrete, Inc.*, 7 A.D.3d 856 (3d Dep't 2004) (same, cited at Potter Br. 17). By contrast, where a customer receives goods or services "supplied to the consuming public at large" and the parties "occup[y] disparate bargaining positions," the transaction is consumer oriented and § 349 applies. *See New York Univ.*, 662 N.E.2d at 770. Here, Plaintiffs do not allege a "private contract dispute" between sophisticated parties. *See id.* Rather, they allege a complex scheme by Defendants to mislead the public about the price of crypto-commodities. Section 349 applies to Defendants' consumer-oriented misconduct.[35]

### 2. Plaintiffs Adequately Allege Causation Because The Deceptive Scheme Targeted Consumers

The Bitfinex/Tether Defendants and Potter argue that under *Abraham v. American Home Mortgage Servicing, Inc.*, 947 F. Supp. 2d 222 (E.D.N.Y. 2013), Plaintiffs fail to allege they were "injured as a result of [defendants'] insufficient or false disclosures," *id.* at 234. Not so. Plaintiffs allege Defendants "fraudulently omit[ed] from their statements" that, among other things, "USDT had been minted and issued for the purpose of controlling the price of crypto-commodities." CAC ¶ 585. Unlike *Abraham*, where the plaintiff "failed to plead that she was injured as a result of any Defendant's actions," 947 F.Supp.2d at 235, Plaintiffs allege they were injured as a result of

---

[35] Even crediting Potter's argument that restitution is not available under § 349 because the statute is "silent on restitution," Potter Br. at 18, that is not a reason to dismiss Plaintiffs' claim. Potter acknowledges that § 349 permits damages for private plaintiffs, *id.*, and that is the remedy Plaintiffs seek, CAC ¶ 591.

Defendants' deliberate inflation of crypto-commodity prices, which was the intended consequence of their omissions regarding Tether's reserves.

The Bitfinex/Tether Defendants also contend that Plaintiffs have not alleged a "direct" relationship between their injuries and Defendants' deception, citing *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616 (N.Y. 2009). B/T Br. at 39. But *Smokes-Spirit* found causation too attenuated where the plaintiff's injury was "entirely derivative of injuries ... suffered by misled consumers." *Id.* at 622; *see also Frintzilas v. DirecTV, LLC*, 731 F. App'x 71, 72 (2d Cir. 2018) (same, cited at B/T Br. at 39–40). Here, Plaintiffs' injuries are not "derivative" of injuries to others; they were injured directly by purchasing crypto-commodities at prices Defendants purposefully inflated through market manipulation. And indeed, courts applying *Smokes-Spirits* have found injury alleged adequately even where the injury is effected through the acts of a nonparty, provided the aim of the deceptive scheme is to injure plaintiffs, as Defendants' scheme was here.

For example, in *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 102 A.D.3d 5 (2d Dep't 2012), the Second Department affirmed denial of a motion for summary judgment where plaintiffs—operators of independent vehicle repair shops—alleged that the defendant, a car-insurance company, made misleading statements to induce nonparty car owners to patronize repair shops affiliated with defendant instead of plaintiffs' repair shops. Applying *Smokes-Spirits*, the Second Department found "plaintiffs alleged that they were *directly* injured by the … defendants' deceptive practices in that customers were misled into taking their vehicles from the plaintiffs to competing repair shops" affiliated with defendants. *Id.* at 17 (emphasis added). The allegedly deceptive conduct was "*specifically targeted at the plaintiffs* . . . in an effort to wrest away customers through false and misleading statements," and thus plaintiffs' injury—"direct business loss of customers"—did not depend on whether the customers themselves suffered any injury. *Id.* Similarly,

74

Plaintiffs were directly injured when they purchased crypto-commodities at prices inflated by Defendants. Plaintiffs and the Class were "specifically targeted," *id.*, because for Defendants' scheme to work, they needed market participants like Plaintiffs to buy crypto-commodities at artificial prices. *See also Casper Sleep, Inc. v. Mitcham*, 2016 WL 7188788, at *2 (S.D.N.Y. Nov. 17, 2016) (finding causation adequately alleged where plaintiff suffered "economic or reputational injury flowing directly from the alleged deception," specifically "the withholding of trade, rather than any customer's subsequent purchase of a competitor's product"). Because Plaintiffs' injuries were the direct and intended consequence of Defendants' deceptive scheme, their injuries are not derivative of another party's injuries and Plaintiffs have adequately alleged causation under § 349.

## V.   THIS COURT HAS PERSONAL JURISDICTION OVER FOWLER

In January of this year, Fowler sat in a courtroom in this District while his attorney explained: "[W]e have made it clear that it's been Mr. Fowler's intention to plead guilty" to a criminal count of operating an unlicensed money transmitting business—exactly the conduct Plaintiffs allege here.[36] CAC ¶¶ 180–84. Nevertheless, Fowler contends this Court does not have jurisdiction over him. His arguments are without merit. As explained below, this Court has jurisdiction pursuant to the CEA, RICO, and CPLR, and because Fowler is a co-conspirator. Jurisdiction over Fowler also comports with due process.

In assessing personal jurisdiction, the Court looks to the applicable statute and then considers due process. *AmTrust Fin. Servs., Inc. v. Lacchini*, 260 F. Supp. 3d 316, 327–28 (S.D.N.Y. 2017). The Court thus "first determines whether the defendant is subject to the general jurisdiction

---

[36] *See United States v. Fowler*, No. 19-CR-254, ECF No. 50 (S.D.N.Y. Feb. 3, 2020), at 23:1–3 (transcript of January 17, 2020 conference). Fowler ultimately did not complete a guilty plea because of a disagreement with the government over the scope of forfeiture. *Id.* at 23:6–21. His criminal case remains pending.

of a court of the state in which the federal court sits or if the relevant statute provides for service

of process," and in doing so, "applies the forum state's personal jurisdiction rules unless a federal

statute specifically provides for national service of process." *Id.* (quotations and brackets omitted).

As to due process, the Court "must determine, first, whether the defendant has sufficient minimum

contacts with the forum (the minimum contacts) inquiry; and, if so, second, whether the exercise

of personal jurisdiction comports with "traditional notions of fair play and substantial justice (the

reasonableness inquiry)." *Id.* at 328 (quotations omitted).

### A.    The Court Has Personal Jurisdiction Over Fowler Under the CEA

Plaintiffs allege federal claims under the CEA against *all* Defendants, including Fowler,

*see* CAC ¶¶ 431–48, and the nationwide service provision in that statute provides that "[p]rocess

. . . . may be served in any judicial district of which the defendant is an inhabitant or *wherever the*

*defendant may be found*." 7 U.S.C. § 25(c) (emphasis added). "This language indicates a congres-

sional intention to extend personal jurisdiction to the limit permitted by the Due Process Clause of

the Fifth Amendment." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526

(S.D.N.Y. 2008). Because personal jurisdiction over Fowler comports with due process, *see* § V.E,

*infra*, this Court has jurisdiction under the CEA.

### B.    The Court Has Personal Jurisdiction Over Fowler Under The RICO Statute

Section 1965(a) of the RICO statute "grants personal jurisdiction over an initial defendant

in a civil RICO case to the district court for the district in which that person resides, has an agent,

or transacts his or her affairs." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d

Cir. 1998). This analysis is "synonymous" with the analysis under the Clayton Act. *City of New*

*York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 541–42 (S.D.N.Y. 2005). The Clayton Act confers

personal jurisdiction "only when the action is brought in the district where the defendant resides,

is found, or transacts business, that is, the district where Section 12 venue lies." *Daniel v. Am. Bd.*

*of Emergency Med.*, 428 F.3d 408, 427 (2d Cir. 2005). As one court explained, applying RICO, the "test for transacting business for venue purposes under the antitrust laws is co-extensive with the test for jurisdiction under New York CPLR § 302." *Cyco.Net*, 383 F. Supp. 2d at 541–42 (citations and quotation marks omitted) (listing cases).[37]

Because the analysis for jurisdiction is "co-extensive" with the CPLR, *see id.*, and CPLR 302 confers jurisdiction over Fowler, *see* Part V.C, *infra*, this Court has jurisdiction over Fowler pursuant to § 1965(a). Fowler's argument (Fowler Br. at 4) that the Court must assesses personal jurisdiction at the time the complaint is filed is inconsistent with the New York long-arm statute, which does not impose any such restriction. And the cases on which Fowler relies for this point are distinguishable. *Welch Foods, Inc. v. Duane Packer & Food Express, Inc.*, WL 665399, at *3 (W.D.N.Y. Nov. 22, 1994), did not evaluate the CPLR at all. And in *Gates v. Wilkinson*, the defendants' alleged contacts ceased many years before the complaints were filed. *See* 2003 WL 21297296, at *2 (S.D.N.Y. June 4, 2003) (New York bank accounts were closed between two and five years before complaint). Here, by contrast, even if Fowler is correct that the New York correspondent bank account was not "open" or "active" when the Complaint was filed, that is only because Fowler was arrested (and his bank accounts presumably seized) before Plaintiffs filed this action. It would be perverse if Fowler's criminal indictment in the Southern District of New York allowed him to escape jurisdiction in a civil suit for the same conduct.

---

[37] Fowler is thus incorrect in arguing that the "transacts business" analysis is independent of the CPLR analysis. Fowler Br. at 4. If that were true, the analysis for RICO would no longer be "synonymous" with the analysis under the Clayton Act. *See Cyco.Net*, 383 F. Supp. 2d at 541–42. Fowler's primary authority for his contrary approach is not persuasive because it is an unpublished 2003 decision relying on a Supreme Court decision that is nearly 100 years old. The only other authority Potter cites is an unpublished Second Circuit decision, which only briefly addresses venue before proceeding to analyze jurisdiction under the CPLR. *See Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012).

Moreover, because the Court has jurisdiction over the other RICO defendants under § 1965(a), the nationwide service provision of § 1965(b) provides a separate basis for this Court's jurisdiction over "additional defendants of any kind," like Fowler. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998). Such jurisdiction, which "requires a showing that the 'ends of justice'" support personal jurisdiction, "is authorized where"—as here—"the RICO claim could not otherwise be tried in a single action because no district court could exercise personal jurisdiction over all of the defendants." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 315 (S.D.N.Y. 2010). Plaintiffs sufficiently plead personal jurisdiction under § 1965(a) for all Defendants (including Fowler), but if the Court were to determine otherwise, then the "ends of justice" compel jurisdiction under § 1965(b) to ensure that the RICO claims are tried in a single action. Fowler's contrary argument (Fowler Br. at 5) confuses the "ends of justice" inquiry with the outcome of a Rule 12(b)(6) analysis. The sufficiency of the RICO allegations is distinct from whether the "ends of justice" warrant jurisdiction over Fowler under § 1965(b), and they do.

### C.    The Court Has Personal Jurisdiction Over Fowler Under The CPLR

New York's CPLR "confers specific jurisdiction over a non-domiciliary defendant arising out of particular acts." *Pettenato v. Beacon Health Options, Inc.*, 425 F. Supp. 3d 264, 273–74 (S.D.N.Y. 2019) (quotations omitted). For personal jurisdiction under CPLR 302(a)(1), "(1) the defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,* 450 F.3d 100, 103 (2d Cir. 2006).

### 1.    Plaintiffs Allege That Fowler Transacted Business In New York

A defendant transacts business in New York when he makes "frequent and deliberate" use of "New York-based banking services" or places "reliance on New York banks to manage its assets and transfer investor funds." *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 260–61

78

(S.D.N.Y. 2019) (quotations omitted); *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). The "transacts business" prong of CPLR 302(a) "may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 2020 WL 4586729, at *8 (S.D.N.Y. Aug. 10, 2020) (quotations omitted); *see also Licci*, 732 F.3d at 172 (finding that "use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct.").

Plaintiffs satisfy these standards. Plaintiffs allege Fowler operated an illicit banking network, which comprised dozens of front companies and bank accounts in numerous states, including New York, to facilitate hundreds of millions of dollars in wire transfers. *See, e.g.*, CAC ¶¶ 182, 359. In arguing (Fowler Br. at 5) that Plaintiffs allege only that he opened an HSBC bank account in New York on behalf of Crypto Capital, Fowler ignores the indictment that has been filed against him and that Plaintiffs incorporate by reference in their complaint. *See* CAC ¶ 41 & n.36. The indictment includes, for example, the following statement:

> From at least in or about February 2018 up to and including in or about October 2018, in the Southern District of New York and elsewhere, REGINALD FOWLER . . . opened and used numerous bank accounts . . . including a bank based in Manhattan, New York . . . [that] were in fact used, by FOWLER and others to transmit funds on behalf of an unlicensed money transmitting business related to the operation of cryptocurrency exchanges.

Indictment, ECF No. 55, *United States v. Fowler*, No. 19-CR-254 (S.D.N.Y. Feb. 20, 2020). These allegations are sufficient to satisfy CPLR 302(a).

Fowler also ignores Plaintiffs' allegation that Bitfinex directed customers to wire funds to a New York HSBC account (No. 141000147) that Fowler opened. CAC ¶ 359. Plaintiffs allege

Case 1:19-cv-09236-KPF   Document 154   Filed 11/05/20   Page 98 of 102

that Fowler opened at least four other HSBC accounts, *id.* ¶ 495,[38] and the bill of particulars in Fowler's criminal case (filed after the Complaint was filed) lists 56 bank accounts, at 12 banks, in Fowler's name and the names of 14 different companies. *See United States v. Fowler,* ECF No. 66.[39] Discovery will resolve whether these additional accounts are in New York.

In evaluating this prong of the analysis, courts have considered "how necessary or integral the correspondent account's use was to the alleged scheme." *Vasquez*, 2020 WL 4586729, at *15. The manipulation and predicate acts that Plaintiffs describe are inseparable from Fowler and Crypto Capital's provision of illegal banking services that relied on accounts in New York and elsewhere. *See, e.g.*, CAC ¶¶ 359–60. Plaintiffs allege that "Fowler was at the center of Crypto Capital's scheme to operate a shadow bank on behalf of crypto-exchanges in which hundreds of millions of dollars passed through accounts controlled by [him] in jurisdictions around the world," and "was responsible for creating shell companies and opening bank accounts that could be used by Bitfinex and Tether to process U.S. dollar and other fiat transactions." *Id.* ¶ 182 (citation omitted). Whether Fowler himself or a different agent of Crypto Capital initiated the transfers "is of no moment" to this analysis "because what matters is defendants' banking activity with the correspondent accounts, here, that the money deposited in New York was credited to the [defendant]

---

[38] HSBC Bank USA account 141000147, held by Global Trading Solutions LLC; HSBC Bank USA account 697825922, held by Reginald D. Fowler; HSBC Securities USA account HMB861668, held by Reginald D. Fowler; HSBC Securities USA/Pershing LLC account HMB878886, held by Global Trading Solutions LLC.

[39] Bank of America, in account 898100395306, held in the name of NLE Consulting d/b/a Global Trade Solutions LLC; JP Morgan Chase Bank, in account 296219550, held in the name of Global Trading Solutions LLC; JP Morgan Chase Bank, in account 779558365, held in the name of Spiral Global Development; Wells Fargo Bank, in account 2514680467, held in the name of NLE Consulting d/b/a Global Trade Solutions LLC.

accounts in accordance with [defendant's] money-laundering" and other predicate acts. *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327–28 (N.Y. 2016).

In sum, Plaintiffs have alleged how Fowler used New York's "banking system as part of an allegedly wrongful course of conduct." *Licci*, 732 F.3d at 172. This "deliberate and recurring activity" constitutes Fowler's "purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 171 (quotations omitted).

### 2. Plaintiffs' Claims Arise From Fowler's Business Activity In New York

Section 302(a) "is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities there were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (N.Y. 1988) (quotations omitted); *see also Anderson v. Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494, 501 (S.D.N.Y. 2000) ("Casual or sporadic acts, or even a single transaction of business in New York, are sufficient to give rise to jurisdiction under section 302(a)(1), provided that the claim itself arises out of those acts."). A claim arises out of New York contacts "if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (quotations omitted). "[C]ausation is not required, and . . . the inquiry under the statute is relatively permissive." *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339–40 (2012). It "requires only some relatedness between the in-state transaction and the legal claim, such that the latter is not completely unmoored from the former." *Ramiro*, 380 F. Supp. 3d at 261–62 (quotations and brackets omitted). This prong is thus satisfied if "one element" of one claim arises from the defendant's New York contacts, *id.*, that is,

"where a plaintiff's claims are 'in some way arguably connected' to the in-state transaction of business," *id.* (quoting *Licci*, 20 N.Y.3d at 340).

Plaintiffs' allegations meet these standards, as *Al Rushaid* confirms. There, the claims at issue "depend[ed] on the assertions that defendants established the banking structure in New York" and a foreign country "through which they orchestrated the money laundering" component of a "bribery/kickback scheme." 28 N.Y.3d at 329–30. Similarly, Plaintiffs allege that Fowler and Crypto Capital served as the co-defendants' bankers and "effected the transfers of money to the New York correspondent bank as part of the money-laundering scheme" that delivered the ill-gotten gains to the other defendants, and that without Fowler's support, Bitfinex and Tether would not have been able to honor *any* withdrawal requests, which would have alerted the market that USDT was built on a lie. CAC ¶¶ 9, 360. As in *Al Rushaid*, the "money laundering scheme" that Fowler "designed relied precisely on the existence of bank accounts in different jurisdictions, through which the money would pass," and many of the predicate acts for the RICO claims "turn entirely on the money laundering" and money transmitting that Fowler and Crypto Capital "set up and maintained, necessarily including the use of a New York bank account." 28 N.Y.3d at 330.

## D.   The Court Has Personal Jurisdiction Over Fowler As A Co-Conspirator

Plaintiffs' conspiracy allegations against Fowler provide an independent basis for personal jurisdiction. This requires Plaintiffs to plead that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (citation omitted). The "*Schwab* standard for conspiracy jurisdiction is extraordinarily broad," and "a court can exercise personal jurisdiction over a defendant based on the actions of a co-conspirator who is entirely unknown to that defendant." *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290,

326–27 (S.D.N.Y. 2020). Just as Plaintiffs' allegations against Potter give rise to personal juris-

diction for the RICO claims under § 1965(b), they establish a conspiracy theory of jurisdiction

over Fowler for the antitrust and the RICO claims. *See Fire & Police Pension Ass'n of Colorado*

*v. Bank of Montreal*, 368 F. Supp. 3d 681, 696 (S.D.N.Y. 2019) ("Post-*Schwab*, at least one court

in this District has held that U.S.-based trading is related to a foreign conspiracy to suppress a

foreign interest rate benchmark if the conspiracy is profit-motivated.").

### E.    Personal Jurisdiction Over Fowler Comports With Due Process

In assessing minimum contacts, courts "addressing federal claims with national service of

process . . . have applied the 'national contacts' test." *Sonterra Capital Master Fund Ltd. v. Credit*

*Suisse Grp. AG*, 277 F. Supp. 3d 521, 589 (S.D.N.Y. 2017) (collecting precedent). Under this test,

"the relevant contacts for determining personal jurisdiction are contacts with the United States as

a whole." *Id.* at 563 (quotations omitted); *accord Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142

n.21 (2d Cir. 2014).

Fowler resides in the United States and operates businesses here. These are sufficient con-

tacts with the United States as a whole, such that the exercise of jurisdiction comports with due

process. *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 730 (S.D.N.Y. 2017) (nation-

wide service comports with due process). "It would be unusual, indeed, if a defendant transacted

business in New York and the claim asserted arose from that business activity within the meaning

of section 302(a)(1), and yet, in connection with the same transaction of business, the defendant

cannot be found to have purposefully availed itself of the privilege of doing business in the forum

and to have been able to foresee being haled into court there, or the assertion of specific jurisdiction

would somehow otherwise offend traditional notions of fair play and substantial justice." *United*

*States v. Prevezon Holdings LTD.*, 122 F. Supp. 3d 57, 77 (S.D.N.Y. 2015) (quotations and brack-

ets omitted). Fowler and Crypto Capital's "repeated use" of a New York bank account or accounts,

"and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry." *Licci*, 732 F.3d at 170–74.

## **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss should be denied. However, if the Court finds Plaintiffs' allegations deficient in any way, Plaintiffs respectfully ask leave to re-plead.

Dated:   New York, NY
         November 5, 2020

/s/ Caitlin Halligan
Philippe Z. Selendy
Caitlin Halligan
Andrew R. Dunlap
SELENDY & GAY PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com


/s/ Todd M. Schneider
Todd M. Schneider (*pro hac vice*)
Jason H. Kim (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
Kyle G. Bates (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
 KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
mweiler@schneiderwallace.com
kbates@schneiderwallace.com

Respectfully submitted,


/s/ Kyle W. Roche
Kyle W. Roche
Edward Normand
Velvel Freedman (*pro hac vice*)
Joseph M. Delich
ROCHE CYRULNIK FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
tnormand@rcfllp.com
vel@rcfllp.com
jdelich@rcfllp.com

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*