**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re Tether and Bitfinex Crypto Asset
Litigation

Case No.: 1:19-cv-09236 (KPF) (SN)

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TETHER AND BITFINEX DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIMS

Michael Jason Lee, Esq. (admitted *pro hac vice*)
LAW OFFICES OF MICHAEL JASON LEE,
APLC
4660 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Tel : (858) 550-9984
Fax : (858) 550-9985

Jim Walden
Stephanie Levick
Daniel A. Cohen
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, NY 10004
Tel: (212) 335-2030
Fax: (212) 335-2040

Sunjina K. Ahuja, Esq. (admitted *pro hac vice*)
Christopher J. Beal, Esq. (admitted *pro hac vice*)
DILLON MILLER & AHUJA LLP
5872 Owens Ave, Suite 200
Carlsbad, CA 920008
Tel.: (858) 587-1800
Fax: (858) 587-2587

*Counsel for Defendants, iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Ludovicus Jan van der Velde, and Giancarlo Devasini.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     Plaintiffs' Antitrust Claims Should Be Dismissed (Counts 1-4) ........................... 2

      A.     Plaintiffs Fail to Plead Defendants' Monopoly Power ............................... 2

      B.     Plaintiffs Fail to Plausibly Allege Attempt or Conspiracy ........................ 4

      C.     Plaintiffs Fail to Allege Antitrust Injury ................................................... 6

      D.     Plaintiffs Fail to Plead Parallel Conduct for Their Section 1 Claim ........................................................................................................... 6

II.     Plaintiffs' CEA Claims Should Be Dismissed (Counts 5-7) ................................. 8

      A.     Plaintiffs Lack Standing to Bring Claims Under the CEA ........................ 8

      B.     Plaintiffs Fail to Plead Market Manipulation with Particularity.............. 11

      C.     Plaintiffs Fail to Plead Reliance or Loss Causation Under Rule 180.1(a) ................................................................................................... 12

III.     Plaintiffs Fail to State a RICO Claim (Counts 8-10) ........................................... 13

      A.     Plaintiffs Fail to Plead "Direct" Causation .............................................. 13

      B.     Plaintiffs Fail to Plead Injury from the Investment of Racketeering Proceeds ............................................................................ 16

      C.     Plaintiffs Fail to Adequately Plead Two Predicate Acts.......................... 18

IV.     The Court Should Dismiss Plaintiffs' State Law Claims (Counts 11 and 12)................................................................................................ 21

      A.     Plaintiffs Fail To State a Common Law Fraud Claim .............................. 21

           1.     Plaintiffs Fail to Plead Reliance.................................................... 21

           2.     Plaintiffs Fail to Plead Loss Causation or Damages .................... 23

      B.     Plaintiffs' GBL § 349 Claim Should Be Dismissed ................................ 24

CONCLUSION................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*4 K & D Corp. v. Concierge Auctions, LLC*,
  2 F. Supp. 3d 525 (S.D.N.Y. 2014)..................................................................... 16, 18

*7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*,
  771 F. App'x 498 (2d Cir. 2019) ......................................................................... 13, 14

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 452 (2006)............................................................................................. 14

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)............................................................................................. 6

*Axar Master Fund, Ltd. v. Bedford*,
  806 F. App'x. 35 (2d Cir. 2020) .......................................................................... 24

*Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Management Co.*,
  149 A.D.3d 146, 48 N.Y.S.3d 654 (1st Dep't 2017) ........................................... 23

*CFTC v. Wilson*,
  No. 13 Civ. 7884, 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ........................ 11

*City of Long Beach v. Total Gas & Power N. America, Inc.*,
  465 F. Supp. 3d 416 (S.D.N.Y. 2020).................................................................. 3, 6

*City of New York v. Smokes-Spirits.com, Inc.*,
  12 N.Y.3d 616 (2009) .......................................................................................... 25

*DeAngelis v. Corzine*,
  17 F. Supp. 3d 270 (S.D.N.Y. 2014).................................................................... 25

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012).................................................................. 12

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................................. 12, 23

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
  902 F.3d 132 (2d Cir. 2018)................................................................................. 14, 15

*Facie Libre Assocs. I, LLC v SecondMarket Holdings Inc.*,
  961 N.Y.S.2d 44 (1st Dep't 2013) ....................................................................... 23

*Gelboim v. Bank of America Corp.*,
  823 F.3d 759 (2d Cir. 2016)................................................................................. 6, 8

*Gucci v. Gucci Shops, Inc.*,
   651 F. Supp. 194 (S.D.N.Y. 1986) ....................................................................... 7

*Harry v. Total Gas & Power North America, Inc.*,
   889 F.3d 104 (2d Cir. 2018)............................................................................... 10

*Hemi Group, LLC v. City of New York*,
   559 U.S. 1 (2010)............................................................................................... 13

*Holmes v. Securities Investor Protection Corp.*,
   503 U.S. 258 (1992)........................................................................................... 13

*Ideal Steel Supply Corp. v. Anza*,
   652 F.3d 310 (2d Cir. 2011)............................................................................... 18

*In re Aluminum Warehousing Antitrust Litigation*,
   95 F. Supp. 3d 419 (S.D.N.Y. 2015)..................................................................... 7

*In re Commodity Exchange, Inc.*,
   No. 11 Md. 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012)............................ 11

*In re Crude Oil Commodity Futures Litigation*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012)............................................................ 3, 4, 6

*In re DiPlacido*,
   CFTC No. 01–23, 2004 WL 2036910 (CFTC Sept. 14, 2004),
   *aff'd*, 364 F. App'x 657 (2d Cir. 2009)............................................................... 11

*In re LIBOR-Based Fin. Instruments Antitrust*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................... 10, 11

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013)................................................................... 9

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)................................................................. 25

*In re Platinum & Palladium Antitrust Litigation*,
   No. 1:14 Civ. 9391, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ....................... 10

*In re Term Commodities Cotton Futures Litigation*,
   No. 12 Civ. 5126, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013)........................ 3, 4

*In re UBS Auction Rate Securities Litigation*,
   No. 08 Civ. 2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010)......................... 22

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
   812 F.2d 786 (2d Cir. 1987)................................................................................ 4

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)..................................................................................... 19

*Laydon v. Mizuho Bank, Ltd*.,
    No. 12 Civ. 3419, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ..................................... 14, 15

*Lentell v. Merrill Lynch*,
    396 F.3d 161 (2d Cir. 2005)................................................................................. 23, 24

*Linares Huarcaya v. Mukasey*,
    550 F.3d 224 (2d Cir. 2008)..................................................................................... 12

*Maxim Group LLC v. Life Partners Holdings, Inc*.,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010)......................................................................... 22

*Merced Irrigation District v. Barclays Bank PLC*,
    165 F. Supp. 3d 122 (S.D.N.Y. 2016)...................................................................... 3, 5, 6

*Michael E. Jones M.D., P.C. v. UnitedHealth Group, Inc*.,
    No. 19 Civ. 7972, 2020 WL 4895675 (S.D.N.Y. Aug. 19, 2020) ............................................. 4

*Minpeco, S.A. v. ContiCommodity Servs., Inc.*,
    552 F. Supp. 332 (S.D.N.Y. 1982) ............................................................................. 23

*Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co*.,
    513 F.2d 102 (2d Cir. 1975)....................................................................................... 8

*Morris v. Gilbert*,
    649 F. Supp. 1491 (E.D.N.Y. 1986) ............................................................................ 25

*National Organization for Women, Inc. v. Scheidler*,
    968 F.2d 612 (7th Cir. 1992) .................................................................................... 17

*Nguyen v. FXCM Inc*.,
    364 F. Supp. 3d 227 (S.D.N.Y. 2019)........................................................................... 8

*North State Autobahn v. Progressive Insurance Group Co*.,
    953 N.Y.S.2d 96 (2d Dep't 2012)................................................................................ 25

*Pasternack v. Laboratory Corp. of American Holdings*,
    27 N.Y.3d 817 (2016) ......................................................................................... 22, 23

*Pennsylvania Public School Employees' Retirement System v. Morgan Stanley & Co., Inc*.,
    772 F.3d 111 (2d Cir. 2014)...................................................................................... 22

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)........................................................................................ 16

*Securities Investor Protection Corp. v. BDO Seidman*, LLP,
   222 F.3d 63 (2d Cir. 2000) ........................................................................... 22

*Shak v. JPMorgan Chase & Co.*,
   156 F. Supp. 3d 462 (S.D.N.Y. 2016) ........................................................ 3, 4

*Sonterra Capital Master Fund Ltd. v. UBS AG*,
   954 F.3d 529 (2d Cir. 2020) ......................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ....................................................................................... 12

*Twin Labs., Inc. v. Weider Health & Fitness*,
   900 F.2d 566 (2d Cir. 1990) ............................................................................ 5

*United States v. Approximately 250 Documents*,
   No. 03 Civ. 8004, 2008 WL 4129814 (S.D.N.Y. Sept. 5, 2008) ................. 17, 20

*United States v. Binday*,
   804 F. 3d 558 (2d Cir. 2015) ......................................................................... 19

*United States v. LaBrunerie*,
   914 F. Supp. 340 (W.D. Mo. 1995) ......................................................... 17, 20

*United States v. Savage*,
   67 F.3d 1435 (9th Cir. 1995) ......................................................................... 20

*United States v. Zarrab*,
   15 Crim. 867, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ....................... 19

*USA Certified Merchants, LLC v. Koebel*,
   262 F. Supp. 2d 319 (S.D.N.Y. 2003) ........................................................... 17

*Volvo North America Corp. v. Men's International Professional Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) ............................................................................... 5

*Williams v. Bank Leumi Tr. Co.*,
   No. 96 Civ. 6695, 1997 WL 289865 (S.D.N.Y. May 30, 1997) ................... 21

## Statutes

18 U.S.C. § 1956 ................................................................................................... 20

18 U.S.C. § 1956(a)(1) .......................................................................................... 17

18 U.S.C. § 1957 ................................................................................................... 20

18 U.S.C. § 1962(a) ..................................................................................... 16, 17, 18

7 U.S.C. § 25(a)(1) ................................................................................................. 8

General Business Law § 349 ........................................................................... 24, 25

**Other Authorities**

CFTC, *Prohibition of Market Manipulation*,
   75 Fed. Reg. 67,657, 67,660 (Nov. 3, 2010) ........................................... 12

Vol. 3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 806 (4th ed. 2020) ............... 5

**Rules**

CFTC Rule 180.1 ..................................................................................................... 12

## PRELIMINARY STATEMENT

Bitfinex and Tether moved to dismiss this case because, apart from its wildly implausible factual premise—that Defendants' proportionally tiny cryptocommodity purchases "created the largest asset bubble in history"—Plaintiffs have failed to allege essential elements of their claims. Plaintiffs' opposition does not overcome these flaws.

*First*, Plaintiffs defend their antitrust claims by accusing Defendants of causing an "artificial" uptick in cryptocommodity prices. But an "artificial" price only implicates the antitrust laws if it flows either from collusion among competitors or a defendant's monopolistic behavior. Here, Plaintiffs allege neither that Defendants conspired with other cryptocommodity actors to restrain competition, nor that they acquired a monopoly position in those markets. Plaintiffs similarly fail to allege injury flowing from competition-reducing behavior. Any alleged injury arose only from "strategically timed" purchases that any single actor, without market power and without any collusion, could do. Thus, Plaintiffs state no antitrust violation.

*Second*, Plaintiffs make the same mistake in their CEA manipulation claims, arguing that an "artificial" price is enough. It is not. Further, only one Plaintiff has potential CEA standing, but Plaintiffs do not even try to connect the timing of his futures trades to the alleged manipulation so as to establish an "actual loss." They just repeat that he paid "artificial" prices. And the foundation of Plaintiffs' manipulation claims is the unreasonable inference that Defendants' transactions, representing *less than one-seventh of one percent* of bitcoin's trading volume, caused the crypto boom-and-bust. This is beyond implausible, for both the CEA and antitrust claims.

*Third*, under RICO's stringent causation standards, courts do not look beyond the "first step" in the causal chain between the wrongdoing and the alleged harm. Plaintiffs, who did not transact directly with Defendants, argue that the first step harmed them because Defendants'

cryptocommodity purchases established a "price floor." But any alleged "price floor" would reach the Plaintiffs only after an untold number of intervening market participants bid up prices. Plaintiffs' losses are simply too remote under RICO.

*Finally*, while the Court should not retain jurisdiction over the state law claims, those, too, are not sufficiently pled. For their fraud claim, Plaintiffs argue that there is no need to plead actual reliance on the misrepresentations, because they relied generally on the "integrity" of the crypto markets. But the Second Circuit has rejected analogous "implied" reliance theories and, in all events, the Complaint alleges the *opposite* of reliance on market integrity. It alleges that crypto markets are "ripe for manipulation." For their consumer fraud claim, Plaintiffs try to shoehorn cryptocommodities into the scope of the statute—consumer goods—but the fact that some crypto products can be used to buy things does not make them consumer goods. Regardless, Plaintiffs describe themselves as "investors," not as users of crypto products for consumer purposes.

The Court should dismiss the Complaint with prejudice.

## ARGUMENT

### I.   PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED (COUNTS 1-4)

#### A.   Plaintiffs Fail to Plead Defendants' Monopoly Power

Defendants' moving brief showed that Plaintiffs failed to allege that Bitfinex and Tether had monopoly power in the cryptocommodity markets for purposes of their Section 2 monopolization claim. (Dkt. 143, Bitfinex and Tether Memorandum of Law in Support of Motion to Dismiss ("BT Br.") 8-10.)[1] While Defendants are accused of causing price increases, the scheme

---

[1] Although Plaintiffs allege Defendants possess a monopoly in the stablecoin market, the relevant market here is the "market for *cryptocommodities* in the United States" (Dkt. 114, Amended Complaint ("Compl.") ¶ 390; emphasis added.) Plaintiffs admit stablecoins are *not* cryptocommodities (*id*. ¶ 114), and do not dispute that any alleged *stablecoin* monopoly is irrelevant here. (BT Br. 12 n.8.)

had nothing to do with exploiting a market-dominant position to unilaterally move markets. It involved "strategically timed" purchases of cryptocommodities so as to "induce other traders to purchase." (Compl. ¶¶ 10, 296.) This is not exercise of monopoly power.

Plaintiffs' chief response is to allege that Defendants' ability to "manipulate" prices is alone proof of market power. (Dkt. 154, Plaintiffs' Opposition ("Opp.") 15-16.) But, as a matter of common sense, this simplistic formulation is wrong. Any trader on an exchange can make trades that affect prices. For example, in *City of Long Beach v. Total Gas & Power N. America, Inc.*, 465 F. Supp. 3d 416, 447 (S.D.N.Y. 2020), Total Gas was accused of engaging in "strategically timed trades . . . [with] the intent and effect of" influencing natural gas prices. *Id*. at 447. Judge Kaplan found that the trades were not ones that flowed from any alleged market power because "any other participant in the market could have" done the same thing. *Id*.

The cases Plaintiffs cite—unlike Plaintiffs' own allegations—involved clear use of market dominance over the commodity at issue to move prices unilaterally. In *In re Crude Oil Commodity Futures Litigation*, 913 F. Supp. 2d 41 (S.D.N.Y. 2012) (cited Opp. 15), the defendant's scheme involved "acquisition of up to 92% of the next month's deliverable . . . supply" of a certain grade of crude oil, and the "artificial market conditions" were thus "spawned by [the defendant's] dominant share of the physical . . . market" for that type of oil. *Id*. at 52, 57. Similarly, in *In re Term Commodities Cotton Futures Litigation*, No. 12 Civ. 5126, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) (cited Opp. 15), "Defendants controlled 99% of the relative market during the relevant period," which they used to "effectuate[] a squeeze" that forced others to pay "artificially high prices in order to settle their contracts." *Id*. at *15, 24-25; *see also Merced Irrigation District v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 142 (S.D.N.Y. 2016) (defendants "successfully capture[d] market share sufficient to move index prices in its favor") (cited Opp. 16). In *Shak v.*

*JPMorgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y. 2016), Judge Engelmayer "[s]ynthesiz[ed]" *Crude Oil* and *Cotton* as follows: "concrete allegations **of a dominant position** in either a physical commodity or a related futures market, combined with significant pricing anomalies that are closely correlated with defendants' alleged conduct, ***may*** be sufficient to plead monopoly power." *Id*. at 485 (emphasis added).

Judge Engelmayer correctly emphasized the element of a "dominant position," which is lacking here. Plaintiffs allege Defendants used "between 1 and 3 billion unbacked USDT" to purchase cryptocommodities, but the purchases were spread out (Compl. ¶ 217) and represented a small fraction of total trading volume of USDT on just the Poloniex and Bittrex exchanges alone (*id.* ¶¶ 168, 175, noting *monthly* trading volumes of $7.6 billion and $4.6 billion), much less the entire market. Further undermining any suggestion of a control position, Plaintiffs allege Defendants did not maintain their cryptocommodity holdings, but rather routinely sold them for U.S. dollars to "backfill" the USDT reserves. (*Id*. ¶¶ 216, 270.) As Plaintiffs admit, any alleged price impact was based on price signals drawing in *other* traders, not on *unilateral* conduct. This alleged scheme bears no resemblance to the use of monopoly power.

### B.    Plaintiffs Fail to Plausibly Allege Attempt or Conspiracy

Plaintiffs similarly have not pled attempted monopolization, or a conspiracy to monopolize, because the alleged scheme shows, at best, an attempt to profit from issuing USDT, and does not contemplate or require monopolizing the cryptocommodity markets. (BT Br. 11-14.) Plaintiffs respond that the "volume and careful timing of [Defendants'] crypto-commodity purchases is best explained by an intent to inflate crypto-commodity prices." (Opp. 18.) But this confuses an intent to manipulate *prices* with what is necessary here: a "specific intent to achieve an unlawful monopoly." *Int'l Distribution Centers, Inc. v. Walsh Trucking Co*., 812 F.2d 786, 795 (2d Cir. 1987); *see also Michael E. Jones M.D., P.C. v. UnitedHealth Group, Inc*., No. 19 Civ. 7972, 2020

WL 4895675, at *11 (S.D.N.Y. Aug. 19, 2020) (dismissing both attempted monopolization and conspiracy for lack of specific intent element). To show attempt or conspiracy to monopolize, the "[c]onduct must not only be inconsistent with competition on the merits; it must also have the potential for making a significant contribution to monopoly power." Vol. 3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 806 (4th ed. 2020). And, correspondingly, the defendant's intent must "go 'beyond the mere intent to do the act' and . . . involve a desire to achieve monopoly power." *Id*. ¶ 805 (citation omitted). As discussed, the alleged scheme here has nothing to do with Bitfinex or Tether gaining a dominant market position in cryptocommodity markets.

Plaintiffs cite *Volvo North America Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55 (2d Cir. 1988), for the proposition that "anticompetitive conduct *can* support inference of specific intent to monopolize." (Opp. 18 (emphasis added).) That case offers a useful contrast to what is alleged here. In *Volvo*, a sports association was accused of having "established a cartel in the market for men's professional tennis," by which "the top one hundred men's professional tennis players all signed" contracts with the defendant. *Id*. at 66, 73. Inferring an attempt to monopolize from those facts is unremarkable. Here, the allegations do not plausibly suggest *any* intent for Bitfinex or Tether to gain a dominant cryptocommodity market position, nor would it even be possible to dominate a market that reached $795 *billion* in size. (Compl. ¶ 98.)[2]

---

[2] An independent ground to dismiss the "attempted monopoly" claim is that Plaintiffs fail to show a near monopoly position in the first place, such that the alleged attempt would have a "dangerous probability of success." (BT Br. 11.) Plaintiffs argue that this showing is unnecessary because they allege an "intent and ability to control market prices" (Opp. 19), but the case cited for that proposition, *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 142 (S.D.N.Y 2016), does not discuss the "dangerous probability" element at all, nor does it purport to overrule Second Circuit cases requiring this element as necessary for attempted monopolization claims. *See, e.g.*, *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990). Regardless, in *Merced*—unlike here—the defendant allegedly "capture[d] market share sufficient to move index prices in its favor." *Merced*, 165 F. Supp. 3d at 142.

### C.     Plaintiffs Fail to Allege Antitrust Injury

The Supreme Court has rejected the view that all misconduct that "distorts the markets" results in antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 339 n.8 (1990). As Defendants' moving brief showed, Plaintiffs offer no more than alleged price distortion, and do not allege the type of competition-reducing injury falling within the antitrust laws. (BT Br. 6-8.) In response, Plaintiffs repeat their mantra that trading in any market with allegedly distorted prices is all they need to show, relying primarily on *Gelboim v. Bank of America Corp*., 823 F.3d 759 (2d Cir. 2016) (Opp. 12-14.) But *Gelboim* did not announce such a categorical rule. To the contrary, the Second Circuit made clear that showing losses flowing from "competition-reducing" behavior was essential: "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a *competition-reducing* aspect or effect of the defendant's behavior." *Id*. at 777 (citations and internal quotation marks omitted; emphasis added).

Here, the alleged losses flow from "strategically timed trades that, as far as the complaint alleges, any other participant in the market could have made." *Long Beach*, 465 F. Supp. 3d at 447. Unlike Plaintiffs' cited cases, such as *Merced* and *Crude Oil*, Plaintiffs' alleged injuries do *not* flow from classically anticompetitive practices such as acquiring huge portions of the cryptocommodity market, or colluding with other cryptocommodity suppliers to control output or fix prices. No injury caused by competition-reducing activity is alleged here.

### D.     Plaintiffs Fail to Plead Parallel Conduct for Their Section 1 Claim

Defendants showed that Plaintiffs' Section 1 claim should be dismissed because they do not plausibly allege facts supporting an inference of an antitrust conspiracy. (BT Br. 12-14.) In response, Plaintiffs claim it is sufficient to allege "interdependent conduct, accompanied by circumstantial evidence and plus factors," such as (i) parallel conduct that would be against one's self interest absent a similar commitment from competitors, and (ii) communications between

6

competitors. (Opp. 20.) They claim to meet this standard by alleging that Bitfinex and Tether: "worked with the Exchange Defendants to facilitate their manipulation of USDT"; "worked with Crypto Capital and Fowler to mask Tether's inadequate reserves"; and discussed the risk that bitcoin prices could "tank." (Opp. 21.) But none of the above reflects parallel conduct between *competitors* or a similar anticompetitive agreement, particularly given what the Complaint actually alleges. Plaintiffs allege that Bitfinex and Tether "worked with the Exchange Defendants" because the Exchange Defendants allegedly knew about the use of "debased" USDT but did not report it to regulators. (Compl. ¶¶ 331-33.) This is not "parallel" conduct and is indicative of nothing more than the Exchange Defendants acting in their own independent self-interest. Similarly, the Amended Complaint alleges ***not*** that Crypto Capital and Fowler helped "mask" purportedly inadequate reserves, but instead that they "facilitate[d]" Bitfinex and Tether gaining "access to U.S. correspondent banking services to execute USDT-to-U.S. dollar exchanges" (*id*. ¶ 349)—*i.e.*, they took in dollar deposits that backed USDT issuances. Finally, the conversation about "tank[ing]" bitcoin prices reflected Bitfinex *confronting* Crypto Capital—not conspiring with it— because Crypto Capital was slow to process withdrawals. (*Id*. ¶ 362.) No fair inference of collusion can therefore be drawn in Plaintiffs' favor.

The reality is that the core alleged harmful conduct—Bitfinex buying and selling cryptocommodities with "unbacked" USDT (Compl. ¶¶ 260, 264)—did not require parallel or concerted action with anyone else, except perhaps its own affiliate, Tether.[3] Nor did it require the

---

[3] Bitfinex and Tether are alleged to be under "shared control" (Compl. ¶ 157) and so cannot conspire with one another for purposes of the antitrust laws. *In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419, 445 (S.D.N.Y. 2015) ("jointly controlled" companies cannot conspire under the antitrust laws). The same is true of their officers, Defendants van Der Velde and Devasini, and former officer Phil Potter. *Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 197 (S.D.N.Y. 1986).

type of interdependent conduct—conduct "only in one's self-interest if done in concert with others," *Modern Home Institute, Inc. v. Hartford Acc. & Indem. Co.*, 513 F.2d 102, 111 (2d Cir. 1975)—that constitutes an *antitrust* conspiracy.

Plaintiffs rely primarily on *Gelboim*, a LIBOR price-fixing case, to suggest that their allegations suffice. (Opp. 20-24.) But the *Gelboim* complaint quoted damning internal bank documents, including one email showing a bank knowing "in advance of the submission deadline, the proposed confidential submissions of every USD LIBOR panel bank," and another where a bank employee stated that he or she "did not want to be an outlier in the libor fixings." *Id*. at 781 n.19 (emphasis removed). That is, there was (1) "parallel" conduct by which the banks acted together in submitting artificially low interest rate information to depress LIBOR, and (2) "plus" factors, showing that the parallel conduct was based on collusion, not independent decision-making. Neither is alleged here.

## II.   PLAINTIFFS' CEA CLAIMS SHOULD BE DISMISSED (COUNTS 5-7)

### A.   Plaintiffs Lack Standing to Bring Claims Under the CEA

Plaintiffs concede that the only Plaintiff who *could* have standing under the CEA is Pinchas Goldshtein, the only Plaintiff to have purchased commodities futures. (*Compare* BT Br. 14-17 *with* Opp. 26.) But the Complaint does not plead facts showing that he suffered "actual damages," as the CEA requires. *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 239 (S.D.N.Y. 2019) (quoting 7 U.S.C. § 25(a)(1)). Plaintiffs do not connect his purchases with particular alleged manipulative activity or show that he sold particular positions at a loss because of Defendants' conduct.

Instead, Plaintiffs allege only that, over two-and-one-half years starting in January 2018, Goldshtein bought bitcoin futures at "artificially inflated" prices. (Compl. ¶ 22.) This is not enough, particularly when Plaintiffs allege that Defendants' conduct caused alternating episodes of (i) "spikes" in the hours after "debased" USDT issuances, followed by (ii) "downward pressure"

later, when Defendants sold crypto assets to "backfill" the USDT reserves. (BT Br. 11, 15-17.) Did Goldshtein buy when the downward pressure helped his position, or when the spikes hurt his position? Did he sell any position at an actual loss? The Complaint does not say—yet that is precisely what the law requires.

Plaintiffs argue that they need not connect Goldshtein's trading to any particular manipulation because the manipulation was "persistent." (Opp. 27.) But that characterization is directly contradicted by the Complaint, which refers to "carefully timed" USDT issuances only when certain prices were nearing "round number thresholds," and further refers to "downward pressure" on prices when Defendants allegedly had to "backfill" USDT reserves. (Compl. ¶¶ 3, 216, 295.) Where alleged "manipulation d[oes] not occur on every day of the Class Period, but rather on only a subset of those days"—particularly when it is a "subset that plaintiffs can . . . identify"—it is incumbent on a plaintiff to connect his or her trading activity to when prices were allegedly manipulated. *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 962 F. Supp. 2d 606, 621 (S.D.N.Y. 2013). Plaintiffs failed to do so here.

This is not a mere technical or theoretical shortcoming. Plaintiffs allege that the "peak of the bubble" was in December 2017 (Compl. ¶ 334), but Goldshtein did not begin buying futures until after that date (*id.* ¶ 22), when, despite hundreds of millions in USDT issuances, bitcoin prices steadily *fell*. (*Id.* ¶¶ 96, 272.) Even assuming USDT issuances were somehow able to distort crypto prices upward during the earlier period, there is no reason to think this phenomenon was occurring during the crypto crash.

Plaintiffs argue that Goldshtein "cannot be expected to know now, at the pleadings stage, the precise amount of his damages." (Opp. 26.) But, of course, Plaintiffs well know that is not what is lacking here—namely, plausible allegations that Goldshtein suffered actual loss, not the

precise amount. If there were actual damages, they would be easily discernible because Plaintiffs know when Goldshtein bought and sold, when the allegedly "debased" USDT issuances occurred, and what price movements occurred in those timeframes.[4]

The cases Plaintiffs cite on these issues show precisely what Plaintiffs fail to plead here. First, in *In re Platinum & Palladium Antitrust Litigation*, No. 1:14 Civ. 9391, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) (cited Opp. 26), the defendants "manipulated and artificially suppressed the price of physical platinum and palladium." *Id*. at *1. The plaintiffs did not merely allege that they sold those products at artificially low prices, but, instead, their complaint included four appendices that "cross-reference[d] sale dates with artificial suppressions dates." *Id*. at *29.

Second, Plaintiffs argue that *Harry v. Total Gas & Power North America, Inc*., 889 F.3d 104, 112 (2d Cir. 2018) described a "hypothetical" set of facts that would have sufficed for standing. (Opp. 27.) But that scenario involved a hypothetical plaintiff who "traded and lost money. . . *during a bout of defendant's alleged market manipulation* in the same contract type in the same exchange for delivery at same time and place." *Total Gas*, 889 F.3d at 112 (emphasis added). Here, the alleged "bouts" of manipulation are known, but are not connected to Goldshtein's purchases.

Third, in *In re LIBOR* (cited Opp. 26), the court emphasized that "LIBOR was fixed anew every day" so that the exact effect "could not be known by plaintiffs" without discovery. 935 F.

---

[4] There is no dispute that this information is public. In fact, the Complaint alleges that the public nature of blockchain technology "allows economic experts to perform sophisticated forensic analyses" on the movements of virtual currency and that "USDT issuances . . . are all visible by anyone with internet access on the blockchain." (Compl. ¶¶ 104, 118.) It refers repeatedly to "expert analysis" based on this information, allegedly showing the alleged impact of "unbacked" USDT on crypto asset prices. (*E.g*., *id*. ¶¶ 191, 216-17, 265.) For example, Plaintiffs allege that "[a]s expert analysis reveals, in the hours following the transfer of USDT from Bitfinex to Bittrex and Poloniex, the price of bitcoin increased appreciably." (*Id*. ¶ 273.) Yet the Complaint is silent as to whether the price movements in those hours caused Goldshtein any losses.

Supp. 2d 666, 718-19 (S.D.N.Y. 2013). The court contrasted the facts before it with a "situation in which the defendant disseminated false information and the plaintiff can allege precisely when the false statements were made." *Id*. Here, the exact dates and times of alleged "false" pricing signals *are* known; thus, Goldshtein is required to link his transactions with those pricing signals to plausibly allege a resulting loss. The failure to do so is reason alone to dismiss the CEA claims.

### B.    Plaintiffs Fail to Plead Market Manipulation with Particularity

Plaintiffs do not dispute that the new tether issuances represented *less than one-seventh of one percent* of bitcoin's trading volume (to say nothing of the overall crypto market) (BT Br. 20 (citing Compl. ¶¶ 242, 244)), and do not plausibly allege how these relatively miniscule transaction volumes "caused prices to skyrocket" (as opposed to merely stabilizing prices) throughout the crypto markets over a six-year period. (Compl. ¶ 12.)

Even assuming some price impact resulted, however, a CEA defendant is not liable for manipulation simply because he or she executes transactions knowing or expecting a price impact. *CFTC v. Wilson*, No. 13 Civ. 7884, 2018 WL 6322024, at *14-15 (S.D.N.Y. Nov. 30, 2018). The factual allegations here, at best, show trading with the understanding that prices may be affected. The typical markers of manipulation are absent. Plaintiffs have not, for example, alleged behavior that would be otherwise unexplainable, such as the placement of uneconomic bids or offers, *In re DiPlacido*, CFTC No. 01–23, 2004 WL 2036910, at *8 (CFTC Sept. 14, 2004), *aff'd*, 364 F. App'x 657 (2d Cir. 2009), or "contemporaneous communications" showing concerted action among market participants. *In re Commodity Exchange, Inc.*, No. 11 Md. 2213, 2012 WL 6700236, at *11 (S.D.N.Y. Dec. 21, 2012) (collecting cases).

Rather than address these glaring shortcomings, Plaintiffs chide Defendants for even suggesting the Court draw any inference "*other* than the one Plaintiffs allege." (Opp. 30 (emphasis in original).) But when assessing whether fraud allegations are sufficiently particular, courts do

11

not blindly accept a complaint's claimed inferences and hypotheses. Instead, courts must "consider plausible, nonculpable explanations for the defendant's conduct" and accept the culpable explanation only if it is "at least as compelling" as the alternative. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). Plaintiffs' theories fall far short of these standards.

### C.    Plaintiffs Fail to Plead Reliance or Loss Causation Under Rule 180.1(a)

Plaintiffs have failed to plead reliance or loss causation, both of which are necessary for their claim under CFTC Rule 180.1. (BT Br. 21-23.) Plaintiffs suggest that these elements are *not* required (Opp. 34), but when the CFTC proposed Rule 180.1, it specifically stated that "[r]eliance, loss causation and damages are elements of private claims" brought under the rule. CFTC, *Prohibition of Market Manipulation*, 75 Fed. Reg. 67,657, 67,660 (Nov. 3, 2010). The CFTC's guidance is "controlling." *Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229 (2d Cir. 2008).

Plaintiffs halfheartedly attempt to argue, in a conclusory footnote, that the loss causation element is met because Defendants' actions "caused Goldshtein economic loss." (Opp. 35 n.19.) But the Complaint does not allege anything about Goldshtein having, for example, sold out of a position at a loss or otherwise actually having lost money. It alleges only that he bought futures at "artificially inflated" prices (Compl. ¶ 22), which is exactly the sort of allegation the Supreme Court has found not to satisfy loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (holding that "an inflated purchase price" does not establish loss causation).

For reliance, Plaintiffs invoke the fraud-on-the-market theory (Opp. 35 n.19), but that requires pleading that the plaintiff traded in an efficient market in the first place. The Complaint does not allege anything about the efficiency of the markets in which he traded (or even *identify* those markets). (Compl. ¶ 22.) Without it, Plaintiffs' reliance theory does not work. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012) ("conclusory allegations regarding 'artificially inflated' prices do not suffice to plead an 'efficient market'").

III.    PLAINTIFFS FAIL TO STATE A RICO CLAIM (COUNTS 8-10)

A.      Plaintiffs Fail to Plead "Direct" Causation

Under RICO's rigorous causation standards, courts generally do not look "beyond the first step" in the causal chain, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269-71 (1992), and dismiss claims when "[m]ultiple steps separate the alleged fraud from the asserted injury." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 3 (2010). (*See* BT Br. 24-27.) Here, Plaintiffs claim first-step harm from Defendants "using USDT to establish fraudulent price floors in the crypto-commodity market." (Opp. 44.) But the obvious sleight of hand in this formulation is to collapse multiple steps into the concept of "establish[ing]" a price floor.

According to the Complaint, the allegedly "debased USDT" was transferred to Bittrex and Poloniex and then used "to buy large amounts of cryptocommodities." (Compl. ¶ 191.) *Those* transactions—to buyers who were *not* Plaintiffs and who are expressly *excluded* from the proposed Class (*id.* ¶ 378)—are the "first steps" in the causal chain. Those transactions, in turn, triggered subsequent steps: they supposedly "attracted more purchases" in the crypto markets and ultimately kept prices rising across "hundreds" of crypto assets. (*Id.* ¶¶ 47 n.37, 191.) To the extent this sequence of events injured the Plaintiffs, there were countless independent investment decisions made by market actors standing between the actions of the Defendants and any alleged downstream harm to Plaintiffs. While Plaintiffs allege that their harm was the "foreseeable result of Defendants' conduct" (Opp. 3), the Supreme Court has held that RICO's causation requirement does not "turn on foreseeability," but, rather, "on the existence of a sufficiently 'direct relationship.'" *Hemi*, 559 U.S. at 12. This direct relationship is lacking here.

On this point, Plaintiffs cannot meaningfully distinguish *7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*, 771 F. App'x 498 (2d Cir. 2019). There, the Second Circuit found no proximate cause when a bondholder alleged that LIBOR price fixing caused its "portfolio to

decline in value." *Id*. at 504. The Court held: "the injury was directly caused by buy/sell decisions that independent market actors made," even if "LIBOR may have influenced" those decisions. *Id*. Here, too, if Plaintiffs' crypto portfolios were harmed, the cause was countless independent buy/sell decisions, even if the initial transactions "may have influenced" those decisions.

Plaintiffs argue that *Citigroup* is distinguishable because the plaintiff in that case held "bonds *not* pegged to LIBOR." (Opp. 45 (emphasis in original).) But bitcoin and other crypto assets are not alleged to be "pegged" to tether (or to one another). Here, just as in *Citigroup*, any alleged injury would "flow[] from the ripple effect" of the alleged wrongdoing. 771 F. App'x at 503. These same ripple-effect dynamics are why the court dismissed the RICO claims in *Laydon v. Mizuho Bank, Ltd*., No. 12 Civ. 3419, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015). The plaintiff accused the defendants of fixing two interest rate benchmarks (Euroyen TIBOR and Yen–LIBOR), but the court found no standing because there were multiple "discrete links in a complicated series of market transactions" between the alleged wrongdoing and the plaintiff's alleged loss. *Id*. at *10.

Dismissal here is not only required with the case law but by the purpose of RICO's stringent causation standards, which is to avoid enmeshing courts in "intricate, uncertain inquiries" about damages, *Anza v. Ideal Steel Supply Corp*., 547 U.S. 452, 460 (2006), such as "how much the tortious conduct injured the defendant, as compared to other factors." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018). Nothing could be more "intricate" and "uncertain" than trying to quantify, over *hundreds* of crypto assets, the price impact of relatively isolated USDT issuances spread out over *six years*.

Recognizing the slender reed on which this claim rests, Plaintiffs claim that quantifying the direct relation between USDT issuances and cryptocommodity prices somehow resembles the use in *securities* cases of expert "event studies" to isolate how false statements concerning a single

company affects that company's stock's price. (Opp. 46.) There is no resemblance. Plaintiffs propose to measure "price signals" supposedly sent by relatively small USDT transactions, and their impact on *every other* crypto asset in the entire market, regardless of whether the USDT was used to buy the same or different crypto assets as the Plaintiffs purchased. This would be like a securities fraud case brought on behalf of stockholders in an entire sector (say, internet stocks) because of generalized demand signals that were supposedly fraudulent. Plaintiffs cite no securities fraud case where similar expert analysis was performed or accepted, much less a RICO case. In fact, in *Laydon*, the plaintiffs provided "statistical analyses" allegedly showing "a correlation between the prices of the contracts in which Plaintiff . . . traded and the manipulated benchmark rates," but that was still not "a sufficiently direct connection between the alleged misconduct and the injury," because of all the intervening market forces. *Laydon,* 2015 WL 1515487, at *10. As in *Laydon*, the causal connection here is simply too indirect, regardless of any alleged correlation Plaintiffs or their experts may put forward. Plaintiffs' opposition brief never meaningfully addresses this problem, instead proceeding on the baseless assumption that "Defendants' conspiracy created the largest asset bubble in history." (Opp. 11.) The audacity of that statement is a telling indicator that Plaintiffs are advancing an elastic concept of causation, totally at odds with the stringent legal requirements under RICO.[5]

---

[5] A related problem is that Plaintiffs ignore the more "immediate victim[s]," who could sue under more "straightforward" theories. *Empire*, 902 F.3d at 141. Here, sellers of crypto assets who allegedly received "debased" USDT in exchange are far better suited to sue than Plaintiffs, because those sellers can measure their losses (if any) by reference to what they paid and what they received in return in the particular transaction. By contrast, Plaintiffs' theory would cover *every downstream purchaser*, regardless of what crypto asset was purchased and where, or how far removed from the initial transaction. One Plaintiff's purchase may be close in time on the same exchange and involve the same asset sold for the "debased" USDT; another may be months (or years) later, in a different asset on a different exchange. Avoiding the impossible parsing of cause-and-effect for circumstances like these is why RICO's direct injury requirement generally reaches the immediate victims only—and why the RICO claim here should be dismissed.

Plaintiffs cite no case that supports a different result. They cite *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 531 (2d Cir. 2020) (Opp. 44-45), but that case concerned whether there was sufficient injury for Article III standing, not RICO's more stringent standard. For Article III standing, a plaintiff need only show an injury that is "fairly traceable" to the defendant's conduct. *Id*. at 534. That standard "is lower than that of proximate cause," *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), and *a fortiori* lower than the RICO causation standard—which is nowhere mentioned in *Sonterra*. In fact, the *Sonterra* defendants, on remand, moved to dismiss the RICO claim because it failed to allege direct causation under RICO's stricter standards. *See* 15 Civ. 5844, ECF 525, at pp. 40-41 (S.D.N.Y. Oct. 9, 2020).[6]

**B.      Plaintiffs Fail to Plead Injury from the Investment of Racketeering Proceeds**

As a fallback, Plaintiffs raise an "investment injury" theory under 18 U.S.C. § 1962(a), which makes it unlawful for a person receiving "income derived, directly or indirectly, from a pattern of racketeering activity" to use those "proceeds" for the "acquisition of any interest in, or the establishment or operation of" a separate enterprise. *Id*. According to Plaintiffs, the "debased USDT constituted 'proceeds' of Defendants' wire fraud," and those proceeds were invested in other crypto assets, thereby harming Plaintiffs. (Opp. 52.)

There are least three independent reasons why the Court should reject this theory. First, the "direct" causation standards apply equally for investment injuries under § 1962(a), *see 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 544 n.12 (S.D.N.Y. 2014), and, for all the reasons above, Plaintiffs' alleged losses are too indirect for recovery.

---

[6] It is also puzzling for Plaintiffs to cite *Sonterra* because the Second Circuit, in addressing the lower Article III "fairly traceable" standard, highlighted causation allegations that are absent here. The *Sonterra* complaint listed "transactions in which Plaintiffs traded derivatives at unfavorable rates *on days when Defendants had manipulated Yen LIBOR to their own advantage*." 954 F.3d at *532 (emphasis added). Plaintiffs offer no such detail.

Second, the alleged "debased" USDT were not "proceeds" that were "derived" from "racketeering activity." 18 U.S.C. § 1962(a). This phrasing refers only to "income that the defendants would not have received 'but for' their racketeering conduct." *National Organization for Women, Inc. v. Scheidler*, 968 F.2d 612, 625 (7th Cir. 1992), *rev'd on other grounds*, 510 U.S. 249 (1994). The mere creation of USDT does not involve defrauding (or even interacting with) any third party and cannot be described as the "proceeds" or income "derived" from anything.

Consider, for example, *United States v. LaBrunerie*, 914 F. Supp. 340 (W.D. Mo. 1995), a case arising under the money laundering statute, which also requires proof of dealing in the "proceeds" of criminal activity. 18 U.S.C. § 1956(a)(1). The defendants in *LaBrunerie* bought a bank check that they intended to use to bribe a city councilman, but the court dismissed the money laundering charge because those funds did not qualify as "proceeds" of criminal activity. The "money they earmarked to pay to [the councilman] was in their control before" the unlawful activity; thus, "it was not money that came into their hands *because*" of the unlawful activity. 914 F. Supp. at 342 (emphasis added). The same is true here: the USDT at issue was under Defendants' control from the start. *See also United States v. Approximately 250 Documents*, No. 03 Civ. 8004, 2008 WL 4129814, at *2 (S.D.N.Y. Sept. 5, 2008) (forged documents are an instrumentality, not "proceeds," of crime).

Third, there is no separate "enterprise" into which the alleged proceeds were invested. It is well-settled that "[w]here investment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity"—and hence no § 1962(a) claim can proceed. *USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 331 (S.D.N.Y. 2003). For example, in *4 K & D Corp.*, a real estate business alleged that its competitor made "misrepresentations about [its]

17

auction results, sales statistics, and track records," to gain market share. 2 F. Supp. 3d at 534. The plaintiff alleged that the defendant used some of its fraudulent income to pay for referrals from Sotheby's. *Id*. This was not an "investment injury," however, because the plaintiff's injuries were not "caused specifically by the referral[s]," but instead were "caused by the alleged misrepresentations by the defendants, that is, the predicate acts of wire fraud." *Id*. at 544.

This last point is exactly what distinguishes this case from the primary case Plaintiffs rely upon: *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 327 (2d Cir. 2011) (cited Opp. 52-53). There, one retailer accused its competitor of not charging sales tax at one store location in Queens, and then "invest[ing] funds derived from [the] Queens store's cash-no-tax scheme to establish [a] store in the Bronx"—thereby "caus[ing] [the plaintiff] to lose a substantial amount of business at its Bronx store." *Id*. at 314. This fits comfortably within § 1962(a) because there was a separate enterprise (the Bronx store) into which the funds were invested, and that separate investment is what caused the plaintiff harm (losses at its own Bronx store). Nothing like that is alleged here.

## C.     Plaintiffs Fail to Adequately Plead Two Predicate Acts

Plaintiffs have failed, in multiple respects, to plead two predicate acts against each Defendant (*see* BT Br. 30-35), and nothing in Plaintiffs' opposition rescues the deficiencies.

**Wire Fraud**. Plaintiffs' core allegation of wire fraud is based on a series of wildly unreasonable inferences supposedly showing that USDT was unbacked, including that: (1) Plaintiffs rely on Tether's lack of access to correspondent banking, yet that accounts for only five months (April 1 to September 1, 2017) of the six years in question; (2) Plaintiffs grossly misread a financial document concerning a separate entity's *profits* as somehow indicating the size of Tether's USDT *reserves*; and (3) Plaintiffs rely principally on an academic article that was revised to concede that the alleged purchases propping up prices could have been made by "one large player." (BT Br. 28-30.) Rather than rebutting these points, Plaintiffs instead include only a

18

footnote stating that their "Complaint is replete" with enough allegations. (Opp. 42 n.21.)

Contrary to Plaintiffs' position, under the heightened standard for pleading fraud, the Court must "draw on its judicial experience and common sense" and consider whether the facts alleged suggest "alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). This is exactly the sort of case where Plaintiffs rely on unreasonable inferences that the Court can and should reject.

**Bank Fraud**. The same unreasonable inferences doom the bank fraud allegation. (BT Br. 31-33.) Moreover, Plaintiffs fail to plead how any bank was defrauded out of anything. While Plaintiffs argue that Bitfinex and Tether "directed customers to use accounts that had been fraudulently opened and maintained" (Opp. 62), there is no factual allegation that any bank faced the risk of loss. All Plaintiffs allege is that "contrary to the understanding of the banks," the accounts were used for crypto transactions that banks sought to avoid. (*Id*. at 60.) But causing victims to enter "into transactions that they otherwise would not have entered into, without proving that the ostensible victims would thereby have suffered some economic harm" is not criminal fraud. *United States v. Binday*, 804 F. 3d 558, 581 (2d Cir. 2015). Plaintiffs cite *United States v. Zarrab*, 15 Crim. 867, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) (cited Opp. 59-60), where the defendant evaded U.S. economic sanctions against Iran by hiding the true source of certain payments. Critically, the banks faced the risk of "massive fines and forfeiture" if they processed the transactions, and the court cited a real-world example where HSBC paid over $1 billion in fines for doing so. *Id*. at *14. Plaintiffs have not pleaded any facts to show the banks were exposed to any comparable genuine risk of loss.

In addition, the causal connection between this alleged racketeering activity and Plaintiffs' alleged losses is nonexistent. Whatever Crypto Capital or others may have said to banks has

nothing to do with the cryptocommodity prices paid by Plaintiffs. Defendants made this point in their moving papers, and Plaintiffs have no answer. (*Compare* BT Br. 32 *with* Opp. 59-62.)

**Money Laundering and Unlawful Money Transactions**. The lynchpin of Plaintiffs' theory is that "[a]ny additional USDT issued after the first 'unbacked' USDT was issued represents the ongoing 'proceeds' of Defendants' misrepresentations." (Opp. 55.) This is incorrect. For purposes of the money laundering statute, "'proceeds' are funds obtained from prior, separate criminal activity." *United States v. Savage*, 67 F.3d 1435, 1441 (9th Cir. 1995). That is why, for example, fake documents allegedly signed by President Kennedy are not themselves the "proceeds" of crime; they are the instrumentalities used to *generate* proceeds. *250 Documents*, 2008 WL 4129814, at *2. And that is why, as discussed, money set aside to bribe a politician is not itself the proceeds of a crime. *LaBrunerie*, 914 F. Supp. at 342. The same is true for the allegedly "debased" USDT.[7]

**Unlawful Money Transmitting**. Plaintiffs' allegations that Bitfinex and Tether operate an unlicensed money transmitting business rest solely on threadbare legal conclusions. (BT Br. 34-35.) Further, as Plaintiffs concede, two of the Defendants (one affiliated with Bitfinex and the other with Tether) *are* registered with FinCEN as money transmitters for activities in Wyoming. (Compl. ¶¶ 530, 532.) Trying to manufacture a claim from these facts, Plaintiffs speculate that, because the companies "have been involved in legal proceedings . . . in California and New York," Bitfinex and Tether must be transmitting money from other states. (Opp. 58-59.) This is exactly the sort of baseless guesswork that cannot sustain a Complaint.

Nor do Plaintiffs adequately allege that Bitfinex or Tether somehow aided and abetted any

---

[7] Plaintiffs do not dispute that the same grounds for rejecting the above predicate acts under 18 U.S.C. § 1956 (money laundering) are sufficient to reject their allegations of unlawful money transactions under 18 U.S.C. § 1957. (*Compare* BT Br. 34 *with* Opp. 54-62.)

bank fraud committed by Crypto Capital or Fowler. (BT Br. 32.) Plaintiffs argue that "Bitfinex and Tether knew about Crypto Capital and Fowler's bank fraud" (Opp. 61), but fail to specify *anything* Bitfinex or Tether did to provide the necessary "substantial assistance." *Williams v. Bank Leumi Tr. Co.*, No. 96 Civ. 6695, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997). Plaintiffs argue that Bitfinex and Tether were "central players in the alleged scheme" (Opp. 61), but those labels say nothing about what, if anything, Bitfinex or Tether actually *did* to assist Crypto Capital in defrauding a domestic bank. Nothing is alleged.

Finally, Plaintiffs have not pleaded any resulting harm. They allege that legitimate USDT redemptions "buttressed the illusion that USDT was backed." (Opp. 59.) But Plaintiffs do not allege that any U.S. bank accounts were used to do so. (BT Br. 32-33.) Regardless, nothing about such *bona fide* USDT purchases or redemptions injured *Plaintiffs*. That these transactions involving "*backed*" USDT somehow "buttressed" USDT does not turn them into a proximate cause of losses supposedly arising from issuance of *unbacked* USDT, and Plaintiffs cite no case adopting such a sweeping notion of causation.

## IV. THE COURT SHOULD DISMISS PLAINTIFFS' STATE LAW CLAIMS (COUNTS 11 AND 12)

### A. Plaintiffs Fail to State a Common Law Fraud Claim

Defendants' moving papers showed that Plaintiffs fail to adequately plead reliance, damages, and loss causation. (BT Br. at 36-38.) Plaintiffs do not show otherwise.

#### 1. Plaintiffs Fail to Plead Reliance

Defendants showed that Plaintiffs failed to allege that they made any specific purchases in reliance on Defendants' allegedly fraudulent statements. (BT Br. 36-37.) In opposition, Plaintiffs argue that, in manipulation cases, it suffices to "allege reliance on the integrity of the market." (Opp. 67.) Even assuming Plaintiffs have adequately alleged market manipulation—which, as shown above, they have not—this argument fails for three reasons.

First, Plaintiffs cannot rely upon an unpled claim. Plaintiffs' Complaint does not allege reliance on the integrity of the markets. Instead, it enumerates 11 supposedly false statements and alleges, in conclusory fashion, that "Plaintiffs reasonably relied on these false representations." (Compl. ¶¶ 574, 579.) A plaintiff "cannot amend its pleading through its opposition brief." *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010).

Second, even if Plaintiffs could so amend, the Complaint alleges the *opposite* of Plaintiffs' new claim. Rather than allege that crypto markets are "efficient" as required for a "fraud on the market" theory, Plaintiffs allege that they are "ripe for manipulation" because they are "volatile and lightly regulated." (Compl. ¶¶ 79, 83.) Plaintiffs cannot claim to have relied on the assumption of markets free from manipulation when they admittedly knew otherwise. *In re UBS Auction Rate Securities Litigation*, No. 08 Civ. 2967, 2010 WL 2541166, at *22 (S.D.N.Y. June 10, 2010) (no reliance on markets "free of the allegedly manipulative conduct" when the risk was known).

Third, neither the Second Circuit nor the New York state courts have recognized the "integrity-of-the-market" theory as satisfying the reliance element of common law fraud. To the contrary: the Second Circuit "repeatedly ha[s] refused to apply" its close analogue, the fraud-on-the-market theory, "to state common law cases." *Pennsylvania Public School Employees' Retirement System v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 121 (2d Cir. 2014). Similarly, in *Securities Investor Protection Corp. v. BDO Seidman*, LLP, 222 F.3d 63, 72 (2d Cir. 2000), the Second Circuit refused to recognize reliance "on the integrity of the regulatory process" as a substitute for actual reliance in common law fraud cases, because that theory was just a variant of the fraud-on-the-market theory. *Id.* at 72-73. Similarly, in *Pasternack v. Laboratory Corp. of Am. Holdings*, 27 N.Y.3d 817, 829 (2016), the Court of Appeals "decline[d] to extend the reliance element of fraud to a claim based on the reliance of a third party, rather than plaintiff." Yet that is

22

precisely what Plaintiffs now claim: they did not detrimentally rely on Defendants' alleged false statements, but instead were injured by *third parties'*—i.e., the *"market's"*—alleged reliance.[8]

### 2. Plaintiffs Fail to Plead Loss Causation or Damages

Defendants showed that Plaintiffs fail to plead any "actual pecuniary loss" or that their losses were "caused by the alleged misstatements." (BT Br. 37-38.) Plaintiffs respond that they "purchased crypto-commodities at artificially high prices and suffered losses when the bubble inflated by Defendants inevitably burst." (Opp. 68.) This does not suffice, for two reasons.

First, stripped of the conclusory claim to have "suffered losses," Plaintiffs nowhere allege that they sold any particular position at an "out of pocket" loss. *Facie Libre Assocs. I, LLC v SecondMarket Holdings Inc.*, 961 N.Y.S.2d 44, 45 (1st Dep't 2013) (dismissing claim because "plaintiffs failed to allege any out-of-pocket loss as a result of the subject transaction").

Second, Plaintiffs do not plead facts to connect any losses to the alleged wrongdoing. As the Supreme Court held in *Dura*, this typically requires a "corrective disclosure" exposing the fraud; otherwise, a plaintiff's investment losses may "reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations" or other factors that "taken separately or together account for some or all of" the loss. *Dura*, 544 at 343; *see also Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005) ("to establish loss causation, a plaintiff must allege . . . that the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security") (internal quotation marks and citation omitted; emphasis added); *Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgt. Co.*, 149 A.D.3d 146, 149 (1st Dep't 2017) (similar; citing *Lentell*). Plaintiffs, however, allege no such

---

[8] For the same reason, Plaintiffs' reliance on cases from this District purporting to eliminate any such personal reliance element—*Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 552 F. Supp. 332 (S.D.N.Y. 1982), and cases derived therefrom—is misplaced. *Minpeco* and its progeny address neither the controlling Second Circuit precedent cited above, nor *Pasternack*.

"corrective disclosure" or revelation of information allegedly concealed by Defendants that caused their alleged loss.[9] To the contrary: Plaintiffs allege only that the market reached its peak on December 17, 2017—and then crashed. (Compl. ¶¶ 94-95.) The Complaint contains no allegations connecting the crash to Defendants' alleged practices rather than market conditions. Plaintiffs allege Defendants' market manipulation scheme continued through at least December 2018. (Compl. ¶¶ 261-262.) As of December 2018, 72% of all tether issued were allegedly transferred, in furtherance of the market manipulation scheme, to Bittrex and Poloniex at the 1AA6 and 1J1d deposit addresses. (Compl. ¶¶ 261-262, 272 (chart overlaying USDT issuances).) However, the market is alleged to have crashed starting *December 18, 2017,* falling from its approximate $20,000 peak to a three-year low of $3,500 by December 2018. (Compl. at ¶¶ 94, 96, 98.) Tether continued to issue new USDT throughout the downturn, just as it had done on the way up, and so the notion that Defendants' conduct caused *either* the boom or the bust is implausible.

### B.    Plaintiffs' GBL § 349 Claim Should Be Dismissed

Defendants showed that Plaintiffs' GBL § 349 claim should be dismissed because Plaintiffs fail to allege consumer-oriented conduct or "direct" causation. (BT Br. 39-40.) Plaintiffs' opposition fails to rescue their claims.

On the first point, Plaintiffs claim that cryptocommodities have "multiple consumer-facing applications," (Opp. 71); *i.e.*, they can be used like money. But money is simply not a consumer good. Moreover, Plaintiffs nowhere allege that *they* use crypto-commodities in any consumer-like fashion. To the contrary, Plaintiffs describe themselves as "investors": "When the bubble burst, *investors like Plaintiffs* . . . sustained significant damages." (Opp. 1 (emphasis added).) As such,

---

[9] In response, Plaintiffs claim that this is an "evidentiary" issue. (Opp. 68.) As *Lentell* shows, it is not; it is a basic pleading requirement. 396 F.3d at 173; *see also Axar Master Fund, Ltd. v. Bedford*, 806 F. App'x. 35 (2d Cir. 2020) (dismissing common law fraud claim for failure to allege loss causation).

GBL § 349 is inapplicable. *Morris v. Gilbert*, 649 F. Supp. 1491, 1497 (E.D.N.Y. 1986); *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014).[10]

On the second point, Plaintiffs concede that, under *City of New York v. Smokes-Spirits.com, Inc.*, 12 N.Y.3d 616 (2009), § 349 does not reach indirect injuries. (Opp. 74.) Having so conceded, Plaintiffs seek to liken their case to *North State Autobahn v. Progressive Ins. Group Co.*, 953 N.Y.S.2d 96 (2d Dep't 2012). (Opp. 74-75.) But *North State* is inapposite. There, a car insurance company allegedly steered auto repair business from plaintiffs to their direct *competitors*—certain favored "DRP" shops—by mispresenting the "workmanship, price, timeliness of service, and character" of the plaintiffs' shops. *Id*. at 99. Plaintiff suffered direct injury because "customers were misled into taking their vehicles from the plaintiffs to competing repair shops." *Id.* at 105. Thus, "plaintiffs' alleged injury *did not require a subsequent consumer transaction*; rather, it was sustained when customers were unfairly induced into taking their vehicles from the plaintiffs' shop to a DRP shop." *Id.* (emphasis added). Plaintiffs allege nothing of the sort here. Plaintiffs suffered no injury whatsoever at the time Defendants allegedly used newly issued USDT to purchase bitcoin. Rather, a subsequent transaction was required for Plaintiffs' injury—namely, Plaintiffs' own subsequent bitcoin or other cryptocommodity purchases through a chain of countless intervening events. Hence, the alleged injury is indirect or derivative, not direct.

## CONCLUSION

For the foregoing reasons, and those in Defendants' moving papers, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice.

---

[10] Whether *unnamed* class members might use cryptocommodities differently does not matter. "It is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).

Dated: December 17, 2020

LAW OFFICES OF MICHAEL JASON LEE, APLC

*/s/ Michael Jason Lee*
Michael Jason Lee (admitted pro hac vice)
4660 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Tel : (858) 550-9984
Fax : (858) 550-9985

DILLON MILLER & AHUJA LLP

*/s/ Sunjina K. Ahuja*
Sunjina K. Ahuja (admitted *pro hac vice*)
Christopher J. Beal (admitted *pro hac vice*)
5872 Owens Ave, Suite 200
Carlsbad, CA 920008
Tel.: (858) 587-1800
Fax: (858) 587-2587

Respectfully Submitted,

WALDEN MACHT & HARAN LLP

*/s/ Jim Walden*
Jim Walden
Stephanie T. Levick
Daniel A. Cohen
One Battery Park Plaza, 34th Floor
New York, NY 10004
Tel: (212) 335-2030
Fax: (212) 335-2040

*Counsel for Defendants, iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Ludovicus Jan van der Velde, and Giancarlo Devasini*

26