UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No.: 1:19-cv-09236-KPF-SN |

# DEFENDANT PHILIP G. POTTER'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

WILLKIE FARR & GALLAGHER LLP
Charles D. Cording
787 Seventh Avenue
New York, NY  10019-6099
Tel.:  (212) 728-8000
Email:  CCording@willkie.com

*Attorney for Defendant Philip G. Potter*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii
PRELIMINARY STATEMENT ......................................................................................................... 1
ARGUMENT ........................................................................................................................................ 3
I     Plaintiffs Fail To Plead Antitrust Violations Against Mr. Potter........................................ 3
        A.     Plaintiffs Lack Antitrust Standing .............................................................................. 3
        B.     Plaintiffs Fail To Allege That Mr. Potter Has Monopoly Power In The Crypto-Commodities Market ............................................................................................... 3
        C.     Plaintiffs' Antitrust Claims Devolve Into Impermissible Group Pleading .............. 4
II    Plaintiffs Fail To Plead CEA Violations Against Mr. Potter ............................................... 5
        A.     Plaintiffs Fail To State A Claim For Market Manipulation ..................................... 5
        B.     The Principal Agent Liability And Aiding And Abetting Claims Fail .................... 7
III   Plaintiffs' RICO Claims Do Not Allege Any Predicate Acts Committed By Mr. Potter .... 8
IV   Plaintiffs Fail To Plead Common Law Fraud Against Mr. Potter ....................................... 9
V    Plaintiffs Fail To Plead A Violation Of GBL Section 349 Against Mr. Potter ................ 10
CONCLUSION ................................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abraham v. Am. Home Mortg. Servicing, Inc.*,
  947 F. Supp. 2d 222 (E.D.N.Y. 2013) ...................................................................................10

*In re Air Cargo Shipping Services Antitrust Litig.*,
  Nos. 06-MDL-1775 (JG)(VVP), 10-CV-639 (JG)(VVP), 2010 WL 10947344
  (E.D.N.Y. Sept. 22, 2010) ..................................................................................................4, 5

*In re Amaranth Nat. Gas Commodities Litig.*,
  612 F. Supp. 2d 376 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ..............................6

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ....................................................................................................7

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012) .......................................................................................4

*Cruz v. NYNEX Info. Res.*,
  263 A.D.2d 285, 703 N.Y.S.2d 103 (1st Dep't 2000) ...........................................................10

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ....................................................................................................9

*DeAngelis v. Corzine*,
  17 F. Supp. 3d 270 (S.D.N.Y. 2014) ................................................................................8, 10

*Eaves v. Designs for Fin., Inc.*,
  785 F. Supp. 2d 229 (S.D.N.Y. 2011) .....................................................................................9

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
  711 F.3d 68 (2d Cir. 2013) ......................................................................................................3

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ....................................................................................................3

*Gray v. Seaboard Sec., Inc.*,
  14 A.D.3d 852, 788 N.Y.S.2d 471 (3d Dep't 2005) ..............................................................10

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ....................................................................................................9

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986) ......................................................................................................9

*McEssy v. Gray*,
   No. 5:15-CV-1462 (DNH/TWD), 2016 WL 10518458 (N.D.N.Y. Aug. 11,
   2016) ..................................................................................................................................10

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   165 F. Supp. 3d 122 (S.D.N.Y. 2016)............................................................................3, 4

*Merrill Lynch, Pierce, Fenner & Smith v. Young*,
   No. 91 Civ. 2923 (CSH), 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) .......................................8

*Pludeman v. N. Leasing Sys., Inc.*,
   10 N.Y.3d 486, 890 N.E.2d 184, 860 N.Y.S.2d 422 (2008)........................................................9

*In re Rough Rice Commodity Litig.*,
   No. 11 C 18, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012)...............................................................6

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
   No. 97 CIV. 5499 (DNE), 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ....................................4

*In re Sotheby's Hldgs. Inc. Sec. Litig.*,
   No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..................................6

**Other Authorities**

Grace Caffyn, *Bitcoin Price Falls 14% Following Bitfinex "Flash Crash,"*
   BAYPAY FORUM (Aug. 19, 2015), https://www.baypayforum.com/blockchain-
   coins/bitcoin-price-falls-14-following-bitfinex-flash-crash ......................................................7

*WhalePool Interview: Bitfinex CSO Comments on Litigation Withdraw[a]l
   against Wells Fargo apr/2017*, YOUTUBE (Apr. 12, 2017),
   https://www.youtube.com/watch?v=6trVOpsoxfo ...................................................................7

Defendant Philip G. Potter respectfully submits this Reply Memorandum of Law in Further Support of his Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] To avoid duplicative arguments, Mr. Potter joins in the Reply Memorandum of Law in Further Support of the Motion to Dismiss filed by the Corporate Defendants [Dkt. 164].

## PRELIMINARY STATEMENT

As in the Complaint, Mr. Potter is, at best, an afterthought in Plaintiffs' Consolidated Opposition Brief [Dkt. 154] (the "Opposition" or "Opp. Br."). Indeed, the Opposition highlights the deficiencies of Plaintiffs' "group pleading." Having filed an omnibus Opposition directed primarily at other Defendants, Plaintiffs fail to address various arguments advanced by Mr. Potter in favor of dismissal. Instead, they seek to connect him to the alleged market manipulation conspiracy, giving rise to twelve different antitrust, Commodity Exchange Act ("CEA"), RICO, and fraud causes of action against him, based primarily on the fact that he served as Chief Strategy Officer ("CSO") of Bitfinex and Tether, even though he left that position in February 2018, months before the alleged conspiracy came to a head. Because the allegations directed at Mr. Potter are insufficient to state a claim against him, the Complaint should be dismissed as to Mr. Potter.

In distinctly rote fashion, Plaintiffs respond to Mr. Potter's arguments for dismissal by repeating, in whole or in part, the same litany of allegations from the Complaint: (1) Mr. Potter was a "senior corporate officer" of Bitfinex and Tether; (2) he remains a shareholder of certain Bitfinex corporate affiliates; (3) Mr. Potter "incorporated" a number of Bitfinex and Tether entities; (4) he helped develop the Bitfinex platform to make it "prone to manipulation"; (5) he helped conceal "Bitfinex and Tether's true relationship"; and (6) he served as an "architect" of Tether's "shadow-banking scheme." Opp. Br. at 31, 36, 37, 63, 69–71.

---

[1] Capitalized terms not defined herein shall have the same meanings ascribed to them in Mr. Potter's Opening Brief in Support of his Motion to Dismiss [Dkt. 145] ("Br.").

1

The short answer to the Opposition is that none of these allegations, even taken as true, support a plausible inference of anticompetitive, manipulative, or fraudulent conduct on the part of Mr. Potter.  To be sure, he was a former Bitfinex and Tether executive (and current shareholder), but Second Circuit law makes clear that no culpable inference can be drawn from his corporate position.  The specific acts cited by Plaintiffs—such as incorporating corporate entities or designing technology platforms—are routine corporate functions that simply follow from Mr. Potter's position; how they evidence his culpable participation in a sprawling market manipulation conspiracy is never explained by Plaintiffs.  Likewise, Plaintiffs offer no response to his argument that the alleged concealment of Bitfinex and Tether's "true relationship" is wholly irrelevant because it did not constitute market manipulation.  As to the "shadow-banking" allegations, Mr. Potter demonstrated that they bear no causal relation to the alleged harm suffered by Plaintiffs.  Plaintiffs' response—that this implicates disputed fact issues—is no response at all because, as pled, the alleged money laundering did not give rise to any of Plaintiffs' alleged losses.

By contrast, there are no allegations here that Mr. Potter misrepresented the "1:1 backing" of USDT, the lynchpin of the alleged market manipulation scheme.  Nor, for that matter, are there allegations that Mr. Potter engaged in anti-competitive conduct, such as agreeing to restrain trade, manipulating or even interacting with any of the Plaintiffs, or engaging in the predicate acts for the alleged RICO violations (other than through the deeply confused "shadow-banking" allegations).  Simply put, Plaintiffs cannot fill in these very substantial gaps in their pleading by lumping Mr. Potter together with 13 other defendants and arguing that, assuming this conspiracy existed, he must have been part of it by virtue of his corporate position.

For these reasons and the reasons discussed below, this Court should therefore dismiss, with prejudice, all counts alleged against Mr. Potter.

**ARGUMENT**

**I        Plaintiffs Fail To Plead Antitrust Violations Against Mr. Potter**

      A.        <u>Plaintiffs Lack Antitrust Standing</u>

Plaintiffs lack standing due to their failure to allege antitrust injury. In their Opposition, Plaintiffs cite *Gelboim v. Bank of America Corp.* to support the argument that a consumer suffers an antitrust injury whenever she pays a higher price because of price fixing. 823 F.3d 759, 777 (2d Cir. 2016). In *Gelboim*, plaintiffs alleged that defendant-banks colluded to depress LIBOR by violating the rate-setting rules, and that the payout associated with various financial instruments fell below what it would have been in the absence of collusion, causing injury to plaintiffs. *Id.* at 765. But the price fixing allegations were substantiated with statistics compiled by the DOJ, and many allegations followed from evidence collected in governmental investigations, unearthing "numerous[] emails, communications, and documents." *Id.* at 767. Here, the allegations against Mr. Potter are different in kind and conclusory, and they do not facially link him to an antitrust conspiracy. In particular, Plaintiffs do not plead how their alleged injury of paying inflated prices for crypto assets "flows from that which makes . . . [Mr. Potter's] acts unlawful." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (no injury where bid-rigging scheme was not unlawful) (internal quotation omitted). No act alleged against Mr. Potter—from incorporating entities to serving as CSO—can be said to be unlawful or caused inflated prices.

      B.        <u>Plaintiffs Fail To Allege That Mr. Potter Has Monopoly Power In The Crypto-Commodities Market</u>

Nowhere do Plaintiffs allege that Mr. Potter possessed, let alone unlawfully acquired, monopoly power to prevent competitors from issuing stablecoins or to restrict competition. Plaintiffs again rely upon *Merced Irrigation District v. Barclays Bank PLC*, 165 F. Supp. 3d 122 (S.D.N.Y. 2016). There, however, the antitrust claims were alleged against only a corporate

defendant, Barclays. The plaintiff sufficiently pled Barclays' ability to fix prices, in part, because the plaintiff attached a report from the Federal Energy Regulatory Commission, which concluded that "Barclays manipulated the ICE Daily Index Prices during 655 product days over 35 product months." *Id.* at 142; *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 52 (S.D.N.Y. 2012) (finding direct evidence of monopoly power by relying in part on an action brought by the CFTC against the defendant). Here, Plaintiffs do not rely on any such extrinsic evidence against Mr. Potter; instead, they offer blanket allegations that Mr. Potter manipulated or conspired to inflate crypto-commodity prices. *See* Opp. Br. at 13–16.

      C.      <u>Plaintiffs' Antitrust Claims Devolve Into Impermissible Group Pleading</u>

The Complaint is silent as to any agreement between Mr. Potter and the other Defendants to restrain trade. The Opposition instead analogizes to *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.* to argue that Mr. Potter's former status as CSO is sufficient to tie him to the antitrust violations. Opp. Br. at 24. In *Six West Retail Acquisition, Inc.*, top Sony executives were held individually liable for antitrust violations "because of the influence they exerted in effecting Sony's corporate policy." No. 97 CIV. 5499 (DNE), 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000). But the allegations specifically detailed how Sony executives interfered with pre-contractual relationships in an effort to reduce competition. *Id.* at *31, 36. The plaintiffs also described letters sent by Sony's President, one of which allegedly "constitute[d] an admission of block-booking agreements between Sony and various distributors." *Id.* at *10. None of the allegations against Mr. Potter, by contrast, tie him to any anti-competitive conduct.

Plaintiffs also rely on *In re Air Cargo Shipping Services Antitrust Litig.* to argue that the lack of allegations directed at Mr. Potter is irrelevant because the Complaint, taken as a whole, permits the reasonable inference that he joined the conspiracy. Opp. Br. at 24. But even under this standard, Plaintiffs fail to allege how the conduct attributed to Mr. Potter resulted in an antitrust

4

violation.  Rather, Plaintiffs employ a "lump" pleading approach, levying allegations against Mr. Potter and his "named co-conspirators" without specifying exactly who did what and when—the very pleading that *In re Air Cargo* denounced.  Nos. 06-MDL-1775 (JG)(VVP), 10-CV-639 (JG)(VVP), 2010 WL 10947344, at *8 (E.D.N.Y. Sept. 22, 2010) ("If the entirety of the plaintiffs' allegations was that the defendants conspired to restrain trade and violate the Sherman Act, that would be the sort of conclusory allegation that falls short under *Twombly* and *Iqbal* . . . .").

To wit, in that case, the court acknowledged that the allegations against individual defendant Sanfilippo were described in "general terms" and questioned whether they sufficed to give rise to individual liability under the Sherman Act.  *Id.* at *11.  Even so, those allegations were far more detailed than the ones against Mr. Potter because they "establish[ed] who Sanfilippo spoke with, what was discussed and agreed upon, and provide[d] a general time frame" relating to the alleged conspiracy to fix commercial air freight prices.  *Id*.  Furthermore, Sanfilippo was alleged to have participated in conversations with defendants who already pleaded guilty to criminal charges.  *See id*. at *7, *11.  Here, Mr. Potter is lumped with the other "Individual Defendants" under the antitrust causes of action, Complaint at ¶¶ 389–430, without any specific allegations stating what Mr. Potter did or what role he played.

**II      Plaintiffs Fail To Plead CEA Violations Against Mr. Potter[2]**

   A. <u>Plaintiffs Fail To State A Claim For Market Manipulation</u>

Plaintiffs fail to address nearly all of Mr. Potter's arguments concerning market manipulation, including:  (1) how his alleged participation in concealing the relationship between Bitfinex and Tether constituted market manipulation; (2) how Mr. Potter, as CSO, was able to

---

[2] Even to the extent that a single purchase of bitcoin futures by Plaintiff Goldshtein shortly before Mr. Potter departed the companies suffices to confer standing, Br. at 7–8, Plaintiffs nevertheless lack standing under the CEA for the reasons articulated in the Corporate Defendants' Reply Brief.

control market prices or manipulate the market; or (3) how his alleged market manipulation resulted in a transaction that lost value for the Plaintiffs. Br. at 8–10. With respect to the arguments that Plaintiffs do address, they still fail to allege how Mr. Potter's conduct constituted market manipulation. For example, Plaintiffs assert that Mr. Potter's April 2017 WhalePool interview comments "describe[d] Tether and Bitfinex's illicit attempts to access correspondent banking." Opp. Br. at 31 n.17. As explained before, Mr. Potter's comments focused on the difficulties cryptocurrency companies faced in accessing correspondent banks. Br. at 8–9. Fatally, Plaintiffs never explain how these statements had anything to do with the market manipulation scheme.

Alleging that Mr. Potter is a former CSO does not establish an ability to influence prices or engage in market manipulation. *See In re Rough Rice Commodity Litig.*, No. 11 C 18, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012) (dismissing market manipulation claim where plaintiffs alleged that defendants, all of whom occupied executive roles, had "'ample ability to cause and did cause artificial prices'"); *In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 388–89 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013) (rejecting argument that defendant was liable for market manipulation by virtue of being CEO); *In re Sotheby's Hldgs. Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("[B]oilerplate allegations . . . based solely on [] board membership or executive positions are insufficient to plead scienter"). Indeed, the *In re Amaranth* court dismissed the primary CEA violation against the defendant-CEO, despite allegations that highlighted his responsibilities, such as ratifying positions and trading strategies, and that referenced documents concerning the CEO and other defendants. *See* 612 F. Supp. 2d at 389. Here, Plaintiffs' allegations are far less concrete. Plaintiffs cannot solely rely on Mr. Potter's former corporate role to allege market manipulation against him.

6

Plaintiffs claim Mr. Potter concealed the links between Bitfinex and Tether before the corporate relationship was exposed following the release of the Paradise Papers in November 2017.  Complaint at ¶ 156.  But as early as 2015, Tether's website listed Mr. Potter as an advisor, *id.* at ¶ 155, and public reporting from August of that year noted his affiliation with Bitfinex.[3]  Indeed, further underscoring that the links between Bitfinex and Tether were well-known, the April 12, 2017 WhalePool interview, cited by Plaintiffs in the Complaint, was posted on YouTube and includes instances underscoring Mr. Potter's involvement in Bitfinex and Tether as well as the connection between the two entities. [4]  And another YouTube interview cited by Plaintiffs in the Complaint, dated April 24, 2017, listed Mr. Potter's affiliation with both companies **in the very title of the interview**, months before the Paradise Papers leaked.  *Id.* at ¶ 396 n.196.  Finally, Plaintiffs argue that Mr. Potter participated in a "shadow-banking scheme," citing Complaint at ¶ 219–58.  Opp. Br. at 31.  Yet Mr. Potter is never mentioned in those paragraphs.

B.     The Principal Agent Liability And Aiding And Abetting Claims Fail

Plaintiffs identify four acts that, they argue, suffice to allege that Mr. Potter aided and abetted the market manipulation scheme.  Each fails.  First, the act of incorporating certain entities is insufficient to allege aiding and abetting.  Second, Plaintiffs point to Mr. Potter's April 2017 interview wherein he discussed Bitfinex's plans to create a "private market for the equity [shareholders] to trade among themselves."  Complaint at ¶ 144.  This statement fails to

---

[3] *See* Grace Caffyn, *Bitcoin Price Falls 14% Following Bitfinex "Flash Crash,"* BAYPAY FORUM (Aug. 19, 2015), https://www.baypayforum.com/blockchain-coins/bitcoin-price-falls-14-following-bitfinex-flash-crash (discussing a WhalePool interview with Bitfinex's Phil Potter).

[4] *WhalePool Interview:  Bitfinex CSO Comments on Litigation Withdraw[a]l against Wells Fargo apr/2017,* YOUTUBE (Apr. 12, 2017), https://www.youtube.com/watch?v=6trVOpsoxfo.  In the interview, Mr. Potter commented on the relationship between Bitfinex and Taiwan before mentioning that Tether was involved in a project with the Taiwanese government.  *Id.* at 16:52–17:07.  Later, Mr. Potter made arrangements to have an interviewer's Tether account verified.  *Id.* at 17:07–18:00.  Judicial notice of the interview is permitted because it was cited and relied upon in the Complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

demonstrate how he made the Bitfinex platform prone to manipulation. Third, Plaintiffs allege that Mr. Potter assisted in concealing Bitfinex and Tether's true relationship, citing Complaint at ¶¶ 153–56. Yet these paragraphs do not show that the relationship was intentionally concealed, nor show Mr. Potter's role. Fourth, Plaintiffs claim, without any support, that Mr. Potter aided a "shadow-banking scheme." Plaintiffs cite an October 15, 2018 chat where Devasini asks Crypto Capital for funds, *id.* at ¶¶ 250, 362, but that chat postdates Mr. Potter's departure by 8 months.

## III    Plaintiffs' RICO Claims Do Not Allege Any Predicate Acts Committed By Mr. Potter

Plaintiffs assert that Mr. Potter's position as CSO is sufficient to allege that he engaged in the predicate acts of wire fraud and money laundering.[5] Opp. Br. at 63. Yet, nowhere do Plaintiffs allege the "interstate wire transportation of any communication by [Mr. Potter]" nor do they "allege facts showing the circumstances under which [Mr. Potter] caused any of the listed communications to be transmitted by third parties." *Merrill Lynch, Pierce, Fenner & Smith v. Young*, No. 91 Civ. 2923 (CSH), 1994 WL 88129, at *23 (S.D.N.Y. Mar. 15, 1994). Some of the misrepresentations identified were posted by Bitfinex or Tether on their websites. However, as *DeAngelis v. Corzine* acknowledged, "it is far from obvious that senior corporate officers would be involved in drafting text for a corporate website." 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (quotations omitted). Moreover, several of the misrepresentations were made *after* Mr. Potter stepped down as CSO. None of the alleged misrepresentations were "directly or foreseeably caused by [Mr. Potter] in furtherance of the scheme" nor on their face implicate him. *See Merrill Lynch, Pierce, Fenner & Smith*, 1994 WL 88129, at *25 Overall, Plaintiffs cannot allege the predicate act of wire fraud. Additionally, for the reasons stated in Mr. Potter's Opening Brief, Plaintiffs' allegation of money laundering must also fail. Br. at 13–14.

---

[5] Plaintiffs do not address Mr. Potter's specific arguments regarding (1) engaging in an unlicensed money transmitting business, (2) unlawful money transactions, and (3) bank fraud. Br. at 12, 14.

**IV      Plaintiffs Fail To Plead Common Law Fraud Against Mr. Potter**

Plaintiffs attempt to evade Rule 9(b)'s heightened pleading by focusing on *Pludeman v. N. Leasing Sys., Inc.*, and arguing that the Complaint gives rise to a "reasonable inference" that Mr. Potter "knew of and/or [was] involved in the fraud" by virtue of being CSO. 10 N.Y.3d 486, 493, 890 N.E.2d 184, 188, 860 N.Y.S.2d 422, 426 (2008). Yet, under *Pludeman*, specificity is still required: "[W]here a cause of action . . . is based upon fraud, 'the circumstances constituting the wrong shall be stated in detail.'" *Id.* at 491, 890 N.E.2d at 189, 860 N.Y.S.2d at 427 (quoting CPLR 3016(b)). There, plaintiffs alleged that the corporation defrauded them into signing a one-page contract, which in reality contained three additional pages. *See id*. 489–90, 890 N.E.2d at 185, 860 N.Y.S.2d at 423. Here, there was no contractual relationship, let alone any interaction, between Plaintiffs and Mr. Potter. *Pludeman* does not override Second Circuit precedent on Rule 9(b) pleading. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) ("[T]o comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent") (quotations omitted). There are virtually no allegations where Mr. Potter is not lumped in with others, which is prohibited by Rule 9(b). *See Luce v. Edelstein*, 802 F.2d 49, 54–55 (2d Cir. 1986); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 247 (S.D.N.Y. 2011). Plaintiffs use *In re DDAVP Direct Purchaser Antitrust Litig.*, Opp. Br. at 70, to argue that "Rule 9(b) requires only the *circumstances* of fraud to be stated with particularity" and that Mr. Potter's role as CSO is a sufficient circumstance to allege his knowledge of, and participation in, the fraud. 585 F.3d 677, 695 (2d Cir. 2009). There, the allegations described specific conduct by the defendant drug company, giving rise to a plausible inference of knowledge and liability. *Id.* Here, Plaintiffs have not alleged conduct by Mr. Potter suggesting knowledge, nor conduct upon which Plaintiffs relied that caused them injury.

9

**V       Plaintiffs Fail To Plead A Violation Of GBL Section 349 Against Mr. Potter**

Cryptocommodities are more akin to securities than to the "vehicles, appliances or groceries" identified in *Gray v. Seaboard Sec., Inc.*, 14 A.D.3d 852, 853, 788 N.Y.S.2d 471, 472 (3d Dep't 2005); *see also Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 289–90, 703 N.Y.S.2d 103, 106 (1st Dep't 2000) (noting that Section 349 provides relief where the goods or services are primarily for personal, family, or household purposes).  Plaintiffs concede that cryptocommodities are complex financial instruments and analogize them to securities.  Complaint at ¶ 105.  In *McEssy v. Gray*, the court dismissed Section 349 claims involving securities in part because they "are subject to pervasive federal regulation."  No. 5:15-CV-1462 (DNH/TWD), 2016 WL 10518458, at *14 (N.D.N.Y. Aug. 11, 2016).   There is a growing regulatory body overseeing cryptocommodities, such as the CFTC and NYDFS.  *See DeAngelis*, 17 F. Supp. 3d at 284 ("[T]he commodities markets, like the securities markets, are subject to federal oversight and regulation."). Indeed, Plaintiffs struggle to distinguish *DeAngelis*, where the court was "not persuaded that commodities investments constitute consumer activity as described in § 349."  *Id.* at 285.  Lastly, even if cryptocommodities were included under Section 349's purview, Plaintiffs have still failed to allege how any deceptive practice by Mr. Potter caused them injury.  *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 234–35 (E.D.N.Y. 2013).

## CONCLUSION

For the foregoing reasons, and for the reasons previously stated in his Opening Brief, Mr. Potter respectfully requests that this Court dismiss, with prejudice, all counts alleged against him in the Complaint.

Respectfully submitted,

Dated:  December 17, 2020
New York, New York

**WILLKIE FARR & GALLAGHER LLP**

/ s / *Charles D. Cording*
Charles D. Cording
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019-6099
Tel.:  (212) 728-8000
Email:  CCording@willkie.com

*Attorney for Defendant Philip G. Potter*

11