UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TETHER AND BITFINEX CRYPTO ASSET LITIGATION

Index No. 1:19-cv-09236-KPF

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# THE EXCHANGE DEFENDANTS' MOTION TO DISMISS

Dated: December 17, 2020

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000

MCNAUL EBEL NAWROT &
HELGREN PLLC
600 University Street, Suite 2700
Seattle, WA 98101
Telephone: (206) 467-1816

*Attorneys for Bittrex, Inc.*

NELSON MULLINS RILEY &
SCARBOROUGH LLP
One Financial Center 35th Floor
Boston, MA 02111
Telephone: (617) 217-4700

NELSON MULLINS RILEY &
SCARBOROUGH LLP
280 Park Avenue
15th Floor, West
New York, New York 10017
Telephone: (646) 428-2600

*Attorneys for Poloniex, LLC*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .................................................................................................................................. 1

    I.    All claims against the Exchange Defendants fail because the CAC does not plausibly plead an agreement to manipulate cryptocurrency trading. ............. 1

    II.    The Sherman Act claims against the Exchange Defendants should be dismissed. ............................................................................................................... 3

    III.    The CEA claims against the Exchange Defendants should be dismissed. ............ 6

        A.    The statute of limitations bars Plaintiffs' CEA claims. ............................. 6

        B.    Plaintiffs' speculative damages are insufficient. ........................................ 6

        C.    Plaintiffs do not adequately plead a manipulation claim. .......................... 7

        D.    Plaintiffs do not plead price manipulation. ................................................ 9

    IV.    The RICO claims against the Exchange Defendants should be dismissed. ............ 9

CONCLUSION ............................................................................................................................. 10

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013)......................................................................................................9

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)......................................................................................................8

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)........................................................................................................5

*GAMCO Inv., Inc. v. Vivendi, S.A.*,
    927 F. Supp. 2d 88 (S.D.N.Y. 2013)........................................................................................8

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)......................................................................................................4

*Grinsphun v. N. Am. Title Co.*,
    2015 WL 1516608 (S.D.N.Y. Mar. 31, 2015) .........................................................................7

*Harry v. Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018)......................................................................................................6

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990)......................................................................................................10

*Kaplan v. New York State Dep't of Labor*,
    2019 WL 3252911 (S.D.N.Y. July 19, 2019) .........................................................................7

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d. Cir. 2005).....................................................................................................6

*In re LIBOR-Based Fin. Instr. Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)......................................................................................7

*Morin v. Trupin*,
    711 F. Supp. 97 (S.D.N.Y. 1989)............................................................................................10

*Staehr v. Hartford Fin. Serv. Grp. Inc.*,
    547 F.3d 406 (2d Cir. 2008)......................................................................................................6

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
    2018 WL 6322024 (S.D.N.Y. Nov. 18, 2018) .........................................................................9

*Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*,
    857 F.2d 55 (2d Cir. 1988)..................................................................................................5

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)................................................................................................9

## Other Authorities

John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (Oct. 28, 2019),
    https://ssrn.com/ abstract=3195066 ........................................................................................3

**PRELIMINARY STATEMENT**

Plaintiffs' 84-page Opposition follows a pattern: refer to allegations of bad conduct by "Defendants" and then, on occasion, mention an innocuous fact about the Exchange Defendants to justify naming them as Defendants. But the serious claims Plaintiffs assert against the Exchange Defendants—accusing them of violating the Sherman Act, the Commodity Exchange Act, and RICO—require far more to survive a motion to dismiss. Plaintiffs must plead facts that yield a plausible inference that the Exchange Defendants intended, and agreed, to harm competition and manipulate the cryptocurrency markets. They have not done so.

Plaintiffs' case against the Exchange Defendants rests on the notion that *other* Defendants traded on their exchanges to engage in market manipulation. And Plaintiffs' allegations about the Exchange Defendants merely confirm that they did, in fact, operate their trading platforms. They allowed customers to open accounts, they allowed customers to make large transfers of cryptocurrencies—including USDT—to and from their accounts repeatedly using the same address, and they profited from such trading because they earn commissions on trades. Plaintiffs do not contend that the Exchange Defendants themselves engaged in market manipulation, or even traded cryptocurrencies for their own accounts. Instead Plaintiffs say that the Exchange Defendants must have been in on it, because it happened on their exchanges. That is not enough. The Complaint should be dismissed as to the Exchange Defendants.

**ARGUMENT**

**I.   All claims against the Exchange Defendants fail because the CAC does not plausibly plead an agreement to manipulate cryptocurrency trading.**

As the Exchange Defendants explained in their opening brief, all of the claims against them rest on two conclusory allegations: (i) Bitfinex owned or controlled the Accounts, and (ii) the Exchange Defendants knew that Bitfinex was using the Accounts to manipulate the

crypto market and therefore must have agreed to it.  (*See* Mem. at 4–8.)[1]  The Opposition does not deny this.  Nor does it deny that these allegations are speculative inferences Plaintiffs want the Court to draw from trading in the Accounts.  Given the paucity of supporting fact allegations in the CAC—some of which Plaintiffs have abandoned (*see* Opp. at 9, n.2) after the Exchange Defendants presented evidence to the contrary—those inferences are not plausible.  Plaintiffs' claims against the Exchange Defendants should be dismissed for this reason alone.

First, Plaintiffs do not address the Exchange Defendants' argument that there is no basis to infer that Bitfinex owned or controlled the Accounts.  Defendants explained that large USDT transfers from the Bitfinex exchange to the Accounts says nothing about the ownership of the Accounts.  (Mem. at 5.)  Plaintiffs offer no response and do not point to any facts suggesting that Bitfinex itself effectuated the transfers.  Plaintiffs' allegation that only Bitfinex would have been permitted to use the same deposit address for multiple transfers is just plain wrong.  (*See* Mem. at 5–6 (citing Exchange websites explaining how any customer can use a repeat address).)  The Opposition repeats the allegation, without acknowledging the public facts proving otherwise.  (*See* Opp. at 9.)  And in response to the Exchange Defendants' showing the falsity of Plaintiffs' allegation that Bitfinex must have owned or controlled the Accounts because the USDT transfers to them occurred early (Mem. at 6), Plaintiffs withdrew the allegation (Opp. at 9, n.2).  Plaintiffs do not point to any other basis to infer that Bitfinex owned or controlled the Accounts.

Second, even if Bitfinex owned or controlled the Accounts, Plaintiffs have not pleaded a basis to infer that the Exchange Defendants *knew* that Bitfinex was using the Accounts for market manipulation, much less *agreed* to it.  Plaintiffs do not, for example, dispute that they

---

[1] The Exchange Defendants use the same defined terms and citing conventions as in their opening brief, which is cited as "Mem."  Plaintiffs' opposition is cited as "Opp."

have not pleaded any facts suggesting that the Exchange Defendants' know-your-customer ("KYC") documentation linked the Accounts to Bitfinex. (*See* Mem. at 6.) The Opposition likewise does not mention the "Paradise Papers," after the Exchange Defendants showed that those papers did not suggest that the Exchange Defendants knew about Bitfinex's alleged manipulation. (*See id.* at 7.) And Plaintiffs have no answer to the Exchange Defendants' observation that because the cited experts spent years analyzing data to reach their conclusion, any inference that the Exchange Defendants must have figured it out themselves is untenable. (*See id.* at 7–8.) Nor do Plaintiffs even address the undisputed fact that the Revised Griffin Article concluded that the transfers and trading pattern are equally consistent with one large trader exchanging USDT for Bitcoin. (*See id.* at 7 (discussing John M. Griffin & Amin Shams, *Is Bitcoin Really Un-Tethered?* (Oct. 28, 2019), https://ssrn.com/ abstract=3195066).) That expert ambiguity precludes a reasonable inference from the facts that the Exchange Defendants *must have* known about it and therefore *must have* been in on it.

## II. The Sherman Act claims against the Exchange Defendants should be dismissed.

Even if Plaintiffs could plausibly allege that the Exchange Defendants knew that Bitfinex controlled the Accounts and was using them to manipulate the crypto market, the Sherman Act claims against the Exchange Defendants still fail because knowledge is not enough: Plaintiffs must show that those Defendants entered into *an agreement to restrain trade*. (*See* Mem. at 8.)

Plaintiffs do not dispute this burden or that they have not pleaded direct evidence of such an agreement.[2] They instead point to CAC allegations they claim provide circumstantial

---

[2] Plaintiffs trumpet (Opp. at 23) their allegations of conversations between Devasini (Bitfinex's CFO) and Crypto Capital (Bitfinex's financial institution), but cannot dispute that there is no alleged connection between them and the Exchange Defendants.

3

evidence that the Exchange Defendants entered into an agreement.  (*See* Opp. at 20–21.)[3]  But most of these paragraphs do not even mention one of the Exchange Defendants or the Accounts.  Plaintiffs do not allege, for example, that the Exchange Defendants "work[ed] with Crypto Capital and Fowler to mask Tether's inadequate reserves," did anything "to quell the market's liquidity concerns," or "begged for unlawful access to capital."  (Opp. at 9.)  Nor do they allege that the Exchange Defendants "were trading USDT for crypto-commodities" (*id.* at 10), as opposed to merely offering a marketplace for customers to do so.  (*See id.* (arguing that "*Defendants* designed *their* trades to keep crypto-commodity prices up . . . [and] transferred ten times as much USDT to Bittrex and Poloniex," i.e., that the Exchange Defendants *received* transfers from *other* Defendants doing the trading).)  Indeed, the only *fact* allegations found in the cited paragraphs that even mention the Exchange Defendants merely note that they allowed USDT to be traded on their exchanges, including through the identified Accounts, and earned commissions from such trades.  (*See, e.g.*, CAC ¶¶ 165–67 (alleging USDT traded on Poloniex), 173–74 (alleging USDT traded on Bittrex), 205–07 (alleging large USDT transfers to Accounts), 339–40 (alleging commissions and increased trading volume).)  In other words, all Plaintiffs have alleged is that the Exchange Defendants operated a marketplace in which market participants might on occasion break the law.  (*See* CAC ¶ 331 (alleging that "[b]ecause it happened on their exchanges, Bittrex and Poloniex also knew" about the Tether Defendants' alleged unlawful conduct).)  If such allegations were enough, exchanges would be strictly liable for market manipulation on their exchanges.  They are not.

---

[3] Plaintiffs argue that *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), supports their claim, but there the plaintiffs had alleged, among other things, communications among the defendants essentially admitting to being part of a cartel.  *See id.* at 766 n.5.  Here Plaintiffs make no such detailed allegations about the Exchange Defendants.

Lacking allegations against the Exchange Defendants, Plaintiffs knock down a strawman: that the Exchange Defendants have argued that "Plaintiffs must rule out all possible innocent explanations of Defendants' conduct." (Opp. at 22.) That is of course not the law—or the argument. The Exchange Defendants argued (Mem. at 11–12), as the Second Circuit requires, that Plaintiffs must plead facts that are not only "consistent with an unlawful agreement" but also sufficient to "suggest that an agreement to engage in anticompetitive conduct was made." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). They have not done so.

Plaintiffs next point to their allegations of "expert analysis." (Opp. at 23.) But as they themselves put it, their expert analysis shows only "that crypto-commodity trades on Bittrex and Poloniex moved in tandem with new issuances of [allegedly] debased USDT and that those trades were strategically timed." (*Id.*) In other words, it suggests strategic trading—which of course is not illegal—and concludes only that such trading might have occurred on the Bittrex and Poloniex exchanges, not that the Exchange Defendants engaged in or condoned it.

Moreover, to state a claim under the Sherman Act, Plaintiffs must plead that the Exchange Defendants entered into an agreement *to restrain trade*. Plaintiffs' allegations that the Exchange Defendants "agreed" to allow customers to trade on their exchanges and such customers engaged in anticompetitive conduct are not enough—the Exchange Defendants themselves must have agreed to harm competition. This makes Plaintiffs' citation (Opp. at 18) to *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55 (2d Cir. 1988), inapposite. As Plaintiffs put it, *Volvo* stands for the proposition that "anticompetitive conduct can support [an] inference of specific intent to monopolize" (Opp. at 18), but Plaintiffs have not pleaded that the Exchange Defendants engaged in conduct to harm competition *at all*. Plaintiffs try to overcome the implausibility of the Exchange Defendants

5

conspiring to give their competitor a monopoly (*see* Mem. at 12) by noting that the Exchange Defendants benefited in the short term from increased traffic and commissions (Opp. at 18), but cannot explain why a rational actor would take such temporary gains to destroy their exchanges—by giving their competitor a monopoly—in the long run.

**III.     The CEA claims against the Exchange Defendants should be dismissed.**

    **A.     The statute of limitations bars Plaintiffs' CEA claims.**

The Exchange Defendants demonstrated that publication of the Tether Report in January 2018 triggered the two-year statute of limitations for CEA claims, making the June 2020 CAC untimely. (*See* Mem. at 13–14.) In response, Plaintiffs cite *Staehr v. Hartford Financial Services Group Inc.*, 547 F.3d 406 (2d Cir. 2008), but there the Second Circuit held that *one article* in a specialized publication was insufficient to trigger notice. (*See* Opp. at 39.) Here, numerous major news publications (The New York Times, CNBC, and Bloomberg) reported the Tether Report's allegations and other Defendants' alleged specific involvement (with one such article even linking to the report). (*See* Mem. at 14, 15, n.6.)[4]

    **B.     Plaintiffs' speculative damages are insufficient.**

As the Exchange Defendants showed, a valid CEA claim requires actual damages. (*See* Mem. at 15–17 (discussing *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104 (2d Cir. 2018)).) Plaintiffs do not dispute this requirement and merely repeat the allegation that Goldshtein purchased Bitcoin futures at an artificially high price. (*See* Opp. at 25–26.) But that is not an allegation of a concrete detriment—i.e., from a market decline or selling at a loss.

---

[4] Plaintiffs' own case law confirms that it is appropriate to decide this issue now. *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d. Cir. 2005) ("[W]here the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of [the injury] can be gleaned from the complaint and papers . . . integral to the complaint, we can readily resolve the issue on a motion to dismiss"; courts have done so in "a vast number of cases.").

6

Plaintiffs cite *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*LIBOR I*"), which is distinguishable.  In *LIBOR I*, there was a direct connection between the manipulation of LIBOR and the price of the futures contracts.  *See id.* at 697 ("LIBOR was directly incorporated into the price of [the commodity's] futures contracts, and by allegedly manipulating LIBOR, defendants manipulated the price of those contracts.").  Here, the Exchange Defendants are not alleged to have controlled the pricing of Bitcoin.  Plaintiffs instead allege a scheme to pump USDT into the market, which in turn impacted the price of all crypto-commodities, which in turn impacted Bitcoin futures.  (*See* CAC at ¶¶ 12, 14, 191, 272.)

### C. Plaintiffs do not adequately plead a manipulation claim.

Plaintiff's' arguments (Opp. at 33–34) as to why they have pleaded a manipulation claim are unavailing.  To begin, Plaintiffs alleged that the Exchange Defendants falsely stated that USDT was backed 1:1 to the U.S. dollar, but did not allege the statements were false when made.  (*See* Mem. at 17–18.)  Plaintiffs concede this argument by ignoring it.  *See Kaplan v. New York State Dep't of Labor*, 2019 WL 3252911, at *5 (S.D.N.Y. July 19, 2019) (Failla, J.) (failure to address motion to dismiss arguments "effectively concedes that the claims cannot survive").

The Exchange Defendants also explained that Plaintiffs' "*should have* known" allegations do not plead scienter.  (*See* Mem. at 18.)  In response, Plaintiffs argue that (1) the Exchange Defendants violated KYC regulations by allowing repeat transfers of large amounts of USDT through the same addresses, and (2) allowing "disproportionate" volume of USDT trades from those addresses was "recklessness." (*See* Opp. at 32.)  Neither argument has merit.

First, Plaintiffs do not specify the regulatory obligations the Exchange Defendants allegedly violated, rendering these allegations meaningless.  *See, e.g.*, *Grinsphun v. N. Am. Title Co.*, 2015 WL 1516608, at *3 (S.D.N.Y. Mar. 31, 2015) (complaint insufficiently pled where

7

plaintiff failed to "specify what those requirements are and how Defendants violated them."). Second, Plaintiffs have not pleaded facts suggesting that the Exchange Defendants were "reckless": An alleged failure by the Exchange Defendants to investigate supposedly suspicious trading practices is insufficient. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269–70 (2d Cir. 1996) (rejecting argument that failure to investigate "red warning flags" concerning trading practices amounted to recklessness). In *Chill*, one of the factual allegations the Second Circuit found insufficient for recklessness was the defendant's alleged failure to investigate an increase in trading volume. *See id*. Plaintiffs' contention (Opp. at 32) that the Exchange Defendants permitted a "disproportionate" number of USDT trades from certain addresses fares no better. *Chill* also rejects the notion that violations of industry standards and government regulations sufficiently plead recklessness, unless accompanied by corresponding allegations of fraudulent intent. *See* 101 F.3d at 270. And the Exchange Defendants' pursuit of profit through the normal operation of business (*see* Opp. at 32) is likewise not enough to plead scienter. *See Chill*, 101 F.3d at 268 (2d Cir. 1996) (profit motive that "could be imputed to any . . . for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

Plaintiffs also fail to plead reliance. (*See* Mem. at 18–19.) Plaintiffs argue that if reliance is required, they are entitled to the fraud on the market presumption. (*See* Opp. at 35 n.19.) But for that presumption, Plaintiff must plead that the "alleged misrepresentations were publicly known, . . . that the [Bitcoin] traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." *See GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 99 (S.D.N.Y. 2013). Plaintiffs make no such allegations.

8

Plaintiffs argue that they have stated an aiding-and-abetting claim against the Exchange Defendants by noting that they permitted USDT trading on their platforms and allowed the Accounts to be opened. (*See* Opp. at 36.) But as the Second Circuit has explained, "the provision of routine [operational] services, when combined only with allegations that the [defendant] knew of trading activity that was highly suggestive but not dispositive of manipulation, is not enough to state a claim for aiding and abetting under Section 22 of the CEA." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 185 (2d Cir. 2013). The Plaintiffs plead nothing more against the Exchange Defendants.

        **D.**       **Plaintiffs do not plead price manipulation.**

In their Opposition, Plaintiffs assert a new price manipulation claim against the Exchange Defendants. (*See* Opp. at 28–32.) Count 5 of the CAC identifies the Defendants that Plaintiffs claim are liable for price manipulation, and neither Bittrex nor Poloniex is named. (*See* CAC ¶ 434 (not mentioning Exchange Defendants), ¶ 438 ("Plaintiffs . . . suffered actual damages and injury in fact due to artificial prices . . . caused by DigFinex, the Bitfinex Defendants, the Tether Defendants, and the Individual Defendants.").) The new claim should be disregarded, because a plaintiff may not use its opposition to assert a new claim. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 177–78 (2d Cir. 1998).[5]

**IV.**       **The RICO claims against the Exchange Defendants should be dismissed.**

The Exchange Defendants demonstrated that Plaintiffs do not allege sufficient facts for a plausible claim that the Exchange Defendants joined a RICO conspiracy. (*See* Mem. at 21–24.)

---

[5] Nor do Plaintiffs plead facts that satisfy the elements of a price manipulation claim. Plaintiffs do not allege that the Exchange Defendants had an ability to influence the market, that any of their specific conduct actually did influence the prices, or that either had the specific intent to influence the prices. *See U.S. Commodity Futures Trading Comm'n v. Wilson*, 2018 WL 6322024, at *20 (S.D.N.Y. Nov. 18, 2018) ("[A] clear line between lawful and unlawful activity is required . . . to ensure that innocent trading activity not be regarded with the advantage of hindsight as unlawful manipulation.").

9

Plaintiffs do not plausibly plead the fundamental bedrock—*a conscious agreement* to join the conspiracy. Plaintiffs defend their allegations on a group basis, without showing how their limited allegations *concerning the Exchange Defendants* are enough. (*See* Opp. at 64–65.) Plaintiffs merely double down on their conclusory allegations that the Exchange Defendants "had knowledge of the RICO scheme and the enterprise's planned conduct," without citing any allegation demonstrating this alleged "knowledge" or explaining why mere knowledge is enough. (*See* Opp. at 65.) Such vague, unsupported allegations of knowledge are not a basis to infer an agreement. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25–26 (2d Cir. 1990) (plaintiffs must plead facts establishing basis for inferring agreement to join conspiracy); *Morin v. Trupin*, 711 F. Supp. 97, 111 (S.D.N.Y. 1989) ("[B]are allegations of 'conspiracy' … are insufficient to support a civil RICO claim.").[6]

Finally, to be liable, the Exchange Defendants must have proximately caused Plaintiffs' injury. (*See* Mem. at 24.) As explained, any injuries Plaintiffs allegedly suffered are too remote from the Exchange Defendants, who simply allowed cryptocurrencies to be traded on their platforms in the normal course of businesses. (*See id.* at 24–25.) Plaintiffs' failure to respond again dooms their claim.

## CONCLUSION

The Opposition only confirms the fatal flaws in Plaintiffs' claims against the Exchange Defendants. The complaint should be dismissed as to the Exchange Defendants in its entirety, and with prejudice.

---

[6] Plaintiffs do not respond to the argument that the 13-month time frame Plaintiffs allege for this conspiracy is insufficient to establish a *pattern* of racketeering activity. (*See* Mem. at 24.) Again, the Court may deem this point conceded.

Dated: December 17, 2020
       New York, New York

Respectfully submitted,

| | |
|---|---|
| **O'MELVENY & MYERS LLP** | **NELSON MULLINS RILEY & SCARBOROUGH LLP** |
| */s/* Abby F. Rudzin | |
| Abby F. Rudzin | Matthew G. Lindenbaum |
| Seven Times Square | (*admitted pro hac vice*) |
| New York, NY 10026 | One Financial Center, 35th Floor |
| Telephone: (212) 326-2000 | Boston, MA 02111 |
| arudzin@omm.com | Telephone: (617) 217-4700 |
| | matthew.lindenbaum@nelsonmullins.com |
| William K. Pao | |
| (*admitted pro hac vice*) | Robert L. Lindholm |
| 400 South Hope Street | 280 Park Avenue |
| Los Angeles, California 90071 | 15th Floor, West |
| Telephone: (213) 430-6000 | New York, New York 10017 |
| wpao@omm.com | Telephone: (646) 428-2600 |
| | robert.lindholm@nelsonmullins.com |
| **MCNAUL EBEL NAWROT & HELGREN PLLC** | *Attorneys for Poloniex, LLC* |
| Greg J. Hollon | |
| (*admitted pro hac vice*) | |
| Timothy B. Fitzgerald | |
| 600 University Street, Suite 2700 | |
| Seattle, WA 98101 | |
| Telephone: (206) 467-1816 | |
| ghollon@mcnaul.com | |
| tfitzgerald@mcnaul.com | |

*Attorneys for Bittrex, Inc.*

11