```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     In re TETHER AND BITFINEX        20 cv 453 (KPF)
 3   CRYPTO ASSET LITIGATION,         20 cv 169 (KPF)
                                      20 cv 211 (KPF)
 4   --------------------------- x
                                           New York, N.Y.
 5                                         December 22, 2020
                                           10:00 a.m.
 6
     Before:
 7
                       HON. KATHERINE POLK FAILLA,
 8
                                           District Judge
 9
                             APPEARANCES
10
     SELENDY & GAY PLLC
11        Attorneys for Plaintiffs
     BY:  CAITLAN JOAN HALLIGAN
12        KYLE WILLIAM ROCHE
          MITCHELL NOBEL
13
     HOGAN LOVELLS
14        Attorneys for Defendant Fowler
     BY:  MICHAEL C. HEFTER
15        SAMUEL RACKEAR
16   NELSON MULLINS RILEY & SCARBOROUGH LLP
          Attorneys for Defendant Poloniex
17   BY:  MICHAEL G. LINDENBAUM
          ROBERT LAURI LINDHOLM, JR.
18
     WALDEN MACHT & HARAN LLP
19        Attorneys for Defendant iFinex
     BY:  JIM WALDEN
20        STEPHANIE TSAY LEVICK
21   WILLKIE FARR & GALLAGHER LLP
          Attorneys for Defendant Potter
22   by:  CHARLES DEAN CORDING
23   O'MELVENY & MYERS LLP
          Attorneys for Defendant Bittrex
24   BY:  ABBY FAITH RUDZIN
25
```

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, state your name for the

3    record, beginning with plaintiff.

4          MS. HALLIGAN:  Caitlin Halligan for plaintiffs.  And

5    with me, pursuant, with your Honor's permission, to your Rule

6    3(d) regarding participation by junior attorneys is an

7    associate at Selendy & Gay, Mitchell Nobel.

8          THE COURT:  Okay, Ms. Halligan, Mr. Nobel, thank you

9    very much.

10          Does that mean that I should be directing my questions

11    to Mr. Nobel this morning?

12          MS. HALLIGAN:  If you would, your Honor.  Thank you

13    very much.

14          THE COURT:  I would be happy to do that.

15          Representing the defendants, please.  I know there are

16    several of you.  Go ahead.

17          MR. ROCHE:  Kyle Roche is here also for plaintiffs.

18          THE COURT:  Sir, thank you very much.  I did not mean

19    to ignore you.  Thank you.

20          Representing Mr. Fowler today?

21          MR. HEFTER:  Your Honor, good morning.  This is

22    Michael Hefter from Hogan Lovells on behalf of Mr. Fowler.  And

23    with me on the telephone, pursuant to your Honor's directives,

24    is my colleague Samuel Rackear from Hogan Lovells as well.

25          THE COURT:  Thank you very much.

1           Are there any other attorneys on the call representing

2   Mr. Fowler?

3           MR. HEFTER:  I don't believe so, your Honor.

4           THE COURT:  Thank you.  Thank you to both of you for

5   appearing.

6           Other counsel who would like to make a notice of

7   appearance?  Mr. Lindenbaum?

8           MR. LINDENBAUM:  Good morning, your Honor.  Matthew

9   Lindenbaum for Poloniex, LLC.  With me dialed in is my partner,

10  Robert Lindholm.

11          THE COURT:  Okay.  Good morning to both of you this

12  morning.  Thank you.

13          Mr. Walden.

14          MR. WALDEN:  Good morning, Judge.  Jim Walden and

15  Stephanie Levick on the telephone for the iFinex defendants.

16          THE COURT:  Thank you so much.

17          I'm looking at the folks whose images are showing up

18  on my screen right now.  Have I omitted anyone?  It's not my

19  intention to do that.

20          MR. CORDING:  Good morning, your Honor.  Charles

21  Cording from Wilkie Farr & Gallagher for Defendant Potter.

22          THE COURT:  Thank you.  Now that you've spoken, you've

23  actually shown up on my screen.

24          Someone else, please.

25          MS. RUDZIN:  Good morning, your Honor.  Abby Rudzin

1    from O'Melveny & Myers for Defendant Bittrex, Inc.

2              THE COURT:  There you are as well.  Thank you.

3              Let me ask you this, Ms. Rudzin, beginning with you:

4    Do you have a horse in this race?

5              MS. RUDZIN:  No.

6              THE COURT:  Okay.  Thank you.

7              Obviously Mr. Hefter does very much have a horse in

8    the race.

9              Mr. Nobel, perhaps you'll want to be heard as well.

10             Are there other counsel who want to speak to this

11   particular issue about the motion to withdraw as counsel?

12             MR. WALDEN:  For the iFinex defendants, no,

13   your Honor.

14             THE COURT:  Thank you.

15             MR. LINDENBAUM:  Your Honor, for Poloniex, the answer

16   is no as well.

17             THE COURT:  Thank you for letting me know.

18             Mr. Hefter, let me turn to you, please, sir, and let

19   me understand a little bit better than I currently do your

20   application.

21             It is my understanding that there is a case before

22   Judge Carter, a criminal case before Judge Carter.  And I did

23   look at the public docket in that case.  I saw that there was a

24   motion filed in early November.

25             The last entry that I saw was an entry regarding a

1    hearing to be held on December 18.  And I believe I understand

2    from Judge Carter's chambers that the motion to withdraw has

3    been granted.

4           But perhaps I could hear from you as to what you think

5    I should know and I'm permitted to know about the application

6    in the criminal case because I do note that it occurred about

7    two months after your opening brief was filed for the motion to

8    dismiss in this case and about one month before your

9    application to withdraw in this case.  So I'm trying to

10   understand the timeline a little bit better.

11          MR. HEFTER:  Again, for the record, this is Michael

12   Hefter from Hogan Lovells, counsel for Mr. Fowler.

13          I want to say at the outset, your Honor, thank you for

14   moving the conference today.  I did have an evidentiary

15   hearing.  I mentioned it to Judge Isgur, Bankruptcy Judge Isgur

16   in Texas, in Houston, and he appreciated your accommodation.

17          And I also wanted to thank all counsel on the phone

18   for accommodating my schedule in that regard.  I would also

19   note that the hearing is continuing this afternoon.

20          THE COURT:  We'll be sure to be done by the

21   continuation time of the hearing.

22          MR. HEFTER:  Thank you.

23          Just to give you a little sense of the timing, your

24   Honor, you are correct that Mr. Fowler is a criminal defendant

25   in a case that's pending before Judge Carter.  That case was

1    brought in or around May of 2019.  We were retained to

2    represent Mr. Fowler in connection with that case in October of

3    2018.

4             I would also note, your Honor, since we are on a

5    public record, I'm going to refrain from disclosing

6    attorney-client privileged material.  As your courtroom deputy

7    also mentioned, it's entirely possible that there are members

8    of the media who may have dialed in.

9             They have certainly dialed in to the proceedings in

10   front of Judge Carter, and there have been several articles

11   written about Mr. Fowler and his involvement in the criminal

12   proceeding.

13            In connection with that case, your Honor, as a result

14   of COVID, the trial date in that case had been extended once or

15   twice.  I don't recall the specifics of it, but we were

16   scheduled to go to trial earlier in the year.

17            That date has been pushed back because of COVID and

18   the closing of the Southern District of New York at times, as

19   well as, as your Honor is fully aware, the process for getting

20   cases back at trial.

21            That being said -- and this is a matter of public

22   record -- Mr. Fowler appeared at a plea hearing.  At the plea

23   hearing, the plea fell apart for a variety of reasons, and

24   Judge Carter scheduled the case for trial later in the year.

25            Your Honor will -- if your Honor looked at the docket,

 1     at this point there are several letters that appear on the

 2     docket that we submitted after we filed our motion to withdraw.

 3     And that was pursuant to a process of several conferences

 4     before Judge Carter.

 5              After filing the motion, Judge Carter held a

 6     conference to obtain more information.  Judge Carter asked us

 7     to prepare an ex parte letter given what we had indicated in

 8     our motion in that case, as well as the motion before

 9     your Honor that there were attorney-client privileged and other

10     sensitive material that would bear on the application.

11              We had submitted that ex parte to Judge Carter.  That

12     letter -- I don't have the exact date, but my colleague,

13     Mr. Rackear, may know exactly when that letter was submitted to

14     Judge Carter.

15              But subsequent to that, Judge Carter issued an order

16     indicating his at least preliminary views on the motion but

17     also directed us, as counsel for Mr. Fowler, to provide two

18     different versions:  One, a public version that would be

19     submitted on the docket, as well as a separate letter that

20     would be submitted to the United States Attorney's Office which

21     would exclude attorney-client privileged material but would

22     include matters that the government was aware of but that

23     Judge Carter did not believe the public should be aware of.

24     And we submitted those letters.

25              I would also add that as a result of the process in

1    filing these type of letters in the clerk's office of the

2    Southern District, it wasn't the easiest thing to do, your

3    Honor.

4           So it took us a little while to navigate that,

5    including a requirement for wet signatures on the letters which

6    caused a slight delay in those letters being put on the docket.

7    But we had submitted those to Judge Carter and the government

8    prior to that point in time.

9           The government's response to our motion was required

10   to be filed on December 8, if I recall correctly.  On

11   December 9, the government put in their response.  And in that

12   response, the government indicated that they were not opposed

13   to the relief that we were seeking.

14          And then this past Thursday or Friday -- I'm sorry.

15   Thursday because my conflict also interfered with

16   Judge Carter's order that we have a hearing on this on Thursday

17   of last week.  So Judge Carter again graciously accommodated my

18   schedule.  We had a hearing on Friday of last week.

19          And during that hearing, Judge Carter granted our

20   motion to withdraw.  I think that the basis for the withdrawal

21   is laid out fairly clearly in the letters that we had submitted

22   to the Court, including the one that's currently on the public

23   docket.

24          THE COURT:  Mr. Hefter, when you say the letters

25   "submitted to the Court," do you mean the letter submitted to

1    Judge Carter or the letters submitted to me?

2         Because the ones submitted to me seemed quite summary

3    in their description of the difficulties or their bases for the

4    motion to withdraw.

5         MR. HEFTER:  I would assume, your Honor, that

6    Judge Carter took into consideration the letter that was

7    submitted to him ex parte as part of his consideration.

8         And I'm not entirely sure of the letter that you're

9    referencing, your Honor.  But if it's the one on the public

10   docket, the one on the public docket in the criminal matter,

11   that would be the one that I'm referring to.

12        THE COURT:  Mr. Hefter, let me restate what I've just

13   said.

14        What I'm saying is I learned more, though apparently

15   not as much as Judge Carter knows, by reading the letters on

16   the public docket in the criminal case.  And I was surprised

17   that the letter to me wasn't as detailed as the letters in the

18   criminal case.

19        And I don't have I'm pretty sure the ex parte letter.

20   So I am trying to figure out the bases for the motion to

21   withdraw.  And I've been told that there are fee issues.  But

22   I've been told as well that there are professional

23   considerations.

24        I'm not sure if I get to know in this conference what

25   the professional considerations are or whether that's something

1    you believe would be better addressed in an ex parte submission

2    or whether it's something else entirely.

3              MR. HEFTER:  Well, I believe I am constrained in this

4    forum, your Honor.  But I would also indicate to you that the

5    primary basis would be the fee issue -- I don't want to mislead

6    the Court in any way -- which is laid out in the public docket.

7              But to the extent that we did not include the ex parte

8    submission to your Honor, we apologize for that.  That's

9    certainly something that we can provide to your Honor that

10   would not include the matters that are redacted on the public

11   letter.

12             THE COURT:  Please understand, sir, that I'm not

13   really interested in criticizing you.  I'm really just trying

14   to understand what happened.

15             Is it not the case that by September 3 when you filed

16   your opening brief, the fee issues that came to characterize

17   the latter portion of your relationship with Mr. Fowler -- they

18   were there.

19             Because it seemed to me, based on what I was reading

20   in Judge Carter's docket, that there have been problems

21   throughout this calendar year and there have been multiple

22   efforts to obtain clarity from Mr. Fowler as to when and how

23   your firm and the defense firm in the criminal case would

24   receive payment.

25             And it seemed that by July, you all knew that it was

1    going to be really difficult.  And yet in September, we got the

2    motion.  And I'm not sure why you waited until December on the

3    eve that the reply brief was due to ask to withdraw.

4          MR. HEFTER:  Well, let me address that, your Honor.  I

5    think that there are two questions perhaps embedded in your

6    question.

7          THE COURT:  Okay.

8          MR. HEFTER:  And I think that -- again, I think I'm

9    constrained in what I can say because I believe that there are

10   aspects of the response to your Honor that would reveal

11   attorney-client privileged communications between Mr. Fowler

12   and us as we diligently attempted to seek payment of our fees.

13         But I'm not disagreeing with your Honor on the timing.

14   I think that there are reasons why we proceeded to file our

15   motion to dismiss in this case given where we were in our

16   communications with Mr. Fowler, as well as what we understood

17   to be the state of play in terms of the trial date in the

18   criminal matter which at that point in time was scheduled for

19   January I believe, although it may have been moved.

20         Actually, I'm sorry, your Honor.  I think at that

21   point it had been moved to the spring, but I want to confirm

22   that before I make any affirmative representation on that point

23   so your Honor has the actual schedule clear.

24         THE COURT:  You said there were two issues embedded in

25   my question.

1              Do I now have the two issues teed up, sir?

2              MR. HEFTER:  The second issue, your Honor, is we filed

3    our motion to withdraw in the criminal matter on November 9

4    according to my records, and I believe we filed in the civil

5    case on December 11.

6              So I think the second question embedded in your

7    statement is why did we wait for at least that long to file in

8    the civil action on the eve of the reply.  And I think that was

9    part of your question, your Honor, if I had that correct.

10             THE COURT:  It is, yes, especially because it was not

11   merely a month after filing in the criminal case, but it was

12   two weeks after Judge Carter issued his decision of November 23

13   discussing, with a measure of detail, what the issues were.

14             MR. HEFTER:  Yes.  We were aware of those details as

15   well, your Honor.  I think the response to that, your Honor, is

16   that we were waiting to see what the ultimate decision in front

17   of Judge Carter would be but then realized that there were

18   ongoing proceedings before your Honor and we'd still have the

19   same basis for withdrawing in the case.

20             So rather than prolong it and wait for a final

21   decision by Judge Carter, which we didn't know which way it was

22   going to go one way or the other obviously, we determined to

23   file in the civil action.

24             THE COURT:  Mr. Hefter, there are questions that I may

25   now be asking you or questions that you may not be able to

1    answer for any number of reasons, but I'll ask them

2    nonetheless.

3          It is my understanding at this time that Mr. Fowler

4    has not sought the appointment of counsel under the Criminal

5    Justice Act.

6          Am I correct so far?

7          MR. HEFTER:  You are correct, your Honor.  Because it

8    was a matter of public record in the hearing on Friday,

9    Mr. Fowler was in appearance virtually.  That question was

10   posed by Judge Carter, and Judge Carter has allowed Mr. Fowler

11   I believe a 45-day period to obtain counsel.

12         And Judge Carter has also given Mr. Fowler the

13   opportunity, in the event that he cannot find replacement

14   counsel, to come back to him for the appointment of CJA

15   counsel, although it was Mr. Fowler's statement on the record

16   that he was going to seek replacement counsel.

17         THE COURT:  Right now today has he retained someone to

18   replace your firm?

19         MR. HEFTER:  I don't believe so.

20         THE COURT:  I am intuiting from Judge Carter's

21   decision that there may be an issue with certain assets that

22   Mr. Fowler might otherwise have access to but have been frozen

23   as a result of the criminal matter.

24         Is that something that you can confirm or deny?  I

25   think there's an asset freeze in place.

1          MR. HEFTER:  I think that was part of the -- if you

2     don't mind, I have the redacted portion of the letter up on

3     another screen.  I don't want to -- if you will just give me a

4     moment, please.

5          THE COURT:  Of course.

6          MR. HEFTER:  So the letter, your Honor, that is on the

7     public docket has a sentence that is partially redacted, but it

8     does say:  "Nevertheless, Mr. Fowler informed us at the time

9     that the Department of Justice had recently frozen both his,"

10    and then you can intuit from that --

11         THE COURT:  That something got frozen.

12         MR. HEFTER:  Yes.

13         THE COURT:  What I'm asking, sir -- and this is the

14    question I can understand if you cannot answer.

15         My prior experience with asset forfeiture included

16    situations in which the government and criminal defendants

17    negotiated regarding the unfreezing of certain assets in order

18    to permit the payment of a criminal defense attorney or, if the

19    negotiations did not succeed, the conduct of what I knew and

20    what may still be called *Monsanto* hearings regarding the

21    unfreezing of assets.

22         If you know, sir, is there a plan in place to either

23    negotiate with the government or to have some sort of hearing

24    regarding the unfreezing of assets?

25         MR. HEFTER:  I don't believe I can answer that

1  question on the record, your Honor.  I'm happy to answer that

2  question ex parte, but I don't believe I can.

3         THE COURT:  Okay.  I want to hear from Mr. Nobel in a

4  moment, sir.

5         Before I do that, what is the plan here?

6         Does Mr. Fowler think that -- is he going pro se in

7  this matter?

8         MR. HEFTER:  Your Honor, I can only tell you that I

9  believe it's Mr. Fowler's intention to obtain new counsel.

10        THE COURT:  In 45 days in the middle of a pandemic

11 with his assets frozen?  Yes.

12        MR. HEFTER:  I think that's what his plan is.

13        THE COURT:  Okay.

14        MR. HEFTER:  I can't tell you, your Honor, the

15 likelihood of success of that effort.

16        THE COURT:  Of course.  That's why I'm asking

17 questions about the unfreezing of assets.  I might have a

18 different view as to his odds if I knew that he and the

19 government were in negotiations regarding the unfreezing of

20 assets or whether there would be a hearing scheduled.

21        But if we find ourselves -- you're probably going to

22 ask me to give the same 45 days that Judge Carter gave him.

23 I'm not agreeing to do anything yet, just in case for the rest

24 of you on the call -- but you're going to ask for the same

25 time.

1          If we find ourselves with nothing, then he's going pro

2    se in a case -- this is a very complicated case for him to do

3    pro se I would think.  Maybe you're right.  Maybe there is

4    counsel out there who wants to come on board for any number of

5    reasons.  But today, there isn't.  He doesn't have someone in

6    the wings.

7          Correct?

8          MR. HEFTER:  I believe that's correct, your Honor.

9          THE COURT:  Okay.  Did I hear you say, sir, a few

10   moments ago that the government was not opposed to the relief

11   sought in the criminal case?

12         I think I was a little bit confused.  Perhaps what I

13   understood them to be saying was that it was fine so long as it

14   didn't interfere with the trial date.

15         MR. HEFTER:  That's accurate, your Honor.

16         THE COURT:  Okay.  So they were agnostic as to who was

17   representing him, as long as that person, whoever he or she may

18   be, was able to proceed in the spring with the set trial date.

19         MR. HEFTER:  I believe that's true, your Honor.  I'd

20   want to go back and look exactly at their letter because I do

21   think it went a little further than that.

22         THE COURT:  That's fine.  You had said to me they were

23   not opposed.  I wasn't sure I had read that from their

24   submission.  But that's fine.  We can both look back at the

25   letters at a different time.  Thank you, sir.

1           Let me turn now to Mr. Nobel.

2           Mr. Nobel, I hope that when you start speaking, that

3    you're going to show up on my screen.  Why don't you begin

4    talking, and then I'll hopefully see you pop up somewhere.

5           MR. NOBEL:  Thank you, your Honor.  I hope I pop up as

6    well.  Mitchell Nobel for the plaintiffs.

7           THE COURT:  There you are.  Yes.

8           Sir, what is plaintiffs' position with respect to this

9    application and then please tell me why.

10          MR. NOBEL:  Plaintiffs take no position on the merits

11   of Mr. Fowler's counsel's motion to withdraw.  But plaintiffs

12   would request that resolution of the motion be deferred until

13   after oral argument on the motion to dismiss, if the Court is

14   inclined to hear oral argument on those motions.

15          And we ask that just to avoid any undue delay in this

16   case.  Undue delay has been recognized consistently by courts

17   in this district as an appropriate consideration in evaluating

18   motions to withdraw and courts, when faced with a situation

19   like this one where a party moves to withdraw after briefing is

20   completed on a motion to dismiss and prior to oral argument

21   have deferred the resolution of the motion to withdraw until

22   after oral argument in order to avoid delay.

23          THE COURT:  Excuse me, Mr. Nobel.

24          Is it not the case that briefing hasn't concluded?

25   That's the point.  I was waiting for reply briefing, and I

1   don't think Mr. Hefter is going to waive on his client's behalf

2   his right to submit a reply brief in the motion to dismiss.

3           So that's for me the bigger issue, is that I've got

4   and you have a reply brief I believe as to the other defendants

5   in the case and we don't have one as to Mr. Fowler.

6           So I would imagine your argument is that if I let them

7   off now, we're going to have a delay of at least 45 days, and I

8   would suspect that new counsel wouldn't be ready immediately to

9   jump in and file a reply brief.  So can we talk about that.

10          MR. NOBEL:  Yes.  Of course, your Honor.

11          From plaintiffs' perspective, as of the 17th when

12  Mr. Fowler's reply brief was due under the extension he

13  requested and received, he was represented by counsel, and

14  there was no brief filed.

15          So from plaintiffs' perspective, that's generally the

16  conclusion of briefing.  The decision to not file on the 17th

17  was presumably a reflection of Mr. Fowler and his counsel who

18  was without question representing him at that time, their legal

19  judgment as to the necessity of a reply.  There has been no

20  request for a further extension either before that deadline

21  passed or subsequent that the plaintiffs have seen.

22          So as far as plaintiffs are concerned, the deadline

23  has past, and no one has requested an extension.  If Mr. Fowler

24  or his counsel is now seeking to request an extension,

25  plaintiffs would oppose that request.

1    Plaintiffs also agree that granting the motion to

2    withdraw here creates a risk of delay for that reason as well.

3    THE COURT:  Stay right there, Mr. Nobel.

4    Mr. Hefter, if I were to grant your motion, which,

5    again, I'm not making any decisions at this second, is there a

6    concurrent request for an extension on the reply briefing?

7    Or is your client foregoing a reply briefing?

8    MR. HEFTER:  No.  I don't believe I have the authority

9    to say that he is foregoing reply briefing, your Honor, at this

10   point in time.  So I gather we are, on behalf of Mr. Fowler,

11   even though we believe that we should be relieved of our

12   obligation in this case, that he should have an opportunity to

13   put in a reply brief.

14   THE COURT:  Okay.

15   MR. HEFTER:  Subject to his determination as to

16   whether he wants to waive it, but I'm not sure that he would

17   want to do that without consulting with counsel.

18   THE COURT:  To Mr. Nobel's point then, I understood,

19   Mr. Hefter, you to be asking on behalf of the attorneys

20   representing Mr. Fowler to be relieved before having to submit

21   a reply brief.

22   Now, if you're saying actually, no, Failla.  We'll

23   submit the reply brief, and then we want out before oral

24   argument or before its resolution, then I would just like to

25   know that.

1          If you could just perhaps help me and perhaps help

2    Mr. Nobel understand what is the time frame.

3          What responsibilities are you continuing to accept,

4    and which ones would you prefer to defer to new counsel, if new

5    counsel is secured?

6          MR. HEFTER:  We would want your Honor to defer,

7    subject to your permission obviously, to defer all of it at

8    this point, given the -- let me be very clear about this.

9          THE COURT:  Yes.

10         MR. HEFTER:  Given the substantial amount of fees that

11   Mr. Fowler has not paid, having us continue on that basis is

12   not only untenable but I believe is grounds for withdrawal now.

13         THE COURT:  I understand that.  Mr. Nobel and I are

14   going to have that discussion in just a moment.  I don't want

15   you to think that I am unmindful of how much in arrears your

16   client may be.

17         The fact that I work for the government doesn't mean

18   that I don't understand the significance of clients paying the

19   fees that are incurred and the attorney's fees that are

20   incurred, because your firm is not, at least in this matter,

21   doing this pro bono.  I completely understand that.  So please,

22   please understand that I do understand that.

23         But the issue becomes I'm here in this case.  I've got

24   a bunch of motions to dismiss.  I need one more briefing before

25   I can really start thinking about them.

1          And you're asking me -- maybe you're just asking me to

2     do this, to wait and to let somebody else come in, get up to

3     speed, and file the reply brief in the case.

4          MR. HEFTER:  Well, that's your decision obviously,

5     whether we are required to file the reply brief, in which case

6     you would have all of the briefs sub judice.

7          At the very least, we would not want -- if your Honor

8     were to order us to continue through the briefing, we wouldn't

9     want that to be with prejudice to our motion to withdraw or any

10    implicit acceptance or waiver of any of our arguments that we

11    actually undertook another piece of work pro bono.

12         THE COURT:  Of course.  If we were in that position,

13    I'd order you -- the question is whether I should, and

14    Mr. Nobel and I will talk about that momentarily.

15         Mr. Hefter, I'm going to ask a question with my

16    characteristic lack of diplomacy.

17         If what you're telling me is you don't want to file

18    the reply brief because your client is so deep in the hole that

19    it's really getting to the point of being ridiculous, I will

20    listen to you, and Mr. Nobel and I will have that discussion.

21         If you're saying that you don't want to file this

22    reply brief because there are other things in this relationship

23    that you'd like me to know about in a more ex parte

24    communication and that that's also something I really do need

25    to consider and it's not just the fees, then please let me know

1    because I think Mr. Nobel and I need to have that discussion as

2    well.

3              MR. HEFTER:  Your Honor, I think the primary issue is

4    the fees issue.

5              THE COURT:  I really do appreciate your candor on that

6    point, sir, because I've had other attorneys who find all sorts

7    of professional conflicts that transcend the monetary.

8              MR. HEFTER:  If I may, your Honor.

9              THE COURT:  Of course, sir.

10             MR. HEFTER:  On that point, of course this would not

11   be for public consumption on the record but certainly would be

12   something for your Honor to consider if your Honor would want

13   ex parte communications, the nature of the discussions between

14   us and Mr. Fowler -- it would indicate a robust discussion

15   around these issues, and I'll leave it at that.

16             THE COURT:  I appreciate that, sir.  Thank you again

17   for the candor.

18             Mr. Nobel, the playing field has sort of been set up

19   for us now based on the conversations I've just had with

20   Mr. Hefter.  They want an extension.  They don't want to forego

21   reply briefing.  They would prefer that someone else did the

22   reply briefing.

23             Let's imagine that there are substantial billings that

24   have accrued and have not been paid.  So I don't wish to be

25   Grinch-like during this season, but let's talk about your

1   client's concerns in the face of what Mr. Hefter has just said

2   to us.

3           MR. NOBEL:  Thank you, your Honor.

4           Based on Mr. Hefter's representations, plaintiffs

5   would oppose any extension for reply briefing.  An extension,

6   particularly a second extension that's requested after the

7   deadline, should only be granted if there is good cause.

8   Mr. Fowler and his counsel have not provided any reason why a

9   brief wasn't filed on the 17th.

10          On the 17th, Mr. Fowler was represented by capable

11  counsel who was familiar with all the issues in this case.  We

12  haven't heard anything at all suggesting that they couldn't

13  have filed a reply brief at that time.

14          In fact, Mr. Fowler's counsel requested the extension

15  that set that deadline that they then failed to meet.  So there

16  has been no cause at all, let alone good cause, for why that

17  reply brief deadline wasn't met.

18          THE COURT:  Mr. Nobel, please excuse me.  I'm going to

19  push back just a little bit.

20          In the letter of December 2 asking for the extension,

21  there was a hint that there might be a forthcoming motion to

22  withdraw.

23          Am I correct?

24          MR. NOBEL:  You're correct, your Honor.

25          THE COURT:  And in fact, they filed the motion to

1    withdraw on the 11th of December, which I get was not the 17th

2    of December.  But you and I could imagine that the filing of

3    the motion to withdraw was designed to just sort of stop the

4    bleeding in terms of billings at this time and to tell us we

5    need to get new counsel in.  We've gotten to the point where we

6    need to do something.

7           So I understand what you're saying, that there was no

8    second extension requested of me, and you would have opposed it

9    for the very reasons that you've just articulated.

10          I think it may be a little too cute to say that

11   they're done now -- they've lost their opportunity -- because I

12   think I was supposed to -- and I did in fact -- interpret the

13   motion to withdraw as a request as well that they not be

14   required to file the reply brief.

15          And from that, I understood that their hope was that

16   somebody else would do it.  But you may think otherwise.  So

17   let me hear from you.

18          MR. NOBEL:  That's fair, your Honor.  Treating the

19   December 2 or the December 11 -- either the December 2 request

20   for an extension or the December 11 motion to withdraw as sort

21   of a request that the clock on their reply brief be stopped in

22   some way, accepting that construction, plaintiffs still think

23   that any sort of substantial extension here like what it seems

24   that Mr. Fowler's counsel is requesting on his behalf, is

25   inappropriate.

1    As the Court indicated, these issues that are driving

2  the motion to withdraw and therefore driving the request for a

3  second extension are not sudden or unanticipated.  They've been

4  on the horizon for Mr. Fowler and his counsel for months, maybe

5  years.  Mr. Fowler in the motion to withdraw indicates that

6  they've been discussing the possible need to withdraw since

7  February of this year.

8    So in light of that, when Mr. Fowler agreed to a

9  briefing schedule that gave them six months after the amended

10  complaint before the briefing concluded, almost seven months,

11  and then requested a second extension, filed the opening brief,

12  the opening motion to dismiss -- at any time of these times,

13  the issues that were driving this were visible.  If they had

14  been raised more promptly, there wouldn't be the delay that

15  we're looking at.

16    Instead, it really is the 11th hour when Mr. Fowler's

17  counsel is coming asking to withdraw and to then delay

18  everything else while Mr. Fowler hopes to obtain counsel.

19    And as your Honor has indicated, that might be a

20  daunting prospect for Mr. Fowler.  So the delay that could be

21  caused by this request for an extension could be very

22  substantial.

23    THE COURT:  Mr. Nobel, have you had occasion to look

24  at any entries in Judge Carter's case?

25    MR. NOBEL:  Yes.  We have reviewed the public entries,

1    but we of course have not had any access to the ex parte

2    materials or the redacted.

3           THE COURT:  You and me both, sir.  Thank you very

4    much.

5           The reason for my asking is I went and looked at what

6    I guess is the public version of counsel's letter, which, as

7    you and I know, is quite heavily redacted.  Even with those

8    redactions, I thought that there were a lot of dates that

9    weren't redacted.

10          From that I could imagine that this wasn't a situation

11   where Mr. Fowler's counsel never spoke with their client about

12   the need to keep current on billings.  And it looked like those

13   were pretty constant discussions from February to now.

14          And I say that, sir, because I was wondering -- and

15   perhaps you were as well -- whether there was some detente that

16   was reached between February and December or November that just

17   suddenly became unraveled.

18          But it does look like there was a fairly constant

19   stream of discussion about getting paid or getting payment

20   from February through July and then probably into the fall.

21          You've seen that as well, sir; correct?

22          MR. NOBEL:  Yes.  That is correct.

23          THE COURT:  What do you think I should do with that?

24          Here's what I mean by that.  That's a pretty

25   open-ended question.  So let me try and give you a better one.

1          On the one hand, it does show diligence.  It does show

2   diligence, that they were trying to make this work and trying

3   to represent their client in two cases where the client needed

4   their representation.

5          On the other hand, I suppose you could argue that they

6   should have figured out somewhere in July that this wasn't

7   going to happen and that they should have planned accordingly.

8          That is at that fork in the road that I find myself,

9   sir.  So let me hear, sir, arguments on that point.

10          MR. NOBEL:  Yes.  Thank you, your Honor.

11          Plaintiffs' view is that your Honor is of course

12   correct.  Plaintiffs don't mean to imply that Mr. Fowler's

13   counsel has been anything other than diligent in their attempts

14   to work out the relationship or not.  As plaintiffs said, we're

15   not taking any position on the merits of the ultimate motion to

16   withdraw.

17          But in terms of the timing, plaintiffs do feel that

18   the length of time for which these issues have been visible to

19   Mr. Fowler and his counsel suggests that their resolution

20   shouldn't delay all of the motions to dismiss here.

21          In particular, by the time they filed their motion to

22   withdraw before Judge Carter which was back in November, it

23   seems hard to believe that Mr. Fowler and his counsel couldn't

24   have understood that they would ultimately need to withdraw in

25   this matter as well.

1          And if they had so moved back in November and had this

2    issue been resolved in November, the delay in bringing in new

3    counsel, getting them up to speed, and filing the reply brief

4    might have been much more limited.  It might not have delayed

5    anything at all.  It might have only been a small delay.

6          But by waiting until the reply briefs are essentially

7    due to make this request, Mr. Fowler and his counsel have put

8    the Court and the parties in a position where the delay that --

9    the only delay they could be requesting is a very substantial

10   one.  And we do think that should ultimately be put at the feet

11   of Mr. Fowler and his counsel.

12         THE COURT:  Mr. Nobel, I'm going to return to

13   Mr. Hefter for his thoughts in reply.  I don't want to deprive

14   you of any other arguments.  You've been answering my

15   questions, and I really do appreciate that.  If there are other

16   arguments that you want to make in response to questions I

17   haven't asked you, now is your chance.

18         MR. NOBEL:  No.  That's everything, unless there is

19   anything further from the Court.

20         THE COURT:  It is, unless my discussions with

21   Mr. Hefter disclose anything.  Thank you very much.

22         Mr. Hefter, I'll hear from you on reply.

23         MR. HEFTER:  Yes, your Honor.  So I'll pick up on

24   Mr. Nobel's comment that if we had disclosed this in November,

25   there would have been a substantial delay in any event.

1          So what I heard him saying is that the delay would

2     have been shorter.  But that doesn't take into consideration

3     facts and boots on the ground, your Honor, in dealing with an

4     incredibly sensitive situation.

5          I do want to make a point about whether this case was

6     standing alone or standing next to a previously filed criminal

7     indictment.  And I think that's highly relevant to this

8     discussion, your Honor, because I'm not suggesting that counsel

9     is saying this.  But it was not a situation in July where we

10    had information and all of a sudden we were just going to throw

11    up our hands.

12         This is a gentleman who faces a significant indictment

13    in the Southern District of New York.  We've been working on

14    the case for quite some time.  And doing that, in just saying,

15    well, we're not getting paid our fees.  So we're just going to

16    drop the client is just not something that ever crossed our

17    mind.  And this gets into discussions I believe that are not

18    appropriate for the public docket, your Honor.

19         So looking at the record cold -- and, again, I

20    apologize to the Court for not including our letter to

21    Judge Carter.  But looking at the record cold, if you look at

22    the situation from July to November or whatever it is and you

23    look at the number of communications that are disclosed in the

24    letter, it was a very sensitive thing for our firm to consider

25    as we proceeded to determine the best way of dealing with

1    Mr. Fowler's criminal representation.

2            I don't think we were in a position to say, well, you

3    need to tell the plaintiffs in the civil matter that we need to

4    withdraw because that would have sent a message to the

5    government that also -- I'll leave it at that, your Honor.

6            THE COURT:  Leave it at that.  I can finish that

7    sentence myself.  Thank you.

8            MR. HEFTER:  Yes.

9            THE COURT:  All right.  Other things you'd like me to

10   know, sir?

11           MR. HEFTER:  No, your Honor.

12           THE COURT:  All right.  Mr. Hefter, I would like to

13   see the ex parte submission.  Let me turn back to Mr. Nobel for

14   a moment.

15           Mr. Nobel, may I imagine, sir, that you have no

16   objection if Mr. Hefter were to send to me either what was sent

17   to Judge Carter, just to save him the trouble of having to

18   re-do it or something that was perhaps -- if he wants to retool

19   it for me, that's fine too.

20           But you would have no problem with my getting an ex

21   parte submission?

22           MR. NOBEL:  The plaintiffs object to an ex parte

23   submission.  However, plaintiffs would request that -- I

24   believe Mr. Hefter indicated that he prepared something that

25   was perhaps less redacted than the public version but still

 1   more redacted than what judge Carter received.  It may be

 2   that's not appropriate here.

 3          THE COURT:  I understood that to be, sir, something

 4   that was submitted to the U.S. Attorney's Office because it

 5   made reference to information in their possession which we

 6   don't have.  So I think we have the public information which

 7   you and I have both read.  I'd like to see the ex parte

 8   submission.

 9          Do you have an objection to that, sir?

10          MR. NOBEL:  Plaintiffs don't object to that.

11          THE COURT:  Mr. Hefter, do you feel comfortable

12   sending me what you sent to Judge Carter?

13          Or do you think you'd need to retool it to make it

14   less focused on the criminal case?

15          I think I could handle seeing what was sent to him and

16   it would save you the trouble of retooling the letter, but I'll

17   leave it to you.

18          MR. HEFTER:  I believe we can do that, your Honor.  I

19   would want to take one more read through it before submitting

20   it to chambers, but I don't believe that's going to be a

21   problem.

22          THE COURT:  May I have that by tomorrow, sir?

23          MR. HEFTER:  Yes, your Honor.

24          THE COURT:  I think I need to see it before I make a

25   final decision, but I imagine I'll be entering either a written

1  endorsement or a written order, although I appreciate each of

2  you participating.

3          This was my first conference with Microsoft Teams,

4  other than an internal one with my clerks and my deputies.  So

5  you were my betas today, and I really do appreciate it.

6          Mr. Nobel and Mr. Hefter, thank you very much for a

7  very well-presented argument.

8          Is there anyone else who wishes to speak to me at this

9  time?

10          I don't mean to cut anyone off, but I do think for me

11  the information I need is going to be in a letter that I have

12  not yet received.

13          Seeing no one and hearing no one, I will adjourn the

14  conference at this time.  I'm going to wish to each of you

15  safety and good health during this pandemic.  I'm going to wish

16  you as well a very happy holiday season, a very happy New Year.

17          I really do look forward to the day when we can back

18  in the courtroom, rather than doing it through these

19  videoconferences.  As much as I enjoy seeing your homes and

20  your offices, I really would much prefer to have you with me.

21  So be well, everyone.  Thank you very much.

22          (Adjourned)

23

24

25