1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


In re:                          :
                                  Docket #19cv9236
   TETHER AND BITFINEX CRYPTO    : 1:19-cv-09236-KPF
       ASSET LITIGATION

                                : New York, New York
                                  February 8, 2022
------------------------------------ :
                                  VIDEOCONFERENCE


PROCEEDINGS BEFORE
THE HONORABLE KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiffs:          SELENDY GAY ELSBERG PLLC
                         BY:  CAITLIN HALLIGAN, ESQ.
                              LAURA KING, ESQ.
                         1290 Avenue of the Americas
                         New York, New York 10104


For BT Defendants:       DEBEVOISE & PLIMPTON LLP
                         BY:  ELLIOT GREENFIELD, ESQ.
                         66 Hudson Boulevard
                         New York, New York 10001


For Defendant -          NELSON MULLINS RILEY & SCARBOROUGH
Poloniex, LLP:           LLP
                         BY:  MATTHEW LINDENBAUM, ESQ.
                         One Financial Center, 35th Floor
                         Boston, Massachusetts 02111




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

<u>APPEARANCES (Continued)</u>:

For Defendant Bittrex:    O'MELVENY & MYERS LLP
                          BY:  ABBY RUDZIN, ESQ.
                          7 Times Square
                          New York, New York 10036

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

1

                                                                    4

1

2          THE CLERK:  Your Honor, this is in the matter

3   In re Tether and Bitfinex Crypto Asset Litigation.

4          HONORABLE KATHERINE POLK FAILLA (THE COURT):

5   Thank you all very much, I've had my deputy check in

6   with all of you to see which attorneys are appearing.

7   For those of you appearing either by video or by phone

8   I welcome your participation, I thank you. I understand

9   today's agenda to concern two issues and hopefully the

10  parties agree with me. The first concerns a request

11  from plaintiff's counsel for an extension of the

12  discovery deadlines in this case, the second concerns a

13  clarification regarding certain protocols involving

14  what we've called the anonymous trader's information.

15          I'm going to begin, please, with the request

16  for extension and in furtherance of that, I have

17  reviewed the parties' submissions, the plaintiff's

18  letter of the 23rd of January, and then the responses of

19  the 26th of January from the BT defendants, from Bittrex

20  and from Poloniex.  So why I'm telling you that is not

21  just to confirm for you that I've read this stuff but

22  to ask you please not simply to restate what is in your

23  written submissions. My thought is what may have

24  happened is that your own positions may have been

25  modified as a result of what you've seen from your

```
 1                                                      5
 2  colleagues or that there may have been discussions
 3  preliminary to this conference where these issues were
 4  addressed. So I guess what I'd like is just what you
 5  want to be sure I know that I couldn't get just from
 6  reading the letters.
 7          Ms. Halligan, may I please begin with you.
 8          MS. CAITLIN HALLIGAN:  Thank you, Your Honor,
 9  and I know that we're going to address this issue first
10  so I just want to request Your Honor's permission
11  pursuant to Rule 3(d) that Laura King who is an
12  associate at the firm be permitted to address the
13  issues related to the anonymous trader.
14          THE COURT:  Of course, thank you.
15          MS. HALLIGAN:  Thank you, Your Honor. So, Your
16  Honor, we just want to make three points if we can. The
17  defendants, themselves, as you know from reading our
18  letters to you added two months to the schedule
19  pursuant to a request from the BT defendants, and the
20  defendants have agreed --
21          THE COURT:  Please pause -- please pause right
22  there, I don't want, I want to be very careful about
23  what arguments are being made. I didn't understand them
24  to have added two months to the discovery schedule.
25  They, with your consent, asked for and received a two
```

6

1

2  month extension of an interim deadline, so it's not as

3  though there was an addition of two months to the

4  schedule, and I did not understand, although you'll

5  tell me if I'm misremembering something, that at that

6  time in August there was some suggestion that later on

7  there would be a request for additional discovery. No

8  one at the time, Ms. Halligan, suggested an extension

9  of the general fact discovery deadline, is that

10  correct?

11          MS. HALLIGAN:  That is correct, Your Honor, I

12  did not mean to be imprecise about that.  But my point

13  is that my understanding is that the defendants at this

14  juncture did not oppose an extension to the general

15  schedule of two months.  We requested four months and

16  they said they would agree to two months, so that was

17  the point I was --

18          THE COURT:  Okay, I'm not sure I understood

19  that, I guess I'll have to look back at my notes, but I

20  understood that the BT defendants didn't object to a

21  two month extension so long as there were no further

22  discovery requests, but I did not appreciate the

23  Poloniex or Bittrex had consented to a two month

24  extension. Did I, have there been subsequent

25  discussions or did I perhaps misread those two

1

2  submissions?

3          MS. HALLIGAN:  My understanding, Your Honor,

4  is that they did, but obviously they can address that

5  themselves.

6          THE COURT:  I'll talk to them at some point.

7  Go ahead.  Go ahead.

8          MS. HALLIGAN:  So, Your Honor, we are mindful

9  of your caution that any request for an extension has

10  to be accompanied by a detailed factual justification.

11  We believe we have that as laid out in the papers and

12  there are three reasons why we think it's essential.

13  First of all, as we lay out, there have been serious

14  deficiencies in defendants' productions, many of which

15  were not apparent to us until after the extended

16  substantial completion deadline at the end of October

17  and as recently as January, last month, with regard to

18  productions from the exchange defendants.  And I'm

19  happy to outline what those deficiencies are, but they

20  go to the core of our case.

21          With respect to the BT defendants, the bank

22  records are very woefully incomplete and we need --

23          THE COURT:  But those materials were produced

24  to you in April I am told, and you could have told them

25  -- you could have told them back in April that they

```
 1                                                    8
 2   were deficient, is that, did they misstate that in
 3   their letter to me?
 4           MS. HALLIGAN:  Your Honor, my, my
 5   understanding is that half of the documents produced by
 6   BT were produced as of the date of final completion
 7   which is the end of October. Those records are
 8   incredibly complex.  We offered them to try to sort out
 9   a way to identify the bank accounts that held reserves
10   in an expeditions way and they declined. So we received
11   hundreds of thousands of pages, those records, some are
12   in Chinese, many of the bank records do not have full
13   data for every day in the month, there are 112 bank
14   accounts, and so we have been sorting through those at
15   as quick a pace as we can from the end of October until
16   now and all we are trying to do is to ensure that we
17   have full information regarding their reserves. So we
18   could not have done that sooner than we are coming to
19   the Court now.
20           With respect to the exchange defendants, Your
21   Honor, those communications that have given rise to
22   both additional requests and to our requests for an
23   extension came to light when they produced them in
24   January last month.  What both of the Exchange
25   defendants, and the facts are a little bit different
```

9

1
2   with respect to each and I'm happy to go into more

3   detail if Your Honor would like, what is at issue with

4   each of those defendants is the scope of messaging

5   platforms across which they have searched for

6   communications that could go to the core of our

7   allegations about an agreement to prop up the prices of

8   Tether and other crypto commodities. And frankly they

9   played hide the ball.  We are pressing very hard both

10  to remedy the deficiencies and with respect to Poloniex

11  where they have now made clear there are custody and

12  control issues, to test those and to pursue every other

13  avenue we can to get the relevant materials --

14          THE COURT:  Please pause -- please pause, Ms.

15  Halligan, I'm behind you a bit because I paused with

16  the words hide the ball. So tell me, please, how

17  defendants are hiding the ball from you?

18          MS. HALLIGAN:  So, Your Honor, they've

19  produced -- let me, let me speak differently, if I can,

20  specifically about Polonies and Bittrex if that's okay,

21  Your Honor?

22          THE COURT:  Of course.

23          MR. HAZELWOOD: So -- so we had requested early

24  on in the litigations materials, communications with

25  other defendants, the anonymous trader and other

1                                                            10

2   Exchanges and Poloniex told us as they now informed the

3   Court that their employees used a range of messaging

4   platforms during the relevant time period and they also

5   told us that the company had been sold twice and that

6   they would produce documents in their custody and

7   control.

8         They claim that that told us in meet and

9   confers that they were only searching email and Slack

10  and suggest that we were late in coming to them to

11  press than for other platforms. We have searched our

12  own notes of those meet and confers, our

13  correspondence, and we have conferred with prior

14  counsel, and our understanding is that Poloniex did

15  tell us that the first sale in 2018 meant that there

16  were limited documents transferred. They made no

17  representations about communications from the period

18  following the sale through the end of the class period.

19  In fact, in 2022, they did not give us a firm answer

20  about custody and control and offered to explore a

21  compromise.

22        Last month in January of '23, they finally

23  produced messages from a platform called Slack and when

24  we reviewed them we learned that their employees had,

25  in fact, been extensively using these other

communications platforms and they also made clear their

position, for the first time made clear that they

lacked custody and control over communications on those

other platforms.

So that was a month ago. We are trying to test

their assertion about custody and control and we are

exploring and have already taken steps to reach out to

former employees with subpoenas in order to see if we

can secure documents from them as well as what we

believe to be the successor entities. So that happened

last month and we are pursuing it aggressively.

With respect to Bittrex, we had asked for

communications across messaging platforms, but Bittrex

said that they had not authorized their employees to us

other platforms other than email, Slack and two others,

but they never told us that they were not searching

those platforms.  What we discovered when we went

through another defendant's production were documents

indicating that their employees, including the CEO, in

fact did use other platforms. So we are pressing them

to complete that search and to provide us those

documents.

THE COURT:  Ms. Halligan, please pause.  Thank

you.  Returning to Bittrex.  Bittrex said to you at the

```
 1                                                    12
 2   outset they did not authorize their employees to use
 3   other platforms, you say they did not tell you that
 4   they were going to not search those other platforms.
 5   Was there a follow up question by someone on
 6   plaintiff's counsel's team to make -- to clarify that
 7   issue? That seems, if someone had said to me we don't
 8   authorize our employees to use them, my follow-up
 9   question would have been do they use them anyway and,
10   if so, who is going to look for them. I guess I'm
11   trying to figure out whether you were actually left
12   with a misimpression or simply did not ask follow-up
13   questions?
14          MS. HALLIGAN:  Well, Your Honor, when we
15   received documents from another production which made
16   clear that that representation was inaccurate, that is
17   what lead us to press them. I mean we got a document
18   which made clear that their CEO was using another
19   platform. And so that was what led us to need to test
20   this. And they told us that they had not used other
21   platforms that turned out not to be accurate. And so
22   that's why we are probing this now as opposed to when
23   that assertion was initially made.
24          If I can make two other points, Your Honor --
25          THE COURT:  Of course.
```

1

2          MS. HALLIGAN:  I want to be mindful of the

3  Court's time, as we lay out in our letter, we are

4  exploring new evidence that has come to light in the

5  defendant's productions that there may be a wider range

6  of entities that were involved in the manipulation

7  scheme, particularly market makers and other exchanges,

8  and the defendants say that's' not fair because it's

9  far afield from our claims. But that is just flat

10  wrong, those kinds of communications would go squarely

11  to our claims of market manipulation.

12          And finally, Your Honor, we are not asking

13  you, to be clear, to revisit your ruling on the

14  anonymous trader, but I would like to tell the Court

15  those protocols have imposed an extraordinary time

16  consuming burden. And if I could just explain that, I'm

17  not a tech person but i will do my best.

18          So for every file with trader related

19  information, and these, this information often appears

20  multiple times within a document and across production

21  volume, so just one production by Bittrex at the end of

22  December had 72 documents and we had to do more than

23  1,700 redactions. With each of those, we have to go

24  through a process of redacting, exporting and

25  overwriting the file in native and text, reviewing it,

14

queue seeing it and reconverting it. And so given that
this is sprinkled amongst all of the documents, it is
frankly taking longer than we had expected and that is
why we moved the Court for relief. And we understand
the Court's ruling on that but it is something that has
introduced, you know, a greater burden in terms of time
than we had anticipated.

THE COURT:  Yes, but you're not suggesting it
requires four additional months to conclude, are you?

MS. HALLIGAN:  Your Honor, I'm saying with
along with our need to follow up on these deficiencies,
we are really pushing this case as hard as we can.
And, you know, perhaps if we have, you know, perhaps if
we would do something differently going forward I think
it would be to come to the Court more quickly, we would
be happy to schedule a routine status conference with
Your Honor to --

THE COURT:  And I have no, please be clear, I
have no interest in your routine status conference.

MS. HALLIGAN:  Understood.

THE COURT:  I have responded promptly to --

MS. HALLIGAN:  Yes, you have.

THE COURT:  (continuing) -- to every discovery
dispute that you have given me. So please don't be

1 
2 suggesting that somehow I am to blame.  No, no, no, no,
3 because --

4          MS. HALLIGAN:  I did not, no, Your Honor --

5          THE COURT:  Please stop speaking. You're
6 suggesting that going forward things will be different.
7 I don't know, things should have been different all
8 along. It does not give me any comfort to hear that now
9 you have new ideas as to how to do this.  You have
10 given me your reasons, I will take very seriously your
11 reasons, but suggesting that somehow I should get
12 involved more actively to ensure that you abide by your
13 commitments to the Court, I'm not interested in doing
14 that.  I'm here to help you all.  I'm here to help you
15 where there are disputes. I'm not interested in
16 babysitting. But let me not, let me stop there, tell me
17 what else you want me to know about the extension
18 issue.

19          MS. HALLIGAN:  Yes. Your Honor, I did not mean
20 to suggest that, all I meant to suggest is that we
21 should push to impasse more quickly ourselves. I
22 certainly did not mean to suggest that we want or would
23 request babysitting. I apologize.

24          THE COURT:  I do not, the point is, Ms.
25 Halligan, I don't understand why now you're telling me

1

2 that you should have done this earlier. I'm not sure,

3 because it's not as though, however imposing I may seem

4 today, it's not as though I was ever not available for

5 you. So I don't under -- I do think, and I think in a

6 quiet moment you might even agree, that there were

7 issues that you should have brought to my attention

8 much more quickly than January 23rd. I just don't

9 understand why you didn't do it.

10           MS. HALLIGAN:  Your Honor, you certainly have

11 been exceedingly responsive --

12           THE COURT:  Okay, let's not go that far --

13           MS. HALLIGAN:  I think as quick as any judge

14 we've seen.  Okay.  But, Your Honor, two points, one is

15 we truly have been trying to work through these issues

16 with multiple defendants in earnest so that we have not

17 had to come to the Court.  And when we have really

18 reached impasse after what are, you know, sometimes

19 long negotiations, we have come promptly. And my point

20 was simply that I think that we should perhaps take a

21 harder line and we will do that, I was not intending to

22 suggest anything else.

23           Why we came to you in the middle of January is

24 that the process of going through, first of all, the

25 bank records that we got at the end of October, given

                                                                    17

 1 | their complexity, the fact that a number of them were
 2 | in Chinese, these are paper records, paper records that
 3 | we had to image and then review, it simply took us a
 4 | lot of time to figure out what the BT defendants could
 5 | have told us on the front end. Which is what's the
 6 | array of accounts where they claim to have reserves,
 7 | and what are the records attendant to those accounts,
 8 | and where are there deficiencies that show whether or
 9 | not there are, you know, X dollars in Y accounts on a
10 | certain day. So that brought us to the end of the
11 | calendar year and then we spent some time in early
12 | December negotiating the parameters of an extension
13 | request.

14 |          With respect to the Exchange defendants, Your
15 | Honor, those productions that were made to us in early
16 | to mid-January just a couple of weeks ago are what led
17 | us to understand both that there were communications on
18 | other platforms and that there was a position with
19 | respect to custody and control that was now made clear
20 | to us. So that is why we did not come to Your Honor
21 | sooner, but we have not been anything other than
22 | diligent, we have every interest in moving this case
23 | forward as quickly as possible.

24 |          THE COURT:  Thank you.

```
 1                                                    18
 2              MS. HALLIGAN:  Thank you, Your Honor.
 3              THE COURT:  The next set of notes that I have
 4   are from the BT defendants, so is that Mr. Greenfield?
 5              MR. ELLIOT GREENFIELD:  Yes, good morning,
 6   Your Honor.
 7              THE COURT:  And, again, take no offense to
 8   those of you who are, I guess it would be Ms. Rudzin
 9   and Mr. Weiler, it's just how I organized my notes, Mr.
10   Greenfield, please respond.
11              MR. GREENFIELD:  Sure.  So, you know, I don't
12   want to repeat what's in the letter, I heard what you
13   said. I will say that, in general, we, as a matter of
14   professional courtesy, do agree to extensions if
15   they're reasonable requests, and in this case we, they
16   asked for a four-month, we said, you know, and I
17   believe this was on behalf of all defendants, we said -
18   -
19              THE COURT:  Oh, excuse me, okay, then I take
20   that back, I guess when I read the, the Exchange
21   defendants, I just saw, I saw from one of them does not
22   believe that any extension is warranted and the other,
23   the Bittrex defendants noted that I had already granted
24   an extended discovery schedule, so I misperceived that.
25   So I take that back, thank you.
```

1

2          MR. GREENFIELD:  It is all of our defendants'

3  position that no extension is necessary here.  But we

4  did as a group, as a defense group say we would be okay

5  with a two-month extension, as you noted, conditioned

6  only on the agreement by plaintiffs not to serve

7  additional discovery. They rejected that, they wanted

8  four months, no conditions, not a day less.  And, you

9  know, we think there's enough time in the schedule that

10  an extension for them to complete depositions by late

11  May and to file for class certification by late June.

12          Let me just respond to a couple of points that

13  Ms. Halligan raised, if I can.  First, you know, the

14  need to follow up on any perceived deficiencies is not

15  something we're objecting to and there is no reason

16  that they can't continue to do that.  That's very

17  different from serving more requests for more

18  documents.

19          With respect to the purported deficiencies in

20  the BT defendants' production of bank records, that is

21  just, you know, flatly wrong, we've responded to their

22  letter.  They say in their request to the Court, they

23  say, quote, that BT defendants are missing, quote,

24  "multiple years' worth of financial records for over

25  100 accounts at more than 30 banks."  That's just

                                                              20

1

2  flatly wrong.  Most of the bank accounts that they

3  asked about were not bank accounts that held USDT

4  reserves.  There are bank accounts that held USDT

5  reserves but only for, you know, some number of months

6  or years and not the entire relevant period, so we

7  provided bank account statements for those months.

8          There are some of those accounts, as we

9  explained in our letter to plaintiffs, there are some

10 accounts that don't produce a monthly bank statement

11 unless there's activity in the account.  That you may

12 have, you know, the example that was in their letter,

13 there was a bank statement in June and there was a bank

14 statement in September and there is nothing in July or

15 August because there is no activity those months. And

16 they match up the ending balance in June to the

17 starting balance in September.

18          We've gone through and responded to their

19 letter. Their letter actually does not point to any

20 deficiency --

21          THE COURT:  Mr. Greenfield, please pause right

22 there.  Thank you.  I am concerned when you refer to

23 your adversary's argument as flatly wrong. I am

24 assuming that you've had the, you've relayed the

25 information that you've just relayed to me now

1

2  regarding the account statements to plaintiff's

3  counsel?

4         MR. GREENFIELD:  Yes, this is all in --

5         THE COURT:  But are you saying to me, sir,

6  that there are, that your bank records production was

7  absolutely complete or that some deficiency, but just a

8  smaller deficiency than initially thought, was

9  identified by plaintiff's counsel?

10         MR. GREENFIELD:  What I'm saying is that I

11  don't think they identified any deficiency in their

12  letter. I'm not saying that our production is entirely

13  completely, we're still, you know, trying to see if we

14  can track down. There may be some number additional

15  bank statements. We're trying to, you know, investigate

16  and make sure that we produced everything that we need

17  to produce but it's substantially complete and I think

18  any missing documents would be a very small number.

19         Another related point is that we have produced

20  a report which plaintiffs are aware of because they

21  asked about it some months ago, called the BRG report,

22  which for the bulk of the relevant period at least does

23  identify every bank statement, every bank account that

24  held USDT reserves. So they do have that information,

25  there's a period of time after that the BRG report was

1

2   issued, there may be some additional bank accounts and

3   we are in discussions with plaintiffs about their

4   serving interrogatory, answering an interrogatory that

5   provides a complete list.

6          So I would say and, you know, turning from,

7   you know, these, any deficiencies or any follow-ups

8   that they need to do to their new request for

9   additional documents, I think those, you know, again, I

10  don't want to repeat what's in the letter, but it's

11  hard to think of a more blatant fishing expedition than

12  to say, you know, we need every document about Sam

13  Bankman-Fried and Alameda Research, right?  And, in

14  particular, they're pointing to a chat that was

15  reported in the <u>New York Times</u> or <u>Wall Street Journal</u>

16  that took place in November, 2022, so just a few months

17  ago. And that related to an attempt, an alleged attempt

18  by Mr. Bankman-Fried to destabilize the cryptocurrency

19  market by trying to impact the price of Tether by

20  trying to not artificially knock Tether off of its one

21  dollar pay and kind of cause a ripple effect throughout

22  the cryptocurrency market. This is when he, you know,

23  company was on the verge of bankruptcy and, you know,

24  apparent attempt to kind of take down the whole system

25  with him.

THE COURT:  Yes, although I believe, I believe
the email or the communication that was included with
plaintiff's counsel's letter was from 2018, was within
the relevant time period.  I think you are going to
tell me it doesn't mean what they say it means or it
certainly doesn't mean, it's certainly not a harbinger
of doom, but let me have you tell me why it's not
important?

MR. GREENFIELD:  Yeah, it also, like the 2022
chat, it also relates to attempts to knock USDT off its
peg and to artificially manipulate USDT, not by
Bitfinex or Tether but by other players in the crypto
world. And Bitfinex' response to Mr. Bankman-Fried
that, you know, that was not acceptable and he'd be
banned if he, if he followed through. That regardless,
the claims here, and plaintiffs want to, you know,
broadly construe them anything having to do with
manipulation in the cryptocurrency world, that's not
what this case is about.  This case is about a very
specific allegation that the BT defendants printed
completely unbacked Tether, and sent that unbacked
Tether to accounts at Bittrex and Poloniex and used
that completely unbacked Tether to try to, you know,
inflate the price of bitcoin. It's a very specific

24

1
2  scheme and, you know, that does not open the door in
3  our view to anything having to do with any allegation
4  of manipulation anywhere in the cryptocurrency world.

5          THE COURT:  Just one moment, please.  Thank
6  you.  Mr. Greenfield, I am interested in the claim that
7  plaintiffs make that the vast majority of the defense
8  productions in this case took place in October with the
9  October deadline. Now, of course, better to have it
10 before the deadline than after the deadline, to be
11 sure, but I would like to understand from your
12 perspective the degree to which materials were produced
13 in August, at times other than October and, more
14 importantly, the degree to which you have been
15 producing things since October.  Thank you.

16         MR. GREENFIELD:  Sure, I'm happy to discuss
17 that. So what, we produced a large quantity of
18 documents in August. Those were largely documents that
19 had previously been produced to various government
20 regulators, the CFTC, the NYAG, for example, and those
21 were documents that we were able to review and produce
22 because we had reached agreement with plaintiffs on the
23 scope of that production.  What led to, and I don't
24 want to, you know, go through the full history of this
25 case unless you want to hear it, you know, what led to

1                                                    25

2   our asking for the 60 day extension of our substantial

3   completion deadline was the fact that we could not get

4   plaintiffs to engage and agree on custodians and search

5   terms, particularly search terms, until August.

6          So all of the documents that required, you

7   know, collection, you know, filtering using search

8   terms and then review and productions, that process

9   could not have begun until August.  And so that was

10  largely produced, you know, in the fall.  We did

11  produce, you know, approximately 190,000 documents,

12  about a million pages of document, and 92 percent of

13  that, and you can do that by page count or document

14  count, was produced on or before the October 24th

15  deadline for substantial completion.

16         Since that time, there are, you know, various

17  categories of documents that, you know, either we

18  hadn't agreed to produce and Your Honor compelled

19  production of I think in September, some of that has

20  taken a bit longer to collect, there have been some

21  technical challenges. So, you know, even after October

22  there has been some kind of, some smaller productions

23  being made. We produced I think 88 documents yesterday,

24  I think in the next week we're going to probably

25  produce another couple of hundred to kind of close out

26

1

2   various RFPs.  But the vast majority they had on or

3   before October 24th.  The, you know, Chinese bank

4   account records that they're mentioned, they got in

5   August as part of the government production, so they've

6   know about that.  They requested bank accounts,

7   statements from Chinese banks so they're in Chinese.

8           THE COURT:  All right, anything else, sir?

9           MR. GREENFIELD:  Nothing else from me unless

10  you have questions?

11          THE COURT:  No, I've asked the questions that

12  I have, thank you very much. Mr. Lindenbaum, may I hear

13  from you next, please, sir?

14          MR. MATTHEW LINDENBAUM:  Yes, good morning,

15  Your Honor --

16          THE COURT:  Good morning.

17          MR. LINDENBAUM:  Thank you for the opportunity

18  to speak to this.  In addition to the points that Mr.

19  Greenfield made I just want to address a few additional

20  things that came up.  First, we did, along with the

21  other defendants, offer as compromise the two extra

22  months and no new requests, but our position, you know,

23  which remains our position today, is that no additional

24  extension is required. So just to clarify that, that

25  was our offer of compromise.

1

2          THE COURT:  All right, no, I'm going, I was

3    obtuse before, I'll be obtuse again, sir.  Are you

4    still offering that in compromise or have you withdraw

5    that because it's been rejected by Ms. Halligan and her

6    team?

7          MR. LINDENBAUM:  It was rejected so there's

8    no, I think the offer has been rejected so there is no

9    offer out there.

10          THE COURT:  Thank you.  And is it your

11    position as you speak to me now, that there should be

12    no extension at all, courtesy or otherwise?  I just

13    want clarity, please, sir?

14          MR. LINDENBAUM:  Well like Mr. Greenfield, we

15    believe in courtesy extensions but we don't think that

16    one is needed here. We think there's enough additional

17    time in discovery to work through any issues that the

18    plaintiffs may have. But we also strongly believe that

19    no additional discovery should be served at this point,

20    in light of what, in light of the most recent requests

21    that the FTX, Sam Bankman-Friend, far afield from the

22    allegations in this action.

23          The other point I wanted to address is the

24    statement that we are hiding the ball --

25          THE COURT:  Yes.

1

2          MR. LINDENBAUM:  Or that there is custody and

3    control issues, which his simply not the case --

4          THE COURT:  Please, yes, that I would like

5    with some detail, please, sir.

6          MR. LINDENBAUM:  So back over a year ago,

7    January of 2022, our interrogatory responses identified

8    what types of communication platforms people used and

9    that is all laid out, that is not, that was there from

10   the beginning. In our initial meet and confers we

11   explained that what we had from the time in which we

12   owned the Poloniex Exchange was more limited because we

13   had maintained emails and Slack Channel messages, we

14   hadn't maintained the other sorts of communications. So

15   we were upfront about that from the beginning.

16          And to actually take a step back, Your Honor,

17   the other thing that we're upfront about which is

18   really also of public record, is that my client,

19   Poloniex LLC, only owned the Poloniex Exchange for a

20   very short period of time, for a period of 18 months.

21   We bought it from a predecessor and then, that was in

22   February of 2018, actually really kind of, that's the

23   core factual, you know, time period of this case, and

24   then we sold it in November of 2019 to a successor.

25   The plaintiffs have known about this from the beginning

1                                                             29

2   and we explained from the beginning that because of

3   that we don't have everything that the predecessors

4   have in terms of documents and we don't have everything

5   that the successors had because we sold the business.

6           It was only last week, Your Honor, that the

7   plaintiffs served document discovery on the

8   predecessors and on the successor, but that's a fact

9   that in addition to being public, is something that we,

10  that we discussed with them, you know, a year ago. I

11  don't know if it's a question of the handoff from one

12  set of counsel to another where some just got lost, but

13  we've been, we've been clear on these things

14  throughout.  We were clear on what people used, we're

15  clear on what we have and why we have, you know, what

16  we have.

17          THE COURT:  Mr. Lindenbaum, Mr. Lindenbaum,

18  please, just because Ms. Halligan has focused on this

19  in her presentation to me, I do want to make sure I

20  understand that. I appreciate what you're saying, that

21  there have been ownership changes and that there is

22  both a predecessor and a successor entity, but I want

23  to, I want to be sure that I understand how you

24  communicated to plaintiff's counsel the limits on the

25  information that you had as distinguished from that

1

2 that might be in the possession, custody or control of

3 the predecessor or successor entities?

4          MR. LINDENBAUM:  So we identified in our

5 interrogatory responses who the, what platforms were

6 used, and we in meet and confers early on explained

7 here is what we maintained in terms of during the time

8 period that we owned the platform, namely email and

9 slack. And we were upfront about the fact, and I think

10 that this was disclosed in our early interrogatories as

11 well, who those entities were.  But, again, it's a

12 matter of public record as well.

13          So the delay in, I mean any follow-up could

14 have been done at that time and we would have been

15 happy to do it, but like I said, it was only last week

16 that they served discovery on the predecessors and

17 successors, that's not on us and it's no secret who

18 they are.

19          THE COURT:  Sir, at any time before January of

20 2023, did you say specifically to plaintiff's counsel

21 in any of your responses or in any meet and confer that

22 something they were seeking was in the custody of the

23 predecessor or the successor entity?

24          MR. LINDENBAUM:  That something that they were

25 seeking was in the custody of the -- well we said that

1
2  we don't have everything that the predecessor has and

3  we said that we don't, you know, and that we sold the

4  exchange to the successor. I, myself, don't know what

5  the predecessor has or what the successor has, those

6  are other entities. I know, you know, we can say what

7  we gave the successor but we're upfront about the fact

8  that we don't have anything, we only owned this for 18

9  months and we were only brought into this lawsuit after

10 we had already sold the business to the successor.

11         THE COURT:  Mr. Lindenbaum, let me be a little

12 bit more precise with my questioning.  I'm always

13 amazed at discovery responses because of the sheer

14 number of objections that precede the little morsel of

15 information that is disclosed. And so it would not

16 surprise me, for example, if you had said, look, we

17 have what we have, we don't have what we don't have, as

18 just a form objection, did you have anything along

19 those lines where you made clear in your objections to

20 requests for documents or interrogatories or whatnot,

21 that there were limits on what was in your client's

22 possession, custody or control?

23         MR. LINDENBAUM:  Well we have been clear from

24 the beginning, both in our responses to the initial

25 requests for production and in meet and confers after

32

1

2  that.  There's been no hiding of this and it's, you

3  know, we are different entities.

4      THE COURT:  Well not really, I think everybody

5  understands that there are different entities, I guess

6  the point is I could see a situation where your clients

7  retained certain materials even if only in duplicate.

8  And so I guess I'm asking the clarity with which you

9  advise plaintiff's counsel that things has been

10  transferred and were just no longer with your client as

11  a consequence of the sale, or conversely, that Your

12  Honor client didn't receive everything in February of

13  2018 when it took over.

14      MR. LINDENBAUM:  As an example, one of the

15  things that we had mentioned earlier, at least I

16  believe both in the beginning and in subsequent meet

17  and confers, is that for the predecessor owner, Your

18  Honor, what we call the Poloniex founders, we only had

19  the email of the Poloniex founders, we didn't have

20  their other employees' emails. And they had asked

21  specifically about one particular employee, do you have

22  his emails, and we said no, all we have are the three

23  Poloniex founders, that's what we have.  And again --

24      THE COURT:  Go ahead, finish your thought.

25  Thank you.

33

1

2          MR. LINDENBAUM:  It was last week that for the

3   first time they served request on the Poloniex founders

4   personally, they could have done that back in the

5   beginning, they could have done that when we had the

6   conversation in September.

7          THE COURT:  Mr. Lindenbaum, I want to be clear

8   that I'm hoping that I'm not misperceiving the

9   arguments that Ms. Halligan or any of you are making to

10  me today, but what was the clarity that they obtained

11  in January?  I thought I understood Ms. Halligan to say

12  that in making, in undertaking the review of the Slack

13  chats that they realized that other platforms were

14  used, you indicated that you advised them that there

15  was, that you had email, that you had Slack, what else

16  was there that was being used that either you knew

17  about or had access to or didn't have access to?

18         MR. LINDENBAUM:  So, again, over a year ago in

19  our initial discovery responses to their

20  interrogatories we explained, we listed the different

21  messaging platforms that people did use.  So we

22  identified those from the beginning.

23         THE COURT:  Yes, sir.

24         MR. LINDENBAUM:  But we did not, we did not

25  maintain all those, all those and we've said the two

```
 1                                                    34
 2   primary here are Slack and email, that's what we
 3   maintain. So to take, to take Skype, which is something
 4   that was referenced, it's another platform reference in
 5   the Slack messages --
 6            THE COURT:  Yes, of sainted memory, sir, yes,
 7   we used to use it, too, yes.
 8            MR. LINDENBAUM:  Right, right back in, back in
 9   the day people used that, but so there's reference to
10   that in the slacks but those Skype messages were not
11   maintained. In fact Skype is often used as it was, used
12   as a videoconference, so there's reference to using
13   Skype but, you know, those videos aren't recorded, we
14   won't have them in our database.  So that, so there
15   shouldn't be any confusion here and we've been open
16   from the beginning.
17            THE COURT:  All right, is there anything else
18   you wanted me to know, sir, I did not mean to derail
19   you?
20            MR. LINDENBAUM:  No, no, just that, not to
21   repeat anything in the letter, but there's enough time
22   in discovery for any kind of working through, you know,
23   perceived deficiencies, and so we think that's
24   important to note, and the fact that there really
25   doesn't need to be any new discovery at this point, you
```

1
2   know, on topics like FTX and Sam Bankman-Fried.

3          THE COURT:  That's something that your

4   colleagues are all echoing, I understand, I'm not

5   agreeing or disagreeing at this point.  All right,

6   anything else, sir?

7          MR. LINDENBAUM:  No, not unless you have any

8   additional questions, Your Honor.

9          THE COURT:  Thank you, no, I've asked the

10  questions I have, Mr. Rudzin, I appreciate your

11  patience, may I hear from you now, please.

12         MS. ABBY RUDZIN:  Certainly, Abby Rudzin from

13  O'Melveny & Myers for Bittrex.  I'd like to start by

14  addressing Ms. Halligan's contention that we made

15  inaccurate representations, and I think you already got

16  this nuance which is we told the plaintiffs these,

17  these being Slack and email, are the platforms that are

18  the corporate platforms that people at Bittrex use to

19  communicate, and they were not authorized, there are no

20  other official channels. And Ms. Halligan says, well,

21  we've learned that maybe they used Skype or something

22  called Telegram, which I never heard of before, the

23  fact that they might have been used by employees and

24  some occasions in their sort of personal use, does not

25  make our representation inaccurate.

1

2          We, at the beginning of the case we did what's

3  appropriate, we interviewed relevant people at the, you

4  know, left at the company to find out what kind of data

5  they had.  We collected it, we searched it.  Now Ms.

6  Halligan says, well, it turns out that one of your

7  employees used Telegram and they discovered this

8  because one of the other defendants produced a Telegram

9  chat that referred to one of our employees.  That

10  Telegram chat was produced I believe about eight months

11  ago, so Ms. Halligan's suggestion that this was new

12  information is I think in itself inaccurate.

13          As for them, my understanding is that Telegram

14  is kind of like a Facebook group where people with a

15  similar interest can chat to each other. It's not the

16  employees, or CEO or whatever his position was at the

17  time conducting business, he's, you know, doing

18  whatever people do on their computers and chatting with

19  people, and that's his personal account.  So when the

20  plaintiffs raised this issue about his Telegram, we, as

21  a courtesy, I don't think we had any obligation to do

22  this because that platform is not in our possession,

23  custody or control, we went to him and asked him to

24  please log in under his own name, his personal, you

25  know, password, and pull the data so that we could

1

2 search it. and we have done that and we've hit, hit on

3 the search terms 21 documents. so we'll probably be

4 producing five of them maybe next week.

5 So we, at the end we conducted a good faith

6 search, they've raised some issues, we've gone back to

7 try to, you know, chase down every alleyway to see if

8 there is anything else.  The company doesn't have a

9 Skype database, it doesn't have a signal database, it

10 doesn't have a Telegram database, like these platforms

11 are third party, I mean to me they're social media, I

12 just don't know how Bittrex is required to search its

13 employees or former employees' social media platforms.

14 One other point I want to address is Ms.

15 Halligan's contention that they're just following up on

16 deficiencies that came to light recently.  I have in my

17 hand here a letter the plaintiff sent to us Monday

18 night, February 6th, complaining about Bittrex'

19 production in response to RFP 42 which was served in

20 2021 and we did our responses and objections on January

21 28th of 2022. And we told them in those responses and

22 objections that their request was overbroad and not

23 really feasible and we told them exactly what we would

24 produce in response to that request. They didn't

25 object, they didn't raise it in a meet and confer. That

38

1  was over a year ago.

2        We made that production on April 1st, so 10

3  months ago we made the production of exactly what we

4  told them in January we were going to produce, and two

5  days ago they sent us a letter saying your production

6  in response to RFP 42 is deficient because you didn't

7  give us everything we asked for and you only gave us

8  what you said you would give us. I don't think that

9  reflects diligence in terms of, you know, following up

10  on issues or questions or anything like that, and I

11  appreciate your point that Ms. Halligan can say now

12  they're going to move forward and get really

13  aggressive.  But I don't want to give them eight months

14  to do that, and that's what they're asking for now.

15  You know, we're now the recipient of the letters

16  accusing us of having deficient productions and

17  demanding responses within two days on something we

18  produced 10 months ago.

19        So as with Poloniex, our position is there

20  shouldn't be any extension. They've got almost four

21  months left already right now and it was a compromise

22  offer that is obviously no longer on the table of the

23  two months.

24        THE COURT:  All right.  Ms. Halligan, brief

1

2  reply.

3          MS. HALLIGAN:  Thank you, Your Honor. First of

4  all, as a general matter, as Your Honor said, the

5  letter that we reference and I believe it's sealed so I

6  won't go into it, is from 2018. What defendants call

7  new requests, I think we would call following up on new

8  evidence of manipulation and of conversations about the

9  prices in this space. We invited the defendants to

10  represent to us if they were involved in this chat and

11  when it began and they declined to do so. So we have

12  not yet teed that up for Your Honor, but that is why we

13  are looking. It is crucial and goes to the core of our

14  theory.

15          With respect very briefly to each of the three

16  defendants, you know, we received two productions from

17  the BT defendants last night at 10 p.m., I don't know

18  what's in them yet.  But that is part of why we are

19  here today, we still do not have a clear answer from

20  them on all of the accounts comprehensively that they

21  claim back up USDT.  And I would also add that they

22  told us at the time that they needed an extension due

23  to difficulties in collection, not for some reason

24  related to our negotiations. And if the negotiations

25  have taken a while, that is in part because they have

40

1
2  taken very hard lines including widespread objections.

3      With respect to Poloniex, Your Honor, your
4  know, the question of legal control is whether they can
5  require former employees to provide these chats. We are
6  exploring with them their assertion that they lack
7  custody and control. Again, we have not teed that up
8  for the Court, we are trying to come to ground with
9  them on this and also reaching out, as you just heard,
10  to the founders and other entities. But we're trying to
11  test the proposition of something they notified us
12  about a couple of weeks ago.

13      With respect finally to Bittrex, again, you
14  know, a company is required to search any records that
15  its employees use for business. And they can't simply
16  refuse to use, to search a platform that not just any
17  employee but its CEO used simply because they think
18  it's social media.

19      And with respect to the timing, we did not
20  assume that the production was complete when we only
21  had 300 documents.  As Ms. Rudzin says, we are still
22  negotiating with them, we hope that we will come to
23  closure on this question with regard to the scope of
24  the search, if we do not we will certainly tee it up
25  for Your Honor expeditiously.

```
 1                                                   41
 2          Again, Your Honor, you know, we have I believe
 3   worked very diligently, we think these issues are
 4   critical to exploring the claims on behalf of the
 5   class. Any suggestion that this is due to the departure
 6   of Roche Freedman I think is misplaced. They were out
 7   before the extended deadline even hit. And we really
 8   would ask Your Honor to give us the four months that we
 9   need to come to ground on these issues.
10          THE COURT:  All right, thank you all very
11   much. I'm going to just turn off my mic in camera for a
12   few moments. I've been taking notes, as you see, I want
13   to get my thoughts together, I'll be right back, thank
14   you.
15          MS. HALLIGAN:  Thank you, Your Honor.
16              (PAUSE IN PROCEEDING)
17          THE COURT:  Counsel, thank you very much for
18   your patience, I'm going to ask you, please, to return
19   to the platform.  Thank you.
20          All right, my hope is that I have everyone
21   back.  My deputy had to step out for something so of
22   course we are lost without her but I thank you.  And so
23   let me speak to these issues, and took more time than I
24   thought I needed, I appreciate your patience in that
25   regard, but it was because I was concerned about both
```

1
2 the, some of the arguments that were being made to me
3 and the responses to them, and about my own responses
4 to those arguments.

5          One of the things that troubled me about this
6 request was that I felt that there was a lot of loose
7 language, and that's been borne out as well by the
8 arguments to me today that things were critical or that
9 things were the core of the case, or that someone was
10 hiding the ball, and I don't actually find that those
11 statements were necessarily borne out by the record.

12          So part of the reason I took the time that I
13 did was because I wanted to be sure that what I'm
14 saying to you now could not be or would not embody the
15 same overstatements that bothered me so much during the
16 arguments today.  I have, I have views, we all have
17 views, I have a lot of views as to this case and as to
18 the conduct of counsel in this case, I don't need to
19 share the details of them with you today. Suffice it to
20 say that I am dissatisfied with plaintiff's progress, I
21 am dissatisfied with their explanations, I am
22 dissatisfied with their diligence in, at least with
23 respect to discovery in this case.  I went back and I
24 looked at the original timetable, there was a
25 protracted schedule, I chose the longer schedule. I've

43

looked at the timeframe on the disputes that I've
resolved, I do not see a need for an extension.

I agree in large measure, I won't say
entirely, with the defense's arguments regarding their
productions. I agree in large measure with the
explanations given, for example, today by the Exchange
defendants about platforms and custody and control.
Conversely, I do not agree, though I do appreciate the
effort, to argue that new areas of discovery are
somehow organic follow-ups to earlier requests. And I
understand that there are discovery disputes that I
will be seeing soon, I think I heard three of them
identified by plaintiff's counsel. I'll address them
when I address them, I don't foresee them as a threat,
I just understand that they are coming, but I have to
say a comment by Ms. Rudzin resonated with me that it's
tough when you've made a production months and months
ago to be asked to run around, rearrange your schedule
and respond in days because someone was inattentive to
it.

So to be clear, and I think my statements to
you this afternoon are clear, I don't want to grant a
discovery extension. I don't want to grant a discovery
extension and I particularly don't want to grant a

44

1
2   discovery extension to pursue new lines of inquiry that
3   are attenuated from the original complaint.  But the
4   fact remains that the parties, at least at one point,
5   thought it was appropriate to offer or to discuss a
6   two-month extension. And I have spent a significant
7   portion of the last period of time trying to find a way
8   or a reason for me to completely disregard the courtesy
9   that defense counsel was willing to exchange to
10  plaintiff. And the fact remains that had the parties
11  agreed on this extension and presented it to me, I
12  would have been annoyed, as I am with this request, but
13  I probably would have granted it. And given that, I
14  don't, I think it would only be pettiness for me to
15  deny it now.
16          At some point a bunch of you thought two
17  months was okay, and I don't think it is appropriate
18  for me to disagree with that, inasmuch as you are all
19  closer to the case, but I'll say again, I don't think
20  any extension is warranted, I would have granted none.
21  So where we are is that I will grant the two months on
22  the condition offered by the defense, that there be no
23  new discovery requests during that period.  This
24  extension, the completion of this discovery, is for
25  plaintiff to do and to complete what they should,

45

1  plaintiffs, to complete what they should have completed

2  all along and not to engage in new frolics and detours

3  into new areas and not to come to me in two months and

4  ask for additional time.

5  So I guess I'll ask the parties to meet and

6  confer and provide for me a revised amended case

7  management plan to address the two months.  Be

8  forewarned that I will take very seriously what is new

9  discovery and what is an appropriate follow-up

10  question. And I think it is -- well, I mean I think

11  it's unfortunate that we are where we are right now. I

12  cannot communicate enough my disappointment with that.

13  So I believe that resolves the extension request.

14  I'm telling myself, and I hope that plaintiffs

15  didn't seek a four-month assuming I'd split the baby

16  and give two months. Again, I don't, I, were I not

17  presented the context of the courtesies, and they were

18  courtesies extended by the defense, I'd give nothing

19  and I'd be very comfortable with it.

20  So that's where we are on that issue and that

21  leaves us the issue of the anonymous trader. So I think

22  I have Ms. King on that point --

23  MR. GREENFIELD:  Your Honor?

24  THE COURT:  Oh, yes, there's someone speaking,

46

1   yes, Mr. Greenfield, yes, sir?

2          MR. GREENFIELD:  Yes, just one quick question

3   on that ruling.  I'm curious how it impacts the

4   numerous third party subpoenas that plaintiffs have

5   sent out just in the last couple of weeks while this

6   discussion about an extension was going on, including

7   two, Sam Bankman-Fried and Alameda Research, is that

8   considered --

9          THE COURT:  Look, the -- I think the Alameda

10  and the Bankman-Fried stuff is at the frontier of what

11  I would consider relevant to this case.  It's out there

12  and I'm not going to retract it, but nothing, nothing

13  more like that. I think plaintiffs are done with their

14  sending out requests, I think they're really limited at

15  this point to following up on deficiencies and asking

16  for try clarifications of things.

17         Mr. Greenfield, does that answer your

18  question?

19         MR. GREENFIELD:  Yes, understood, thank you

20  very much.

21         THE COURT:  All right, thank you, very much.

22  Yes, Ms. Halligan?

23         MS. HALLIGAN:  Understood, Your Honor, I'm

24  going to let Ms. King take the podium to address the

```
 1                                                      47
 2   anonymous trader issue if I may?
 3            THE COURT:  Thank you very much, yes. Ms.
 4   King, you're welcome.
 5            MS. HALLIGAN:  Thank you, Your Honor.
 6            MS. LAURA KING:  Good morning, Your Honor.
 7            THE COURT:  When you're ready, Ms. King, thank
 8   you.
 9            MS. KING:  Good morning, Your Honor, Laura
10   King for Selendy on behalf of plaintiffs.  I first want
11   to start off by saying we understand the Court's ruling
12   as to the anonymous trader securities concerns and
13   information.  Our position is simple, what we are
14   seeking is parity here. As we understand it now, the
15   anonymous trader's position is that all parties seeking
16   to share the trader's personally identifying
17   information with non-attorneys or experts should be
18   subject to the Court's previous orders.
19            Defendants have repeatedly taken the position
20   in response to our requests and to this Court that they
21   take the same position as the anonymous trader. And
22   defendants have taken the position that it is not their
23   place to waive the protections the Court has afforded
24   tot eh trader. So there is no reason that the Court's
25   restriction on sharing the trader's personally
```

48

1

2 identifying information with non-attorneys and experts

3 would not apply equally to defendants.

4            THE COURT:  Ms. King, just so that I'm clear,

5 what I'm understanding you to say is that the prior

6 decision that I had that any transmission of materials

7 to staff or to expert witnesses would be in redacted

8 form, you're saying that that applies, it does apply to

9 you all and it applies equally, it should apply equally

10 to the defendants, do I understand that correctly?

11            MS. KING:  Yes, Your Honor, that is correct.

12            THE COURT:  Okay, please continue, thank you.

13            MS. KING:  To date that is not the position

14 defendants have communicated to us, the position they

15 have articulated is that the restrictions only apply to

16 plaintiff's counsel because they can do whatever they

17 want with their own documents.  This Court's order at

18 docket 215, Your Honor, which you just mentioned,

19 adopted the anonymous trader's proposal which provided

20 that his material could be used by redacting his

21 personally identifying information in order to share

22 them with non-attorneys and experts. That restriction

23 applies equally to defendants.

24            And I think a contrary position is

25 inconsistent with his position the trader's security

concerns and this Court's rationale for imposing these

protections. At the highest level, the anonymous

trader's position has been that wider dissemination of

his personally identifying information poses a greater

risk to his security.  This Court has endorsed that

rationale in maintaining the protections and so we

would ask that for all non-attorneys defendants be

required to similarly submit a list of non-attorneys

with access to the trader's personally identifying

information to the trader and to the Court articulating

the need for access as plaintiffs have done, and with

respect to experts we ask the defendants likewise be

required to redact any documents containing the

trader's personally identifying information consistent

with this Court's order at docket 215.

          Finally, going forward, Your Honor, given the

--

          THE COURT:  I'm sorry, can I just ask you to

pause for a second, I'm sorry, I'm trying to take the

note.

          MS. KING:  Absolutely.

          THE COURT:  The docket entry again, please,

was 215?

          MS. KING:  215, Your Honor.

50

1

2          THE COURT:  Thank you, and just one more

3   moment, please, as I take the note down.

4          MS. KING:  Absolutely.

5          THE COURT:  Thank you, please continue.

6          MS. KING:  And, finally, going forward, Your

7   Honor, given that plaintiffs alone have shouldered the

8   burden of redacting the trader's personally identifying

9   information for nearly a year at the expense of moving

10  more efficiently, it is our position that defendants

11  should be required to produce to plaintiffs a clean

12  copy and a redacted copy of all documents containing

13  the trader's personally identifying information in

14  future productions.

15          And I'm happy to answer --

16          THE COURT:  I'm not sure I was ready for that

17  request, let me hear that again, please.

18          MS. KING:  Sure.

19          THE COURT:  You've already done the redacting

20  or you're in the process of doing it with respect to

21  your expert witnesses, correct?

22          MS. KING:  Correct, Your Honor, we're saying

23  for future -- for future productions, not anything

24  that's been produced to date.

25          THE COURT:  I see, are there additional

1
2 anonymous trader records that you believe are out there

3 and would be produced in future productions?

4         MS. KING:  I do, Your Honor, I think it's

5 going to depend on the custody and control issue that

6 Ms. Halligan raised. But to give Your Honor an example,

7 you know, one Poloniex employee indicated that he

8 exchanged 1,500 messages with the anonymous trader in

9 an 11 month period, and we have no, none of those

10 underlying communications. So it seems possible at

11 least that we will be getting more anonymous trader

12 information.

13         THE COURT:  Okay, thank you.  Mr. Greenfield,

14 I don't know if you want to be heard on this issue?

15         MR. GREENFIELD:  Sure, thank you.  So I think

16 as a threshold issue to the extent in question, we do

17 not believe that the protective order or any of the

18 Court's subsequent orders that are specific to the

19 anonymous trader apply to defendants' handling of their

20 own documents. The protective order, the original

21 protective order which is docket 151, states that,

22 quote, "This protective order does not in any way

23 restrict the use or discovery by a party or other

24 person of its own discovery material," that's standard

25 language in every protective order that I've seen.  The

1

2  Court's subsequent order specific to the anonymous

3  trader from November of 2021 and April of 2022, both

4  refer to materials that are received through discovery

5  and not to, you know, parties' own documents.

6          THE COURT:  But, Mr. Greenfield, let me say

7  this.  I think you're accurately quoting the documents

8  in this case, but the issue the trader has expressed

9  concerns to me about his security.  How is it that I

10  can impose on plaintiffs these very severe restrictions

11  when it comes to transmission to staff or to expert

12  witnesses, but that you all don't have similar

13  restrictions, that would seem to undermine everything

14  the anonymous trader is seeking.

15          MR. GREENFIELD:  Well the defendants, you

16  know, already know the identity of the anonymous

17  trader, so, you know, our clients all know that

18  identity and his PII.  We are, you know, very careful

19  about his information in the same way we're extremely

20  careful about the information of all of our customers.

21          THE COURT:  Sir, I'm thinking -- excuse me,

22  sir, I'm thinking particularly about expert witnesses,

23  why shouldn't those materials be redacted when given to

24  expert witnesses?

25          MR. GREENFIELD:  I don't have a problem with

53

1
2  that, I think that in the past in full disclosure, you

3  know, quite a while ago and, you know, I was not

4  directly involved in it but I believe that anonymous

5  trader materials were shared with an expert because

6  those were, again, our own documents and we didn't

7  understand any of the Court's orders to be preventing

8  that. On a going forward basis we don't see any need

9  for our experts to see unredacted copies. I don't think

10 it's, you know, quite as burdensome as plaintiffs

11 suggest because, you know, maybe I'm being proven wrong

12 but I don't see why an expert needs to see all kinds of

13 text messages involving the anonymous trader, I think

14 an expert is largely going to be, you know, evaluating

15 transaction records. So on a going forward basis we're

16 willing to redact that information before we provide

17 documents to experts to the extent they have not

18 already received unredacted documents, you know, unless

19 we see, you know, down the road see a need for

20 unredacted documents and we would come back and address

21 it at that point.

22      THE COURT:  Sir, do you want to speak to Ms.

23 King's last point which is about future productions, do

24 you contemplate there being any productions from your

25 clients that would involve the anonymous trader and if

1                                                             54

2  there are, are you willing to provide them in redacted

3  and clean form?

4          MR. GREENFIELD:  I don't anticipate that there

5  are going to be more, I can't say for certain they're

6  not. The one thing, the reason I'm pausing is that, you

7  know, we're going through our privilege review and

8  inevitably when you do a privilege review some

9  documents fall out of that and you decide, all right,

10 that was originally tagged as privilege but we don't

11 think it is and can be produced. So there may be some

12 small number that come through that way.  You know, I

13 guess I don't feel strongly either way.

14          I don't, the whole, you know, asymmetry of the

15 burden is, you know, sometimes hard to take on the

16 defense side, you know, given that, you know, we, as I

17 said earlier, reviewed and produced, well we produced

18 190,000 documents, a million pages, we reviewed

19 multiple of that.  Plaintiffs have produced to us I

20 think 10,000 documents. So there's asymmetry is a

21 burden everywhere in litigation, it usually falls more

22 on the defense side, but happy to comply with however

23 Your Honor would like to proceed.

24          THE COURT:  Well that's because you also think

25 there are very few documents that it would apply to but

55

1
2  I do appreciate the willingness sir, all right, thank

3  you.  May I hear from Mr. Lindenbaum now?

4          MR. LINDENBAUM:  Sure, Your Honor, I don't

5  have anything different to add to say on this topic

6  other than what Mr. Greenfield just said. I would

7  anticipate to the extent there are any additional

8  productions, they're more likely to come from third

9  parties actually and not parties to this case.

10         THE COURT:  All right, and Ms. Rudzin.

11         MS. RUDZIN:  I'll be very brief, we agree with

12  what Mr. Greenfield said, we have no problem not

13  revealing the identity to an expert, we haven't done so

14  yet and we are fine not doing it in the future. But I

15  also think, and I don't think we're really going to be

16  producing any more documents with his identifying

17  information, but I think the plaintiff's claim that

18  it's too burdensome for them when, as Mr. Greenfield

19  points out, we have to review five, ten documents for

20  every one we produce, I think they can handle the

21  burden of a few extra redactions.

22         THE COURT:  Okay, thank you.  All right, Ms.

23  King, your reply, please.

24         MS. KING:  Yes, Your Honor, I won't, I won't

25  repeat the burden of the redaction process but I will

```
 1                                                    56
 2   say to this Court that I have personally spent many,
 3   many, many hours dealing with the ancillary issues that
 4   arose out of it.  That element of it is not a lack of
 5   diligence and it was always an effort to comply with
 6   this Court's order.
 7           You know, I think defendants are saying
 8   there's no reason, really, they shouldn't be subject to
 9   the same restrictions, to the extent, you know, they've
10   provided things to experts, perhaps they want to claw
11   back things revealing the anonymous traders identity,
12   but certainly going forward we would ask that they
13   redact anything with this personally identifying
14   information and are under the same protocol that
15   plaintiffs are under.
16           THE COURT:  Ms. King, let me just make sure I
17   understand what you're saying. I do think there is
18   agreement or at least they'll allow me to order that
19   with respect to their communications with their expert
20   witnesses, the personal identifying information of the
21   anonymous trader would be redacted from any materials
22   given to the expert witnesses. For the one person who
23   may have gotten something earlier, I'm not going to
24   bother with the claw back, I'm not really worried about
25   that now. The security issues were only brought to my
```

57

attention when they were brought to my attention.

What they're saying, however, is that's really focusing on the expert witnesses. To the extent that there are client representatives who know who this person is, it seems a little bit foolish to do the redactions. So will you accept as a compromise the offer to redact any materials going to expert witnesses or similar third parties?

MS. KING:  Yes, Your Honor.

THE COURT:  Yes, good, okay.

MS. KING:  And I want to be clear, I wasn't suggesting that this Court's order, you know, changed what their client representatives could do with their documents, but rather that non-attorneys and experts, the lawyers in this action are doing would be subject.

THE COURT:  And, Ms. King, I appreciate that, let me just, I'm just trying to understand, in terms of the non-lawyers, what are you thinking about?  Are you thinking about staff at each of the law firms, are you thinking about some document vendor, I just want to make sure I understand it?

MS. KING:  No, I'm thinking about staff at the law firm, Your Honor. I think it probably depends how they maintain their documents, right, but for

1                                                                    58

2 plaintiffs the issue with the anonymous trader, having

3 the anonymous trader's material on the (indiscernible)

4 review was the following. Our litigation support

5 specialists have access to our document hosting

6 platform. So if we put the documents unredacted on that

7 document hosting platform, by virtue of doing that non-

8 attorneys would have had access to, potentially had

9 access to the information.  So we were redacting before

10 we were putting it on that platform.

11          And so, and so, you know, we have come up with

12 a list of the minimum amount of people that need, that

13 from our firm that are not attorneys need access, and

14 we think defendants should do the same. And we think

15 that's consistent with the trader's security concerns

16 and the rationale this Court has articulated in

17 limiting the dissemination of his information.

18          THE COURT:  All right, now, see, Mr.

19 Greenfield, this is the issue, I knew it was too easy.

20 On the issue of expert witnesses I think we're in

21 agreement, on the issue of documents going forward,

22 recognizing the arguments regarding information

23 asymmetry, because I'm telling myself that there will

24 be so few of these documents being produced I will ask

25 you to produce them in clean copy and other, and

                                                     59

1
2   redacted form.  And you can come back to me if it turns

3   out that there are a million documents and I'll see if

4   I need to revisit the issue. If there are we have I

5   think bigger problems.

6           But what do I do with your paralegals, sir,

7   what do I do with litigation support specialists, I

8   imagine these documents are already in your system, is

9   that correct?

10          MR. GREENFIELD:  Yeah, I mean I think that

11  ship has sailed, we've been using non-attorneys at our

12  firm and document vendors to host and review these

13  documents.  You know, I don't think that we can undo

14  that or that there's a reason to either. These are,

15  again, our client's documents and if they want to share

16  them with their lawyers as part of a lawsuit and their

17  law firm, that seems reasonable to me.

18          THE COURT:  Well let me ask this, Mr.

19  Greenfield, would it be possible for you to identify

20  the folks in your respective defense firms who are

21  looking at the materials, because I thought I

22  understood that there were individuals as to whom the

23  anonymous trader has given an all clear to access the

24  information without redaction, am I misunderstanding

25  that?

60

MR. GREENFIELD:  I'm not sure I'm following, I know that --

THE COURT:  Okay, let me try that, I'll try that again and I'll try and be more thoughtful, excuse me.  I thought I understood that the anonymous trader accepted or gave an all clear to eight members of plaintiff's firm's staff who could look at these, look at the information without redactions. Ms. King, am I correct or have I misunderstood that?

MS. KING:  No, you are correct, Your Honor, that's correct.

THE COURT:  Okay.  So, Mr. Greenfield, is it possible that we could get perhaps retroactive approval nunc pro tunc approval for the folks on your teams who are looking at this, and if the anonymous trader were to say it's fine that they're looking at it then we wouldn't have to worry about it.  And if he said it's not fine, then there might be something else for us to do.

MR. GREENFIELD:  I'm happy to look into that, I really can't say --

THE COURT:  Of course.  Of course, no, I understand --

MR. GREENFIELD:  Because I don't know in this

1

2  much detail as perhaps I should about, you know, the

3  process for who has had access or handled them within

4  the firm.

5       THE COURT:  Of course, sir, please understand,

6  I'm not interested in giving you all a lot of extra

7  homework.  I'm trying to address which, what for me may

8  have been late breaking concerns about security. If

9  ultimately you belief it can't be done, what I'm asking

10  for is ridiculous, then write me a letter and tell me

11  that and I will, I will think about it. If you think

12  that you can gather together a list of people and the

13  other firms, Mr. Lindenbaum's firm and Ms. Rudzin's

14  firm could get together the people who are involved and

15  we could show that to the anonymous trader and the

16  anonymous trader could say, yay or nay, that's a

17  possibility. It just may be impracticable. I mean I'm

18  sort of giving it to you on the fly.

19       MR. GREENFIELD:  As you're talking I'm

20  thinking about it, I think it's impracticable, I think

21  we've used multiple document hosting vendors, we've

22  used outside vendors to do kind of some of the first

23  level review of documents.  It's not a matter of, you

24  know, a handful of people at Debevoise which we could

25  do, but I don't think, I mean I don't think it's

62

1

2  possible at this point to go back and identify anyone

3  who's had access over the past year.

4          THE COURT:  And I accept that for the reasons

5  that you've just said but let me ask you, what about

6  going forward?

7          MR. GREENFIELD:  Yeah, I think we can give it

8  a shot and I will write a letter if on further

9  consideration and discussion with my team they tell me

10  that that's a crazy thing I never should have said yes

11  to.

12          MS. RUDZIN:  Your Honor, may I be heard?

13          THE COURT:  Ms. Rudzin, yes, please.

14          MS. RUDZIN:  Just a quick possible better

15  suggestion is what if we got blanket approval from the

16  anonymous trader that employees of our firms could see

17  them rather than trying to name people? Because I'm

18  sure you know that at a big firm people leave, new

19  people come in, any list would be --

20          THE COURT:  You don't say, yes.  Listen, if

21  you can do it, I -- yes, that's fine.

22          MS. RUDZIN:  Okay.

23          THE COURT:  I'll accept a blanket approval,

24  too, but not on the expert witnesses.

25          MS. RUDZIN:  No, agreed, I just think the

63

trader has never expressed a concern about O'Melveny

knowing his identity and I think it's partly because

we're not suing him or accusing him of wrongdoing so he

probably feels a little more comfortable with us. But

that might be better than specific identities.

THE COURT:  All right, I will leave to you,

Mr. Lindenbaum and Mr. Greenfield, how best to approach

counsel -- the anonymous trader doesn't have counsel,

does he, is he doing all of this, Ms. Rudzin, if you

know?

MS. RUDZIN:  I believe he has consulted with

someone but he doesn't officially have counsel in the

matter.

THE COURT:  All right, let's ask the question

differently, has your firm communicated directly with

him?

MS. RUDZIN:  Yes, remember, we obtained that

declaration a couple of years ago.

THE COURT:  Okay, fair enough. I guess, well I

guess my question is would you be reaching out, he has

what I would call shadow counsel basically, was your

contemplation to reach out to shadow counsel or reach

out to him directly?

MS. RUDZIN:  To shadow counsel.

```
1                                                    64
2              THE COURT:  I'll let you do that, thank you.
3              MS. RUDZIN:  Okay.
4              THE COURT:  Okay.  All right, Ms. King, I
5    thank you, I believe that resolves the issues you've
6    raised to my attention, is that correct?
7              MS. KING:  I think that's right, Your Honor, I
8    think this exchange illustrates how the protocols have
9    limited plaintiffs and not quite the same has been true
10   for defendants, and so we are just seeking parity
11   consistent with the anonymous trader's concerns and I
12   thank the Court for its time.
13             THE COURT:  I thank you all very much. I've
14   kept you for now two hours, I appreciate your
15   willingness to forego lunch for these conferences. I
16   will be looking for  a revised case management plan
17   that I will sign while holding my nose but it will be
18   done. I thank you very much, I ask you to please get
19   along better with each other and to communicate a
20   little bit better with each other, and I wish you
21   continued safety and good health in this pandemic. We
22   are adjourned. Thank you.
23                  (Whereupon the matter is adjourned.)
24
25
```

1                                                      65

2                    C E R T I F I C A T E

3

4          I, Carole Ludwig, certify that the foregoing

5    transcript of proceedings in the United States District

6    Court, Southern District of New York, In re: Tether and

7    Bitfinex Crypto Asset Litigation, Docket #19cv9236, was

8    prepared using PC-based transcription software and is a

9    true and accurate record of the proceedings.

10

11

12

13

14   Signature_____
                        *Carole Ludwig*

15                    Carole Ludwig

16   Date:   February 13, 2023

17

18

19

20

21

22

23

24

25