```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
        ------------------------------:

        IN RE TETHER AND BITFINEX      : Case No.: 19-cv-9236

        CRYPTO ASSET LITIGATION        : New York, New York

                                       : June 6, 2023

        ------------------------------:
```

                 TRANSCRIPT OF STATUS CONFERENCE HEARING

              BEFORE THE HONORABLE KATHERINE POLK FAILLA

                    UNITED STATES DISTRICT JUDGE


```
        APPEARANCES:

        For Plaintiff:          SELENDY GAY ELSBERG PLLC
        Matthew Script          BY:  Andrew R. Dunlap, Esq.
                                     Laura M. King, Esq.
                                1290 Avenue of the Americas
                                New York, New York 10104

        For Plaintiff           SCHNEIDER WALLACE
        Pinchas Goldshtein      COTTRELL KONECKY, et al.
                                BY:  Todd M. Schneider, Esq.
                                2000 Powell Street - Suite 1400
                                Emeryville, California 94612

        For Defendant           DEBEVOISE & PLIMPTON LLP
        Tether Holdings         BY:  Elliot Greenfield
                                66 Hudson Boulevard
                                New York, New York 10001

        For Defendant           WILLKIE FARR & GALLAGHER LLP
        Philip G. Potter        BY:  Charles D. Cording, Esq.
                                787 Seventh Avenue
                                New York, New York 10019

        Proceedings recorded by electronic sound recording;
        Transcript produced by transcription service.
```

```
1                    APPEARANCES CONTINUED

2

3    For Defendant            NELSON MULLINS RILEY &
     Poloniex, LLC            SCARBOROUGH LLP
4                             BY:  Matthew G. Lindenbaum, Esq.
                              One Financial Center - 35th Fl.
5                             Boston, MA 02111

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1           THE DEPUTY CLERK:  Counsel, please hold
2      while I bring in the Judge.
3           Your Honor, this is in the matter In re
4      Tether and Bitfinex Crypto Asset Litigation.
5           THE COURT:  All right.  Good morning to
6      everyone.  And my hope is that you can hear me, and
7      you can raise your hand if you cannot.
8           I see nods.  I appreciate that very much.
9      Mr. Lindenbaum, thank you.
10           I know that there are a number of people
11      participating by telephone today.  In person, or at
12      least on the screen, I have some folks I can
13      identify.  I have Mr. Dunlap, Mr. Schneider and
14      Ms. King for the plaintiffs.  I have Mr. Greenfield
15      for the BT defendants.  I have Mr. Cording for
16      Mr. Potter.  I have Mr. Lindenbaum for Poloniex.
17           So -- and I have a number of you, again,
18      participating by phone.  And wherever you are
19      participating and by whatever means, I am hoping
20      that you are all safe because there have been some
21      strange recent events.  I didn't want to have this
22      conference, but we're having this conference, and
23      let me explain to you what I'm trying to achieve and
24      what my concerns are.
25           We had a conference on February 8th where I

PROCEEDINGS

1   had some pretty stern words with Ms. Halligan about

2   what I thought was insufficiently rapid progress,

3   insufficient attention paid to discovery in this

4   case.   Perhaps defense counsel thought that that

5   meant it was open season on plaintiffs' counsel.   It

6   was not.

7          My sense, based on everything I've seen

8   since then, is that plaintiffs and their counsel

9   have, since the February 8th conference, tried to

10   catch up, tried to resolve the discovery issues, and

11   tried to figure out what is outstanding and what the

12   disputes between the parties are.   I've been

13   getting, basically, weekly discovery disputes, and

14   I've tried to resolve them as quickly as I can.

15          What causes me concern is the most recent

16   series of letters that I've received from the

17   parties.   I did not think that I had to issue the

18   May 1st endorsement.   I thought that was clear, but

19   I will accept the fact that some of you thought that

20   was not clear.

21          That said, the May 30th endorsement was, to

22   me, entirely unnecessary.   And to the extent that

23   defense counsel are now suggesting that I meant

24   something other than what I said, I'm very

25   disappointed because I don't think you could fairly

PROCEEDINGS

1  and in good faith interpret my endorsements --

2  earlier endorsements any way other than the way

3  plaintiffs interpreted them.  So I have to say, the

4  May 30th endorsement was a difficult one for me to

5  write and to sign.

6          We are now in the position where

7  plaintiffs' counsel is asking for an extension.

8  Everyone on this conference knows I don't want to

9  grant this extension.  But I feel as though defense

10  counsel are forcing my hand and forcing me to do so.

11  The reason we're having this conference today is

12  that if I am granting an extension, for whatever

13  length it is, I want it to be the last.  And I don't

14  know how with this group of attorneys to communicate

15  that to you.

16          So, Mr. Dunlap, for example, one of the

17  things raised in the most recent set of submissions

18  that I got over the last day or so was that there is

19  still the issue of the anonymous trader.  There may

20  be a Hague Convention issue.  There may be other

21  issues.  I don't know.  But I'm not especially -- if

22  you're asking for 90 additional days, I don't want

23  you to come to me on day 89 and say, we need another

24  120 for the anonymous trader.  I also need to

25  understand what remains as discovery disputes.

PROCEEDINGS

1          And I appreciate -- and I'm saying this to

2    both sides, all sides, that you might not know

3    there's a dispute until there's a dispute.  But I

4    keep thinking, I'm answering issues, I'm resolving

5    issues, and there can't be that many more categories

6    of documents left to address.  But perhaps I am

7    wrong.  So we are here today so that you understand.

8          Plaintiffs' counsel, I'm watching you in

9    the sense that I do not want to have accretive

10   discovery extension requests.  I just don't.

11         Defense counsel, I'm watching you because,

12   as clever as you are, I'm beginning to -- well,

13   let's just say you're dissipating a lot of the

14   goodwill you have with me with your most recent

15   suggestions.  And let me just think.

16         Mr. Lindenbaum, this idea of dismissing the

17   whole case as to Poloniex because there haven't been

18   timely notices of deposition, that -- that's really

19   where my blood started to boil.  So let's not do

20   that again.

21         So, friends, now that we're all together,

22   let me understand what's left, how long is it going

23   to take to resolve.

24         Mr. Dunlap, I am beginning with you.  And,

25   counsel, just so you understand, you're all

PROCEEDINGS

1    switching positions in my Teams meeting, so if my

2    eyes go to different places, it's because I'm trying

3    to follow you.

4         Mr. Dunlap?

5         MR. DUNLAP:  Yes, Your Honor, and thank

6    you.  I can tell you exactly what we think is

7    outstanding on the trading records.  And this really

8    is, for us, about the trading records.  Our position

9    is not that we need every single last e-mail before

10   we can start depositions.  We think trading records

11   are in a different category.  We think you recognize

12   that in your September order when you said they go

13   to our core allegations.

14        So we have received a flurry of productions

15   from the BT defendants recently, but we think there

16   are three basic issues that we have.  The first is

17   that we still don't have any records for account

18   3319.  And they make reference to this in a footnote

19   in their most recent letter, where they say that

20   they're continuing to search for any responsive

21   transaction records in this automated system and

22   that it requires substantial time and computing

23   resources to query.  We're not sure why that is.  We

24   identified this account to them long ago, including

25   our April motion to compel.  But we don't have any

PROCEEDINGS

1   records.  And they say also in the footnote, they

2   don't think these records are relevant.  We hope we

3   don't have to re-litigate again that this is

4   relevant.

5        But this is a big deal because this is one

6   of their two major reserve accounts.  While we don't

7   have records for it, we do have documents describing

8   that account, one of which says there were around

9   500,000 trades in a single month in 2017.  That

10  would extrapolate out to millions of trades in the

11  relevant period.  So this is a very, very big deal.

12       Any suggestion we can, sort of, move ahead

13  with our analysis without this account is kind of

14  like saying we can eat the meal without the entree.

15  Like, we need these records.  It could be a large

16  chunk of the data.

17       There are also a couple of smaller issues.

18  There are a couple of accounts they've produced to

19  us where we see some gaps that we're talking to them

20  about.  For example, account 1675, that is one

21  belonging to Mr. Devasini.  You may recall evidence

22  we presented that they had denominated trades in USD

23  as -- in USDT as USD before 2019.  We don't see any

24  USDT bitcoin trades in that account.  And this was

25  one where they say they're not still looking.  They

PROCEEDINGS

1    just say there are no records.

2              That strikes us as peculiar because we have

3    documents indicating trades of USDT for bitcoin in

4    January of 2015, a month before the relevant period

5    starts.  So we've asked them to confirm not just

6    that there are no records, but that there were no

7    trades.  Or if there were trades, but there are no

8    records, to explain to us what happened to the

9    records, if they were deleted, when and how.  So

10   far, they've declined to give us any of that

11   information, so we're still meeting and conferring.

12             And the third bucket of concerns, I would

13   say, to use an old term now, are unknown unknowns.

14   They produced many documents to us recently.  We got

15   a bunch at 9 p.m on Monday night.  We got others

16   last night we're still reviewing.  We can't be

17   100 percent sure this is the full universe.  At one

18   point, they gave us a rog answer listing all their

19   accounts.  That was in April.  We identified

20   accounts that were missing.  They said they would

21   give us supplementary answer on that list.  We

22   haven't gotten that yet.

23             So we certainly hope that we at least know

24   what all the accounts are, and we just have

25   identified ones where there are gaps, but we can't

PROCEEDINGS

1    be 100 percent sure.

2             THE COURT:  All right.

3             MR. DUNLAP:  So that's what we think is

4    missing, and that's why we're asking for the

5    additional time.

6             THE COURT:  But, Mr. Dunlap, my concern is,

7    what you've just said to me does not, to me, sound

8    like there's anything new.  It sounds like these are

9    things that we've talked about in the past, except

10   for what you've just described as "the unknown

11   unknowns."  I think you're telling me and giving

12   yourself the wiggle room to say, I didn't even know

13   to ask for that because I didn't know it existed,

14   but all right.

15            And, Mr. Dunlap, anything else you want me

16   to know in response, for example, to the letters

17   that I've received in the last 24 to 36 hours?

18            MR. DUNLAP:  Well, I'm glad to answer any

19   questions you might have about that.  I mean, our

20   request basically boils down to -- we're not really

21   looking for more absolute time.  We're just looking

22   to be put in the position we would have been in had

23   we received all of the trading records at the

24   current substantial completion deadline in March.

25   So that would give us about four months to take all

PROCEEDINGS

1    the records.  It will take us, because this is so

2    large -- it's like a jigsaw puzzle, you need to have

3    all the pieces before you can understand what the

4    whole image looks like.

5              We need about four months.  That would be

6    time to analyze the data on the front end, take

7    depositions, use that information on the back end

8    for expert work for the next stage of the case.

9    That's where we would have been if they'd given us

10   everything in March, and that's where we're asking

11   you to put us in now.  We want to move this case

12   forward.  We don't want to drag our feet.  We don't

13   want to ask for this extension.  We certainly don't

14   want to ask for another one, but we feel compelled

15   to just because we want a fair shot to take

16   depositions and analyze the data on a full record.

17             THE COURT:  Mr. Dunlap, when I spoke with

18   your former colleague, Ms. Halligan, now Judge

19   Halligan, in February, she said to me in the course

20   of our discussions that there were brewing discovery

21   disputes that she anticipated would result in

22   letters being submitted to me.  My sense was that to

23   the extent that there were discovery disputes, you

24   have since February identified them and made me

25   aware of them.

PROCEEDINGS

1          At this moment, are you aware of simmering

2     discovery disputes that you have not advised me of

3     before now?

4          MR. DUNLAP:  I am not aware of any.  I will

5     just drop a footnote that there may be some I'm

6     currently unaware of that my team is not, but

7     there's no big-picture thing.  Just -- and if I

8     could just step back.  You know, we had been looking

9     for some additional documents.  I think you -- from

10    additional sources.  I think you gave us some very

11    clear guidance about where you thought the

12    boundaries of relevance were.  So we have really

13    tried to focus within the boundaries that you set

14    for us.  The main focus is getting the data and

15    records out of the BT defendants.  There's some

16    additional stuff that we've gotten from third

17    parties and from Poloniex.

18          I'm not aware of anything else that's

19    major, and certainly nothing that's major that would

20    lead us to ask for an extension or otherwise delay

21    depositions.  This is really, to us, about the data,

22    and the gaps that remain.

23          THE COURT:  All right.  Thank you very

24    much.

25          Mr. Greenfield, may I hear from you next,

PROCEEDINGS

1    please.

2              MR. GREENFIELD:  Yes.  Thank you, Your

3    Honor.  Let me just start by, you know, giving you a

4    genuine apology for misunderstanding your September

5    order and your May 1st order.  I can tell you that

6    we are not trying to be clever or strategic or

7    tactical or withholding any documents.  We had a

8    legitimate misunderstanding about what the scope of

9    that was, partly in response to correspondence with

10   plaintiffs after the May 1st order where they

11   indicated to us that they were not interested in

12   personal accounts that were used purely for personal

13   trading.  They later clarified that that distinction

14   did not apply to seven individuals who are

15   specifically mentioned in their letter.

16             That was not our understanding.  We didn't

17   understand any reason to turn over purely personal

18   trading records.  We understand that we misread the

19   Court's orders.  We apologize for that, but that was

20   not any kind of gamesmanship or anything like that,

21   I can assure you.

22             With respect to these personal trading

23   records, you know, they -- we don't see that there's

24   a reason for them to hold up the depositions.  We

25   think that plaintiffs have, as we put in our letter,

PROCEEDINGS

1    unnecessarily delayed beginning of depositions.
2    They waited until April --
3            THE COURT:  Mr. Greenfield, I disagree with
4    you.
5            MR. GREENFIELD:  Okay.
6            THE COURT:  Produce the personal trading
7    records.  I disagree with you.
8            MR. GREENFIELD:  I totally understand.  We
9    have fully produced the personal trading records.
10   We produced them on Monday.  So they now have them.
11   We believe they have plenty of time under the
12   current schedule to move forward, respond to the
13   dates that we've proposed.  They noticed depositions
14   in mid-May.  We responded with dates, proposed dates
15   for all of the depositions they noticed, and they
16   will not respond to our proposed dates.  We'd like
17   to schedule the depositions and move forward.  They
18   have all the documents that they've requested.
19           In terms of account records --
20           THE COURT:  Sir, if I could just pause for
21   a moment.  Thank you so much.
22           As a result of -- I believe as a result of
23   my May 1st and May 30th orders, you and your team
24   have the clarity you may not have had originally.
25   Your opening statements suggest as much.

PROCEEDINGS

1          Now that you have that clarity, have you

2   produced everything covered by those endorsements

3   and orders?

4          MR. GREENFIELD:  Yes.  There's -- the one

5   exception I understand is this account 3319.  And I

6   think it'd be helpful if I can just explain a little

7   bit of background about that account.

8          Mr. Dunlap referred to it as a "reserve

9   account," and there are documents out there

10  referring to it as a "reserve account."  It was not

11  an account that held USDT reserves, which is the

12  subject of this lawsuit.  It was referred to as a

13  "reserve account" in other contexts, in that it was

14  a system account that held assets on behalf of

15  Bitfinex.  And, specifically, its main purpose, my

16  understanding, is when trades are executed by

17  customers on the Bitfinex exchange, there's a small

18  fee.

19          So if you trade bitcoin, you know, maybe

20  0.0001 bitcoin is a fee.  It's deposited into this

21  account.  The account then sells that for dollars.

22  So there is a -- an exchange of bitcoin for dollar

23  in that account.  It is just the natural automated

24  process of the account selling off these fees.  It

25  may have other, kind of, similar purposes, but these

PROCEEDINGS

1    are all, kind of, automated processes.

2            We searched this account based on, you

3    know, our original understanding of the September

4    order, which, at the time, did not include USD

5    trades.  USD was not part of the RFPs at the time.

6    And we came back with no responsive transactions.

7    So that's why plaintiffs don't have any.

8            We've now gone back after the Court

9    clarified in the May 1 order, yes, you should

10   include USD transactions.  We are going back and we

11   are researching it.  But it's an enormous account.

12   It's been in operation -- you know, this is a

13   five-year discovery period.  There's upgrades to the

14   systems.  Things, you know, change in the operation

15   of the system.  So it is a very time-consuming

16   process to search this account.

17           Just a bit of further context on this,

18   Bitfinex is a crypto account.  It's not like the

19   New York Stock Exchange.  It runs 24 hours a day.

20   There are no holidays or trading hours.  And it

21   takes the same people and the same computing power

22   that's used to run the exchange to then run searches

23   over this extended period to try to, you know, pull

24   out any relevant transactions like, you know, USD

25   for bitcoin or for, you know, the certain other

PROCEEDINGS

1    crypto commodities that are listed in the RFP.

2           So it's just necessarily a process that,

3    even if you tell us produce immediately, we hit go,

4    it's going to take a long time to do it.  And

5    there's, they said, different versions over time, so

6    it's not even search one database, it's search

7    multiple databases over time.  But --

8           THE COURT:  Do you have a -- and to be

9    clear, sir, I want to acknowledge that there are

10   things that I thought were not -- were fully clear.

11   I suspect -- I think I'd have to confess that the

12   dollar -- the USD/USDT distinction was not as clear

13   in my May 1st order than it could have been, so

14   that's on me.

15          What do you think is the estimated time

16   frame for the production of these documents, sir,

17   recognizing that it's an enormous amount of work?

18          MR. GREENFIELD:  What I've been told is

19   that it should take, like, another, like, week,

20   maybe ten days for this query to fully run and for

21   us to be able to produce the documents.

22          THE COURT:  I see, sir.  Okay.

23          MR. GREENFIELD:  But, again, these are --

24   these are, you know, trading commissions being

25   cashed out.  It's hard to see how that has any

PROCEEDINGS

1    relevance to these claims, which, you know, again,

2    if we can remember what's actually in the complaint

3    in this case, is, you know, Tether issuing unbacked

4    USDT, sending it to Bittrex and Poloniex, making

5    strategically timed purchases of bitcoin on those

6    two exchanges, and creating this, you know, biggest

7    bubble in human history.

8            I don't know what that's got to do with

9    this kind of automated account that's cashing out

10   commissions, but I don't want to re-litigate

11   relevance.  I'm not --

12           THE COURT:  I thank you, sir.  Okay.  Thank

13   you.

14           All right.  Sir, with respect to the 1675

15   account, any intel on the gaps that are mentioned by

16   Mr. Dunlap?

17           MR. GREENFIELD:  I'm sorry, I'm not in the

18   weeds enough on that particular account.

19           THE COURT:  Yeah, okay.

20           MR. GREENFIELD:  But I -- my understanding

21   from my team, who is deep in the weeds, is that we

22   have fully produced for the personal accounts.

23           THE COURT:  Okay.  Thank you.

24           Sir, I could tell that you were listening

25   very carefully to what I said at the beginning.

PROCEEDINGS

1  And, again, my issue is -- I appreciate that you're

2  telling me, please, Failla, do not extend this

3  discovery deadline further.  I don't want to.  I've

4  already made that clear, but I am at least

5  considering the possibility.  I really don't want to

6  do it another time.

7          To the best of your knowledge, sir, and

8  your discussions with your team, are you aware of

9  other disputes or other instances in which there are

10  outstanding meets and confers or outstanding e-mail

11  disputes that I just don't know about?

12          MR. GREENFIELD:  Yeah.  So let me -- I just

13  want to make sure that no one comes away with this

14  with any misapprehensions about, kind of, what's

15  left.

16          We have this 3319 account.  We have some

17  Skype data for Mr. Devasini that we are -- expect to

18  produce in the next few days.  You know, this is

19  just, again, to give you a sense of how we are

20  digging deeply to try to produce this stuff.  This

21  stuff was not available on Skype.  We recently found

22  an old archived backup of the Skype account.  It's

23  archived in some format that's not used anymore.  So

24  it's been a technical challenge to, kind of -- I

25  don't know what the word is -- reinvigorate, pull

PROCEEDINGS

1  out the actual messages again.  We found a vendor
2  who's able to do that.  And so we're going to go
3  through and produce documents from that.
4       We're finalizing our privilege review.  I
5  think the bulk of the documents that have been
6  produced since March are all, kind of, things that
7  are falling out of the privilege review.  There may
8  be a few more documents, so I just want to put that
9  out there.
10       THE COURT:  Mr. Greenfield, on that point,
11  please, sir, I have fears.  I'm not going to say I'm
12  being kept up late at night, but maybe I am, about
13  how long your privilege log is.
14       Are we talking about thousands of
15  documents?  Hundreds of documents?  Millions of
16  documents?
17       MR. GREENFIELD:  I don't know the answer.
18  I think it's probably thousands.
19       THE COURT:  Okay.
20       MR. GREENFIELD:  But we've produced, you
21  know, over 200,000 documents.  So something I think
22  in the low thousands would be typical, but --
23       THE COURT:  It would be.  It doesn't mean
24  we're not going to have a privilege battle later on,
25  but I just wanted to get myself girded for it.  So

PROCEEDINGS

1    thank you, sir.  Please continue.

2              MR. GREENFIELD:  And, you know, we have --

3    as I'm sure you know, we have layers of privilege

4    review, right, it's people doing the first overview,

5    tag things as potentially privileged.  We're

6    scrutinizing and continue to scrutinize as we put

7    together a privilege log.  So if there's anything

8    that we don't think belongs there, we're going to

9    pull it off, we're going to produce it.  And, you

10   know, I don't want that to be held against us.  We

11   have a -- one former employee or contractor who

12   notified us that she has a file of documents, so

13   we're going to produce that.  I think that that's

14   basically it.

15             The interrogatory response, I don't think

16   it was deficient.  Plaintiffs came and asked us for

17   additional information that was not technically part

18   of what they had asked for, and we are agreeing to

19   amend that, and we expect to get that in the next

20   week.  Hopefully, sooner than a week, but I don't

21   want to make promises.

22             We produced a bunch of Telegram chats

23   yesterday.  This was another point where, you know,

24   we had technical challenges with the production.

25   And we actually had our -- the CFO sit and take, you

PROCEEDINGS

1    know, 160 separate screenshots of his phone, and we

2    produced it because that's the only means we had of,

3    kind of, getting both sides of the conversation to

4    come out.  So that was for this.

5            In terms of remaining issues for potential

6    dispute, I think there's just a couple that I don't

7    know for sure are going to get put in front of you,

8    but they're, as you said, brewing.  One is we made a

9    request for plaintiffs' tax returns, not the full

10   tax return, but just portions of tax returns that

11   itemize their crypto transactions and any gains or

12   losses.

13           We don't have comfort that we've gotten a

14   full set of transaction records from plaintiffs.

15   Obviously, it's -- I don't think it's an

16   exaggeration to say those are critical.  That's the

17   whole basis of their lawsuit.  And, you know, we

18   think we're entitled to those portions of the tax

19   returns.  We're not asking for the full thing.

20   We're not trying to invade their privacy, just those

21   portions.  Plaintiffs so far had said, absolutely

22   not.  So that's one issue that might come before

23   you.

24           And the other issue that we've been

25   discussing in meet and confers relates to the

PROCEEDINGS

1    30(b)(6) deposition that they've noticed for iFinex.

2    IFinex is the parent company of BFXNA and BFXWW.

3    Collectively, that is, basically, the Bitfinex

4    exchange.  They sent us a deposition notice for

5    iFinex.  We responded.  We sent our two designees.

6    If we have to divide up the topics, the two

7    designees are going to be able to speak on behalf of

8    all three of the Bitfinex defendants as they were

9    defined in that notice.

10           And plaintiffs are insisting that they

11   should be able to take separate 30(b)(6)s of iFinex,

12   BFXNA, BFXWW.  They want to take one at the

13   beginning of the deposition period.  They want to

14   take one at the end to, according to them, be able

15   to address any inconsistencies in testimony

16   throughout the deposition period.  We think that's

17   duplicative and cumulative and unduly burdensome to

18   have multiple 30(b)(6) depositions for, basically,

19   asking the same questions about the Bitfinex

20   exchange.

21           So I'm hopeful that on both of those we can

22   work it out, but just so you're not surprised if

23   there's another filing, I'm putting it out there.

24           THE COURT:  Sir, I won't be surprised, but

25   my sense is -- and you'll tell me if I'm wrong --

PROCEEDINGS

1    that as to each of these two issues, the opening

2    letter is coming from you.

3         MR. GREENFIELD:  Well, the 30(b)(6), yes.

4    So, yeah, the 30(b)(6) if they -- we don't know if

5    they're going to actually follow through on this

6    plan to notice a second 30(b)(6) deposition for

7    Bitfinex.  If they did, then we would be seeking a

8    protective order.  So that would come from us.

9         THE COURT:  Okay.

10        MR. GREENFIELD:  On the tax returns, yes,

11   that would also come from us.  And then, I guess,

12   for the sake of completeness, not to overstay my

13   welcome here, but, you know, we've raised the issue

14   of holding the depositions remotely.  Our witnesses

15   are located in foreign countries around the world,

16   and the idea of traveling around the world for all

17   these depositions, to us, seems unnecessary and

18   unduly costly and burdensome, given that, you know,

19   for the past three years, we've all been doing

20   depositions via Zoom without any issues.

21        That's all I can think of right now.

22        THE COURT:  Okay.  No, I -- actually, I

23   thank you for thinking of those because I am now --

24   I will now not be surprised or perturbed if I

25   receive them.  I mean, I would hope that you all

PROCEEDINGS

 1     would be able to work these issues out, but if

 2     you're not, then I'm around, and that's

 3     understandable.  Thank you.

 4             Mr. Lindenbaum, is there something you want

 5     to add, sir?

 6             MR.  LINDENBAUM:  No, Your Honor.  I'll

 7     just say that I think that this motivated the

 8     statement about, you know, potential dismissal,

 9     which is we -- you know, we've been done with our

10     production for quite a long time, many, many months.

11     None of the recent disputes -- really, any of the

12     disputes have concerned us other than the number of

13     depositions.  And we just have the concern that, you

14     know, particularly with respect to the anonymous

15     trader and the fact that, you know, there hasn't

16     been a deposition for him or perhaps even an

17     initiation of the Hague process, that there may be

18     further requests for extension since that is, you

19     know, what we think is a pretty important

20     deposition.

21             So -- but that's all.  That's all I wanted

22     to note.  And I'm not aware on our side of any, you

23     know, brewing disputes that should cause, you know,

24     extension on our side.

25             THE COURT:  Okay.  Thank you.  I appreciate

PROCEEDINGS

1   that.  Thank you.

2          And, Mr. Cording, I appreciate your

3   patience, sir.  What would you like to add, if

4   anything?

5          MR.  CORDING:  Not much, Your Honor.

6   Thanks very much.  Just very briefly, building off

7   Mr. Lindenbaum's comments, we were fast out of the

8   gate here in terms of discovery.  We made the core

9   of our production last May, over a year ago, and

10  supplemented that over the course of last year.  I

11  think we've been completed for over six months now.

12  We had a few following the February 8th conference,

13  a few what I would characterize as constructive

14  conversations with the plaintiffs around particular

15  follow-up requests.

16         To my knowledge, there are no open issues

17  involving Mr. Potter's productions or, you know,

18  even simmering issues.  If that's in error, we would

19  welcome correction on that point from the

20  plaintiffs' lawyers.  So to our view, this is not

21  really about us, though, we, of course, appreciate

22  the interdependencies around the schedule.

23         The one thing I just wanted to note very

24  briefly, as privilege logs are coming due later this

25  month, we had written the plaintiffs last month

PROCEEDINGS

1   stating our intention, under the Local Rules of the
2   SDNY, to present a categorical privilege log for
3   Mr. Potter.  And we think that he's, sort of,
4   particularly amenable to that since these would be
5   logging documents largely around Mr. Potter's
6   departure from Bitfinex and Tether, now going on
7   five years ago.
8          These would not be documents where Mr.
9   Potter was interfacing with attorneys, where
10  Bitfinex or Tether would be the owner of the
11  privilege.  These would be documents involving, you
12  know, essentially, personal legal advice Mr. Potter
13  was receiving.  So we were intending to proceed on
14  that basis, not having received any objections or
15  gotten any, you know, kind of engagement or pushback
16  from the plaintiffs on that.
17         So I just -- while we were on the topic of
18  privilege log, wanted to make sure that one point
19  was clear, and nor do I expect that to be a
20  voluminous amount of documents that are logged.
21         THE COURT:  You don't have thousands on the
22  privilege log, sir?
23         MR.  CORDING:  We don't.
24         THE COURT:  Okay.  Thank you.  All right.
25         Anything -- Mr. Cording, anything else

PROCEEDINGS

1    you'd like me to know, sir?

2                MR.  CORDING:  No, Your Honor.  Appreciate

3    it.

4                THE COURT:  Okay.  Thank you.

5                Mr. Dunlap, in the speakers who followed

6    you, I've been advised of certain issues that I, of

7    course, sit here and hope will not be issues, but I

8    figured I'd -- now that you've heard these -- each

9    of the -- your adversary counsel speak about open

10   issues, tell me now if you believe that these are

11   going to be problematic.  Tell me now if you -- if

12   these are going to result in you asking me for still

13   another extension.

14               MR. DUNLAP:  Let me -- I think those are

15   slightly two separate questions, so let me break

16   that down.  And apologies if I misunderstood your

17   question to me.  I had -- I didn't understand that

18   there were any other issues in terms of production

19   of documents or data.

20               I think there are issues, as Mr. Greenfield

21   said, about depositions.  We do have issues about

22   how many 30(b)(6)s we can take and the topics.  We

23   do have disputes about whether they should tell us

24   where their witnesses are and give us the option to

25   depose some of them in person.  And we will work

PROCEEDINGS

1    through those.  And he may move.  We may move.  That

2    is something that will come out.

3              On the privilege log, we're glad to --

4              THE COURT:  And --

5              MR. DUNLAP:  Sorry.

6              THE COURT:  And, Mr. Dunlap, no, just to --

7              MR. DUNLAP:  Yes.

8              THE COURT:  -- that point, I -- what you

9    were -- what you're saying is absolutely right.  I

10   was asking a question about simmering discovery

11   disputes, I think in my head what I was thinking

12   about -- and excuse me if I wasn't clear, and I will

13   be -- is things that would cause you to ask for

14   still another extension.

15             MR.  DUNLAP:  Right.

16             THE COURT:  If the issue is one of how is

17   this deposition going to take place and how many

18   depositions will there be, in my mind, that would

19   not necessitate an extension of the discovery

20   schedule.  It would just necessitate clarification

21   or resolution of the dispute.

22             MR. DUNLAP:  Right.  And that's where I was

23   going, which is that and things about documents

24   falling out of privilege logs, assuming there's no,

25   like, catastrophic issue that requires extended

PROCEEDINGS

1     motion practice.  Those sorts of things.  If we get

2     the extension that we're asking for, I don't

3     anticipate that any of those issues would require us

4     to ask for more time.

5          Anything can happen, but I certainly would

6     expect that we can either work out or bring up to

7     you very quickly issues about 30(b)(6) depositions,

8     locations of depositions, privilege issues, you

9     know, supplementary rog responses in the near

10    future, and that it wouldn't cause a delay beyond

11    what we're asking for.

12         THE COURT:  Mr. Dunlap, to the point of

13    these other issues that have been raised by

14    adversary counsel, the issues that were raised, for

15    example, whether the depositions are remote, how

16    many 30(b)(6) witnesses, the request for the tax

17    returns, the possibility of a categorical privilege

18    log, things of that nature, at this time, as you're

19    talking to me, do you believe that those are issues

20    that will necessitate letter motion practice before

21    me, or do you not know?

22         MR. DUNLAP:  I think the depositions might.

23    The tax returns, I hope not, but I would -- you

24    know, I'd need to refresh myself on exactly where we

25    are on that.  And on the privilege log, I expect we

PROCEEDINGS

1      can work it out.  I need to double-check with my

2      team, but I think we can probably work that out.  I

3      think depositions -- you know, hope springs

4      eternal that we can work out a deal with

5      Mr. Greenfield.  But if not, we will bring that to

6      you promptly.

7                THE COURT:  Okay.  Thank you.

8                I appreciate everyone's preparation for

9      this conference and the information that you've

10     given me.  I'm going to just take myself out of the

11     conference for a moment or two and look at my notes,

12     and then I'll get back to you as soon as I can.  If

13     you wish to turn off your monitors and mute

14     yourselves, that's fine as well.  I'll get back as

15     soon as I can.  Thank you.

16               MR. GREENFIELD:  Thank you.

17               (A recess was taken.)

18               THE DEPUTY CLERK:  Counsel, the judge will

19     be on in about two minutes.

20               (Pause in proceedings.)

21               THE COURT:  Counsel, I appreciate your

22     patience while I took that time to think about these

23     issues.  And lest you think I was just back here in

24     my chambers flipping a coin, I was not.  I was

25     really thinking about these issues.  And I have to

PROCEEDINGS

1    say that I share some of the frustration that was

2    expressed to me this morning by Mr. Cording and by

3    Mr. Lindenbaum because, as you noted to me, you --

4    what was the expression of Mr. Cording, you were

5    fast out of the gate.  I don't think I've had any

6    issues with Mr. Potter's production.  I think I may

7    have had one dispute about the Poloniex production.

8    But we are where we are.  And, unfortunately, I

9    can't schedule this for separately tracked discovery

10   schedules.

11        I do not believe -- I don't want to believe

12   that my orders were imprecise or that they were

13   subject to multiple views or that they were

14   confusing, but Mr. Greenfield effectively tells me

15   that they are.  And as a consequence of that,

16   documents are only now being produced and

17   plaintiffs' counsel is only now receiving them.  And

18   with much regret and a twinge of annoyance in my

19   voice, I am granting the 90-day extension.  It is

20   grudging, but it must be done.

21        I want to be clear that I am telling

22   Mr. Dunlap and his team by extension to plan for all

23   eventualities, to plan for the unknown unknowns.  I

24   will not extend based on any dealings with the

25   anonymous trader.  I will not extend -- and my -- by

PROCEEDINGS

1    saying "I will not extend," I mean I will not extend

2    beyond the one I'm doing today for depositions if it

3    turns out you believe and you can demonstrate to me

4    that you are entitled to more than the 15 that I've

5    allowed.  So this is it.  This has to be it.

6              And I feel that in today's conference, if

7    nothing else, we've aired out these issues.  Again,

8    I think you all know, given my Chambers' inbox, I

9    think you know that I'm around for discovery

10   disputes.  I've heard a couple of potential ones

11   today.  I hope you get them to me as soon as

12   possible.

13             Mr. Dunlap, you did propose a new case

14   management plan.  I can sign that, but we may be --

15   we may have already lost a week on it.

16             Mr. Dunlap, is it your preference, sir, to

17   submit a new one or to have me sign what was

18   submitted last week, or in the last couple of weeks?

19             MR. DUNLAP:  Given what's going on here

20   today, Your Honor, I think best that we confer with

21   the other side and try to submit a plan that

22   reflects your orders, that incorporates all the

23   updated dates.

24             THE COURT:  Okay.  I will look forward to

25   it later this week.

PROCEEDINGS

1          Thank you, all, for your time today.  I

2    appreciate it.  I hope not to hear about further

3    discovery disputes, but I'll be prepared if we are.

4          Be well, everyone.  Thank you.  We're

5    adjourned.

6

7                          0o0

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3        I, Adrienne M. Mignano, certify that the

 4    foregoing transcript of proceedings in the case of

 5    In re Tether and Bitfinex Crypto Asset Litigation,

 6    Docket #19CV9236 was prepared using digital

 7    transcription software and is a true and accurate

 8    record of the proceedings.

 9

10

11    Signature   Adrienne M. Mignano

12                  ADRIENNE M. MIGNANO, RPR

13

14    Date:        June 8, 2023

15

16

17

18

19

20

21

22

23

24

25
```