# EXHIBIT 1



Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
+1 212 909 6000

August 18, 2023

BY EMAIL

Philippe Z. Selendy
SELENDY GAY ELSBERG PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com

Todd M. Schneider
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street
Emeryville, CA 94608
tschneider@schneiderwallace.com

Re: *In re Tether and Bitfinex Crypto Asset Litig.*, No. 19 Civ. 9236 (KPF) (S.D.N.Y.)

Dear Counsel:

We write on behalf of the B/T Defendants[1] to respond to Plaintiffs' August 15 letter regarding Plaintiffs' proposed topics for their Rule 30(b)(6) deposition of the Bitfinex Defendants (the "Revised Notice").

Plaintiffs continue to insist on a number of topics that are irrelevant, overbroad, unduly burdensome, and/or fail to "describe with reasonable particularity the matters for examination," as required by Fed. R. Civ. P. 30(b)(6). (*See* Topics 1, 3, 4, 7-11, 14, 16-18, 22, and 23.)  As Plaintiffs know, "[a]ll 30(b)(6) deposition topics are constrained by Rule 26(b)(3)—meaning that they must seek information relevant to the claims and defenses that is proportional to the needs of the case." *See City of Almaty, Kazakhstan v. Sater*, 2022 WL 10374082, at *3 (S.D.N.Y. Oct. 18, 2022).  Even where a topic is "minimally relevant," courts disallow Rule 30(b)(6) testimony where its relevance is "outweighed by the burden" of preparing the deponent(s). *See City of New York v. FedEx Ground Package Sys., Inc.*, 2017 WL 4155410, at *3 (S.D.N.Y. Sept. 19, 2017). Moreover, "[r]easonable particularity means that the noticing party must describe the noticed topics with painstaking specificity as to subject areas that are relevant to the dispute at issue," and courts may strike topics that "are so overly broad as to make it impossible for the responding

---

[1] Capitalized terms have the meaning set out in the B/T Defendants' July 31, 2023 letter regarding the Revised Notice.

Philippe Selendy and Todd Schneider      2                        August 18, 2023

party to prepare its witness." *N. Shore Window & Door, Inc. v. Andersen Corp.*, 2022 WL 16788807, at *1 (E.D.N.Y. Sept. 14, 2022).

Despite these requirements, Plaintiffs were unable to articulate either the information that they seek for the topics listed above or its relevance to Plaintiffs' claims during an almost two-hour meet and confer on August 11. The B/T Defendants followed up on August 14 with a lengthy letter regarding the scope of those topics and their relevance to Plaintiffs' claims, but Plaintiffs' August 15 response largely fails to engage with the B/T Defendants' explanations or their proposed compromises. Plaintiffs still cannot articulate what specific information they seek and how it is relevant to their claims.

The flaws in the Revised Notice largely stem from a fundamental lack of focus in Plaintiffs' theory of this case. Absent any evidence supporting Plaintiffs' initial claim that the B/T Defendants artificially inflated the price of cryptocommodities with strategically timed purchases of bitcoin on Bittrex and Poloniex using unbacked USDT, Plaintiffs now seek testimony on a range of ill-defined new topics in the apparent hope that they will uncover some other supposed wrongdoing. The B/T Defendants substantially completed their production of documents almost a year ago, in October 2022, and completed their production of transaction records in June 2023. The Court granted Plaintiffs' request for a three-month extension based on Plaintiffs' representation that they needed to "analyze the full scope of [the alleged market manipulation] scheme before taking Rule 30(b)(6) testimony from B/T Defendants about their overall operation of that scheme." (Dkt. No. 374 at 2.) Yet over two months later – and over *twenty* months into fact discovery – Plaintiffs still cannot articulate the purported market manipulation scheme, the evidence they seek in connection with that alleged "scheme," or how that evidence would be relevant to their claims and proportional to the needs of the case.

The B/T Defendants have offered meaningful compromises in response to many of the 24 topics in the Revised Notice, including for topics that are wholly irrelevant, and have offered additional compromises below. Plaintiffs have not justified the substantial burden that additional testimony would impose on the B/T Defendants.

**Topic 1**: "The corporate structure and responsibility of each Bitfinex Defendant."

The B/T Defendants have offered to provide testimony on "the corporate form, place of incorporation and the corporate structure of iFinex Inc., BFXNA Inc., and BFXWW Inc." (July 31 Ltr. at 2.) In response to Plaintiffs' request, the B/T Defendants further offered to provide testimony to the effect that (1) "[i]t is iFinex that engages all of the personnel who operate the Bitfinex exchange and perform all related functions (*e.g.*, compliance and customer service). BFXNA and BFXWW do not have any separate directors, officers or other personnel" and (2) "BFXNA and BFXWW exist as separate entities to facilitate reporting to certain U.S. and foreign regulatory bodies. They play no role in operating the Bitfinex exchange or in otherwise managing its affairs." (Aug. 14 Ltr. at 1-2 (citing Dkt. No. 403, at 1).)

Plaintiffs now claim that they seek even more additional testimony on the "role" of each of the Bitfinex Defendants, without explaining what relevant information they believe is not covered by the B/T Defendants' prior offer. To the extent that Plaintiffs seek additional information, please

Philippe Selendy and Todd Schneider      3                          August 18, 2023

identify that information and explain its relevance so that the deponent(s) can be adequately prepared.

**Topic 2**: "The roles, responsibilities, and tenures of: Adam Chamely, Amy Churchill, Bill Brindise, Bjorn de Wolf, Chakrit Sakunkrit, Chrise Lee (San-Ting Lee), Claudia Lagorio, Craig Sellers, Drew Samsen, Giancarlo Devasini, Grzegorz Opalinski, Ingo Christian Fiedler, John Kloosterman, Josh Rossi, Julian Arriagada, Karolis Juskys, Leonardo Real, Ludovicus Jan Van Der Velde, Marian Wang, Matthew Tremblay, Michael Abruzzese, Michael Hilliard, Paolo Ardoino, Peter Warrack, Philip Potter, Sarah Compani, Shann Lu, Silvano Di Stefano, Stephen Moore, Stuart Hoegner, and Will Harborne."

The B/T Defendants understand that Plaintiffs have agreed to the B/T Defendants' proposal in their July 31 letter to provide a high-level description of the roles and responsibilities on behalf of the Bitfinex Defendants, if any, of the identified individuals.

**Topics 3 and 4**: "Bitfinex Defendants' policies, practices, and procedures for the maintenance and retention of documents, communications, and records, from February 17, 2015 through the present" and "Bitfinex Defendants' destruction or loss of emails, chat or messaging logs, transaction records, or banking records, and the circumstances of that destruction, from February 17, 2015 to the present."

As the B/T Defendants have now said multiple times, Plaintiffs' requests for testimony on document retention policies that post-date the Relevant Period in connection with Topic 3 as well as Topic 4 impermissibly seek "collateral discovery" or "discovery on discovery" without establishing the requisite "factual basis" for such discovery. (*See* B/T Defendants' July 31 Ltr. at 3; Aug. 14 Ltr. at 2 (quoting *Mortg. Resol. Serv., LLC v. JPMorgan Chase Bank*, 2016 WL 3906712, at *7 (S.D.N.Y. July 14, 2016) (holding that requests for such discovery "should be closely scrutinized")).)

In response to the B/T Defendants' requests that Plaintiffs identify any factual basis for such discovery, along with the specific discovery Plaintiffs seek, you have cited a single, plainly inapplicable document that supports no such discovery. Contrary to Plaintiffs' assertion that Bitfinex_Tether_0058819 "reference[s] intentional deletion of transaction records," (Aug. 15 Ltr. at 3), Stephen Moore and Craig Sellars discussed revisions to a spreadsheet that had been compiled for Tether Limited's accountants. (*See* Bitfinex_Tether_0058819 (Mr. Moore explaining on October 12, 2016 that "I have *updated the original spreadsheet* and taken out the transactions made after 31st December 205 – this still leaves 3,669 transactions that need to be explained or deleted"); Bitfinex_Tether_0500640 (Mr. Moore forwarding requests "from the accountants" on July 15, 2016 and explaining on August 23, 2016 that "[t]his annual return is for Tether Ltd in Hong Kong – and so we only need the transactions for this company – I think that we can remove as 'testing' a lot of the transactions that were done before Tether Ltd was formed").) These documents clearly refer to *Tether Limited*, and not the Bitfinex Defendants and, in any event, do not suggest that the B/T Defendants deleted any transaction records from their systems, much less that they deleted transaction data from *2017*, a year later, as Plaintiffs suggest.

Philippe Selendy and Todd Schneider	4	August 18, 2023

Plaintiffs once again refuse to identify any other factual basis for their request for collateral discovery, or even the discovery they purport to seek, instead referring generally to the voluminous correspondence regarding the B/T Defendants' productions that the parties have exchanged over the course of several months.  None of that correspondence suggests any destruction of documents.

**Topic 5**: "Bitfinex Defendants' policies, practices, and procedures for purchases, sales, margin trading, over-the-counter trading, and any other transactions offered on the Bitfinex exchange, including without limitation (a) if and how such transactions are equally available to all users; (b) electronic order books or other processes for initiating, coordinating, matching, or recording such transactions."

The B/T Defendants understand that Plaintiffs have accepted the B/T Defendants' offer in their August 14 letter to interpret Topic 5 as limited to a high-level overview of (*i*) Bitfinex's OTC platform, (*ii*) the types of transactions and order types available to customers on the Bitfinex exchange, (*iii*) the process for matching orders on the Bitfinex exchange, and (*iv*) the records generated for transactions on the Bitfinex exchange, as well as, in connection with (*iii*), a high-level overview of the process by which counterparties execute trades with one another via the OTC desk.

**Topic 6**: "Bitfinex Defendants' policies, practices, and procedures for setting prices for crypto-assets on the Bitfinex exchange."

The B/T Defendants understand that Plaintiffs have accepted the compromise set forth in the B/T Defendants' July 31 letter to provide a high-level overview on (*i*) how market prices for crypto-assets are reflected on the Bitfinex exchange and (*ii*) how prices for orders on Bitfinex's OTC platform are set.  For the avoidance of doubt, the Bitfinex exchange does not "determine" market prices, as Plaintiffs suggest (August 15 Ltr. at 4), and instead reflects the prices of orders and transactions.  *See* https://trading.bitfinex.com.

**Topic 7**: "Bitfinex Defendants' policies, practices, and procedures for transacting as a market maker, including transacting on the Bitfinex, Bittrex, or Poloniex exchanges and over-the-counter trading."

Plaintiffs still have not "describe[d] with reasonable particularity the matters for examination," as required by Fed. R. Civ. P. 30(b)(6), or articulated how they are relevant to Plaintiffs' claims.

Plaintiffs insist that the "Bitfinex Defendants' market making transactions are key to Plaintiffs' allegations" "[t]o the extent that these activities are inconsistent with natural supply and demand."  (Aug. 15 Ltr. at 4.)  But Plaintiffs' complaint does not allege any improper market-making transactions by the Bitfinex Defendants, and Plaintiffs have not identified a single market-making transaction that they contend is actually "inconsistent with natural supply and demand." (*Id.*)  Moreover, while Plaintiffs' complaint properly distinguished between market *manipulation* and "benign market *making* activities"  (Dkt. No. 114, ¶ 288 (emphasis added)), Plaintiffs' current request appears to be based on a misunderstanding of the term "market making."  Market makers generally provide liquidity for an asset and decrease price volatility by placing both buy and sell orders, and profiting from the bid-ask spread.  That is why the

Philippe Selendy and Todd Schneider        5                          August 18, 2023

existence of market makers is one factor that courts consider in determining whether a stock trades in an efficient market. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (listing *Cammer* factors); *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) ("Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level.").

Plaintiffs' request for testimony about market-making is thus both irrelevant and goes far beyond the scope of their complaint. *City of Almaty*, 2022 WL 10374082, at *3 (limiting Rule 30(b)(6) topic to the "detailed allegations" set forth in plaintiffs' complaint). Nonetheless, the B/T Defendants will prepare the Bitfinex Designee to provide a high-level overview of whether and under what circumstances the Bitfinex Defendants acted as market makers on the Poloniex exchange or Bittrex exchange.

**Topic 8**: "Bitfinex Defendants' policies, practices, and procedures for storing USDT."

While Plaintiffs have accepted the B/T Defendants' offer in their August 14 letter to provide "a high-level overview of the process by which the Bitfinex Defendants stored USDT in hot and cold wallets during the Relevant Period," Plaintiffs now seek additional testimony that is both beyond the scope of Topic 8 and not a proper topic of Rule 30(b)(6) testimony. Specifically, Plaintiffs ask that the designee "be prepared to discuss the purpose of each wallet address which stored USDT owned or controlled by the Bitfinex Defendants." (Aug. 15 Ltr. at 5.)

Plaintiffs' request for testimony about specific wallet addresses plainly exceeds their initial request for testimony on the "Bitfinex Defendants' policies, practices, and procedures for storing USDT." Moreover, asking a deponent to memorize specific wallet addresses – lengthy strings of alphanumeric characters – and testify to their "purpose" (beyond storing USDT, presumably) is not reasonable. *See, e.g.*, *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 9400671, at *2 (S.D.N.Y. Apr. 27, 2017) ("[A] Rule 30(b)(6) deposition should not be a 'memory contest' of topics better suited to a written response or a supplemental document production."). The B/T Defendants do not agree to that expansion of this topic.

**Topic 9**: "Bitfinex Defendants' policies, practices, and procedures for financial recordkeeping and accounting, including the use of accountants or accounting software."

While Plaintiffs justify Topic 9 on the basis that the B/T Defendants identified (*i*) "Bitfinex's obligation under the Facility Agreement dated March 19, 2019" and (*ii*) "receivables that Bitfinex owed to Tether" as USDT reserves during the Relevant Period (B/T Defendants' First Amended Response to Plaintiffs' Interrogatory No. 13 at 7-8), Plaintiffs nonetheless reject the B/T Defendants' offer to provide a high-level overview of the Bitfinex Defendants' recordkeeping with respect to the amounts that they owed to Tether and for which Tether's receivables served as Reserves during the Relevant Period.

Plaintiffs also seek testimony on "how Bitfinex tracked total assets and liabilities, to understand whether it was sufficiently solvent to pay amounts owed to Tether[]." (Aug. 15 Ltr. at 6.) Plaintiffs ignore that the B/T Defendants have already produced documents showing that

Philippe Selendy and Todd Schneider    6    August 18, 2023

Bitfinex *in fact repaid in full* the amounts that it owed to Tether, obviating the need for burdensome, transaction-specific Rule 30(b)(6) testimony on the hypothetical of whether it was able to do so. (*See* B/T Defendants' First Amended Response to Plaintiffs' Interrogatory No. 13, Appendix A (identifying Tether's bank statements evidencing receipt of funds from Bitfinex); *id.*, Appendix C (identifying documents evidencing Bitfinex's payment in full under the Facility Agreement dated March 19, 2019)). There is no basis for the B/T Defendants to incur the burden of preparing a deponent to discuss "if Bitfinex's total liabilities exceeded its assets, or if the accounts [the B/T Defendants identified] also contain customer funds." (Aug. 15 Ltr. at 6.) Nonetheless, as a compromise, the Bitfinex Designee will be prepared to provide a high-level overview of the Bitfinex Defendants' financial recordkeeping and accounting for its total assets and liabilities, in addition to their recordkeeping with respect to the amounts that they owed to Tether and for which Tether's receivables served as Reserves during the Relevant Period.

**Topic 10**: "Bitfinex Defendants' policies, practices, and procedures with respect to facilitating, regulating, or encouraging algorithmic or high-volume trading on the Bitfinex exchange, and any arrangements between Bitfinex Defendants on the one hand, and market makers on the other."

The B/T Defendants proposed to interpret this topic as covering a high-level explanation of algorithmic order types and the "Application Programming Interface" (API) available on the Bitfinex exchange during the Relevant Period. (July 31 Ltr. at 5.) Plaintiffs rejected that proposal, yet Plaintiffs do not "describe with reasonable particularity" what additional information they seek, as required by Fed. R. Civ. P. 30(b)(6), or explain how it is relevant.

Plaintiffs say that "this topic seeks information about Bitfinex Defendants' policies and practices that incentivized high volume trading, such as discounts on transaction fees or pool agreements that allow for faster transfers of fiat currency," as well as any "arrangements or incentives" that the Bitfinex Defendants provided to any "other high-volume traders" beyond the Anonymous Trader. (Aug. 15 Ltr. at 7.) That is far too broad, and unduly burdensome. Plaintiffs appear to interpret "policies and practices" to encompass any actions by the Bitfinex Defendants that had the effect of "incentiviz[ing]" high-volume trading, and provide only a non-exclusive list of topics they propose to address. A deponent cannot reasonably be prepared to testify to all actions that may have had that effect, or to their relationships with *all* high-volume traders on the Bitfinex Exchange, over a five-year period. *Agniel v. Cent. Park Boathouse LLC*, 2015 WL 463971, at *2 (S.D.N.Y. Jan. 26, 2015) (holding 30(b)(6) testimony was adequate in response to certain questions that, "although within the scope of the [topics], demand a degree of detailed recollection of past arrangements that would be unrealistic without more specific notice").

Plaintiffs also have not explained how such testimony is relevant or proportional to the needs of the case. While Plaintiffs claim that they must understand "whether Bitfinex incentivized market makers to place specifically priced and timed orders to influence market prices" (Aug. 15 Ltr. at 7), that new theory goes far beyond Plaintiffs' claims in their Complaint that *the B/T Defendants themselves* artificially inflated the price of cryptocommodities with their strategically timed purchases on Bittrex and Poloniex. And Plaintiffs' suggestion that the Bitfinex Defendants somehow incentivized customers to manipulate the market is pure speculation. *City of Almaty*, 2022 WL 10374082, at *3 (rejecting "explanation for questioning" that was "based on speculation," and limiting Rule 30(b)(6) topic to the "detailed allegations" set forth in plaintiffs'

Philippe Selendy and Todd Schneider     7                                        August 18, 2023

complaint). Moreover, the B/T Defendants have already agreed to provide testimony regarding "the market maker incentives and market taker fees for the Anonymous Trader on the Bitfinex exchange" and "incentives the Anonymous Trader received from the Bitfinex Defendants for high volume trading during the Relevant Period." (*See* Topic 20, *infra*.) Plaintiffs' desire to "assess" whether the Anonymous Trader was "unique" cannot justify the burden of preparing a deponent to testify on every other high-volume trader on the Bitfinex exchange, none of whom are alleged to have participated in the supposed market manipulation scheme actually alleged in Plaintiffs' complaint.

**Topic 11**: "Bitfinex Defendants' policies, practices, and procedures for storing customer assets (including crypto-assets and fiat currency), including any accounts or wallets used to hold those assets, and the segregation of customer assets from assets owned by Bitfinex or Tether Defendants."

In response to Plaintiffs' request for testimony about the Bitfinex Defendants' storage of customer assets, the B/T Defendants offered to provide a high-level overview of how the Bitfinex exchange holds customer assets. (July 31 Ltr. at 5.) Plaintiffs now claim that they also require testimony "as to whether each [Bitfinex Defendant] account holding amounts payable to Tether also contained customer assets during the relevant period," as that is supposedly relevant to "Bitfinex's ability to pay the Tether accounts receivables included in the USDT reserves." (Aug. 15 Ltr. at 7.) As the B/T Defendants explain in connection with Topic 9, above, the B/T Defendants have already produced documents showing that Bitfinex *in fact* repaid the amounts that it owed to Tether. Accordingly, there is no need for burdensome Rule 30(b)(6) testimony on whether it was able to do so or whether the Bitfinex accounts that "held amounts sufficient to satisfy and were used to pay the receivables that Bitfinex owed Tether" (B/T Defendants' First Amended Response to Plaintiffs' Interrogatory No. 13 at 8) also held customer assets.

The B/T Defendants reiterate their proposal to provide a high-level overview of the Bitfinex Defendants' financial recordkeeping and accounting for its total assets and liabilities and their recordkeeping with respect to the amounts that they owed to Tether and for which Tether's receivables served as Reserves during the Relevant Period.

**Topic 12**: "Bitfinex Defendants' policies, practices, and procedures for crediting deposits of USDT as U.S. Dollars on the Bitfinex exchange, allowing U.S. Dollars to be withdrawn as USDT from the Bitfinex exchange, and denominating trades using USDT as U.S. Dollar trading pairs."

The B/T Defendants have already agreed to "interpret this topic as limited to the Bitfinex Defendants' practice, during a portion of the Relevant Period, of (*i*) crediting in customers' account balances deposits of USDT to accounts on the Bitfinex exchange as U.S. dollars and (*ii*) permitting customers to withdraw U.S. dollar balances from such accounts as USDT," and to provide additional testimony on "whether the Bitfinex Defendants 'denominat[ed] trades using USDT as U.S. Dollar trading pairs,' even though Plaintiffs have no basis to suggest that the Bitfinex Defendants did so." (July 31 Ltr. at 5.) In addition, as a compromise in response to Plaintiffs' requests at the meet and confer and in their August 15 letter, the B/T Defendants agree to provide testimony on whether the Bitfinex Defendants' transaction records reflect, or there is

Philippe Selendy and Todd Schneider            8                        August 18, 2023

any other means for determining, whether a U.S. dollar transaction on the Bitfinex exchange during that time period was made using a U.S. dollar account balance based on a deposit of USDT. The B/T Defendants understand the parties to now be in agreement on this topic.

**Topic 13**: "Bitfinex Defendants' policies, practices, and procedures for sending USDT to Tether Defendants, or receiving USDT from Tether Defendants, including any associated transfers of fiat currency."

The B/T Defendants understand that Plaintiffs have agreed to the B/T Defendants' proposal in their July 31 letter.

**Topic 14**: "Bitfinex Defendants' policies, practices, and procedures for sending USDT to customers, or receiving USDT from customers, including any associated transfers of fiat currency."

Despite the B/T Defendants' repeated requests and a two-hour long meet-and-confer, Plaintiffs are unable to articulate how the information they seek in connection with this topic is relevant or proportional to their claims. In their August 14 letter, the B/T Defendants nevertheless offered to provide a high-level overview of the process by which the Bitfinex Defendants, for a certain time, purchased USDT from the Tether Defendants as the Tether Defendants' only direct customer and made that USDT available to customers on the Bitfinex exchange. (Aug. 14 Ltr. at 6.) Plaintiffs now insist that they also need testimony on "(i) the assets for which customers could exchange USDT from Bitfinex and (ii) the timing of the exchange of such assets for USDT, including whether such exchanges to [sic] simultaneous." (Aug. 15 Ltr. at 9.)

Similar to Topics 9 and 11 above, Plaintiffs claim that this information "is necessary to determine whether Bitfinex made contemporaneous transfers of US Dollars when buying or selling USDT, and therefore its ability to pay Tether amounts owed to the reserves." (Aug. 15 Ltr. at 9.) In other words, Plaintiffs effectively argue that every transaction that the Bitfinex Defendants engaged in during the Relevant Period is a proper subject of Rule 30(b)(6) testimony because it might bear on the Bitfinex Defendants' overall solvency and ability to pay its debts to Tether. That line of reasoning cannot justify any and all questions about the Bitfinex exchange's business. As discussed above, the B/T Defendants have already produced documents showing that Bitfinex *in fact* repaid the amounts that it owed to Tether, obviating the need for burdensome Rule 30(b)(6) testimony on whether it was able to do so. Moreover, the assets for which customers could exchange USDT from the Bitfinex exchange and the timing of such transactions is at best marginally relevant to the Bitfinex Defendants' overall assets and liabilities, and thus cannot justify the burden of preparing a Rule 30(b)(6) witness to speak to all of these transactions over a more-than five-year Relevant Period. *Blackrock*, 2017 WL 9400671, at *2 (S.D.N.Y. Apr. 27, 2017) ("[A] Rule 30(b)(6) deposition should not be a 'memory contest' of topics better suited to a written response or a supplemental document production."); *Trustees of Chicago Reg'l Council v. Drive Constr., Inc.*, 2023 WL 415542, at *4 (N.D. Ill. Jan. 25, 2023) ("Rule 30(b)(6) depositions are 'not designed to be a memory contest,' nor are they 'meant to be traps in which the lack of an encyclopedic memory commits an organization to a disadvantageous position.'") (citations omitted).

Philippe Selendy and Todd Schneider	9	August 18, 2023

The B/T Defendants reiterate their proposal to provide a high-level overview of the Bitfinex Defendants' financial recordkeeping and accounting for its total assets and liabilities and their recordkeeping with respect to the amounts that they owed to Tether and for which Tether's receivables served as Reserves during the Relevant Period.

**Topic 15**: "The circumstances related to, and transactions of fiat currency and USDT related to, the Facility Agreement dated March 19, 2019."

The B/T Defendants understand that Plaintiffs have agreed to the B/T Defendants' proposal in their August 14 letter to interpret Topic 15 to be limited to a high-level overview of the Bitfinex Defendants' reasons for engaging in the transactions outlined at pages 1-5 of Bitfinex_Tether_1032193.

**Topic 16**: "Bitfinex Defendants' policies, practices, and procedures for loaning crypto-assets or fiat currency, including margin trading and credit lines."

Following the parties' meet and confer last week, the B/T Defendants explained in detail why Plaintiffs' conclusory assertions that loans may be relevant to Tether's USDT reserves or to market manipulation fail to establish any actual connection between this topic and the claims Plaintiffs have asserted.  (Aug. 14 Ltr. at 6-7.)  Plaintiffs simply refuse to engage with the B/T Defendants' explanations in their response, instead asserting in even more conclusory fashion that the information they seek "is relevant to B/T Defendants' ability to purchase Bitcoin and other crypto-assets with unbacked USDT."  (Aug. 15 Ltr. at 10.)  Plaintiffs do not say how that might be so.

As the B/T Defendants have already explained, the loans extended *by the Bitfinex Defendants to third parties* are not relevant to the sufficiency of *Tether*'s USDT reserves.  (Aug. 14 Ltr. at 6.)  Similarly, Plaintiffs have not explained how loans extended by the Bitfinex Defendants might be relevant to market manipulation, either by the B/T Defendants themselves or by third parties.  As the B/T Defendants said in their August 14 Letter, "the fact that loaned assets—just like any other assets—could be used to manipulate the market does not demonstrate how any loans by the Bitfinex Defendants are relevant to Plaintiffs' stated claims that the B/T Defendants artificially inflated the price of Bitcoin on the Bittrex and Poloniex exchanges."  (Aug. 14 Ltr. at 6-7.)  Again, Plaintiffs must establish that the testimony they seek is relevant to their actual claims, rather than speculating that they might conceivably find evidence of some other wrongdoing.  Moreover, as discussed in connection with Topic 10 above, Plaintiffs' desire to assess whether the B/T Defendants granted the Anonymous Trader any "special arrangements" cannot justify the burden of preparing a deponent to testify to the Bitfinex Defendants' treatment of *all* other customers.  The B/T Defendants have already agreed to provide testimony on "any loans of USDT that the Anonymous Trader received from the Bitfinex Defendants" in connection with Topic 20.

Plaintiffs have thus not justified the burden of attempting to prepare a deponent to speak to the Bitfinex Defendants' "general practice" with respect to all loans issued over the course of an over five-year Relevant Period.  Nor have Plaintiffs specified the information they seek in connection with Topic 16, asserting only that it "includ[es] the eligibility criteria for receiving a loan or credit line, and the types and amounts of collateral required, if any."  (Aug. 15 Ltr. at 10.)

Philippe Selendy and Todd Schneider       10                         August 18, 2023

That does not permit the deponent(s) to be adequately prepared.  *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 74 (D. Conn. 2010) ("the language 'including but not limited to' is overbroad when identifying a 30(b)(6) topic and defeats the purpose of giving notice of the topics to be discussed in the deposition"); *see also Eng-Hatcher v. Sprint Nextel Corp.*, 2008 WL 4104015, at *5 (S.D.N.Y. Aug. 28, 2008) (concluding that reference to "include but are not limited to" in 30(b)(6) notice rendered it "overly broad" because it was "impossible for the defendants to identify the limits of the inquiry noticed").

**Topic 17**:  "Any accounts owned or controlled by Bitfinex Defendants holding amounts owed or accounts payable to Tether Defendants as identified in B/T Defendants Interrogatory Responses, the periods during which such accounts were used, the purpose of assets held in such accounts, and whether such accounts held customer funds, payroll, operating expenses, or other assets used for the operation of the Bitfinex exchange."

As for Topic 11, Plaintiffs claim that they "must understand whether Bitfinex accounts holding amounts owed to Tether also contained funds used for other purposes." (Aug. 15 Ltr. at 11.)  As discussed in greater detail above, the B/T Defendants have already produced documents showing that Bitfinex in fact repaid the amounts that it owed to Tether, obviating the need for burdensome testimony as to whether the specified Bitfinex accounts held sufficient funds to repay Tether or were also used for other purposes.

The B/T Defendants again reiterate their proposal to provide a high-level overview of the Bitfinex Defendants' financial recordkeeping and accounting for its total assets and liabilities and their recordkeeping with respect to the amounts that they owed to Tether and for which Tether's receivables served as Reserves during the Relevant Period.

**Topic 18**:  "Transactions for the purchase, sale, or trade of an asset (including crypto-assets and fiat currency) in exchange for U.S. Dollars, USDT, or other crypto-assets conducted by Bitfinex Defendants as contemplated by Revised RFPs 23-25 and the corresponding accounts."

Plaintiffs claim that it is "unreasonable" for the B/T Defendants to request that Plaintiffs identify the accounts on which Plaintiffs seek testimony. (Aug. 15 Ltr. 11.)  Plaintiffs nonetheless say that they "will identify a list of accounts for which we seek testimony if Bitfinex Defendants will provide testimony regarding (i) the purpose of each account and (ii) the policies, practices, and procedures governing trading in each account."  Plaintiffs' proposal is still far too broad in light of Plaintiffs' reference to all accounts for which the B/T Defendants "have produced records in response to Revised RFPs 23-25," which include, among other things, accounts owned by the Tether Defendants or the B/T Defendants' personnel.

The B/T Defendants agree to provide a high-level overview of the purpose of accounts owned or controlled by the Bitfinex Defendants that the B/T Defendants identified in response to Interrogatory No. 14 and for which the B/T Defendants have produced transaction records in response to RFPs 23-25, insofar as Plaintiffs identify which accounts they seek testimony on and explain their relevance.  As the B/T Defendants said in their August 14 letter, Plaintiffs sought—and received—a three-month extension based on their argument that they needed to fully understand the B/T Defendants' transaction records before taking any Rule 30(b)(6) deposition.

Philippe Selendy and Todd Schneider      11                        August 18, 2023

(Aug. 14 Ltr. at 7; Dkt. No. 374 at 2.)  Plaintiffs must now articulate some justification for the burden of preparing a Rule 30(b)(6) designee to testify to individual accounts.

**Topic 19**: "Bitfinex Defendants' policies, practices, and procedures for setting prices for crypto-assets, including Bitcoin and Ethereum, on the Bitfinex Exchange and Bitfinex over-the-counter trading platform."

The B/T Defendants understand that Plaintiffs do not seek testimony in connection with Topic 19 beyond what the B/T Defendants have agreed to provide in connection with Topic 6, above.

**Topic 20**: "Any benefits, offers, accommodations, commissions, arrangements, or agreements between Bitfinex Defendants on the one hand, and the Anonymous Trader on the other, including incentives for high volume trading."

The B/T Defendants understand that Plaintiffs have agreed to the B/T Defendants' proposal in their July 31 letter to provide an overview of (*i*) the fee structures for the Anonymous Trader's transactions, (*ii*) the market maker incentives and market taker fees for the Anonymous Trader on the Bitfinex exchange, (*iii*) any loans of USDT that the Anonymous Trader received from the Bitfinex Defendants, and (*iv*) incentives the Anonymous Trader received from the Bitfinex Defendants for high volume trading during the Relevant Period.

**Topic 21**: "Any Government or regulatory investigations or subpoenas, whether formal or informal, involving the Anonymous Trader, including the nature and conduct of those investigations, materials produced in connection with those investigations, and the resolution of those investigations."

The B/T Defendants understand that Plaintiffs have agreed to the B/T Defendants' proposals in their July 31 and August 14 letters to interpret this topic to be limited to any government or regulatory investigations of the Anonymous Trader, if any, of which the Bitfinex Defendants were aware during the Relevant Period, an overview of any materials that the Bitfinex Defendants produced in connection with any such investigations, and a high-level overview of the Bitfinex Defendants' understanding (if any) of the nature and resolution of any such investigations.

**Topic 22**: "Any benefits, offers, accommodations, commissions, arrangements, or agreements between Bitfinex Defendants on the one hand, and Jump Trading LLC (a/k/a Satomoto LLC) on the other."

Jump Trading LLC is wholly irrelevant to Plaintiffs' claims.  Plaintiffs did not allege and do not now claim that Jump Trading LLC played any role in their purported market manipulation scheme or that it differed in some relevant way from other large customers of the Bitfinex exchange.  Plaintiffs' suggestion that this testimony is nonetheless warranted because the Bitfinex Defendants' transactions with Jump Trading LLC might—like every other transaction by the Bitfinex Defendants—ultimately bear on the Bitfinex Defendants' solvency is absurd.  Notably, Plaintiffs' counsel, Selendy Gay Elsberg, appear to have recently filed a different case against Jump Trading LLC involving alleged manipulation of UST or aUST (crypto assets issued

Philippe Selendy and Todd Schneider     12                       August 18, 2023

by Terra), but that obviously cannot justify their attempt to seek further discovery from the B/T Defendants in this case.[2]

**Topic 23**: "Bitfinex Defendants' understanding of the reason or cause for any differences in the list price of crypto-assets on the Bitfinex Exchange on the one hand, and other crypto-asset exchanges on the other, and Bitfinex Defendants' role (if any) in causing or contributing to those differences."

As the B/T Defendants have said repeatedly, Topic 23 improperly seeks expert testimony from a fact witness. (July 31 Ltr. at 8; Aug. 14 Ltr. at 13.) While Plaintiffs now claim that they seek only the "Bitfinex Defendants' *own understanding* of the persistent Bitcoin price premium on the Bitfinex exchange, not objective causal analysis" (Aug. 15 Ltr. at 13), they have not explained how the Bitfinex Defendants' "own understanding" of that subject is relevant to their claims.

**Topic 24**: "The definitions, variables, and inputs used in [specified] transaction records:"

The B/T Defendants understand that Plaintiffs have agreed to the B/T Defendants' proposals in their July 31 and August 14 letters.

Best regards,

/s/ Natascha Born

---

[2] https://www.selendygay.com/news/general/2023-05-9-selendy-gay-elsberg-files-class-action-compaint-against-jump-trading