

Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
+1 212 909 6000

September 25, 2023

<u>BY ECF AND EMAIL</u>

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

**Re:  *In re Tether and Bitfinex Crypto Asset Litigation*, No. 19 Civ. 9236 (S.D.N.Y.) (KPF)**

Dear Judge Failla:

We write on behalf of the B/T Defendants in opposition to Plaintiffs' motion to compel.  (Dkt. No. 456.)  Plaintiffs' motion is a desperate and incoherent attempt to cast doubt – yet again – on the adequacy of the B/T Defendants' document production.  Plaintiffs identify no deficiencies and instead seek documents and information that (*i*) have already been produced in full to the extent that they exist or (*ii*) fall well outside the scope of any document request or interrogatory.

As a threshold matter, Plaintiffs' motion should be denied because Plaintiffs made no attempt to meet and confer with the B/T Defendants before filing it – a blatant violation of the Court's Individual Rule 3(C), which requires a party wishing to raise a discovery dispute to "first confer in good faith with the opposing party" and to represent to the Court that they have done so.

If the Court considers Plaintiffs' motion, it should be denied for the following reasons:

***First***, Plaintiffs' demand that the B/T Defendants produce "all records of Bitfinex payables to Tether" in response to Revised RFP 31 and "identify all such payables" in response to Interrogatory No. 13 ignores the plain text of those requests and reflects a fundamental misunderstanding of the accounting concepts of "receivables" and "payables."

Tether – not Bitfinex – holds USDT reserves.  Tether is the issuer of the USDT stablecoin and holds reserves for the USDT it issues.  Bitfinex is a crypto-exchange and a customer of Tether.  No Bitfinex account ever held USDT reserves.  In certain instances, Tether issued USDT to Bitfinex and did not immediately receive a payment in U.S. dollars, for example because of banking delays, many of which lasted only a few days.  Bitfinex always repaid those amounts in full, but in the meantime Tether temporarily counted as part of its USDT reserves a "receivable" in the amount of the issued USDT.  A "receivable" is an amount owed to a company – *i.e.*, an asset.  Bitfinex, on the other hand, would account for the amount it owed as a "payable," which is a liability.  Bitfinex's payables were *not assets*, were *not held by Tether*, and were *not counted as USDT reserves*.

Accordingly, there is no merit to Plaintiffs' contention that the B/T Defendants should have produced records of Bitfinex's payables in response to Revised RFP 31 or included this information in response to Interrogatory No. 13 – *both of which are expressly limited to USDT reserves*.  Revised RFP 31 called for "documents sufficient to establish USDT Reserves," which

were held by Tether.  Interrogatory No. 13 sought the identification of "all account(s) holding Reserves," and the B/T Defendants' response included all such accounts, as well as Tether's receivables and other components of Tether's USDT reserves.  (Dkt. No. 456-5.)  Notably, Plaintiffs misleadingly submit the original versions of their RFPs.  (Dkt. No. 456-3.)  The substantially narrowed Revised RFPs 22-25, 29, and 31 can be found at Dkt. No. 240-1, and the agreed RFP 37 is at Dkt. No. 456-4.

Plaintiffs also mischaracterize Bitfinex's "PowerBoard," which is neither an "accounting system" nor a repository of records; it is a *user interface* that displays data from other sources.  PowerBoard cannot generate historical balance sheets or general ledgers for a particular date, or targeted information about particular payables.  Plaintiffs inappropriately rely on the testimony of Paolo Ardoino, who was not the Rule 30(b)(6) designee for this topic.[1]

*Second*, in response to Revised RFP 29, the B/T Defendants have already produced all balance sheets showing total assets and liabilities for the Bitfinex Defendants that could be located by a reasonable search.  Attempting to reconstruct a statement of all assets and liabilities as of a specific point in history would take many months, if it is even possible, and the B/T Defendants are under no obligation to undertake such a process.  *See Barton Grp., Inc. v. NCR Corp.*, 2009 WL 6509348, at *1 (S.D.N.Y. July 22, 2009) ("Defendant is only required to produce documents that exist; it has no obligation to create documents to support plaintiff's theory of the case.").

Specific information regarding particular assets is well beyond the scope of Revised RFPs 29 and 31 and Interrogatory 13.  Revised RFP 29 was limited to "general ledgers, balance sheets, income statements, cash-flow statements, and profit-and-loss statements," and did not include other documents concerning particular assets or liabilities.  Revised RFP 31, as discussed above, called for "documents sufficient to establish USDT Reserves," and Bitfinex's assets were not counted as USDT reserves.  And, again, Interrogatory No. 13 sought identification of "all account(s) holding Reserves," and none of Bitfinex's accounts held reserves.  Although the B/T Defendants – as an accommodation – agreed to provide information regarding the accounts Bitfinex used to pay amounts owed to Tether, the B/T Defendants were clear that Bitfinex accounts did not hold USDT reserves.  Tether, not Bitfinex, issued USDT and held reserves.

*Third*, the B/T Defendants have already produced records for the credit lines that Bitfinex issued to the Anonymous Trader.  (Dkt. 456-4 at 1.)  Plaintiffs' assertion that they are somehow entitled to the B/T Defendants' privileged analysis of the Anonymous Trader's credit line, conducted at the direction of counsel in connection with this litigation, is outrageous and meritless.  Contrary to Plaintiffs' assertion, that analysis was not merely "an export of Bitfinex's financial records," but a careful analysis of account data focused on issues of interest to counsel.  Importantly, the analysis was based *entirely* on the Anonymous Trader's account ledger information – *the same information produced to Plaintiffs*.  Plaintiffs are free to conduct their own analysis of that data, but they are not entitled to the B/T Defendants' privileged work product.[2]

---

[1]  Topic 9 of the Bitfinex notice covers (*i*) the Bitfinex Defendants' financial recordkeeping and accounting for its total assets and liabilities, and (*ii*) Bitfinex Defendants' recordkeeping with respect to the amounts that they owed to Tether and for which Tether's receivables served as Reserves during the Relevant Period.

[2]  The suggestion that the B/T Defendants waived privilege with respect to that analysis is contrary to law and unsupported by authority.  The sole case on which Plaintiffs rely involved an entirely different situation where a

The Honorable Katherine Polk Failla   3   September 25, 2023

As to Plaintiffs' demand for records of any Bitfinex trades "on the basis of credit lines it issued to itself," the B/T Defendants have already produced all transaction records responsive to Revised RFP Nos. 23-25, including any trades made in connection with such a credit line. (RFP 22, which Plaintiffs also cite, concerned wallet addresses, not trades.) The B/T Defendants have also produced all documents responsive to Plaintiffs' request for loans made "between Bitfinex and Tether" in response to RFP 37. (Dkt. No. 456 at 3.) Plaintiffs' assertion that RFP 37 also includes any purported loan of USDT by Bitfinex "to itself" is incorrect. (*Id.*)

*Fourth*, for the same reasons discussed above, "records of assets [Bitfinex] held to cover the credit lines it extended" are not responsive to Revised RFP 29 or 31. Insofar as Plaintiffs suggest that Bitfinex maintained documents that "tracked" specific assets to cover specific liabilities – whether payables to Tether or credit lines to customers – that is incorrect. Contrary to Plaintiffs' assertion, Mr. Ardoino did *not* testify that Bitfinex "has records of the assets it held to cover the credit lines it extended." (Dkt. No. 456 at 2.) He stated that such information "would be derived from the platform" and that he could not "talk to the complexity of that process." (Dkt. No. 456-2 at 121:5-20.) That testimony reflects the fact that Bitfinex *does not have* preexisting records of assets backing credit lines; instead, it is possible that information could be derived through analysis of data existing in raw form in a database. And Mr. Ardoino testified that, "if the information is available," Bitfinex would need to undertake this exercise "for every credit line provided" on a line-by-line basis. (*Id.* at 252:14-254:13.) The discovery rules do not impose such an obligation. *See Barton*, 2009 WL 6509348, at *1.

*Fifth*, as the B/T Defendants have made clear to Plaintiffs, the transaction records the B/T Defendants produced already include any "margin trades" responsive to Plaintiffs' document requests, including Revised RFPs 23-25 and 28. (Dkt. No. 456-4 at 1.) In light of that fact, Plaintiffs' demand that the B/T Defendants "should promptly produce all records reflecting USDT margin trading conducted by either B/T Defendants or the Anonymous Trader" is baffling. Separately, Plaintiffs' statement that margin trading by a customer means that "Bitfinex necessarily lent that customer" assets is completely wrong and reflects a lack of basic research. (Dkt. No. 456 at 3.) Margin trading is discussed at length on the Bitfinex website, which states that customers trade on margin "by receiving borrowed funds *from the peer-to-peer (P2P) market* on the Margin Funding platform."[3] Peer-to-peer lending is not a loan *by Bitfinex*.[4] Loans that were not made by Bitfinex are beyond the scope of RFP 37. (Dkt. No. 456 at 3.)

Respectfully submitted,

/s/ Elliot Greenfield

---

witness used notes to refresh her recollection "fifteen minutes immediately prior to her deposition," and their contents "evince[d] no work-product concerns," were "a central part of the deposition" and were "likely to play a substantial role in plaintiff's case." *Thomas v. Euro RSCG Life*, 264 F.R.D. 120, 122 (S.D.N.Y. 2010) (citing Fed. R. Evid. 612(2)). By contrast, Mr. Ardoino never saw the analysis in question (only a summary), it is clearly work product and not central to this case, and Mr. Ardoino mentioned it in answer to a single question. (Dkt. No. 456-1 at 163:24-165:19.) Nor did it refresh Mr. Ardoino's recollection, as required by Rule 612.

[3] https://support.bitfinex.com/hc/en-us/articles/115004555165-What-is-Margin-Trading-on-Bitfinex.

[4] https://support.bitfinex.com/hc/en-us/articles/19889116973337-Understanding-the-Peer-To-Peer-P2P-Market-Place-Services-on-Bitfinex.