UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | No. 19 Civ. 9236 (KPF) |

**THE B/T DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

Michael Jason Lee (*pro hac vice*)
LAW OFFICES OF MICHAEL JASON
LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984

Sunjina K. Ahuja (*pro hac vice*)
Christopher J. Beal (*pro hac vice*)
DILLON MILLER, AHUJA & BOSS, LLP
5872 Owens Ave., Suite 200
Carlsbad, California 92008
(858) 587-1800

Maeve L. O'Connor
Michael Schaper
Elliot Greenfield
Natascha Born
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Defendants iFinex Inc.,
DigFinex Inc., BFXNA Inc., BFXWW Inc.,
Tether International Limited, Tether
Operations Limited, Tether Holdings Limited,
Tether Limited, Giancarlo Devasini, and
Ludovicus Jan van der Velde*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 4

I.      BACKGROUND. ........................................................................................ 4

      A.     Crypto-Assets and the USDT Stablecoin. ................................................ 4

      B.     Tether and Bitfinex. ............................................................................. 5

      C.     The Anonymous Trader. ........................................................................ 6

II.     THE AMENDED COMPLAINT. ................................................................... 7

III.    THE ANONYMOUS TRADER'S DECLARATION. ........................................ 9

IV.    THE CFTC AND NYAG SETTLEMENT ORDERS. .................................... 10

V.     THE ANDERSON COMPLAINT ............................................................... 11

VI.    THE COURT'S DECISION ON THE MOTIONS TO DISMISS. ..................... 12

VII.   THE SCHEDULING ORDER ..................................................................... 13

VIII.  DISCOVERY .......................................................................................... 13

IX.    THE PROPOSED SECOND AMENDED COMPLAINT. ............................... 15

ARGUMENT ....................................................................................................... 17

I.      PLAINTIFFS FAIL TO SHOW GOOD CAUSE FOR DELAY. ..................... 17

      A.     Plaintiffs Make No Attempt to Show Diligence. ................................... 17

      B.     The Key Facts Alleged in the PSAC Were Known to Plaintiffs Years Ago. ....... 19

      C.     Nothing in the PSAC Justifies Plaintiffs' Delay. .................................... 22

II.     DEFENDANTS WOULD BE PREJUDICED BY THE AMENDMENT. ............. 23

III.    PLAINTIFFS FAIL TO STATE A CLAIM. .................................................. 26

      A.     Plaintiffs' Market Manipulation Theory Is Implausible. ......................... 26

           1.     Plaintiffs Fail to Plead Artificial Inflation of Cryptocommodity
                  Prices. ............................................................................. 26

|  |  | a. | The Alleged Purchases of Bitcoin Do Not Represent Artificial Demand. ..................................................... 26 |
|  |  | b. | Plaintiffs' Allegations of "Debased" USDT Do Not Support Their Claims. ............................................ 28 |
|  |  | c. | Plaintiffs Do Not Plausibly Allege That Arbitrage Causes Price Inflation. ................................................ 29 |
|  | 2. | Plaintiffs' Allegation That Bitfinex Caused a Bitcoin Price Premium on Its Exchange Is Implausible. .................. 31 |
|  | 3. | Plaintiffs Fail to Plead That Defendants Conspired ███ ██████████████████████████. .................................. 32 |
| B. | Plaintiffs Fail to State a Claim Under the Antitrust Laws. .................................. 33 |
|  | 1. | Plaintiffs Lack Antitrust Standing. .......................................... 34 |
|  |  | a. | Plaintiffs Do Not Plead Antitrust Injury. ....................................... 35 |
|  |  | b. | Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws. ................................................. 35 |
|  | 2. | Plaintiffs Fail to Plead Monopolization Under Section 2. ...................... 37 |
|  | 3. | Plaintiffs Fail to Plead a Conspiracy to Monopolize Under Section 2. .............................................. 39 |
|  | 4. | Plaintiffs Fail to Plead an Agreement in Restraint of Trade Under Section 1. ............................................. 40 |
|  |  | a. | Plaintiffs Do Not Allege a Conspiracy ████████ ██████. ....................................... 40 |
|  |  | b. | Plaintiffs Do Not Allege a Conspiracy Among the Defendants. .................................................. 42 |
| C. | Plaintiffs Fail to State a Claim Under the Commodity Exchange Act. ............... 42 |
| CONCLUSION | ................................................................................................ 45 |

# TABLE OF AUTHORITIES

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ..................................................................................43

*Agerbrink v. Model Serv. LLC*,
  155 F. Supp. 3d 448 (S.D.N.Y. 2016) ....................................................................18

*Ahmed v. Astoria Bank*,
  2015 WL 4394072 (E.D.N.Y. July 16, 2015) ..........................................................24

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016) ......................................................................34

*Am. Needle, Inc. v. National Football League*,
  560 U.S. 183 (2010) ..............................................................................................42

*Anderson v. Binance*,
  2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ..........................................................43

*Anderson v. Tether Holdings Ltd.*,
  2023 WL 5001074 (S.D.N.Y. Aug. 4, 2023) ................................................ *passim*

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ......................................................................................4

*Baez v. Delta Airlines, Inc.*,
  2013 WL 5272935 (S.D.N.Y. Sept. 18, 2013) ........................................................24

*Baker v. Saint-Gobain Performance Plastics Corp.*,
  2023 WL 2388727 (N.D.N.Y. Mar. 7, 2023) ..........................................................18

*Blackrock Allocation Target Shares v. Wells Fargo Bank*,
  247 F. Supp. 3d 377 (S.D.N.Y. 2017) ....................................................................17

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ..........................................................................30

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) ..................................................................................45

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..................................................................................43

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ..............................................................................................42

*Gatt v. Comm'ns, Inc. v. PMC Assocs., LLC*,
    711 F.3d 68 (2d Cir. 2013)........................................................................34

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016).............................................................. *passim*

*Gentleman v. State Univ. of New York Stony Brook*,
    2022 WL 1447381 (2d Cir. May 9, 2022) ................................................26

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016).....................................................23

*Gullo v. City of New York*,
    540 F. App'x 45 (2d Cir. 2013) .........................................................18, 23

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)....................................................................34

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    19 F.4th 127 (2d Cir. 2021) ..............................................................36, 40

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)......................................................44

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)............................................40, 44, 45

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)........................................................35

*In re Crude Oil Commodity Litig.*,
    2007 WL 1946553 (S.D.N.Y. June 28, 2007) .........................................45

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).........................................34

*In re GPC Biotech AG Sec. Litig.*,
    2009 WL 5125130 (S.D.N.Y. Dec. 29, 2009) .........................................25

*In re Pfizer Inc. Sec. Litig.*,
    2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ...........................................18

*In re Platinum & Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023) ..............................................................34, 36

*In re Term Commodities Cotton Futures Litig.*,
    2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014).........................................42

*In re Vale S.A. Sec. Litig.*,
 2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019).........................................................30

*In re Zinc Antitrust Litig.*,
 155 F. Supp. 3d 337 (S.D.N.Y. 2016).......................................................................39

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
 850 F. App'x 38 (2d Cir. 2021) ...............................................................................17

*James v. Gage*,
 2019 WL 1429520 (S.D.N.Y. Mar. 29, 2019) .........................................................16

*Laydon v. Cooperatieve Rabobank U.A.*,
 55 F.4th 86 (2d Cir. 2022) .......................................................................................44

*Liverpool v. Davis*,
 2020 WL 7398745 (S.D.N.Y. Dec. 17, 2020) ....................................................18, 23

*Moore v. Publicis Groupe SA*,
 2013 WL 4483531 (S.D.N.Y. Aug. 23, 2013) .........................................................19

*Morrison v. National Australia Bank Ltd.*,
 561 U.S. 247 (2010).................................................................................................43

*Newmann v. Mediterranean Shipping Co.*,
 2019 WL 4805864 (S.D.N.Y. Sept. 30, 2019).........................................................26

*Nypl v. JPMorgan Chase & Co.*,
 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) .........................................................37

*One World, LLC v. Onoufriadis*,
 2021 WL 4452070 (2d Cir. Sept. 29, 2021) .............................................................26

*Otegbade v. New York City Admin. for Child. Servs.*,
 2015 WL 851631 (S.D.N.Y. Feb. 27, 2015).............................................................18

*PepsiCo, Inc. v. Coca-Cola Co.*,
 315 F.3d 101 (2d Cir. 2002).....................................................................................38

*Phillips v. Kidder, Peabody & Co.*,
 1994 WL 570072 (S.D.N.Y. Oct. 13, 1994) ............................................................18

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
 937 F.3d 94 (2d Cir. 2019).......................................................................................42

*Rowley v. City of New York*,
 2005 WL 2429514 (S.D.N.Y. Sept. 30, 2005).........................................................39

*Schleifer v. Lexus of Manhattan*,
  2018 WL 11593271 (S.D.N.Y. Nov. 21, 2018)...................................................18

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
  2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009) .....................................................24

*Soroof Trading Dev. Co. v. GE Microgen, Inc.*,
  283 F.R.D. 142 (S.D.N.Y. 2012) .................................................................18, 19

*State Tchrs. Ret. Bd. v. Fluor Corp.*,
  654 F.2d 843 (2d Cir. 1981)........................................................................18, 24

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) ...............................................................................30

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).................................................................................4

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011)...............................................................................18

**Statutes**

7 U.S.C. §§ 9, 25.......................................................................................................26

15 U.S.C. §§ 1-3 ........................................................................................................26

The B/T Defendants[1] respectfully submit this memorandum of law in opposition to Plaintiffs' motion for leave to amend (Dkt. No. 479, "Motion to Amend" or "Mot.").

## PRELIMINARY STATEMENT

Plaintiffs' Motion to Amend is in reality a motion for leave to start over – after the close of fact discovery – with a brand new and previously undisclosed theory of liability.  The reason for this dramatic change of course is clear:  two years of fact discovery – including more than a million pages of document discovery and numerous individual and Rule 30(b)(6) depositions – have not revealed a single shred of evidence supporting the market manipulation scheme alleged in the Amended Complaint ("AC").  By filing their Motion to Amend to conform to the evidence, Plaintiffs concede, as they must, that the theory presented in the AC – now abandoned – did not do so, and Rule 11 bars them from continuing to pursue it.  Plaintiffs attempt to stay alive by concocting a new theory of market manipulation.  But the result is a pleading that is fundamentally incoherent, legally deficient in multiple respects, and much too late.

Despite Plaintiffs' claims that they merely seek to "narrow the case" and that the allegations in the proposed Second Amended Complaint ("PSAC") are a "subset" of those in the AC, the PSAC actually presents an entirely new theory of market manipulation.  (Mot. 2; Dkt. No. 493 at 5:1-10.)  In the AC, Plaintiffs alleged that Defendants printed completely unbacked USDT out of thin air, transferred it to accounts they held at Poloniex and Bittrex (their competitors and alleged co-conspirators), and used that USDT to make carefully timed purchases of bitcoin, artificially simulating organic demand for bitcoin and creating a massive bubble in the prices of cryptocommodities.  *None of that* appears in the PSAC.  Instead, Plaintiffs now assert █ ████████████████████████████████████████████████████, involving USDT that

---

[1]    The "B/T Defendants" are iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Giancarlo Devasini, and Ludovicus Jan van der Velde.  The B/T Defendants and Philip G. Potter are the "Defendants."

was fully paid for at $1 per token (instead of printed out of thin air), a persistent price premium for bitcoin on the Bitfinex exchange purportedly caused by margin trading, and price inflation somehow caused by arbitrage trading.

Plaintiffs' belated request for a "do-over" should be denied for three reasons. *First*, Plaintiffs filed their Motion to Amend *twenty-two months* after the deadline, and they do not – and cannot – demonstrate "good cause" for that delay. It is far too late – four years into this case and nearly two years after the Court-ordered deadline for motions to amend – for Plaintiffs to seek to start over. Plaintiffs make no attempt to demonstrate "good cause" for this delay – *i.e.*, that they acted diligently to promptly assert their new claims – as required by Rule 16(b). Nor could they: Plaintiffs have known for years all of the core facts on which they now seek to rely, including by means of the Anonymous Trader's October 2020 declaration (detailing ██ ████████████████████████████████████████████████████████████████████), the 2021 CFTC and NYAG settlement orders (explaining that Tether counted receivables from Bitfinex as USDT reserves), and a host of legal filings, news reports, and other public documents, many of which are expressly cited in the PSAC.

*Second*, although Plaintiffs' failure to demonstrate "good cause" for their delay is itself sufficient to deny the Motion to Amend, the Rule 15(a) factor of prejudice also supports denial. Defendants are clearly disadvantaged by having conducted fact discovery based on a theory that Plaintiffs had secretly discarded, only to be apprised of their new theory after fact discovery closed. For example, Defendants used the Anonymous Trader's deposition to confirm ████ ██████████████████████████████████████████████████████ – facts that Plaintiffs now admit – and were not on notice that Plaintiffs would later ██████████ ████████████████████████████████.

2

*Third*, Plaintiffs' Motion to Amend should be denied as futile because the PSAC fails to state a claim for multiple, independent reasons. The allegations in the PSAC are based entirely on legitimate arbitrage trading ███████████████████████████████████████

███████. Plaintiffs' attempt to recast those trades as market manipulation is incoherent and relies on several conclusory assertions that are wholly implausible:

- Plaintiffs' assertion that the use of USDT to purchase bitcoin created artificial inflation makes no sense, as there is no longer any allegation that bitcoin was purchased with USDT printed out of thin air. Instead, all of the alleged bitcoin purchases were made using USDT that was purchased for $1 and therefore, by definition, constituted real, organic demand. A bitcoin purchase with USDT that was purchased for $1 reflects exactly the same demand as a bitcoin purchase with U.S. dollars. It makes no difference whether, as Plaintiffs allege, USDT *should have been* valued at less than $1 – i.e., was "debased." ███████████████████████████████

███████████████████████████████████████

- There is no basis to credit Plaintiffs' assertion that Bitfinex created a price premium for bitcoin on its exchange by allowing its customers to (*i*) purchase bitcoin with USDT and (*ii*) trade on margin. As Plaintiffs admit elsewhere in the PSAC, it was not possible to transact with USDT on Bitfinex during the proposed class period. And the assertion that margin trading inflates prices is nonsensical. Margin trading is offered by all major brokers and exchanges, and it does not constitute market manipulation.

- Plaintiffs do not plausibly allege that Defendants ███████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Because Plaintiffs do not plausibly allege any artificial inflation of cryptocommodity prices or any agreement or conspiracy in restraint of trade, Plaintiffs fail to plead the core elements of their Commodity Exchange Act ("CEA") and Sherman Act claims. They also fail to plead a domestic transaction in crypto-asset futures, as required for the CEA claim. Accordingly, denial of Plaintiffs' motion is independently warranted on the basis of futility.

The Court should deny Plaintiffs' motion for leave to file the PSAC.

## STATEMENT OF FACTS[2]

### I.    BACKGROUND.

#### A.    Crypto-Assets and the USDT Stablecoin.

Crypto-assets are decentralized, digital assets based on "blockchain technology." (Dkt. No. 480-1, PSAC ¶¶ 43, 46.) Cryptocommodities, as defined by Plaintiffs, are a subset of crypto-assets that "provide a secure medium of exchange for general purposes, have a controlled supply that cannot be unilaterally increased, and are decentralized." (*Id.* ¶ 60.)

While the price of most crypto-assets, such as bitcoin, can change dramatically over time and experience volatility, certain other crypto-assets – referred to as "stablecoins" – are intended to track traditional "fiat currency," such as the U.S. dollar, and maintain a consistent market

---

[2]    The factual allegations in the PSAC are taken as true solely for the purposes of this motion, except where those allegations are contradicted by other allegations in the PSAC or by documents cited and relied on in the PSAC. The Court may also consider documents cited and relied on in the PSAC. *See Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (courts may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Copies of such documents are attached as exhibits to the accompanying Declaration of Natascha Born and are cited herein as "Ex. __."

price over time.  (*Id.* ¶ 113.)  Individuals can purchase stablecoins with fiat currency or other

crypto-assets and then trade the stablecoins for other crypto-assets.  (*Id.* ¶¶ 113, 127, 156.)

The "U.S. dollar tether" token, or "USDT," is a stablecoin pegged to the U.S. dollar.  (*Id.*

¶ 116.)  The purpose of USDT is to maintain a market price of $1 per token and to be "easily

transferable across different crypto-exchanges."  (*Id.* ¶ 127; *see also id.* ¶¶ 2, 112-13, 123-26.)

### B.    Tether and Bitfinex.

Tether is the issuer of USDT.  (*Id.* ¶ 145.)  Tether issues USDT to customers in exchange

for an equal amount of U.S. dollars.  (*Id.* ¶ 125.)  Customers holding USDT can trade them for

other crypto-assets or for U.S. dollars on crypto-exchanges.  (*Id.* ¶ 285.)  Tether maintains the

collateral backing USDT as reserves.  (*Id.* ¶¶ 124-25, 136-37.)

Bitfinex operates a crypto-exchange and is an affiliate of Tether.  (*Id.* ¶¶ 106-107.)

Tether and Bitfinex share common ownership and management.  DigFinex Inc., Mr. van der

Velde, and Mr. Devasini together own a controlling share of both Tether and Bitfinex.  (*Id.*

¶¶ 23-33.)  During the proposed class period, Mr. van der Velde was the CEO of Tether and

Bitfinex, and Mr. Devasini was their CFO.  (*Id.* ¶¶ 34-35.)  Mr. van der Velde and Mr. Devasini

are the sole directors of those entities.  (*Id.*)   Plaintiffs allege that Bitfinex and Tether were under

"common control" and "joint operation."  (*Id.* ¶ 148.)  Although Plaintiffs allege that Bitfinex

and Tether sought to "conceal" their common ownership, Defendants publicly disclosed that

information in court filings on April 5, 2017, five days into the proposed class period.[3]  (*See id.*)

During the proposed class period, the Bitfinex exchange did not support trading of

USDT.  (*Id.* ¶ 285.)  However, Bitfinex customers could deposit USDT to their accounts, which

would be credited with an equal amount of U.S. dollars.  (*Id.*)  And Bitfinex customers with a

---

[3]    *See* Certificate of Interested Parties, Dkt. No. 4, *iFinex Inc. v. Wells Fargo & Co.*, No. 17-cv-1882 (N.D Cal,
filed Apr. 5 2017), cited at PSAC ¶ 24 n.4.

U.S. dollar balance in their accounts could choose to withdraw that balance either as U.S. dollars or as USDT.  (*Id.*)  A customer's withdrawal of a U.S. dollar account balance in the form of USDT is thus effectively a purchase of USDT – at a price of $1 per USDT token – because the customer has exchanged one U.S. dollar for each USDT withdrawn.

In order to accommodate withdrawals in the form of USDT, Bitfinex purchased USDT from Tether.  (*Id.* ¶¶ 146, 156-57, 285.)  That USDT was transferred to Bitfinex's "cold wallet" – a wallet that for security purposes was not connected to the internet – or its "hot wallet" – a wallet that could process transfers to and from customers.  (*Id.* ¶ 10.)

Typically, Tether issued USDT to Bitfinex in exchange for a contemporaneous payment of U.S. dollars by wire transfer.  When contemporaneous payment was not possible, for example because of banking issues, Tether accounted for the amount owed by Bitfinex as a "receivable" and counted the receivable as part of its USDT reserves.  (*Id.* ¶¶ 167-70, 182.)  Of course, because Tether and Bitfinex were under common management (*id.* ¶¶ 34-35, 38, 148), Tether management always knew the amount of funds available to Bitfinex and had control over those funds, eliminating any risk typically associated with a third-party "IOU."

In particular, in April 2017, Wells Fargo stopped providing correspondent banking services to crypto companies, and Tether was no longer able to accept international incoming wire transfers until September 15, 2017, when it was able to open an account at Noble Bank International ("Noble").  (*Id.* ¶¶ 169-79.)  During that period of time, Tether issued USDT only to Bitfinex, and it recorded a receivable from Bitfinex for each USDT issuance.  (*Id.* ¶¶ 180-82.)  By September 15, 2017, the amount of that receivable had reached $382 million, and that full amount was paid by Bitfinex as soon as Tether's Noble account was opened.  (*Id.* ¶¶ 182-85.)

C.     **The Anonymous Trader.**

The individual referred to in this litigation as the "Anonymous Trader" was a customer of

Bitfinex.  (*Id.* ¶ 265.)  The Anonymous Trader engaged in a strategy known as "cross-exchange arbitrage," which involves simultaneously buying a crypto-asset on one exchange and selling an equal amount of the crypto-asset (at a slightly higher price) on another exchange.  (*Id.* ¶¶ 260-61.)  The Anonymous Trader automated ▮▮ arbitrage strategy by programming a "bot" to monitor prices and execute trades when an arbitrage opportunity arose.  (*Id.* ¶¶ 261, 265-68.)  Bitfinex facilitates automated trading by its customers.  (*Id.* ¶¶ 265, 271, 322-25.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

## II.     THE AMENDED COMPLAINT.

Plaintiffs filed the AC on June 5, 2020, claiming that Defendants, along with Bittrex, Poloniex, and Crypto Capital, "executed a sophisticated scheme to fraudulently inflate the price of cryptocommodities."  (Dkt. No. 114, AC ¶ 1.)  Plaintiffs were specific about what the supposed scheme entailed:  they alleged that "Tether issued *billions* of USDT to itself with *no*

U.S. dollar backing – simply creating the USDT out of thin air" – and that Bitfinex and Tether then used that "fraudulently issued USDT to make strategically timed, massive purchases of cryptocommodities just when the price of those commodities was falling." (*Id.* ¶¶ 7, 10.) According to the AC, those "massive, carefully timed purchases" artificially inflated the entire cryptocommodity market, causing the largest bubble in human history, with over $450 billion in value disappearing when the bubble burst in December 2017. (*Id.* ¶¶ 1, 3, 14, 93-97.)

The AC described in detail how Defendants supposedly pulled this off. Between 2015 and 2020, Tether allegedly "issued Bitfinex between 1 and 3 billion unbacked USDT." (*Id.* ¶ 217.) The AC alternately described that USDT as "unbacked," "essentially counterfeit," "fraudulently issued," "freely printed," and "debased." (*E.g., id.* ¶¶ 4, 5, 10, 191, 271, 375.) The point was that Tether printed USDT "out of thin air," and that Bitfinex and Tether then used "the USDT they printed for themselves to manipulate the cryptocommodity market." (*Id.* ¶¶ 7, 259.)

Bitfinex and Tether allegedly transferred this "freely printed" USDT to "Bitfinex's deposit addresses on Bittrex and Poloniex," ██████████████████████" where they then used the unbacked USDT to purchase cryptocommodities. ██████████████████ Those purchases, according to the AC, "converted Bitfinex and Tether's freely printed USDT into valuable cryptocommodities" and "artificially inflate[d] cryptocommodity prices." (*Id.* ¶¶ 190-91.) The B/T Defendants allegedly were able to trigger price inflation in the hundreds of billions of dollars leveraging only the $1 to $3 billion in USDT that Tether supposedly printed out of thin air by "carefully" and "strategically" timing their cryptocommodity purchases in order to create "price floor[s]." (*Id.* ¶¶ 3, 10, 295-99.)

This scheme worked, so Plaintiffs claimed, because the B/T Defendants kept secret that Tether had printed the USDT out of thin air and assured the public that Tether was fully backed.

The market thus mistakenly perceived Bitfinex's purchases of cryptocommodities with USDT as "investment of the equivalent of fiat currency in those cryptocommodities, reflecting genuine customer demand at those prices," when in fact the USDT was essentially Monopoly money that represented zero genuine demand.  (*Id.* ¶ 191.)  According to the AC, the B/T Defendants' representations that USDT was fully backed were false because the $1 to $3 billion in unbacked USDT that Tether supposedly printed for Bitfinex devalued all USDT in circulation.  (*Id.* ¶ 8.)  In the AC, Plaintiffs sometimes used the term "debased USDT" to refer to this notion that all outstanding USDT was only *partially* backed (because billions of outstanding USDT had been freely printed).  (*Id.*)  At other times Plaintiffs used "debased" to mean *completely* unbacked, for example, in alleging that "Bitfinex and Tether issued *unbacked* USDT and used that *debased* USDT to buy large amounts of cryptocommodities." (*Id.* ¶ 191.)

Plaintiffs alleged in the AC that the B/T Defendants conspired with various other defendants to carry out this scheme.  Specifically, Plaintiffs claimed that competitors Bittrex and Poloniex "agreed with the Tether and Bitfinex Defendants to manipulate the market for crypto commodities," "set up bespoke addresses for Bitfinex's exclusive use," and knew that the USDT flowing ███████████████████████ "was not backed."  (*Id.* ¶¶ 310-41.)  Plaintiffs also claimed that, absent collusion, Bittrex, Poloniex, and Bitfinex "would have competed with one another" as "horizontal competitors," and "would have never been able to inflate the prices of bitcoin and other cryptocommodities."  (*Id.* ¶¶ 421, 425.)

## III.   THE ANONYMOUS TRADER'S DECLARATION.

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

On October 27, 2020, Bittrex's counsel provided Plaintiffs with a sworn declaration by the Anonymous Trader explaining that ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

The Anonymous Trader further stated that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

Bittrex advised Plaintiffs that the Anonymous Trader had offered to answer any questions, that Plaintiffs could "email ████ directly," and that Bittrex was otherwise "happy to pass along any questions you have."  (*Id.* at 2.)  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

## IV.   THE CFTC AND NYAG SETTLEMENT ORDERS.

In 2021, the New York Attorney General's Office ("NYAG") and the Commodity Futures Trading Commission ("CFTC") made public the same core allegations about Tether's USDT reserves and leveraged trading on Bitfinex on which Plaintiffs now rely in the PSAC.

On February 23, 2021, the NYAG publicly released a settlement order with Bitfinex and

Tether (the "NYAG Order") alleging that Tether misrepresented the sufficiency of USDT reserves in 2017 and again in 2018-2019. The NYAG faulted Tether for failing to disclose that, between June and September 2017, Tether's reserves included a receivable for up to $382 million that Bitfinex owed to Tether and that Bitfinex held in a "comingled account." (Ex. C, NYAG Order, ¶ 21.) The NYAG also concluded that Tether had misrepresented that USDT was fully backed by traditional currency in late 2018 and 2019 when it had entered into transactions with Bitfinex that resulted in Tether temporarily holding a portion of its reserves in an account at Crypto Capital that became inaccessible. (*Id.* ¶ 44.) The NYAG Order included detailed factual findings for both of those determinations. (*Id.* ¶¶ 14-53.) Plaintiffs were well aware of the NYAG Order: they sent it to the Court two days after it was posted online. (Dkt. No. 176.)

On October 15, 2021, the CFTC publicly issued settlement orders regarding Tether and Bitfinex (the "CFTC Orders"). The CFTC, like the NYAG, concluded that from June through September 2017, "some of the Tether Reserves were held in Bitfinex's bank accounts and comingled with Bitfinex operational and customer funds, amounting to approximately $382 million by September 14." (Ex. D, Tether CFTC Order at 5.) Likewise, the CFTC described Bitfinex and Tether's 2018 transfers resulting in Tether holding certain reserves in a Crypto Capital account. (*Id.* at 6.) The CFTC also noted that Bitfinex permitted customers to trade with borrowed funds. Specifically, from 2016 through 2018, Bitfinex offered "trading on a leveraged or margined basis" and "the substantial majority of margin trading was financed through Bitfinex's peer-to-peer ('P2P') funding program." (Ex. E, Bitfinex CFTC Order at 3.)

## V.     THE *ANDERSON* COMPLAINT.

After the NYAG and CFTC published their orders, a different set of plaintiffs promptly filed suit on December 10, 2021, seeking to represent a purported class of USDT purchasers. *See Anderson v. Tether Holdings Ltd.*, 2023 WL 5001074 (S.D.N.Y. Aug. 4, 2023). Based on

the NYAG and CFTC Orders, the *Anderson* plaintiffs alleged – just as Plaintiffs here would

allege two years later in the PSAC – that Tether devalued USDT by including receivables from

Bitfinex and other non-cash assets in its USDT reserves.  The plaintiffs relied on allegations

nearly identical to those now alleged in the PSAC – *e.g.*, that "[b]etween June 1, 2017 and

September 15, 2017, Bitfinex held approximately $382 million of Tether's funds in a comingled

account," that "[t]hese funds should have been held by Tether to back the Tether tokens in

circulation but were not," and that "Tether accounted for this money as a 'receivable' from

Bitfinex."  (Ex. F, *Anderson* Compl., ¶ 84.)  The *Anderson* plaintiffs detailed Tether's public

statements regarding USDT reserves (*id.* ¶¶ 74-80, 110-11), as well as its banking issues with

Wells Fargo, Noble, and Crypto Capital (*id.* ¶¶ 81-108).

As a result, according to the *Anderson* plaintiffs, USDT was not worth the $1 they paid

for it.  The *Anderson* court rejected that argument and dismissed the complaint for lack of Article

III standing, finding that the plaintiffs failed to allege any facts showing that they were "deprived

of some value" at the time of purchase or that "their USDT had a diminished actual value at all."

*Anderson*, 2023 WL 5001074, at *2.

## VI.     THE COURT'S DECISION ON THE MOTIONS TO DISMISS.

On September 28, 2021, the Court granted in part and denied in part the defendants'

motions to dismiss.  (Dkt. No. 182, the "MTD Order.")  The Court succinctly summarized

Plaintiffs' theory of the case at that time, stating that the "crux" of the AC was that:

- The B/T Defendants "fraudulently issued between $1 and $3 billion worth of the crypto-asset USDT, which asset Defendants claimed was backed at all times by an equivalent amount of U.S. dollar reserves, but was in fact completely unbacked and 'print[ed] out of thin air.'"

- That "unbacked USDT was transferred from Tether to Bitfinex, and then further transferred to accounts maintained by Bitfinex on two crypto-exchanges operated by the

Exchange Defendants, Poloniex and Bittrex."

- "Once the unbacked USDT was transferred to Poloniex and Bittrex, Defendants used it to make carefully timed purchases of cryptocommodities when prices threatened to fall, thereby fraudulently giving the appearance of price 'floors' in the market, artificially simulating organic demand, and creating a 'colossal bubble' in the cryptocommodity market."

- "[T]he Exchange Defendants were knowing and willing participants in the scheme, despite ostensibly competing with Bitfinex."

(MTD Order 16.)  The Court accepted as true the allegation that the 1AA6 and 1J1d Addresses

belonged to Bitfinex.  (*Id.* at 19-20, 28-30 & n.20.)

The Court dismissed the RICO claims, N.Y. GBL § 349 claim, and conspiracy to

monopolize claim under Section 2 of the Sherman Act, and it allowed the remaining fraud,

antitrust, and CEA claims to proceed to discovery.  (*Id.* at 127.)  The surviving claims all relied

on the core allegations outlined above, which the Court found adequately alleged a scheme to

"artificially inflate" cryptocommodity prices.  (*Id.* at 49-61, 68-70, 78-80, 83-87, 123.)

## VII.    THE SCHEDULING ORDER.

On November 22, 2021, the Court issued a Scheduling Order directing that "[a]ny motion

to amend or to join additional parties shall be filed within **30** days from the date of this Order" –

*i.e.*, December 22, 2021.  (Dkt. No. 194, ¶ 4.)  That December 2021 deadline was over a year

after Plaintiffs had received the Anonymous Trader's declaration, ten months after they sent the

NYAG Order to the Court, two months after the CFTC's orders, and three months after the

Court's decision on the motions to dismiss.  Plaintiffs did not seek leave to amend before the

deadline or request an extension of the deadline.

## VIII.   DISCOVERY.

Over the course of the following two years, the parties engaged in extensive fact

discovery.  The B/T Defendants produced over 200,000 documents, amounting to over a million

pages.  Plaintiffs deposed the Anonymous Trader; individual defendants Ludovicus Jan van der

Velde, Giancarlo Devasini, and Philip Potter; four additional witnesses associated with the B/T

Defendants; and, over the course of four days, both Bitfinex and Tether pursuant to Rule

30(b)(6).  The B/T Defendants deposed each of the four remaining Plaintiffs,[4] the Anonymous

Trader, and John Griffin (who authored the article on which the AC was based).

Although Plaintiffs took an incredibly expansive approach to fact discovery, demanding

broad categories of documents and testimony about nearly every aspect of the B/T Defendants'

business, they ultimately came up empty, as evidenced by Plaintiffs' abandonment of that theory

in the PSAC.  For example, from September 2022 through May 2023, Plaintiffs demanded and

received ever broader sets of transaction records for the B/T Defendants and certain of their

personnel, and the discovery period was extended to allow Plaintiffs time to analyze those

records.  Not surprisingly, Plaintiffs found no transactions by the B/T Defendants supporting a

claim of market manipulation.  After first accusing the B/T Defendants of destroying evidence –

without any basis – Plaintiffs appear to have eventually recognized that the B/T Defendants did

not engage in any improper transactions:  the PSAC includes *no* mention of *any* purchases of

cryptocommodities by the B/T Defendants.  Similarly, Plaintiffs found no evidence of any

conspiracy or agreement with Poloniex, Bittrex or Crypto Capital and have dropped those

entities from their theory of the case and as defendants.

At no time during that two-year discovery period did Plaintiffs reveal that they were

pursuing a theory different from the one alleged in the AC, although they must have been doing

so for some time.  The B/T Defendants thus conducted fact discovery on the basis of the AC.

---

[4]    David Leibowitz declined to join the Amended Complaint, and Aaron Leibowitz withdrew as a named plaintiff
during discovery.  (AC at 1; Dkt. No. 323.)

## IX.    THE PROPOSED SECOND AMENDED COMPLAINT.

In a surprise filing the day after the close of fact discovery, Plaintiffs filed their Motion to Amend, seeking to assert a wholly new theory of the case.  The redline that Plaintiffs submitted, comparing the AC and PSAC, belies any suggestion that Plaintiffs merely seek to narrow their claims or amend to conform to the evidence produced in discovery.  (Dkt. No. 487; Mot. 1, 2, 8.)

Plaintiffs no longer contend that Defendants purchased bitcoin with USDT that they had freely printed out of thin air and issued to themselves.  Indeed, they no longer allege *any* purchases of cryptocommodities by Defendants, much less massive, carefully timed purchases designed to create price floors or simulate organic demand.  Plaintiffs no longer allege that Bitfinex owned the identified accounts at Bittrex and Poloniex.  And Plaintiffs no longer allege that Defendants conspired with their competitors, Bittrex and Poloniex, or with Crypto Capital.

In place of that theory, Plaintiffs now assert a conspiracy ███████████████ ███████████████ to inflate the price of cryptocommodities between March 31, 2017 and February 25, 2019.  Plaintiffs' new theory has three main components.

*First*, Plaintiffs allege that USDT was "debased" – now used to mean that it was worth less than $1 – to the extent that Tether included receivables from Bitfinex as a component of USDT reserves or temporarily held reserves at Crypto Capital.  On this point, Plaintiffs' allegations are virtually identical to the NYAG and CFTC Orders and the allegations in the *Anderson* complaint, all of which were made public in 2021.  As a result of this purported "debasement," Plaintiffs assert that *any* purchase of *any* cryptocommodity with USDT automatically inflated the price of that cryptocommodity.

*Second*, Plaintiffs allege that Defendants ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

*Third*, Plaintiffs allege that Bitfinex created a price premium for bitcoin on its exchange relative to other crypto-exchanges in two ways.  Plaintiffs allege that the supposedly "debased" USDT inflated the price of bitcoin when customers used it "to purchase bitcoin on Bitfinex." (*Id.* ¶ 312.)  But Plaintiffs admit elsewhere that Bitfinex did not allow any trading of USDT during the proposed class period.  (*Id.* ¶¶ 282 n.119, 285.)  *See James v. Gage*, 2019 WL 1429520, at *14 (S.D.N.Y. Mar. 29, 2019) ("Where the plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true.").  Plaintiffs next assert that Bitfinex facilitated a price premium by allowing customers to trade on margin or using temporary credit lines.  Yet Plaintiffs offer only the conclusory allegation – without explanation or factual support – that "the natural economic consequence" of margin trading and credit lines was "to create price premiums on Bitfinex versus other exchanges."  (PSAC ¶¶ 313-19.)

Plaintiffs allege that the "scheme" ended on February 25, 2019, the same date indicated

in the CFTC Order, presumably because on that date Tether revised the disclosure on its website to state that its USDT reserves "may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities." (Ex. D at 7.) The PSAC does not allege that the price of USDT or of cryptocommodities fell after Tether revealed to the market that USDT was not fully backed by liquid U.S. dollars held as traditional currency.

Beyond this new market manipulation theory, the PSAC is rife with half-truths, blatantly false statements and inflammatory speculation, all aimed at suggesting – incorrectly – that Defendants lacked sufficient assets to cover receivables and credit lines, made payments using customer funds, and were generally insolvent. Although the Court need not address them in this motion, Defendants strenuously object to those allegations, which are not supported by evidence.

## ARGUMENT

### I. PLAINTIFFS FAIL TO SHOW GOOD CAUSE FOR DELAY.

#### A. Plaintiffs Make No Attempt to Show Diligence.

As the Court noted at the October 31, 2023 hearing, Plaintiffs do not even attempt to satisfy their burden of showing "good cause" for their two-year delay in moving to amend, which requires establishing that they acted promptly on the information giving rise to the amendment. (Mot. 6-8; Dkt. No. 493 at 19:20-20:24.) Plaintiffs do not argue that they only recently received information without which they could not have asserted the claim set forth in the PSAC, and they should not be permitted to do so for the first time on reply. *See Blackrock Allocation Target Shares v. Wells Fargo Bank*, 247 F. Supp. 3d 377, at 415 n. 19 (S.D.N.Y. 2017) (court "need not consider" argument "raised for the first time on reply").

Under Rule 16, "a court's scheduling order should not be modified" to permit a belated motion to amend "except upon a showing of good cause, which requires the moving party to have acted diligently." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 850 F. App'x 38, 43 (2d Cir.

2021).  Whether "good cause exists is for the movant to establish," *Otegbade v. New York City Admin. for Child. Servs.*, 2015 WL 851631, at *3 (S.D.N.Y. Feb. 27, 2015), and a "lack of diligence" is "reason alone to deny leave to amend," *Int'l Techs.*, 850 F. App'x at 43.  Although Plaintiffs acknowledge in passing that their failure to abide by the Scheduling Order subjects them to Rule 16, they incorrectly suggest that Defendants are required to show prejudice by citing cases that apply only Rule 15.[5]  (Mot. 6.)  Under Rule 16, it was Plaintiffs' burden to establish that they acted diligently in moving to amend their complaint, and they failed to do so.

The "good cause" standard is stringent.  A party must demonstrate "that despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Liverpool v. Davis*, 2020 WL 7398745, at *3 (S.D.N.Y. Dec. 17, 2020).  Accordingly, "if the proposed amendment relies on information that the party knew or should have known prior to the deadline, leave to amend is properly denied." *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 147 (S.D.N.Y. 2012).  If a party learns of information justifying an amendment following the deadline, then it must move promptly.  *See Gullo v. City of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) ("The district court acted well within its discretion in concluding that plaintiffs' three-month failure to move for amendment . . . failed to demonstrate the diligence necessary to satisfy Rule 16.").  Importantly, "a court will not accept a party's claim that facts relevant to its amendment were previously unavailable just on its say-so," but will instead examine "what facts emerged in discovery." *Schleifer v. Lexus of Manhattan*, 2018 WL

---

[5]  *See Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (assessing motion under Rule 15(a), with no mention of Rule 16); *Baker v. Saint-Gobain Performance Plastics Corp.*, 2023 WL 2388727, at *2 (N.D.N.Y. Mar. 7, 2023) (same).  Plaintiffs rely almost exclusively on cases that do not implicate Rule 16.  *See State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (assessing motion under Rule 15(a), prior to the adoption of the "good cause" standard in Rule 16 in 1983); *Williams v. Citigroup Inc.*, 659 F.3d 208, 213 (2d Cir. 2011) (assessing motion under Rule 15(a), with no mention of Rule 16); *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *1 (S.D.N.Y. Mar. 22, 2012) (same); *Phillips v. Kidder, Peabody & Co.*, 1994 WL 570072, at *4 (S.D.N.Y. Oct. 13, 1994) (same).

11593271, at *2 (S.D.N.Y. Nov. 21, 2018).

Plaintiffs' argument that they "diligently pursued . . . discovery" misses the point.  (Mot. 7.)  The question is not whether Plaintiffs diligently pursued discovery, but whether they "acted diligently in moving to amend the complaint" upon receiving new evidence.  *Soroof Trading Dev. Co.*, 283 F.R.D. at 149.  Plaintiffs do not argue that their Motion to Amend is justified on the basis of material they received in response to the discovery motions they cite, nor could they.  *First*, Plaintiffs' motions to compel production of the B/T Defendants' trading records are plainly irrelevant given that Plaintiffs no longer allege that the B/T Defendants' trades manipulated the market.  (Dkt. Nos. 240, 328, 368.)  The PSAC does not mention any purchase of crypto-commodities by the B/T Defendants.  *Second*, Plaintiffs' September 2022 motion to compel production of financial statements cannot justify a motion to amend over a year later, particularly as the only reference to the B/T Defendants' financial records in the PSAC is the alleged *lack* of historical records.  (Dkt. No. 240; PSAC ¶ 201.)  *Third*, Plaintiffs cannot rely on their September 20, 2023 motion, as the B/T Defendants produced only three additional spreadsheets in response (Dkt. Nos. 456, 473-4 at 3), which Plaintiffs do not assert were necessary for the PSAC.

## B.   The Key Facts Alleged in the PSAC Were Known to Plaintiffs Years Ago.

Plaintiffs cannot show that they acted diligently because they have known about all of the necessary ingredients for their PSAC for years.  Plaintiffs' new claims are based on ███

████████████████████████████████████████████████████████████████████

██████████████████, the purported "debasement" of USDT based on the inclusion of receivables in Tether's USDT reserves (*id.* ¶¶ 3, 143-257), and a purported price premium for bitcoin on the Bitfinex exchange (*id.* ¶¶ 308-21).  Plaintiffs knew or were on notice of all of those key facts well before the December 2021 deadline and more than two years before they filed their Motion to Amend.  *See Moore v. Publicis Groupe SA*, 2013 WL 4483531, at *8

(S.D.N.Y. Aug. 23, 2013) (denying leave to amend where "discovery may have provided some additional support for the proposed new claims" but "was not the primary basis").

*First*, Plaintiffs learned *three years ago*, in October 2020, that the Anonymous Trader ████████████████████████ and used a bot to conduct automated cross-exchange arbitrage in exactly the way that Plaintiffs now allege.  (Ex. A ¶¶ 3, 5-6.)  Bittrex's counsel sent Plaintiffs a sworn declaration by the Anonymous Trader detailing all of those facts, and the Anonymous Trader offered to answer any questions Plaintiffs had.  (*Id.* at 2.)  Although it is hard to imagine why Plaintiffs' counsel would not jump at the opportunity to interview a key witness ████████████████████████, Plaintiffs refused to do so.

*Second*, Plaintiffs concede that they have known about the supposedly "debased" USDT since 2021, as the PSAC cites the NYAG and CFTC Orders as "Confirm[ing] USDT Was Debased."  (PSAC at 62.)  Moreover, Plaintiffs have known since at least February 2021 that receivables for amounts owed by Bitfinex were part of Tether's USDT reserves.  On February 25, Plaintiffs sent the NYAG Order to the Court, which concluded that a portion of Tether's USDT reserves had been "accounted for as a 'receivable' from Bitfinex."  (Ex. C at 5-6.)  The PSAC bears a striking similarity to the NYAG Order and covers much of the same ground. Among other things, the NYAG Order discusses Bitfinex's and Tether's use of banks in Taiwan before March 2017; Wells Fargo's suspension of correspondent banking services in March 2017; the account Tether's General Counsel opened in trust for Tether at the Bank of Montreal in 2017; Bitfinex's transfer of $382 million to Tether in September 2017; Friedman LLP's September 2017 verification of Tether's reserves; Deltec Bank & Trust Limited's November 1, 2018 confirmation that Tether held 1.8 billion dollars in its account; and the B/T Defendants' relationship with Crypto Capital and transactions with each other using their Crypto Capital

accounts.  (PSAC ¶¶ 167-91, 206-51; Ex. C ¶¶ 14-49.)

The October 2021 CFTC Order similarly stated that Tether "at times included receivables and non-fiat assets among its counted reserves."  (Ex. D at 2; *see also id.* at 5-6.)  The PSAC also states that USDT was "debased" because Tether held a portion of its reserves in inaccessible accounts at Crypto Capital following a series of transactions with Bitfinex, an assertion that the NYAG and the CFTC both made in 2021 too, citing the same series of transactions amounting to $625 million in November 2018.  (PSAC ¶¶ 244-48; Ex. C ¶¶ 43-44; Ex. D at 6.)

It is not hindsight to suggest that this information could have been incorporated into a civil complaint, as the *Anderson* plaintiffs did exactly that in December 2021 (before the deadline for Plaintiffs to move to amend).  Starting from the NYAG and CFTC Orders, the *Anderson* plaintiffs claimed that USDT was actually worth less than the $1 price they had paid for it because of the composition of Tether's USDT reserves, just as Plaintiffs now allege that USDT was "debased" for that same reason.  (Ex. F ¶¶ 5, 81-97; PSAC ¶¶ 3-4, 143-257.)

*Third*, the price at which bitcoin traded on Bitfinex as compared to Bittrex and Poloniex has been public all along.  And Plaintiffs have known for years that Bitfinex permitted its customers to trade with borrowed funds, which appears to be the entire factual basis for Plaintiffs' assertion that Bitfinex caused or facilitated a price premium.  (PSAC ¶¶ 311-21.)  The fact that Bitfinex offered peer-to-peer margin lending to its customers was obviously public at the time.  And the CFTC clearly stated in its October 2021 order regarding Bitfinex that, from 2016 through 2018, Bitfinex offered "trading on a leveraged or margined basis."  (Ex. E at 3.)

Plaintiffs have thus known about all of the necessary ingredients for the scheme they now allege in their PSAC since before the December 2021 deadline.  The extent to which the PSAC is based on information that was publicly available as of 2020 is also clear from the sheer

number of the paragraphs – *79 out of 448 paragraphs* – that cite public sources dated 2020 or earlier.[6]  These include public court filings from a 2019 action in New York State court and an April 2017 action in federal court in California (*e.g.*, *id.* ¶¶ 23, 135), academic and news articles (*e.g.*, *id.* ¶¶ 222, 369), and public statements by Bitfinex and Tether (*e.g.*, *id.* ¶¶ 187, 240).

### C.    Nothing in the PSAC Justifies Plaintiffs' Delay.

Plaintiffs' citation in the PSAC to a limited number of documents produced in discovery and deposition testimony does not justify their two-year delay because they were aware of all of the core facts alleged in the PSAC well before the December 2021 deadline.

*First*, with respect to the Anonymous Trader, Plaintiffs have had – for three years – the Anonymous Trader's declaration describing ▌ arbitrage strategy.  ▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌

*Second*, Plaintiffs' new assertion in the PSAC that Bitfinex did not have sufficient funds to pay Tether for USDT issuances is not supported by any facts, much less new evidence. Plaintiffs claim that an inability to pay can be inferred from the fact that Bitfinex "did not keep the U.S. dollars that it owed Tether" in a "segregated account," a fact also included in the NYAG and CFTC Orders in 2021.  (PSAC ¶ 200; Ex. C ¶ 21; Ex. D at 5.)  Plaintiffs also claim that Bitfinex failed to "maintain a balance sheet" that "showed its total assets and liabilities," but the *lack* of historical financial records does not justify Plaintiffs' delay in seeking to amend.  (PSAC ¶ 201.)   A lack of historical records also says nothing about what was known at the time and does not support Plaintiffs' speculation that Bitfinex had insufficient funds.  Indeed, the only *document* that Plaintiffs cite on this point is dated May 8, 2019 and was also cited in the AC.

---

[6]    PSAC ¶¶ 23-26, 30, 32-36, 38, 51, 81-87, 92, 107, 109-11, 120-22, 128-39, 149, 153, 156-58, 164, 165, 167-70, 172, 173, 179, 184, 186, 187, 204, 210, 218, 221, 222, 232, 234, 235, 240, 241, 365, 369, 371-74, 376, 378, 380-82, 385.

(PSAC ¶ 204 & n.95; AC ¶ 220 & n.128.)  Notably, Plaintiffs flatly misstate the contents of that

document:  it states that Bitfinex had 333.5 million in *profits* – not *revenue* – in 2017.  (Ex. G,

Initial Exchange Offering of LEO Tokens, at 11.)  Of course, Bitfinex's profits say nothing about

its ability to pay for USDT.  *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 583 (S.D.N.Y.

2016) (allegations contradicted by documents on which plaintiffs rely are "not entitled to the

usual presumption of truth applicable on a motion to dismiss") (citing cases).

*Third*, Plaintiffs cite little deposition testimony in the PSAC, and the testimony that is

cited is duplicative and at best marginally relevant.  For example, Plaintiffs cite Mr. Potter's

opinion on the nature and "legitima[cy]" of receivables (PSAC ¶ 198), and his description of the

genesis, purpose, and early use of USDT and Tether (*id.* ¶¶ 115-16, 258-59), as well as Mr. van

der Velde's description of the "purpose of stablecoins like USDT" (*id.* ¶ 294).  That testimony

provides some minimally relevant background; it contains no new information justifying

Plaintiffs' delay.  Likewise, Plaintiffs cite additional detail that the Anonymous Trader provided

on ▮ cross-exchange arbitrage strategy, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮, but that adds nothing significant to ▮ declaration.

## II.    DEFENDANTS WOULD BE PREJUDICED BY THE AMENDMENT.

Although the Court need not reach the issue to deny Plaintiffs' motion, the B/T

Defendants would be prejudiced by the proposed amendment.[7]  Had the B/T Defendants known

about the new purported scheme alleged in the PSAC, they would have sought discovery

relevant to the new claims, including from the Anonymous Trader, Plaintiffs, Bittrex and

---

[7]    *Gullo v. City of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) (affirming denial of leave to amend because lack of prejudice "does not change the fact that plaintiffs failed to pursue amendment with diligence"); *Liverpool v. Davis*, 2020 WL 7398745, at *3 (S.D.N.Y. Dec. 17, 2020) (denying leave to amend where party failed to establish good cause, despite no showing of prejudice); *Otegbade*, 2015 WL 851631, at *4 (declining "to reach the issue of prejudice" and denying leave to amend "under the 'good cause' standard of Rule 16(b)").

Poloniex, and third parties.  Plaintiffs' years-long delay also caused the B/T Defendants to expend substantial resources defending against claims that Plaintiffs now concede are meritless.

Courts regularly find prejudice and deny leave to amend where, as here, plaintiffs seek to assert a new theory of the case.  *See*, *e.g.*, *Baez v. Delta Airlines, Inc.*, 2013 WL 5272935, at *4 (S.D.N.Y. Sept. 18, 2013) (finding prejudice and denying leave to amend where "a careful review of the record makes clear that Plaintiff is in fact trying to introduce, at the eleventh hour, an entirely new theory of the case"); *Ahmed v. Astoria Bank*, 2015 WL 4394072, at *3 (E.D.N.Y. July 16, 2015) (denying leave to amend where the proposed amendment "substantially alters the theory of the case . . . long after the court-ordered deadline for making such amendments" and after the close of "fact discovery"); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2009 WL 3467756, at *6 (S.D.N.Y. Oct. 28, 2009) (affirming denial of leave to amend under Rule 16 where plaintiffs sought a "fundamental recasting of breach of Fiduciary Duty claims based on a new theory of liability").  By contrast, as Plaintiffs point out, courts have permitted amendments where a plaintiff seeks only to "refine" the complaint.  *See*, *e.g.*, *State Tchrs. Ret. Bd.*, 654 F.2d at 856 (allowing amendment where the "amended claim was obviously one of the objects of discovery and related closely to the original claim"); *Phillips*, 1994 WL 570072, at *4 (allowing amendment where the "new allegations only add additional facts" and "the proposed amended complaint is closely related to the original claim").

Here, Plaintiffs do not merely "refine" the AC; they abandon it and seek to assert a complicated and wholly new conspiracy.  The new scheme relies on ████████████████ ██████████████████████████; "debased" USDT that was paid for in full and thus equivalent to a U.S. dollar rather than freely printed USDT; and cross-exchange arbitrage ██ ██████████████ rather than "strategically timed" purchases by Bitfinex and Tether.  That

is an entirely different set of operative facts and an entirely different theory of liability.  The AC did not put the B/T Defendants on notice of the new conspiracy alleged in the PSAC merely because, at the highest possible level of generality, Plaintiffs still allege artificial price inflation that was somehow related to an alleged deficiency in USDT reserves.  Nor did Plaintiffs' scattershot approach to discovery put Defendants on notice of their convoluted new scheme.

The B/T Defendants would be prejudiced by the amendment because they would have conducted discovery differently if they had known about the claims asserted in the PSAC.  ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

The B/T Defendants also would have sought different discovery from Plaintiffs, including interrogatories aimed at their contentions in the PSAC, rather than the AC.  And they would have sought discovery from Bittrex and Poloniex, as well as from other exchanges, regarding their use of margin trading and credit lines, as Plaintiffs now allege that the "Defendants facilitated a price premium for bitcoin on Bitfinex versus other crypto-asset exchanges" by "providing credit lines and margin trading on Bitfinex."  (PSAC ¶ 11.)

The B/T Defendants would also be prejudiced by a belated amendment because they have expended significant resources over the past two years defending against claims that Plaintiffs have now jettisoned.  *See In re GPC Biotech AG Sec. Litig.*, 2009 WL 5125130, at *5 (S.D.N.Y. Dec. 29, 2009) (finding prejudice in the "unusual circumstances" where defendants "spent considerable resources defending against charges that plaintiffs now acknowledge were false" and that "should have been withdrawn much earlier").

### III.    PLAINTIFFS FAIL TO STATE A CLAIM.

The Court should also deny Plaintiffs' Motion to Amend based on futility.  Despite

having completed two years of fact discovery, Plaintiffs are unable to plausibly allege that

Defendants engaged in a scheme to artificially inflate prices in the cryptocommodities market.

Accordingly, Plaintiffs fail to state a claim under the Sherman Act, 15 U.S.C. §§ 1, 2, 3, or the

CEA, 7 U.S.C. §§ 9, 25, and the proposed amendment would be futile. *See United States ex rel.*

*Raffington v. Bon Secours Health Sys.*, Inc., 285 F. Supp. 3d 759, 766-67 (S.D.N.Y. 2018) (claim

is futile if it could not "survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)").

Although the Court must accept "all factual allegations in the complaint as true," it need

not credit "a legal conclusion couched as a factual allegation" or factual allegations "that are no

more than conclusions."  *Gentleman v. State Univ. of New York Stony Brook*, 2022 WL 1447381,

at *1 (2d Cir. May 9, 2022)*.  The Court is "not required to credit allegations that are speculative

or conclusory," *One World, LLC v. Onoufriadis*, 2021 WL 4452070, at *1 (2d Cir. Sept. 29,

2021), and "cannot draw unreasonable inferences" in Plaintiffs' favor.  *Newmann v.*

*Mediterranean Shipping Co.*, 2019 WL 4805864, at *2 (S.D.N.Y. Sept. 30, 2019).

### A.    Plaintiffs' Market Manipulation Theory Is Implausible.

The PSAC could not survive a motion to dismiss because it does not plausibly allege that

Defendants █████████████████ conspired to inflate the price of cryptocommodities.

#### 1.    Plaintiffs Fail to Plead Artificial Inflation of Cryptocommodity Prices.

##### a.    The Alleged Purchases of Bitcoin Do Not Represent Artificial Demand.

Plaintiffs fail to state a claim because they allege no facts showing *artificial* inflation.

The critical difference between the AC and the PSAC is the lack of any alleged purchase of

cryptocommodities with USDT that was printed out of thin air.  As the Court has recognized, the

central premise of Plaintiffs' theory in the AC was the allegation that the B/T Defendants issued to themselves billions of dollars of completely unbacked USDT– in exchange for nothing – and used that fake, unbacked USDT to purchase bitcoin on Bittrex and Poloniex and artificially inflate the bitcoin market.  (AC ¶¶ 185-89, 193-218, 261; MTD Order 16.)  In the PSAC, Plaintiffs abandon that theory and now ███████████████████████████████ ███████████████████████████████.

That difference is fatal to Plaintiffs' claims because purchases of bitcoin using USDT that was purchased for $1 – rather than being printed out of thin air – by definition represent real, organic demand for bitcoin.  A bitcoin purchase with USDT that had been purchased for $1 reflects exactly the same demand for bitcoin as a purchase with U.S. dollars.  For example, there is no difference between (*i*) a purchase of a bitcoin for $10,000 in fiat currency and (*ii*) a purchase of 10,000 USDT for $10,000 in fiat currency and a subsequent purchase of a bitcoin for that 10,000 USDT.  At bottom, any transaction made with USDT purchased for $1 per token cannot be said to be "artificial" in any sense.

Although Plaintiffs misleadingly assert that Defendants ██████████████████ ███████████████████████████████████████████████████ ██████, the factual allegations in the PSAC make clear ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ █ ██████████ ████████████████████████████████████████████

---

[8]    *See also* PSAC ¶ 9 (Bitfinex "allowed customers to withdraw U.S. dollars from their accounts as USDT"), ████████████████████████████████████████████████.

██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████   The *only* USDT that Plaintiffs allege was *not* issued in exchange for a contemporaneous payment in U.S. dollars is the USDT that was issued by Tether to Bitfinex "in exchange for an IOU" and was deposited in Bitfinex's hot or cold wallet.  (PSAC ¶¶ 3, 181-82, 192, 247, 300, 312.)  That USDT is not alleged to have been used to purchase cryptocommodities or anything else.  Instead, it sat in the hot or cold wallet until Bitfinex customers purchased it for $1 by choosing to withdraw their U.S. dollar account balances in the form of USDT.  (PSAC ¶¶ 10, 298-99.)  Thus *any* purchase of *any* crypto-commodity with USDT necessarily was made with USDT purchased for $1 and represents real, organic demand for that cryptocommodity.[9]

> **b.** **Plaintiffs' Allegations of "Debased" USDT Do Not Support Their Claims.**

Plaintiffs' allegations that USDT was "debased" – *i.e.*, worth less than $1 – do not support their claims.  Whether USDT, in a theoretical sense, *should have* had a market price of less than $1 based on the composition of Tether's USDT reserves is entirely irrelevant to Plaintiffs' claims because, as discussed above, any purchases of bitcoin or other crypto-commodities were made with USDT that had been purchased for $1.  Those cryptocommodity purchases represent real, organic demand, regardless of whether USDT was actually worth $1.

Plaintiffs' contrary assertions miss the mark.  (PSAC ¶¶ 339-42.)  Plaintiffs offer the conclusory assertion that when "debased USDT" was used to purchase cryptocommodities, "the

---

[9]  ████████████████████████████████████████████████
████████████████████████████████████████████████ "
████████████████████████████████████████████████████
██████████████████████████████████████

trades artificially inflated the price of those cryptocommodities."  (PSAC ¶ 342.)  But that necessarily assumes that the buyer of cryptocommodities purchased the USDT at the purported "debased" value.  Using Plaintiffs' example, if an individual somehow acquired USDT at a price of 90 cents (the "debased" value) and used it to purchase bitcoin, that purchase would signal false demand to the market:  the market sees $1 of demand where there is only 90 cents.  (*Id.*)  But – as relevant here – if the individual had purchased the USDT for $1, then the subsequent bitcoin purchase represents a genuine $1 worth of demand, regardless of whether USDT hypothetically should have had a market value of less than $1.  Plaintiffs do not allege that the Defendants sold USDT ███████████ for less than $1.

Plaintiffs' theory of "debased" USDT has already been rejected by another court in this District in the *Anderson* case.  In that case, the plaintiffs were purchasers of USDT and claimed they were injured by purchasing USDT that was allegedly worth less than $1 because it was not backed entirely by U.S. dollars held in a Tether bank account.  The *Anderson* court rejected that argument and dismissed the complaint, finding that the plaintiffs failed to allege any facts showing that they were "deprived of some value" at the time of purchase or that "their USDT had a diminished actual value at all."  *Anderson*, 2023 WL 5001074, at *2.  Instead, the USDT they purchased had maintained a consistent market value of $1 and was redeemable for $1, consistent with its purpose as a stablecoin.  Tellingly, as in *Anderson*, there is no allegation in the PSAC that the price of USDT or any cryptocommodity declined in February 2019 when Tether disclosed on its website that its reserves included "receivables from loans made by Tether to third parties, which may include affiliated entities."  (PSAC ¶¶ 137, 340-41; Ex. C ¶ 45.)

### c.     Plaintiffs Do Not Plausibly Allege That Arbitrage Causes Price Inflation.

Plaintiffs also fail to plead artificial price inflation because they do not plausibly allege

that ███████████████ cross-exchange arbitrage could cause price inflation.  By definition, arbitrage involves buying and selling an asset in exactly equal quantities and therefore exerts equal amounts of upward and downward pressure on prices.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  The net impact of those trades, if any, would be to narrow the price difference between the two exchanges.

For this reason, arbitrage is generally viewed as beneficial to the efficient operation of markets.  Indeed, "the existence of market makers and arbitrageurs" is one of the key factors that courts consider in evaluating whether a security trades in an efficient market.  *See In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *10 (S.D.N.Y. Sept. 27, 2019) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1283-87 (D.N.J. 1989)).  Simply put, "[a]rbitrage is not market manipulation." *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995) ("By buying stock on the exchange where the price is lower and reselling it on the other exchange, the arbitrageur brings about a convergence of price with value.").

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  Although Plaintiffs assert that they have identified "pricing anomalies" by reference to various charts and graphs (Mot. 21; PSAC ¶¶ 351-61), those only support the theory in the AC that "carefully timed" purchases created price reversions, not the theory in the PSAC based on automated arbitrage.

### 2. Plaintiffs' Allegation That Bitfinex Caused a Bitcoin Price Premium on Its Exchange Is Implausible.

Plaintiffs' new theory of price inflation also relies on implausible allegations that Defendants created a persistent premium in the price of bitcoin on the Bitfinex exchange, as compared with other crypto-asset exchanges.

*First*, Plaintiffs allege that when Bitfinex customers purchased bitcoin using so-called "debased" USDT – *i.e.*, USDT backed in part by receivables – it "artificially inflated bitcoin prices" on that exchange.  (PSAC ¶ 312.)  As a threshold matter, this allegation fails because – as Plaintiffs acknowledge – *there was no trading of USDT* on the Bitfinex exchange during the alleged class period.  (*Id.* ¶ 282 n.119.)  The allegation also fails for the same reason discussed above:  any purchase of bitcoin was made with USDT that had been purchased for $1 and therefore cannot be said to represent "a false demand for bitcoin."  (*Id.* ¶ 312.)

*Second*, Plaintiffs rely on the misguided and implausible assertion that allowing Bitfinex customers to trade on margin somehow increased bitcoin prices on that exchange.  The obvious flaw in Plaintiffs' assertion is the conflation of increased *trading volume* with increased *demand for bitcoin*:  according to Plaintiffs, allowing margin trading "creat[ed] more demand for bitcoin on Bitfinex than on other exchanges," and the "natural economic consequence" was "to create price premiums on Bitfinex versus other exchanges."  (*Id.* ¶ 319.)  In other words, Plaintiffs assert:  "Bitfinex increased liquidity on its exchange, encouraging more trades there, increasing demand for bitcoin, thus increasing bitcoin prices."  (*Id.* ¶ 11.)

That is utter nonsense:  there is no basis to infer that permitting margin trading creates increased demand for any cryptocommodity or causes price inflation.  Margin trading is available from every major stock broker in the county, and every stock on the NYSE and Nasdaq can be traded on margin – yet their prices are not inflated.  Indeed, there is no allegation that

other crypto-exchanges lacked margin trading.  In any event, a trade made on margin is no more likely to push prices up (with bitcoin purchases) than down (with sales of bitcoin), and there is no basis to infer that increased liquidity on an exchange would impact prices.  The same is true for Bitfinex's "credit lines," which simply allowed customers to begin trading during the short period of time after fiat currency or crypto assets had been deposited in their accounts but before the funds had been received by Bitfinex – *e.g.*, while a wire transfer was being processed.  (*Id.* ¶ 313.) ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

### 3.    Plaintiffs Fail to Plead That Defendants Conspired ████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████████████

32

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Tether publicly announced in April

2017 that it could no longer receive incoming wires via its Taiwanese banks.  (*Id.* ¶ 172.)

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

**B.      Plaintiffs Fail to State a Claim Under the Antitrust Laws.**

Plaintiffs' failure to plausibly allege that Defendants artificially inflated crypto-

commodity prices, or ████████████████████████████████████████

necessarily dooms their Sherman Act claims.

The Court's decision that Plaintiffs adequately pleaded an antitrust violation in the AC

was based entirely on allegations that Plaintiffs have now abandoned.  Specifically, the Court

found that Plaintiffs adequately alleged a scheme to "artificially inflate" cryptocommodity prices

based on allegations in the AC that Defendants purchased bitcoin with USDT that they printed

out of thin air and issued to themselves.  (MTD Order 48-61.)  Those allegations do not appear in

the PSAC.  As discussed above, Plaintiffs do not plausibly ███████████████

██████████████████████████████████████████████████████████████

The Court's previous finding of a conspiracy or agreement in restraint of trade also relied on allegations that do not appear in the PSAC.  (*Id.* at 65-73.)  Plaintiffs no longer allege a horizontal conspiracy between Defendants and their competitors, Poloniex and Bittrex.  ████

██████████████████████████████████████████████████  The absence of an alleged horizontal conspiracy is important because the vast majority of conspiracies that courts have deemed unlawful under the Sherman Act are horizontal conspiracies among competitors.  Indeed, Plaintiffs previously argued that Defendants could not have inflated prices without that horizontal conspiracy (AC ¶¶ 421, 425), and even now they rely almost exclusively on precedent that concerns horizontal conspiracies.[10]  Plaintiffs have not identified *any* cases in which an alleged agreement between a company and its customer was found to be anticompetitive under the Sherman Act.

For the reasons set forth below, Plaintiffs fail to plead antitrust standing or any of the core elements of a Sherman Act violation.

### 1.    Plaintiffs Lack Antitrust Standing.

Plaintiffs fail to plead that (*i*) they suffered "a special kind of antitrust injury" and (*ii*) they are "efficient enforcer[s]" of the antitrust laws, and they therefore fail to establish antitrust standing.  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

---

[10]    Mot. 15-25 (citing *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) (horizontal conspiracy between competitor aluminum warehouse owners and aluminum futures traders); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) (horizontal conspiracy between competitor); *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023) (horizontal manipulation scheme between banks and precious metals commodity dealer); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) (horizontal price-fixing conspiracy among competitors); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016) (horizontal conspiracy between competitor-banks); *Gatt v. Comm'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68 (2d Cir. 2013) (horizontal bid-rigging scheme for radios)).

a.      **Plaintiffs Do Not Plead Antitrust Injury.**

Plaintiffs fail to establish antitrust injury – *i.e.*, injury "of the type the antitrust laws were intended to prevent" and that "flow[s] from that which makes defendants' acts unlawful." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 56-57 (S.D.N.Y. 2012).

The Court previously rejected Plaintiffs' argument that "merely purchasing an item in a market subject to price manipulation necessarily suffices," but concluded that the Plaintiffs pleaded antitrust injury in the AC by plausibly alleging that "the price manipulation by which they claim to have been injured was the product of an anticompetitive scheme." (MTD Order 48.)  In the PSAC, Plaintiffs no longer plausibly allege that the Defendants artificially inflated cryptocommodity prices or that any alleged manipulation was the "product of anticompetitive scheme." (*Id.*)

*First*, Plaintiffs no longer plausibly allege that "they were harmed by purchasing cryptocommodities at artificially inflated prices." (*Id.* at 49-50.)  As discussed above, Plaintiffs acknowledge that ███████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████████████

*Second*, Plaintiffs' new market manipulation theory in the PSAC no longer involves any plausible conspiracy for the reasons discussed above. (*See supra* Section III.B.3.)  The Court's conclusion that Plaintiffs had sufficiently alleged a conspiracy in the AC was based on allegations that do not appear in the PSAC, including that the Defendants, Bittrex, and Poloniex conspired to "use unbacked USDT to simulate organic demand for cryptocommodities." (MTD Order 49-50.)

b.      **Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws.**

The PSAC also fails to establish that Plaintiffs are efficient enforcers of the antitrust

laws.  In assessing whether plaintiffs are efficient enforcers, courts look to:

> (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).  Taken together, these factors indicate that Plaintiffs are not the right parties to enforce the antitrust laws here.

*First*, Defendants were not a direct cause of Plaintiffs' alleged injuries.  This factor "requires some direct relation between the injury asserted and the injurious conduct alleged" and turns on "familiar principles of proximate causation."  *In re Am. Express Anti-Steering Rules Antitrust Litig*., 19 F.4th 127, 139-40 (2d Cir. 2021).  The B/T Defendants cannot have proximately caused ███████████████████████████████████████████████ ███████████ merely by allowing Bitfinex customers (including the Anonymous Trader) to withdraw USDT.  Plaintiffs' suggestion that there was "no intervening act by anyone (including by the Anonymous Trader)" ████████████████████████████ borders on the absurd. (Mot. 18.)  The proximate cause analysis applies with equal force when computer software is involved, and the individual who programs a bot causes the bot's actions.  Here, the ██████████ ███████████████████████████████████████████████████████████████ ███████████ breaks "the chain of causation."  *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 260-61 (2d Cir. 2023).  The remainder of Plaintiffs' argument for causation is that the "Defendants' actions were necessary ███████████████████████████," which (if true) would establish only *but-for* causation, not *proximate* causation.[11]  (Mot. 17-18.)

---

[11] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

*Second*, if anyone were harmed by Defendants' purported "debasement" of USDT, there would certainly be "more direct victims" of that alleged conduct:  purchasers of USDT.  *Nypl v. JPMorgan Chase & Co.*, 2017 WL 1133446, at *7 (S.D.N.Y. Mar. 24, 2017).  As discussed above, a putative class action was already filed on behalf of USDT purchasers based on the exact same theory of "debased" USDT, and it was dismissed for failure to plead an injury in fact.  *Anderson*, 2023 WL 5001074, at *2-3.

*Third*, Plaintiffs' theory of injury and damages is "highly speculative."  *Gelboim*, 823 F.3d at 779.  Plaintiffs would first have to establish what the market would have assessed USDT's "true" value to be had it known of the alleged "debasement," which Plaintiffs allege would require a risk-discounting analysis based on historical records that Plaintiffs allege do not exist.  (PSAC ¶¶ 201, 312.)  Plaintiffs would then need to show the impact of ████████ ████████ purchases and sales of bitcoin not merely on the price of bitcoin on that exchange and at that time, but on all cryptocommodities purchased during the proposed class period.  As prices varied across exchanges and over time, Plaintiffs would need to quantify the ripple effects of the supposed inflation across exchanges, currencies, and time.[12]  (PSAC ¶ 8.)  Any such analysis would be enormously speculative, every step of the way.

### 2.  Plaintiffs Fail to Plead Monopolization Under Section 2.

Plaintiffs fail to plausibly allege a monopolization claim under Section 2 of the Sherman Act (Count 2) because they do not adequately plead "(1) the possession of monopoly power in

---

████████████████████████████████████  The PSAC thus raises the same "concern of damages disproportionate to the wrongdoing" as the claims in *Gelboim*, where the court noted that "if the Banks control only a small percentage of the ultimate identified market," requiring them to "pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap" would "vastly extend the potential scope of antitrust liability."  823 F.3d at 779.

[12]   In addition, Plaintiffs' assertion in their motion that they can readily quantify damages because the records for their trades are all "indelibly recorded on the blockchain" is directly contradicted by their allegation in the PSAC that trades "within a single crypto-exchange are not visible" on the blockchain.  (Mot. 19; PSAC ¶ 105.)

the relevant market and (2) the willful acquisition or maintenance of that power." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

*First*, Plaintiffs no longer plead that Defendants possessed a monopoly in the cryptocommodity market because Plaintiffs do not plausibly allege that Defendants controlled prices. (Mot. 20-21.) Plaintiffs' theory of price control relies on implausible allegations that ███

████████████████████████████████████████████████████████████████████

███████████████████ The Court's prior holding that Plaintiffs adequately pleaded that Defendants had "the ability to control prices in the cryptocommodity market" was expressly based on allegations in the AC – now abandoned – involving the issuance of "unbacked USDT to simulate organic market demand for cryptocurrencies" and "create artificial price floors." (MTD Order 53, 58.)

*Second*, Plaintiffs' allegations in the PSAC no longer establish "the willful acquisition or maintenance" of monopoly power. (*Id.* at 59-61.) Again, the Court's previous conclusion that Plaintiffs pleaded willful acquisition was based on allegations that Plaintiffs abandon, in particular that Defendants printed USDT "out of thin air" and used that "counterfeit 'money' to purchase cryptocommodities, . . . artificially inflating cryptocommodity prices." (*Id.* at 60-61.) Likewise, there are no longer any alleged purchases of bitcoin by Defendants, much less "seemingly irrational purchases of large quantities of bitcoin with USDT." (*Id.* at 60.) And the Court's determination that a "rational market actor would be unlikely to make large purchases of cryptocommodities when the prices of those commodities dropped significantly" does not apply to the cross-exchange arbitrage that Plaintiffs now allege. (*Id.* at 61.)

Contrary to Plaintiffs' assertions, Defendants' alleged conduct – permitting Bitfinex customers to withdraw USDT and counting receivables as part of Tether's USDT reserves – does

not plausibly evince any intent to eliminate competition or inflate cryptocommodity prices. (Mot. 22.)  Nor is an intent to monopolize demonstrated by Defendants' alleged knowledge that USDT, as the most frequently used stablecoin, played a key role in the cryptocommodity market and that its collapse would have a detrimental effect.  (*Id.*)  Plaintiffs' assertion that no "rational economic actor would . . . offer to redeem or exchange USDT at 100 cents on the dollar" turns reality on its head:  Defendants' promise to redeem USDT for $1 was the core principle underlying USDT as a stablecoin.  (*Id.*; PSAC ¶¶ 122, 124, 295.)

### 3. Plaintiffs Fail to Plead a Conspiracy to Monopolize Under Section 2.

Plaintiffs' half-hearted assertion of a conspiracy to monopolize falls far short of stating a claim.  Notwithstanding Plaintiffs' representation that they seek only to "narrow the case," they reassert the conspiracy to monopolize claim that the Court already dismissed.  (MTD Order 63-65.)  And they devote only half a footnote to it, which by itself is reason to disregard that argument.  (Mot. 25 n.2.)  *See Rowley v. City of New York*, 2005 WL 2429514, at *6 (S.D.N.Y. Sept. 30, 2005) ("[M]ere mention in a footnote does not amount to raising an argument.").

To the extent the Court considers this claim, the proposed amendment would be futile: the Court's prior conclusion that Plaintiffs impermissibly pleaded "a Section 2 conspiracy claim based on a shared monopoly theory" still applies.  (MTD Order 63-65.)  Although Plaintiffs recite in the PSAC that ███████████████████████████████████████████████ ██████████████████████████████████████████, the purported scheme still relies on a shared monopoly theory because it asserts in substance that Defendants ████████████ ██████ "collectively sought to dominate" the cryptocommodity market.  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016).

### 4.   Plaintiffs Fail to Plead an Agreement in Restraint of Trade Under Section 1.

As a preliminary matter, Plaintiffs do not actually assert in the PSAC the Section 1 claim they argue in pages 22-25 of their motion – *i.e.*, ██████████████████████████ ██████████████████████████████████   The only Section 1 claim asserted in the PSAC is the "Fourth Cause of Action," which alleges that Defendants conspired and agreed "*amongst themselves* to manipulate cryptocommodity prices" and purports to be brought "in the alternative, to the extent that Tether and Bitfinex are determined separate entities for purposes of the Sherman Act."  (PSAC ¶¶ 438-39 (emphasis added).)  Plaintiffs address that "alternative" claim only in passing in a footnote, which the Court may properly disregard.  (Mot. 25 n.2.)

Even if Plaintiffs had actually asserted and argued these two counts, they would still fail to state a claim because they fail to plead "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade." (MTD Order 66 (quoting *Am. Express Co.*, 838 F.3d at 193).)

### a.   Plaintiffs Do Not Allege a Conspiracy ██████████████ ██████.

Plaintiffs' un-pleaded claim of a conspiracy ██████████████████████ ██████ fails because the PSAC does not plausibly allege any "agreement, tacit or express" to fix prices.  (MTD Order 66.)   To establish an agreement, Plaintiffs must "assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or 'circumstantial facts supporting the *inference* that a conspiracy existed.'"  (*Id.* (citing *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 659 (S.D.N.Y. 2016)).  Absent direct evidence, pleading a conspiracy requires "allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors," which include "[i] a common motive to conspire; [ii] evidence that shows that the parallel acts were against the apparent individual economic self-

40

interest of the alleged conspirators; and [iii] evidence of a high level of interfirm communications." (*Id.* at 67.)  After two years of discovery, Plaintiffs do not argue that there is "direct evidence" of an agreement, and instead rely on "plus factors."  (Mot. 23.)

The "plus factors" cited by Plaintiffs apply more squarely to an alleged "horizontal" conspiracy among competitors than to an alleged conspiracy between a company and one of its customers, as they are intended to distinguish between conspiracy and the parallel conduct of companies engaged in the same business.  *See Gelboim*, 823 F.3d at 781 (plus factors used to distinguish "conspiracy from parallelism").

In any event, Plaintiffs do not adequately allege the "plus factors" with respect to their new alleged conspiracy.  *First*, the alleged "common intent and motive" of "increasing the market value of their cryptocommodities" is completely generic and would apply equally to anyone holding any cryptocommodities; nor, after two years of fact discovery, are Plaintiffs able to allege any facts supporting that conclusory assertion.  (Mot. 14.)  *Second*, as discussed above, Plaintiffs' assertion that Tether acted against its self-interest by honoring its core promise to redeem USDT is nonsensical.  (*Id.* at 24.)  Nor is extending credit to large customers against a company's self-interest.  (*Id.*) ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  *Third*, as Plaintiffs implicitly acknowledge, the "high level of interfirm communications" factor does not apply to a conspiracy between a company and one of its customers.  (Mot. 23-24.)

Plaintiffs also do not plausibly ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████   (*See supra* Section III.A.1.a)   And an agreement to inflate prices cannot be inferred from

a series of independent actions that do not artificially inflate prices.   (*See supra* Section III.A.3.)

> **b.   Plaintiffs Do Not Allege a Conspiracy Among the Defendants.**

Plaintiffs have not pleaded any basis for their assertion of an alternative claim "to the

extent that Tether and Bitfinex are determined separate entities for purposes of the Sherman

Act."   (PSAC ¶ 438.)   Section 1 applies only to concerted action that "joins together separate

decisionmakers," or "separate economic actors pursuing separate economic interests," such that

the agreement "deprives the marketplace of independent centers of decisionmaking."   *See Am.*

*Needle, Inc. v. National Football League*, 560 U.S. 183, 195-96 (2010) (citing *Copperweld Corp.*

*v. Indep. Tube Corp.*, 467 U.S. 752, 760 (1984)); *In re Term Commodities Cotton Futures Litig.*,

2014 WL 5014235, at *7 (S.D.N.Y. Sept. 30, 2014) (holding plaintiffs had failed to allege that

affiliated entities were "separate corporate consciousnesses").   As Plaintiffs concede, they allege

in the PSAC that Tether and Bitfinex were not separate decisionmakers.   (Mot. 25 n.2; PSAC

¶¶ 148, 300; *see also* Dkt. No. 468 at 1 ("Devasini was the final decision maker at both Bitfinex

and Tether.").)   For that reason, Defendants are not capable of conspiring in violation of the

Sherman Act.   In any event, Plaintiffs' claim that Defendants conspired amongst themselves fails

for the same reasons as ████████████████████████████████████.

> **C.   Plaintiffs Fail to State a Claim Under the Commodity Exchange Act.**

> **1.   Plaintiffs' CEA Claim Is Impermissibly Extraterritorial.**

Plaintiffs' claim under Sections 6(c)(1) and 22 of the CEA should be dismissed on the

basis of extraterritoriality.   As the Second Circuit has made clear, the CEA must be interpreted

"in light of the presumption against extraterritoriality."   *Prime Int'l Trading, Ltd. v. BP P.L.C.*,

937 F.3d 94, 102 (2d Cir. 2019).   Plaintiffs do not overcome this presumption, because they fail

to plead both (*i*) a "domestic transaction" and (*ii*) "domestic – not extraterritorial – *conduct* by Defendants that is violative of a substantive provision of the CEA." *Id.* at 105.

    *First*, Plaintiffs fail to plead a "domestic transaction," as defined by the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and clarified in subsequent Second Circuit decisions. *See*, *e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012) ("domestic transaction" requires that "that irrevocable liability was incurred or that title was transferred within the United States"). Although Plaintiffs allege that Pinchas Goldshtein traded "cryptocommodity futures" – specifically, "Bitcoin futures contracts" – they offer no facts whatsoever regarding the location of his futures transactions. (PSAC ¶ 22.) And, despite Plaintiffs' general allegations that "Bitcoin futures contracts" were traded on the Chicago Mercantile Exchange, they do not – and cannot – allege that Mr. Goldshtein's trades were executed on that exchange. (*Id.* ¶ 69.) Furthermore, even if Plaintiffs had alleged that Mr. Goldshtein initiated his trades from the United States – which they do not – that would still fall short of pleading a domestic transaction. *See City of Pontiac*, 752 F.3d at 181-82, 188 (transaction not considered "domestic" merely because "a U.S. entity places a buy order in the United States" for a purchase on a foreign exchange); *Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (allegation that "Plaintiffs bought [crypto] tokens while located in the U.S." insufficient to plead a domestic transaction).[13]

    *Second*, Plaintiffs fail to allege "domestic" conduct by Defendants in violation of Section 6(c)(1) of the CEA. *See Prime*, 937 F.3d at 106 (holding that "a domestic transaction" is necessary but not sufficient "to invoke the private remedy afforded by Section 22"). Indeed,

---

[13] Defendants did not raise extraterritoriality in their motion to dismiss in the AC based on the understanding that Mr. Goldshtein had traded bitcoin futures on the Chicago Mercantile Exchange. At his deposition, Mr. Goldshtein testified that he traded bitcoin futures only on Deribit, a foreign exchange, and it is now clear that Plaintiffs avoided alleging the location of his transactions for that reason. (Ex. I, Goldshtein Tr. at 96:11-17.)

there are *no* allegations of any conduct by any of the Defendants in the United States.  *Id.*

(dismissing CEA claims where the "alleged misconduct" was "entirely foreign"); *see also*

*Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 97 (2d Cir. 2022) (dismissing CEA claims

where "alleged manipulative conduct occurred almost entirely abroad").

### 2.   Plaintiffs Fail to State a Claim for Price Manipulation.

#### a.   Plaintiffs Fail to Show Price Manipulation.

Plaintiffs fail to state a claim for market manipulation under the CEA because they do not

adequately plead in the PSAC that "[i] the defendant possessed an ability to influence market

prices; [ii] an artificial price existed; [iii] the defendant caused the artificial price; and [iv] the

defendant 'specifically intended to cause the artificial price."  (MTD Order 83.)

*First*, Plaintiffs have not alleged that Defendants were able to "influence market prices."

(*Id.*)  Plaintiffs rely entirely on the assertion that ███████████████████████████████

██████████████████████████████████████████████████, but, as discussed

above, Plaintiffs do not plausibly allege artificial inflation.  (*See supra* Section III.A.1.)

*Second*, Plaintiffs do not plausibly allege that cryptocommodity prices were artificial –

*i.e.*, that they did "not reflect basic forces of supply and demand."  *In re Commodity Exch., Inc.*,

213 F. Supp. 3d at 669.  █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████  Trading that is "supported by a legitimate economic rationale" and based on "legitimate

economic motives" – like arbitrage trading – "cannot be the basis for liability under the CEA

because it does not send a false signal."  *In re Amaranth Nat. Gas Commodities Litig.*, 587 F.

Supp. 2d 513, 534 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

*Third*, for the reasons discussed above, Defendants did not proximately cause any

artificial price.  (*See supra* Section III.B.1.b.)

*Fourth*, Plaintiffs fail to plead that Defendants "specifically intended to cause" an artificial price.  Plaintiffs' assertions that Defendants had an interest in increasing the price of their cryptocommodities, encouraging trades on Bitfinex, and promoting USDT (Mot. 14) at best establish a "generalized motive" that is "insufficient to show intent."  *See In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *8 (holding insufficient motives that "could be imputed to any corporation with a large market presence in a commodity market," such as standing "to gain large profits" from manipulated prices); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (holding insufficient motive to "maintain the appearance of corporate profitability").

Nor do Plaintiffs allege "strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 669.  Allegations of knowledge regarding issues that have no bearing on cryptocommodity prices, such as the composition of USDT reserves, do not support a reasonable inference that Defendants sought to artificially inflate the price of cryptocommodities or were reckless in that regard.  (Mot. 14; PSAC ¶ 414.)

### b.      Plaintiffs Fail to Show Use of a Manipulative Device.

For the same reasons, Plaintiffs fail to state a claim based on a "manipulative device," which requires pleading with particularity "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  (MTD Order 86-87.)  Plaintiffs do not plausibly allege that Defendants manipulated the price of cryptocommodities, and Plaintiffs cannot establish any connection between the supposed manipulative device – alleged misrepresentations about USDT reserves – and any purported artificial inflation in the price of cryptocommodities.

### CONCLUSION

For the reasons set forth herein, the Court should deny Plaintiffs' Motion to Amend.

Dated:   New York, New York           DEBEVOISE & PLIMPTON LLP
         December 8, 2023

                                      /s/ *Elliot Greenfield*

                                      Maeve L. O'Connor
                                      Michael Schaper
                                      Elliot Greenfield
                                      Natascha Born
                                      66 Hudson Boulevard
                                      New York, New York 10001
                                      (212) 909-6000
                                      moconnor@debevoise.com
                                      *mschaper@debevoise.com*
                                      *egreenfield@debevoise.com*
                                      *nborn@debevoise.com*

                                      Michael Jason Lee (*pro hac vice*)
                                      LAW OFFICES OF MICHAEL JASON LEE, APLC
                                      4660 La Jolla Village Drive, Suite 100
                                      San Diego, California 92122
                                      (858) 550-9984
                                      *michael@mjllaw.com*

                                      Sunjina K. Ahuja (*pro hac vice*)
                                      Christopher J. Beal (*pro hac vice*)
                                      DILLON MILLER, AHUJA & BOSS, LLP
                                      5872 Owens Ave., Suite 200
                                      Carlsbad, California 92008
                                      (858) 587-1800
                                      *sahuja@dmablaw.com*
                                      *cbeal@dmablaw.com*

                                      *Attorneys for Defendants iFinex Inc., DigFinex Inc.,*
                                      *BFXNA Inc., BFXWW Inc., Tether International*
                                      *Limited, Tether Operations Limited, Tether Holdings*
                                      *Limited, Tether Limited, Giancarlo Devasini, and*
                                      *Ludovicus Jan van der Velde*