UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | No. 19 Civ. 9236 (KPF) |

# [PROPOSED] SUR-REPLY OF THE B/T DEFENDANTS' IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Michael Jason Lee (*pro hac vice*)
LAW OFFICES OF MICHAEL JASON
LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984

Sunjina K. Ahuja (*pro hac vice*)
Christopher J. Beal (*pro hac vice*)
DILLON MILLER, AHUJA & BOSS, LLP
5872 Owens Ave., Suite 200
Carlsbad, California 92008
(858) 587-1800

Maeve L. O'Connor
Michael Schaper
Elliot Greenfield
Natascha Born
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Defendants iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Giancarlo Devasini, and Ludovicus Jan van der Velde*

The B/T Defendants respectfully submit this sur-reply memorandum of law in opposition to Plaintiffs' Motion to Amend.

## ARGUMENT

In this sur-reply, the B/T Defendants address certain of Plaintiffs' new arguments on reply as to "good cause" and futility. As a threshold matter, Plaintiffs' assertions that they "plead the same essential theory" in the PSAC and "simply fill[] in details" are not credible. (Reply 2, 11.) Plaintiffs' new theory – that USDT was "debased" by the inclusion of receivables in Tether's reserves and that ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ – is fundamentally different, based on facts they have known for years, and fails to state a claim. Plaintiffs fail to show "good cause" for their two-year delay because they do not identify any material evidence that they learned only recently. Unable to defend their new theory, Plaintiffs seek to sow confusion, offering a series of unsupported and often incoherent assertions. The well-pleaded facts in the PSAC, however, make clear that the Anonymous Trader engaged in legitimate, cross-exchange arbitrage and ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊.

### I.   PLAINTIFFS FAIL TO SHOW GOOD CAUSE FOR DELAY.

Plaintiffs do not defend their failure to demonstrate good cause in their opening brief, and their improper attempt to do so in the Reply falls far short. (Opp'n 17-19; Reply 4-11.) Where, as here, a "proposed amendment relies on information that the party knew or should have known prior to the deadline, leave to amend is properly denied." *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 147 (S.D.N.Y. 2012). Plaintiffs do not – and cannot – dispute that they knew all of the core facts alleged in the PSAC well before the December 2021 deadline:

- the Anonymous Trader's cross-exchange arbitrage ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ (Opp'n 20);

- the inclusion in Tether's USDT reserves of receivables for amounts owed by Bitfinex and the details of its banking relationships, as set forth in the 2021 NYAG and CFTC Orders and alleged in the 2021 *Anderson* complaint (Opp'n 20-21); and

- the availability of margin trading and the purported price premium for bitcoin on the Bitfinex exchange, which have always been public (Opp'n 21).

Nor do Plaintiffs dispute that the PSAC relies heavily on public sources dated 2020 or earlier, including public court filings, articles and public statements by Defendants. (Opp'n 21-22.)

Plaintiffs' suggestion that they could not have relied on the CFTC or NYAG Orders because Defendants later disagreed with some of their findings lacks any credibility; civil complaints regularly rely on regulatory settlements. (Reply 1-2, 6-7.) And Plaintiffs give no reason why they could not have relied on the Anonymous Trader's sworn declaration or accepted ▉ invitation to speak with them outside of the context of a deposition. (Reply 10.)

Unable to dispute these points, Plaintiffs fall back on a handful of largely peripheral issues, but even as to those issues, Plaintiffs fail to identify new *facts* learned in discovery that would justify their two-year delay in seeking amendment.

*First*, Plaintiffs' contention that they could not have alleged any earlier that Bitfinex purportedly "did not hold sufficient funds to back receivables" (Reply 4) is belied by the fact that Plaintiffs included that exact allegation in the AC in June 2020: "Bitfinex and Tether simply did not have the cash reserves on hand to back the USDT it was issuing to itself." (AC ¶ 220.) And Plaintiffs cited then the only document they cite now, which actually says nothing about Bitfinex's ability to pay for USDT. (PSAC ¶ 204; Opp'n 22-23.)

Furthermore, Plaintiffs cannot justify their delay on the basis that they purportedly discovered a *lack of evidence* regarding Bitfinex's funds. (Reply 4-7.) Rule 16 requires the discovery of *new evidence* supporting amendment – not the lack of it. (Opp'n 17-19.) Plaintiffs' attempt to spin a lack of historical financial records as "compelling circumstantial evidence that

2

Bitfinex lacked the funds" is nonsensical and would turn Rule 16's stringent standard on its head. (Reply 7.) An absence of records tracking funds says *nothing* about whether the funds existed at the time. As Plaintiffs are well aware, Bitfinex did not maintain formal financial records; its Powerboard system provided contemporaneous information about assets and liabilities but cannot generate historical records. (Dkt. No. 516-5 at 47-48.)

Indeed, Plaintiffs are unable to cite any new evidence supporting their assertion because the only evidence in the record contradicts it. Giancarlo Devasini, Bitfinex's CFO, testified that he carefully tracked the company's funds in real time and that they were always sufficient to pay the amounts owed to Tether for USDT issuances. (*Id.* at 74-82.) And Bitfinex always paid Tether the amounts owed, including the $382 million cited in the Reply on the same day that Tether was able to open an account to accept payment.[1] (PSAC ¶¶ 182-85.)

*Second*, Plaintiffs' reference to Bitfinex's credit lines is a red herring. These credit lines do not support Plaintiffs' new theory in the PSAC, and they certainly are not material or necessary to it. Bitfinex's credit lines were generally short-term loans – the "vast majority is repaid within one or two days" – advancing assets that were in the process of being deposited to the Bitfinex exchange (*e.g.*, a pending wire transfer); the loaned assets could not be removed from the Bitfinex exchange and were fully collateralized by other assets in the customer's account. (Dkt. No. 516-4 at 115, 117-18, 122; Dkt. No. 456-1 at 162-63, 166, 236.) There is no

---

[1] Plaintiffs present a blatantly false narrative of the course of discovery in this case (Reply 4-7), none of which is relevant to Plaintiffs' Motion to Amend because, as the Court has noted, the issue is not whether Plaintiffs diligently pursued discovery but whether they diligently sought amendment upon receiving new evidence. (Opp'n 17-19; Dkt. No. 493 at 19:20-20:24.) Nonetheless, the B/T Defendants state in response that (*i*) they never refused to provide records of Tether's USDT reserves, (*ii*) they consistently stated that Tether – not Bitfinex – held USDT reserves, (*iii*) they consented to service of Plaintiffs' Interrogatory No. 13, which sought a list of bank accounts holding USDT reserves, (*iv*) they voluntarily produced information and identified bank statements for Bitfinex accounts used to satisfy its payables to Tether, even though that information fell outside the scope of the interrogatory, (*v*) one Bitfinex account was incorrectly included in the response but was promptly removed in an amended response, (*vi*) Paolo Ardoino's testimony that amounts owed by Bitfinex were backed by its "balance sheet" clearly refers to the company's assets and not to a document, and (*vii*) Giancarlo Devasini did not testify that the he disposed of records showing Bitfinex's total assets and liabilities.

basis, therefore, for Plaintiffs' assertion that credit lines allowed Bitfinex customers to "buy more cryptocommodities on its exchange than they otherwise would have" or "receive dollars on credit . . . which they could withdraw from Bitfinex as USDT." (Reply 8.) Nor is there any basis for the assertion that "Bitfinex loaned out funds purportedly held to back the Tether receivables." (*Id.*) Plaintiffs cite no evidence for those assertions because there is none. Plaintiffs' unsupported assertions do not satisfy their burden to show "good cause," as the Court must examine "what facts emerged in discovery." *Schleifer v. Lexus of Manhattan*, 2018 WL 11593271, at *2 (S.D.N.Y. Nov. 21, 2018).[2]

*Third*, Plaintiffs do not identify any new evidence regarding the Anonymous Trader that would justify their delay in seeking to amend. ███████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(Dkt. No. 506-1.) Confirmation of previously known facts is not "good cause" for delay. Plaintiffs do not claim (nor could they) that they recently discovered any new evidence that is the

---

[2]   Here, again, Plaintiffs misrepresent the discovery record. (Reply 8-9.) The parties agreed that the B/T Defendants' production of documents regarding loans would be limited to loans made between Bitfinex and Tether or to the Anonymous Trader or the Exchange Defendants. Accordingly, there was no obligation to produce records of loans by Bitfinex to other customers. (Dkt. No. 456-4 at 1.)

4

"primary basis" for their new theory. *Moore v. Publicis Groupe SA*, 2013 WL 4483531, at *8 (S.D.N.Y. Aug. 23, 2013) (no "good cause" where discovery "may have provided some additional support for the proposed new claims, but certainly it was not the primary basis").[3]

## II. PLAINTIFFS FAIL TO STATE A CLAIM.

Plaintiffs do not dispute that, absent plausible allegations of artificial inflation, they cannot state a claim under the Sherman Act or the CEA, and they offer no explanation of how cryptocommodity purchases with USDT acquired for $1 could possibly artificially inflate the market. Plaintiffs also cannot explain how arbitrage could inflate prices, or how margin trading could cause an artificial price premium. Nor – after two full years of discovery – can Plaintiffs point to *any* facts suggesting a conspiracy ▮▮▮▮▮▮▮▮▮▮. At bottom, Plaintiffs' new theory simply does not make sense. The Court need not and should not credit Plaintiffs' "conclusory allegations" about market manipulation or accept a theory that is both contrary to "common sense" and "implausible in light of factual allegations in the pleading itself." *AJ Energy LLC v. Woori Bank*, 829 F. App'x 533, 534 (2d Cir. 2020).

### A. Plaintiffs Fail to Plead Artificial Inflation of Cryptocommodity Prices.

Plaintiffs do not dispute that all of their claims hinge on whether ▮▮▮▮▮▮ ▮▮▮▮ bitcoin purchases "signaled inflated, artificial demand and so artificially inflated cryptocommodity prices." (Reply 14.) And those purchases could not have signaled artificial demand because – according to Plaintiffs' own allegations in the PSAC – they were made using USDT that was purchased for $1. A bitcoin purchase with USDT that was purchased for $1

---

[3] Contrary to Plaintiffs' assertions, there is zero evidence of Mr. Devasini ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5

reflects *exactly* the same demand as a bitcoin purchase with U.S. dollars. (Opp'n 27.)

Plaintiffs' only response is a false comparison between the demand signaled by the purchase with USDT and "the amount of dollars backing the USDT." (Reply 14.) The proper comparison is between the demand the purchase *signaled to the market* and the amount the purchaser *actually paid*. Here, if ███████████ purchased bitcoin with 100 USDT, ██ purchase signaled $100 of demand for bitcoin, and that is exactly what ██ paid for it. There is no artificial demand. As the *Anderson* court concluded, the composition of reserves does not change the fact that USDT had a market value of $1; Plaintiffs cannot distinguish that decision other than to note that it involved different claims. (Opp'n 29; Reply 15-16.)

Unable to substantively dispute this straightforward point, Plaintiffs resort to the blatantly misleading and unsupported assertion that Defendants ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The withdrawal of a customer's U.S. dollar account balance as USDT is the same as a purchase of USDT for $1 per token. (Opp'n 5-6, 16, 27.) ████████████████████████████████████████████████████████████████████████████████████████

Plaintiffs' only other argument on this point is an incoherent theory regarding hypothetical trades made using credit lines that – after the close of fact discovery – is

6

unsupported by any factual allegations in the PSAC indicating that any such trades *actually occurred*. (Reply 15 (citing PSAC ¶¶ 279, 318, 332); Opp'n 28 n.9.)

### B. Plaintiffs Do Not Plausibly Allege That Arbitrage Causes Price Inflation.

Plaintiffs concede that cross-exchange arbitrage does not artificially inflate prices "under normal market conditions." (Reply 16.) Their assertion that arbitrage caused price inflation in this case because of an "artificial price premium" for bitcoin on the Bitfinex exchange is not plausible: the effect of arbitrage, if any, would be to narrow the price difference between exchanges and remove any purported premium. (Opp'n 30.)

### C. Plaintiffs Do Not Plausibly Allege That Defendants Caused a Bitcoin Price Premium on the Bitfinex Exchange.

Plaintiffs offer no explanation of how margin trading could plausibly cause an artificial price premium for bitcoin on the Bitfinex exchange. (Opp'n 31-32.) Instead, Plaintiffs now assert – without *any* explanation whatsoever – that an artificial premium was caused by the *combination* of margin trading, "debased" USDT, and the "commingling" of USDT and U.S. dollars. (Reply 18.) Plaintiffs do not explain the role supposedly played by "debased" USDT, which they concede was not traded on the Bitfinex exchange. (Opp'n 31; Reply 17-18.) Commingling USDT and U.S. dollars is not even possible: USDT exists on the blockchain; U.S. dollars exist in bank accounts. Insofar as Plaintiffs are referring to the withdrawal of dollar account balances as USDT, those are just purchases of USDT for $1. Plaintiffs also misstate the CFTC Order[4] and their own allegations regarding Mr. Devasini's testimony.[5]

---

[4] The CFTC did not state that Bitfinex funded margin trading. (Reply 18.) In fact, margin trading was based on peer-to-peer lending. (PSAC ¶ 318.) The CFTC Order states only that Bitfinex would liquidate the margin positions of customers whose equity dropped below the required minimum. (Dkt. No. 506-5 at 3.)

[5] Plaintiffs allege in the PSAC that Mr. Devasini stated – as a hypothetical – that one *could* inflate prices using an *unbacked* line of credit on an exchange: "I could give 1 trillion usd [credit] line on your account." (PSAC ¶ 320.) Again, there is no allegation that anyone ever *actually* did that.

D.   **Plaintiffs Fail to Plead That Defendants Conspired** ▮

After two years of discovery, Plaintiffs cannot point to any facts suggesting that ▮

▮ But that was public information, as Plaintiffs themselves allege that "USDT issuances . . . are all recorded on the blockchain." (PSAC ¶ 126.) And Plaintiffs' supposed "plus factors" consist of "ordinary business activities and unremarkable communications that do nothing" to show any "illicit anticompetitive scheme." *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *13 (S.D.N.Y. July 30, 2019). (Reply 28-29.)<sup>6</sup>

Nor do Plaintiffs plead proximate causation. (Opp'n 36.) ▮

▮ (Opp'n 36 (citing *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023)).) Plaintiffs cannot distinguish *Platinum & Palladium*, as they allege no involvement in

▮ That lack of involvement is equally fatal to Plaintiffs' attempt to plead causation for their CEA claims. (Reply 17.) *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012) ("The causation element requires that a defendant be the proximate cause of the price artificiality.").

E.   **Plaintiffs' CEA Claim Is Impermissibly Extraterritorial.**

Plaintiffs do not dispute that they must plead both "a domestic transaction" and

---

<sup>6</sup> Plaintiffs plead no facts supporting their "alternative" claim that Bitfinex and Tether were separate decision-makers and could thus conspire amongst themselves. (Opp'n 42; Reply 29.) "To actually plead in the alternative, [a plaintiff] has to plead *facts* in the alternative." *J & J Sports Prods., Inc. v. Nacipucha*, 2018 WL 2709222, at *8 (E.D.N.Y. May 18, 2018) (emphasis added).

8

"domestic – not extraterritorial – conduct by Defendants that is violative of a substantive provision of the CEA." *Prime Int'l Trading, Ltd. v. BP P.L.C.,* 937 F.3d 94, 105 (2d Cir. 2019). The Reply confirms that they do neither. (Opp'n 42-44; Reply 19-22.) *First*, Plaintiffs do not – as they claim – allege that "Goldshtein entered bitcoin futures contracts from the United States." (Reply 20.) That allegation would be insufficient in any event.[7] (Opp'n 43.) *Second*, although Plaintiffs assert that Defendants' conduct is not "predominantly foreign," *Platinum & Palladium*, 61 F.4th at 267, their list of tangential ties to the United States does not include *any* domestic conduct by the Defendants that supposedly violated the CEA. (Reply 21-22.)

With no real argument on this point, Plaintiffs ask the Court to ignore the issue because Defendants did not raise it earlier. (Reply 19-20; Opp'n 43 n.13.) The Second Circuit is clear that "the defense of failure to state a claim is not waivable." *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *see also In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006) (arguments aimed at "judicial resolution of the controversy" not waived even if not raised in earlier motion to dismiss); Fed. R. Civ. P. 12(h)(1) (listing waivable defenses). Amendment is futile because Plaintiffs' CEA claim would not survive dismissal under Rule 12(b)(6) or 12(c). *See* Fed. R. Civ. P. 12(h)(2)(B).

## CONCLUSION

For the reasons set forth herein, the Court should deny Plaintiffs' Motion to Amend.

Dated:  New York, New York            DEBEVOISE & PLIMPTON LLP
        January 23, 2024

                                      /s/ *Elliot Greenfield*

---

[7] Although Plaintiffs claim that "other courts in this District have disagreed" with *Anderson v. Binance*, 2022 WL 976824 (S.D.N.Y. Mar. 31, 2022), the sole case they cite does no such thing. (Reply 21 n.10.) In *Barron v. Helbiz Inc.*, 2023 WL 8622204 (S.D.N.Y. Dec. 13, 2023), the court did not, as Plaintiffs claim, grant "class certification" or disagree with *Anderson*. It certified for interlocutory appeal its finding of a domestic transaction in a case that did not even involve a foreign exchange.

9

Maeve L. O'Connor
Michael Schaper
Elliot Greenfield
Natascha Born
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
moconnor@debevoise.com
*mschaper@debevoise.com*
*egreenfield@debevoise.com*
*nborn@debevoise.com*

Michael Jason Lee (*pro hac vice*)
LAW OFFICES OF MICHAEL JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984
*michael@mjllaw.com*

Sunjina K. Ahuja (*pro hac vice*)
Christopher J. Beal (*pro hac vice*)
DILLON MILLER, AHUJA & BOSS, LLP
5872 Owens Ave., Suite 200
Carlsbad, California 92008
(858) 587-1800
*sahuja@dmablaw.com*
*cbeal@dmablaw.com*

*Attorneys for Defendants iFinex Inc., DigFinex Inc., BFXNA Inc., BFXWW Inc., Tether International Limited, Tether Operations Limited, Tether Holdings Limited, Tether Limited, Giancarlo Devasini, and Ludovicus Jan van der Velde*

10