**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re Tether and Bitfinex<br>Crypto Asset Litigation | Case No. 19-cv-9236 (KPF) |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND**

/s/ Andrew R. Dunlap
Philippe Z. Selendy
Andrew R. Dunlap
Oscar Shine
SELENDY GAY ELSBERG PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
adunlap@selendygay.com
oshine@selendygay.com

/s/ Todd M. Schneider
Todd M. Schneider (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
   KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

    A.    Relevant Allegations in the Consolidated Amended Complaint .............................2

    B.    Relevant Evidence Disclosed in Discovery ..........................................................3

ARGUMENT ...............................................................................................................................6

I.    THERE IS GOOD CAUSE TO GRANT PLAINTIFFS' LEAVE TO AMEND...............6

II.    PLAINTIFFS PLEAD VIABLE CLAIMS........................................................................8

    A.    PLAINTIFFS STATE VIABLE COMMODITIES EXCHANGE ACT CLAIMS ...............................................................................................................9

        1.    Plaintiffs Have CEA Standing ..................................................................9

    B.    PLAINTIFFS STATE VALID ANTITRUST CLAIMS ......................................15

        1.    Plaintiffs Have Antitrust Standing ..........................................................15

        2.    Plaintiffs State a Section 2 Claim ...........................................................20

        3.    Plaintiffs State a Section 1 Claim ...........................................................22

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agerbrink v. Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016)......................................................................................7

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016)...............................................................................16, 19

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988).......................................................................................................21

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d.......................................................................................................................17

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016)...........................................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................8

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    2023 WL 2388727 (N.D.N.Y. Mar. 7, 2023) ..................................................................7

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................8

*City of Providence v. Bats Glob. Mkts, Inc.*,
    878 F.3d 36 (2d Cir. 2017)...........................................................................................13

*In re Comm. Exch., Inc.*,
    213 F. Supp. 3d .........................................................................................................12

*In re Comm. Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)............................................................................13

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)............................................................... *passim*

*Elsevier, Inc. v. Grossman*,
    2017 WL 1843298 (S.D.N.Y. May 8, 2017) ...............................................................6, 8

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 U.S. Dist. LEXIS 128237 (S.D.N.Y. Sep. 20, 2016)..........................................18, 19, 20

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC,*
  711 F.3d 68 (2d Cir. 2013) ..................................................................................15

*Gelboim v. Bank of Am. Corp.,*
  823 F.3d 759 (2d Cir. 2016) ......................................................................16, 17, 18

*Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.,*
  201 F. Supp. 2d 236 (S.D.N.Y. 2002) ..................................................................25

*Holmes v. Grubman,*
  568 F.3d 329 (2d Cir. 2009) ...................................................................................6

*In re LIBOR-Based Financial Instruments Antitrust Litigation,*
  935 F. Supp. 2d 666 (S.D.N.Y. 2013) ..................................................................10

*Merced Irrigation Dist. v. Barclays Bank PLC,*
  165 F. Supp. 3d 122 (S.D.N.Y. 2016) ..............................................16, 20, 21, 25

*In re Pfizer Inc. Sec. Litig.,*
  2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ..........................................................7

*Phillips v. Kidder, Peabody & Co.,*
  1994 WL 570072 (S.D.N.Y. Oct. 13, 1994) ...........................................................8

*In re Platinum and Palladium Antitrust Litig.,*
  61 F.4th 242 (2d Cir. 2023) ..................................................................................18

*In re Platinum and Palladium Antitrust Litigation,*
  2017 1169626 (S.D.N.Y. Mar. 28, 2017) ...............................................................9

*Sanner v. Bd. of Trade,*
  62 F.3d 918 (7th Cir. 1995) ..................................................................................19

*Secs. Exch. Comm'n v. U.S. Env't, Inc.,*
  155 F.3d 107 (2d Cir. 1998) .................................................................................11

*Estate of Skogindustrier v. Cyrus Capital P'ners, L.P.,*
  2023 WL 3312388 (Bankr. S.D.N.Y. May 8, 2023) ...............................................8

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC,*
  366 F. Supp. 3d 516 (S.D.N.Y. 2018) ..............................................................9, 10

*State Teachers Ret. Bd. v. Fluor Corp.,*
  654 F.2d 843 (2d Cir. 1981) ...................................................................................8

*Sullivan v. Barclays,*
  2017 WL 685570 ...................................................................................................10

*In re Term Commodities Cotton Futures Litig.*,
   2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ...............................................................20, 21

*In re Tether & Bitfinex Crypto Asset Litig.*,
   576 F. Supp. 3d 55 (S.D.N.Y. 2021) ........................................................... *passim*

*U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
   875 F. Supp. 2d 233 (S.D.N.Y. 2012) ......................................................................13

*United States v. Vorley*,
   420 F. Supp. 3d 784 (N.D. Ill. 2019) .......................................................................13

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) .......................................................................................25

*Williams v. Citigroup Inc.*,
   659 F.3d 208 (2d Cir. 2011) .......................................................................................6

**Statutes**

17 C.F.R. § 180.1(a)(1) .....................................................................................................10

17 CFR § 180.1 .................................................................................................................10

17 CFR § 180.1(a) ...............................................................................................................9

17 CFR § 240.10b-5 ..........................................................................................................11

7 U.S.C. §§ 9 ......................................................................................................................9

7 U.S.C. §§ 25 ....................................................................................................................9

7 U.S.C. § 25(a)(1)(D)(i) ...................................................................................................10

**Other Authorities**

Fed R. Civ. P. 9(b) ............................................................................................................13

Fed R. Civ. P. 12(b)(6) .......................................................................................................8

Fed R. Civ. P. 15 .................................................................................................................7

Fed R. Civ. P. 15(a) ............................................................................................................6

Fed R. Civ. P. 15(a)(2) ....................................................................................................6, 8

Fed R. Civ. P. Rule 16(b) ...................................................................................................6

3 Moore's Federal Practice - Civil § 15.14 .........................................................................8

Plaintiffs Matthew Script, Benjamin Leibowitz, Jason Leibowitz, and Pinchas Goldshtein respectfully submit this memorandum of law in support of their motion to amend the complaint.

## PRELIMINARY STATEMENT

Plaintiffs seek leave to amend their complaint to conform to evidence produced in discovery. In their Amended Consolidated Class Action Complaint, Dkt. 114 ("CAC"), Plaintiffs alleged that Defendants[1] conspired to inflate the price of cryptocommodities, like bitcoin, using a purported stablecoin, USDT, that they secretly debased. CAC ¶¶ 185-187. Discovery, including recently produced documents and depositions, confirms that Defendants debased USDT and used it to manipulate cryptocommodity prices. Plaintiffs' proposed Second Amended Complaint ("SAC") describes this scheme in detail, while removing other allegations, parties, and claims, to streamline the case. Because Plaintiffs have ample good cause to amend, their motion should be granted.

Discovery confirms that Defendants debased USDT. While promising that USDT was backed one-to-one by U.S. dollars, Tether issued hundreds of millions of USDT not for U.S. dollars but instead for "receivables"—promises to pay—from Bitfinex. During one period, Tether lacked a bank account entirely; during another, much of its purported reserves had been seized by government authorities. Instead of having no credit risk, as Tether promised, USDT had massive credit risk that reduced its true value, all of which Defendants concealed.

Discovery also confirms that Defendants used debased USDT to inflate cryptocommodity prices. They did so with Bitfinex's ███ customer, a high-frequency arbitrage trader (the "Anonymous Trader"), who they knew operated automated trading software (a "bot"). In a fair market, arbitrage should have equalized prices across exchanges, but it did not. Bitcoin consistently traded

---

[1] iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Philip G. Potter, Giancarlo Devasini, and Ludovicus Jan van der Velde.

at a premium on Bitfinex compared to other exchanges, which Defendants encouraged by letting Bitfinex's biggest customers trade on credit, inflating demand for bitcoin on their exchange. This led the bot to consistently trade in one direction: it withdrew USDT from Bitfinex and traded it for cryptocommodities on other exchanges, bidding up prices on the other exchanges.

Importantly, Defendants knew the bot was ***automatic***. Once it spotted a price difference, it withdrew USDT from Bitfinex and bought cryptocommodities on other exchanges. Defendants affirmatively provided USDT to the bot. ███████ Tether affirmatively authorized the issuance of new USDT to Bitfinex and ███████ Bitfinex affirmatively authorized the transfer of USDT to Bitfinex's "hot wallet," from which the bot withdrew the USDT. The bot's trades could not occur without Defendants feeding it USDT and, once they did, the inflationary trades were inevitable. Defendants thus proximately caused the bot's inflationary trades.

On these facts, Plaintiffs seek to amend to narrow the case. They bring fewer claims, focusing on a Commodity Exchange Act claim and claims under the Sherman Act. They pursue fewer defendants, dropping Bittrex, Poloniex, and Crypto Capital. They propose a shorter class period, from April 2017 to February 2019 (the "<u>Class Period</u>"). They seek reduced damages. Plaintiffs seek no new discovery and are prepared to move for class certification on the current schedule based on their proposed amended complaint, which they intend to speed resolution of this case.

## <u>BACKGROUND</u>

### A.    Relevant Allegations in the Consolidated Amended Complaint

This case concerns USDT, a purported stablecoin pegged to the U.S. dollar. Tether represented that each USDT issued would be backed, one-to-one, by one U.S. dollar held in Tether's reserve accounts. CAC ¶¶ 125, 127. Tether distributed USDT using Bitfinex, a crypto exchange owned and controlled by the individual Defendants. CAC ¶¶ 23, 34-36, 188-189. Bitfinex repeated the representation that USDT was fully backed, one-to-one, by U.S. Dollars. CAC ¶¶ 574-575.

USDT was not fully backed by U.S. Dollars. CAC ¶ 187. It was only partially backed, and thus debased. CAC ¶¶ 8, 280. In 2017, Tether lost access to correspondent banking services, and so could not move U.S. dollars in or out of its bank accounts, CAC ¶¶ 233, 252, but over the next several months it issued 409 million USDT that it claimed were fully backed. CAC ¶¶ 240, 252. Tether did not hold the $409 million required to fully back these issuances. CAC ¶ 258.

Tether's issuance of debased USDT inflated the market for crypto commodities, including bitcoin. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████. Because Defendants represented that USDT was fully backed by U.S. dollars held by Tether, the market perceived these trades as adding new money to the crypto-commodity market. CAC ¶ 486. Purchases using debased USDT inflated crypto-commodity prices. CAC ¶ 11.

## B.   Relevant Evidence Disclosed in Discovery

Discovery confirms that USDT was persistently debased throughout the Class Period. From April 17 to September 15, 2017, Tether did not have a bank account that could receive U.S. dollars to back issuances of new USDT. SAC ¶¶ 171, 185 . Yet, during that time, Tether issued 382 million USDT to Bitfinex. *See* SAC ¶¶ 180-81. Bitfinex did not provide U.S. dollars for these issuances. SAC ¶ 182. Instead, Tether tracked the U.S. dollars owed by Bitfinex as a receivable. *Id.* A receivable is not a payment; it is merely a promise to pay. *Id.*. In purporting to hold a receivable as part of its reserves, Tether violated its core promise to customers and the market that each USDT in circulation would be backed by a dollar held in Tether's accounts.

To make matters worse, Bitfinex did not hold sufficient U.S. dollars to cover these receivables. SAC ¶ 183. Bitfinex did not keep the funds in a segregated account. SAC ¶ 200. It

commingled its own funds and its customers' funds in "omnibus" bank accounts and has no historical records of which funds were which. *Id.* Bitfinex executives claim that these IOUs were backed by Bitfinex's balance sheet, but they admitted that Bitfinex never maintained a balance sheet and cannot reconstruct what its balance sheet would have been at the time. SAC ¶ 201. Bitfinex ultimately paid for this USDT from an account containing both Bitfinex's funds and customer funds, indicating that it did not have sufficient U.S. dollars of its own to fully cover these receivables, deepening the credit risk and thus the debasement of the USDT issued in exchange.

Tether did the same thing from August 2018 to February 2019. It issued 500 million USDT to Bitfinex for receivables, not U.S. dollars, after Bitfinex could not timely withdraw funds from the shadow-bank Crypto Capital. SAC ¶¶ 247-48. Years earlier, Devasini recognized that "***CC is a ticking bomb in my opinion.***" Dkt. 468-7 Devasini Tr. 224:13-16. But Bitfinex and Tether continued to bank with Crypto Capital even after its funds were seized by Polish authorities, causing a liquidity crisis for Bitfinex. To cover, Defendants had Tether send Bitfinex accessible U.S. dollars from its reserves held at Deltec Bank in exchange for inaccessible funds that Bitfinex held at Crypto Capital—offloading Bitfinex's liquidity crisis onto Tether, without telling the market. SAC ¶¶ 247-48. Tether also continued to issue Bitfinex USDT in exchange for receivables. *Id.* This introduced a massive, yet hidden, credit risk to USDT.

Defendants affirmatively provided debased USDT to the Anonymous Trader's bot, which they knew it would use to buy crypto assets, knowing it could not trade without sufficient USDT. SAC ¶¶ 296-97. They knew the bot executed trades ***automatically***, without the Anonymous Trader (or anyone else) approving the trades before execution. SAC ¶ 309. During most of the Class Period, ███████████████████████████████████████████████████████. SAC ¶ 268. Defendants also made bespoke technical arrangements that let the bot perform a large

volume of trades. *See, e.g.,* SAC ¶ 322. They 
███████████████████████████████████. SAC ¶ 324. ███
███████████████████████████████████████. SAC ¶ 326.
████████████████████████████████████████████████
████████████████████████████████████. SAC ¶ 327.
███████████████████████████████████████. SAC
¶ 329. And, ████████████████████████████████████
████████████████████████████████████████████████
███████. SAC ¶ 330.

Defendants actively encouraged the Anonymous Trader's arbitrage trading. Devasini told them, for example, that not only did ███ bot trade price differences between Bitfinex and other exchanges, but it also used Bitfinex to trade price differences solely between other exchanges. Kraken, for example, allowed trades in U.S. dollars but not USDT; Poloniex allowed trades in USDT but not in U.S. dollars. To arbitrage between Kraken and Poloniex, the Anonymous Trader's bot would make intermediate trades on Bitfinex. SAC ¶ 273. As Devasini recognized: "*the only way to arb between Polo and Kraken is by making Bitfinex profit.*" SAC ¶ 274. He encouraged the Anonymous Trader: "*keep arbing with Polo.*" *Id.*

Discovery confirms that Defendants' scheme to issue debased USDT and distribute it via the Anonymous Trader's bot inflated bitcoin prices. Bitcoin typically traded at a higher price on Bitfinex than it did on Bittrex and Poloniex, SAC ¶ 282, a premium that should not have existed given extensive cross-exchange arbitrage. Defendants encouraged the Bitfinex premium by allowing Bitfinex's biggest customers to trade on credit, creating additional demand for bitcoin on the exchange. SAC ¶ 313. Because of this persistent premium, the bot bought more bitcoin on Bittrex

and Poloniex and sold it on Bitfinex than vice versa, SAC ¶ 284, inflating bitcoin prices. At one point, Devasini wrote to the Anonymous Trader: ***"[C]an you please push the [bitcoin] price above 10k again?"*** ▮ responded: ***"Sure no problem, just issue me some [USDT.]"*** SAC ¶ 335.

As expert analysis shows, the bot's trades with debased USDT did exactly that, inflating the price of bitcoin and other cryptocommodities. ▮▮▮▮. Defendants knew it. In an October 2018 chat, for example, Devasini begged Crypto Capital to speed up redemptions of USDT: "please understand all this could be extremely dangerous for everybody, the entire crypto community. ***BTC could tank to below 1k if we don't act quickly***." SAC ¶ 366. Defendants understood that if the market knew that Tether could not effectively redeem USDT, the market would lose confidence in USDT, tanking bitcoin prices. *Id*. Defendants are responsible for the artificial increase in the prices of bitcoin and bitcoin futures caused by their scheme.

## ARGUMENT

### I.   THERE IS GOOD CAUSE TO GRANT PLAINTIFFS' LEAVE TO AMEND

Under Federal Rule of Civil Procedure 15(a)(2), "[a] court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "This permissive standard is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (per curiam) (citation omitted). Because the Court entered scheduling orders with previous amendment deadlines, Dkt. 194; *see also* Dkt. 387, "[this] lenient standard under Rule 15(a)" is balanced against Rule 16(b)'s requirement that the schedule "shall not be modified except upon a showing of good cause.'" *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (citation omitted). In considering good cause, the Court examines the moving party's diligence and prejudice to the non-moving party. *Elsevier, Inc. v. Grossman*, 2017 WL 1843298, at *7 (S.D.N.Y. May 8, 2017) (citations omitted).

"Courts routinely grant leave to amend when a plaintiff seeks to refine the complaint to

6

reflect evidence obtained during discovery." *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *2 (S.D.N.Y. Mar. 22, 2012) (granting leave to amend under Rules 15). Plaintiffs seek to amend here based on evidence of (1) Defendants scheme to debase USDT; (2) Bitfinex's lack of assets backing receivables to Tether; (3) Bitfinex's extension of margin trading and credit lines to its customers; and (4) the relationship between Defendants and the Anonymous Trader.

Plaintiffs diligently pursued this discovery. Well over a year ago, they moved to compel Defendants to produce transaction data and financial information, including Defendants' trading records, wallet addresses, balance sheets, and ledgers. Dkts. 240, 240-1. Defendants withheld many of these records, requiring Plaintiffs to file multiple motions to compel. *See, e.g.,* Dkts. 328, 368 (seeking Defendants' transaction records). When Paolo Ardoino revealed the existence of additional documents in his depositions on September 12 and 13, 2023—which Defendants tried to delay by another month, Dkt. 433—Plaintiffs promptly asked Defendants for the documents and, when they refused, quickly moved to compel. Dkt. 456.

Defendants could not show "undue prejudice" from the proposed amendment, as would be their burden. *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) ("[O]nly undue prejudice warrants denial of leave to amend. […] [T]he non-moving party bears the burden of demonstrating that substantial prejudice would result were the proposed amendment to be granted.") (cleaned up; original emphasis); *Baker v. Saint-Gobain Performance Plastics Corp.*, 2023 WL 2388727, at *3 (N.D.N.Y. Mar. 7, 2023) ("In determining what constitutes undue prejudice, courts 'generally consider whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'").

Plaintiffs' allegations are related to their prior allegations, focusing on Defendants' debasement of USDT ███████████████████████████████. Plaintiffs bring no new claims (they bring fewer claims), seek no new discovery, and seek no extension of the schedule. Plaintiffs merely seek to conform their complaint to the evidence.

There is thus ample good cause to grant Plaintiffs leave to amend. *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (granting leave to amend where "[t]he amended claim was obviously one of the objects of discovery and related closely to the original claim […] This is not a case where the amendment came on the eve of trial and would result in new problems of proof."); *Phillips v. Kidder, Peabody & Co.*, 1994 WL 570072, at *4 (S.D.N.Y. Oct. 13, 1994) (granting leave to amend where "the proposed amended complaint does not add any new causes of action or new parties."); *Estate of Skogindustrier v. Cyrus Capital P'ners, L.P.*, 2023 WL 3312388, at *4 (Bankr. S.D.N.Y. May 8, 2023) (granting leave where proposed amendments merely conformed pleadings to evidence obtained in discovery); *see generally* 3 Moore's Federal Practice - Civil § 15.14 ("A liberal, pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)(2).").

## II.     PLAINTIFFS PLEAD VIABLE CLAIMS

Courts grant motions for leave to amend if the proposed amended claims would not be futile. *Elsevier*, 2017 WL 1843298, at *7. An amended pleading is not futile if the proposed claims could withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.* (citations omitted). To survive such a motion, the complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

## A. PLAINTIFFS STATE VIABLE COMMODITIES EXCHANGE ACT CLAIMS

Plaintiffs bring CEA claims for market manipulation in violation of 7 U.S.C. §§ 9, 25 and CFTC Rule 180.1(a). They adequately plead CEA standing and market manipulation.

### 1. Plaintiffs Have CEA Standing

"To have standing to sue under the CEA, a plaintiff must show that he or she suffered 'actual damages' as a result of the manipulation." *In re Tether & Bitfinex Crypto Asset Litig.* ("*Tether*"), 576 F. Supp. 3d 55, 107 (S.D.N.Y. 2021). "To establish 'actual damages' a plaintiff must show an 'actual injury caused by the violation.'" *Id.* (citation omitted). "[W]here the CEA claims are based on persistent manipulation, CEA plaintiffs may establish actual injury at the motion to dismiss stage by pleading that they engaged in transactions during the period of sustained manipulation because prices were 'allegedly artificial throughout the Class Period.'" *Id.* (citing *LIBOR II*, 962 F. Supp. 2d at 622 and *Platinum I*, 2017 WL 1169626, at *28.).

Plaintiffs allege persistent manipulation: Throughout the Class Period, Defendants debased USDT by issuing it without receiving U.S. dollars in return at the time of issuance and by allowing Tether's reserves to fall below the number of issued USDT. SAC ¶¶ 3, 147. Defendants provided debased USDT to the Anonymous Trader that ▉ used to trade for crypto commodities, artificially inflating cryptocommodity prices. SAC ¶¶ 296-97, ▉. These trades artificially inflated the prices of cryptocommodity futures, which are closely linked to the prices of the underlying cryptocommodities. SAC ¶¶ 71-73, 364. This was not episodic manipulation; the debasement occurred regularly throughout the Class Period, *see* SAC ¶¶ 143-257, and the inflationary effects of the Anonymous Trader's trades persisted throughout that time, SAC ¶ 367. *Platinum I*, 2017 WL 1169626, at *29; *accord Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 553 (S.D.N.Y. 2018).

Plaintiffs allege that Plaintiff Pinchas Goldshtein suffered actual damages with each purchase made an artificially inflated price. *Id.* Plaintiffs have alleged the occasions and amounts of these purchases, *id.* This is more than sufficient for the Court to infer that Goldshtein suffered actual damages as a result of his purchases. *Tether*, 576 F. Supp. 3d, at 108-09 (accepting allegations of persistent inflation as true, court can infer that plaintiff suffered actual damages from any purchase during class period). Plaintiffs need not plead the precise amount of those damages. *LIBOR I*, 935 F. Supp. 2d at 719; *see also Sullivan v. Barclays*, 2017 WL 685570, at *11(plaintiffs pled CEA standing by alleging "years-long conspiracy to secretly manipulate the Euribor" and that they traded within that time, even though they did not trace dates of manipulation to each of their individual transactions). This is more than enough to plead CEA standing.

### a.     Plaintiffs Allege a Manipulative Device

Plaintiffs pursue a manipulative device theory pursuant to 7 U.S.C. § 25(a)(1)(D)(i) and CFTC Rule 180.1. Section 25(a)(1)(D)(i) provides a remedy for:

> the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate[.]

*Id.* CFTC Rule 180.1 prohibits:

> any person . . . in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery . . . to intentionally or recklessly . . . [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud[.]

17 C.F.R. § 180.1(a)(1).

The CFTC advises that the terms "manipulate device" and "contrivance" are "virtually identical" to terms in Section 10(b) of the Securities Exchange Act of 1934, so caselaw under that

10

Act and SEC Rule 10b-5 is "instructive" in construing this regulation. 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180). Section 10(b), in turn, "prohibits not only material misstatements but also manipulative acts," including "a transaction [that] sends a false pricing signal to the market." *Tether*, 576 F. Supp. 3d at 113 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007)).

"[W]here . . . plaintiffs allege both manipulation and misrepresentation . . . . as part of a single scheme, they may satisfy their pleading burden by alleging with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants and need not also plead loss causation or reliance at the motion to dismiss stage." *Tether*, 576 F. Supp. 3d at 112 (citing *In re Comm. Exch., Inc.*, 213 F. Supp. 3d 631, 668–69 (S.D.N.Y. 2016) and *Platinum I*, 2017 WL 1169626, at *36).

Plaintiffs plead a manipulative scheme here by alleging that (1) Defendants debased USDT by failing to keep sufficient dollars in Tether's accounts to match the number of issued USDT, SAC ¶ 411; (2) they concealed this debasement by falsely representing to the market that issued USDT was backed one-to-one by U.S. dollars, *id.*; (3) they actively provided vast amounts of this debased USDT to the Anonymous Trader that ██ traded for cryptocommodities, *id.*; (4) these trades artificially inflated cryptocommodity prices by sending a false signal to the market about the level of demand for those assets, *id*. Plaintiffs allege all this with particularity, providing the dates on which USDT was debased (and to what extent), SAC ¶¶ 143-257, and the dates and times of the Anonymous Trader's trades of USDT for cryptocommodities, SAC ¶¶ 275-89.

Plaintiffs also allege scienter by pleading that Defendants facilitated trades they knew would artificially inflate cryptocommodity prices. *Secs. Exch. Comm'n v. U.S. Env't, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) (under Section 10(b), "it is well-settled that knowledge of the

proscribed activity is sufficient scienter") (citation omitted) (citing Restatement (Second) of Torts, § 8A (1965) ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."). Plaintiffs allege Defendants knew that (1) USDT was debased, SAC ¶ 412; (2) their representations that USDT was fully backed were false, *id.*; (3) the Anonymous Trader used a bot to automatically withdraw USDT from Bitfinex and trade it for cryptocommodities, *id.*; and (4) those trades would inflate cryptocommodity prices, *id.*

### b.  Plaintiffs Allege Price Manipulation

"To state a claim for market manipulation under the CEA, Plaintiffs must allege that: [i] the defendant possessed an ability to influence market prices; [ii] an artificial price existed; [iii] the defendant caused the artificial price; and [iv] the defendant specifically intended to cause the artificial price." *Tether*, 576 F. Supp. 3d at 110 (citations omitted). The first three elements overlap. *In re Comm. Exch., Inc.*, 213 F. Supp. 3d at 668–69. A market manipulation claim sounding in fraud is evaluated under Federal Rule of Civil Procedures 9(b), although that standard "is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.* at 668 (citations omitted).

Plaintiffs plead the first element by alleging that Defendants could inflate the price of cryptocommodities by debasing USDT, providing it to the Anonymous Trader's bot, and affirmatively facilitating the bot's trades of USDT for cryptocommodities, SAC ¶ 411. They have identified specific times when USDT was debased and the degree of the debasement during each. SAC ¶¶ 143-257. They have also identified specific instances when the Anonymous Trader's bot traded with debased USDT, including the dates, times, and amounts of each trade. SAC ¶¶ 275-89. This

easily satisfies Rule 9(b). *See Tether*, 576 F. Supp. 3d at 110 (allegations of specific instances of manipulative trading satisfy Rule 9(b)) (citing *Platinum I*, 2017 WL 1169626, at *32); *see also U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 245–46 (S.D.N.Y. 2012) ("[T]he ability to influence prices can manifest itself in various ways" and the allegation that Defendants' conduct "caused or at least contributed to" the market movement is sufficient.).

Plaintiffs plead the second element by alleging that the Anonymous Trader's trades of debased USDT for cryptocommodities artificially inflated cryptocommodity prices, SAC ¶ 413. These prices were artificial because they did not "reflect basic forces of supply and demand." *Comm. Exch.*, 213 F. Supp. 3d at 669-72 (sustaining CEA price manipulation claim where plaintiffs alleged a conspiracy to fix gold futures). They instead reflected artificially high demand based on fraudulent information, which is not a legitimate component of the supply-demand equation. *See City of Providence v. Bats Glob. Mkts, Inc.*, 878 F.3d 36, 49 (2d Cir. 2017); *see also e.g.*, *United States v. Vorley*, 420 F. Supp. 3d 784, 802 (N.D. Ill. 2019) (if the supply-demand equation is based on fraudulent information then the resulting price will be artificial).

Plaintiffs plead the third element by alleging that Defendants' conduct caused this artificial increase in cryptocommodity prices. SAC ¶ 415. A plaintiff may show such causation by alleging that the defendant's conduct "had an immediate effect on pricing" in the market. *In re Comm. Exch.*, 213 F. Supp. 3d at 671. Plaintiffs identify the specific times during which USDT was debased, SAC ¶¶ 143-257, and the specific instances during those times when the Anonymous Trader traded debased USDT for cryptocommodities, SAC ¶¶ 275-89, thereby inflating cryptocommodity prices.

Plaintiffs plead the final element by alleging that "the defendants had both motive and

opportunity to commit the fraud" and by alleging facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness;" either is sufficient. *Tether*, 576 F. Supp. 3d at 110. (citation omitted).

Plaintiffs allege that Defendants had the motive to commit the fraud: Inflated cryptcommodity prices would benefit them by (1) increasing the market value of their cryptocommodities, SAC ¶ 388; (2) encouraging additional trades of cryptocommodities on Bitfinex, which would lead to increased trading fees, SAC ¶ 413; and (3) encouraging additional trades of USDT on other exchanges, which would promote the use of USDT as the crypto economy's dominant dollar-pegged stablecoin, *id.* They also allege that Defendants had the opportunity to carry out this scheme: (1) Defendants were the sole issuers of Tether, SAC ¶¶ 29, 117; (2) they had sole control over Tether's reserves that purportedly backed issued USDT, SAC ¶¶ 117, 124; (3) they had sole control over how much USDT they made available to the Anonymous Trader's bot via Bitfinex's hot wallet, SAC ¶ 306; (4) they knew that ▮ bot would automatically withdraw USDT from that wallet and trade it for cryptocommodities on other exchanges, SAC ¶ 412; and (5) they affirmatively facilitated those trades by, among other things, ▮▮▮▮▮▮▮ and allowing ▮ to trade on credit and ▮▮▮▮▮▮▮▮▮▮▮, SAC ¶¶ 323, 332.

Plaintiffs also allege circumstantial evidence of Defendants' conscious misconduct or recklessness, including that Defendants (1) were aware that Tether's total accessible assets were insufficient to back all issued USDT on a one-to-one basis, SAC ¶ 414; (2) concealed the debasement of USDT, *id.*, including by offering to redeem USDT at 100 cents on the dollar at any time; (3) concealed links between Tether and Bitfinex, *id.*; (4) knew that crypto-commodity prices were linked to the price of USDT, *id.*; and (5) took steps to maintain the market perception that USDT was backed one-to-one by U.S. dollars specifically to prevent cryptocommodity prices from

14

"tank[ing]," SAC ¶ 366.

### B.   PLAINTIFFS STATE VALID ANTITRUST CLAIMS

Plaintiffs bring monopolization claims under Section 2 of the Sherman Act and price fixing claims under Section 1 of the Sherman Act.

### 1.   Plaintiffs Have Antitrust Standing

To establish antitrust standing, "a private antitrust plaintiff [must] plausibly . . . allege [1] that it suffered a special kind of antitrust injury, and [2] that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (citations and internal quotations omitted). Plaintiffs have done both.

### a.   Plaintiffs Suffered an Antitrust Injury by Transacting in a Market Subject to Price Manipulation

"In order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) (cleaned up); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 56–57 ("*Crude Oil*") (S.D.N.Y. 2012) (quoting *Atlantic Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990)) ("To have standing for a section 2 claim, Plaintiffs must show antitrust injury. Antitrust injury is an injury of the type the antitrust laws were intended to prevent ... flowing from that which makes defendants' acts unlawful."). For a court to determine if a plaintiff suffered an antitrust injury

> (1) the plaintiff must "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; (2) then the court must "identify the actual injury the plaintiff alleges" by "looking to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct"; and finally, (3) the court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.

*Tether*, 576 F. Supp. 3d at 92 (citation omitted).

Under this test, a plaintiff pleads antitrust injury for a Section 2 claim by pleading "losses from transacting in a market tainted by price manipulation." *Crude Oil*, 913 F. Supp. 2d 41, at 57 (for Section 2 claim, plaintiffs pled "a quintessential antitrust injury" by alleging losses from transacting in oil derivatives market caused by artificial market conditions created by defendants); *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 133 (S.D.N.Y. 2016) (for Section 1 and 2 claims, "Merced has pled an antitrust injury causally linked to Barclays' practices: it is a purchaser of electricity on the daily markets in which it alleges it paid higher supra-competitive prices or received lower sub-competitive prices as a result of Barclays' rate-manipulation.").

Similarly for a Section 1 claim, when consumers, due to anticompetitive conduct, "must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "[T]he machinery employed by a combination for price-fixing is immaterial to the antitrust laws." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 57 (S.D.N.Y. 2016) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

Plaintiffs meet this test. They identify the practice complained of: Defendants' debasement of USDT, SAC ¶ 421, their provision of debased USDT to the Anonymous Trader, SAC ¶ 425, and their facilitation of the Anonymous Traders' trades of debased USDT for cryptocommodities. *Id*. Plaintiffs identify why this practice is anticompetitive: It artificially inflated cryptocommodity prices. *Id*. They explain why this practice placed them in a worse position: Plaintiffs paid higher cryptocommodity prices than they would have absent Defendants' anticompetitive conduct, *id.*, a "quintessential antitrust injury." *Crude Oil*, at 57. Plaintiffs also show a direct connection between

16

Defendants' practice and their injury: Defendants' provision of debased USDT to the Anonymous Trader was necessary for ██ anticompetitive trades to occur; ██ could not have made those trades without that debased USDT; and—because ██ trades were automatic—once Defendants made the debased USDT available to ██ the trades were bound to occur without any intervening acts, SAC ¶ 307. For their Section 1 claim, Plaintiffs identify the conspirators, Defendants and the Anonymous Trader, and the mechanism of the conspiracy, facilitating arbitrage to increase prices across the market. SAC ¶ 439.

### b. Plaintiffs Are Efficient Enforcers of the Antitrust Laws

"Even a plaintiff that has suffered an antitrust injury must also demonstrate that it is a suitable plaintiff, i.e., an 'efficient enforcer' of the antitrust laws." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 157–58 (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)). Courts look to four factors:

> (1) the "directness or indirectness of the asserted injury,"; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which appellants' damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Gelboim*, 823 F.3d at 778 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)) Plaintiffs meet this test.

*First*, Defendants were a direct cause of Plaintiffs' injuries. Plaintiffs were injured when the Anonymous Trader's bot traded debased USDT for cryptocommodities, inflating the prices at which they bought cryptocommodities. SAC ¶ 426. Defendants were a direct cause of those trades: Tether was the sole issuer of USDT. SAC ¶ 29. They had sole control over the extent of USDT's backing, controlling how much USDT they would issue, what they would accept in exchange (including Bitcoin pledges and receivables), and how many dollars were in Tether's bank accounts. *See* SAC ¶¶ 9, 299. Defendants had sole control over how much USDT Bitfinex would make

available to the Anonymous Trader from Bitfinex's hot wallet. SAC ¶ 299. Defendants acted af-

firmatively to place debased USDT into that wallet, by transfers from Bitfinex's cold wallet and

new issuances from Tether, both of which required affirmative approvals by Defendants' execu-

tives. *Id*. Defendants' actions were necessary for the Anonymous Trader to make ███ trades—if

they did not provide ███ with USDT, ███ trades could not have occurred.

Because the Anonymous Trader's bot was automatic, its trades inevitably occurred once

Defendants made the debased USDT available. SAC ¶ 307. There was no intervening act by any-

one (including by the Anonymous Trader) between Defendants' provision of the USDT to the

Bitfinex hot wallet and the trades that injured Plaintiffs. *See In re Platinum and Palladium Anti-*

*trust Litig.*, 61 F.4th 242, 259 (2d Cir. 2023) ("[W]hether the violation was a direct or remote cause

of the injury—turns on familiar principles of proximate causation.") (finding standing for plaintiffs

who transacted in a market subject to defendants' manipulation.); *Crude Oil*, 913 F. Supp. 2d at

57 (finding standing for plaintiff traders in crude oil futures when defendant dumped underlying

crude oil to shift price in the futures market).

*Second*, there are no more direct victims of Defendants' scheme to inflate cryptocommod-

ity prices. Plaintiffs paid those inflated prices by buying cryptocommodities during the Class Pe-

riod. While not all Plaintiffs bought cryptocommodities directly from the Anonymous Trader, they

were all injured by the inflation caused by ███ trades. *See In re Platinum and Palladium Antitrust*

*Litig.*, 61 F.4th 242 at 264 (counterparties to manipulative trading need not be identified because

"[t]o hold otherwise would be to hold that anticompetitive behavior on an exchange can directly

injure no one."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 U.S. Dist. LEXIS

128237, at *44 (S.D.N.Y. Sep. 20, 2016) ("The antitrust laws do not require a plaintiff to have

purchased directly from a defendant in order to have antitrust standing.").

*Third*, Plaintiffs' damages are not speculative. Plaintiffs can show the extent of USDT's debasement during the Class Period by comparing the number of USDT in circulation to the number of U.S. dollars in Tether's bank accounts. They can show the degree to which the Anonymous Trader's trades inflated cryptocommodity prices during the Class Period by comparing the prices at which ■ made those trades to the prices at which ■ would have made them had the debasement been revealed. (This "but for" analysis would account for other factors affecting cryptocommodity prices.) And Plaintiffs can show the amounts by which their purchases of cryptocommodities were inflated through this scheme by applying that inflation rate to their trades, which are indelibly recorded on the blockchain. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 U.S. Dist. LEXIS 128237, at *49 ("Plaintiffs will seek to prove damages by comparing the prices [they] paid in identifiable transactions with what the price would have been but for collusion. At the motion to dismiss stage, any holding that these damages would be speculative is premature."); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d 44, 61 (S.D.N.Y. 2016) ("Plaintiffs have alleged that they were directly harmed by Defendants' anticompetitive conduct by having to pay higher prices (or earning lower profits) from instruments tied to ISDAfix, there is nothing particularly speculative about the injury alleged, and the damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery."); *Sanner v. Bd. of Trade*, 62 F.3d 918, 930 (7th Cir. 1995) ("Damages will be neither speculative nor difficult to apportion. . . . A damages calculation for a market manipulation scheme, though it may require expert testimony, is hardly beyond the ken of the federal courts.").

*Fourth*, there is no risk of a duplicative recovery. To the best of Plaintiffs' knowledge, no Defendant is subject to an investigation or lawsuit seeking to recover for their inflation of cryptocommodity prices. To the extent that Defendants have entered into settlement agreements with

state or federal agencies, Plaintiffs are not aware of any such settlements being paid as restitution to the victims of the anticompetitive scheme. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 U.S. Dist. LEXIS 128237, at *40 ("First, none of the regulatory investigations in the United States appear to be aimed at providing restitution to any injured parties, and the [defendants] have not shown otherwise. . . . Because public enforcement does not provide redress to victims of the conspiracy, the [plaintiff class] is an efficient and necessary enforcer.").

### 2. Plaintiffs State a Section 2 Claim

Plaintiffs bring a claim for monopolization under Section 2 of the Sherman Act. They "must establish: [i] the possession of monopoly power in the relevant market and [ii] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Tether*, 576 F. Supp. 3d at 94. They must also show that they suffered an antitrust injury. *Id.* at 92. Plaintiffs have done so.

### a. Defendants Possess Monopoly Power in the Cryptocommodity Market

Plaintiffs may show the possession of monopoly power "by showing direct evidence of anticompetitive effects through price control." *Tether*, 576 F. Supp. 3d at 96 (holding that allegations of defendants' ability to control cryptocommodity prices through manipulative trading, without allegations of dominant market share of that market, pled monopoly power) (citations omitted); *see also Merced*, 165 F. Supp. 3d at 141–42 (holding that allegations of defendants' ability to control prices for electricity-related contracts through manipulative trading, without allegations of dominant market share of that market, pled monopoly power); *Crude Oil*, 913 F. Supp. 2d at 56 (holding that allegations of defendants' ability to control prices in the crude oil futures market, without allegations of dominant market share in that market, pled monopoly power); *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *25 ("*Cotton*") (S.D.N.Y. Dec. 20,

2013), *on reconsideration in part*, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014) (holding that allegations of defendants' ability to control prices in the cotton futures market, without allegations of dominant market share of that market, pled monopoly power).

Plaintiffs show such evidence here. They allege that (1) Defendants debased USDT, SAC ¶ 421; (2) Defendants provided massive amounts of that debased USDT to the Anonymous Trader's bot, SAC ¶ 422; (3) Defendants facilitated, and were a direct cause of, the bot's trading of that debased USDT for cryptocommodities, *id.*; and (4) the bot's massive number of such trades with enormous quantities of USDT artificially inflated cryptocommodity prices across the market. ███████. That is, they allege that Defendants' conduct directly led to improperly inflated cryptocommodity prices. Plaintiffs have thus shown "pricing anomalies . . . closely correlated with defendants' alleged conduct," which is "sufficient to plead monopoly power." *See Tether*, 576 F. Supp. 3d at 98 (citation omitted).

Defendants' conduct was anticompetitive. Intentional distortion of a commodities market through manipulation for profit is anticompetitive, *see Merced*, 165 F. Supp. 3d at 143; *Crude Oil*, 913 F. Supp. 2d at 56, and Plaintiffs plead that Defendants inflated cryptocommodities prices for their own profit. SAC ¶ 388. Anticompetitive conduct also includes "unethical and deceptive practices," *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988), and Plaintiffs allege that Defendants falsely represented to the market that USDT was backed one-to-one by U.S. dollars when they knew that it was not, SAC ¶ 422.

### b.    Defendants Willfully Acquired Monopoly Power

Plaintiffs must show "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Tether*, 576 F. Supp. 3d at 98 (citation omitted). In doing so, they must show anticompetitive conduct: "conduct without a legitimate business purpose that makes sense only because it

21

eliminates competition." *Id.* (citation omitted). Plaintiffs can do so by alleging conduct from which the Court can reasonably infer Defendants' intent to control prices. *Id.* at 100 (citation omitted).

Plaintiffs allege facts from which the Court can easily infer that intent: Defendants (1) misrepresented that USDT was backed one-to-one by U.S. dollars when they knew that it was not, SAC ¶ 422; (2) knew that the market's perception of USDT's backing was correlated with cryptocommodity prices and if the market determined that USDT was not fully backed by U.S. dollars then cryptcommodity prices would fall, SAC ¶ 366; (3) actively concealed USDT's debasement and to maintain its "peg" to the U.S. dollar, SAC ¶ 422; and (4) ███████████████████████████
███████████████████████████████████████. SAC ¶¶ 322-36.

No rational economic actor would, as Tether and Bitfinex did, offer to redeem or exchange USDT at 100 cents on the dollar when it knew that the USDT was debased below that level and that Tether did not have sufficient assets to redeem all issued USDT. Defendants' conduct makes sense only as part of a scheme to secretly debase USDT and provide it to customers including the Anonymous Trader's bot for trading that they knew would inflate cyrptocommodity prices. Defendants benefited from this scheme: The price of their own cryptocommodity holdings increased and rising prices led to increased trades of USDT for cryptocommodities, generating additional trading fees from such trades for Defendants on Bitfinex.

### 3. Plaintiffs State a Section 1 Claim

While the evidence shows that Defendants unilaterally monopolized the crypto-commodity market, Section II.B.2, *supra*, it also indicates that Anonymous Trader knew that the Defendants had debased USDT. On this basis, Plaintiffs allege that Defendants conspired with the Anonymous Trader to inflate cryptocommodity prices in violation of Sections 1 and 3 of the Sherman Act. Plaintiffs must show "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade." *Tether*, 576 F. Supp. 3d at

101 (citing *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016)).

###### a.  Defendants Conspired with the Anonymous Trader

To plead an unlawful agreement, "Plaintiffs must assert either direct evidence . . . or circumstantial facts supporting the inference that a conspiracy existed." *Tether*, 576 F. Supp. 3d at 101–02 (citation omitted). "Because conspiracies are rarely evidenced by explicit agreements . . . a conspiracy nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Id.* at 102 (citing *Gelboim*, 823 F.3d at 781). Plaintiffs meet this standard by alleging "plus factors" including "[i] a common motive to conspire; [ii] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and [iii] evidence of a high level of interfirm communications." *Id.* (citation omitted). At the pleadings stage, plaintiffs "must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." *Id.* (citation omitted).

Plaintiffs allege an agreement by Defendants and the Anonymous Trader to manipulate cryptocommodity prices: (1) Defendants debased USDT and misrepresented that it was backed one-to-one by U.S. dollars, SAC ¶ 443; (2) the Anonymous Trader knew of this debasement because ▮ knew of banking difficulties that prevented Defendants from issuing new USDT in exchange for U.S. dollar deposits and from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, SAC ¶¶ 333-36; (3) Defendants and the Anonymous Trader knew that ▮ bot would withdraw large amounts of USDT from Bitfinex and trade it for cryptocommodities on other exchanges, SAC ¶ 309; (4) Defendants actively provided vast quantities of USDT to the Anonymous Trader's bot for this trading at ▮ request, SAC ¶¶ 294-307; (5) Defendants facilitated this trading by, for example, allowing the Anonymous Trader to trade on credit, SAC ¶ 332; and (6) Defendants and the Anonymous Trader knew that these trades would inflate cryptocommodity prices, SAC ¶ 364. They explicitly

23

acknowledged this agreement, when Devasini asked, "can you please push the [bitcoin] price above 10k again?" and the Anonymous Trader replied, "Sure no problem, just issue me some [USDT.]" SAC ¶ 335.

Plaintiffs also allege a common intent and motive: Defendants and the Anonymous Trader sought to inflate cryptocommodity prices which would (1) increase the value of their cryptcommodity holdings, SAC ¶ 388; and (2) lead to increased trades of USDT for cryptocommodities, benefitting Defendants by increasing the distribution of USDT, encouraging more trades on Bitfinex, and creating more arbitrage opportunities, SAC ¶ 391.

Plaintiffs also allege that Defendants and the Anonymous Trader acted against their apparent self-interest to obtain anticompetitive ends. For example: (1) Defendants promised the market that it would redeem all USDT at 100 cents on the dollar, even though they knew it was debased, and Tether did not have the assets to do so, SAC ¶ 443; (2) ███████████████████████████ ██████████████████████████████████████████████████████ ██████, SAC ¶ 336; (3) Defendants extended interest-free credit lines to encourage trading SAC ¶ _332_; and (4) ██████████████████████████████. SAC ¶ 330. They took such actions to maintain the illusion that USDT was fully backed and encourage trading using the token, thus sending false signals to the market of the demand for cryptocommodities, driving cryptocommodity prices higher. SAC ¶ 443.

### b.    Their Agreement was in Restraint of Trade

To plead that an agreement was "in restraint of trade or commerce among the several States," Plaintiffs must "show that the concerted action was unreasonable." *Tether*, 576 F. Supp. 3d at 104 (citation omitted). "Any conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity is illegal per se, and the precise machinery employed is immaterial." *Id.* (citations omitted). Plaintiffs meet this standard by

alleging that the agreement between Defendants and the Anonymous Trader, or between Bitfinex and Tether, was to fix prices—specifically, to inflate cryptocommodity prices, SAC ¶ 439—which is per se unreasonable. *Merced*, 165 F. Supp. 3d at 138.[2]

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for leave to amend.

---

[2] Plaintiffs bring two other claims. *First*, they bring a claim for conspiracy to monopolize under Section 2 of the Sherman Act. SAC ¶¶ 428-36. They must show "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (citation omitted). "[A]nticompetitive or exclusionary conduct[] may be used to infer . . . specific intent to monopolize[.]" *Id*. The evidence supporting Plaintiffs' other claims shows elements one and two and Defendant's specific intent. The Anonymous Trader's specific intent can be inferred from (1) ██ trades using debased USDT, SAC ¶ 432; (2) ██ trades at Defendants' request, SAC ¶ 431; and (3) ██ motive to inflate the value of ██ cryptocommodities. SAC ¶ 434. *Second*, Plaintiffs bring an alternative Section 1 claim. SAC ¶¶ 437-46. While Plaintiffs allege that Tether and Bitfinex were under common control with a unity of purpose, SAC ¶ 148, if they were separate entities conducting business at arms' length, then they can be liable for conspiring in restraint of trade, despite common ownership. *See Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*, 201 F. Supp. 2d 236, 275 (S.D.N.Y. 2002) (collecting cases), *rev'd on other grounds*, 386 F.3d 385 (2d Cir. 2004). Plaintiffs allege that Tether and Bitfinex agreed (1) to issue, and accept, debased USDT, SAC ¶ 439; (2) push unbacked USDT into the market via the Anonymous Trader's bot, SAC ¶ 439; and (3) conceal their relationship from the market. SAC ¶ 153. They had opportunity and motive to conspire: Their employees were in constant communication, they both held cryptocommodities and would benefit from increased cryptocommodity prices, SAC ¶ 388, Bitfinex would also benefit from the increase in trading volume, SAC ¶ 391, and Tether would also benefit from the increase in USDT distribution in the market, *id*.

Dated:  New York, NY                  Respectfully submitted,
         October 24, 2023

| | |
|---|---|
| /s/ Andrew R. Dunlap | /s/ Todd M. Schneider |
| Philippe Z. Selendy | Todd M. Schneider (*pro hac vice*) |
| Andrew R. Dunlap | Matthew S. Weiler (*pro hac vice*) |
| Oscar Shine | SCHNEIDER WALLACE COTTRELL |
| SELENDY GAY ELSBERG PLLC |    KONECKY LLP |
| 1290 Sixth Avenue | 2000 Powell Street, Suite 1400 |
| New York, NY 10104 | Emeryville, CA 94608 |
| adunlap@selendygay.com | tschneider@schneiderwallace.com |
| oshine@selendygay.com | mweiler@schneiderwallace.com |

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*