**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re Tether and Bitfinex
Crypto Asset Litigation

Case No. 19-cv-9236 (KPF)

**PLAINTIFFS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND**

Philippe Z. Selendy
Andrew R. Dunlap
Oscar Shine
Laura M. King
SELENDY GAY ELSBERG PLLC
1290 Sixth Avenue
New York, NY 10104
pselendy@selendygay.com
adunlap@selendygay.com
oshine@selendygay.com
lking@selendygay.com

Todd M. Schneider (*pro hac vice*)
Matthew S. Weiler (*pro hac vice*)
SCHNEIDER WALLACE COTTRELL
 KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................3

I.     Good Cause Exists to Grant Plaintiffs' Leave to Amend ...................................................3

     A.    Plaintiffs Diligently Pursued and Uncovered Key Facts Underlying Their Amended Claims That Defendants Withheld Until Late in Discovery .................4

          1.    Plaintiffs Learned in October 2023 That Bitfinex Lacked Sufficient Funds to Pay Tether for USDT Issued for Receivables ...........................4

               a.    Defendants Have No Records of Funds Backing Tether Receivables from Bitfinex for USDT .............................4

               b.    Bitfinex Extended Massive Loans to Its Customers ......................8

     B.    Plaintiffs' Learned Key Facts Showing Defendants' Collusion With The Trader In 2023, Including in Depositions in Fall 2023 .............................9

     C.    Amendment Will Not Prejudice Defendants ...............................................11

II.    Because Plaintiffs State Viable Claims, Amendment is Not Futile ...................................13

     A.    Plaintiffs State a Commodities Exchange Act Claim ............................................14

          1.    Plaintiffs Allege That Defendants Artificially Inflated Cryptocommodity Prices .......................................................14

          2.    Plaintiffs Allege That Defendants Caused These Artificial Prices ...........17

          3.    Plaintiffs Allege Defendants' Scienter .......................................................18

          4.    Defendants Waived Their Extraterritoriality Defense, Which Would Also Fail on the Merits .......................................................19

     B.    Plaintiffs' State Viable Antitrust Claims ............................................................22

          1.    Plaintiffs Have Antitrust Standing ..............................................................22

          2.    Plaintiffs State a Section 2 Monopolization Claim .....................................25

          3.    Plaintiffs State a Section 2 Conspiracy Claim ............................................26

          4.    Plaintiffs State Section 1 Claims ................................................................26

III.   Plaintiffs State Viable Claims Against Potter ...................................................................30

CONCLUSION........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)....................................................................................20, 21

*Ahmed v. Astoria Bank*,
    2015 WL 4394072 (E.D.N.Y. July 16, 2015) ........................................................12

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016)..................................................................23, 24

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)......................................................................16

*Anderson News, LLC v. Am. Media Inc.*,
    680 F.3d 162 (2d Cir. 2012).....................................................................................28

*Anderson v. Binance*,
    2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ..........................................................21

*Anderson v. Tether Holdings Ltd.*,
    2023 WL 5001074 (S.D.N.Y. Aug. 4, 2023)....................................................15, 16

*Baez v. Delta Airlines, Inc.*,
    2013 WL 5272935 (S.D.N.Y. Sept. 18, 2013)........................................................12

*Barron v. Helbiz, Inc.*,
    2023 WL 8622204 (S.D.N.Y. Dec. 13, 2023) .........................................................21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................27

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996).....................................................................................19

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014).....................................................................................21

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y 2016)........................................................15, 17, 18

*Commodity Futures Trading Comm'n v. Int'l Fin. Servs. (New York), Inc.*,
    323 F. Supp. 2d 482 (S.D.N.Y. 2004).....................................................................21

*Conyers v. Rossides*,
    558 F.3d 137 (2d Cir. 2009)................................................................21

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. 2012)................................................22, 25

*In re Crude Oil Commodity Litig.*,
    2007 WL 1946553 (S.D.N.Y. June 28, 2007) .....................................19

*Duling v. Gristede's Operating Corp.*,
    265 F.R.D. 91 (S.D.N.Y. 2010) ...........................................................12

*Enzymotec Ltd. v. NBTY, Inc.*,
    754 F. Supp. 2d 527 (E.D.N.Y. 2010) .................................................10

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)................................................................24

*Ideavillage Prod. Corp. v. Copper Compression Brands LLC*,
    2021 WL 5013799 (S.D.N.Y. Oct. 27, 2021) ...................................3, 13

*Johnson v. Bryson*,
    851 F. Supp. 2d 688 (S.D.N.Y. 2012)................................................20

*Kreppein v. Celotex Corp.*,
    969 F.2d 1424 (2d Cir. 1992).............................................................12

*Laydon v. Cooperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) .................................................................22

*Lee v. Kylin Mgmt. LLC*,
    2019 WL 917097 (S.D.N.Y. Feb. 25, 2019)....................................13, 26

*MBC Fin. Servs. Ltd. v. Bos. Merch. Fin., Ltd.*,
    2016 WL 5946709 (S.D.N.Y. Oct. 4, 2016) ........................................19

*Merced Irrigation Dist. v. Barclays Bank PLC*,
    165 F. Supp. 3d 122 (S.D.N.Y. 2016)..............................................25, 27

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)...........................................................................20

*Ouedraogo v. A-1 Int'l Courier Serv., Inc.*,
    2013 WL 3466810 (S.D.N.Y. July 8, 2013) ........................................13

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
    2013 WL 1830416 (S.D.N.Y. May 1, 2013) .......................................26

*Perez v. MVNBC Corp*,
   2016 WL 6996179 (S.D.N.Y. Nov. 29, 2016) ............................................................7

*In re Platinum & Palladium Antitrust Litig.*,
   61 F.4th 242 (2d Cir. 2023) ............................................................19, 21, 23

*In re Platinum & Palladium Antitrust Litigation*,
   2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ............................................................19

*Prime Int'l Trading, Ltc. v. BP P.L.C.*,
   937 F.3d 94 (2d Cir. 2019) ............................................................22

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   341 F.R.D. 542 (S.D.N.Y. 2022) ............................................................11, 26

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009) ............................................................12

*Sokol Holdings, Inc. v. BMD Munai, Inc.*,
   2009 WL 2524611 (S.D.N.Y. Aug. 14, 2009) ............................................................12

*Square D Co. v. Schneider S.A.*,
   760 F. Supp. 362 (S.D.N.Y. 1991) ............................................................29

*State Tchrs. Ret. Bd. v. Fluor Corp.*,
   654 F.2d 843 (2d Cir. 1981) ............................................................11, 13

*In re Term Commodities Cotton Futures Litig.*,
   2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ............................................................21

*In re Tether and Bitfinex Asset Litig.*,
   576 F. Supp. 3d 55 (S.D.N.Y. 2021) ............................................................19, 22, 26, 27, 30

*United States v. Miranda*,
   780 F.3d 1185 (5th Cir. 2015) ............................................................20

*United States Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
   875 F. Supp. 2d 223 (S.D.N.Y. 2012) ............................................................14, 15, 17

*United States v. Apple*,
   791 F.3d 290 (2d Cir. 2015) ............................................................28

*United States v. Fowler*,
   No. S3 19-CR-254 (ALC) (S.D.N.Y. June 14, 2023) ............................................................11

**Statutes**

Fed. R. Civ. P. 8(a)(2) ............................................................27

Fed. R. Civ. P. 9(b) ..................................................................................................................19

Fed. R. Civ. P. 12(b)(6) ...........................................................................................................13

Fed. R. Civ. P. 15 ..............................................................................................................3, 13

Fed. R. Civ. P. 16 ...........................................................................................................3, 7, 10

Fed. R. Civ. P. 30(b)(6) ..............................................................................................................5

**Other Authorities**

5C CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE § 1388 (4th ed.
   2009) ......................................................................................................................................20

## PRELIMINARY STATEMENT

Simply put: Defendants did it. Tether announced that USDT was backed one-to-one by U.S. dollars but issued hundreds of millions of USDT without receiving dollars in exchange. Tether instead issued USDT for receivables from Bitfinex, which, as Defendants controlled both entities, were just promises to pay themselves, but Bitfinex has no records of having those dollars, net of customer funds, at the time. Defendants also swapped some of Tether's accessible dollar reserves for inaccessible accounts at Crypto Capital seized by foreign governments, which were decidedly not available to redeem USDT. Defendants thus debased USDT. Knowing that the Anonymous Trader had set up a "bot" on Bitfinex that automatically withdrew USDT there and traded it for cryptocommodities on other exchanges, Defendants decided to affirmatively provide the bot with debased USDT. The bot's trades, they knew, would artificially inflate cryptocommodity prices, as a price premium on Bitfinex would pull those prices up. Defendants' lending activity and commingling of U.S. dollar and USDT on Bitfinex facilitated this premium and let them inject USDT into the crypto economy, without receiving actual dollars in exchange. Defendants profited from this scheme, while members of the putative class overpaid for cryptocommodities.

The Court should grant Plaintiffs leave to amend their pleadings to reflect these facts.

*First*, Plaintiffs have been diligent. Defendants withheld trading records, withheld key communications with the Anonymous Trader, and gave vague and contradictory answers about Tether's reserves well into 2023. It was not until depositions in September and October 2023 that Plaintiffs learned that Defendants lacked records of funds backing the Tether receivables, the extent of the credit lines that Bitfinex extended to its customers, and the extent of collusion between Defendants and the Trader. Contrary to Defendants' assertions, Plaintiffs could not have reasonably deposed the Trader without first receiving documents related to ███ and could not have amended earlier by blindly relying on CFTC and NYAG Orders that contain statements that

Defendants contradicted in this litigation. Sections I.A & B, *infra*.

*Second*, the proposed amendment would not prejudice Defendants. The Second Amended Complaint ("SAC") refines the theory of the First Amended Complaint ("CAC"): Defendants secretly debased USDT, it was traded in the ██████████████, and those trades inflated cryptocommodity prices. The SAC simply fills in details based on discovery, providing the when and how of debasement, showing ████████████████████████████████ ██████, and explaining how the trades sent false demand signals that inflated prices. Defendants cannot credibly argue surprise: Plaintiffs said starting in 2020 that they were investigating Defendants' relationship with the Trader, and they pursued records of Tether's purported reserves from the start of the litigation. Section I.C, *infra*.

*Third*, Plaintiffs state viable claims under the Commodities Exchange Act ("CEA"). Defendants dispute that they artificially inflated cryptocommodity prices on the basis that the Anonymous Trader purportedly paid Bitfinex a dollar for each USDT that it gave █ bot, but Plaintiffs allege that the Trader ***did not*** pay actual dollars for USDT—█ deposited no dollars with Bitfinex during the Class Period. Bitfinex rather credited ██ account with dollars, fueled by sales on credit and margin, which Defendants allowed █ bot to withdraw as USDT without receiving actual dollars in exchange. Section II.A.1, *infra*. While the bot made the trades, Defendants need be only "one cause of the alleged artificial pricing," which they were by giving the bot debased USDT and by facilitating a price premium for cryptocommodities on Bitfinex. Section II.A.2, *infra*. Defendants do not dispute most allegations of their scienter, asserting only that Plaintiffs plead a "generalized motive," which is contradicted by the SAC's detailed allegations. *See* Section II.A.3, *infra*. Defendants also lob in a new extraterritoriality defense, but they waived it by not including it in their prior motion to dismiss, and it is meritless in any event. Section II.A.4, *infra*.

*Finally*, Plaintiffs also state viable antitrust claims. Defendants dispute Plaintiffs' antitrust standing by asserting that the Trader paid a dollar for each USDT token, which, as discussed, is inaccurate. They also say that they were not a direct cause of the bot's trades, but the law only requires "some direct relation between the injury asserted and the injurious conduct alleged," easily established by Defendants giving debased USDT to the Trader's bot for automatic trading. Section II.B.1. For Plaintiffs' Sherman Act Section 2 claims, Defendants ask the Court to ignore inferences of their intent to acquire monopoly power, Section II.B.2, and of a conspiracy to provide that power to Defendants, which the Court should not do on the pleadings, Section II.B.3. For Plaintiffs' Section 1 claims, Defendants similarly ask the Court to ignore reasonable inferences of multiple "plus factors" showing a conspiracy between them and the Trader, which is also inappropriate. Defendants insist that a chat in which they explicitly asked the Trader to push the price of bitcoin "above 10k again" and ▮ replied "[s]ure no problem, just issue me some [USDT]," was a joke, not direct evidence of a conspiracy, but this "smiley face" defense is for a jury. Section II.B.4.

## ARGUMENT

### I. Good Cause Exists to Grant Plaintiffs' Leave to Amend

The Court should grant Plaintiffs leave to amend. Under Rule 15, the Court "should freely give leave when justice so requires" unless the proposed amendment would prejudice the non-movant or be futile. *Ideavillage Prod. Corp. v. Copper Compression Brands LLC*, 2021 WL 5013799, at *2 (S.D.N.Y. Oct. 27, 2021) (Failla, J.) (citing Fed. R. Civ. P. 15(a)(2)). Under Rule 16, the Court may allow late amendments for "good cause," which a plaintiff shows if, "despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Id.* (citing Fed. R. Civ. P. 16(b)(4)). Under Rule 16, the Court may also consider "whether allowing the amendment of the pleading at this stage of the litigation will prejudice non-movants." *Id.* (internal citations omitted). Plaintiffs easily satisfy these tests.

A. **Plaintiffs Diligently Pursued and Uncovered Key Facts Underlying Their Amended Claims That Defendants Withheld Until Late in Discovery**

Plaintiffs uncovered critical facts alleged in the SAC well after the December 2021 amendment deadline, specifically that (1) Bitfinex's finances strongly indicate that it did not hold sufficient funds to back receivables (tracked by Bitfinex as payables) that Tether counted as part of its USDT reserves because Bitfinex has no records of funds used to back the receivables and it extended massive loans to its customers; and (2) Defendants colluded with the Anonymous Trader for ██ bot to trade debased USDT for cryptocommodities. Defendants did not reveal key evidence on both points until depositions that concluded in mid-October 2023.[1]

1. **Plaintiffs Learned in October 2023 That Bitfinex Lacked Sufficient Funds to Pay Tether for USDT Issued for Receivables**

a. **Defendants Have No Records of Funds Backing Tether Receivables from Bitfinex for USDT**

Plaintiffs asked Defendants for records of Tether's USDT reserves in their first discovery requests. *See* ECF No. 225-1 at 27-29 (RFP Nos. 31 & 32). Since Defendants refused to provide them, Plaintiffs moved to compel. ECF No. 239. In September 2022, the Court ordered Defendants to produce documents showing the reserves, calling them "necessary . . . to assess the backing of USDT with US dollars." ECF No. 247. Defendants produced records from over a hundred bank accounts, but did not say which held Tether's reserves, *see* ECF No. 274-3 (Pls.' Jan. 17, 2023 Ltr. to Defs.) at 2, later admitting that most did not. *See* Ex. ECF No. 307-9 at 1.

In March 2023, Plaintiffs served an interrogatory with the Court's leave, asking Defendants to identify all accounts holding Tether reserves. *See* ECF No. 313. Defendants provided an

---

[1] Although Defendants assert in their Opposition ("Opp.") at 23 that only some SAC paragraphs expressly cite deposition testimony, many other paragraphs are based on it. *See, e.g.*, SAC ¶¶ 211, 226, 272, 313, 330.

incomplete list that included Bitfinex's account at Noble Bank, as holding reserves "for Tether" from June 9, 2017 to September 15, 2017. *See* ECF No. 396-14 (Defs.' First Resps. and Objs. to Pls.' Interrogs. Nos. 13-15) at 7; Ex. 1 (Defs.' May 15, 2023 Ltr.) at 3. Defendants also cited documents identifying Bitfinex accounts that "held amounts sufficient to satisfy and were used to pay the receivables that Bitfinex owed Tether," but Defendants failed to identify any Bitfinex accounts holding funds for those receivables **when issued**. ECF No. 396-14 at 7. Bitfinex's ability to pay the receivables that Defendants effectively issued to themselves in exchange for newly issued USDT is highly probative of Defendants' debasement of USDT. SAC ¶¶ 123-24, 127-38. Plaintiffs pushed for complete responses. ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. Defendants still failed to identify Bitfinex accounts with sufficient dollars, net customer funds, to back the Tether receivables. *Id.*

Plaintiffs sought to ask about these Bitfinex accounts in a Rule 30(b)(6) topic, but Defendants objected, claiming such discovery was better suited to "a written response." ECF No. 431 at 2. Plaintiffs *again* moved to compel, and, on September 7, 2023, the Court ordered Defendants to either provide the information or explain why Bitfinex accounts did not hold Tether reserves. ECF No. 445. On September 26, 2023, Defendants responded that Tether's reserves included "receivables that Bitfinex owed to Tether," but—contrary to their prior representations—now stated that "no Bitfinex account ever held USDT reserves[.]" Ex. 3 (Defs.' Sept. 26 Ltr.) at 3. Defendants still refused to identify the relevant Bitfinex accounts. *Id.*

Around the same time, Defendants' corporate representative and now CEO of Tether, Paolo Ardoino, testified that the receivables were backed by Bitfinex's "balance sheet," indicating

Defendants had records of funds backing the receivables that they had withheld. *See* Ex. 4 (Bitfinex 30(b)(6) Vol. 1 Tr.) at 48:8-49:9. Plaintiffs moved to compel for a third time, and the Court ordered Defendants to (1) produce additional information on receivables for USDT reserves; and (2) supplement their interrogatory responses to reflect any additional accounts or assets backing the receivables, not including customer assets. ECF No. 460.

On October 5, 2023, Tether and Bitfinex's CFO, Giancarlo Devasini, admitted in his deposition that Bitfinex has no historical financial records of its total assets and liabilities, including customer funds, Ex. 5 (Devasini Tr.) at 26:22-25; 118:10-119:4; 209:16-24, and that he threw away the only written records soon after this litigation began, *id.* at 41:24-42:7; 52:23-53:17. Devasini further admitted that every Bitfinex account was commingled between company and customer funds, and no single account was dedicated to Tether receivables—therefore, Bitfinex has no records showing that it had funds sufficient to cover the receivables when issued. *Id.* at 209:16-24. In October, Defendants' former Chief Strategy Officer, Phil Potter, similarly testified that Bitfinex's "poorly designed" financial records "lacked the precision and the ability to historically pull figures out []at any point in time," which is why he had told Devasini on June 14, 2017 that he had trouble "figur[ing] out how much money [Bitfinex had]." Ex. 6 (Potter Tr.) at 382:20-385:6.

On October 13, 2023, Defendants finally admitted in writing that "[b]ased on the deposition testimony, ***any attempt in this litigation to retroactively link specific accounts or assets to specific payables would … be impossible as a practical matter***." *See* Ex. 7 (Defs.' Oct. 13 Ltr.) at 3 (emphasis added). Plaintiffs promptly moved to amend 11 days later, on October 24, 2023.

Defendants assert that Plaintiffs knew about the Tether receivables all along because the NYAG and CFTC Orders discussed them. Opp. 20. Not so. Neither Order said that Bitfinex lacked records showing that it had sufficient dollars to cover them. Not only that, while Defendants told

the NYAG and CFTC that Tether's reserves included Bitfinex's Noble account in 2017, *see* Opp. Ex. C ¶ 21; Opp. Ex. D at 5, in this case, Bitfinex's and Tether's General Counsel, Stuart Hoegner, testified that those statements were ***false***, saying now that only Tether, not Bitfinex, held USDT reserves. Ex. 8 (Bitfinex 30(b)(6) Vol. 2 Tr.) at 133:15-134:17, 171:6-20. Hoegner further testified that Bitfinex's "Noble account" held customer funds of a few institutional players pursuant to special agreements, not Tether's reserves. *Id.* at 143:16-144:7, 162:10-17. Plaintiffs could not have brought their current claims based on NYAG and CFTC Orders that Defendants now dispute.

Defendants pretend that their lack of records of financial backing for nearly $400 million in receivables for USDT does not support the proposition "that Bitfinex had insufficient funds" for them. Opp. 19, 22. Of course it does. It is compelling circumstantial evidence that Bitfinex lacked the funds necessary to cover the receivables when issued (else it would have tracked that money and put it aside or simply paid Tether), further showing that USDT was debased. Defendants knew that they lacked these records but failed to say so—for years—despite multiple discovery requests and court orders. Plaintiffs' prompt amendment after learning this information in the face of Defendants' obstruction easily meets Rule 16's diligence requirement. *Perez v. MVNBC Corp*, 2016 WL 6996179 at *4 (S.D.N.Y. Nov. 29, 2016) (finding diligence under Rule 16 and granting leave to amend where "[d]efendants did not respond substantively to Plaintiffs' discovery requests" for a prolonged period).[2]

_____

[2] Defendants assert that Plaintiffs' pursuit of Defendants' trading records is irrelevant because the SAC "does not mention any purchase of cryptocommodities by the B/T Defendants." Opp. 19. In fact, the SAC alleges that Defendants traded cryptocommodities on credit lines in their own accounts, SAC ¶¶ 313, 317, contributing to the premium on the Bitfinex exchange, and that Defendants' trades benefitted from the inflation of cryptocommodity prices, *id.* ¶¶ 387-88. Plaintiffs diligently pursued Defendants' full trading records in discovery, ECF No. 239, and successfully moved to compel their production multiple times, ECF Nos. 247, 347, 370, but Defendants did not complete production until September 2023, *see* Ex. 11 (Defs.' Sept. 7, 2023 Production Ltr.).

### b.    Bitfinex Extended Massive Loans to Its Customers

Plaintiffs asked for Bitfinex's financial records starting in their initial requests, which the Court compelled Defendants to produce in September 2022. *See* ECF No. 225-1 at 25-26; ECF No. 240-1 at 5 (revised requests); ECF No. 247. Defendants waited until April 2023 to produce four lists of accounts to which Bitfinex apparently extended credit lines. On September 13, 2023, Ardoino testified that the lists were incomplete. *See* Ex. 9 (Ardoino Tr.) at 226:11-237:18 & Ex. 10 (Ardoino Ex. 57) (listing nearly 300 accounts). When Plaintiffs promptly moved to compel, Defendants represented to the Court that they had produced all available information of credit lines that Bitfinex extended to the Anonymous Trader and had no "preexisting records of assets backing credit lines." ECF Nos. 456, 459 at 3. On October 5, 2023, Devasini testified that Bitfinex does not have complete records of the credit lines that it extended, Ex. 5 at 118:10-119:4, but admitted that Bitfinex maintained standing credit lines for its own account and routinely extended credit lines to its biggest customers, amounting at times to around $100 million. *Id.* at 26:22-25, 129:10-13, 209:16-24. This massive lending is relevant to Plaintiffs' amendment because (1) it allowed Bitfinex's customers to buy more cryptocommodities on its exchange than they otherwise would have, facilitating a price premium there; (2) it allowed Bitfinex customers to receive dollars on credit (either directly or from sales of crypto assets made on credit), which they could withdraw from Bitfinex as USDT, thus receiving USDT without providing actual dollars in exchange; and (3) it suggests Bitfinex loaned out funds purportedly held to back the Tether receivables and so did not fully back them. *See* SAC ¶¶ 197-205, 308-21.

Defendants assert that the CFTC Order said that Bitfinex let customers trade with borrowed funds, Opp. 11, but neither it nor the NYAG Order revealed that Bitfinex extended credit to itself or the estimated size of Bitfinex's loans. Defendants also contradicted CFTC findings in this case. The CFTC Order said that Bitfinex funded some margin trading itself, although the "majority" was

funded by customers on a peer-to-peer basis. Opp. Ex. E at 3. But Defendants told the Court that all margin trading on Bitfinex was peer-to-peer and "not a loan by Bitfinex," ECF No. 459, and on that basis refused to produce records of margin positions that they inherited, *see* ECF No. 328-19 at 3. Potter ultimately admitted that Bitfinex traded those inherited margin positions, which at one point were underwater by tens of millions of dollars and "maybe a lot more," Ex. 6 at 319:21-321:21, 335:14-25, a critical fact that the CFTC Order did not contain. *See* SAC ¶¶ 387-88.

### B. Plaintiffs' Learned Key Facts Showing Defendants' Collusion With The Trader In 2023, Including in Depositions in Fall 2023

Even had Plaintiffs known earlier the full truth about the Tether receivables (they did not), they could not have sought to amend without also learning of Defendants' collusion with the Anonymous Trader. After the Trader provided ███████████████████████████████, Plaintiffs actively investigated the Trader's relationship with Defendants. They sought related trading records in their first discovery requests, *see* ECF No. 225-1 at 25 (RFP No. 28), which Defendants did not produce until October 2022. Plaintiffs also sought the Trader's communications with Defendants, but Defendants withheld two of the most important chats until late in discovery, producing the "market manipulation" chat at the end of March 2023, Opp. at 22; Ex. 12 (Anon. Trader Ex. 6), and chats showing Devasini ███████████████████████████, Ex. 13 (Anon. Trader Ex. 3). After getting most documents, Plaintiffs actively sought the Trader's deposition, a process that required several months of negotiation, ████████████████, and ultimately a Court order allotting time among the parties. ECF Nos. ███ ███ ███ 414, 418.

Far from simply confirming ████████████, *contra* Opp. 20, 22, the Anonymous Trader actually testified in ██████████████████████████████████████████████



███████████████████████████████████████████████.[3]  In Devasini's

October 2023 deposition, Plaintiffs then learned that Defendants knew the Trader used a bot that

operated automatically, moving large amounts of USDT between exchanges, and that relied on

Bitfinex commingling U.S. dollar and USDT in customers' account balances. *See, e.g.*, Ex. 5 at

304:9-305:19, 306:20-314:14. These facts indicate that Defendants and the Trader knowingly con-

spired to inflate cryptocommodity prices and, at a minimum, that Defendants were a proximate

cause of the bot's trades. SAC ¶¶ 428-36.

      Contrary to Defendants' assertions, Opp. 20, Plaintiffs could not have reasonably deposed

the Trader without first receiving ███ documents. Even then, because Defendants refused to explain

the meanings of various notations in the Trader's records, ECF No. 396-7, Plaintiffs did not learn

those meanings until Ardoino's deposition in September 2023. *See* Ex. 9 at 242:20-251:22. His

testimony helped confirm that, despite receiving ████████ USDT from Bitfinex, the Trader

never deposited any U.S dollars with Bitfinex between March 30, 2017 and September 9, 2018.

SAC ¶ 279. Combined with Tether issuing debased USDT, Bitfinex's lending activity, and Bit-

finex allowing customers to withdraw U.S. dollar balances as USDT, this shows that Defendants

were pushing USDT into the market without receiving dollars in exchange. Plaintiffs moved to

amend their complaint within six weeks of the Trader's deposition, easily showing the diligence

required by Rule 16. *See Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010)

(granting motions for leave to amend brought within two months of acquiring new information);

---

[3] *See* ████████: 

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████

*Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 551 (S.D.N.Y. 2022) (same for motion brought within five months, "[g]iven the complexity of Plaintiffs' allegations").

### C.    Amendment Will Not Prejudice Defendants

Defendants come nowhere near showing prejudice. Contrary to Defendants' assertions, Opp. 24-25, the CAC and SAC plead ███████████████ Defendants lied to the market and secretly issued debased USDT, █████████████████████████ for cryptocommodities, inflating prices and injuring Plaintiffs. ████████████████████████████



████████████████████ The SAC does ***not*** allege that USDT "was paid for in full and thus equivalent to a U.S. dollar," *contra* Opp. 24; it alleges the opposite, that the USDT was debased because Tether did not receive dollars in exchange, SAC ¶¶ 180-82, just as in the CAC. CAC ¶¶ 219-58. ██████████████████████████

████████████████████████████████████

████████████████████████████████ The SAC does not plead a different theory of price inflation, *contra* Opp. 24-25, it pleads a narrower version of the prior theory, still focused on Defendants' issuance of debased USDT that sent artificial price signals to the market, the subsequent trading of which inflated cryptocommodity prices, *compare* SAC ¶¶ 13, 195-96, 411, *with* CAC ¶¶ 187, 191, 393. Courts regularly permit such amendments that seek to refine a complaint. *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843,

---

[4] While Defendants say that the SAC abandons Bittrex, Poloniex, or Crypto Capital, Opp. 24, ██ ████████████████████████████ and Defendants' swapping Tether's reserves at Deltec for inaccessible funds at Crypto Capital, *id.* ¶¶ 206-51. Plaintiffs dropped these entities as defendants for prudent reasons: Bittrex is in bankruptcy, ECF No. 349; the prior Poloniex defendant controlled the exchange for only a portion of the class period and so had limited documents, and Crypto Capital's funds were seized by foreign governments while Reginald Fowler, who managed those funds, was sentenced to jail. *See* Tr. of Sentencing Proceeding, *United States v. Fowler*, No. S3 19-CR-254 (ALC) (S.D.N.Y. June 14, 2023), ECF No. 143.

856 (2d Cir. 1981) (finding no prejudice where new or revised allegations were "objects of dis-covery and related closely to the original claim[s]").[5]

Defendants cannot credibly claim surprise. Plaintiffs told Defendants that they were inves-tigating their relationship with the Anonymous Trader on August 12, 2020:

> [Plaintiffs seek to] disprove the Exchange Defendants' conclusory, untested assertion that [the Trader] was not part of Defendants' scheme through evidence linking the individual to the Defendants . . . through discovery such as: (1) the individual's communications with the relevant Defendants; (2) ███████████████ ███████████████; (3) the individual's and the relevant Defend-ants' internal documents regarding that trading activity; (4) expert analysis of that trading activity; and (5) depositions of the individual and Defendants regarding the individual's role in the scheme.

ECF No. 137 at 3; *see also* ECF No. 191 at 2. Plaintiffs did just that. Defendants also knew that Plaintiffs were pursuing records of Tether's reserves, including records of Bitfinex accounts that Defendants at one point asserted were part of those reserves, and—once Defendants changed course and declared that only receivables from Bitfinex were reserves—records of Bitfinex ac-counts showing sufficient net assets to cover them. *See, e.g.*, ECF Nos. 307-7 at 2 n.2 (Pls.' Feb. 22, 2023 Ltr.); 307 at 2 n.1 (Pls.' Feb. 28, 2023 Mot. to Serve Interrogatory Nos. 13-15). Defend-ants thus cannot show prejudice. *See Kreppein v. Celotex Corp.*, 969 F.2d 1424, 1427 (2d Cir. 1992) (finding no prejudice from adding claim where defendants were on notice of underlying facts); *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 102-03 (S.D.N.Y. 2010) (same).

---

[5] Defendants' cited cases are inapposite. Opp. 24. Unlike *Baez v. Delta Airlines, Inc.*, 2013 WL 5272935, at *8 (S.D.N.Y. Sept. 18, 2013), the amendment does not hinge on "topics not explored through discovery." Unlike *Ahmed v. Astoria Bank*, 2015 WL 4394072, at *1-*2 (E.D.N.Y. July 16, 2015), Plaintiffs do not seek to add new parties or causes of action. And unlike *Sokol Holdings, Inc. v. BMD Munai, Inc.*, 2009 WL 2524611, at *9 (S.D.N.Y. Aug. 14, 2009), *aff'd sub nom. Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009), Plaintiffs do not attempt a "fourth 'bite at the apple'" by recasting dismissed claims as new claims based on facts that they do not contend were newly discovered.

In any event, Defendants do not identify any meaningful discovery that they were denied related to the SAC. They say that they would have deposed the Anonymous Trader about the conspiracy. Opp. 25. But Plaintiffs deposed ██████ about it at length. ███████████████ ████████████████████████████████████████████████████████. And Defendants (who examined the Trader after Plaintiffs) opted not to do the same, using less than half of their allotment. ████████████████. Defendants say that they would have asked the named Plaintiffs different questions, but do not say what these would have been, and ████████████ ██████████████. Opp. 25. Defendants also say they would have sought discovery of various exchanges' lending practices, *id.*, but this would be at best marginally relevant, as other exchanges could not issue USDT in exchange for receivables or knowingly loan debased USDT, and so could not similarly create a premium on their exchanges or distort supply and demand.

Defendants also cannot credibly claim prejudice from the timing of Plaintiffs' amendment, as they actively concealed information about the receivables and their relationship with the Anonymous Trader for years. *See State Tchrs*, 654 F.2d at 856 (finding no prejudice based on the time plaintiffs spent to verify information that was "better known to the defendants than to the plaintiffs"). And Defendants' litigation expenditures, Opp. 25, are not a stand-alone basis to deny a motion to amend. *Ideavillage*, 2021 WL 5013799, at * 4 (internal quotations and citations omitted).

## II. Because Plaintiffs State Viable Claims, Amendment is Not Futile

Under Rule 15, it is Defendants' burden to show that Plaintiffs' amended claims would be futile for failure to state a claim under Rule 12(b)(6). *See, e.g.*, *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, 2013 WL 3466810, at *6 (S.D.N.Y. July 8, 2013). Defendants fall well short of showing futility. *See, e.g.*, *Lee v. Kylin Mgmt. LLC*, 2019 WL 917097, at *3 (S.D.N.Y. Feb. 25, 2019) (granting leave to amend under Rule 15 where court rejected defendant's only futility argument).

A.      **Plaintiffs State a Commodities Exchange Act Claim**

Plaintiffs plead both a manipulative device theory and a separate price manipulation theory under the CEA. Opening Brief ("Mot.") 10-15. Defendants do not dispute Plaintiffs' CEA standing, Mot. 9-10, or address all elements of each theory, instead generally criticizing Plaintiffs' price manipulation and causation theories. Opp. 44-45 (citing *id.*); Potter Opp. 3-5. Those criticisms fail.

1.      **Plaintiffs Allege That Defendants Artificially Inflated Cryptocommodity Prices**

Plaintiffs allege that Defendants harmed them by artificially inflating cryptocommodity prices. Under the CEA, "a price may be artificial if it is higher than it would have been absent Defendants' conduct." *United States Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 223, 247 (S.D.N.Y. 2012) (citation omitted). "[D]etermining artificiality involves an analysis of the suspected price in the context of aggregate supply and demand factors." *Id.* (citations omitted). Plaintiffs allege that the trades by the Trader's bot with debased USDT provided by Defendants signaled inflated, artificial demand and so artificially inflated cryptocommodity prices. *See, e.g.*, SAC ¶¶ 311-13, 321. Plaintiffs support their allegations with detailed ██████████████████████████████████████████████████. ██████████████.

Citing nothing, Defendants assert that any trade made with USDT that a trader bought from Bitfinex for a dollar per token cannot be artificial. Opp. 26-27, 28-29. Not so. Plaintiffs allege that, contrary to its public representations, Tether lacked sufficient dollars to back all issued USDT one-to one. SAC ¶¶ 167-257. To the extent that Tether counted Bitfinex's receivables (*i.e.*, an IOU) as part of the reserves, there are no records that Bitfinex set aside sufficient U.S. dollars to cover the amounts owed when the USDT was issued. *Id.* ¶ 201. When a trader used this debased USDT to purchase cryptocommodities, the demand it signaled to the market exceeded the amount of dollars backing the USDT. *Id.* ¶¶ 337-43. This created a "price that does not reflect basic forces of supply

and demand." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 669-72 (S.D.N.Y 2016) (cleaned up) (sustaining CEA price manipulation claim); *see Parnon Energy Inc.*, 875 F. Supp. 2d at 246 (same).

Defendants assert that the Anonymous Trader's bot's purchases with USDT reflected "organic demand" because ▮ purportedly paid Bitfinex a dollar for each USDT token. Opp. 6, 16, 26-28. In fact, Plaintiffs allege that the Trader ***did not*** pay Bitfinex actual dollars for this USDT: ▮ deposited ***no*** dollars to Bitfinex during the Class Period. SAC ¶ 279. Bitfinex extended credit lines to the Trader, *id.* ¶ 332, itself, and its biggest customers, *id.* ¶¶ 313-20.[6] Effectively, Bitfinex let customers buy cryptocommodities on credit from the Trader (and others) without providing actual dollars. *Id.* ¶ 318. Bitfinex would credit the Trader's account with dollars, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ but no one had provided actual dollars for it. *Id.* ¶ 279. When the bot withdrew the USDT to trade on other exchanges, it sent artificial demand signals, inflating cryptocommodity prices. *See, e.g.*, *id.* ¶¶ 13, 195-96, 312, 411. Neither Bitfinex nor Tether thus received actual dollars for the USDT used in these trades; they rather operated like a fractional reserve. They distorted supply by creating and issuing USDT not fully backed by dollars, and they distorted demand by lending and giving the Trader USDT without receiving actual dollars in exchange. The result was artificially increased cryptocommodity prices. *See Parnon Energy Inc.*, 875 F. Supp 2d at 247 (determining artificiality involves analysis of suspected price in the context of aggregate supply and demand factors).

Defendants assert that *Anderson v. Tether Holdings Ltd.*, 2023 WL 5001074, at *2

---

[6] Defendants' argument that Bitfinex allowed credit line trading only on its own exchange is beside the point. Opp. 28 n.9. The Trader's credit line inflated ▮ account balance, allowing ▮ to withdraw more USDT against the assets ▮ deposited than ▮ otherwise could, which was in turn used to purchase cryptocommodities on other exchanges.

(S.D.N.Y. Aug. 4, 2023) rejected the theory that Plaintiffs advance here. Opp. 29. It did not. The *Anderson* court dismissed contract, unjust enrichment, and consumer protection claims brought by USDT purchasers against Tether for misrepresenting the value of USDT; because plaintiffs could have redeemed USDT for a dollar per token at any time, they suffered no injury, 2023 WL 5001074, at *2. Here, cryptocommodity futures and cryptocommodities purchasers bring CEA and antitrust claims, respectively, against both Tether and Bitfinex for artificially inflating cryptocommodity prices. Plaintiffs allege that they overpaid for these assets as a result, SAC ¶ 367, and that Defendants' promise to redeem USDT for a dollar per token (even when it was worth less) was part of their manipulative scheme. *Id.* ¶¶ 339-43. *Anderson* did not consider this theory or causes of action and so is irrelevant.

Defendants also argue that the trades by the Trader's bot could not be artificially inflationary because they were part of the Trader's cross-exchange arbitrage, a practice that has no effect on market prices. Opp. 29-30. While arbitrage might not artificially inflate prices under normal market conditions, Plaintiffs allege that conditions were far from normal: Defendants fed the bot debased USDT, SAC ¶¶ 258-79, and facilitated a persistent, artificial price premium on Bitfinex, *id.* ¶¶ 308-21, constantly injecting debased USDT into the crypto economy. As a result, the bot pulled prices on other exchanges up towards the artificially high price on Bitfinex, artificially raising prices across the market. *Id.* ¶¶ 337-85.[7]

---

[7] In discussing arbitrage, Defendants cite *In re Amaranth Natural Gas Commodities Litigation*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008) to assert that the Trader's bot could not send false market signals because it was based on legitimate economic motives. Opp. 44. In fact, *Amaranth* held that even trading "supported by a legitimate economic rationale" can be manipulative if accompanied by "something more." *Id.* ("something more" was selling large numbers of futures just before close of settlement periods), *aff'd*, 730 F.3d 170 (2d Cir. 2013). Here, the "something more" is Defendants secretly debasing USDT, and facilitating the bot's trades and a price premium on Bitfinex.

### 2.  Plaintiffs Allege That Defendants Caused These Artificial Prices

Plaintiffs allege that Defendants were a proximate cause of the Trader's bot's inflationary trades. Mot. 13. Under the CEA, Defendants need not be the sole cause of the trades, as long as "[Defendants'] action **contributed** to the price movement." *Parnon Energy Inc.*, 875 F. Supp 2d at 248 (emphasis added) (cleaned up); *accord In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 671 (finding CEA causation where plaintiffs alleged defendants' conduct "was at least one cause of the alleged artificial pricing" although only some plaintiffs were "efficient enforcers" of antitrust laws).  Defendants helped cause the bot's inflationary trades by issuing debased USDT, providing a platform for the bot, giving USDT to the bot at the Trader's request, knowing it would automatically trade USDT for cryptocommodities, and facilitating a price premium on Bitfinex that caused those trades to inflate cryptocommodity prices. SAC ¶¶ 15-16, 270-74, 294-336. Because the trades were automatic, Defendants' provision of USDT to the bot was the last act necessary for the trades to occur, and thus a proximate cause. *Id.* ¶¶ 305-07. This comfortably pleads CEA causation. *See, e.g.*, *Parnon Energy Inc.*, 875 F. Supp 2d at 248 (under CEA, plaintiffs pled defendants caused prices increases in crude oil futures market by alleging defendants refrained from selling long positions in tight physical crude oil market, sending market signals that inflated futures prices); *Commodity Exch., Inc.*, 213 F. Supp. 3d at 671 (under CEA, plaintiffs pled defendants caused price increases in gold futures market by alleging they manipulated gold price-setting auctions and that price swings occurred around those auctions).

Plaintiffs plausibly plead that Defendants facilitated the persistent premium on the Bitfinex exchange, which ensured that when Defendants fed debased USDT to the bot, it would use that USDT to buy cryptocommodities on other exchanges, thereby inflating prices. SAC ¶¶ 308-21. Defendants assert that they could not directly inflate bitcoin prices with debased USDT because Bitfinex did not list a USDT trading pair (*i.e.*, no trades on Bitfinex were denoted in USDT) during

the Class Period. Opp. 31. But because Bitfinex commingled and treated dollars and USDT as equivalent on its exchange, Bitfinex customers could buy cryptocommodities with "dollars," deposited as USDT, and the Trader's bot could "arbitrage" between dollar-denominated prices on Bitfinex and USDT-denominated prices on other exchanges. SAC ¶ 285. This falsely signaled that all demand for cryptocommodities on Bitfinex was in dollars, further distorting the markets.

Defendants also assert that they could not facilitate a price premium on Bitfinex's exchange by simply loaning money to its customers, Opp. 31-32, but Plaintiffs allege that they facilitated the premium through the combination of those loans ***plus*** Tether issuing debased USDT ***plus*** Bitfinex commingling USDT and dollars. SAC ¶¶ 308-21. Defendants note that the NYSE and Nasdaq allow margin trading, but those exchanges do not fund margin trading themselves (brokers do), while Bitfinex's own accounts traded on credit and funded customers' margin trading. *Id.* ¶¶ 317, 387. Defendants also assert that customer-funded peer-to-peer margin trading is no more likely to push prices up than down, but the CFTC Order that Defendants cite says that Bitfinex funded margin trading, effectively making loans. Opp. 31-32; *see* Opp. Ex. E at 3 (after force-liquidating customer's position, Bitfinex would "act as the counterparty to that transaction"). Devasini admitted that making large loans to customers would inflate prices on an exchange. SAC ¶ 320. Defendants may contest this at trial, but at the pleadings stage, courts "may not pick and choose among plausible explanations and must assume that Plaintiff's well-pled allegations are true." *Comm. Exch.*, 213 F. Supp. 3d at 670 (denying motion to dismiss CEA claim).

### 3. Plaintiffs Allege Defendants' Scienter

Plaintiffs plead Defendants' scienter for their manipulative device theory by alleging that they facilitated the Anonymous Trader's bot's trades, which they knew would artificially inflate cryptocommodity prices. Mot. 11-12. Defendants do not address these allegations.

Plaintiffs plead Defendants' scienter for their price manipulation theory—that they

specifically intended to cause these artificial prices—by alleging that Defendants had motive and opportunity to commit the fraud and alleging circumstantial evidence of Defendants' conscious misconduct or recklessness. Mot. 13-15. Defendants do not dispute that Plaintiffs have alleged that they had opportunity to commit fraud. *See* Mot. 14. They also do not dispute most of the circumstantial evidence of their misconduct, *see id.*, asserting only that their misrepresentations of Tether's reserves are irrelevant, Opp. 45, but those misrepresentations are quite relevant to facilitating inflationary trades of debased USDT for cryptocommodities. SAC ¶¶ 339-42, 411.

Defendants are left to assert that Plaintiffs allege only a "generalized motive" to make money. Opp. 45. In fact, Plaintiffs also allege a specific motive for Defendants to benefit from their scheme. *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *33 (S.D.N.Y. Mar. 28, 2017), *rev'd in part on other grounds*, 61 F.4th 242 (2d Cir. 2023) ("concrete benefits that could be realized by" manipulation are sufficient). This is not a case like *In re Crude Oil Commodity Litigation*, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) or *Chill v. General. Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996), where plaintiffs alleged nothing but a profit motive that could be attributed to any for-profit entity. Plaintiffs' detailed allegations about Defendants' scheme "easily satisfy the 'relaxed' Rule 9(b) pleading standard" for the CEA. *In re Tether and Bitfinex Asset Litig.*, 576 F. Supp. 3d 55, 110 (S.D.N.Y. 2021).

### 4. Defendants Waived Their Extraterritoriality Defense, Which Would Also Fail on the Merits

Defendants waived their new defense that Plaintiffs' CEA claims are impermissibly extraterritorial. Opp. 42-43.[8] Whether a statute extends extraterritorially goes to the merits, not subject-

---

[8] If the Court believes that additional domestic transactions allegations are required, it could deny the motion regarding the CEA claim without prejudice, allowing Plaintiffs to provide them in a new proposed amended pleading. *E.g., MBC Fin. Servs. Ltd. v. Bos. Merch. Fin., Ltd.*, 2016 WL 5946709, at *12 (S.D.N.Y. Oct. 4, 2016), *aff'd*, 704 F. App'x 14 (2d Cir. 2017).

matter jurisdiction, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010), so an extra-territoriality defense may be waived. *United States v. Miranda*, 780 F.3d 1185, 1189-91 (5th Cir. 2015) (appellants waived extraterritoriality defenses to Maritime Drug Law Enforcement Act). Filing "an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment." *Johnson v. Bryson*, 851 F. Supp. 2d 688, 704-05 (S.D.N.Y. 2012). Defendants' extraterritoriality defense was available when they moved to dismiss the CAC—the same statutes, plaintiffs, and transactions were at is-sue—but they did not raise it, *see* ECF No. 143, and they did not include it in their Answer, ECF No. 183. They thus waived the ability to raise it now. *See Johnson*, 851 F. Supp. 2d at 706 (de-fendant waived improper venue defense to amended complaint based on facts known at time of prior complaint); 5C CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE § 1388, at 491 (4th ed. 2009).[9]

In any event, Plaintiff Pinchas Goldshtein's trades were "domestic transactions," because plaintiffs "allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). "[I]t is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States[.]" *Id.* Such allegations may include "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money[.]" *Id.* at 70. Plaintiffs allege here that Goldshtein entered bitcoin futures contracts from the United States, SAC ¶ 22; *see also* Opp. Ex. I (Goldshtein Tr.) 98: 8-10,

---

[9] Defendants say that they believed that Goldshtein had traded bitcoin futures on the Chicago Mer-cantile Exchange when moving to dismiss the CAC, Opp. 43 n.13, but Plaintiffs' allegations re-garding Goldshtein's trades, and the CME were materially the same in the SAC as in the CAC, *compare* CAC ¶¶ 22, 73 *with* SAC ¶¶ 22, 69.

and hence became bound to sell or buy bitcoin at a given price and time in the United States. *See, e.g.*, *Platinum & Palladium*, 61 F.4th at 267 (allegations that a plaintiff based in California sold precious metals alleged a domestic transaction).[10]

Defendants' misconduct was also not "predominantly foreign;" it involved "both foreign and domestic activity." *Platinum & Palladium*, 61 F.4th at 268. While Defendants assert that the SAC alleges no domestic conduct, Opp. 43-44, Plaintiffs plead that (1) access to the U.S. financial system was essential to Tether's business, SAC ¶ 160; (2) Bitfinex and Tether required customers to have either a U.S. bank account or a bank that maintained a correspondent account with a U.S. bank, *id.* ¶ 161; (3) Defendants' transfers of USDT to Bitfinex's "hot wallet," which fed USDT to the Trader's bot, ███████████████████████████████████████████████████████ ███████████; and (4) Defendants facilitated the bot's trades on █████████████████████ ██████████████████████████. Defendants also sold USDT to individuals located in the

---

[10] This case is not like *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014), where "the mere placement of a buy order in the United States"—one of the four relevant factors under *Absolute Activist*—was insufficient to allege that a purchaser incurred irrevocably liability for the purchase of a foreign security on a foreign exchange. Plaintiffs allege more than a mere buy order of a foreign security. Goldshtein entered into a futures contract in the United States, becoming bound to deliver bitcoin at a predetermined price and time in the United States. *See Commodity Futures Trading Comm'n v. Int'l Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482, 494 (S.D.N.Y. 2004) (an "essential element" of a futures contract is "an obligation to make or take delivery of a commodity in the future"). He placed the order, formed the contract, and passed the title of bitcoin in the United States, which is sufficient under *Absolute Activist*. Defendants also cite *Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022), Opp. 43, which found allegations of buying crypto tokens in the United States to be insufficient. But other courts in this District have disagreed, *e.g.*, *Barron v. Helbiz, Inc.*, 2023 WL 8622204, at *2 (S.D.N.Y. Dec. 13, 2023) (granting class certification where plaintiffs identified purchasers who were physically present in the United States), and Plaintiffs are entitled to all reasonable inferences at the pleadings stage, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009). In any event, unlike plaintiffs in *Binance*, Goldshtein entered into and settled bitcoin ***futures*** contracts, incurring liability to take or deliver bitcoin in the United States. He did not merely tender an offer to buy from the United States, but rather obligated himself to buy or sell bitcoin at a predetermined price at a specified future time. *See Absolute Activist*, 677 F.3d at 68.

United States, and Bitfinex allowed U.S.-based customers to trade on its platform. *See, e.g.*, Opp. Ex. C ¶ 7; Opp. Ex. D at 4. This is more than sufficient.[11]

### B.  Plaintiffs' State Viable Antitrust Claims

#### 1.  Plaintiffs Have Antitrust Standing

Plaintiffs sufficiently plead both elements of antitrust standing: (1) they suffered an antitrust injury; and (2) they are efficient enforcers of the antitrust laws. Mot. 15-20.

On antitrust injury, Defendants' main argument is that Plaintiffs do not plausibly allege price manipulation, Opp. 35 (citing Opp. Section III.A.1.a), but as shown above, they do. Section II.A.1, *supra*. Relevant only to Plaintiffs' Section I claim, Defendants also argue that Plaintiffs do not plausibly allege conspiracy, Opp. 35 (citing Opp. Section III.B.3), but, as also shown below, they do that too. Section II.B.3, *infra*. In short, by alleging losses from transacting in a cryptocommodities market that Defendants manipulated, Plaintiffs plead a "quintessential antitrust injury." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 57 (S.D.N.Y. 2012); *see also Tether*, 576 F. Supp. 3d at 48.

On enforcement, Defendants offer three arguments, none with merit.

*First*, Defendants argue that they were not a direct cause of the Trader's bot's trades, Opp. 36; *see also id.* 33, but Plaintiffs allege causation in detail: ███████████████████████

███████████████████████████████████████████████████████████

███████, SAC ¶¶ 323, 331, and ███████████████████████. *Id.* ¶¶ 301, 303, 323, 331.

---

[11] This case is not like Defendants' authorities, Opp. 43-44, which both involved almost wholly foreign conduct. *See Prime Int'l Trading, Ltc. v. BP P.L.C.*, 937 F.3d 94, 106-07 (2d Cir. 2019) (manipulation of foreign oil crude affected foreign benchmark, disseminated by foreign press, used to price futures contracts on exchanges around the world); *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 97 (2d Cir. 2022) (manipulation by employee of foreign banks via foreign trading desks to fix index tied to foreign market and set by foreign entity, affecting foreign derivatives that could be traded on U.S.-based exchange).

███████████████████████████████████████████████████████████████████. *Id.* ¶¶ 8, 12, 15, 265, 268, 305, 307. Defendants' provision of USDT to the bot was the last action that anyone took to cause the trades. This readily shows "some direct relation between the injury asserted and the injurious conduct alleged," *Platinum & Palladium*, 61 F.4th at 264; *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 61 (S.D.N.Y. 2016) ("Directness in the antitrust context means close in the chain of causation.]").

Defendants assert that the Trader's cross-exchange arbitrage was an "independent decision" that breaks the causal chain, citing *Platinum & Palladium*. Opp. 36. Not so. There, defendants allegedly manipulated a benchmark for precious metals, which automatically set the price of derivatives in those metals and which third parties also incorporated into contracts for trades of the metals themselves. *Platinum & Palladium*, 61 F.4th at 254-55. The court found that the "KPFF" plaintiff, which traded in the physical metals market, lacked antitrust standing because defendants had nothing to do with incorporating the benchmark into KPFF's trading contracts, conducted no trades in that market, and derived no benefit from KPFF's trades. *Id.* at 259-61 (affirming district court). But the "Exchange" plaintiffs, who traded in the derivatives market, had antitrust standing because defendants' benchmark manipulation automatically set artificial prices in that market, from which defendants benefited. *Id.* at 263-66 (reversing district court).

Unlike with the KPFF plaintiffs in *Platinum & Palladium*, Defendants' manipulation targeted the cryptocommodity market and was effectuated by their ability to create USDT, a cryptocurrency specifically designed to purchase cryptocommodities. ████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████, SAC ¶¶ 301, 303, 309, 320-23, 331, 364, 412-13. The Trader's decision to set up the bot came before Defendants began their scheme,

and the bot, being a bot, made no independent decisions. Like with the Exchange plaintiffs in *Platinum & Palladium*, rather, Defendants' conduct directly inflated prices in the cryptocommodities market, Defendants traded there, and they benefited from the manipulation. SAC ¶¶ 6, 13, 196, 292, 413, 434, 442.[12]

*Second*, Defendants do not identify "more direct victims" of their manipulation of the cryptocommodity markets than Plaintiffs. They argue that USDT purchasers are more direct victims of their debasement of USDT, Opp. 37, but Plaintiffs do not bring antitrust claims for USDT holders; they rather allege that USDT debasement was part of a scheme to manipulate cryptocommodity prices. Whether USDT purchasers had standing in *Anderson* for different claims based solely on USDT debasement is irrelevant to Plaintiffs' standing here.

*Third*, while Defendants assert that Plaintiffs' injury is speculative, Opp. 37, it is straightforward: Defendants caused Plaintiffs to overpay for cryptocommodities. *See Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 61 ("there is nothing particularly speculative" about alleging antitrust injury from paying higher prices). While Defendants say that Plaintiffs' damages are speculative, their criticisms go only to the complexity of proving damages, a subject for trial, and they do not dispute that there is no risk of duplicative recovery. Opp. 37; *see* Mot. 19-20.[13]

---

[12] Plaintiffs do not argue that the issuer of a crypto token is always the proximate cause of all trades in that token, or that a crypto exchange is always the proximate cause of all trades on that exchange; Plaintiffs rather argue that, under the unique circumstances here, Defendants were a direct cause of the bot's trades.

[13] Citing *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 779 (2d Cir. 2016), ████████████████████████████████████████████████████████████████ It does not. Under *Gelboim*, the question is whether damages are disproportionate to **wrongdoing**, 823 F.3d at 779, and Defendants do not argue that damages here—calculated based on inflation from the but-for price absent manipulation—would be disproportionate to their scheme's effect on cryptocommodity prices.

### 2.    Plaintiffs State a Section 2 Monopolization Claim

Plaintiffs state a monopolization claim under Section 2 of the Sherman Act by alleging that (1) Defendants had monopoly power in the cryptocommodities market through their ability to control prices there; and (2) Defendants willfully acquired that power. Mot. 20-22.

On monopoly power, Defendants repeat that Plaintiffs do not plausibly allege artificial inflation. Opp. 38. In fact, they do. *See* Section II.A.1, *supra*. By alleging that Defendants caused trades with debased USDT that sent artificial demand signals to the cryptocommodity market, inflating prices, SAC ¶¶ 13, 312, 342, 411, Plaintiffs plead an "ability to distort ordinary forces of supply and demand" there and thus state a Section 2 claim. *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 143 (S.D.N.Y. 2016); *see In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *24-*25 (S.D.N.Y. Dec. 20, 2013), *reconsidered in part*, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014); *Crude Oil*, 913 F. Supp. 2d at 51-52.

On willful acquisition of monopoly power, Defendants pretend that Plaintiffs have only pled that Tether had receivables in its reserves and Bitfinex let customers withdraw USDT. Opp. 38-39. In fact, Plaintiffs allege that Defendants secretly debased USDT and knowingly injected debased USDT into the crypto economy to make purchases, knowing those trades would inflate cryptocommodity prices to their benefit. Mot. 22. From this, one can readily infer Defendants' intent to control those prices. Defendants assert that promising to redeem USDT for a dollar was "the core principle underlying USDT as a stablecoin," but that does not make it economically rational to keep doing so when they knew Tether was not receiving dollars in return for the USDT it was issuing, and that it lacked sufficient dollars to redeem the USDT previously issued. Defendants' fraudulent statements regarding their reserves are rather consistent with concealing USDT's debasement to perpetuate a scheme to inflate cryptocommodity prices. *See* Mot. 22.

### 3.    Plaintiffs State a Section 2 Conspiracy Claim

Plaintiffs state a claim for conspiracy to monopolize. Mot 25 n.2. Although the Court dismissed a prior version, Plaintiffs may replead it now based on facts learned in discovery. *See, e.g.,* *Sjunde AP-Fonden*, 341 F.R.D. at 551 (granting leave to replead previously-dismissed claim as plaintiffs "could not have successfully filed their proposed amendment before … fact discovery") (internal citations omitted); *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1830416, at *4 (S.D.N.Y. May 1, 2013) (granting leave to replead previously-dismissed claim at "the end of discovery").

Defendants do not contest that Plaintiffs adequately plead a specific intent to monopolize. They rather assert that Plaintiffs plead a "shared monopoly theory," Opp. 39, but Plaintiffs in fact allege that ***Defendants*** intended to acquire monopoly power and the Anonymous Trader intended to "facilitate[e] and confer[] monopoly power on ***Defendants***[.]" SAC ¶ 432 (emphasis added), not to share that power. *Cf. Tether*, 576 F. Supp. 3d at 100 (finding complaint "appears to plead a shared monopoly theory" that "does not specify which entity Defendants conspired to confer monopoly power upon"). While Defendants insist that Plaintiffs assert a shared monopoly theory in substance, Plaintiffs actually allege that Defendants asked the Trader to keep trading in order to financially benefit them, *see* SAC ¶¶ 6, 13-14, 273-74, 335.[14]

### 4.    Plaintiffs State Section 1 Claims

Plaintiffs state a claim under Section 1 of the Sherman Act that Defendants and the Anonymous Trader conspired to manipulate the cryptocommodities market, Mot. 22-25, which is *per*

---

[14] Defendants ask the Court to disregard this claim because Plaintiffs discuss it in their one substantive footnote. Opp. 39. Defendants provide no good reason for this, and notably do not ask the Court to ignore their own 13 footnotes. In any event, ignoring the footnote would not dispose of the claim, which Defendants have the burden of showing is futile. *Lee*, 2019 WL 917097, at *3.

*se* unreasonable. *Merced*, 165 F. Supp. 3d at 138. Plaintiffs need "only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." *Tether,* 576 F. Supp. 3d at 102 (internal citations omitted).[15]

Plaintiffs allege direct evidence of a conspiracy, including a chat in which Devasini asked the Anonymous Trader to push the price of bitcoin "above 10k again" and the Trader replies, "[s]ure no problem, just issue me some [USDT]," SAC ¶ 335. Defendants insist that this was a joke because the chat included "lol" and a smiley face, Opp. 32-33, but those characters are consistent with Devasini and the Trader reveling in the success of their conspiracy—as when Devasini used a smiley face to urge the Trader to "keep arbing with Polo[niex]" for Defendants' financial benefit. *See* SAC ¶ 274. Defendants' arguments for a contrary interpretation are for trial.

Plaintiffs allege additional evidence of the conspiracy, most of which Defendants do not address. Opp. 23-24.[16] Defendants assert that Tether did not issue USDT directly to the Trader,

---

[15] Defendants say that Plaintiffs' Section 1 conspiracy claim between Defendants and the Trader is "un-pleaded" because the SAC does not include a separate count for it—although they do not ask for dismissal on that basis. Opp. 40. In any event, while Plaintiffs acknowledge the lack of a separate count, Rule 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief … [that gives] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Defendants cannot dispute that the SAC plainly asserts this claim, SAC ¶ 401(h) ("Whether ***Defendants and the Anonymous Trader conspired to manipulate cryptocommodity prices in violation of Sections 1 and 3 of the Sherman Act***, 15 U.S.C. §§ 1, 3) (emphasis added); *see also id.* ¶¶ 17, 325-336, 430-435 (alleging Defendants' conspiracy with the Trader). Defendants also do not dispute that the SAC put them on fair notice of the claim; Plaintiffs motion for leave (filed the same day) explained the claim in detail, Mot. 22-24, and Defendants respond to it, Opp. 40-42. There is thus no basis to dismiss it. *See Tether*, 576 F. Supp. 3d 55, 106 n.38 (declining to dismiss CEA claims against various defendants because they were not included in the *ad damnum* clauses for those counts, as plaintiffs advanced extensive factual allegations against them and defendant moved to dismiss the claims, showing they had fair notice of them).

[16] Defendants ignore that (1) they debased USDT, SAC ¶ 439; (2) they and the Trader knew the bot would withdraw USDT from Bitfinex to trade cryptocommodities on other exchanges, *id.* ¶ 309; (3) ███████████████████████████████████████████, *id.* ¶¶ 294-307; and (4) they and the Trader knew the trades would inflate cryptocommodity prices, *id.* ¶¶ 335, 364.

Opp. 33, but Plaintiffs allege that Defendants had Tether issue USDT to Bitfinex, ████████ ███████████████████████, SAC ¶¶ 10, 301, 304-06. Defendants also assert that the Trader's knowledge of Bitfinex's banking difficulties does not indicate a conspiracy because they publicly disclosed Tether's inability to receive incoming wires in April 2017, Opp. 33, but that knowledge combined with the Trader's knowledge that Tether continued to issue USDT at ███ request without banking access indicates that ███ knew the USDT was debased, and thus a conspiracy.[17]

Plaintiffs also allege plus factors from which one can infer a conspiracy. Mot. 23-24. Defendants note that courts often apply these factors to conspiracies among competitors, but they cite nothing to suggest that the Court should not apply them here, Opp. 41; *see also id.* 33-34, and it makes sense to do so, as conspiracies (horizontal, vertical, or otherwise) that violate Section 1 are almost always proved through "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, LLC v. Am. Media Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (cleaned up); *United States v. Apple*, 791 F.3d 290, 315 (2d Cir. 2015). Defendants' criticisms of the plus factors here, Opp. 41, fall flat:

- They do not dispute that Devasini acted against his unilateral self-interest by ████████ ████████████████████. SAC ¶ 330.

- They say that everyone who held cryptocommodities wanted their value to go up, but, even if true, Defendants and the Trader still had a common intent and motive to increase prices.

- They say that Plaintiffs do not allege facts showing this common intent, but Plaintiffs allege that Defendants and the Trader had a common motive to conspire to inflate cryptocommodity prices, SAC ¶ 434, and a common understanding of how USDT functioned, SAC ¶¶ 273-74, allowing them to fix those prices, SAC ¶¶ 335, 444.

- They say it would be "nonsensical" for Tether not to redeem UDST at a hundred cents on the dollar, but doing so would be economically irrational if they knew that USDT was

---

[17] Defendants say that extending credit lines to the Trader was not against Bitfinex's self-interest, Opp. 41, but Plaintiffs do not say it was, as it facilitated trading with USDT that Defendants knew was debased. Mot. 23-24.

actually worth less than that. SAC ¶¶ 248-49, 343, 422.

- They say that the Trader's ███████████████████████████████████████████████████████████████████████████████████████████████████, but it shows that USDT was not fully backed by dollars in Tether's reserves, ███████████████████████████████████████████████

- They say that the "high level of interfirm communications" factor does not apply, but the Court can consider ███████████████████████████████████████████████████████████████████ SAC ¶¶ 322-36.

While Defendants again argue that the bot's trades did not artificially inflate cryptocommodity prices, Opp. 41-42, as discussed, they did, *see* Section II.A.1, *supra*.

Defendants' main response to Plaintiffs' alternative Section 1 claim, premised on a conspiracy between Tether and Bitfinex, SAC ¶ 439, is that Plaintiffs said elsewhere that the two companies were not separate decisionmakers. Opp. 42. But Plaintiffs bring this claim in the alternative, only if Defendants prevail on their argument—made elsewhere in this litigation, *e.g.*, ECF No. 307-6 at 2-3 (claiming Bitfinex's operation to be unrelated to Plaintiffs' claims), and advanced by their officers in depositions, *e.g.*, Ex. 16 (Van der Velde Tr.) at 94:7-10[18]—that the companies actually were independent. *See*, *e.g.*, *Square D Co. v. Schneider S.A.*, 760 F. Supp. 362, 368 (S.D.N.Y. 1991) (denying motion to dismiss Section 1 claim where plaintiff alleged antitrust defendant's subsidiaries and agents were acting as one entity under defendant's control and alleged, in the alternative, the various defendants were discrete entities, as "alternative pleading is permitted in the federal courts").

Defendants also assert that this alternative claim fails for "the same reasons" as Plaintiffs' primary Section 1 claim involving the Trader, Opp. 42, but this claim is based on separate allegations that (1) Tether issued USDT to Bitfinex for only a promise to pay, violating its promise to

---

[18] At other times, including in their opposition, Defendants have asserted that the two companies were not independent. *E.g.*, Opp. 6 ("Tether and Bitfinex were under common management").

the market, SAC ¶¶ 124-25, 182; (2) Bitfinex knew of but concealed the debasement, *id.* ¶¶ 5, 185, 411, 414; (3) Bitfinex redeemed USDT for a dollar when it knew that USDT was worth less, *id.* ¶¶ 248-49, 343, 422; and (4) Tether swapped accessible dollars of its USDT reserves at Deltec for Bitfinex's inaccessible dollars at Crypto Capital when Bitfinex faced a liquidity crisis, *id.* ¶¶ 243-44, 250. As Defendants do not explain why these allegations fail to state a claim, they do not meet their burden of showing that the claim would be futile.

## III. Plaintiffs State Viable Claims Against Potter

The Court should reject Defendant Philip Potter's arguments against granting leave. His arguments against good cause, Potter Opp. 1-3, are the same as other Defendants', and fail for the same reasons. *See* Section I, *supra*. In asserting that Plaintiffs fail to plead a CEA claim against him, Potter repeats arguments that the Court previously rejected. *Id.* 3-5; *see also Tether*, 576 F. Supp. 3d at 114. Plaintiffs have "establish[ed] the requisite conduct and intent" because, as in the CAC, they allege in the SAC "Potter's leadership role at Tether, Bitfinex, and DigFinex," SAC ¶¶ 24, 38, 118-20, 150-51, his knowledge of Tether and Bitfinex's banking difficulties in relation to their use of Noble and Crypto Capital, *id.* ¶¶ 177-84, 212, 215-16, and his "willing involvement in covering up" the lack of backing of USDT issued by Tether to Bitfinex for receivables, *id.* ¶ 198. Potter's intent to participate in the manipulative scheme is further evidenced by his trading of cryptocommodities through Bitfinex-controlled accounts for profit during the Class Period. *Id.* ¶¶ 387-88. Plaintiffs' antitrust claims, *see* Potter Opp. 5, n.3, are also sufficiently specific. *See Tether*, 576 F. Supp. 3d at 105, 114 (applying the same reasoning to antitrust and CEA claims). Potter does not meet his burden of showing amendment would be futile.

## CONCLUSION

For the reasons stated, the Court should grant Plaintiffs' motion for leave to amend.

Dated:    New York, NY
          January 12, 2024

/s/ Andrew R. Dunlap                        /s/ Todd M. Schneider
Philippe Z. Selendy                         Todd M. Schneider (*pro hac vice*)
Andrew R. Dunlap                            Matthew S. Weiler (*pro hac vice*)
Oscar Shine                                 SCHNEIDER WALLACE COTTRELL
Laura M. King                                KONECKY LLP
SELENDY GAY ELSBERG PLLC                    2000 Powell Street, Suite 1400
1290 Sixth Avenue                           Emeryville, CA 94608
New York, NY 10104                          tschneider@schneiderwallace.com
pselendy@selendygay.com                     mweiler@schneiderwallace.com
adunlap@selendygay.com
oshine@selendygay.com
lking@selendygay.com

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*

31