**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | Case No. 19 Civ. 9236 (KPF) <br><br> **JURY TRIAL DEMANDED** |

## <u>SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

I.      INTRODUCTION ........................................................................................................4

II.     PARTIES ..................................................................................................................10

    A.  PLAINTIFFS...........................................................................................................10
    B.  DEFENDANTS.........................................................................................................12
        1.  DigFinex ........................................................................................................12
        2.  The Bitfinex Defendants.................................................................................13
        3.  The Tether Defendants ...................................................................................13
        4.  The Individual Defendants .............................................................................14

III.    JURISDICTION AND VENUE ..............................................................................15

IV.     FACTUAL ALLEGATIONS ..................................................................................16

    A.  CRYPTO-ASSETS AND THE CRYPTOCOMMODITY MARKET ........................ 16
        1.  Bitcoin: The First Crypto-Asset.....................................................................16
        2.  The Diversification of Crypto-Assets .............................................................19
        3.  The Cryptocommodity Market .........................................................................21
        4.  How Crypto-Assets Are Transferred and Exchanged ................................... 30
    B.  DEFENDANTS MANIPULATE CRYPTOCOMMODITY PRICES............................... 32
        1.  Defendants Operate Bitfinex, a Crypto-Exchange ........................................ 32
        2.  Defendants Create Tether—and USDT—To Support Bitfinex ............................. 34
    C.  DEFENDANTS DEBASED USDT ............................................................................ 41
        1.  2017: Tether Issues USDT to Bitfinex in Exchange for IOUs ......................... 45
        2.  2018-19: Tether Issues More USDT to Bitfinex In Exchange For IOUs and Loans Bitfinex its U.S. Dollar Reserves ............................................................................................... 54
        3.  Investigations By The New York Attorney General and the U.S. Commodity Futures Trading Commission Confirm USDT Was Debased ...................................................... 62
    D.  THE ANONYMOUS TRADER'S BOT TRADED VAST AMOUNTS OF DEBASED USDT FOR CRYPTOCOMMODITIES................................................................................................ 64
        1.  The Anonymous Trader Developed an Automated Trading Bot............................ 65
        2.  B/T Defendants Knew About the Anonymous Trader's Cross-Exchange Arbitrage Bot Well Before the Class Period Began........................................................................................... 66
        3.  The Anonymous Trader's Bot Traded Vast Amounts of Debased USDT For Cryptocommodities................................................................................................................ 68
        4.  Due To A Persistent Price Premium On Bitfinex, The Anonymous Trader's Trades Resulted In More Sales of Bitcoin On Bitfinex and More Purchases of Bitcoin on Other Exchanges ........ 69
    E.  DEFENDANTS FACILITATED THE ANONYMOUS TRADER'S TRADING ................. 74
        1.  Defendants Gave the Anonymous Trader Vast Quantities of USDT..................... 74
        2.  Defendants Were Aware of and Facilitated the Bitfinex Price Premium ............ 77
        3.  Defendants Helped the Anonymous Trader's Bot Trade Large Volumes ........... 80
    F.  DEBASED USDT TRADED FOR CRYPTOCOMMODITIES ARTIFICIALLY INFLATED CRYPTOCOMMODITY PRICES—AND DEFENDANTS KNEW IT.................................................... 83
        1.  Debased USDT funded Massive Crypto-Asset Purchases on Bittrex and Poloniex ............. 85

    G.  DEFENDANTS PROFITED FROM THEIR SCHEME .......................................... 105

V.      CLASS ALLEGATIONS.......................................................................................107

CAUSES OF ACTION ......................................................................................................110

FIRST CAUSE OF ACTION ..........................................................................................110

**SECOND CAUSE OF ACTION** ............................................................................................113

**THIRD CAUSE OF ACTION**................................................................................................115

**COSTS, INTEREST, AND ATTORNEYS' FEES** .............................................................118

**JURY TRIAL**...........................................................................................................................118

Matthew Script, Benjamin Leibowitz, Jason Leibowitz, and Pinchas Goldshtein (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Philip G. Potter, Giancarlo Devasini, Ludovicus Jan van der Velde (together, "Defendants"), and allege as follows:

## I.     Introduction

1.      From March 31, 2017 to February 25, 2019 (the "Class Period"), Defendants fraudulently inflated the price of cryptocommodities, a class of crypto-assets that includes bitcoin, by billions of dollars.

2.      Through their Tether entities, Defendants issued USDT, a crypto-asset known as a "stablecoin" because it supposedly maintained a stable value of one U.S. dollar for each USDT. Defendants told the public that USDT was backed one-for-one by U.S. dollars that Tether held in its reserves in its bank account, and that holders could exchange their USDT for those dollars anytime they wished.

3.      This was not true. During the Class Period, Tether often held fewer U.S. dollars in its bank accounts than the number of USDT that it had issued. In reality, Tether often issued USDT with no U.S. dollars backing—in exchange for an IOU from Defendants' crypto-exchange Bitfinex. Because the same principals controlled Bitfinex and Tether, Tether could simply transfer newly issued USDT into an account on Bitfinex without receiving U.S. dollars in exchange, as would have been required for any other customer. These IOUs, which Tether accounted for as "receivables," were not U.S. dollars; they were promises to pay, meaning there were not enough dollars in reserve to back each issued USDT, creating a redeemability risk that USDT was not supposed to have.

4.      Bitfinex also did not have sufficient U.S. dollars, net of customer funds, to cover these "receivables," compounding this risk. Bitfinex commingled all its U.S. dollars in "omnibus" accounts, which included Bitfinex's customer deposits, its operating funds, and dollars received from individuals purchasing USDT. This commingling of its U.S. dollars increased the risk that Bitfinex would not have sufficient U.S dollars to send to Tether in the event that Tether received a large number of USDT redemption requests, especially if those redemption requests occurred at when Bitfinex's customers were withdrawing U.S. dollars from their trading accounts on Bitfinex. Tether's internal records show that, on multiple occasions during the Class Period, its shareholder equity—its total assets minus all issued USDT—was negative. Instead of being fully backed by U.S. dollars, USDT was repeatedly debased. The more USDT that Tether issued to Bitfinex, the more debased each USDT became.

5.      Defendants concealed this debasement. Believing that USDT was backed one-for-one by U.S. dollars, the market interpreted purchases of cryptocommodities made with USDT as reflecting genuine demand of the equivalent number of U.S. dollars for cryptocommodities. Had the market known that USDT was debased, it would have understood the purchase of cryptocom-modities as reflecting lower demand, resulting in lower cryptocommodity prices. By concealing USDT's debasement and manipulating the supply of USDT, Defendants ensured that any purchase of cryptocommodities made with USDT would artificially inflate the prices of those assets.

6.      Defendants engaged in a sophisticated scheme to artificially inflate the price of cryptocommodities by pushing USDT into the market that was not fully backed by U.S. dollars, creating the illusion of increased demand for cryptocommodities, facilitating trading of crypto-commodities on credit and loaned funds, and thus driving up cryptocommodity prices. Defendants benefited from this scheme in several ways, not least by preserving the larger cryptocommodity

economy on which their business models depended, and by artificially preserving the value of their cryptocommodity holdings.

7.      In the normal course, customers who purchased USDT from either Tether or Bitfinex did so by exchanging one U.S. dollar for one USDT. If a customer did not provide a dollar, then, according to Tether's representations, Tether or Bitfinex did not provide a USDT. But because the same people controlled Tether and Bitfinex, Tether could and did send newly issued USDT to Bitfinex addresses that Tether and Bitfinex controlled for nothing. The market believed those new USDT were paid for with, and were fully backed by, U.S. dollars.

8.      Defendants used the Bitfinex exchange to push debased USDT into the market. During the Class Period, Defendants provided ███████ USDT to an individual who used proprietary, automated arbitrage-trading software (a "bot")—the Anonymous Trader. Defendants provided ██████ USDT to █ bot, sending most of this amount (██████ USDT between March 31, 2017 and December 31, 2017) during a period of extraordinary increase in the price of bitcoin and other cryptocommodities. Accounting for the USDT that the bot sent back to Bitfinex, it received ██████ USDT during this period, over ███ of all newly issued USDT on a net basis. The bot engaged in cross-exchange arbitrage using USDT. When exchanges listed different prices for the same crypto-asset, it bought the asset on the lower-priced exchange and simultaneously sold it on the higher-priced exchange. The bot was automatic: Once it detected an arbitrage opportunity, it ordered the trades without any further human involvement.

9.      During the Class Period, bitcoin persistently traded at a higher price on Bitfinex than it did on other crypto-asset exchanges. The Anonymous Trader's bot thus sold more bitcoin on Bitfinex and bought more bitcoin with USDT on other exchanges. During the Class Period, Bitfinex treated USDT deposited to accounts on its exchange as U.S. dollars and allowed

customers to withdraw U.S. dollars from their accounts as USDT. The bot sold ███████ more worth of bitcoin on Bitfinex than buying on Bitfinex and selling elsewhere. Since the bot used USDT in these transactions, the net direction of its trades—i.e., the net sales of bitcoin on Bitfinex and the net purchases of bitcoin on other exchanges, predominantly Poloniex and Bittrex, with USDT—had the effect of pumping debased USDT out of Bitfinex and into the broader crypto-asset market.

10.     Defendants used debased USDT to facilitate the bot's arbitrage. They provided the bot with debased USDT, activating it to buy bitcoin and other cryptocommodities with USDT on other exchanges. Defendants kept Bitfinex's "hot wallet," from which customers withdrew assets, stocked with USDT. When the USDT in the hot wallet ran low, as it often did, Defendants either transferred USDT from Bitfinex's "cold wallet" or had Tether issue new USDT to Bitfinex's hot wallet. These processes were not automatic; they required affirmative approvals by Defendants. Defendants provided the Anonymous Trader's account (as well as the accounts of other Bitfinex customers, Bitfinex's proprietary trading accounts, and the accounts of Defendants' principals) with credit lines and access to margin trading, funded at least in part by USDT recorded as "assets" in Bitfinex's commingled "omnibus" accounts.

11.     By issuing debased USDT, as well as by providing credit lines and margin trading on Bitfinex backed in part by debased USDT commingled with its other assets, Defendants facilitated a price premium for bitcoin on Bitfinex versus other crypto-asset exchanges like Poloniex and Bittrex. That price premium, in turn, predictably triggered the bot to consistently sell bitcoin on Bitfinex during the Class Period. Defendants allowed Bitfinex customers to trade on margin with collateral as low as 15%, encouraging them to conduct more trades than they otherwise would have. Defendants also extended credit to their biggest customers, further encouraging additional

trades. By essentially acting as a fractional-reserve bank, Bitfinex increased liquidity on its exchange, encouraging more trades there, increasing demand for bitcoin, thus increasing bitcoin prices. Defendants also failed to maintain sufficient assets to back the credit they extended, creating *false* demand by allowing customers to trade with assets that did not exist. This further increased bitcoin prices on Bitfinex.

12.     Defendants also helped the Anonymous Trader trade large volumes. They gave the Anonymous Trader ████████████████████████████████████████████ ████, allowing the Anonymous Trader to trade faster. Defendants ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. Defendants ████████████████████████████████████████████████████████████ ██████████████████████. And Defendants extended the Anonymous Trader a credit line, for free, allowing ██ bot to trade more assets than reflected in ██ Bitfinex accounts.

13.     The Anonymous Trader's bot's trades inflated bitcoin prices during the Class Period. By trading debased USDT for bitcoin and other crypto assets on other exchanges, the bot sent an artificial signal about the level of demand for bitcoin, inflating bitcoin prices on those exchanges. Because the market believed USDT was fully backed by U.S. dollars, it perceived these purchases as investment of the equivalent of fiat currency in those cryptocommodities, reflecting genuine customer demand at those prices. This perceived increase in demand for cryptocommodities, and the resulting increase in prices, naturally attracted more purchases from other investors and further raised cryptocommodity prices. This benefitted Defendants by rapidly expanding the volume of trades on their exchange, inflating cryptocommodity prices, and pushing more USDT

out to other exchanges, encouraging its use as the crypto economy's dominant U.S. dollar-pegged stablecoin.

14.     Defendants knew, contributed to, and benefitted from this scheme.

15.     Defendants were a direct cause of the Anonymous Trader's trades of USDT for bitcoin. They controlled the supply of USDT. If they had not regularly supplied debased USDT to Bitfinex's hot wallet, the Anonymous Trader's bot could not have withdrawn it and traded with it. When Defendants did supply USDT to Bitfinex's hot wallet, the bot's trades were inevitable—the bot would automatically withdraw the USDT and use it to trade for bitcoin on other exchanges, inflating the prices of those assets. Defendants also facilitated the creation of the Bitfinex price premium, which enabled the bot to buy more bitcoin with USDT on other exchanges, thereby exporting USDT from Bitfinex, and selling more bitcoin on Bitfinex.

16.     Akin to pushing a victim in front of a moving train for which they had laid the track and provided the engine's fuel, Defendants are responsible for the cryptocommodity price inflation caused by their issuance of debased USDT and the trades made with that debased USDT through the bot developed by the Anonymous Trader.

17.     While this scheme would be sufficient to hold Defendants liable if they acted independently, evidence produced in discovery indicates that the Anonymous Trader was aware that Defendants had issued debased USDT—and thus conspired with them to inflate cryptocommodity prices. Among other things, when the Chief Financial Officer of both Tether and Bitfinex asked the Anonymous Trader: "can you please push the [bitcoin] price above 10k again?", ▮ replied, "Sure no problem, just issue me some [USDT.]"

18.     Plaintiffs seek to redress Defendants' misconduct during the Class Period on behalf of the class of cryptocommodities purchasers described below under the Commodities Exchange Act ("CEA") and the Sherman Act.

## II.   Parties

### A.   Plaintiffs

19.     Matthew Script is a citizen of Buffalo, New York. During the Class Period, he purchased cryptocommodities, the prices of which had been artificially inflated by Defendants' market manipulation, and as a result suffered economic losses and actual damages. For example, Matthew Script made the following purchases:

       a.     On October 24, 2017, he purchased 0.08362939 Bitcoin for $500.00.

       b.     On October 24, 2017, he purchased 0.47647755 ether for $150.00.

       c.     On November 29, 2017, he purchased 0.06356349 Bitcoin for $750.00.

       d.     On November 30, 2017, he purchased 0.01013354 Bitcoin for $100.00.

       e.     On December 10, 2017, he purchased 0.01713119 Bitcoin for $250.00.

       f.     On December 18, 2017, he purchased 0.05150696 Bitcoin for $1,000.00.

       g.     On January 6, 2018, he purchased 0.02986745 Bitcoin for $520.00.

20.     Jason Leibowitz is a citizen of New York, New York. During the Class Period, he purchased cryptocommodities, the prices of which had been artificially inflated by Defendants' market manipulation, and as a result suffered economic losses and actual damages. For example, Jason Leibowitz made the following purchases:

       a.     On October 18, 2017, he purchased 2.8968181 Bitcoin for 50 Bitcoin cash.

       b.     On November 5, 2017, he purchased 16.48699964 ether for $5,000.00.

       c.     On November 17, 2017, he purchased 20 Bitcoin cash for 2.50114287 Bitcoin.

     d.     On November 26, 2017, he purchased 100 ether classic for 0.22638997 Bitcoin.

     e.     On November 26, 2017, he purchased 10 Zcash for 0.35988776 Bitcoin.

     f.     On November 26, 2017, he purchased 8.86152055 monero for 0.15337342 Bitcoin.

     g.     On December 12, 2017, he purchased 154.7619048 ether for $91,000.

     h.     On January 17, 2018, he purchased 0.53495903 dash for 0.03797655 Bitcoin.

21.     Benjamin Leibowitz is a citizen of New York, New York. During the Class Period, he purchased cryptocommodities, the prices of which had been artificially inflated by Defendants' market manipulation, and as a result suffered economic losses and actual damages. For example, Benjamin Leibowitz made the following purchases:

     a.     On August 10, 2017, he purchased 5 ether for $1,537.82.

     b.     On August 10, 2017, he purchased 5 litecoin for $242.40.

     c.     On January 8, 2018, he purchased 1.03187263 Bitcoin for $15,000.

     d.     On January 16, 2018, he purchased 5 ether for $5,879.64.

     e.     On January 16, 2018, he purchased 25 litecoin for $5,320.44.

22.     Pinchas Goldshtein is a citizen of Miami, Florida. During the Class Period, he purchased cryptocommodities and cryptocommodity futures, the prices of which had been artificially inflated by Defendants' market manipulation and as a result suffered economic losses and actual damages. For example, Pinchas Goldshtein made the following purchases and executed the following bitcoin futures positions:

     a.     On November 21, 2017, he purchased 0.58956003 Bitcoin for $5,000.

     b.     On November 26, 2017, he purchased 0.27038791 Bitcoin for $2,500.

     c.     On November 28, 2018, he purchased 0.63950893 Bitcoin for $6,500.

     d.     On December 7, 2017, he purchased 0.35 Bitcoin for $5,569.08.

e.      On January 16, 2018, he initiated a short position by selling 5,000 Bitcoin futures contracts with a notional value of $50,000.

f.      On February 2, 2018, he initiated a long position by purchasing 1,910 Bitcoin futures contracts with a notional value of $19,100.

g.      On February 6, 2018, he initiated a long position by purchasing 1,000 Bitcoin futures contracts with a notional value of $10,000.

### B.      Defendants

#### 1.      DigFinex

23.      DigFinex Inc. ("DigFinex") is incorporated in, and is a citizen of, the British Virgin Islands.[1] DigFinex operates as the ultimate parent company of the Bitfinex Defendants (defined below) and, together with Giancarlo Devasini and Ludovicus Jan van der Velde, controls the Tether Defendants (defined below). It is the majority owner of iFinex, Inc. and owns roughly 20% of Tether Holdings Limited.

24.      The shareholders of DigFinex are Ludovicus Jan van der Velde, Giancarlo Devasini, Paolo Ardoino ("Ardoino"),[2] Philip Potter, Stuart Hoegner ("Hoegner"),[3] and Perpetual Action Group (Asia) Inc.[4]

---

[1] Brian M. Whitehurst Affirmation ¶ 89, ECF No. 1, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. Apr. 25, 2019) ("Whitehurst Aff."); Ex. K, ECF No. 16, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. Apr. 25, 2019) ("DigFinex and iFinex Register of Directors").

[2] Ardoino is the Chief Technology Officer of both Bitfinex, *see Bitfinex Leadership – Paolo Ardoino, Chief Technology Officer*, bitfinex.com (Mar. 12, 2018), https://perma.cc/3ERS-AM6N, and Tether.

[3] Hoegner is the General Counsel of both Bitfinex, *see Bitfinex Leadership – Stuart Hoegner, General Counsel*, bitfinex.com (Mar. 12, 2018), https://perma.cc/W8UA-PRF4, and Tether.

[4] ECF No. 9, *iFinex Inc. v. Wells Fargo & Co.*, No. 3:17-CV-01882 (N.D. Cal. Apr. 5, 2017) at 1 ("Certificate of Interested Entities").

### 2. The Bitfinex Defendants

25.     iFinex Inc., BFXNA Inc., and BFXWW Inc. (collectively, "Bitfinex") together operate an online platform called "Bitfinex" for exchanging and trading crypto-assets.[5]

26.     iFinex Inc. is incorporated in, and is a citizen of, the British Virgin Islands.[6] iFinex Inc. owns and operates the online crypto-exchange called "Bitfinex" accessible at bitfinex.com.[7] It is also the holding company that wholly owns Defendants BFXNA Inc. and BFXWW Inc.[8]

27.     BFXNA Inc. is incorporated in, and is a citizen of, the British Virgin Islands.[9]

28.     BFXWW Inc. is incorporated in, and is a citizen of, the British Virgin Islands.[10]

### 3. The Tether Defendants

29.     Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited (collectively, "Tether") are the central authority over, and issuer of, USDT.

30.     Tether Holdings Limited is incorporated in, and is a citizen of, the British Virgin Islands.[11] It is the holding company of Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.[12]

---

[5] Whitehurst Aff. ¶ 10.

[6] Whitehurst Aff. ¶ 7; DigFinex and iFinex Register of Directors.

[7] *Terms of Service*, bitfinex.com § 14.5 (July 12, 2019) ("The Site and Services are owned by iFinex."), https://perma.cc/4U5J-3MKY.

[8] Whitehurst Aff. ¶ 8; Stuart Hoegner Affirmation ¶ 3, ECF No. 24, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. April 30, 2019) ("Hoegner Aff.").

[9] Hoegner Aff. ¶ 3.

[10] *Id.*

[11] Whitehurst Aff. ¶ 13; Hoegner Aff. ¶ 5.

[12] *Id.*

31.     Tether Operations Limited is incorporated in, and is a citizen of, the British Virgin Islands. Tether Operations Limited owns the Tether platform.

32.     Tether International Limited is incorporated in, and is a citizen of, the British Virgin Islands.[13]

33.     Tether Limited is incorporated in, and is a citizen of, Hong Kong.[14]

### 4.     The Individual Defendants

34.     Ludovicus Jan van der Velde ("Velde")[15] is the Chief Executive Officer of iFinex Inc., BFXNA Inc., BFXWW Inc., and Tether Limited.[16] He has held this position since early 2013.[17] Velde is one of two directors of DigFinex, iFinex Inc., and Tether Limited. Velde is also a shareholder of DigFinex and Tether Holdings Limited, and is the former CEO of DigFinex shareholder Perpetual Action Group (Asia).[18] Velde is a citizen of the Netherlands.[19]

35.     Giancarlo Devasini ("Devasini") was involved in creating Bitfinex. He is the Chief Financial Officer of Bitfinex and Tether.[20] Devasini is a director of DigFinex, iFinex Inc., and

---

[13] *Tether International Limited*, LEI-LOOKUP.COM, (Oct. 5, 2019) https://perma.cc/JUR6-DHZE.

[14] *Tether Limited*, HONG KONG REGISTRY, (Oct, 5, 2019) https://perma.cc/RDU3-9E7D. Tether Limited also has a lapsed Legal Entity Identifier (LEI) that incorrectly identifies a *different* address in Taiwan as its registered address. *See Tether Limited*, LEI-LOOKUP.COM, https://perma.cc/FLT7-B8L7.

[15] Velde sometimes use the aliases JL, Jan Ludovicus, and Jean-Louis.

[16] *Bitfinex Leadership – Jean-Louis van der Velde, Chief Executive Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/3XVL-DNQC.

[17] *Id.*

[18] Certificate of Interested Entities at 1; J.L. van der Velde, LINKEDIN, (June 3, 2020), https://perma.cc/5FQW-N3GQ (identifying Velde as former CEO of Perpetual Action Group (Asia)).

[19] DigFinex and iFinex Register of Directors.

[20] *Bitfinex Leadership – Giancarlo Devasini, Chief Financial Officer*, BITFINEX.COM (Mar. 12, 2018), https://perma.cc/4B32-XAWZ. Devasini was also the president of Smart Property Solutions SA, the Swiss company behind Tether's Euro-backed stablecoin EURT. *See Terms of Service*,

Tether Limited. He is also a shareholder of Tether Holdings Limited and DigFinex.[21] Devasini is a citizen of Italy.[22]

36.      In the early days of Bitfinex and Tether, Devasini posted under the username "ur-whatuknow" on the Bitcointalk.org forum.[23]

37.      Collectively DigFinex, Devasini, and Velde own approximately 70% of Tether Holdings Limited.

38.      Philip G. Potter ("Potter" and, with Velde and Devasini, the "Individual Defendants") was the Chief Strategy Officer of the Bitfinex and Tether enterprises until June 2018.[24] He also was or is a director of Tether Holdings Limited and a shareholder in DigFinex.[25] Potter is a citizen of New York.[26]

### III.    Jurisdiction and Venue

39.      This Court has original subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1964(c).

---

tether.ch, https://perma.cc/E5FH-PZ6H (last updated Sept. 10, 2017); *Commercial Register*, SWISS OFFICIAL GAZETTE OF COMMERCE (May 16, 2017), https://perma.cc/7LG6-QAWX.

[21] Certificate of Interested Entities.

[22] DigFinex and iFinex Register of Directors.

[23] *See, e.g.*, urwhatuknow, *Re: [Beta]Bitfinex.com First Bitcoin P2P Lending Platform for Leverage Trading*, BITCOINTALK.ORG (April 22, 2013, 11:17 PM, 11:20 PM, 11:28 PM,11:30 PM), https://perma.cc/RTL5-GSNS. Bitcointalk.org is an internet forum dedicated to the discussion of Bitcoin and other crypto-assets.

[24] Anna Irrera, *Bitfinex Chief Strategy Officer Departs*, REUTERS (June 22, 2018), https://perma.cc/A4Z2-HDYF.

[25] *Tether Holdings Limited*, Offshore Leaks Database, (Oct. 6, 2019) https://perma.cc/UDT7-ACVW; Certificate of Interested Entities.

[26] Brian M. Whitehurst Aff. Ex. N, at 2, ECF No. 95, *James v. iFinex Inc.*, No. 450545/2019 (Sup. Ct. N.Y. Cty. July 8, 2019) (Feb. 2018 Bank Account Application).

40.     Venue lies in this District under 15 U.S.C. § 22, 7 U.S.C. § 25(c), 18 U.S.C. § 1965, and 28 U.S.C. § 1391, because one or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

41.     This Court has personal jurisdiction over each Defendant pursuant to N.Y. C.P.L.R. 301 and 302(a)(1)-(3), 18 U.S.C. § 1965(a)-(b), and Federal Rule of Civil Procedure 4(k). Each Defendant transacted business, maintained substantial contacts, and/or they or their coconspirators committed overt acts in furtherance of their illegal conspiracy in the United States, including in this District. Bitfinex and Tether have submitted to jurisdiction in multiple states, including New York. Defendants' scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

42.     The Court also has quasi in-rem jurisdiction over Defendants by virtue of U.S. dollar accounts in New York.

## IV.     Factual Allegations

### A.     Crypto-assets and the Cryptocommodity Market

#### 1.     Bitcoin: The First Crypto-Asset

43.     This case concerns crypto-assets.[27] Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer.

---

[27] The commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies." In order to avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto-assets" to describe the full range of digital assets.

44.     Bitcoin[28] was the world's first major crypto-asset. While the potential of a fully digital asset had previously been recognized in theory, bitcoin's novel architecture provided three key traits that enabled it to succeed: It is a secure medium of exchange, it has a controlled supply, and it is decentralized.

45.     *Secure Medium of Exchange*: Bitcoin works effectively because it can be securely transferred to exactly one person at a time. Most digital assets, like all digital files, can be easily duplicated, potentially allowing transfer of a single asset to multiple people. The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

46.     Bitcoin solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every bitcoin in existence. Each bitcoin user has a digital "address" used to receive bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of bitcoin associated with that address. By looking at the blockchain, anyone can see every bitcoin transaction in which that address has engaged.

47.     By providing a full transaction history of each bitcoin, the blockchain allows for the secure exchange of all bitcoin. Any attempt to duplicate a bitcoin or to transfer it to multiple people at once would be futile, because a bitcoin user could use the blockchain to verify each transaction involving that bitcoin. There is thus no effective way to counterfeit bitcoin.

48.     *Controlled Supply*: Bitcoin maintains its blockchain and provides for new bitcoin to enter the economy through a consensus mechanism known as "mining." Individuals "mine" bitcoin by having sophisticated computer programs perform complex, resource-intensive

---

[28] The term "Bitcoin" can refer to a computer protocol or a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

automated verifications of past transactions, which are then added to the blockchain. Those who mine bitcoin—"miners"—are rewarded with new bitcoin.

49.     The mining process creates a scarcity that underlies the value of bitcoin. Bitcoin is designed so it gets harder and harder to mine. The more bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new bitcoin. This process ensures that the supply of bitcoin will not rise sharply or unpredictably, thus preventing a flood of new bitcoin that could undercut the value of the preexisting bitcoin. Likewise, the number of bitcoin that miners receive as a reward is halved roughly every four years. This will continue until all bitcoin have been mined, at which point miners will receive fees paid solely by network users.

50.     Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver. While the supply of bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and bitcoin is not devalued. This ensures market participants that their bitcoin will not diminish in value due to sudden inflation.[29]

51.     *Decentralized*: Bitcoin's architecture ensures that it is entirely decentralized. The Bitcoin protocol was first released on October 31, 2008 through a white paper authored under the pseudonym Satoshi Nakamoto. That paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."[30]

---

[29] Subsequent to the invention of Bitcoin, other crypto-assets have adopted approaches other than mining for ensuring a controlled supply. In particular, some crypto-assets now use a consensus mechanism called "Proof of Stake," which provides new currency to those who own the most of that currency instead of those who expend significant electrical resources mining. This consensus mechanism shares with Bitcoin mining, however, the core feature that there is no way for additional digital coins to be released to the market outside of a predetermined protocol that ensures scarcity.

[30] Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, DECENTRALIZED BUS. REV. 1, 8 (2008).

While the first 50 bitcoin were mined into existence by Satoshi three months after the release of the white paper, it has since attracted a community of many competing miners who work to ensure the decentralization of the network.

52.     Accordingly, there is no 'Bitcoin Inc.' that administers or manages Bitcoin as a whole. If Bitcoin were run on centralized servers, the underlying value of bitcoin would rely on the trust that individuals had in those operating the centralized servers. If Bitcoin's creator could issue more bitcoin at a whim, the value of bitcoin would reflect that uncertainty. But because Bitcoin's cryptographic protocols are self-sustaining and cannot be affected by the originator, the success of Bitcoin does not hinge on any single entity.

53.     This decentralization distinguishes bitcoin from other assets. The value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation. The value of government bonds is tied to the credit of the government that issues them. The value of a currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank. None of this is true for bitcoin.

### 2.     The Diversification of Crypto-Assets

54.     Since the creation of Bitcoin, the number and types of distinct crypto-assets have grown dramatically. In April 2013, there were only seven crypto-assets listed on coinmart-ketcap.com, a popular website that tracks the crypto-asset markets. As of this filing, that site monitors more than 2,000 crypto-assets.

55.     The creators of different crypto-assets have decided, in many instances, to deviate from core features of bitcoin, creating crypto-assets that work in numerous different ways and serve numerous different purposes and markets.

56.     Some crypto-assets are not intended to be used as a secure medium of exchange. Basic attention token ("BAT"), for example, is a crypto-asset architecture designed to provide a

transparent solution for the digital advertising market. Released by the creators of the Brave web browser, BAT can be used to obtain a variety of advertising and attention-based services, as it is exchanged between publishers, advertisers, and users. The token's utility is therefore derived from the attention of internet users. When used in conjunction with the Brave web browser, BAT creates a transparent and efficient block-chain based digital advertising market: publishers receive more revenue for displaying advertisements on their websites because middlemen fees are reduced, advertisers achieve better targeting and higher returns on their advertisement budgets, and users have greater control of how their data is used for targeted advertising.

57.     Other crypto-assets are distributed through issuances akin to those of traditional corporate securities and do not have a controlled supply. The crypto-asset XRP, for example, was not mined but instead was created and sold to customers by an entity called Ripple. Similarly, several crypto-assets known as ERC-20 tokens have been issued in Initial Coin Offerings ("ICOs"). In these ICOs, digital tokens are created and sold to the public, deriving their value from the promises of the issuers. The issuers of an ERC-20 token known as TaTaTu, for example, promised to use the money raised through an ICO to create a video streaming platform, on which TaTaTu tokens could be used to pay for membership. Similarly, Sirin Labs created an ERC-20 token, SRN, that it sold with the promise of using that revenue to create a secure phone using blockchain technology.

58.     Some crypto-assets are not decentralized. ERC-20 tokens, for example, do not have an independent blockchain unique to that digital asset. Other crypto-assets can be used on only one platform. BinanceCoin, for example, is usable exclusively on the crypto-exchange Binance; hence its value depends on the continued vitality of that platform.

59.     These are only some of the many varieties of crypto-assets that have arisen since the creation of Bitcoin. Deviations from the Bitcoin model have led to different markets for different crypto-assets suited for different uses by different types of customers.

### 3.     The Cryptocommodity Market

60.     Some crypto-assets reproduce Bitcoin's defining central architecture—they provide a secure medium of exchange for general purposes, have a controlled supply that cannot be unilaterally increased, and are decentralized. These crypto-assets are called "cryptocommodities." Cryptocommodities, which include bitcoin, make up a distinct market, which has grown substantially and, as of this filing, has a total market capitalization of over $800 billion.

61.     Demand for cryptocommodities is driven by the desire for a cryptographically secure and pseudonymous means of exchange in digital transactions for a wide variety of assets, independent of the control of any government, which can also be held by customers as a long-term, independent store of value. Demand is also driven by the speed with which cryptocommodities can be used to execute and settle transactions—especially those conducted on international digital platforms—and their ability to be used in "microtransactions" that may be too costly if performed with fiat currency or through other electronic means, such as credit cards.

62.     Examples of the cryptocommodities at issue here are bitcoin, bitcoin cash, ethereum, ethereum classic, litecoin, monero, dash, and ZCash.

63.     The different cryptocommodities within this market, such as bitcoin and ether,[31] are reasonable substitutes for each other. They (a) are suitable for satisfying the demand for products that allow for quick and secure transactions; (b) can serve as long-term stores of value not

---

[31] Just as "bitcoin" refers to one unit of exchange in the "Bitcoin" system, so too does "ether" refer to one unit of exchange in the "Ethereum" system.

controlled by a government or a private entity; and (c) are efficient for both large and small transaction volumes.

64.     Fiat currency and gold (or other precious metals) are not substitutes for cryptocommodities. They do not provide a cryptographically secure, anonymous means of exchange. Their use in digital transactions, and particularly cross-border transactions, is generally accompanied by fees and other transaction costs that are considerably higher than those for cryptocommodities. They are not practical for digital "microtransactions" due to limits on their divisibility and the transaction costs involved. And fiat currencies are not independent of government influence or control.

65.     Other crypto-assets that are not a secure medium of exchange, not controlled in supply, or not decentralized are likewise not substitutes for cryptocommodities. Crypto-assets designed for use within a closed digital ecosystem—like BAT, used only for participation in a decentralized digital advertising marketplace—are not designed to be securely and rapidly exchanged for a variety of other assets. Crypto-assets designed for use on a highly centralized or closed digital ecosystem—like BinanceCoin, used only on the Binance crypto-exchange—also are not used as a general means of secure exchange. And crypto-assets issued without a protocol that independently ensures a controlled supply—like ERC-20 tokens—do not offer an independent store of value, because their value depends on the actions of the issuers and the market's perception of those actions.

66.     Accordingly, an attempt to increase the price of a cryptocommodity above a competitive price by 5% or more would not result in customers switching to fiat currency, gold, or other crypto-assets.

67.     There are meaningful barriers to entry into the cryptocommodity market. These barriers include the need to create a sufficiently large community of independent "miners" and other users to create a distributed "peer-to-peer" network to verify transactions on their own block-chains. Additionally, the need for cryptocommodities to be traded on exchanges, a process that requires significant technical challenges, represents a barrier to entry before any given cryptocommodity can become a widely accepted means of exchange with a long-term, independent store of value.

68.     The cryptocommodity market includes both the cryptocommodities themselves (e.g., bitcoin, ethereum,) and their corresponding futures contracts. A futures contract is an agreement to purchase or sell an underlying asset at a predetermined date. In the context of bitcoin futures, investors are exposed to the future price of bitcoin.

69.     Bitcoin futures have traded on the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange since December 2017. Bitcoin futures stopped trading on the Chicago Board Options Exchange in June 2019.

70.     Futures and spot transactions for the same commodity are inherently part of the same product market because they involve the same commodity. While a commodity's prices may be lower or higher in futures transactions than in spot transactions, those prices will necessarily converge as the delivery date for the futures converges to the present.

71.     Bitcoin and bitcoin futures prices move in step, indicating that the spot market for bitcoin directly affects bitcoin future prices. Any price manipulation or interference with price discovery in the "spot" market accordingly has direct and immediate effects on bitcoin futures prices.

72.    The chart below illustrates the close relationship between prices of bitcoin and bitcoin futures on the CME from December 2017 until February 2020:



73.    Regulatory filings confirm the connection between the "spot" price and futures prices. The final settlement price for bitcoin futures traded on the CME is equal to the CME CF Bitcoin Reference Rate ("BRR"). CME informed the CFTC that "[s]tatistical analysis indicates that the BRR accurately reflects the underlying spot market." In other words, CME designed bitcoin futures to track the spot price as closely as possible. Bitcoin futures that traded on Cboe were similarly engineered.

74.    The geographic market for cryptocommodities is global. Developers, issuers, and miners of cryptocommodities can be in any country. Crypto-exchanges are located all over the world and many allow access to customers from all over the world. Cryptocommodities transactions occur over the internet and so are not geographically limited.

### a.    The Cryptocommodity Market Is Susceptible to Manipulation

75.    The cryptocommodity market has historically been vulnerable to price manipulation because it is volatile and lightly regulated.

76.    The average daily volatility of bitcoin, ethereum, and litecoin from 2014 to 2019 was seven times greater than the volatility of the Bloomberg commodity index; three times greater than the volatility of the Bloomberg energy index; and six times the volatility of the Bloomberg precious metal index.

77.    This volatility derives in part from the newness of the cryptocommodity market; absent a long trading history, it is difficult for traders to anticipate price movements. This volatility also derives, in part, from a lack of easily reportable figures understood to correlate with growth. Unlike the value of conventional commodities like oranges, which is tied to physical and quantifiable metrics like rainfall, the values of cryptocommodities are not linked to physical metrics. The lack of significant price anchors that come with large-scale institutional capital investments also contribute to volatility.

78.    The cryptocommodity market has also, for much of its existence, been subject to limited regulation. The CFTC categorized bitcoin as a commodity in 2015 and since then has brought few enforcement actions.

79.    These conditions created an environment ripe for manipulation.

80.    One infamous example of such manipulation took place between 2013 and 2014 through an automated trading program (a "bot") termed the "Willy Bot."

25

81.     Between 2013 and 2014, Mark Karpeles, the owner and operator of crypto-ex-change Mt. Gox, which then handled 70% of all bitcoin trading,[32] implemented the Willy Bot to successfully manipulate bitcoin's price from about $150 to over $1,000 in less than two months.[33] When Mt. Gox finally suspended trading due to its insolvency, the price fell to $500.[34]

82.     On May 25, 2014, an anonymous trader posted a report titled, "The Willy Report: proof of massive fraudulent trading activity at Mt. Gox, and how it has affected the price of Bitcoin" (the "Willy Report").[35] The Willy Report provided a detailed analysis of Mt. Gox's leaked trading logs and concluded that someone had programmed a bot to buy ten to twenty bitcoin every five to ten minutes. It concluded that this "enormously" affected the price of bitcoin and played a key role in its rise to $1,000.[36]

83.     Additional academic research reached the same conclusion. In an article published in 2018, one team found that "suspicious trading activity of a single actor was the primary cause of the massive spike in the USD/BTC exchange rate in which the rate rose from around $150 to over $1,000 in just two months in late 2013."[37]

84.     The researchers observed that the Willy account became active on September 9, 2013 and continued to trade until their data cutoff on November 30, 2013. Because Karpeles owned

---

[32] *See* Neil Gandal et al., *Price Manipulation in the Bitcoin Ecosystem*, 95 J. MONETARY ECON. 86, 86-87 (2018), https://perma.cc/P35S-M7TN.

[33] *Id.*

[34] Paul Vigna, *5 Things About Mt. Gox's Crisis*, WALL ST. J. (Feb. 25, 2014), https://perma.cc/A2WH-SXFL.

[35] Willy Report (May 25, 2014), https://perma.cc/EN6E-2HJP.

[36] *Id.*

[37] Gandal, *supra* note 32, at 87.

and operated the exchange, Willy never actually had to pay for bitcoin, but nonetheless "acquired 268,132 bitcoin, nominally for around $112 million" during that time period.[38]

85.   One passage captures their findings particularly well:

> Separating the days on which Willy was active from those he was not, reveals a dramatic difference: In the case of Mt. Gox, the average USD/BTC rate increased by $21.85 on the 50 days Willy was active; it actually fell (by $0.88 on average) on days when Willy was not active. The same dramatic difference holds for the other exchanges as well…These results are striking and make it very clear that the suspicious purchasing activity could have caused the huge price increases.[39]

86.   The below chart from the Gandal article illustrates the dramatic effectiveness of this scheme:[40]



Figure 1: Bitcoin-USD exchange rate at Bitstamp exchange, with periods of suspicious activity shaded.

---

[38] *Id.* at 89.

[39] *Id.* at 93.

[40] *Id.* at 90.

87.     While it was initially unclear who controlled the Willy Bot, Karpeles eventually admitted to controlling it at his trial in 2017.[41]

88.     The Willy Bot scheme underscores how control of an exchange and the opportunity to trade with non-existent money can allow a single individual or entity to dramatically influence cryptocommodity prices.

### b.     The Cryptocommodity Bubble

89.     From 2014 to 2016, bitcoin's price fluctuated between $200 and $800. But, by the end of 2016, bitcoin—and other cryptocommodities—began to see significant price increases. By March 2017, the price of bitcoin was $1,200. By July 2017, it was above $2,500.[42]

90.     On December 17, 2017, the price of bitcoin reached a record high of nearly $20,000. At that point, bitcoin's market capitalization was nearly $327 billion, roughly the same as Amazon at that time.

91.     Then the market crashed. By February 2018, bitcoin's price had fallen to $6,200. The bitcoin market continued to hemorrhage throughout that year. In December 2018, roughly a year from its high, the price of bitcoin was $3,500, and bitcoin's market capitalization was down to $62 billion.

---

[41] William Suberg, *Mt. Gox Trial Update: Karpeles Admits 'Willy Bot' Existence*, CoinTelegraph (July 11, 2017), https://perma.cc/5FMC-SJYM.

[42] *Top 100 Cryptocurrencies by Market Capitalization*, coinmarketcap.com, https://coinmarketcap.com/.

92.     The relative price inflation of the bitcoin bubble far exceeded that of the most infamous market bubbles in history, including France's Mississippi bubble, Britain's South Sea bubble, the Dutch tulip bubble, and the dot.com bubble on the Nasdaq composite index:[43]



**How Bitcoin's Ascent Stacks Up**
The cryptocurrency's rally tops historical asset bubbles

■ Bitcoin    ■ Mississippi    ■ Tulips    ■ South Sea    ■ Nasdaq Composite

Note: Starting price is the price three years prior to each asset's high, or the earliest available price in cases with fewer than three years of data.
Source: Bloomberg, International Center for Finance at Yale School of Management, Peter Garber

**Bloomberg**

93.     The economic devastation was not confined to bitcoin. As bitcoin prices fell, so did the prices of other cryptocommodities. The combined market capitalization of all virtual currencies as of January 6, 2018, was roughly $795 billion; by Feb. 6, 2018, the total value had dropped to $329 billion.

---

[43] Eric Lam et al., *Did Bitcoin Just Burst? How It Compares to History's Big Bubbles*, BLOOMBERG (Jan. 17, 2018), https://perma.cc/DL4Z-6JDQ.

### 4. How Crypto-Assets Are Transferred and Exchanged

94.     Unlike in traditional banks, where each customer has a bank account and is identified as the owner, control of crypto-assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto-assets, including bitcoin and USDT.

95.     To use Bitcoin as an example, the public key is used to produce the Bitcoin address. A Bitcoin address is a destination for transfers of bitcoin, like the account number of a conventional bank account. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9.

96.     A private key allows the owner of a Bitcoin address to access it, like a long PIN or password for a conventional bank account.

97.     Those who wish to transfer bitcoin need to know the recipient's bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

98.     A transfer of bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is, anyone could see that Bitcoin address 1s5F transferred 10.3 bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are private.

99.     Because transfers between addresses are all public, one can follow the flow of crypto-assets by downloading and analyzing the relevant blockchain. This allows economic

experts to perform sophisticated forensic analyses to trace the digital chain of custody of crypto-assets belonging to a particular address.

100.    Crypto exchanges emerged to enable smoother and faster trading between individuals, just as stock and commodities exchanges emerged to enable easy trading of securities among counterparties who never meet.

101.    When a customer wishes to trade crypto-assets on an exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset. The exchange will typically then transfer the crypto-assets into one of its other addresses for storage.

102.    When a customer with an existing account wishes to transfer more crypto-assets into an exchange to use in future trades, she must ask the exchange for a deposit address. This destination address is often different each time the customer makes a transfer, meaning that one cannot easily trace transactions belonging to a particular individual.[44]

103.    This process is similar to the process used by a customer transferring funds to an online account with a stockbroker like Charles Schwab or E-Trade. Such a customer wires funds from her personal bank account to an account controlled by the broker, for which she has a PIN and password. The broker credits her with an equivalent amount of funds on its trading platform and places the funds it received into its reserve.

---

[44] For an example of how to withdraw/deposit with Poloniex's USDT personal deposit address, *see How to Deposit/Withdraw USDT-Tron, USDT-ERC20, & USDT-BEP20*, Poloniex, https://support.poloniex.com/hc/en-us/articles/360040015014-How-to-deposit-withdraw-USDT-TRON-USDT-ERC-USDT-OMNI.

104.    When a customer wants to withdraw a crypto-asset from an exchange, she tells the exchange the address into which she would like her crypto-assets transferred. The exchange then debits the user's account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address.

105.    But trades within a single crypto-exchange are not visible in the way that trades between users are, because such intra-exchange trades do not transfer actual crypto-assets between addresses. That is, if Jane Smith transfers bitcoin from her 1s5F address, which is not on Poloniex, to an address controlled by Poloniex, the blockchain will record a transfer from the 1s5F address to an address designated by Poloniex and from there to an address that Poloniex uses to store consumer bitcoin. But trades Jane makes within Poloniex will not be recorded on the blockchain. Instead, intra-exchange transactions are kept only on the account balance sheets for customers trading on the platform. Such intra-exchange activity is visible to the exchange itself, and may be publicized, but it is not public.

## B.    Defendants Manipulate Cryptocommodity Prices

106.    Defendants owned and/or operated two business: Bitfinex and Tether.

### 1.    Defendants Operate Bitfinex, a Crypto-Exchange

107.    Bitfinex is one of the "largest and least regulated" crypto-exchanges in the world.[45] While many crypto-exchanges only facilitate crypto-to-crypto transactions, Bitfinex is one of relatively few that allow users to deposit and withdraw fiat currency such as U.S. dollars or euros. Accordingly, Bitfinex is a common entry point for new traders, allowing them to convert traditional currency into crypto-assets.

---

[45] Nathaniel Popper, *Bitcoin's Price Was Artificially Inflated, Fueling Skyrocketing Value, Researchers Say*, N.Y. TIMES (June 13, 2018), https://perma.cc/U6UV-KQ3V.

108.   Bitfinex was publicly announced in 2012 when its then-Chief Technology Officer, Raphael Nicolle, posted about its creation on the popular online crypto-asset forum bitcointalk.org.

109.   Bitfinex is one of the largest exchanges by volume for trading bitcoin against the U.S. dollar. For the 24 months ended March 31, 2019, Bitfinex had the largest share of such trading as reported by data.bitcoinity.org.[46]

110.   A report published by the New York Attorney General found that Bitfinex's platform was ripe for abuse. Even though "[t]rading by platform employees poses a conflict of interest," Bitfinex does "not provide any restrictions on employee trading."[47] Bitfinex also offers a number of "special order types" that "are only useful to professional, automated traders using sophisticated algorithmic strategies, where orders can be submitted and cancelled automatically, in response to market signals not visible (or even available) to regular traders."[48] Bitfinex "offer[s] an order type called 'hidden,' in which the 'hidden' order does not appear on the publicly visible order book."[49] These hidden orders present an "opaque channel" mechanism for selling off bitcoin without crashing the price.

---

[46] *Initial Exchange Offering of LEO Tokens*, BITFINEX.COM (May 8, 2019), https://perma.cc/LC7E-HY62.

[47] Office of the N.Y. Att'y Gen, *Virtual Markets Integrity Initiative Report*, Virtual Markets Integrity Initiative Office of the N.Y. Att'y Gen. (Sept. 18, 2018), https://virtualmarkets.ag.ny.gov/. [https://perma.cc/7YS8-LS7S].

[48] *Id.* § II.A.

[49] *Id.*

111.    And in June 2014, one month after the Willy Report about Mt. Gox was published, Devasini all but admitted on an online message board that he was working on a "Willy Bot" of his own to drive the price of bitcoin to $10,000, as shown in this screen shot[50]:



2.    **Defendants Create Tether—and USDT—To Support Bitfinex**

112.    Tether controls the crypto-asset USDT, one of the first stablecoins.

113.    Stablecoins are crypto-assets designed to maintain a consistent value relative to one or more 'real world' assets like gold or fiat currency.

114.    Unlike bitcoin, stablecoins are not mined and are not cryptocommodities. For most stablecoins, an issuer unilaterally controls the creation of new coins. Absent restrictions on the creation of new coins, a stablecoin would be valueless—it would be subject to potentially unlimited inflation as more was created.

115.    In public interviews and in sworn testimony, Potter claims to have "[come] up with the idea for Tether in late 2013."

116.    According to Potter, he developed the idea for USDT to complement the business of the crypto-exchange Bitfinex. By creating a crypto-native stablecoin purportedly backed by

---

[50] *Re: And We Have Another Bitfinex Hookey THIEVING Short Squeeze!*, Bitcointalk.org (June 22, 2014), https://perma.cc/HW9Q-5JVA.

equivalent amounts of U.S. Dollars held in reserve, Potter believed that Bitfinex would be able to operate as a "crypto-only" exchange, and that other exchanges would follow suit.

117.    During the Class Period, Defendants controlled USDT.

118.    Potter stated that, in September 2014, he and Devasini incorporated Tether Holdings Limited in the British Virgin Islands.

119.    At the time of its incorporation, Potter was listed as a Director of Tether Holdings Limited, and Devasini was listed as a Shareholder of Tether Holdings Limited. In fact, both Potter and Devasini were shareholders of Tether Holdings Limited.

120.    Potter stated that he and Devasini used the Tether Holdings Limited entity to acquire another company, called RealCoin, which claimed to be developing a similar stablecoin, "backed one-to-one by a fully auditable reserve of dollars."[51] RealCoin was founded by investor Brock Pierce, its first CEO Reeve Collins, and software engineer Craig Sellars.[52] According to Potter, Tether Holdings Limited aimed to partner with other industry players working on similar stablecoin projects and "[bring] everybody involved in this back under one roof."

121.    In November 2014, RealCoin was renamed Tether and its RealCoins were rebranded as "tether" or USDT, the ticker under which the token is listed on crypto-exchanges around the world.[53]

122.    After the rebranding, Collins reiterated Tether's guarantee. He publicly asserted "that the number of [USDT] in circulation will always equate to the dollars in its bank account"

---

[51] Michael J. Casey, *Dollar-Backed Digital Currency Aims to Fix Bitcoin's Volatility Dilemma*, WALL ST. J. (July 8, 2014), https://perma.cc/NX5W-UTYZ.

[52] *Id.*

[53] Pete Rizzo, *Realcoin Rebrands as 'Tether' to Avoid Altcoin Association*, Coindesk (Nov. 20, 2014), https://perma.cc/DD89-UPL8.

and "that there are no pegs or formulas that complicate the process for its partners."[54] He was unequivocal: "When you want to redeem them, we issue you cash."[55]

123.    In promoting USDT to the market, Defendants represented that they would keep USDT "stable" by issuing USDT only in a manner linked to actual U.S. Dollars.

124.    For USDT, this promise came in the form of three guarantees. First, Tether promised that each USDT would be backed by one U.S. dollar held in Tether's reserves held in Tether's own bank accounts. Second, Tether promised that it would issue new USDT only in response to legitimate market demand—customers' willing to exchange dollars one-for-one for USDT. Third, Tether promised that customers could redeem USDT for U.S. dollars at any time.

125.    These promises, if true, would ensure that the value of a USDT would always be one U.S. dollar. When a customer sent Tether one U.S. dollar, plus fees, Tether would send one USDT in exchange, putting it into circulation. When a customer sent Tether one USDT, Tether would provide one U.S. dollar, minus fees, in exchange and revoke that USDT from circulation—a process known as "burning" USDT.

126.    These USDT issuances and burns, like bitcoin transactions, are all recorded on the blockchain. However, the corresponding U.S. dollar exchanges that are supposed to occur in this process are not visible to the public.

127.    Tether's promises were the foundation of USDT's value. If Tether were telling the truth, a USDT would combine the best aspects of fiat currency and crypto-assets: It would be stable and safe like the U.S. dollar but also, like other crypto-assets, easily transferable across different crypto-exchanges, and free from many government regulations.

---

[54] *Id.*

[55] *Id.*

128.    Similarly, from its formation until March 20, 2015, Tether's website stated that USDT

> is backed 100% by actual fiat currency assets in our reserve account and ***always maintains a one-to-one ratio with any currency held***. For example, 1 USDT = 1 USD. With almost zero conversion and transfer fees, [USDT] is redeemable for cash at any time.[56]

129.    During that same time, Tether's website also claimed that "Tether currencies are essentially Dollars, Euros, and Yen formatted to work on the Blockchain. [USDT]s always hold their value at 1:1 to the underlying assets." [57]

130.    On January 15, 2015, Bitfinex—the crypto exchange controlled by Defendants— represented that "each [USDT] is backed 1-to-1 by its corresponding currency, which can be viewed and verified in real-time via the Tether.to website and on the Blockchain. Tether will be fully transparent and audited to demonstrate 100% reserves at all times."[58]

131.    On June 17, 2016, Tether released a white paper further assuring the public that each USDT was backed by non-digital assets. It promised that:

> [E]ach [USDT] in circulation represents one US dollar held in our reserves (i.e. a one-to-one ratio) which means the system is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve. [59]

132.    To bolster confidence in Tether's reserves, the white paper asserted Tether's commitment to "maintaining the guarantee of 100% redeemability"[60] and promised that USDT "may

---

[56] *Frequently Asked Questions*, tether.to (Mar. 20, 2015) (emphasis added), https://perma.cc/L46W-VCNX.

[57] *Id.*

[58] *Bitfinex Feature Announcement: Tether*, bitfinex.com (Jan. 15, 2015), https://perma.cc/T4N8-G7DQ.

[59] *Tether: Fiat currencies on the Bitcoin blockchain*, tether.to, 9 (June 17, 2016), https://perma.cc/M2WS-58JC ("Tether White Paper").

[60] *Id.* at 17.

be redeemable/exchangeable for the underlying fiat currency pursuant to Tether Limited's terms of service or, if the holder prefers, the equivalent spot value in bitcoin."[61]

133.    Tether's white paper also depicted how USDT supposedly would be created when fiat was deposited and would be withdrawn from circulation when redeemed for fiat:[62]



134.    Tether's white paper acknowledged that it was "risky" to hold fiat on an exchange and pointed to "the growing number of insolvency events" as indicative of that danger. It further represented that it "believe[d] that using tethers exposes exchange users to less counterparty risk than continually holding fiat on exchanges."[63]

135.    A year later, on April 5, 2017, during court proceedings against Wells Fargo, Velde filed a declaration, under penalty of perjury, swearing to USDT's redeemability:

> Tether is a financial technology company that operates a platform to store, send, and make purchases with a form of digital currency – digital tokens called [USDT]– that are fully backed by U.S. dollars

---

[61] *Id.* at 4.

[62] *Id.* at 7-8.

[63] *Id.* at 13.

on deposit from customers. [USDT] may be redeemed or exchanged for the underlying U.S. dollars. . . . Customers who want to purchase Virtual Currency through Bitfinex must deposit U.S. dollars or [USDT] into their Bitfinex account and in exchange receive an equivalent amount of Virtual Currency until they ask Bitfinex to remit back the U.S. dollars they deposited. Likewise, customers who want to purchase [USDT] through Tether must deposit U.S. dollars in their Tether account and in exchange receive an equivalent amount of [USDT] until they ask Tether to remit back the U.S. dollars they deposited. . . . For these systems to work, customers depend on Bitfinex's and Tether's ability to send back to them the U.S. dollars they deposited with Bitfinex or Tether.[64]

136.    Until at least February 19, 2019, Tether's website continued to represent that Tether "converts cash into digital currency," that "[e]very [USDT] is always backed 1-to-1, by traditional currency held in our reserves[] [s]o 1 USDT is always equivalent to 1 USD;" and that "all [USDT] in circulation always match our reserves."[65]

137.    On March 4, 2019, Tether stated that every USDT was "1-to-1 pegged to the dollar" and "100% backed" by reserves that "from time to time may include other assets."[66]

138.    On April 25, 2019, Tether's counsel represented to the Office of the New York Attorney General that "issuances of new [USDT] occur when an investor has requested to purchase [USDT] by depositing U.S. dollars with Tether the company, or by depositing U.S. dollars with a trading platform that is authorized to accept dollar deposits in exchange for USDT."[67]

139.    As of October 2019, USDT was reportedly the most widely used crypto-asset in the world by trading volume, surpassing even bitcoin.  In October 2019, Bitfinex and Tether's Chief

---

[64] J.L. van der Velde Declaration ¶¶ 5, 6, 12, 14, ECF No. 9, *iFinex Inc. v. Wells Fargo & Co.*, No. 3:17-CV-01882 (N.D. Cal. Apr. 5, 2017).

[65] tether.to (Feb. 19, 2019), https://perma.cc/B663-LR72.

[66] tether.to (Mar. 04, 2019), https://perma.cc/FWY6-23EP.

[67] Whitehurst Aff. ¶ 34.

Technical Officer boasted that USDT possesses a near-perfect monopoly on the stablecoin market by accounting for 98.7% of worldwide stablecoin trading volumes.[68]

140.    While the market value of USDT would fluctuate—at times, one USDT would trade for more or less than one US dollar—Tether said that it would always redeem one USDT for one US dollar (minus fees).

141.    For most of the Class Period, Tether had a nearly 100% market share in stablecoin pegged to U.S. dollars; for the rest, it had a dominant share:



142.    USDT is currently the third largest crypto-asset in the world by market capitalization, purportedly over $83 billion based on the over 83 billion USDT in circulation.[69]

---

[68] Olga Kharif, *Biggest Crypto Exchange Takes on Tether With Own Stablecoins*, Bloomberg (June 6, 2019), https://perma.cc/XNE7-RV78.

[69] *Top 100 Cryptocurrencies by Market Capitalization*, coinmarketcap.com, https://coinmarketcap.com/.

### C.   Defendants Debased USDT

143.    Core to Defendants' scheme was Tether's ability to convince the markets that USDT was backed one to one by U.S. dollars. Throughout the Class Period, this guarantee was unambiguous. Because the market accepted Tether's representation, USDT had the same economic power within the crypto-economy as U.S. dollars.

144.    Tether's representation that USDT was fully backed by U.S. dollars was false.

145.    Tether "authorized" USDT by creating it on the blockchain and placing the USDT tokens into Tether's treasury wallet. Tether considered USDT to be "issued," and thus in circulation, once it transferred USDT to a Tether customer through the Tether platform. (Tether excluded from its definition of "issued" USDT any USDT that had been authorized but not issued and USDT that had been "quarantined" as the result of a hack.) Based on Defendants' representations, any issued USDT required dollar backing.

146.    During the Class Period, Tether issued 2,995,048,400 total USDT. During the same period, it *net* issued 1,848,776,275 USDT to Bitfinex (this net issuance equals the USDT that Tether's treasury wallet sent to Bitfinex minus the USDT that Bitfinex sent back to Tether's treasury wallet).

147.    Throughout the Class Period, Tether often held fewer U.S. dollars in its bank accounts than the number of USDT that it had issued.

148.    The scheme to issue USDT without full U.S. dollar backing was made possible by Defendants' common control of Tether and Bitfinex, which Defendants took affirmative steps to conceal, and by the joint operation and commingling of their businesses.

149.    In November 2014, when RealCoin rebranded to become Tether, it stated that Tether had formed "new partnerships in the bitcoin space, including agreements with Hong Kong-based bitcoin exchange Bitfinex."[70]

150.    The November 2014 announcement omitted that Devasini and Potter—Bitfinex's CFO and CSO—created and had controlled Tether's holding company since September 2014.[71]

151.    It also omitted that Velde and Devasini—Bitfinex's CEO and CFO—had incorporated Tether Limited in September 2014 and served as its only directors along with Defendant Potter.[72]

152.    An archived copy of the Tether website from March 2015 identified Potter and Devasini as "advisors" and did not identify Velde at all.[73]

153.    This overlapping control structure remained largely concealed from the public until November 2017, when German reporters leaked over 13 million electronic documents known as the Paradise Papers.[74]

154.    The links between Tether and Bitfinex go beyond their shared control.

155.    Tether's "Treasury" is the account, solely controlled by Tether, in which all USDT are revoked/burned.[75]

---

[70] Pete Rizzo, *Realcoin Rebrands as 'Tether' to Avoid Altcoin Association*, COINDESK (Nov. 20, 2014), https://perma.cc/DD89-UPL8.

[71] *Tether Holdings Limited*, Offshore Leaks Database, https://perma.cc/UDT7-ACVW.

[72] *Tether Limited*, Hong Kong Registry, https://perma.cc/RDU3-9E7D.

[73] *Our Team*, tether.to (Mar. 29, 2015), https://perma.cc/UC2T-JEJF.

[74] Nathaniel Popper, *Warning Signs About Another Giant Bitcoin Exchange*, N.Y. TIMES (Nov. 21, 2017), https://perma.cc/N33P-WNDG.

[75] *See* Tether White Paper, at 8.

156.    Until November 2017, customers could theoretically purchase USDT directly from Tether in exchange for U.S. dollars.[76] These direct purchases were reenabled on November 27, 2018.[77]

157.    But direct purchases by customers other than Bitfinex have always made up a tiny fraction of all issued USDT. Tether issued the vast majority of USDT to accounts on Bitfinex, which was the **only** exchange to which Tether directly transferred USDT.[78]

158.    Tether's exclusive relationship with Bitfinex for initial USDT issuances meant that Bitfinex was the only meaningful path for USDT to enter the crypto-economy. Bitfinex's role in distributing USDT accordingly gave it substantial economic power in the crypto-markets.[79]

159.    Tether could have set aside a U.S. dollar in reserve for each new USDT it issued to Bitfinex. If that were the case, then USDT would remain readily exchangeable for U.S. dollars and so the digital equivalent of U.S. dollars. But it did not do so.

160.    Access to the U.S. financial system was an essential component of Tether's business. Tether's model depends on its use of the U.S. financial system—*i.e.*, U.S. dollar deposits and redemptions—to back its manufactured digital assets.

161.    To accept and transmit U.S. dollars to their customers, Bitfinex and Tether required either a U.S. bank account or an account with a bank that maintains its own "correspondent

---

[76] Whitehurst Aff. ¶ 36.

[77] *Tether Reopens Account Verification and Direct Redemption of Its Fiat from Its Platform*, TETHER (Nov. 27. 2018), https://perma.cc/C9XV-NA7Y.

[78] *What is Driving Tether's Growth and What Financial Institutions Could Learn From It*, Chainalysis (Aug. 2018), *available at* tether.to, https://perma.cc/4MYT-3F8B.

[79] Robert-Jan Den Haan, *Clearing Up Misconceptions: This is How Tether Should (and Does) Work*, Bitcoin Magazine (June 14, 2018), https://perma.cc/6J2Q-2U33.

account" with a U.S. bank. In the second scenario, the correspondent account serves as an intermediary and 'clears' the U.S. dollar transaction.

162.    Money never actually 'moves' across the border in international transactions. To transmit funds in other currencies, banks maintain 'correspondent accounts' at foreign banks. "Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions."[80]

163.    To transmit U.S. dollar funds internationally, a series of bank accounts are credited or debited accordingly. The graphic below depicts a typical U.S. dollar transaction in which:

- Bitfinex instructs its bank to wire U.S. dollars to a customer located in the United Kingdom;

- a Taiwanese bank debits Bitfinex's account and instructs its U.S. correspondent to process the transaction;

- the U.K. correspondent bank is instructed to debit the account of the Taiwanese correspondent and credit the account of the U.K. bank;

- the U.K. bank is instructed to credit the customer's account; and

- the U.K. customer gains access to the funds.



---

[80] *Sigmoil Resources, N.V. v. Pan Ocean Oil Corp. (Nigeria),* 234 A.D.2d 103, 104 (1st Dep't 1996).

164.     Access to a U.S. correspondent account is therefore essential to transmitting U.S. dollars internationally.[81]

165.     For the correspondent bank, these transactions are high-risk from an anti-money laundering perspective because the originator and beneficiary are one step removed from the bank. Money launderers often capitalize on this disconnect by using shell companies to obscure the true counterparties even more.[82]

166.     Because Bitfinex's and Tether's businesses required them to exchange USDT for U.S. dollars, access to U.S. correspondent banking was critical. Without it, they could not operate.

### 1.     2017: Tether Issues USDT to Bitfinex in Exchange for IOUs

167.     Initially, Bitfinex and Tether utilized Taiwanese banks including Hwatai Commercial Bank, KGI Bank, First Commercial Bank, and Taishin Bank to hold fiat currency, including USDT reserves.[83]

168.     Those banks relied on Wells Fargo as a correspondent bank to transfer funds internationally.[84] Unless Tether's customers maintained a bank account in Taiwan, they required Wells Fargo to send or receive US Dollars from Tether in exchange for USDT.

---

[81] *See Correspondent banking*, Committee on Payments & Mkt. Infrastructures, Bank for International Settlements, at 9 (July 2016) ("On a cross-border level, however, correspondent banking is essential for customer payments and for the access of banks themselves to foreign financial systems for services and products that may not be available in the banks' own jurisdictions."), https://perma.cc/9Z92-KSU6.

[82] Alexander Weber, et al., *Money to Launder? Here's How (Hint: Find a Bank)*, BLOOMBERG (Mar. 9, 2019), https://perma.cc/DXP4-FHXX.

[83] Complaint ¶¶ 31, 32 ECF No. 1, *iFinex Inc. v. Wells Fargo & Co.*, No. 3:17-CV-01882 (N.D. Cal. Apr. 5, 2017) ("Wells Fargo Compl.").

[84] Wells Fargo Compl. ¶¶ 33-34.

169. On March 31, 2017, Wells Fargo stopped providing correspondent banking services for Bitfinex and Tether.[85]

170. In a lawsuit they filed against Wells Fargo, Bitfinex and Tether stated that Wells Fargo's "decision to suspend outgoing wire transfers in U.S. dollars from [their] correspondent accounts presented an existential threat to their businesses," and that if they "could not remit to customers U.S. dollars that belong to their customers, [their] businesses would be crippled" and "brought to a standstill."[86]

171. Tether was cut off from its Taiwanese banks on April 17, 2017.[87]

172. On April 22, 2017, Tether issued a statement confirming that "all incoming international wires to Tether have been blocked and refused by our Taiwanese banks. As such, we do not expect the supply of [USDT] to increase substantially until these constraints have been lifted."[88]

173. Bitfinex and Tether's banking troubles should have constrained their ability to issue or redeem USDT—either because they lost part of their U.S. dollar reserves or because they could not receive additional U.S. dollars to back the USDT they would issue. If Tether's representations were accurate, it could not have issued new USDT until it found a way to receive new U.S. dollars.

174. Despite having no banking access to process fiat, Tether kept issuing USDT.

---

[85] Wells Fargo Compl. ¶¶ 39-41.

[86] *Id.* ¶ 47.

[87] Announcement, tether.to (Apr. 22, 2017) (emphasis added), https://perma.cc/AW3W-TJZK.

[88] Announcement, tether.to (Apr. 22, 2017) (emphasis added), https://perma.cc/AW3W-TJZK.

175.    In May 2017, after losing access to banking in Taiwan, Tether transferred its U.S. dollar reserves—the reserves backing issued USDT—to an account at Bank of Montreal held by Tether's General Counsel, Stuart Hoegner, in trust for Tether.

176.    Per Tether's agreement with Bank of Montreal, Tether could use that account only to store USDT reserves and pay customer redemptions. The Bank of Montreal would not allow Tether to use the account to accept new deposits following the initial transfers of funds from the Taiwanese banks. Tether thus could not accept fiat currency in exchange for new issuances of USDT after April, 2017. By Tether's own representations, Tether should not have issued any new USDT since it could not process any fiat deposits or purchases of Tether by customers either directly via the Tether platform or via Bitfinex.

177.    In June 2017, having also lost its correspondent banking, Bitfinex opened an account with a Puerto Rico-based entity named Noble Bank International ("Noble"). Noble was run by a chief executive officer whom Potter had known for many years. Members of Bitfinex and Tether management invested in Noble in 2017.

178.    Noble, on behalf of Bitfinex, accepted funds from only a handful of institutional customers of the exchange.

179.    Defendants did not open an account for Tether at Noble, or with any other banking institution, at that time. Defendants did not open an account for Tether until September of 2017, which it opened with Noble.[89]

180.    During the six months from April through September 2017 when Tether did not have a bank account that could receive U.S. dollars, it issued nearly 409 million new USDT:

---

[89] Whitehurst Aff., at ¶ 53; ECF No. 95, *James v. iFinex Inc*., No. 450545/2019 (Sup. Ct. N.Y. Cty. July 8, 2019) (Feb. 2018 Bank Account Application).

| Timestamp | USDT Transfer Amount | Blockchain TXID |
|---|---|---|
| 4/3/2017 0:06 | 1,000,000 | b8d1a643184c5c6839faf62237ed87dfdd54397b0a286cb9b4fc6b5d4ddfde83 |
| 4/3/2017 15:24 | 1,500,000 | d554bee84bdadfdaa28bea3b87cd7dc9989423f4f3622b836e1af589fde04a1e |
| 4/5/2017 19:26 | 1,500,000 | 248eb37c05afd4552f73e44adc39a1e04b5262897173696ec40bf066c2bbaba3 |
| 4/12/2017 17:08 | 1,000,000 | a74be8a756589288d0ca789256cdff812a98ef86320e0331c48f4ae805089671 |
| 4/13/2017 10:24 | 1,500,000 | cd9adc6b4a26c25fc3fefee42cc1ef55c771506e78bc2043b6e3beb644fc3374 |
| 4/18/2017 7:30 | 1,600,000 | 8d1d117a25c0c78e2dc2d5fc09408732a4277ece1dd1ef179bd51d8f23d15f |
| 4/25/2017 7:09 | 10,000,000 | 08d3a4711d491ed7c17e388f368aac79393c11b7f02131bef3ae93983de312a |
| 5/23/2017 22:40 | 2,000,000 | 112b251e382542321cfb32f155cab8c453e9cb161b32b6d4fcce5f9420814277 |
| 5/24/2017 13:50 | 4,000,000 | 36c7e874662608bc1f2c689157d28949f3d379299a53bcfabc92fb65d7f15954 |
| 5/25/2017 0:26 | 2,000,000 | 10046816e7b3f5e08d7a77911d8c437750a078c7208711af583d8fa64e0e6d58 |
| 5/25/2017 7:55 | 4,000,000 | 11dbcbe1e7915394c51299c27920bd9532135e69c754c694e058e3cd177860b3 |
| 5/25/2017 18:47 | 6,000,000 | db6629f480f9fb3830e0f8ad90464f122086599bd3f00c16eafd0db7a5d4b356 |
| 5/26/2017 13:41 | 4,000,000 | 3905b41ec59f44d4cc794b9d402a48f169bfca0aa8a6d5730ef8220f0793f8a0 |
| 5/26/2017 20:33 | 600,000 | b3ea5423110075befe4d39e57bda3ea9ac6dc508d84468bc71de8b6f0ca24d69 |
| 5/26/2017 21:58 | 10,000,000 | f005cb4ba2b828c99c7400a69216479aee2c9bede710aadc32ef986438ed22c1 |
| 5/27/2017 11:14 | 5,000,000 | c2ec6608d5c7358972f35163594d0b194b8a97c5542e2a4064ff4a0f4ef42d9a |
| 5/27/2017 15:48 | 5,000,000 | 1024d3399aa3532c12339bb19305c4c2ee32cb1aa0d18eec92ab0ee76425f124 |
| 5/29/2017 7:01 | 5,000,000 | 7f4a4e50e9194601c4ef67014f1fec2009ccea90f0b08bdf70ea7c215fd67d00 |
| 6/6/2017 7:14 | 10,000,000 | 5e3c0a1c29f7630d6ca5a2926b1b849a96005222c9fe2b2cfabc402400b314e3 |
| 6/6/2017 17:40 | 4,500,000 | 3a5559e39e249b3694311de4de3b5f831df067ea9525ba572847e1c9c6178705 |
| 6/6/2017 23:52 | 3,000,000 | c48eb1cb7f2a44db17417437c64d056f249a306c031306cbab95e4d7cf6818fa |
| 6/12/2017 22:35 | 5,000,000 | 20ae78d39ebe975f2e28409195b4d8360bc631fd74c156d0859be265a9b37dfe |
| 6/14/2017 16:18 | 5,000,000 | fd0bbaf903212a7570472c6930a220a7fc85ae94dd20c3c1d06836fb547ae381 |
| 6/15/2017 12:58 | 5,000,000 | d6d422aaf590f8ae5fc710a6b8c081639dd0b577390c55647779e2a182004dbb |
| 6/15/2017 23:10 | 2,200,000 | 70eeaa8c26d1695478c084a53f234b7fb6dca74acebe6185e87cf013dbf1d26d |
| 6/21/2017 21:55 | 6,500,000 | 1ceb875df8d790e3bdeb6582124ed136bd4d32cf77677e5525ea07fb882e6900 |
| 6/21/2017 22:33 | 2,500,000 | c15786c059f1ed391a924a47d8ec41130abc95d5767f3f89dfdc71fc0ce983a3 |
| 6/22/2017 22:30 | 3,000,000 | 27c0768cd8d4081bb2916028910be0d789e4744779f2679059e2ef129d166529 |
| 6/23/2017 17:44 | 5,000,000 | 2b017390e46b9ece79ef54169b0d0fac07c36e6c3f41d992cb79d7c2847fba1c |
| 6/24/2017 16:31 | 3,200,000 | 4f3368b8b349d7026c7a67001726c8130f1658cdac0a51ac4edbc265da81ce4f |
| 6/24/2017 22:27 | 10,000,000 | 5a2bace7baa1d7827afaaa68d8c31cb539c11ac40f335fa20f0880ba33906d8a |
| 6/26/2017 8:06 | 5,000,000 | 9e8fcc6ca4ddbef482b90b35d644711c0bf5ffc339e663c9568f02cd27cee934 |
| 6/26/2017 15:06 | 5,081,775 | a9352a2a98436607127f4d388e79b092fff59db9100ec48ea55fb7da17f40491 |
| 6/26/2017 18:33 | 10,000,000 | d72d8082dfa5c037f50792f07f23a560ee2d9bd684846c4fca10086dcb7afb9c |
| 6/26/2017 22:46 | 5,000,000 | b8223ac91fdc11935dfca7ff787fdd28223ce5d4aa4425392ff7cfb6216e45d2 |
| 6/27/2017 12:30 | 10,000,000 | 21e2a6c1fc73838890671a272e9de1501f8ef41adfc0454dbb28aa8ad6a21075 |
| 6/27/2017 16:05 | 5,000,000 | fe446e42915118fb478bd0305775e25b94307aa2fd281f8c0628cb0c50cb7d6f |
| 7/2/2017 9:06 | 5,000,000 | c9735068b8dd2878e9ab2a2ecff6f01e1ca46a0f71354eccfed6643db095505c |
| 7/10/2017 14:20 | 5,000,000 | dbefb4d9843ff8bc722153eefc9dc1d3a15321ed217d841f9ee5b5825d89c14a |
| 7/10/2017 17:42 | 10,000,000 | 0add54d1abde8c35083e4e5cd041aab9ba094760125b2826e8ce7478738dfa03 |
| 7/10/2017 23:37 | 5,000,000 | f7f42320402a8a2e72c431988023680937e9e133fed3debc881f8c74bc9b9bb7 |
| 7/10/2017 23:53 | 4,000,000 | 9b6dc061f0d915069e55d1b64e6ea9e379c170ea5aa825ebf86a2cb2547f0f36 |
| 7/11/2017 7:51 | 15,000,000 | ca0f89855fc19663ce36e529cf56fb71587b25791aa5cf3030a019cb9a48fc21 |
| 7/12/2017 11:08 | 10,000,000 | 0e3e6334b6d16a8a382457050b4cf013d5d490ab14c6c98b5101d9a266e9fdb3 |

| Timestamp | USDT Transfer Amount | Blockchain TXID |
|---|---|---|
| 7/13/2017 16:33 | 5,500,000 | 630756dc52f585218f722f5ac59bbef521a28e5251bb527c3699cbde1de89313 |
| 7/13/2017 22:14 | 15,000,000 | 4275e16f602457584c8c6c7b9a6a0f075e497c4f4630781cfb6efb09ff8227b4 |
| 7/15/2017 19:53 | 5,000,000 | 8935ccfe09ecf1c71631130bab6c934122e7349d1545d86d6836570b2ea27101 |
| 7/18/2017 3:18 | 5,000,000 | b2b685c4017bdb1154c127cea7a64e1979675ecbd4f3075c34ad531a219f64a4 |
| 7/18/2017 20:24 | 10,000,000 | f3ff4daed4325097104288f8906363e08ded0839b2accbb7fb3c56679623303e |
| 7/20/2017 7:07 | 10,000,000 | b89ba738d204ca8e321d8b6ed04ac02322414f7ca04e68c08d41a1b5b09175c2 |
| 9/2/2017 8:45 | 5,500,000 | 9200fe95486fdf753ec20dc70bafa89eeee640c204714894eabd453e216a0dd9 |
| 9/2/2017 15:55 | 14,500,000 | 5bd0f9b9a4c9f07bc9da3edcced5ba6f02222fc2ecf30a922a6eae3a97560df6 |
| 9/2/2017 22:19 | 4,500,000 | 0949dd875b08d6239625f36efe0ec1aa131f1ae181b2a975656274d1eb55f550 |
| 9/3/2017 13:56 | 20,000,000 | e189d337cb788d05ffbe02908cab7ddb44b5de8ba08169c915aa759c293323a4 |
| 9/4/2017 18:31 | 6,200,000 | f57d1f91d85c1617966fc1e8a5451c5dca880a47da4aa2d7374b64b3d15cec52 |
| 9/5/2017 6:51 | 15,000,000 | e3048a56294f18d2fc7cd9d42bd66084399e427c02b112c7744ca84b6871c9f2 |
| 9/7/2017 9:52 | 9,000,000 | b22b60c16203393aec2b6abc37093c0d1a37781736b3f0198a3d4b953c0ab9cc |
| 9/9/2017 12:19 | 10,000,000 | c53c029e74963499548938ea46037a0e1a4dd13e92e1ca8276fae966acd581f9 |
| 9/13/2017 9:39 | 10,000,000 | 3c45c086747866883c0205e37a0bc6a48125cf7d49ed5ed7810f6a147df840b9 |
| 9/14/2017 17:37 | 5,000,000 | f6ca993afbc8f68658e31562bd2b5a2e50cbc2f327f26fb7d135d7ce30c01161 |
| 9/15/2017 9:13 | 15,000,000 | 134f218857fe6275adb6537cae587dd1a8961096dce74a58e5af746e643dcc58 |
| 9/15/2017 16:41 | 9,000,000 | d8b5f5481743b704f6af4f803e4fde38f49539dafc0fc2f226637c60c2ac90db |
| 9/29/2017 11:12 | 10,000,000 | e88457b5650bdf67a9974d4f34d91271a589cbff19b623570cd2bedc2b1af343 |
| **Total** | **408,881,775** | |

181.     Tether issued this USDT to Bitfinex. But Bitfinex did not pay Tether U.S. dollars for any of the USDT it received at the time that Tether issued the USDT, as other customers would have been required to do.

182.     Instead, Bitfinex gave Tether a promise to pay for the USDT in the future: an "IOU" which Tether tracked on its books as an account receivable. By September of 2017, Bitfinex owed Tether's reserves nearly $400 million.

183.     Up until September 15, 2017, the only U.S. dollars that Tether held, and which ostensibly backed the over $400 million USDT in circulation, were in an account holding $61 million.

184.    In the late summer of 2017, online reports questioning Tether's backing caused concern among Bitfinex and Tether executives.[90] To counter them, in September of 2017, Bitfinex and Tether sought to have the auditing firm Friedman LLP issue a verification of its cash balances.

185.    Defendants acted to conceal from the market that it had issued USDT backed by IOUs. On September 15, 2017, Defendants opened a bank account for Tether at Noble and transferred to it $382 million from Bitfinex's Noble account, which included commingled Bitfinex funds and customers' assets.

186.    Defendants then had Friedman conduct its verification of Tether's assets as of 8 p.m. EST the evening of September 15, 2017.[91]

187.    In a so-called "Transparency Update," dated September 30, 2017, Tether announced that it had engaged Friedman to "analyze its bank balances" and posted a redacted copy of Friedman's report.[92] The announcement and report listed Tether's bank balances as of 8 p.m. EST on September 15, 2017. Friedman made "no representations about [Tether's] ability to access funds from the accounts or whether the funds are committed for purposes other than Tether token redemptions."[93]

---

[90] *The Curious Tale of Tethers*, Hackernoon, (Aug. 6, 2017) https://hackernoon.com/the-curious-tale-of-tethers-6b0031eead87.

[91] Memorandum Regarding Consulting Services Performed, Friedman LLP, (September 28, 2017) https://assets.ctfassets.net/vyse88cgwfbl/7ow3ykSHqpJIoiIunVvi0B/3e3e4738ee0b7ff1fb492e9d28757604/Final-Tether-Consulting-Report-9-15-17_Redacted.pdf ("Friedman Audit Memo").

[92] Transparency Update, tether.io, (Sep. 30, 2017), https://tether.to/en/announcement-transparency-update/.

[93] Friedman Audit Memo at 4.

188.    In January 2018, Friedman resigned from its engagement to perform an audit of Tether. It stated that its "most significant concerns regarding the cash balances are the existence of the cash and any restrictions on the balances."

189.    It added: "[f]rom our discussions with Noble, the Noble banking platform was implemented this year and has not yet been audited by an independent accounting firm or tested by regulators. ***Noble's customers balances are held in an omnibus account with BNY which means that BNY wouldn't be able to confirm the balance held on behalf of Tether***."

190.    Tether understood that Friedman resigned from its engagement to audit Tether in part because of the relationship between Tether and Noble. According to Tether, it was Noble's largest customer around the time that Friedman resigned.

191.    After Bitfinex paid the initial receivable accrued between April and September 2017, Bitfinex accrued another debt to Tether's reserves for nearly $400 million between late October and early December 2017. By March of 2018, the receivable Bitfinex owed Tether had ballooned to over $1.8 billion.

### a.    Receivables Were Not One-to-One Dollar Backing

192.    When Tether counted IOUs from Bitfinex as a part of its "reserves," Tether was printing and issuing its stablecoin without full U.S. dollar backing. The USDT that Tether had issued was not backed one-to-one by U.S. dollars held in Tether's bank accounts, as Tether had promised the market.

193.    By promising that USDT was backed one-to-one by U.S. dollars held in Tether's own bank accounts, Tether was promising customers that it would always have the dollars available to redeem all outstanding USDT at 100 cents on the dollar and thus, customers faced no credit or liquidity risk in buying and holding USDT.

194.    By accepting IOUs in exchange for issuing USDT, Tether was introducing undis-closed credit risk that it would not have the U.S. dollars required to redeem all USDT in circulation at any given time. During periods where Bitfinex's payments were outstanding, Tether was vul-nerable to bank runs in the event traders lost confidence in USDT—precisely the type of liquidity crisis that Tether assured traders could never occur because of USDT's supposed one-to-one back-ing.

195.    Tether's violation of its core promise to traders had an outsized effect on the crypto-asset market. Because Tether represented that it was backed one-to-one by fiat assets, traders be-lieved that every time new USDT was issued, a commensurate amount of new U.S. dollars had effectively entered the market, signaling increased demand for cryptocommodities. This, in turn, caused prices to rise.

196.    Because Bitfinex did not pay for the USDT it received, there was no limit to the amount of USDT it could acquire. Instead, issuances were made on an ad hoc basis at the whims of Bitfinex and Tether executives. The influx of a debased asset reflected false demand signals, which allowed Tether and Bitfinex to inflate the price of cryptocommodities in the market.

### b.    Bitfinex Did Not Have U.S. Dollars Sufficient to Pay for the USDT Issuances it Received at the Time of Issuance

197.    Not only could Tether not redeem all issued USDT in circulation when it issued USDT to Bitfinex without payment, Tether also bore the risk that Bitfinex could not pay the amounts due.

198.    Defendants understood that a receivable was not the same as fiat currency.  For example, Potter testified that the value of a receivable is typically discounted to reflect the risk that it may not be repaid. As Potter further testified, a receivable could be legitimate where it was

maintained in a segregated account, in the name of a company that Defendants controlled, but that anything short of that would disqualify such a receivable.

199.    Bitfinex did not have net U.S. dollars sufficient to pay for the USDT that it received from Tether at the time of issuance.

200.    Bitfinex did not keep the U.S. dollars that it owed Tether for this USDT in a segregated account. Bitfinex also did not segregate customer assets from its own assets in its bank accounts. Bitfinex instead commingled all funds in what is called "omnibus" accounts.

201.    Bitfinex did not even maintain a balance sheet during the Class Period that showed its total assets and liabilities. It has no historical record of total assets and liabilities, and cannot recreate any records showing that it had sufficient net U.S. dollars to cover the amounts that it owed to Tether.

202.    The only historical record of Bitfinex's finances for most of the Class Period appears to have been a paper notebook maintained by Devasini, which he discarded shortly after the litigation was filed.

203.    Bitfinex's shocking lack of record keeping meant that it did not know if it had sufficient net U.S. dollars on hand to back the USDT being distributed into the market.

204.    The evidence strongly indicates Bitfinex could ***not*** pay U.S. dollars for all the USDT that it received from Tether in 2017. iFinex, the corporate entity responsible for operating the Bitfinex exchange,[94] had total revenues of $333.5 million in 2017,[95] less than the $382 million that Bitfinex promised to pay Tether for USDT between April and September of that year. And

---

[94] Dkt. 403 at 1 ("It is iFinex that engages all of the personnel who operate the Bitfinex exchange and perform all related functions (e.g., compliance and customer service). BFXNA and BFXWW do not have any separate directors, officers or other personnel.").

[95] Initial Exchange Offering of LEO Tokens, bitfinex.com (May 8, 2019), https://perma.cc/LC7EHY62.

Bitfinex ultimately paid for these receivables with funds in a Noble bank account that contained customer funds, strongly indicating that Bitfinex did not have sufficient net U.S. dollars of its own to cover those issuances.

205.    Tether did not account for the risk of nonpayment when counting receivables from Bitfinex as part of its reserves. Had it done so, the receivable would have been less than the full value of the USDT that Tether had issued to Bitfinex on credit.

### 2.    2018-19: Tether Issues More USDT to Bitfinex In Exchange For IOUs and Loans Bitfinex its U.S. Dollar Reserves

206.    Defendants' debasement of USDT was not limited to issuing USDT to Bitfinex in exchange for an IOU. Tether also loaned Bitfinex U.S. dollars in its reserves in exchange for funds seized by authorities that Defendants knew that Tether could not access.

207.    This came to a head in 2018, as Defendants ran into trouble with one of their financial partners, Crypto Capital.

208.    Bitfinex and Tether partnered with Crypto Capital, a Panamanian entity, in 2014 and throughout the Class Period and relied heavily on it for day-to-day business operations.

209.    In 2019, Crypto Capital principals were indicted for bank fraud,[96] and one of the principals pled guilty in 2022.[97] The other principals of Crypto Capital, including Oz Yosef ("Oz"), remain at large.[98]

---

[96] ECF No. 7, *United States v. Fowler*, No. 19-CR-254 (S.D.N.Y. April 30, 2019) ("Fowler Indictment").

[97] *Former Co-Owner of Vikings Pleads Guilty To Providing Shadow Banking Services Tp Cryptocurrency Exchanges*, U.S. ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK (Apr. 25, 2022), https://www.justice.gov/usao-sdny/pr/former-co-owner-vikings-pleads-guilty-providing-shadow-banking-services-cryptocurrency#_ftn1

[98] *Id.*

210.    Crypto Capital was a "shadow bank" that facilitated the exchange of fiat currencies for cryptocommodities.[99] Bitfinex used Crypto Capital to hold funds and process payments to and from its clients. Bitfinex did not know what institutions held the funds it deposited, or the funds it directed its customers to deposit, with Crypto Capital.

211.    Bitfinex and Tether relied on Crypto Capital despite their executives' serious concerns about their ability to withdraw funds held there.

212.    On June 3, 2015, Velde wrote Devasini and Potter that they could use an account at Crypto Capital to receive a wire but "its [sic] not a proper bank, so not so hot to work on large amounts through them."

213.    In April of 2016, Devasini wrote "I can't deny I'm getting pretty nervous about Oz[] and the way he handles our business[.]"

214.    In November of 2016, Devasini wrote to a Bitfinex shareholder: "if you plan to use [Crypto Capital], I suggest you to flip your money between platforms quickly . . . business model is poor, they make no money, which is scary to me."

215.    In November of 2016, Devasini wrote to Potter Crypto Capital "is a ticking bomb in my opinion . . . Oz is clearly lying to us." Potter replied: "need to get balance to zero."

216.    On June 8, 2017, Potter wrote to Devasini that he was hearing "bad things" about Crypto Capital including that they were day trading using customer funds. Potter added "we cannot have a balance with them at June 30th."

---

[99] Danny Nelson, Prosecutors Detail 'Shadow Bank' Accounts in Fowler Crypto Case, Coindesk, (Aug 27, 2020), https://www.coindesk.com/markets/2020/08/27/prosecutors-detail-shadow-bank-accounts-in-fowler-crypto-case/.

217.    Despite serious red flags, Defendants continued to place funds with Crypto Capital. In October of 2017, Devasini wrote to another employee of Bitfinex, "CC is a ticking bomb, but it is also our best banking solution so we can't avoid exposure."

218.    By early 2018, Crypto Capital purportedly controlled over $1 billion of commingled customer and corporate Bitfinex funds, even though Crypto Capital and Bitfinex had not had a single written agreement over their four-year business partnership.[100]

219.    In January 2018, Devasini wrote: "we have our ass wide open with CC anyways."

220.    By the middle of February of 2018, Devasini wrote to Crypto Capital asking them to process wires, describing "the situation" as "becoming unbearable" and reporting that a customer had reported Bitfinex to the authorities.

221.    On April 6, 2018, one week after several individuals with ties to Crypto Capital were indicted for money laundering and prostitution in the United States, Polish law enforcement seized $375 million USD worth of Polish zloty from multiple Crypto Capital accounts, including Crypto SP. Z.O.O—the Bitfinex shadow account in which it instructed customers to deposit fiat.[101]

222.    The seizure of funds at Crypto Capital were linked to Bitfinex in press articles on April 7, 2018.[102] Those reports reflected that Crypto Capital funds had been seized from a Polish bank for ties to drug cartel operations from an account affiliated with Bitfinex.[103] Bitfinex

---

[100] Whitehurst Aff. ¶¶ 58-59.

[101] Samuel Haig, *Bitfinex Cries Fraud as Crypto Capital Executive Indicted by US*, Cointelegraph (Oct. 30, 2019), https://cointelegraph.com/news/bitfinex-cries-fraud-as-crypto-capital-executive-indicted-by-us.

[102] Marie Huillet, *Unconfirmed: Polish Prosecutors Seize €400 mln Amid Allegations Bitfinex Is Implicated In Fraud*, Cointelegraph (Apr. 7, 2018), https://cointelegraph.com/news/unconfirmed-polish-prosecutors-seize-400-mln-amid-allegations-bitfinex-is-implicated-in-fraud.

[103] *Id.*

executives were aware of these reports. That same day, Velde wrote to Devasini "hope the polish mess will not blow up in our face, I mean . . is every bank that runs into shit now a "bitfinex bank"?

223.    By July of 2018, Devasini also knew that funds held by Crypto Capital in Portugal had also been seized.

224.    On July 30, 2018, Devasini wrote to Oz of Crypto Capital that they needed to lower their balance at Crypto Capital in the amount by $200 million. He described it as a temporary measure and noted that "if the market starts going up more the inflows will grow again and we'll start being 'cash flow' positive again[.]"

225.    In August of 2018, by its own admission Bitfinex was facing a liquidity crisis. On August 1, 2018, Devasini said to Oz that Bitfinex "need[s] to move 200M out of CC to solve this temporary liquidity crisis[.]"

226.    By August of 2018, Bitfinex indisputably knew that funds held by Crypto Capital had been seized, including its customer deposits. Bitfinex nevertheless continued to use Crypto Capital and directed its customers to utilize Crypto Capital to fund their accounts.

227.    On August 15, 2018, Devasini wrote to Oz that "we are seeing massive withdrawals and we are not able to face them anymore unless we can transfer some money out of Cryptocapital[.]"

228.    On August 21, 2018, Tether began issuing large amounts of USDT to Bitfinex in exchange for receivables. In August and September 2018, Tether issued 300 million USDT in exchange for receivables, receiving no U.S. Dollars in exchange. These receivables posed the same problems as the receivables issued in 2017—they violated Tether's promise of one-to-one U.S. dollar backing and did not reflect true counterparty risk.

229.     These 2018 receivables were even more problematic than the 2017 receivables, however, because they consisted of funds purportedly held by Crypto Capital on behalf of Bitfinex, which its executives knew were inaccessible.

230.     On August 27, 2018, Defendants arranged for Tether to loan $100 million of its U.S. dollar reserves to Bitfinex.

231.     By the beginning of October 2018, Crypto Capital had not processed any payments for Tether or Bitfinex in over a month. On October 3, 2018, Devasini wrote to Oz that the "situation is getting unbearable."

232.     Despite this, on October 7, 2018, Bitfinex issued a statement entitled "A Response to Recent Online Rumours" in which it assured customers that it was "not insolvent" and that "both fiat and cryptocurrency withdrawals are functioning as normal."[104]

233.     That representation was false and misleading, as Bitfinex executives knew that Tether had lent Bitfinex a portion of its U.S. dollar reserves and that Bitfinex could not process or receive payments from inaccessible Crypto Capital accounts purportedly holding hundreds of millions of dollars.

234.     In October of 2018, as concerns mounted about the ability of Bitfinex customers to withdraw funds from the Bitfinex exchange, Bitfinex temporarily suspended fiat deposits.[105]

---

[104] *A Response to Recent Online Rumors*, BITFINEX (Oct. 7, 2018) https://blog.bitfinex.com/announcements/response-to-online-rumours/.

[105] Nikhilesh De, *Bitfinex Saus Withdrawals Are Fine, But Crypto Exchange Customers Disagree*, CoinDesk (Oct. 15, 2018), https://www.coindesk.com/markets/2018/10/15/bitfinex-says-withdrawals-are-fine-but-crypto-exchange-customers-disagree/?_gl=1*1l3iusy*_up*MQ..*_ga*NDc5MDk0MTcwLjE2OTc2MDEwNDQ.*_ga_VM3STRYV N8*MTY5NzYwMTA0My4xLjAuMTY5NzYwMTA0My4wLjAuMA.

235.    On October 15, 2018, USDT began trading below its $1 peg.[106] Press articles reported that "[t]here is concern about tether and whether it is truly backed by dollars."[107]

236.    In an October 15, 2018 chat, Devasini pleaded to Crypto Capital: "I have been telling you since a while too many withdrawals waiting a long time[.] Is there any way we can get money from you?" He said: "[a]part with cryptocapital we are running low in cash reserves, please help."

237.    On October 16, 2018, Tether redeemed 250 million USDT, including 200 million it had issued to Bitfinex in exchange for an IOU.

238.    On October 17, 2018, Devasini wrote "Oz, I need urgently some funds either Tethers or USD, we need at least 100M within the next week."

239.    On October 24, 2018, Tether issued an announcement, titled "Upcoming USDT Redemption," in which it announced that it would destroy 500 million USDT from the Tether treasury, leaving approximately 466 million USDT for future issuances. Tether stated that its "issuance and redemption process is outlined in the Tether white paper," providing a hyperlink.[108] Tether did not disclose that it counted IOUs from Bitfinex in its USDT reserves, contrary to its white paper's assurance that all issued USDT would be one-to-one backed by U.S. dollars.

---

[106]Ryan Browne, *Major cryptocurrencies jump as the controversial dollar-pegged token tether falls*, CNBC (Oct. 15, 2018), https://www.cnbc.com/2018/10/15/bitcoin-other-cryptocurrencies-jump-as-dollar-pegged-tether-falls.html.

[107] *Id.*

[108] *Upcoming USDT Redemption*, Tether (Oct. 24, 2018) https://tether.to/en/upcoming-usdt-redemption-october-24th-2018/.

240.    On November 1, 2018, Tether publicly announced that it had established a relation-ship with Deltec Bank & Trust Limited ("Deltec"), headquartered in the Bahamas.[109] In reality, Tether had established this relationship in February 2018. It represented that "USDT in the market are fully backed by US dollars that are safely deposited in our bank accounts."[110]

241.    The announcement linked to a document on Deltec letterhead and addressed to Tether Limited, dated November 1, 2018, which stated:

Dear Sirs:

We hereby confirm that, at the close of business on October 31, 2018, the portfolio case value of your account with our bank was US $1,831,322, 828.[111]

242.    Tether's website still stated that USDT was backed one-to-one by U.S. dollars, cre-ating the impression that Deltec had confirmed that Tether had $1.8 billion U.S. dollars in its ac-counts. In fact, Tether's Deltec accounts included many non-dollar assets including bonds and commercial paper—as well as receivables from Bitfinex.

243.    Having assured the market that Tether held sufficient reserves at Deltec in an effort to prop up the value of USDT, Defendants then promptly swapped a big chunk of those Deltec reserves for inaccessible funds held at Crypto Capital. The next day, November 2, 2018, Tether began lending U.S. dollars in its accounts held at Deltec—ostensibly part of its reserves for issued USDT—to Bitfinex in exchange for funds that Bitfinex held at Crypto Capital. (Crypto Capital

---

[109] *Tether Banking Relationship Announced*, Tether (Nov. 1, 2018), https://tether.to/en/tether-banking-relationship-announced/.

[110] *Tether Banking Relationship Announced*, TETHER (Nov. 1, 2018) https://tether.to/en/tether-banking-relationship-announced/.

[111] Letter from Deltec Bank & Trust Ltd. To Tether Ltd., (Nov. 1, 2018) (available at: https://assets.ctfassets.net/vyse88cgwfbl/RPHIloRD3eE4J5QYNRnYX/bed2f368b73776c14e067088028f8a5c/Tether-Letter.pdf).

allowed the companies to swap the funds for purposes of their accounts with Crypto Capital, even while the actual funds remained seized by authorities.)

244.    In total, Tether swapped $625 million of accessible funds at Deltec for $625 million of completely inaccessible funds at Crypto Capital.

245.    Tether also issued $150 million USDT as part of the $625 million transaction in exchange for another IOU from Bitfinex purportedly backed by inaccessible, seized funds purportedly held by Crypto Capital that Bitfinex could not access.

246.    In January and February of 2019, Bitfinex took additional loans of Tether's reserves worth $25 million each.

247.    In total, between November 2018 and February 2019, Tether loaned Bitfinex $525 million dollars and issued an additional $150 million USDT backed by an IOU from Bitfinex.

248.    Defendants knew that the Crypto Capital funds in Tether's reserves were inaccessible. In fact, they swapped these funds *because* the funds were inaccessible and Bitfinex needed liquidity. Bitfinex offloaded its lack of liquidity at Crypto Capital to Tether. But Defendants never disclosed these transfers and did not discount the value of the Crypto Capital funds in Tether's reserves to reflect the very real risks that the funds would remain inaccessible and that Tether could not redeem all issued USDT at it had promised.

249.    Defendants knew that funds held at Crypto Capital were not proper backing for USDT. In February of 2018, in expressing his doubts about Noble, Devasini stated: "[I]nflating a d[y]sfunctional bank account is a breach of our fiduciary duty towards ou[r] customers money." Devasini stated: "*if the money can't move it's not ours*." The Tether reserves held at Crypto Capital could not move and thus were not proper reserves.

250.     Defendants were able to make these transfers solely because Bitfinex and Tether were under common control. The same individuals who decided to extend the loans for Tether were precisely the same individuals who signed off for Bitfinex—Devasini and Van der Velde. No reasonable company in Tether's position would have agreed to exchange reserves with Deltec for inaccessible funds with Crypto Capital seized by government authorities.

251.     Had Defendants not controlled both Bitfinex and Tether, Tether could not have sustained its USDT supply while simultaneously decreasing its U.S. dollar reserves; it would have had to redeem $625 million USDT to free up the $625 million that it loaned to Bitfinex. Because they did control both companies, however, Defendants could maintain the USDT supply along with the fiction that Tether had sufficient U.S. dollars in its accounts to back it all.

### 3.     Investigations By The New York Attorney General and the U.S. Commodity Futures Trading Commission Confirm USDT Was Debased

252.     On February 23, 2021, the New York Attorney General ("NYAG") announced a settlement, and related findings of fact, concluding its yearslong investigation of Tether and Bitfinex.

253.     The NYAG announced that "Tether made false statements about the backing of the "tether" stablecoin, and about the movement of hundreds of millions of dollars between the two companies to cover up the truth about massive losses by Bitfinex."[112]

---

[112] *Attorney General James Ends Virtual Currency Trading Platform Bitfinex's Illegal Activities in New York*, N.Y. State Att'y Gen. (Feb. 23, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-ends-virtual-currency-trading-platform-bitfinexs-illegal.

254. According to the NYAG, "[b]etween June 1, 2017 and September 15, 2017, Bit-finex held approximately $382 million of Tether's funds in a comingled account, which should have been held by Tether as 'backing' for tethers then in circulation but was not."[113]

255. On October 15, 2021, the U.S. Commodity Futures Trading Commission ("CFTC") announced a settlement with Bitfinex and Tether.[114]

256. The CFTC concluded that "from at least June 1, 2016 to February 25, 2019, Tether misrepresented to customers and the market that Tether maintained sufficient U.S. dollar reserves to back every USDT in circulation with the 'equivalent amount of corresponding fiat currency' held by Tether and 'safely deposited' in Tether's bank accounts."[115]

257. The CFTC continued: "In fact Tether reserves were not 'fully-backed' the majority of the time," and "Tether failed to disclose that it included unsecured receivables and non-fiat assets in its reserves, and that Tether falsely represented that it would undergo routine, professional audits to demonstrate that it maintained '100% reserves at all times' even though Tether reserves were not audited."[116]

---

[113] *Settlement Agreement*, N.Y. State Att'y Gen. (Feb. 17, 2021), https://ag.ny.gov/sites/default/files/2021.02.17_-_settlement_agreement_-_execution_version.b-t_signed-c2_oag_signed.pdf

[114] *Release Number 8450-21*, CFTC (Oct. 15, 2021), https://www.cftc.gov/PressRoom/PressReleases/8450-21

[115] *Id*.

[116] *Id*.

**D.    The Anonymous Trader's Bot Traded Vast Amounts of Debased USDT for Cryptocommodities**

258.    Defendants understood that, for USDT to be successful, the stablecoin needed to become useful to the crypto community. Potter said: "[I]n order for USDT to be useful, people need[ed] to be willing to accept it in lieu of dollars."

259.    In late 2015, Poloniex became the first crypto-exchange other than Bitfinex to integrate USDT onto its platform. According to Potter, "that's when the magic started happening: People started doing cross-exchange arbitrage with Tether[.]"

260.    In cross-exchange arbitrage, a trader buys an asset on one exchange while simultaneously selling another unit of that same asset on a different exchange for a higher price, creating a profit from the delta between the prices on the two exchanges.

261.    Several crypto-traders recognized USDT's potential for cross-exchange arbitrage and began implementing high-volume trading strategies to capitalize on the myriad price differences between cryptocommodities across the market. Among them was the Anonymous Trader, who developed an automated software program ████████████████████ pushing debased USDT into the crypto market during the Class Period.

262.    Because each transaction involving debased USDT created an inflationary effect in the price of the purchased asset (e.g., bitcoin), each time the Anonymous Trader's bot executed a transaction, the trade contributed further to the price inflation. Defendants uniquely and specifically facilitated the Anonymous Trader's transactions.

263.    For most of the Class Period, neither Poloniex nor Bittrex accepted fiat-based deposits or offered fiat-to-crypto exchanges, meaning users of those exchanges could not trade U.S. dollars for bitcoin. Users of those U.S. based exchanges could, however, trade USDT for bitcoin.

264.    During the Class Period, most USDT issued by Tether first went to Bitfinex and then from Bitfinex to two other exchanges: Bittrex and Poloniex. ███████████████████
███████████████████████████████████████████ .

### 1.    The Anonymous Trader Developed an Automated Trading Bot

265.    The Anonymous Trader developed an automated software program (i.e., the "bot") to engage in cross-exchange arbitrage on Bitfinex and other exchanges. As the Anonymous Trader testified, ████████████████████████████████████████████

████████████████████████████████████████████████

█████████████ ." ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ . ███████

████████████████████████████████████████████████

█████████████ .

266.    The Anonymous Trader ██████████████████████████

█████████████ . ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ . ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ .

267.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ . ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████. █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.

268.   ██████████████████████████████████████████

█████████████████████████████. █████████████████████████████

██████████████████████████████. ██████████████████████████

████████████████████████████████████████████████████

██████████████████████. █████████████████████████████

█████████████████. ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████.

269.   ██████████████████████████████████████████

█████████████████. ███████████████████████████████████████

█████████████████████████████.

## 2. B/T Defendants Knew About the Anonymous Trader's Cross-Exchange Arbitrage Bot Well Before the Class Period Began.

270.   Defendants knew that the Anonymous Trader was using an automatic "bot" to execute ██ cross-exchange arbitrage strategy throughout the Class Period.

271.   As early as March 2016, Bitfinex's Head of Customer Support, Bjorn de Wolf, asked Paolo Ardoino, Bitfinex's CTO, to "greenlane[]" the Anonymous Trader's account—a

security setting that allows a customer skip cumbersome verifications—because the Trader was viewed as a "market maker" and "███ bot require[d] instant withdrawals." Ardoino complied with the request and greenlaned the Trader's account.

272.    Devasini first became aware of the Anonymous Trader in 2015 or 2016. By January 2017, Devasini and the Anonymous Trader were exchanging direct private messages over Skype.

273.    In one such message from January 11, 2017, Devasini asked the Anonymous Trader how the bot was able to arbitrage between an exchange like Poloniex, which accepted USDT but not USD, and an exchange like Kraken, which accepted USD but not USDT. The Anonymous Trader explained that Bitfinex served as a required intermediary: "When my bot needs USDT on Polo[niex] it transfers from [Bitfinex]." Because Bitfinex was the only exchange that offered both USD and USDT, any USD proceeds from an arbitrage sale on Kraken needed to first be transferred to Bitfinex, where the USD would be exchanged for USDT, before flowing back to Poloniex to complete the arbitrage cycle. In other words, the Anonymous Trader was using USDT exactly as Defendants intended: as a proxy for U.S. Dollars in cross-exchange arbitrage. *See supra* ¶¶ 258-59.

274.    The Anonymous Trader fully understood the intended function of USDT and, in the same message chain, expressed desire for other crypto-exchanges, like Kraken, to adopt the stablecoin to better allow seamless cross-exchange arbitrage with those exchanges that could not support USD deposits. Devasini replied that Bitfinex was "working on it," but in the meantime he encouraged the Anonymous Trader to "keep arbing with Polo[niex]" as he acknowledged: "the only way to arb between Polo and Kraken is by making Bitfinex profit."

### 3. The Anonymous Trader's Bot Traded Vast Amounts of Debased USDT For Cryptocommodities

275. ███████████████████████████████████████

███████. From March 2017 to November 2018,[117] the Anonymous Trader's bot acquired ██

██████ all USDT issued from Tether's Treasury wallet:[118]



276. ███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████.

---

[117] After November 28, 2018, Bitfinex stopped treating USD and USDT the same resulting in gaps in the trading records prior to the official listing of USDT.

[118] ████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████. The figure ends on November 28, 2018, corresponding to the date on which Bitfinex separated USD and USDT balances.

277.    The Anonymous Trader's bot used the USDT that it withdrew from the ████

████ on Bitfinex to the crypto exchange Poloniex. During the Class Period, the Anonymous

Trader's bot transferred approximately ████████ USDT from ███ to Poloniex to trade.

278.    The Anonymous Trader's bot used the USDT that it withdrew from the ████

████ on Bitfinex to an address on the crypto exchange Bittrex. During the Class Period, the Anon-

ymous Trader's bot transferred approximately ████████ USDT from ████ to Bittrex to trade.

279.    Between March 30, 2017, and September 9, 2018, the Anonymous Trader never

wired any fiat currency to Bitfinex or Tether.

### 4.    Due To A Persistent Price Premium On Bitfinex, The Anonymous Trader's Trades Resulted In More Sales of Bitcoin On Bitfinex and More Purchases of Bitcoin on Other Exchanges

280.    During the Class Period, bitcoin consistently traded at a premium on Bitfinex com-

pared to other exchanges such as Poloniex and Bittrex despite the fact that on Bitfinex, bitcoin

trading was nominally denominated in U.S. dollars, while on Poloniex and Bittrex, bitcoin trading

was denominated in USDT.

281.    This persistent premium is unnatural. In an unmanipulated market, prices for the

same commodity across exchanges should align. If bitcoin is trading for $10,000 on Exchange A

and for $10,010 on Exchange B, arbitrage traders will purchase bitcoin on Exchange A to be sold

on Exchange B to the point where, netting any fees, there is no price difference between Exchange

A and Exchange B. Although price fluctuation happens, price differences should rarely be one-

directional, and any price gap should be short-lived because arbitrage traders would immediately

exploit it.

282.    During the Class Period, however, bitcoin regularly traded at a higher price on Bit-

finex than it did on Poloniex and Bittrex. For example, between March 2017 and January 2018

██████████████████████████████████████████████████████ Bitfinex's bitcoin

premium over Poloniex lasted for eight months and that over Bittrex lasted for nine months. The following chart shows the extent of Bitfinex's premiums (over Poloniex in green; over Bittrex in blue), measured by the USD-based price on Bitfinex and USDT-based price on Poloniex and Bittrex, based on monthly summaries of closing prices on the three exchanges. The chart shows that, analyzed on a daily basis, bitcoin traded at a premium on Bitfinex relative to Bittrex on 58% of days during the Class Period, and on 57% of days relative to Poloniex. The disproportionate number of price premium days on Bitfinex increases, as the price differential increases. For example, there were 201 days on which the average bitcoin price differential between Bitfinex and Bittrex was more than $25 (in either direction), and 125 such days with respect to Bitfinex and Poloniex. On 78% of those "large premium" days for Bitfinex and Bittrex, the price of bitcoin was at a premium on Bitfinex; and on 87% of those "large premium" days for Bitfinex and Poloniex, the price of bitcoin was at a premium on Bitfinex.[119]

---

[119] During the Class Period, Bitfinex only supported the BTC/USD trading pair, whereas Poloniex and Bittrex only supported the BTC/USDT trading pair, until May 2018, when Bittrex also introduced the BTC/USD trading pair. Between May 2018 and February 2019, the BTC-USD price on Bitfinex was also consistently higher than the BTC-USD price on Bittrex.



283.    The Anonymous Trader's bot captured much of this premium.

284.    The bot traded based on cryptocurrencies' price differentials across exchanges,

████████████████████████████████████████████████████████. Given

the persistent bitcoin price premium on Bitfinex, the bot purchased many more bitcoin on other

exchanges and sold many more bitcoin on Bitfinex than the other way around.

285.    At the same time, although Bitfinex did not support the BTC/USDT trading pair

during the Class Period, it allowed customers to deposit USDT to their Bitfinex accounts, which

it would credit as US dollars in their accounts. Bitfinex then allowed customers to withdraw it as

either US dollars or as USDT. During the Class Period, the Anonymous Trader's bot sold bitcoin

on Bitfinex for U.S. dollars, withdrew those dollars as USDT from Bitfinex and used that USDT

to purchase bitcoin on other exchanges. As a result, on a net basis, bitcoin flowed from other

exchanges to Bitfinex, and USDT flowed from Bitfinex to other exchanges.

286.    This chart shows the daily percentage premium that the Anonymous Trader's bot

earned during the Class Period by buying bitcoin on Bittrex for USDT and selling it on Bitfinex

for US dollars, with the daily percentage premium in blue, and the gross BTC purchase volume on Bittrex in green[120]:



287.    While the daily measure was occasionally negative (i.e., at times, the average daily price of bitcoin was lower on Bitfinex than on Bittrex), the overall trend during the Class Period—illustrated by the 30-day moving average—shows that the Anonymous Trader's bot captured the consistent premium on Bitfinex versus Bittrex by purchasing bitcoin on Bittrex (with USDT that had been transferred from Bitfinex to Bittrex) to sell at a higher U.S. dollar (or effectively, USDT) price on Bitfinex. Throughout the Class Period, the Anonymous Trader's bot purchased on **net** (purchases minus sales) approximately ███████ worth of bitcoin on Bittrex to be sold on Bitfinex.

288.    This chart shows the daily percentage premium that the Anonymous Trader's bot earned during the Class Period by buying bitcoin on Poloniex for USDT and selling it on Bitfinex

for U.S. dollars, (or effectively, USDT) with the daily percentage premium in blue, and the gross BTC purchase volume on Bittrex in green.[121]



289.    Albeit smaller and less consistent than the premium versus Bittrex, the average daily premium captured by the Anonymous Trader's trades was also positive on Bitfinex versus Poloniex during the Class Period, and sufficiently persistent on an intraday basis to generate the significant daily bitcoin purchase volumes indicated in the chart above. While the percentage price differential on Poloniex was not as large as on Bittrex, it was still large and persistent enough for Anonymous Trader's bot to generate a substantial net outflow of USDT from Bitfinex. For example, █████████████████████████████████████████████████████████ ████████████████████████████████████████. Throughout the Class Period, the Anonymous Trader's bot purchased on *net* (purchases minus sales) approximately ████████████ worth of bitcoin on Poloniex to be sold on Bitfinex.

---

[121] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

### E.   Defendants Facilitated the Anonymous Trader's Trading

290.   Defendants knew what the Anonymous Trader was doing.

291.   Defendants knew that █ was using a bot to conduct cross-exchange arbitrage involving USDT. They believed that the bot was efficiently designed. The Anonymous Trader told them, often, that █ was using a bot. They were aware that the bot developed by the Anonymous Trader placed █ orders per second, something no human could do manually, and that the bot could place orders even when the Anonymous Trader █████ was not online. They knew as well that the Anonymous Trader's bot was placing orders worth ████████████, which generated substantial trading income for Bitfinex.

292.   Defendants influenced both sides of the Anonymous Trader's trades. Defendants used debased USDT to facilitate the arbitrage. They provided █ bot with debased USDT—allowing the bot to buy bitcoin with USDT on other exchanges at artificially inflated prices. They facilitated a price premium for bitcoin on Bitfinex versus Poloniex and Bittrex—allowing the bot to consistently sell bitcoin on Bitfinex at artificially inflated prices. And they helped the Anonymous Trader's bot perform a larger volume of total trades.

293.   This benefitted Defendants by inflating bitcoin prices, encouraging more trades on their Bitfinex exchange, and pushing more USDT onto other exchanges, encouraging its use as the crypto economy's dominant U.S. dollar-pegged stablecoin.

#### 1.   Defendants Gave the Anonymous Trader Vast Quantities of USDT

294.   Defendants knew that USDT was specifically useful for arbitrage, because it allowed traders to buy and sell crypto-assets on different exchanges much more quickly than they could using U.S. dollars through traditional banking networks, in which transmission of funds could take days. Van der Velde testified that the purpose of stablecoins like USDT it to "provide

a means for traders to arbitrage between different exchanges and overcome the limitations of banks that do not operate 24/7."

295.    Bitfinex allowed customers to withdraw US dollars from their accounts as USDT at the rate of one USDT for one dollar, even when USDT was trading below a dollar on other exchanges or was not backed 1-to-1 by U.S. Dollars.

296.    Defendants actively provided the Anonymous Trader with the USDT that ▮ bot needed to facilitate trades and buy cryptocommodities on other exchanges.

297.    While the Anonymous Trader's bot could automatically request USDT withdrawals, Bitfinex could not execute those requests unless it had sufficient USDT to honor them.

298.    Bitfinex processed customer withdrawals of USDT from its "hot wallet." This wallet was on-line and connected to the exchange's operations. Bitfinex processed withdrawals from its hot wallet automatically. If Bitfinex's hot wallet did not contain sufficient USDT to cover a withdrawal request, the request would be "stuck" until Bitfinex replenished its hot wallet's supply of USDT.

299.    To add USDT to its hot wallet, Bitfinex had to either (a) transfer USDT from Bitfinex's "cold wallet"—an offline wallet not connected to the exchange; or (b) request that Tether issue additional USDT to Bitfinex's hot wallet. Neither process was automatic—both required the approval of multiple individuals, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

300.    Further because the same principals controlled Bitfinex and Tether, and Tether would issue USDT to Bitfinex in exchange for an IOU, the issuances were effectively on demand instantaneously and unconstrained by the number of dollars in the bank or any time constraints that should have been required to actually process fiat prior to issuance.

301.   ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████." ██████████████████████

██████████████████████████████.

302.   The Anonymous Trader had direct contact information for Bitfinex's top executives and would contact them multiple times a week—sometimes multiple times a day—when ██ bot needed more USDT than available in the hot wallet. ████████████████████████████

████.

303.   ███████████████████████████████████████████

███████████████████████████████████████████████."

Bitfinex knew this, and its executives responded to the Anonymous Trader's requests as quickly as possible, at all hours of the day and night. Ardoino and Devasini created ████████████

██████████████████████████ allowing the Anonymous Trader to contact two of Bitfinex's highest executives "in the middle of the night" if needed.

304.   Through the end of 2018, Bitfinex provided the Anonymous Trader's bot with nearly ██████████ USDT from Bitfinex's hot wallet via the ████████████████. One can measure the flow of USDT in a given period either based on the *gross* outflows of USDT, or based on the *net* flows of USDT, accounting for the USDT sent back to Bitfinex. Under either measure, however, the Anonymous Trader bot received ████████████████ USDT issued by Tether during the Class Period. For example, from May 23 to May 27, 2017, Tether issued 42.6 million USDT to Bitfinex. During that same period, Bitfinex provided the bot with ██████████ USDT in withdrawals, which accounts for ███ of the total transfers of USDT out of Bitfinex during those days. Considered differently, accounting for the transfers of USDT back to Bitfinex by the bot and other

traders during the same period, the Anonymous Trader's bot accounts for █████ of the net transfers of USDT from Bitfinex during this same period. During the run-up in Bitcoin prices between March 31, 2017 and December 31, 2017, Bitfinex sent nearly ████████ USDT to the bot on a gross basis; accounting for the USDT sent back to Bitfinex, Bitfinex sent the bot on net ████████ USDT during this time period. These net USDT flows to the bot account for over ████ of the total newly issued USDT on a net basis over this same time period. ██████████████████ ███████████████████████████████████████████ ██████████████████████████████████████.

305.    When Defendants moved USDT to Bitfinex's hot wallet, the Anonymous Trader's bot would automatically withdraw USDT from Bitfinex and trade it on other crypto exchanges, often for cryptocommodities.

306.    The Anonymous Trader's trades of USDT for cryptocommodities required affirmative acts by Defendants. They controlled the supply of USDT. They had to provide USDT to the Anonymous Trader via Bitfinex's hot wallet in order for ███ bot to withdraw that USDT and trade it for cryptocommodities on other exchanges. If Defendants did not transfer the USDT to Bitfinex's hot wallet, the trades would not have occurred. Defendants knew this.

307.    Once Defendants transferred the USDT to Bitfinex's hot wallet, the trades were inevitable: The bot executed them without human intervention; no further action was required. Defendants knew this too.

### 2.    Defendants Were Aware of and Facilitated the Bitfinex Price Premium

308.    Running a cryptocurrency exchange, Defendants were closely monitoring market conditions and were aware of the persistent bitcoin price premium on Bitfinex. They discussed the premium internally, as well as with customers and reporters.

309.    Because Defendants understood the Anonymous Trader's bot's trading strategy, they knew that, given the persistent premium, the bot would automatically withdraw USDT from Bitfinex and trade it for bitcoin on other exchanges, sell those bitcoin on Bitfinex for U.S. dollars, (or effectively, USDT, because of the commingling of U.S. dollars and USDT on Bitfinex), and repeat the cycle. They thus knew that the premium would cause an outflow of debased USDT from Bitfinex to other exchanges.

310.    Defendants' public explanation for the premium is untenable. They claimed that negative media coverage of Bitfinex and Tether caused customers to panic into buying bitcoin. Yet, as a Bloomberg reporter observed, if customers lost trust in Bitfinex and wanted to move their trades to other exchanges, they would simply sell their holdings on Bitfinex, which would suppress, not increase, bitcoin prices. If customers had misgivings about USDT and wanted to exchange it for bitcoin, the same phenomenon should have occurred on Bittrex and Poloniex, which accepted USDT for trading, but it did not.

311.    Defendants caused or facilitated the premium in at least two ways.

312.    First, Tether issued USDT to Bitfinex in exchange for IOUs during the Class Period. The USDT issued based on IOUs signaled to the market a false demand for bitcoin and other cryptocurrencies. If someone with $1,000 in her bank account borrows another $1,000 and buys $2,000 worth of a commodity, the market perceives a $2,000 demand, even though the customer tendered only $1,000 of her own money. When USDT was partially backed by receivables from or loans to Bitfinex, it reflected USDT demand in the full amount of those receivables, without discounting for collection or counterparty risk. When traders used this debased USDT to purchase bitcoin on Bitfinex, it artificially inflated bitcoin prices there.

313.     Second, Defendants allowed Bitfinex's largest customers to trade on credit lines and on margin backed in part by debased USDT commingled with its other assets. Defendants themselves traded and purchased cryptocommodities on credit lines. In issuing credit lines, Bitfinex credited assets to customers' accounts, allowing them to trade, **before** receiving the funds or crypto assets that the customers deposited. Defendants do not have full records of the amount that they lent to their biggest customers and cannot recreate them from existing data.

314.     The records that do exist show that these credit lines were substantial, resulting in more liquidity being available for the exchange's customers to purchase cryptocurrencies.

315.     There is no documentary evidence that Bitfinex had sufficient assets of its own to back the credit lines that it issued. Bitfinex commingled all of its customers funds and operational funds in omnibus accounts and has no historical records showing its net assets or liabilities from the Class Period.

316.     Bitfinex also facilitated credit lines to traders using other customers' coins.

317.     Bitfinex also placed accounts that were allowed to trade on credit on "safe liquidation mode" so that they would not be liquidated even when they incurred a negative balance. An October 27, 2017 chat indicated negative equity of -$19,658,260 for one customer's account (█████ █████████), and of -$22,272 for an account ████████████████ to settle trades in foreign currencies (████████). These negative balances allow traders to withdraw beyond the funds in their own accounts, which likewise reflects lending activity by Bitfinex.

318.     Similarly, during the Class Period, Bitfinex allowed customers to conduct peer-to-peer margin trading, buying and selling cryptocurrencies with borrowed money. The collateral required to open a margin trading position in bitcoin versus the U.S. dollar was 30 percent, and the

minimum required collateral to keep the position open was 15 percent. Defendants also acknowledged that the margin trading feature was "popular."

319.    The natural economic consequence of Bitfinex's extension of credit line and enabling of margin trading was to create price premiums on Bitfinex versus other exchanges. Allowing margin trading or trading on credit made more assets available to Bitfinex customers, creating more demand for bitcoin on Bitfinex than on other exchanges. Bitfinex's practice artificially created higher prices for bitcoin on Bitfinex than other exchanges.

320.    Defendants knew that increasing credit on the Bitfinex exchange would lead to higher bitcoin prices. As Devasini stated in a chat with a customer with username softwind6: "[T]hey don't realize we wouldn't need [USDT] if we wanted to pump [bitcoin] … I could give 1 trillion usd [credit] line on your account and then you can pump it to the moon without even touching [USDT]." Devasini also acknowledged at his deposition that issuing a substantial credit line "that is not backed by anything of an enormous amount of money" would cause customers to "use this fake money to buy an enormous amount of Bitcoin and, therefore, the price will increase."

321.    Through at least two means, Bitfinex was actively facilitating the bitcoin price premium on Bitfinex, knowing the Anonymous Trader's bot would persistently trade this premium using debased USDT, and that it would send the debased USDT from Bitfinex to the market at large.

### 3.    Defendants Helped the Anonymous Trader's Bot Trade Large Volumes

322.    ███████████████████████████████████████████████████████ ███████████████. Bitfinex offered a "greenlane" feature that allowed customers to withdraw cryptocurrencies faster while still meeting various security standards. While Bitfinex limited

most customers to greenlane withdrawals of assets worth $250,000, ███████████████

████████████████████, ███████████████████████.

323.   ████████████████████████████████████

███████████████████████████████████████████████

██████████████. ██████████████████████████████

███████████████████████.

324.   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████. The Anonymous

Trader testified that ██████████████████████████

███████████.

325.   ████████████████████████████████████

████████████. ████████████████████████████████

███████████████████████████████████████████████

█████████████████████.

326.   ████████████████████████████████████

████████████████. ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████.

327. ███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████.

328.    The Anonymous Trader also ███████████████████████

████████████████████████████████████████████

██████."

329. ███████████████████████████████████████

████████████████████████████████████████████

██, ████████████████████████████████████████

████████████████████████████████████████████

█████████████████.

330. ███████████████████████████████████████

████████████████████████████████████████████

███████████████.

331. ███████████████████████████████████████

████████████████████████████████. As the Anonymous Trader

put it, ██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████. █████████████████

████████████████████████████████████████████

███████████████████████████████████."

332.    Bitfinex extended the Anonymous Trader credit lines for free. This allowed the bot

to trade cryptocurrencies that it did not have on the Bitfinex exchange and withdraw U.S. dollars

that it did not have in the form of USDT that it could use to purchase bitcoin on other exchanges. Even if Bitfinex's loans to the Anonymous Trader had been fully backed, this allowed █ bot to trade larger volume of bitcoin and USDT than it otherwise would have been able to trade.

333.    The Anonymous Trader was aware of Bitfinex's lack of access to traditional banking in 2017. On May 15, 2017, the Anonymous Trader asked Devasini if there was "any news on banking." The Anonymous Trader further advised that Kraken was using banking in Japan that "work[ed] fast, no problems."

334.    ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████.

335.    At one point, in 2018, Devasini wrote to the Anonymous Trader: "[C]an you please push the [bitcoin] price above 10k again?" █ responded: "Sure no problem, just issue me some [USDT.]"

336.    In late 2018, shortly after Bitfinex had taken a $625 million dollar loan of Tether's reserves to address its liquidity crisis, ███████████████████████████
██████████████████████████████████████████████
████████████████████████. ████████████████████
███████████████████████████."

### F.    Debased USDT Traded for Cryptocommodities Artificially Inflated Cryptocommodity Prices—And Defendants Knew It

337.    As a matter of basic economics, debasing a non-fiat currency causes the price of goods sold in that currency to rise. For example, when the Roman Empire reduced the silver

content of its coins from 100% to 5% over the course of 150 years, prices rose by approximately 1000 percent.

338.    If a government were to debase a non-currency in secret, prices based on that currency would be artificially inflated. Were the debasement public, the market would respond by increasing prices to account for the debasement. The amount of that increase is the artificial portion of the price while the debasement remains hidden.

339.    During the Class Period, there was demand for cryptocommodities priced in USDT. That price varied based on cryptocommodity supply and on consumer demand. Defendants represented that USDT was backed one-to-one by U.S. dollars. When a market participant offered to pay one USDT in exchange for a cryptocommodity, the market understood it to be offering the equivalent of one U.S. dollar.

340.    Tether secretly debased USDT by not maintaining in Tether's bank accounts the same number of dollars as the USDT that Tether had issued. Defendants did not publicly disclose the amount of USDT that Tether had issued in exchange for bitcoin and not for U.S. dollars, or the amount of the Tether receivables from Bitfinex that they counted as reserves backing USDT, or the amount of customer loans by Bitfinex that were effectively financed with USDT, or the occasions on which their records showed that Tether's shareholder equity was negative.

341.    Had this debasement been public, the market would have responded by reducing the market price of transactions in USDT. For example, if Tether had issued a million USDT, but had only $900,000 on deposit, the market would have understood an offer to pay one USDT as an offer to pay the equivalent of 90 cents.

342.    When market participants bought cryptocommodities with debased USDT, the trades artificially inflated the price of those cryptocommodities. For example, if at a given moment

a hundred buyers were each bidding 10,000 USDT worth one dollar each for a single bitcoin, the market would understand total demand to be equivalent to $1 million. If there were a hundred sellers at that price, the market price would be 10,000 USDT per bitcoin, reflecting $10,000. If those hundred buyers were each bidding 10,000 USDT worth 90 cents each for a single bitcoin, however, the market would understand total demand to be equivalent to $900,000; with a hundred sellers the market price would be 10,000 USDT per bitcoin, reflecting $9,000, not $10,000. If the USDT's debasement was concealed, the amount that the price would have dropped if the debasement had been revealed—in this example, $1,000—would be artificial.

343.    In this way, Defendants controlled cryptocommodity prices during the Class Period. Knowing of the Anonymous Trader's cross-exchange arbitrage, they provided the bot vast quantities of USDT that they knew was debased, enabling the bot to perform more trades more often with ███████████████████████. The bot's trades with debased USDT inflated cryptcocommodity prices, causing market participants to pay prices for cryptocommodities that did not reflect ordinary market conditions.

**1.    Debased USDT funded Massive Crypto-Asset Purchases on Bittrex and Poloniex**

344.    Defendants pushed USDT to the Anonymous Trader's bot, which automatically sent that USDT to wallet address on Bittrex and Poloniex to purchase bitcoin and other cryptocurrencies. The bot sent these cryptocommodities back to Bitfinex to be sold and to repeat the cycle.













352.   The impact on the price of Bitcoin of the ███████████████ transactions involving debased USDT through the bot on Bitfinex, Bittrex, and Poloniex is evident in the following figure:



353.   Since the bot was programmed to trade on the basis of arbitrage opportunities, *i.e.* differences in prices between exchanges, and not on the basis of overall market prices, the increase in bitcoin prices does not explain the bot's increased trade count. Regardless of whether two exchanges listed bitcoin as $100 and $101 respectively, or $1000 and $1001 respectively, the expected profit on the trade is still $1. There is thus no reason that an increase in bitcoin prices would cause an increase in the bot's trade count. It was rather Defendants ever-flowing supply of debased USDT to the Anonymous Trader's bot, combined with Defendants commingling of USDT and U.S. dollars on Bitfinex, that caused the bot to execute an enormous increase in the number of its

transactions, which in tun led to increased bitcoin and other cryptocommodity prices across the crypto ecosystem.













361.   ████████████████████████████████████████████████████████

████████████████████████████████████.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

362.   Expert analysis confirms that during the Class Period, the daily returns for bitcoin were highly correlated with the daily returns for other major cryptocommodities, such as ethereum (ETH) and litecoin (LTC). These correlations are reflected in both U.S. dollar denominated and USDT denominated trading pairs. The high correlation in the returns for bitcoin and other crypto-assets indicates that the prices of these other crypto-assets tend to rise and fall with bitcoin prices.

|          | BTC-USD | ETH-USD | LTC-USD |
|----------|---------|---------|---------|
| **BTC-USD** | 100.0%  | 93.6%   | 79.6%   |
| **ETH-USD** |         | 100.0%  | 67.9%   |
| **LTC-USD** |         |         | 100.0%  |

|           | BTC-USDT | ETH-USDT | LTC-USDT |
|-----------|----------|----------|----------|
| **BTC-USDT** | 100.0%   | 93.5%    | 74.0%    |
| **ETH-USDT** |          | 100.0%   | 67.4%    |
| **LTC-USDT** |          |          | 100.0%   |

363.    Defendants could have prevented this inflation. Because they controlled the USDT supply, they could have refrained from issuing USDT unless it was fully backed by U.S. dollars in Tether bank accounts. Because they controlled the Bitfinex exchange, they could have prevented customers from withdrawing funds as USDT. Or, having decided to allow USDT withdrawals, they could have refused to let customers withdraw funds as USDT from Bitfinex unless Tether's bank accounts held one U.S. dollar for each issued USDT in circulation. Any of these actions would have ensured that the Anonymous Trader's trades did not artificially inflate cryptocommodity prices. Defendants did none of those things.

364.    Defendants knew that trades with debased USDT would inflate cryptocommodity prices. They knew that those prices were linked to the market price of USDT—and that revealing the debased nature of USDT would cause cryptocommodity prices to fall.

365.    On October 15, 2018, Devasini, going by the name "Merlin," had the following exchange with Oz Yosef from Crypto Capital, going by the handle "CCC":

> **Merlin**
> Hey Oz, sorry to bother you every day, is there any way to move at least 100M to [*redacted*]? We are seeing massive withdrawals and we are not able to face them anymore unless we can transfer some money out of Cryptocapital
>
> …
>
> **CCC**
> I know. We are following the banks we post as many as we can and let them process as much as possible according to them. Everytime [*sic*] we push them they push back with account closure without reason
> **Merlin**
> dozens of people are now waiting for a withdrawal out of cryptocapital
>
> …

**Merlin**
I need to provide customers with precise answer at this point, can't
just kick the can a little more
**Merlin**
the international I mean
**CCC**
I will keep you posted here
**CCC**
On the process of all international payments.
**Merlin**
please understand all this could be extremely dangerous for every-
body, the entire crypto community
**Merlin**
BTC could tank to below 1k if we don't act quickly[122]

366.    Defendants knew that if they could not process USDT redemptions, the market

would realize USDT was not fully backed and the price of bitcoin "could tank to below 1k," which

would harm "the entire crypto community."

367.    The price inflation caused by Defendants' scheme persisted throughout the Class

Period. When USDT was debased, Class members who purchased cryptocommodities at inflated

prices were injured. When USDT was not debased, Class members who had earlier purchased

cryptocommodities at inflated prices still bore the injury of having previously overpaid. Class

members who sold cryptocommodities at prices reflecting less inflation than the prices at which

they bought were injured by the amount of the difference.



---

122 Whitehurst Aff. ¶¶ 63, 67; *see also* Whitehurst Aff., Ex. E.









**G.    Defendants Profited from Their Scheme**

386.    Defendants had both long- and short-term incentives in facilitating the Anonymous Trader's arbitrage trading. Short-term, Defendants sought to ride in █ bot's inflationary wake— as █ pushed more and more debased USDT into the market, the price of cryptocommodities, especially bitcoin, rose.

387.    During the Class Period, Defendants personally held crypto commodities and also held a significant amount of cryptocommodities in Bitfinex-controlled accounts, including commissions customers paid in the form of cryptocommodities and collateral and/or margin positions that Bitfinex inherited from customers' accounts. Bitfinex and Tether executives were also actively trading, including on Bitfinex, and encouraged employees to trade on Bitfinex instead of elsewhere.

388.    During the Class Period, Defendants also held substantial long positions in cryptocommodities, including bitcoin, through both their own accounts and Bitfinex-controlled accounts.

Expert analysis reflects that ███████ account on Bitfinex, for example, has maintained a positive balance of bitcoin since 2015. ██ also accumulated significant holdings of ethereum, and ethereum classic. At one point, these positions accumulated to an amount of ████████████████ ██ of dollars. Defendants thus were incentivized to drive up cryptocommodity prices and they generally profited from the inflation in those prices.

389.    Long-term, Defendants had their sights set on establishing USDT as the pre-eminent stablecoin and an unassailable pillar of the crypto-trading community. They succeeded, but only at the expense of the Class.

390.    In the early days of Tether, USDT topped out at around one million total in circulation. By the end of 2016 and the beginning of 2017 that figure rose to five million. By the end of 2017—the middle of the Class Period—there were 1.4 billion USDT in circulation. Today, that figure is closer to 83 billion.[137]

391.    Defendants achieved what they set out to do—establish the crypto-world's most dominant stablecoin. They have outgrown the need to support individual, high-volume traders like the Anonymous Trader; the larger crypto community trades in USDT, which is now accepted on 117 different crypto-exchanges.[138] Defendants can now park their USDT reserves in treasury bonds, CDs, and similar instruments—having changed their disclosures to reflect this—and make billions in interest each year.

392.    Defendants' success was not possible without their facilitation of the Anonymous Trader's bot during the Class Period. Defendants knew this. They fed it debased USDT, artificially driving up cryptocommodity prices and harming the Class.

---

[137] Blockworks, https://blockworks.co/price/usdt (last visited Oct. 23, 2023).

[138] Coincodex, https://coincodex.com/crypto/tether/exchanges/ (last visited Oct. 23, 2023).

393.    This lawsuit seeks to hold Defendants accountable.

## V.    Class Allegations

394.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a), (b), and

(c)(4) of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") defined as follows:

> All persons or entities that purchased or otherwise acquired crypto-commodities (including bitcoin, bitcoin cash, ethereum, ethereum classic, litecoin, monero, dash and ZCash) or cryptocommodity Futures, in the United States or its territories at any time from March 31, 2017 through February 25, 2019 and were injured thereby.

395.    Plaintiffs also seek to represent a subclass (the "Cryptocommodity Futures Sub-class") defined as follows:

> All persons or entities that purchased or otherwise acquired Crypto-commodity Futures in the United States or its territories at any time from March 31, 2017, through February 25, 2019 and were injured thereby.

396.    The Class excludes any person or entity whose purchases of cryptocommodities or

cryptocommodity futures were exclusively through Bitfinex. Also excluded from the Class are

Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, as well

as the Anonymous Trader. Also excluded is the Judge presiding over this action, his or her law

clerks, spouse, and any person within the third degree of relationship living in the Judge's house-

hold and the spouse of such a person.

397.    Plaintiffs reserve the right to amend the definitions of the Class if further investi-

gation and/or discovery indicate that the Class definition should be narrowed, expanded, or other-

wise modified.

398.    The members of the Class are so numerous that joinder of all members is impracti-

cable. The precise number of members of the Class is unknown to Plaintiffs at this time, but it is

believed to be in the tens of thousands.

399.    The members of the Class are readily ascertainable and identifiable. They may be identified by publicly accessible blockchain ledger information. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

400.    Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

401.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

     a.     Whether Tether's issuance of USDT was "one-to-one" backed with U.S. dollars;

     b.     Whether Defendants were a cause of the Anonymous Trader's trades of USDT for cryptocommodities by providing ▮ with the debased USDT that ▮ bot used to automatically conduct those trades;

     c.     Whether those trades artificially increased the price of cryptocommodities;

     d.     Whether Defendants violated Sections 6(c)(3), 9(a) and 22 of the CEA;

     e.     Whether Defendants' manipulated bitcoin and injected artificial prices into Bitcoin futures that traded on the CME and Cboe;

     f.     Whether Defendants had monopoly power in the market for cryptocommodities;

     g.     Whether Defendants monopolized the market for cryptocommodities for purposes of the Sherman Act, 15 U.S.C. § 2;

     h.     Whether Defendants and the Anonymous Trader conspired to manipulate cryptocommodity prices in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

     i.     In the alternative, whether Defendants conspired to manipulate cryptocommodity prices in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

     j.     Whether the Class suffered injury due to Defendant's violations of the CEA and the Sherman Act;

     k.     The appropriate class-wide measure of relief for the Defendants' violations of the CEA and the Sherman Act;

402.   Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Defendants' practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages from Defendants' practices.

403.   Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class actions and crypto-asset-related litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

404.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Furthermore, the interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered by some of the individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

405.   Plaintiffs anticipate no difficulty in the management of this action as a class action.

406.   WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a), (b) and (c)(4) of the Federal Rules of Civil

Procedure, that they be named Class Representatives, that undersigned counsel be named Co-Lead Class Counsel, and that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Market Manipulation
### Commodities Exchange Act

407.     Plaintiffs incorporate the preceding paragraphs.

408.     Cryptocommodities are commodities within the definition of 7 U.S.C. § 1a. The CFTC has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities, and are therefore subject as a commodity to applicable provisions of the [Commodity Exchange] Act and Regulations."[139]

409.     Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

410.     The CFTC timely promulgated Rule 180.1(a), which makes it

> unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

---

[139] *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5 (C.F.T.C. June 2, 2016).

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

411.    Defendants employed a manipulative and deceptive device and scheme. Defendants violated Rule 180.1(a), by *inter alia*, communicating false information about USDT being fully backed by U.S. dollars, debasing USDT by failing to keep sufficient dollars in Tether's accounts to match the number of issued USDT and otherwise misrepresenting the demand for cryptocommodities by issuing unbacked USDT. They concealed this debasement by falsely representing to the market that issued USDT was backed one-to-one by U.S. dollars. They actively provided vast amounts of this debased USDT to the Anonymous Trader's bot facilitating trades of cryptocommodities. Those trades artificially inflated cryptocommodity prices by sending a false signal to the market about the level of demand for those assets, preventing true price discovery. These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocommodity market.

412.    Defendants acted intentionally or recklessly. They knew that USDT was frequently not backed one-to-one by dollars in Tether's bank accounts. They knew that their representations that USDT was fully backed were false. They knew that the Anonymous Trader used a bot to automatically withdraw USDT from Bitfinex and trade it for cryptocommodities. And they knew

that those trades would inflate cryptocommodity prices, because they knew that if USDT's debasement was revealed then those prices would fall.

413.   Defendants also engaged in price manipulation. They could inflate the price of cryptocommodities by debasing USDT, providing it to the Anonymous Trader, and affirmatively facilitating ▮ trades of USDT for cryptocommodities. The Anonymous Trader's trades of debased USDT for cryptcommodities artificially inflated cryptocommodity prices, as they did not accurately reflect market demand. Defendants' conduct caused this artificial increase in cryptocommodity prices. Defendants had motive to inflate cryptocommodity prices—it inflated the value of their cryptocommodity holding, encouraged more trades on their Bitfinex exchange, and promoted the widespread adoption of USDT as a dollar-pegged stablecoin. They had the opportunity to do so—they controlled issuances of USDT, they provided debased USDT to the Anonymous Trader, and they knew ▮ bot would automatically trade it for cryptocommodities.

414.   Defendants displayed consciousness of their misbehavior or recklessness by being aware of USDT's debasement, concealing that debasement from the public, concealing links between Tether and Bitfinex, acknowledging that cryptocommodity prices were linked to the market value of USDT, and taking efforts to maintain the illusion that USDT was backed one-to-one by U.S. dollars.

415.   As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Cryptocommodity Futures Subclass suffered actual damages and injury in fact due to artificial prices to which they would not have been subject but for Defendants' unlawful conduct. Plaintiffs and members of the Cryptocommodity Futures Subclass were further legally injured and suffered injury in fact because they transacted in futures contracts of cryptocommodities in an artificial and

manipulated market operating under the artificial prices caused Defendants. That conduct caused injury to the Plaintiffs and the Cryptocommodity Futures Subclass.

416.    WHEREFORE, Plaintiffs pray that the Court adjudge and decree that Defendants violated the CEA, 7 U.S.C. § 1 *et seq.*, damaged Plaintiffs and members of the Class; and enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Crypto-commodity Futures Subclass for the actual damages suffered, and disgorge Defendants of their ill-gotten gains.

## SECOND CAUSE OF ACTION

### Monopolization
### Sherman Antitrust Act Section 2

417.    Plaintiffs incorporate the preceding paragraphs.

418.    Defendants willfully acquired and maintained market power in the market for cryptocommodities in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

419.    Defendants used the instrumentalities of interstate commerce, including interstate wires, to effectuate their illegal scheme.

420.    Defendants' manipulation and conduct alleged herein was in U.S. import commerce and had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims, within the meaning of 15 U.S.C. § 6a.

421.    Defendants have market power in the cryptocommodities market because they can control prices of cryptocommodities. Defendants exercised this control prices by issuing large amounts of USDT, falsely representing that the USDT was fully backed by U.S. dollar reserves, and actively facilitating the Anonymous Trader's automatic trading of debased USDT for cryptocommodities.

422.    Defendants acquired and maintained this market power through anticompetitive actions, including by misrepresenting to the market that USDT was backed one-to-one by U.S. dollars, concealing the relationship between Bitfinex and Tether, and providing debased USDT to the Anonymous Trader that they knew ▮ would automatically trade for assets including cryptocommodities. In mispresenting that USDT was fully backed, Defendants offered to (and sometimes did) redeem USDT for U.S. dollars at 100 cents on the dollar, even though they knew that it was debased to a value less than that. No rational economic actor would have done so.

423.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' anticompetitive conduct. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

424.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

425.    Plaintiffs and members of the Class have suffered an injury that is of the type the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful. Defendants' scheme to use debased USDT to purchase bitcoin and other cryptocommodities interfered with the natural interplay of market forces. Defendants provided debased USDT to the Anonymous Trader, knowing ▮ bot would automatically trade it for assets including cryptocommodities. These actions deprived Plaintiffs and members of the Class of a competitive marketplace. The prices at which Plaintiffs and members of the Class purchased cryptocommodities were higher than the prices that Plaintiffs would have paid absent Defendants' scheme. This anticompetitive conduct caused Plaintiffs and members of the Class to pay supra-competitive prices, which is an injury of the type that the antitrust laws were intended to prevent.

426.     Defendants directly caused this injury to Plaintiffs and members of the Class. Plaintiffs and members of the Class are naturally motivated to enforce the antitrust laws because they purchased cryptocommodities on exchanges during the relevant period at prices that were inflated as a result of these Defendants' scheme. There are no other purchasers of cryptocommodities who were more directly injured than Plaintiffs and members of the Class.

427.     WHEREFORE, Plaintiffs request that the Court adjudge and decree that Plaintiffs and members of the Class have antitrust standing under the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26; that Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 2; enter joint and several judgments against Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, injunctive relief, and attorneys' fees.

### THIRD CAUSE OF ACTION

**Agreement in Restraint of Trade**
**Sherman Antitrust Act Sections 1 and 3**

428.     Plaintiffs incorporate the preceding paragraphs.

429.     Defendants engaged in a pattern of concerted action which included, *inter alia*, the issuance of unbacked USDT, the transfer of USDT and cryptocommodities across three exchanges, facilitating the Anonymous Trader's bot to trade debased USDT for cryptocommodities, and providing special accommodations and access to features that increased the Bot's ability to trade.

430.     Defendants engaged in a number of overt acts in furtherance of this conspiracy, including issuance of unbacked USDT, the transfer of USDT and cryptocommodities across three exchanges, facilitating the Anonymous Trader's bot to trade debased USDT for cryptocommodities, providing special accommodations and access to features that increased the Bot's ability to trade, directing trades at the Defendant's request, closely coordinating with Defendants to ensure constant operation and maximal efficiency of the trading bot.

431.     Defendants and the Anonymous Trader also acted with the specific intent to mo-
nopolize. Defendants, via their anticompetitive issuance of debased USDT, intended to acquire
monopoly power in the market for cryptocommodities, and the Anonymous Trader acted with the
specific intent of facilitating and conferring monopoly power on Defendants.

432.     Defendants took these actions with the specific intent to obtain market power over
the market for cryptocommodities.

433.     Defendants and the Anonymous Trader had a common motive to conspire to inflate
prices of cryptocommodities because they all owned cryptocommodities themselves and to further
the adoption of USDT by other players in the crypto economy, which resulted in increased profits
for both Defendants and the Anonymous Trader.

434.     Defendants and the Anonymous Trader's scheme and the concrete acts undertaken
in furtherance thereof directly resulted in Plaintiffs and members of the Class paying artificially
high prices for cryptocommodities during the Class Period. Plaintiffs' injuries are of the type the
antitrust laws were designed to prevent and flow from that which makes Defendants' conduct un-
lawful.

435.     Plaintiffs bring this claim in the alternative, to the extent that Tether and Bitfinex
are determined separate entities for purposes of the Sherman Act.

436.     Defendants violated 15 U.S.C. § 15 by conspiring and agreeing amongst them-
selves to manipulate cryptocommodity prices by debasing USDT and facilitating the Anonymous
Trader's purchase of cryptocommodities, creating the false impression of significant demand for
those cryptocommodities and keeping prices artificially high. This price-fixing agreement is a *per
se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint
of trade without any countervailing procompetitive rationale.

437.    Defendants' conspiracy occurred within the flow of, and substantially affected, interstate commerce, and commerce in U.S territories.

438.    Absent Defendants' collusion, the Anonymous Trader would not have traded large amounts of debased USDT for cryptocommodities and the prices of those cryptocommodities would have be determined by the natural interplay of supply and demand.

439.    Defendants benefitted by coordinating their market activities.

440.    Defendants' actions are inconsistent with unilateral conduct in their rational self-interest. In misrepresenting that USDT was backed one-for-one by U.S. dollars, Tether allowed customers to redeem USDT at 100 cents on the dollar, even when it was not backed one-to-one by U.S. dollars. Bitfinex allowed customers (including the Anonymous Trader) to withdraw US dollars as USDT at 100 cents on the dollar, even when USDT was trading at a lower value. These actions were contrary to their rational self-interest. The actions served to maintain the illusion that USDT was fully backed, which was key to inflating cryptocommodity prices.

441.    Defendants' conduct constitutes a *per se* violation of the antitrust laws because the intention of the scheme was to fix, stabilize, or otherwise maintain prices of cryptocommodities. The risk of harm from this conduct is clear and obvious: to restrict free and unfettered price discovery through competition that the Sherman Act was enacted to promote.

442.    Defendants' scheme and concrete acts undertaken in furtherance thereof directly resulted in Plaintiffs and members of the Class paying artificially high prices for cryptocommodities during the Class Period. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

443.    WHEREFORE, Plaintiffs request that the Court adjudge and decree that Defendants violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3; enter joint and several

judgments against these Defendants in favor of Plaintiffs and members of the Class; and award Plaintiffs and members of the Class actual damages, treble damages, injunctive relief, interest, reasonable expenses, and attorneys' fees.

## COSTS, INTEREST, AND ATTORNEYS' FEES

444.    Plaintiffs request that the Court award reasonable costs of suit, pre- and post-judgment interest, and reasonable attorneys' fees.

## JURY TRIAL

445.    Plaintiffs demand a trial by jury for all claims.


Dated: New York, NY                        Respectfully submitted,
   July 12, 2024

/s/ Andrew R. Dunlap                       /s/ Todd M. Schneider
Philippe Z. Selendy                        Todd M. Schneider (*pro hac vice*)
Andrew R. Dunlap                           Matthew S. Weiler (*pro hac vice*)
Oscar Shine                                SCHNEIDER WALLACE COTTRELL
Laura King                                  KONECKY LLP
SELENDY GAY PLLC                           2000 Powell Street, Suite 1400
1290 Sixth Avenue                          Emeryville, CA 94608
New York, NY 10104                         tschneider@schneiderwallace.com
pselendy@selendygay.com                    mweiler@schneiderwallace.com
adunlap@selendygay.com
oshine@selendygay.com
lking@selendygay.com


*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*