UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

TETHER AND BITFINEX CRYPTO ASSET
LITIGATION

19 Civ. 9236 (KPF)



**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

On September 28, 2021, this Court issued an Opinion and Order
granting in part and denying in part Defendants' motions to dismiss the
Amended Consolidated Class Action Complaint (the "CAC") in this case. The
decision permitted Plaintiffs to proceed to discovery on claims that were
predicated on extensive allegations that Defendants engaged in a scheme to
manipulate the market price for certain cryptocommodities in connection with
Defendants' fraudulent issuance of a crypto-asset called "USDT" or "tether."
*See In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 70 (S.D.N.Y.
2021). Since that time, the parties have engaged in lengthy and contentious
fact discovery, including the exchange of written interrogatories, the production
of documents, and the taking of depositions.

The fact discovery period is now closed, and before the Court is Plaintiffs'
motion for leave to file a second amended complaint. Plaintiffs seek to conform
the allegations in the CAC to reflect certain facts revealed during discovery, and
to narrow the scope of this case before it proceeds through its remaining
stages. To that end, Plaintiffs represent that they have or will dismiss their
claims against Defendants Bittrex, Poloniex, and Crypto Capital Corp., as well
as the latter's co-founder, Reginald Fowler. Remaining in this case are two sets

of Defendants: (i) the B/T Defendants,[1] comprising various entities and individuals associated with Bitfinex, the cryptocurrency exchange, and Tether, the issuer of USDT; and (ii) Defendant Philip G. Potter, the co-founder of Tether and its former Chief Strategy Officer, *inter alia*.  In the Proposed Second Amended Complaint (the "PSAC"), Plaintiffs assert claims against the B/T Defendants and Potter arising under the Commodities Exchange Act (the "CEA"), 7 U.S.C. §§ 1-27, and the Sherman Act, 15 U.S.C. §§ 1-38, reflecting Plaintiffs' theory of market manipulation, as refined by the fact discovery record.  Specifically, Plaintiffs now allege that Defendants moved vast quantities of debased USDT onto the market via an anonymous, non-party trader (the "Anonymous Trader"), and in doing so, artificially drove price increases in certain cryptocommodities.  For the reasons set forth in the remainder of this Opinion, the Court grants Plaintiffs' motion for leave to amend, and will permit Plaintiffs to file a redacted version of the PSAC and accompanying motion papers.

## BACKGROUND[2]

### A.    Factual Background

The Court presumes familiarity with the facts set forth in its extensive opinion resolving Defendants' motion to dismiss the CAC.  *See In re Tether*, 576

---

[1]    For clarity, those entities and individuals are: iFinex Inc., BFXNA Inc., BFXWW Inc., Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited, DigFinex Inc., Giancarlo Devasini, and Ludovicus Jan van der Velde.

[2]    The facts stated herein are drawn from the facts alleged in the Amended Consolidated Class Action Complaint (Dkt. #114 (CAC)), and the parties' submissions in connection with Plaintiffs' motion for leave to file a second amended complaint.  For ease of

F. Supp. 3d at 70-84.  Because the merits of Plaintiffs' motion to amend turn in large part on the degree of factual overlap across Plaintiffs' pleadings, the Court provides a brief restatement of those allegations in the CAC that provide context for the new allegations raised in the PSAC.

### 1.    The Relevant Parties

Plaintiffs Matthew Script, Jason Leibowitz, Benjamin Leibowitz, Aaron Leibowitz, and Pinchas Goldshtein are purchasers of various cryptocommodities.  *See In re Tether*, 576 F. Supp. 3d at 72-73.  Plaintiffs allege that, during the Class Period, they each purchased cryptocommodities at prices that had been artificially inflated by Defendants' market manipulation, causing Plaintiffs to suffer economic losses and actual damages.  *Id.*  Only one of the named Plaintiffs, Pinchas Goldshtein, is alleged to have purchased cryptocommodities futures, having done so between January 16, 2018, and June 3, 2020.  *Id.*

Defendants, as noted, are all related in some manner to Tether and/or Bitfinex.  Defendant Tether is the central authority over and issuer of USDT, a type of crypto-asset known as a "stablecoin," meaning it is purportedly pegged to and backed by U.S. dollars that are held in reserve by Tether.  *See In re*

reference, the Court refers to Plaintiffs' Memorandum of Law in Support of Their Motion for Leave to Amend as "Pl. MTA Br." (Dkt. #480), and to the Proposed Second Amended Complaint annexed thereto as the "PSAC" (Dkt. #480-1); to Defendant Philip G. Potter's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend as "Potter MTA Opp." (Dkt. #503); to the B/T Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend as "B/T MTA Opp." (Dkt. #505); to Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Leave to Amend as "Pl. MTA Reply" (Dkt. #515); and finally to the Declaration of Laura M. King in Support of Plaintiffs' Reply Memorandum of Law as "King Decl." and its exhibits as "King Decl., Ex [ ]" (Dkt. #516).

*Tether*, 576 F. Supp. 3d at 70-71.  Plaintiffs allege that Tether represented to the market that every USDT in circulation was essentially the "digital equivalent of [a] U.S. dollar[]," insofar as each USDT was backed by a U.S. dollar in Tether's bank account, and USDT holders could exchange their USDT for those U.S. dollars anytime they wished.  *Id.* at 71, 78.  Any USDT that was exchanged for U.S. dollars was deemed "burned," and removed from the market.  *Id.* at 78.  Implicit in these representations was the notion that Tether would not issue USDT unless that USDT was sufficiently backed by U.S. dollar collateral, which notion signaled to the market that any new issuance of USDT by Tether constituted a quantifiable increase in U.S.-dollar demand for crypto-assets.  *Id.*  Today, USDT is one of the most widely used crypto-assets in the world by trading volume, and the third-largest crypto-asset in the world by market capitalization, with a market capitalization of $9.1 billion.  *Id.* at 71.

Tether is merely the issuer of USDT; it does not operate a platform for the actual exchange of USDT or other crypto-assets.  That role is played by Defendant Bitfinex, which operates an eponymous online platform for trading crypto-assets.  *In re Tether*, 576 F. Supp. 3d at 71.  As alleged, Bitfinex is one of the "largest and least[-]regulated" crypto-exchanges in the world, allowing users to deposit and withdraw fiat currency, such as U.S. dollars or euros, in addition to facilitating crypto-to-crypto transactions.  *Id.*

Finally, Individual Defendants Giancarlo Devasini and Ludovicus Jan van der Velde (also B/T Defendants), as well as Philip G. Potter, are all current or former senior management at and shareholders of one or more of the various

entities comprising Tether and Bitfinex, as well as DigFinex, the ultimate

parent entity of Tether and Bitfinex. *In re Tether*, 576 F. Supp. 3d at 72.

### 2.    The Alleged Price Manipulation Scheme of the CAC

As detailed in the Court's prior opinion, Plaintiffs' theory of price

manipulation, as set forth in the CAC, proceeded as follows:  In the first stage,

Defendants, who controlled Tether and Bitfinex, caused Tether to issue

significant quantities of USDT unbacked by any corresponding U.S. dollar

collateral, and to transfer that USDT to Bitfinex for trading on the open market.

*In re Tether*, 576 F. Supp. 3d at 77-78.  Critically, Defendants did not inform

the market of the debased nature of this USDT, and instead undertook

significant public efforts to maintain the façade that each USDT was backed by

one U.S. dollar held in Tether's reserves, that any new issuance of USDT was in

response to legitimate market demand, and that customers could exchange

USDT at parity with the U.S. dollar.  *Id.*  Defendants also concealed from the

market the interrelationship between Tether and Bitfinex, creating the illusion

that USDT was supported by two independent entities: Tether, responsible for

maintaining the cash reserve necessary to ensure the stability of USDT; and

Bitfinex, a third-party exchange interested only in facilitating trades in USDT

and other crypto-assets.  *Id.*

Once issued, Defendants transferred this secretly debased USDT from

Bitfinex to two specific accounts on the Poloniex and Bittrex exchanges.  *In re

Tether*, 576 F. Supp. 3d at 78.  Plaintiffs allege that these accounts, the "1AA6

Address" on Poloniex, and the "1J1d Address" on Bittrex, were controlled by

Defendants, and that, from October 2014 through December 2018, Defendants issued $3 billion in USDT — comprising 72% percent of all USDT issued during that time — to the 1AA6 and 1J1d Addresses. *Id.* at 78-79. According to Plaintiffs, Defendants then used the secretly debased USDT in these accounts to buy other cryptocommodities on the open market from counterparties who believed the USDT was fully backed by U.S dollars, thereafter returning the non-USDT cryptocommodities to the Bitfinex exchange to be sold for actual U.S. dollars or other crypto-assets. *Id.* at 81-82. Put simply, "Plaintiffs allege that Tether and Bitfinex were issuing [debased] USDT to themselves," then swapping that debased USDT for cryptocommodities of real value, leaving the market holding the bag. *Id.* at 79.

Plaintiffs claim that this scheme to exchange debased USDT for other cryptocommodities was executed in such a way and at such a scale as to move the market prices of the cryptocommodities themselves. *See In re Tether*, 576 F. Supp. 3d at 81-82. Importantly, because USDT and other cryptocommodities are traded on traceable blockchains, Plaintiffs have access to significant and specific data tracing the flow of the allegedly debased USDT. The data, Plaintiffs maintain, reveal a correlation between Defendants' issuances of debased USDT and the reversal of dips in the market price of certain cryptocommodities, namely, Bitcoin. *Id.* at 82. As Plaintiffs explain, this phenomenon reflects the market's perception that the influx of USDT onto the market represented a significant increase in demand for cryptocommodities, leading to a resulting increase in their price. *Id.*

In Plaintiffs' view, the correlation between issuances of debased USDT and cryptocommodity prices reveals Defendants' efforts to manipulate the market prices of cryptocommodities in accordance with their own agenda. *In re Tether*, 576 F. Supp. 3d at 81. As Plaintiffs further emphasize, this scheme would not have been possible if the market were aware of the spurious nature of the collateral backing the debased USDT flooding the market, information Defendants took care to conceal. *Id.* Had the reality of the USDT's collateral (or lack thereof) come to light, the illusion that USDT represented U.S. dollars would have been lost, as would the demand signal associated with Tether's issuances of USDT.

### 3.    The Amended Price Manipulation Scheme of the PSAC

As discussed in greater detail below, the PSAC maintains a largely overlapping theory of market manipulation with that of the CAC, with two significant amendments. *First*, the PSAC recognizes the fact, revealed during discovery, that the debased USDT issued by Tether as a part of Defendants' scheme was actually backed by Bitfinex receivables of a certain U.S. dollar amount. (*See, e.g.*, PSAC ¶¶ 1-4). In other words, the USDT issued by Tether was, in fact, collateralized — just not by U.S. dollars, as Tether had represented. Still, the PSAC alleges that USDT backed only by Bitfinex receivables was still debased, inasmuch as the value of an inherently risky receivable is necessarily less than the value of cash. (*See id.* ¶¶ 192-196). Furthermore, the risk inherent in holding Bitfinex receivables was exacerbated by the company's liquidity issues, meaning the value of those receivables was

even further diminished.  (*See id.* ¶¶ 197-205).  That is all to say that the PSAC maintains the CAC's overarching narrative, *i.e.*, that Defendants, knowing the true nature of USDT's collateral, made false representations to the market that USDT was actually backed one-to-one by U.S. dollars in order to maintain the potency of USDT as a demand signal when deployed on the open market, and to preserve the debased USDT as a tool for price manipulation.  (*See id.* ¶¶ 364-367).

　　*Second*, the PSAC concedes that ███████████████████████ ███████████████████████████████████████████ ███████████████████████.  Rather, the PSAC alleges that █████ ███████████████████ the Anonymous Trader, a non-party to this litigation, who employed the debased USDT in support of an automated cross-exchange arbitrage trading strategy.  (*See* PSAC ¶¶ 276-278).  The PSAC therefore reflects Plaintiffs' amended theory that Defendants utilized the Anonymous Trader's automated trading activity, ████████████████████ ██████, as the vehicle for introducing the debased USDT into the market and effectuating their manipulative scheme.  (*See id.* ¶¶ 275-289, 344-367).

　　In addition to these two substantive amendments, the PSAC also adds detailed allegations regarding the relationship between Defendants and the Anonymous Trader, and the lengths to which Defendants went to facilitate the Anonymous Trader's activity on Bitfinex.  Notably, Plaintiffs allege that Defendants implemented a generous margin trading policy, allowing the Anonymous Trader to access and trade USDT on credit, *i.e.*, without providing

any dollars up front.  (*See* PSAC ¶¶ 10-11; *see also id.* ¶ 313 (alleging that "Bitfinex credited assets to customers' accounts, allowing them to trade, before receiving the funds or crypto assets that the customers deposited")).  According to Plaintiffs, this policy was so generous that the Anonymous Trader received ███████ USDT ███████████████████████████████████████ ███████████████████, without ever "wir[ing] any fiat currency to Bitfinex or Tether."  (*See id.* ¶ 279).  Plaintiffs further allege that Defendants maintained a persistent price premium on Bitfinex in order to incentivize the Anonymous Trader's arbitrage algorithm to liquidate cryptocommodities purchased with debased USDT on Bitfinex, rather than another exchange.  (*See id.* ¶¶ 308-321).  The PSAC also details communications between Defendants and the Anonymous Trader, including at least one exchange where Defendants and the Anonymous Trader corresponded about moving the price of Bitcoin.  (*See id.* ¶¶ 322-336).  As in the CAC, however, the PSAC maintains that it was Defendants' issuance of debased USDT at scale — and the market's concomitant misimpression that the influx of USDT represented increased organic demand (rather than the Anonymous Trader's arbitrage strategy) — that artificially inflated prices for cryptocommodities.  (*See, e.g.*, *id.* ¶¶ 13, 350-362).

## B.    Procedural History

As noted, the fact discovery period of this case has been extensive, and fraught with significant disagreement amongst the parties.  For the sake of

brevity, however, the Court details only those events since the issuance of its prior opinion that are relevant to Plaintiffs' motion to amend.

Following the Court's resolution of the motions to dismiss, Defendants filed their answers on October 28, 2021. (Dkt. #183-186). Before the Court could enter any scheduling order governing discovery, however, on November 12, 2021, Bittrex and Poloniex filed a letter seeking a pre-motion conference to discuss a proposed motion for summary judgment and the possibility of limited discovery pending resolution of that motion. (Dkt. #188).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████. Bittrex and Poloniex asserted that such information absolved them of Plaintiffs' claims of wrongdoing, a position Plaintiffs strongly opposed. (Dkt. #188, 191). Thereafter, on November 18, 2021, the parties provided dueling proposed civil case management plans and scheduling orders. (Dkt. #193).

By order dated November 22, 2021, the Court denied Bittrex and Poloniex's request for a pre-motion conference and limited discovery, directed the parties to treat "all materials related to the [A]nonymous [T]rader … as strictly [Attorneys' Eyes Only] in the first instance," and resolved the parties' remaining disputes over the case management plan. (Dkt. #195). To that end, on that same day, the Court entered the parties' first Civil Case Management Plan and Scheduling Order, establishing that "[a]ny motion to amend or to join

additional parties shall be filed within 30 days from the date of this Order."
(Dkt. #194).  The Order further provided that "all [f]act discovery shall be
completed no later than 18 months from the date of this Order."  (*Id.*).

Thus began a turbulent discovery period, punctuated by the Court's
reappointment of interim class counsel (*see* October 13, 2022 Minute Entry;
Dkt. #253 (Transcript of Proceedings)), and lasting until January 23, 2023, at
which time Plaintiffs filed a letter motion seeking an extension of the fact
discovery deadline (Dkt. #274), which motion Defendants opposed (Dkt. #283).
In a conference on February 8, 2023, the Court granted the Plaintiffs' motion
for an extension of the fact discovery deadline, and on February 17, 2023, the
Court entered the parties' Amended Civil Case Management Plan and
Scheduling Order, setting the fact discovery deadline for July 24, 2023.  (*See*
February 8, 2023 Minute Entry; Dkt. #295 (Transcript of Proceedings); Dkt.
#298 (Amended CMP)).

As discovery continued, so too did the discovery disputes, as the parties
litigated the language of Plaintiffs' proposed interrogatories (*see, e.g.*,
Dkt. #310, 318, 321); the diligence of certain Defendants' search for and
production of relevant documents (*see, e.g.*, Dkt. #322); Plaintiffs' desire to
compel the production of additional trading information from the B/T
Defendants (*see, e.g.*, Dkt. #347); and Plaintiffs' motion to expand the
deposition limit to accommodate 15 depositions (*see* Dkt. #356).  Events once
again came to a head on June 1, 2023, when Plaintiffs again filed a letter
requesting a 90-day extension of the fact discovery deadline.  (Dkt. #374).  At a

conference held on June 6, 2023, the parties represented to the Court that an extension was necessary because document production remained ongoing and had been hampered, to a degree, by the parties' myriad disputes. (*See* June 6, 2023 Minute Entry; Dkt. #384 (Transcript of Proceedings)). Given the volume of outstanding discovery, the Court granted the extension and subsequently entered the parties' Second Amended Civil Case Management Plan and Scheduling Order on June 15, 2023, setting a fact discovery deadline of October 23, 2023. (Dkt. #387).

In the final phase of fact discovery, the parties' discovery disputes focused on depositions, with disagreements as to both form and substance. Notably, on August 2, 2023, the Court endorsed the parties' joint letter regarding a proposed deposition of the Anonymous Trader, which deposition was held on September 10, 2023. (Dkt. #420, 468-10). Thereafter, the parties conducted depositions of Defendants, including the Rule 30(b)(6) deposition of Bitfinex on September 12, 2023 (King Decl., Ex. 4), and the individual depositions of van der Velde on September 29, 2023 (*id.*, Ex. 14), Devasini on October 5, 2023 (*id.*, Ex. 5), and Potter on October 6, 2023 (*id*, Ex. 6).

Fact discovery closed on October 23, 2023, and on that same day Plaintiffs filed a stipulation of dismissal with prejudice as to Poloniex. (Dkt. #477). One day later, on October 24, 2023, Plaintiffs filed their motion for leave to amend, representing in that motion that the PSAC "drop[s] Bittrex, Poloniex, and Crypto Capital," as Defendants. (Dkt. #479-480).

On October 31, 2023, the parties appeared before the Court for a post-fact discovery conference, at which conference the Court set a briefing schedule for the motion.  (*See* October 31, 2023 Minute Entry; Dkt. #490 (Transcript of Proceedings)).  Pursuant to that schedule, the B/T Defendants and Potter each filed their oppositions to Plaintiffs' motion to amend on December 8, 2023.  (Dkt. #503 (Potter MTA Opp.), 505 (B/T MTA Opp.)).  Finally, Plaintiffs filed their reply on January 12, 2024.  (Dkt. #515 (Pl. MTA Reply)).[3]

On June 26, 2024, the Court filed and provided to the parties an unredacted copy of this Opinion under seal and allowed the parties to propose redactions in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  On or before July 19, 2024, the parties shall file a joint letter suggesting redactions to the Opinion.  Taking the parties' suggestions into consideration, the Court will then file a redacted version of the Opinion on the public docket.

## DISCUSSION

### A.    Motions to Amend Under Fed. R. Civ. P. 15 and 16

When considering a motion for leave to amend following the close of fact discovery, a court's analysis is guided by two Federal Rules of Civil Procedure.  Rule 15(b)(2) authorizes a party to "move — at any time, even after judgment — to amend the pleadings to conform them to the evidence and to raise an

---

[3]    After some back and forth over proposed redactions, on April 8, 2024, Plaintiffs filed a motion for leave to file redacted versions of the PSAC and accompanying motion for leave to amend.  (Dkt. #539).  On April 12, 2024, the B/T Defendants filed a letter attaching a separate letter from the Anonymous Trader to the Court opposing Plaintiffs' motion.  (Dkt. #542).  As set forth herein, the Court accepts Plaintiffs' proposed redactions, and therefore will grant Plaintiffs' motion.

unpleaded issue." Fed. R. Civ. P. 15(b)(2).  When considering a motion for leave to amend pursuant to Rule 15(b)(2), the court "should freely give leave [to amend] when justice so requires," as further set forth by Rule 15(a)(2).  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has correspondingly held that a court may deny such a motion only on the grounds of "undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Quaratino* v. *Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995).  "The permissive standard of Rule 15 is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits," rather than on pleading technicalities.  *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks omitted) (citing *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)); *see also Foman* v. *Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [she] ought to be afforded an opportunity to test [her] claim on the merits.").

By contrast, Rule 16(b) dictates that where, as here, "a party files a motion to amend after the pleading deadline set forth in the case management plan and scheduling order," she "must establish 'good cause' to amend [her] pleadings." *Pristine Jewelers NY, Inc.* v. *Broner*, 492 F. Supp. 3d 130, 131-32 (S.D.N.Y. 2020) (citation omitted).  In contrast to the permissive standard of Rule 15, the "good cause" requirement of Rule 16(b) "is not a forgiving standard." *Mangahas* v. *Eight Oranges Inc.*, No. 22 Civ. 4150 (LJL), 2023 WL 3170404, at *3 (S.D.N.Y. May 1, 2023).  "To show good cause, a movant must

demonstrate diligence before filing her motion, such that despite the movant's effort, the deadline to amend the pleadings could not have been reasonably met." *Scott* v. *Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 197 (S.D.N.Y. 2014). Stated differently, "the good cause standard of Rule 16 is not satisfied when the proposed amendment rests on information that the party knew or should have known, in advance of the deadline." *Sherman* v. *Fivesky, LLC*, No. 19 Civ. 8015 (LJL), 2020 WL 5105164, at *1 (S.D.N.Y. Aug. 31, 2020) (internal quotation marks and citation omitted). As with the Rule 15 analysis, "[t]he [c]ourt 'also may consider other relevant factors, including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice [non-movants].'" *Weng* v. *HungryPanda US, Inc.*, No. 19 Civ. 11882 (KPF), 2021 WL 1750305, at *2 (S.D.N.Y. May 4, 2021) (quoting *Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)).

While the Rule 15 and Rule 16 standards "share some overlapping factors, there remain important differences." *Schleifer* v. *Lexus of Manhattan*, No. 17 Civ. 8789 (AJN), 2018 WL 11593271, at *2 (S.D.N.Y. Nov. 21, 2018). "Chief among these [differences] is that the burden under Rule 16(b) lies with the party seeking to amend, while under Rule 15(a) it is on the opposing party to make a showing of prejudice or bad faith." *Id.* (citing *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Accordingly, to determine whether leave to amend should be granted after the close of fact discovery, courts must first determine whether the movant has met its burden to establish good cause, and

then determine whether the opposing party can rebut such a showing by establishing prejudice or bad faith.  *See AT&T Corp.* v. *Atos IT Sol'ns & Servs., Inc.*, — F. Supp. 3d —, No. 21 Civ. 4550 (VSB) (RWL), 2024 WL 379952, at *4 (S.D.N.Y. Feb. 1, 2024) (remarking that "the standards of Rule 16(b) must be met first and cannot be short-circuited by an appeal to those of Rule 15" (internal quotation marks and citation omitted)).

Ultimately, whether to permit amendment in light of Rule 16(b) and Rule 15 is a decision that lies within the court's discretion.  *See Kassner*, 496 F.3d at 244 (acknowledging "the trial court's general discretion to limit, by means of a scheduling order entered under Rule 16(b), the time during which the pleadings may be amended"); *Foman*, 371 U.S. at 182 (holding that "the grant or denial of an opportunity to amend [under Rule 15] is within the discretion of the District Court").

## B. The Court Grants Plaintiffs' Motion to Amend

Plaintiffs seek the Court's leave to amend the CAC principally to (i) add new factual allegations regarding the debased nature of USDT, the relationship between Defendants and the Anonymous Trader, and that relationship's role in the scheme to manipulate the price of cryptocommodities; and (ii) conform Plaintiffs' CEA and Sherman Act claims to reflect these new factual allegations. (*See generally* PSAC).  As discussed, the Court first considers whether Plaintiffs have demonstrated good cause to amend pursuant to Rule 16(b), focusing principally on the parties' arguments pertaining to Plaintiffs' diligence and prejudice to Defendants.  Finding that Plaintiffs have demonstrated good

cause, the Court then considers whether leave to amend is appropriate under Rule 15, primarily considering Defendants' arguments that Plaintiffs' proposed amendments would be futile.  As the Court ultimately determines that Plaintiffs' CEA and Sherman Act claims are not futile, the Court grants Plaintiffs' motion.

### 1.    Plaintiffs Have Demonstrated Good Cause to Amend Pursuant to Rule 16(b)

Beginning with Rule 16(b), the Court's "primary consideration" in determining whether good cause exists is "whether the moving party can demonstrate diligence." *Kassner*, 496 F.3d at 244.  Diligence is not, however, "the only consideration," and "in deciding whether there is 'good cause' to amend under Rule 16(b), a trial court may consider not only the diligence of the moving party but also the prejudice to the opposing party." *Fresh Del Monte Produce, Inc.* v. *Del Monte Foods, Inc.*, 304 F.R.D. 170, 175 (S.D.N.Y. 2014) (internal quotation marks omitted) (citing *Kassner*, 496 F.3d at 244). The Court considers both factors below, finding that Plaintiffs acted diligently in moving to amend, and that Defendants will not be prejudiced by such amendment.

### a.    Plaintiffs Acted Diligently in Moving to Amend

To establish diligence, "the moving party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sjunde AP-Fonden* v. *Gen. Elec. Co.*, 341 F.R.D. 542, 550 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).  It is well established that "if a party learns new facts through discovery that were

17

unavailable prior to the applicable deadline and moves promptly to [amend its allegations] based on such facts, leave to amend is appropriate." *Port Auth. Police Benevolent Ass'n* v. *Port Auth. of New York & New Jersey*, No. 15 Civ. 3526 (AJN), 2016 WL 6083956, at *5 (S.D.N.Y. Oct. 17, 2016) (collecting cases). Plaintiffs, for their part, argue that their motion to amend arises under precisely such circumstances, maintaining that the facts animating the current motion did not emerge until late in the discovery period, and that Plaintiffs moved promptly to amend upon the discovery of these facts. (*See* Pl. MTA Reply 4-11). While the Court "will not accept [Plaintiffs'] claim that facts relevant to [their] amendment were previously unavailable just on [Plaintiffs'] say-so," as set forth below, the Court's own review of the record confirms the Plaintiffs' account of their diligence. *Schleifer*, 2018 WL 11593271, at *2.

*First*, Plaintiffs credibly represent that it was only in the final months of fact discovery that Defendants actually produced information clarifying how Tether's USDT reserves were structured, revealing Tether's practice of collateralizing USDT with Bitfinex receivables. (*See* Pl. MTA Reply 4-9). As discussed, the months leading up to the October 23, 2023 close of discovery in this matter were laden with Plaintiffs' motions to compel, which motions sought clarity on the interrelationship between Tether's reserves and its receivables, among other topics. (*See, e.g.*, Dkt. #387-475). Things came to a head in connection with Defendants' Rule 30(b)(6) deposition of Bitfinex's corporate representative, held on September 12, 2023, and the subsequent deposition of Giancarlo Devasini, Tether and Bitfinex's CFO, on October 5,

2023.  (*See* Pl. MTA Reply 6 (citing King Decl., Ex. 4 ("Bitfinex 30(b)(6) Tr."); *id.*, Ex. 5 ("Devasini Tr."))).  Plaintiffs attest that it was in these depositions that they first became aware of the specifics supporting their general allegations regarding the problematic interrelationship between Tether's reserves and receivables, which specifics Plaintiffs now seek to include in the PSAC.  (*See id.* (citing Bitfinex 30(b)(6) Tr. 48:8-49:9; Devasini Tr. 26:22-25, 41:24-42:7, 52:23-53:17, 118:10-119:4, 209:16-24)).

*Second*, it is likewise evident that the details of Bitfinex's margin trading policy (pursuant to which Bitfinex permitted the Anonymous Trader to access and trade the debased USDT on credit) — as well as Bitfinex's relationship with the Anonymous Trader more broadly — only crystallized during the September and October 2023 depositions.  For instance, through Devasini's deposition, Plaintiffs learned that Bitfinex maintained standing credit lines for its own exchange account and routinely extended credit lines to high-volume users, but did not have complete records documenting those credit lines.  (*See* Pl. MTA Reply 8 (citing Devasini Tr. 26:22-25, 118:10-119:4, 129:10-13, 209:16-24)).  And more to the point, while Plaintiffs became aware of ████████████ ████████████████████████████████████████████ in or around October 2020, the actual facts regarding the Anonymous Trader's relationship with the B/T Defendants did not emerge until the Anonymous Trader's deposition on September 10, 2023, and Plaintiffs' subsequent depositions of the B/T Defendants.  (*See* Dkt. #468-10; King Decl., Ex. 4-6, 14).

Moreover, the granularity of the facts that came to light in these depositions and interrogatory responses rebuts Defendant's arguments that Plaintiffs had access to this information earlier in the litigation and, by extension, were dilatory in their motion to amend. (*See* B/T MTA Opp. 19). As one notable example, Defendants maintain that public settlement announcements issued in 2021 by the New York Attorney General and the Commodity Futures Trading Commission referenced the fact that USDT was backed by receivables held by Tether, and revealed that Bitfinex permitted margin trading, such that the information revealed in the B/T Defendants' depositions was hardly revelatory. (B/T MTA Opp. 11, 20). Defendants similarly identify ███████████████████████████████████████ ████████████████████████████████████████████████. (*Id.* at 20). Still, while the broad contours of the issues were evident from those materials, they did not contain the critical details regarding (i) the magnitude of Bitfinex's receivables and how they were accounted for in Tether's USDT reserves; (ii) the connection of those receivables to Bitfinex's margin trading policy; and (iii) the Anonymous Trader's relationship with the B/T Defendants, which details all emerged in depositions held near the close of fact discovery.

The Court therefore agrees with Plaintiffs that the facts comprising the substantive amendments in the PSAC did not emerge until late in discovery, namely September and October 2023. Plaintiffs' motion to amend, filed on October 24, 2023, consequently demonstrated sufficient diligence to satisfy Rule 16(b). *See Atos IT Sol'ns & Servs.*, 2024 WL 379952, at *7 n.14 (noting

that "courts commonly find that a party acts diligently if it seeks leave to amend within approximately two months of acquiring a new claim or defense" (collecting cases)); *see also Schleifer*, 2018 WL 11593271, at *3 (observing that "courts in [the Second Circuit] have found that parties who moved to amend within two months of acquiring the new information showed sufficient diligence to satisfy Rule 16(b)" (collecting cases)).

### b.    Defendants Will Not Be Prejudiced by Amendment

Having found Plaintiffs acted diligently in moving to amend following the close of fact discovery, the Court next considers whether Defendants would be prejudiced by amendment.  *See Ruotolo* v. *City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (observing that leave to amend "may properly be denied … for undue prejudice to the opposing party by virtue of allowance of the amendment" (internal quotation marks omitted)).  "In gauging prejudice," courts should consider "whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute."  *Id.* (internal quotation marks and citation omitted).

Unsurprisingly, Defendants argue that amendment at this stage would be highly prejudicial, characterizing Plaintiffs' proposed amendments as essentially seeking to assert a new theory of the case, requiring substantial new discovery, and raising the possibility of delay.  (B/T MTA Opp. 24).  Upon its own comparison of the allegations of the CAC against those of the PSAC, the Court finds Defendants' concerns to be largely overblown, as Plaintiffs'

"amended claim[s] [were] obviously one of the objects of discovery and related closely to the original claim[s]," such that amendment will clarify, rather than complicate, this case. *State Tchrs. Ret. Bd.* v. *Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

As discussed, the CAC "detail[s] a wide-ranging conspiracy to artificially inflate the price of [] cryptocommodities." *In re Tether*, 576 F. Supp. 3d at 70. In particular:

> The thrust of Plaintiffs' allegations [in the CAC] is that [Defendants] engaged in a scheme to make large, carefully-timed purchases of cryptocommodities using a fraudulently issued crypto-asset — called "tether" or "USDT" — in an effort to signal to the market that there was enormous, organic demand for cryptocommodities, thus causing the price of those commodities to spike, and thereby creating and sustaining a "bubble" in the cryptocommodity market.

*Id.* The CAC also contains detailed allegations concerning Tether's numerous public representations that "each USDT would be backed by one U.S. dollar held in Tether's reserves," such that the market would perceive transactions in USDT as representing legitimate market demand, when in reality Tether's USDT were not collateralized as such. *Id.* at 78-79. Finally, the CAC alleges that it was Defendants, through Bitfinex, who purchased cryptocommodities with the debased USDT on the open market, via the 1AA6 and 1J1d Addresses on Poloniex and Bittrex, respectively. *Id.* at 81-82.

The PSAC amends this overarching narrative to explain that (i)  Defendants

relied on the Anonymous Trader's automated cross-exchange arbitrage trading program, ███████████████████████████, to flood the market with debased USDT (*see, e.g.*, PSAC ¶¶ 332-343); and (ii) the debased USDT used to effectuate the scheme was not wholly unbacked, but rather backed only by risky Bitfinex receivables worth far less than their nominal amount (*see id.* ¶¶ 192-205). In short, the PSAC clarifies that Defendants effectuated the same broad market manipulation scheme described in the CAC by relying on the Anonymous Trader's algorithmic bot — fed by Defendants' debased USDT supplied on credit (rather than in exchange for U.S. dollars) — ███████████ ████████████████████████████.

Thus, and contrary to Defendants' assertions, the PSAC does not present a "complicated and wholly new conspiracy" involving the Anonymous Trader, of which Defendants had no notice prior to the close of discovery. (B/T MTA Opp. 24-25). The PSAC remains principally concerned with Defendants' alleged strategic issuance of secretly debased USDT, knowing that the debased USDT would be used to drive predictable increases in the prices of cryptocommodities, all to Defendants' ultimate profit. (██████████████████ ████████████████████████████████████). In effect, the PSAC refines Plaintiffs' theory of market manipulation by updating general theories with specific allegations that are "related closely to the original claim," such that amendment is appropriate. *State Tchrs.*, 654 F.2d at 856; *see also Edwards* v. *City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (observing that "[p]rejudice ... could hardly flow" from the addition of allegations "derived from

evidence obtained during discovery regarding matters already obtained in the complaint in some form").

Plaintiffs' approach here stands in stark contrast to that of the plaintiffs in the cases cited by Defendants in support of their position. In those cases, amendment was found to be prejudicial, as it would permit the plaintiffs to broaden their allegations from the specific to the general, after discovery revealed those plaintiffs' operative claims were likely to fail. In *Baez*, for example, the plaintiff sought leave to amend in order to abstract his theory of tort liability from a specific claim arising from the defendant's negligent maintenance of a single vehicle, to a general one concerning "the longstanding customs and practices employed by [defendant]" in maintaining its entire fleet of vehicles. *Baez* v. *Delta Airlines, Inc.*, No. 12 Civ. 3672 (KPF), 2013 WL 5272935, at *4, 8 (S.D.N.Y. Sept. 18, 2013). In denying leave to amend, this Court recognized that such an approach was prejudicial because it would essentially restart the case with claims "based upon different facts and [] requir[ing] the application of different law." *Id.* at 6, 8 (further observing that the amendment implicated "topics not explored through discovery"). Similarly, the court in *Ahmed* denied leave to amend after discovery had closed where the "plaintiff's proposed pleading not only adds a new defendant but substantially alters the theory of the case." *Ahmed* v. *Astoria Bank*, No. 14 Civ. 4595 (JBW) (RLM), 2015 WL 4394072, at *3 (E.D.N.Y. July 16, 2015).

More significantly, in both *Baez* and *Ahmed*, each court's finding of prejudice was informed by a separate determination that the plaintiff had not

demonstrated diligence in moving to amend.[4]  There, each plaintiff's new factual allegations were drawn not from information revealed during discovery, but instead from "information [that] ha[d] long been known to plaintiff," well in advance of discovery.  *Ahmed*, 2015 WL 4394072, at *3; *see also Baez*, 2013 WL 5272935, at *6 (remarking that the proposed amendment reflected "facts [] learned long before [p]laintiff swore out his affidavit or sat for his deposition").

In contrast to *Baez* and *Ahmed*, Plaintiffs' proposed amendments implicate neither new claims nor facts previously unknown to Defendants, but instead stem from underlying facts about which Defendants had full notice. *See Kreppein* v. *Celotex Corp.*, 969 F.2d 1424, 1427 (2d Cir. 1992) (finding no prejudice where "[t]he defendants were on notice of the underlying facts relied upon by plaintiff").  Indeed, and as discussed, Plaintiffs' pursuit of information regarding Tether's reserves, Bitfinex's margin trading policy, and Defendants' relationship with the Anonymous Trader was litigated extensively in discovery, such that Defendants were aware of the direction in which the case was heading.  Likewise, the new factual allegations set forth in the PSAC are principally drawn from the depositions of Defendants' witnesses, to whom Defendants have unfettered access, as well as from the deposition of the Anonymous Trader, whom Defendants had ample time to depose following Plaintiffs' examination.  *See State Tchrs.*, 654 F.2d at 856 (finding no prejudice

---

[4]    Similar, too, were the circumstances of *Sokol Holdings, Inc.* v. *BMB Munai, Inc.*, No. 05 Civ. 3749 (KMW), 2009 WL 3467756, at *6 (S.D.N.Y. Oct. 28, 2009), in which case the court denied the plaintiffs' motion for leave to amend on the basis of their lack of diligence, and expressly noted that "[c]onsideration of prospective prejudice to [d]efendants ... [was] therefore not warranted."  (*See* B/T Opp. 24 (citing *Sokol Holdings*, 2009 WL 3467756, at *6)).

based on the time plaintiffs spent to verify information that was "better known to the defendants than to the plaintiffs").  To the extent that Defendants believe that it becomes necessary to supplement the factual record in this case, they can do so via affidavit or analogous written submission.  The expenditure of resources in doing so, however, does not itself inherently prejudice Defendants. *See Hadassah* v. *Hadassah Acad. Coll.*, No. 19 Civ. 8953 (JPO), 2021 WL 4459121, at *4 (S.D.N.Y. Sept. 29, 2021) (allowing amendment where inclusion would not require expenditure of significant additional resources, cause delay, or alter "the focus of the entire case" (internal quotation marks and citation omitted)).

Accordingly, the Court finds that Plaintiffs have demonstrated diligence in moving to amend, and that Defendants would not be prejudiced by amendment.  It is not the case, as Defendants would have it, that Plaintiffs are attempting to restart this action based on an entirely new theory of liability. Rather, the PSAC will realign the allegations of the complaint to facts adduced during discovery, and in doing so will support a more efficient resolution of the issues on the merits.  The Court therefore finds that Plaintiffs have established good cause to depart from the deadline for amendment set forth in the CMP.

### 2.    Leave to Amend Is Likewise Appropriate Under Rule 15(a)

The Court next considers whether leave to amend is appropriate pursuant to Rule 15(a).  As discussed, Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a).  Having already found that good cause exists to permit amendment

under the higher bar of Rule 16(a), the Court finds as a threshold matter that Plaintiffs have demonstrated that amendment would be consistent with the interests of justice under Rule 15(a).  *See, e.g., Infinity Headwear & Apparel, LLC* v. *Jay Franco & Sons, Inc.*, No. 15 Civ. 1259 (JPO), 2016 WL 5372843, at *7 (S.D.N.Y. Sept. 26, 2016) (finding that, where a movant "satisfie[d] the standards of Rule 16(b) [it] by extension [satisfied] the laxer standard of Rule 15(a)").

The Court's analysis, however, does not end there, as it is well-established that leave to amend is inappropriate where the proposed amendments would be futile.  *See Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (per curiam) (observing that under Rule 15, leave to amend may be denied "for such reasons as ... futility of the amendment").  Therefore, the Court must consider Defendants' arguments that Plaintiffs' proposed amendments to the CAC would serve no purpose.

When assessing the futility of proposed amendments, the Court applies a standard akin to that used when considering a motion to dismiss pursuant to Rule 12(b)(6).  *See, e.g., Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (directing that "[t]he adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading"); *see also Raffington* v. *Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 776-67 (S.D.N.Y. 2018) (observing that a claim is futile if it could not "survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)").  The Court accepts the facts alleged by the party seeking

amendment as true and construes them in the light most favorable to that party. *Aetna*, 404 F.3d at 604. Importantly, "[t]he party opposing a motion to amend bears the burden of establishing that an amendment would be futile." *Sjunde AP-Fonden*, 341 F.R.D. at 550 (citing *Ouedraogo* v. *A-1 Int'l Courier Serv., Inc.*, No. 12 Civ. 5651 (AJN), 2013 WL 3466810, at *6 (S.D.N.Y. July 8, 2013)).

As Defendants challenge the viability of each claim raised in the PSAC, the Court's analysis proceeds claim-by-claim, beginning with those arising under the CEA. Ultimately, the Court finds that the PSAC raises viable claims under both the CEA and the Sherman Act therefore and grants Plaintiffs' motion to amend.

### a.    Plaintiffs Plead a Viable Commodities Exchange Act Claim

In the PSAC, Plaintiffs assert one count under the CEA for market manipulation in violation of 7 U.S.C. §§ 9 and 25 and Commodity Futures Trading Commission ("CFTC") Rule 180.1(a), 17 C.F.R. § 180.1. (*See* PSAC ¶¶ 407-416). Plaintiffs assert this claim on behalf of a subclass of "[a]ll persons or entities that purchased or otherwise acquired Cryptocommodity Futures in the United States or its territories [during the class period]." (*Id.* ¶ 395). Defendants maintain that Plaintiffs' amended CEA claim is futile, arguing principally that Plaintiffs cannot plead the artificial inflation of cryptocommodity prices, and that Plaintiffs' allegation that Bitfinex caused a Bitcoin price premium on its exchange is implausible. (B/T MTA Opp. 26-32). Defendants also assert that amendment is futile because Plaintiffs have failed

to plead that Defendants conspired with the Anonymous Trader, or otherwise caused the at-issue trades.  (*Id.* at 32).  As explained below, the Court is unpersuaded by Defendants' arguments, and will permit Plaintiffs' CEA claim to move forward.[5]

As Plaintiffs raised similar market manipulation claims in the CAC, the Court assumes familiarity with the governing law, and sets forth only what is necessary to its consideration of the viability of the amended claims.  *See In re Tether*, 576 F. Supp. 3d at 109-13.  Broadly, CEA Sections 6(c)(1) and 22, as well as 7 U.S.C. §§ 9 and 25, make it unlawful for "any person, directly or indirectly, to use or employ or attempt to use or employ … any manipulative or deceptive device or contrivance."  CFTC Rule 180.1(a), in relevant part, makes it unlawful for any person to "intentionally or recklessly" "[m]ake, or attempt to make, any untrue or misleading statement of a material fact"; to "omit a material fact necessary in order to make the statements made not untrue or misleading"; or to "[e]ngage, or attempt to engage, in any practice, or course of

---

[5]    As a threshold matter, Defendants also raise the argument that application of the CEA would be impermissibly extraterritorial.  (B/T MTA Opp. 42-44).  Accepting the well-pleaded allegations of the PSAC as true, and construing them in Plaintiffs' favor, however, the Court finds that Plaintiffs have alleged "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money" in the United States.  *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 68, 70 (2d Cir. 2012) (observing that such allegations support the "plausible inference that the parties incurred irrevocable liability within the United States").  In particular, Plaintiffs allege not only that Goldshtein entered into [B]itcoin futures contracts from the United States (PSAC ¶ 22), but also that the B/T Defendants utilized the U.S. financial system to distribute the allegedly debased USDT (*id.* ¶¶ 139, 160), required customers to have a U.S. bank account or a bank that maintained a correspondent account with a U.S. bank (*id.* ¶ 161), and approved the transfers of allegedly debased USDT from the United States (*id.* ¶¶ 38, 299).  Accordingly, the Court finds that Defendants have not met their burden to demonstrate that the CEA claims pleaded in the PSAC would be futile due to extraterritoriality, regardless of whether such claims were waived by having not been raised earlier in the proceeding.

business, which operates or would operate as [] fraud or deceit."  17 C.F.R.
§ 180.1(a).

When evaluating manipulation claims sounding in fraud, courts apply a
relaxed form of the Rule 9(b) pleading standard, reflecting the Second Circuit's
"recogni[tion] that 'a claim of manipulation can involve facts solely within the
defendant's knowledge," and corresponding instruction that "'at the early
stages of litigation, the plaintiff need not plead manipulation to the same
degree of specificity as a plain misrepresentation claim.'"  *In re Tether*, 576 F.
Supp. 3d at 110 (alteration adopted) (quoting *In re Platinum & Palladium
Antitrust Litig.*, No. 14 Civ. 9391 (GHW), 2017 WL 1169626, at *49 (S.D.N.Y.
Mar. 28, 2017) ("*Platinum I*"), *aff'd in relevant part*, 61 F.4th 242 (2d Cir. 2023)
("*Platinum II*")); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87,
102 (2d Cir. 2007) (same).  Such a standard "is satisfied when the complaint
'simply specif[ies] what manipulative acts were performed, which defendants
performed them, when the manipulative acts were performed, and what effect
the scheme had on the market for the securities at issue.'"  *Commodity Futures
Trading Comm'n* v. *Gorman*, 587 F. Supp. 3d 24, 39 (S.D.N.Y. 2022) (quoting
*Platinum I*, 2017 WL 1169626, at *49).  In the PSAC, Plaintiffs pursue claims of
market manipulation under both a manipulative device theory and a price
manipulation theory, each of which the Court addresses in turn.

### i.    Plaintiffs Allege a Viable Manipulative Device Claim

"[W]here — as here — plaintiffs allege both 'manipulation and
misrepresentation as part of a single scheme,' they may satisfy their pleading

burden" to establish a manipulative device claim "'by alleging with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants.'" *In re Tether*, 576 F. Supp. 3d at 112 (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 673 (S.D.N.Y. 2016)); *see also ATSI Comm'cns*, 493 F.3d at 102 (same). Such a showing is sufficient, "and [plaintiffs] need not also plead loss causation or reliance at the motion to dismiss stage." *In re Tether*, 576 F. Supp. 3d at 112.

As to the facts, Plaintiffs have alleged with particularity the various roles Defendants played in the manipulative device and have adequately pleaded scienter. The PSAC details how Defendants allegedly debased USDT by issuing tokens backed not by the promised one-to-one U.S. dollar reserve, but instead by a less-valuable receivable, primarily from Bitfinex. (*See* PSAC ¶¶ 180, 167-191, 411). Defendants purportedly concealed this debasement by continuing to represent to the market that the issued USDT was fully backed by actual U.S. dollars, so that the market would interpret transactions in USDT as reflecting higher demand. (*See id.* ¶¶ 5, 411). Next, the PSAC alleges that Defendants manipulated the market by providing this debased USDT to the Anonymous Trader, via Bitfinex, at such a scale as to not only enable the Trader's arbitrage strategy to profit from cross-exchange pricing differentials, but also send a false signal to the market that there was a spike in demand for cryptocommodities, therein artificially increasing prices for those cryptocommodities. (*Id.* ¶¶ 290-362). Plaintiffs allege that Bitfinex further enabled this strategy by maintaining a generous margin trading policy that

allowed the Anonymous Trader to access this debased USDT on credit, without actually depositing any dollars with Bitfinex during the Class Period. (*Id.* ¶¶ 279, 313-321, 332).

What is more, to demonstrate the impact of this device on the market, Plaintiffs provide evidence illustrating a correlation between Defendants' transfers of allegedly debased USDT and higher BTC-USDT trading volumes, and the corresponding inflation of Bitcoin prices. (*See* PSAC ¶¶ 344-362). And to plead scienter, Plaintiffs allege that Defendants engaged in such conduct knowingly, given that Defendants knew (i) the extent to which USDT was not actually dollar-backed; (ii) that the Anonymous Trader's arbitrage strategy was executed by an automated bot that traded USDT from Bitfinex for cryptocommodities on other exchanges; and (iii) that the Anonymous Trader's conduct would drive price inflation. (*See id.* ¶ 412).

This issuance of secretly debased USDT and its unchecked pipeline to the market was plausibly "[m]arket manipulation in [one of] its various manifestations," as it functioned as "an artificial stimulus applied to ... market prices, ... prevent[ing] the determination of those prices by free competition alone." *U.S. Commodity Futures Trading Comm'n* v. *Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) (further noting that an artificial price is one that "does not reflect basic forces of supply and demand" (internal quotation marks and citation omitted)); *see also United States* v. *Vorley*, 420 F. Supp. 3d 784, 802 (N.D. Ill. 2019) ("The market price is only as 'real' as the data that inform the process of price discovery. By the same token, the market price is

'artificial' when the market is misinformed." (quoting *United States* v. *Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006))).

While Defendants counter with a number of arguments, each comes up short at establishing futility. *First*, Defendants argue that Plaintiffs cannot state a claim because they cannot show any artificial inflation of cryptocommodity prices in connection with USDT-fueled trades. (*See* B/T MTA Opp. 26). Defendants suggest that the Anonymous Trader purchased USDT from Bitfinex at parity (*i.e.*, one dollar for one USDT), and therefore that the Anonymous Trader's resulting arbitrage activity represented real, organic demand. (*See id.* at 26-28). At best, however, Defendants' argument presents a fact-based challenge to Plaintiffs' well-pleaded allegation that the Anonymous Trader had unrestricted access to USDT on credit alone, by virtue of Bitfinex's generous margin trading policy. (*See* Pl. MTA Reply 15 (citing PSAC ¶ 279)).[6]

Defendants likewise miss the mark in their argument that Plaintiffs' claims are futile because cross-exchange arbitrage cannot itself cause price inflation. (B/T MTA Opp. 29-30). As discussed, Plaintiffs' theory is not that arbitrage was the mechanism that influenced the prices in the

---

[6]     Defendants are similarly premature in their attack on Plaintiffs' allegation that Bitfinex caused a Bitcoin price premium on its exchange. (*See* B/T MTA Opp. 31-32). The allegations set forth in the PSAC plausibly establish that a persistent price premium existed during the period and could be facilitated through the combination of Bitfinex's generous margin trading policy, Tether's issuance of debased USDT, and Bitfinex's commingling of USDT and dollars. (*See* SAC ¶¶ 280-289, 308-321). *See Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005) (per curiam) (holding that courts assessing futility must accept as true the well-pleaded factual allegations of the proposed amended pleading). Defendants may, at a later point, introduce evidence to challenge the plausibility of Plaintiffs' price premium theory, whether through expert analysis or some other format.

cryptocommodities market.  Rather, Plaintiffs allege that it was the flood of debased USDT, brought to the market via the Anonymous Trader's arbitrage bot, that artificially signaled demand to the market, leading to price inflation. (*See* PSAC ¶¶ 258-279, 308-321, 337-385).[7]  As Plaintiffs' put it, "Defendants sought to ride in [the] bot's inflationary wake — as [the Anonymous Trader] pushed more and more debased USDT into the market, the price of cryptocommodities, especially [B]itcoin, rose."  (*Id.* ¶ 386).

Finally, Defendants attack Plaintiffs' position that USDT was actually debased, relying again on the theory that "any [at-issue] purchases of [B]itcoin or other cryptocommodities were made with USDT that had been purchased for [one dollar]."  (B/T MTA Opp. 28).  To the contrary, however, Plaintiffs plausibly allege that the Anonymous Trader did not actually purchase the allegedly debased USDT for any meaningful consideration (*i.e.*, U.S. dollars), and instead relied on Bitfinex's generous margin trading policy that permitted the Anonymous Trader to access ███████████████ USDT on credit alone. (*See* PSAC ¶ 279 ("Between March 30, 2017, and September 9, 2018, the Anonymous Trader never wired any fiat currency to Bitfinex or Tether.")).[8]

---

[7]    To that end, Defendants are incorrect that Plaintiffs must plead that Defendants actually conspired with the Anonymous Trader or caused his trades.  (*See* B/T MTA Opp. 32).  Plaintiffs' theory of manipulation lies in Defendants' knowing facilitation of the Anonymous Trader's activities, and understanding that the Trader's automated bot could, if supplied with a sufficient amount of debased USDT and tempted by an artificially-maintained price premium on the Bitfinex exchange, inflate the prices of cryptocommodities to Defendants' benefit.  (*See* PSAC ¶¶ 290-343).

[8]    Defendants' reliance on *Anderson* v. *Tether Holdings Ltd.* does not sway the Court. No. 21 Civ. 10613 (LTS), 2023 WL 5001074, at *2 (S.D.N.Y. Aug. 4, 2023).  *Anderson* is distinguishable on its facts, as it simply supports the proposition that purchasers of USDT did not have standing to pursue claims against Tether for misrepresenting the value of USDT, because those purchasers possessed the right to redeem USDT for a

###### ii.    Plaintiffs Allege a Viable Price Manipulation Claim

Next, to state a claim for price manipulation under the CEA, Plaintiffs must allege that: "[i] the defendant possessed an ability to influence market prices; [ii] an artificial price existed; [iii] the defendant caused the artificial price; and [iv] the defendant specifically intended to cause the artificial price." *In re Tether*, 576 F. Supp. 3d at 110 (internal quotation marks and citations omitted).  "This final element of scienter 'can be pled by alleging facts [i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 670).

Given the conclusions in the preceding section concerning Plaintiffs' manipulative device theory, the Court finds that the PSAC also sufficiently alleges the elements of a price manipulation claim.  That is, Plaintiffs plausibly allege that Defendants had and did exercise their ability to influence market prices through the unchecked issuance of debased USDT, leading to an artificial price for cryptocommodities.  As discussed, Plaintiffs do so by: (i) identifying the dates on which debased USDT was issued (PSAC ¶¶ 143-257); (ii) similarly detailing the subsequent dates and times of the Anonymous Trader's transactions exchanging the debased USDT for cryptocommodities (*id.*

---

dollar per token at any time.  *Id.*  This case, on the other hand, is entirely different as it concerns the artificial inflationary effects in the cryptocommodity market connected to the issuance of debased USDT, with the harm lying in the Plaintiffs' overpayment for cryptocommodities as a result of such inflation.

¶¶ 275-289); and (iii) providing "examples showing predictable price movements in the [cryptocommodities] market" corresponding to trades of this debased USDT. *In re Tether*, 576 F. Supp. 3d at 110 (quoting *Platinum I*, 2017 WL 1169626, at *32); *see also In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 671 (observing that causation may be established by demonstrating that the defendant's conduct "had an immediate effect on pricing" in the market). (*See* PSAC ¶¶ 344-362).

As to scienter, Plaintiffs plausibly allege both that Defendants had the motivation to commit the fraud in light of the significant benefits associated with the artificial inflation of cryptocommodity prices (*see* PSAC ¶¶ 388, 413); as well as the opportunity to do so in light of Defendants' ability to control the supply of USDT and move USDT into the market via the Bitfinex exchange and the Anonymous Trader's bot (*see id.* ¶¶ 107-142, 306, 322-336, 412). *Accord In re Tether*, 576 F. Supp. 3d at 110 (observing that "[the] final element of scienter 'can be pled by alleging facts [] showing that the defendants had both motive and opportunity to commit the fraud'" (quoting *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 670)). Likewise, Plaintiffs identify facts that demonstrate "strong circumstantial evidence of conscious misbehavior or recklessness," *id.* (citation omitted), namely by pointing to Defendants' exclusive knowledge of the extent to which USDT was backed by allegedly unstable receivables, and their apparent efforts to conceal that information from the market, *id.* (*See* PSAC ¶¶ 143-257, 366, 414).

Accordingly, the Court finds that the PSAC presents viable market manipulation claims, under both a manipulative device and a price manipulation theory, and therefore will permit amendment to that end.

### b.    Plaintiffs Plead Viable Sherman Act Claims

Finally, the Court considers the PSAC's three proposed antitrust claims, all brought under the Sherman Act.  In particular, Plaintiffs seek to bring claims for monopolization and conspiracy to monopolize under Section 2 of the Sherman Act, and for unlawful agreement in restraint of trade under Sections 1 and 3 of the Sherman Act.  (PSAC ¶¶ 417-446).  As these theories of liability largely parallel those already found to be viable in the context of Plaintiffs' CEA claims, and otherwise track the Sherman Act claims that previously survived Defendants' motion to dismiss in this case, the Court focuses on those arguments raised by Defendants that are not otherwise foreclosed by the Court's prior analysis, finding all but one to be unsuccessful at demonstrating futility.  Notably, the Court agrees with Defendants that claims predicated on an unlawful conspiracy with the Anonymous Trader fall short of the showing required to state a Section 2 conspiracy to monopolize claim, and therefore denies leave to amend the CAC to add such a claim.

### i.    Plaintiffs Have Antitrust Standing

To establish antitrust standing, "a private antitrust plaintiff [must] plausibly ... allege [i] that it suffered a special kind of antitrust injury, and [ii] that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns, Inc.* v. *PMC*

*Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (citations and internal quotation marks omitted).  Plaintiffs satisfy both elements via the PSAC.

The Court first considers whether Plaintiffs have suffered an antitrust injury, which involves a three-step process:

> [i] the plaintiff must "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; then [ii] the court must "identify the actual injury the plaintiff alleges" by "look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct"; and finally, [iii] the court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges."

*City of Long Beach* v. *Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 444-45 (S.D.N.Y. 2020) (quoting *Harry* v. *Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018)).  Here, because the Court has already found that the PSAC plausibly alleges a theory of cryptocommodity price manipulation on the part of Defendants for purposes of the CEA, the Court likewise accepts the PSAC's allegations that Plaintiffs were "harmed by purchasing cryptocommodities at artificially inflated prices that were the product of Defendants' manipulation of the cryptocommodity market."  *In re Tether*, 576 F. Supp. 3d at 93.  (*See* PSAC ¶¶ 19-22).  These allegations are sufficient to establish antitrust injury for the purposes of Section 2, which recognizes injuries connected to "losses from transacting in a market tainted by price manipulation," *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 47 (S.D.N.Y. 2012), as well as Section 1, which similarly acknowledges injuries

from the "pay[ment] [of] prices that no longer reflect ordinary market conditions," *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016).

Moving on, the Court considers whether Plaintiffs are efficient enforcers of the antitrust laws. As the Second Circuit has instructed, courts must assess a number of factors when considering this element, namely:

> [i] whether the violation was a direct or remote cause of the injury; [ii] whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; [iii] whether the injury was speculative; and [iv] whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.

*Gelboim*, 823 F.3d at 772.

Defendants, for their part, direct their arguments primarily at the first element, which "requires some direct relation between the injury asserted and the injurious conduct alleged," and is assessed according to "familiar principles of proximate causation." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139-40 (2d Cir. 2021). The Court, however, finds that Plaintiffs' claimed injury (*i.e.*, purchases made at inflated prices) was a sufficiently "direct" result of Defendants' conduct for purposes of standing, even though Defendants may later revisit the issue at later stages in this case. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *11 (S.D.N.Y. Sept. 20, 2016) (finding price premium theory of injury was not speculative, as plaintiffs could "prove damages by comparing the prices [they] paid in identifiable transactions with what the price would have been but for collusion," and noting that "any holding that these damages

would be speculative is premature" in the context of a motion to dismiss);
*Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 175 F. Supp. 3d 44, 61
(S.D.N.Y. 2016) (concluding that plaintiffs' allegations "that they were directly
harmed ... by having to pay higher prices (or earning lower profits) from
instruments tied to [defendants' alleged anticompetitive conduct]," were not
speculative).

Defendants' arguments to the contrary are again unavailing. For one,
Defendants assert that it was the Anonymous Trader's arbitrage activity, rather
than Defendants' conduct, that was the proximate cause of the price inflation,
and thus of Plaintiffs' injury. (B/T MTA Opp. 36). Not so. As discussed above,
the PSAC plausibly alleges that the Anonymous Trader was simply the vehicle
by which Defendants executed their scheme to manipulate cryptocurrency
prices through the introduction of debased USDT *en masse*.

Nor does *Platinum II*, on which Defendants also rely, dictate a different
conclusion. (*See* B/T MTA Opp. 36 (citing *Platinum II*, 61 F.4th at 260-61)). In
that case, which concerned the alleged manipulation of the market spot price
for platinum and palladium, the Second Circuit found that participants in the
corresponding futures market suffered a direct injury in connection with the
spot price manipulation, even though a direct market buyer who made the
independent decision to incorporate the benchmark prices into its contracting
did not. *Platinum II*, 61 F.4th at 263-64. Here, Plaintiffs are more akin to the
*Platinum II* plaintiffs who "lost money through futures contracts transactions in

the same market" that was manipulated by the defendants, as opposed to the plaintiff who participated in a distinct, albeit parallel direct market  *Id.* at 263.

Defendants are similarly unsuccessful in their argument that purchasers of the debased USDT were more "direct" victims of the alleged misconduct. (B/T MTA Opp. 37).  As discussed, Plaintiffs' theory centers on injuries sustained as a result of Defendants' manipulation of the market for certain cryptocommodities, using debased USDT as their key instrumentality.  (*See* PSAC ¶¶ 19-22).  Plaintiffs, as the purchasers of those cryptocommodities, are sufficiently direct victims for the purposes of their antitrust claims.

### ii.    Plaintiffs State a Viable Section 2 Monopolization Claim

Having found that the PSAC plausibly alleges that Plaintiffs have antitrust standing, the Court proceeds to address the merits of their claims. The Court begins with Plaintiffs' claim for monopolization under Section 2 of the Sherman Act, arising out of Defendants' alleged acquisition and maintenance of market power in the market for cryptocommodities through the issuance of debased USDT.  (*See* PSAC ¶¶ 417-427).  "[T]o state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish: '[i] the possession of monopoly power in the relevant market and [ii] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). The Court addresses each element in turn.

"There are two ways a plaintiff can show the possession of monopoly power: [i] through direct evidence of anticompetitive effects or [ii] by defining a relevant market and showing defendants' excess market share." *In re Tether*, 576 F. Supp. 3d at 95 (quoting *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d at 51). As in the CAC, Plaintiffs take the former path to establish monopoly power, alleging that Defendants, through the issuance of secretly debased USDT, possessed the "ability to distort ordinary forces of supply and demand," sufficient to control cryptocommodity prices. *Merced Irrigation Dist.* v. *Barclays Bank PLC*, 165 F. Supp. 3d 122, 143 (S.D.N.Y. 2016). (*See* PSAC ¶¶ 12-13, 337-362, 425). As further evidence, Plaintiffs identify specific correlations between the issuance of this allegedly debased USDT, its transfer to and use by the Anonymous Trader, and the subsequent price movement of Bitcoin seemingly correlated with this trading activity. (*See id.* ¶¶ 350-362). These allegations largely echo those raised in the context of Plaintiffs' CEA claims, and once again prevail over Defendants' position that the USDT was fully backed and therefore its influx into the market provided a legitimate, rather than artificial, signal of organic market demand for cryptocurrencies. (*See* B/T MTA Opp. 38). Consequently, the Court finds that the PSAC sufficiently pleads monopoly power, as it "provide[s] 'concrete allegations of Defendants' dominant position in a related market,' and ha[s] pleaded 'significant pricing anomalies that are closely correlated with [D]efendants' alleged conduct.'" *In re Tether*, 576 F. Supp. 3d at 98 (alteration adopted)

(quoting *Shak* v. *JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 485 (S.D.N.Y. 2016)).

Next, to show willful acquisition of monopoly power at the pleading stage, a plaintiff must identify anticompetitive conduct, defined by the Second Circuit as "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Tether*, 576 F. Supp. 3d at 98 (quoting *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014)). In the CAC, the Court found such a showing was met by Plaintiffs' allegations that Defendants "printed the crypto-equivalent of money out of thin air, and then used that counterfeit money to purchase cryptocommodities when prices of those commodities began tanking." *Id.* at 99 (alteration adopted and internal quotation marks and citation omitted). Such a scheme not only "increase[ed] Defendants' market share through anticompetitive means," but also "more critically, artificially inflat[ed] cryptocommodity prices divorced from any legitimate market forces." *Id.*

Defendants argue that discovery has undercut this logic, as the revelation that USDT was ostensibly backed by Bitfinex receivables belies any finding that "Defendants printed USDT 'out of thin air.'" (B/T MTA Opp. 38). To the contrary, the clarification that Tether's unchecked issuance of USDT was backed by mere promises from Bitfinex that it could pay the collateral amount, rather than the CAC's allegation that the USDT was backed by nothing at all, does not change the Court's conclusion that the USDT issued by Tether was debased, especially in light of Plaintiffs' detailed allegations

explaining how the value of Bitfinex receivables should have been discounted in light of their inherent risk.  (*See* PSAC ¶¶ 192-205).  Nor are Defendants correct that the Anonymous Trader's cross-exchange arbitrage strategy explains away the allegedly suspicious correlation between Defendants' issuance of debased USDT and the movement of cryptocommodity prices, especially given Plaintiffs' allegations, discussed above, that the Anonymous Trader was essentially betting with Defendants' house money.  For all of these reasons, the Court finds that the PSAC plausibly states a claim for monopolization under Section 2 of the Sherman Act.

### iii.  Plaintiffs' Section 2 Conspiracy to Monopolize Claim Is Futile

Plaintiffs next claim that Defendants entered into a conspiracy with the Anonymous Trader to engage in the aforementioned monopolization, seeking to revive Section 2 conspiracy claims that the Court has previously dismissed. (*See* PSAC ¶¶ 428-436).  *See In re Tether*, 576 F. Supp. 3d at 100-01.  Such claims "require[] a showing of: '[i] concerted action, [ii] overt acts in furtherance of the conspiracy, and [iii] specific intent to monopolize.'"  *Id.* (quoting *Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997)).

In its prior opinion, the Court found that the CAC fell short of establishing that the Exchange Defendants or any of the Individual Defendants had any intent to assist the B/T Defendants to monopolize, given the lack of any allegations that those parties engaged in anticompetitive behavior.  *In re Tether*, 576 F. Supp. 3d at 101.  Rather, the Court found that the allegations of

the CAC "more properly describe[] an agreement, *inter alia*, in restraint of trade
or to manipulate cryptocommodity prices for profit — not to reduce competition
in that market or exclude competitors from the market." *Id.* at 101 n.33. So
too here, where Plaintiffs' conclusory allegation that the Anonymous Trader
acted with the specific intent to confer monopoly power on Defendants is
supported primarily by an alleged "common motive [between Defendants and
the Trader] to conspire to inflate prices of cryptocommodities." (PSAC ¶ 434).
The Court therefore finds the PSAC's conspiracy to monopolize claim to be
futile, though it will permit Plaintiffs to proceed with their claim for unlawful
agreement in restraint of trade, as discussed below.

### iv.    Plaintiffs State a Viable Section 1 Conspiracy Claim

Finally, Plaintiffs claim that Defendants' conspiracy to inflate
cryptocommodity prices violated Sections 1 and 3 of the Sherman Act,
proscribing agreements in restraint of trade. (*See* PSAC ¶¶ 437-446).[9]

---

[9]    As a threshold matter, the parties dispute how the Court should understand the
Section 1 claims raised in the PSAC. In relevant part, the PSAC alleges that
"Defendants violated 15 U.S.C. § 15 by conspiring and agreeing amongst themselves to
manipulate cryptocurrency prices by debasing USDT and facilitating the Anonymous
Trader's purchase of cryptocommodities." (PSAC ¶ 439). Plaintiffs maintain that these
allegations present two claims: *first*, that Defendants conspired with the Anonymous
Trader to manipulate cryptocurrency prices; and *second*, that Defendants conspired
amongst themselves to manipulate cryptocurrency prices. (*See* Pl. MTA Br. 22-25, 25
n.2). Defendants, on the other hand, assert that the language of the PSAC only
supports the latter reading, although they address both claims in their opposition brief.
(*See* B/T MTA Opp. 40-42).

Given that the allegations of the PSAC provide fair notice of Plaintiffs' theory of an illicit
conspiracy between Defendants and the Anonymous Trader, the Court will permit
Plaintiffs to proceed on both theories, notwithstanding the ambiguous semantics of
certain paragraphs in the PSAC. *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555
(2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain
statement of the claim showing that the pleader is entitled to relief,' in order to 'give the
defendant fair notice of what the ... claim is and the grounds upon which it rests.'").

"Section 1 of the Sherman Act prohibits restraints on trade 'effected by a contract, combination, or conspiracy.'" *In re Tether*, 576 F. Supp. 3d at 101 (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 553 (2007)).[10] To state a claim under Section 1 of the Sherman Act, a plaintiff must show "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade." *United States* v. *Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016). Addressing each element in turn, the Court finds that the PSAC presents a viable Section 1 claim.

To satisfy the first element of a Section 1 claim, "Plaintiffs must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or 'circumstantial facts supporting the inference that a conspiracy existed.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 659 (quoting *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). Recognizing that proof of a conspiracy is rarely reduced to direct evidence, the Second Circuit permits a plaintiff to support her claim "through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Gelboim*, 823 F.3d at 781 (internal quotation marks and citation omitted). A plaintiff may meet this burden through "allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors." *Id.* (internal quotation marks and citation omitted). As the parties are aware, "[t]hose illustrative, non-exhaustive 'plus factors' include '[i] a common

---

[10]    Section 3 simply "extends the reach of Section 1 to trade or commerce involving U.S. Territories and the District of Columbia." *Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 107 n.10 (S.D.N.Y. 2015).

motive to conspire; [ii] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and [iii] evidence of a high level of interfirm communications.'" *In re Tether*, 576 F. Supp. at 102 (quoting *Gelboim*, 823 F.3d at 781).

The Court begins with Plaintiffs' allegations supporting the inference of an agreement between the Defendants and the Anonymous Trader to manipulate cryptocommodity prices, which facts are discussed extensively throughout this Opinion. (*See* Pl. MTA Br. 23). Relevant to the Section 1 "plus factors," Plaintiffs allege that Defendants and the Anonymous Trader had a common motive to conspire to inflate cryptocommodity prices, as evidenced by the apparent back-and-forth conversations between Defendants and the Anonymous Trader, including an exchange in which the parties spoke about "push[ing] the [Bitcoin] price above 10k," in connection with the issuance of USDT to the Anonymous Trader. (PSAC ¶ 335; *see also id.* ¶¶ 322-336). These exchanges echo the specific shared intent to manipulate prices already accepted by this Court in the context of the similar Section 1 claim raised in the CAC. *See In re Tether*, 576 F. Supp. at 103 (finding allegations that the conspirators intended "to stop the prices of cryptocommodities from falling, and to artificially increase the prices in the cryptocommodity market," to be sufficient for the purposes of a motion to dismiss).

Likewise, Plaintiffs' allegations concerning the overly generous margin trading policy implemented by the Bitfinex exchange (PSAC ¶ 332), █

███████████████████████ (*id.* ¶ 336), and ██████████████████████

███████████████████████████████████ (*id.* ¶ 330), all provide

evidence of action against apparent individual economic self-interest sufficient

to support a threshold inference of conspiracy. While Defendants' proffered

innocuous explanations for these actions may be relevant at summary

judgment, for the purposes of assessing futility, Plaintiffs "must only put forth

sufficient factual matter to plausibly suggest an inference of conspiracy, even if

the facts are susceptible to an equally likely interpretation." *Gelboim*, 823 F.3d

at 782 (citing *Anderson News*, 680 F.3d at 184 ("Because plausibility is a

standard lower than probability, a given set of actions may well be subject to

diverging interpretations, each of which is plausible.")).

Having found that Plaintiffs have plausibly alleged a conspiracy between

Defendants and the Anonymous Trader, the Court next considers Plaintiffs'

allegations that the conspiracy was "in restraint of trade or commerce among

the several States." *In re Tether*, 576 F. Supp. 3d at 104. Here, the Court's

analysis is necessarily brief, given its earlier findings that Plaintiffs have

plausibly alleged that Defendants, relying in part on the Anonymous Trader's

cross-exchange arbitrage activity, sought to artificially inflate the price of

cryptocommodities. As the parties are aware, "[a]ny conspiracy formed for the

purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing

the price of a commodity is illegal *per se*, and the precise machinery employed

is immaterial." *Id.* (internal quotation marks and citation omitted).

Accordingly, the PSAC presents a viable claim predicated on an agreement in restraint of trade between Defendants and the Anonymous Trader.

Finally, the Court considers Plaintiffs' alternative theory that Defendants Tether and Bitfinex conspired between themselves in restraint of trade, notwithstanding their common ownership, as evidenced by the extensive allegations in the PSAC detailing an alleged agreement between Tether and Bitfinex to issue debased USDT in connection with a scheme to artificially inflate the price of cryptocommodities. (*See* Pl. MTA Br. 25 n.2; Pl. MTA Reply 27 n.15, 29-30). While Defendants are correct that this theory is in tension with the principle that Section 1 applies only to concerted action that "joins together separate decisionmakers" (B/T MTA Opp. 42 (quoting *Am. Needle, Inc.* v. *Nat'l Football League*, 560 U.S. 183, 195-96 (2010))), such an argument does not foreclose Plaintiffs' ability to plead this theory in the alternative, given Defendants' argument that Bitfinex and Tether were independent entities (Pl. MTA Reply 29 (citing *Square D Co.* v. *Schneider S.A.*, 760 F. Supp. 362, 368 (S.D.N.Y. 1991) (permitting plaintiff to proceed with an alternative theory that a defendant's subsidiaries were discrete entities, in addition to the plaintiff's principal theory that defendant's subsidiaries acted as one entity under defendant's control))).

Accordingly, the Court finds that the PSAC alleges viable claims under Section 1 of the Sherman Act.

**C.**    **The Court Grants Plaintiffs' Motion to File a Redacted Version of the PSAC**

Having resolved the merits of Plaintiffs' motion for leave to amend, the Court finally turns to Plaintiffs' motion for leave to file redacted versions of their PSAC and accompanying brief.  (Dkt. #539).  While Defendants take no substantive position on Plaintiffs' request, they provide a letter from the Anonymous Trader to the Court, vigorously opposing Plaintiffs' proposed redactions.  (Dkt. #542 (B/T cover letter), 542-1 (Anonymous Trader letter)).  Having unsuccessfully met-and-conferred pursuant to the Court's prior order (Dkt. #511), Plaintiffs and the Anonymous Trader represent they are at an impasse and require the Court's intervention to resolve the parties' line-by-line redactions across the 448-paragraph PSAC.

Under both the common law and the First Amendment, a strong presumption of public access attaches to judicial documents.  *See Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006).  For the avoidance of doubt, the PSAC and the Second Amended Complaint, when it is filed, both constitute "judicial documents."  *See Bernstein* v. *Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 140 (2d Cir. 2016).  Such a designation makes sense, as "[a] complaint … is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision."  *Id.* (citation omitted).  This presumption is balanced, to a degree, against "the privacy rights of participants and third parties."  *United States ex rel. Wenzel* v. *Pfizer, Inc.*, 881 F. Supp. 2d 217, 221 (D. Mass. 2012); *Standard Chartered*

*Bank Int'l (Americas) Ltd.* v. *Calvo*, 757 F. Supp. 2d 258, 260 (S.D.N.Y. 2010) ("In considering whether presumptively public judicial documents ... should be sealed, a court considers ... the privacy interests of those who resist disclosure." (citing *United States* v. *Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995))).

Of relevance here, where "the unsealing of a ... complaint would threaten a litigant's personal privacy or safety, courts have the discretion to ... unseal a complaint with redactions." *Wenzel*, 881 F. Supp. 2d at 221. When considering these interests, however, "courts must be leery of confidentiality requests that 'permit the parochial interest of one party to trump the public interest in the efficient and transparent administration of justice.'" *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 602, 604 (S.D.N.Y. 2011) (quoting *Calvo*, 757 F. Supp. 2d at 260).

Turning to the circumstances of this case, the Court agrees with Plaintiffs that the Anonymous Trader's proposed redactions are impermissibly overbroad, and "would have the practical effect of sealing the entire case." *In re Platinum & Palladium*, 828 F. Supp. 2d at 604. Indeed, while technically a third party to this litigation, the Anonymous Trader is heavily implicated in Defendants' alleged price manipulation scheme, as detailed in the foregoing discussion of the PSAC. While the Court recognizes the Anonymous Trader's interest in the nondisclosure of the Trader's personal information, this interest does not extend to the Anonymous Trader's trading activities on the open market and the Trader's business interactions with Defendants that lie at the

center of this case.  *Cf. United States ex rel. Doe* v. *Horizon Therapeutics PLC*, No. 20 Civ. 3207 (MKV), 2021 WL 3500911, at *2 (S.D.N.Y. Aug. 9, 2021) (recognizing that the risk of professional retaliation is not one of the "'higher values' that outweigh the presumption of public access" to documents filed in an ongoing case (collecting cases)).

While the Court will accept redactions concerning the specifics of certain trades or trading activity, it will not accept the Anonymous Trader's proposed redactions regarding the general nature of the Trader's automated trading strategy, or how that automated trading strategy was used by Defendants to push USDT onto the market and thereby inflate cryptocommodity prices.  For example, the Anonymous Trader proposes that the Court approve redactions of section headings alleging that "Defendants gave the Anonymous Trader vast quantities of USDT; Defendants were aware of and facilitated the Bitfinex price premium; [and] Defendants helped the Anonymous Trader's bot trade large volumes."  (Dkt. #539-2 at 2).  Elsewhere, the Anonymous Trader seeks redaction, *inter alia*, of allegations that Defendants "extended the Anonymous Trader a credit line," and that "[t]he Anonymous Trader's bot's trades inflated [B]itcoin prices during the Class Period.  By trading debased USDT for [B]itcoin and other crypto assets, the bot sent an artificial signal about the level of demand for [B]itcoin, inflating [B]itcoin prices on those exchanges."  (PSAC ¶¶ 12-13).  None of these allegations, however, implicates the Anonymous Trader's personal information.  And as detailed above, such allegations are integral to the theory of market manipulation set forth in the PSAC.

Nor is the Anonymous Trader correct in the related position that the Court's prior orders governing the treatment of evidence produced in discovery dictate the treatment of redactions in what is to become the operative pleading in this case. (Dkt. #542-1 at 3). As the Second Circuit instructs, there is a distinction between judicial documents, which are those "relevant to the performance of the judicial function and useful in the judicial process," and "[d]ocuments that are never filed with the court, but simply 'passed between the parties in discovery.'" *Brown* v. *Maxwell*, 929 F.3d 41, 50 (2d Cir. 2019) (quoting *Amodeo*, 71 F.3d at 50). While the latter category of discovery documents "lie[s] entirely beyond the presumption's reach," and therefore may be governed by protective orders and the Court's authority to oversee discovery, judicial documents, including the PSAC in this case, are governed by the more stringent presumption in favor of public access. *Id.* In this case, the Court finds that the Anonymous Trader's proposed redactions would inappropriately seal allegations that are relevant to the performance of the Court's judicial function in granting leave to amend, and in assessing future substantive motions, including for class certification and summary judgment.

Accordingly, having reviewed the disputed redactions to the PSAC, the Court finds that Plaintiffs' approach properly redacts the Anonymous Trader's identifying information, while still ensuring that the operative allegations of the PSAC are presented in open court, and understandable to the public. *See Lugosch*, 435 F.3d at 119 (emphasizing the importance of open access to judicial documents in ensuring that "the public [has] confidence in the

conscientiousness, reasonableness, [and] honesty of judicial proceedings" (citation omitted)).  It will therefore grant Plaintiffs' motion for leave to file a redacted PSAC.

## CONCLUSION

For the reasons detailed above, Plaintiffs' motions for (i) leave to file a second amended complaint and (ii) leave to file redacted versions of certain motion papers and the Proposed Second Amended Complaint ("PSAC") are GRANTED.  Plaintiffs shall file the redacted versions of these materials on or before **July 8, 2024**.  Plaintiffs shall further file their Second Amended Complaint on or before **July 12, 2024**, and may employ the same redacting conventions that the Court has authorized for the PSAC.

Thereafter, the parties are ORDERED to meet and confer and to submit proposed next steps, including a proposed deadline for the filing of Defendants' answer, a proposed schedule for the remaining dispositive motions in this action, and the parties' contemplated schedule for expert discovery.  The parties shall do so in a submission, not to exceed ten pages, on or before **July 26, 2024**.

The Clerk of Court is directed to terminate the motions pending at docket entries 479 and 539.  The Clerk of Court is further directed to file this Opinion and Order under seal, viewable only to the parties and the Court.

Finally, the parties are ORDERED to submit, under seal, a joint letter proposing redactions to this Opinion on or before **July 19, 2024**.

SO ORDERED.

Dated:    June 26, 2024
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge