UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | No. 19 Civ. 9236 (KPF) |

**ANSWER OF THE B/T DEFENDANTS TO THE SECOND AMENDED COMPLAINT**

Michael Jason Lee (*pro hac vice*)
LAW OFFICES OF MICHAEL JASON
LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984

Sunjina K. Ahuja (*pro hac vice*)
Christopher J. Beal (*pro hac vice*)
DILLON MILLER, AHUJA & BOSS, LLP
5872 Owens Ave., Suite 200
Carlsbad, California 92008
(858) 587-1800

Maeve L. O'Connor
Michael Schaper
Elliot Greenfield
Natascha Born
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Defendants iFinex Inc.,
DigFinex Inc., BFXNA Inc., BFXWW Inc.,
Tether International Limited, Tether
Operations Limited, Tether Holdings Limited,
Tether Limited, Giancarlo Devasini, and
Ludovicus Jan van der Velde*

Defendants iFinex Inc., BFXNA Inc., and BFXWW Inc., Tether Holdings Limited, Tether Limited, Tether Operations Limited, and Tether International Limited, DigFinex Inc., Ludovicus Jan van der Velde, and Giancarlo Devasini (collectively, the "B/T Defendants"), by and through their undersigned attorneys, answer and assert additional defenses to the allegations contained in Plaintiffs' Second Amended Complaint ("SAC") as follows:

## PRELIMINARY STATEMENT

The B/T Defendants aver as follows:

i.      Plaintiffs' claims of a conspiracy to inflate bitcoin prices are pure fiction.  When Plaintiffs commenced this lawsuit years ago, they alleged that Defendants had printed USDT "out of thin air" and used those counterfeit tokens to make carefully-timed purchases of bitcoin on third-party exchanges, artificially inflating its price and causing the "largest bubble in human history."  None of that had any basis in reality.  After two years of discovery – including production by the B/T Defendants of more than a million pages of documents and a massive amount of transaction records – Plaintiffs were forced to admit that there was no evidence supporting the market manipulation scheme they alleged, and they abandoned it.

ii.      Rather than dismiss their frivolous lawsuit, as Federal Rule of Civil Procedure 11 requires, Plaintiffs instead switched gears and asserted a new – equally baseless – theory in the Second Amended Complaint.  Plaintiffs' new theory is not supported by a shred of evidence and, indeed, defies all logic and common sense.  It simply did not happen.  The B/T Defendants are confident that they will prevail when the actual evidence – rather than Plaintiffs' false and misleading allegations – is finally put before the Court.  Plaintiffs' continued pursuit of claims that they know lack evidentiary support violates Rule 11, and the B/T Defendants have notified Plaintiffs and their counsel that they intend to seek sanctions under that Rule, including but not limited to attorney's fees and costs.

iii.     Having jettisoned their prior theory, Plaintiffs now claim that bitcoin prices were inflated worldwide because a single Bitfinex customer, referred to in this case as the Anonymous Trader to protect his identity, engaged in cross-exchange arbitrage:  profiting from price differences across exchanges by buying bitcoin on one exchange and selling it on another. Arbitrage is a common, legitimate trading strategy employed by many traders – both in the crypto markets and the traditional financial markets.  If anything, it acts to *decrease* price differences between exchanges.  It does not inflate prices.

iv.     Plaintiffs' allegations that the Anonymous Trader artificially inflated the price of bitcoin when he purchased it using USDT are baseless and contradict well-settled economic principles.  The Anonymous Trader fully paid for each USDT – one U.S. dollar per USDT token – that he used in his arbitrage trading.  That is important because a purchase of bitcoin using USDT that was purchased for $1 represents *genuine* demand for bitcoin.  It cannot, by definition, cause *artificial* inflation.  Plaintiffs know that, and so they seek to obscure the issue with misleading allegations that Defendants "provided," "pushed," "gave," or "fed" USDT to the Anonymous Trader, falsely suggesting that he received USDT for free, or at a discount.  He did not.

v.     And Plaintiffs' allegations that USDT was somehow "debased" – worth less than $1 – are both factually incorrect and completely irrelevant to their claims.  If an individual uses $100 to buy 100 USDT, and then uses that 100 USDT to buy bitcoin, the purchase of bitcoin represents a genuine $100 worth of demand.  There is no artificial inflation.  It makes no difference whether, as Plaintiffs incorrectly contend, USDT should have had a market value of less than $1.

vi.    Plaintiffs' convoluted theory of market manipulation and artificial price inflation falls apart under even minimal scrutiny.  Plaintiffs try to paper over those deficiencies and sow confusion throughout the Second Amended Complaint with allegations that are false and misleading, and, in many cases, have no bearing on their claims.

vii.    The following averments respond in further detail to some of Plaintiffs' baseless and misguided allegations.

viii.    ***Tether and USDT***.  Tether is a pioneer in the field of stablecoins and the issuer of the USDT token, among other stablecoins.  USDT combines the stability of the U.S. dollar with the benefits of cryptocurrency technology.  The market price of USDT is intended to track the U.S. dollar.  As the chart below illustrates, aside from a few minor and temporary fluctuations, USDT has maintained a consistent market price of $1 since it was first issued, despite periods of significant volatility in the crypto markets.



Historical USDT Prices
March 6, 2015 to September 4, 2024

Source and Notes:
Data from CoinMarketCap.
Chart depicts the USD close price (end of day UTC time) of USDT from March 6, 2015 to September 4, 2024.
Removes outlier price data prior to March 6, 2015. Data begins February 26, 2015.

ix.     Tether's business model has remained essentially unchanged since its founding. Tether issues USDT to and redeems USDT from its customers in exchange for an equivalent amount of U.S. dollars, and it maintains reserves that "back" the issued USDT and ensure that USDT can always be redeemed for $1 per USDT.  Tether has honored redemption requests, even during market upheavals.  For example, during the tumultuous period following the collapse of the so-called "algorithmic stablecoin" TerraUSD, Tether redeemed over 20 billion USDT in about a month without blinking.  USDT's steady market price reflects the market's confidence in Tether's ability to redeem USDT.

x.     ***The Bitfinex Exchange***.  Bitfinex is a prominent crypto-asset exchange.  During the alleged Class Period, Bitfinex and Tether were under common control and management, with Ludovicus Jan van der Velde as their CEO, Giancarlo Devasini as their CFO, and, for much of that time, Paolo Ardoino as their CTO.  In 2023, Mr. Ardoino became Tether's CEO.

xi.     Like Tether, Bitfinex sought to bridge the gap between the traditional fiat economy and the crypto economy, and it was one of the first crypto exchanges that enabled customers to deposit and trade both fiat and crypto currencies.  Bitfinex allowed customers to maintain U.S. dollar balances and to trade U.S. dollars for crypto-assets – for example, the USD/BTC trading pair.  Bitfinex also shared Tether's confidence in the USDT stablecoin, and, through November 27, 2018, it credited deposits of USDT to customer accounts as U.S. dollar balances and permitted customers to withdraw U.S. dollar balances from their accounts in the form of either U.S. dollars or USDT.  After November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange.

xii.     Bitfinex offered a range of services and features for its customers, some of which are relevant to Plaintiffs' allegations.  For example, Bitfinex offered peer-to-peer margin trading to its customers, which allowed customers to lend assets to each other subject to certain conditions.  Among other things, Bitfinex required customers borrowing assets to maintain sufficient collateral in their accounts, and it automatically liquidated margin positions if the collateral dropped below certain thresholds.  Bitfinex also extended credit lines to a limited number of customers.  Bitfinex required these credit lines to be overcollateralized by assets held in the customers' Bitfinex accounts – *i.e.*, customers had to hold more assets in their Bitfinex accounts than the amount of the credit line – and therefore customers could not use a credit line to withdraw more assets than they held in their accounts.  For the most part, credit lines were used by Bitfinex customers for the short period of time after fiat currency or crypto assets had been deposited in their accounts but before the funds or assets had been received by Bitfinex – for example, while a wire transfer was being processed.  This practice is entirely uncontroversial, as many retail stock brokerages offer the same service to their customers.

xiii.     Bitfinex also offered certain features for high-volume traders.  For example, customers could access the Bitfinex exchange by means of its API, which allowed customers to trade using automated software programs, sometimes referred to as "bots."  Trading fees on Bitfinex were tiered, such that higher volume traders paid lower fees per trade.  And customers could seek to be "greenlaned," meaning that they could withdraw assets from the Bitfinex exchange without the extra security step of a manual email confirmation.  Similar features are offered by many other crypto exchanges.

xiv.     ***USDT Issuances to Bitfinex***.  As noted, Bitfinex allowed customers to withdraw U.S. dollar account balances as USDT.  That required having a supply of USDT, which Bitfinex

purchased from Tether as a customer.  Tether issued USDT to Bitfinex in exchange for payment

of an equal amount of U.S. dollars, typically by means of a contemporaneous wire transfer.

When contemporaneous payment was not possible, for example because of short banking delays,

Tether would count the amount owed by Bitfinex as part of its reserves backing USDT.  And

Bitfinex fully paid Tether for all issuances of USDT.

     xv.      In the spring of 2017, Bitfinex and Tether lost access to U.S. correspondent

banking for their bank accounts in Taiwan and had to seek an alternative banking solution.  For

several months, Tether issued USDT to Bitfinex without receiving an immediate payment of

U.S. dollars and counted an account receivable for the amount owed by Bitfinex as part of its

USDT reserves.  Because the same people controlled and managed Tether and Bitfinex, they had

complete knowledge of – and control over – Bitfinex's assets.  They knew that Bitfinex had

sufficient U.S. dollars to satisfy the receivable and would make the payment.  There was no risk

of non-payment.  On September 15, 2017 – the same day that Tether was able to open a new

bank account that could receive the funds – Bitfinex paid Tether the entire amount due.

     xvi.     Plaintiffs' allegation that, during the interim period, Bitfinex did not have

sufficient U.S. dollars to pay for those USDT issuances is false and unsupported by any

evidence.  Bitfinex carefully tracked in real time its assets and liabilities, customer assets, and

amounts owed to Tether for USDT issuances and confirmed that its net assets (excluding

customer assets) were sufficient to pay the amounts owed to Tether for USDT issuances.

Plaintiffs' suggestion that Bitfinex used customer funds to purchase USDT is incorrect and

unsupported by evidence.  (SAC ¶ 204.)  And, again, Bitfinex paid off the receivable on

September 15, 2017, the first day that Tether had a bank account that could receive the funds.

xvii.    ***The Anonymous Trader.***  The individual referred to as the Anonymous Trader is a Bitfinex customer who engaged in cross-exchange arbitrage.  As noted above, cross-exchange arbitrage involves profiting from price differences across exchanges by simultaneously buying an asset on one exchange (at the lower price) and selling the same amount of that asset on a second exchange (at the higher price).  Arbitrage is widely viewed as *beneficial* to the efficient operation of markets.  Indeed, "the existence of market makers and arbitrageurs" is one of the key factors that courts consider in evaluating whether a security trades in an efficient market.  *See Cammer v. Bloom*, 711 F. Supp. 1264, 1283-87 (D.N.J. 1989).

xviii.    During the alleged Class Period, the Anonymous Trader conducted his cross-exchange arbitrage using an automated software program or "bot."  A bot can be programmed to monitor prices on different exchanges, and to issue trade orders when it detects a profitable arbitrage opportunity.  Like other high-volume traders, the Anonymous Trader was in the lowest fee tier, and his account was "greenlaned."

xix.    As part of his arbitrage strategy, the Anonymous Trader bought and sold bitcoin on Bitfinex in exchange for U.S. dollars.  Like all other customers, if the Anonymous Trader deposited USDT on Bitfinex during this period, it was credited as U.S. dollars in his account.  And if he sent bitcoin to his Bitfinex account and sold it for U.S. dollars, he could withdraw that dollar balance in the form of USDT.  Any other customer could do the same.

xx.    Importantly, a withdrawal of a U.S. dollar balance in the form of USDT is precisely equivalent to a purchase of USDT for U.S. dollars.  Accordingly, when the Anonymous Trader chose to withdraw his U.S. dollar account balance as USDT, he was effectively purchasing that USDT for $1 per token.

xxi.    ***Arbitrage Trading Does Not Cause Artificial Price Inflation***.  The Anonymous Trader's cross-exchange arbitrage did not – and could not – cause artificial price inflation.  By definition, arbitrage involves buying and selling the same asset in equal quantities and therefore exerts equal amounts of upward and downward pressure on prices.  The net impact of those trades – if any – would be to narrow the price difference between the two exchanges.  Simply put, "[a]rbitrage is not market manipulation."  *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995) ("By buying stock on the exchange where the price is lower and reselling it on the other exchange, the arbitrageur brings about a convergence of price with value.").

xxii.    ***USDT Purchased For $1 Does Not Cause Artificial Price Inflation***.  The Anonymous Trader purchased USDT for $1 per token, and therefore his subsequent purchases of bitcoin with that USDT represented genuine demand and cannot cause artificial inflation.  A bitcoin purchase with USDT that had been purchased for $1 reflects exactly the same demand for bitcoin as a purchase with U.S. dollars.  For example, there is no difference between (*i*) a purchase of a bitcoin for $100 and (*ii*) a purchase of 100 USDT for $100 and a subsequent purchase of a bitcoin for that 100 USDT.  At bottom, there is no sense in which a transaction made with USDT purchased for $1 per token is "artificial."

xxiii.    Plaintiffs seek to avoid that obvious conclusion with misleading allegations suggesting that the Anonymous Trader traded with USDT he had not paid for, and that Defendants "provided," "pushed," "gave," or "fed" USDT to the Anonymous Trader.  (SAC ¶¶ 8, 10, 292, 296, 304, 306, 343, 344, 392, heading IV.E.1.)  All that Bitfinex did was allow the Anonymous Trader – *like every other Bitfinex customer at the time* – to withdraw his U.S. dollar account balance in the form of USDT.  A withdrawal of a U.S. dollar balance in the form of

USDT is precisely equivalent to a purchase of USDT for U.S. dollars.  Accordingly, when the Anonymous Trader chose to withdraw his U.S. dollar account balance as USDT, he was purchasing that USDT for $1 per token.  This crucial point – which cannot reasonably be disputed – undermines any allegation or insinuation that the Anonymous Trader ever received any USDT from Bitfinex for which he did not fully pay.

xxiv.    Similarly, Plaintiffs' allegation that the Anonymous Trader was able to use a credit line to "withdraw U.S. dollars that [he] did not have in the form of USDT" is false.  (SAC ¶ 332.)  It was impossible for the Anonymous Trader – or any other Bitfinex customer – to use a credit line to withdraw from the Bitfinex exchange more funds than he held in his account because of Bitfinex's overcollaterization requirement.  Plaintiffs know this because they have the Anonymous Trader's full account records.

xxv.    Plaintiffs also misleadingly suggest that the Anonymous Trader did not pay for the USDT he acquired from Bitfinex by alleging that, during certain months, he "never wired any fiat currency to Bitfinex."  (SAC ¶ 279.)  That suggestion is false because, as Plaintiffs themselves allege, the Anonymous Trader *sent bitcoin to Bitfinex*, sold that bitcoin on Bitfinex for U.S. dollars, and used the U.S. dollars to purchase USDT.  (SAC ¶ 285.)  The Anonymous Trader thus paid $1 for each and every USDT that he acquired from Bitfinex.

xxvi.    Indeed, the *only* USDT that Plaintiffs allege was *not* issued in exchange for a contemporaneous payment in U.S. dollars is certain USDT that was issued to Bitfinex and deposited in Bitfinex's hot or cold wallet.  (SAC ¶¶ 3, 181-82, 192, 247, 300, 312.)  That USDT is not alleged to have been used to purchase crypto-assets or anything else.  Instead, it sat in the hot or cold wallet until Bitfinex customers purchased it for $1 by choosing to withdraw their U.S. dollar account balances in the form of USDT.  (SAC ¶¶ 10, 298-99.)  Thus, any crypto-asset

purchase with USDT necessarily was made with USDT purchased for $1 and represents real, organic demand for that crypto-asset.

      xxvii.    ***Allegedly "Debased" USDT Does Not Cause Artificial Price Inflation.***

Plaintiffs' repeated allegation that USDT was "debased" – *i.e.*, that it was not actually worth its $1 market price – does not support a claim of market manipulation. As discussed above, the Anonymous Trader purchased USDT for $1 per token, and his subsequent purchases of bitcoin with that USDT reflects exactly the same demand for bitcoin as a purchase made directly with U.S. dollars. Whether, in Plaintiffs' view, USDT was actually worth something less than $1 based on the composition of Tether's USDT reserves is completely irrelevant.

      xxviii.    Moreover, Plaintiffs' allegations about purportedly "debased" USDT are incorrect and unsupported by evidence. Plaintiffs claim that USDT was "debased" because during certain periods of time, Tether's USDT reserves included an account receivable for amounts owed by Bitfinex, and "Tether did not account for the risk of nonpayment when counting receivables from Bitfinex as part of its reserves." (SAC ¶ 205.) But Tether appropriately assigned zero risk of nonpayment because, as noted above, Tether knew that Bitfinex would pay for USDT issuances, and it always did.

      xxix.    Plaintiffs' allegations that USDT was "secretly debased" and that, if Tether had disclosed that USDT reserves included account receivables or other assets, "the market would have responded by reducing the market price of transactions in USDT" are demonstrably false. (SAC ¶¶ 340-41.) In fact, when Tether updated its website in February 2019 to make explicit that USDT reserves "include traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities," there was *no impact* on the market price of USDT. (SAC ¶ 137 &

n.66.)  Plaintiffs are left to rely on nonsensical analogies to silver coins of the Roman Empire. (SAC ¶ 337.)

xxx.    ***Margin Trading and Credit Lines Do Not Cause Artificial Price Inflation***. Plaintiffs' misguided allegations that the availability of peer-to-peer margin trading and credit lines on the Bitfinex exchange somehow caused a "persistent" bitcoin price premium on that exchange merit little attention.

xxxi.    Margin trading is a common feature of the traditional markets:  it is available from every major stock broker in the county, and every stock on the NYSE and Nasdaq can be traded on margin.  Margin trading does not artificially inflate prices because it can be used to buy or sell an asset.

xxxii.    The same is true for Bitfinex's "credit lines," which, as noted above, customers generally used to begin trading during the brief period of time after they had deposited assets to their accounts and before the funds had been received by Bitfinex.  These credit lines were required to be overcollateralized by assets held in the customers' Bitfinex accounts, meaning that customers could not use a credit line to withdraw more assets than they held in their accounts.  There is no basis to claim that those temporary credit lines inflated bitcoin prices.

xxxiii.    ***Conclusion.***  As with the claims asserted in their original complaint – now abandoned – Plaintiffs' claims asserted in the Second Amended Complaint are wholly without merit.  They are not supported by evidence, do not make sense, and simply did not happen.  Ultimately, it is the facts and evidence that matters, not Plaintiffs' false and misleading allegations.  The B/T Defendants remain confident that they will prevail in this litigation, and that Plaintiffs' nonsensical conspiracy theories will be rejected.

## GENERAL DENIAL

Except as otherwise expressly admitted herein, the B/T Defendants deny each and every allegation contained in the Second Amended Complaint. The B/T Defendants state that the titles and headings used throughout the Second Amended Complaint do not constitute well-pleaded allegations of fact and, therefore, require no response. To the extent a response is required, the allegations in the titles and headings in the Second Amended Complaint are denied. The B/T Defendants expressly reserve the right to seek to amend and/or supplement their Answer as may be necessary. The B/T Defendants further state that the footnotes citing sources throughout the Second Amended Complaint do not constitute well-pleaded allegations of fact and, therefore, require no response. To the extent a response is required, the allegations in such footnotes are denied. The B/T Defendants state that no response is required to the allegations to the extent they relate to Count III, alleging a conspiracy to monopolize under Section 2 of the Sherman Act, of the Proposed Second Amended Complaint (Dkt. No. 480-1), because they are no longer applicable following the Court's June 26, 2024 Order (Dkt. No. 544).

By referring to or admitting the existence of any documents quoted, described, or otherwise referenced in the Second Amended Complaint, the B/T Defendants do not acknowledge or concede that such documents are what they purport to be, are accurate as to their substance, are relevant to Plaintiffs' allegations, constitute business records within the meaning of the rules of evidence, or are otherwise admissible on any other basis. By referring to or admitting the existence of any document quoted, described, or otherwise referenced in the Second Amended Complaint, the B/T Defendants do not acknowledge or concede that the B/T Defendants have any knowledge or information concerning the document quoted, described, or otherwise referenced at any particular point in time prior to the filing of the Second Amended Complaint, unless explicitly admitted herein.

## SPECIFIC RESPONSES

1.      Deny the allegations in Paragraph 1.

2.      Deny the allegations in Paragraph 2, except admit that the Tether platform ("Tether") issues USDT, admit that USDT is a stablecoin, admit that USDT is intended to track the U.S. dollar and maintain a consistent market price over time, admit that Tether stated during the alleged Class Period that USDT was backed by Tether's USDT reserves, and admit that Tether stated during the alleged Class Period that it would redeem USDT in exchange for one U.S. dollar per USDT (less fees).

3.      Deny the allegations in Paragraph 3, except admit that Tether and Bitfinex were under common control and management during the alleged Class Period, admit that at certain times during the alleged Class Period Tether issued USDT to the Bitfinex exchange ("Bitfinex") prior to receiving a payment of U.S. dollars, admit that Bitfinex paid Tether in full for all issuances of USDT, admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, and admit that at certain times during the alleged Class Period Tether's USDT reserves included an account receivable for amounts owed by Bitfinex.

4.      Deny the allegations in Paragraph 4.

5.      Deny the allegations in Paragraph 5, except deny knowledge or information sufficient to form a belief as to the alleged interpretation and understanding of the "the market.

6.      Deny the allegations in Paragraph 6.

7.      Deny the allegations in Paragraph 7, except admit that Tether issued USDT in exchange for U.S. dollars, admit that Tether and Bitfinex were under common control and management during the alleged Class Period, admit that at certain times during the alleged Class Period Tether issued USDT to Bitfinex prior to receiving a payment of U.S. dollars, admit that Bitfinex paid Tether in full for all issuances of USDT, admit that USDT was backed by Tether's

USDT reserves during the alleged Class Period, admit that at certain times during the alleged Class Period Tether's USDT reserves included an account receivable for amounts owed by Bitfinex, and deny knowledge or information sufficient to form a belief as to the alleged beliefs of "the market."

8.      Deny the allegations in Paragraph 8, except admit that the Anonymous Trader engaged in trading in his Bitfinex account using an automated software program at certain times during the alleged Class Period and state that analysis of the prices of bitcoin and other "cryptocommodities" (as that term is used by Plaintiffs) and of the Anonymous Trader's transactions is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

9.      Deny the allegations in Paragraph 9, except admit that, prior to November 27, 2018, Bitfinex credited deposits of USDT to customer accounts as U.S. dollar balances and permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, and state that the analysis of the relative prices of bitcoin on different crypto-asset exchanges and the Anonymous Trader's transactions is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

10.      Deny the allegations in Paragraph 10, except admit that the Anonymous Trader was a Bitfinex customer during the alleged Class Period, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers

could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, admit that Bitfinex processed customer withdrawals of USDT from its hot wallets, admit that Bitfinex sometimes requested that Tether issue USDT to Bitfinex's hot wallets to facilitate customer withdrawals, and admit that Bitfinex sometimes transferred USDT from its cold wallets to its hot wallets to facilitate customer withdrawals.

11.     Deny the allegations in Paragraph 11.

12.     Deny the allegations in Paragraph 12, except admit that "greenlaning" is a security feature that is available to Bitfinex customers who meet certain security requirements and that permits them to withdraw assets from the Bitfinex exchange without a manual email confirmation, admit that the Anonymous Trader's account was "greenlaned," admit that the default "greenlane" withdrawal limit was $250,000, admit that a customer's "greenlane" withdrawal limit was set by reference to the assets the customer held on the Bitfinex exchange, admit that Bitfinex extended credit lines to a limited number of customers, admit that Bitfinex required such credit lines to be overcollateralized by assets held in the customers' Bitfinex accounts, admit that Bitfinex did not charge its customers fees or interest for credit lines that it extended to them, and admit that Bitfinex extended credit lines to the Anonymous Trader on the same terms as other Bitfinex customers.

13.     Deny the allegations in Paragraph 13, except deny knowledge or information sufficient to form a belief as to the alleged beliefs of the "the market."

14.     Deny the allegations in Paragraph 14.

15.     Deny the allegations in Paragraph 15, except admit that the Anonymous Trader was a Bitfinex customer during the alleged Class Period, admit that the Anonymous Trader used

an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, admit that Bitfinex processed customer withdrawals of USDT from its hot wallets, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the operation of the Anonymous Trader's automated software program or its alleged effect on the market.

16.    Deny the allegations in Paragraph 16.

17.    Paragraph 17 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 17 is necessary, the B/T Defendants deny them, state that Paragraph 17 omits the smiley-face emoji following the Anonymous Trader's response and the reply of "lol," and respectfully refer the Court to the cited exchange for its complete contents.

18.    Paragraph 18 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 18 is necessary, the B/T Defendants deny them, except admit that Plaintiffs assert claims under the Commodity Exchange Act and the Sherman Act.

19.    Paragraph 19 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 19 is necessary, the B/T

Defendants deny them, except deny knowledge or information sufficient to form a belief as to Mr. Script's alleged citizenship and crypto-asset purchases.

20.    Paragraph 20 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 20 is necessary, the B/T Defendants deny them, except deny knowledge or information sufficient to form a belief as to Jason Leibowitz's alleged citizenship and crypto-asset purchases.

21.    Paragraph 21 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 21 is necessary, the B/T Defendants deny them, except deny knowledge or information sufficient to form a belief as to Benjamin Leibowitz's alleged citizenship and crypto-asset purchases.

22.    Paragraph 22 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 22 is necessary, the B/T Defendants deny them, except deny knowledge or information sufficient to form a belief as to Mr. Goldshtein's alleged citizenship and crypto-asset and bitcoin futures purchases.

23.    Paragraph 23 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 23 is necessary, the B/T Defendants deny them, except admit that DigFinex is incorporated in the British Virgin Islands, admit that DigFinex owns a majority of shares in iFinex, Inc., and admit that DigFinex, Mr. Devasini, and Mr. van der Velde collectively own a majority of the shares in Tether Holdings Limited.

24.    Deny the allegations in Paragraph 24, except admit that Mr. Devasini and Mr. Ardoino are shareholders of DigFinex, admit that Mr. Ardoino is the Chief Technology Officer of Bitfinex; and admit that Mr. Hoegner is the General Counsel of Bitfinex and Tether.

25.     Deny the allegations in Paragraph 25, except admit that iFinex Inc. operates Bitfinex, an online platform for exchanging and trading digital assets.

26.     Paragraph 26 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 26 is necessary, the B/T Defendants deny them, except admit that iFinex Inc. is incorporated in the British Virgin Islands, admit that iFinex Inc. operates Bitfinex, and admit that iFinex Inc. wholly owns BFXNA Inc. and BFXWW Inc.

27.     Paragraph 27 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 27 is necessary, the B/T Defendants deny them, except admit that BFXNA Inc. is incorporated in the British Virgin Islands.

28.     Paragraph 28 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 28 is necessary, the B/T Defendants deny them, except admit that BFXWW Inc. is incorporated in the British Virgin Islands.

29.     Deny the allegations in Paragraph 29, except admit that Tether authorizes, issues, redeems, and destroys USDT and that Tether Operations Limited owns and operates the Tether platform.

30.     Paragraph 30 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 30 is necessary, the B/T Defendants deny them, except admit that Tether Holdings Limited is incorporated in the British Virgin Islands, and admit that Tether Holdings Limited wholly owns Tether Limited, Tether Operations Limited, and Tether International Limited.

31.     Paragraph 31 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 31 is necessary, the B/T Defendants deny them, except admit that Tether Operations Limited is incorporated in the British Virgin Islands, and admit that Tether Operations Limited owns the Tether platform.

32.     Paragraph 32 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 32 is necessary, the B/T Defendants deny them, except admit that Tether International Limited is incorporated in the British Virgin Islands.

33.     Paragraph 33 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 33 is necessary, the B/T Defendants deny them, except admit that Tether Limited is incorporated in Hong Kong.

34.     Deny the allegations in Paragraph 34, except admit that Mr. van der Velde is the Chief Executive Officer of iFinex Inc., BFXNA Inc., and BFXWW Inc., admit that he has held the position of CEO of iFinex Inc. since 2013, admit that he is a director of DigFinex, iFinex Inc., and Tether Limited, admit that he is a shareholder of Tether Holdings Limited, admit that he was once the CEO of Perpetual Action Group (Asia), admit that he is a citizen of the Netherlands, and admit that Mr. van der Velde is sometimes referred to as JL, Jan Ludovicus, and Jean-Louis.

35.     Deny the allegations in Paragraph 35, except admit that Mr. Devasini is the Chief Financial Officer of Bitfinex and Tether, admit that he is a director of DigFinex, iFinex Inc., and Tether Limited, admit that he is a shareholder of Tether Holdings Limited and DigFinex, admit that he is a citizen of Italy, admit that he was the president of Smart Property Solutions SA, and

respectfully refer the Court to the webpages cited in Footnote 20 concerning Smart Property Solutions SA for their complete contents.

36.    Deny the allegations in Paragraph 36, except admit that Mr. Devasini has used the username "urwhatuknow" to post on Bitcointalk.org, and deny knowledge or information sufficient to form a belief as to the nature of Bitcointalk.org.

37.    Deny the allegations in Paragraph 37, except admit that DigFinex, Mr. Devasini, and Mr. Velde collectively own a majority of Tether Holdings Limited.

38.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38, except admit that Mr. Potter was the Chief Strategy Officer of Bitfinex and Tether until 2018, and admit that he formerly was a director of Tether Holdings Limited and a shareholder of DigFinex.

39.    Paragraph 39 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 39 is necessary, the B/T Defendants deny them, except admit that this Court has subject matter jurisdiction over this matter.

40.    Paragraph 40 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 40 is necessary, the B/T Defendants deny them, except admit that this Court is the proper venue for this action.

41.    Paragraph 41 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 41 is necessary, the B/T Defendants deny them with respect to the B/T Defendants and deny knowledge or information sufficient to form a belief with respect to Mr. Potter.

42. Paragraph 42 states legal conclusions to which no response is necessary. To the extent that any response to the allegations contained in Paragraph 42 is necessary, the B/T Defendants deny them with respect to the B/T Defendants and deny knowledge or information sufficient to form a belief with respect to Mr. Potter.

43. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43, except admit that this case purports to concern "crypto-assets," as that term is used by Plaintiffs, and deny knowledge and information sufficient to form a belief as to the accuracy or completeness of Plaintiffs' definition of "crypto-assets."

44. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44, except admit that Bitcoin was the world's first major crypto-asset, admit that the term "Bitcoin" is used to refer to a computer protocol, software, and community, and admit that the term "bitcoin" is used to refer to a unit of exchange.

45. Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45.

46. Deny the allegations in Paragraph 46, except admit that Bitcoin employs a ledger system commonly referred to as the "blockchain," admit that bitcoin may be received by users via a digital "address," and admit that certain information about transactions recorded on the Bitcoin blockchain is public.

47. Deny the allegations in Paragraph 47, except admit that the Bitcoin blockchain allows for the transfer of bitcoin, and admit that certain information about transactions recorded on the Bitcoin blockchain is public.

48.     Deny the allegations in Paragraph 48, except admit that the term "mining" is sometimes used to describe the process through which transaction data is added to the Bitcoin blockchain, and admit that "miners" may receive a reward of new bitcoin.

49.     Deny the allegations in Paragraph 49, except admit that the number of new bitcoin entering circulation decreases over time.

50.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50, except admit that some crypto-assets utilize a "Proof of Stake" mechanism.

51.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51, except admit that the Bitcoin protocol was first described in a white paper authored under the pseudonym Satoshi Nakamoto, and respectfully refer the Court to the white paper cited in Footnote 30 for its complete contents.

52.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52, except admit that there is not a "Bitcoin Inc." that administers or manages Bitcoin as a whole.

53.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53, except admit that bitcoin's decentralization distinguishes it from certain other assets.

54.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54, except admit that the number of crypto-assets have increased since the creation of Bitcoin, and respectfully refer the Court to coinmarketcap.com for its complete contents.

55.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 55.

56.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56.

57.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57.

58.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58.

59.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 59.

60.     Paragraph 60 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 60 is necessary, the B/T Defendants deny them, except admit that some crypto-assets share certain of Bitcoin's features.

61.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61.

62.     Paragraph 62 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 62 is necessary, the B/T Defendants deny them.

63.     Paragraph 63 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 63 is necessary, the B/T Defendants deny them, except admit that "ether" can refer to a unit of exchange in the "Ethereum" system.

23

64.     Paragraph 64 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 64 is necessary, the B/T Defendants deny that "fiat currency and gold (or other precious metals) are not substitutes for cryptocommodities," as that term is used by Plaintiffs, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 64.

65.     Paragraph 65 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 65 is necessary, the B/T Defendants deny that "other crypto-assets" are "not substitutes for cryptocommodities," as that term is used by Plaintiffs, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 65.

66.     Paragraph 66 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 66 is necessary, the B/T Defendants deny them.

67.     Paragraph 67 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 67 is necessary, the B/T Defendants deny them.

68.     Paragraph 68 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 68 is necessary, the B/T Defendants deny them, except admit that a futures contract is an agreement to purchase or sell an asset at a predetermined date, and admit that, in the context of bitcoin futures, investors are exposed to the future price of bitcoin.

69.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69.

70.    Paragraph 70 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 70 is necessary, the B/T Defendants deny them.

71.    Paragraph 71 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 71 is necessary, the B/T Defendants deny them.

72.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72.

73.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73, and respectfully refer the Court to the unidentified "regulatory filings" for their complete contents.

74.    Paragraph 74 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 74 is necessary, the B/T Defendants deny them, except admit that there are crypto-exchanges in many different countries and admit that certain crypto-exchanges permit trading by customers located in other countries.

75.    Paragraph 75 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 75 is necessary, the B/T Defendants deny them.

76.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76.

77.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77.

78.     Paragraph 78 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 78 is necessary, the B/T Defendants deny them.

79.     Paragraph 79 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 79 is necessary, the B/T Defendants deny them.

80.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80.

81.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81.

82.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82, and respectfully refer the Court to the "Willy Report" cited in Footnotes 35 and 36 for its complete contents.

83.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83, and respectfully refer the Court to the article from the Journal of Monetary Economics cited in Footnote 37 for its complete contents.

84.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84, and respectfully refer the Court to the article from the Journal of Monetary Economics cited in Footnote 38 for its complete contents.

85.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85, and respectfully refer the Court to the article from the Journal of Monetary Economics cited in Footnote 39 for its complete contents.

86.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86, and respectfully refer the Court to the article from the Journal of Monetary Economics cited in Footnote 40 for its complete contents.

87.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87, and respectfully refer the Court to the article from CoinTelegraph cited in Footnote 41 for its complete contents.

88.    Deny the allegations in Paragraph 88.

89.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89, except admit that the price of bitcoin varied between 2014 and July 2017, and respectfully refer the Court to the coinmarketcap.com website cited in Footnote 42 for its complete contents.

90.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90, except admit that in December 2017 the price of bitcoin reached what was then an all-time high.

91.    Deny the allegations in Paragraph 91, except admit that the price of bitcoin in February 2018 and in December 2018 was lower than the price of bitcoin in December 2017.

92.    Deny the allegations in Paragraph 92, and respectfully refer the Court to the article from Bloomberg cited in Footnote 43 for its complete contents.

93.    Deny the allegations in Paragraph 93, except deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93 relating to the prices of "other cryptocommodities" and the market capitalization of "all virtual currencies."

94.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94, except admit that control of USDT may be attested through cryptographic keys, and admit that there are both public and private cryptographic keys.

95.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95, except admit that a public cryptographic key may be used to produce a Bitcoin address, admit that a Bitcoin address may be used to identify a transferee of bitcoin, admit that Bitcoin addresses consist of a string of alphanumeric characters, and admit that Bitcoin addresses are at times abbreviated by reference to a portion of those alphanumeric characters.

96.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96, except admit that a private key permits the holder of the private key to access the corresponding Bitcoin address.

97.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 97, except admit that in certain circumstances a transferor may transfer bitcoin to a recipient's Bitcoin address, and admit that a transferor may authorize certain bitcoin transfers with the transferor's private key.

98.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98, except admit that for transfers of bitcoin between Bitcoin addresses, the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred are visible on the Bitcoin blockchain.

99.    Deny the allegations in Paragraph 99.

100.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 100, except admit that Bitfinex allows for trading of certain assets between Bitfinex account-holders.

101.    Deny the allegations in Paragraph 101, except admit that a customer who wishes to use Bitfinex must first create a Bitfinex account, admit that a Bitfinex customer may deposit certain crypto-assets to Bitfinex using a deposit address assigned by Bitfinex, admit that Bitfinex credits customers' deposits of crypto-assets to their account balances, admit that Bitfinex stores crypto-assets in hot and cold wallets, and deny knowledge or information sufficient to form a belief as to the functioning of other exchanges.

102.    Deny the allegations in Paragraph 102, except deny knowledge or information sufficient to form a belief as to the functioning of exchanges other than Bitfinex and respectfully refer the Court to the Poloniex webpage cited in Footnote 44 for its complete contents.

103.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 103.

104.    Deny the allegations in Paragraph 104, except admit that Bitfinex customers who seek to withdraw crypto-assets from their Bitfinex accounts must specify an address to which the crypto-assets will be transferred, admit that when Bitfinex customers withdraw crypto-assets from their accounts Bitfinex transfers the crypto-assets to the specified address, admit that withdrawals of crypto-assets from the Bitfinex exchange are reflected in customers' account balances, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the functioning of other exchanges.

105.    Deny the allegations in Paragraph 105, except admit that certain information about transactions recorded on a blockchain is public, admit that trades on the Bitfinex exchange

generally are recorded on Bitfinex's internal ledger rather than a blockchain, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the functioning of other exchanges.

106.    Deny the allegations in Paragraph 106, and respectfully refer the Court to the B/T Defendants' answers to Paragraphs 23-38 above.

107.    Deny the allegations in Paragraph 107, except admit that Bitfinex is a crypto-exchange that allows users to deposit and withdraw certain fiat currencies, and respectfully refer the Court to the New York Times article cited in Footnote 45 for its complete contents.

108.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108, except admit that Bitfinex was launched in 2012, and respectfully refer the Court to the unidentified post on bitcointalk.org for its complete contents.

109.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109, and respectfully refer the Court to data.bitcoinity.org and the Initial Exchange Offering of LEO Tokens cited in Footnote 46 for their complete contents.

110.    Deny the allegations in Paragraph 110, and respectfully refer the Court to the cited New York Attorney General report for its complete contents.

111.    Deny the allegations in Paragraph 111, and respectfully refer the Court to the Bitcointalk.org thread cited in Footnote 50 for its complete contents.

112.    Deny the allegations in Paragraph 112, except admit that Tether authorizes, issues, redeems, and destroys USDT, and admit that USDT was one of the first stablecoins.

113.    Deny the allegations in Paragraph 113, except admit that stablecoins are intended to track traditional fiat currency or other assets and maintain a consistent market price over time.

114.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114, except admit that USDT is not mined, admit that Tether issues USDT, and admit that stablecoins are intended to track traditional fiat currency or other assets and maintain a consistent market price over time.

115.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114, and respectfully refer the Court to the unidentified public interviews and testimony for their complete contents.

116.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 116.

117.    Deny the allegations in Paragraph 117, except admit that Tether authorized, issued, redeemed, and destroyed USDT during the alleged Class Period.

118.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118, except admit that Tether Holdings Limited was incorporated in the British Virgin Islands in September 2014.

119.    Deny the allegations in Paragraph 119, except admit that Mr. Potter was a Director of Tether Holdings Limited at the time of its incorporation, and admit that Mr. Devasini was a shareholder of Tether Holdings Limited at the time of its incorporation.

120.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120, and respectfully refer the Court to the Wall Street Journal article cited in Footnotes 51 and 52 and Mr. Potter's unidentified statements for their complete contents.

121.    Deny the allegations in Paragraph 121, except admit that the U.S. dollar tether token is referred to as "USDT," and respectfully refer the Court to the CoinDesk article cited in Footnote 53 for its complete contents.

122.    Deny the allegations in Paragraph 122, and respectfully refer the Court to the CoinDesk article cited in Footnotes 54 and 55 for its complete contents.

123.    Deny the allegations in Paragraph 123, except admit that, during the alleged Class Period, Tether issued USDT in exchange for U.S. dollars, admit that Tether stated during the alleged Class Period that USDT was backed by Tether's USDT reserves, and admit that Tether redeemed USDT in exchange for U.S. dollars.

124.    Deny the allegations in Paragraph 124, except admit that, during the alleged Class Period, Tether issued USDT in exchange for U.S. dollars, admit that USDT was backed by Tether's USDT reserves, and admit that Tether redeemed USDT in exchange for U.S. dollars.

125.    Deny the allegations in Paragraph 125, except admit that, during the alleged Class Period, Tether issued USDT in exchange for U.S. dollars, admit that Tether redeemed USDT in exchange for U.S. dollars, and admit that Tether charged a fee for USDT issuance and redemption.

126.    Deny the allegations in Paragraph 126, except admit that Tether's issuances and destructions of USDT are recorded on the blockchain, and admit that transmittals of U.S. dollars associated with Tether's issuances and redemptions are generally not public.

127.    Deny the allegations in Paragraph 127, except admit that USDT is intended to track the U.S. dollar and maintain a consistent market price over time.

128.    Deny the allegations in Paragraph 128, except respectfully refer the Court to the March 20, 2015 snapshot of the Tether webpage cited in Footnote 56 for its complete contents, and deny any allegation or characterization inconsistent therewith.

129.    Deny the allegations in Paragraph 129, except respectfully refer the Court to the March 20, 2015 snapshot of the Tether webpage cited in Footnote 57 for its complete contents, and deny any allegation or characterization inconsistent therewith.

130.    Deny the allegations in Paragraph 130, respectfully refer the Court to the cited Bitfinex webpage for its complete contents, and deny any allegation or characterization inconsistent therewith.

131.    Deny the allegations in Paragraph 131, respectfully refer the Court to the Tether white paper cited in Footnote 59 for its complete contents, and deny any allegation or characterization inconsistent therewith.

132.    Deny the allegations in Paragraph 132, respectfully refer the Court to the Tether white paper cited in Footnotes 60 and 61 for its complete contents, and deny any allegation or characterization inconsistent therewith.

133.    Deny the allegations in Paragraph 133, respectfully refer the Court to the Tether white paper cited in Footnote 62 for its complete contents, and deny any allegation or characterization inconsistent therewith.

134.    Deny the allegations in Paragraph 134, respectfully refer the Court to the Tether white paper cited in Footnote 63 for its complete contents, and deny any allegation or characterization inconsistent therewith.

135.    Deny the allegations in Paragraph 135, respectfully refer the Court to the Declaration of Mr. Velde cited in Footnote 64 for its complete contents, and deny any allegation or characterization inconsistent therewith.

136.    Deny the allegations in Paragraph 136, respectfully refer the Court to the Tether website cited in Footnote 65 for its complete contents, and deny any allegation or characterization inconsistent therewith.

137.    Deny the allegations in Paragraph 137 respectfully refer the Court to the Tether website cited in Footnote 66 for its complete contents, and deny any allegation or characterization inconsistent therewith.

138.    Deny the allegations in Paragraph 138, and respectfully refer the Court to the affirmation of New York Assistant Attorney General Brian Whitehurst for its complete contents.

139.    Deny the allegations in Paragraph 139, and respectfully refer the Court to the Bloomberg article cited in Footnote 68 for its complete contents.

140.    Deny the allegations in Paragraph 140, except admit that Tether stated it would redeem one USDT in exchange for one U.S. dollar (less fees).

141.    Paragraph 141 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 141 is necessary, the B/T Defendants deny them.

142.    Deny the allegations in Paragraph 142, except deny knowledge or information sufficient to form a belief as to the market capitalization of crypto-assets other than USDT.

143.    Deny the allegations in Paragraph 143.

144.    Deny the allegations in Paragraph 144.

145.    Deny the allegations in Paragraph 145, except admit that Tether authorized USDT by creating them on a blockchain and placing them in a Tether treasury wallet, admit that Tether considered USDT to be issued and in circulation once the USDT had been transferred to a Tether customer, admit that Tether did not consider USDT that had been authorized but not issued or USDT that had been quarantined to be issued, and admit that issued USDT was backed by Tether's USDT reserves.

146.    Tether's USDT issuances and redemptions are a matter of public record because they are visible on the blockchain, and analysis of Tether's USDT issuances and redemptions is a matter for expert opinion to which no response is required.  To the extent any response to the allegations in Paragraph 146 is required, the B/T Defendants deny them.

147.    Deny the allegations in Paragraph 147, except admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, and admit that at certain times during the alleged Class Period Tether's USDT reserves included, in addition to U.S. dollars in accounts that were held by or for Tether, an account receivable for amounts owed by Bitfinex and other assets.

148.    Deny the allegations in Paragraph 148.

149.    Deny the allegations in Paragraph 149, and respectfully refer the Court to the cited CoinDesk article for its complete contents.

150.    Paragraph 150 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 150 is necessary, the B/T Defendants deny them, except admit that Mr. Devasini was a shareholder of Tether Holdings Limited in November 2014, and admit that Mr. Potter was a director of Tether Holding Limited in November 2014.

151.    Deny the allegations in Paragraph 151, except admit that Tether Limited was incorporated in September 2014, admit that Mr. van de Velde and Mr. Devasini were directors of Tether Limited in November 2014, and respectfully refer the Court to the cited CoinDesk article for its complete contents.

152.    Respectfully refer the Court to the cited snapshot of a Tether webpage from March 2015 for its complete contents, and deny any allegation or characterization inconsistent therewith.

153.    Deny the allegations in Paragraph 153.

154.    Deny the allegations in Paragraph 154, except admit that Tether and Bitfinex were under common control and management during the alleged Class Period.

155.    Deny the allegations in Paragraph 155, respectfully refer the Court to the cited Tether white paper for its complete contents, and deny any allegation or characterization inconsistent therewith.

156.    Deny the allegations in Paragraph 156, except admit that Tether issued USDT to Tether customers through the Tether platform until November 2017, admit that Tether then suspended USDT issuances to Tether customers other than Bitfinex until November 27, 2018, admit that Tether resumed issuing USDT to Tether customers other than Bitfinex through the Tether platform on November 27, 2018.

157.    Tether's USDT issuances are a matter of public record because they are visible on the blockchain, and analysis of Tether's USDT issuances is a matter for expert opinion to which no response is required.  To the extent any response to the allegations in Paragraph 157 is required, the B/T Defendants deny them, except admit that Tether issued USDT to Bitfinex.

158.    Paragraph 158 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 158 is necessary, the B/T Defendants deny them.

159.    Deny the allegations in Paragraph 159, except admit that during the alleged Class Period, Tether issued USDT in exchange for U.S. dollars, admit that USDT was backed by Tether's USDT reserves, and admit that Tether redeemed USDT in exchange for U.S. dollars.

160.    Deny the allegations in Paragraph 160, except admit that Tether's business involved U.S. dollar deposits and redemptions of USDT in exchange for U.S. dollars.

161.    Deny the allegations in Paragraph 161, except admit that, during certain periods of time, Bitfinex and Tether used Taiwan-based banks with correspondent bank agreements with U.S.-based banks in order to send and receive international wire transfers of U.S. dollars.

162.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 162.

163.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 163, except admit that during certain periods of time, Bitfinex used Taiwan-based banks with correspondent bank agreements with U.S.-based banks to facilitate customer withdrawals of U.S. dollars from their Bitfinex accounts.

164.    Deny the allegations in Paragraph 164 and respectfully refer the Court to the Bank for International Settlements report cited in Footnote 81 for its complete contents.

165.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 165.

166.    Deny the allegations in Paragraph 166, except admit that, during certain periods of time, Bitfinex and Tether used Taiwan-based banks with correspondent bank agreements with U.S.-based banks in order to send and receive international wire transfers of U.S. dollars.

167.    Deny the allegations in Paragraph 167, except admit that, for certain periods of time, Tether and/or Bitfinex held U.S. dollars in accounts at Hwatai Bank, KGI Bank, First Commercial Bank, and Taishin International Bank (the "Taiwan Banks"), admit that, for certain periods of time, Tether held USDT reserves in accounts at the Taiwan Banks (among others), and respectfully refer the Court to the complaint cited in Footnote 83 (the "Wells Fargo Complaint") for its complete contents.

168.    Deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 168, except admit that, during certain periods of time, Tether used the Taiwan Banks, which used Wells Fargo as a correspondent bank, in order to send and receive international wire transfers of U.S. dollars, and respectfully refer the Court to the Wells Fargo Complaint for its complete contents.

169.    Deny the allegations in Paragraph 169, except admit that on or about March 31, 2017, Wells Fargo stopped servicing outgoing wire transfers from Bitfinex's and Tether's accounts at the Taiwan Banks, and respectfully refer the Court to the Wells Fargo Complaint for its complete contents.

170.    Deny the allegations in Paragraph 170, and respectfully refer the Court to the Wells Fargo Complaint for its complete contents.

171.    Deny the allegations in Paragraph 171, respectfully refer the Court to the cited April 22, 2017 statement for its complete contents, and deny any allegation or characterization inconsistent therewith.

172.    Deny the allegations in Paragraph 172, respectfully refer the Court to the cited April 22, 2017 statement for its complete contents, and deny any allegation or characterization inconsistent therewith.

173.    Deny the allegations in Paragraph 173.

174.    Deny the allegations in Paragraph 174, except admit that Tether issued USDT after March 31, 2017.

175.    Deny the allegations in Paragraph 175, except admit that in or around May 2017 Tether transferred a portion of its USDT reserves to an account at the Bank of Montreal that Stuart Hoegner, General Counsel of Tether, held in trust for Tether Limited.

176.    Paragraph 176 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 176 is necessary, the B/T Defendants deny them, except admit that the account held in trust for Tether Limited at the Bank of Montreal held USDT reserves and was used to pay Tether's customers U.S. dollars for USDT redemptions.

177.    Deny the allegations in Paragraph 177, except admit that Bitfinex opened an account at Noble Bank in June 2017.

178.    Deny the allegations in Paragraph 178.

179.    Deny the allegations in Paragraph 179, except admit that Tether opened an account with Noble in September 2017.

180.    Deny the allegations in Paragraph 180, except admit that Tether issued USDT to Bitfinex in the amounts and at the times reflected in Paragraph 180 between April 3, 2017 and September 29, 2017.

181.    Deny the allegations in Paragraph 181, except admit that Tether issued USDT to Bitfinex in the amounts and at the times reflected in Paragraph 180 between April 3, 2017 and September 29, 2017, admit that between May 23, 2017 and September 14, 2017 Tether issued approximately 356,781,775 USDT to Bitfinex, admit that Bitfinex paid Tether $356,781,775, on September 15, 2017, the day that Tether's Noble Bank account was opened, and state that Tether received payment in U.S. dollars from Bitfinex before or within a day of issuing to Bitfinex the USDT identified in Paragraph 180 in April 2017, on September 15, 2017, and on September 29, 2017.

182.    Deny the allegations in Paragraph 182, except admit that between May 23, 2017 and September 15, 2017 Tether counted as part of its USDT reserves an account receivable in the amount of the USDT that it issued to Bitfinex, admit that Bitfinex paid Tether $356,781,775, the full balance of the accrued account receivable, on September 15, 2017, the day that Tether's Noble Bank account was opened, and state that Tether received U.S. dollars from Bitfinex within two days after Tether issued to Bitfinex the USDT identified in Paragraph 180 in April 2017 and that Tether received U.S. dollars from Bitfinex before or on the same day that Tether issued to Bitfinex the USDT identified in Paragraph 180 on September 15, 2017 and September 29, 2017.

183.    Deny the allegations in Paragraph 183, except admit that between March 31, 2017 and September 15, 2017 Tether's USDT reserves consisted of U.S. dollars in accounts that were held by or for Tether as well as accounts receivable for amounts owed by Bitfinex.

184.    Deny the allegations in Paragraph 184, except admit that Tether Limited engaged Friedman LLP to determine the amount of Tether's cash reserves and issued USDT as of September 15, 2017 at 8:00 p.m. EDT.

185.     Deny the allegations in Paragraph 185, except admit that Bitfinex transferred $382,056,054.57 from its Noble Bank account to Tether's Noble Bank account, including $356,781,775 for the full balance of the accrued account receivable that Bitfinex owed Tether for USDT issuances, on September 15, 2017, the day that Tether's Noble Bank account was opened.

186.     Deny the allegations in Paragraph 186, except admit that Tether Limited engaged Friedman LLP to determine the amount of Tether's cash reserves and issued USDT as of September 15, 2017 at 8:00 p.m. EDT, and respectfully refer the Court to Friedman LLP's Memorandum Regarding Consulting Services Performed cited in Footnote 91 for its complete contents.

187.     Deny the allegations in Paragraph 187, and respectfully refer the Court to the September 30, 2017 statement cited in Footnote 92 and to the Friedman LLP Memorandum cited in Footnote 93 for their complete contents.

188.     Deny the allegations in Paragraph 188, except admit that Friedman LLP resigned from its engagement with Tether Limited in January 2018, and respectfully refer the Court to the cited communication from Friedman LLP for its complete contents.

189.     Deny the allegations in Paragraph 189, except admit that Friedman LLP resigned from its engagement with Tether Limited in January 2018, and respectfully refer the Court to the cited communication from Friedman LLP for its complete contents.

190.     Deny the allegations in Paragraph 190.

191.     Deny the allegations in Paragraph 191.

192.     Deny the allegations in Paragraph 192, except admit that Tether and Bitfinex were under common control and management during the alleged Class Period, admit that at certain times during the alleged Class Period Tether issued USDT to Bitfinex prior to receiving a

payment of U.S. dollars, admit that Bitfinex paid Tether in full for all issuances of USDT, admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, and admit that at certain times during the alleged Class Period Tether's USDT reserves included an account receivable for amounts owed by Bitfinex.

193.    Deny the allegations in Paragraph 193.

194.    Deny the allegations in Paragraph 194.

195.    Deny the allegations in Paragraph 195, except deny knowledge or information sufficient to form a belief as to the alleged beliefs of unidentified "traders."

196.    Deny the allegations in Paragraph 196.

197.    Deny the allegations in Paragraph 197.

198.    Deny the allegations in Paragraph 198, and respectfully refer the Court to Mr. Potter's testimony for its complete contents.

199.    Deny the allegations in Paragraph 199.

200.    Deny the allegations in Paragraph 200, except admit that Bitfinex did not maintain separate bank accounts for the U.S. dollars that it owed to Tether for USDT issuances or for customers' assets, and state that Bitfinex carefully tracked its assets and liabilities, customer assets, and amounts owed to Tether for USDT issuances in real time and confirmed that Bitfinex's net assets, excluding customer assets, were sufficient to pay the amounts owed to Tether for USDT issuances.

201.    Deny the allegations in Paragraph 201, except admit that during the alleged Class Period Bitfinex did not produce conventional balance sheets, admit that Bitfinex cannot create historical records of its total assets and liabilities from during the alleged Class Period, and state that Bitfinex carefully tracked its assets and liabilities, customer assets, and amounts owed to

Tether for USDT issuances in real time and confirmed that Bitfinex's net assets, excluding customer assets, were sufficient to pay the amounts owed to Tether for USDT issuances.

202.    Deny the allegations in Paragraph 202, and state that Mr. Devasini's paper notebook reflected his own personal notes and was not a "historical record of Bitfinex's finances."

203.    Deny the allegations in Paragraph 203, and state that Bitfinex carefully tracked its assets and liabilities, customer assets, and amounts owed to Tether for USDT issuances in real time and confirmed that Bitfinex's net assets, excluding customer assets, were sufficient to pay the amounts owed to Tether for USDT issuances.

204.    Deny the allegations in Paragraph 204, state that the Initial Exchange Offering of LEO Tokens cited in Footnote 95 refers to a profit – not "total revenues" – of $333.5 million in 2017, respectfully refer the Court to the Initial Exchange Offering of LEO Tokens for its complete contents and deny any allegation or characterization inconsistent therewith, and state that Bitfinex carefully tracked its assets and liabilities, customer assets, and amounts owed to Tether for USDT issuances in real time and confirmed that Bitfinex's net assets, excluding customer assets, were sufficient to pay the amounts owed to Tether for USDT issuances.

205.    Deny the allegations in Paragraph 205.

206.    Deny the allegations in Paragraph 206.

207.    Deny the allegations in Paragraph 207.

208.    Deny the allegations in Paragraph 208.

209.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 209.

210.    Deny the allegations in Paragraph 210, except admit that Bitfinex used Crypto Capital to send and receive customer payments, admit that Bitfinex did not at all times know the specific banks where Crypto Capital held funds, and deny knowledge or information sufficient to form a belief as to truth of the allegations regarding Crypto Capital's business.

211.    Deny the allegations in Paragraph 211.

212.    Respectfully refer the Court to the exchange cited in Paragraph 212 for its complete contents, and deny any allegation or characterization inconsistent therewith.

213.    Respectfully refer the Court to the exchange cited in Paragraph 213 for its complete contents, and deny any allegation or characterization inconsistent therewith.

214.    Respectfully refer the Court to the exchange cited in Paragraph 214 for its complete contents, and deny any allegation or characterization inconsistent therewith.

215.    Respectfully refer the Court to the exchange cited in Paragraph 215 for its complete contents, and deny any allegation or characterization inconsistent therewith.

216.    Respectfully refer the Court to the exchange cited in Paragraph 216 for its complete contents, and deny any allegation or characterization inconsistent therewith.

217.    Deny the allegations in Paragraph 217, respectfully refer the Court to the cited exchange for its complete contents, and deny any allegation or characterization inconsistent therewith.

218.    Deny the allegations in Paragraph 218.

219.    Respectfully refer the Court to the exchange cited in Paragraph 219 for its complete contents, and deny any allegation or characterization inconsistent therewith.

220.    Respectfully refer the Court to the exchange cited in Paragraph 220 for its complete contents, and deny any allegation or characterization inconsistent therewith.

221.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 221.

222.    Deny the allegations in Paragraph 222, except deny knowledge and information sufficient to form a belief as to truth of the allegation regarding the alleged "seizure of funds" from Crypto Capital, respectfully refer the Court to the cited exchange for its complete contents, and deny any allegation or characterization inconsistent therewith.

223.    Deny the allegations in Paragraph 223.

224.    Deny the allegations in Paragraph 224, respectfully refer the Court to the cited exchange for its complete contents, and deny any allegation or characterization inconsistent therewith.

225.    Deny the allegations in Paragraph 225, respectfully refer the Court to the cited exchange for its complete contents, and deny any allegation or characterization inconsistent therewith.

226.    Deny the allegations in Paragraph 226, except admit that Crypto Capital continued to process customer withdrawals for Bitfinex during and after August 2018.

227.    Respectfully refer the Court to the exchange cited in Paragraph 227 for its complete contents, and deny any allegation or characterization inconsistent therewith.

228.    Deny the allegations in Paragraph 228.

229.    Deny the allegations in Paragraph 229.

230.    Deny the allegations in Paragraph 230.

231.    Deny the allegations in Paragraph 231, respectfully refer the Court to the cited exchange for its complete contents, and state that Crypto Capital continued to process payments for Bitfinex into November 2018.

232.    Deny the allegations in Paragraph 232, respectfully refer the Court to the cited Bitfinex blog post for its complete contents, and deny any allegation or characterization inconsistent therewith.

233.    Deny the allegations in Paragraph 233.

234.    Deny the allegations in Paragraph 234, except admit that Bitfinex suspended fiat deposits (but not fiat withdrawals) for certain customer accounts for less than a week in October 2018.

235.    Deny the allegations in Paragraph 235, except admit that on October 15, 2018, USDT's market price temporarily dropped below $1 and respectfully refer the Court to the CNBC article cited in Footnotes 106 and 107 for its complete contents.

236.    Deny the allegations in Paragraph 236, respectfully refer the Court to the cited exchange for its complete contents, and deny any allegation or characterization inconsistent therewith.

237.    Deny the allegations in Paragraph 237, except admit that on October 16, 2018, Tether redeemed 250 million USDT from Bitfinex.

238.    Respectfully refer the Court to the exchange cited in Paragraph 238 for its complete contents, and deny any allegation or characterization inconsistent therewith.

239.    Deny the allegations in Paragraph 239, respectfully refer the Court to the cited announcement for its complete contents, and deny any allegation or characterization inconsistent therewith.

240.    Deny the allegations in Paragraph 240, except admit that Tether first held USDT reserves in its Deltec Bank & Trust Limited ("Deltec") account in March 2018, respectfully refer

the Court to the cited November 1, 2018 announcement for its complete contents, and deny any allegation or characterization inconsistent therewith.

241.    Respectfully refer the Court to the cited Deltec letter for its complete contents, and deny any allegation or characterization inconsistent therewith.

242.    Deny the allegations in Paragraph 242, except admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, and admit that Tether's account at Deltec as of October 31, 2018 included U.S. dollars and other assets.

243.    Deny the allegations in Paragraph 243, except admit that in November 2018 Tether transferred $475 million from its Deltec account to Bitfinex's Deltec account, admit that in exchange Bitfinex transferred $475 million from its Crypto Capital account to Tether's Crypto Capital account, and admit that, pursuant to the Credit Facility Agreement dated March 19, 2019 between iFinex Inc. and Tether Limited ("Credit Facility Agreement"), the $475 million amount was retroactively "deemed to be a loan."

244.    Deny the allegations in Paragraph 244, except admit that in November 2018 Tether transferred $475 million from its Deltec account to Bitfinex's Deltec account and admit that in exchange Bitfinex transferred $475 million from its Crypto Capital account to Tether's Crypto Capital account, and state that in November 2018 Tether issued $150 million USDT to Bitfinex in exchange for a transfer of $150 million U.S. dollars from Bitfinex's Crypto Capital account to Tether's Crypto Capital account.

245.    Deny the allegations in Paragraph 245, except admit that in November 2018 Tether issued 150 million USDT to Bitfinex, admit that in exchange Bitfinex transferred $150 million from its Crypto Capital account to Tether's Crypto Capital account, and admit that,

pursuant to the March 19, 2019 Credit Facility Agreement, the $150 million amount was retroactively "deemed to be a loan."

246.    Deny the allegations in Paragraph 246, except admit that in January and February 2019 Tether made two transfers of $25 million each from its Deltec account to Bitfinex's Deltec account, admit that in exchange Bitfinex made two transfers of $25 million each from its Crypto Capital account to Tether's Crypto Capital account, and admit that, pursuant to the March 19, 2019 Credit Facility Agreement, the $50 million amount was retroactively "deemed to be a loan."

247.    Deny the allegations in Paragraph 247, except admit that, pursuant to the March 19, 2019 Credit Facility Agreement, the $675 million amount was retroactively "deemed to be a loan."

248.    Deny the allegations in Paragraph 248.

249.    Deny the allegations in Paragraph 249, respectfully refer the Court to the cited exchange for its complete contents, and deny any allegation or characterization inconsistent therewith.

250.    Deny the allegations in Paragraph 250, except admit that Tether and Bitfinex were under common control and management during the alleged Class Period, and respectfully refer the Court to the B/T Defendants' answers to Paragraphs 23-38 above.

251.    Deny the allegations in Paragraph 251.

252.    Respectfully refer the Court to the cited NYAG press release for its complete contents, and otherwise deny the allegations in Paragraph 252.

253.    Deny the allegations in Paragraph 253, and respectfully refer the Court to the cited NYAG press release for its complete contents.

254.    Deny the allegations in Paragraph 254, and respectfully refer the Court to the cited NYAG Settlement Agreement for its complete contents.

255.    Respectfully refer the Court to the cited CFTC press release for its complete contents, and otherwise deny the allegations in Paragraph 255.

256.    Deny the allegations in Paragraph 256, and respectfully refer the Court to the cited CFTC press release for its complete contents.

257.    Deny the allegations in Paragraph 257, and respectfully refer the Court to the cited CFTC press release for its complete contents.

258.    Deny the allegations in Paragraph 258, except admit that USDT is successful in part because it is useful to the crypto community, and respectfully refer the Court to the cited testimony by Mr. Potter for its complete contents.

259.    Deny the allegations in Paragraph 259, except admit that Poloniex integrated USDT onto its platform in 2015, admit that Poloniex was the first crypto-exchange other than Bitfinex to do so, and respectfully refer the Court to the cited podcast for its complete contents.

260.    Deny the allegations in Paragraph 260, except admit that cross-exchange arbitrage may involve the simultaneous purchase of an asset on one exchange and sale of the same asset on a second exchange for a higher price, creating a profit from the difference between the prices on the two exchanges, less fees and other costs.

261.    Deny the allegations in Paragraph 261, except deny knowledge or information sufficient to form a belief as to the truth of what "[s]everal crypto-traders" allegedly "recognized" or the "strategies" they allegedly implemented, and admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period.

262.    Deny the allegations in Paragraph 262.

263.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 263.

264.    Analysis of Tether's USDT issuances and the Anonymous Trader's transactions is a matter for expert opinion to which no response is required. To the extent any response to the allegations in Paragraph 264 is required, the B/T Defendants deny them, except admit that Tether issued USDT to Bitfinex.

265.    Deny the allegations in Paragraph 265, except admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, admit that the Anonymous Trader used Bitfinex's application programming interface ("API") to connect his automated software program to the exchange, deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the development or operations of the Anonymous Trader's automated software program, and respectfully refer the Court to the cited testimony by the Anonymous Trader for its complete contents.

266.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 266, and respectfully refer the Court to the cited testimony by the Anonymous Trader for its complete contents.

267.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 267, and respectfully refer the Court to the cited testimony by the Anonymous Trader for its complete contents.

268.    Analysis of the Anonymous Trader's transactions is a matter for expert opinion to which no response is required. To the extent a response is required, the B/T Defendants admit

that the Anonymous Trader was a Bitfinex customer during the alleged class period, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 268.

269.    Analysis of the Anonymous Trader's transactions is a matter for expert opinion to which no response is required.  To the extent a response is required, the B/T Defendants admit that the Anonymous Trader was a Bitfinex customer in 2017 and 2018, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 269.

270.    Deny the allegations in Paragraph 270, except admit that certain of the B/T Defendants knew that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period.

271.    Deny the allegations in Paragraph 271, except admit that "greenlaning" is a security feature that is available to Bitfinex customers who meet certain security requirements and that permits those customers to withdraw assets from the Bitfinex exchange without a manual email confirmation, admit that the Anonymous Trader's account was "greenlaned," and respectfully refer the Court to the cited exchange for its complete contents.

272.    Deny the allegations in Paragraph 272, except admit that Mr. Devasini and the Anonymous Trader exchanged Skype messages in January 2017.

273.    Deny the allegations in Paragraph 273, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding exchanges other than Bitfinex, and respectfully refer the Court to the cited exchange for its complete contents.

274.    Deny the allegations in Paragraph 274, except deny knowledge and information sufficient to form a belief as to the truth of what the Anonymous Trader's allegedly "understood," and respectfully refer the Court to the cited exchange for its complete contents.

275.    Analysis of the Anonymous Trader's transactions and USDT issuances is a matter for expert opinion to which no response is required.  To the extent a response is required, the B/T Defendants deny the allegations in Paragraph 275, except admit that, prior to November 27, 2018, Bitfinex credited deposits of USDT to customer accounts as U.S. dollar balances and permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, and state that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange.

276.    Deny the allegations in Paragraph 276.

277.    Deny the allegations in Paragraph 277.

278.    Deny the allegations in Paragraph 278.

279.    Admit that the Anonymous Trader did not wire fiat currency to Bitfinex or Tether between March 30, 2017 and September 9, 2018, but state that the Anonymous Trader transferred other assets to his Bitfinex account during that period.

280.    Deny the allegations in Paragraph 280, and state that the analysis of the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

281.    Deny the allegations in Paragraph 281, and state that the analysis of the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no

response is required; to the extent a response is required, the B/T Defendants deny those allegations.

282.     Analysis of the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny the allegations in Paragraph 282, except admit that Bitfinex supported the BTC/USD trading pair during the alleged Class Period, admit that Bitfinex did not support a BTC/USDT trading pair during the alleged Class Period, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the trading pairs available on Bittrex and Poloniex.

283.     Analysis of the Anonymous Trader's transactions is a matter for expert opinion to which no response is required.  To the extent a response is required, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 283.

284.     Analysis of the Anonymous Trader's transactions is a matter for expert opinion to which no response is required.  To the extent a response is required, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 284.

285.     Deny the allegations in Paragraph 285, except admit that Bitfinex did not support the BTC/USDT trading pair during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex credited deposits of USDT to customer accounts as U.S. dollar balances and permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and state that

analysis of the Anonymous Trader's transactions is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

286.    Analysis of the Anonymous Trader's transactions and the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no response is required.  To the extent any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 286.

287.    Analysis of the Anonymous Trader's transactions and the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no response is required.  To the extent any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 287.

288.    Analysis of the Anonymous Trader's transactions and the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no response is required.  To the extent any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 288.

289.    Analysis of the Anonymous Trader's transactions and the relative prices of bitcoin on different crypto-asset exchanges is a matter for expert opinion to which no response is required.  To the extent any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 289.

290.    Deny the allegations in Paragraph 290.

291.    Deny the allegations in Paragraph 291, except admit that certain of the B/T Defendants were aware that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period.

292.    Deny the allegations in Paragraph 292.

293.    Deny the allegations in Paragraph 293.

294.    Deny the allegations in Paragraph 294, except admit that USDT may be used in cross-exchange arbitrage, and respectfully refer the Court to the cited testimony of Mr. Van der Velde for its complete contents.

295.    Deny the allegations Paragraph 295, except admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, irrespective of the market price of USDT on other exchanges, and admit that USDT was backed by Tether's USDT reserves during the alleged Class Period.

296.    Deny the allegations in Paragraph 296, except admit that the Anonymous Trader was a Bitfinex customer during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class

Period, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Anonymous Trader's transactions on other exchanges.

297.    Deny the allegations in Paragraph 297, except admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and admit that Bitfinex could not execute a customer's request to withdraw USDT if Bitfinex had an insufficient supply of USDT.

298.    Deny the allegations in Paragraph 298, except admit that Bitfinex processed customer withdrawals of USDT from its hot wallets, admit that Bitfinex's hot wallets were connected to the main infrastructure of the Bitfinex exchange, and admit that a withdrawal request could be referred to as "stuck" if, among other things, the relevant Bitfinex's hot wallet did not contain sufficient USDT to cover the withdrawal request.

299.    Deny the allegations in Paragraph 299, except admit that Bitfinex could add USDT to its hot wallets by transferring USDT from a Bitfinex cold wallet, admit that a cold wallet is a wallet that is not linked to the internet, admit that transferring assets from Bitfinex's cold wallets to its hot wallets required the approval of multiple individuals, and admit that Bitfinex could request that Tether issue USDT to Bitfinex's hot wallets.

300.    Deny the allegations in Paragraph 300, except admit that Tether and Bitfinex were under common control and management during the alleged Class Period, admit that at certain times during the alleged Class Period Tether issued USDT to Bitfinex prior to receiving a payment of U.S. dollars, state that Bitfinex paid Tether in full for all issuances of USDT, and state that Bitfinex carefully tracked its assets and liabilities, customer assets, and amounts owed to Tether for USDT issuances in real time and confirmed that Bitfinex's net assets, excluding customer assets, were sufficient to pay the amounts owed to Tether for USDT issuances.

301.    Deny the allegations in Paragraph 301, except admit that the Anonymous Trader was a customer of Bitfinex during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, admit that Bitfinex sometimes transferred USDT from its cold wallets to its hot wallets to facilitate customer withdrawals, admit that the Anonymous Trader at times contacted Bitfinex personnel for technical support if one of his withdrawal requests was "stuck," and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Anonymous Trader's alleged reasoning.

302.    Deny the allegations in Paragraph 302, except admit that the Anonymous Trader had contact information for certain members of Bitfinex management, and admit that Bitfinex personnel provided technical support to its customers, including the Anonymous Trader.

303.    Deny the allegations in Paragraph 303, except deny knowledge or information sufficient to form a belief as to whether "speed of execution was paramount for the Anonymous Trader's bot operation," admit that Bitfinex takes pride in the quality of its customer support and its responsiveness to its customers, and respectfully refer the Court to the cited testimony of the Anonymous Trader and the cited Telegram chat for their complete contents.

304.    Analysis of the Anonymous Trader's crypto-asset transactions is a matter for expert opinion to which no response is required.  To the extent any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 304.

305.    Deny the allegations in Paragraph 305, except admit that the Anonymous Trader was a customer of Bitfinex during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Anonymous Trader's transactions on other exchanges.

306.    Deny the allegations in Paragraph 306, except admit that the Anonymous Trader was a customer of Bitfinex during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Anonymous Trader's transactions on other exchanges.

307.    Deny the allegations in Paragraph 307, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Anonymous Trader's transactions on other exchanges.

308.    Deny the allegations in Paragraph 308.

309.    Deny the allegations in Paragraph 309.

310.    Deny the allegations in Paragraph 310, and respectfully refer the Court to the unidentified Bloomberg reporter's comments for their complete contents.

311.    Deny the allegations in Paragraph 311.

312.    Deny the allegations in Paragraph 312, except admit that Tether issued USDT in exchange for U.S. dollars, admit that Tether and Bitfinex were under common control and management during the alleged Class Period, admit that at certain times during the alleged Class Period Tether issued USDT to Bitfinex prior to receiving a payment of U.S. dollars, admit that Bitfinex paid Tether in full for all issuances of USDT, admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, and admit that at certain times during the alleged Class Period Tether's USDT reserves included an account receivable for amounts owed by Bitfinex.

313.    Deny the allegations in Paragraph 313, except admit that Bitfinex offered peer-to-peer margin trading to its customers, admit that Bitfinex extended credit lines to a limited number of customers, admit that Bitfinex required such credit lines to be overcollateralized by assets held in the customers' Bitfinex accounts, and admit that certain of the Defendants were issued credit lines.

314.    Deny the allegations in Paragraph 314.

315.    Deny the allegations in Paragraph 315, except admit that Bitfinex extended credit lines to a limited number of customers, admit that Bitfinex required such credit lines to be overcollateralized by assets held in the customers' Bitfinex accounts, admit that during the alleged Class Period Bitfinex did not maintain separate bank accounts for its customers' assets,

admit that during the alleged Class Period Bitfinex carefully tracked its assets and liabilities and customer assets in real time, and admit that Bitfinex cannot recreate historical records of its total assets and liabilities from during the alleged Class Period.

316.    Deny the allegations in Paragraph 316.

317.    Deny the allegations in Paragraph 317 and respectfully refer the Court to the cited exchange for its complete contents.

318.    Deny the allegations in Paragraph 318, except admit that during the alleged Class Period Bitfinex offered peer-to-peer margin trading to its customers, admit that during the alleged Class Period Bitfinex required its customers to post 30 percent collateral to open a bitcoin-U.S. dollar margin trading position and to maintain 15 percent collateral to keep the position open, and admit that the margin trading feature was popular with Bitfinex customers.

319.    Deny the allegations in Paragraph 319.

320.    Deny the allegations in Paragraph 320 and respectfully refer the Court to the cited exchange and testimony of Mr. Devasini for their complete contents.

321.    Deny the allegations in Paragraph 321.

322.    Deny the allegations in Paragraph 322, except admit that "greenlaning" is a security feature that is available to Bitfinex customers who meet certain security requirements and that permits them to withdraw assets from the Bitfinex exchange without a manual email confirmation, admit that the Anonymous Trader's account was "greenlaned," admit that the default "greenlane" withdrawal limit was $250,000, admit that a customer's "greenlane" withdrawal limit was set by reference to the assets the customer held on the Bitfinex exchange, and admit that at one time the Anonymous Trader had a "greenlane" withdrawal limit of $5 million.

323.    Deny the allegations in Paragraph 323.

324.    Deny the allegations in Paragraph 324, except admit that Bitfinex notified customers connected to its API of platform maintenance and updates that might impact automated trading activities, admit that Bitfinex's Head of Customer Support on occasion messaged customers to notify them of platform maintenance on Bitfinex, and respectfully refer the Court to the cited exchange and testimony by the Anonymous Trader for their complete contents.

325.    Deny the allegations in Paragraph 325, except admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, admit that the Anonymous Trader used Bitfinex's API to connect his automated software program to the exchange, admit that Bitfinex notified customers connected to its API of platform maintenance and updates that might impact automated trading activities, and respectfully refer the Court to the cited exchange for its complete contents.

326.    Deny the allegations in Paragraph 326, and respectfully refer the Court to the cited communications for their complete contents.

327.    Deny the allegations in Paragraph 327, except admit that the Anonymous Trader, like certain other Bitfinex customers, communicated with Mr. Devasini and Mr. Ardoino, and admit that Bitfinex personnel offered technical support to its customers, including the Anonymous Trader.

328.    Deny the allegations in Paragraph 328, and respectfully refer the Court to the cited exchange for its complete contents.

329.    Deny the allegations in Paragraph 329, except admit that during the alleged Class Period Bitfinex charged order execution fees based on a customer's trading volume, admit that

the Anonymous Trader and other Bitfinex customers were in the highest volume trading tier and thus the lowest fee tier, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the operation of the Anonymous Trader's automated software program and the Anonymous Trader's transactions on other exchanges.

330.    Deny the allegations in Paragraph 330.

331.    Deny the allegations in Paragraph 331, and respectfully refer the Court to the cited testimony by the Anonymous Trader and the cited exchange for their complete contents.

332.    Deny the allegations in Paragraph 332, except admit that Bitfinex extended credit lines to a limited number of customers, admit that Bitfinex required such credit lines to be overcollateralized by assets held in the customers' Bitfinex accounts, admit that Bitfinex did not charge its customers fees or interest for credit lines that it extended to them, and admit that Bitfinex extended credit lines to the Anonymous Trader on the same terms as other Bitfinex customers.

333.    Deny the allegations in Paragraph 333, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding what the Anonymous Trader allegedly "was aware of," respectfully refer the Court to the B/T Defendants' answers to Paragraphs 170-72 above, and respectfully refer the Court to the cited exchange for its complete contents.

334.    Deny the allegations in Paragraph 334, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about the Anonymous Trader's bank account, and respectfully refer the Court to the cited exchange for its complete contents.

335.     Deny the allegations in Paragraph 335, state that Paragraph 335 omits the smiley-face emoji following the Anonymous Trader's response and the reply of "lol," and respectfully refer the Court to the cited exchange for its complete contents.

336.     Deny the allegations in Paragraph 336, and respectfully refer the Court to the cited exchange for its complete contents.

337.     Deny the allegations in Paragraph 337, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Roman Empire.

338.     Deny the allegations in Paragraph 338, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding a hypothetical secret "debasement" of a "non-currency."

339.     Deny the allegations in Paragraph 339, except admit that Tether stated during the alleged Class Period that USDT was backed by Tether's USDT reserves, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding what "the market" allegedly understood.

340.     Deny the allegations in Paragraph 340, except admit that Tether issued USDT in exchange for U.S. dollars, admit that Tether and Bitfinex were under common control and management during the alleged Class Period, admit that at certain times during the alleged Class Period Tether issued USDT to Bitfinex prior to receiving a payment of U.S. dollars, admit that Bitfinex paid Tether in full for all issuances of USDT, admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, admit that at certain times during the alleged Class Period Tether's USDT reserves included an account receivable for amounts owed by Bitfinex, admit that Bitfinex extended credit lines to a limited number of customers, and admit

that Bitfinex required such credit lines to be overcollateralized by assets held in the customers' Bitfinex accounts.

341.    Deny the allegations in Paragraph 341, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about how "the market would have responded" and what "the market would have understood."

342.    Paragraph 342 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 342 is necessary, the B/T Defendants deny them, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about what "the market would understand."

343.    Paragraph 343 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 343 is necessary, the B/T Defendants deny them.

344.    Deny the allegations in Paragraph 344, except admit that the Anonymous Trader was a Bitfinex customer during the alleged class period, admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, admit that prior to November 27, 2018, Bitfinex permitted customers to withdraw U.S. dollar balances from customer accounts in the form of either U.S. dollars or USDT, admit that on November 27, 2018, Bitfinex introduced USDT/USD trading pairs, which means that customers could acquire USDT by trading for it on the exchange, admit that from November 27, 2018, Bitfinex permitted customers to withdraw USDT from customer accounts in the form of USDT, and deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the operation of the Anonymous Trader's automated software program and the Anonymous Trader's transactions on other exchanges.

345.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 345.

346.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 346.

347.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 347.

348.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 348.

349.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 349.

350.    Deny the allegations in Paragraph 350, except admit that USDT was backed by Tether's USDT reserves during the alleged Class Period, deny knowledge or information sufficient to form a belief of the truth of the allegations regarding what "the market" allegedly

"believed" or "perceived," and state that analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

351.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 351.

352.    Deny the allegations in Paragraph 352, and state that analysis of the Anonymous Trader's transactions and their purported impact on the price of bitcoin is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

353.    Deny the allegations in Paragraph 353, except admit that the Anonymous Trader used an automated software program to conduct cross-exchange arbitrage during the alleged Class Period, deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding the operation of the Anonymous Trader's automated software program, and state that analysis of the Anonymous Trader's transactions and their alleged impact on the price of bitcoin is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

354.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 354.

355.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 355.

356.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 356.

357.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 357.

358.    Deny the allegations contained in Paragraph 358, and state that analysis of the Anonymous Trader's transactions and their alleged impact on the price of bitcoin is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

359.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 359.

360.    Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary,

the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 360.

361.     Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 361.

362.     Analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required.  To the extent that any response is necessary, the B/T Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 362.

363.     Deny the allegations in Paragraph 363.

364.     Deny the allegations in Paragraph 364.

365.     Deny the allegations in Paragraph 365, and respectfully refer the Court to the cited exchange for its complete contents.

366.     Deny the allegations in Paragraph 366, and respectfully refer the Court to the cited exchange for its complete contents.

367.     Paragraph 367 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 367 is necessary, the B/T Defendants deny them.

368.     Deny the allegations in Paragraph 368.

369.     Deny the allegations in Paragraph 369 and respectfully refer the Court to the cited article *Is Bitcoin Really Untethered?* by John M. Griffin and Amin Sham (the "Griffin Article") for its complete content.

370.    Deny the allegations in Paragraph 370 and respectfully refer the Court to the cited Griffin Article for its complete content.

371.    Deny the allegations in Paragraph 371 and respectfully refer the Court to the cited Griffin Article for its complete content.

372.    Deny the allegations in Paragraph 372 and respectfully refer the Court to the cited Griffin Article for its complete content.

373.    Deny the allegations in Paragraph 373 and respectfully refer the Court to the cited Griffin Article for its complete content.

374.    Deny the allegations in Paragraph 374 and respectfully refer the Court to the cited Griffin Article for its complete content.

375.    Deny the allegations in Paragraph 375 and respectfully refer the Court to the cited Griffin Article for its complete content.

376.    Deny the allegations in Paragraph 376 and respectfully refer the Court to the cited Griffin Article for its complete content.

377.    Deny the allegations in Paragraph 377 and respectfully refer the Court to the cited Griffin Article for its complete content.

378.    Deny the allegations in Paragraph 378 and respectfully refer the Court to the cited Griffin Article for its complete content.

379.    Deny the allegations in Paragraph 379.

380.    Deny the allegations in Paragraph 380 and respectfully refer the Court to the cited online post *Quantifying the Effect of Tether* published under a pseudonym on January 24, 2018 (the "Tether Report") for its complete content.

381.     Deny the allegations in Paragraph 381 and respectfully refer the Court to the cited Tether Report for its complete content.

382.     Deny the allegations in Paragraph 382 and respectfully refer the Court to the cited Tether Report for its complete content.

383.     Deny the allegations in Paragraph 383, state that Tether's USDT issuances and redemptions are a matter of public record because they are visible on the blockchain, and state that analysis of alleged crypto-asset transfers, trades and price movements are matters for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

384.     Deny the allegations in Paragraph 384, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding TokenAnalyst's alleged "mission" and respectfully refer the Court to the TokenAnalyst post cited in Footnote 134 for its complete content.

385.     Deny the allegations in Paragraph 385 and respectfully refer the Court to the cited TokenAnalyst post for its complete content.

386.     Deny the allegations in Paragraph 386.

387.     Deny the allegations in Paragraph 387, except admit that iFinex Inc., DigFinex Inc., Mr. Devasini, and Mr. van der Velde owned "cryptocommodities," as that term is used by Plaintiffs, at certain times during the alleged Class Period and deny knowledge or information sufficient to form a belief as to Mr. Potter's alleged "cryptocommodity" holdings.

388.     Deny the allegations in Paragraph 388, except admit that iFinex Inc., DigFinex Inc., Mr. Devasini, and Mr. van der Velde owned "cryptocommodities," as that term is used by Plaintiffs, at certain times during the alleged Class Period, deny knowledge or information

sufficient to form a belief as to Mr. Potter's alleged "positions in crypto-commodities," and state that analysis of holdings of "cryptocommodities" is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

389.    Deny the allegations in Paragraph 389, except admit that Tether was a pioneer in the stablecoin market and is now the largest and most trusted stablecoin issuer in the world.

390.    Deny the allegations in Paragraph 390 except state that Tether's USDT issuances and redemptions are a matter of public record because they are visible on the blockchain, and state that analysis of Tether's USDT issuances and redemptions is a matter for expert opinion to which no response is required; to the extent a response is required, the B/T Defendants deny those allegations.

391.    Deny the allegations in Paragraph 391, except admit that Tether is the largest and most trusted stablecoin issuer in the world, and admit that USDT is backed by Tether's USDT reserves.

392.    Deny the allegations in Paragraph 392.

393.    Deny the allegations in Paragraph 393.

394.    Paragraph 394 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 394 is necessary, the B/T Defendants deny them, except admit that Plaintiffs purport to assert claims on behalf of the alleged "Class."

395.    Paragraph 395 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 395 is necessary, the B/T

Defendants deny them, except admit that Plaintiffs purport to assert claims on behalf of the alleged "Cryptocommodity Futures Subclass."

396.     Paragraph 396 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 396 is necessary, the B/T Defendants deny them, except admit that Plaintiffs purport to exclude certain person or entities from the definition of the alleged "Class."

397.     Paragraph 397 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 397 is necessary, the B/T Defendants deny them.

398.     Paragraph 398 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 398 is necessary, the B/T Defendants deny them.

399.     Paragraph 399 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 399 is necessary, the B/T Defendants deny them.

400.     Paragraph 400 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 400 is necessary, the B/T Defendants deny them.

401.     Paragraph 401 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 401 is necessary, the B/T Defendants deny them.

402.    Paragraph 402 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 402 is necessary, the B/T Defendants deny them.

403.    Paragraph 403 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 403 is necessary, the B/T Defendants deny them.

404.    Paragraph 404 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 404 is necessary, the B/T Defendants deny them.

405.    Paragraph 405 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 405 is necessary, the B/T Defendants deny them.

406.    Paragraph 406 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 406 is necessary, the B/T Defendants deny that Plaintiffs, or any alleged class members, are entitled to the orders requested, and deny that this action may properly be maintained as a class action pursuant to Rules 23(a), (b) and (c)(4) of the Federal Rules of Civil Procedure.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Market Manipulation
### Commodities Exchange Act

407.    The B/T Defendants incorporate by reference their answers to Paragraphs 1 through 406.

408.    Paragraph 408 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 408 is necessary, the B/T Defendants deny them.

409.    Paragraph 409 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 409 is necessary, the B/T Defendants deny them.

410.    Paragraph 410 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 410 is necessary, the B/T Defendants deny them.

411.    Paragraph 411 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 411 is necessary, the B/T Defendants deny them.

412.    Paragraph 412 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 412 is necessary, the B/T Defendants deny them.

413.    Paragraph 413 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 413 is necessary, the B/T Defendants deny them.

414.    Paragraph 414 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 414 is necessary, the B/T Defendants deny them.

415.    Paragraph 415 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 415 is necessary, the B/T Defendants deny them.

416.    The B/T Defendants deny that Plaintiffs, or any alleged class members, are entitled to the relief requested or to any relief.

## SECOND CAUSE OF ACTION

### Monopolization
### Sherman Antitrust Act Section 2

417.    The B/T Defendants incorporate by reference their answers to Paragraphs 1 through 416.

418.    Paragraph 418 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 418 is necessary, the B/T Defendants deny them.

419.    Paragraph 419 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 419 is necessary, the B/T Defendants deny them.

420.    Paragraph 420 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 420 is necessary, the B/T Defendants deny them.

421.    Paragraph 421 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 421 is necessary, the B/T Defendants deny them.

422.    Paragraph 422 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 422 is necessary, the B/T Defendants deny them.

423.    Paragraph 423 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 423 is necessary, the B/T Defendants deny them.

424.    Paragraph 424 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 424 is necessary, the B/T Defendants deny them.

425.    Paragraph 425 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 425 is necessary, the B/T Defendants deny them.

426.    Paragraph 426 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 426 is necessary, the B/T Defendants deny them.

427.    The B/T Defendants deny that Plaintiffs, or any plaintiff class, are entitled to the relief requested or to any relief.

## THIRD CAUSE OF ACTION

### Agreement in Restraint of Trade
### Sherman Antitrust Act Sections 1 and 3

428.    The B/T Defendants incorporate by reference their answers to Paragraphs 1 through 427.

429.    Paragraph 429 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 429 is necessary, the B/T Defendants deny them.

430.    Paragraph 430 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 430 is necessary, the B/T Defendants deny them.

431.    Paragraph 431 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 431 is necessary, the B/T Defendants deny them.

432.    Paragraph 432 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 432 is necessary, the B/T Defendants deny them.

433.    Paragraph 433 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 433 is necessary, the B/T Defendants deny them.

434.    Paragraph 434 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 434 is necessary, the B/T Defendants deny them.

435.    Paragraph 435 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 435 is necessary, the B/T Defendants deny them.

436.    Paragraph 436 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 436 is necessary, the B/T Defendants deny them.

437.    Paragraph 437 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 437 is necessary, the B/T Defendants deny them.

438.    Paragraph 438 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 438 is necessary, the B/T Defendants deny them.

439.    Paragraph 439 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 439 is necessary, the B/T Defendants deny them.

440.    Paragraph 440 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 440 is necessary, the B/T Defendants deny them.

441.    Paragraph 441 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 441 is necessary, the B/T Defendants deny them.

442.    Paragraph 442 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations contained in Paragraph 442 is necessary, the B/T Defendants deny them.

443.    The B/T Defendants deny that Plaintiffs, or any plaintiff class, are entitled to the relief requested or to any relief.

## COSTS, INTEREST, AND ATTORNEYS' FEES

444.    The B/T Defendants deny that Plaintiffs, or any plaintiff class, are entitled to the relief requested or to any relief.

## JURY TRIAL

445.    The B/T Defendants admit that Plaintiffs demand a trial by jury.

## ADDITIONAL DEFENSES

As additional defenses, the B/T Defendants allege, assert, and state the following, which apply to each and every cause of action asserted in the Second Amended Complaint to which such defense may be applicable.  By virtue of alleging these further defenses, the B/T Defendants do not assume any burden of proof, persuasion, or production not otherwise legally assigned to them.  The B/T Defendants also do not concede that facts contrary to one or more of the statements that follow would support liability as to any or all of them.  The B/T Defendants assert and expressly reserve all rights to assert any and all other defenses as appropriate.  The B/T Defendants further reserve all rights to join additional parties and assert counterclaims.  Use of the term "Plaintiffs" in the defenses refers to the Named Plaintiffs and to any member of the putative plaintiff class alleged in the Second Amended Complaint.

## FIRST DEFENSE

The Second Amended Complaint fails to state any claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiffs lack standing to assert some or all of their claims.

## THIRD DEFENSE

Plaintiffs cannot demonstrate that the B/T Defendants were part of any alleged conspiracy to manipulate the price of digital assets.

79

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct did not lessen competition in any relevant market or markets.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered an injury-in-fact or antitrust injury traceable to allegedly unlawful conduct of the B/T Defendants.

## SIXTH DEFENSE

The purported relevant market alleged in the Second Amended Complaint is not a relevant antitrust market, and Plaintiffs cannot carry their burden of defining a proper relevant market.

## SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the B/T Defendants' conduct challenged by Plaintiffs was lawful, fair, non-deceptive, justified, and pro-competitive; it constituted bona fide business practice consistent with industry practices and was carried out in furtherance of legitimate business interests; and it was part of the B/T Defendants' lawful business operations.

## EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the B/T Defendants did not manipulate the price of digital assets.

## NINTH DEFENSE

Plaintiffs' claims of a conspiracy to manipulate digital asset prices fail because the defendants were not separate decisionmakers for purposes of the Sherman Act.

## TENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs did not rely on any allegedly false or misleading statement or omission by the B/T Defendants when deciding to purchase, retain, sell, or otherwise transact, the assets at issue in the Second Amended Complaint.

## ELEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of the B/T Defendants or were caused, if at all, solely and proximately by the conduct of parties other than the B/T Defendants, market forces, or other external factors beyond the B/T Defendants' control.

## TWELFTH  DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they did not suffer any injury or compensable damages.

## THIRTEENTH  DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any alleged injury is speculative and remote, because their alleged damages are too speculative to be calculated for relief to be granted, and because of the impossibility of the proof and allocation of these alleged damages.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they failed to mitigate damages.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any claimed injury or damage has been offset by benefits or payments Plaintiffs received.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the relief sought is broader than what is necessary to remedy the alleged harm.

## SEVENTEENTH DEFENSE

Plaintiffs would be unjustly enriched if they were permitted to obtain recovery in this action.

## EIGHTEENTH DEFENSE

The B/T Defendants assert that should they be held liable to Plaintiffs, which liability is specifically denied, the B/T Defendants would be entitled to contribution and/or indemnity from other parties, entities, or individuals.

## NINETEENTH DEFENSE

Plaintiffs' claims are barred in whole in part to the extent they have released their claims.

## TWENTIETH DEFENSE

Plaintiffs' claims are barred in whole or in part by the doctrines of waiver, laches, and/or estoppel.

## TWENTY-FIRST DEFENSE

Plaintiffs' claims on behalf of a putative class(es) are barred in whole or in part because the applicable requirements of Federal Rule of Civil Procedure 23 are not satisfied.

## TWENTY-SECOND DEFENSE

Plaintiffs fail to state a claim for costs and/or attorneys' fees.

## TWENTY-THIRD DEFENSE

The B/T Defendants hereby adopt and incorporate by reference any and all other defenses asserted or to be asserted by any other defendants.

## **TWENTY-FOURTH DEFENSE**

The B/T Defendants hereby reserve all affirmative and other defenses available under any applicable federal or state law.

## **PRAYER FOR RELIEF**

WHEREFORE, the B/T Defendants respectfully request judgment dismissing the Second Amended Complaint in its entirety and awarding costs and attorneys' fees, together with such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       September 13, 2024

DEBEVOISE & PLIMPTON LLP

/s/ *Elliot Greenfield*

Maeve L. O'Connor
Michael Schaper
Elliot Greenfield
Natascha Born
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
moconnor@debevoise.com
*mschaper@debevoise.com*
*egreenfield@debevoise.com*
*nborn@debevoise.com*

Michael Jason Lee (*pro hac vice*)
LAW OFFICES OF MICHAEL JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
(858) 550-9984
*michael@mjllaw.com*

Sunjina K. Ahuja (*pro hac vice*)
Christopher J. Beal (*pro hac vice*)
DILLON MILLER, AHUJA & BOSS, LLP
5872 Owens Ave., Suite 200
Carlsbad, California 92008
(858) 587-1800
*sahuja@dmablaw.com*
*cbeal@dmablaw.com*

*Attorneys for Defendants iFinex Inc., DigFinex Inc.,*
*BFXNA Inc., BFXWW Inc., Tether International*
*Limited, Tether Operations Limited, Tether Holdings*
*Limited, Tether Limited, Giancarlo Devasini, and*
*Ludovicus Jan van der Velde*