# Exhibit 27
# Filed Under Seal

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| **Tether Holdings Limited, Tether** | ) |
| **Operations Limited, Tether Limited,** | ) **CFTC Docket No. 22-04** |
| **and Tether International Limited,** | ) |
| | ) |
| **Respondents.** | ) |
| | ) |

**RECEIVED CFTC**

Office of Proceedings
Proceedings Clerk
*9:16 am, Oct 15, 2021*

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO**
**SECTION 6(c) AND (d) OF THE COMMODITY EXCHANGE ACT, MAKING**
**FINDINGS, AND IMPOSING REMEDIAL SANCTIONS**

## I.    INTRODUCTION

The Commodity Futures Trading Commission ("Commission") has reason to believe that from at least June 1, 2016 to February 25, 2019 (the "Relevant Period"), Respondents Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited, all doing business as "Tether" (collectively, "Respondents" or "Tether"), violated Section 6(c)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 9(1) (2018), and Commission Regulation ("Regulation") 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions ("Order"), and acknowledges service of this Order.[1]

---

[1] Respondents consent to the use of the findings of fact and conclusions of law in this Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof. Respondents do not consent, however, to the use of this Order, or the findings or conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party or claimant, other than: a proceeding in bankruptcy or receivership; or a proceeding to enforce the terms of this Order. Respondents do not consent to the use of the Offer or this Order, or the findings or conclusions in this Order, by any other party in any other proceeding.

## II.    FINDINGS

The Commission finds the following:

### A.    SUMMARY

Tether introduced the U.S. dollar tether token ("USDt" or "tether token") as a stablecoin in 2014.  The USDt is a commodity as defined by the Act.  At various times during the Relevant Period, Tether misrepresented to customers and the market that Tether maintained sufficient fiat reserves to back every USDt in circulation "one-to-one" with the "equivalent amount of corresponding fiat currency" held in reserves by Tether (the "Tether Reserves"), and that Tether would undergo routine, professional audits to demonstrate that it maintained "100% reserves at all times."  In fact, during the majority of the Relevant Period, Tether failed to maintain fiat currency reserves in accounts in Tether's own name or in an account titled and held "in trust" for Tether (collectively the "Tether Bank Accounts") to back every USDt in circulation.  While Tether represents that it maintained adequate reserves, some of the Tether Reserves were in accounts other than the Tether Bank Accounts, and at times included receivables and non-fiat assets among its counted reserves.  In addition, at least until 2018, Tether utilized a manual process to track the Tether Reserves, which did not capture the real-time status of the Tether Reserves.  Further, from at least 2018 through February 25, 2019, Tether failed to disclose that the Tether Reserves included unsecured receivables, commercial papers, funds held by third-parties, and other non-fiat assets.  Finally, Tether Reserves were not routinely audited.

### B.    RESPONDENTS

**Tether Holdings Limited** was incorporated in the British Virgin Islands on September 5, 2014.  Tether Holdings Limited owns 100% of Tether Operations Limited, Tether Limited, and Tether International Limited.  Tether Holdings Limited has never been registered with the Commission in any capacity.

**Tether Limited** was incorporated in Hong Kong on September 8, 2014.  Tether Limited operated Tether's website and token platform, tether.to from September 8, 2014 through March 15, 2017.  Throughout the Relevant Period, Tether Limited was and continues to be registered with FinCEN as a non-bank financial institution known as a Money Services Business ("MSB").  Tether Limited has never been registered with the Commission in any capacity.

**Tether Operations Limited** was incorporated in the British Virgin Islands on March 15, 2017.  Tether Operations Limited operates Tether's website and token platform, tether.to.  Tether Operations Limited has never been registered with the Commission in any capacity.

**Tether International Limited** was incorporated in the British Virgin Islands on March 15, 2017.  Tether International Limited has never been registered with the Commission in any capacity.

## C.    OTHER RELEVANT ENTITIES[2]

**iFinex Inc**. ("iFinex") is a privately-held financial technology company incorporated in the British Virgin Islands on May 21, 2013.  iFinex operates the Bitfinex trading platform.

**BFXNA Inc.** ("BFXNA") was incorporated in the British Virgin Islands on November 4, 2014.  BFXNA is a wholly-owned subsidiary of iFinex.

**BFXWW Inc.** ("BFXWW") was incorporated in the British Virgin Islands on April 28, 2015.  BFXWW is a wholly-owned subsidiary of iFinex.

## D.    FACTS

## 1.    The Tether Token

Since its launch in 2014, Respondents have represented that the tether token is a "stablecoin," a type of virtual currency whose value is pegged to fiat currency.  At launch, Respondents announced, through their Facebook account, that: "Tether means a digital tie between a real-world asset and the digital assets backed by currencies."  Although Respondents offer tether tokens in several national currencies, the dominant tether token is the U.S. dollar tether token, commonly referred to as "USDt."  Throughout the Relevant Period, Respondents repeatedly represented that one USDt may always be redeemed for one U.S. dollar.  Respondents' website represents the purpose and value of the USDt token as:

> Tether is a token backed by actual assets, including USD and Euros.  One Tether equals one underlying unit of the currency backing it, e.g., the U.S. Dollar, and is backed 100% by actual assets in the Tether platform's reserve account.  Being anchored or "tethered" to real world currency, Tether provides protection from the volatility of cryptocurrencies.

Beginning in January 2015, tether tokens have been used to deposit and withdraw funds on the Bitfinex platform. Tether tokens provide a medium of exchange across cryptocurrency trading platforms.  For example, a trader may transfer USDt to Bitfinex or another cryptocurrency exchange and use the tether tokens to purchase or trade digital assets such as bitcoin. BTC/USDT is a frequently traded pair.

Before November 2017, customers could only acquire and redeem tether tokens directly from Respondents.  To do so, typically, customers transferred the corresponding amount of U.S. dollars in order to acquire USDt from Respondents and received the corresponding amount of U.S. dollars in exchange for redeemed USDt, less any applicable fees.  On or around November 19, 2017, Respondents experienced a cyber-attack during which the attackers caused the unauthorized transfer of nearly 31 million USDt tokens that had been authorized but not issued (the "2017 Tether Hack").  No reserve funds were at risk or stolen during the 2017 Tether

---

[2] iFinex, BFXNA and BFXWW collectively did business as "Bitfinex" throughout the Relevant Period. Concurrently with this Order, the Commission is issuing an order against Bitfinex settling separate and distinct violations of Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a), 6d(a)(1) (2018), as well as BFXNA's violation of Part VII. A of the Commission's 2016 Order in *In re BFXNA Inc. d/b/a Bitfinex*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016).

Hack.  Following the 2017 Tether Hack, and continuing until on or about November 27, 2018, Respondents ceased directly issuing and redeeming tether tokens, and tether tokens could only be issued or redeemed through Bitfinex.  Thereafter, beginning in or around November 27, 2018, customers could obtain USDt tokens from Bitfinex or Tether.  Today, tether tokens can be obtained from dozens of cryptocurrency exchanges, including several operating in the U.S.

2.    **Respondents' Untrue or Misleading Statements and Omissions: USDt Would Be Fully Backed by US Dollars Held In the Tether Bank Accounts**

Throughout the Relevant Period, Respondents represented that Tether backed every tether token in circulation 1:1 with corresponding fiat currency reserves held by Tether.  Prior to February 25, 2019, Respondents' website consistently represented that tether tokens are "100% Backed: Every tether [token] is always backed 1-to-1 by traditional currency held in our reserves.  So 1 USDT is always equivalent to 1 USD."

Until February 25, 2019, Respondents' Terms of Service similarly represented that:

Tether Tokens are fully backed by the currency or property used to purchase them at issuance. Tether Tokens are denominated in a range of currencies. For example, if you purchase EURT, your Tethers are fully backed by Euros. If you cause to be issued EURT 100.00, Tether holds €100.00 to back those Tether Tokens. […] Tether Tokens are backed by money, but they are not money themselves. Tether will not issue Tether Tokens for consideration that is other Digital Tokens (for example, bitcoin), and will not redeem Tether Tokens for other Digital Tokens; only money will be accepted upon issuance, and only money will be provided upon redemption.

Respondents' website includes a page entitled 'Transparency Page,' (the "Tether Transparency Page").  A June 20, 2018 announcement on the Tether Transparency Page stated "All Tethers in circulation are fully backed by USD reserves. Full stop.... Reserves have always, and will always, match the number of Tethers in circulation."

Beginning on April 16, 2015 and continuing throughout the Relevant Period, a whitepaper entitled "Tether: Fiat Currencies on the Bitcoin blockchain" (the "Tether Whitepaper") has been available on Tether's website.  Respondents' representations in the Tether Whitepaper include:

Tethers are fully reserved in a one-to-one ratio, completely independent of market forces, pricing, or liquidity constraints. Tether has a simple and reliable Proof of Reserves implementation and undergoes regular professional audits. Our underlying banking relationships, compliance, and legal structure provide a secure foundation for us to be the custodian of reserve assets and issuer of tethers. . . . Each Tether issued into circulation will be backed in a one-to-one ratio with the equivalent amount of corresponding fiat currency held in reserves by Hong Kong based Tether Limited. As the custodian of the backing asset we are acting as a trusted third party responsible for that asset. . . . Tether Limited has a bank account

4

which will receive and send fiat currency to users who purchase/redeem
tethers directly with us.

Similarly, in announcing a new banking relationship on November 1, 2018, Tether again
represented that "USDT in the market are fully backed by US dollars that are safely deposited in
our bank accounts."

Respondents also made similar representations in blog posts, interviews, and even public
court filings. For example, in April 2017, in a federal lawsuit filed by Tether Limited, iFinex
and Bitfinex, the companies alleged that "Tether is a digital token and each tether unit issued into
circulation is backed one-to-one by the U.S. Dollar, i.e., customer dollars held by Tether."
*iFinex v. Wells Fargo*, Case No. 3:17-cv-01882 (N.D. Cal. Apr. 5, 2017).

**3.    The Tether Reserves: USDt Was Not At All Times Fully Backed by U.S. Dollars
Held In the Tether Bank Accounts**

In contrast to Respondents' statements, Respondents did not at all times hold sufficient
fiat reserves in the Tether Bank Accounts to back USDt tokens in circulation for the substantial
majority of the Relevant Period. Indeed, for the time period of September 2, 2016 through
November 1, 2018, the aggregate amount of fiat currency held by Tether in the Tether Bank
Accounts was less than the corresponding USDt tokens in circulation on 573 of 791 days,
meaning that, contrary to Respondents' representations, the Tether Reserves were "fully-backed"
by fiat currency reserves held in the Tether Bank Accounts only 27.6% of the time. Instead, at
various times, Tether maintained some of the Tether Reserves in bank accounts other than the
Tether Bank Accounts. Tether represents that, at times, it also included receivables and non-fiat
assets among its counted reserves; and further represents that Tether has not failed to satisfy a
redemption request for tether tokens.

Beginning on or around May 5, 2017, Respondents began depositing some of their cash
holdings, including funds comprising the Tether Reserves, in an account at Bank 1 titled in the
name of the individual serving as Tether's General Counsel, In Trust for Tether Limited (the
"GC Trust Account"). Beginning on or around June 2, 2017, some of the Tether Reserves were
held in Bitfinex's bank accounts and comingled with Bitfinex operational and customer funds,
amounting to approximately $382 million by September 14, 2017. On September 15, 2017,
Respondent Tether International opened an account in its name. On that same day, Bitfinex
transferred $382,064,782 in reserve funds from one of its bank accounts to Tether International's
newly-opened bank account.

During this same period, the number of tether tokens in circulation grew by at least a
hundred million month-to-month: on June 1, 2017, there were at least 109,844,263 tether tokens
in circulation; by July 1, 2017, there were at least 214,852,881 tethers in circulation; by August
1, 2017, there were at least 319,398,873 tether tokens in circulation; and, by September 15, 2017,
there were at least 442,481,760 tether tokens in circulation. During this same time, the amount
held in the GC Trust Account never exceeded $61.5 million.

At various times during the Relevant Period, Respondents relied upon unregulated
entities and certain third-parties to hold some of their funds, including Tether Reserves, and for a

period of time commingled Tether Reserves with funds belonging to Bitfinex and/or Bitfinex customers.  In aggregate, during the Relevant Period Tether and Bitfinex's assets included funds held by or received from third-parties pursuant to at least 51 different arrangements, only 22 of which were documented through loan agreements, trust agreements, or other formal contracts.

On or about October 2017, Respondents opened an account with an unlicensed money transmitting business (the "Payment Processor") registered in Panama.  Bitfinex had opened accounts with the same Payment Processor beginning in or around 2014.  In aggregate, Respondents and Bitfinex had at least twelve accounts with Payment Processor (the "PP Accounts").  The PP Accounts held funds received from customers, including those in the U.S., in connection with tether tokens issuances and funds related to Bitfinex customer transactions. Beginning in August 2018, the PP Accounts also held funds comprising part of the Tether Reserves.  Respondents had no written agreements governing the Payment Processor's handling of the PP Accounts, and Respondents did not receive or have access to all periodic account statements issued by the Payment Processor, but instead maintained an internal ledger of the funds they believed were being held in those accounts.

From at least October 2017 through November 1, 2018, Respondents and Bitfinex directed customers to deposit funds by wiring them to the Payment Processor.  In the first quarter of 2018, for example, customers deposited more than $480 million into the PP Accounts.  By April 2018, media reports began to emerge that authorities seized approximately $371 million in funds held by Payment Processor.  At or around the same time, Bitfinex encountered increasing difficulties withdrawing funds from the PP Accounts.  Internally, Respondent and Bitfinex's CFO characterized the situation as a "liquidity crisis."  Nevertheless, Bitfinex continued to rely upon the Payment Processor to hold funds, and by July 2018, the CFO told PP "over 80% of our money is now with you."  At that time, the PP Accounts held in excess of one billion dollars.  In August 2018, the CFO informed the Payment Processor "we have too much money with you and almost nothing elsewhere."

Respondents transferred funds between Tether and Bitfinex to assist Bitfinex in responding to this "liquidity crisis."  For example, in November 2018, Respondents transferred $625 million from Respondents' bank accounts—funds comprising the Tether Reserves—to Bitfinex to provide Bitfinex with liquidity it needed, unrelated to USDt.[3]  To "offset" this transfer, Bitfinex directed PSP to make a ledger entry reflecting a transfer of $625 million from Bitfinex to Tether.  On November 2, 2018, a similar set of transactions occurred.  At this time, Respondents' and Bitfinex's funds held by the Payment Processor were at least encumbered, but more likely wholly unavailable.  Subsequently, Tether Limited and iFinex entered into a Credit Facility Agreement, finalized in March 2019, that retroactively formalized the November 2018 transfer of $625 million, among others. Respondents represent that in January 2021, iFinex repaid the loan in full.

Beginning in or before August 2018, Tether Reserves were held in non-fiat financial products and other less-liquid assets including commercial paper, and bank repurchase

---

[3] Respondents and Bitfinex shared common ownership, leadership, management, employees and operational resources.  For example, the same individuals at Tether and Bitfinex serve as Chief Executive Office, Chief Financial Officer, Chief Technology Officer and General Counsel, respectively.  They have also shared common business functions including marketing, audit, legal, compliance, finance, tech and support resources.

agreements. At various times during the Relevant Period, Respondents also considered anticipated receivables and anticipated wire transfers as assets for purposes of calculating the Tether Reserves.

On February 25, 2019, Respondents amended their disclosures to state that "Tether Tokens are 100% backed by Tether's Reserves," defined as "traditional currency and cash equivalents and, from time to time, may include other assets and receivables from loans made by Tether to third parties, which may include affiliated entities."

### 4.    The Tether Reserves Were Not Audited

No audit of the Tether Reserves occurred during or prior to the Relevant Period. Respondents retained independent third-parties to conduct reviews of the Tether Reserves twice during the Relevant Period. First, in 2017, Respondents retained an accounting firm to perform a review of the Tether Reserves, as reported on the Tether Transparency Page, against fiat currency held in Tether's name on a single date, September 15, 2017, a date selected by Respondents and known to their principals ahead of the accounting firm's review. On that date, with the full knowledge of Respondents, Bitfinex transferred $382,064,782 from Bitfinex's bank accounts to Tether's newly-opened bank account. Second, in 2018, Respondents retained a law firm to compare Tether's holdings in two bank accounts to the USDt in circulation as of June 1, 2018, based on the information provided by Respondents or publicly available on the blockchain. Thereafter, on October 15, 2018, Respondents released a statement claiming that the firm "based on a random date balance inspection and a full review of relevant documentation of bank accounts, confirmed that all tether tokens in circulation as of that date were indeed fully backed by USD reserves." In 2018, Tether stated publicly that professional audits were not obtainable at that time. To date, Respondents have not completed an audit of the Tether Reserves.

### 5.    Respondents Failed to Employ an Automated Process to Track Reserves

Tether did not accurately track reserves at all times during the Relevant Period. In particular, at least until 2018, Respondents did not employ an automated method for tracking Tether Reserves against tether tokens in circulation in real time. Respondents developed an additional internal, proprietary database (the "Tether Database") after the 2017 Tether Hack. The Tether Database stores data regarding tether token issuances and redemptions, as well as transaction information for customers' deposits and withdrawals. For much of the Relevant Period, there was no automated process for incorporating bank statements and balances into the Tether Database, and information regarding the amount of fiat currency held in Respondents' accounts as Tether Reserves had to be manually inputted into the Tether Database. Further, at least until 2018, Respondent's internal accounting system for tracking fiat balances, including bank balances for USDt reserves, primarily consisted of a spreadsheet (the "Reserve Spreadsheet"). The Tether executive team was ultimately responsible for the Reserve Spreadsheet. The Reserve Spreadsheet required manual updates and was not always kept up to date in real time. Respondents were aware of the limitations of the Reserve Spreadsheet. For example, in an internal chat on June 15, 2016, Tether's then-Chief Strategy Officer informed Respondents' CFO and other employees stated that the: "transparency page needs to be dealt with ASAP . . . I am surprised the issuance address is not updated dynamically, btw . . . and how often does the bank balance get updated?" Following the Relevant Period, Respondents have

implemented more automated processes for tracking and updating bank balances and reporting information about the Tether Reserves on the Tether Transparency Page.

## III.     LEGAL DISCUSSION

### A.     USDt is a Commodity in Interstate Commerce

Digital assets such as bitcoin, ether, litecoin, and tether tokens are commodities. As defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018), commodities, with limited exceptions, includes all manner of "other goods and articles . . . and all services, rights and interests . . . in which contracts for future delivery are presently or in the future dealt in." *See Bd. of Trade of City of Chicago v. SEC*, 677 F. 2d 1137, 1142 (7th Cir. 1982) ("This language was also meant to encompass futures markets that were expected to be expanded to cover non-traditional goods and services . . .") *vacated on other grounds*, 459 U.S. 1026 (1982). Digital assets are commodities and subject to applicable provisions of the Act and Regulations, including Section 6(c)(1) of the Act and Regulation 180.1(a). *See, e.g.*, *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a commodity . . . . They fall well-within the common definition of 'commodity' as well as the [Act's] definition of 'commodities' as 'all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in.'"); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495–98 (D. Mass. 2018) (denying motion to dismiss; determining that a non-bitcoin virtual currency is a "commodity" under the Act); *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order) ("bitcoin and other virtual currencies are encompassed in the definition [of Section 1a(9) of the Act] and properly defined as commodities."). The USDt token, a virtual currency stablecoin, is a commodity and subject to applicable provisions of the Act and Regulations.

The Act broadly defines the terms "interstate commerce" and "in interstate commerce." *See* Sections 1a(30) of the Act (defining "interstate commerce") and 2(b) of the Act (providing that, for purposes of the Act, a transaction is "in interstate commerce" if the traded item is part of the current of commerce "from one State" to another), 7 U.S.C. §§ 1a(30), 2(b) (2018). Section 1a(13) of Act defines the term "contract of sale" to include sales, agreements of sale, and agreements to sell. 7 U.S.C. § 1a(13) (2018). Digital assets, like USDt tokens, constitute a commodity in interstate commerce under Section 6(c)(1) of the Act. *McDonnell*, 332 F.Supp.3d at 717, 723 (holding Section 6(c)(1) and Regulation 180.1(a) were violated by fraudulent misrepresentations in connection with digital asset transactions, as those digital assets were commodities in interstate commerce).

### B.     By Intentionally or Recklessly Making Untrue or Misleading Statements and Omissions of Material Facts, Tether Violated Section 6(c)(1) of the Act and Regulation 180.1(a)(2)

Taken together, Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020), prohibit "intentionally or recklessly … mak[ing] any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading" in connection with any swap, or contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any

8

registered entity.  Respondents violated Section 6(c)(1) and Regulation 180.1(a)(2) by intentionally or recklessly making untrue or misleading statements of material facts and by omitting to state material facts necessary in order to make statements made not untrue or misleading.  Those untrue or misleading statements and omissions included: repeated representations that Tether would fully back the USDt token with fiat currency, specifically, the US Dollar, in accounts held in Tether's own name; omissions regarding the actual backing of USDt including non-fiat assets, such as commercial paper; representations that Tether would undergo regular professional audits; and omissions regarding the pre-disclosed timing of one of the two reviews that Tether did undertake.

## IV.    FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, Tether violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation § 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020).

## V.    OFFER OF SETTLEMENT

Respondents have submitted the Offer in which they, without admitting or denying the findings and conclusions herein:

A.    Acknowledge service of this Order;

B.    Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.    Waive:

  1.    The filing and service of a complaint and notice of hearing;

  2.    A hearing;

  3.    All post-hearing procedures;

  4.    Judicial review by any court;

  5.    Any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

  6.    Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018), and 28 U.S.C. § 2412 (2018), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this proceeding;

  7.    Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered

sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this proceeding; and

8.    Any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief, including this Order.

D.    Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer;

E.    Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.    Makes findings by the Commission that Respondents violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation § 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020);

2.    Orders Respondents to cease and desist from violating Section 6(c)(1) of the Ac, and Regulation § 180.1(a)(2);

3.    Orders Respondents to pay, jointly and severally, a civil monetary penalty in the amount of $41 million dollars ($41,000,000), plus any post-judgment interest if the civil monetary penalty is not paid within ten days of the date of entry of this Order; and

4.    Orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VI of this Order.

F.    Represent that Tether has engaged in remediation efforts, including but not limited to: since May 2019 Tether has been segregating operational funds from the Tether Reserves and will continue to do so; and in 2019 Tether implemented more automated processes for tracking and updating bank balances and reporting information about the Tether Reserves on the Tether Transparency Page.

Upon consideration, the Commission has determined to accept the Offer.

## VI.    ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

1.    Respondents and their successors and assigns shall cease and desist from violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2020).

2.    Respondents shall pay, jointly and severally, a civil monetary penalty in the amount of $41 million dollars ($41,000,000) (the "CMP Obligation"), within ten days of the date of the entry of this Order.  If the CMP Obligation is not paid in full within ten days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using

the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2018).

Respondents shall pay the CMP Obligation and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> CFTC
> c/o ESC/AMK326; RM 265
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment is to be made by electronic funds transfer, Respondents shall contact Marie Thorne or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondents and the name and docket number of this proceeding. The paying Respondent(s) shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

3.    Respondents and their successors and assigns shall comply with the following conditions set forth in the Offer:

  1.    Public Statements: Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents': (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

  2.    Cooperation, in General: Respondents shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement, in this action, and in any current or future Commission investigation or action related thereto. Respondents shall also cooperate with the Commission in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

11

3.     Partial Satisfaction:  Respondents understand and agree that any acceptance by the Commission of any partial payment of Respondent's CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

4.     Change of Address/Phone: Until such time as Respondents satisfy in full their CMP Obligation as set forth in this Consent Order, Respondents shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten calendar days of the change.

5.     Until such time as Respondents satisfy in full their CMP Obligation, upon the commencement by or against Respondents of insolvency, receivership, or bankruptcy proceedings or any other proceedings for the settlement of Respondents' debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership, bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Legal Division
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street N.W.
Washington, DC 20581

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated:  October 15, 2021

12