# EXHIBIT 4
# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Tether and Bitfinex Crypto Asset Litigation | No. 19 Civ. 9236 (KPF) |

## DECLARATION OF GIANCARLO DEVASINI IN SUPPORT OF THE B/T DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Giancarlo Devasini, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Chief Financial Officer ("CFO") of Bitfinex and the Chairman of Tether. During the period from March 31, 2017 through February 25, 2019, which I understand to be the relevant period in this litigation (the "Relevant Period"), I was the CFO of both Bitfinex and Tether. In my capacity as CFO of Bitfinex and Tether, I had primary responsibility for managing the finances of both businesses and have personal knowledge of their operations and finances during that time.

2. I submit this declaration based on my personal knowledge in support of the B/T Defendants' Opposition to Plaintiffs' Motion for Class Certification. Unless specified otherwise, my declaration addresses the Relevant Period.

**I.    Bitfinex, Tether, and the USDT Stablecoin**

3. Bitfinex is a crypto exchange that permits customers to deposit and trade both crypto-assets and fiat currencies. Tether issues the USDT stablecoin, among other stablecoins.

During the Relevant Period, both businesses were under common management with, in addition to my serving as CFO, Ludovicus Jan van der Velde serving as Chief Executive Officer, Paolo Ardoino serving as Chief Technology Officer (for most of that time), and Stuart Hoegner serving as General Counsel.

4. During the Relevant Period, Bitfinex permitted customers to maintain U.S. dollar account balances and to trade U.S. dollars for crypto-assets like bitcoin. Customers deposited U.S. dollars to their Bitfinex accounts by wiring or transferring those funds to one of Bitfinex's bank accounts. Because crypto-assets are held in wallets on the blockchain rather than in bank accounts, customers deposited crypto-assets like bitcoin to their Bitfinex accounts via a blockchain transfer to the deposit address that Bitfinex had assigned to the customer. Bitfinex then swept the deposited crypto-assets to its wallets for secure storage.

5. Bitfinex (like other crypto exchanges) held customers' fiat currency in its bank accounts and their crypto-assets in its wallets on the blockchain, and it tracked customers' deposits, withdrawals, transactions, and account balances via an internal ledger. When customers traded on the exchange, the assets did not physically change hands and the movements were instead tracked via ledger entries. For example, if Customer A purchased one bitcoin from Customer B for $500, Bitfinex would on its ledger (*i*) credit Customer A's account with one bitcoin and debit the bitcoin from Customer B's account and (*ii*) debit $500 from Customer A's account and credit Customer B's account with $500. All the while, the bitcoin would remain in Bitfinex's wallets and the U.S. dollars would remain in Bitfinex's bank accounts.

6. Until November 27, 2018, USDT was not traded on the Bitfinex exchange. Bitfinex used USDT as a "transport layer" that allowed customers to send the digital equivalent of a U.S. dollar to and from the Bitfinex exchange without the expense, inconvenience, and delay

of wire transfers. Accordingly, although USDT was not traded on the Bitfinex exchange and customers could not hold any USDT in their Bitfinex accounts, they could use USDT for deposits and withdrawals.

7. When a customer deposited USDT to the exchange, Bitfinex automatically converted the USDT to U.S. dollars at a one-to-one exchange rate and credited the U.S. dollars to the customer's account. Bitfinex's internal ledger credited the customer's account with the U.S. dollars, allocated an equivalent amount of Bitfinex's existing U.S. dollar holdings to the customer's account, and recorded that the initial deposit to Bitfinex prior to the conversion had been in the form of USDT. Customers were not assessed fees for this conversion. Bitfinex retained the USDT that had been deposited to the exchange in its wallets as its own proprietary funds. By this process, each deposit of USDT was a sale of that USDT to Bitfinex at a price of $1 per USDT token.

8. As an example, if Customer A sent 100 USDT to Bitfinex, Bitfinex would take that 100 USDT, allocate $100 in Bitfinex's bank accounts to Customer A, and credit $100 to Customer A's U.S. dollar account balance. In this example, Customer A sold 100 USDT to Bitfinex for $100.

9. Bitfinex also permitted customers to withdraw their U.S. dollar account balances either (*i*) in the form of U.S. dollars or (*ii*) in the form of USDT, following an automatic conversion of the U.S. dollars to USDT at the one-to-one exchange ratio. When a customer chose to withdraw a U.S. dollar balance in the form of USDT following an automatic conversion of U.S. dollars to USDT, Bitfinex transferred the USDT from its hot wallet to a blockchain address specified by the customer, less fees. Bitfinex's internal ledger debited the U.S. dollars from the customer's account, reduced the allocation of Bitfinex's existing U.S. dollar holdings to

3

the customer's account, and recorded that the withdrawal following the conversion was in the form of USDT. By this process, each withdrawal of U.S. dollars in the form of USDT was a purchase of that USDT from Bitfinex at a price of $1 per USDT token.

10. As an example, if Customer A withdrew $100 in the form of USDT, Bitfinex would send 100 USDT to Customer A, reduce the allocation to Customer A of U.S. dollars held in its bank accounts by $100, and debit $100 from Customer A's U.S. dollar account balance. In this example, Customer A purchased 100 USDT from Bitfinex for $100.

11. In order to accommodate customers' deposits and withdrawals of U.S. dollars and USDT during this time, Bitfinex held a supply of USDT in its wallets and U.S. dollars in its bank accounts. Bitfinex tracked in real time the amount of USDT in its wallets, and these amounts were recorded by and can still be viewed on the blockchain. Bitfinex also monitored customer withdrawals and deposits of USDT, and as Bitfinex's on-hand USDT began to be depleted, Bitfinex would often replenish its supply by buying more USDT from Tether.

12. On November 27, 2018, Bitfinex introduced USDT/USD trading pairs, meaning that customers could trade USDT for U.S. dollars and vice versa, and customers were allowed to hold USDT balances in their accounts. This change meant that when customers deposited USDT to their Bitfinex accounts, Bitfinex no longer automatically converted the USDT to U.S. dollars, and instead simply credited their account balance with the USDT. Similarly, customers could no longer choose to withdraw their U.S. dollar account balances in the form of USDT. Instead, customers with a U.S. dollar balance who wanted to acquire USDT could trade for it on the exchange using the USDT/USD trading pairs.

**II.     Credit Lines on the Bitfinex Exchange**

13.     During the Relevant Period, Bitfinex extended credit lines to a limited number of customers. Because Bitfinex did not support USDT account balances prior to November 27, 2018, Bitfinex did not extend any USDT credit lines prior to that date.

14.     Bitfinex extended credit lines by crediting the asset in question in a customer's "exchange wallet" while simultaneously accruing a corresponding negative balance for that asset in the customer's "credit line wallet." The funds that Bitfinex lent to customers by crediting them in the customer's exchange wallet were Bitfinex's own proprietary funds, and Bitfinex did not lend out any funds that it did not itself own or that it had obtained on credit.

15.     Customers primarily used credit lines in order to permit them to begin trading during the short period of time after they had initiated a deposit of fiat currency or crypto-assets to their Bitfinex accounts but before Bitfinex had received the funds or assets. For example, customers at times used credit lines while an incoming wire transfer of U.S. dollars was being processed, which can take several days, especially if the wire is initiated during or shortly before a weekend or banking holiday.

16.     Bitfinex required the credit lines that it extended to be overcollateralized by assets already held in the customers' Bitfinex accounts. In other words, customers had to hold more assets in their Bitfinex accounts than the value of the credit line. For example, a 120% collateral requirement meant that a customer would have to have $120 worth of other assets in their account for every $100 worth of credit they were issued.

17.     As protection for Bitfinex, the assets acting as collateral could not be removed from the Bitfinex exchange. It was therefore impossible for customers to use a credit line to withdraw more assets from the exchange than they already held in their accounts. In fact, the overcollateralization requirement meant that a customer with a credit line could withdraw less

5

from their account than they would have been able to without the credit line. For example, a customer with $120 in their account and no credit line could withdraw the full $120; if that customer was issued a credit line of $100 (with a 120% collateral requirement), the $120 in collateral had to remain on the exchange, and the customer could withdraw only $100.

**III.    Margin Trading and Margin Funding on the Bitfinex Exchange**

18.     Although the term "margin trading" often refers to an investor borrowing funds from a broker in order to purchase securities, margin trading on the Bitfinex exchange did not involve any loans of any kind from Bitfinex. Instead, all margin trading was conducted through Bitfinex's peer-to-peer margin funding platform, which enabled Bitfinex customers to borrow assets from other Bitfinex customers subject to certain conditions and payment of interest. Bitfinex itself did not lend funds to customers via the peer-to-peer platform at any time during the Relevant Period. Bitfinex generated revenue from maintaining the platform for its customers by charging a fee (a percentage of the interest paid by the borrowers) when customers used the platform.

19.     Margin trades are simply purchases or sales using borrowed funds, and Bitfinex permitted its customers to open either "long" or "short" margin trading positions. A "long position" involved borrowing funds in order to purchase an asset in the hopes that the price of the asset rises by the time the borrower sells the asset to close the position and repay the lender. A "short position" involved borrowing and then selling an asset in the hopes that the price of the asset falls by the time the borrower repurchases the asset to close the position and repay the lender.

20.     The peer-to-peer margin funding platform did not permit Bitfinex customers to withdraw from the exchange any funds that they did not already own. Bitfinex customers who borrowed funds through the peer-to-peer margin funding platform were not able to withdraw the

6

borrowed funds from the exchange, or to use them for any purpose other than opening a margin trading position. Once the borrower opened a margin trading position, it also could not withdraw the assets it acquired in exchange for the borrowed funds while the position was open. On the other end, the lender could not withdraw assets that were lent through the peer-to-peer margin funding platform.

## IV. Bitfinex's Accounting and Financial Practices

21.     During the Relevant Period, Bitfinex's "PowerBoard" system was used to track Bitfinex's assets and liabilities, customer assets, and amounts owed by Bitfinex to Tether in real time. PowerBoard is a user interface, or dashboard, that aggregates and displays data from various sources, but it is not itself a repository of information and cannot be used after the fact to generate a historical record. The data that PowerBoard aggregated and displayed permitted me to confirm in real time that Bitfinex always held sufficient U.S. dollars, excluding customer funds, to pay the amounts owed to Tether for USDT issuances. PowerBoard also permitted me to confirm in real time that Bitfinex's U.S. dollar holdings always exceeded its customers' U.S. dollar account balances.

22.     Bitfinex did not produce formal financial statements reporting assets and liabilities during the Relevant Period. At times, various members of my team entered certain financial information into spreadsheets in response to a request by a third party or when they believed it would be useful on an ad hoc basis. However, I relied on the data aggregated by PowerBoard, not spreadsheets, in my capacity as Bitfinex's CFO, and it was the data aggregated by PowerBoard that was used to run Bitfinex. I have reviewed spreadsheets that were produced in this litigation that contain incomplete or inaccurate data, including because the spreadsheet was still in draft form or because the team member who generated the spreadsheet was missing key information.

7

23. One of the sources that PowerBoard drew from was a database that Bitfinex created, which we generally referred to simply as the "Database." Among other things, Bitfinex used the Database to generate and maintain a record of each of the hundreds of millions of deposits, withdrawals, and transactions on the exchange. The Database automatically generated a ledger entry with a unique identification number after every such operation on the exchange and tracked the ownership of every asset deposited on Bitfinex and the balance of every account. The Database also generated ledger entries in connection with the extension and repayment of credit lines.

24. It is this Database that permitted Bitfinex to produce the full account records, including comprehensive credit line records, for the individual who I understand is known in this litigation as the Anonymous Trader, as well as other trading records requested by Plaintiffs.

25. Because money is fungible, Bitfinex considered its aggregate U.S. dollar holdings across its bank accounts in confirming that Bitfinex always held sufficient U.S. dollars, excluding customer funds, to pay the amounts owed to Tether for USDT issuances. For example, when Bitfinex was unable to immediately pay Tether for USDT issuances between May and September 2017 after both companies lost access to U.S. correspondent banking for their bank accounts in Taiwan, I confirmed in real time that Bitfinex always had sufficient U.S. dollars across all of its bank accounts (net of customer assets) to pay Tether. Bitfinex ultimately paid Tether in full using its Noble Bank account on September 15, 2017, the same day that Noble Bank opened an account for Tether that could accept the payment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:     April 30th , 2025

_____
Giancarlo Devasini