**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re Tether and Bitfinex Crypto Asset Litigation |

Case No. 19-cv-9236 (KPF)

**PLAINTIFFS' AMENDED MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS COUNSEL**

SELENDY GAY PLLC
1290 Sixth Avenue
New York, NY 10104

SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND ................................................................................................. 3

    A.    Defendants Represented That USDT Is Backed One-To-One by US Dollars ................................................................................................. 3

    B.    Defendants Debased USDT by Issuing it Without One-To-One Backing ............. 4

    C.    Defendants Used Debased USDT to Inflate Cryptocommodity Prices ................ 10

    D.    Experts Analyses Confirm Defendants' Inflationary Scheme .............................. 13

ARGUMENT ....................................................................................................... 17

I.    THE PROPOSED CLASS SATISFIES RULE 23(A) ................................... 17

    A.    The Class and Futures Sub-Class Are Ascertainable ............................................ 17

    B.    The Class and Futures Sub-Class Are Sufficiently Numerous .............................. 18

    C.    There Are Multiple Common Questions of Law and Fact ..................................... 19

    D.    Named Plaintiffs Bring Typical Claims ................................................................. 20

    E.    Named Plaintiffs Will Fairly and Adequately Represent the Class and Futures Sub-Class ............................................................................................... 21

II.    THE PROPOSED CLASS SATISFIES RULE 23(B)(3) ............................... 22

    A.    Common Legal and Factual Questions Predominate .......................................... 22

        1.    Plaintiffs' CEA Claims Present Predominantly Common Questions ........ 24

        2.    Common Questions Predominate as to Plaintiffs' Antitrust Claims ......... 35

    B.    A Class Action Is Superior to the Alternatives ..................................................... 42

III.    THE COURT SHOULD APPOINT SELENDY GAY AND SCHNEIDER WALLACE AS CO-LEAD COUNSEL ......................................................... 43

CONCLUSION .................................................................................................... 44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Actos Antitrust Litig.*,
  2024 WL 4251891 (S.D.N.Y. Aug. 9, 2024) ............................................................19, 23, 37

*In re Actos Antitrust Litig.*,
  2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024) ...............................................................18, 19

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............................................................24, 37, 38

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ...................................................................... *passim*

*Audet v. Fraser*,
  332 F.R.D. 53 (D. Conn. 2019) ..........................................................................18

*Blessing v. Sirius XM Radio Inc.*,
  2011 WL 1194707 (S.D.N.Y. Mar. 29, 2011) .........................................................36

*In re Buspirone Pat. Litig.*,
  210 F.R.D. 43 (S.D.N.Y. 2002) ..........................................................................38

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*,
  403 F. Supp. 3d 191 (S.D.N.Y. 2019) ..................................................................37

*City of Philadelphia v. Bank of Am. Corp.*,
  2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023) ........................................................23, 40, 41

*Clifford v. TRON Found.*,
  2020 WL 3577923 (S.D.N.Y. June 30, 2020) ........................................................43

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ..............................................................................35, 38

*Damassia v. Duane Reade, Inc.*,
  250 F.R.D. 152 (S.D.N.Y. 2008) ........................................................................22

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015) .......................................................................19, 36, 41

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ..........................................................................21

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ...................................................................41

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009)...........................................................................................37, 41

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)........................................................................................................20

*Hart v. Rick's Cabaret Int'l, Inc.*,
   60 F. Supp. 3d 447 (S.D.N.Y. 2014).........................................................................................42

*Iowa Pub. Emps. Ret. Sys. v. Bank of Am.*,
   2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) .................................................................... *passim*

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
   2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017) ..........................................................................43

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   244 F.R.D. 469 (N.D. Ill. 2007)................................................................................................35

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
   897 F.3d 88 (2d Cir. 2018)........................................................................................................17

*Martinek v. AmTrust Fin. Servs., Inc.*,
   2022 WL 326320 (S.D.N.Y. Feb. 3, 2022)..................................................................... *passim*

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   328 F.R.D. 86 (S.D.N.Y. 2018) ...............................................................................................21

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015).........................................................................................36

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) .......................................................................................24, 36

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ...............................................................................20, 42, 43

*In re Nat. Gas Commodities Litig.*,
   231 F.R.D. 171 (S.D.N.Y. 2005) ...............................................................................23, 35, 43

*New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988).....................................................................................................41

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)................................................................................................17, 23

*In re Platinum & Palladium Commodities Litig.*,
    2014 WL 3500655 (S.D.N.Y. July 15, 2014) ................................................................ *passim*

*Ploss v. Kraft Foods Grp.*,
    431 F. Supp. 3d 1003 (N.D. Ill. 2020) ..............................................................35, 39

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)................................................................22, 41, 42

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)................................................................21

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ................................................................20, 42

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d. Cir. 2015)................................................................19

*In re Term Commodities Futures Litig.*,
    2022 WL 485005 (S.D.N.Y. Feb. 17, 2022)................................................................21

*In re Tether & Bitfinex Crypto Asset Litig.*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021)................................................................24, 33

*In re Tether and Bitfinex Crypto Asset Litig. ("Tether II")*,
    2024 WL 3520363 (S.D.N.Y. July 24, 2024) ................................................................ *passim*

*In re Tether Holdings Ltd.*,
    CFTC No. 22-04, 2021 WL 8322874 (Oct. 15, 2021)................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................17, 19

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ................................................................19

*Williams v. KuCoin*,
    2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021) ................................................................17, 43

*Williams v. KuCoin*,
    2022 WL 392404 (S.D.N.Y. Feb. 9, 2022)................................................................43, 44

**Statutes**

17 C.F.R. § 180.1(a)(1)................................................................24

7 U.S.C. § 1 et seq................................................................ *passim*

15 U.S.C. §§ 1, 2................................................................3, 43

Fed. R. Civ. P. 23 ................................................................................................................ *passim*

## PRELIMINARY STATEMENT

Documents and testimony summarized in the post-discovery Second Amended Complaint (ECF No. 556, "SAC"), and expert evidence discussed in the attached expert reports, confirm that from March 31, 2017 through February 25, 2019 (the "Class Period"), Defendants[1] manipulated the prices of cryptocommodities and cryptocommodity futures. Defendants did this by debasing USDT, a "stablecoin" that they controlled, and pumping vast quantities of it into the crypto-economy to be traded for cryptocommodities. This scheme harmed numerous investors who bought those assets at prices artificially inflated by Defendants' conduct.

To resolve these investors' claims based on common factual and expert evidence of Defendants' manipulations, Plaintiffs ask the Court to certify the following class (the "Class") pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons or entities that purchased or otherwise acquired cryptocommodities (Bitcoin, Bitcoin cash, ethereum, ethereum classic, litecoin, monero, dash and ZCash) or cryptocommodity Futures, in the United States or its territories at any time from March 31, 2017 through February 25, 2019.

Plaintiffs also ask the Court to certify the following sub-class (the "Futures Sub-Class"):

> All persons or entities that purchased or otherwise acquired cryptocommodity futures in the United States or its territories at any time from March 31, 2017 through February 25, 2019.[2]

---

[1] iFinex Inc., BFXNA Inc., BFXWW Inc. (collectively, "Bitfinex"), Tether Holdings Limited, Tether Operations Limited, Tether Limited, Tether International Limited (collectively, "Tether"), DigFinex Inc., Philip G. Potter, Giancarlo Devasini, and Ludovicus Jan van der Velde.

[2] The Class and the Futures Sub-Class exclude any person or entity whose purchases of cryptocommodities or cryptocommodity futures were exclusively through Bitfinex. They also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and the Anonymous Trader. They also exclude the Judge presiding over this action, her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

Plaintiffs finally ask the Court to appoint Selendy Gay PLLC and Schneider Wallace Cottrell Konecky LLP as Co-Lead Class and Sub-Class Counsel, pursuant to Rule 23(g).

Defendants cannot seriously contest that they repeatedly lied to the market about USDT's reserves. While it promised that it would "always" hold one US dollar for every USDT that it issued, Tether chronically issued unbacked USDT, as Ken Malek,[3] a Certified Public Accountant and president of Malek Capital Advisors LLC, will show through a forensic analysis of Defendants' financial records. Tether routinely issued millions of USDT in exchange for receivables from its sister company, Bitfinex—that is, for promises that Defendants would pay themselves at some uncertain point in the future—not for US dollars at the time of issuance. Defendants then misled the market with public statements implying that Tether had full and accessible reserves of US dollars, when in fact it held hundreds of millions in receivables, lacked access to traditional banks for months, and later swapped portions of its cash reserves for inaccessible funds in a shadow bank that had been seized by foreign governments.

Defendants intentionally used this debased USDT to inflate cryptocommodity prices. Defendants flooded the market with debased USDT through the so-called "Anonymous Trader," ███ ███████████, who operated automated trading software (the "AT Bot"). The AT Bot was programmed to (1) identify cryptocommodity price differences across crypto-exchanges; (2) promptly withdraw USDT from Bitfinex; and (3) use it to buy cryptocommodities on other exchanges. Defendants funneled USDT to the AT Bot, which automatically traded it for cryptocommodities without further human intervention. The AT Bot could not have made these trades

---

[3] Ex. 1 to January 10, 2025 Declaration of Andrew R. Dunlap in Support of Plaintiffs' Motion for Class Certification (Expert Report of Ken Malek ("Malek Report"), Jan. 10, 2025). References to "Ex." in this memorandum correspond to exhibits to the Dunlap Declaration.

unless Defendants affirmatively issued and provided it with USDT. As Dr. David DeRamus,[4] an economist and founding partner of Bates White, will show, because Defendants created a repeated price premium on Bitfinex by permitting its largest customers to trade on credit and margin, the AT Bot's trades overwhelmingly moved debased USDT from Bitfinex to other exchanges, where the bot traded it for cryptocommodities, inflating cryptocommodity prices.

Plaintiffs' claims are ripe for class-wide resolution because they focus on Defendants' conduct. For Plaintiffs' Commodities Exchange Act ("<u>CEA</u>") claim, the central question is whether Defendants engaged in a manipulative scheme that inflated cryptocommodity futures prices. For their Sherman Act claims, the central questions are whether Defendants manipulated cryptocommodity prices in violation of the antitrust laws and whether Defendants conspired with the Anonymous Trader to artificially inflate those prices. As courts consistently find, the answers turn on proof common to the class, and DeRamus sets forth a common methodology for determining each Class and Futures Sub-Class member's damages by comparing the prices they paid for their cryptocommodities or futures to the prices they would have paid but for Defendants' conduct.

The Court should grant Plaintiffs' motion.

## <u>BACKGROUND</u>

### A.    Defendants Represented That USDT Is Backed One-To-One by US Dollars

USDT is a stablecoin. Unlike most crypto-assets, stablecoins are meant to maintain a stable price, pegged to an asset like fiat currency or gold. DeRamus Report ¶ 40. USDT's purported value depended on it being backed one-to-one by US dollars.

During the Class Period, Defendants represented to the market that USDT was (1) "always" backed; (2) "one-to-one;" (3) by "USD;" (4) held "by … Tether Limited." When Tether

---

[4] Ex. A to January 22, 2025 Letter with Amended Class Certification Filings (Amended Expert Report of Dr. David DeRamus ("<u>DeRamus Report</u>"), Jan. 22, 2025).

launched USDT in 2013, it promised that "[e]ach [USDT] issued into circulation is backed in a one-to-one ratio (i.e. one Tether USDT is one US dollar) by the corresponding fiat currency unit held in deposit by … Tether Limited." Ex. 36 ("Tether Whitepaper") at 4; Ex. 6 (Potter Tr. Excerpt) 128:2-129:22. It said that USDT "is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve." *Id*. at 9. Tether then represented that "[e]very Tether is *always* backed 1-to-1, by traditional currency held in [Tether's] reserves. So 1 USDT is always equivalent to 1 USD." *Tether*, Tether (Feb. 19, 2019) (emphasis added), https://perma.cc/B663-LR72); *see also* Ex. 3 (Hoegner Individual Tr. Excerpt) 292:12-293:10.

On this basis, Tether told the market that USDT "will not face any market risks such as Black Swan events, liquidity crunches, etc [*sic*] as reserves are maintained in a one-to-one ratio rather than relying on market forces." Tether Whitepaper at 4. The prevailing market perception during the Class Period thus was that all new USDT was bought with, and fully backed by, actual US dollars held by Tether in its own accounts. SAC ¶¶ 2, 7, 13, 143, 239; DeRamus Report §§ IV(A), VII(A)(5). Investors thus believed that inflows of new USDT into the market represented organic demand for cryptocommodities. SAC ¶¶ 2, 124, 128, 131-133, 135-136, 140, 143; DeRamus Report § VII(A)(5).

### B.    Defendants Debased USDT by Issuing it Without One-To-One Backing

Contrary to Defendants' representations, Tether issued hundreds of millions of USDT without receiving or holding equivalent amounts of US dollars in its own accounts. By Defendants' own definition, USDT was not fully backed by US dollars—it was debased. *See* Ex. 3 289:18-290:15; 292:12-293:10.

The debasement began on March 31, 2017, when Wells Fargo stopped providing Tether with correspondent banking services; a few weeks later, Tether's banks in Taiwan stopped

accepting wire transfers. SAC ¶¶ 169, 171; *see also Announcement*, tether.to (Apr. 22, 2017), https://perma.cc/AW3W-TJZK. Tether called these actions "an existential threat to [Defendants'] businesses." SAC ¶ 170. Because Tether had promised to issue USDT only when it received US dollars, *see id.* ¶¶ 123-124, it should not have been able to issue any new USDT.

Defendants issued new USDT anyway, using undisclosed related-party transactions with Tether's sister company Bitfinex, a crypto-asset exchange. From May 23, 2017 to September 14, 2017, Tether issued approximately 356.8 million USDT to Bitfinex in exchange for "receivables" of $356.8 million. *Id.* ¶¶ 180-182; ECF No. 566, BT Answer ¶ 181; Malek Report ¶¶ 16, 74-75; DeRamus Report § IV. Defendants never disclosed that Tether issued these USDT without receiving an equivalent number of US dollars in return or that its reserves included related-company IOUs instead of the actual US dollars that Tether had promised. SAC ¶ 239.

To conceal this debasement, Defendants hired an audit firm, Friedman LLP, to publish a "Transparency Update" attesting that, as of 8 p.m. Eastern Time on September 15, 2017, Tether's account at Noble Bank in Puerto Rico held $382 million. *Id.* ¶¶ 185-187; *see* Ex. 34 (Hoegner Tether 30(b)(6) 72:23-78:7. In reality, Defendants had opened that account for Tether on the same day, and had transferred $382 million into it from a Bitfinex account at Noble just hours before the auditors attested that Tether had the funds. SAC ¶¶ 185-187.[5] Defendants did not disclose that Tether had lacked sufficient US dollars to back all issued USDT for months or that the source of Tether's new funds was a Bitfinex account that comingled Bitfinex's operating capital with funds

---

[5] *See also* Ex. 4 (Noble-Tether-SDNY-Cub-Subpoena 0202400); Ex. 5 (Noble-Tether-SDNY-Cub-Subpoena 0202402) (showing that on September 15, 2017, B/T Defendants authorized Noble to move funds from Bitfinex's account to Tether's bank accounts to settle the receivables); Ex. 6 375:4-376:25 ("A. . . . [Friedman] did their first attestation after we closed the receivable. And once we had the Tether account open, they were, you know, party to all of that in the sense that they were aware and they were, you know, in the tent, under the kimono with us.").

belonging to Bitfinex customers. *Id.* ¶¶ 169-176, 184-185; Ex. 34 83:5-85:4; Malek Report ¶¶ 16, 38, 39, 94.[6]

In 2018, Defendants further debased USDT as part of a secret bailout of Bitfinex, then teetering on the brink of insolvency. Bitfinex depended on Crypto Capital, a Panamanian payment processor, to receive and hold incoming wire transfers, SAC ¶¶ 208, 210-212, 218-220;[7] Crypto Capital held approximately $1 billion of comingled Bitfinex customer and corporate funds, *id.* ¶ 218. Starting in April 2018, foreign governments began seizing hundreds of millions of dollars' worth of funds held at Crypto Capital, preventing it from transferring those funds to its customers, including Bitfinex. *Id.* ¶¶ 221-224.[8] By August 2018, Giancarlo Devasini, the CFO of both Bitfinex and Tether, said that Bitfinex faced a "liquidity crisis" as it was "seeing massive withdrawals and we are not able to face them anymore unless we can transfer some money out of" Crypto Capital. *Id.* ¶¶ 225-227; Ex. 14 (BITFINEX_TETHER_0475883) at 892, 897.

---

[6]  *See e.g.*, Ex. 7 (BITFINEX_TETHER_0309533) at 33-34, 40; Ex. 8 (BITFINEX_TETHER_1063137); Ex. 9 (BITFINEX_TETHER_1030043) at 47-48; Ex. 10 (FLLP_T_0009676). *See also* Ex. 11 (Hoegner Bitfinex 30(b)(6) Tr. Excerpt) 171:6-20 ("Q. And does that mean that some of the funds in Bitfinex's Noble account included customer funds? A. Well, to the extent that – to the extent that Noble needed to transfer over under the pool agreement funds, allow the release of funds that it had already deposited to Noble, that was in satisfaction of amounts that had been allocated to other customers. So, I mean, I guess those are – those are customer funds, or due to customers."); *see also* Ex. 12 (Devasini Tr. Excerpt) 75:23-76:21.

[7] Samuel Haig, *Bitfinex Cries Fraud as Crypto Capital Executive Indicted by US*, COINTELEGRAPH (Oct. 30, 2019), https://cointelegraph.com/news/bitfinex-cries-fraud-as-crypto-capital-executive-indicted-by-us; Marie Huillet, *Unconfirmed: Polish Prosecutors Seize €400 mln Amid Allegations Bitfinex Is Implicated In Fraud*, COINTELEGRAPH (Apr. 7, 2018), https://cointelegraph.com/news/unconfirmed-polish-prosecutors-seize-400-mln-amid-allegations-bitfinex-is-implicated-in-fraud; Ex 12 274:16-275:8; Ex. 13 (BITFINEX_TETHER_0409099) at 21 (Van der Velde to Devasini: "hope the polish [*sic*] mess will not blow up in our face, I mean . . . is every bank that runs into shit now a 'bitfinex bank'?").

[8] *See supra* note 7.

Amid this crisis, Defendants had Tether issue hundreds of millions of new USDT to Bitfinex in exchange for receivables—more promises that Defendants would pay themselves in the future. *See* Malek Report ¶¶ 16, 76-83; Ex. 15 (BITFINEX_TETHER_0271723); Ex. 16 (BITFINEX_TETHER_0271725); Ex. 12 91:6-93:4; *see also* Ex. 3 64:19-66:10. These receivables were especially problematic because they consisted of Bitfinex's inaccessible holdings at Crypto Capital. SAC ¶¶ 228-229; Malek Report ¶¶ 70, 76; *see also* Ex. 11 187:11-189:5. These issuances gave Bitfinex USDT that it could transfer to its customers. But it left Tether with hundreds of millions of USDT backed by inaccessible funds seized by foreign authorities. SAC ¶¶ 221-223, 228-229, 233; Malek Report ¶¶ 70, 76. Bitfinex effectively offloaded its liquidity crisis to Tether. SAC ¶ 248; Malek Report ¶¶ 47, 70, 76.

Defendants concealed this debasement too. They did not disclose that Bitfinex's assets were impaired or that Tether's "reserves" included receivables backed by inaccessible funds. *Id.* Instead, on October 7, 2018, they published "A Response to Recent Online Rumours," falsely assuring customers that Bitfinex was "not insolvent" and that "both fiat and cryptocurrency withdrawals are functioning as normal." *A Response to Recent Online Rumours*, Bitfinex (Oct. 7, 2018), https://blog.bitfinex.com/announcements/response-to-online-rumours/ (last visited Jan. 9, 2025). In reality, Defendants had not been able to withdraw any funds from Crypto Capital in over a month. SAC ¶¶ 231, 233, 236.[9] This was not enough to calm the market; on October 15, 2018 USDT began to trade below its $1 peg. SAC ¶¶ 234-235, 239; DeRamus Report ¶ 294.

---

[9] *See also* Ex. 14 at 909 (Devasini: "when do you expect to be able to send out the pending payments? the situation is getting unbearable on our side. . . . since one month we didn't get anything, last Tethers we got was on sept 6th.").

Defendants again shuffled funds to create the false impression that USDT was fully backed. They first destroyed (or "burned") 500 million USDT that they knew neither Tether nor Bitfinex had sufficient US dollars to cover. SAC ¶ 239; DeRamus Report ¶ 209 n.448; Ex. 17 (BIT-FINEX_TETHER_0144587); Ex. 18 (Ludovicus Jan Van der Velde ("JVL") Tr. Excerpt) 90:21-93:15; Ex. 11 212:12-214:3. They then published a letter from Deltec bank stating that Tether had $1.8 billion in its Deltec accounts. SAC ¶¶ 240-242 (that number included non-dollar assets such as bonds, commercial paper, and Bitfinex receivables). The next day, Defendants began secretly swapping Tether's cash reserves at Deltec for Bitfinex's inaccessible funds at Crypto Capital—and they deemed those inaccessible Crypto Capital funds to be part of Tether's purportedly liquid "reserves." Ex. 18 90:17-93:15; *see also* Malek Report ¶¶ 70, 80. Defendants ultimately swapped as much as $625 million of Tether's accessible US dollars for inaccessible funds at Crypto Capital. Malek Report ¶¶ 80, 83.

Through these actions, Defendants debased USDT. As a purported stablecoin, USDT was supposed to have no credit risk, because all USDT investors were supposedly able to redeem their USDT for US dollars at any time. As a basic economic matter, however, receivables are not US dollars—they carry a credit risk that they will not be paid in full or on time. *See* DeRamus Report ¶ 154. Receivables from Bitfinex carried an elevated credit risk because Bitfinex allowed customers to trade on margin (*i.e.*, borrow money to trade) with collateral as low as 15%, *see* ECF No. 566, BT Answer ¶ 181; Malek Report ¶¶ 16, 75, 92, 93; SAC ¶ 318; and gave its biggest customers massive credit lines without requiring collateral or charging interest, SAC ¶ 313; De-Ramus Report ¶¶ 220-234.[10] If those customers' losses exceeded the value of any assets in their

---

[10] *See also* Ex. 19 (Ardoino Bitfinex 30(b)(6) Tr. Excerpt) 255:17-24; Ex. 12 116:16–121:25, 209:16-24; Ex. 6 319:2-20; Ex. 20 (BITFINEX_TETHER_0547982); Ex. 19 118:5-15 ("Q. Did

accounts, Bitfinex bore the loss. Ex. 6 319:2-321:21; 328:2-335:25. The risk that Bitfinex would suffer such losses increased the risk that it would not have sufficient funds to cover the receivables pledged to Tether. *See, e.g.*, Ex. 6 at 326:24-327:7. Bitfinex receivables backed by funds in Crypto Capital accounts seized by foreign governments carried a still higher credit risk, because Bitfinex could not access them, further hamstringing its ability to cover its pledges to Tether. SAC ¶¶ 221-223, 229-234; Malek Report ¶¶ 16, 76, 83. Had Defendants disclosed these credit risks, the market would have understood that one USDT was not equal to one US dollar, and priced USDT accordingly. DeRamus Report ¶¶ 154-155, 291-297.

Bitfinex cannot prove that it held enough US dollars (net of customer funds and its own operating costs) to fully pay the receivables that it owed Tether during the Class Period. Bitfinex did not keep those funds in a separate account. Malek Report § IV(C). It rather maintained so-called "omnibus" accounts, in which it comingled amounts that it owed to Tether, amounts that it owed to Bitfinex's own customers, and its own operating capital. Ex. 12 209:16-24. Defendants concede they do not have and cannot reconstruct balance sheets showing that Bitfinex held funds sufficient (net of customer funds and operating costs) to pay all amounts that Bitfinex owed Tether.[11] Devasini claimed that he tracked this information by hand, in a paper notebook, which he destroyed after Plaintiffs brought this litigation. SAC ¶ 202; Ex. 12 52:23-53:15.

_____

Bitfinex charge any fees or interest for these credit lines? A. No. . . . A. Bitfinex provided these credit lines free of charge to all the traders that Bitfinex decided to provide the credit lines to.").

[11] *See* Ex. 21 (B/T Defendants' Letter to Plaintiff, dated October 13, 2023) at 3 ("Multiple witnesses have clearly testified that they carefully monitored Bitfinex bank balances and that Bitfinex's balances, net of customer assets, were always sufficient for any purchase of USDT from Tether. . . . . It is no surprise, therefore, that Bitfinex promptly and fully paid every amount owed to Tether in connection with those purchases. Based on the deposition testimony, any attempt in this litigation to retroactively link specific accounts or assets to specific payables would not only be impossible as a practical matter, but wholly artificial and counterfactual."). Ex. 12 42:2-7 ("I personally took note on my notebook of the amount that Bitfinex owed to Tether"); 52:23-53:15.

## C.    Defendants Used Debased USDT to Inflate Cryptocommodity Prices

Misrepresenting USDT's backing and concealing its debasement was only part of Defendants' scheme. Defendants injected massive amounts of this debased USDT into the crypto-economy via the Anonymous Trader. They knew that the Trader used the AT Bot to execute trades automatically, without human action. SAC ¶¶ 268-274, 307, 309; ███████████████ ██████ They knew that the AT Bot generally ███████████████████████ ████████████. And they knew that the AT Bot conducted a cross-exchange arbitrage strategy, withdrawing USDT from Bitfinex and using it to buy cryptocommodities on other exchanges. Ex. 19 162:18-163:2; 172:14-176:11.

Once Defendants fed USDT to the AT Bot, it automatically placed trades that pumped debased USDT into the crypto-economy. SAC ¶¶ 296-297, 307. Although the Anonymous Trader paid no US dollars to Bitfinex or Tether, Defendants gave the AT Bot ██████ USDT, allowing it to place huge numbers of trades, SAC ¶¶ 269, 279, 304-307; 344; ██████████; DeRamus Report ¶¶ 21, 78-97, 249-262—███████████████████████████████████ ██

Defendants went to great lengths to facilitate the AT Bot's operation. They gave the Anonymous Trader ███████████████████████████████████ ███████████████████████████████████████████████ ██; Ex. 23 (AT Dep., Exhibit 6 (BITFINEX_TETHER_1017968)); Ex. 24 (AT Dep. Exhibit 7 ((BITFINEX_TETHER_0575872)).[12] ███████████████████████████████

---

[12] *See also* Ex. 24 at -5951 (AT: "ETH balance is low. Please fill extra for the night." Ardoino: "eth done"); Ex. 32 (BITFINEX_TETHER_1019002) (Defendants discussing the Trader's trading of "ltc" and "eth"); Ex. 33 (BITFINEX_TETHER_0579698) (Ardoino to Trader: "doing ██████████." Trader replies: "I will withdraw half of it instantly, we might need more").



████████████████████.[13] Bitfinex also gave ██████████ "greenlane" trading limits, exempting the AT Bot from cumbersome verifications when it withdrew USDT. *Id.* ¶¶ 9, 271; *see also* Ex. 19 138:19-142:21. Defendants told the Anonymous Trader in advance when USDT would be issued. DeRamus Report ¶ 85. ████████████████████

████████████████████████████; ████████████████████

██████; Ex. 25 (AT Dep. Exhibit 2 (BITFINEX_TETHER_0574502)). ████████████

████████████████████████████; █████████████;

Ex. 25. ████████████████████████

████████████████████████████

██████████; Ex. 26 (AT Dep. Exhibit 3 (BITFINEX_TETHER_1070498)).

The AT Bot automatically sprang into action as soon as it detected the same crypto asset trading at different prices on different exchanges. SAC ¶¶ 268-269, 305, 307; ████████████

██████████████; Ex. 19 162:18-163:2; 172:14-176:11. Because there was a repeated price premium on Bitfinex relative to other exchanges, DeRamus Report ¶¶ 317-321, the AT Bot's "arbitrage" was primarily in one direction, moving debased USDT from Bitfinex to other exchanges, raising Bitcoin prices on those other exchanges, *id.* ¶¶ 92-97, 256; Ex. 19 162:18-163:2; 172:14-176:11. Defendants engineered Bitfinex's price premium by allowing Bitfinex's largest customers to trade on credit lines and on margin, backed in part by debased USDT. *See* DeRamus Report ¶¶21-22, 220-222, 234, 262; SAC ¶¶ 282, 313, 318.[14] The AT Bot purchased Bitcoin and other cryptocommodities on other exchanges with USDT, sold them on Bitfinex for US dollars,

---

[13] *See also* Ex. 19 104:2-5 (█████████████████████████

████████████████████████████.").

[14] *See also* Ex. 19 111:22-112:16 (Bitfinex extended Bitcoin Cash credit line to the Trader).

withdrew those US dollars from Bitfinex as USDT, and did so ████████ times. SAC ¶¶ 269, 284-285; DeRamus Report ¶¶ 78-79; 84-97.

This inflated cryptocommodity prices. *See* DeRamus Report ¶¶ 286-290, 298-310; *infra* Background Section D. ███████████████████████████████████████████████████████

███████████████████████████████; DeRamus Report ¶¶ 249-255. ███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████; DeRamus Report ¶¶ 286-288.

Defendants knew and intended that their scheme would artificially inflate cryptocommodity prices. They said so explicitly. Devasini directly asked the Anonymous Trader: "[C]an you please push the [Bitcoin] price above 10k again?" The Trader responded: "Sure no problem, just issue me some [USDT]." SAC ¶ 335; Ex. 23 at 968; DeRamus Report Figure 6. In an October 2018 chat, similarly, Devasini begged Crypto Capital to send Defendants money to meet USDT redemption requests: "please understand all this could be extremely dangerous for everybody, the entire crypto community. [Bitcoin] could tank to below 1k if we don't act quickly." SAC ¶¶ 365-366; Ex. 14 at 915. That is: Defendants knew that if the market learned that Tether could not honor USDT redemption requests because Defendants had been lying about its reserves, cryptocommodity prices would "tank."

Defendants benefitted from their scheme. When the AT Bot pumped debased USDT into the crypto-economy, it created "network effects" for USDT, encouraging broader use of USDT and increasing the adoption of USDT. Ex. 6 80:19-81:24. The more widely that USDT was adopted, the more that Defendants benefitted from increased dollars in their bank accounts, drawing interest. *See* DeRamus Report ¶ 42 n.67. Bitfinex, meanwhile, earned fees for an increased

number of crypto transactions, both by the AT Bot and by momentum traders drawn in by rising prices. *Id.* ¶¶ 263-264, 289-290. Defendants also held long positions in cryptocommodities, which increased in market value because of the artificial price inflation that Defendants had caused. SAC ¶ 388; Ex. 12 19:15-20:25; *see also* DeRamus Report ¶ 236 n.508. The scheme also inflated the market value of cryptocommodities held by Defendants' co-conspirator, the Anonymous Trader.

### D.    Experts Analyses Confirm Defendants' Inflationary Scheme

Expert analysis will confirm Defendants' chronic practice of issuing debased USDT throughout the Class Period. Malek will analyze publicly available data to quantify Tether's total issuances of USDT during the Class Period, *see* Malek Report § III.A, Exhibit 1, and compare them to Tether's banking and internal accounting records and to Defendants' Interrogatory responses. *See id.* § IV.A. This will confirm Tether's debasement: (1) between May 23, 2017 and September 14, 2017, Tether issued 356.8 million USDT to Bitfinex in exchange for receivables; (2) in August and September 2018, Tether issued 300 million USDT to Bitfinex in exchange for receivables backed by inaccessible funds held at Crypto Capital, and transferred $100 million of its accessible cash reserves to Bitfinex in exchange for $100 million of inaccessible funds; and (3) between November 2018 and February 2019, Tether issued another 150 million USDT to Bitfinex in exchange for receivables backed by inaccessible Crypto Capital funds, and transferred another $525 million of its accessible cash reserves to Bitfinex in exchange for $525 million of such inaccessible funds. *See id.* ¶¶ 67-84.

Malek will also show that Tether issued USDT on 281 occasions during the Class Period but received US dollars in its reserve accounts prior to issuance only 12 times. Malek Report ¶¶ 15, 64. Of the 4.19 billion USDT that Tether issued during the Class Period, it received equivalent US dollars prior to issuance for only 0.14 billion of those issuances, just 3.3%. *Id.*

DeRamus's independent analysis will confirm that USDT was debased throughout the Class Period. *See* DeRamus Report § IV. DeRamus estimates the amount of debased USDT throughout the Class Period by looking at Tether's USDT issuances in return for Bitfinex "receivables" and at Tether's issuances of USDT to Bitfinex that were sent to and then circulated in the market by the AT Bot. *See id.* § IV-V. His analysis confirms that USDT was persistently debased throughout the Class Period by at least 20%. *See id.* ¶¶ 19, 148.

Expert analysis will also confirm that Defendants could and did artificially inflate the prices of cryptocommodity and cryptocommodities futures. DeRamus will use a widely-accepted econometric regression model to calculate how changes in the volume of outstanding USDT affected Bitcoin prices during the Class Period. *Id.* ¶¶ 325-334. His model finds a positive, statistically significant relationship between the two. *Id.* ¶ 334. Controlling for other variables, DeRamus finds that a 10% increase in the volume of USDT in circulation resulted in an increase of approximately 3% in Bitcoin prices. *Id.* He will use several sensitivity analyses and robustness checks to confirm the reliability of those results. *Id.* ¶¶ 346-350.

DeRamus will further show that the artificial inflation caused by Defendants' scheme persisted throughout the Class Period. He will use a short-run dynamic econometric model to account for temporary differences in the long-run relationship between outstanding USDT and Bitcoin prices. *Id.* ¶¶ 335-338. This model's dynamic captures how past USDT issuances influence Bitcoin prices, showing that the effect of debased USDT issuances persists for some period of time, just as an increase in the money supply has a persistent impact on inflation. *See id.* To estimate this persistence, DeRamus will use a well-accepted econometric error-correction model. *See id.* DeRamus's error-correction model shows that increasing outstanding USDT by 10% increases the price of Bitcoin by approximately 3.5%. *See id.* ¶ 338.

14

DeRamus's damages methodology builds on these econometric models to calculate the "overcharge percentage"—the percentage by which Bitcoin prices were artificially inflated—on any given day. DeRamus first determines the "but-for" USDT issuance—the amount of USDT that would have been outstanding but for Defendants' practice of issuing debased USDT—by subtracting the amount of debased USDT from the total actual amount of outstanding USDT on that day.[15] The econometric model uses the resulting number to determine the "but-for" price of Bitcoin on that day—the price that would have prevailed but for the Defendants' issuance of debased USDT. *See id.* ¶¶ 361-365. It then calculates the overcharge percentage for that day by dividing the difference between the actual Bitcoin price and the but-for Bitcoin price by the actual Bitcoin price. *See id.* ¶ 366. DeRamus's damages methodology can thus show the specific amounts by which Class members' purchases were inflated through Defendants' scheme by applying that inflation rate to their trades. *Id.* ¶¶ 30, 370. To demonstrate his methodology, DeRamus calculates the overcharge for each of the named Plaintiffs' Bitcoin purchases during the Class Period. *Id.* ¶ 379.[16]

DeRamus also offers a damages methodology for the Futures Sub-Class to calculate the overcharge on trading of Bitcoin futures contracts during the Class Period. He explains that the price of a futures contract is a function of the price of the underlying asset (*i.e.*, Bitcoin or another cryptocommodity), and he identifies an accepted formula for determining the prices of futures

---

[15] DeRamus explains that if, for example, 20% of the outstanding USDT were not backed by US dollar deposits in Tether reserves, then the outstanding USDT in the but-for world would have been 80% of the amount of outstanding USDT that was observed in the marketplace on that given day. DeRamus Report ¶ 363.

[16] For illustrative purposes, if, as DeRamus found, at least 20% of outstanding USDT was debased throughout the Class Period, then the resulting Bitcoin overcharge was 7.2% using his long-run econometric model, and 6.7% using his error correction model, on average. DeRamus Report ¶¶ 367-368. His model can calculate overcharges based on any debasement percentage that the jury might find. *Id.* ¶¶ 148, 357, 360.

contract. *Id.* ¶¶ 371-372. Using that formula, his model maps the but-for price of Bitcoin onto the price of a Bitcoin futures contract, arriving at the but-for price of Bitcoin futures. *Id.* ¶¶ 373-374. It then calculates the overcharge impact on the Bitcoin futures. *Id*. This methodology can thus calculate the amounts by which Defendants' scheme impacted Futures Sub-Class members' purchases of futures contracts. *Id*. To show this methodology, DeRamus calculates the overcharge on the named Plaintiffs' Bitcoin futures purchases during the Class Period. *Id.* ¶ 380.

DeRamus also examines empirical evidence that confirms that Defendants inflated Bitcoin prices via the AT Bot. *See id.* § VII(B). Using a correlation analysis, he will compare Bitcoin prices during periods in which Tether issued debased USDT to Bitcoin prices in selected control periods with no new USDT issuances. *Id.* ¶¶ 300-310. This shows that Bitcoin prices increased after all 132 new USDT issuances during the Class Period, *id.* ¶¶ 308-310, while prices in the control periods did not, *id*. These price increases were reflected in the futures market. *Id.* ¶¶ 371-372.

While DeRamus focuses on Bitcoin prices in his current report, he explains that he can use the same analyses, models, and methodologies to show the relationship between the volume of outstanding USDT and the prices of other cryptocommodities, and to determine the overcharges for Class members' purchases of other cryptocommodities and cryptocommodity futures. *See id.* ¶¶ 351-354, 376. Because the prices of all cryptocommodities were highly correlated during the Class Period, he expects that the effect of Defendants' scheme on other cryptocommodities will be like its effect on Bitcoin. *Id.* ¶¶ 39, 351-354. To show this, he analyzes the cryptocommodity Ethereum, finding that its prices track Bitcoin prices very closely. *Id.* ¶ 351. He also provides a prototype for an Ethereum-specific model, which demonstrates that Defendants' scheme similarly impacted the price of Ethereum during the Class Period. *Id.* ¶ 352 n.698.

## ARGUMENT

## I.    THE PROPOSED CLASS SATISFIES RULE 23(A)

A class must satisfy Rule 23's implied requirement of "ascertainability," *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017), and Rule 23(a)'s requirements of "numerosity," "commonality," "typicality," and "adequacy," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). The Class and Futures Sub-Class meet all these requirements.

### A.    The Class and Futures Sub-Class Are Ascertainable

Rule 23's implicit ascertainability requirement "commands that the proposed class be defined using objective criteria that establish a membership with definite boundaries." *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022) (Failla, J) (citations and quotations omitted). The Class and Futures Sub-Class meet that requirement: They are defined by investors' purchases of specific cryptocommodities or cryptocommodity Futures in the United States in a specific timeframe, SAC ¶¶ 394-395, criteria that are "clearly objective," *id.* at *8 (citing *In re Petrobras Sec.*, 862 F.3d at 269) (finding ascertainability for class of investors who bought "particular securities, on particular public markets, during a particular time period").

Identifying Class and Futures Sub-Class members will be administratively feasible, as they can identify their purchases in sworn statements in response to public notice. *Williams v. KuCoin*, 2021 WL 5316013, at *14 (S.D.N.Y. Oct. 21, 2021) (finding ascertainability for class of investors who could "self-identify themselves in response to a public notice"); *see also Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 91 n.2 (2d Cir. 2018) ("[W]e see no ascertainability problem with having the class members submit sworn affidavits describing the circumstances under which the purchases were made."). Class members can also provide trading records, emailed trade confirmations, proof of wallet ownership, and other objective proof of their purchases. *See, e.g., Audet v. Fraser*, 332 F.R.D. 53, 73 (D. Conn. 2019) (accepting "(1) confirmatory emails from

[m]iners; (2) records confirming transfers of Bitcoin from outside exchanges to [m]iners; and/or (3) credit card records" to establish membership in a class); *In re Actos Antitrust Litig.*, 2024 WL 4345568, at *9 (S.D.N.Y. Sept. 30, 2024) (certifying class where "data is available to identify class members, whose membership can be confirmed through a claim form that includes an affidavit.").

**B.    The Class and Futures Sub-Class Are Sufficiently Numerous**

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts in this Circuit presume numerosity at 40 putative class members," *Martínek*, 2022 WL 326320 at *5 (citation omitted), but Plaintiffs "need not provide a precise quantification of their class, since a court may make common sense assumptions to support a finding of numerosity," *id.* (citation omitted).

The Class and Futures Sub-Class here easily satisfy Rule 23(a)(1). The Class consists of all persons or entities that purchased or otherwise acquired cryptocommodities or cryptocommodity futures in the United States or its territories at any time from March 31, 2017 through February 25, 2019. The Futures Sub-Class consists of all persons or entities that purchased or otherwise acquired cryptocommodity futures in the United States or its territories at any time from March 31, 2017 through February 25, 2019. SAC ¶¶ 394-395. During the Class Period, the trading volume of US dollar- and USDT-based transactions for Bitcoin alone was 514 billion—with between 1 million and 9 million purchases and sales of Bitcoin on crypto-exchanges each month—and the monthly trading volume of Bitcoin futures during the Class Period ranged from over $1.5 billion to over $5 billion on just the Chicago Board Options Exchange and the Chicago Mercantile Exchange. *See* DeRamus Report ¶¶ 38, 77, 134. The enormous volume of Bitcoin and Bitcoin futures in circulation—just one of the assets at issue—and the high frequency of their trading, shows that the Class and Futures Sub-Class are sufficiently numerous to make joinder impracticable. *See Martínek*, 2022 WL 326320, at *5 (finding numerosity based on large volume shares of

outstanding stock and frequent trading during class period); *Wallace v. IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014) (finding numerosity based on large number of outstanding shares alone).

### C.    There Are Multiple Common Questions of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that class members have "suffered the same injury." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 (2d. Cir. 2015) (quoting *Dukes*, 564 U.S. at 350). The class members' claims "must depend upon a common contention" about defendants' conduct, such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "'Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *In re Actos Antitrust Litig.*, 2024 WL 4251891, at *15 (S.D.N.Y. Aug. 9, 2024) (citing *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 137 (2d Cir. 2015)), *report and recommendation adopted*, 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024). Commonality may be satisfied by even "a single common question," *Dukes*, 564 U.S. at 359 (cleaned up).[17]

Plaintiffs readily satisfy Rule 23(a)(2). Common factual questions include: (1) whether Tether's issuances of USDT were backed "one-to-one" by US dollars; (2) whether Defendants facilitated trades of debased USDT through the AT Bot; (3) whether those trades artificially increased the price of cryptocommodities; and (4) whether the Class was injured as a result. Common legal questions include: (1) for Plaintiffs' CEA claim, whether Defendants' conduct was a manipulative device or price manipulation under the CEA; (2) for their Section 2 claim, whether

---

[17] Where, as here, plaintiffs invoke Rule 23(b)(3), its "predominance" requirement subsumes Rule 23(a)(2)'s "commonality" requirement. *See Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)). Plaintiffs address predominance *infra* in Section II.

Defendants controlled prices in the cryptocommodities market; and (3) for their Section 1 claim, whether Defendants conspired with the Anonymous Trader. The answers "will be determined on a classwide basis without regard for evidence pertaining to individual class members." *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (finding commonality for CEA and antitrust claims based on "overarching questions" of "whether the [d]efendants manipulated the futures or physical markets for platinum or palladium"); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996) ("Numerous courts have held that allegations concerning the existence, scope and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)."); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 (S.D.N.Y. 1998) ("[A]ll [CEA] class members must initially prove the existence of the same conspiracy; in fact, the existence *vel non* of the alleged conspiracy will likely be the central issue at trial.").

### D.    Named Plaintiffs Bring Typical Claims

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted). "[C]ourts have made clear that the typicality requirement is not demanding." *Martínek*, 2022 WL 326320, at *6 (cleaned up). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936-37 (2d Cir. 1993). Typicality is generally satisfied for CEA and antitrust claims because they depend upon a central conspiracy or scheme. *See, e.g., In re Digital Music Antitrust Litig.*, 321 F.R.D.

64, 87 (S.D.N.Y. 2017) (collecting cases); *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010) (typicality satisfied where class was impacted by "same common course of manipulative conduct").

Rule 23(a)(3) is satisfied here because the named Plaintiffs' and the Class and Sub-Class members' "claim[s] arise[] from the same course of events" and they all pursue the same "legal arguments to prove the defendant's liability." *In re Term Commodities Futures Litig.*, 2022 WL 485005, at *6 (S.D.N.Y. Feb. 17, 2022) (citations and quotations omitted). Specifically, they all bought cryptocommodities or cryptocommodity futures during the Class Period, were all injured by Defendants' inflationary scheme by paying higher prices for cryptocommodities or cryptocommodity futures, and now all pursue the same CEA and antitrust claims. This is more than enough to establish typicality. *See In re Platinum*, 2014 WL 3500655, at *9 (finding typicality for CEA and antitrust claims where "each class member's claims arise out of the same course of events" that "caused artificiality in the relevant markets, affecting participants in those markets similarly").

### E.    Named Plaintiffs Will Fairly and Adequately Represent the Class and Futures Sub-Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy has two components: First, class counsel must be qualified, experienced and generally able to conduct the litigation, and second, the class members must not have interests that are antagonistic to one another." *Martinek*, 2022 WL 326320, at *7 (cleaned up). Courts sometimes address the typicality and adequacy requirements together, *see, e.g.*, *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 91 (S.D.N.Y. 2018), and, even when they do not, "[t]he fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class," *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008).

Rule 23(a)(4) is comfortably met here. First, Class counsel here are experienced in antitrust class actions and crypto-related litigations, SAC ¶ 403, have served as class counsel in many cases, and this Court has found them suitable to represent the interim class, *see* ECF No. 253, 10/13/2022 Tr. at 8. Second, the named Plaintiffs have shown their willingness to prosecute this case by producing documents (including trading records, emails, and text messages) and sitting for depositions. There are no conflicts between the named Plaintiffs and the Class members, who pursue the same claims based on the same allegations. This is more than enough to establish adequacy. *See, e.g.*, *Martinek*, 2022 WL 326320, at *7.

## II.    THE PROPOSED CLASS SATISFIES RULE 23(B)(3)

Rule 23(b)(3) requires Plaintiffs to show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members;" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs show both.

### A.    Common Legal and Factual Questions Predominate

"Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013)). Predominance "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," only that the common issues "*predominate* over any questions affecting only individual [class] members." *In re Petrobras Sec.*, 862 F.3d at 268 (original emphasis and alterations) (citation omitted).

In assessing predominance, a court considers: "'[(1)] the elements of the claims and defenses to be litigated, [(2)] whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief, and [(3)] whether the common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues.'" *Iowa Pub. Emps. Ret. Sys. v. Bank of Am.*, 2024 WL 5004632, at *11 (S.D.N.Y. Dec. 6, 2024) (Failla, J.) (quoting *Scott v. Chipotle Mexican Grill, Inc*., 954 F.3d 502, 512 (2d Cir. 2020)). "[T]he existence of individualized defenses does not compel a finding that individual issues predominate over common ones." *Id.* at *15 (cleaned up).

Courts routinely find predominance in CEA and antitrust cases, as "the entire case … centers on the Defendants' alleged market manipulation." *See, e.g.*, *In re Platinum*, 2014 WL 3500655, at *10; *see also Iowa Pub. Emps. Ret. Sys.*, 2024 WL 5004632, at *19 (finding predominance for antitrust class); *City of Philadelphia v. Bank of Am. Corp.*, 2023 WL 6160534, at *9 (S.D.N.Y. Sept. 21, 2023) ("The predominance requirement is a test readily met in certain cases alleging violations of the antitrust laws.") (cleaned up); *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. at 386 (finding predominance for CEA class); *In re Nat. Gas Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y. 2005) (finding predominance for CEA class as "claims of all class members arise from a common course of conduct by the [d]efendants").

Plaintiffs will prove their claims using classic common evidence—documents and deposition testimony about Defendants' actions and expert analysis of Defendants' documents and market data. *See generally In re Actos Antitrust Litig.*, 2024 WL 4251891, at *19 (evidence to establish the elements of monopolization concerned the defendant's conduct and would "be the same for each putative class member"); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527,

551 (S.D.N.Y. 2021) (proving a violation of antitrust laws focuses on a defendant's conduct and relies on "common evidence [that] generally predominates over individualized evidence"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *48 (E.D.N.Y. Oct. 15, 2014) ("[M]arket analyses have been accepted by courts as a source of common evidence of impact in the past[.]"); *Iowa Pub. Emps. Ret. Sys.*, 2024 WL 5004632, at *12 (finding that an expert model showing class-wide injury was "common evidence").

### 1. Plaintiffs' CEA Claims Present Predominantly Common Questions

#### a. Manipulative Device Theory

Plaintiffs' manipulative device claim requires proof that (1) "Defendants engaged in pro-hibited conduct (*i.e.*, employed a fraudulent scheme; made a material misrepresentation, mislead-ing statement or deceptive omission; or engaged in a business practice that operated as a fraud)"; (2) "with scienter"; (3) "in connection with a contract of sale of a commodity in interstate com-merce." *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 112 (S.D.N.Y. 2021) (quoting *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018)); 17 C.F.R. § 180.1(a)(1). Each element focuses on Defendants' conduct and will be proved with common evidence.

#### i. Prohibited Conduct

Defendants intentionally (1) issued debased USDT; (2) misrepresented that USDT was al-ways backed one-to-one by US dollars held by Tether; and (3) facilitated the circulation of debased USDT using the AT Bot, causing artificial increases in cryptocommodity prices.

**Debased USDT**. There is overwhelming common evidence that Defendants intentionally debased USDT. A comparison of blockchain and banking records from May 23, 2017 to Septem-ber 14, 2017, for example, shows that Tether sent approximately 356.8 million USDT to Bitfinex in exchange for "receivables," not US dollars, violating Defendants' representations about USDT's backing and introducing a major undisclosed credit risk to USDT. *See* Background Part B (citing

24

evidence). Similarly, records show that from August 2018 to February 2019, a period when foreign authorities had seized funds held by Crypto Capital, Tether issued 450 million USDT in exchange for receivables backed by inaccessible funds held at Crypto Capital and swapped another $625 million of its accessible cash reserves for $625 million of those inaccessible funds. Malek Report ¶¶ 16, 70, 76-82; Ex. 17; Ex. 18 90:21-93:15; *see also* DeRamus Report § IV(B). Defendants kept this secret and contrived public statements to create the false impression that Tether had always had sufficient accessible US dollars in its own accounts to cover all USDT in circulation. *See* Background Part B; SAC ¶¶ 185, 187, 240-242.

Expert testimony will show that these incidents, in which Defendants issued more than 800 million debased USDT, were not isolated—they persistently issued debased USDT throughout the Class Period. Malek's analysis confirms that Tether received zero US dollars in exchange for (1) the approximately 356.8 million USDT that Tether issued to Bitfinex between May 23, 2017 and September 14, 2017; (2) the 300 million USDT that Tether issued to Bitfinex between August and September of 2018; and (3) the 150 million USDT issued to Bitfinex between November 2018 and February 2019. *See* Background Part D. His analysis also confirms that Tether further debased USDT by loaning money to Bitfinex from the very accounts that were supposed to hold USDT reserves; Tether loaned as much as $625 million to Bitfinex between August 2018 and February 2019—the same period when Tether issued 450 million USDT without receiving any US dollars in return. *See* Background Part D.[18] Malek's analysis of Defendants' data will also show that Tether issued USDT on 281 occasions during the Class Period but received US dollars in its

---

[18] DeRamus's independent analysis likewise confirms Tether received zero US dollars in exchange for the more than 800 million USDT that Tether issued to Bitfinex in 2017 and 2018, and that Tether debased USDT by loaning $625 million in total to Bitfinex in 2018 and 2019. *See* DeRamus Report § IV(B).

reserve accounts prior to issuing on only 12 of them. Malek Report ¶¶ 15, 64. Of the 4.19 billion USDT that Tether issued during the Class Period, it received equivalent US dollars for only 0.14 billion of those issuances, just 3.3% of the time. *Id.*

**Marketwide Misrepresentations**. Throughout the Class Period, Defendants repeatedly and falsely represented that all issued USDT was backed one-to-one by US dollars held in Tether's bank accounts. *See* Background Parts A & B. Defendants failed to disclose that, in fact, Tether did not always hold US dollars equal to all USDT in circulation or that Tether's purported reserves contained assets other than US dollars. Proof of Defendants' misrepresentations and omissions all relates to Defendants' actions and is therefore common to the class. *In re Platinum*, 2014 WL 3500655, at *10 (predominance satisfied where "the entire case…centers on the [d]efendants' alleged market manipulation"). For example:

- Tether represented that "each [USDT] in circulation represents one US dollar held in our reserves (*i.e.*, a one-to-one ratio) which means the system is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve." Tether Whitepaper at 9. In fact, USDT was not fully reserved according to Defendants' own definition.

- Tether represented that customers could redeem USDT for the equivalent amount of US dollars at any time. Ex. 27 (*In re Tether Holdings Ltd.*, CFTC No. 22-04, 2021 WL 8322874 (Oct. 15, 2021)) at 3. In fact, Tether did not have enough US dollars on hand to redeem all USDT in circulation.

- Tether represented that (1) it "converts cash into digital currency;" (2) "[e]very [USDT] is always backed 1-to-1, by traditional currency held in our reserves[] [s]o 1 USDT is always equivalent to 1 USD;" and (3) "all [USDT] in circulation always match our reserves." *Tether*, Tether (Feb. 19, 2019), https://perma.cc/B663-LR72. All three statements were false.

- Bitfinex stated that "Each Tether is backed 1-to-1 by its corresponding currency, which can be viewed and verified in real-time via the Tether.to website and on the Blockchain. Tether will be fully transparent and audited to demonstrate 100% reserves at all times." *Bitfinex Feature Announcement: Tether*, bitfinex.com, https://blog.bitfinex.com/announcements/bitfinex-feature-announcement-tether/. In fact, Tether was not fully transparent, was never audited, and did not hold 100% reserves at all times.

- On September 5, 2017 Tether dismissed what it called "outlandish conspiracy theories suggesting that Tether [was] not backed 1:1 by currency on deposit with banking institutions" as "unequivocally false." *Tether Update*, (Sept. 5, 2017), https://tether.io/news/tether-update/. In fact, Defendants knew Tether had issued vast quantities of USDT not for "currency on deposit with banking institutions" but for related-party "receivables" from Bitfinex.

In sworn responses to Plaintiffs' interrogatories, Defendants "do not contend that USDT issued by Tether was fully backed one-to-one by US dollars held in accounts controlled by Tether during the [Class Period]."[19] This admission flatly contradicts Tether's repeated representations that "1 USDT is always equivalent to 1 USD," and that "the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in our reserve."[20]

**Circulation of USDT Via the Anonymous Trader's Bot**. Defendants understood that the Trader's central trading strategy for ███ AT Bot was to trade USDT for cryptocommodities across crypto exchanges, capturing the price differences among those exchanges. Common evidence shows that Defendants used the AT Bot to flood the market with debased USDT that it used to purchase cryptocommodities on other exchanges. *See* Background Part C. Record and expert

---

[19] Ex. 28 (B/T Defendants' October 23, 2023 Responses and Objections to Plaintiffs' Interrogatories 16-25) at Response 17.

[20] Tether Whitepaper at 9; *Tether*, Tether (Feb. 19, 2019), https://perma.cc/B663-LR72.

evidence shows that, during the Class Period, Defendants provided nearly ██████ debased USDT to the AT Bot, which executed over ████████ trades swapping USDT for cryptocommodities and vice versa. ████████.[21] Despite this staggering trading volume, Defendants admit that the Anonymous Trader wired no US dollars to Bitfinex or Tether between March 31, 2017 and September 9, 2018. *See* DeRamus Report ¶ 252 n.553.

Common evidence shows that Defendants facilitated the AT Bot's distribution of debased USDT by giving the Anonymous Trader white glove treatment. Defendants testified that ████████ ████████████████████████████████,[22] and gave ████████ "greenlane" trading limits—a security setting that let the AT Bot withdraw USDT and cryptocommodities without cumbersome verifications. Ex. 19 138:19-142:21. Records show that Defendants (1) ████████████████████████████████████;[23] (2) ████████ ████████████████████████████████████████████ ████████;[24] (3) ████████████████████████████████ ████████;[25] (4) ████████████████████████████████ ████████████████████;[26] and (5) ████████████████████████████

---

[21] *See also* DeRamus Report ¶¶ 93-95 (AT Bot accounted for ████ of BTC-USD(T) trading volume on Bitfinex, ████ on Poloniex, and ████ on Bittrex).

[22] Ex. 19 104:2-5 ('██████████████████████████ ████████████████████.").

[23] DeRamus Report Figure 6; Ex. 24 at 6064 ('████ tether incoming").

[24] ████████████████████████████; Ex. 25.

[25] ████████████ Ex. 25.

[26] ████████████████████; Ex. 23; Ex. 24.

████████████████████████████████████████████

████████████████; Ex. 26.

Defendants further facilitated their scheme by giving lines of credit to Bitfinex's customers, including the Trader. This let Bitfinex's customers receive dollars on credit that they could withdraw from Bitfinex as USDT—receiving USDT without providing actual US dollars in exchange. *See* Background Part C. Expert evidence shows that these credit lines also let Bitfinex's customers buy more cryptocommodities on that exchange than they otherwise would have, facilitating a price premium there, and driving the AT Bot's trades to inflate cryptocommodity prices on other exchanges. DeRamus Report ¶¶ 21-22, 234. The scale at which Defendants dumped debased USDT into the market via the AT Bot sent a false signal to the market of a spike in demand for cryptocommodities, artificially increasing their prices. *See infra* Section II(A)(1)(a)(ii).

### ii.  Scienter

Defendants' scienter is particularly susceptible to class-wide proof "[b]ecause [intent] can be shown without reference to the class members included in the action," so "efficiency is greatly served by answering these questions on a class-wide basis." *In re Amaranth*, 269 F.R.D. at 383. Plaintiffs will show Defendants' scienter through common evidence.

*First*, Defendants knew that their representations about Tether's reserves were false. They knew that a "receivable" is not the same as cash—Philip Potter (Bitfinex's and Tether's Chief Strategy Officer during the Class Period) testified that a receivable's value is typically discounted to reflect the risk that it may not be paid. Ex.6 146:9-148:13—but they did not discount Bitfinex receivables or disclose that they were part of Tether's reserves. One can also infer this intent from Defendants' shuffling of funds to make misleading public statements that Tether had always been fully reserved: (1) Friedman's 2017 statement that Tether had $382 million in its accounts—after Bitfinex gave it that money on the same day from a bank comingled with customer funds; and

29

(2) Deltec's 2018 statement that Tether had $1.8 billion in its accounts—after Defendants destroyed 500 million unbacked USDT and just before they issued Bitfinex $675 million in loans and USDT in exchange for inaccessible funds in Bitfinex's Crypto Capital accounts. Malek Report ¶¶ 16, 76-82; Ex. 4; Ex. 5; Ex. 29 (Hoegner Tether 30(b)(6) Dep. Exhibit 506 (Friedman Report)); Ex. 30 (Hoegner Tether 30(b)(6) Dep. Exhibit 502 (Deltec Attestation)).

*Second*, Defendants intentionally used the AT Bot to pump USDT into the crypto-economy. They knew that the AT Bot's primary strategy was to withdraw USDT from Bitfinex and trade it for cryptocommodities on other exchanges; hence they knew that the AT Bot could not trade unless they intentionally fed it USDT. Ex. 19 162:18-163:2; 172:14-176:11. Defendants also knew that the AT Bot would trade automatically, without the Trader's intervention, once they gave it USDT. ███████████. Defendants intentionally fed USDT to the AT Bot, with top Tether and Bitfinex executives expressly approving the issuances and transfers to Bitfinex's hot wallet. Ex. 6 251:24-253:20. Record evidence and expert testimony show numerous instances of the Trader asking Tether and Bitfinex executives for more USDT, Tether issuing new USDT from its treasury wallet to Bitfinex's hot wallet within a few hours, and the AT Bot withdrawing that USDT soon thereafter. DeRamus Report Figure 6. This understanding is also reflected in record communications: In a group chat, for example, Paolo Ardoino (Bitfinex's and Tether's Chief Technology Officer during the Class Period and currently Tether's CEO) told the Trader: "███ tether is incoming," Devasini said: "that will last 2 hrs to ███," and the Trader responded: "At your service," Ex. 24 at 6064—showing Defendants' knowledge of the scheme.

*Third*, Defendants knew and intended that their scheme would artificially inflate cryptocommodity prices to their benefit. In a February 12, 2018 chat with the Trader, Devasini wrote: "[C]an you please push the [Bitcoin] price above 10k again?" The Trader agreed: "Sure no

problem, just issue me more [USDT]." Ex. 23. In a October 2018 chat with Crypto Capital executives, Devasini begged Crypto Capital to process wires: "please understand all this could be extremely dangerous for everybody, the entire crypto community. [Bitcoin] could tank to below 1k if we don't act quickly." Ex. 14 at 915. This shows Defendants' knowledge that if the market learned that they could redeem all outstanding USDT, cryptocommodity prices would plummet.

*Finally*, Defendants had a strong motive to inflate cryptocommodity prices, from which one can further infer their scienter. By placing orders worth ███ of dollars every month, the Trader generated sizeable trading fee income for Bitfinex.[27] DeRamus will show that Defendants profited from their scheme by (1) generating substantial trading fees in connection with the issuance of debased USDT;[28] (2) earning dividends paid by Bitfinex to its shareholders, which included Bitfinex executives and employees; and (3) receiving substantial fees from the Trader's trading on Bitfinex. DeRamus Report ¶¶ 263-265; Ex. 35 (Ardoino Individual Tr. Excerpt) 21-22. The value of Defendants' own holdings of Bitcoin, Ethereum, and other cryptocommodities also increased because of their scheme.[29] Defendants thus had "the motivation to commit the fraud in light of the significant benefits associated with the artificial inflation of cryptocommodity prices." *In re Tether and Bitfinex Crypto Asset Litig. ("Tether II"),* 2024 WL 3520363, at *14 (S.D.N.Y.

---

[27] Devasini told the Trader in July 2017, "you are moving more than ███ a month just with us." Ex. 24 at 5972. He also directed the Trader to "keep arbing with Polo", acknowledging "the only way to arb between Polo and Kraken is by making Bitfinex profit." Ex. 31 (BITFINEX_TETHER_1070542) at 546.

[28] The AT Bot alone generated more than ███ in trading fees for Bitfinex during the Class Period. DeRamus Report ¶ 264.

[29] Defendants held cryptocommodities in their personal accounts. *See, e.g.*, Ex. 12 19:15-20:25 (Devasini "personally purchased" "several" cryptocommodities including "Bitcoin, Ethereum, [and others]" during Class Period and generally held "longer" positions); DeRamus Report ¶ 236 n.508.

July 24, 2024).

### iii.  Sale of Commodities

Plaintiffs will use common evidence to show the impact of Defendants' scheme. *Tether II*, 2024 WL 3520363, at *12 ("[W]here—as here—plaintiffs allege both manipulation and misrepresentation as part of a single scheme, they may satisfy their pleading burden to establish a manipulative device claim by alleging with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants.") (internal citations omitted). Courts regularly accept econometric and statistical model analyses at the Rule 23 stage as reliable methods of showing that an artificial price exists and/or that a defendant caused it. *See, e.g.*, *In re Amaranth*, 269 F.R.D. at 383 (causation elements of a CEA claim "can only be efficiently proven on a class-wide basis by applying various econometric and statistical models").

DeRamus's econometric regression model shows that Defendants' provision of debased USDT via the AT Bot increased Bitcoin prices. DeRamus Report ¶¶ 334, 359-369; *see also* Background Section Part D. It finds that a 10% increase in the volume of USDT in circulation generally resulted in an increase of approximately 3% in Bitcoin prices, DeRamus Report ¶ 334, and can reliably identify the portion of any Bitcoin price increase caused by debased USDT in circulation on any given day, *id.* ¶¶ 359-369. These price increases were reflected in the futures market for cryptocommodities, as the price of a futures contract is a function of the price of the underlying asset. *Id.* ¶¶ 371-372.

DeRamus's correlation analysis confirms that Defendants' provision of debased USDT, as an empirical matter, inflated cryptocommodity prices. He compares Bitcoin prices during periods in which Tether issued USDT to Bitcoin prices in selected control periods when it did not. *Id.* ¶¶ 300-310. This shows that while Bitcoin prices in the control periods did not increase, *id.* ¶¶ 306-310, they did increase after new USDT issuances—including those in which Defendants

issued USDT and provided it to the AT Bot at the Anonymous Trader's request, *id.* ¶ 306; after the AT Bot transferred USDT from Bitfinex to Poloniex or Bittrex within the same hour, *id.* ¶ 307; and after all 132 new USDT issuances during the Class Period, *id.* ¶¶ 308-310. This confirms Defendants' manipulation of cryptocommodity futures prices. *See id.* ¶¶ 371-372.

### b.    Price Manipulation Theory

To prevail on their price manipulation theory, Plaintiffs must prove that (1) Defendants "possessed an ability to influence market prices;" (2) "an artificial price existed;" (3) Defendants "caused the artificial price;" and (4) Defendants "specifically intended to cause the artificial price." *Tether*, 576 F. Supp. 3d at 107 (citation omitted). Common evidence will prove each element.

### i.    Defendants Had the Ability to Influence Market Prices

DeRamus shows that Defendants could influence cryptocommodity prices and, thus, the cryptocommodities futures market. Defendants leveraged USDT's position as the dominant stablecoin and Bitfinex's position as the largest crypto-asset exchange to issue secretly debased USDT, increasing the supply of money in the crypto-economy, and putting upward pressure on cryptocommodity prices. DeRamus Report ¶¶ 124-142, 270-278.[30] These issuances signaled a false demand for Bitcoin to the market, inflating the prices of Bitcoin and other cryptocommodities. *Id.* ¶¶ 279-290.

As discussed, *see supra* Section II(A)(1)(a)(iii), Background Part D, DeRamus's econometric analyses show that increasing the USDT supply and flooding the market with debased USDT increased the price of Bitcoin, and his empirical correlation analysis confirms that Bitcoin

---

[30] The "quantity theory of money" holds that an increase in the money supply puts upward pressure on the price of goods or commodities. DeRamus Report ¶ 270. DeRamus shows that, as an empirical matter, the relationship between USDT and Bitcoin prices closely tracks the quantity theory of money. *See id.* ¶¶ 280-282.

prices increased following new USDT issuances but not in periods without new issuances. DeRamus's analyses are consistent with documents and testimony showing that Defendants issued debased USDT and funneled it to the market through the AT Bot, knowing that doing so would artificially inflate cryptocommodity prices. *See supra* Section II(A)(1)(a)(i)-(ii).

### ii.  Artificial Prices, Caused by Defendants

Plaintiffs will show that Defendants created artificial prices through common expert evidence. Plaintiffs "are required to propose a workable *methodology* for proving these elements before a class action may be certified," *In re Amaranth*, 269 F.R.D. at 383 (original emphasis), but "are not required to successfully employ their proposed methods at the class certification stage," *id.* at 385, only to show that "the proposed methods are sufficiently developed to permit the conclusion that they can be used to demonstrate liability on a class-wide basis," *id.*; *accord Iowa Pub. Emps. Ret. Sys.*, 2024 WL 5004632, at *12.

DeRamus will show that Defendants could and did artificially inflate cryptocommodity prices, and thus the prices of cryptocommodity futures contracts, by issuing debased USDT. DeRamus Report ¶¶ 325-338, 371-372; Background Part D. His econometric model will calculate the amount by which Bitcoin and other cryptocommodities were inflated during the Class Period, and the results of his analyses can be reliably applied to determine the overcharge on trading of Bitcoin futures contracts during the Class Period. Background Part D; DeRamus Report ¶¶ 371-374.

DeRamus's models are methodologically sound and capable of proving class-wide impact, all that is required at the Rule 23 stage. *Iowa Pub. Emps. Ret. Sys.*, 2024 WL 5004632, at *13. Courts routinely accept such models as proof of class-wide impact in granting class certification. *See, e.g.*, *In re Amaranth*, 269 F.R.D. at 386 (rejecting defendants' challenges to plaintiffs' proposed regression models and certifying market manipulation class even where models were "in some respects incomplete"); *In re Nat. Gas Commodities Litig.*, 231 F.R.D. at 180 (certifying class

bringing CEA price manipulation claims, as all class members had claims arising from defendants'

common course of conduct and had to present data and analysis establishing the factual basis for

their claims); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 475 (N.D. Ill. 2007) (granting

class certification and noting "[p]laintiffs allege that defendants' conduct manipulated the price of

[a futures contract] upward to an artificial level, and, thus, each purchaser of [this contract] within

the class period would have paid a higher price than would otherwise be the case absent the alleged

manipulation), *aff'd*, 571 F.3d 672 (7th Cir. 2009); *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993

v. Kraft Foods Grp., Inc.* 431 F. Supp. 3d 1003, 1013-19 (N.D. Ill. 2020) (granting class certifica-

tion after finding the predominance of two common questions, (1) whether defendant engaged in

the manipulation scheme, and (2) whether that scheme inflated futures price in the marketplace).

### iii. Defendants' Intent

Plaintiffs will use the same common evidence to show Defendants' intent to cause artificial

prices that they will use to show their intent to use a manipulative device. *See supra* Sec-

tion II(A)(1)(a)(ii); *see also Tether II*, 2024 WL 3520363, at *14 (noting overlap between price

manipulation and manipulative device theories).

## 2.    Common Questions Predominate as to Plaintiffs' Antitrust Claims

To establish an antitrust claim, a plaintiff must prove (1) a violation of antitrust law; (2) in-

jury and causation; and (3) damages. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502

F.3d 91, 105 (2d Cir. 2007). Plaintiffs' antitrust claims focus on common questions.

### a.    Violation of Section 2

Plaintiffs' Section 2 claim "[is] contingent upon a showing of monopoly power and an

examination of the manner in which such power was acquired or maintained," "questions that are

undoubtedly common to all the members of the putative class." *Meredith Corp. v. SESAC, LLC*,

87 F. Supp. 3d 650, 659 (S.D.N.Y. 2015). Plaintiffs must show "[(1)] the possession of monopoly

power in the relevant market and [(2)] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Tether II*, 2024 WL 3520363, at *17 (quoting *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)).

### i.    Monopoly Power

Plaintiffs will prove "that Defendants, through the issuance of secretly debased USDT, possessed 'the ability to distort ordinary forces of supply and demand,' sufficient to control cryptocommodity prices," *Tether II*, 2024 WL 3520363, at *17 (quoting *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 143 (S.D.N.Y. 2016)), using the same common evidence that will prove their CEA claims, *see supra* Section II.A.1; *see also Tether II*, 2024 WL 3520363, at *17 (crediting Plaintiffs' monopoly power allegations which "largely echo those raised in the context of Plaintiffs' CEA claims").

Plaintiffs will show that Defendants operated in the cryptocommodities market and exerted their market power there to raise prices in the cryptocommodities market, using evidence that is common to the class. *See Blessing v. Sirius XM Radio Inc.*, 2011 WL 1194707, at *7-8 (S.D.N.Y. Mar. 29, 2011) (market definition and market power susceptible to class-wide proof); *In re Namenda*, 338 F.R.D. at 551 (proving a violation of antitrust laws focuses on a defendant's conduct and relies on "common evidence [that] generally predominates over individualized evidence."); *Dial Corp.*, 314 F.R.D. at 114 (liability issues related to monopoly power "can be proven through class-wide, common evidence because they focus on [defendant's] conduct, not on the actions of putative class members").

DeRamus's regression analysis will show that Defendants' issuance of debased USDT into the cryptocommodities market artificially inflated Bitcoin prices, *see supra* Section II)(A)(1)(b)(ii), DeRamus Report § VIII(A); his correlation analysis will show that those

issuances were highly correlated with Bitcoin price spikes, *see supra* Section (II)(A)(1)(b)(i); and he will opine that the same is likely true for other cryptocommodities, *see* DeRamus Report § VIII(B). Record evidence will further confirm Defendants' ability to control cryptocommodity prices, including Defendants' communications with the Anonymous Trader about inflating Bitcoin prices, and documents showing that Defendants knew of the repeated Bitcoin price premium on Bitfinex even as they provided the AT Bot with vast amounts of USDT, *see supra* Section II(A)(1)(a)(iii); Ex. 23.

Courts routinely accept and consider this type of common evidence in analyzing market power. *See, e.g.*, *In re Actos Antitrust Litig.*, 2024 WL 4251891, at *19 (evidence to establish market power "will be the same for each putative class member"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *27 (E.D.N.Y. Oct. 15, 2014) (recommending class certification and considering expert testimony on market power), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 92 (D. Conn. 2009) (certifying class and considering expert testimony on market power); *cf. Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 207-08 (S.D.N.Y. 2019) (considering expert testimony on summary judgment to determine relevant market and market power).

### ii.    Willful Acquisition

Plaintiffs will show that Defendants willfully acquired their ability to control cryptocommodity prices using the same common evidence that shows their use of a manipulative device under the CEA. *See supra* Section (II)(A)(1)(a). This includes documents and testimony showing that Defendants intentionally, and in secret, flooded the market with debased USDT through the AT Bot, despite persistent representations to the market that USDT was backed one-to-one by

US dollars, and that Defendants understood the inflationary impact of their scheme on the prices of Bitcoin and other cryptocommodities, and intended it to have that effect.

### b. Violation of Section 1

For their Section 1 claim, Plaintiffs must show "[(1)] a combination or some form of concerted action between at least two legally distinct economic entities"—*i.e.*, a conspiracy—"that [(2)] unreasonably restrains trade." *Tether II*, 2024 WL 3520363, at *18 (quoting *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016)). Proof of Plaintiffs' Section 1 claim "is indisputably common because it focuses on the allegedly unlawful actions of the defendants, not the actions of individual plaintiffs." *In re Air Cargo*, 2014 WL 7882100, at *38; *see also Cordes*, 502 F.3d at 105 ("allegations of the existence of a price-fixing conspiracy are susceptible to common proof"); *In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 58 (S.D.N.Y. 2002) (holding that "proof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged [Section 1] liability is common to the claims of all the plaintiffs.").

### i. Conspiracy

Plaintiffs must present either "direct evidence … or circumstantial facts supporting the inference that a conspiracy existed." *Tether II*, 2024 WL 3520363, at *19 (internal citation and quotation marks omitted). When doing the latter, plaintiffs may meet their burden through "allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors." *Id.* at *19 (internal quotation marks and citation omitted). These plus factors include "[i] a common motive to conspire; [ii] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and [iii] evidence of a high level of interfirm communications." *Id.* (internal citation and quotation marks omitted).

Common evidence will show that Defendants and the Anonymous Trader conspired to inflate cryptocommodity prices. *See* Section (II)(A)(1)(a)(i)-(ii); *see also Ploss*, 431 F. Supp. 3d

38

at 1014 (identifying the "two common questions" for CEA and antitrust claims as "(1) whether [defendant] engaged in the alleged … scheme; and (2) whether that scheme inflated futures prices in the marketplace"). The Trader knew that Defendants debased USDT and misrepresented that it was backed one-to-one by US dollars because ▆ knew that banking difficulties prevented Tether from issuing new USDT in exchange for US dollar deposits and from honoring all requests to redeem USDT.[31] Defendants and the Trader both knew that ▆ bot automatically withdrew large amounts of USDT from Bitfinex's hot wallet and traded it for cryptocommodities on other exchanges without any human intervention. *See* Background Part C; *supra* Section (II)(A)(1)(a)(i). They both knew that Defendants actively provided vast quantities of USDT to the AT Bot before, and regardless of whether, Tether received US dollars in exchange. *See* Background Part C; *supra* Section (II)(A)(1)(a)(i). And they both knew that these trades would inflate cryptocommodity prices. *See, e.g.*, Ex. 23; *see also* Section (II)(A)(1)(a)(i)-(ii).

Common evidence will also show the conspirators' intent to inflate cryptocommodity prices: doing so would (1) increase the market price of Defendants' and the Trader's cryptocommodity holdings;[32] and (2) lead to increased trades of USDT for cryptocommodities, benefitting Defendants by increasing the distribution of USDT and encouraging more trades on Bitfinex. *See* DeRamus Report at ¶¶ 263-264, 289-290; Ex. 6 80:19-81:24. This intent can also be inferred from their conduct. Defendants redeemed all USDT at 100 cents on the dollar, despite knowing that USDT was debased, and so overpaid to redeem USDT. *See* Background Parts A & B; *supra* Section (II)(A)(1)(a)(i). ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. These decisions to act

---

[31] *See* Ex. 24 at 95; Ex. 23; Ex. 12 302:17-303:9; ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[32] SAC ¶ 388; Ex. 12 19:15-20:25; *see also* DeRamus Report ¶ 236 n.508.

contrary to their economic interests indicate that Defendants and the Trader were acting to further their more profitable conspiracy to inflate cryptocommodity prices.

### ii.  Restraint of Trade

Section 1's unreasonable restraint of trade inquiry overlaps with Section 2's willful acquisition of market power inquiry. *See Tether II*, 2024 WL 3520363, at *19 (finding the "in restraint of trade" element satisfied where plaintiffs had established that "Defendants, relying in part on the Anonymous Trader's cross-exchange arbitrage activity, sought to artificially inflate the price of cryptocommodities"). Plaintiffs will thus establish restraint of trade through the same common proof of willful acquisition. *See infra* Section II(B)(A)(2)(b)(ii).

### iii.    Antitrust Impact and Causation

Plaintiffs need not prove class-wide harm at the Rule 23 stage; they simply need to propose evidence capable of establishing class-wide impact. *Iowa Pub. Emps. Ret. Sys.*, 2024 WL 5004632, at *12 ("'[T]he Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact *could* prove such impact, not whether plaintiffs in fact can prove class-wide impact.'") (emphasis added) (citing *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001); *City of Philadelphia*, 2023 WL 6160534, at *8 (expert's models are "'theoretically capable of evidencing a common impact, and her factual analysis actually does so.'") (cleaned up) (citing *In re Air Cargo*, 2014 WL 7882100, at *48).

DeRamus's proposed models and methodologies are easily able to show class-wide injury. His regression analysis will show that Defendants caused Plaintiffs to pay higher cryptocommodity prices, *supra* Background Part D; DeRamus Report § VIII, and he offers a class-wide methodology that uses those inflation rates to calculate the amounts by which this scheme inflated Class members' Bitcoin purchases, *supra* Background Part D; DeRamus Report § IX.

Courts routinely accept models like DeRamus's analysis at the Rule 23 stage in certifying classes for antitrust claims. *See, e.g.*, *City of Philadelphia*, 2023 WL 6160534, at *5 (noting that "regression models are routinely used—and accepted—in antitrust cases," that "no complex model is perfect," and that models need only "*estimate*[] what the modeler is attempting to measure.") (original emphasis); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *9 (S.D.N.Y. Mar. 28, 2014) (accepting model using the "widely-used 'before and after' approach"); *In re Ethylene*, 256 F.R.D. at 100 ("The real question" is whether Plaintiffs "have established a *workable multiple regression equation*, not whether [their] model actually works.") (emphasis added).

### b.    Damages

To support class certification, Plaintiffs may show that damages are "measurable on a class-wide basis through use of a common methodology." *Dial Corp.*, 314 F.R.D. at 118 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013)); *accord Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015); *Iowa Pub. Emps. Ret. Sys.*, 2024 WL 5004632, at *16-17. A well-accepted methodology for measuring class-wide damages is one that shows "the difference between the prices actually paid and the prices that would have been paid absent the conspiracy." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988).

DeRamus will do just that, comparing actual Bitcoin prices with but-for Bitcoin prices, generating an overcharge percentage that shows the amount that Class members overpaid for their cryptocommodities. DeRamus Report ¶¶ 355-369. He can do the same for all other cryptocommodities and futures at issue. *Id.* ¶ 376. His model "actually measure[s] damages that result from the class's asserted theory of injury," *Roach*, 778 F.3d at 407, based on the artificial inflation of cryptocommodity prices caused by Defendants. DeRamus Report ¶¶ 355-369.

After Plaintiffs establish class-wide damages at trial, calculating individual damages in the claims process will be "simple and mechanical." *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d

447, 472 (S.D.N.Y. 2014). DeRamus's models can be used to calculate the damages for individual cryptocommodity and cryptocommodity futures transactions. DeRamus Report ¶¶ 359-376. He has applied his baseline model to named Plaintiffs' purchases of Bitcoin and Bitcoin futures, *id.* ¶¶ 379-380, and the same can be done at the claims administration stage for other Class members who present their trading records. *See In re Sumitomo Copper Litig.*, 182 F.R.D. at 93 (approving overcharge methodology at class certification for CEA claims); *Iowa Pub. Emps. Ret. Sys.,* 2024 WL 5004632, at *16-17 (same for antitrust claims).

### B.    A Class Action Is Superior to the Alternatives

Rule 23(b)(3) requires that a class action be superior to any other method "for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500505, at *10.

As in other market manipulation cases, a class action is superior to other means of adjudication here. Due to the size of the Class and Futures Sub-Class, "[m]ultiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims." *NASDAQ*, 169 F.R.D. at 527; *see In re Amaranth*, 269 F.R.D. at 386 (finding superiority where case "involves more than one thousand potential claimants" asserting claims based on "common issues."); *Martinek*, 2022 WL 326320, at *19 ("multiple lawsuits would be costly and inefficient").

A class action is also superior because no similar litigation is pending elsewhere, courts in this District have expertise in complex market manipulation claims under the CEA and the

Sherman Act, and this Court is familiar with this action. *See In re Amaranth*, 269 F.R.D. at 386. There are no problems in managing this case as a class action, and "[c]ourts are generally loath to deny class certification based on speculative problems with case management." *NASDAQ*, 169 F.R.D. at 527; *see In re Natural Gas*, 231 F.R.D. at 185 (rejecting defendants' manageability arguments; noting that "any class action based on a manipulation claim or a similar theory necessarily involves large databases and complex calculations for determining individual class member damages").

## III.   THE COURT SHOULD APPOINT SELENDY GAY AND SCHNEIDER WALLACE AS CO-LEAD COUNSEL

Under Rule 23(g)(1)(A), a court must consider "the work counsel has done," "counsel's experience," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Selendy Gay and Schneider Wallace have extensive experience with antitrust, market manipulation, and crypto-related class actions and have collectively recovered billions of dollars for their class and non-class clients. *See, e.g.*, *Williams v. KuCoin*, 2022 WL 392404, at *3 (S.D.N.Y. Feb. 9, 2022) (appointing Selendy Gay as class counsel); *Clifford v. TRON Found.*, 2020 WL 3577923, at *3 (S.D.N.Y. June 30, 2020) (same); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *16 (S.D.N.Y. Mar. 31, 2017) (appointing Schneider Wallace as class counsel). They have devoted many millions of dollars to this case and will continue to prosecute it vigorously. *See, e.g.*, *Williams v. KuCoin*, 2021 WL 5316013, at *13 (S.D.N.Y. Oct. 21, 2021), *report and recommendation adopted*, 2022 WL 392404 (S.D.N.Y. Feb. 9, 2022). They have also adeptly represented the class, defeating Defendants' motion to dismiss, ECF No. 182, winning numerous discovery motions, ECF Nos. 247, 268, 347, 356, 370, 445, 460, and winning leave to

file the amended complaint that now governs the case, ECF No. 545. They commit to serving the

Class equally well going forward.

## **<u>CONCLUSION</u>**

Plaintiffs respectfully ask the Court to grant their motion.

Dated:    New York, NY                             Respectfully submitted,
          January 22, 2025

<u>/s/ Andrew R. Dunlap</u>                         <u>/s/ Todd M. Schneider</u>
Philippe Selendy                          Todd M. Schneider (*pro hac vice*)
Andrew R. Dunlap                          Matthew S. Weiler (*pro hac vice*)
Oscar Shine                               SCHNEIDER WALLACE COTTRELL
Laura M. King                             KONECKY LLP
SELENDY GAY PLLC                          2000 Powell Street, Suite 1400
1290 Sixth Avenue                         Emeryville, CA 94608
New York, NY 10104                        tschneider@schneiderwallace.com
pselendy@selendygay.com                   mweiler@schneiderwallace.com
adunlap@selendygay.com
oshine@selendygay.com
lking@selendygay.com

*Interim Lead Counsel and Attorneys for the Plaintiffs and the Proposed Class*

44

## CERTIFICATE OF WORD COUNT COMPLIANCE

We certify that this Memorandum of Law complies with Rule 4.B of the Hon. Katherine Polk Failla's Individual Rules of Practice in Civil Cases, Local Civil Rule 7.1, and the Amended Civil Case Management Plan and Scheduling Order, Dkt. 564, and according to Microsoft Word is 44 pages in length and contains 13,903 words exclusive of the caption, tables, and signature blocks.

Dated:    New York, NY                    Respectfully submitted,
          January 22, 2025

                        By:   /s/ Andrew R. Dunlap
                              Philippe Selendy
                              Andrew R. Dunlap
                              Oscar Shine
                              Laura M. King
                              SELENDY GAY PLLC
                              1290 Avenue of the Americas
                              New York, NY  10104
                              Tel: 212-390-9000
                              pselendy@selendygay.com
                              adunlap@selendygay.com
                              oshine@selendygay.com
                              lking@selendygay.com

                              /s/ Todd M. Schneider
                              Todd M. Schneider (*pro hac vice*)
                              Matthew S. Weiler (*pro hac vice*)
                              Schneider Wallace Cottrell Konecky LLP
                              2000 Powell Street, Suite 1400
                              Emeryville, CA 94608
                              tschneider@schneiderwallace.com
                              mweiler@schneiderwallace.com

                              *Interim Lead Counsel and Attorneys for the*
                              *Plaintiffs and the Proposed Class*