UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:*<br><br>TETHER AND BITFINEX CRYPTO ASSET LITIGATION | 19 Civ. 9236 (KPF)<br><br><br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

In prior opinions in this long-running class action, Plaintiffs have gotten by on their factual allegations; this time, they have had to proffer evidence. Broadly speaking, Plaintiffs claim that Defendants[1] engaged in a scheme to manipulate the market price for certain cryptocommodities that Plaintiffs purchased through Defendants' fraudulent issuance of a crypto asset called "USDT" or "tether." *See In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 70 (S.D.N.Y. 2021) ("*Tether I*"). Specifically, Plaintiffs allege that Defendants moved vast quantities of debased USDT onto the market via an anonymous, nonparty trader (the "Anonymous Trader"), and in doing so, artificially drove price increases in certain cryptocommodities. *In re Tether*, No. 19 Civ. 9236 (KPF), 2024 WL 3520363, at *1 (S.D.N.Y. July 24, 2024) ("*Tether II*").[2] After several rounds of motion practice, Plaintiffs are left with

---

[1] Defendants include (i) various entities and individuals associated with Bitfinex, the cryptocurrency exchange, and Tether, the issuer of USDT, including iFinex Inc.; BFXNA Inc.; BFXWW Inc.; Tether Holdings Limited; Tether Operations Limited; Tether Limited; Tether International Limited; Bittrex, Inc.; DigFinex Inc.; Giancarlo Devasini; and Ludovicus Jan van der Velde (together, the "B/T Defendants"); and (ii) Philip G. Potter, the co-founder of Tether and its former Chief Strategy Officer. *See In re Tether*, No. 19 Civ. 9236 (KPF), 2024 WL 3520363, at *1 & n.1 (S.D.N.Y. June 26, 2024).

[2] The version of *Tether II* available on legal databases is a redacted version of a Sealed Opinion and Order, which is available at docket entry 544.

claims under the Commodities Exchange Act (the "CEA"), 7 U.S.C. §§ 1-27, and the Sherman Act, 15 U.S.C. §§ 1-38.

Before the Court now are two motions: (i) the B/T Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Dr. David W. DeRamus under Federal Rule of Evidence 702; and (ii) Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23. The Court considers the motions together because certain of Plaintiffs' arguments for class certification turn on whether Dr. DeRamus's testimony is admissible. For the reasons set forth below, the Court grants in part and denies in part the B/T Defendants' Motion to Exclude, and grants in modified form Plaintiff's Motion for Class Certification.

**BACKGROUND**[3]

## A.    Factual Background

This case's factual background has been recounted at length in the Court's previous opinions in *Tether I* and *Tether II*, which resolved Defendants'

---

[3]    This Opinion draws its facts from the Second Amended Consolidated Class Action Complaint ("SAC" (Dkt. #556)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain exhibits provided by the parties in connection with their motions, including the Amended Expert Report of David W. DeRamus ("DeRamus Rep." (Dkt. #592-1)) and the exhibits attached to the Declarations of Andrew Dunlap ("Dunlap CC Decl." (Dkt. #587)) and Natascha Born ("Born Decl." (Dkt. #592)).

For ease of reference, the Court refers to the B/T Defendants' memorandum of law in support of their motion to exclude Dr. DeRamus's testimony as "Def. MTE Br." (Dkt. #610); to Plaintiffs' memorandum of law in opposition to the B/T Defendants' motion to exclude as "Pl. MTE Opp." (Dkt. #621); to Defendants' reply memorandum of law in support of their motion to exclude as "Def. MTE Reply" (Dkt. #626); to Plaintiffs' memorandum of law in support of their motion for class certification as "Pl. CC Br." (Dkt. #592-3); to the B/T Defendants' memorandum of law opposing Plaintiffs' motion for class certification as "Def. CC Opp." (Dkt. #605); and to Plaintiffs' reply

motion to dismiss and Plaintiffs' motion for leave to file a second amended complaint, respectively.  The Court presumes familiarity with the background set forth in those opinions and recounts only the facts relevant to the parties' pending motions.  *See Tether I*, 576 F. Supp. 3d at 70-84 (providing factual background).

### 1. Plaintiffs' Theory of the Case

#### a. USDT and Other Stablecoins

USDT is a stablecoin.  (SAC ¶ 2).  Unlike most crypto assets, stablecoins are meant to maintain a stable price, pegged to an asset like fiat currency or gold.  (DeRamus Rep. ¶ 40).  When Tether launched USDT in 2013, it touted that "[e]ach [USDT] issued into circulation is backed in a one-to-one ratio (i.e. one Tether USDT is one US dollar) by the corresponding fiat currency unit held in deposit by … Tether Limited."  (Dunlap CC Decl., Ex. 36 ("Tether Whitepaper"), at 4).  Tether indicated that USDT "is fully reserved when the sum of all [USDT] in existence (at any point in time) is exactly equal to the balance of USD held in [Tether's] reserve."  (*Id.* at 9).

On this basis, Tether told the market that USDT "will not face any market risks … as reserves are maintained in a one-to-one ratio rather than relying on market forces."  (Tether Whitepaper 4).  The prevailing market perception was thus that all new USDT was bought with, and fully backed by, actual US dollars held by Tether in its own accounts.  (SAC ¶¶ 2, 7, 13, 143,

---

memorandum of law in support of their motion for class certification as "Pl. CC Reply" (Dkt. #624).

239; DeRamus Rep. ¶¶ 152-165, 291-294).  What is more, investors were led to believe that inflows of new USDT into the market represented organic demand for cryptocommodities.  (SAC ¶¶ 124, 131-136, 143; DeRamus Rep. ¶¶ 291-294).

### b.    The Debasement of USDT

Notwithstanding these representations, Plaintiffs allege that Tether issued hundreds of millions of USDT without receiving or holding equivalent amounts of U.S. dollars ("USD") in its own accounts.  (Dunlap CC Decl., Ex. 3 ("Hoegner Individual Dep."), at 289:18-290:15, 292:12-293:10; SAC ¶¶ 180-182).  This "debasement" began on March 31, 2017, when Wells Fargo stopped providing Tether with correspondent banking services; a few weeks later, Tether's banks in Taiwan stopped accepting wire transfers.  (SAC ¶¶ 169, 171).

Yet despite Tether's challenges receiving USD, it issued new USDT anyway, issuances made possible through transactions with Tether's sister company Bitfinex, a crypto asset exchange.  From May 23, 2017, to September 14, 2017, Tether issued approximately 356.8 million USDT to Bitfinex in exchange for receivables of $356.8 million.  (SAC ¶¶ 180-182; Dkt. #566 ¶ 181; Dunlap CC Decl., Ex. 1 ("Malek Rep."), ¶¶ 16, 74).  Defendants never disclosed that Tether issued these USDT without receiving an equivalent number of USD in return.  (SAC ¶ 239).

Instead, Defendants hired an audit firm, Friedman LLP, to publish a "Transparency Update" attesting that, as of September 15, 2017, Tether's account at Noble Bank in Puerto Rico held $382 million.  (SAC ¶¶ 185-187;

Dunlap CC Decl., Ex. 34 ("Hoegner Oct. 12 30(b)(6) Dep."), at 72:23-78:7).  In reality, Defendants had opened the Noble account for Tether that day and had transferred the money into it from a Bitfinex account at the same bank.  (SAC ¶¶ 185-187).  Defendants did not disclose that Tether lacked sufficient USD to back all issued USDT before opening the Noble account, or that the source of Tether's new funds was a Bitfinex account that comingled Bitfinex's operating capital with funds belonging to Bitfinex customers.  (SAC ¶¶ 169-176, 184-185; Hoegner Oct. 12 30(b)(6) Dep. 83:5-85:4; Malek Rep. ¶¶ 16, 38-39, 94).

Tether further debased USDT when it bailed out Bitfinex in 2018.  At that time, Bitfinex was on the brink of insolvency.  It had depended on Crypto Capital, a Panamanian payment processor, to receive and hold incoming wire transfers.  (SAC ¶¶ 208, 210-212, 218-220).  Crypto Capital held approximately $1 billion of Bitfinex customer and corporate funds.  (*Id.* ¶ 218).  Starting in April 2018, foreign governments began seizing hundreds of millions of dollars from Crypto Capital, preventing it from transferring those funds to its customers, including Bitfinex.  (*Id.* ¶¶ 221-224).  By August of that year, Giancarlo Devasini, the CFO of both Bitfinex and Tether, said that Bitfinex faced a "liquidity crisis," as it was "seeing massive withdrawals" and was "not able to face them anymore unless [it could] transfer some money out of Crypto[ C]apital."  (*Id.* ¶¶ 225-227).

All the while, Tether issued hundreds of millions of new USDT to Bitfinex in exchange for more receivables.  (Malek Rep. ¶¶ 16, 76-83; Dunlap CC Decl., Ex. 12 ("Devasini Dep."), at 91:6-93:4).  These receivables consisted of

Bitfinex's inaccessible holdings at Crypto Capital, effectively offloading Bitfinex's liquidity crisis onto Tether. (SAC ¶¶ 228-229, 248; Malek Rep. ¶¶ 47, 70, 76; Dunlap CC Decl., Ex. 11, at 187:11-189:5). Tether was left with hundreds of millions of USDT backed by inaccessible funds seized by foreign authorities. (SAC ¶¶ 221-223, 228-229, 233; Malek Rep. ¶¶ 70, 76).

Defendants did not disclose that Bitfinex's assets were impaired or that Tether's reserves included receivables backed by inaccessible funds. (SAC ¶ 248; Malek Rep. ¶¶ 47, 70, 76). To the contrary, on October 7, 2018, Defendants published "A Response to Recent Online Rumours," assuring customers that Bitfinex was "not insolvent" and that "both fiat and cryptocurrency withdrawals are functioning as normal." *A Response to Recent Online Rumours*, Bitfinex (Oct. 7, 2018), https://blog.bitfinex.com/announcements/response-to-online-rumours/. In reality, Defendants had not been able to withdraw any funds from Crypto Capital in over a month. (SAC ¶¶ 231, 236). Soon thereafter, on October 15, 2018, USDT began to trade below its $1 peg. (*Id.* ¶ 235; DeRamus Rep. ¶ 294).

Defendants again shuffled funds to create the impression that USDT was fully backed. They first "burned" 500 million USDT that they knew neither Tether nor Bitfinex had sufficient USD to cover. (SAC ¶ 239; DeRamus Rep. ¶ 209 n.448; Dunlap CC Decl., Ex. 18 ("Van der Velde Dep."), at 90:21-93:15). They then published a letter from another bank, Deltec, stating that Tether had $1.8 billion in Deltec accounts; in reality, that figure actually included non-

USD assets such as bonds, commercial paper, and Bitfinex receivables.  (SAC ¶¶ 240-242).

The next day, Defendants began swapping Tether's cash reserves at Deltec for Bitfinex's inaccessible funds at Crypto Capital, while deeming the latter to be part of Tether's purportedly liquid reserves.  (Van der Velde Dep. 90:21-93:15; *see also* Malek Rep. ¶¶ 70, 80).  Defendants ultimately swapped as much as $625 million of Tether's accessible USD for inaccessible funds at Crypto Capital without informing the market.  (Malek Rep. ¶¶ 80, 83).  Plaintiffs allege that, through these actions, Defendants debased USDT.  And debasement meant that USDT investors were not guaranteed to be able to redeem their USDT for USD at any time.

The risks of backing USDT with receivables from Bitfinex provide a helpful illustration.  Receivables are not USD — they carry a credit risk that they will not be paid in full or on time.  (*See* DeRamus Rep. ¶¶ 154-155).  If receivables are not paid, investors cannot trade in their USDT for USD.  This alone constitutes a risk, but Plaintiffs allege a second level of risk because Bitfinex allowed customers to trade on margin.  (Malek Rep. ¶¶ 75, 92-93; SAC ¶¶ 313-318; DeRamus Rep. ¶¶ 225-234).  If those customers' losses exceeded the value of any assets in their accounts, Bitfinex bore the loss, increasing the odds that Bitfinex would not have sufficient funds to cover the receivables pledged to Tether.  (Dunlap CC Decl., Ex. 6 ("Potter Dep."), at 319:2-321:21, 326:24-327:7, 328:2-335:25).  And as a third level of risk, Bitfinex could not access the receivables backed by Crypto Capital funds, further hamstringing its

ability to cover its pledges to Tether.  (SAC ¶¶ 221-223, 229, 234; Malek Rep. ¶¶ 16, 76, 83).

It is unclear whether Bitfinex held enough USD to fully pay the receivables that it owed Tether during this time.  Bitfinex did not keep those funds in a separate account.  (Malek Rep. ¶¶ 94-98).  Instead, Bitfinex maintained "omnibus" accounts that included amounts that it owed to Tether, amounts that it owed to its own customers, and its own operating capital. (Devasini Dep. 209:16-209:24).  Defendants claim that Bitfinex possessed sufficient funds to back any USDT purchase (*see, e.g.*, Dunlap CC Decl., Ex. 21, at 3), but no definitive proof exists (*see* SAC ¶ 202; Devasini Dep. 52:23-53:15 (claiming that this information was tracked by hand in a paper notebook, but that notebook has since likely been discarded)).

### c.   The Anonymous Trader

As USDT was becoming further debased, an individual known as the Anonymous Trader was engaging in cross-exchange arbitrage on the Bitfinex exchange and on other exchanges.  (Born Decl., Ex. 12, ¶¶ 138-139, 146).  This arbitrage involved profiting from price differences across different exchanges by buying an asset on one exchange (at the lower price) and selling the same amount of that asset on a second exchange (at the higher price).  ██████████ ███████████████████████████████████████████ .

Plaintiffs allege that Defendants used the Anonymous Trader to inject massive amounts of debased USDT into the crypto-economy.  They knew how the Anonymous Trader's bot operated and that it operated automatically,

without human action.  (SAC ¶¶ 268-274, 307, 309; Dunlap CC Decl., Ex. 19

("Ardoino 30(b)(6) Dep."), at 162:18-163:2, 172:14-176:11).  Defendants

provided the Anonymous Trader with ███████ unbacked USDT, allowing ███

bot to place ██████████ trades.  (SAC ¶¶ 269, 279, 304-307, 344;

███████████████████

The Anonymous Trader had █████████████████████

████████████████████████

██████████████      And Bitfinex gave ███████████ "greenlane" trading

limits, exempting the bot from cumbersome verifications when it withdrew

USDT.  (SAC ¶¶ 12, 271).  ███████████████████

████████████████████████████

██████████████ (DeRamus Rep. ¶ 85; SAC ¶ 324; ████████████

█████████  ████████████████████

████████████████████████

███  ████████████████████████

████████████████████████████

███████████████████████

██████████████████

Because there was a repeated price premium on Bitfinex relative to other

exchanges (DeRamus Rep. ¶¶ 317-321), the Anonymous Trader's arbitrage was

primarily one-directional, moving debased USDT from Bitfinex to other

exchanges (*id.* ¶¶ 96-97, 256; Ardoino 30(b)(6) Dep. 162:18-163:2, 172:14-

176:11).  The Anonymous Trader repeatedly purchased Bitcoin and other

cryptocommodities on other exchanges with USDT, sold them on Bitfinex for USD, and withdrew those USD from Bitfinex as USDT.  (SAC ¶¶ 269, 284-285; DeRamus Rep. ¶¶ 78-79, 84-97).  ███████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████

Plaintiffs further allege that Defendants knew and intended that their scheme would artificially inflate cryptocommodity prices.  For example, Mr. Devasini asked the Anonymous Trader if ██ could "please push the [Bitcoin] price above 10k again," to which the Anonymous Trader responded, "Sure no problem, just issue me some [USDT]."  (SAC ¶ 335).  Mr. Devasini also asked Crypto Capital to send Defendants money to meet USDT redemption requests, warning that "[Bitcoin] could tank to below 1k if we don't act quickly."  (SAC ¶¶ 365-366).  According to Plaintiffs, this exchange indicates that Defendants knew that if the market learned that Tether could not honor all USDT redemption requests, cryptocommodity prices would fall.

Finally, Plaintiffs allege that Defendants benefited from this scheme.  By pumping debased USDT into the crypto-economy, the Anonymous Trader created "network effects" for USDT, encouraging USDT's broader use.  (Potter Dep. 80:19-81:24).  As USDT became more widely adopted, Defendants' bank accounts grew and drew increased interest.  (*See* DeRamus Rep. ¶ 42 n.67).  Bitfinex also earned fees for an increased number of crypto transactions, both

by the Anonymous Trader and by momentum traders drawn in by rising prices. (*Id.* ¶¶ 263-264, 289-290).

### 2. Plaintiffs' Proposed Classes

Plaintiffs claim that Defendants artificially inflated the prices of Bitcoin and other crypto assets (the "Class Assets") from March 31, 2017, through February 25, 2019 (the "Class Period"), in violation of the Sherman Act and the CEA. (SAC ¶¶ 1, 407-443). The four named Plaintiffs purchased Bitcoin and other crypto assets during the Class Period. One named Plaintiff, Pinchas Goldshtein, also purchased Bitcoin futures. (Born Decl., Ex. 12, ¶¶ 180-182, 187-198). Plaintiffs' Sherman Act claims are based on their cryptocommodity purchases, while their CEA claims are based on Mr. Goldshtein's futures purchases. (SAC ¶¶ 407-443).

Plaintiffs ask the Court to certify the following class (the "Class") under Rule 23(b)(3):

> All persons or entities that purchased or otherwise acquired cryptocommodities (Bitcoin, Bitcoin cash, ethereum, ethereum classic, litecoin, monero, dash and ZCash) or cryptocommodity Futures, in the United States or its territories at any time from March 31, 2017 through February 25, 2019.

(Pl. CC Br. 1). They also seek certification of the following subclass (the "Futures Subclass"):

> All persons or entities that purchased or otherwise acquired cryptocommodity futures in the United States or its territories at any time from March 31, 2017 through February 25, 2019.

(*Id.*).[4]  Plaintiffs ask the Court to appoint Selendy Gay PLLC and Schneider Wallace Cottrell Konecky LLP as Co-Lead Class and Subclass Counsel under Rule 23(g).  (*Id.* at 2).

### 3.  Plaintiffs' Expert Reports

In support of their theory of the case, Plaintiffs disclosed two expert reports: one from Kenneth Malek, an accounting expert, and one from Dr. DeRamus, an economics and antitrust expert.  Mr. Malek seeks to show USDT's debasement by comparing the total issuances of USDT with Tether's banking and internal accounting records.  (Malek Rep. ¶¶ 59-91).  He purports to show numerous instances of debasement, in which Tether issued USDT without receiving an equivalent amount of USD.  (*Id.* ¶¶ 15, 64, 67-84).

Dr. DeRamus seeks to demonstrate the impact of Defendants' alleged conduct on the price of Bitcoin.  At a high level, Dr. DeRamus opines in his report (the "DeRamus Report") that an increase in the amount of USDT in the crypto-economy, where it could be used to buy Bitcoin or other crypto assets, caused an increase in Bitcoin prices.  (DeRamus Rep. ¶¶ 11, 282).  Therefore, when USDT was "unbacked" or "debased," the amount of USDT in the crypto-economy was artificially inflated, and investors were "overcharged" for Bitcoin

---

[4]  The Class and the Futures Subclass exclude any person or entity whose purchases of cryptocommodities or cryptocommodity futures were exclusively through Bitfinex.  They also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and the Anonymous Trader.  They also exclude the Judge presiding over this action, her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.  (Pl. CC Br. 1 n.2).

compared to what they would have been charged had USDT not been unbacked or debased.  (*Id.* ¶¶ 355-358).

The terms "unbacked" and "debased" in the DeRamus Report relate to whether Tether's issuance of USDT and/or the composition of its reserves were consistent with Tether's representations in the Tether Whitepaper.  (DeRamus Rep. ¶ 16; Born Decl., Ex. 5 ("DeRamus Dep."), at 46:10-47:16, 68:15-70:2, 73:6-73:24).  In his deposition, Dr. DeRamus further explained his view that USDT is unbacked or debased if Tether issues USDT before first receiving payment in USD or if any portion of Tether's reserves consists of assets other than USD or U.S. Treasuries that were held in a segregated bank account in Tether's name that was used solely to hold reserves and process redemptions. (DeRamus Dep. 44:25-46:9, 51:20-52:11, 56:23-57:12, 68:13-68:23).

Dr. DeRamus's analysis comprises: (i) an event study that purports to show that the issuance of USDT caused the price of Bitcoin to increase; (ii) a regression analysis that purports to model "how a change in the outstanding volume of USDT affects Bitcoin prices"; and (iii) an overcharge model that purports to quantify the artificial inflation of Bitcoin based on the extent to which USDT was debased or unbacked.  (DeRamus Rep. ¶¶ 298-310, 329-337, 355-358).

For his event study, Dr. DeRamus examines all USDT issuances during the Class Period and compares the price of Bitcoin before and after each issuance, extending 12.5 hours on either side.  (DeRamus Rep. ¶¶ 302-304). He calls that data set the "treatment group," which he compares to data in the

control group.  (*Id.*).  Dr. DeRamus compiles the control group data set by identifying 25-hour periods — the same timeframe as the treatment group — without any USDT issuances but with similar trends in Bitcoin price movement during the first 12 hours as the treatment group.  (*Id.*).

Dr. DeRamus then compares the treatment group with the control group to "assess whether there are significant differences in Bitcoin prices in the second half of the 25-hour window that followed the issuance of USDT in the treatment group as compared to the second half of the 25-hour window for the control group (with no issuances)."  (DeRamus Rep. ¶ 304).  The values he compares in the two groups are what he calls "normalized prices," which are equal to the Bitcoin price at that time, divided by the price at the time of issuance, minus one.  (*Id.* ¶ 304 & n.642; *see also* Born Decl., Ex. 1 ("Hendershott Rep."), ¶ 76 (describing Dr. DeRamus's methodology)).  These normalized prices thus reflect Bitcoin's return from its price just prior to the issuance of USDT (or from the 12.5 hour mark in the control group) to its price at a given point in time within the 25-hour period.

To test for statistical significance, Dr. DeRamus uses a t-test,[5] which compares the returns over the last 12 hours in the treatment group with those in the control group.  (DeRamus Rep. ¶ 304 & n.645).  He compares six

---

[5]     A "t-test" is a statistical model used to determine the likelihood that variance between an observed result and an expected result is attributable to chance.  *See Smith* v. *Xerox Corp.*, 196 F.3d 358, 366 (2d Cir. 1999) (describing the t-test), *overruled on other grounds by*, *Meacham* v. *Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14 MD 2542 (VSB), 2025 WL 354671, at *45 (S.D.N.Y. Jan. 3, 2025) (discussing t-tests).

different data sets, finding each significant at a 95% confidence level.  (*Id.*
¶¶ 304-309).  These findings allegedly "corroborate[ ] … that increases in USDT
issuances led to increases in Bitcoin prices during the Class Period."  (*Id.*
¶ 308).

Dr. DeRamus's regression analysis[6] models the relationship between the
volume of all USDT issued by Tether and Bitcoin prices using ordinary least
squares regression.  (DeRamus Rep. ¶¶ 325-334).  It controls for certain
variables likely to influence Bitcoin prices.  (*Id.* ¶¶ 340-345).  The "baseline"
regression model shows that a 10% increase in the supply of USDT results in
an approximately 3% increase in the price of Bitcoin.  (*Id.* ¶ 334).

Dr. DeRamus's regression analysis, when paired with the trier of fact's
finding of how much USDT was unbacked or debased, can estimate an
"overcharge percentage" — the percentage by which Bitcoin prices were
artificially inflated.  (DeRamus Rep. ¶¶ 326-327, 359).  To calculate the
overcharge percentage, Dr. DeRamus's model first subtracts the amount of
unbacked or debased USDT from the total actual amount of outstanding USDT

---

[6]     For a primer on regression analyses, see *Reed Constr. Data Inc.* v. *McGraw-Hill Cos.,
Inc.*, 49 F. Supp. 3d 385, 396-97 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016)
(summary order).  In that case, the court explained:

> The basic regression method is simple: isolate the effect of one
> variable (the "independent variable") on another variable (the
> "dependent variable") by holding all other potentially relevant
> variables (the "control variables") constant.  By controlling for other
> factors that might influence the dependent variable, one
> "regresses" the influence of the independent variable on the
> dependent variable.  The number associated with that influence is
> called a "coefficient."

*Id.* at 396; *see also id.* at 396 n.5 ("Specifically, the ordinary least-squares (OLS) method
of linear regression solves for a linear equation that minimizes the sum of the squared
residuals.").

on that day to determine the "but-for" USDT issuance — the amount of outstanding USDT that would have existed if Defendants had removed unbacked or debased USDT from circulation. (*Id.* ¶¶ 360-363). The model then calculates the overcharge percentage by dividing the difference between the actual Bitcoin price and the but-for Bitcoin price by the actual Bitcoin price. (*Id.* ¶¶ 362-366). While the report focuses on Bitcoin, Dr. DeRamus explains that the factfinder can use the same methodology to estimate overcharges for other cryptocommodities and cryptocommodity futures. (*Id.* ¶¶ 351-354, 357, 376).

Dr. DeRamus's testimony has other components as well. For example, he offers two ways to estimate the degree to which USDT was unbacked or debased: one based on the amount of Bitfinex receivables included in Tether's USDT reserves, and one based on the amount of USDT that the Anonymous Trader withdrew from Bitfinex. (DeRamus Rep. ¶¶ 147 fig. 23, 173-199, 252-254). And separately, he opines that if the market had known that Tether's reserves included non-cash assets, the price of USDT would have dropped, and the price of Bitcoin would have fallen with it. (*Id.* ¶¶ 291-292).

### 4.    Defendants' Expert Reports

Defendants submitted rebuttal expert reports from Professor Terrence Hendershott, an economics expert; Professor Peter D. Easton, an accounting expert; and Professor Stephen McKeon, a crypto industry expert. Each responds to a portion of the DeRamus Report.

Specifically, Professor Hendershott, in his report (the "Hendershott Report"), opines that (i) Dr. DeRamus's definitions of "unbacked" and "debased" have "no economic basis"; (ii) Dr. DeRamus's proposed methodologies for demonstrating that Defendants' conduct caused the price of Bitcoin to increase and quantifying that supposed impact are unreliable; (iii) Dr. DeRamus's proposed methodology for estimating "overcharge" suffers from various "difficulties"; (iv) Dr. DeRamus's assertion that if the market were aware of the composition of Tether's reserves, the prices of USDT and Bitcoin would both decline is not supported by any reliable methodology; and (v) Dr. DeRamus's assertion that "debased" USDT created "false market signals" "does not make any sense from an economic perspective." (Hendershott Rep. ¶¶ 12-14). Professor Easton asserts that there is no evidence that the Anonymous Trader received any USDT from Bitfinex without paying the full price of $1 per USDT token. (Born Decl., Ex. 2 ("Easton Rep.") ¶¶ 142-160). He also opines that Dr. DeRamus's definitions of "unbacked" and "debased" are inconsistent with accounting principles. (*Id.* ¶¶ 176-179). Finally, Professor McKeon rebuts Dr. DeRamus's opinion that USDT and USD could be "commingled" on the Bitfinex exchange. (Born Decl., Ex. 3 ("McKeon Rep.") ¶¶ 22(b), 62).

## B.    Procedural Background

### 1.    *Tether I* and *Tether II*

This case began on October 6, 2019, with the filing of the initial class action complaint. (Dkt. #1). After consolidation, the appointment of interim class counsel, and the filing of an amended class complaint, certain

Defendants moved to dismiss. *Tether I*, 576 F. Supp. 3d at 84-85. On September 28, 2021, the Court issued an Opinion granting in part Defendants' motion to dismiss. *Id.* at 132. The parties then entered a lengthy period of fact discovery, after which Plaintiffs moved for leave to file a second amended complaint. *Tether II*, 2024 WL 3520363, at *1. On June 26, 2024, the Court issued an Opinion granting Plaintiffs leave to amend. *Id.* at *21.

### 2.    The Current Motions

Plaintiffs filed the SAC on July 12, 2024. (Dkt. #556-557). The B/T Defendants filed their answer on September 13, 2024. (Dkt. #566). Mr. Potter answered on the same day. (Dkt. #567, 571). On November 15, 2024, the Court entered a Civil Case Management Plan and Scheduling Order, which, among other things, set a briefing schedule for Plaintiffs' motion for class certification. (Dkt. #578). On January 10, 2025, Plaintiffs filed their motion for class certification, along with supporting papers. (Dkt. #585-587). On January 22, 2025, Plaintiffs notified the Court of minor data errors in the initially submitted version of the DeRamus Report and provided an amended Report. (Dkt. #592).

From there, briefing proceeded with numerous interruptions. On February 18, 2025, the Court granted the B/T Defendants' request for an extension in the briefing schedule. (Dkt. #598). On May 2, 2025, the B/T Defendants filed their opposition papers to Plaintiffs' motion for class certification. (Dkt. #605, 608). The next day, the B/T Defendants filed a motion to exclude the testimony of Dr. DeRamus, along with supporting

papers.  (Dkt. #609-610).  Mr. Potter filed a joinder as to both motions.  (Dkt. #606-607).

Thereafter, Plaintiffs filed a motion asking the Court to strike the B/T Defendants' *Daubert* motion (Dkt. #612), which motion the Court denied while noting that the B/T Defendants had not been entirely forthcoming about their intent to file such a motion (Dkt. #618).  Plaintiffs also sought an extension in the briefing schedule (Dkt. #615), which the Court granted (Dkt. #618).  The parties then stipulated to a briefing schedule concerning the remaining submissions for the B/T Defendants' *Daubert* motion.  (Dkt. #619).

On July 8, 2025, Plaintiffs filed their opposition to the B/T Defendants' *Daubert* motion, along with supporting papers.  (Dkt. #621-622).  On August 5, 2025, Plaintiffs then filed their reply papers in support of their motion for class certification.  (Dkt. #623-625).  And the next day, the B/T Defendants filed their reply papers in support of their *Daubert* motion.  (Dkt. #626-627).

One day later, the B/T Defendants requested leave to file a surreply to address certain arguments raised in Plaintiffs' class certification reply.  (Dkt. #628).  The Court granted the B/T Defendants' request but narrowed the topics that they could address in the surreply.  (Dkt. #630).  On August 15, 2025, the B/T Defendants filed their surreply, thus concluding briefing on the two pending motions.  (Dkt. #631).  Redacted versions of sealed documents were filed on the public docket on September 22, 2025.  (Dkt. #636-646).

On February 23, 2026, the Court filed and provided to the parties an unredacted copy of this Opinion under seal and allowed the parties to propose

redactions in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d

110 (2d Cir. 2006).  On or before March 9, 2026, the parties shall file a joint

letter suggesting redactions to the Opinion.  Taking the parties' suggestions

into consideration, the Court will then file a redacted version of the Opinion on

the public docket.

## DISCUSSION

### A.    The Court Grants in Part and Denies in Part the B/T Defendants' Motion to Exclude the Expert Testimony of Dr. DeRamus

#### 1.    Applicable Law

The Supreme Court has tasked district courts with a "gatekeeping" role

with respect to expert opinion testimony.  *Daubert* v. *Merrell Dow Pharms., Inc.*,

509 U.S. 579, 597 (1993) (holding that it is the district court's responsibility to

ensure that an expert's testimony "both rests on a reliable foundation and is

relevant to the task at hand").  This gatekeeping function applies whether the

expert testimony is based on scientific, technical, or other specialized

knowledge.  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 141 (1999) (citing

Fed. R. Evid. 702).  "It is well-established that 'the trial judge has broad

discretion in the matter of the admission or exclusion of expert evidence[.]'"

*Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting

*Salem* v. *U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

Expert testimony is governed primarily by Federal Rule of Evidence 702,

which provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if the proponent

demonstrates to the court that it is more likely than not
that:

> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in
> issue;
>
> (b) the testimony is based on sufficient facts or
> data;
>
> (c) the testimony is the product of reliable
> principles and methods; and
>
> (d) the expert's opinion reflects a reliable
> application of the principles and methods to the
> facts of the case.

Fed. R. Evid. 702. A court's inquiry focuses on three issues: (i) whether the
witness is qualified to be an expert; (ii) whether the opinion is based upon
reliable data and methodology; and (iii) whether the expert's testimony on a
particular issue will assist the trier of fact. *Nimely* v. *City of New York,* 414
F.3d 381, 396-97 (2d Cir. 2005).

At the class certification stage, "where an expert's model is the basis for a
plaintiff's claim of classwide impact and causation, a court is obliged to
rigorously examine the soundness of that model." *In re Aluminum Warehousing
Antitrust Litig.*, 336 F.R.D. 5, 46 (S.D.N.Y. 2020). "[T]he question is not
whether a jury at trial should be permitted to rely on the expert's report to find
facts as to liability, but rather whether the Court may utilize it in deciding
whether the requisites of Rule 23 have been met." *City of Philadelphia* v. *Bank
of Am. Corp.*, No. 19 Civ. 1608 (JMF), 2023 WL 6160534, at *3 (S.D.N.Y.
Sept. 21, 2023) (internal quotation marks omitted) (quoting *Ge Dandong* v.

*Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013)).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007). If "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). But testimony that falls within "the range where experts might reasonably differ" should be permitted because the jury — not the Court — should assess the weight and sufficiency of the evidence. *Kumho Tire Co.*, 526 U.S. at 153.

### 2.    Analysis

The B/T Defendants argue that the DeRamus Report "violates every provision of Rule 702." (Def. MTE Br. 9). But despite this assertion, they do not contest Dr. DeRamus's qualifications, and their challenge to the helpfulness of the DeRamus Report is bound up in their challenges to its reliability. *See Nimely,* 414 F.3d at 396-97. (*Cf.* Pl. MTE Opp. 7-9 (arguing that Dr. DeRamus's testimony satisfies the requirements of qualification and helpfulness and asserting that the B/T Defendants do not argue otherwise)). Following the B/T Defendants' lead, this Opinion focuses on whether Dr. DeRamus's testimony is reliable.

As noted, a district court has "broad latitude" to determine reliability. *Restivo* v. *Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Kumho Tire Co.*, 526 U.S. at 142). For expert testimony to be reliable, it must be (i) "grounded on sufficient facts or data"; (ii) "the product of reliable principles and methods"; and (iii) "applied … reliably to the facts of the case." *Clerveaux* v. *E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Williams*, 506 F.3d at 160).

Defendants offer three reasons why the Court should exclude all or portions of Dr. DeRamus's testimony as unreliable. *First*, they argue that Dr. DeRamus relies on speculative assertions unsupported by evidence. (Def. MTE Br. 9-16). *Second*, they challenge Dr. DeRamus's methodology. (*Id.* at 16-24). *Third*, they argue that Dr. DeRamus engages in improper factfinding and exceeds the scope of his expertise. (*Id.* at 24-28). The Court addresses each argument in turn. It ultimately finds that Dr. DeRamus's testimony largely satisfies Rule 702 at this stage of the litigation, but that one component of his methodology — the t-test used to support his event study — is unreliable and must be excluded.

### a.    Dr. DeRamus's Opinions Are Not Speculative

"An expert's opinion must be more than 'subjective belief or unsupported speculation,' but need not reach the level of 'known to a certainty'[.]" *United States* v. *Carneglia*, 47 F. App'x 27, 32 (2d Cir. 2002) (summary order) (quoting *Daubert*, 509 U.S. at 590); *accord Bobcar Media, LLC* v. *Aardvark Event*

23

*Logistics, Inc.*, 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020). Here, the B/T

Defendants argue that the DeRamus Report speculates on four topics without

evidentiary support, and that its speculation on each topic should be excluded.

(Def. MTE Br. 9-16).

The Court disagrees. Each purported speculation is simply a factual

dispute over how to interpret the evidence that Dr. DeRamus cites, not a basis

to exclude Dr. DeRamus's opinions altogether. *See Cedar Petrochemicals, Inc.*

v. *Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011)

("Questions over whether there is a sufficient factual basis for an expert's

testimony may 'go to weight, not admissibility.'" (quoting *Adesina* v. *Aladan*

*Corp.*, 438 F. Supp. 2d 329, 343 (S.D.N.Y. 2006))). In other words, and as

explained further in this Opinion, certain of the B/T Defendants' arguments

are better suited for later stages of the litigation, and they do not mandate the

exclusion of Dr. DeRamus's testimony now.

### i.    Dr. DeRamus Does Not Speculate That the Anonymous Trader Received USDT Without Paying for It

*First*, the B/T Defendants ask the Court to exclude any statements that

the Anonymous Trader received USDT without paying for it, an assertion they

argue lacks a basis in the record. (Def. MTE Br. 10-13). Simply put, the B/T

Defendants argue that the Anonymous Trader paid $1 for every USDT token █

received from Bitfinex, and they suggest that Dr. DeRamus "implies" otherwise

by focusing on the large amounts of USDT that the Anonymous Trader

withdrew from Bitfinex without providing any cash to Bitfinex or Tether.  (*Id.* at 10-12).

The B/T Defendants' argument is unavailing, mostly because they misconstrue Dr. DeRamus's testimony.  As they acknowledge, Dr. DeRamus nowhere states that the Anonymous Trader received USDT without paying for it.  (Def. MTE Br. 10 (noting that Dr. DeRamus does "not ... explicitly state that the [Anonymous Trader] received USDT without paying for it")).  Instead, Dr. DeRamus opines on whether the USDT that the Anonymous Trader received was unbacked or debased, not whether it was free of charge.  (*See* DeRamus Rep. ¶ 16).

The statement that the B/T Defendants seek to exclude therefore does not exist.  And the evidence supports Dr. DeRamus's actual testimony that Tether issued USDT, including to the Anonymous Trader, without first receiving an equivalent amount of USD in its bank accounts.  (DeRamus Rep. ¶¶ 16-18, 252 & n.553, 257-259).  To be sure, the B/T Defendants may be correct in their larger point — that this timing issue does not mean that the Anonymous Trader actually failed to pay for each USDT.  (Def. MTE Br. 11-12).  But the factual dispute does provide a basis for Dr. DeRamus to assert that USDT was at times unbacked or debased.

### ii.    Dr. DeRamus Does Not Speculate That Credit Lines and Margin Trading Allowed Anyone to Receive USDT Without Paying for It

*Second*, the B/T Defendants ask the Court to exclude Dr. DeRamus's testimony about how credit lines and margin trading could render USDT

unbacked or debased.  (Def. MTE Br. 12-13).  This argument falters for the same reason as the previous one:  The B/T Defendants misconstrue what Dr. DeRamus is trying to say.  They accuse him of "speculat[ing] that credit lines and margin trading could have allowed … Bitfinex customers to withdraw USDT without paying for it" (*id.* at 13), but he actually testifies that margin trading and credit lines could have resulted in Tether issuing debased or unbacked USDT (DeRamus Rep. ¶¶ 222-234).

There is sufficient support for the latter assertion.  While there are significant factual disputes about how the credit lines and margin trading worked (*see* Pl. MTE Opp. 20-21) — all best left to the jury — there is evidence that Bitfinex accepted cryptocommodities as collateral and that customers could draw on credit lines in the form of USDT without anyone first sending USD to Tether (DeRamus Rep. ¶¶ 220-225).  This evidence speaks directly to whether USDT was debased or unbacked according to Dr. DeRamus's definition, the exact topic of his testimony.  (*See* DeRamus Dep. 44:25-46:9, 51:20-52:11, 56:23-57:12, 68:13-23; DeRamus Rep. ¶ 16).

In arguing that this testimony lacks a factual basis, the B/T Defendants are taking issue with Plaintiffs' theory of the case — that the conduct Plaintiffs identify subjects Defendants to liability — rather than the evidentiary basis for the DeRamus Report.  The Court thus sees no reason to exclude Dr. DeRamus's testimony about credit lines and margin trading at this stage.

### iii.    Dr. DeRamus's Theory of Commingled USD and USDT Is Based on Sufficient Evidence

*Third*, the B/T Defendants argue that Dr. DeRamus's theory of "commingled" USD and USDT lacks a basis in evidence and should be excluded. (Def. MTE Br. 14-15). This argument, like the previous two, reveals a factual dispute misplaced in a *Daubert* motion. Dr. DeRamus cites evidence, including ████████████████████████████ various depositions, that Bitfinex did not distinguish between USD and USDT in customer accounts and in trading until November 2018 (DeRamus Rep. ¶¶ 56 & nn.101-104, 211-213 & nn.458-459), and that Tether's funds in Bitfinex's accounts were commingled with customers' and other entities' assets (*id.* ¶ 168 & nn.330-332).

For their part, the B/T Defendants point to a declaration — postdating the DeRamus Report — from Bitfinex's former CFO, who asserts that Bitfinex did convert USDT deposits to USD and did not allow trading of USDT on the exchange. (Born Decl., Ex. 4, ¶¶ 4-12). Dr. DeRamus acknowledged that a revelation that Bitfinex converted deposits of USDT to USD would cause him "to revisit th[e] issue." (DeRamus Dep. 142:3-142:17). But offering to rethink testimony if and when presented with additional information does not mean that an expert's initial opinion is baseless, particularly where the parties dispute the significance of the proffered information. *See, e.g.*, *United States* v. *Wilson*, 441 F.2d 655, 656 (2d Cir. 1971) ("An expert need not have absolute certitude about his opinion for it to be allowed into evidence.").

iv.     **Dr. DeRamus Does Not Speculate About the Trading Accounts of Tether/Bitfinex Principals**

*Fourth*, the B/T Defendants ask the Court to exclude Dr. DeRamus's statement that he "ha[s] not been able to reconcile the significant amount of cryptocommodities purchases by the Tether/Bitfinex principals on Bitfinex with the amount of cash associated with their individual trading accounts." (DeRamus Rep. ¶ 235). The B/T Defendants may offer a compelling explanation why his statement does not necessarily "suggest anything improper" (Def. MTE Br. 15-16), but they do not explain why it is speculation.

Instead, as Plaintiffs point out, there is evidence in the record that certain Tether/Bitfinex principals bought millions of dollars' worth of cryptocommodities on Bitfinex, but their trading records show no cash deposits or sales to fully cover those purchases. (DeRamus Rep. ¶¶ 235-237). Determining whether that evidence suggests something improper is, as Plaintiffs suggest, a job for the jury. (*See* Pl. MTE Opp. 22). *See also Wilson*, 441 F.2d at 656. In sum, the Court holds that the DeRamus Report is based on sufficient evidence and will not exclude any part of it as speculative at this stage.

b.     **Dr. DeRamus's Methodology Is Largely Reliable, But the T-Test Used to Support His Event Study Must Be Excluded**

Next, the B/T Defendants attack the reliability of the methodology that Dr. DeRamus uses to show that Defendants' conduct with respect to USDT artificially inflated the price of other cryptocommodities, especially Bitcoin. (Def. MTE Br. 16-24). In assessing whether a methodology or scientific theory

is reliable, courts may look to (i) whether it "can be (and has been) tested"; (ii) whether it "has been subjected to peer review and publication"; (iii) its "known or potential rate of error, and the existence and maintenance of standards controlling [its] operation"; and (iv) whether it "has gained general acceptance in the relevant scientific community." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 467 (S.D.N.Y. 2018) ("*LIBOR VII*") (quoting *Amorgianos*, 303 F.3d at 266).

At the class certification stage, the question is whether the expert's model is "workable … , not its accuracy or credibility." *Bernstein* v. *Cengage Learning, Inc.*, No. 19 Civ. 7541 (ALC) (SLC), 2023 WL 6211771, at *7 (S.D.N.Y. Sept. 25, 2023). Here, the B/T Defendants challenge multiple components of Dr. DeRamus's methodology. The Court finds a large part of Dr. DeRamus's methodology to be reliable under Rule 702. But it agrees with the B/T Defendants' objections to the statistical significance test that Dr. DeRamus performed to support his event study and therefore holds that the test must be excluded.

### i.    Dr. DeRamus's Significance Test Is Not Reliable

The B/T Defendants first argue that the t-test that Dr. DeRamus uses to establish the statistical significance of his study is unreliable because he made a "critical error" in implementing the test. (Def. MTE Br. 17-18). The B/T Defendants are correct, such that any assertions that Dr. DeRamus makes regarding the statistical significance of his event study must be excluded.

Professor Hendershott explains that a key assumption establishing the validity of a t-test is that the values within in each tested group are independent, meaning that they are not correlated with each other. (Hendershott Rep. ¶ 81). He then argues that Dr. DeRamus's t-test violates this basic principle because the normalized prices that Dr. DeRamus uses as data points are actually "cumulative returns," meaning that each subsequent value is correlated with the values that come before it. (*Id.* ¶ 82).

For example, the normalized price six hours after the issuance of USDT is correlated with the normalized price five hours after the issuance of USDT because both incorporate the same five-hour period, with the former incorporating an additional one hour — in layperson's terms, their measurements overlap. (*See* Hendershott Rep. ¶ 82). Professor Hendershott continues to explain that when correlated values are used in t-tests, the results are biased toward finding a statistically significant difference even when there is none (*id.*), as it is logical that dependence will decrease variability in calculations.

Professor Hendershott offers two possible corrections for Dr. DeRamus's error: Either he can measure Bitcoin returns in each incremental hour, rather than the returns from the time of USDT issuance (i.e., the return from hour 11 to hour 12 rather than from issuance to hour 12), or he can measure a single cumulative return over the entire 12-hour window following each issuance. (Hendershott Rep. ¶ 83). Professor Hendershott then applies both approaches

to Dr. DeRamus's data, demonstrating no statistical significance for each study that Dr. DeRamus performed.  (*Id.* ¶¶ 84-85 & fig. 6).

Plaintiffs protest that the methodological dispute between Dr. DeRamus and Professor Hendershott "is a 'battle of the experts' inappropriate for resolution on a *Daubert* motion."  (Pl. MTE Opp. 16 (quoting *AU New Haven, LLC* v. *YKK Corp.*, No. 15 Civ. 3411 (GHW) (SN), 2019 WL 1254763, at *14 n.99 (S.D.N.Y. Mar. 19, 2019)))).  But there is a difference between a battle of the experts and a scenario in which an expert's test "is itself an unreliable methodology."  *AU New Haven, LLC*, 2019 WL 1254763, at *14 & n.99.  Here, Dr. DeRamus's statistical significance test violates a basic principle on which t-tests depend.  Calling it a "t-test" does not cure his methodology of its deficiencies.  (*Cf.* Pl. MTE Opp. 16 (defending Dr. DeRamus's significance test because "the t-test" is "a well-accepted methodology")).

Key here is that Plaintiffs cannot offer even a single justification for Dr. DeRamus's approach.  Plaintiffs do not respond by arguing that independence is not a basic assumption of a t-test; they do not attempt to defend Dr. DeRamus's normalized prices as independent; and they do not explain why the normalized prices' interdependence does not matter in this scenario.  (*See* Pl. MTE Opp. 16 (simply asserting that the B/T Defendants' "criticism ... does not" "ha[ve] merit")).  Their silence is deafening.  (*See id.* at 16 (stating that Dr. DeRamus "will provide" his "response ... at the merits phase")).  Dr. DeRamus's significance test is itself unreliable, and thus the Court strikes it.

The Court has also considered the B/T Defendants' corollary argument that if Dr. DeRamus's t-test falls, so must the rest of his analysis, including his regression analysis and his overcharge model. (Def. MTE Br. 17). Here, however, the Court disagrees. As Plaintiffs point out, the event study is separate from the other two steps. (Pl. MTE Opp. 16). And as the following subsections make clear, the Court finds the regression analysis and overcharge model to be reliable at this stage of the litigation. To the degree that these remaining components of Dr. DeRamus's analysis evince a relationship between the issuance of USDT and the price of Bitcoin, they could assist the trier of fact. In other words, the failure of the t-test does not mean that no relationship exists between the issuance of USDT and the price of Bitcoin, it just means that the event study cannot prove one. As such, the t-test's unreliability does not necessitate a finding that a completely separate regression model is also unreliable (though it may, of course, undermine what that model purports to show).

For that reason, this case is different from other cases in which courts have struck entire expert reports when each step of the expert's analysis follows from the step before it. *Cf. Amorgianos*, 303 F.3d at 267 (explaining that each independent analysis by an expert must "be reliable at every step," but not foreclosing the idea that certain independent analyses by an expert may be reliable while others are not); *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 310 F.R.D. 69, 76 (S.D.N.Y. 2015) ("[I]t is routine for a party to retain a single expert to opine on a variety of issues that, while related, can be

analyzed independently under the *Daubert* standard.  In such cases, … a court may exclude portions of an expert report while admitting other portions.").  Because Dr. DeRamus's event study is independent from his regression analysis and overcharge model, exclusion of the former does not mandate exclusion of the latter.

### ii.        Dr. DeRamus's Regression Analysis Is Reliable

The B/T Defendants next independently challenge Dr. DeRamus's regression analysis for failing to properly test whether the variables in the analysis are cointegrated, which is a crucial requirement for the type of regression analysis he performs.  (Def. MTE Br. 18-19).  Specifically, the B/T Defendants, citing Professor Hendershott, argue that Dr. DeRamus uses the wrong "critical values" to test for cointegration.  (*Id.* at 19 (citing Hendershott Rep. ¶¶ 12, 99-100)).  Plaintiffs retort, unsurprisingly, that Dr. DeRamus's critical values were correct and that his model can produce significant results even if the cointegration test fails by using a "first differences methodology." (Pl. MTE Opp. 13-15).

Unlike their argument with regard to Dr. DeRamus's t-test, Plaintiffs here have provided an adequate defense of the reliability of Dr. DeRamus's regression analysis, and they are right that this dispute presents a battle of the experts that the Court should not resolve at this stage.  *See AU New Haven, LLC*, 2019 WL 1254763, at *14 & n.99.  The disagreements about which critical values are most appropriate are best resolved by a factfinder, not in a *Daubert* motion.  *See In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir.

1995) ("Trial courts should not arrogate the jury's role in 'evaluating the evidence and the credibility of expert witnesses' by 'simply choosing sides in the battle of the experts.'" (alterations adopted) (quoting *Christophersen* v. *Allied-Signal Corp.*, 902 F.2d 362, 366 (5th Cir. 1990), *superseded on rehearing*, 939 F.2d 1106 (5th Cir. 1991))).  Dr. DeRamus's regression analysis is therefore sufficiently reliable at this stage.

### iii.        Dr. DeRamus's Overcharge Model Is Reliable

The B/T Defendants also independently attack Dr. DeRamus's overcharge model.  As to this component, the B/T Defendants have identified problems in Dr. DeRamus's methodology, but not enough to render it unreliable under Rule 702.

The overcharge model takes Dr. DeRamus's regression analysis — which quantifies how a change in the volume of USDT affects Bitcoin prices — and applies it using the amount of unbacked or debased USDT as the "change in volume" value in the regression analysis.  (DeRamus Rep. ¶¶ 325-334, 360-366).  The B/T Defendants are correct that the central premise of the model — and one that must be true to establish its reliability — is the existence of a "connection between 'unbacked or debased' USDT and 'the amount of outstanding USDT.'"  (Def. MTE Br. 19 (quoting DeRamus Rep. ¶¶ 363-364)).  The B/T Defendants posit that these two concepts are completely unrelated, and thus the model fails.  (*Id.* at 19-21).  The Court sees it differently.  There is a logical connection between the two concepts.  How Dr. DeRamus's model

quantifies that connection may be open to debate, but challenges to his calculations are best left to cross-examination.

The B/T Defendants' main argument is that Defendants' act of unbacking or debasing USDT did not directly cause Defendants to issue additional USDT. (Def. MTE Br. 19-20). And if unbacking or debasing USDT did not cause Defendants to increase the supply of USDT, then the regression analysis, which models how the amount of USDT affects the price of bitcoin, is useless. (*Id.* at 20 (citing Hendershott Rep. ¶¶ 12, 32-36)). There are two problems, however, with the B/T Defendants' position.

*First*, Plaintiffs contest the B/T Defendants' assertion that the unbacking or debasing of USDT did not cause Defendants to issue additional USDT. Instead, Plaintiffs reason that "[i]ssuing unbacked or debased USDT let Tether increase the USDT supply by 'effectively engaging in fractional reserve banking.'" (Pl. MTE Opp. 17 (alteration adopted) (quoting DeRamus Rep. ¶ 268)). Plaintiffs are right that unbacking or debasing USDT could have let Defendants increase the supply of USDT. Whether it *in fact* had that effect is a question for the factfinder. If Defendants increased the supply of USDT when the value of their non-USD reserves increased, or if Defendants issued unbacked USDT to customers who sought to purchase USDT with anything other than USD, there is a clear link between the amount of unbacked or debased USDT and the amount of outstanding USDT.

*Second*, even if the factual basis of the B/T Defendants' assertion — that the unbacking or debasing of USDT did not cause Defendants to issue

additional USDT — were true, the B/T Defendants' argument accounts for only half of basic economic theory. What the B/T Defendants miss is that unbacking or debasing USDT could affect the *demand* for, rather than the *supply* of, USDT. And that could in turn establish an overcharge.

Consider the B/T Defendants' hypothetical: On Day 1, there is no unbacked or debased USDT. (Def. MTE Br. 20 (citing DeRamus Dep. 190:16-191:2)). On Day 2, Tether then invests 30% of its cash reserves, effectively rendering it debased. (*Id.* (citing DeRamus Dep. 191:6-191:13)). The B/T Defendants point out "that there has been *no change* in the amount of outstanding USDT," which they assert means that there is no inflation in Bitcoin's price, even though Dr. DeRamus's model would find an overcharge. (*Id.*).

But again, this only accounts for the effect of supply on price and completely ignores the effect of demand. The B/T Defendants are correct that, in their hypothetical, increased supply of USDT is not driving up Bitcoin prices (because there is no increased supply). But Plaintiffs' model may also account for the fact that unbacking or debasing USDT could decrease *demand* for USDT, which means that Bitcoin's market price would be artificially inflated compared to what it otherwise would be.

Returning to the hypothetical above, Dr. DeRamus's model assumes that, if Tether invested 30% of its cash reserves but did not increase the supply of USDT, Bitcoin prices became inflated not because the amount of USDT increased, but rather because the demand for USDT would have decreased if

USDT owners had known about the debasing, which would have caused the price of Bitcoin to decrease.  In other words, the inflated price is not the amount that Bitcoin increased in price, but rather the amount that Bitcoin otherwise would have fallen in price had demand for USDT not been artificially inflated.  This is a valid economic theory that connects the issuance of unbacked or debased USDT with the value or price of outstanding USDT, even assuming supply stays constant.

The Court thus finds that Dr. DeRamus's overcharge model is reliable. *Cf. Clerveaux*, 984 F.3d at 233.  Of course, that does not mean that it is completely accurate, nor need it be.  *See United States* v. *Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *6 n.8 (S.D.N.Y. May 13, 2021) (noting that expert reports based on social science are admissible even though they "cannot have the exactness of hard science methodologies" (internal quotation marks omitted) (quoting *United States* v. *Joseph*, 542 F.3d 13, 21 (2d Cir. 2008), *abrogated on other grounds by*, *United States* v. *Ferguson*, 676 F.3d 260, 276 n.14 (2d Cir. 2011))).

As with other segments of Dr. DeRamus's expert submissions, the overcharge model is ripe for cross-examination.  For example, because Dr. DeRamus derives the but-for USDT issuance by subtracting the unbacked or debased USDT from the total outstanding USDT (DeRamus Rep. ¶ 361), his model inherently assumes that the demand for unbacked or debased USDT is zero.  Put another way, he believes that if 30% of USDT is unbacked or debased, the but-for USDT issuance would be 70% of the actual USDT

issuance.  This implies that there is no demand for unbacked or debased USDT.

The Court, like the B/T Defendants (*see* Def. MTE Reply 8), finds that proposition dubious.  But such skepticism is no reason to exclude the model; instead, it is an argument to make to the jury.  The model Dr. DeRamus offers is grounded in economic theory and workable, and so the Court finds it reliable under Rule 702.  *See Fed. Deposit Ins. Corp.* v. *Suna Assocs., Inc.*, 80 F.3d 681, 686 (2d Cir. 1996) ("[E]xpert testimony must be based upon reliable theories or principles." (internal quotation marks omitted) (quoting Glen Weissenberger, *Federal Evidence* 346 (2d ed. 1995))); *In re Actos Antitrust Litig.*, No. 13 Civ. 9244 (RA) (SDA), 2024 WL 4251891, at *24 (S.D.N.Y. Aug. 9, 2024) (noting that at the class certification stage, "the question is whether the [plaintiffs] have presented a workable model, not … whether the jury ultimately will accept or reject the underlying calculations"), *report and recommendation adopted*, No. 13 Civ. 9244 (RA), 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024).[7]

> ### iv.    Dr. DeRamus's Testimony About the Market Effect of Revealing That USDT Was Unbacked or Debased Is Reliable

Next, the B/T Defendants seek exclusion of Dr. DeRamus's "opini[on] that if the market had known that Tether's reserves included non-cash assets,

---

[7]    The B/T Defendants also argue that Dr. DeRamus's methodology "rests upon a novel, untested application of the 'quantity theory of money.'"  (Def. MTE Br. 17).  They do not return to the topic, so it is unclear if they believe that this is a reason to exclude the testimony.  It is not.  As Plaintiffs explain, the theory is well-established and backed by evidence.  (*See* Pl. MTE Opp. 15 (first citing DeRamus Rep. ¶¶ 270-278; then citing Hendershott Rep. ¶ 104)).

the price of USDT 'would have dropped substantially,' and the 'price of Bitcoin would likely have declined significantly as well.'" (Def. MTE Br. 21-23 (quoting DeRamus Rep. ¶¶ 291-292)).  In large part, Defendants criticize Dr. DeRamus for failing to conduct an event study to substantiate this opinion.  (*Id.* at 21-22).  The Court disagrees based on two relevant considerations.

For one, the opinion that the B/T Defendants seek to exclude is closely related to statements Dr. DeRamus makes that *are* substantiated.  The Court already held as sufficiently reliable Dr. DeRamus's opinion that the issuance of unbacked or debased USDT leads to price increases in Bitcoin.  *See supra* A.2.b.ii-.iii.  His separate opinion — that had the market known that USDT was unbacked or debased, Bitcoin prices would have decreased — is closely related to his already-accepted testimony about the issuance of unbacked or debased USDT.  As a result, the Court is disinclined to exclude it for lack of support.

In addition, the B/T Defendants are wrong that Dr. DeRamus employs no reliable methodology in making his simple assertion about the market effects of knowing that USDT was unbacked or debased.  (Def. MTE Br. 21).  He identifies two instances where public revelations about Tether's reserves coincided with USDT prices falling.  (DeRamus Rep. ¶¶ 292-294).  And he also analyzes changes to other stablecoins' prices after the market learned that they were unbacked or debased.  (*Id.* ¶¶ 295-297).  *See AngioDynamics, Inc.* v. *C.R. Bard, Inc.*, No. 17 Civ. 598 (BKS) (CFH), 2022 WL 2643583, at *6 (N.D.N.Y. July 8, 2022) (noting that "[c]ourts have allowed expert economists to testify based on qualitative analyses" (collecting cases)).  Though Dr. DeRamus's

testimony about market reactions to revelations about USDT debasement is subject to challenge — indeed, there is considerable merit to the B/T Defendants' "cherry-pick[ing]" arguments (Def. MTE Br. 21; *see also* Def. MTE Reply 11-12) — the Court is constrained to find that it is sufficiently reliable to admit at this stage.

### v.    Dr. DeRamus's Approach to Quantifying Unbacked and Debased USDT Is Reliable

Finally, the B/T Defendants contest Dr. DeRamus's two methods for estimating the amount of unbacked and debased USDT.  Specifically, they argue that (i) his method based on receivables is unreliable because it exceeds the scope of his expertise, and (ii) his method based on the amount of USDT that the Anonymous Trader withdrew from Bitfinex is speculative because, as they argued earlier, there is no evidence that the Anonymous Trader received USDT without paying for it.  (Def. MTE Br. 23-24).

Considering first the method based on receivables, the Court notes that Dr. DeRamus is an economist, but that courts have often permitted economists to analyze financial records, including those containing receivables.  *See LIBOR VII*, 299 F. Supp. 3d at 516 (permitting economics expert to analyze financial documents despite lack of financial services industry experience); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 261-62 (E.D.N.Y. 2022) (similar).  This Court agrees with those decisions and finds that Dr. DeRamus's testimony estimating the amount of unbacked and debased USDT by examining relevant receivables is sufficiently reliable.

Regarding the method based on the Anonymous Trader's withdrawals, the B/T Defendants' argument fails because the Court has already rejected its foundational premise that Dr. DeRamus speculated about the Anonymous Trader's acquisition of unbacked or debased USDT.  *See supra* A.2.a.i.  As such, the Court declines to exclude Dr. DeRamus's testimony quantifying the amount of unbacked or debased USDT.  Ultimately, this is a question of fact that the jury must decide.  *See Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d at 1135.

### c.     Dr. DeRamus Does Not Improperly Engage in Factfinding or Exceed the Scope of His Expertise

The B/T Defendants next argue that the Court should exclude parts of the DeRamus Report in which Dr. DeRamus "usurp[ed] the role of the Court as finder of fact."  (Def. MTE Br. 24-27).  They first assert that Dr. DeRamus cannot opine on how investors would have interpreted Tether's public statements (*id.* at 24), but analyzing market reaction is not "state of mind" testimony and is permissible for experts, *see In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14 MD 2542 (VSB), 2025 WL 354671, at *39 (S.D.N.Y. Jan. 30, 2025) (holding that an expert's analysis and conclusions regarding potential market reaction did not "speak to customers' state of mind and therefore is not impermissible expert testimony").

Under the rubric of improper factfinding, the B/T Defendants also contest Dr. DeRamus's definitions of "unbacked" and "debased" (Def. MTE Br. 24-25), but defining key terms is good practice, and not factfinding at all, *see Great White Bear, LLC* v. *Mervyns, LLC*, No. 06 Civ. 13358 (RMB) (FM),

41

2008 WL 11396805, at *2 (S.D.N.Y. July 9, 2008) ("Expert reports must contain 'essential details needed to understand and assess' the expert's conclusions." (quoting *Lava Trading, Inc.* v. *Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *7 (S.D.N.Y. Apr. 11, 2005))). And Defendants do not identify any conceptual errors in Dr. DeRamus's definitions.

The Court also rejects the B/T Defendants' argument that Dr. DeRamus acts as a narrator of facts. (Def. MTE Br. 25). Indeed, he discusses the underlying facts often, but his testimony is an *analysis* of those facts, not "simply a 'conduit' for inadmissible hearsay." *Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d at 254-55. For example, Dr. DeRamus discusses Tether's loans to Bitfinex and Bitfinex's loss of access to its accounts at Crypto Capital to support his economic analysis of whether Tether issued unbacked or debased USDT. (DeRamus Rep. ¶¶ 185-210). And after concluding that Tether issued unbacked or debased USDT, he evaluates that fact's effect on Bitcoin prices. (*Id.* at ¶¶ 270-272, 291, 302-310, 333). Finally, Dr. DeRamus discusses Defendants' "special arrangements" with the Anonymous Trader, but only to explain how the Anonymous Trader's activity led to further debasement of USDT and thus inflated cryptocommodity prices. (*Id.* ¶¶ 81-97, 141-142, 298-310, 317-321).

In addition to arguing that Dr. DeRamus improperly finds facts, the B/T Defendants also argue that his factfinding is based on inadmissible evidence. (Def. MTE Br. 25-27). As Plaintiffs point out, the B/T Defendants take issue with only a small subset of materials that Dr. DeRamus relies on: (i) regulatory

settlement orders from the New York Attorney General and the Commodity

Futures Trading Commission, (ii) news articles and blog posts, and

(iii) spreadsheets produced by Defendants detailing amounts that Bitfinex owed

to Tether.  (*Id.*; *see also* Pl. MTE Opp. 24).

The Court declines to exclude Dr. DeRamus's testimony on that basis at

this stage of the litigation.  During class certification, "the Court may only

examine … expert reports as far as they bear on the Rule 23 determination."  *In

re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009) (internal

quotation marks omitted) (quoting *Hnot* v. *Willis Grp. Holdings Ltd.*, 241 F.R.D.

204, 210 (S.D.N.Y. 2007)).  Given the limited nature of the B/T Defendants'

objections, a determination of whether this evidence is admissible will not bear

on the Court's class certification determination.  Indeed, the B/T Defendants

identify no key testimony that is supported only by the evidence they contest.

*Cf. Houser* v. *Pritzker*, 28 F. Supp. 3d 222, 244 n.5 (S.D.N.Y. 2014) ("Because it

is unnecessary to consider the substance of [the expert]'s conclusions in order

to resolve the class certification motion, the concerns raised … are moot.").

As Plaintiffs point out, Defendants have not cited any case in which a

court declined to consider purportedly inadmissible evidence at the class

certification stage.  (Pl. MTE Opp. 26).  Instead, those cases prohibit

transmitting certain hearsay to a jury.  *See, e.g.*, *United States* v. *Mejia*, 545

F.3d 179, 197-98 (2d Cir. 2008) (holding that an expert's statements violated

Federal Rule of Evidence 703 because that expert acted as a "case agent" to

provide hearsay evidence to the jury); *United States* v. *Dukagjini*, 326 F.3d 45,

58-59 (2d Cir. 2003) ("[A]n expert [may] rely on hearsay evidence for the purposes of rendering an opinion based on his expertise, but in this case the expert was repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay.").

Of course, the Court is not currently deciding whether it will permit Dr. DeRamus to testify at trial as to the contents of the contested evidence.  *See In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 580 (E.D.N.Y. 2007) ("*In limine* motions respecting particular aspects of … experts' proposed testimony will be considered when it becomes clear what will be the detailed issues to be tried."), *vacated in part on other grounds by, UFCW Local 1776* v. *Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010))).  But at this stage, the Court declines to exclude Dr. DeRamus's testimony on the basis that he relied on inadmissible evidence.

The B/T Defendants close by arguing that Dr. DeRamus's opinions about the crypto industry should be excluded because he is not a crypto industry expert. (Def. MTE Br. 28).  But as Plaintiffs point out, Dr. DeRamus does not opine as an expert on the crypto industry; instead, he applies economic concepts to crypto markets.  (*See* Pl. MTE Opp. 7-8).  Indeed, courts routinely "accept[ ] expert testimony from financial and economic analysts even when those witnesses lack 'industry specific' knowledge." *Arista Recs. LLC* v. *Lime Grp. LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *10 (S.D.N.Y. May 2, 2011) (quoting *Johnson & Johnson Vision Care, Inc.* v. *CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006)); *see also,*

*e.g.*, *Johnson & Johnson Vision Care, Inc.*, 2006 WL 2128785, at *6 (permitting an accountant to testify in an optic lens case despite lack of expertise in optometry); *TC Sys. Inc.* v. *Town of Colonie*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) (permitting an economist to opine in a telecommunications case despite lack of telecommunications industry experience); *Phx. Light SF Ltd.* v. *Bank of N.Y. Mellon*, No. 14 Civ. 10104 (VEC), 2020 WL 1322856, at *9-10 (S.D.N.Y. Mar. 20, 2020) (permitting a statistician to testify in a loan servicing case despite lack of expertise in loan servicing).

The mere fact that Dr. DeRamus discusses the crypto industry and the types of commodities available in it does not mean that he testifies as an expert on that industry. *See, e.g.*, *DPWN Holdings (USA), Inc.* v. *United Air Lines, Inc.*, No. 11 Civ. 564 (BMC) (PK), 2019 WL 1515231, at *6 (E.D.N.Y. Feb. 20, 2019) ("[The witness] is an expert in econometrics and antitrust damages, and he can apply that expertise to different underlying subject matters and industries."). Here, Dr. DeRamus employs standard economic methods (with the exception of his t-test) that courts have long accepted. *See, e.g.*, *City of Philadelphia*, 2023 WL 6160534, at *5. At this stage, the Court declines to hold that any of Dr. DeRamus's testimony exceeds the scope of his expertise.

### d. Plaintiffs Have Established the Admissibility of the DeRamus Report Exclusive of the T-Test

The Court recognizes that Plaintiffs have the burden of establishing the admissibility of Dr. DeRamus's testimony. *See Williams*, 506 F.3d at 160. To the extent that the above analysis does not make it clear that Plaintiffs have

met their burden as to all testimony besides Dr. DeRamus's t-test, *see supra* A.2.b.i, the Court holds so here.

As Plaintiffs argue and the B/T Defendants do not contest (*see* Pl. MTE Opp. 7-8), Dr. DeRamus is qualified to opine on economics and antitrust, *see Nimely*, 414 F.3d at 396-97.  Indeed, courts around the country have found him to be qualified to opine on these issues.  *See In re Purdue Pharma L.P.*, No. 19-23649 (SHL) (Bankr. S.D.N.Y. filed Sept. 15, 2019); *XY, LLC* v. *Trans Ova Genetics, LC*, No. 13 Civ. 879 (RM) (CBS) (D. Colo. filed Apr. 4, 2013); *Perrigo Co.* v. *United States*, No. 17 Civ. 737 (RJJ) (PJG) (W.D. Mich. filed Aug. 15, 2017).  In addition, as the Court has already discussed at length, most of Dr. DeRamus's opinions are "based upon reliable data and methodology." *Nimely*, 414 F.3d at 396-97; *see also supra* A.2.a-.c.  Those that are not based on sound methodology — namely, his assertion that his event study demonstrates statistical significance — have already been excluded above.  *See supra* A.2.b.i.

Finally, Dr. DeRamus's admissible opinions are relevant, meaning that they "will assist the trier of fact." *Nimely*, 414 F.3d at 396 (internal quotation marks omitted) (quoting Fed. R. Evid. 702).  (*See* Pl. MTE Opp. 8-9).  At the class certification stage, an expert's opinion may be relevant for tending to show that liability can be proven with classwide evidence or that class members are ascertainable.  *See Actos Antitrust Litig.*, 2024 WL 4251891, at *9.  Here, Dr. DeRamus's opinions are relevant to, among other things, determining

whether issues of law or fact common to the proposed class predominate over individual ones under Rule 23(b)(3). *See infra* B.3.a.

In sum, because the DeRamus Report largely satisfies the requirements of Rule 702, the Court denies the B/T Defendants' motion to exclude it at this stage, with the exception of the flawed t-test. Having resolved the evidence it may properly consider in resolving Plaintiffs' Motion for Class Certification, the Court proceeds to consider that motion.

## B. The Court Grants in Modified Form Plaintiffs' Motion for Class Certification

### 1. Applicable Law

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met[.]" *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006). The party seeking certification must establish that the proposed class meets all the requirements of Rule 23 "by a preponderance of the evidence." *Myers* v. *Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Under Rule 23(a), the moving party must make a threshold showing that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

These Rule 23(a) prerequisites — commonly referred to as numerosity, commonality, typicality, and adequacy — are subject to "rigorous analysis." *Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 33 (internal quotation marks

omitted) (quoting *Gen. Tel. Co. of the Sw.* v. *Falcon*, 457 U.S. 147, 161 (1982)).

In addition to Rule 23(a)'s textual requirements, the Second Circuit also

recognizes an implicit "ascertainability" requirement, whereby the proposed

class must be "defined using objective criteria that establish a membership

with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir.

2017).

"[I]f the threshold requirements of Rule 23(a) are met, a plaintiff must

also establish that the proposed class falls into one of the three categories set

forth in Rule 23(b)." *Azor-El* v. *City of New York*, No. 20 Civ. 3650 (KPF), 2024

WL 4326921, at *7 (S.D.N.Y. Sept. 27, 2024). Here, Plaintiffs seek to certify a

class under Rule 23(b)(3). (Pl. CC Br. 1). Rule 23(b)(3) provides that a class

action "may be maintained" if "the court finds [i] that the questions of law or

fact common to class members predominate over any questions affecting only

individual members, and [ii] that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ.

P. 23(b)(3).

"Ultimately, the district court has broad discretion in deciding how and

whether to certify a class, arising from its 'inherent power to manage and

control pending litigation.'" *Aluminum Warehousing Antitrust Litig.*, 336 F.R.D.

at 37 (quoting *Myers*, 624 F.3d at 547). This includes the power to "alter or

modify the class, create subclasses, and decertify the class whenever

warranted." *Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*, 262 F.3d

134, 139 (2d Cir. 2001). The same class certification requirements apply to the

certification of subclasses:  "[A] court must assure itself that each subclass independently meets the requirements of Rule 23."  *Ramirez* v. *Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014).

### 2. Rule 23(a) Analysis

#### a. The Class and the Futures Subclass Are Ascertainable

Before turning to Rule 23's textual requirements, the Court first addresses the implicit ascertainability requirement.  The Second Circuit has described ascertainability as a "modest threshold requirement [that] will only preclude certification if a proposed class definition is indeterminate in some fundamental way."  *Petrobras Sec.*, 862 F.3d at 269.

As Plaintiffs argue — and the B/T Defendants do not contest — the Class and the Futures Subclass satisfy the ascertainability requirement.  (*See* Pl. CC Br. 17-18; Pl. CC Reply 2).  The putative classes are defined by investors' purchases of specific cryptocommodities or cryptocommodity futures in a specific timeframe (SAC ¶¶ 394-395), criteria that are "clearly objective." *Martínek* v. *AmTrust Fin. Servs., Inc.*, No. 19 Civ. 8030 (KPF), 2022 WL 326320, at *8 (S.D.N.Y. Feb. 3, 2022) (internal quotation marks omitted) (quoting *Petrobras Sec.*, 862 F.3d at 269).

And identifying Class Members will be administratively feasible:  They may certify their purchases in sworn statements after public notice or through providing trading records.  *See, e.g.*, *Williams* v. *KuCoin*, No. 20 Civ. 2806 (GBD) (RWL), 2021 WL 5316013, at *14 (S.D.N.Y. Oct. 21, 2021) (finding ascertainability for class of investors who could "self-identify themselves in

response to a public notice"), *report and recommendation adopted*, No. 20 Civ. 2806 (GBD) (RWL), 2022 WL 392404; *Langan* v. *Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 91 n.2 (2d Cir. 2018) ("[W]e see no ascertainability problem with having the class members submit sworn affidavits describing the circumstances under which the purchases were made."). Therefore, both the Class and the Futures Subclass are sufficiently ascertainable.

### b. The Class and the Futures Subclass Are Sufficiently Numerous Under Rule 23(a)(1)

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts in this Circuit presume numerosity at 40 putative class members." *Stewart* v. *Hudson Hall LLC*, No. 20 Civ. 885 (PGG) (SLC), 2021 WL 6285227, at *7 (S.D.N.Y. Nov. 29, 2021) (report and recommendation). That said, "[t]he movant need not provide a precise quantification of their class, since a court may make common sense assumptions to support a finding of numerosity[.]" *Lea* v. *Tal Educ. Grp.*, No. 18 Civ. 5480 (KHP), 2021 WL 5578665, at *5 (S.D.N.Y. Nov. 30, 2021) (internal quotation marks omitted) (quoting *Kalkstein* v. *Collecto, Inc.*, 304 F.R.D. 114, 119 (E.D.N.Y. 2015)).

As Plaintiffs argue with no objection from the B/T Defendants, both the Class and the Futures Subclass easily satisfy Rule 23(a)(1). (*See* Pl. CC Br. 18-19; Pl. CC Reply 2). During the Class Period, the trading volume of USD- and USDT-based transactions for Bitcoin alone was $514 million, and the monthly trading volume of Bitcoin futures ranged from over $1.5 billion to over $5 billion just on the Chicago Board Options Exchange and the Chicago

Mercantile Exchange.  (*See* DeRamus Rep. ¶¶ 38 fig. 1, 77).  This enormous volume shows that the Class and the Futures Subclass are sufficiently numerous to make joinder impracticable.  *See Martínek*, 2022 WL 326320, at *5 (finding numerosity based on a large volume of outstanding stock shares and frequent trading during the class period); *Wallace* v. *IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014) (finding numerosity based on a large number of outstanding shares alone).

### c.     There Are Multiple Common Questions of Law and Fact Under Rule 23(a)(2)

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In other words, class members' claims "must depend upon a common contention" about a defendant's conduct, such "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011).  "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."  *Actos Antitrust Litig.*, 2024 WL 4251891, at *15 (internal quotation marks omitted) (quoting *Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015)).

Plaintiffs here satisfy Rule 23(a)(2).[8]  Many of the key factual questions revolve around Defendants' conduct — whether USDT was backed by USD,

---

[8]     Rule 23(b)(3)'s predominance requirement subsumes Rule 23(a)(2)'s commonality requirement.  *See Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 609 (1997); *Dial Corp.* v. *News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015).  Consequently, the Court offers a brief analysis of commonality here and will turn to a larger predominance analysis later.

whether Defendants flooded the market with debased USDT through the Anonymous Trader, whether those trades artificially raised the price of cryptocommodities — making them common to the whole class.  *See, e.g.*, *Nguyen-Wilhite* v. *Tapestry, Inc.*, No. 23 Civ. 3339 (JLR), 2025 WL 504628, at *5 (S.D.N.Y. Feb. 14, 2025) ("Where the question of law involves standardized conduct of the defendant[,] … a common nucleus of operative fact is typically presented and the commonality requirement … is usually met." (internal quotation marks omitted and omissions in original) (quoting *Balverde* v. *Lunella Ristorante, Inc.*, No. 15 Civ. 5518 (ER), 2017 WL 1954934, at *6 (S.D.N.Y. May 10, 2017))).

In addition to common factual questions, there are common legal questions also tied to Defendants' conduct.  These include whether Defendants' conduct constituted price manipulation, whether Defendants controlled prices, and whether Defendants conspired with the Anonymous Trader.  The answers to each of these questions "will be determined on a classwide basis without regard for evidence pertaining to individual class members."  *In re Platinum & Palladium Commodities Litig.*, No. 10 Civ. 3617 (WHP), 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (finding commonality for CEA and antitrust claims based on "overarching questions" of "whether the Defendants manipulated the futures or physical markets for platinum or palladium").

---

*See infra* B.3.a.  The B/T Defendants do not contest commonality on its own, but they do contest predominance.  (*See* Def. CC Opp. 11-45).  Their arguments will be addressed in the Court's discussion of predominance.

Indeed, "courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 509-10 (S.D.N.Y. 1996) (collecting cases); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 (S.D.N.Y. 1998) ("[A]ll [CEA] class members must initially prove the existence of the same conspiracy; in fact the existence *vel non* of the alleged conspiracy will likely be the central issue at trial."). The Court holds the same here.

### d. Named Plaintiffs Bring Typical Claims Under Rule 23(a)(3)

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Robidoux* v. *Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). This "requirement is 'not demanding.'" *Villella* v. *Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019) (quoting *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015)). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual

claims." *Robidoux*, 987 F.2d at 936-37.  Typicality is generally satisfied in CEA and antitrust cases because they depend on a central conspiracy or scheme. *See, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 547 (S.D.N.Y. 2021) ("[T]he typicality requirement is met because [the plaintiff] must prove the existence of an antitrust conspiracy, that the conspiracy caused injury, and that it resulted in damages.").

Defendants wisely do not contest Plaintiffs' argument that typicality is satisfied here.  (*See* Pl. CC Br. 20-21; Pl. CC Reply 2).  Claims by both the named Plaintiffs and the Class and Subclass Members "arise[ ] from the same course of events," and they all pursue the same "legal arguments to prove [Defendants'] liability."  *In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126 (ALC) (KNF), 2022 WL 485005, at *6 (S.D.N.Y. Feb. 17, 2022) (internal quotation marks omitted) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund* v. *Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007)).  Specifically, the named Plaintiffs and the putative Class and Subclass Members all bought cryptocommodities or cryptocommodity futures during the Class Period, were all allegedly injured by Defendants' scheme, and now all pursue the same claims.  This is more than enough to establish typicality.  *See Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 547.

> ### e.   Named Plaintiffs Will Fairly and Adequately Represent the Class and the Futures Subclass Under Rule 23(a)(4)

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). "Adequacy has two components:  'First, class counsel must be qualified,

experienced, and generally able to conduct the litigation,' and 'second, the class members must not have interests that are antagonistic to one another.'" *Haw. Structural Ironworkers Pension Tr. Fund, Inc.* v. *AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021) (alteration adopted) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Adequacy fails when there are "fundamental" "conflicts of interest between named parties and the class they seek to represent." *Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d at 35 (internal quotation marks omitted) (first quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001), *abrogated in part by*, *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); then quoting *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 625 (1997)). These conflicts must "extend … beyond the apportionment of damages." *Iowa Pub. Emps.' Ret. Sys.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 17 Civ. 6221 (KPF) (SLC), 2024 WL 5004632, at *10 (S.D.N.Y. Dec. 6, 2024) (internal quotation marks omitted and omission in original) (quoting *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019) ("*Forex III*")).

The adequacy requirement has some connection to the typicality requirement in Rule 23(a)(3). *See, e.g.*, *Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 91 (S.D.N.Y. 2018) (considering the two factors together). "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class[.]" *Damassia* v. *Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008).

Unlike the previous Rule 23(a) requirements, the B/T Defendants argue that adequacy is lacking.  They do not contest the adequacy of class counsel, and indeed, the Court agrees with Plaintiffs that class counsel is adequate under Rule 23(a)(4).  (Pl. CC Br. 22; Pl. CC Reply 2).  But the B/T Defendants argue that there are irreconcilable conflicts among Class Members such that the named Plaintiffs cannot adequately represent the Class.  (Def. CC Opp. 45-47).  They offer two sources of potential intraclass conflict, neither of which ultimately defeats adequacy.

### i.    Intraclass Trading Does Not Undermine Adequacy

*First*, the B/T Defendants argue that because Class Members traded directly with each other, buyers of a crypto asset covered by the Class will want to show that they purchased at a high rate of inflation, while sellers will want to show that they sold at a low rate of inflation.  (Def. CC Opp. 45).  This is related to the opinion raised by Professor Hendershott that a Class Member who traded Bitcoin for Ethereum is harmed only if the Ethereum inflation was greater than the Bitcoin inflation, while their trading partner is harmed only if the opposite is true.  (Hendershott Rep. ¶¶ 205-208).

The B/T Defendants are wrong that the intraclass trading they identify creates adverse incentives in this litigation.  That is because no one in either the Class or the Futures Subclass will want to show a low rate of inflation.  After all, cryptocommodity sellers are not included in either the Class or Futures Subclass — only buyers.  To the extent that some buyers also sold

56

cryptocommodities, their interest in this litigation is the same as all other Class Members: to prove that they bought at inflated prices.

In this way, the instant case is different from cases that the B/T Defendants cite for the proposition that when class members "trade directly with each other," "oppositional trading positions ... create fundamental conflicts that preclude class certification." (Def. CC Opp. 45 (internal quotation marks omitted) (quoting *Forex III*, 407 F. Supp. 3d at 439)). *See also LIBOR VII*, 299 F. Supp. 3d at 539 (denying class certification where "named plaintiffs with opposite net trading positions will have directly conflicting incentives to establish ... the existence ... [and] magnitude of any manipulation"). Both *Forex III* and *LIBOR VII* dealt with price manipulation that drove prices up and down, meaning that class members had different incentives to show whether defendants manipulated prices on a given day and in what direction. *See Forex III*, 407 F. Supp. 3d at 439 ("The Named Plaintiffs and their class member counterparties would have directly conflicting incentives to establish whether spread manipulation occurred on certain dates and the extent to which it affected their transactions."); *LIBOR VII*, 299 F. Supp. 3d at 539 ("[T]he named plaintiffs with opposite net trading positions will have directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation that occurred on those dates.").

Not so here. Plaintiffs' argument is that Defendants drove prices only in one direction — up. (SAC ¶ 367). And no Class Member stands to gain from arguing that upward price manipulation did not occur on a given day. *Cf.*

*LIBOR VII*, 299 F. Supp. 3d at 539 (finding no adequacy because certain class members were disincentivized to establish price manipulation on certain days); *Forex III*, 407 F. Supp. 3d at 439 (noting that a class was certified in *NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 513, when "spread manipulation inflated prices for purchasers and depressed prices for sellers, giving *both* an incentive to establish spread manipulation").  In fact, the *LIBOR VII* court explicitly distinguished that case from ones in which the class "include[d] only traders who transacted in a single direction and alleged manipulation in defined directions over the class period." *LIBOR VII*, 299 F. Supp. 3d at 538. Here, the Class and the Futures Subclass include only buyers, and those buyers allege only price inflation.

To the extent that Professor Hendershott asserts that Class Members who sold less-inflated assets for more-inflated ones are not "harmed" (Hendershott Rep. ¶¶ 205-208), his statement does not carry legal weight, *see Martin* v. *Brighthouse Life Ins. Co.*, No. 21 Civ. 2923 (MMG), 2025 WL 2731710, at *6 (S.D.N.Y. Sept. 25, 2025) ("It is an 'axiomatic principle' that experts cannot provide 'legal opinions or conclusions.'" (quoting *Am. Empire Surplus Lines Ins. Co.* v. *J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 543 (S.D.N.Y. 2024))).  And in any event, he is wrong as a matter of law.

"[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 557 (internal quotation marks omitted) (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015)); *see also*

*Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (noting that consumers suffer antitrust injury by paying prices that "no longer reflect ordinary market conditions").  Given this case law, all Class Members want to prove price inflation here, even those who later sold cryptocommodities at similarly inflated prices.[9]

Therefore, a Class Member's sales have no bearing on liability; they bear — at most — on damages.  (*See* Pl. CC Reply 4-5).[10]  But "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."  *Seijas* v. *Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).  More specifically, as this Court recently explained, "[a]t the class certification phase, potential conflicts over the allocation of damages do not defeat adequacy."  *Iowa Pub. Emps.' Ret. Sys.*, 2024 WL 5004632, at *10.  The B/T Defendants are correct to point out that intraclass trading could create friction, but any conflict is confined to "the apportionment of damages," unlike in the cases on which the B/T Defendants rely.  *See, e.g.*, *Forex III*, 407 F. Supp. 3d at 439.

---

[9]     The Court does have concerns, however, with those who only obtained Class Assets using other cryptocommodities.  In that scenario, the Court does not believe that harm is automatically established.  The Court will discuss that issue later and responds by narrowing the class.  *See infra* B.3.a.v.

[10]    Plaintiffs point out — correctly — that the B/T Defendants' concern about intraclass trading matters only if the Court uses netting to calculate damages.  (Pl. CC Reply 4-5).  But potential intraclass disputes about netting cannot defeat class certification.  *See City of Philadelphia* v. *Bank of Am. Corp.*, No. 19 Civ. 1608 (JMF), 2023 WL 6160534, at *12 (S.D.N.Y. Sept. 21, 2023) (noting that "issues of absorption and netting[ ] are otherwise identical to the determination of damages' … [and are] not sufficient, at this stage, to defeat class certification" (quoting *LIBOR VII*, 299 F. Supp. 3d 430, 595 (S.D.N.Y. 2018))).

ii.      **There Are No Intraclass Conflicts Based on Plaintiffs' Alternative Methods for Showing USDT Debasement**

*Second*, the B/T Defendants contest adequacy because Plaintiffs offer four methods of showing USDT debasement and two expert models for calculating cryptocommodity inflation.  (Def. CC Opp. 46-47).  Certain Class Members would do better under certain models, which the B/T Defendants argue will create intraclass conflicts sufficient to undermine adequacy.  (*Id.* (citing Hendershott Rep. ¶¶ 14(a)-(b), 223-242)).

The cases that the B/T Defendants cite in support of their position are inapposite.  In *Set Capital LLC* v. *Credit Suisse Group AG*, a sister court in this District found that adequacy was lacking because two separate classes that the plaintiffs wished to certify were in direct conflict with one another, and some plaintiffs were in both classes.  No. 18 Civ. 2268 (AT), 2023 WL 2535175, at *12 (S.D.N.Y. Mar. 16, 2023).  This created a conflict between, on the one hand, the class members in both classes and, on the other hand, the subset of class members who were only in one class, because these two groups would lack "the same 'incentive to prove all the elements of the cause of action'" on which a given class relied.  *Id.* at *12-13 (quoting *Houser*, 28 F. Supp. 3d at 245).

*Set Capital LLC* thus reflected a very specific scenario that is not present in this case.  Plaintiffs here offer one liability theory:  Defendants debased USDT, pumped it into the crypto-economy, and inflated cryptocommodity prices.  And each Plaintiff has the same incentive to prove the necessary elements.  *Cf. Set Cap. LLC*, 2023 WL 2535175, at *12-13.  Plaintiffs' methods

of showing debasement differ in the extent of the debasement they show on certain days, but they are not diametrically opposed.  In fact, the debasement is, by default, one-directional.

The instant case is also unlike the other case on which the B/T Defendants rely, *LIBOR VII*.  In that case, the court found adequacy lacking because plaintiffs' models differed not only in magnitude but also in direction, which the court found "particularly corrosive of adequacy."  *LIBOR VII*, 299 F. Supp. 3d at 539.  The models Plaintiffs offer here do not differ in direction, so they are not competing like those in *LIBOR VII*.[11]  The Court thus does not believe that Plaintiffs' multiple debasement models are sufficient to undermine adequacy.  Plaintiffs' Class and Futures Subclass thus satisfy Rule 23(a).

### 3.    Rule 23(b)(3) Analysis

#### a.    Common Questions Predominate Over Individual Questions for Each of Plaintiffs' Claims

Rule 23(b)(3) first requires plaintiffs to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *Roach* v. *T.L. Cannon Corp.*, 778 F.3d

---

[11]    It is also worth noting that, unlike here, the *LIBOR VII* court had already found adequacy lacking because class members had conflicting incentives to argue for different directions of price manipulation.  299 F. Supp. 3d at 538-39.  As discussed, in this case, the Class Members have the same incentives.  *See supra* B.2.3.i.

401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729

F.3d 108, 118 (2d Cir. 2013)).

When assessing predominance, a court must examine "[i] 'the elements

of the claims and defenses to be litigated,' [ii] 'whether generalized evidence

could be offered to prove those elements on a class-wide basis or whether

individualized proof will be needed to establish each class member's

entitlement to relief,' and [iii] 'whether the common issues can profitably be

tried on a class-wide basis, or whether they will be overwhelmed by individual

issues.'" *Scott* v. *Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020)

(alteration adopted) (quoting *Johnson*, 780 F.3d at 138).

### i.    Plaintiffs' Claims and the Predominance Inquiry in CEA and Sherman Act Cases

Plaintiffs here raise three causes of action: market manipulation under

the CEA, monopolization under Section 2 of the Sherman Act, and agreement

in restraint of trade under Sections 1 and 3 of the Sherman Act.  (SAC ¶¶ 407-

443).  The Court finds it useful to briefly discuss the elements of Plaintiffs'

claims before explaining how the predominance inquiry works in cases like this

one.

Plaintiffs' CEA cause of action combines two theories — a manipulative

device theory based on 17 C.F.R. § 180.1(a), and a price manipulation theory.

The manipulative device theory requires proof that (i) "Defendants engaged in

prohibited conduct (i.e., employed a fraudulent scheme; made a material

misrepresentation, misleading statement or deceptive omission; or engaged in a

business practice that operated as a fraud); [ii] with scienter; and [iii] in

connection with a contract of sale of a commodity in interstate commerce." *Commodity Futures Trading Comm'n* v. *McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018).

Plaintiffs' price manipulation theory requires them to prove that "[i] the defendant 'possessed an ability to influence market prices;' [ii] 'an artificial price existed;' [iii] the defendant 'caused the artificial price; and' [iv] the defendant 'specifically intended to cause the artificial price.'" *In re Platinum & Palladium Antitrust Litig.*, No. 14 Civ. 9391 (GHW), 2017 WL 1169626, at *31 (S.D.N.Y. Mar. 28, 2017) (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013)).

As for Plaintiffs' Sherman Act claims, "[t]he three required elements of an antitrust claim are [i] a violation of antitrust law; [ii] injury and causation; and [iii] damages." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Cordes & Co. Fin. Servs., Inc.* v. *A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007)). Across Plaintiffs' three causes of action, certain elements center on Defendants' conduct, while others concern the impact that Defendants' conduct has on the crypto-economy. Now the Court turns to the contours of the predominance inquiry in cases like this one.

While the predominance inquiry is "demanding," *Amchem Prods. Inc.*, 521 U.S. at 623-24, antitrust and CEA cases often present compelling arguments for predominance, as "the entire case … centers on the Defendants' alleged market manipulation," *Platinum & Palladium Commodities Litig.*, 2014 WL

3500655, at *10; *see also City of Philadelphia*, 2023 WL 6160534, at *9 ("The predominance requirement is 'a test readily met in certain cases alleging … violations of the antitrust laws.'" (quoting *Cordes & Co. Fin. Servs., Inc.*, 502 F.3d at 108)).  In other words, the elements of antitrust and CEA cases that pertain to Defendants' conduct almost always present a common question that predominates.  *See, e.g.*, *Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 44 ("Defendants do not dispute that the first element presents a common question. …  The Court easily finds, by a preponderance, that proof of the alleged conspiracy is a common issue, susceptible to classwide proof.").

Because of this, class certification in CEA and antitrust cases often turns on whether common issues predominate in establishing injury, causation, or damages.  *See, e.g.*, *Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 44 ("The parties vigorously dispute, however, whether the second element — individual injury resulting from the alleged conspiracy — is capable of common proof.").  "Without common proof of injury and causation," otherwise known as impact, plaintiffs in antitrust cases "cannot establish predominance."  *Id.* at 45 (internal quotation marks omitted) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019)).

In cases where plaintiffs put forth an expert's model as the basis for their claim of classwide impact, "[a] court may certify a class … only where the Court finds the model methodologically sound."  *Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 46.  That said, "the Court only evaluates whether the method by which plaintiffs propose to prove classwide impact *could* prove such

impact, not whether plaintiffs in fact ... prove[d] classwide impact." *In re Magnetic Audiotape Antitrust Litig.*, No. 99 Civ. 1580 (LMM), 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001) (emphasis added).

> ### ii.    Common Questions Predominate as to Elements Related to Defendants' Conduct

As in many antitrust cases, the B/T Defendants do not argue that individual questions predominate on the various elements related to Defendants' conduct. *See Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 44. Plaintiffs point out that they will use common evidence about Defendants' actions to establish that Defendants engaged in certain conduct, such as issuing debased or unbacked USDT, misrepresenting that USDT was always backed one-to-one by USD held in reserve by Tether, disseminating debased USDT through the Anonymous Trader, and conspiring with the Anonymous Trader to increase cryptocommodity prices. (*See* Pl. CC Br. 23-29, 38-39). *See also Actos Antitrust Litig.*, 2024 WL 4251891, at *19 (noting that evidence on the elements of monopolization concerned defendant's conduct and would "be the same for each putative class member"); *Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 551 ("Because [this element] is primarily a determination that focuses on the defendants' conduct[,] ... common evidence generally predominates over individualized evidence[.]"); *Meredith Corp.* v. *SESAC, LLC*, 87 F. Supp. 3d 650, 659 (S.D.N.Y. 2015) (noting that questions of "monopoly power ... are undoubtedly common to all the members of the putative class" (internal quotation marks omitted) (quoting *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 57 (S.D.N.Y. 2002))).

For the elements related to Defendants' scienter or intent, Plaintiffs also will rely on common evidence, including statements made by Defendants, their representatives, and the Anonymous Trader.  (*See* Pl. CC Br. 29-32, 35, 37-40 (discussing the common evidence used to establish the intent requirements of each claim)).  *See also In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 383 (S.D.N.Y. 2010) (noting that scienter is particularly susceptible to class-wide proof "[b]ecause [intent] can be shown without reference to the class members included in the action," so "efficiency is greatly served by answering these questions on a class-wide basis").  The Court thus agrees with sister courts that have found common questions to predominate as to issues related to defendants' anticompetitive conduct.  *See, e.g., Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 44; *Actos Antitrust Litig.*, 2024 WL 4251891, at *19.

### iii.     Plaintiffs Can Demonstrate Classwide Impact Through Dr. DeRamus's Regression Analysis

The closer question for the Court is whether Plaintiffs have established that they can prove classwide *impact*, given that each of their claims requires proof that Defendants' actions had some effect on the market.  *See Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 45 (noting that "[w]ithout common proof of injury and causation, antitrust plaintiffs cannot establish predominance" (internal quotation marks omitted and alteration adopted) (quoting *Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d at 623)).[12]

---

[12]     Plaintiffs appear to argue that "[e]ach element" of their manipulative device theory under the CEA "focuses on Defendants' conduct" (Pl. CC Br. 24), but they also recognize

The parties hotly contest whether Plaintiffs can prove classwide impact using the DeRamus Report. The B/T Defendants argue that the DeRamus Report fails to provide a workable model to demonstrate that impact. (Def. CC Opp. 11-21). In so doing, the B/T Defendants repeat much of their *Daubert* motion. (*Id.* at 1-2 (recognizing as much)). The Court has already considered whether the DeRamus Report is admissible, holding that it is, except for the t-test that Dr. DeRamus performed to support his event study. *See supra* A.2. The question, then, is whether the remaining admissible components of the DeRamus Report can establish classwide impact. The Court holds that, for the purposes of class certification, they can.

The key question is whether Dr. DeRamus's regression analysis and overcharge model, without the support of an event study showing statistical significance, can demonstrate classwide impact.[13] The Court acknowledges

---

that the requirement that Defendants' conduct is in connection with a contract of sale of a commodity in interstate commerce contains a question of the effect of Defendants' conduct (*see id.* at 32 (discussing "the impact of Defendants' scheme" when considering that element)). *See Tether II*, 2024 WL 3520363, at *12 (describing that Plaintiffs must "establish a manipulative device claim by alleging ... effect of the fraudulent conduct").

[13]    The B/T Defendants first parrot the unsuccessful argument from their *Daubert* motion that Dr. DeRamus speculated that the Anonymous Trader received free USDT. (Def. CC Opp. 13-15). The Court has already rejected this argument at the *Daubert* stage, and it does so for similar reasons here. *See supra* A.2.a.i-.ii. As a baseline matter, the Court does not believe that Dr. DeRamus insinuates that the Anonymous Trader received free USDT, only unbacked or debased USDT. *See supra* A.2.a.i. And Plaintiffs' theories only depend on the Anonymous Trader receiving unbacked or debased USDT, which the evidence supports. (*See* DeRamus Rep. ¶¶ 16, 18, 252 & n.553, 257-60). The Court tends to agree with Plaintiffs that this argument by Defendants is a "strawman." (Pl. CC Reply 15-16).

For the same reason, the Court also rejects the B/T Defendants' repeated argument that Dr. DeRamus speculated about how the composition of Tether's USDT reserves impacted the price of Bitcoin (Def. CC Opp. 18), as well as their argument that Dr. DeRamus's testimony does not support an inference of artificial inflation (*id.* at 19-21). Put simply, the Court believes that sufficient economic theory supports his assertions, and his models sufficiently reflect those assertions. *See supra* A.2.b.iv.

that strong arguments can be made on both sides, and thus pauses to summarize them here.  Defendants are correct that without Dr. DeRamus's t-test, Plaintiffs struggle to "demonstrate any causal relation between UDST issuances and bitcoin price returns."  (Def. CC Opp. 13).  And causation — that Defendants' conduct affected the market — is a key component of Plaintiffs' claims.

Plaintiffs retort that the failing of the t-test does not "negate the existence of the effect" that Dr. DeRamus observed in the event study.  (Pl. CC Reply 17).  But Plaintiffs' response overlooks the importance of statistical significance, which is required to establish that an observed effect is not random.  *Cf., e.g.,* *Ark. Tchrs. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018) (noting that, in a securities fraud class action, if "price movement is indistinguishable from random price fluctuations, it cannot be attributed to company-specific information announced on the event date").

Plaintiffs' response is especially weak given that (i) Defendants have demonstrated that Dr. DeRamus's event study lacks statistical significance when the t-test is performed correctly (Hendershott Rep. ¶¶ 83-85 & fig. 6); and (ii) Plaintiffs barely attempt to defend or explain their t-test in the face of the B/T Defendants' criticism.[14]  The B/T Defendants are thus correct that the Court cannot rely on the event study to establish classwide causation.

---

[14]    As discussed above, Plaintiffs elected not to respond to Professor Hendershott's debunking of Dr. DeRamus's t-test, instead stating that Dr. DeRamus "will provide" his "response ... at the merits phase."  (Pl. MTE Opp. 16).  Plaintiffs may win their motion for class certification, but the Court questions whether they could survive a summary judgment motion on the issue of causation based on the current record.

But Plaintiffs still have the better argument at the class certification stage, because their remaining evidence could serve as common proof, regardless of the ultimate validity of that proof.  Most importantly, the Court has already established that Dr. DeRamus's regression analysis is reliable.  *See supra* A.2.b.ii.  (*Contra* Def. CC Opp. 16-18).  As Plaintiffs point out, that model can establish classwide impact by showing how Defendants' provision of debased USDT increased Bitcoin prices.  (*See* Pl. CC Br. 32-35).  The model controls for certain variables likely to influence Bitcoin prices (DeRamus Rep. ¶¶ 340-345), which the B/T Defendants have not contested (*cf.* Def. CC Opp. 16 (failing to identify any variables that Dr. DeRamus overlooks)).  This qualifies as "a workable *methodology* for proving [the required] elements." *Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. at 383.

Courts have repeatedly found that a reliable regression analysis is sufficient for plaintiffs to demonstrate classwide impact in antitrust cases.  *See, e.g.*, *Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *16-19 (accepting expert's regression model at the class certification stage because opposing party's critiques went to the model's proactiveness, not its admissibility).  And while courts require the *methodology* of those regression analyses to be proper, there can still be debates about the results.  *See, e.g.*, *Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. at 386 (rejecting defendants' challenges to plaintiffs' proposed regression models and certifying market manipulation class even though models were "in some respects incomplete"); *Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *4 ("[T]he Court only

evaluates whether the method by which plaintiffs propose to prove classwide impact *could* prove such impact, not whether plaintiffs in fact … prove[d] classwide impact." (emphasis added)); *In re Ethylene Propylene Diene Monomer Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) (noting that "[t]he real question … is whether the plaintiffs have established a *workable* multiple regression equation, not whether [their] model actually *works*").

Here, Professor Hendershott's main criticism of the regression analysis is not that Dr. DeRamus failed to test for cointegration, but rather that the values at which Dr. DeRamus concludes there is cointegration are different from what Professor Hendershott would have chosen.  (*See* Hendershott Report ¶¶ 99-103).  That is a difference in opinion, and not a fatal flaw in methodology.  The fact that Dr. DeRamus's regression analysis can show classwide impact is enough.  As the Second Circuit has stated, "[r]egression models are a well-known and widely accepted tool of economic analysis, and while they cannot explicitly determine causation or prove causality between … variables, they can strongly support a causal relationship."  *Sergeants Benevolent Ass'n Health & Welfare Fund* v. *Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 95-96 (2d Cir. 2015) (internal quotation marks omitted).

Of course, given the Court's exclusion of Dr. DeRamus's flawed t-test, one could argue that Plaintiffs ought not rely on their regression analysis to prove classwide impact because it "may blame the defendants for pricing harm that they did not cause."  *Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 61-62.  The Court recognizes that, absent any evidence of causation at all, Dr.

DeRamus's regression analysis would, in fact, blame Defendants for harm they did not cause. But, as discussed above, *see supra* A.2.b.i, Dr. DeRamus's event study is independent from his regression analysis. While the t-test measures the statistical significance of a key assumption in the regression analysis — namely, that there is a relationship between USDT issuances and crypto prices — the failure of the t-test does not necessarily mean that the regression analysis itself lacks causal significance.

What is more, the B/T Defendants have not provided a sufficient reason to exclude the regression analysis. Compare this case to *Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5, in which another court in this District found that a regression analysis could not be used to show classwide impact. That decision hinged on the fact that the expert's regression did not account for a key variable that may have altered the model. *Id.* at 61. Here, the problem is not with a variable in the regression, but rather the fact of causation.

That type of challenge sounds more in summary judgment than in Rule 23(b)(3). Indeed, the Supreme Court has warned that when "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity — [an alleged] failure of proof as to an element of the plaintiffs' cause of action — courts should engage that question as a matter of summary judgment, not class certification." *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U.S. 442, 457 (2016) (internal quotation marks omitted and alteration in original)

(quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)).

Such is the case here.  The B/T Defendants have called into question Plaintiffs' ability to establish an element of their claims, but that does not mean that an individual question will predominate over a common one, as required to defeat certification under Rule 23(b)(3).  *See Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013) ("A failure of proof on the *common* question of materiality [in a securities fraud cause] ends the litigation and thus will never cause individual questions of reliance or anything else to overwhelm questions common to the class.  Therefore, under the plain language of Rule 23(b)(3), plaintiffs are not required to prove materiality at the class-certification stage.  In other words, they need not, at that threshold, prove that the predominating question will be answered in their favor.").  As such, the Court finds that the admissible components of the DeRamus Report can demonstrate classwide impact for the purpose of class certification.

### iv.        Damages Are Measurable on a Classwide Basis

Under Rule 23(b)(3), Plaintiffs must also show that damages are "measurable on a class-wide basis through the use of a common methodology." *Dial Corp.* v. *News Corp.*, 314 F.R.D. 108, 118 (S.D.N.Y. 2015) (citing *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 30 (2013)); *accord Roach*, 778 F.3d at 408.  A well-accepted methodology for measuring classwide damages in an antitrust case shows "the difference between the prices actually paid and the prices that

would have been paid absent the conspiracy." *New York* v. *Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988).

Dr. DeRamus's overcharge model does just that, comparing actual Bitcoin prices with but-for Bitcoin prices and generating an overcharge percentage that shows the amount that Class Members overpaid for their cryptocommodities. (DeRamus Rep. ¶¶ 355-369). Specifically, it uses a regression analysis to ascertain the impact of increasing the supply of USDT on Bitcoin prices (*id.* ¶¶ 359-360), then apportions the impact to the supply increase attributable to Defendants' issuance of debased or unbacked USDT to obtain the overcharge amount (*id.* ¶¶ 361-367).

In so doing, the model is designed to "actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407; *see also Ethylene Propylene Diene Monomer Antitrust Litig.*, 256 F.R.D. at 96 ("If plaintiffs can present a feasible multiple regression analysis that purports to establish impact and damages using data and information common to the class, they will have met the requirement of demonstrating that damages can be proved by evidence common to the class."). The same model can be used for the other Class Assets. (DeRamus Rep. ¶ 376). And it can easily be applied at the claims administration stage for Class Members who present their trading records. Assuming that Dr. DeRamus's regression analysis is reliable, which the Court already found, damages are measurable on a classwide basis through his overcharge model.

**v.    Common Questions Predominate on the Issue of Injury, But Only for Class Members Who Purchased Cryptocommodities with Fiat Currency or Stablecoins**

The B/T Defendants next argue that even if Plaintiffs' models can demonstrate classwide impact, individual questions will predominate when resolving questions of injury, extraterritoriality, and reliance.  (Def. CC Opp. 21-45).  On the question of injury, whether common issues predominate turns on whether injury occurs (i) when a Class Member purchases an artificially inflated cryptocommodity, or (ii) when that Class Member experiences economic loss flowing from their purchase of that cryptocommodity.

Plaintiffs point out that in antitrust cases, injury occurs at "the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 557 (internal quotation marks omitted) (quoting *Nexium Antitrust Litig.*, 777 F.3d at 27); *see also Cordes & Co. Fin. Servs., Inc.*, 502 F.3d at 107 ("If the plaintiffs' single formula can be employed to make a valid comparison between the but-for fee and the actual fee paid, then it seems to us that the injury-in-fact question is common to the class.").  Similarly, in a CEA case, plaintiffs have suffered an injury if they "engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged … manipulative conduct, and that the artificiality was adverse to their position." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 667 (S.D.N.Y. 2016) (internal quotation marks omitted and

omission in original) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 622 (S.D.N.Y. 2013)).

The B/T Defendants do not challenge the above law, but they argue that this case is "unlike a typical antitrust case … [b]ecause the Class Assets [here] were purchased and sold in much the same way as securities." (Def. CC Opp. 23). In other words, the B/T Defendants want the Court to import the concept of injury from the securities context (*see id.* at 22-28), where merely purchasing the security at issue does not constitute injury, *see Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 342-43 (2005) ("Normally, in cases such as this one (*i.e.,* fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.").

Put simply, the B/T Defendants argue that economic loss is required for Class Members to establish injury — like in the securities context — while Plaintiffs argue that the magnitude of loss only matters for the calculation of damages — like in the antitrust context. The Court thinks that Plaintiffs have the better argument, though the issue is close.

The B/T Defendants are correct that the Class Assets share more in common with securities than commodities such as olive oil, especially given that purchasers of cryptocommodities often sell them later, either at a loss or gain. (Def. CC Opp. 23-25). But the Court ultimately sides with Plaintiffs because, at its core, this is an antitrust case, not a securities action. And unlike in securities cases, "antitrust injury flows from the overcharge itself." *Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 557.

75

Class Members are "entitled to conduct [their] business in a market that is not infected with an anticompetitive distortion." *IQ Dental Supply, Inc.* v. *Henry Schein, Inc.*, 924 F.3d 57, 64 (2d Cir. 2019).  Even those who ultimately sold cryptocommodities at more inflated prices than they bought them have been denied access to an undistorted market when they purchased the asset, which "is the type of injury the antitrust laws were designed to prevent."  *Id.*

The B/T Defendants cite snippets from multiple cases that state, for example, that "the question of actual injury" in antitrust cases is whether a plaintiff "is worse off than it would be if the market were free of anticompetitive forces."  *IQ Dental Supply, Inc.*, 924 F.3d at 64; *see also Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (noting that defendants' conduct "could not injure respondents" because "as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price"); *Lavoho, LLC* v. *Apple, Inc.*, 232 F. Supp. 3d 513, 525 (S.D.N.Y. 2016) ("[A] plaintiff cannot establish antitrust injury where it 'actually tended to benefit' from the alleged conduct." (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586)).  (*See also* Def. CC Opp. 27).

This language may appear at first blush to support the B/T Defendants' position, but upon closer examination, each case concerns a scenario in which parties *only* benefited from the antitrust violation, not cases where they initially were harmed and then later recouped their losses in some way.  For example, in *Matsushita Electric Industrial Co.*, the plaintiffs were competitors of the entity inflating prices, so they only stood to gain from the price inflation.  475 U.S. at

582-83; *see also IQ Dental Supply, Inc.*, 924 F.3d at 63-64 (distinguishing the case from others, like *Matsushita Electric Industrial Co.*, in which courts "denied antitrust standing to a competitor that benefitted from a market distorted by anticompetitive conduct"). That is not the case here. Class Members initially purchased at inflated prices, notwithstanding the possibility of later recoupment. That is an injury for the purposes of the antitrust laws. *See Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 557.

For avoidance of doubt, the Court's finding does not mean that those who ultimately gained from Defendants' alleged price manipulation will be able to collect damages. The B/T Defendants provide strong arguments for why the Court should net damages in this case (*see* Def. CC Opp. 25-26), and the Court is inclined to do just that, *see Nypl* v. *JP Morgan Chase & Co.*, No. 15 Civ. 9300 (LGS), 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) ("That plaintiffs in an antitrust action may recover only for their net injury is a common-sense and well-established principle."); *LIBOR VII*, 299 F. Supp. 3d at 543-44 ("Assuming that LIBOR manipulation had measurable price impact ... , any ... trading losses experienced by a class member resulting from that manipulation over the class period must be netted against any gains resulting from that manipulation over the class period."). But that is not a reason to reject class certification. *See City of Philadelphia*, 2023 WL 6160534, at *12.

The Court remains concerned, however, that the initial harm that is required to establish an antitrust injury is not as clearcut for Class Members who purchased cryptocommodities with other cryptocommodities instead of fiat

currency or stable coins.  Even *Namenda* recognized that while antitrust injury does not require a net economic loss, it does require an initial overcharge. *Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. at 557.

If a purchaser bought a cryptocommodity with a different cryptocommodity, whether that purchaser has incurred the required initial overcharge would depend on whether the purchasing cryptocommodity was more or less inflated than the purchased cryptocommodity.  As the B/T Defendants point out, this inquiry would predominate and may even undermine adequacy.  (*Cf.* Def. CC Opp. 26-27).  As such, the Court limits the Class and the Futures Subclass to those who purchased Class Assets with fiat currency or stable coins, as these Class Members, following Plaintiffs' theory of the case, suffered an initial antitrust injury.

In a similar vein, the Court agrees with the B/T Defendants' request to narrow the Class and the Futures Subclass to exclude Class Members who "otherwise acquired" Class Assets.  (Def. CC Opp. 27-28).  Class Members who acquired Class Assets only by engaging in mining, using the crypto fork, or receiving them as gifts were not injured in any way because they did not pay market price for those assets.  (Hendershott Rep. ¶¶ 13(e), 148-150).[15]

---

[15]    Because the Court finds that Class Members under the modified class definition suffered antitrust injury, it declines to consider the B/T Defendants' arguments that uninjured class members preclude class certification.  (Def. CC Opp. 28-35).  The Court recognizes that determining the exact damages for each Class Member may prove difficult, but again, that difficulty does not foreclose certification.  *See Trautz* v. *Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994) ("While the damage calculation may prove to be difficult, we do not think it sufficient reason to deny plaintiffs' motion for class certification since we retain the power to modify the class, by dividing it into subclasses or certifying it only as to certain issues or claims."); *Chen-Oster* v. *Goldman, Sachs & Co.*, 325 F.R.D. 55, 84 (S.D.N.Y. 2018) (noting "the 'number of management

vi.     **Common Questions Predominate on Issues of
        Extraterritoriality, Except Those Regarding
        Futures Trades on Foreign Exchanges**

The B/T Defendants also argue that individual questions predominate on
the question of whether transactions occurred domestically.  (Def. CC Opp. 35-
43).  "[Q]uestions as to the 'domesticity' of any given transaction — and the
resulting individualized determinations of class member eligibility — go to the
core of the predominance analysis."  *Petrobras Sec.*, 862 F.3d at 269 n.21; *see
also Forex III*, 407 F. Supp. 3d at 430-31 (denying class certification in part
because "an individualized inquiry would be required to determine the location
of … trading activities").[16]

On Plaintiffs' CEA cause of action, individual questions predominate
regarding futures trades on foreign exchanges, but common questions
predominate regarding futures trades on domestic or stateless exchanges.
Because the CEA does not apply extraterritorially, CEA plaintiffs must
demonstrate that their transactions were domestic.  To do so, they must prove
(i) "domestic … *conduct* by Defendants that is violative of … the CEA," *Prime
Int'l Trading, Ltd.* v. *BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019), and (ii) that
their claim is "based on transactions occurring in the territory of the United

---

tools available to a district court to address any individualized damages issues, such as
bifurcation, the use of a magistrate or special master, alteration of the class definition,
the creation of subclasses, or even decertification after a finding of liability'" (quoting *In
re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006))).

[16]     The Court recognizes that the proposed Class and Subclass definitions encompass
persons or entities that "purchased or otherwise acquired [Class Assets] in the United
States or its territories."  (Pl. CC Br. 1).  This section of the Opinion provides guidance
on what would constitute a qualifying purchase or acquisition.

States," *id.* at 104 (internal quotation marks omitted) (quoting *Loginovskaya* v. *Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014)).

The B/T Defendants acknowledge that the first element presents a question common to the class (Def. CC Opp. 36), and they are right. The second element is far less clear. The B/T Defendants point out that proving whether a transaction is domestic requires the Court to "assess a broad range of evidence" as part of a case-by-case analysis. (*Id.* (first citing *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010); then citing *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012))). *See Petrobras Sec.*, 862 F.3d at 272 (noting that courts consider "various types of evidence ... to prove the domesticity of various types of transactions," including where contracts were formed, where purchases were placed, where title was passed, and where money was exchanged); *see also Myun-Uk Choi* v. *Tower Rsch. Cap. LLC*, 890 F.3d 60, 66 (2d Cir. 2019) (confirming that the *Morrison* "domestic transactions" test applies to the CEA).

According to the B/T Defendants, the disparate means of proving domesticity effectively necessitate a finding that individual questions predominate. (Def. CC Opp. 36-39). But the Court is not so sure. The domesticity inquiry depends at least in part on whether a transaction was executed on a domestic exchange, foreign exchange, or stateless exchange. As the B/T Defendants acknowledge, transactions on domestic exchanges qualify as domestic. *In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 267 (2d Cir. 2023); *see also Morrison*, 561 U.S. at 269-70. Therefore, as the B/T

Defendants also acknowledge (Def. CC Opp. 37), there are no individualized questions as to domesticity for futures transactions executed on domestic exchanges.  At the very least, the Futures Subclass may include people who used those exchanges.

The question of domesticity when U.S.-based Class Members transacted on non-domestic exchanges is much thornier.  In that scenario, it is not sufficient for Class Members to show that they are U.S. citizens or residents, used a domestic broker, or placed an order from within the United States.  *See Ficeto*, 677 F.3d at 69 ("While it may be more likely for domestic transactions to involve parties residing in the United States, 'a purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States.'" (alteration adopted) (quoting *Plumbers' Union Loc. No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010))); *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 188-89 (2d Cir. 2014) (concluding that merely "plac[ing] a buy order in the United States ... is insufficient to incur irrevocable liability ... in the United States").

Instead, a Class Member would have to show evidence of domesticity that would vary depending on the specifics of the transaction.  *Myun-Uk Choi*, 890 F.3d at 66-68.  Given that the relevant inquiry requires the Court to examine "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money," *Petrobras Sec.*, 862 F.3d

81

at 272 (internal quotation marks omitted) (quoting *Ficeto*, 677 F.3d at 70), the Court agrees with the B/T Defendants that individual issues predominate regarding futures trades on foreign exchanges.[17]  The Court will thus adjust the Class and the Futures Subclass to remove cryptocommodity futures purchased on foreign exchanges.

The above has made clear that domestic exchanges always yield domestic transactions, but the domesticity of transactions on foreign exchanges is too fact-specific for class certification.  But there remains a question, especially important in the context of the crypto-economy, of whether exchanges that are effectively stateless are governed by the domestic exchange rule or foreign exchange rule.  In *Williams* v. *Binance*, 96 F.4th 129 (2d Cir. 2024), the Second Circuit explained that when an exchange had "not registered in any country," had "no physical or official location whatsoever," and was "not … subject to the

---

[17]    As discussed above, Plaintiffs are incorrect that these individualized inquiries are solved by requiring trades to be placed in the United States.  (Pl. CC Reply 11-12 (first citing *Williams* v. *Binance*, 96 F.4th 129, 136-37 (2d Cir. 2024); then citing *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 267 (2d Cir. 2023))).  The two cases they rely on are not as helpful as they think.

In *Platinum and Palladium Antitrust Litigation*, the Second Circuit found that the transactions at issue were domestic because the seller corporation both had a principal place of business in the United States and sold the physical commodities from that principal place of business.  *Platinum & Palladium Antitrust Litig.*, 61 F.4th at 267-68.  Here, Class Members may have sold commodities on foreign exchanges to foreign buyers, a far different scenario than what was at issue in *Platinum and Palladium Antitrust Litigation*.

And in *Binance*, the Second Circuit explicitly stated that "determin[ing] whether a transaction is domestic … is not always a simple task," and it noted that the key question is "when and where the transaction became irrevocable," not the location of buyer or seller.  *Binance*, 96 F.4th at 136-37.  Further, the *Binance* court explicitly hinged its finding of domesticity on the fact that the exchanges at issue were *not* "within [another country's] jurisdiction."  *Id.* at 139-40.  It was not enough that the transactions were carried out in the United States.  *Id.*

oversight of any country's regulatory authority," applying U.S. law was appropriate if either (i) the trades at issue were matched on servers in the United States, or (ii) plaintiffs had placed their orders, agreed to the exchange's terms of use, and sent payments, all from the United States, and the exchange's terms of use prohibited them from revoking the orders once placed. *Id.* at 136-41.  If this exception applies, a transaction on the relevant stateless exchange can be considered domestic under the CEA.

The B/T Defendants argue that individual questions predominate on the question of whether specific exchanges qualify as stateless under *Binance* (Def. CC Opp. 37-38), and thus that transactions on even arguably stateless exchanges must be excluded from the Futures Subclass definition.  The Court disagrees.  The inquiry about whether a transaction on a stateless exchange qualifies as domestic under the Second Circuit's decision in *Binance* can be determined on an exchange-by-exchange, rather than person-to-person, basis. The Court does not think that this is enough to exclude those who purchased on stateless exchanges from the Futures Subclass.  *See In re Vale S.A. Sec. Litig.*, No. 19 Civ. 526 (RJD) (SJB), 2022 WL 969724, at *5 (E.D.N.Y. Mar. 31, 2022) (finding that "some indeterminate number of individual domesticity questions [does] not overwhelm the cohesiveness of the class to defeat predominance").

That said, the Court does believe it necessary to incorporate *Binance* into the Futures Subclass definition, such that the Futures Subclass includes those who purchased futures on either domestic or stateless exchanges, but excludes

those who purchased on foreign exchanges.  As such, the Futures subclass

would only include those who bought Class Assets from the United States on

either (i) U.S. exchanges or (ii) non-U.S. exchanges that were not subject to any

other country's regulation and that either (a) matched trades on servers in the

United States or (b) prohibited buyers from revoking their orders once placed.

*See Binance*, 96 F.4th at 136-37.[18]

Turning to Plaintiffs' Sherman Act causes of action, no individualized

questions predominate on the issue of extraterritoriality.  The B/T Defendants

argue that the Foreign Trade Antitrust Improvements Act (the "FTAIA"), 15

U.S.C. § 6a, creates individual questions that predominate on Plaintiffs'

Sherman Act claims.  (Def. CC Opp. 40-43).  To review, the FTAIA limits the

extraterritorial applicability of the Sherman Act by barring plaintiffs from

asserting claims based on trades "on a foreign exchange" or trades between

parties "operating abroad."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*,

No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *13-14 (S.D.N.Y. Sept. 20, 2016)

("*Forex II*").

But unlike the CEA doctrine, the FTAIA has a statutory exception for

foreign conduct that "*both* [i] sufficiently affects American commerce … *and*

[ii] has an effect of a kind that antitrust law considers harmful."  *Sonterra Cap.*

---

[18]    Because the Court allows the Futures Subclass to include purchasers of futures on
stateless exchanges, it also rejects, at this stage, the B/T Defendants' argument that
Mr. Goldshtein is not an appropriate class representative for the Futures Subclass.
(*See* Def. CC Opp. 47-48).  If the Court determines at a later date that any exchange he
used to purchase futures was foreign, rather than stateless, it may decertify the
Futures Subclass.

*Master Fund, Ltd.* v. *Barclays Bank PLC*, 366 F. Supp. 3d 516, 548-49 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 162 (2004)); *see also* 15 U.S.C. §§ 6a(1)-(2). Conduct that satisfies the FTAIA's exception is brought back within the Sherman Act's reach. Overall, "[t]he FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business agreements ... , however anticompetitive, as long as those agreements adversely affect *only* foreign markets." *Empagran S.A.*, 542 U.S. at 161 (emphasis added).

While the B/T Defendants argue that individual questions exist as to whether Class Members traded on foreign exchanges, the Court sees only common questions. That is primarily due to the FTAIA's exception for conduct that affects domestic commerce. *See* 15 U.S.C. § 6a(1)-(2). Whether the exception applies depends on the effect of the crypto-economy on American commerce, which is a question common to the Class. It thus does not bar class certification (or even require a narrowing of class definitions). *See Iowa Pub. Emps.' Ret. Sys.*, 2024 WL 5004632, at *17-18 (holding that the FTAIA did not bar claims alleging manipulation of U.S. stock loan market, as any foreign conduct had the effect of increasing spreads on domestic transactions); *Fund Liquidation Holdings LLC* v. *UBS AG*, No. 15 Civ. 5844 (GBD), 2021 WL 4482826, at *10 (S.D.N.Y. Sept. 30, 2021) (holding that the FTAIA did not bar claims alleging manipulation of a derivatives market because any foreign conduct had the effect of manipulating the domestic market for those

85

derivatives); *Sonterra*, 366 F. Supp. 3d at 548-49 (holding that the FTAIA did not bar the relevant claims because foreign conduct led to price manipulation of domestic financial instruments).[19]

### vii.    No Individualized Reliance Issues Predominate for Plaintiffs' CEA Claim

The B/T Defendants close their predominance challenge by asserting that individualized inquiries predominate on Plaintiffs' manipulative device claim under the CEA because such a claim requires a showing that Plaintiffs relied on an efficient market free from manipulation.  (Def. CC Opp. 43-45). The B/T Defendants may be correct if Plaintiffs' CEA Claim were to, in fact, require a showing of reliance.  *See, e.g., Amgen Inc.*, 568 U.S. at 462-63 (noting that when reliance is required, absent a presumption, class certification is "ordinarily preclude[d] … because individual reliance issues would overwhelm questions common to the class").  But as Plaintiffs note, the Court has already held that Plaintiffs "need not establish loss causation or reliance" for their CEA claim, "given Plaintiffs' allegations of sustained market manipulation."  *Tether I*, 576 F. Supp. 3d at 112 (first citing *Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *36; then citing *Commodity Exch., Inc.*, 213 F. Supp. 3d at 673).  (*See* Pl. CC Reply 14-15).  When these two theories are combined, the

---

[19]    Plaintiffs are correct to distinguish this case from *Forex II*, on which the B/T Defendants rely.  (Pl. CC Reply 14 n.18).  In that case, manipulation of the foreign market had no direct effect on foreign exchange prices in the United States.  *Forex II*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *14 (S.D.N.Y. Sept. 20, 2016) (noting that plaintiffs "fail to plead that any domestic effect of Defendants' conduct proximately caused their foreign injuries").

The Court also notes that even if the FTAIA were to apply, the Court would only narrow the Class rather than decertify it, as it did on Plaintiffs' CEA cause of action.  *See supra*.

Court has held that reliance is not a necessary element.  And the B/T
Defendants cite no case law to the contrary.  The B/T Defendants' argument
about reliance is thus an attempt to persuade the Court to reconsider its ruling
in *Tether I*, which it declines to do without an intervening change in law.

### b. A Class Action Is Superior to Alternatives Under Rule 23(b)(3)

In addition to predominance, Rule 23(b)(3) also requires that a class
action be "superior to other available methods for fairly and efficiently
adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Courts consider "(A) the
class members' interests in individually controlling the prosecution or defense
of separate actions; (B) the extent and nature of any litigation concerning the
controversy already begun by or against class members; (C) the desirability or
undesirability of concentrating the litigation of the claims in the particular
forum; and (D) the likely difficulties in managing a class action."  *Platinum &
Palladium Commodities Litig.*, 2014 WL 3500655, at *10 (internal quotation
marks omitted) (quoting Fed. R. Civ. P. 23(b)(3)).

As Plaintiffs point out, the B/T Defendants do not contest superiority,
and the Court agrees that Plaintiffs have established it.  (*See* Pl. CC Reply 7).
As in other market manipulation cases, due to the sizes of the Class and the
Futures Subclass, "[m]ultiple lawsuits would be costly and inefficient, and the
exclusion of class members who cannot afford separate representation would
be neither 'fair' nor an 'adjudication' of their claims."  *NASDAQ Mkt.-Makers
Antitrust Litig.*, 169 F.R.D. at 527; *see also Amaranth Nat. Gas Commodities
Litig.*, 269 F.R.D. at 386 (finding superiority when the case "involves more than

one thousand potential claimants who are asserting claims based on common issues").

Furthermore, no litigation is pending elsewhere.  And there have been few problems in managing this case as a class action.  *See NASDAQ Mkt.- Makers Antitrust Litig.*, 169 F.R.D. at 527 ("Courts are generally loath to deny class certification based on speculative problems with case management[.]").  Consequently, Plaintiffs have established superiority, and with it all requirements for class certification under Rule 23(a) and Rule 23(b)(3).

### 4. The Court Appoints Selendy Gay and Schneider Wallace as Co-Lead Counsel

The Court's final task is appointing class counsel under Rule 23(g).  Relevant factors include "the work counsel has done," "counsel's experience," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).

Both Selendy Gay and Schneider Wallace have experience with antitrust, market manipulation, and crypto-related class actions.  *See, e.g.*, *Williams* v. *KuCoin*, No. 20 Civ. 2806 (GBD) (RWL), 2022 WL 392404, at *3 (S.D.N.Y. Feb. 9, 2022) (appointing Selendy Gay as class counsel); *Clifford* v. *TRON Found.*, No. 20 Civ. 2804 (VSB), 2020 WL 3577923, at *3 (S.D.N.Y. June 30, 2020) (same); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, No. 12 Civ. 2548 (VSB), 2017 WL 1273963, at *16 (S.D.N.Y. Mar. 31, 2017) (appointing Schneider Wallace as class counsel).  They have devoted considerable resources to this case already, and the Court expects them to continue to prosecute it vigorously.

## CONCLUSION

For the reasons stated above, the B/T Defendants' motion to exclude the DeRamus Report is GRANTED IN PART and DENIED IN PART, and Plaintiffs' motion for class certification is GRANTED, with adjustments in class definitions.

Given the above discussion in which the Court narrowed the Class and the Futures Subclass in different ways, the Court certifies two separate classes.[20]  The Primary Class includes the following members:

> All persons or entities that purchased cryptocommodities (Bitcoin, Bitcoin Cash, Ethereum, Ethereum Classic, Litecoin, Monero, Dash, and ZCash), with fiat currency or stablecoins in the United States or its territories at any time from March 31, 2017, through February 25, 2019.

The Futures Class includes the following members:

> All persons or entities that purchased cryptocommodity (Bitcoin, Bitcoin Cash, Ethereum, Ethereum Classic, Litecoin, Monero, Dash, and ZCash) futures with fiat currency or stablecoins in the United States or its territories at any time from March 31, 2017, through February 25, 2019, so long as they purchased futures on either (i) U.S.-based exchanges or (ii) non-U.S.-based exchanges that were not subject to any other country's regulation and that either (a) matched trades on servers in the United States or (b) prohibited buyers from revoking their orders once placed.

---

[20]    Both classes exclude any person or entity whose purchases of cryptocommodities or cryptocommodity futures were exclusively through Bitfinex.  They also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and the Anonymous Trader.  They also exclude the Judge presiding over this action, her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

The Clerk of Court is directed to terminate the pending motions at docket entries 609 and 623.  The Clerk of Court is further directed to file this Opinion and Order under seal, viewable to the Court and the parties only.

The parties are ORDERED to submit, under seal, a joint letter proposing redactions to this Opinion on or before **March 9, 2026**.

SO ORDERED.

Dated:    February 23, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

90